**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| ANTHONY MAYS, Individually and on behalf of a class of similarly situated persons; and JUDIA JACKSON, as next friend of KENNETH FOSTER, Individually and on behalf of a class of similarly situated persons, | ) ) ) ) ) ) | |
| Plaintiffs-Petitioners, | ) ) ) | Case No. 1:20-cv-2134 |
| v. | ) ) | |
| THOMAS DART, Sheriff of Cook County, | ) ) | |
| Defendant-Respondent. | ) | |

**CLASS ACTION COMPLAINT**
**REPRESENTATIVE PETITION FOR HABEAS CORPUS**

Plaintiff ANTHONY MAYS and Plaintiff JUDIA JACKSON, the next friend of Kenneth Foster, by their undersigned attorneys, for their complaint against defendant THOMAS DART, Sheriff of Cook County, allege as follows:

**INTRODUCTION**

1.      A rapidly escalating public health disaster is unfolding behind the walls of the Cook County Jail (the "Jail"). In the 11 days since March 23, the number of confirmed cases of COVID-19, the disease caused by a deadly coronavirus for which there is no vaccine and no cure, has risen from one to at least 167. A total of 46 corrections staff are also known to have COVID-19. These numbers will continue to rise dramatically because of the circumstances alleged in this complaint.

2.      The Jail, which is operated under the supervision of defendant Thomas Dart, the Sheriff of Cook County, has failed in its constitutional responsibility to the persons detained there to provide reasonable protection against the further spread of this deadly disease. Social distancing within the Jail is currently impossible because the Jail is a crowded, congregate environment in

which some 4,700 individuals are detained, in dual cell or dorm quarters. The Jail has repeatedly failed and continues to fail to separate persons known to have been exposed to COVID-19 from other detainees. Sanitation of surfaces and objects that are frequently touched by the infected and the not-yet-infected is non-existent. Personal hygiene is impossible because detainees do not have soap or hand sanitizer. These conditions violate applicable guidance of the Centers for Disease Control and Prevention (the "CDC") and ensure the continued rapid, uncontrolled spread of COVID-19 within the Jail and beyond—because the Jail is not and cannot be isolated from the larger community.

3.     This is a representative action on behalf of the class of persons who are detained in the Jail and, because of the failings of Defendant Dart and his staff, are facing unreasonable and unnecessary risks of exposure to the coronavirus, possible serious respiratory illness, and death.

4.     Included in the class are persons at elevated risk for contracting serious COVID-19 and dying from the disease because they are elderly and/or have underlying health issues, such as asthma, other chronic respiratory problems, kidney problems or hypertension, among others. The risks to these vulnerable people from remaining in the chaotic and infectious environment that reigns within the Jail are unacceptable. This group cannot, under current conditions, receive reasonable medical care or protection from COVID-19 within the Jail. They must be released because, within the time frame that would be necessary to improve safety, they would suffer irreparable harm and are therefore jailed in violation of the Constitution of the United States.

## JURISDICTION AND VENUE

5.     This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343(a), and 2241(a). This Court has jurisdiction over Subclass A's petition for a writ of habeas corpus under 28 U.S.C. § 2241.

6. Venue is proper in this District under 28 U.S.C. § 1391(b) because the events giving rise to the claims asserted in this complaint occurred in this District.

## PARTIES

7. Plaintiff-Petitioner Anthony Mays is a detainee in Cook County Jail. He has diabetes and had been referred for an evaluation of a heart condition when COVID-19 hit the jail. He is housed in Division 8, in an open-dormitory setting. Multiple detainees on his tier have been removed after testing positive for COVID-19.

8. Plaintiff-Petitioner Kenneth Foster is a detainee at Cook County Jail. This action is brought on Mr. Foster's behalf by his next friend, Judia Jackson. Ms. Jackson is aware of Mr. Foster's wishes with respect to this action. Ms. Jackson is serving as next friend because the undersigned counsel attempted to contact Mr. Foster by telephone within the Cook County Jail, but were unable to do so due to the Jail's operational difficulties arising out of the COVID-19 pandemic. *See* Declaration of Alison Horn (Ex. A). Mr. Foster has stomach cancer, Lung-Sarcoidosis, high blood pressure, asthma, and bronchitis. He is living in a dorm setting in Division 2. Mr. Foster estimates that five or six people from his tier have tested positive for COVID-19. The people who tested positive for the virus were removed from the dorm.

9. Defendant-Respondent Thomas J. Dart is the Sheriff of Cook County, Illinois. He is sued in his official capacity.

## FACTUAL ALLEGATIONS

### A. The COVID-19 epidemic is a global health emergency.

10. The coronavirus that causes COVID-19 has reached pandemic status according to the World Health Organization ("WHO"). In only a few months more than one million people worldwide have been diagnosed with COVID-19, and nearly 60,000 of those people have died.[1]

---

[1]     https://www.worldometers.info/coronavirus/ (last visited April 3, 2020).

In the United States alone, as this complaint is being filed, there are hundreds of thousands of confirmed cases and over six thousand deaths.[2]  The number of confirmed COVID-19 cases has grown, and is expected to grow, exponentially.  The CDC projects that without swift and effective public health interventions, over 200 million people in the U.S. could be infected with COVID-19 over the course of the epidemic, with as many as 1.7 million deaths.[3]  As of April 2, there were more than 7,695 confirmed cases of COVID-19 in Illinois, up from just 20 on March 18, 2020.  Of these, 157 people have died.[4]

**B. COVID-19 is a highly contagious and lethal disease.**

11.     COVID-19 is a particularly contagious disease.  The virus can survive for up to three hours in the air, as an aerosol, and can be directly transmitted by inhalation to other individuals in close proximity.  Droplets can also land on surfaces and be picked up by the hands of another person who can then become infected by contacting a mucous membrane (eyes, mouth, or nose) with their hand.  COVID-19 can survive four hours on copper, up to twenty-four hours on cardboard, and up to two to three days on plastic and stainless steel.[5]  A recent study of an early cluster of COVID-19 cases in Wuhan, China revealed the dangers of indirect transmission

---

[2]     Coronavirus Disease 2019 (COVID-19): Cases in U.S., Centers for Disease Control and Prevention, https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fcases-in-us.html (last visited April 1, 2020).

