**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| ANTHONY MAYS, Individually and on behalf of a class of similarly situated persons; and JUDIA JACKSON, as next friend of KENNETH FOSTER, Individually and on behalf of a class of similarly situated persons, | ) ) ) ) ) ) | |
| Plaintiffs-Petitioners, | ) ) | Case No. 20-cv-2134 |
| v. | ) ) | |
| THOMAS DART, Sheriff of Cook County, | ) ) | |
| Defendant-Respondent. | ) | |

**EMERGENCY MOTION FOR TEMPORARY RESTRAINING ORDER OR
PRELIMINARY INJUNCTION**

**<u>TABLE OF CONTENTS</u>**

THE FACTS THAT NECESSITATE THIS MOTION ..............................................................2

    COVID-19 Presents a Lethal Threat to Detainees in the Cook County Jail. ......................2

    The Jail Is Not Taking Remotely Sufficient Precautions; An Uncontrolled
        Outbreak Is In Progress...........................................................................................6

ARGUMENT ....................................................................................................................9

    B.      Traditional Legal Remedies Are Inadequate; Plaintiffs Will Be Irreparably
        Harmed If Interim Relief Is Not Granted...............................................................12

    2.      The Balance of Harms and the Public Interest Favor a Temporary
        Restraining Order Requiring the Jail to Implement Constitutionally
        Sufficient Conditions ...........................................................................................15

    3.      The Balance of Harms and the Public Interest Favor a Temporary
        Restraining Order Requiring Transfer of Subclass B Members to a Safe
        Facility or Other Form of Confinement .................................................................17

CONCLUSION.................................................................................................................18

i

Defendant Sheriff Thomas J. Dart is currently confining close to 5,000 people in conditions within the Cook County Jail that threaten their lives. At the time of this filing, at least 167 detainees and 46 staff members in the Jail have tested positive for the novel coronavirus that causes COVID-19—though the Sheriff has not updated that figure for several days. The Sheriff is not taking reasonable, appropriate measures to halt the further spread of this deadly virus, putting the lives and health of thousands of people in the Jail, and countless others in the community, at risk. The Due Process Clause of the United States Constitution forbids this.

Plaintiffs seek to represent the class[1] of all individuals jailed by Dart, and two subclasses. Subclass A consists of all people who, because of age or previous medical conditions, are at particularly grave risk of harm from COVID-19. Subclass B consists of all people who are currently housed on a tier where someone has already tested positive for the coronavirus. Subclass A seeks immediate release through a petition for habeas corpus because there are no feasible conditions under which they may currently be constitutionally confined under present circumstances at the Jail; the entire Class seeks a temporary restraining order and preliminary injunction requiring Dart to implement constitutionally-sufficient procedures to protect their safety; and Subclass B seeks a temporary restraining order and preliminary injunction requiring Dart to remove or transfer them to a safe facility or other form of custody.

Because of the grave risk to health and life at stake, Plaintiffs request that this Court consider this motion on an emergency basis and that the Court grant a temporary restraining

---

[1] Plaintiffs' Motion for Class Certification is pending. Plaintiffs file this motion on behalf of the putative class members, but for ease of reference, describe them as "class members" throughout this brief. Although this is a prototypical case for which the class action vehicle was created, the Court need not rule on Plaintiffs' class certification motion or formally certify a class in order to issue the requested emergency relief. *See, e.g.*, Newberg on Class Actions § 24:83 (4th ed. 2002) ("The absence of formal certification is no barrier to classwide preliminary injunctive relief."); Moore's Federal Practice § 23.50, at 23-396, 23-397 (2d ed.1990) ("Prior to the Court's determination whether plaintiffs can maintain a class action, the Court should treat the action as a class suit."). Slightly more than 100 people in the jail are serving sentences, and they are excluded from the Class.

order requiring the release of Subclass A members pending briefing and argument. On April 3, 2020, counsel for Plaintiffs gave notice of their intent to file this lawsuit and motion to General Counsel for the Cook County Sheriff's Office, as well as the Division Chief and Supervisor of the Special Litigation Section, and the Division Chief of the Complex Litigation Division, of the Cook County State's Attorney's Office.

As the supporting declarations attached to the Complaint make clear, this is a matter of life and death. Each hour that passes risks Plaintiffs' lives. Absent immediate action by this Court, some Plaintiffs likely will face the ultimate irreparable harm: death.

