## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

ANTHONY MAYS, Individually and on behalf    )
of a class of similarly situated persons; and    )
JUDIA JACKSON, as next friend of KENNETH    )
FOSTER, Individually and on behalf of a class    )
of similarly situated persons,    )
    )
    Plaintiffs-Petitioners,    )
    )
    v.    )    Case No. 20 C 2134
    )
THOMAS DART, Sheriff of Cook County,    )
    )
    Defendant-Respondent.    )

## <u>PLAINTIFFS' RESPONSE TO THE COURT'S APRIL 3, 2020 ORDER</u>

Stephen Weil
Sarah Grady
Loevy & Loevy
311 North Aberdeen St., 3rd Fl.
Chicago, IL 60607
(312) 243-5900
sarah@loevy.com

Locke E. Bowman
Alexa A. Van Brunt
Roderick and Solange MacArthur Justice Center
Northwestern Pritzker School of Law
375 East Chicago Ave.
Chicago, IL 60611
(312) 503-0884

Charles Gerstein (*pro hac vice* application pending)
Alec Karakatsanis (*pro hac vice* application forthcoming)
Civil Rights Corps
1601 Connecticut Ave NW, Ste. 800
Washington, DC 20009
(202) 894-6128

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................1

DISCUSSION ...................................................................................................................2

I.     The Relevant Provisions of 18 U.S.C. § 3626 ................................................2

II.    The PLRA Does Not Apply to Subclass A's Request for a Writ of Habeas Corpus ..........4

III.   Plaintiffs' Request for a Preliminary Injunction to Remedy Unconstitutional Conditions of Confinement at the Jail Satisfy Section 3626(a)(2) and Are Necessary, Although Potentially Insufficient, To Protect the Class ......................................................5

     A.  Plaintiff's Proposed Injunctive Relief Regarding Conditions at the Jail Satisfies Section 3626(a)(2) ................................................................................5

     B.  Plaintiffs' Proposed Injunctive Relief May Not Be Sufficient ...................................10

IV.   Subclass B Seeks Transfer Within the Jurisdiction of the Sheriff in Response to a Growing Pandemic Inside the Jail, Relief That Satisfies the Need-Narrowness-Intrusiveness Criteria and Is Not a Prisoner-Release Order ...............................................17

     A.  Plaintiffs' Requested Transfer Is Within the Court's Equitable Authority and Does Not Require the Sheriff to Exceed His Statutorily Prescribed Authority ...................18

     B.  The Requested Relief is Not a Prisoner Release Order ...............................................20

     C.  The Relief Requested for Subclass B is Narrowly Drawn, Extends No Further than Necessary, and is the Least Intrusive Means Necessary to Address the Violations at Stake ................................................................................24

CONCLUSION ...............................................................................................................25

## TABLE OF AUTHORITIES

**Cases**

*Abu-Jamal v. Wetzel,* 2017 WL 34700 (M.D. Pa. Jan. 3, 2017)...................................................24

*Armstrong v. Schwarzenegger*, 622 F.3d 1058 (9th Cir. 2010) .....................................................7

*Basank v. Decker*, ___ F. Supp. 3d ____, (S.D.N.Y. Mar. 26, 2020) ...........................................4

*Benjamin v. Fraser*, 156 F. Supp. 2d 333 (S.D.N.Y. 2001) ...................................................... 7-8

*Blair–Bey v. Quick*, 151 F.3d 1036 (D.C.Cir.1998) .....................................................................4

*Braggs v. Dunn*, 383 F. Supp. 3d 1218 (M.D. Ala. May 4, 2019)............................................. 8-9

*Brown v. Plata*, 563 U.S. 493 (2011)...........................................................................................7

*Caiozzo v. Koreman*, 581 F.3d 63 (2d. Cir. 2009) ................................................................. 7-12

*Chan v. County of Sacramento*, 2011 WL 2636262 (E.D. Cal. July 5, 2011).............................24

*Davis v. Fechtel*, 150 F.3d 486 (5th Cir.1998) .............................................................................4

*DeBartolo Corp v. Florida Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568 (1988)...16

*Doe v. Younger*, No. 91-187 (E.D. Ky. Sept. 4, 1996) ...................................................... 19, 21-22

*Duvall v. O'Malley*, 2016 WL 3523682 (D. Md. June 28, 2016) .................................................10

*Estelle v. Gamble*, 429 U.S. 97 (1976) .......................................................................................16

*Farmer v. Brennan*, 511 U.S. 825 (1994) ..................................................................................17

*Farnam v. Walker*, 593 F.Supp.2d 1000 (C.D. Ill. 2009) ...........................................................24

*Fields v. Smith*, 653 F.3d 550 (7th Cir. 2011) .........................................................................3, 7

*Flynn v. Doyle*, 630 F.Supp.2d 987 (E.D. Wis. Apr. 24, 2009)...................................................24

*Francis v. Hammond,* 2013 WL 12167887 (W.D. Wash. Mar. 4, 2013) ......................................24

*Gilmore v. California*, 220 F.3d 987 (9th Cir. 2000)............................................................ 20-22

*Glaus v. Anderson*, 408 F.3d 382 (7th Cir. 2005).......................................................................17

*Greyer v. Illinois Dep't of Corr.*, 933 F.3d 871 (7th Cir. 2019) ......................................................4

*Helling v. McKinney*, 509 U.S. 25 (1993).................................................................16, 24,

*Johnson v. Harris*, 479 F. Supp. 333 (S.D.N.Y. 1979) .................................................17

*Jones v. United States*, 529 U.S. 848 (2000) ...............................................................16

*Kentucky v. King*, 563 U.S. 452 (2011) ..............................................................15, 20

*McIntosh v. United States Parole Commission,*......................................................4

*McNearney v. Washington Dep't of Corr.* (W.D. Wash. Jan. 9, 2013) ........................24

*Mitts v. Obandina*, 2012 WL 4060013 (S.D. Ill. Aug. 27, 2012) ...............................24

*Morales Feliciano v. Rullan*, 378 F.3d 42 (1st Cir. 2004)......................................7, 23

*Moran v. Sondalle*, 218 F.3d 647 (7th Cir. 2000) ....................................................2, 5

*Murphy v. Lane*, 833 F.2d 106 (7th Cir. 1987)..........................................................17

*NLRB v. Catholic Bishop of Chicago*, 440 U.S. 490 (1979)......................................16

*Norsworthy v. Beard*, 87 F.Supp.3d 1164 (N.D. Cal. 2015)......................................24

*Perez v Cate*, 2009 WL 440508 (N.D. Cal. Feb. 23, 2009)........................................24

*Petties v. Carter*, 836 F.3d 722 (7th Cir. 2016) .......................................................18

*Plata v. Brown*, 2013 WL 3200587 (N.D. Cal. June 24, 2013)..................................20

*Plata v. Newsom*, No. 90 C 0520 (N.D. Cal. April 4, 2020)......................................15

*Preiser v. Rodriguez*, 411 U.S. 475 (1973).................................................................17

*Reaves v. Dep't of Correction,* 392 F.Supp.3d 195 (D. Mass. 2019) ....................... 17, 20-21, 23

*Thakker v. Doll*, No. 20 C 0480 (M.D. Pa. Mar. 31, 2020) ........................................5

*Turner v. Clelland*, 2016 WL 1069665 (M.D.N.C. Mar. 16, 2016) ............................24

*Tyler v. Anderson*, 749 F.3d 499 (6th Cir. 2014)................................................12, 15

*United States ex rel. Attorney General v. Delaware & Hudson Co.*, 213 U.S. 366 (1909)...........16

*United States v. Alabama*, 2015 WL 3796526 (M.D. Ala. June 18, 2015) ............................ 9-10

*United States v. Wallen*, 177 F. Supp. 2d 455 (D. Md. 2001) ....................................17

*Walker v. O'Brien*, 216 F.3d 626 (7th Cir. 2000) ...................................................4, 24

*Weinberger v. Romero-Barcelo*, 456 U.S. 305 (1982) .............................................20

