# EXHIBIT H

IN THE UNITED STATES DISTRICT COURTS

FOR THE EASTERN DISTRICT OF CALIFORNIA

AND THE NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES DISTRICT COURT COMPOSED OF THREE JUDGES

PURSUANT TO SECTION 2284, TITLE 28 UNITED STATES CODE

| | |
|---|---|
| RALPH COLEMAN, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>GAVIN NEWSOM, et al.,<br><br>Defendants. | Case No. 2:90-cv-0520 KJM DB P<br><br>**THREE-JUDGE COURT** |
| MARCIANO PLATA, et al.,<br><br>Plaintiff,<br><br>v.<br><br>GAVIN NEWSOM, et al.,<br><br>Defendants. | Case No. 01-cv-01351-JST<br><br>**THREE-JUDGE COURT**<br><br>**ORDER DENYING PLAINTIFFS' EMERGENCY MOTION TO MODIFY POPULATION REDUCTION ORDER** |

Before: WARDLAW, Circuit Judge, MUELLER, Chief District Judge, and TIGAR, District Judge

We are living in unprecedented times. The spread of COVID-19 is a global crisis, a crisis that is heightened in the most vulnerable groups among us. One such group is before us today. Plaintiffs, two classes of inmates incarcerated in California state prisons, have filed a motion asking us to order the state to release an unspecified, but significant, number of prisoners so that the prison population can be reduced to a level sufficient to allow physical distancing to prevent the spread of COVID-19—which, in Plaintiffs' view, requires that prisoners who live in dorm-style environments be housed six feet apart from one another. ECF No. 3219/6522.[1]

While we cannot know with certainty due to the pathogenesis of the virus, it appears that

---

[1] All filings in this Three-Judge Court are included in the individual docket sheets of both *Plata v. Newsom*, No. 01-cv-01351-JST (N.D. Cal.), and *Coleman v. Newsom*, No. 2:90-cv-0520 KJM DB P (E.D. Cal.). The Court cites to the docket number of *Plata* first, then *Coleman*.

COVID-19 has not yet surged in California's prisons. Thus far, only thirteen inmates have confirmed cases of the disease. Cal. Dep't of Corr. & Rehab., *Population COVID-19 Tracking*, https://www.cdcr.ca.gov/covid19/population-status-tracking/ (last visited Apr. 4, 2020). And, to their credit, Defendants[2] have already taken steps to combat the virus, including taking measures to reduce the prison population. But given the undisputed risk of further contagion in a carceral environment,[3] Plaintiffs' desire to maximize the reduction in the state's prison population is understandable.

We conclude, however, that under Federal Rule of Civil Procedure 60(b)(5) and the Prison Litigation Reform Act (PLRA), 18 U.S.C. § 3626, Plaintiffs' emergency motion for relief based on COVID-19 is not properly before us. This three-judge court was first convened in 2007 to consider a different issue: whether a release of prisoners was necessary to remedy California's structural failure to provide constitutionally adequate medical and mental health care services to inmates incarcerated in the state's prisons. We are therefore bound to deny Plaintiffs' motion. However, we do so without prejudice to Plaintiffs' seeking relief in a procedurally appropriate forum, including the individual *Coleman* and/or *Plata* courts.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. Procedural History

Given the exigency of the circumstances before us, we provide only a brief procedural history here.[4] The proceedings before this three-judge court began long ago as two separate cases: *Coleman*, filed in 1990 in the Eastern District of California, alleged that Defendants were failing to provide constitutionally adequate mental health care services to inmates with serious mental disorders. *Plata*, filed in 2001 in the Northern District of California, alleged that Defendants were

---

[2] Defendants are various California state officials, including Governor Gavin Newsom.

[3] *See, e.g.*, *167 Inmates at Cook County Jail Confirmed Positive for COVID-19*, Chi. Sun Times (Apr. 1, 2020), https://chicago.suntimes.com/coronavirus/2020/4/1/21203767/cook-county-jail-coronavirus-positive-covid-19 (reporting that 167 pre-trial detainees housed at the Cook County, Ill. jail tested positive for COVID-19 over a ten-day span).

