**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

ANTHONY MAYS, Individually and on behalf )
of a class of similarly situated persons; and )
JUDIA JACKSON, as next friend of KENNETH )
FOSTER, Individually and on behalf of a class )
of similarly situated persons, )
      Plaintiffs-Petitioners, )
                               ) Case No. 1:20-cv-02134
           v. )
                               )
THOMAS DART, Sheriff of Cook County, )
      Defendant-Respondent. )

**PLAINTIFFS' SUPPLEMENTAL BRIEF IN SUPPORT OF
THEIR MOTION FOR A TEMPORARY RESTRAINING ORDER**

Plaintiffs Anthony Mays and Kenneth Foster, by his next friend, submit this brief in compliance with the court's instructions at the close of the hearing on April 7, 2020, on their motion for a temporary restraining order. Plaintiffs (a) explain the mental-state requirement for the Class's claims under 42 U.S.C. § 1983; (b) explain why Subclass A Petitioners' claims are not barred by the exhaustion doctrine; and (c) advise the Court whether electronic home monitoring constitutes "custody" under Illinois law.

**SELECTED POINTS OF FACT FOR PLAINTIFFS' LEGAL ARGUMENTS**

The evidence supporting Plaintiffs' motion shows that the Sheriff's policies are not sufficient to provide "objectively reasonable" conditions for detainees who are exposed to the massive outbreak of COVID-19. The policies—facially and as a matter of implementation—fail to comport with CDC Guidance, including governing correctional facilities, and put the lives of detainees at risk. This renders an emergency Temporary Restraining Order (T.R.O.) both proper and necessary, under the Fourteenth Amendment. The deficient policies are:

--**Medical Triage of the Vulnerable**: The Cook County Sheriff's Office (CCSO) policies, as evidenced by the "Coronavirus Operation Plan" ("Operation Plan"), Ex. P to Defendant's Response

to Plaintiffs' Motion for a Temporary Restraining Order, and by "Michael Miller's Declaration"

(Miller Decl.) and supporting exhibits, Ex. H to the Defendant's Response, do not provide a process

by which the Sheriff identifies detainees who are in high risk categories for contracting serious

COVID 19, either because of age or pre-existing medical conditions. They also do not provide for

any measures to separate these vulnerable detainees from others who have the virus or are suspected

to have the virus. The Sheriff's policy failures are supported by the declarations of the named

plaintiffs, both of whom are medically vulnerable (Foster with lung cancer, Complaint Ex. F; Mays

with diabetes and a heart condition, Compl. Ex. D). Neither have received particular protections as a

result of their unique susceptibility to a lethal disease. The same is true of other detainees in

divisions throughout the Jail,[1] evidenced by the declarations submitted with the Complaint.[2]

--**Social Distancing**: The CCSO policies do not adequately provide for social distancing.  The CDC

recommends individuals keep a spatial distance of 6 feet from other people, not gather in groups,

and stay out of crowded places and avoid mass gatherings.[3] This is in line with the Governor's stay-

---

[1]     E.g., Anthony Mays (Complaint Ex. D) (Mr. Mays is a detainee housed in Division 8, tier 3F, with Diabetes and a heart condition); Vincent Stewart (Compl. Ex. E) (Mr. Stewart is a detainee housed in Division 8 with Hodgkin's Lymphoma); Kenneth Foster (Compl. Ex. F) (Mr. Foster is a detainee housed in Division 2 with Stage 4 Stomach Cancer, Lung-Sarcoidosis, high blood pressure, asthma, and bronchitis); Charles James Wimberly (Compl. Ex. H) (Mr. Wimberly is a detainee housed in Division 6 with bronchitis); Terrance Robinson (Compl. Ex. J) (Mr. Robinson is a detainee housed in Division 6 with bronchitis); Brandon Mathis (Compl. Ex. K) (Mr. Mathis is a detainee housed in Division 11 who previously suffered a gunshot wound to the throat that required reconstructive surgery, and he had open heart surgery as a child; he currently suffers from blood clots in his feet); Sean Alexander (Compl. Ex. L) (Mr. Alexander is a detainee housed in Division 11 with sickle cell anemia); Christopher Zeigler (Compl. Ex. M) (Mr. Zeigler is a detainee housed in Division 6 with MRSA [Methicillin-resistant Staphylococcus aureus] and a compromised immune system); Clayborn Smith (ECF 36-2) (Mr. Smith is a detainee housed in Division 11, tier CF with chronic asthma).

[2]     It is well established that hearsay testimony is admissible in preliminary injunction hearings. *See SEC v. Cherif*, 933 F.2d 403, 412 n.8 (7th Cir. 1991).

[3]     Centers on Disease Control and Prevention, "Coronavirus Disease 2019 (COVID-19): Social Distancing, Quarantine, and Isolation," https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/social-distancing.html (last visited Apr. 7, 2020); Centers on Disease Control, Interim Guidance on Management of Coronavirus Disease in Correctional Detention Facilities,

at-home order.[4] The lack of social distancing contributes to the spread of the disease, especially for people who are at higher risk of infection, as the CDC makes clear.[5] There is no CCSO policy mandating social distancing for detainees in the Jail. The Sheriff's policy is ostensibly to *try to* fill every tier to no more than 50% of capacity—it is not, in fact, in effect. Miller Decl. ¶ 18(d) ("Providing a single cell to every detainee, or if in a dorm setting not exceeding 50% occupancy, *is an on-going process*, subject to our ability to open previous closed areas safely and securely.") (emphasis added). Implementing social distancing is not ultimately feasible given the current population size.[6] Puisis makes this clear: "The County of Cook is forcing over 4,700 people to live in congregate living conditions at the Cook County…The current CDC recommendations for social distancing and frequent handwashing measures, which are the only measures available to protect against infection, are not possible in the current correctional environment at the Jail." Puisis Dec. (Ex. ) at 23, 25.[7] Michael Miller's chart confirms that the divisions remain at more than 80% capacity in much

---

https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html (last visited Apr. 7, 2020).

