**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| **ANTHONY MAYS, individually and on behalf of a class of similarly situated persons; and JUDIA JACKSON, as next friend of KENNETH FOSTER, individually and on behalf of a class of similarly situated persons,** ) ) ) ) ) ) ) | |
| ) | |
| **Plaintiffs-Petitioners,** ) | |
| ) | |
| **vs.** ) | **Case No. 20 C 2134** |
| ) | |
| **THOMAS DART,** ) | |
| ) | |
| **Defendant-Respondent.** ) | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

MATTHEW F. KENNELLY, District Judge:[1]

Anthony Mays and Kenneth Foster[2] are pretrial detainees at Cook County Jail in

Chicago, Illinois.  On behalf of themselves and a putative class, they have sued the

Cook County Sheriff Thomas Dart, who operates the Jail, alleging that he has violated

their rights under the Fourteenth Amendment by failing to provide them with reasonably

safe living conditions in the face of the current coronavirus pandemic.  The plaintiffs

assert claims under 42 U.S.C. § 1983 and for writs of habeas corpus under 28 U.S.C. §

2241.  They have moved for entry of a temporary restraining order requiring the Sheriff

---

[1]  Judge Kennelly is addressing this matter as emergency judge pursuant to paragraph 5 of Second Amended General Order 20-0012.

[2] The claim for Foster is brought by Judia Jackson, his next friend, because plaintiffs' counsel attempted to contact Foster by telephone but were unable to reach him due to the Jail's operational limits arising out of the coronavirus pandemic.

to take additional precautions to stem the spread of coronavirus into and within the Jail. Ultimately, plaintiffs contend, they cannot be held at the Jail in a way that is consistent with their constitutional rights—though they do not seek outright release from custody as part of their motion for a temporary restraining order.  Rather, they seek changes in the Sheriff's policies, including in how they are carried out, as well as, for one proposed subclass, a change in the locations where they are kept in custody.  *See* Emerg. Mot. for Temp. Restraining Order of Prelim. Inj., dkt. no. 2, at 15-16, 17–19 (spelling out the relief sought on the request for a TRO).

The Court begins by acknowledging the importance of the issues presented by the parties.  The Sheriff is responsible for operating and administering a very large physical facility—actually a campus of separate physical facilities—whose population, if one considers including both detainees and staff, is the size of a small (but not all that small) town.  This is an extraordinarily difficult task.  The detainee population runs the gamut from persons with lengthy criminal records who are accused of committing violent crimes to non-violent offenders in custody for the first time who, perhaps, remain in custody only because they and their families were unable to post bond money.  And it also runs the gamut from young, healthy persons to older detainees with serious medical or mental health issues.  Operating the Jail, even under normal circumstances, is a very challenging task that occupies a large, full-time staff of policymakers, subject matter experts, and front-line correctional officers, medical and mental health workers, counselors, and others.  And these are not normal circumstances.  Fashioning a public policy and public health response to the coronavirus pandemic has challenged government officials across our country and throughout the world, who are facing a

crisis unlike any we have faced for decades, and perhaps generations. The task is no less difficult, and no less unfamiliar, for administrators of jails.

This does not mean, however, that constitutional protections fall by the wayside. Government officials in our country are bound by constitutional requirements even when they are dealing with difficult and unfamiliar challenges to public health and safety. Persons accused of crimes who are detained pending trial do not shed their constitutional rights at the jailhouse door. The government has determined to lock them up pending determination of their guilt or innocence, and by doing so the government takes on an obligation to protect their health and safety. And it cannot be forgotten that by requiring this, we safeguard the health and safety of the community at large—from which the detainees have come and to which they and the officers guarding them will return.

In light of these considerations, and for the reasons stated below, the Court issues a temporary restraining order, though considerably narrower than the order the plaintiffs have requested. In particular, the Court declines the plaintiffs' request to require the Sheriff to move certain of them to other forms of custodial arrangements such as home incarceration.

### Background

Mays and Foster have serious medical conditions that make them highly vulnerable to complications arising from what has been termed COVID-19, a novel form of coronavirus that is causing a global pandemic. (The Court will use the term coronavirus.) As of this morning, 432,550 Americans and over 1,502,610 people around the world have been diagnosed with the virus—figures that understate its

3

spread, as they include only those who have managed to get tested.   *See* Coronavirus Resource Center, Johns Hopkins Univ. & Med., https://coronavirus.jhu.edu/ (last updated April 9, 2020, 8:38 A.M.).  Over 89,910 have died, including over 14,800 Americans.  *Id.*  At present, there is no known cure and no known vaccine.

People over the age of 65 and people of all ages with serious underlying medical conditions face an elevated risk of suffering from severe illness if they contract coronavirus.  Because the virus spreads more rapidly when people are in close contact with each other, government officials have drastically reduced activity involving person-to-person contact in cities, nations, and economies around the world, including Chicago and Illinois.

Reducing the spread of the virus is, however, especially challenging in jails and prisons.  The Cook County Jail is a complex where, at any given time, thousands of detainees live in either barracks-style dormitories, shared cells, or individual cells as they await trial on the crimes of which they have been accused.  As of April 8, 2020, 251 detainees and 150 employees at the Jail have tested positive for coronavirus, and one detainee has died of apparent complications from it.  *See* COVID-19 Cases at CCDOC, Cook County Sheriff's Office, https://www.cookcountysheriff.org/covid-19-cases-at-ccdoc/ (last updated April 8, 2020, 5:00 P.M.).  While the Court was drafting this opinion, the news broke that the Jail is the largest single known source of infections in the nation.  *See* Timothy Williams and Danielle Ivory, "Chicago's Jail is Top U.S. Hot Spot as Virus Spreads Behind Bars" (April 8, 2020), N.Y. Times, https://www.nytimes.com/2020/04/08/us/coronavirus-cook-county-jail-chicago.html (last updated April 9, 2020, 8:47 A.M.).   The plaintiffs allege that conditions at the Jail—

4

including, for example, the very close proximity in which detainees are held in the Jail's housing divisions and intake areas, inadequate distribution of soap and sanitation supplies for detainees, and a lack of personal protective equipment (PPE) for detainees who have been exposed to others with symptoms of the virus—violate constitutional requirements.

On April 3, 2020, the plaintiffs filed this lawsuit. In Count 1, they allege, under 42 U.S.C. § 1983, that the Sheriff has violated their Fourteenth Amendment right to constitutionally adequate living conditions by failing to implement appropriate measures to control the spread of the virus. In Count 2, they petition for writs of habeas corpus through 28 U.S.C. § 2241 because, they contend, they cannot constitutionally be detained at the Jail during the pandemic.

At the same time the plaintiffs filed suit, they moved to certify a class consisting of "all people who are currently or who will in the future be housed in the Cook County Jail for the duration of the COVID-19 pandemic." Compl., dkt. no. 1, ¶ 60. They also requested certification of two subclasses. "Subclass A consists of all people who, because of age or previous medical conditions, are at particularly grave risk of harm from COVID-19." *Id.* ¶ 61. "Subclass B consists of all people who are currently housed on a tier where someone has already tested positive for the coronavirus." *Id.* ¶ 62.