[3]      Sheri Fink, Worst-Case Estimates for U.S. Coronavirus Deaths, The New York Times, (Mar. 13, 2020), https://www.nytimes.com/2020/03/13/us/coronavirus-deaths-estimate.html

[4]      http://www.dph.illinois.gov/topics-services/diseases-and-conditions/diseases-a-z-list/coronavirus (last visited April 3, 2020).

[5]     Dr. Michael Puisis, Dr. Robert Cohen, Dr. John Raba, Dr. Sergio Rodriguez, and Dr. Ron Shansky, Declaration of Medical Professionals Concerned about the Spread of COVID-19 in the Cook County Jail (hereinafter Puisis *et al.*) (Ex. B) ¶ 11.

resulting from infected people contaminating common surfaces such as the communal mall bathroom in the study.[6]

12.     Controlling the spread of COVID-19 is even more difficult because of the prominence of asymptomatic transmission—*i.e.,* transmission by people who are contagious but who exhibit limited or no symptoms.  This poses enormous challenges to control of spread, because it renders ineffective any screening tools dependent on identifying disease symptoms.[7]

13.     Older adults face greater chances of serious illness or death from COVID-19. Certain underlying medical conditions increase the risk of serious COVID-19 disease for people of any age—including lung disease, heart disease, chronic liver or kidney disease (including hepatitis and dialysis patients), diabetes, epilepsy, hypertension, compromised immune systems (such as from cancer, HIV, or autoimmune disease), blood disorders (including sickle cell disease), inherited metabolic disorders, stroke, and developmental delay.[8]  The WHO-China Joint Mission Report indicates that the mortality rate for those with cardiovascular disease was 13.2%, 9.2% for diabetes, 8.4% for hypertension, 8.0% for chronic respiratory disease, and 7.6% for cancer.[9]

14.     For people who are older or with medical conditions that increase the risk of serious COVID-19 infection, symptoms such as fever, coughing and shortness of breath can be especially

---

[6]     Cai J, Sun W, Huang J, Gamber M, Wu J, He G. Indirect virus transmission in cluster of COVID-19 Cases, Wenzhou, China, 2020. Emerg Infect Dis. 2020 Jun. (https://wwwnc.cdc.gov/eid/article/26/6/20-0412_article) (last visited Mar. 31, 2020).

[7]     Puisis *et al.* ¶¶ 12; Johnny Milano, Infected but Feeling Fine:  The Unwitting Coronavirus Spreaders, New York Times, https://www.nytimes.com/2020/03/31/health/coronavirus-asymptomatic-transmission.html (last visited April 1, 2020) Graham Lawton, You Could Be Spreading Coronavirus Without Realising You've Got It, New Scientist March 24, 2020 (https://www.newscientist.com/article/2238473-you-could-be-spreading-the-coronavirus-without-realising-youve-got-it/) (last visited Mar. 31, 2020).

[8]     Puisis, *et al.* ¶ 27.

[9]     Report of the WHO-China Joint Mission on Coronavirus Disease 2019 (COVID-19), World Health Organization (Feb. 28, 2020), at 12, https://www.who.int/docs/default-source/coronaviruse/who-china-joint-mission-on-covid-19-final-report.pdf

severe. In a February 29, 2020 WHO-China Joint Mission Report, the preliminary mortality rate analyses showed that individuals age 70-79 had an overall 8% mortality rate, individuals age 60-69 had a 3.6% mortality rate, and individuals age 50-59 had a 1.3% mortality rate. Increasingly, and in the United States in particular, even some younger and healthier people who contract COVID-19 will require hospitalization for supportive care, including intravenous fluids and supplemental oxygen.[10]

15. Patients who eventually die do so of multiple organ failure, shock, acute respiratory distress syndrome, heart failure, arrhythmias, and renal failure.[11] For those who survive serious COVID-19, recent clinical evidence indicates that the virus may cause damage to organs such as the heart, the liver, and the kidneys, as well as to organ systems such as the blood and the immune system.[12] This damage can be so extensive and severe that it may be enduring.[13] Among other things, patients who suffer severe symptoms from COVID-19 end up having damage to the walls and air sacs of their lungs, leaving debris in the lungs and causing the walls of lung capillaries to thicken so that they are less able to transfer oxygen going forward.[14] Indeed studies of some recovered patients in China and Hong Kong indicate a declined lung function of 20% to 30% after recovery.[15]

---

[10]    Puisis *et al.* ¶ 10.

[11]    Tianbing Wang et al., Comorbidities and multi-organ injuries in the treatment of COVID-19, The Lancet, https://www.thelancet.com/journals/lancet/article/PIIS0140-6736(20)30558-4/fulltext (March 21, 2020).

[12]    Tianbing Wang et al., Comorbidities and multi-organ injuries in the treatment of COVID-19, The Lancet, https://www.thelancet.com/journals/lancet/article/PIIS0140-6736(20)30558-4/fulltext (March 21, 2020).

[13]    George Washington University Hospital, GW Hospital Uses Innovative VR Technology to Assess Its First COVID-19 Patient https://www.gwhospital.com/resources/podcasts/covid19-vr-technology (last visited April 1, 2020)

[14]    https://health.clevelandclinic.org/heres-the-damage-coronavirus-covid-19-can-do-to-your-lungs/

[15]    https://www.dw.com/en/covid-19-recovered-patients-have-partially-reduced-lung-function/a-52859671

16.     A high percentage of people in higher risk categories who develop COVID-19 will need advanced supportive care requiring highly specialized equipment that is in limited supply, and the dedicated attention of an entire team of care providers, respiratory therapists, and intensive care doctors.[16]  This level of support can quickly exceed local health care resources.