## THE FACTS THAT NECESSITATE THIS MOTION

### COVID-19 Presents a Lethal Threat to Detainees in the Cook County Jail.

Lives have been upended around the world by the unprecedented health emergency caused by the rapid spread of COVID-19. The disease is highly contagious; it spreads through respiratory droplets or by touching a surface or object that has the virus on it.[2] There is no known cure, and development of a vaccine is likely at least 12 months away.[3] On March 11, 2020, the World Health Organization declared COVID-19 a global pandemic.[4] On March 13, President Trump declared a national emergency.[5] Illinois Governor J.B. Pritzker has declared Illinois to be in a state of disaster and has imposed a statewide shelter in place order.[6]

---

[2] Dr. Michael Puisis, Dr. Robert Cohen, Dr. John Raba, Dr. Sergio Rodriguez, and Dr. Ron Shansky, Declaration of Medical Professionals Concerned about the Spread of COVID-19 in the Cook County Jail (hereinafter Puisis et al.) (Attached as Exhibit A to the Complaint, ECF 1.) ("Puisis *et al.*") ¶¶ 22-24.

[3] Saralyn Cruickshank, *Experts Discuss Covid-19 and Ways to Prevent Spread of Disease*, John Hopkins Mag. (Mar. 17, 2020), https://hub.jhu.edu/2020/03/17/coronavirus-virology-vaccine-social-distancing-update.

[4] World Health Organization, Director-General Opening Remarks (March 11, 2020), https://www.who.int/dg/speeches/detail/who-director-general-s-opening-remarks-at-the-media-briefing-on-covid-19--1 1-march-2020.

[5] Proclamation on Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19 ) Outbreak (Mar. 13, 2020) https ://www.whitehouse.gov/presidential-actions/proclamation -declaring-national-emergency-concerning-novel-coronavirus-disease-covid l9-outbreak/.

[6] Executive Order In Response to COVID-19 (COVID-19 Executive Order No.8), https://www2.illinois.gov/IISNews/21288-Gov._Pritzker_Stay_at_Home_Order.pdf; Illinois' Stay-at-Home Order

The Centers for Disease Control and Prevention (CDC) urgently recommend the following practices to prevent the spread of infection: (1) wash hands with soap and water "often," especially after being in a public place; (2) use hand sanitizer that contains at least 60% alcohol to disinfect hands when soap is not immediately available; (3) clean and disinfect frequently touched surfaces daily, and (4) employ "social distancing"–that is, avoiding contact with others as much as possible and keep at least a six-foot distance from others.[7] Governor Pritzker's "shelter in place" order makes social distancing mandatory and violations can be punished criminally; it closes public schools, closes nonessential businesses, and bans groups of more than 10 people.[8]

As the declarations submitted in support of the class action complaint make clear, none of the critical measures for mitigating the spread of COVID-19 is available for persons confined in the Cook County Jail. The Jail is a congregate environment, in which people are confined in close proximity to one another and to Jail staff.[9] Rigorous hygiene, as urgently recommended by the CDC, is virtually impossible in facilities packed with thousands of inmates who share an touch doors, tables, dinner trays, and numerous other surfaces. Many of those detained—those in Subclass A—suffer from underlying health conditions, including, among many others, asthma, diabetes, and hypertension, that place them at elevated risk for contracting and dying from

---

Extended Through April, Pritzker Announces, NBCChicago (Mar. 31, 2020)
https://www.nbcchicago.com/news/local/illinois-stay-at-home-order-expected-to-be-extended-sources/2247274/

[7] *How to Protect Yourself*, Centers for Disease Control (Mar. 18, 2020),
https://www.cdc.gov/coronavirus/2019-ncov/prepare/prevention.html; *see also* sources cited *supra* notes 1 & 2.

[8] Grace Hauck, These states are ordering residents to stay home or shelter in place. What does that mean? (Mar. 23, 2020), https://www.usatoday.com/story/news/nation/2020/03/21/coronavirus-lockdown-orders-shelter-place-stay-home-state-list/2891193001/ (discussing measures taken in Michigan; South Carolina; Massachusetts; Indiana; Kentucky; Delaware; Louisiana; Ohio; California; New York; Illinois; Connecticut; Oregon; New Jersey; Dallas County, Texas; Philadelphia, Pennsylvania; Atlanta, Georgia; and Saint Louis County and Kansas City in Missouri).

[9] *See* Dr. Michael Puisis, Dr. Robert Cohen, Dr. John Raba, Dr. Sergio Rodriguez, and Dr. Ron Shansky, Declaration of Medical Professionals Concerned about the Spread of COVID-19 in the Cook County Jail (hereinafter Puisis et al.) (Attached as Exhibit A to the Complaint, ECF 1.) ("Puisis *et al.*") ¶¶ 23-24. The highest known person-to-person transmission rate for COVID-19 to date took place in two other congregate environments: a skilled nursing home facility in Kirkland, Washington, and on afflicted cruise ships in Japan and off the coast of California.