*Williams v. Dart*, Case No. 19-02108 (7th Cir) ........................................................18

**Statutes**

18 U.S.C. § 3626 ........................................................................................... *passim*

28 U.S.C. § 1983 ........................................................................................... *passim*

28 U.S.C. § 2241 ..................................................................................................4

28 U.S.C. § 2254 ..................................................................................................4

**Other Authorities**

Bryant. Miranda. "Coronavirus Spread at Rikers is a 'Public Health Disaster,' Says Jail's Top
    Doctor," The Guardian (Apr. 1, 2020), https://www.theguardian.com/us-
    news/2020/apr/01/rikers-island-jail-coronavirus-public-health-disaster ..........................11

Centers for Disease Control, Coronavirus Disease 2019 (COVID-19): Social Distancing,
    Quarantine, and Isolation, (last visited Apr. 6, 2020)
    https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/social-distancing.html
    ..........................................................................................................................14

Cook County Board of Commissioners. Current Budget Information,
    https://www.cookcountyil.gov/Budget ...............................................................12

Cook County Sheriff's Office. Cook County Jail infection figures: Cook County
    Sheriff, https://www.cookcountysheriff.org/covid-19-cases-at-ccdoc/ ..........................12

Cook County Sheriff's Office. COVID-19 Cases at CCDOC (last updated Apr. 5,
    2020), https://www.cookcountysheriff.org/covid-19-cases-at-ccdoc/ ..............................12

Cook County Sheriff's Office. "Sheriff Dart Institutes Comprehensive Precautionary Measures
    to Address COVID-19 Threat," (Mar. 20,
    2020), https://www.cookcountysheriff.org/sheriff-dart-institutes-comprehensive-
    precautionary-measures-to-address-covid-19-threat/ ..........................................11

Ewing Tia. "Inmates concerned as COVID-19 spreads through Cook County Jail,"

Fox 32 (Apr. 3, 2020), *available at* https://www.fox32chicago.com/news/inmates-concerned-as-covid-19-spreads-through-cook-county-jail ..............................................11

Kendall, Tyler. Coronavirus cases surge inside Chicago's Cook County Jail," CBSNews (Apr. 5, 2020), https://www.cbsnews.com/news/chicago-cook-county-jail-coronavirus-life-inside-covid-19-cases/ ......................................................................13

Kendall, Tyler. "We're at war with no weapons": Coronavirus cases surge inside Chicago's Cook County Jail," CBSNews (Apr. 5, 2020), https://www.cbsnews.com/news/chicago-cook-county-jail-coronavirus-life-inside-covid-19-cases/ ........................................................13

Lewis, Sean. "Sheriff Dart working to contain COVID-19 spread in Cook County Jail, WGN (Mar. 31, 2020), *available at* https://www.fox32chicago.com/news/inmates-concerned-as-covid-19-spreads-through-cook-county-jail ..............................................11

NBC Chicago. Read Pritzker's Full Statement Announcing Illinois Stay-at-Home Order Extension," NBC5 (Mar. 31, 2020), https://www.nbcchicago.com/news/local/read-pritzkers-full-statement-announcing-illinois-stay-at-home-order-extension/2247976/ ....19

Neff, Joseph, Blaninger, Keri. Federal Prisons Agency 'Put Staff in Harm's Way' of Coronavirus, The Marshall Project (Apr. 3, 2020) https://bit.ly/2xVAeaE .....................10

New York Times, Almukhtar, Sarah , et al. Coronavirus in the U.S.: Latest Map and Case Count," N.Y. Times (last updated Apr. 5, 2020), https://www.nytimes.com/interactive/2020/us/coronavirus-us-cases.html ........................1

Pritzker,Governor J.B. Executive Order in Response to COVID-19 (COVID Executive Order No. 8) (Mar. 20, 2020), pg. 1-5, *available at* https://www2.illinois.gov/Documents/ExecOrders/2020/ExecutiveOrder-2020-10.pdf ......................................................................................................19

Sheets, Connor. Alabama prison system's COVID-19 plan anticipates widespread infection, deaths, National Guard intervention, AL.com (Apr. 5, 2020), *available at* https://www.al.com/news/2020/04/alabama-prison-systems-covid-19-plan-anticipates-widespread-infection-deaths-national-guard-intervention.html.........................................10

Quandt, Katie Rose, Casella, Jean. "U.S. Jails Will Become Death Traps in Coronavirus Pandemic," The Guardian (Mar. 30, 2020), https://www.theguardian.com/commentisfree/2020/mar/30/jails-coronavirus-us-rikers-island.....................................................................................................11

## INTRODUCTION

The Cook County Jail is now the site of the largest known cluster of COVID-19 cases in the United States.[1] Since the filing of the case, two days ago, the number of detainees infected with the disease has grown from 167 to at least 234; 78 staff are infected; 14 detainees are hospitalized.[2] These numbers rise every day, and the rate of infection in the Jail is now 32 times the rate in Cook County writ large. In the two weeks since it was first detected, 1 out of every 20 detainees at the Jail has become infected.[3] It is unclear how many have been tested or how many tests are outstanding.

Plaintiffs have filed a Complaint seeking an emergency writ of habeas corpus for detainees who are especially vulnerable to a grave risk of serious illness and death because of their age or medical condition. They also seek injunctive relief under 42 U.S.C. § 1983 to bring the conditions at the Jail into compliance with the Constitution, and to transfer those detainees at the Jail who have been exposed to the virus to a form of custody that is safe. In their motion for a temporary restraining order or preliminary injunction, Plaintiffs request three categories of relief: (1) for Subclass A, they seek immediate release through a writ of habeas corpus; (2) for Subclass B, they seek transfer to a safe environment; and (3) for the entire Class, they seek an Order requiring the Jail to adhere to CDC guidelines and take other actions required by medical

---

[1] "Coronavirus in the U.S.: Latest Map and Case Count," N.Y. Times (last updated Apr. 5, 2020), https://www.nytimes.com/interactive/2020/us/coronavirus-us-cases.html ("Though many of the first coronavirus cases in the United States were tied to overseas travel, localized outbreaks have become increasingly common." Cook County Jail is the top locale for this type of outbreak).

[2] COVID-19 Cases at CCDOC (last updated Apr. 5, 2020), https://www.cookcountysheriff.org/covid-19-cases-at-ccdoc/.

[3] *See infra* pg. 12.

consensus to bring the conditions of confinement at the Jail into constitutional compliance. Dkt. 2 at 11.

Plaintiffs submit this brief in response to the Court's request to "provide their position regarding the applicability and effect of 18 U.S.C. § 3626 to their lawsuit and, in particular, to the relief they are requesting in the TRO/PI motion." Dkt. 10. In summary: (1) Plaintiffs' first request, for habeas relief, is not governed by 18 U.S.C. § 3626. *Moran v. Sondalle*, 218 F.3d 647, 651 (7th Cir. 2000) (per curiam). (2) Plaintiffs' claims for emergency injunctive relief under Section 1983 comply with 18 U.S.C. § 3626 because they seek narrowly drawn injunctive relief that extends no further than what is required to ensure class members are held in constitutionally compliant conditions. (3) Neither of the requests for injunctive relief under Section 1983 constitutes a prisoner release order, 18 U.S.C. § 3626(a)(3), and thus the requirements of Section 3626(a)(3) do not apply to Plaintiffs' current requests. (4) Given the imminent threat that an uncontrolled outbreak at the Jail imposes on class members and to the general public, however, Plaintiffs believe that a three-judge panel should be convened in the event that immediate compliance with the Constitution is not achieved. The unprecedented global pandemic—an infectious disease spreading inside the Cook County Jail at a rate fifty times that of the general U.S. population—requires unique and prompt action by this Court to ensure that this Court is in a position to save as many lives as possible.

## DISCUSSION

### I.        The Relevant Provisions of 18 U.S.C. § 3626.

The Prison Litigation Reform Act (PLRA) applies to "any civil action with respect to prison conditions," 18 U.S.C. § 3626, but not to petitions for habeas corpus. *Moran*, 218 F.3d at 651. Requests for relief under Section 3626 are governed by Subsection (a) of that statute, which

contains three core provisions: Subsection (1) governs all prospective relief, Subsection (2) governs preliminary injunctions and temporary restraining orders, and Subsection (3) governs "prisoner release order[s]."