[4] The history of these proceedings is chronicled more thoroughly in a 2009 order of our court, *Coleman v. Schwarzenegger*, 922 F. Supp. 2d 882 (E.D. Cal./N.D. Cal. 2009), and the Supreme Court's decision in *Brown v. Plata*, 563 U.S. 493 (2011).

2

failing to provide constitutionally adequate medical care.

The individual *Coleman* and *Plata* courts entered numerous remedial orders, including appointing a Special Master to oversee remedial efforts in *Coleman* and a Receiver to take control of the medical care delivery system in *Plata*. These measures failed to cure the constitutional deficiencies, and in 2007, both courts concluded that, absent a reduction in the state prison population—which was then almost double the prison system's design capacity—Defendants would never be able to deliver constitutionally adequate medical and mental health care.

Because they were not individually empowered to order a release of prisoners from California's prisons, the *Plata* and *Coleman* courts granted Plaintiffs' separate motions to convene a three-judge court to consider the issue. *See* 18 U.S.C. § 3626(a)(3)(B) (providing that a prisoner release order can be entered only by a three-judge court). The Chief Judge of the United States Court of Appeals for the Ninth Circuit appointed this three-judge court in both cases to determine whether a release order was appropriate.[5] *See Brown v. Plata*, 563 U.S. 493, 500 (2011) ("Because the two cases are interrelated, their limited consolidation for this purpose has a certain utility in avoiding conflicting decrees and aiding judicial consideration and enforcement.").

After holding a fourteen-day trial, we concluded that a significant reduction in the state prison population was the only way to bring Defendants into compliance with their constitutional obligations to provide adequate medical and mental health care services. *See generally Coleman v. Schwarzenegger*, 922 F. Supp. 2d 882 (E.D. Cal./N.D. Cal. 2009) ("*Coleman I*"). We therefore ordered Defendants to reduce California's prison population to 137.5% design capacity within two years. *Id.* at 970.

Defendants appealed, and the Supreme Court affirmed.[6] *Plata*, 563 U.S. 493. The Court held that the PLRA's requirements for entering a prisoner release order were satisfied, *see* 18

---

[5] The original members of the three-judge court, the Hon. Stephen Reinhardt, Circuit Judge; the Hon. Lawrence K. Karlton, District Judge; and the Hon. Thelton E. Henderson, District Judge, have since been replaced by its current members: the Hon. Kim McLane Wardlaw, Circuit Judge; the Hon. Kimberly J. Mueller, Chief District Judge; and the Hon. Jon S. Tigar, District Judge.

[6] By statute, a three-judge district court order granting a permanent injunction may be appealed directly to the Supreme Court. 28 U.S.C. § 1253.

3

1  U.S.C. § 3626, and that there was ample evidence supporting our conclusion that crowding was
2  the primary cause of the constitutional violations in California's delivery of medical and mental
3  health services in its prison system. *Plata*, 563 U.S. at 517–530. It also concluded that the
4  137.5% population cap we ordered was "narrowly drawn, extend[ed] no further than necessary to
5  correct the violation of [the] federal right, and [was] the least intrusive means necessary to correct
6  the violation," and that we gave appropriate "substantial weight" to public safety, as the PLRA
7  requires. *Id.* at 530–41; *see* 18 U.S.C. § 3626(a). At the same time, the Supreme Court
8  recognized our ability to modify our remedial order as necessary:

> The three-judge court, however, retains the authority, and the responsibility, to make further amendments to the existing order or any modified decree it may enter as warranted by the exercise of its sound discretion. "The power of a court of equity to modify a decree of injunctive relief is long-established, broad, and flexible." *New York State Assn. for Retarded Children, Inc. v. Carey*, 706 F.2d 956, 967 (C.A.2 1983) (Friendly, J.). A court that invokes equity's power to remedy a constitutional violation by an injunction mandating systemic changes to an institution has the continuing duty and responsibility to assess the efficacy and consequences of its order. *Id.*, at 969–971. Experience may teach the necessity for modification or amendment of an earlier decree. To that end, the three-judge court must remain open to a showing or demonstration by either party that the injunction should be altered to ensure that the rights and interests of the parties are given all due and necessary protection.

*Plata*, 563 U.S. at 542–43.