[4]      Executive Order in Response to COVID-19 (Mar. 20, 2020) (Executive Order), pg. 1-5, *available at* https://www2.illinois.gov/Documents/ExecOrders/2020/ExecutiveOrder-2020-10.pdf (last visited Apr. 6, 2020); *see also* "Read Pritzker's Full Statement Announcing Illinois Stay-at-Home Order Extension," NBC5 (Mar. 31, 2020), https://www.nbcchicago.com/news/local/read-pritzkers-full-statement-announcing-illinois-stay-at-home-order-extension/2247976/ (last visited Apr. 4, 2020).

[5]      Centers on Disease Control and Prevention, "Coronavirus Disease 2019 (COVID-19): Social Distancing, Quarantine, and Isolation, *supra* note 3 ( "Since people can spread the virus before they know they are sick, it is important to stay away from others when possible, even if you have no symptoms. Social distancing is especially important for people who are at higher risk of getting very sick."); Donald G. McNeil Jr., "Restrictions are Slowing Coronavirus Infections, New Data Suggest," N.Y. Times (Mar. 30, 2020), *available at* https://www.nytimes.com/ 2020/03/30/health/coronavirus-restrictions-fevers.html (last visited Apr. 6, 2020).

[6]      Dart has publicly admitted to having a "crowding issue." Shannon Heffernan, "Sheriff Dart Attacks Pritzker for Refusing New Inmates in State Prisons." WBEZ (Mar. 27, 2020) https://www.wbez.org/stories/sheriff-tom-dart-attacks-gov-pritzker-for-refusing-new-inmates-in-state-prisons/c66148e3-8ce6-4786-be2b-ea739d008191

[7]      On March 30, 2020, following the death of a COVID-19 patient at Stateville Correctional Center, Dr. Nzibe Ezike, Director of the Illinois Department of Public Health, acknowledged the heightened risk posed by correctional settings and the inability to conform them to public health standards: "Congregate

of the Jail. Ex. 1 to Miller Decl. at 4-9. Cook County Sheriff Correctional Officer, David Evans,

backs this up. Evans Decl., ECF 36-1, ¶ 8. Detainees affirm that they are living in packed tiers.[8]

Even if the jail divisions were driven to 50% capacity on the tiers, achieving that level "in a dorm

setting" will not result in the degree of social distance that the CDC requires. *See* Complaint, ¶ 12-14

(photos of dormitories).

---

settings such as Stateville, any other correctional center, pose unique challenges in stopping the spread of disease and protecting the health of individuals who live and work there. The options for isolation of COVID-19 cases are limited in this focused setting and it becomes very difficult depending on the size of the facility and the population that's already in the facility. Ideally, all cases should be isolated individually and close contact should be quarantined individually." *See* "Daily Coronavirus Briefing from Illinois Health Officials, NBC 5 https://www.nbcchicago.com/news/local/watch-live-daily-coronavirus-briefing-from-illinois-health-officials/2234359/ (last visited Apr. 7, 2020).

[8]        E.g., Anthony Mays (Complaint Ex. D) ("Each cell on his tier [in Division 8] has two concrete beds, spaced two feet apart."); Kenneth Foster (Compl. Ex. F) ("Social distancing is not possible in the division [Division 2]. Everyone on Mr. Foster's tier shared a shower and bathroom area. Everyone is together all the time and there is very little privacy."); Charles James Wimberly (Compl. Ex. H) ("The detainees in the division [Division 6] have a shared shower area."); Carver Young (Compl. Ex. I) ("I was housed in a congregate living situation, similar to a giant gymnasium. There were 350 to 400 people housed there with me. We spent all day in this room [Division 2, dorm 4]. . . . The bunks were approximately 1 foot apart. I slept on the lower bunk. It was impossible to socially distance or be separate from other people."); Brandon Mathis (Compl. Ex. K) ("Social distancing is not possible in the division [Division 11]. All detainees are close together when they are in the common room, on the phones, or in the dayroom."); Sean Alexander (Compl. Ex. L) ("Social distancing is not possible in the division [Division 11]. All residents are close together when in the common area. All residents share the shower area."); Aish Ayyash (Compl. Ex. N) ("Our beds were less than 3 feet apart [in Division 9, tier 1B]. It was impossible to maintain a 6-foot distance between us because out cell was not big enough to allow it."); Darnell Singelton (Compl. Ex. O) ("The bunks were about 3 to 4 feet apart [in Division 2, dorm 2]. . . . The bunks were about 4 to 5 feet apart [in Division 2, dorm 4]. . . . It was impossible to socially distance in both dorms. We were crammed together."); Edward Reed (Compl. Ex. P) ("The cell was very tight [in Division 10, tier 1D] and it was impossible to get away from my cellmate."); Erica Petty (Compl. Ex. Q) ("I shared a cell with one other woman [in Division 5, tier 2L]. I slept on the lower bunk. It was impossible to socially distance."); Michael Clark (Compl. Ex. R) ("I shared a cell [in Division 11] until the time I left. The cell was approximately 6 feet by 5 feet."); Raymond Sanchez (Compl. Ex. S) ("There were 2 people housed in each cell [in Division 9, tier 3H]. . . . My cell was about 4 feet by 6 feet. There was no room to move around. It was impossible to socially distance. . . . The dayroom was not large enough for social distancing. . . . There was no room to socially distance from others while we ate."); Rafael Ortiz (Compl. Ex. U) ("Mr. Ortiz is living in a dorm [Division 2, dorm 4] with many other people. All of the people in the dorm are sleeping on cots, close together. The people in the dorm must use a shared bathroom and shower area. There is no privacy."); Clayborne Smith (ECF 36-2) ("I am living in a cell with another cellmate. My cellmate has complained that something is wrong with his smell, something is wrong with his throat, that he feels cold, and that he has headaches.").

--**Social Distancing at Intake**: Relatedly, the CCSO policies do not ensure proper social distance of all persons arriving at the Jail for intake. It appears they continue to utilize bullpens in which groups of arriving detainees from widely divergent parts of the County are held in close proximity.