The plaintiffs also immediately moved for a temporary restraining order or preliminary injunction requiring implementation of specified preventive and protective measures at the Jail. *See* Emerg. Mot. for Temp. Restraining Order of Prelim. Inj., dkt. no. 2, at 15-16. The measures that the plaintiffs seek to implement would require the Sheriff to triage medically vulnerable detainees, enable social distancing, provide

detainees with adequate supplies for sanitation and handwashing, distribute PPE to detainees, and take additional steps when quarantining and isolating symptomatic of coronavirus positive detainees, among other things. And, as indicated, their motion seeks relocation of certain class members to other custodial locations. On April 7, 2020, the Court held a hearing on the motion, at which counsel appeared and argued via telephone.

## Discussion

**A.    Conditional class certification**

The plaintiffs seek classwide relief in the form of a temporary restraining order, but because the lawsuit was just filed there has not yet been a class certification ruling. This does not foreclose the possibility of relief for the plaintiffs at this stage, because a district court has general equity powers allowing it to grant temporary or preliminary injunctive relief to a conditional class. *Lee v. Orr*, No. 13 CV 8719, 2013 WL 6490577, at *2 (N.D. Ill. Dec. 10, 2013) (citing *Ill. League of Advocates for the Developmentally Disabled v. Ill. Dep't of Human Servs.*, No. 13 C 1300, 2013 U.S. Dist. LEXIS 90977, at *10-11 (N.D. Ill. June 28, 2013)); *see also Al Otro Lado v. Wolf*, 952 F.3d 999, 1005 n.4 (9th Cir. 2020); *Gooch v. Life Inv'rs Ins. Co. of Am.*, 672 F.3d 402, 433 (6th Cir. 2012) ("[T]here is nothing improper about a preliminary injunction preceding a ruling on class certification."); *Howe v. Varity Corp.*, 896 F.2d 1107, 1112 (8th Cir. 1990). Furthermore, Federal Rule of Civil Procedure 23(b)(2) "does not restrict class certification to instances when final injunctive relief issues" and permits certification of a conditional class for the purpose of granting preliminary injunctive relief. *Meyer v. Portfolio Recovery Assocs., LLC*, 707 F.3d 1036, 1043 (9th Cir. 2012); *see also Howe*, 896 F.2d at 1112 (affirming

grant of a preliminary injunction to a conditional class).

Under Rule 23(a), the four prerequisites for class certification are numerosity, commonality, typicality, and adequate representation. *Beaton v. SpeedyPC Software*, 907 F.3d 1018, 1025 (7th Cir. 2018). "Once these four prerequisites are satisfied, the potential class must also satisfy at least one provision of Rule 23(b)." *Rosario v. Livaditis*, 963 F.2d 1013, 1017 (7th Cir. 1992). The plaintiffs have made a sufficient showing for conditional certification of Subclasses A and B for the purpose of the present motion for a temporary restraining order.

As for the first prerequisite, numerosity, there is "no magic number" that is regarded as sufficient, but forty is generally accepted as sufficient to satisfy Rule 23(a). *Mulvania v. Sheriff of Rock Island Cty.*, 850 F.3d 849, 859 (7th Cir. 2017). It is undisputed that there are over 4,000 detainees in the Jail, and the plaintiffs cite statistics that in incarcerated populations, on average 15 percent of the detainees have asthma, 10 percent have heart conditions, 10 percent have diabetes, and 30 percent have hypertension. Applying even the lowest of these percentages to the detainee population of over 4,000 yields hundreds of detainees with medical conditions that heighten the risk of harm from a coronavirus infection. This is sufficient to establish numerosity for conditional certification of Subclass A. As for Subclass B, the plaintiffs have likewise sufficiently demonstrated numerosity for purposes of conditional certification. Over two hundred detainees have tested positive for coronavirus, and most detainees are housed in tiers which are shared with anywhere from forty to several hundred other detainees. This is sufficient to show that there are likely far more than forty detainees in proposed Subclass B.

There is also commonality with respect to the claims of Subclass A member and Subclass B members.  Commonality requires at least one question common to all the class members, the answer to which is "apt to drive the resolution of the litigation."  *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011).  Both subclasses' claims turn on a common question of whether detainees are facing an unconstitutional risk of harm to their health due to conditions in the Jail that facilitate the spread of coronavirus and the absence of protections adequate to stem its spread.

The Seventh Circuit has explained that a named plaintiff's claims are typical if they "arise[ ] from the same event or practice or course of conduct that gives rise to the claims of other class members and [are] based on the same legal theory." *Lacy v. Cook County*, 897 F.3d 847, 866 (7th Cir. 2018).  The claims of the named plaintiffs here are typical of the class, because the named plaintiff and the members of the class all contend that they face a serious risk of contracting coronavirus due to the Jail's allegedly deficient living conditions and precautions, and they and the class seek the same relief.  In addition, the named plaintiffs' claims are typical of the putative members of Subclass A, who all contend that they face an elevated risk of experiencing complications if they contract coronavirus, and of the putative members of Subclass B, who all claim exposure at the Jail to someone who has already tested positive.

There is also adequate representation of both subclasses by Foster.  Under this requirement of Rule 23(a), the named plaintiff must be a member of the putative class and must have the same interest and injury as other members.  *Beaton*, 907 F.3d at 1027.  Foster alleges that he faces heightened risk of harm from coronavirus infection because he suffers from stomach cancer, lung disease, asthma, and bronchitis, so he is

a member of putative Subclass A. And because several people on Foster's tier have tested positive for coronavirus, he is also a member of putative Subclass B. Foster shares an interest with members of both subclasses in relief from the jail conditions that the classes allege have put them at risk severe risk of health harm from coronavirus.

In sum, the requirements of Rule 23(a) are sufficiently met to allow provisional certification of both subclasses for purposes of the motion for temporary restraining order.

Rule 23(b)(2) permits class actions if "the party opposing the class has acted or refused to act on grounds that apply generally to the class," so that injunctive or declaratory relief is appropriate for the class as a whole. The plaintiffs satisfy this requirement because they seek "the same . . . injunctive relief for everyone" in the class and in each subclass. *See Chi. Teachers Union, Local No. 1 v. Bd. of Educ. of Chi.*, 797 F.3d 426, 442 (7th Cir. 2015).

For these reasons, the Court conditionally certifies Subclasses A and B for the purpose of the motion for a temporary restraining order.

## B.     Temporary restraining order

The Court addresses in this decision only the plaintiffs' motion for a temporary restraining order, not their motion for a preliminary injunction. One reason is that the motion involves at least some disputed facts that potentially require an evidentiary hearing before they may be determined. *See Dexia Credit Local v. Rogan*, 602 F.3d 879, 884 (7th Cir. 2010); *Promatek Indus., Ltd. v. Equitrac Corp.*, 300 F.3d 808, 814 (7th Cir. 2002), *as amended* (Oct. 18, 2002); *Syntex Ophthalmics, Inc. v. Tsuetaki*, 701 F.2d 677, 682 (7th Cir. 1983). The motion for preliminary injunction is therefore left for

later consideration.