17.     There is no vaccine or known cure for COVID-19.  No one is immune, nor is there any known medication to prevent or treat infection.  In this setting, the only known methods to reduce the risk for vulnerable people of serious illness or death from COVID-19 are to prevent infection through social distancing and rigorous hygiene, including washing hands frequently with soap and water.

18.     The measures required to accomplish this prevention effectively are extreme.  The CDC and other public health agencies have universally prescribed social distancing—every person should remain at a distance of at least six feet from every other person—and rigorous hygiene—including regular and thorough hand washing with soap and water, the use of alcohol-based hand sanitizer, proper sneeze and cough etiquette, and frequent cleaning of all surfaces—as the only ways to meaningfully mitigate the spread of this virus.[17]

19.     The CDC has issued a guidance that gatherings of more than 10 people must not occur.[18]  People in congregate environments, which are places where people live, eat, and sleep in close proximity, face increased danger of contracting COVID-19, as already evidenced by the

---

[16]     https://jamanetwork.com/journals/jama/fullarticle/2763879

[17]     Coronavirus Disease 2019 (COVID-19): How to Protect Yourself, CDC, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/prevention.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fprepare%2Fprevention.html (last visited Mar. 29, 2020).

[18]     Interim Guidance for Coronavirus Disease 2019 (COVID-19), Guidance as of 3/15/2020, https://www.cdc.gov/coronavirus/2019-ncov/community/large-events/mass-gatherings-ready-for-covid-19.html (last visited Apr. 1, 2020).

rapid spread of the virus in cruise ships and nursing homes.  The CDC also warns of "community spread" where the virus spreads easily and sustainably within a community where the source of the infection is unknown.[19]

### C. Incarcerated People Are Particularly Vulnerable to COVID-19.

20.     None of the recommended measures for mitigating the spread of COVID-19 are available for persons confined in correctional facilities and for those who must interact with them. Jails are designed to be, and operate as, congregate environments, where the priority is security— not medical quarantine.[20]  Many people live in dormitory-like sleeping arrangements. They have limited freedom of movement and no control over the movements of others with whom they are required to congregate on a daily basis.  It is impossible to achieve the CDC's social distancing standard in these settings.[21]  Infectious diseases, particularly airborne diseases such as COVID-19, are more likely to spread rapidly between individuals in correctional facilities.[22]

21.     The risk of contracting an infectious disease is also higher in correctional facilities because the facilities are not sanitary environments.  People share toilets, sinks, and showers, and often have limited access to soap, hand sanitizer, hot water, and other necessary hygiene items. Jails are a warren of metal doors and surfaces that are touched by dozens, and sometimes hundreds, or correctional staff and detainees every day.  Surfaces are infrequently washed, if at all, and cleaning supplies are in short supply.[23]  Activities that free citizens can perform on their own, like

---

[19]     Coronavirus Disease 2019 (COVID-19): How Coronavirus Spreads, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/how-covid-spreads.html (last visited Apr. 1, 2020).

[20]     Puisis *et al.* ¶¶ 16, 23-24.

[21]     *Id.*, ¶ 25.

[22]     *Id.*, ¶¶ 23-25.

[23]     *Id.*, ¶ 25.

eating, are entirely different in the correctional setting: food, dishes, utensils, cups and trays pass through numerous hands on the way to the detainee.

22.     The people who live in these environments—environments that defy all current public health standards—are themselves at significant risk of death from COIVD-19 due to the high rates of chronic health conditions, substance use, mental health issues, and aging and chronically ill populations who may be vulnerable to more severe illnesses, and to death, after infection from COVID-19.[24] Prisoners are unusually vulnerable to stress-related and communicable diseases.  Formerly incarcerated persons suffer higher rates of certain kinds of psychiatric and medical problems.  Incarceration leads to higher rates of morbidity (illness rates) and mortality (i.e., it lowers the age at which people die).

23.     Health profiles of incarcerated people show that they are significantly sicker and more vulnerable to COVID-19 than the population at large:

| Health condition | Prevalence of health condition by population | | | |
| | Jails | State prisons | Federal prisons | United States |
| --- | --- | --- | --- | --- |
| Ever tested positive for Tuberculosis | 2.5% | 6.0% | | 0.5% |
| Asthma | 20.1% | 14.9% | | 10.2% |
| Cigarette smoking | n/a | 64.7% | 45.2% | 21.2% |
| HIV positive | 1.3% | 1.3% | | 0.4% |
| High blood pressure/hypertension | 30.2% | 26.3% | | 18.1% |
| Diabetes/high blood sugar | 7.2% | 9.0% | | 6.5% |
| Heart-related problems | 10.4% | 9.8% | | 2.9% |
| Pregnancy | 5.0% | 4.0% | 3.0% | 3.9% |

*Health conditions that make respiratory diseases like COVID-19 more dangerous are far more common in the incarcerated population than in the general U.S. population. Pregnancy data come from our report, Prisons neglect pregnant women in their healthcare policies, the CDC's 2010 Pregnancy Rates Among U.S. Women, and data from the 2010 Census. Cigarette smoking data are from a 2016 study, Cigarette smoking among inmates by race/ethnicity, and all other data are from the 2015 BJS report, Medical problems of state and federal prisoners and jail inmates, 2011-12, which does not offer separate data for the federal and state prison populations. Cigarette smoking may be part of the explanation of the higher fatality rate in China among men, who are far more likely to smoke than women.*

Peter Wagner & Emily Widra, *No need to wait for pandemics: The public health case for criminal justice reform*, Prison Policy Initiative (Mar. 6, 2020), www.prisonpolicy.org/blog/2020/03/06/pandemic/

---

[24]     *Id.*, ¶ 27.