COVID-19.[10]

Dr. Michael Puisis, the former Medical Director of the Cook County Jail, and his colleagues—Cook County correctional experts, Dr. Robert Cohen, Dr. John Raba, Dr. Sergio Rodriguez, and Dr. Ron Shansky—explained that the risk posed by COVID-19 in jails and prisons is significantly higher than in the community, both in terms of risk of transmission, exposure, and harm to individuals who become infected. *See* Dr. Michael Puisis, Dr. Robert Cohen, Dr. John Raba, Dr. Sergio Rodriguez, and Dr. Ron Shansky, Declaration of Medical Professionals Concerned about the Spread of COVID-19 in the Cook County Jail (hereinafter Puisis et al.) (Attached as Exhibit A to the Complaint, ECF 1.) ("Puisis *et al*.") ¶¶ 22-24. This is due to a number of factors, including, among others, the inability to engage in social distancing inside the jail, the inability to isolate and manage known and suspected cases of COVID 19, and the endemic problems of hygiene and sanitation that universally plague contemporary U.S. jails and prisons, and the Cook County jail in particular. *Id.*[11]

As a result of these realities, the CDC has issued Guidance on the Management of COVID

---

[10] *See* Detainee declarations submitted in support of the Class Action Complaint; *see also Are You at Higher Risk for Severe Illness?*, Centers for Disease Control (Mar. 20, 2020), https://www.cdc.gov/coronavirus/2019-ncov/specific-groups/high-risk-complications.html.

[11] *See also* Detainee declarations submitted in support of the Class Action Complaint; Matthew Impelli, *Alcohol-Free Sanitizer Given to Prisoners to Prevent Them from Making 'Moonshine,'* Newsweek (Mar. 16, 2020), https://www.newsweek.com/alcohol-free-sanitizer-given-prisoners-prevent-them-making-moonshine-1492523 (reproducing comments of Sherif Sultan, president of the International Society of Vascular Surgery); Jennifer Gonnerman, *A Rikers Island Doctor Speaks Out to Save Her Elderly Patients from Coronavirus*, New Yorker (Mar. 20, 2020), https://www.newyorker.com/news/news-desk/a-rikers-island-doctor-speaks-out-to-save-her-elderly-patients-from-the-coronavirus?fbclid=IwAR3Uv1Cu5RjQdbpdPHPiYjUQPHUnm0O5Ky6Hhg3N27rDlCypA73S8VypEg; Amanda Klonsky, Opinion, *An Epicenter of the Pandemic Will Be Jails and Prisons, If Inaction Continues* (Mar. 16, 2020), https://nyti.ms/3d4c4uY. "The pathway for transmission of pandemic influenza between jails and the community is a two-way street. Jails process millions of bookings per year. Infected individuals coming from the community may be housed with healthy inmates and will come into contact with correctional officers, which can spread infection throughout a facility. On release from jail, infected inmates can also spread infection into the community where they reside." *Pandemic Influenza and Jail Facilities and Populations,* American Journal of Public Health, October, 2009; *see also* Dr. Anne Spaulding, Coronavirus and the Correctional Facility: for Correctional Staff Leadership, Mar. 9, 2020, https://www.ncchc.org/filebin/news/COVID_for_CF_Administrators_3.9.2020.pdf.

19 in Correctional and Detention Facilities, specifying steps that must be taken in light of the "unique challenges for control of COVID 19 transmission" that are present in correctional and detention settings.[12] These steps include, among many others, specified actions to ensure sanitation of frequently touched surfaces, the provision of protective gear to staff and to infected persons, screening of those entering the facility, isolation of those with COVID-like symptoms, and quarantine of those who are known to be infected. *Id.* The Guidelines state that "adequate levels of custody and healthcare staffing must be maintained to ensure safe operation of the facility." *Id.*

These steps are by no means the equivalent of the precautions recommended for those in the free community. They are the bare minimum that must be done to prevent a severe outbreak of contagion within the Cook County Jail. The Guidelines recognize the well-known facts that options for medical isolation of COVID-19 patients are "limited" in a carceral setting and the ability to sanitize is compromised. *Id.*

These realities are particularly frightening for members of Subclass A, who are vulnerable, at elevated risk of contracting serious COVID-19, and who may suffer acute, painful symptoms or death. These realities are underscored by the supporting declarations filed with the Complaint. Moreover, an outbreak within the Jail cannot be confined to those incarcerated there. Jails are not—and cannot become—isolated facilities. Each day, jail staff, including corrections officers, social workers, medical staff, and administrative personnel, enter the facility, touch detained individuals or surfaces which detained individuals have touched, and return home to their families and communities. A sudden influx of serious coronavirus cases from the Jail risks overwhelming Cook County's public hospital. The outbreak in the Jail cannot be contained. It puts us all at risk.

---

[12] Centers for Disease Control and Prevention, Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities, https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html.