Subsection (1) requires that "[p]rospective relief in any civil action with respect to prison conditions shall extend no further than necessary to correct the violation of the Federal right of a particular plaintiff or plaintiffs," 18 U.S.C. § 3626(a)(1)(A), and instructs courts to "give substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the relief" when considering whether "such relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right." *Id.* Further, the statute requires that courts not order a state official to exceed their authority under state law unless doing so is required by federal law to protect a federal right and no other relief will do. *Id.* § 3626(a)(1)(B). Courts refer to these requirements as the "needs-narrowness-intrusiveness" criteria. *E.g., Fields v. Smith*, 653 F.3d 550, 558 (7th Cir. 2011).

Subsection (2) applies the narrow-tailoring requirements of Subsection (1) to requests for preliminary injunctive relief, and further requires that all such relief "automatically expire on the date that is 90 days after its entry, unless the court makes the findings required under subsection (a)(1) [that the relief be narrowly tailored and minimally intrusive] . . . and makes the order final before the expiration of the 90-day period." 18 U.S.C. § 3626(a)(2).

Finally, Subsection (3) governs "prisoner release order[s]." *Id.* § 3626(a)(3). A "prisoner release order" is defined as "any order, including a temporary restraining order or preliminary injunctive relief, that has the purpose or effect of reducing or limiting the prison population, or that directs the release from or nonadmission of prisoners to a prison." *Id.* § 3626(g)(4).

3

Subsection (3) imposes substantive and procedural requirements on prisoner-release orders. Procedurally, a prisoner-release order may issue only by order of a three-judge district court, and only after "a court has previously entered an order for less intrusive relief that has failed to remedy the deprivation of the Federal right sought to be remedied through the prisoner release order[,] and the defendant has had a reasonable amount of time to comply with the previous court orders." *Id.* at (3)(A) (numerals omitted). Substantively, "[t]he three-judge court shall enter a prisoner release order only if the court finds by clear and convincing evidence that crowding is the primary cause of the violation of a Federal right[] and no other relief will remedy the violation of the Federal right." *Id.* at (3)(E).

## II. The PLRA Does Not Apply to Subclass A's Request for a Writ of Habeas Corpus.

The PLRA does not apply to habeas corpus actions. *Walker v. O'Brien*, 216 F.3d 626, 634 (7th Cir. 2000) ("[W]e conclude that cases properly brought under §§ 2241 or 2254 as habeas corpus petitions are not subject to the PLRA. In so doing, we bring this circuit into line with all of our sister circuits who have ruled on the matter." (citing *Davis v. Fechtel*, 150 F.3d 486, 488–90 (5th Cir.1998); *McIntosh v. United States Parole Commission*, 115 F.3d 809, 811–12 (10th Cir.1997); *Blair–Bey v. Quick*, 151 F.3d 1036, 1039–41 (D.C.Cir.1998)); *see also, Greyer v. Illinois Dep't of Corr.*, 933 F.3d 871, 878 (7th Cir. 2019) (observing that "habeas corpus petitions do not give rise to a strike under the PLRA."). Recent district court orders granting petitions for habeas corpus relief in light of COVID-19 have not applied the PLRA to those actions. *See, e.g., Basank v. Decker*, ___ F. Supp. 3d ____, 2020 WL 1481503, at *7 (S.D.N.Y. Mar. 26, 2020) (granting petitioner's Section 2241 request for a TRO, releasing them

from immigration detention because of COVID-19); *Thakker v. Doll*, No. 20 C 0480, Dkt. 47

(M.D. Pa. Mar. 31, 2020) (attached as Ex. G) (same).[4]

### III. Plaintiffs' Request for a Preliminary Injunction to Remedy Unconstitutional Conditions of Confinement at the Jail Satisfy Section 3626(a)(2) and Are Necessary, Although Potentially Insufficient, To Protect the Class.

#### A. Plaintiff's Proposed Injunctive Relief Regarding Conditions at the Jail Satisfies Section 3626(a)(2).

The relief Plaintiffs seek on behalf of the entire Class is, simply, constitutionally compliant

Jail conditions so that everyone in the Class is protected from the rampant transmission of a

virulent and lethal disease. As set forth in Plaintiffs' motion for a temporary restraining order or

preliminary injunction, the Sheriff must comply with the CDC Guidance for Managing Detention

and Correctional Facilities, including specific requirements for quarantine, medical isolation,

access to trained medical staff to monitor and provide adequate care, sufficient soap, sanitizer

and cleaning supplies, and—importantly—effective social distancing to the maximum possible

extent for all staff and detainees. Pls.' Prelim. Inj. Mot., Dkt. 2, at 15-16. These mandates also

echo the expert recommendations of the medical declarants who have extensive experience with

Cook County and Illinois correctional medical care, including former medical directors of the

Cook County Jail. *See* Complaint, Ex. B, Dkt. 1-2.

In particular, in their motion for a temporary restraining order or preliminary injunction,

Plaintiffs seek an Order from this Court requiring the Jail to immediately take the following

actions:

---

[4] There are, of course, questions as to what process would be appropriate to enable the Court to evaluate the claims of the members of Subclass A for a temporary restraining order granting habeas relief. Should the court desire briefing on those questions, Plaintiff is prepared to submit a memorandum on an expedited schedule.

—  Acquire rapid testing for COVID-19 in adequate supply to ensure that all who enter the facility with the coronavirus can be quickly identified and medically isolated;

—  Quarantine all new detainees until test results become available or, if testing cannot be done, for 14 days, unless they become symptomatic;

—  Medically isolate all detainees who are positive for COVID-19 in a controlled, monitored environment in which they are not at risk for infecting others;

—  Quarantine all detainees who are symptomatic and/or have been exposed to a confirmed case of COVID-19 in a controlled, monitored environment for the appropriate time period where they are not at risk for infecting others;

—  Provide adequate medical staff to monitor all detainees within the Jail who are in medical isolation or under quarantine;

—  Provide sufficient soap and hand sanitizer to all detainees so that detainees may frequently wash their hands;

—  Provide masks to all detainees;

—  Provide instruction to all staff and to all detainees regarding the importance of regularly sanitizing all surfaces and objects on which the virus could be present;

—  Provide the soap and cleaning materials to enable this sanitizing, and supervise to ensure that sanitizing takes place between all uses of such surfaces and objects; and

—  Mandate social distancing of detainees such that each is not at risk of exposure.

Dkt. 2 at 17-18. These steps are necessary to protect detainees at the Jail from further uncontrolled spread of COVID-19. They accordingly satisfy the criteria of section 3626(a)(2).

Section 3626(a)(2) permits a court to order injunctive relief if it finds that the relief, taken as a whole, is narrowly drawn, extends no further than necessary to correct the constitutional violation, and is the least intrusive means necessary to correct the constitutional violation. 18 U.S.C. § 3626(a); *see also Armstrong v. Schwarzenegger*, 622 F.3d 1058, 1070 (9th Cir. 2010) (rejecting argument that PLRA requires provision-by-provision explanation of district court's findings; court must make findings considering its "order as a whole"); *see also Fields*, 653 F.3d at 558 (finding that district court properly complied with PLRA because court "evaluated the record *as a whole* and identified evidence that fully support[ed] the scope of the injunctive relief" (emphasis added)). The application of this requirement is case-specific, and "must be undertaken in light of both the magnitude of existing constitutional violations and the available alternative remedies." *Morales Feliciano v. Rullan*, 378 F.3d 42, 54 (1st Cir. 2004).