Two years after the Supreme Court affirmed our prison population reduction order, Defendants asked us to terminate that order even though they had not yet complied with it. *Coleman v. Brown*, 922 F. Supp. 2d 1004, 1008 (E.D. Cal./N.D. Cal. 2013) ("*Coleman II*"). Plaintiffs filed a cross-motion asking us to impose institution-specific population caps to supplement the system-wide 137.5% cap that we had already ordered. *Id.* We denied both requests. *Id.* We concluded, among other things, that Defendants had failed to demonstrate that they could provide constitutionally adequate medical and mental health care with a prison population that exceeded 137.5% design capacity. *Id.* at 1034–43. At the same time, we concluded that Plaintiffs' request for institution-specific caps was premature because, until Defendants met the systemwide 137.5% cap, it was difficult to determine whether additional relief was necessary. *Id.* at 1048.

4

In 2015, Defendants succeeded, for the first time, in reducing the statewide prison population to less than 137.5% design capacity. The population has remained below that benchmark ever since.[7] Since that time, we have largely stepped back as the individual *Coleman* and *Plata* courts have continued to work to ensure that California provides constitutionally adequate medical and mental health services to its inmates.

### B. Plaintiffs' Emergency Motion Based on COVID-19

On March 25, 2020, Plaintiffs filed the motion currently before us, which they have styled as an "Emergency Motion to Modify Population Reduction Order." ECF No. 3219/6522. The motion asks us to order Defendants to release to parole or post-release community supervision certain categories of inmates, including those who are scheduled to parole within a year and are either (a) low risk, as determined by the California Department of Corrections and Rehabilitation's (CDCR) risk assessment tool or (b) serving time for a non-violent offense. *Id.* at 27. Plaintiffs also ask us to require Defendants to release or relocate inmates who, because of their age or other medical conditions, are at a high risk of developing a severe form of COVID-19. *Id.* at 27–28. While Plaintiffs have not put forth a specific number of inmates that they believe should be released, they argued at the April 2, 2020 telephonic hearing on this motion that Defendants must release as many inmates as would be required to allow all remaining inmates to practice physical distancing, especially those who reside in crowded dorm housing.

Although the current record is unclear as to when Defendants began planning a response to COVID-19, they started implementing preventive measures at least as of March 11, 2020, when normal visiting at CDCR institutions was canceled statewide, fact sheets and posters on the pandemic were delivered to the inmate population, and additional hand-sanitizing dispenser stations were ordered. ECF No. 3241-1/6553-1. CDCR has activated "a centrally-located command center where CDCR and CCHCS [California Correctional Health Care Services] experts monitor information, prepare for known and unknown events, and exchange information centrally

---

[7] As of the most recent status report filed with us on March 16, 2020, California's prison population is at 134.4% design capacity. ECF No. 3213/6502 at 2.

5

1   in order to make decisions and provide guidance quickly." ECF No. 3240/6553-2 ¶ 4 (Gipson
2   Decl.). The center's "goal is to implement measures and strategies to protect inmates and staff
3   during the COVID-19 pandemic and to enhance social distancing and housing options during this
4   time." *Id.*

5   On March 24, 2020, California Governor Gavin Newsom issued an executive order
6   directing CDCR to suspend admission of inmates to state custody for 30 days, with the possibility
7   that the suspension would be extended for an additional 30 days. ECF No. 3241/6553 ¶ 4 (Diaz
8   Decl.). On March 30, 2020, CDCR Secretary Ralph Diaz announced that release would be
9   accelerated for inmates who have less than sixty days remaining on their sentence, are not serving
10  a term of incarceration for a violent felony or a domestic violence offense, and are not required to
11  register as a sex offender. *Id.* ¶ 5. These last two measures are expected to result in an
12  approximately 6,500-person reduction in the prison population over the coming weeks.[8] *Id.* ¶¶ 4–
13  7.

14  Defendants oppose Plaintiffs' motion, arguing both that their response to COVID-19 so far
15  has been constitutionally sufficient, and that the motion is not properly before this three-judge
16  court because the relief it seeks is, in substance, a *new* prisoner release order, rather than a
17  modification of our 2009 order imposing the 137.5% population cap. ECF No. 3235/6552.