-- **Sanitation**: The CCSO policies fail to provide for the distribution of soap, sanitizing agents or cleaning products to detainees. This is despite the fact that sanitation and handwashing are some of the best defenses against the spread of the disease and CDC Guidance for Corrections Facilities mandate their availability.[9] The Coronavirus Operation Plan sets forth a supposed "Enhanced Sanitation Process," which in fact provides no provision for the distribution of sanitation supplies to detainees. Coronavirus Operation Plan at 10. Michael Miller's declaration similarly omits any mention of the provision of cleaning supplies and sanitizing agents to detainees. The declarations submitted on behalf of the detainees underscore that there is a total lack of such essential items throughout the Jail.[10] Evans confirms that the shortage of such supplies is an issue not only for detainees but for staff as well. ECF 36-1 at 14, 21-22.

---

[9]     Centers on Disease Control, "Coronavirus Disease 2019 (COVID-19): How to Protect Yourself and Others," https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/prevention.html(last visited Apr. 7, 2020); Centers on Disease Control, Interim Guidance on Management of Coronavirus Disease in Correctional Detention Facilities, https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html (last visited Apr. 7, 2020).

[10]     E.g., Anthony Mays (Complaint Ex. D) ("Nobody has come on the tier to pick up trash in two days" as of April 2, 2020); Vincent Stewart (Compl. Ex. E) ("He has been given no additional cleaning or sanitizing products since the outbreak of COVID-19 in Illinois and in the Jail."); Kenneth Foster (Compl. Ex. F) ("The detainees in the division [Division 2] share a shower area. The shower area has not been sanitized."); Charles James Wimberly (Compl. Ex. H) ("The detainees in the division [Division 6] have a shared shower area. Mr. Wimberly does not have access to soap. He has not received hand sanitizer since last week. . . . Mr. Wimberly uses his shirt to cover the phone, because staff are not cleaning the phones," as of April 2, 2020); Carver Young (Compl. Ex. I) ("We received one small bar of soap per week. I did not witness any changes in procedure regarding COVID-19. We did not receive additional hygiene or cleaning supplies."); Terrance Robinson (Compl. Ex. J) ("The detainees in the division [Division 6] share a shower area. Mr. Robinson does not have access to soap or sanitizer."); Brandon Mathis (Compl. Ex. K) ("Mr. Mathis is living in a cell with another cellmate. . . . The cell has not been cleaned. . . . The detainees in the division [Division 11] share a shower area. The shower area has not been sanitized. . . . Mr. Mathis has not been given soap or sanitizer.") Sean Alexander (Compl. Ex. L) ("Mr. Alexander shared a sink and a toilet with his cellmate. They have not been given cleaning products to clean their cell. . . . Mr. Alexander stated … that the detainees in Division 11 are being given soap but not sanitizer. While jail staff have sprayed (disinfected) the common area, they have

--**Personal Protective Equipment (PPE)**: The policies do not provide that every detainee must be

afforded PPE, including the masks that the CDC mandates that prisoners wear when in quarantine.[11]

Evans confirms detainees have no access to PPE. Evans Decl., ECF 36-1, ¶ 7. The detainee

declarations also confirm this.[12]

---

not disinfected the individual cells."); Christopher Zeigler (Compl. Ex. M) ("Mr. Zeigler works to clean up the
tier. There are no more Clorox wipes for cleaning. They have not received the normal chemicals to clean the
shower stalls. Mr. Zeigler has observed black mold in the shower area."); Aish Ayyash (Compl. Ex. N) ("I was
not given soap. I had to purchase soap at commissary with my own funds. It was crushed by the officers
before purchase. . . . While I was there, one person tested positive for COVID-19. He appeared sick for
multiple days before he saw a doctor. After he tested positive, he was taken from the division [Division 9], his
belongings were placed in a garbage bag, and the officers quickly wiped down his cell. Staff did not clean any
of the common areas."); Darnell Singelton (Compl. Ex. O) ("Dorm 4 [Division 2] was closed before I was
move there. It was filthy when we arrived. There was one large fan blowing the same air around the room
with no exhaust. . . . The soap did not last long. If you wanted enough soap to wash up, shower, and clean
your clothes, you needed to purchase it. We did not receive hand sanitizer."); Edward Reed (Compl. Ex. P)
("The showers were covered with mold and infested with mice and cockroaches. . . . The officers were not
giving out soap at the time I left. Typically, we received one bar of soap every two weeks. If we wanted more
soap, we had to purchase it from commissary. We did not receive additional hygiene or cleaning supplies in
response to COVID-19."); Erica Petty (Compl. Ex. Q) ("We were not given hand sanitizer. We were given a
small bar of soap once a week, or every other week. If we wanted enough soap for our needs, we had to
purchase it."); Michael Clark (Compl. Ex. R) ("We received one bar of soap per week. If we wanted to have
soap regularly, we had to purchase it. We did not receive additional hygiene or cleaning supplies in response
to COVID-19."); Raymond Sanchez (Compl. Ex. S) ("We received one small bar of soap weekly. It would
only last about 3 uses. If we wanted more soap, we had to purchase it from commissary. We could only buy
one bar at a time at commissary, and could only go to commissary two times per month. . . . We did not
receive additional hygiene or sanitary supplies in response to COVID-19."); Tyneshia Perkins (Compl. Ex. T)
("We received one small bar of soap each week. If we wanted more soap or other hygiene products, we had
to buy them. I had to buy my own soap because I have sensitive skin from eczema. . . . We did not receive
additional hygiene or sanitation supplies."); Rafael Ortiz (Compl. Ex. U) ("The Commissary was shut down
last week. Detainees, including Mr. Ortiz, are not receiving any soap sanitizer, bleach or alcohol wipes.");
Clayborn Smith, (ECF 36-2) ("There are no cleaning materials provided at any time other than during the day
shift. During the day shift, all of the detainees in the tier are collectively provided a single spray bottle full of
an unknown liquid. . . . The cleaning material doesn't last beyond the day shift. . . . The last time I was given a
bar of soap was Wednesday. I have not been given any access to hand sanitizer anywhere. . . . One of the
people who got taken out today had a cellmate who was taken out by medical staff on Thursday. He remained
in his cell until today. No one came to clean the cell or provide him cleaning supplies. No one's cell has been
cleaned by anybody after a detainee was taken out by medical staff." ).

[11]      *See* Centers on Disease Control, Interim Guidance on Management of Coronavirus Disease in
Correctional Detention Facilities, *supra* note 3 ("If cohorted, quarantined individuals should wear face masks
at all times (to prevent transmission from infected to uninfected individuals).").