The standard for issuing a temporary restraining order is identical to that governing the issuance of a preliminary injunction. *Trs. of Chi. Reg'l Council of Carpenters Welfare Fund v. Norem*, No. 17 C 4851, 2017 WL 4620798, at *2 (N.D. Ill. Oct. 16, 2017) (citing *Long v. Bd. of Educ., Dist. 128*, 167 F. Supp. 2d 988, 990 (N.D. Ill. 2001)). A court's determination of whether to issue a preliminary injunction or temporary restraining order involves a two-step inquiry, with a threshold phase and a balancing phase. *Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1044 (7th Cir. 2017). At the threshold phase, the moving party must show: (1) without the requested relief, he will suffer irreparable harm during the pendency of his action; (2) traditional legal remedies would be inadequate; and (3) he has some likelihood of success on the merits. *Id.* If the movant satisfies these requirements, the court proceeds to the balancing analysis "to determine whether the balance of harms favors the moving party or whether the harm to other parties or the public sufficiently outweighs the movant's interests." *Id.*

The Court also notes that the plaintiffs are arguably seeking what is sometimes referred to as a "mandatory injunction," that is, a restraining order that requires an affirmative act by the defendant. Mandatory injunctions are "ordinarily cautiously viewed and sparingly issued." *Graham v. Med. Mut. of Ohio*, 130 F.3d 293, 295 (7th Cir. 1997).

### 1. Likelihood of success on the merits

The moving party "need not demonstrate a likelihood of absolute success on the merits." *Whitaker*, 858 F.3d at 1046. A "better than negligible" chance of success is

sufficient. *Id.* (quoting *Cooper v. Salazar*, 196 F.3d 809, 813 (7th Cir. 1999)).

### a. Habeas corpus

Plaintiffs and subclass A have petitioned for a writ of habeas corpus under 28 U.S.C. § 2241, which is the appropriate way for a state pre-trial detainee to challenge his or her detention. *Jackson v. Clements*, 796 F.3d 841, 843 (7th Cir. 2015). "Because a pre-trial detainee is not yet in custody pursuant to the judgment of a State court, relief under 28 U.S.C. § 2254 is not available." *Id.* (internal quotation marks omitted).

Section 2241 has no express exhaustion requirement, but courts apply a common-law exhaustion rule. *Richmond v. Scibana*, 387 F.3d 602, 604 (7th Cir. 2004). A pretrial detainee must "exhaust all avenues of state relief" before seeking a writ of habeas corpus through a section 2241 action. *See United States v. Castor*, 937 F.2d 293, 296–97 (7th Cir. 1991). Although there are exceptions, "the hurdle is high." *Richmond*, 387 F.3d at 604. In deciding whether an exception applies, courts "must balance the individual and institutional interests involved, taking into account 'the nature of the claim presented and the characteristics of the particular administrative procedure provided.'" *Gonzalez v. O'Connell*, 355 F.3d 1010, 1016 (7th Cir. 2004) (quoting *McCarthy v. Madigan*, 503 U.S. 140, 146 (1992), *superseded by statute on other grounds as recognized in Porter v. Nussle*, 534 U.S. 516 (2002)). A court may excuse exhaustion where:

> (1) requiring exhaustion of administrative remedies causes prejudice, due to unreasonable delay or an indefinite timeframe for administrative action; (2) the agency lacks the ability or competence to resolve the issue or grant the relief requested; (3) appealing through the administrative process would be futile because the agency is biased or has predetermined the issue; or (4) where substantial constitutional questions are raised.

11

*Id.*; *see also Chazen v. Marske*, 938 F.3d 851, 863 (7th Cir. 2019) (applying futility exception).

It is undisputed that a state court has the authority to release a pretrial detainee. A detainee in Illinois may challenge his or her detention by seeking judicial review of his or her bond. 725 Ill. Comp. Stat. Ann. 5/110-6.[3] And on March 23, 2020, in response to an emergency petition filed by the Cook County Public Defender, the Presiding Judge of the Cook County Circuit Court's Criminal Division issued an order setting out an expedited bond hearing process that applied to seven designated classes of detainees. Defs.' Resp., Ex. E (dkt. no. 31-1) at 1-2. The classes included those at an elevated risk of contracting coronavirus due to their ages or underlying medical conditions—that is, the putative members of Subclass A. *Id.* The expedited hearings took place from March 24 through March 27. *Id.* at 3–5. Although the expedited hearings do not appear to be currently ongoing, Cook County's courts are still available for emergency matters, and judges are hearing motions to review or reduce bail daily at all locations where court is held. Defs.' Supp. Resp., Ex. A (dkt. no. 41-1) at 1.

The plaintiffs do not contend that they sought expedited bond hearings or initiated any sort of state proceedings challenging their bonds.[4] Instead, they contend

---

[3] At the hearing held on April 7, 2020, though not in their supplemental brief filed after the hearing, the plaintiffs advanced another futility argument, specifically that the risk to their health could not be asserted as a basis to allow release on bond. The argument is unsupported, and it is undercut by the numerous bond reductions and releases that have taken place in recent weeks, largely as a result of the coronavirus outbreak.

[4] At the hearing, but not in any of their briefs, the plaintiffs suggested that the Public Defender's motion could serve to exhaust their claims. But they were not named parties to that motion and, regardless, the state court's ruling on that motion would undermine their argument because it made possible an *additional* avenue of relief.

that exhaustion is futile because the bond review process does not move quickly enough. The defendants, in turn, contend that the plaintiffs should have sought reductions of their bonds through the expedited and/or emergency hearings that were available, may now seek release via other established processes, and that these processes are not futile.

The plaintiffs in subclass A cannot show that they exhausted available state court remedies before petitioning for habeas corpus. As indicated, the plaintiffs have not sought bond reductions at all. And the record reflects that this process is anything but futile. During the week the expedited bond hearings were held, the Jail's population decreased by 424 detainees. Defs.' Resp., Ex. B (dkt. no. 30-2) ¶ 27. Since March 9, the Jail's population has decreased by 1,175 detainees—bringing it to a record low, at least for the past few decades—and even since the completion of the expedited bond hearing process, the Jail's population has decreased by over 265 detainees. *E.g.*, *id.* ¶¶ 10, 28–29.

Nor have the plaintiffs established that the existing and available process for review of their detention is unduly time-consuming in a way that undermines their claimed constitutional rights. They say the process, in its entirety, could take several weeks or months. But this assumes a given detainee will lose at every stage and will have to appeal all the way to the state supreme court. In the Court's view, it is rather incongruous to call an otherwise available process unnecessarily time-consuming or futile when one has made no effort to initiate it. More to the point, the plaintiffs point to no evidence that detainees who have sought bond hearings are currently facing undue delays. Thus although a court may excuse exhaustion in unusual circumstances if it

would cause an unreasonable delay, *see, e.g.*, *Gonzalez*, 355 F.3d at 1016, the plaintiffs have not made the necessary showing. And to the extent they contend that the requirement of exhaustion should be excused due to the nature of the constitutional questions they raise, they have made no showing that the state courts cannot remedy these claimed violations.