24. Jail health units are not equipped with sufficient emergency medical equipment, such as oxygen tanks, negative pressure rooms, and oxygen face masks, to respond to an outbreak of patients with respiratory distress. For these reasons, among others, experts have warned that, "widespread community transmission of COVID-19 within a correctional institution is likely to result in a disproportionately high COVID-19 mortality rate."[25] While Cook County Jail has a dedicated health unit, that unit ultimately relies on outside community hospitals to provide more advanced and intensive medical care, and during an epidemic, this will not be possible, as those outside facilities become at or over capacity.[26]

25. Jails, furthermore, are not closed environments. By necessity, members of the free community, including correctional officers, social workers, attorneys, medical personnel, and many others must enter and leave jails on a daily basis. Staff arrive and leave each facility three times a day in large numbers, and there is no current, in-place ability to adequately screen staff for new, asymptomatic infection. In addition, new detainees are admitted into jails every day, many of whom may be asymptomatic and thus not flagged for quarantine, even with robust intake screening procedures. When the COVID-19 virus occurs and spreads within a jail, all persons, staff and prisoners alike, are at heightened risk of contracting the virus and, in turn, spreading the virus to others with whom they come in contact in their own homes and neighborhoods.[27]

---

[25] "COVID-19 in Correctional Settings: Unique Challenges and Proposed Responses" (March 23, 2020), https://amend.us/wp-content/uploads/2020/03/COVID-in-Corrections-Challenges-and-Solutions-1.pdf; *see also* "Correctional Facilities In The Shadow Of COVID-19: Unique Challenges And Proposed Solutions," Health Affairs Blog, March 26, 2020, available at: https://www.healthaffairs.org/do/10.1377/hblog20200324.784502/full/

[26] Puisis *et al.* ¶ 18.

[27] *Id.* ¶ 27.

26.     It is virtually impossible, in short, to prevent an extremely contagious disease like COVID-19 from entering a jail and infecting the population there.

**D.  Cook County Jail is a COVID-19 Accelerator**

27.     The danger COVID-19 poses to correctional facilities generally is even more in evidence at Cook County Jail.  Each of the statements in paragraphs 20 through 26, *supra* applies with full force to the Cook County Jail.

28.     Local community groups have amplifying the acute danger that COVID-19 posed to Cook County Jail since early March.[28]  The Circuit Court rejected requests from the Cook County Public Defender to issue mass orders freeing low-level detainees and those who were in detention solely because they could not afford their money bonds, instead requiring individual bond hearings for each person who might be released.  That review was expedited for detainees whose court of charge was the 2600 South California Avenue complex, but no such expediting orders were issued for detainees whose court of charge were the multiple Circuit Court locations in the Chicago suburbs.

29.     The upshot of these measures has led to the release of approximately 800 detainees from the Jail since March 20, 2020.  Those measures, however, have left more than 4,700 detainees in the Jail at the time of this filing.  And, as set forth below, the Jail has demonstrably failed to protect these thousands of individuals from COVID-19.

30.     Cook County Jail is one of the largest single-site jails in the United States.  In addition to its 4,700 detainees, it is served by hundreds of staff who enter and leave the facility in three different shifts every day.

---

[28]     https://chicagobond.org/2020/03/06/people-should-be-released-from-cook-county-jail-to-support-public-health-during-coronavirus-outbreak/

31.     Throughout the course of a person's detention, the Jail subjects people to one congregate setting after another, as the ensuing publicly-available photographs make clear Those congregate settings begin on intake, when new detainees are housed together in bullpens or similar environments, presenting a ready opportunity for the spread of the virus:



32.     Many of the units housing the largest numbers of detainees are congregate settings as well, in which social distancing is not a remote possibility.  The photographs below depict one of several tiers in Division 2 of the jail (in which several of the detainees whose declarations are attached hereto reside), and which houses a large portion of the jail's detainees:







33.     The situation is similar in the Jail's Residential Treatment Unit ("RTU"), where

medically vulnerable detainees are housed:



34.     Notably, the RTU also contains numerous mentally ill detainees, who make up a substantial portion of the Jail's population.[29] Mentally ill prisoners are particularly vulnerable, among other reasons, because they may not have the wherewithal to inform jail staff that they feel ill.[30]

35.     Detainees are surrounded not only by other detainees, but also numerous hard surfaces that, if touched, can host COVID-19 for hours.  Such areas are the only places where detainees can sit, eat, and perform any number of basic functions that persons in the free world can perform in social isolation.  Indeed, the Jail is a warren of doors, sally ports, showers, bathrooms, and various other surfaces that are constantly being touched by jail staff and by detainees all day, every day; COVID-19 can survive on such surfaces for days. And as the supporting declarations make clear, the shared communal areas within the divisions are still in daily use.

**E.  The Jail is not effectively preventing the spread of COVID-19.**

36.     Inside accounts from Jail staff, detainees, and Cermak medical personnel paint a picture of an unfolding disaster.

37.     ***Detainees are housed in congregate settings***.  To combat the spread of COVID-19, the Sheriff's Office has implemented quarantine protocols.  As Dr. Michael Puisis, the former Medical Director of the Cook County Jail, and his colleagues—Cook County correctional experts, Dr. Robert Cohen, Dr. John Raba, Dr. Sergio Rodriguez, and Dr. Ron Shansky—explain, however, these protocols are insufficient and unsustainable as currently implemented:

> Inmates are still being admitted into Cook County Jail.  New inmates are being quarantined.  Known or suspicious cases of COVID-19 require isolation from others.

---

[29]     https://www.motherjones.com/crime-justice/2019/01/chicagos-jail-is-the-one-of-the-countys-biggest-mental-health-care-providers-heres-a-look-inside/

[30] Puisis et al. ¶ 21.

However, the housing units are not set up for mass quarantine or isolation. The jail was built with security in mind not medical isolation or quarantine. For purposes of quarantine, the jail is cohorting groups of incoming inmates into tiers for a period of time. Because inmates continue to be incarcerated in the Jail, invariably, this will result in a significant portion of the jail dedicated to quarantine. It is recommended that quarantine continue for 14 days. If any individual in the cohort becomes COVID-19 positive, the entire group is again quarantined again for another 14 days. As the number of persons in quarantine grows, managing them clinically becomes insurmountable and will result in failure to manage.