**The Jail Is Not Taking Remotely Sufficient Precautions; An Uncontrolled Outbreak Is In Progress.**

There is an escalating public health emergency in the Cook County Jail. COVID-19 diagnoses have skyrocketed within a matter of days. By Monday, March 23, two detainees and one staff member within the Jail were known to be infected. As of the filing of this motion, on April 3, 2020, there are 167 known infections.[13]  The graph below[14] displays this grim reality:



The number of known infections will continue to rise.  Indeed, there are likely now many more infections in the Jail than are known because of the limited availability of COVID-19 tests, and medical staff to administer temperature checks that can detect symptoms of the diease.

---

[13] This number has almost certainly been surpassed; the Sheriff's Department has not updated data of its testing since April 1, 2020.
[14]   Injustice Watch, Cook County Jail population and COVID-19 tracker,
https://datastudio.google.com/u/0/reporting/1AI4THiXJ_6Nt-9NXwE0MfO_DUaa1Koxi/page/hcyJB?s=oQGghs5nYPk  ("CCJ COVID-19 Tracker") (last visited April 3, 2020).

Hundreds of detainees are being quarantined, with a number of suspicious cases almost equal to the number of confirmed, positive cases. Puisis *et al*. ¶ 29 Staff are also falling ill. In less than two weeks, reported, known cases of corrections staff infection have ballooned from one to 46, as the graph above also shows. *See* CCJ COVID-19 Tracker. As infections continue to rise in the Jail, the CDC guidance is being ignored and chaos is reigning, as set forth in the accompanying Complaint.

*First,* the Jail is failing in its responsibility to enable social distancing. In contravention of the terms of the Governor's "shelter-in-place" order, the Jail continues to house detainees in dormitory-style settings and in double cells where detainees are in close physical contact with one another. Complaint, ECF 1 ¶¶ 15, 35. Dayrooms and other congregate areas are open and are in use. *Id.*¶ 35. Many detainees are using common showers, common toilets and common sinks—if not with the entire tier, then with a cellmate. *Id.* A group of prominent Illinois doctors with extensive individual and collective experience in corrections medicine puts the problem this way:

> At a time when the President's task force on COVID-19 recommends limiting gatherings to no more than 10 persons, the President has declared a national emergency and there is a stay-at-home order in Illinois through at least April 30, 2020, the County of Cook is forcing over 4,700 people to live in congregate living conditions at the Cook County Jail with a continuing influx of new inmates every day. These inmates intermingle and it is not possible to attain the President's aim of limiting gatherings of less than 10 individuals or engage in social distancing. This is contrary to the President's recommendation, the Illinois stay-at-home order, and to current public health recommendations. These circumstances are likely to result in spread of disease.

Puisis *et al*. ¶ 23.

There are also multiple reports that the Jail's system for quarantine and medical isolation is flawed. For example, one detainee reports that, after a detainee who had tested positive for COVID-19 was removed from his tier for medical isolation, that person's cellmate was rehoused on the tier with another detainee. Complaint, ECF 1 ¶ 35. Detainees uniformly report that, when

a detainee who is symptomatic or who has tested positive for COVID 19 is removed from a tier, no measures are taken to quarantine the others on the tier who were exposed. *Id.* Others report that their division is in quarantine, and yet detainees continue to share bathroom and shower areas, and common living areas. *Id*.

*Second*, the Jail has no functioning system to enable prisoners to protect themselves from exposure. Corrections staff in the Jail now wear masks, but there are no masks available to the detainees, a precaution that, under these congregate living conditions and with many known COVID infections, is essential. Puisis *et al*. ¶ 31. The Jail's aging physical plant is unsanitary and detainees have no ability to mitigate filthy conditions. There are no cleaning supplies to use to disinfect the common showers, common sinks and common toilets that detainees to continue to use. Complaint, ECF 1 ¶ 35. Soap and hand sanitizer are unavailable for many, if not the majority, of those confined in the Jail. *Id.*

In this face of this dysfunction, COVID-19 will continue its unrelenting spread through the Jail. Under accepted standards of medical care and the CDC Guidance, quarantine will be necessary for greater and greater numbers of detainees. As this happens, it will become more and more difficult to separate those who are infected (or might be infected) from those who are not. Puisis *et al*. ¶ 17. Necessary monitoring of the temperature and other symptoms of those who are or are suspected to be infected will become overwhelming. To the extent that medical management of these quarantined individuals is not already impossible, it will become so. *See id.* ¶ 16.

All of these problems are magnified by the risks to the health and safety of medical workers in the Jail, which will limit the Jail's ability to manage and monitor those who are in quarantine and those in medical isolation. Puisis *et al*. ¶ 18. As the virus spreads and healthcare staff are increasingly infected, Cook County's public healthcare system will be stretched to breaking. The

Jail has limited facilities for isolating and caring for acutely ill detainees. By the Jail's report, 14 detainees have already been transferred to Stroger Hospital with serious COVID-19. The urgent necessity of focusing on the spread of COVID-19 and the treatment of those who are infected has limited the Jail's ability to provide medication and other needed treatment to non-COVID patients. Puisis *et al*. ¶ 18. If immediate action is not taken, many detainees and jail staff may die as a result.