In *Brown v. Plata*, 563 U.S. 493 (2011), the Supreme Court explained that the narrow tailoring required by Section 3626(a) simply mandates "a fit between the [remedy's] ends and the means chosen to accomplish those ends." *Id.* at 531 (internal quotation marks omitted). Although the injunctive relief must not "reach out to improve prison conditions other than those that violate the Constitution[,]" narrow tailoring does not "suggest that a narrow and otherwise proper remedy for a constitutional violation is invalid simply because it will have collateral effects." *Id.* Where the constitutional violation at issue is systemwide, systemwide relief is the appropriate, tailored remedy. *See, e.g., Benjamin v. Fraser*, 156 F. Supp. 2d 333, 345-55 (S.D.N.Y. 2001) (finding that systemwide injunctive relief satisfied the criteria of Section 3626(a) in class action litigation over the conditions of confinement for jail detainees), *aff'd, in part, at* 343 F.3d 35, 53-54 (2nd Cir. 2003), *overruled on other grounds in Caiozzo v. Koreman*,

581 F.3d 63 (2d. Cir. 2009); *Braggs v. Dunn*, 383 F. Supp. 3d 1218, 1265-1278 (M.D. Ala. May 4, 2019) (same). Indeed as the Second Circuit explained in *Benjamin*, affirming a district court's systemwide injunction order pertaining to prison ventilation, a systemwide injunctive order was in fact "more effective and less intrusive than an individual review of each window at the various facilities." 343 F.3d at 53.

As set forth in the Complaint, the current conditions at the Jail pose a substantial and imminent risk of serious harm to detainees housed there. *See Hardeman v. Curran*, 933 F.3d 816, 823 (7th Cir. 2019). The Complaint sets out evidence that, throughout the Jail, shared communal areas continue to be in use. That includes intake "bull pens" and dormitories for incoming detainees, and the housing of detainees in dormitories and other congregate settings in the Jail. *See* Dkt. 1 ¶ 40. The Complaint also explains that guards have not consistently worn personal protective equipment (PPE), and that detainees have been given none. *Id.* ¶ 41. The Complaint details that detainees have had inconsistent or limited access to soap and hand sanitizer, *id.*, and that detainees do not have access to clearing supplies. *Id.* And it sets out that detainees and staff throughout the Jail touch and share objects throughout the day—from door handles to phones to toilets to tables to lunch trays—that are not cleaned frequently enough to stop the spread of a virus that can live on such surfaces for days. *Id.* ¶¶ 11, 21, 35, 48.

The requested remedial measures are immediately needed to protect the health and safety of detainees at the Jail, and they are designed to address these failures. The injunctive relief sought by Plaintiffs is supported by the CDC's guidance on managing COVID-19 in jails, as well as evidence from doctors with experience with the Cook County correctional medical system, including Dr. Puisis, who was the Medical Director of the Cook County Jail from 1991 to 1996

and Chief Operating Officer for the medical program at the Cook County Jail from 2009 to 2012. Dkt. 1-2; *see also Benjamin*, 156 F. Supp. 2d at 345-55 (relying on expert testimony in finding that systemwide injunctive relief satisfied the needs-narrowness-intrusiveness criteria); *Braggs v. Dunn*, 383 F. Supp. 3d 1218, 1265-1278 (M.D. Ala. May 4, 2019) (same).

The requested relief protects not only the class members, but the safety of the public at large, a consideration encompassed within both subsections (a)(1)(A) and (a)(2) ("The court shall give substantial weight to any adverse impact on public safety or the operation of a criminal justice system . . . ."). The Jail is not a closed environment. The measures put in place to protect the Plaintiffs and class members will simultaneously impact the health and well-being of the community at large. The Complaint explains:

> By necessity, members of the free community, including correctional officers, social workers, attorneys, medical personnel, and many others must enter and leave jails on a daily basis. Staff arrive and leave each facility three times a day in large numbers, and there is no current, in-place ability to adequately screen staff for new, asymptomatic infection. In addition, new detainees are admitted into jails every day, many of whom may be asymptomatic and thus not flagged for quarantine, even with robust intake screening procedures. When the COVID-19 virus occurs and spreads within a jail, all persons, staff and prisoners alike, are at heightened risk of contracting the virus and, in turn, spreading the virus to others with whom they come in contact in their own homes and neighborhoods.

Complaint, Dkt. 1, at ¶ 25.

As the Governor's March 20, 2020 Executive Order makes clear, public safety is served by the emergency relief requested.[5] The implementation of the CDC Guidance measures and

---

[5] Executive Order in Response to COVID-19 (COVID Executive Order No. 8) (Mar. 20, 2020) (Executive Order), pg. 1-5, *available at* https://www2.illinois.gov/Documents/ExecOrders/2020/ExecutiveOrder-2020-10.pdf (last visited Apr. 6, 2020); *see also* "Read Pritzker's Full Statement Announcing Illinois Stay-at-Home Order Extension," NBC5 (Mar. 31, 2020), https://www.nbcchicago.com/news/local/read-pritzkers-full-statement-announcing-illinois-stay-at-home-order-extension/2247976/ (last visited Apr. 4, 2020).

medical experts' recommendations will prevent prisoners from spreading COVID-19 to one another, then transmitting it to correctional staff, who may spread it to their families and their communities. *Cf. United States v. Alabama*, 2015 WL 3796526, at *4 (M.D. Ala. June 18, 2015) (approving a settlement that "will promote public safety by not only protecting the prisoners at Tutwiler [Prison for Women] from sexual abuse and harassment, it will also protect the prison guards"); *Duvall v. O'Malley*, 2016 WL 3523682, *11 (D. Md., June 28, 2016) (approving a consent judgment addressing medical and mental health care and living conditions, and holding that "the facilities will be safer and more orderly when this relief is fully implemented").

The evidence provided by Plaintiffs in their Complaint and motion for a temporary restraining order amply supports the findings required by Section 3626(a)(2): Experts and government agencies alike describe the measures for which Plaintiffs seek an injunction as necessary to protect against the spread of a deadly virus.

**B.    Plaintiffs' Proposed Injunctive Relief May Not Be Sufficient.**

If the Court issues injunctive relief under Section 3626(a)(2), Plaintiffs respectfully submit that within 24 hours thereafter the Court should decide—either *sua sponte* pursuant to Section 3626(a)(3)(D), or pursuant to a submission by Plaintiffs under Section 3626(a)(3)(C)— whether to request the convening of a three-judge court to determine whether a prisoner release order should be issued.  A timeline this short is extraordinary.  But it is called for by the extraordinary circumstances unlike any living person has ever seen, in which a deadly virus has shut down life as we know it around the world and in which crowded U.S. jails and prisons are,

without intervention, about to become sites of mass sickness and death.[6] Section 3626 contemplates precisely such a remedy in circumstances like this.

Section (a)(3) provides that a three-judge panel may consider the appropriateness of a prisoner-release order if, *one*, the Court has entered an order under Section (a)(2) "to remedy the deprivation of the Federal right sought to be remedied through the prisoner release order," and *two*, the Sheriff "has had a reasonable time to comply" with the Section (a)(2) order. 18 U.S.C. §§ 3626(a)(3)(A)(i)-(ii). Plaintiffs seek relief under Section (a)(2) to protect them, and the class they seek to represent, from being incarcerated in a jail where the conditions of confinement have incubated and accelerated the transmission of a fast-moving, lethal virus that threatens to make them seriously ill, damage their internal organs (possibly permanently), or kill them, in a matter of days. Being imprisoned in such circumstances violates Plaintiffs' rights, as set forth in Plaintiffs' motion for a temporary restraining order or preliminary injunction. Dkt. 2 at 13-14.