18  **II.   DISCUSSION**

19  Whether Plaintiffs' motion is properly viewed as a modification request is a critical
20  question. For one, it bears on whether the motion is properly before our three-judge court. But
21  even if the motion were properly before us, the PLRA places significant restrictions on a federal
22  court's authority to order the release of prisoners as a remedy for a constitutional violation. *See* 18
23  U.S.C. § 3626. For example, a prisoner release order may be entered only if "(i) a court has
24  previously entered an order for less intrusive relief that has failed to remedy the deprivation of the
25  Federal right sought to be remedied through the prisoner release order; and (ii) the defendant has

---

[8] Defendants have also taken additional steps to combat COVID-19, including but not limited to transferring approximately 500 inmates out of dorm housing, suspending transfers between facilities, and conducting temperature checks and symptom screenings of all individuals entering the prisons. *E.g.*, ECF No. 3240/6553-2 ¶¶ 6–11.

6

had a reasonable amount of time to comply with the previous court orders." *Id.* § 3626(a)(3)(A)(i)–(ii). Plaintiffs argue that our 2009 order imposing the 137.5% population cap satisfies the PLRA's requirement of a prior order for less intrusive relief. ECF No. 3219/6522 at 31–32. If, however, the relief they seek is not actually a modification of the 2009 order but rather *new* relief based on the *new* threat of harm posed by COVID-19, Plaintiffs likely cannot satisfy the prior order requirement at this point because there have not yet been any orders requiring Defendants to take measures short of release to address the threat of the virus; nor have Defendants had a reasonable time in which to comply.[9]

In arguing that their motion properly seeks to modify our 2009 order imposing the population cap, Plaintiffs rely on Federal Rule of Civil Procedure 60(b)(5), which grants courts authority to "relieve a party . . . from a final judgment" if "applying it prospectively is no longer equitable." We have previously recognized that Rule 60(b)(5) may provide us with authority to modify our 2009 order in appropriate circumstances. *Coleman II*, 922 F. Supp. 2d at 1025–27 (citing *Rufo v. Inmates of Suffolk Cty. Jail*, 502 U.S. 367 (1992)). But we may only modify the order to the extent necessary to ensure that the remedial structure remains tailored to cure the constitutional violations previously found by the *Coleman* and *Plata* courts. *See id.* at 1048 (refusing to modify the 2009 order because it was not yet clear whether the 137.5% design capacity cap would be sufficient to cure the constitutional defects in Defendants' prison health care system). Rule 60(b)(5) does not provide us with free-standing authority to remedy any harm Defendants may inflict upon Plaintiffs, regardless of whether it is tethered to the previous findings of structural constitutional shortcomings in the delivery of medical and mental health care. *Cf. Parsons v. Ryan*, 912 F.3d 486, 501 (9th Cir. 2018) (explaining that a modification of relief was appropriate because it was not issued "in response to new violations of federal rights").

Plaintiffs argue that the potential harm posed by COVID-19 is attributable to the constitutional violations that have been previously found in these cases because "[p]reventing the spread of a dangerous, contagious illness is plainly a requirement of an adequate medical care

---

[9] We recognize that what is reasonable in ordinary times may be quite different from what is reasonable in these extraordinary times.

7

1 system." ECF No. 3248/6558 at 3–4. As a general matter, we agree that the Eighth Amendment
2 requires Defendants to take adequate steps to curb the spread of disease within the prison system.
3 Indeed, disease control is one of the areas in which the *Plata* court previously concluded that
4 Defendants fell short. *See Coleman I*, 922 F. Supp. 2d at 896. For example, the *Plata* court
5 previously found that the prison intake process, "which was designed to allow medical staff to
6 identify inmates' medical issues, including communicable diseases, . . . was woefully inadequate."
7 *Id.* (describing a finding of the *Plata* court in *Plata v. Schwarzenegger*, No. 01-1351-TEH, 2005
8 WL 2932254, at *12 (N.D. Cal. Oct. 3, 2005)). It also found that exam tables and counter tops
9 where prisoners with infectious diseases were treated "were not routinely disinfected or sanitized."
10 *See id.* at 896 (quoting *Plata*, 2005 WL 2932253, at *14); *see also Plata*, 563 U.S. at 508 (citing
11 this fact in affirming the population cap order). Still, Defendants' inability to control disease was
12 only one symptom of an overall failure to provide inmates with access to constitutionally adequate
13 health care services.