[12]      E.g., Anthony Mays (Complaint Ex. D) ("Guards on the tier are wearing masks, but no other
protective equipment."); Vincent Stewart (Compl. Ex. E) ("Guards are wearing masks and gloves, though
that began only recently. Detainees are not given any personal protective equipment (PPE)."); Kenneth
Foster (Compl. Ex. F) ("Mr. Foster has seen the correctional officers wearing masks, but not gloves.

--**Quarantine**: The CCSO policies mandate the quarantine of any tier in which a detainee resided who presented symptoms of COVID-19. Miller Decl., ¶ 19. The quarantine is implemented for 14 days, during which the entire tier is on "lockdown." Ex. 1 to Miller Decl. at 4-9. Consequently, there are now 62 tiers (1,481 individuals) in the Jail, throughout all divisions, on lockdown. *Id.* Every time a new detainee tests positive or exhibits symptoms under this policy, the tier where he or she resides is put on lockdown for another 14 days, resulting in a seemly endless lockdown of detainees, as well as the inevitable scenario in which the Jail is not able to clinically manage the crisis. *See* Puisis Decl., ECF 1-2, ¶ 16 ("As the number of persons in quarantine grows, managing them clinically becomes insurmountable and will result in failure to manage."). This policy also directly contravenes CDC guidance.[13]

---

Detainees are not given access to personal protective equipment (PPE)."); Charles James Wimberly (Compl. Ex. H) ("The Jail does not provide personal protective equipment (PPE) to detainees."); Carver Young (Compl. Ex. I) ("I did not receive personal protective equipment (PPE). Other detainees asked for masks but were denied."); Terrance Robinson (Compl. Ex. J) ("While COs are wearing masks and gloves, detainees are not given personal protective equipment (PPE)."); Brandon Mathis (Compl. Ex. K) ("Detainees are not being given personal protective equipment (PPE)."); Sean Alexander (Compl. Ex. L) ("Some – but not all – of the jail staff wear masks and gloves. Mr. Alexander does not have access to gloves or masks."); Christopher Zeigler (Compl. Ex. M) ("Some nurses and medical staff are wearing protective gear. But detainees have not received any personal protective equipment (PPE)."); Aish Ayyash (Compl. Ex. N) ("Officers were wearing gloves, but very few had masks. One officer told me that he only had a mask because he bought it himself. I was never provided masks, gloves, or any personal protective equipment at any point."); Darnell Singelton (Compl. Ex. O) ("At first, only a few officers were [sic] gloves and masks. When I left, most were wearing gloves and masks. Detainees did not receive masks, gloves, or other personal protective equipment (PPE)."); Edward Reed (Compl. Ex. P) ("We did not receive masks, gloves, or other personal protective equipment (PPE). The only staff I saw wearing gloves or masks were the nurses. Some detainees tried to make masks but the officers confiscated them."); Erica Petty (Compl. Ex. Q) ("We did not receive gloves, masks, or other personal protective equipment (PPE). Some officers and nurses had gloves or masks, but not all of them."); Michael Clark (Compl. Ex. R) ("We did not receive masks, gloves, or other personal protective equipment (PPE). Some guards had masks and/or gloves, but not all of them. Detainees tried making masks but guards confiscated them."); Raymond Sanchez (Compl. Ex. S) (""Some jail staff wore gloves and some wore masks, but most were not wearing either."); Tyneshia Perkins (Compl. Ex. T) ("Some guards wore gloves and masks but not all of them did. Detainees did not receive masks, gloves, or other personal protective equipment (PPE). The officers told us that if we made our own masks, they would be considered contraband."); Rafael Ortiz (Compl. Ex. U) ("Mr. Ortiz has not seen any jail staff wearing masks or gloves. Detainees are not given personal protective equipment (PPE). "; Clayborn Smith (ECF 36-2) ("The Jail provides masks only to the detainees who have a fever, as of yesterday in my tier [Division 11, tier CF]. Before yesterday, they were not giving any of us masks," as of April 6, 2020.)

[13]      *See* CDC, Interim Guidance on Management of Coronavirus Disease in Correctional Detention Facilities," *supra* note 8. ("Facilities should make every possible effort to quarantine close contacts of

7

--**Isolation**: The CCSO isolation policies are similarly inept. Detainees in isolation should be housed in negative pressure environments, as the Sheriff himself acknowledges. Puisis Decl. ¶ 17; Coronavirus Operation Plan at 10. They should also be housed individually, as the CDC commands for correctional facilities.[14] However, as a result of the vast spread of the disease, in the Jail, normal tiers have become isolation units. Ex. 1 to Miller Decl. at 4-9. Eleven tiers are now designated as isolation locations. *Id.* This leaves the detainees on those tiers exposed to other inmates and creates a high risk of transmission to staff and detainees. Puisis Decl. ¶ 17.

Beyond the facial policy deficiencies, the Sheriff's policies are failing in their implementation, as the detainee declarations, tier statistics, and Evans declaration, outlined above, make clear. Drawing from this evidence, the following patterns become clear:

- Detainees in dayrooms, in lines, in waiting areas and in other congregate spaces are not at proper social distance.

- There are longstanding problems of sanitation in the Jail that have not been rectified in the present context. Detainees report that showers are moldy. Surfaces, including shared sinks and toilets in addition to showers, are not regularly sanitized.

- Sanitation supplies are not available. Sufficient cleaning of surfaces is not possible. Puisis Decl. ¶ 25. Cells cannot be kept clean because detainees lack cleaning supplies.

- Masks for the detainees who have not yet tested positive are not available.

---

COVID-19 cases individually. Cohorting multiple quarantined close contacts of a COVID-19 case could transmit COVID-19 from those who are infected to those who are uninfected.").

[14] *See id.* ("Facilities should make every possible effort to place suspected and confirmed COVID-19 cases under medical isolation individually. Each isolated individual should be assigned their own housing space and bathroom where possible.").

- Detainees on tiers where others become symptomatic are not monitored for symptoms, because staff are overworked, overwhelmed and exhausted. *See* Puisis Decl. ¶ 18.

In short, the Sheriff's policies—both in their design and in their implementation—are not working. The ongoing, massive outbreak is the irrefutable evidence of that. In the absence of immediate relief, lives and health will continue to be placed at unacceptable risk.