In sum, the habeas corpus claim on the part of the representatives of subclass A is barred due to their failure to exhaust available state court remedies. As a result, the subclass has no likelihood of success on the merits.[5] This renders moot the plaintiffs' request for the Court to establish a procedure for the expedited consideration of release of the members of subclass A, which the plaintiffs sought only with respect to the habeas corpus claim.

Though this determination renders the parties' other arguments regarding habeas corpus superfluous, the Court will address certain of them to ensure a more complete record and to eliminate issues from the need for future consideration. First, the parties dispute whether detainees can even challenge the conditions of their confinement through section 2241—an issue that has also divided courts. *Compare, e.g.*, *Aamer v. Obama*, 742 F.3d 1023, 1032 (D.C. Cir. 2014) (a prisoner may challenge the conditions of his confinement in a federal habeas corpus petition) *and Thompson v. Choinski*, 525 F.3d 205, 209 (2d Cir. 2008) (same) *with Spencer v. Haynes*, 774 F.3d 467, 469–70 (8th Cir. 2014) (section 2241 petitions may not challenge conditions). The Seventh

---

[5] If the plaintiffs wish to seek prompt appellate review of this ruling, the Court is willing to consider dismissing Count 2 of their complaint for failure to exhaust and certifying the ruling for immediate appeal under 28 U.S.C. § 1292(b). Any such request should be presented to the undersigned judge in his capacity as emergency judge.

Circuit has expressed a "long-standing view that habeas corpus is not a permissible route for challenging prison conditions," at least when a prisoner's claim does not have "even an indirect effect on the duration of punishment." *Robinson v. Sherrod*, 631 F.3d 839, 840–41 (7th Cir. 2011). But the Seventh Circuit has also noted that "the Supreme Court [has] left the door open a crack for prisoners to use habeas corpus to challenge a condition of confinement." *Id.* at 840 (internal quotation marks omitted) (citing *Glaus v. Anderson*, 408 F.3d 382, 387 (7th Cir.2005); *Nelson v. Campbell*, 541 U.S. 637, 644–46 (2004); *Bell v. Wolfish*, 441 U.S. 520, 526 n.6 (1979); *Preiser v. Rodriguez*, 411 U.S. 475, 499–500 (1973)). Were the Court required to address this point, it would not consider it to be an absolute bar to plaintiffs' motion for a temporary restraining order. The plaintiffs' claims, as they have framed them, *do* bear on the duration of their confinement (they contend, ultimately, that they cannot be held in the Jail consistent with the Constitution's requirements), and they are not the sort of claims that are, or can be, appropriately addressed via a claim for damages. The Court need not, however, decide this point definitively at this point.

Next, the Sheriff argues that he has no authority to release detainees because, he contends, only the criminal trial court has authority to release a person in custody. Citing the Illinois County Jail Act, 730 Ill. Comp. Stat. Ann. 125/14, the Sheriff contends that he can transfer pretrial detainees—which, his counsel conceded at the hearing (contrary to statements in the Sheriff's brief), could include placing them in home custody—but that he lacks authority to release them outright. This argument has no bearing on the petition for habeas corpus. The issuance of writ of habeas corpus through a section 2241 petition is a federal remedy (in other words, it does not depend

on state law), and a habeas corpus petition is *always* addressed to the prisoner's custodian, in this case the Sheriff. *Rumsfeld v. Padilla*, 542 U.S. 426, 447 (2004) ("Whenever a § 2241 habeas petitioner seeks to challenge his present physical custody within the United States, he should name his warden as respondent."). Whether the Sheriff has authority under state law to release detainees on his own does not matter.

Finally, the Sheriff also suggests that the subclass A plaintiffs' habeas corpus petition is barred by *Younger v. Harris*, 401 U.S. 37 (1971), which "requires federal courts to abstain from interfering with pending state proceedings to enforce a state's criminal laws and certain other types of law as well." *Sweeney v. Bartow*, 612 F.3d 571, 573 (7th Cir. 2010). Although the Seventh Circuit has held that *Younger* abstention may apply to a habeas corpus petition, *id.*, there is no basis to abstain here, as there is no pending state proceeding. The Sheriff's real argument is non-exhaustion, not *Younger* abstention.

### b.    Section 1983 claim

The Fourteenth Amendment protects pretrial detainees, who are entitled to a constitutional presumption of innocence, from being held in conditions that amount to punishment. *Miranda v. County of Lake*, 900 F.3d 335, 350-51 (7th Cir. 2018). Analysis of a due process challenge to conditions of confinement involves two steps. *See Miranda*, 900 F.3d at 353. The first is a determination of whether the defendant's conduct was purposeful, knowing, or "perhaps even reckless[]," *id.*, with respect to the "physical consequences in the world" of his conduct. *Kingsley v. Hendrickson*, 576 U.S. 389, 135 S. Ct. 2466, 2472 (2015). The conditions created by the defendant's conduct must be, "from an objective standpoint, sufficiently serious."

*See Gray v. Hardy*, 826 F.3d 1000, 1005 (7th Cir. 2016).[6]  The second step is an assessment of the reasonableness of the defendant's conduct, in light of the "totality of facts and circumstances" facing the defendant.  *McCann v. Ogle County*, 909 F.3d 881, 886 (7th Cir. 2018).  The reasonableness of the defendant's conduct is measured objectively "without regard to any subjective belief held by the [defendant]."  *Id.*

### i.   Knowing conduct and seriousness of conditions

The Sheriff does not dispute that his establishment of certain policies and his non-establishment of others that are sought amounts to knowing conduct; at the hearing.  For a condition created by a defendant's conduct to be "sufficiently serious" to violate a detainee's Fourteenth Amendment rights, the defendant's knowing acts or omissions must result "in the denial of the minimal civilized measure of life's necessities."  *See Gray*, 826 F.3d at 1005 (quoting *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)).  Actual, present harm is not required; conditions that pose an "unreasonable risk of serious damage to the [detainee's] future health" may violate a detainee's Fourteenth Amendment rights.  *See Henderson v. Sheahan*, 196 F.3d 839, 847 (7th Cir. 1999).  To determine if conditions of confinement pose an "unreasonable risk" to pretrial detainees' future health, a court must make a "scientific and statistical inquiry into the seriousness of the potential harm and the likelihood that such injury to

---

[6]  The claim in *Gray* was brought by a convicted prisoner, not a pretrial detainee, and therefore his claim was governed by the Eighth Amendment, not the Fourteenth Amendment.  The analyses of conditions-of-confinement claims under Fourteenth Amendment and Eighth Amendment overlap in the assessment of whether the conditions were sufficiently severe, but they diverge in the assessment of the propriety of the defendant's conduct: the standard is subjective for Eighth Amendment claims (which require a showing of deliberate indifference) and objective for Fourteenth Amendment claims (which require a showing of unreasonableness).  *See Hardeman v. Curran*, 933 F.3d 816, 822 (7th Cir. 2019).

health will actually be caused" by the conditions. *Id.* A court must also consider whether the risk of harm was "not one that today's society chooses to tolerate." *Id.*

The plaintiffs are reasonably likely to succeed in showing that at least some of the conditions they cite pose an unreasonable risk to their future health. *See id.* The scientific evidence in the record— including the Center for Disease Control's Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities ("CDC Guidelines") and a declaration from medical doctors submitted by the plaintiffs—reflects that coronavirus is highly contagious, persists in the environment, and may be hard to detect by observation of symptoms only. The virus apparently spreads easily, through coughing or sneezing; droplets with the virus can remain in the air for up to three hours. Additionally, and importantly for purposes of the present case, coronavirus apparently persists on plastic and stainless steel surfaces for up to two to three days. Those who have been infected with the virus may not become symptomatic for up to fourteen days. In light of these qualities and the present lack of a vaccine or cure for the virus, frequent handwashing, social distancing, sanitation of surfaces, and the use of PPE are the only available methods to protect against coronavirus infection.