Puisis et al. ¶ 16 (footnote omitted).

38.     In layman's terms, because the jail is replete with congregate settings—open dormitories and tiers where the persons who are likely to have been infected are cheek by jowl with those who might not be—"[i]ncreasingly it is becoming difficult to separate suspect infected persons from the uninfected[,] and therefore infections will rise."[31] Indeed, Dr. Puisis and his colleagues explain, this failure to contain infected detainees is demonstrated in the explosion of coronavirus infections, from 1 to nearly 200 confirmed cases in 11 days.[32]

39.     The opinion of Dr. Puisis, Dr. Shanksy, Dr. Raba, Dr. Cohen and Dr. Rodriguez is confirmed by facts on the ground. Ample evidence shows that a large percentage of detainees continue to be housed in tightly packed dormitories or similar conditions where the virus can spread easily.

40.     On March 31, counsel for a class of jail employees in an unrelated matter wrote a lengthy letter to Sheriff Dart.[33] Among other things the letter explains that:

● People arriving at the Jail's intake unit are being placed in crowded "bull pens" and open dorms, not single cells. Such bullpens and dormitories, which are depicted above,

---

[31]     Puisis *et al.* ¶ 17.

[32]     *Id.*

[33]     March 31, 2020 Letter from Marni Willenson, Caitlin Cervenka, Matthew J. Piers, Caryn Lederer, Cyrus Mehri, Ellen Eardley, and Michael D. Lieder to Thomas J. Dart and Toni Preckwinkle (hereinafter "March Letter") (Ex. C).

facilitate the spread of the virus, as the Puisis et al. declaration makes clear.

- Incarcerated peoples were moved off a tier to reduce occupancy on that tier to one person per cell--but they are being moved to Division 2, which has dormitory style bunks. The type of Division 2 dormitory bunking, which is depicted in photographs above, makes social distancing impossible.

- The Sheriff opened a "boot camp" building to quarantine other detainees. Nobody in the boot camps is housed in single cells, however; instead it is a dormitory setting that leaves detainees to be housed with infected people.[34]

- Even in situations where detainees are not housed in dormitories, they are not isolated, either. To the contrary, officers assigned to multiple housing divisions report that people are still double or even quadruple bunked.

41. The March 31 staff letter is consistent with accounts of detainees, set forth in the declarations filed in support of this action, who are or were housed throughout the Jail, and who report crowded, dormitory conditions throughout the facility. These detainees report that, in addition to the packed settings, detainees are essentially powerless to practice adequate hygiene or social distancing. The declarations submitted on behalf of the detainees make clear that all are at risk of exposure to COVID-19 positive or symptomatic detainees, all lack access to adequate cleaning supplies and sanitizing agents, all lack any form of personal protective equipment (PPE), none are able to engage in social distancing or indeed *any* distancing in dorm and double-celling living quarters with shared shower and bathroom areas, and all lack adequate medical care, including for those detainees with symptoms of COVID-19.[35] In particular:

---

[34] Puisis et al. also opined that the boot camp had "insufficient jail medical staff to staff this unit which is in part or in whole staffed by individuals from the Cook County Health and Hospital System's ambulatory centers which are now closed." Puisis et al. ¶ 18.

[35] The information in this complaint that is specified as originating from interviews of detainees in the Jail is supported by the additional declarations of Sean Alexander (Ex. L hereto); Christopher Zeigler (Ex. M hereto); Aish Ayyash (Ex. N hereto); Darnell Singelton (Ex. O hereto); Edward Reed (Ex. P hereto); Erica Petty (Ex. Q hereto); Michael Clark (Ex. R hereto); Raymond Sanchez (Ex. S hereto); Tyneshia Perkins (Ex. T hereto); and Rafael Ortiz

- Anthony Mays is 38 years old. He has diabetes and had been referred for an evaluation of a heart condition when COVID-19 hit the jail. He is housed in Division 8, in an open-dormitory setting. The dormitory has beds that are paced two feet apart. There are approximately 40 beds on Mr. Mays' tier, and it is full ("packed"). Mays estimates that only two of the beds are empty. Declaration of Anthony Mays (Ex. D).

- Vincent Stewart has Hodgkin's Lymphoma, and his white blood count is currently 33% of the normal rate. Mr. Stewart is housed in Division 8, in an open dormitory setting. Everyone in the dormitory must share the same microwave for cooking food. He has been given no additional cleaning or sanitizing products since the outbreak of COVID-19 in Illinois and in the Jail. He states that detainees are not given any personal protective equipment. Affidavit of Matthew McLoughlin on Behalf of Shirley Stewart for Vincent Stewart (Ex. E).

- Kenneth Foster is 39 years old. He resides in Division 2. Mr. Foster has stomach cancer, Lung-Sarcoidosis, high blood pressure, asthma and bronchitis. He is living in a dorm setting in Division 2. He sleeps on a lower bunk. Everyone on his tier sleeps very close together. Everyone on Mr. Foster's tier shares a shower and bathroom area. Everyone is together all the time and there is very little privacy. Five or six people from Mr. Foster's dorm have tested positive for COVID-19. The people who tested positive for the virus were removed from the dorm. Affidavit of Christina Lorenzo on Behalf of Judia Jackson for Kenneth Foster (Ex. F).

- Sharita Parks is 35 years old. She is housed in Division 8, in an open-dormitory setting. The other detainees on her tier sleep close to her, and all the women on the dormitory share a bathroom and shower area, as well as a common eating area. One woman in the tier tested positive for COVID-19, and was removed from the dorm. Affidavit of Christina Lorenzo on Behalf of Crystal Smith for Sharita Parks (Ex. G).