The dire state of affairs in the Jail is underscored by the declarations submitted on behalf of class members and the named Plaintiffs, *see* Complaint, ECF 1. These detail the prevalence of life-endangering conditions in the Jail, in different tiers and divisions, where detainees face: exposure to COVID-19 positive or symptomatic detainees, lack of cleaning supplies, sanitizing agents and even basic soap, lack of personal protective equipment (PPE), inability to engage in social distancing or indeed *any* distancing in dorm and double-celling living quarters with shared shower and bathroom areas, a lack of adequate medical care, including for detainees with symptoms of COVID-19, and a lack of clean shared living spaces. It is further solidified by the descriptions of the Jail's inadequate response to the pandemic, in a letter submitted by counsel for a class of jail employees in an unrelated matter to Sheriff Dart, attached as Exhibit C to the Complaint.

## ARGUMENT

In this case, Plaintiffs seek three forms of immediate relief. Subclass A, the elderly and the medically vulnerable, seek immediate release from the chaotic, infectious Jail environment through a writ of habeas corpus. Their lives depend on how quickly they are released from that environment. The Class as a whole seeks an order requiring the Jail to at least adhere to the CDC Guidance on the management of COVID-19 in jails and correctional settings, and to provide such other relief set forth in the Medical Professionals' declaration, Puisis *et al*. ¶¶ 27-37. Subclass B seeks transfer to a safe environment.

To determine whether a party is entitled to a preliminary injunction or temporary restraining order, "a district court engages in an analysis that proceeds in two distinct phases: a threshold phase and a balancing phase." *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of U.S. of Am., Inc.*, 549 F.3d 1079, 1085–86 (7th Cir. 2008). To meet the threshold standard, a party must show that (1) "it will suffer irreparable harm in the interim period prior to final resolution of its claims," *Ty, Inc. v. Jones Group, Inc.*, 237 F.3d 891, 895 (7th Cir.2001); (2) "traditional legal remedies would be inadequate," *Girl Scouts*, 549 U.S. at 1086; and (3) "its claim has some likelihood of succeeding on the merits," *id.* Once these threshold requirements are met, the court "must somehow balance the nature and degree of the plaintiff's injury, the likelihood of prevailing at trial, the possible injury to the defendant if the injunction is granted, and the wild card that is the 'public interest.'" *Lawson Prods., Inc. v. Avnet, Inc.*, 782 F.2d 1429, 1433 (7th Cir. 1986). Courts in the Seventh Circuit employ a "sliding scale" approach to weigh these interests: "The more likely the plaintiff is to win, the less heavily need the balance of harms weigh in his favor; the less likely he is to win, the more need it weigh in his favor." *Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 389 (7th Cir. 1984).

Where circumstances are such that even the time needed to hear a request for a preliminary injunction is too long to prevent irreparable harm, a temporary restraining order (T.R.O.) may issue while a court considers a request for a preliminary injunction. *See* Charles Alan Wright, et al., *Temporary Restraining Orders*, 11A Federal Practice and Procedure § 2951 (3d ed. 2019). Where, as here, the opposing party receives actual notice of the request for a T.R.O., the procedure courts follow does not differ from an application for a preliminary injunction, and no special procedural requirements apply. *Id.*; *see also Budget Rent A Car Corp. v. Harvey Kidd Automotive*, 249 F. Supp. 2d 1048, 1049 (N.D. Ill. 2003).

**A.**     **Plaintiffs Have a Likelihood of Success on the Merits of Their Claim That the Conditions in Which They Are Being Confined Are Unconstitutional**.

The Eighth Amendment's Cruel and Unusual Punishment Clause prohibits the Government from treating the medical needs of incarcerated people with deliberate indifference, *Estelle v. Gamble*, 429 U.S. 97, 103–04 (1976), and from exposing incarcerated individuals to conditions of confinement that threaten their health and safety, *Helling*, 509 U.S. at 33. The Eighth Amendment, however, does not apply to pretrial detainees because they may not be punished *at all*. *See Bell v. Wolfish*, 441 U.S. 520, 535 (1979); *Darnell v. Pineiro*, 849 F.3d 17, 29 (2d Cir. 2017) (noting that civil detainees "have not been convicted of a crime and thus may not be punished in any manner— neither cruelly and unusually nor otherwise"). Instead, pretrial detainees are protected by the Due Process Clause of the Fourteenth Amendment, which, the Supreme Court has held, affords them at least as much protection as the Eighth Amendment does. *See City of Revere*, 463 U.S. at 244. Because they have not been convicted of a crime, and accordingly may not be punished at all, they are not required to show that their jailers act with a culpable state of mind, *see also Miranda v. County of Lake*, 900 F.3d 335, 354 (7th Cir. 2018); they must only show that they are being deprived of objectively reasonable medical care, *id.*