In public statements the Sheriff's office has repeatedly assured members of the public that it has taken extraordinary steps to protect the jail population from the pandemic. The Sheriff contends that he has made available increased cleaning supplies and personal protective

---

[6] For example, five prisoners have already died in a federal prison in Oakdale, Louisiana. Joseph Neff & Keri Blakinger, "Federal Prisons Agency 'Put Staff in Harm's Way' of Coronavirus, The Marshall Project (Apr. 3, 2020), *available at* https://bit.ly/2xVAeaE (last visited Apr. 6, 2020). And the Alabama Department of Corrections predicts that its death count will number 185. Connor Sheets, "Alabama prison system's COVID-19 plan anticipates widespread infection, deaths, National Guard intervention, AL.com (Apr. 5, 2020), *available at* https://www.al.com/news/2020/04/alabama-prison-systems-covid-19-plan-anticipates-widespread-infection-deaths-national-guard-intervention.html (last visited Apr. 6, 2020). The top doctor at Rikers Jail in New York days ago called the COVID-19 outbreak a "public health disaster." Miranda Bryant, "Coronavirus Spread at Rikers is a 'Public Health Disaster,' Says Jail's Top Doctor," The Guardian (Apr. 1, 2020), *available at* https://www.theguardian.com/us-news/2020/apr/01/rikers-island-jail-coronavirus-public-health-disaster (last visited Apr. 6, 2020); *see also* Jean Casella and Katie Rose Quandt, "U.S. Jails Will Become Death Traps in Coronavirus Pandemic," The Guardian (Mar. 30, 2020), *available at* https://www.theguardian.com/commentisfree/2020/mar/30/jails-coronavirus-us-rikers-island (last visited Apr. 6, 2020).

equipment,[7] that he has implemented aggressive testing protocols to ensure that sick individuals are quarantined,[8] and that he has re-opened an unused portion of the jail to accommodate those quarantined and sick detainees.[9]  Indeed, the Sheriff's office has emphasized that it was well-prepared for COVID-19, and that the steps that the Sheriff has taken have been designed to carefully to protect the jail's population and employees.[10]

When put in its proper context—234 known cases of COVID-19 among Jail detainees within the span of two weeks—the Sheriff's assurance that all possible steps to combat the virus have already been taken brings Plaintiffs, and should bring this Court, little comfort.  Even if the Sheriff's media statements are accurate, the official Cook County Department of Corrections (CCDOC) measures are woefully insufficient. Cook County is the host county for the Jail and virtually all its detainees and all of its employees hail from the County. As of this filing, there are 8,054 positive tests for COVID-19 in Cook County, with a total population of 5,150,233, a

---

[7] Tia Ewing, "Inmates concerned as COVID-19 spreads through Cook County Jail," Fox 32 (Apr. 3, 2020), *available at* https://www.fox32chicago.com/news/inmates-concerned-as-covid-19-spreads-through-cook-county-jail (last visited Apr. 6, 2020).

[8] Sean Lewis, "Sheriff Dart working to contain COVID-19 spread in Cook County Jail, WGN (Mar. 31, 2020), *available at* https://www.fox32chicago.com/news/inmates-concerned-as-covid-19-spreads-through-cook-county-jail (last visited Apr. 6, 2020).

[9] Cook County Sheriff's Office, "Sheriff Dart Institutes Comprehensive Precautionary Measures to Address COVID-19 Threat," (Mar. 20, 2020), https://www.cookcountysheriff.org/sheriff-dart-institutes-comprehensive-precautionary-measures-to-address-covid-19-threat/.

[10] Omar Jimenez, "America's largest single site jail is home to a new coronavirus cluster," CNN (Mar. 29, 2020), *available at* https://www.cnn.com/2020/03/29/us/detroit-coronavirus-cook-county-jail/index.html (last visited Apr. 6, 2020); Bill Hutchinson, "One of the largest single-site jails in the US grapples with 141 coronavirus cases," ABC News (Mar. 31, 2020), *available at* https://abcnews.go.com/Health/largest-single-site-jails-us-grapples-141-coronavirus/story?id=69871778 (last visited Apr. 6, 2020).

known infection rate of 1.56 per 1,000 people.[11]  In the Jail, by contrast, there are 234 confirmed infections out of 4,661 detainees and employees—a known infection rate of 50.2 per 1,000 people. That is 32 times the rate in Cook County.[12] The first detainee tested positive for COVID-19 two weeks ago; now 1 in 20 detainees at the Jail are infected. Seventy-eight staff members are infected as well.[13] The Jail, in other words, is a dramatic accelerator of COVID-19, the Sheriff's efforts notwithstanding. As of today, the Jail is the largest known cluster of COVID-19 infections in the United States.[14]

There are three probable reasons for this, all of which are detailed in the Complaint. *First*, the reports from jail detainees and employees indicate that many of the Sheriff's aggressive protocols for cleaning, distribution of soap, and provision of PPE have not been implemented. The Sheriff's office has had a month to change its hygiene protocols to combat

---

[11] County infection figures: State of Illinois, Coronavirus (COVID-19) Response, https://coronavirus.illinois.gov/s/ (last visited Apr. 6, 2020).  County population:  U.S. Census Bureau, https://www.census.gov/quickfacts/fact/table/cookcountyillinois/PST120218 (last visited Apr. 6, 2020).

[12] *Compare* Cook County Jail infection figures: Cook County Sheriff, https://www.cookcountysheriff.org/covid-19-cases-at-ccdoc/ (last visited Apr. 6, 2020), *with* Cook County Jail population figures: Cook County Sheriff, https://www.cookcountysheriff.org/wp-content/uploads/2020/04/CCSO_BIU_CommunicationsCCDOC_v1_2020_04_03.pdf (last visited April 6, 2020).

[13] The Cook County Sheriff has 3,439 employees. See Cook County Board—Current Budget Information, https://www.cookcountyil.gov/Budget. Plaintiffs do not include jail staff in the Jail's infection rate because it is unclear how many staff work within the Jail.  Additionally Jail staff work at, and are thus exposed to, the Jail only on certain days and for certain times of the day.  Indeed news reports suggest that staff have drastically reduced the time they spend at the jail in order to protect themselves, making their high infection rate all the more troubling. *See* Tyler Kendall, "We're at war with no weapons": Coronavirus cases surge inside Chicago's Cook County Jail," CBSNews (Apr. 5, 2020), https://www.cbsnews.com/news/chicago-cook-county-jail-coronavirus-life-inside-covid-19-cases/ (last visited Apr. 6, 2020) (reporting that Jail "employees, who interact closely with inmates on a daily basis, are now going in once a week and working from home the other four.").

[14] *See Supra*, pg. 1 n.1.

COVID-19. The employee and detainee reports indicate that it is incapable of actually implementing such changes in such a short time.

*Second*, there are evidently too many detainees in the jail to implement the social distancing and quarantining necessary to slow the spread of COVID-19. Social distancing is the *sine qua non* for stopping COVID-19's spread.[15] The Court need look no further than our collective experience: in the last few weeks, to achieve social distancing governments around the world have plunged national economies into likely economic depressions. Were other, less draconian measures capable of meaningfully slowing COVID-19's spread, there is no question that social distancing would never have been ordered.

And as Dr. Puisis and his colleagues explain, however, social distancing is effectively impossible in correctional settings, for the simple reason that jails and prisons were designed as congregate security environments where social isolation is impossible. Puisis *et al.*, Dkt. 1-2 ¶¶ 23-24.

*Third*, as Dr. Puisis *et al.* point out, quarantine can also rapidly become impossible in such a setting:

> Inmates are still being admitted into Cook County Jail. New inmates are being quarantined. Known or suspicious cases of COVID-19 require isolation from others. However, the housing units are not set up for mass quarantine or isolation. The jail was built with security in mind not medical isolation or quarantine. For purposes of quarantine, the jail is cohorting groups of incoming inmates into tiers for a period of time. Because inmates continue to be incarcerated in the Jail, invariably, this will result in a significant portion of the jail dedicated to quarantine. It is recommended that quarantine continue for 14 days. If any individual in the cohort becomes COVID-19 positive, the entire group is again quarantined again for another 14 days. As the number of persons in quarantine

---

[15] Centers for Disease Control, Coronavirus Disease 2019 (COVID-19): Social Distancing, Quarantine, and Isolation, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/social-distancing.html (last visited Apr. 6, 2020); Donald G. McNeil Jr., "Restrictions are Slowing Coronavirus Infections, New Data Suggest, N.Y. Times (Mar. 30, 2020), *available at* https://www.nytimes.com/2020/03/30/health/coronavirus-restrictions-fevers.html (last visited Apr. 6, 2020).

> grows, managing them clinically becomes insurmountable and will result in
> failure to manage.