14 Here, however, the impetus for the release order Plaintiffs seek is different from the
15 overarching structural violations underlying the 2009 population reduction order. The specific
16 harm Plaintiffs allege is not caused by constitutional shortcomings in Defendants' ability to
17 provide medical and mental health services. Indeed, Plaintiffs' own expert acknowledges that
18 California's inmates would still face a substantial risk of harm from COVID-19 "even if the health
19 care delivery system were constitutionally adequate." ECF No. 3219-4/6524 ¶ 19 (Stern Decl.).
20 That the harm Plaintiffs face is not dependent on the existence of a constitutionally inadequate
21 health care delivery system is strong evidence that it is rooted in a significantly different
22 underlying cause than what was before us in the prior three-judge court proceedings.

23 While the threat posed by COVID-19 is undoubtedly medical, the particular risks the
24 disease poses to prisoners are primarily a function of the contagiousness of the virus and the
25 nature of incarceration. There is no vaccine for COVID-19. Thus far, the only way to stop its
26 spread is through preventive measures—principal among them maintaining physical distancing
27 sufficient to hinder airborne person-to-person transmission. *See* ECF No. 3221-1/6259-1 at 109
28 (CDC, *Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in*

8

1  *Correctional and Detention Facilities*) (describing physical distancing as a "cornerstone" of
2  reducing transmission of COVID-19). Creating physical distancing is uniquely difficult in a
3  congregate environment like a prison.[10] *Id.* But crucially, this is a problem shared by *all* prisons,
4  not just those with foundering health care delivery systems. *See id.* at 107–10.

That is not to say that Defendants have no constitutional obligation to take steps to prevent the spread of COVID-19 within California's prisons. Defendants themselves acknowledge that the virus presents a "substantial risk of serious harm" and that the Eighth Amendment therefore requires them to take reasonable measures to abate that risk. ECF No. 3235/6552 at 17; *see Farmer v. Brennan*, 511 U.S. 825, 847 (1994); *Helling v. McKinney*, 509 U.S. 25, 33 (1993) (noting that prison officials may not "ignore a condition of confinement that is sure or very likely to cause serious illness and needless suffering the next week or month or year"). But we conclude that any constitutional violation in Defendants' current response to the COVID-19 crisis is different, in both nature and degree, from the violations underlying the 2009 population cap order. That order was never intended to prepare Defendants to confront this unprecedented pandemic. Nor could it have, given that the entire world was unprepared for the onslaught of the COVID-19 virus.

We therefore conclude that to the extent Plaintiffs can establish a constitutional violation based on the threat posed by COVID-19, it must be based on shortcomings in Defendants' response to the virus, not on the longstanding systemic constitutional deficiencies in California's prison health care delivery system. Because Plaintiffs' motion seeks a release order to redress a different constitutional injury than those previously found in the *Coleman* and *Plata* proceedings, that relief cannot be granted through a modification to our prior remedial order.

There is precedent within these proceedings for our conclusion that requests for disease-specific relief generally require a new Eighth Amendment analysis. In 2013, the *Plata* plaintiffs brought a motion asking the court to order the transfer of classes of inmates who were particularly at risk of developing a severe form of Valley Fever—an illness spread by airborne fungal spores—

---

[10] Because the merits of Plaintiffs' motion are not properly before us, we make no findings as to what level of physical distancing might be constitutionally required in a carceral environment.

9

out of the prisons where the disease was most prevalent. *Plata v. Brown*, No. 01-cv-1351-TEH, 2013 WL 3200587, at *1 (N.D. Cal. Jun. 24, 2013). The plaintiffs did not bring their motion under Rule 60(b)(5), nor did the *Plata* court treat it as a modification request. Instead, the court analyzed whether Defendants' specific responses to the threats posed by Valley Fever were sufficient to satisfy the Eighth Amendment. *Id.* at *10–12. After concluding that they were not, the *Plata* court granted the plaintiffs' transfer request, tailoring the scope of relief to the contours of the specific Eighth Amendment violation implicated by Defendants' inadequate Valley Fever response. *Id.* at *10–13.