This court should enter a temporary restraining order to immediately require the Sheriff to correct the failures listed above, as required by the CDC. In a nearly identical case, today, another federal district court judge in Miami entered a T.R.O to address strikingly similarly circumstances. That T.R.O. is attached. *See* Ex A. Further, the court should also establish a procedure for the expedited consideration for release of the members of subclass A.

## I. The Fourteenth Amendment Does Not Require Plaintiffs to Show Defendant Knew His Objectively Unreasonable Conduct Would Cause Plaintiffs To Endure Infirm Conditions but Plaintiffs Have Made That Showing.

Plaintiffs seek emergency injunctive relief because the Sheriff is violating their Fourteenth Amendment right to objectively reasonable conditions of confinement. To prove this claim, Plaintiffs must show that the Sheriff acted with purpose, knowledge, or possibly recklessness "with respect to the bringing about of certain physical consequences in the world." *Kingsley v. Hendrickson*, 576 U.S. 389, 135 S. Ct. 2466, 2472 (2015). The Sheriff concedes, for purposes of the issues in this case (Def. 4/6/20 Br. at 3), that his actions "were purposeful and knowing." Equally clear, though, under multiple, recently decided Seventh Circuit cases, the defendant's state of mind *with respect to whether those actions are inappropriate or potentially harmful* is irrelevant. *See, e.g., Hardeman v. Curran*, 933 F.3d 816, 823 (7th Cir. 2019) (an "objective inquiry applies to all Fourteenth Amendment conditions-of-confinement claims brought by pretrial detainees"). In other words, proof of deliberate indifference on the part of a defendant is *not* required. *Kingsley*, 135 S. Ct. at 2473; *see also Miranda v. County of Lake*, 900 F.3d 335, 354 (7th Cir. 2018).

In *Hardeman*, a class of pretrial detainees brought a lawsuit against the sheriff of Lake County and his chief of corrections under 42 U.S.C. § 1983 for violation of their Fourteenth Amendment rights when the defendants shut off all water in the jail for three days without warning. *Hardeman v. Cty. of Lake*, 2018 WL 3533254, at *1 (N.D. Ill. July 23, 2018). On appeal, the Seventh Circuit held that plaintiffs had sufficiently pled a claim under the Fourteenth Amendment by alleging that "Lake County officials prevented them from caring for themselves and then deprived them of the most basic of human needs—water." *Hardeman*, 933 F.3d at 825. "The resulting alleged unsanitary conditions and physical harms were objectively unreasonable conditions of confinement that (if proven) violated the Fourteenth Amendment's due-process guarantee." *Id.* The Seventh Circuit did *not* require plaintiffs to allege that the corrections chief intended, or even knew, about the conditions in the cellhouse that resulted from their deliberate actions. It was sufficient for plaintiffs to allege that the defendants' actions to turn off the water was intentional, that it was objectively unreasonable, and that defendants' actions proximately caused the plaintiffs to suffer objectively unreasonable conditions of confinement. *Id.*

One district court in this District has expressed the question of intent under the Fourteenth Amendment this way: "The state-of-mind requirement is measured against each defendant's *actions* (that is, whether they intentionally or recklessly engaged in the action), rather than their subjective view of the risks of the allegedly inadequate [action]." *Gaston v. Beatty*, No. 17-cv-01798, 2020 WL 1288878, at *4 (N.D. Ill. Mar. 18, 2020) (emphasis added). In other words, the "intent" that the Supreme Court has long held is required to prevail on a claim under the Fourteenth Amendment, *see Daniels v. Williams*, 474 U.S. 327, 328 (1986), refers to the action of the defendant: is it intentional or is it negligent? *See Miranda*, 900 F.3d at 354 (finding the requisite intent because defendants "deliberately chose a 'wait and see' monitoring plan"). If the action was taken negligently, then liability under the Fourteenth Amendment cannot attach. But if the action was taken

intentionally, and if that action is objectively unreasonable and proximately causes the plaintiffs to suffer injury, then the Fourteenth Amendment has been violated. *See Williams v. Ortiz*, 937 F.3d 936, 942-43 (7th Cir. 2019) (in medical care context, Fourteenth Amendment poses two questions: "(1) whether [the plaintiff] suffered from an objectively serious medical condition and (2) whether the medical staff's response to it was objectively unreasonable"); *Lavite v. Eales*, No. 19-cv-00953-JPG, 2019 WL 6728919, at *2 (S.D. Ill. Dec. 11, 2019) (to prevail on a conditions claim, pretrial detainee must show "(1) there is a deprivation that is, from an objective standpoint, sufficiently serious to deprive the plaintiff of 'the minimal civilized measure of life's necessities, and (2) the defendant's failure to respond or remedy the situation was objectively unreasonable.")

In this case, the Sheriff has admitted that the Office "acted purposefully and knowingly" when promulgating its policies, including what those policies do (and do not) provide, and how those policies do (and do not) comply with the CDC Guidance. Dkt. 40 at 3. Accordingly, the only legal question remaining is whether those policies, and what they contain or omit, are objectively unreasonable. *Miranda*, 900 F.3d at 352; *see also Glisson v. Ind. Dep't of Corrs.*, 849 F.3d 372, 379 (7th Cir. 2017) (a municipality's intentional decision *not* to have a policy is "just as much a 'policy'" as an affirmative policy is); *see also id.* at 383 (Sykes, J., dissenting) (agreeing a municipality's deliberate choice not to have a policy is equivalent to affirmative policy; dissenting on the issue of causation).

Under this law, the Sheriff's COVID-19 policies are objectively unreasonable. As set forth more fully above, the Sheriff's policies fall short of the CDC Guidance both facially and as a matter of implementation. The Sheriff implemented these policies knowingly and purposefully. Precisely because they fall short of the CDC Guidance, which the Sheriff himself acknowledges is the gold standard for response to the coronavirus, there is a public health crisis in the Jail. Among other things, detainees do not have adequate soap, cleaning supplies, or PPE to protect them from this

deadly disease, and vulnerable detainees are forced to share a locked "hot box" with symptomatic detainees without regard to their vulnerability.