In the context of this evidence, the plaintiffs have demonstrated that certain of the conditions created by the intentional actions of the Sheriff enable the spread of coronavirus and significantly heighten detainees' risk of contracting the virus. First, the affidavits from current and recently released detainees reflect that Sheriff's personnel have not been cleaning common spaces after a detainee on the tier has tested positive

for coronavirus.[7]  The affidavits submitted by the plaintiffs also reflect that detainees are being housed under conditions that make social distancing impossible, thereby facilitating the spread of coronavirus.  Many detainees are in congregate living situations, in which anywhere from forty to over a hundred detainees are housed in a single room.  The beds in these open living spaces are very close together, separated by only one to four feet.  And detainees who are housed in single- or dual-occupancy cells still must use common bathroom facilities, which are typically shared by forty to fifty people, including large groups at a single time.

The affidavits submitted by the plaintiffs further suggest that detainees currently lack the means to attempt to protect themselves from a potential coronavirus infection. Although they are sharing tier with someone who has tested positive for coronavirus, the plaintiffs contend, the Sheriff has not provided them with adequate supplies of soap, with cleaning supplies, or with PPE such as facemasks.  The record reflects that only symptomatic detainees have been issued facemasks and that detainees otherwise have not received any PPE.  The plaintiffs' affidavits reflect that requests for facemasks have been refused by Jail personnel and that when detainees have resorted to making their own masks from cloth, those masks have been confiscated.

The plaintiffs also contend that the Jail is not screening its population to identify, and separate, detainees who have heightened vulnerability to coronavirus disease due

---

[7]  Although the Sheriff objects that many of the plaintiffs' affidavits contain hearsay, it is well established that a Court may consider hearsay in ruling on a preliminary injunction motion (and thus on a motion for a temporary restraining order).  *See SEC v. Cherif*, 933 F.2d 403, 412 n.8 (7th Cir. 1991).

to age or preexisting medical conditions. As a result, the plaintiffs contend, those detainees are housed, and will in the future be housed, in tiers where a detainee has tested positive. The plaintiffs argue that this places these vulnerable detainees at a high risk of severe health consequences.

The statistical evidence that exists also indicates that the conditions at the Jail have created a significant and unreasonable risk to the plaintiffs' future health. The Jail currently has the highest rate of new coronavirus infections in the country, and it far exceeds that of Cook County. As of April 6, 2020, the infection rate in Cook County was 1.56 per 1000 people, whereas in the Jail, it was 50 per 1,000 people. The disparity between these rates tends to support the contention that the conditions at the Jail facilitate the spread of coronavirus and exacerbate the risk of infection for detainees.

The plaintiffs have shown a reasonable likelihood of success on their contention that at least some current conditions at the Jail relating to the Sheriff's response to the coronavirus outbreak collectively create a risk of harm from coronavirus that is "not one that today's society chooses to tolerate." *See Sheahan*, 196 F.3d at 847. In recognition of the importance of social distancing, Illinois' governor has instituted a statewide stay-at-home order. Frequent handwashing, use of PPE such as facemasks, and sanitizing of commonly used surfaces have, in the past several weeks, become routine precautions employed by the general population. Under the circumstances, plaintiffs are reasonably likely to succeed on their contention that conditions at the Jail create an unreasonable risk to their health that is sufficiently serious to bring their due process rights into play, thus requiring assessment of the reasonableness of the Sheriff's actions.

20

### ii.    Objective reasonableness

Objective reasonableness is assessed from the perspective of "a reasonable [official] on the scene," based on what the officer knew at the time, *Kingsley*, 135 S. Ct. at 2473; from that perspective a court determines if the official acted reasonably to mitigate the risks to health and safety of the detainees.  *See Hardeman*, 933 F.3d at 825; *see also Darnell v. Pineiro*, 849 F.3d 17, 35 (2d Cir. 2017).  In assessing the reasonableness of the Sheriff's conduct, the Court must account for his legitimate interest in managing the Jail facilities and must defer to policies and practices that "are needed to preserve internal order and discipline and to maintain institutional security."  *Kingsley*, 135 S. Ct. at 2473 (quoting *Bell*, 441 U.S. at).

The Sheriff argues that his conduct has been objectively reasonable because he has promulgated policies and procedures intended to implement the CDC Guidelines, which both parties have expressly relied upon as a guide to assessing the reasonableness of the Sheriff's conduct.  The establishment of a policy that is consistent with authoritative guidance and best practices may, in fact, comply with constitutional requirements.  But establishing appropriate policies does not fully discharge the Sheriff's constitutional obligations; a policy is only as good as its execution.  In this case, the plaintiffs challenge certain of the Sheriff's policies as inadequate and thus unreasonable, but they also challenge the implementation of other policies that may be facially adequate.  For example, the plaintiffs offer an affidavit from a correctional officer who states that, despite the Sheriff's declared policy, facemasks are being rationed and are not readily available for Jail staff.  And they likewise offer affidavits from recent detainees and from persons who have spoken with current detainees that are indicative

of objectively unreasonable deficiencies in the implementation of certain of the Sheriff's declared policies.

With these considerations in mind, the Court assesses the plaintiffs' likelihood of success on its challenges to the Sheriff's actions in response to the health risks to detainees posed by coronavirus.

### a. Medical triage of vulnerable detainees

The plaintiffs contend that the Sheriff has not established a process to identify detainees who are in high risk categories for complications from coronavirus or measures to separate vulnerable detainees from others who are confirmed or suspected of having the virus. The Sheriff contends he has worked to establish policies that are consistent with the CDC's guidelines and that identify potentially vulnerable detainees. He points to evidence that Sheriff's personnel are working to help the state courts expedite case and bond review hearings by identifying detainees who are considered at a high risk of having complications from the virus based on age or medical conditions. But apart from using medical alerts in the Sheriff's office's computer system, the submissions made to the Court offer no description of an actual process for identifying vulnerable detainees.

Given the widely acknowledged risks to medically vulnerable individuals, it undoubtedly would be advisable for the Sheriff to identify, in advance of any symptomatology, detainees who are in high-risk categories. The CDC's guidance says that correctional facilities should ensure that detainees are medically evaluated and treated "at the first signs of COVID-19 symptoms," including a determination regarding whether an individual is in a high-risk category. Defs.' Resp., Ex. O (dkt. no. 30-15), at

23. Knowing in advance who the high-risk detainees are, and maintaining an accessible record of this, would facilitate more careful monitoring and treatment of the medical condition of any such person who develops symptoms consistent with coronavirus disease. But the CDC's guidance does not require correctional facilities to identify medically vulnerable detainees before they show symptoms or to segregate them from other detainees in advance. For purposes of the present motion, the Court cannot say that the plaintiffs are likely to succeed on their contention that the Sheriff's claimed failure to identify these detainees in advance is objectively unreasonable.