- Charles Wimberly is 22 years old. He has bronchitis. Mr. Wimberly is housed in Division 6. He shares a cell with another cellmate. The detainees in the division have a shared shower area. Mr. Wimberly does not have access to soap. He has not received hand sanitizer in over a week. He states that the Jail does not provide personal protective equipment to detainees. Mr. Wimberly uses his shirt to cover the phone, because staff are not cleaning the phones. Affidavit of Christina Lorenzo on Behalf of Jala Burns for Charles James Wimberly (Ex. H).

- Carver Young was housed in Division 2 until he was released from the Jail on March 26. His tier was a large dormitory room, shared with 350 to 400 other people. They spent all day in the same room. Bunks in Division 2 were approximately a foot apart. There were about 30 showers, 11 or 12 toilets, and 4 large sinks with 3 hoses on each sink shared by all the men. At the time he left, each detainee received one small bar of soap per week.

---

(Ex. U hereto), *see also* Testimony from Inside Cook County Jail about the Conditions and Needs of Incarcerated People (Ex. V hereto).

Other than some officers wearing masks, he did not see changes to procedure relating to COVID-19. Declaration of Carver Young (Ex. I).

- Terrance Robinson is 26 years old and residing in Division 6. He suffers from bronchitis and symptoms that include a fever and scratchy throat. Despite those symptoms, he is still co-living with a cellmate. Division 6, where he resides, is on lockdown because it is in quarantine. Two men in the division got sick with the virus. Both were transferred off the deck. Mr. Robinson does not know what happened to them. Declaration of Christina Lorenzo on Behalf of Mary Robinson for Terrance Robinson (Ex. J).

- Brandon Mathis is 26 years old. He resides in Division 11 with a cellmate. Mr. Mathis was previously shot in the throat, and his throat was reconstructed, making it hard for him to breathe. He had open heart surgery when he was a child. He suffers from blood clots and swelling in his feet. Social distancing is not possible in the division. All detainees are close together when they are in the common room, on the phones, or in the dayroom. Mr. Mathis has not been tested for COVID-19 but he has started to feel sick. He feels hot and like he cannot breathe, and suffers headaches. Declaration of Christina Lorenzo on Behalf of Andjine Doret for Brandon Mathis (Ex. K).

42. ***The Jail's medical staff is being depleted by COVID-19***. COVID-19 has a high rate of infection among medical staff who care for coronavirus patients, which appears to be depleting ranks of medical staff at the Jail.[36] What is more, COVID-19 patients require intensive care and attention from skilled medical staff to ensure that they remain stable, which taxes available staff even further.[37]

43. The Jail's medical staff is so diminished that medical personnel have no ability to monitor detainees. This has meant that detainees in non-quarantined environments cannot be monitored and caught early should they become symptomatic. Even detainees on quarantined tiers have been largely abandoned. While Division 6 has been quarantined—as reported by multiple detainees—and though the Division hosted one of the first detainees to have tested positive with COVID-19,[38] detainees there do not report increased testing or even temperatures being taken

---

[36] Puisis *et al.* ¶ 18

[37] *Id.*

[38] https://news.wttw.com/2020/03/23/2-detainees-cook-county-jail-test-positive-covid-19

within the facility. Corroborating this account, detainees report that their tiers no longer have sick call slips, with the effect that visibly sick detainees have no way to report their illnesses to medical personnel.[39]

44.     That is confirmed by the March 31 staff letter. Staff report that "neither the Sheriff's Office nor Cook County Health is conducting regular temperature checks on incarcerated people to identify those with symptoms of COVID-19." Detainees in the quarantine tiers are not being monitored or having their temperature taken because there are not enough nurses to do so. Without any infection control, these "quarantines" are really just incubators of the infection and are rapidly spreading the disease.

45.     Additionally, with so few medical staff, the existing health staff employees—i.e., those dealing with sick detainees—must travel all over the facility to carry out their duties, potentially spreading the illness from one division to another. Indeed, to make matters worse, the March 31 letter reports that many of these employees do not have access to N95 masks, increasing their chances of infection and further raising the risk that they will infect other staff and incarcerated people, spreading the infection even further.

46.     ***The Jail does not have sufficient personal protective equipment***. Because there are still so many detainees to oversee, a large number of staff are needed throughout the Jail complex. And there is not enough personal protective equipment ("PPE") to go around. N95 masks are being rationed among officers, and those officers who do have PPE are being limited to one mask per shift. Other officers have been given surgical masks and told to store them in plastic bags for reuse, and many officers have no masks at all. Staff who work on quarantine units, meanwhile, are given more protective equipment, but they are told to re-use it or have it

---

[39]     Affidavit of Stephen Weil on Behalf of Anthony Mays.

"sanitized"—even when the equipment is specified as single-use. There is no indication that such single-use protective equipment can be effectively sanitized, particularly for a new and little understood virus.

47.     And as the supporting declarations make clear, on information and belief, *no detainees have access to any PPE*, even if they are symptomatic.

48.     ***The Jail has not been able to provide basic hygiene.*** The Sheriff also has not trained all its staff in mitigating the spread of COVID-19. Staff report that "Officers have not been trained on how to teach incarcerated people to properly disinfect showers, bathrooms, common spaces in housing units that numerous people and employees come into contact with, or their own cells. Officers also uniformly report that the Sheriff's Office has not provided them with additional disinfectant or other cleaning supplies to sanitize their own workspaces or other surfaces in the facility that numerous employees come into contact with. Employees report that cleaning supplies that used to be available, including disinfectant wipes, have disappeared. In addition, multiple employees report the reuse of dirty rags without proper disinfection."

49.     ***Correctional staff have not been trained to avoid spreading the disease***. With so many staff still needed to operate the jail, there evidently have not been enough time or resources to train them. The March 31 staff letter reports that "[c]orrectional personnel have not been trained on how to protect themselves from contracting or spreading COVID-19." Staff have not been trained either in protecting themselves or the people incarcerated, how to disinfect the various surfaces in the jail that are touched by incarcerated people and staff constantly, or how to safely dispose of the minimal personal protective equipment that they have been provided.