All detainees, pretrial or otherwise, have a right to be housed safely. That right is violated if they are "incarcerated under conditions posing a substantial risk of serious harm," and their jailers' "state of mind," at least for convicted detainees, "is one of 'deliberate indifference' to inmate health or safety." *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). Specifically, the Supreme Court has held that prison authorities are liable if they "ignore a condition of confinement that is sure or very likely to cause serious illness and needless suffering." *Helling*, 509 U.S. at 33. Detainees may not constitutionally be exposed to a severe risk of contracting a communicable

11

disease. *Gates*, 501 F.2d at 1291 (cited with approval in *Helling*, 509 U.S. at 34); *see also Forbes v. Edgar*, 112 F.3d 262, 266 (7th Cir. 1997) (noting that "exposure of inmates to a serious, communicable disease . . . can qualify [as a] deprivation . . . [that is] sufficiently serious; ); *Jolly v. Coughlin*, 76 F.3d 468, 477 (2d Cir. 1996) ("[C]orrectional officials have an affirmative obligation to protect inmates from infectious disease."); *Lareau v. Manson*, 651 F.2d 96, 109–11 (2d Cir. 1981).

This is not a complicated case on the law. Plaintiffs are being exposed to extreme and unprecedented risk of infection and death because of the failure of the Cook County Jail to meet the most minimal public health standards. Plaintiffs are being exposed to extreme and unprecedented risk of infection and death because of the failure of the Cook County Jail to meet the most minimal public health standards. Every person detained in the Cook County Jail under the chaotic conditions that prevail and where the applicable CDC Guidance is being ignored and disregarded will likely succeed on the merits of their Due Process claim.

### B. Traditional Legal Remedies Are Inadequate; Plaintiffs Will Be Irreparably Harmed If Interim Relief Is Not Granted.

The need for immediate relief to prevent irreparable harm could not be more clear. Plaintiffs allege injuries that are irreparable and, therefore, not suitable for resolution in the ordinary course of litigation. *Girl Scouts*, 549 U.S. at 1086. Injuries do not get more paradigmatically irreparable—that is any more truly *beyond repair*—than death. Additionally, people who contract the coronavirus may develop symptoms that are acutely painful and may result in permanent, irreparable lung damage. Class Action Complaint, ECF 1 ¶ 9. Courts across the country, accordingly, have recognized that risk of exposure to the coronavirus constitutes an irreparable harm. *See infra* at 14-15 (collecting cases granting emergency release to people who are exposed to coronavirus). Plaintiffs easily allege irreparable harm.

### C. The Balance of Relative Harms and the Public Interest Favor Each of the Three Forms of Relief Plaintiffs Are Requesting.

Each of the three forms of relief that the Plaintiff class seeks aims to limit the spread of COVID-19 to the Class. The Jail is not an isolated environment. It cannot be contained or separated from the community at large. Uncontrolled infection within the Jail therefore risks the health and safety of every person connected directly or indirectly to the many correctional officers, healthcare workers and other necessary staff who enter and leave the Jail environment on a daily basis. Therefore, any remedy that will protect the Plaintiff class benefits the wider community and serves the public interest.

#### 1. The Balance of Harms and the Public Interest Favor Release of the Vulnerable Detainees in Subclass A.

The members of Subclass A all have conditions that render them exceptionally vulnerable to death or serious harm if exposed to COVID-19. Because of their medical vulnerability, there is no practicable way to ensure that they receive reasonable medical treatment[15] within the jail and, therefore, their continued detention violates the Constitution and they must be released pursuant to a writ of habeas corpus under 28 U.S.C. 2241.[16]

---

[15] As explained above, Plaintiffs needs not show that Dart acted with deliberate indifference to their needs. But regardless they easily could. There can be no dispute that Dart is aware that an uncontrolled outbreak is threatening his jail and that people within it may die imminently as a result. Moreover, he has ignored his clear authority under the Illinois County Jail Act to remove detainees whose physical health was in jeopardy to a suitable place in his custody, including home confinement or electronic monitoring. *See* 730 ILCS § 125/14.