Dkt. 1-2 ¶ 16 (footnote omitted).

In other words, the procedure for quarantine that Dr. Puisis describes—limited, as it must

be, by the physical structure of the Jail—does not effectively segregate potentially infected,

newly arriving detainees from one another, creating a need to quarantine larger and larger

segments of the Jail's population. Eventually, capacity to manage medically those who are in

quarantine will overwhelm Jail staff. Some of the detainee declarations attached to Plaintiffs'

complaint suggest that this may already be happening.

The exceptional and horrific rate of infection in the Jail and the systemic problems

identified in the Complaint—notwithstanding the Sheriff's insistence that everything possible is

being done—suggest a stark reality. Even after the Court would order the Sheriff to comply with

CDC Guidance, as Plaintiffs request the Court to do, it will become readily apparent (to the

extent it is not already) that *those measures alone will be insufficient to protect the class and*

*particularly the members of Subclass A from the unacceptable risk of infection and possible*

*death.* Therefore, in the interest of saving lives in this unprecedented health emergency the Court

should begin the process of setting up the three-judge panel that Section 3626(a)(3) requires to

address the release of some members of the Class, including but not limited to those detainees

most vulnerable to the disease.

Section 3626(a)(3)(A)(ii) provides that a release order may not be entered until the

defendant has had "a reasonable amount of time to comply with" the Court's Section 3626(a)(2)

order. "Reasonable" does not mean moderate or slow—it is a flexible standard designed to

match the exigencies of the moment. *Kentucky v. King*, 563 U.S. 452, 462 (2011)

(reasonableness requirement under the Fourth Amendment depends on the circumstances); *Tyler*

*v. Anderson*, 749 F.3d 499, 510 (6th Cir. 2014) ("reasonable time" as used in Federal Rule of Civil Procedure 60(b) "depends on the factual circumstances of each case"). *Cf. Black's Law Dictionary*, "Reasonable Time," (11th ed. 2019) ("The time needed to do what a contract requires to be done, based on subjective circumstances").

Indeed, the courts have already recognized that Section 3626(a)(3)(A)(ii)'s "reasonable amount of time" provision meets the exigencies of the COVID-19 epidemic. On April 4, the three-judge court in *Plata v. Newsom*, No. 90 C 0520, Dkt. 3261 (N.D. Cal. April 4, 2020) (attached as Ex. H), which had been impaneled years ago pursuant to an existing release order, held that Plaintiffs had not satisfied Section 3626(a)(3) because the three-judge court had been impaneled for purposes of granting different relief, and thus there had not been the requisite Section 3626(a)(2) order for which defendants had been given a "reasonable amount of time to comply." In its holding, however, the three-judge court made a point to emphasize that "[w]e recognize that what is reasonable in ordinary times may be quite different from what is reasonable in these extraordinary times." *Id.* at 7 n.9. In his concurrence, Chief Judge Mueller emphasized that, while Section (a)(2) had to be complied with first, under the circumstances of the COVID-19 epidemic, the Section (a)(3) release order could still be achieved quickly: "Given the availability of expedited proceedings before those district courts *to immediately exhaust the possibility of inmate transfers and relocations to secure facilities to achieve constitutionally acceptable conditions for the Plaintiff classes*, those proceedings must be invoked first. *Id.* at 15 (Mueller, J., concurring) (emphasis added).[16]

---

[16] If this Court determines that "reasonable time" as used in the PLRA contemplates some fixed, longer period, Plaintiffs respectfully submit that the provision would be unconstitutional as applied. Such an interpretation would unlawfully prevent the application of judicial equitable authority to save people's lives in the face of an unprecedented pandemic, *cf. Helling v. McKinney*, 509 U.S. 25, 33 (1993); *Estelle v. Gamble*, 429 U.S. 97, 103-04 (1976), and must be avoided. *See Jones v. United* States, 529 U.S. 848, 857 (2000) (quoting *United States ex rel. Attorney General v. Delaware & Hudson Co.*, 213 U.S. 366

Plaintiffs have every reason to believe that the efficacy of any Section (a)(2) order will be quickly exhausted. The Sheriff's office claims it has already acted with alacrity to stop the virus. Yet COVID-19 is exploding within the jail, and it is growing by the hour. By all appearances, the Sheriff's office simply does not have the wherewithal to stop the spread of that virus within the Jail's four walls, despite its efforts. Plaintiffs therefore respectfully suggest that 24 hours is a reasonable amount of time to comply with any Section (a)(2) order, and that thereafter the remedy of removal will likely be required.

## IV. Subclass B Seeks Transfer Within the Jurisdiction of the Sheriff in Response to a Growing Pandemic Inside the Jail, Relief That Satisfies the Need-Narrowness-Intrusiveness Criteria and Is Not a Prisoner-Release Order.

To remedy the spread of the disease, to which members of Subclass B members have already been exposed, the members of that subclass must be transferred to a safe facility or location within the Sheriff's jurisdiction and control. That relief could include transfer to home confinement or electronic home monitoring ("EHM"), which are programs under the Sheriff's control and supervision, or to any other safe condition of confinement.[17]

---

(1909)) ("where a statute is susceptible of two constructions, by one of which grave and doubtful constitutional questions arise and by the other of which such questions are avoided, our duty is to adopt the latter."); *Gilmore v. California*, 220 F.3d 987, 998 (9th Cir. 2000) (9th Cir. 2000) ("The courts will therefore not lightly assume that Congress intended to infringe constitutionally protected liberties or usurp power constitutionally forbidden it.") (citing *DeBartolo Corp v. Florida Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 575 (1988); *see also NLRB v. Catholic Bishop of Chicago*, 440 U.S. 490, 500 (1979) ("[A]n Act of Congress ought not be construed to violate the Constitution if any other possible construction remains available.").

[17] Subclass B Plaintiffs do not seek release from CCDOC custody, and thus this request does not implicate the mandates of *Preiser v. Rodriguez*, 411 U.S. 475 (1973). *Cf. Glaus v. Anderson*, 408 F.3d 382, 386 (7th Cir. 2005) ("In *Preiser v. Rodriguez*, the Supreme Court held that the writ of habeas corpus was the exclusive civil remedy for prisoners seeking release from custody.").

A.     **Plaintiffs' Requested Transfer Is Within the Court's Equitable Authority and Does Not Require the Sheriff to Exceed His Statutorily Prescribed Authority.**

Nothing in the PLRA displaces district courts' "broad equitable powers to order the transfer of inmates to facilities better equipped to provide for their medical needs." *Reaves v. Dep't of Correction,* 392 F.Supp.3d 195, 209-10 (D. Mass. 2019) (stay pending appeal denied, 404 F. Supp. 3d 520) (citing *Johnson v. Harris*, 479 F. Supp. 333 (S.D.N.Y. 1979) (ordering prison to either transfer inmate to facility equipped to provide for his medical needs or to insure he is provided with adequate care stemming from prison's deliberate indifference to inmate's serious medical needs); *United States v. Wallen*, 177 F. Supp. 2d 455, 458 (D. Md. 2001) (ordering transfer of pretrial detainee to a hospital since "the Marshal's Service cannot assure this Court that it will provide the medical care that the Constitution mandates so long as he is held at MCAC").[18] This court, accordingly, may—and indeed must—order the transfer of prisoners from a facility infected with COVID-19 to another location within the Sheriff's control (where they will remain in the Sheriff's custody) to ensure that they receive constitutionally adequate medical care and are protected from physical harm. *Cf. Farmer v. Brennan*, 511 U.S. 825, 847 (1994) (prison official can be liable "for denying humane conditions of confinement" where "he knows inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it."); *Petties v. Carter*, 836 F.3d 722, 729 (7th Cir. 2016) ("If a risk from a particular course of medical treatment (*or lack thereof*) is obvious

---

[18] *See also, e.g.,* ABA Standards for Criminal Justice, 23-6.2 (3d ed. 2011) ("A prisoner who requires care not available in the correctional facility should be transferred to a hospital or other appropriate place for care."); *cf. Murphy v. Lane*, 833 F.2d 106 (7th Cir. 1987) (court could consider plaintiff's civil rights claim for retaliatory transfer stemming from prison officials' transfer of plaintiffs to different prison less well-equipped to handle his psychiatric needs).

enough, a factfinder can infer that a prison official knew about it and disregarded it.") (citations omitted) (emphasis added).