The Supreme Court's discussion of our ability to modify the 2009 population cap order confirms our conclusion that the remedy Plaintiffs now seek goes to a different constitutional injury than what has been litigated previously. In describing the scope of our modification authority, the Court explained that it may be appropriate to grant Defendants more time in which to come into compliance with the 137.5% cap if it were necessary to allow the state to develop systems for identifying inmates whose release was least likely to jeopardize public safety. *Plata*, 563 U.S. at 544. It noted such an extension could be conditioned on Defendants' "ability to meet interim benchmarks for improvement in the provision of medical and mental health care." *Id.* The Court also explained that as Defendants made progress in reducing the prison population, it might become apparent "that further population reductions are not necessary or less urgent than previously believed." *Id.* In those circumstances, it could be appropriate to consider whether to extend or modify the requirements of the population cap order. *Id.*

In short, the Supreme Court contemplated that we could adjust our remedial order to ensure that it remained appropriately tailored to its original goal: reducing the prison population to a level sufficient, but no lower than necessary, to allow Defendants to deliver constitutionally adequate medical and mental health care services.[11] *See id.* at 530 (explaining that prospective relief with respect to prison conditions must be "narrowly drawn" and "extend[] no further than

---

[11] The Court's modification ruling also encompassed the situation where Defendants reached the 137.5% goal but were still unable to provide constitutionally adequate medical care. *Plata*, 563 U.S. at 543. We have no doubt that under that scenario, we would have the power to reduce the percentage of the design capacity cap further.

10

necessary to correct the violation"). We do not believe that the Court envisaged us "modifying" our judgment to require an additional reduction in the prison population to respond to a unique threat posed by a specific virus that could not have been foreseen only a few months ago, much less at the time of the 2009 population cap order. Our discretion to modify our prior orders is not boundless.

The cases relied on by Plaintiffs only reinforce our view that the motion before us is not an appropriate modification request. In *Parsons v. Ryan*, the plaintiff class entered into a settlement agreement with prison officials that required them to achieve at least 75 percent compliance with several "health care performance measures," including that they provide inmates with health care services within twenty-four hours after a request was first made. 912 F.3d at 493–94, 499. The prison system's compliance rate with this performance measure was abysmal—as low as 34 percent—and after failed efforts to improve compliance, the district court issued an order requiring the defendants to use community health services (i.e., services outside the prisons) to provide the required care. *Id.* at 499. On appeal, the defendants argued that the PLRA required the district court to "make *new* findings of a constitutional violation" before entering the new remedial order. *Id.* at 501. The Ninth Circuit rejected the argument. It concluded that the district court's order merely implemented a new means of curing the same constitutional violation upon which the original settlement agreement had rested—failure to provide care within a reasonable time period—and that it was therefore a proper modification of the prior remedial order. *Id.*

Similarly, in *Armstrong v. Brown*, 768 F.3d 975 (9th Cir. 2014), the district court entered an injunction that required California prison officials to "track the record of each institution and the conduct of individual staff members" who were not complying with a remedial plan to cure systemic violations of the Americans with Disabilities Act and the Rehabilitation Act. *Id.* at 978. The vague language of the injunction created problems. The defendants contended that it required them to track only substantiated allegations of noncompliance whereas the plaintiffs argued that it required tracking and investigation of *all* alleged violations. *Id.* at 978–79. In response, the district court issued a new injunction that both clarified that the defendants were required to track all allegations—substantiated or not—and added dispute resolution procedures, including a

11

provision that allowed plaintiffs' counsel to review the state's investigations of allegations of noncompliance. *Id.* at 979. The defendants appealed the modified injunction, and the Ninth Circuit affirmed. While noting that the relief ordered by the district court might have been unduly intrusive had it been implemented as an initial remedy, the Ninth Circuit concluded that "the level of intrusiveness [was] acceptable based on the history and circumstances of the case"—namely that the district court "ha[d] attempted narrower, less intrusive alternatives—and those alternatives ha[d] failed." *Id.* at 986.