If this Court determines that Plaintiffs are required to show that Sheriff Dart has actual knowledge of the effects of his policies on the Plaintiff class in order to prevail on any particular request for injunctive relief, Plaintiffs easily meet this burden. In the weeks and days since his objectively unreasonable policies were formalized, the Sheriff has been put on the clearest possible notice that they are failing disastrously. The Jail is the site of a public health disaster.  The Cook County Jail is the site of the second largest cluster of confirmed COVID-19 cases in the United States. Suspected infections have occurred on 62 separate tiers located throughout the Jail, all of which are now on lockdown. Yet, in his submission to the court, the Sheriff *does not even acknowledge the magnitude of the public health disaster unfolding on his watch*. He offers not a shred of evidence that he has sought help or modified his policies in any way in response to the horrific unfolding of COVID-19 cases in the last 14 days.

It is well established that claims for injunctive relief are assessed at the time relief is to be entered. *See, e.g., Helling v. McKinney*, 509 U.S. 25, 36 (1993) (on prisoner's claim for injunctive relief, intent requirement "should be determined in light of the prison authorities' *current* attitudes and conduct" (emphasis added)); *Farmer v. Brennan*, 825 U.S. 511, 845 (1994) (intent on injunctive claim should be "determined in light of the prison authorities' current . . . conduct").  In any event, there is no dispute that the Sheriff *now* knows about the precise conditions that Plaintiffs raise; this lawsuit made him aware. Moreover, the Sheriff regularly walks through the Jail.[15] He knows precisely what is

---

[15]     *See, e.g.*, WGN 720 Radio Interview with Sheriff Dart (Mar. 18, 2020), https://wgnradio.com/roe-conn/covid-19-containing-the-virus-behind-bars/ (last visited Apr. 7, 2020) ("I wandered around division 6 and 10 yesterday talking with our folks, and our staff's . . . just amazing. . . .  And I talked to some of the detainees too and they seem to have an understanding of what's going on."); Mark Konkol, "A Year In Jail For Stealing Toothpaste? New Law Frees Poor Chicago Inmates," DNA Info (Aug. 26, 2015), https://www.dnainfo.com/chicago/20150826/little-village/sheriff-tom-dart-wins-one-for-petty-criminals-locked-up-for-being-poor/.

going on in the tiers. He cannot claim to be unaware of the circumstances about which so many detainees and staff have complained. Accordingly, even if the Court were to conclude, with respect to a particular item, that the Fourteenth Amendment demands a showing of the Sheriff's actual knowledge of the specific conditions that have flowed from his policies, Plaintiffs should prevail.

## II. Petitioners' Habeas Claims Are Not Barred by the Exhaustion Doctrine

This Court requested that Subclass A Plaintiffs brief the question of whether their claims for habeas-corpus relief are barred by the exhaustion doctrine. They are not. First, under the non-statutory, flexible, and prudential standard of exhaustion in pre-conviction cases, exhaustion is futile where each passing day risks Plaintiffs' lives and where exhaustion would take *weeks* rather than days,[16] and for the same reasons exhaustion should be excused under the Court's broad equitable authority.

Federal courts apply a judge-made exhaustion doctrine in § 2241 cases. *See Braden v. 30th Judicial Circuit Court of Kentucky*, 410 U.S. 484, 490 (1973). Unlike the statutory exhaustion requirement in § 2254, though, the judge-made exhaustion requirement for § 2241 petitions is prudential, flexible, and non-jurisdictional. *United States v. Castor*, 937 F.2d 293, 297 (7th Cir. 1991); *Soler v. State of Ind.*, 47 F.3d 1173 (7th Cir. 1995) (same); *see also Santiago-Lugo v. Warden*, 785 F.3d 467, 474 (11th Cir. 2015). The Supreme Court has described the exhaustion doctrine in § 2241 cases as a "judicially crafted instrument which reflects a careful balance between important interests of federalism and the need to preserve the writ of habeas corpus as a '*swift* and imperative remedy in all cases of illegal restraint or confinement.'" *Braden*, 410 U.S. at 490 (emphasis added) (citation omitted). Courts, accordingly, apply it with those dual purposes in mind. *See, e.g., Park v. Thompson*,

---

[16] Plaintiffs mistakenly failed to elucidate in the hearing on April 7, 2020 that the process for review of bail decisions, under Rule 604(c), is a lengthy process, thus making exhaustion futile in this case involving an unprecedented health emergency.

356 F. Supp. 783, 788 (D. Haw. 1973) ("It is the legal issues that are to be exhausted, not the petitioner.").

An exhaustion requirement in this case would require Plaintiffs to risk their lives so that state courts could take at least several weeks—or months—to consider whether the fact that Plaintiffs' confinement is threatening their lives requires their release. Thankfully federal law does not require such a result. Courts have been clear that where a petitioner's claim threatens to become moot while state courts are considering it, they need not wait to go to federal court.

In emergency situations, the exhaustion doctrine does not bar claims that could not be vindicated in state court quickly enough. *See, e.g.*, *Granberry v. Greer*, 481 U.S. 129, 134 (1987) (acknowledging that courts may dispense with exhaustion and disrupt potential state proceedings in "rare cases where exceptional circumstances of peculiar urgency are shown to exist" (quoting *Ex parte Hawk*, 321 U.S. 114, 117 (1944)); *Beharry v. Ashcroft*, 329 F.3d 51, 62 (2d Cir. 2003) (exhaustion requirement is satisfied if "available remedies provide no genuine opportunity for adequate relief" or if "irreparable injury may occur without immediate judicial relief" (quotations omitted)); *Hendricks v. Zenon*, 993 F.2d 664, 672 (9th Cir. 1993) (holding that federal courts "have the discretion to dispense with the [exhaustion] rule in rare cases where exceptional circumstances of peculiar urgency are shown to exist."); *Simmons v. Blodgett*, 910 F. Supp. 1519, 1523 (W.D. Wash. 1996) (excusing exhaustion because "the federal courts need not defer to the state judicial process when no appropriate remedy exists at the state level or when there are circumstances rendering the state process ineffective to protect the rights of the prisoner."), *aff'd*, 110 F.3d 39 (9th Cir. 1997); *cf. also Sweeney v. Bartow*, 612 F.3d 571, 573 (7th Cir. 2010) ("[A] person who is in state custody awaiting a determination by the state courts of the legality of his custody may seek federal habeas corpus to challenge that custody without being barred by the [related] *Younger* doctrine if immediate federal intervention is necessary to prevent the challenge from becoming moot."). Under the common-law

exhaustion requirement applicable to § 224 cases, courts are asked to strike a reasonable balance between the interests of comity and federalism and the protection of petitioners' federal rights. *Braden*, 410 U.S. at 490. In emergency situations, that balance tips in favor of federal rights. *Granberry*, 481 U.S. at 134.