### b. Social distancing

The plaintiffs contend that the Sheriff's policies run afoul of social-distancing guidance; the Sheriff has not mandated this within the Jail; and current housing arrangements make social distancing impossible or virtually so, at least in many of the Jail's divisions. In several areas, detainees are housed in congregate setting somewhat euphemistically called "dormitory"-type rooms—really, more like a military barracks, with dozens of inmates in close-quarters bunkbeds in a single large room. In others, detainees are doubled-celled in very small rooms. And in most areas of the Jail, large groups of detainees share showers, bathrooms, and dayrooms, as is common in most pretrial detention facilities. The plaintiffs contend that this runs afoul of CDC guidance and unreasonably endangers detainees' health. The Sheriff contends that he is undertaking what he contends are reasonably feasible efforts to socially distance detainees and to educate them on the need for social distancing and how to practice it. The Sheriff also contends that he is working to reduce the occupancy of the Jails' dormitory-style housing by as much as fifty percent. He also points to a policy that

requires the isolation of new detainees from the Jail's general population for fourteen days as of April 6, 2020 (up from seven days in an earlier iteration of the policy).

At the April 7 hearing, however, defense counsel was unable to confirm whether such efforts make it possible to separate detainees' beds by six feet or, indeed, how much separation exists in the dormitory-type buildings. The only evidence in the record suggests that detainees likely are still packed rather closely in those facilities. In addition, the record appears to reflect that the Sheriff continues to maintain the historical practice of holding all new detainees awaiting intake for extended periods in enclosed, crowded cells commonly called bullpens. This occurs even before new detainees—all of whom have come from the community at large—are medically evaluated. This, it would appear, is a volitional, knowing policy choice by the Sheriff.

Plaintiffs have shown a reasonable likelihood of success on their contention that the intake procedure is objectively unreasonable and creates an undue risk of harm to new detainees who are thereby exposed to others who have not been medically evaluated and may have coronavirus disease symptoms. The CDC's guidance recommends that correctional facilities "[e]nforce increased space between individuals in holding cells, as well as in lines and waiting areas such as intake." Defs.' Resp., Ex. O (dkt. no. 30-15), at 11. There is no evidence that the Sheriff is enforcing those measures, particularly with respect to the intake process; indeed, what evidence exists is to the contrary.

It is less clear, however, that the Sheriff's existing housing arrangements for admitted detainees may be considered objectively unreasonable. In this regard, the CDC's guidance is not as definitive as plaintiffs suggest; it acknowledges that space

24

limitations may require a departure from better social-distancing practices. Though the existing situation likely increases the risk to detainees, the CDC's guidance expressly recognizes that complete social distancing may not be possible in the sleeping areas of a jail. Space constraints at the Jail do not allow for the more preferable degree of social distancing that exists in the community at large. The Court concludes that plaintiffs have filed to show a reasonable likelihood of success on their contention that the Sheriff is acting in an objectively unreasonable manner by failing to mandate full social distancing. This is particularly so because the Sheriff's submission reflects an ongoing effort to modify custodial arrangements at the Jail in a way that will permit greater separation of detainees.

### c. Sanitation

The plaintiffs contend that, although sanitation and handwashing are considered to be among the best defenses against the spread of coronavirus, the Sheriff's policies fail to provide for sufficient distribution of soap, sanitizing agents, and cleaning products to detainees. In particular, the plaintiffs note, the Sheriff's coronavirus response plan does not provide for the distribution of sanitation supplies to detainees at all. Affidavits submitted by and on behalf of both current and former detainees reflect that detainees are not being given sanitation supplies to clean cells or shared showers that have not otherwise been sanitized, and that they either have not received soap or received only a very small supply insufficient to permit the frequent hand-washing recommended by public health experts. In addition, a correctional officer who has submitted an affidavit in

support of plaintiffs' motion[8] states that access to soap and sanitation supplies also pose a problem for Jail staff who have some responsibility for cleaning areas under their observation and control. For his part, the Sheriff contends he is working to distribute supplies more frequently, to implement more frequent and thorough sanitary measures, and follow the CDC's guidelines.

The CDC's guidance advises correctional facilities to ensure that sufficient amounts of sanitation and cleaning supplies are available and that detainees have free soap "sufficient to allow frequent hand-washing." Defs.' Resp., Ex. O (dkt. no. 30-15), at 8. The CDC also advises that frequently touched surfaces should be cleaned and disinfected several times a day. The Sheriff, however, has offered nothing to indicate that his policies ensure the provision of sufficient soap to detainees (let alone that it is being provided free of charge, assuming that is a relevant consideration for present purposes). By contrast, there is plenty of evidence to the contrary. The Sheriff also points to policies that call for sanitation and cleaning supplies to be made available to detainees, but he offers no evidence that this is actually happening on the ground, and as indicated the plaintiffs have offered significant evidence reflecting that it is *not* happening. This means that it is highly likely, as the plaintiffs contend, that numerous areas subject to common access in the Jail, including dayrooms, other common areas like showers and bathrooms, two-person cells, and the dormitory-type rooms, are going uncleaned for extended periods, thus increasing the risk of transmission of coronavirus

---

[8] At the hearing, defense counsel attempted to cast doubt upon the credibility of the correctional officer, saying that he had been involved in other disputes or lawsuits with the Sheriff. The Court does not and need not make a credibility determination at this stage, other than to note that the officer's statements are consistent with those made by detainees in other affidavits submitted by the plaintiffs.

by detainees not yet isolated as symptomatic who have been in or touched objects in those areas. The Court cannot at this point quantify the risk, but the significant number of confirmed coronavirus infections among detainees certainly suggests the risk is significant. For these reasons, the Court concludes that plaintiffs have shown a reasonable likelihood of success on their claim that the execution of the Sheriff's policies regarding sanitation and sanitation supplies is objectively unreasonable.

### d. PPE

The plaintiffs next contend that the Sheriff's policies do not require providing PPE to every detainee and that this is objectively unreasonable under the circumstances. The first of these propositions appears to be undisputed: detainees as a whole are not being issued facemasks or other forms of PPE. Current and former detainees have stated via affidavits that they did not receive any PPE, that only detainees with symptoms received PPE, that detainees' requests for PPE have been denied by Sheriff's personnel, and that when detainees tried to make their own face coverings, officers have confiscated them. The Sheriff has offered no contrary evidence on these points. The plaintiffs also suggest that some, but not all, correctional officers wear or have been wearing PPE in the Jail—at least, not until recently (though even this appears to be disputed via the affidavit from the correctional officer submitted by the plaintiffs on the morning of April 7). The Sheriff contends that he has been proactively working to obtain PPE and conform with best practices regarding its use, including, as of recently, requiring all employees to wear PPE in the Jail. The Sheriff also offers evidence that he has created a team of officers who patrol tiers checking that correctional staff are appropriately are using PPE.