50.     This failure to train is acute. It includes correctional staff assigned to the quarantined tiers housing people who have tested positive for COVID-19. Having received no

training in how to avoid transmission, these staff routinely exit the COVID-19 quarantines and cross-contaminate passageways, work areas, and other parts of the Jail.

51.     ***The Jail cannot stop corrections staff from importing the virus***.  COVID-19 poses a particular threat because a person can be entirely asymptomatic, yet spread the disease to others. The drastic social distancing measures that have been imposed across the country are designed to combat precisely this problem—staying at home, we are able to limit our contact with other persons, even those who are asymptomatic.  But every day hundreds of jail employees, working on three different shifts, travel into and out of the jail.  Any one of those employees can be carrying—and transmitting—COVID-19, and Sheriff Dart has candidly admitted he has no means of stopping this disease vector.

52.     But the Sheriff has failed to take even modest measures to cut back on the transmission.  The March 31 letter also reports that, apparently due to a lack of medical staff, temperature checks are not being performed on all staff entering the jail, either.  Indeed, a number of employees assigned to the Jail's health facility report that they were not checked at all.  And the March 31 letter reports that while some temperature checks appear to have begun on staff entering some facilities, they are being done with industrial temperature "guns" that are specifically marked as "not for use on humans or animals," indicating the Sheriff simply lacks the capacity to conduct testing.

53.     In so many words, the Jail has failed, in plenary fashion, to implement basic measures that will prevent the COVID-19 pandemic from sweeping through the facility.

**F.  COVID-19 is overrunning the Cook County Jail.**

54.     That catastrophe, indeed, has arrived. On March 22, the first Cook County Department of Corrections employee tested positive for COVID-19. On March 23, the first

22

incarcerated person tested positive. That was eleven days ago. Officially, as of this filing 46 Jail staff have tested positive, while 167 detainees have tested positive. That "attack rate"—that is, the rate at which the population is being infected—is a double-digit multiple of the rate in Cook County.

55. Put differently, the Cook County Jail has shown itself to be a powerful accelerator of COVID-19. The Jail's detainees, and its staff, are all drawn from Cook County. In Cook County, the current COVID-19 infection rate is .87 per 1,000 people. The rate of infection inside the jail on the other hand, is 35.45 per 1,000 people—40 times the infection rate of the surrounding population.

56. If anything, however, these figures dramatically undercount the rate of infection. Staff and detainees alike report that hundreds of detainees still live in congregate dorms where little or no preventative testing is being done to identify and remove sick detainees. Moreover, as Dr. Puisis and his colleagues set forth, the logic of "quarantine" in such settings is simply unsustainable[40]; the Jail, rather, is quickly reaching a point where it will be forced to house detainees suffering from COVID-19 in open, close settings with hundreds of other people, leaving this highly contagious disease to spread freely and rapidly in the population. And given the serious ailments that many detainees already suffer from, there is every reason to expect that numerous detainees at the Jail will die if they are not released immediately. The Sheriff has ceased updating daily information on the number of infected detainees at the Jail. The last update of the infection count occurred on April 2.

57. The Sheriff has the authority to address these conditions. But he has intentionally failed to use it to protect the lives of those in the Jail. Under the Illinois County Jail Act, 730 ILCS

---

[40] Pusis et al. ¶ 16.

§ 125/14, when the Sheriff, as the Warden of the Jail, believes "the lives or health of the prisoners are endangered," he has the authority to "remove" a "group of prisoners… to some suitable place within the county… where they may be confined until they can be safely returned to the place whence they were removed." This statutorily-created authority, in effect since 2012, endows the Sheriff with the ability to place prisoners in his custody who face a health risk on Electronic Monitoring or Home Confinement or in some other place in Cook County, in order to protect the lives of those prisoners.

58.     The Sheriff has intentionally failed to utilize this statutory authority in the midst of a national pandemic and state emergency, while a growing number of detainees and staff are infected and made sick every day.

59.     As a result, the Sheriff has been deliberately indifferent to the rights and wellbeing of all the prisoners in his custody, in violation of the Fourteenth Amendment.

## CLASS ACTION ALLEGATIONS

60.     Pursuant to Rules 23(a) and 23(b)(2) of the Federal Rules of Civil Procedure, the individual named Plaintiffs bring this action on behalf of themselves and a class consisting of all people who are currently or who will in the future be housed in the Cook County Jail for the duration of the COVID-19 pandemic. The class allegations and law are set forth in more detail in the accompanying motion for class certification.

61.     This Class includes two subclasses. Subclass A consists of all people who, because of age or previous medical conditions, are at particularly grave risk of harm from COVID-19.

62.     Subclass B consists of all people who are currently housed on a tier where someone has already tested positive for the coronavirus.

63.    A class action is the only practicable means by which the individual named Plaintiffs and the class members can challenge the Sheriff's unconstitutional actions. Many members of the class are without the means to retain an attorney to represent them in a civil rights lawsuit.

64.    The class and subclasses are so numerous that joinder of all members is impractical. The number of people in custody exceeds 4,700, and each subclass contains at least hundreds of persons. Specifically, demographic data regarding the health of correctional populations, which is set forth above, indicates that Subclass A consists of hundreds of persons. Subclass B, likewise, consists of hundreds of persons, including but not limited to all detainees in Division 6, who live on tiers where one or more infected persons was present.

65.    There are questions of law and fact common to all class members and the subclass, including, among many others: (1) does COVID-19 present a substantial risk of harm to people detained in the Cook County Jail? And (2) is the Sheriff adequately protecting the class members from the risk of serious harm? These questions are also typical to each member of the sub-classes. Additionally, the members of Subclass A share the common question of their particular vulnerability to the COVID-19 pandemic, while the members of Subclass B share the common question regarding whether they are entitled to a safer environment.

66.    The claims of the class representatives are typical of the claims of the class, and of the subclasses. That typicality stems from their claim that Dart has placed them at significant risk of harm by failing to take appropriate steps to address the risk of COVID-19 throughout the Cook County Jail. Every person at the Jail faces a heightened risk of risk of contracting COVID-19 if they are not adequately protected by Dart.