[16] Subclass A members bring this action under 28 U.S.C. § 2241 and Article I, Section Nine of the United States Constitution. They, therefore, need not satisfy the heightened requirements of § 2254. Because they have not been convicted of a crime and are not in custody "pursuant to the judgment of a state court," they may bring this action under § 2241 and need not bring this action under § 2254, which governs habeas petitions challenging state criminal convictions. *Stow v. Murashige*, 389 F.3d 880, 886 (9th Cir. 2004) ("'[T]he general grant of habeas authority in § 2241 is available for challenges by a state prisoner who is not in custody pursuant to a state court judgment—for example, a defendant in pre-trial detention . . . .'" (quoting *White v. Lambert*, 370 F.3d 1002, 1006 (9th Cir. 2004)). Section 2254's heightened standards of review, therefore, do not apply to this case. *Id.* at 888; *Phillips v. Court of Common Pleas, Hamilton County, Ohio*, 668 F.3d 804, 809 (6th Cir. 2012) ("We have long recognized that pretrial detainees pursue habeas relief . . . under § 2241."); *Martinez v. Caldwell*, 644 F.3d 238, 242 (5th Cir. 2011); *Walck v. Edmondson*, 472 F.3d 1227, 1234–35 (10th Cir. 2007); *Gonzalez v. Justices of Mun. Ct. of Boston*, 382 F.3d 1, 6–7 (1st Cir. 2004), *judgment vacated on other grounds*, 544 U.S. 918 (2005); *Atkins v. Michigan*, 644 F.2d 543, 546 & n.1 (6th Cir. 1981).

Subclass A members face a heightened risk of contracting a deadly virus merely because they are incarcerated, and additionally they face a heightened risk of dying if they do. Older people and those with underlying medical conditions, such as lung disease, heart disease, or diabetes, are more likely to develop serious illness.[17] Class Action Complaint, ECF 1 ¶ 7; Puisis *et al*. ¶ 27. The number of cases and deaths from COVID-19 is increasing exponentially. This exponential growth is straining the health care system, which is struggling to care for the current and imminent influx of serious COVID-19 patients. An outbreak in the jail will spread rapidly and further strain health care resources, resulting in a "catastrophic loss of life,"[18] making it more likely that even people who may have ordinarily recovered from the virus will die.[19]

As a practical matter, there is no way to constitutionally confine Subclass A members in the jail under present conditions. Puisis *et al.* ¶¶ 23-25. Although it is in theory possible for a jail to implement the social-distancing, sterilization, and other protective practices that the CDC requires in a jail, because Subclass A members are so vulnerable to death and serious injury from the disease, there is no time for those measures now. This reality is underscored by the declarations on behalf of detainees filed in support of the Complaint. And regardless, as explained below and in the contemporaneously filed Complaint, Dart has woefully failed to implement those procedures to date. Subclass A members, then, are jailed in conditions that will inevitably threaten their lives at least in the near term. They must be removed from those conditions.

For these reasons, in recent weeks courts across the country have granted emergency

---

[17] World Health Organization, Q&A on coronaviruses (COVID-19) (Mar. 9, 2020), https://www.who.int/news-room/q-a-detail/q-a-coronaviruses.

[18] Ex. A.

[19] Sarah Kliff, *There Aren't Enough Ventilators to Cope With the Coronavirus* (Mar. 18, 2020), https://www.nytimes.com/2020/03/18/business/coronavirus-ventilator-shortage.html; Austin Frakt, *Who Should Be Saved First? Efxperts Offer Ethical Guidance* (Mar. 24, 2020), https://www.nytimes.com/2020/03/24/upshot/coronavirus-rationing-decisions-ethicists.html.

habeas petitions ordering the release of medically vulnerable people from confinement. *See, e.g.*, *Francisco Hernandez v. Wolf*, 20-cv-617 (TJH), Dkt. No. 17 (C.D. Cal., Apr. 1, 2020); *Thakker v. Doll*, No. 20-cv-480 (JEJ), Dkt. No. 47 (M.D. Pa, Mar. 31, 2020) ("Social distancing and proper hygiene are the only effective means by which we can stop the spread of COVID-19. Petitioners have shown that, despite their best efforts, they cannot practice these effective preventative measures in the Facilities. Considering, therefore, the grave consequences that will result from an outbreak of COVID-19, particularly to the high-risk Petitioners in this case, we cannot countenance physical detention in such tightly-confined, unhygienic spaces."); *Fraihat v. Wolf*, 20-cv-590 (TJH), (C.D. Cal., Mar. 30, 2020) ("This is an unprecedented time in our nation's history, filled with uncertainty, fear, and anxiety. But in the time of a crisis, our response to those at particularly high risk must be with compassion and not apathy. The Government cannot act with a callous disregard for the safety of our fellow human beings."); *Castillo v. Barr*, 20-cv-605 (TJH)(AFM), Dkt. No. 32 (C.D. Cal. Mar. 27, 2020); *Coronel*, 2020 WL 1487274; *Basank v. Decker*, 20-cv-2518 (AT), Dkt. No. 11 (S.D.N.Y. Mar. 26, 2020) ("The risk that Petitioners will face a severe, and quite possibly fatal, infection if they remain in immigration detention constitutes irreparable harm warranting a TRO."); *Ronal Umana Jovel v. Decker*, 12-cv-308 (GBD), Dkt. No. 27 (S.D.N.Y. Mar. 26, 2020).