And transfers of detainees are in fact directly contemplated by the Sheriff's state law authority under the County Jail Act, 730 ILCS 125/14, which states:

> At any time, in the opinion of the Warden, the lives or health of the prisoners are endangered or the security of the penal institution is threatened, to such a degree as to render their removal necessary, the Warden may cause an individual prisoner or a group of prisoners to be removed to some suitable place within the county, or to the jail of some convenient county, where they may be confined until they can be safely returned to the place whence they were removed.

Under the County Jail Act, transfer within the county includes to Electronic Home Monitoring (EHM), a program that is administered by the Sheriff. As the Sheriff emphasized in separate litigation concerning EHM, a case that was recently heard in the Seventh Circuit, it is solely within his Office's discretion whether to place pre-trial individuals in his custody on Electronic Monitoring: "Whether a given pretrial defendant is placed in the Sheriff's EHM Program as a condition of bond is a discretionary decision of the Sheriff's custody of prisoners on electronic monitoring." Br. of Defendant Appellees at 8 (attached as Ex. A), *Williams v. Dart*, Case No. 19-02108 (7th Cir.); *see also id*. at 7-8 ("The Sheriff's pretrial EHM Program is not a creature of statute—it is his own. Sheriff Dart has discretion to set parameters or guidelines for admission into his program. Whether a given pretrial defendant is placed in the Sheriff's EHM Program as a condition of bond is a discretionary decision of the Sheriff's.").

Anyone transferred to the Sheriff's EHM program as part of the requested relief requested by Subclass B would be subject not only to the conditions of that program as administered by the Sheriff, but by the strict conditions imposed by the Governor's emergency order, which prohibits non-essential travel and engaging in non-essential business, and mandates

19

everyone in the state to stay at their home or place of residence except when engaging in essential activities.[19]

### B. The Requested Relief is Not a Prisoner Release Order.

An order mandating the removal of Subclass B prisoners from the Jail to another location in the Sheriff's custody, including but not limited to EHM, does not constitute a "prisoner-release order" as envisioned by 18 U.S.C. § 3626(a)(3), and thus does not mandate the impaneling of a three-judge panel, for two reasons.

*First*, the relief does not constitute a prisoner-release order because it does not concern prison crowding, which is what the relevant provision of the PLRA was enacted to address. For more than two decades, district courts have found that Section 3626(a)(3) does not apply to orders remedying violations of federal rights other than overcrowding. In *Doe v. Younger*, No. 91-187 (E.D. Ky. Sept. 4, 1996), Op. and Order (attached as Ex. B) at 10-12, the district court banned the housing of juveniles for more than 15 days in jail, where conditions were unacceptable for children. The court held that this was not a prisoner release order requiring a three-judge court under the PLRA, even where it had the effect of reducing the number of children in the facility: "[T]he court's order does not direct the release of any child. It is undisputed that counties . . . often house juveniles in need of a secure facility in other counties. In fact, such transfers from facilities in one county to facilities in another county or even another state are extremely common. Indeed, the Kentucky Juvenile Code specifically contemplates such transfers."

---

[19] *See supra,* Executive Order n.5. The applicability of the stay-at-home order to any class members transferred within the Sheriff's jurisdiction is also relevant to the PLRA's "needs-narrowness-intrusiveness" analysis, discussed in Part C, *infra*.

In *Plata v. Brown*, No. C01-1351-TEH, 2013 WL 3200587, at *8-10 (N.D. Cal. June 24, 2013), the court was faced with the sweeping transmission of coccidioidomycosis, or Valley Fever, "an infectious disease caused by inhalation of a fungus," in certain prisons within the California state prison system. *Id.* at *2. The court granted an exclusionary order for medically vulnerable prisoners, rejecting the defendants' argument that the PLRA barred the requested relief unless issued by a three-judge court:

> Here, looking at the [PLRA] statute as a whole requires reading the definition of "prisoner release order" in conjunction with the requirements for entering one. One such requirement is that a three judge court must determine, by clear and convincing evidence, that "crowding is the primary cause of the violation of a Federal right," before it can enter a prisoner release order. 18 U.S.C. § 3626(a)(3)(E)(i). Consequently, adopting Defendants' interpretation of "prisoner release order" would mean that a court could only order that prisoners be transferred from one prison to another if overcrowding were the primary cause of the violation of those prisoners' rights, and not if any other reason were causing the violation. Defendants have failed to point to anything in the legislative history that indicates an intent to limit the protection of inmates' constitutional rights in this manner . . . .

*Id.* at *9; *see also Reaves*, 404 F. Supp. 3d at 523 (same).

The *Plata* Court emphasized that "a statute should not be construed to displace courts' traditional equitable powers [a]bsent the clearest command to the contrary." *Id.* at * 9 (citing *Gilmore v. California*, 220 F.3d 987, 997 n.12, and *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 313 (1982) ("Unless a statute in so many words, or by a necessary and inescapable inference, restricts the court's jurisdiction in equity, the full scope of that jurisdiction is to be recognized and applied." (quotation marks and citations omitted))). And the PLRA's legislative record indicates that Congress did not intend to limit courts' ability to move or transfer prisoners as a result of other (non-crowding) constitutional violations—including those presented here. *See Reaves*, 404 F. Supp. 3d at 523 ("Accepting Defendants argument would mean that the only way a district court can order the release of a prisoner is for a violation of his constitutional rights

where overcrowding caused the violation, but not if any other reason caused the violation. Defendants have failed to present anything in the legislative history which evidences Congressional intent to limit the protection of inmates' constitutional rights in this way—presumably because there is no such history.").

In reaching their conclusions that the PLRA did not preclude orders that transferred medically vulnerable inmates, both the *Doe* Court and the *Plata* Court found the PLRA's legislative history to be consistent with the relief Plaintiffs seek here, because Congress enacted the PLRA's restrictions out of concern with prison population caps. *See*, *e.g.*, *Plata*, 2013 WL 3200587, at *9 ("Sponsors of the PLRA were especially concerned with courts setting 'population caps' and ordering the release of inmates as a sanction for prison administrators' failure to comply with the terms of consent decrees designed to eliminate overcrowding.") (citing *Gilmore v. California*, 220 F.3d 987, 998 n.14 (9th Cir. 2000)); *Doe v. Younger*, Ex. B, at 11 ("After reviewing the substantive provisions concerning prisoner release orders and the legislative history underlying this provision of the PLRA, it is clear that the prisoner release order provisions are directed at prison caps, *i.e.*, orders directing the release of inmates housed in a particular institution once that institution houses more than a specific number of persons. This is not that kind of case."); *see also* 141 Cong. Rec. S14414 (daily ed. Sept. 27, 1995) (remarks of Sen. Dole) (attached as Ex. C) ("Perhaps the most pernicious form of micromanagement is the so-called prison population cap…. By establishing tough new conditions that a Federal court must meet before issuing a prison cap order, this bill will slam-shut the revolving prison door."); Margo Schlanger, *Anti-Incarcerative Remedies for Illegal Conditions of Confinement*, 6 U. Miami Race & Soc. Just. L. Rev. 1, 27-28 (2016) (attached as Ex. D) (collecting congressional testimonies and reports identifying federal court-imposed prison population caps as the target of

the PLRA). Senators who supported Section 3626's restrictions did so expressly in response to federal court decisions "dictat[ing] prison population size and order[ing] excess prisoners released." 142 Cong. Rec. S10576-02, 1996 WL 522797 (remarks of Sen. Abraham) (attached as Ex. E). Indeed, an earlier version of a bill similar to the PLRA made direct reference to this purpose. The proposed amendment to Section 3626(a)(2), concerning "any relief whose purpose or effect is to reduce or limit the prison population" was specifically titled, "Restrictions on Court-Ordered Relief In Prison Overcrowding Cases." *See* Judicial Impact Statement, Violent Criminal Incarceration Act of 1995, H.R. 667 (June 21, 1995) (attached as Ex. F), at 4.[20]

*Second*, the requested relief is not the release of prisoners but only the *transfer* of those class members to another jurisdiction under the Sheriff's control (*i.e.*, on EHM, as set forth in Part A, *supra*), to remedy an undeniable and growing health crisis. Accordingly, Section 3626(a)(3) does not apply. *See Doe v. Younger*, Ex. B, at 12 ("[T]he court's order does not direct the release of any child."); *see also Plata*, 2013 WL 3200587, at *8 (prison-release order provisions of PLRA did not apply to order granting Plaintiffs' motion for mass transfer of prisoners in response to outbreak of infectious disease in California correctional facilities); *Reaves*, 404 F. Supp. 3d at 523 (holding that a three-judge panel was not required for order of transfer of quadriplegic prisoner to a non-corrections facility in which he would be treated by a physician with training to care for his substantial and numerous medical needs, as remedy for defendants' failure to provide adequate medical care).