Plaintiffs argue that, as in *Parsons* and *Armstrong*, more intrusive measures are necessary here because the 137.5% population cap is insufficient to allow Defendants to implement the physical distancing measures they believe are necessary to prevent the spread of COVID-19. ECF No. 3248/6558 at 4–5. But this argument elides the fact that the population cap order *was never intended* to put Defendants in a position to confront the unique threat posed by this once-in-a-century virus. Thus, this is not a case like *Parsons* and *Armstrong* where a district court implemented progressively more intrusive measures to remedy the same, well-understood constitutional violation that formed the basis for the original remedial order. *See Parsons*, 912 F.3d at 499; *Armstrong*, 768 F.3d at 978–79, 986. Instead, Defendants ask us to alter a decade-old order to address a new alleged constitutional violation—an inadequate response to a specific virus—that our prior order was never designed to address. This request falls outside the scope of our equitable modification authority.

Our order today does not leave Plaintiffs without options for seeking relief. While we must deny their motion as currently procedurally improper, we do so without prejudice to their bringing their request for relief in an appropriate forum. As with the Valley Fever motion in *Plata*, and as was done in the original *Coleman* and *Plata* litigation, Plaintiffs may go before a single judge to press their claim that Defendants' response to the COVID-19 pandemic is constitutionally inadequate. For example, if they believe that the response violates Plaintiffs' right to adequate medical care, they may seek relief before the individual *Plata* court. Likewise, Plaintiffs may seek relief before the individual *Coleman* court if they believe that Defendants' response to COVID-19 is preventing the delivery of adequate mental health care. If a single-judge

12

1  court finds a constitutional violation, it may order Defendants to take steps short of release
2  necessary to remedy that violation.  And if that less intrusive relief proves inadequate, Plaintiffs
3  may request, or the district court may order sua sponte, the convening of a three-judge court to
4  determine whether a release order is appropriate.  *See* 18 U.S.C. § 3626(a)(3).

### III. CONCLUSION

We take no satisfaction in turning away Plaintiffs' motion without reaching the important question of whether Defendants have implemented constitutionally adequate measures to protect the inmates of California's prisons from the serious threat posed by this unparalleled pandemic. But we are bound by Federal Rule of Civil Procedure 60(b)(5) and the PLRA to reach this conclusion.

We emphasize that Defendants have broad authority to voluntarily take steps that may prevent the life-threatening spread of COVID-19 within their prisons, and we recognize the deference that is due to prison authorities to determine which additional measures must be taken to avoid catastrophic results.  *See Turner v. Safley*, 482 U.S. 78, 84–85 (1987).  Defendants have represented to us that they are continuously evaluating what more they can do to protect the inmates within their prisons, and we urge them to leave no stone unturned.  It is likely that only through significant effort will California's prisons be able to minimize the spread of COVID-19.

*   *   *

For the foregoing reasons, Plaintiffs' emergency motion for modification of our 2009 population reduction order is **DENIED** without prejudice to pursuing relief in a procedurally appropriate forum, including in the individual *Coleman* and/or *Plata* courts.

**IT IS SO ORDERED.**

Dated:  April 4, 2020

13

1  MUELLER, Chief District Judge, concurring:

2  I join in the court's conclusion that Plaintiffs have not met their burden of demonstrating
3  they qualify for the relief they seek under Federal Rule of Civil Procedure 60(b)(5), assuming
4  without deciding that as the prevailing party previously they may rely on the rule for affirmative
5  relief. *See, e.g.*, *In re Von Borstel*, No. 01-42235-elp7, 2011 WL 477817, at *4 (Bankr. D. Or.
6  Feb. 3, 2011) ("The rule does not say that 'a losing' party may obtain relief; it says 'a' party."
7  Thus, a prevailing party may use Fed. R. Civ. P. 60(b) to seek to set aside a judgment on the
8  ground that the judgment should have provided additional relief." (citing *United States for Use &*
9  *Benefit of Familian Nw., Inc. v. RG & B Contractors, Inc.*, 21 F.3d 952 (9th Cir. 1994))); *but see*
10 *Cano v. Baker*, 435 F.3d 1337, 1340 (11th Cir. 2006) ("The equitable purpose of Rule 60(b)
11 cannot be to 'relieve' a party from her own lawsuit in which she had prevailed three decades
12 earlier." (citation omitted)). The court's conclusion in this respect is sufficient to resolve the
13 motion before us.