Here, there is no question that it would take at least several weeks, if not months, for Plaintiffs to exhaust the bond-review process and attendant appeals. To exhaust state remedies, a petitioner needs to invoke "one complete round" of the "normal, simple, and established part[s] of the State's appellate review process." *O'Sullivan vs. Boerckel*, 526 U.S. 838, 845 (1999). That process here includes (1) filing a motion for bond reduction in the criminal court, (2) waiting for it to be decided, (3) appealing its denial to the Illinois Court of Appeals, under Illinois Supreme Court Rule 604(c), and (4) waiting for the appeal to be decided.[17] This process takes several months. *Compare, e.g.,* Bond Reconsideration Order, *State v. Ejaz*, No. 19-CR0751-01 (Ck. Cty. Cir. Ct. May 8, 2019), *with* Order, *State v. Ejaz*, No. 19-CR-751-01 (Ill. App. 1d Aug. 6, 2019); *and compare* Bond Modification Order, *State v. Smith*, No. 19-CR-7206 (Ck. Cty. Cir. Ct. May 10, 2019), *with* Order, *State*

---

[17]     Plaintiffs may also have to seek review in the Illinois Supreme Court and wait for that court to decide the case after the 604(c) appeal at the appellate level. Undersigned counsel (after an admittedly abbreviated search given the timeline) could find exactly one published Illinois Supreme Court case ruling on a question of pretrial detention under Illinois Supreme Court Rule 604(c), which authorizes pretrial detainees to seek review in the court. *See People v. Purcell*, 201 Ill.2d 542 (2002) (ruling that defendant's constitutional right to bail was violated by provision of bail statute that placed burden on defendant to establish that the proof of his guilt was not evident, in appeal from appellate court's ruling on 604(c) petition). The U.S. Supreme Court has held that Illinois's certiorari procedure is required for exhaustion of post-conviction habeas claims, see *O'Sullivan*, 526 U.S. at 845, but it is not clear whether certiorari is required for non-post-conviction claims. That is because when a remedy is never used to grant the relief requested it is not considered part of a state's "normal . . . appellate review process." *Compare id.*, with *Wilwording v. Swenson*, 404 U.S. 249, 249–50 (1971) (reversing appellate court judgment dismissing claim for failing to pursue mandamus and noting that mandamus had never been used in state to grant requested relief). In any event, Plaintiffs need not, and do not, take a position on whether resort to the Illinois Supreme Court would be necessary because the ordinary appellate process to which they would be subject would take longer than is reasonable to require them to wait under the extreme circumstances of this case.

*v. Smith*, No. 19-CR-7206 (Ill. App. 1d Aug. 27, 2019).[18] It is not plausible that it would be completed in time to prevent irreparable harm to Plaintiffs' health and lives.[19] This is particularly evident given that Cook County criminal courts are regularly still denying bail reviews, even for people at high risk of COVID-19.[20]

Finally, bond review is the only mechanism available; there is no state habeas proceeding governing these circumstances. *See Beacham v. Walker*, 231 Ill.2d 51, 58 ("It is well established that an order of *habeas corpus* is available only to obtain the release of a prisoner who has been incarcerated under a judgment of a court that lacked jurisdiction of the subject matter or the person of the petitioner, or where there has been some occurrence subsequent to the prisoner's conviction that entitles him to release."). And even were such a proceeding available, Plaintiffs would not need to file one because a *separate* habeas proceeding is not part of Illinois's "normal process . . . of appellate review." *O'Sullivan*, 526 U.S. at 845.

If this is not an emergency situation it is hard to imagine what would be. As explained in Plaintiffs' motion for a T.R.O., their lives are at risk every day. And, as explained above, exhausting state remedies would take at least *weeks*, if not months, to complete. Therefore, exhaustion would be

---

[18]     Plaintiffs would be happy to share courtesy copies of these orders with the Court and defense counsel, but did not attach them in an effort not to overwhelm the record.

[19]     Named Plaintiffs did not submit requests for bond reduction in the context of the special proceeding instituted by Judge Martin, but this does not constitute a procedural default. As this brief makes clear, exhausting the bond review process would take too long and thus would be futile. Moreover, the situation in the jail has deteriorated rapidly since the time of Judge Martin's special proceeding. Plaintiffs' claims in this Court stem from the risks to their safety now; that it was unclear (to them) that their safety was at risk several weeks ago constitutes cause for their default, even if there were one. *See Wainwright v. Sykes*, 433 U.S. 72 (1977) (establishing cause-and-prejudice standard for procedural default). Additionally, many members of the Plaintiffs class were arrested after Judge Martin's proceedings were concluded and thus would not have had this remedy to pursue, or otherwise had their bond review denied in those proceedings.

[20]     Pretrial detainees who have recently moved to alter their conditions of release on the ground that their lives were threatened in the Jail have been turned away by the state courts. *See, e.g.*, Andy Grimm, "Bail denied—twice—for inmate with COVID-19," Chicago Sun-Times, (Apr. 1, 2020), https://chicago.suntimes.com/coronavirus/2020/4/1/21203554/bail-denied-twice-for-inmate-with-covid-19.

futile, and additionally this Court should exercise its discretion to hear this case even if exhaustion would otherwise be required.

###    III.    Home Confinement or the Electronic Monitoring Program is Custodial, for Purposes of the County Jail Act and the Sheriff's Liability.