The CDC's guidelines for detainees' use of PPE recognize some flexibility; they require symptomatic detainees to wear masks but do not mandate this for those detainees' close contacts. But the CDC's guidance also indicates that asymptomatic detainees should get "face masks for source control as feasible based on local supply, *especially if housed as a cohort.*" Defs.' Resp., Ex. O (dkt. no. 30-15), at 25 (emphasis added). Based on the record before the Court, the Sheriff's office gives PPE only to symptomatic detainees—a significant but still relatively modest proportion of the total detainee population at this point—even though the Sheriff currently has enough supplies to provide PPE to employees for at least a month. Because current guidance indicates that even cloth masks can reduce the spread of coronavirus, and the virus is spreading rapidly throughout the Jail, the plaintiffs have a reasonable likelihood of success on their contention that it is objectively unreasonable for the Sheriff to fail to provide facemasks at least to those detainees who are in quarantine—i.e., those who have been exposed to a detainee who is symptomatic (even if not coronavirus-positive). This failure creates an increased risk of further spread of coronavirus to other detainees, not to mention Jail staff and, by extension, members of the general public with whom those staff members have contact. The plaintiffs likewise have shown a reasonable likelihood of success on their contention that the Sheriff is not enforcing the use of PPE by Jail staff who come into contact with detainees, which poses a similar risk to detainees given those staff members' exposure to others outside the Jail.

### e. Quarantine and isolation

The plaintiffs also criticize the Sheriff's policies on quarantining detainees who have been exposed to other detainees who have exhibited symptoms consistent with

coronavirus disease. The policy, as discussed earlier, calls for quarantining the entire tier where any such detainee was housed for a fourteen-day period, extended if someone else in the tier thereafter exhibits symptoms. But plaintiffs' criticism is not that the policy is inappropriate. Rather their contention appears to be that in the near to medium term the Sheriff's practice will make it impossible for him to manage the crisis given the number of tiers that likely will be under quarantine. Plaintiffs' position, it seems to the Court, amounts to a contention that the practice of quarantining is likely to fail, so the Court will ultimately have to order detainee releases now to relieve the pressure. That, however, is not the issue currently before the Court, and in any event the plaintiffs have not made the showing that this is an appropriate remedy at this point.[9]

The Sheriff contends that he is following the CDC's guidance and has implemented it. As indicated, he has quarantined for at least fourteen days any detainee who has been in contact with a symptomatic detainee, and if a tier is quarantined, no new detainees are admitted to it or transferred from it. In addition, symptomatic detainees are moved to isolation tiers, and coronavirus-positive detainees are moved to different isolation tiers, for at least fourteen days. The plaintiffs offer no evidence reflecting that this is not what the Sheriff is doing.

The CDC's guidance does not require correctional facilities to individually isolate detainees who have tested positive for coronavirus or have been in close contact with

---

[9] For this reason, and because the requirements of 18 U.S.C. § 3626(a)(3)(A) have not been met, the Court need not address the applicability of section 3626 to the plaintiffs' request for relief. The same is true with regard to subclass B's request to be transferred to alternate custodial locations. At least at present, the plaintiffs are not seeking release from custody.

29

someone who has. Rather, the CDC recognizes that some facilities may not have enough individual cells for individual isolation and may need to quarantine together groups of detainees exposed to others who have tested positive. The CDC's guidance further states that if a correctional facility has a need to isolate or quarantine detainees in groups, detainees with confirmed coronavirus cases should not be placed into isolation with symptomatic detainees or other detainees. The Sheriff's policies follow this recommendation, and the plaintiffs point to no evidence that he is not implementing those policies. The Court concludes that plaintiffs have not shown a reasonable likelihood of success on their contention that the Sheriff's quarantining policies and practices are objectively reasonable.

### f. Coronavirus testing

The plaintiffs contend—and it is reasonable to believe—that there are likely more infections in the Jail than currently reported because of the limited availability of coronavirus tests. They ask the Court to order the immediate implementation of rapid testing. The Sheriff contends that Cermak Health Services has obtained approval to start administering a rapid testing process developed by Abbott Laboratories as of April 7. But when the Court asked at the hearing—on April 7—about the status of that testing, the Sheriff's counsel did not know whether or how it was being implemented. Rather, counsel said that this was up to Cermak, which is controlled by Cook County, not the Sheriff.

The CDC's guidance does not offer a specific recommendation on how widely testing should be done. It does imply, however, that people who are symptomatic should be tested if feasible. In light of the evidence that the Sheriff now has access to

rapid coronavirus testing, it is not objectively reasonable for the Sheriff himself—not just Cermak Health Services—to fail to have a policy in place regarding implementation of prompt testing, in particular for detainees who exhibit symptoms consistent with coronavirus disease. *See, e.g.*, *Calhoun v. Ramsey*, 408 F.3d 375, 380 (7th Cir. 2005) (failure to have a policy may, in certain circumstances, constitute an unconstitutional policy).

### 2. Irreparable harm and inadequate remedy at law

To meet the threshold requirement for a temporary restraining order, the plaintiffs must also demonstrate that without it, they will suffer irreparable harm for which they lack an adequate remedy at law. *Whitaker*, 858 F.3d at 1044, 1046. This requires a showing of more than a "mere possibility" of harm, but harm need not be a certainty in order for a court may grant relief. *Id.* at 1044.

The plaintiffs have adequately shown a likelihood that they will suffer irreparable harm without a temporary restraining order. Some of the plaintiffs—at least those over the age of 65 or with preexisting health conditions—risk severe health consequences, including death, if they contract coronavirus disease. For others, a coronavirus infection may result in permanent lung damage. These grave risks to health are not an insignificant possibility for the plaintiffs, all of whom are housed in units or tiers in which a person has tested positive for coronavirus, all or nearly all of whom are housed in close proximity with others, and many and likely most of whom have not been given sufficient soap or sanitation supplies, let alone PPE. "[A] remedy for unsafe conditions need not await a tragic event." *Helling v. McKinney,* 509 U.S. 25, 33 (1993). And because the risk of harm to plaintiffs is a grave threat to their health and possibly their

lives, they have shown a risk of harm for which "it is not practicable to calculate damages" and therefore has no adequate remedy at law. *See Foodcomm Int'l v. Barry*, 328 F.3d 300, 304 (7th Cir. 2003); *cf. W.S.R. v. Sessions*, 318 F. Supp. 3d 1116, 1126 (N.D. Ill. 2018) (no adequate remedy of law to address harm from prolonging child's separation from parent).

### 3. Balancing of harms

"Once a moving party has met its burden of establishing the threshold requirements for a preliminary injunction, the court must balance the harms faced by both parties and the public as a whole." *Whitaker,* 858 F.3d at 1054. The nature of the balancing depends on the moving party's likelihood of success: the higher the likelihood, the more the balance tips in favor of granting injunctive relief. *Id.*

The Sheriff argues that this balance tips against entry of a temporary restraining order because an injunction requiring him to implement additional health and protective measures would be disruptive to his ongoing efforts to address the spread of coronavirus in the Jail. The Sheriff also argues that the Court should defer to the Jail's practices and its execution of policies that preserve internal order, discipline, and security in the facility. *See Bell*, 441 U.S. at 547. The plaintiffs contend that their risk of severe health consequences or death as a result of coronavirus infection is so grave that it tips the balance in favor of granting a temporary restraining order. Additionally, the plaintiffs argue that the public health interest in limiting the spread of the virus also favors granting relief.