67. The claims of the subclass representatives are typical of the subclass members as well. The claims of the representatives of Subclass A are typical as each member is subject to increased risk as a result of their existing medical conditions. The claims of the representatives of Subclass B are typical in that they are all threatened with infection because of their housing location, which would be resolved with the proposed remedy.

68. The individual named Plaintiffs will fairly and adequately represent the interests of the class and subclasses. The named Plaintiffs have no conflicts with the unnamed members of the proposed class. In addition, their lawyers are experienced in federal court civil rights class actions, particularly those involving prisons and jails.

69. The Defendant has failed to act in a manner that applies generally to the class as a whole, rendering class-wide injunctive and declaratory relief appropriate.

**COUNT I**
**42 U.S.C. § 1983 (on behalf of all Class members), Fourteenth Amendment**

70. Plaintiffs repeat and re-allege the preceding paragraphs as if fully set forth in this Count.

71. Plaintiffs and the classes they represent have been deprived and continue to be deprived by the Defendant of their rights under the Fourteenth Amendment to reasonably safe living conditions. Specifically, Defendant is aware of the substantial risk of harm that COVID-19 poses to all individuals, and is further aware of the particular risks of severe illness and possible death that Plaintiffs face as a result of the inherently congregate and unclean settings in the Cook County Jail. Despite this knowledge, Defendant has failed to take reasonable measures to mitigate these dangers.

72. As a result of Defendant's actions and inactions, class members face a substantial risk of contracting COVID-19 and sustaining a serious illness that could lead to death.

26

73.     Defendant's failure to take appropriate steps to curb the substantial threat posed by COVID-19 to each person in his custody, as described more fully above, violates Plaintiff's rights to unreasonable risk of death and bodily harm.

74.     Consequently, the Defendants are in continuous violation of these Plaintiffs' rights and the rights of the members of the subclasses under the Fourteenth Amendment to the United States Constitution.

75.     Plaintiffs seek injunctive and declaratory relief against all Defendants to prevent the continued violation of the rights of Plaintiffs and the class they represent.

**COUNT II**
**Petition for Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2241 (on behalf of Subclass A)**

76.     Subclass A petitioners repeat and re-allege the preceding paragraphs as if fully set forth in this Count.

77.     Subclass A Petitioners are not in custody pursuant to a judgment of conviction of a state court.

78.     Subclass A Petitioners should be deemed to have exhausted state court remedies. Because they seek release in light of the immediate and urgent risks to their health and lives, there is no remedy that could be pursued in the courts of the State of Illinois that would protect their rights.  Exhaustion of any such remedy would be futile.

79.     Respondent is holding Subclass A Petitioners in custody in violation of the Due Process Clause of the Fourteenth Amendment to the Constitution of the United States.  Due Process forbids exposing Petitioner to a severe risk of death, pain, or permanent severe injury, and at this time no options available to Respondent will adequately mitigate that risk other than immediate release from custody.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs on behalf of themselves and the class they seek to represent, request that this Court enter judgment in their favor and against Defendant Tom Dart and order the following relief:

a.  Order immediate release pursuant to a writ of habeas corpus for members of Subclass A: People in custody who have vulnerabilities that place them in heightened risk of contracting serious COVID 19, including persons over the age of 65 and persons with underlying medical conditions that put them at particular risk of serious harm or death from COVID-19, including but not limited to people with respiratory conditions including chronic lung disease or moderate to severe asthma; people with heart disease or other heart conditions; people who are immunocompromised as a result of cancer, HIV/AIDS, or any other condition or related to treatment for a medical condition; people with chronic liver or kidney disease or renal failure (including hepatitis and dialysis patients); people with diabetes, epilepsy, hypertension, blood disorders (including sickle cell disease), inherited metabolic disorders; people who have had or are at risk of stroke; and people with any other condition specifically identified by CDC either now or in the future as being a particular risk for severe illness and/or death caused by COVID-19.

b.  Issue a temporary restraining order, preliminary injunction, and final judgment for all Class members requiring the Sheriff to implement constitutionally sufficient procedures to protect their health and safety that are consistent with CDC guidelines and the expert judgment of correctional health specialists.

c. Issue a temporary restraining order, preliminary injunction, and final judgment for all members of Subclass B requiring the Sheriff to transfer them to a safe facility or some other form of custody.

d. Issue an order and judgment granting reasonable attorneys' fees and costs, pursuant to 42 U.S.C. § 1988 and 28 U.S.C § 2241.

e. Grant such other relief as this Court deems just and proper.


Dated: April 3, 2020                         Respectfully submitted,

                                             s// Stephen H. Weil
                                             Stephen H. Weil
                                             Sarah Grady
                                             LOEVY & LOEVY
                                             311 N. Aberdeen Street, #3
                                             Chicago, IL 60607
                                             Tel:  312-243-5900
                                             Fax: 312-243-5902
                                             weil@loevy.com
                                             sarah@loevy.com

                                             Locke E. Bowman
                                             Alexa A. Van Brunt
                                             Roderick and Solange MacArthur Justice Center
                                             Northwestern Pritzker School of Law
                                             375 E. Chicago Avenue, Chicago, IL 60611
                                             (312) 503-0884
                                             l-bowman@law.northwestern.edu
                                             a-vanbrunt@law.northwestern.edu

                                             Charles Gerstein (*pro hac vice* application forthcoming)
                                             Alec Karakatsanis (*pro hac vice* application forthcoming)
                                             Civil Rights Corps
                                             1601 Connecticut Ave NW, Suite 800
                                             Washington, DC 20009
                                             charlie@civilrightscorps.org
                                             202-894-6128

29

## **VERIFICATION**

I, Stephen H. Weil, represent Plaintiff-Petitioners, and I hereby verify the foregoing

allegations on his behalf and on behalf of Subclass A Petitioners pursuant to 28 U.S.C. § 2242.

/s/ Stephen H. Weil