### 2. The Balance of Harms and the Public Interest Favor a Temporary Restraining Order Requiring the Jail to Implement Constitutionally Sufficient Conditions

The Class seeks a temporary restraining order requiring the Jail to immediately comply with the CDC Guidance for managing detention and correctional facilities. In particular, the Jail must immediately:

- Acquire rapid testing for COVID-19 in adequate supply to ensure that all who enter

15

the facility with the coronavirus can be quickly identified and medically isolated.

- Quarantine all new detainees until test results become available or, if testing cannot be done, for 14 days, unless they become symptomatic.

- Medically isolate all detainees who are positive for COVID-19 in a controlled, monitored environment in which they are not at risk for infecting others.

- Quarantine all detainees who are symptomatic and/or have been exposed to a confirmed case of COVID-19 in a controlled monitored environment for the appropriate time period where they are not at risk for infecting others.

- Provide adequate medical staff to monitor all detainees within the Jail who are in medical isolation or under quarantine.

- Provide sufficient soap and hand sanitizer to all detainees so that detainees may frequently wash their hands.

- Provide masks to all detainees.

- Provide instruction to all staff and to all detainees regarding the importance of regularly sanitizing all surfaces and objects on which the virus could be present. Provide the soap and cleaning materials to enable this sanitizing, and supervise to ensure that sanitizing takes place between all uses of such surfaces and objects.

- Mandate social distancing of detainees such that each is not at risk of exposure.

All Class members are currently at imminent risk of death or serious injury from exposure to the coronavirus, and they are accordingly entitled to relief imminently. If this litigation is decided in the ordinary course, many Class members may die before final judgment is entered, and countless others will suffer severe pain or permanent lung damage. Class members are highly likely to succeed on their claims because Dart, as his own staff members confirm, is knowingly

exposing Plaintiffs to a severe risk of harm. *See* March 31, 2020 Letter from Marni Willenson, Caitlin Cervenka, Matthew J. Piers, Caryn Lederer, Cyrus Mehri, Ellen Eardley, and Michael D. Lieder to Thomas J. Dart and Toni Preckwinkle (hereinafter "March Letter") (Attached as Exhibit C to the Complaint).

These steps are neither more nor less than what is required to mitigate the spread of COVID-19 within the Jail.  Because the Jail is not an isolated environment—infections within the Jail can and will spread beyond the Jail's walls—implementing these steps is essential to mitigate the spread of the coronavirus and serves the public interest.

The monetary cost of implementing these necessary changes may be significant, but those costs, whatever they might be, pale in comparison with the cost in human suffering and loss of life that will surely occur if the changes are not made and made immediately. And the requested relief promotes the interests of the Sheriff's office: his own employees are crying out for it as well. *Id.*

### 3.   The Balance of Harms and the Public Interest Favor a Temporary Restraining Order Requiring Transfer of Subclass B Members to a Safe Facility or Other Form of Confinement

The whole Class in this case requests a preliminary injunction requiring the implementation of reasonable sanitation procedures designed to keep them safe. But for people who are housed in an environment *already* exposed to COVID-19, those procedures will be insufficient. Once there is known exposure in a residential environment, it must be emptied and deep cleaned. Therefore, Subclass B members—who are housed in already exposed environments—must be transferred immediately, either to their homes or to another, safe environment, and may not be returned to their current tiers until those tiers have been sanitized to prevent the spread of coronavirus. *See, e.g.*, *Plata v. Brown*, No. 01-cv-1351, 2013 WL 3200587, at *8 (N.D. Cal. June 24, 2013) (granting motion requiring transfer from area at high risk of coccidioidomycosis, known as "Valley Fever").

**CONCLUSION**

For the foregoing reasons, this Court should grant Subclass A's petition for writs of habeas corpus and should grant the Class's and Subclass B's requests for a temporary restraining order or a preliminary injunction requiring the Jail to comply with the United States Constitution.

Respectfully submitted,

SIGNATURES

*/s/* Alexa Van Brunt
*Counsel for Plaintiffs*

Alexa Van Brunt
Roderick and Solange MacArthur Justice Center
Northwestern Pritzker School of Law
375 E. Chicago Avenue
Chicago, IL 60611
(312) 503-1336

**CERTIFICATE OF SERVICE**

I, Stephen Weil, an attorney, hereby certify that on April 3, 2020, I caused a copy of the foregoing to be filed using the Court's CM/ECF system. I further certify that I, or another one of Plaintiffs' attorneys, will promptly serve a copy of the same on General Counsel for the Cook County Sheriff's Office, as well as the Division Chief and Supervisor of the Special Litigation Section, and the Division Chief of the Complex Litigation Division, of the Cook County State's Attorney's Office via email.

/s/ Alexa Van Brunt
Alexa Van Brunt