---

[20] If Section 3626 is interpreted to preclude prisoner transfer to address an imminent risk of serious illness or death arising from a deadly virus, this provision would also be unconstitutional as applied for the same reasons set forth in Section III, *supra* n.16.

### C. The Relief Requested for Subclass B is Narrowly Drawn, Extends No Further than Necessary, and is the Least Intrusive Means Necessary to Address the Violations at Stake.

The relief requested for Subclass B, like the relief requested for the Class as a whole, meets the need-narrowness-intrusiveness criteria in Section 3626(a). Because of the gravamen of the underlying complaint, which implicates literal matters of life or death, there is a strong fit between the violations at stake (the exposure of incarcerated individuals to conditions of confinement that threaten their health and safety), *see Helling*, 509 U.S. at 33, and the requested remedy (an order requiring the Sheriff to impose essential safeguards like social distancing and medical care or, to transfer prisoners from the physical facility where those conditions exist). *See Reeves*, 404 F.Supp.3d at 524 (transfer order met PLRA's narrow tailoring requirements where inmate would die if he was not moved); *cf. Morales Feliciano,* 378 F.3d at 54 ("The narrowness-need-intrusiveness criteria are, to some extent, self-explicating . . . . The application of those criteria is case-specific and must be undertaken in light of both the magnitude of existing constitutional violations and the available alternative remedies."). As discussed more fully above, the Jail is facing a crisis the likes of which has not been seen before. Subclass B members have already been exposed and therefore urgently require transfer to a safe place until the pandemic is over. District courts (including several in this Circuit) have granted a prisoner's request for preliminary injunctive relief in far less urgent situation circumstances than are facing Plaintiffs in this Court.[21]

---

[21] *See, e.g., Abu-Jamal v. Wetzel,* 2017 WL 34700, at *12-20 (M.D. Pa. Jan. 3, 2017) (granting preliminary injunction requiring treatment of plaintiff's Hepatitis C with direct-acting antiviral medication such as Harvoni); *Norsworthy v. Beard*, 87 F.Supp.3d 1164, 1195 (N.D. Cal. 2015) (granting preliminary injunction to "provide Plaintiff with access to adequate medical care, including sex reassignment surgery"), *appeal dismissed as moot and remanded*, 802 F.3d 1090 (9th Cir. 2015); *Francis v. Hammond,* 2013 WL 12167887, at *6-7 (W.D. Wash. Mar. 4, 2013) (recommending preliminary injunction requiring orthopedic evaluation of plaintiff's shoulder injury), *report and recommendation adopted*, 2013 WL 12167888 (W.D. Wash. Apr. 10, 2013); *McNearney v. Washington Dep't of Corrs.*,

Finally, because whatever order this Court enters will leave full control and supervisory authority of the class members with the Sheriff and his correctional staff, there is little risk that the relief would adversely impact the criminal justice system. *Compare Turner v. Clelland*, 2016 WL 1069665, *4 (M.D.N.C., Mar. 16, 2016) (citing adverse impact provision in denying relief requiring "involving a federal court in the day-to-day administration of a prison").

## CONCLUSION

In summary, Plaintiffs' requests for injunctive relief under Section 1983 meet the PLRA's need-narrowness-intrusiveness requirements because they seek narrowly drawn injunctive relief that extends no further than what is required to correct the significant and ongoing constitutional violation. Neither of Plaintiffs' current requests for Section 1983 injunctive relief constitutes a prisoner release order and thus the requirements of 18 U.S.C. 3626(a)(3) do not apply. Given the imminent threat facing the Jail, however, Plaintiffs believe

---

2013 WL 392490, at *2-3 (W.D. Wash. Jan. 9, 2013) (noting prior order to provide required medical care, modifying order to terminate upon the plaintiff's impending release, which might occur before surgery could be performed, to make the order narrowly drawn and least intrusive), *report and recommendation adopted*, 2013 WL 392489 (W.D. Wash. Jan. 31, 2013); *Mitts v. Obandina*, 2012 WL 4060013, at *2 (S.D. Ill. Aug. 27, 2012) (granting preliminary injunction to provide prescribed medical care, holding order "the least intrusive means to correct the treatment deficiency"), *report and recommendation adopted*, 2012 WL 4059982 (S.D. Ill. Sept. 14, 2012); *Chan v. County of Sacramento*, 2011 WL 2636262, at *4 (E.D. Cal. July 5, 2011) (recommending preliminary injunction requiring defendants to have plaintiff examined by an independent dentist competent to perform root canals, permanent fillings, and dentures in order to develop and act on a treatment plan, though declining to recommend specific procedures); *Flynn v. Doyle*, 630 F.Supp.2d 987, 993-94 (E.D. Wis. 2009) (preliminarily enjoining defendants to submit a plan to ensure that medication is dispensed by persons with credentials equal to Licensed Practical Nurses, that they are trained in prison procedures, and that medication orders are timely processed and dispensed); *Perez v Cate*, 2009 WL 440508, at *4-5 (N.D. Cal. Feb. 23, 2009) (granting modification of stipulated injunction providing for improved dental care to prohibit the out of state transfer of prisoners who require dental care within 120 days; rejecting plaintiff's proposal to stop the transfers entirely pending creation of a revised screening process as not narrowly tailored and least intrusive); *Farnam v. Walker*, 593 F.Supp.2d 1000, 1017-18 (C.D. Ill. 2009) (preliminarily enjoining defendants to get the patient to an accredited Cystic Fibrosis Center for examination by a board-certified pulmonologist, and implement that specialist's medical treatment recommendations; specifying treatment to be provided pending that examination); *see also Plata*, 2013 WL 3200587 at *14-15 (directing removal of prisoners at risk for Valley Fever from prisons where it was prevalent; relying on expert evidence and professional society standards in determining compliance with § 3626).

that a three-judge panel should be convened in the event that immediate compliance with the

Constitution is not achieved to protect Class Members from further harm.

Respectfully submitted,

/s/ Sarah Grady
Sarah Grady
Attorney for Plaintiffs

Stephen Weil
Sarah Grady
Loevy & Loevy
311 North Aberdeen St., 3rd Fl.
Chicago, IL 60607
(312) 243-5900

Locke E. Bowman
Alexa A. Van Brunt
Roderick and Solange MacArthur Justice Center
Northwestern Pritzker School of Law
375 East Chicago Ave.
Chicago, IL 60611
(312) 503-0884

Charles Gerstein (*pro hac vice* application pending)
Alec Karakatsanis (*pro hac vice* application forthcoming)
Civil Rights Corps
1601 Connecticut Ave NW, Ste. 800
Washington, DC 20009
(202) 894-6128

## <u>CERTIFICATE OF SERVICE</u>

I, Sarah Grady, an attorney, hereby certify that on April 6, 2020, I caused a copy of the foregoing to be filed using the Court's CM/ECF system, which effected service on all counsel of record.

/s/ Sarah Grady
Sarah Grady
Attorney for Plaintiffs