14 I respectfully do not join in the court's analysis or determination that Plaintiffs' motion
15 arises out of an Eighth Amendment claim entirely distinct from the claims over which this court
16 has continuing jurisdiction. This court previously found, after extended evidentiary proceedings,
17 that "crowding generates unsanitary conditions, overwhelms the infrastructure of existing prisons,
18 and increases the risk that infectious diseases will spread." *Coleman v. Schwarzenegger*, 922 F.
19 Supp. 2d 882, 931 (E.D. Cal. 2009) ("*Coleman I*") (citing Nov. 9, 2007 Scott Report ¶¶ 17–24,
20 ECF No. 1528/3058). In so finding, this court credited multiple experts who opined that prison
21 crowding was a contributor to great vulnerability in the face of outbreak and spread of infectious
22 disease. *Id.* (referencing opinions that "crowding 'contributes to the difficulties of healthcare
23 delivery by virtue of the fact that it increases the incidence of illnesses, [and] infectious
24 disease'"); *id.* (quoting Rep. Tr. at 257:15–22, ECF No. 1832/3541-2, for opinion of Dr. Jeffrey A.
25 Beard that, while prisons may not always be incubators for disease, "they could be if your
26 population densities get so intense," including "if you have a gymnasium that you triple bunk and
27 put hundreds and hundreds of people in a closed dense area"); *id.* ("Until CDCR reduces its
28 population, it will remain highly vulnerable to outbreaks of communicable diseases, including

1 staph infections, tuberculosis and influenza." (quoting Nov. 9, 2007 Shansky Report ¶ 135, ECF
2 No. 1527/3057)).
3       Moreover, this court retained jurisdiction to determine whether the remedy it had ordered
4 proved durable. *See Coleman v. Brown*, 952 F. Supp. 2d 901, 934 (E.D.Cal./N.D.Cal. 2013).
5 Even though the prison population for some time has remained below the cap this court previously
6 set, Defendants have not achieved the durability of remedy required for this court's role to cease.
7 The current circumstances appear to expose, in stark terms, the potential need to revisit the current
8 population cap. Even as I do not believe Plaintiffs' motion grounded in Rule 60(b)(5) can be
9 granted, I am inclined to think this court retains broad equitable powers that might permit some
10 reconsideration of the current cap in light of the unprecedented exigent circumstances here. Those
11 circumstances, as is undisputed, present potentially grave risks to members of the Plaintiff classes,
12 as well as to correctional staff and the communities in which they reside, as a result of the
13 COVID-19 pandemic and its impact on the delivery of medical and mental health care in the state
14 prisons. It is undisputed that the delivery of care, to date, remains below constitutional minima.
15 *See Hutto v. Finney*, 437 U.S. 678, 687 n.9 (1987) ("As we explained in *Milliken v. Bradley*, 433
16 U.S. 267, 281 [ ], state and local authorities have primary responsibility for curing constitutional
17 violations. If, however [those] authorities fail in their affirmative obligations . . . judicial authority
18 may be invoked. Once invoked, the scope of a district court's equitable powers to remedy past
19 wrongs is broad, for breadth and flexibility are inherent in equitable remedies." (internal quotation
20 marks and citation omitted)).
21       At the same time, it is clear that a prisoner release order under the PLRA is a remedy of
22 last resort and neither Plaintiff class has formally sought focused relief from their individual
23 courts, a condition precedent to issuance of a prisoner release order. *See* 18 U.S.C.
24 § 3626(a)(3)(A); *see also Coleman I*, 922 F. Supp. 2d at 918. Given the availability of expedited
25 proceedings before those district courts to immediately exhaust the possibility of inmate transfers
26 and relocations to secure facilities to achieve constitutionally acceptable conditions for the
27 Plaintiff classes, those proceedings must be invoked first.
28       With these observations, I join in the decision to deny Plaintiffs' motion without prejudice.

2