This Court asked Plaintiffs to address whether home confinement or electronic monitoring, as administered by the Sheriff, is considered being in "custody" under Illinois law. The answer to that is an unqualified yes.[21]

As evidence of this, the Illinois crediting statute, effective in 2012, provides that pretrial home detention counts toward the calculation of a term of imprisonment. 730 ILCS 5/5-4.5-100(b): ("Except as set forth in subsection (e), the offender shall be given credit on the determinate sentence or maximum term and the minimum period of imprisonment for the number of days spent in custody as a result of the offense for which the sentence was imposed…. *the trial court shall give credit to the defendant for time spent in home detention* on the same sentencing terms as incarceration as provided in Section 5-8A-3." ) (emphasis added). Home detention is "the confinement of a person convicted or charged with an offense to his or her place of residence under the terms and conditions established by the supervising authority." 730 ILCS 5/5–8A–2(C) (West 2012). "Supervising authority" is defined as "the Department of Corrections, probation supervisory authority, *sheriff*, superintendent of municipal house of corrections or any other officer or agency charged with authorizing and supervising home detention." 730 ILCS 5/5–8A–2(E) (emphasis added).

Interpreting this statutory language in toto, the Illinois appellate courts have said that home confinement that is administered by a sheriff's department (as opposed to as a condition of bond set by the criminal court,) constitutes home detention within the purview of the crediting statute, 730 ILCS 5/5-4.5-100(b), since "any violation of the conditions imposed the sheriff's department 'could

---

[21]    As discussed in the April 7, 2020 hearing, this argument is relevant to Plaintiffs' claim concerning the transfer subclass B members, not Plaintiffs' request for release of medically-vulnerable people.

result in [the detainee's] immediate arrest and reincarceration.'" *People v. Smith*, 2014 IL App (3d) 130548, ¶ 37 (holding defendant was not entitled to credit for time served on home confinement where he had been released by trial court as condition of an appeal bond, but differentiating defendant from someone subject to confinement as part of sheriff's home detention program) (citing *Beachem*, 229 Ill. 2d at 251-53) (individual ordered to report to a Sheriff's Day Reporting Program was "in custody" for purposes of the Illinois crediting statute and could be re-incarcerated in the Cook County Jail at the sheriff's discretion and without a warrant.) ("In the present case, the sheriff's decision to modify the means used to hold defendant had no impact on the sheriff's legal authority over defendant or on defendant's obligation to submit to that authority. Thus, defendant…was in custody while participating in the Program.").

Further evidence of this proposition can be found in the Sheriff's regulations governing electronic monitoring and home confinement.[22] These state that failure to abide by the requirements of home confinement, by tampering with the ankle bracelet or telephone device, renders a detainee subject "to prosecution for the crime of escape." Cook County Sheriff Rules and Regulations for Electronic Monitoring (attached as Ex. _); *see also People v. Rogers*, 2012 IL App (1st) 102031, ¶ 8 (discussing Cook County Sheriff's electronic monitoring program including program contract informing detainees that "violation of the program conditions may result in a warrant being issued for your arrest for [the] crime of escape under 730 ILCS 5/5–8A–4.1."). Per those same rules, detainees who wish to obtain "movement" from their home confinement must provide the request to the Sheriff's Department three days in advance. *Id.* Detainees are only allowed movement if approved by the Sheriff. *Id.* They must allow the Sheriff's correctional staff into their home at any time. *Id.* They are in the Sheriff's custody

---

[22] *See* Cook County Sheriff's Office, Electronic Monitoring Rules and Regulations, https://www.cookcountysheriff.org/wp-content/uploads/2018/08/EMU-711G-Particpant-Information-Brochure.pdf (last visited Apr. 7, 2020).

The question of custody is relevant for purposes of consideration of the Illinois County Jail Act in this litigation. *See* 730 ILCS 125/14 ("At any time, in the opinion of the Warden, the lives or health of the prisoners are endangered or the security of the penal institution is threatened, to such a degree as to render their removal necessary, the Warden may cause an individual prisoner or a group of prisoners *to be removed to some suitable place within the county…where they may be confined* until they can be safely returned to the place whence they were removed.") (emphasis added"). The Sheriff had, and still has, the capacity to move people at risk of contracting COVID-19 from the jail facility at 26th and California to another location in his custody, including home confinement, under the terms of the County Jail Act. That he failed to do so when faced with the spread of an infectious disease is objectively unreasonable. *See Miranda*, 900 F.3d at 353-54 (jury must decide if corrections medical officers were liable under Fourteenth Amendment for failure to provide adequate healthcare where there was evidence they "deliberately chose a 'wait and see' monitoring plan," as to detainee who stopped eating and drinking); *Smith v. Kapotas*, No. 18 C 4260, 2020 WL 553619, at *3 (N.D. Ill. Feb. 4, 2020) (citing *Gordon v. City of Orange*, 888 F.3d 1118, 1125 (9th Cir. 2018) (pretrial detainee must prove, among other elements, that "the defendant did not take reasonable available measures to abate [a serious] risk [of harm], even though a reasonable official in the circumstances would have appreciated the high degree of risk involved—making the consequences of the defendant's conduct obvious")).

## CONCLUSION

For the foregoing reasons, and as set forth in Plaintiffs' Complaint, Motion for a Temporary Restraining Order, supplemental briefing on the Prison Litigation Reform Act, and as addressed in the April 7, 2020 hearing, Plaintiffs respectfully request that this Court enter a Temporary Restraining Order and other such relief as set forth in their Class Action Complaint.

19

Respectfully submitted,

/s/ Alexa Van Brunt
Counsel for Plaintiffs

Stephen H. Weil
Sarah Grady
Loevy & Loevy
311 N. Aberdeen
Chicago, IL 60607
Tel:  312-243-5900

Locke E. Bowman
Alexa A. Van Brunt
Roderick and Solange MacArthur Justice Center
Northwestern Pritzker School of Law
375 E. Chicago Avenue, Chicago, IL 60611
(312) 503-0884

Charles Gerstein (*pro hac vice* admission)
Alec Karakatsanis (*pro hac vice* admission)
Civil Rights Corps
1601 Connecticut Ave NW, Suite 800
Washington, DC 20009
202-894-612

## CERTIFICATE OF SERVICE

I, Alexa Van Brunt, an attorney, hereby certify that on April 7, 2020, I caused a copy of the foregoing to be filed using the Court's CM/ECF system and served upon all counsel who have filed appearances in the above-captioned matter.

/s/ Alexa A. Van Brunt
Alexa A. Van Brunt