The Court concludes that the balance favors granting injunctive relief to the plaintiffs to the limited extent contemplated by this order. First, as detailed above, the

plaintiffs have presented ample evidence of conditions that pose an unreasonable risk of serious harm to the class members' health and at least some shortcomings in the Sheriff's mitigation of that risk. As the Court has detailed, this showing, on the points identified earlier, surpasses the plaintiffs' burden of showing a "better than negligible" chance of success. *Whitaker*, 858 F.3d at 1046. Furthermore, the interest of the public in containing the further spread of this highly contagious virus also favors granting relief to the plaintiffs.

The Court again acknowledges the deference owed to the Sheriff in the operation of the Jail and in his development of internal procedures to maintain safety, order, and security and to response to this severe crisis. The Court has taken these considerations into account in ordering the limited relief described in this order. The Court has tailored this relief to account for deference to the Jail's ongoing planning and efforts to address the risks associated with the coronavirus outbreak. The Court has also, as indicated earlier, taken into account the enhanced requirements for issuing what it has referred to as a "mandatory injunction." The risk to the health and safety of detainees and others is sufficient to invoke this form of relief.

## C.    Remedy

For the reasons stated above, the plaintiffs have met the criteria for a temporary restraining order with regard to at least parts of the claim Count 1 of their complaint. The next question is what remedy is appropriate under the circumstances. The Court addresses in turn each category of remedy the plaintiffs seek.

### 1.    Coronavirus testing

The plaintiffs seek an order requiring the Sheriff to acquire access to rapid

coronavirus testing and ensure that all people who enter the Jail with the virus can be quickly identified and medically isolated. They also seek an order requiring the Sheriff to quarantine all new detainees until test results become available or, if testing cannot be done, for fourteen days unless they become symptomatic.

In light of the evidence that the Sheriff now has access to rapid coronavirus testing, and for the reasons previously stated, the Court grants plaintiffs' request only to the following limited extent. The Court directs the Sheriff to establish by April 11, 2020, and to implement immediately thereafter, a policy requiring prompt coronavirus testing of detainees who exhibit symptoms consistent with coronavirus disease as well as, at medically appropriate times and to the extent feasible based on the acquisition of sufficient testing materials, detainees who have been exposed to others who have exhibited those symptoms or have tested positive for coronavirus.

Because evidence shows the Sheriff has a policy in place requiring a fourteen-day quarantine of all new detainees (the apparent length of coronavirus's incubation period), the Court declines to require further testing or quarantining of new detainees before housing them in the general population, though the Sheriff should account for new detainees in his testing plan.

### 2. Quarantining and social distancing

The plaintiffs also seek an order requiring the Sheriff to medically isolate all detainees who are positive for COVID-19 in a controlled, monitored environment in which they are not at risk for infecting others; quarantine all detainees who are symptomatic and/or have been exposed to a confirmed case of COVID-19 in such an environment; and mandate social distancing among all detainees. For the reasons

34

described earlier, the Court at this time directs only that the Sheriff enforce, effective on April 11, 2020, social distancing during the new detainee intake process, including suspending the use of bullpens to hold new detainees awaiting intake.

### 3. Sanitation

The plaintiffs next seek an order requiring the Sheriff to provide sufficient soap and hand sanitizer to all detainees so that they may frequently wash their hands. In addition, they seek an order directing the Sheriff to provide sanitation supplies to enable all staff and detainees to regularly sanitize surfaces and objects on which coronavirus could be present and to provide supervision to ensure that sanitizing takes place between uses of those surfaces and objects. They also seek an order directing the Sheriff to educate all staff and detainees on the importance of regularly sanitizing all surfaces and objects on which the virus could be present.

For the reasons stated above, the Court directs the Sheriff to begin, by April 10, 2020, providing soap and/or hand sanitizer to all detainees in quantities sufficient to permit them to frequently clean their hands. The Court also orders the Sheriff to begin, by April 10, 2020, providing adequate sanitation supplies to enable all staff and detainees to regularly sanitize surfaces and objects on which the virus could be present, including in all areas occupied or frequented by more than one person (such as two-person cells, as well as bathrooms and showers). The Court further directs the Sheriff to establish, by April 11, 2020, a policy requiring sanitization between all uses of frequently touched surfaces and objects as well as monitoring and supervision to ensure that such sanitization takes place regularly. In light of evidence that the Sheriff has established education programs on preventative measures pertaining to

35

coronavirus, the Court declines to impose any further requirements in this regard.

### 4. PPE

For the reasons the Court has described, it declines plaintiffs' request for an order requiring the Sheriff to provide *all* detainees with PPE. Instead, the Court orders the Sheriff, effective April 12, 2020, to provide facemasks to all detainees who are quarantined—i.e., those who have been exposed to a detainee who is symptomatic (even if not coronavirus-positive).

It appears to the Court that, as of the date of the hearing, the Sheriff is adequately enforcing the use of PPE by Jail staff who come into contact with detainees, so the Court declines to impose further requirements in that regard.

### 5. Adequate medical staff

The plaintiffs request the Court to order the Sheriff to provide adequate medical staff to monitor all detainees within the Jail. Because the plaintiffs have pointed to no evidence that the Jail's medical staff are under the purview of the Sheriff, as opposed to Cermak Health Services, the Court declines to impose this requirement upon the Sheriff. The Court also notes that the record does not sufficiently reflect a current lack of adequate medical staff, making the requested relief inappropriate as part of a temporary restraining order even were this a matter under the control of the Sheriff.

### 6. Medical triage of vulnerable detainees

For the reasons stated above, the Court declines to enter an order requiring the Sheriff to immediately identify or segregate all medically vulnerable detainees even if they are not showing symptoms.

**7.    Transfer of Subclass B members**

Finally, the plaintiffs have requested an order requiring transfer of the putative members of Subclass B to a safe facility or other forms of custody.  They contend that even the implementation of reasonable sanitation and other related procedures is insufficient to protect these class members, some of whom may already have been exposed to coronavirus, from contracting the disease.  The Court concludes that plaintiffs have not demonstrated that the requirements of this temporary restraining order, coupled with the steps the Sheriff is already taking to prevent the spread of the disease, are insufficient and thus denies this requested relief.

**Conclusion**

For the foregoing reasons, the Court grants in part plaintiffs' motion for a temporary restraining order [dkt. no. 2] with regard to Count 1 of the complaint but otherwise denies the motion.  The Court enters a temporary restraining order to the extent explained in the relief section of this opinion.  The Court directs the Sheriff to file a report by 4:00 p.m. on April 13, 2020 regarding his implementation of the Court's directives.  The case is set for a telephonic status hearing before the undersigned judge, as emergency judge, on April 14, 2020 at 9:00 a.m.  The Clerk will provide the parties with call-in information prior to April 14.

_____
MATTHEW F. KENNELLY
United States District Judge

Date:  April 9, 2020