IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| ANTHONY MAYS, et al., | ) | Case No. 20-CV-2134 |
| Plaintiffs, | ) | |
| | ) | Hon. Matthew F. Kennelly, |
| v. | ) | in his capacity as Emergency |
| | ) | Judge |
| THOMAS J. DART, Sheriff of Cook County, | ) | |
| Defendant. | ) | Hon. Robert W. Gettleman, |
| | ) | District Court Judge |
| | ) | |
| | ) | Hon. M. David Weisman, |
| | ) | Magistrate Judge |

**DEFENDANT'S POST-RULING REPORT**

NOW COMES the Defendant, THOMAS J. DART, in his Official Capacity as Sheriff of Cook County, and for his Report to the Court following the April 9, 2020 ruling, states as follows:

## INTRODUCTION[1]

Following the Court's April 9, 2020, ruling on Plaintiffs' Emergency Motion, the Court directed Sheriff Dart to file a report regarding his "implementation of the Court's directives" limited to those four items outlined in the Order. Dkt. 47, pp. 33-37. This Report will demonstrate the measures the Sheriff's Office has taken since April 9 and how they reinforce the CDC-compliant emergency policies and procedures Sheriff Dart already had implemented at the Jail upon Governor Pritzker's March 9, 2020, disaster proclamation relative to the coronavirus pandemic and in the weeks before, as described more fully in Sheriff Dart's earlier submissions to the Court. Dkt. 29-1, Dkt. 41.

These additional measures have all been developed in accordance with The Guidance on Management of Corona Virus Disease 2019 in Correctional and Detention Facilities (Guidance) authored by the Centers for Disease Control and Prevention (CDC). Dkt. 30-15. The Guidance generally permits correctional facilities to adapt the CDC's policies based on the Jail's physical staffing, population, operations, and other

---

[1] The Defendant recognizes that with its April 9, 20202 order, this Court has only conditionally certified subclasses for the purposes of Plaintiffs' TRO. (pp. 6-9). While Defendant reserves his right to challenge conditional and future class certification, as we note in below in this Report, Defendant has complied with each of the substantive directives of the Court's April 9, 2020 order.

resources or conditions. *Id.*, p. 1. The CDC, like the Court, acknowledges that even in the face of an unprecedented global public health crisis, in a correctional setting, it is important to "defer to policies and practices that 'are needed to preserve internal order and discipline and maintain institutional security.'" Dkt. 47, p. 2, 21, quoting *Kingsley v. Hendrickson*, 135 S. Ct. 2466, 2473 (2015).

## I. SOCIAL DISTANCING

The Guidance defines social distancing as "the practice of increasing space between individuals and decreasing the frequency of contact to reduce the risk of spreading a disease (ideally to maintain at least 6 feet between all individuals, including those who are asymptomatic)." Dkt. 30-15, p. 4. In common areas of jails, such as holding cells, intake lines, and other waiting areas, the Guidance recommends increasing the space between individuals either by enforcing their separation in holding cells or removing every other chair in a waiting area, for example. *Id.*, p. 11. The Guidance recognizes that not all strategies are feasible in all facilities, and it allows for solutions to be tailored to the individual space in the facility and the needs of the population and staff. *Id.*

As the Court noted, when detainees arrive at the Cook County Department of Corrections facility after their bond hearings to be processed into the Jail, they go through an intake process, which includes a physical search, booking and numbering, and a medical examination, among other things. Dkt. 47, p. 24. These individuals being processed into the Jail are sometimes referred to as "on the new" detainees. Ordinarily, while awaiting processing, these detainees would be placed together in one or several

large rooms called "bullpens." In light of the potential for detainees to come in contact with others who may be symptomatic as they await medical evaluation, Sheriff Dart has "suspended" use of the "bullpens" to hold new detainees while awaiting intake.

Instead, Sheriff Dart has devised the following modified procedures by which detainees awaiting intake into the Jail can practice social distancing to maintain a six-foot distance from each other. These modified intake procedures—implemented as of April 10, 2020—comply with the Court's directive to "enforce…social distancing during the new detainee intake process, including suspending the use of bullpens to hold new detainees awaiting intake." *Id*., p. 34; Ex. A, Declaration of Brad Curry, ¶7.

Additionally, although not specifically addressed by the Court, the Sheriff recognizes that the same social distancing considerations pertain to the arrestees who are held in a different area of the DOC facility awaiting their bond hearings. Sheriff Dart has voluntarily extended these modified social distancing procedures to the arrestees awaiting their bond hearings, who may or may not later be processed into the Jail through intake.

### A.    Social Distancing for Arrestees Awaiting Bond Hearings

When arrestees are awaiting a hearing before a criminal court judge to determine the conditions of bond, if any, they are temporarily brought into the Reception Classification and Diagnostic Center (RCDC) at the DOC facility, which is connected to the Leighton Criminal Courts Building. Ordinarily, these arrestees would be placed in "bullpens" as they await their bond hearings. Ex. A, Declaration of Brad Curry, ¶10. Sheriff Dart has implemented a process that allows these arrestees to practice social

distancing during this time, which has been in effect since April 10, 2020. Ex. A, Declaration of Brad Curry, ¶7.

As a preliminary matter, when the arrestees arrive at RCDC, a correctional officer wearing a surgical mask[2] gives each arrestee a surgical mask to protect them from possibly spreading or contracting the coronavirus and provides them with hand sanitizer. Ex. A, Declaration of Brad Curry, ¶11. The arrestees are then seated at six-foot intervals on chairs in hallways in the basement and on the first floor of the RCDC. Ex. A, Declaration of Brad Curry, ¶10.

A Cermak Health Services staff member also is present in this area to administer to each arrestee, in turn, standard verbal screening questions for the presence of COVID-19 symptoms and any known contact with an infected person, consistent with the Guidance recommendations. Ex. A, Declaration of Brad Curry, ¶12; Dkt. 30-15, p. 26. Cermak staff also takes the arrestee's temperature to screen for signs of a fever. Ex. A, Declaration of Brad Curry, ¶12. If the arrestee's temperature is above 99.3 degrees or reports having suspected COVID-19 symptoms or other flu-like symptoms, Cermak staff sends the arrestee to medical isolation for further medical evaluation. Ex. A, Declaration of Brad Curry, ¶12. If neither of these conditions is present, the arrestee is

---

[2] All correctional officers are required to wear surgical masks, unless otherwise required to wear an N95 respirator mask. As the Court recognized, this policy is being properly enforced to date (Dkt. 47, p. 36) and will continue to be, while supplies are available. As described more fully in Section IV., *infra*, although the Sheriff's Office is making diligent efforts to obtain adequate supplies of masks and other PPE, the Guidance recognizes that a shortage of masks is "anticipated during the COVID-19 response, particularly for non-healthcare workers." Dkt. 30-15, p. 24.

returned to his seat to await the bond hearing, which is conducted by video. Ex. A, Declaration of Brad Curry, ¶12.

In the meantime, as each arrestee awaits his initial medical inquiry, notices are displayed articulating the common symptoms of COVID-19 and prevention behaviors, such as frequent hand washing, practicing social distancing, and reporting any symptoms to staff, consistent with the Guidance recommendations. Ex. A, Declaration of Brad Curry, ¶13; Ex. C; Dkt. 30-15, p. 6. A correctional officer then sanitizes the area touched by the arrestees, consistent with the practices outlined in the Amended Sanitation Guidelines Specific to COVID-19 Procedure. Ex. A, Declaration of Brad Curry, ¶14. Following the bond hearing, arrestees are either released or transferred to the intake area for further processing into the Jail. Ex. A, Declaration of Brad Curry, ¶14.

### B.      Social Distancing for Detainees Awaiting Intake

The process described above is similar for the Detainees Awaiting Intake who will be processed into the Jail after a criminal court judge has ordered that he be remanded to the Sheriff's custody. Ex. A, Declaration of Brad Curry, ¶8. This intake process takes place in an area of the RCDC separate from the Arrestee holding area, and includes a physical search, contraband search through DOC metal detectors, booking and numbering assignment, and a standard medical evaluation of detainees' medical needs by Cermak staff. Ex. A, Declaration of Brad Curry, ¶16. Detainees Awaiting Intake continue wearing the masks they received in holding, have had their hands sanitized, and have had their temperatures taken. Ex. A, Declaration of Brad Curry, ¶15. As these detainees are moved through the intake process and the RCDC facility, they

are seated six feet apart from each other or lined up according to floor markings spaced six feet apart. Ex. A, Declaration of Brad Curry, ¶17. Notices also are posted in these areas articulating the typical symptoms of COVID-19 and recommended strategies for infection prevention. Ex. A, Declaration of Brad Curry, ¶18; Ex. C.

As the Court recognized, and as described in the Sheriff's response brief, all of the new Custodial Detainees are being quarantined for 14 days before joining the general population. Dkt. 29-1, p.23; Dkt. 47, p.34; Ex. A, Declaration of Brad Curry, ¶20. Once the intake process is completed, the now-Custodial Detainees are taken to the Quarantine Tier. Ex. A, Declaration of Brad Curry, ¶8, 20.

## C.    Implementation

The Sheriff has been implementing these new arrestee and intake procedures since April 10, 2020. Ex. A, Declaration of Brad Curry, ¶7. All correctional officers received an email notification of these policy changes. Ex. A, Declaration of Brad Curry, ¶14. Additionally, those officers assigned to the Arrestee and Detainee Intake areas received a memorandum at roll call informing them of these new procedures. Ex. A, Declaration of Brad Curry, ¶16. Video of these arrestee and intake processes is periodically reviewed by CCSO Video Monitoring Unit and Quality Improvement Unit to ensure proper administration of these procedures as well. Ex. A, Declaration of Brad Curry, ¶15.

From March 1 to April 13, the number of Arrestees initially booked at the facility has steadily declined, from 227 total arrestees on March 9 at the highest point, to 43 arrestees on April 6 at the lowest point. Ex. A, Declaration of Brad Curry, ¶15. The

number of detainees eventually booked into the Jail has similarly declined, from 117 detainees on March 8 at the highest point to 9 detainees on April 6 at the lowest point.

These modified arrestee and intake procedures described above can be maintained while the number of arrestees and detainees remains at these low levels. Ex. A, Declaration of Brad Curry, ¶20. However, if these populations rise beyond a threshold number of approximately 45 arrestees or detainees at one time, the Sheriff may no longer be able to maintain these modified procedures and reserves the right to adapt them, as permitted by the Guidance. Ex. A, Declaration of Brad Curry, ¶20. The Sheriff is investigating an alternative procedure to bring all arrestees and detainees to an open tier for holding while awaiting their bond hearings or full intake, if necessary based on numbers of individuals. Ex. A, Declaration of Brad Curry, ¶20.

## II.    COVID TESTING

As described more fully in his response brief, the Sheriff's Office has worked diligently to facilitate delivery of the Abbott Laboratory rapid-testing technology to Cermak for use at the Jail. Dkt. 29-1, p.10, 12. This is one of the first sites in the nation to receive and implement this cutting-edge technology that will greatly reduce the amount of time required to detect the presence of the coronavirus. Ex. F, Declaration of Dr. Menella. That, in turn, will allow detainees to be admitted to medical isolation sooner to prevent further spreading of the virus. Ex. F, Declaration of Dr. Menella. Because the technology is so new, Cermak has worked with IDPH and CDPH to develop guidelines for its implementation. Ex. F, Declaration of Dr. Menella. Thus, the Cook County Health and Hospital System (CCHHS) has amended its Outbreak Prevention and Control

Policy for Cermak to create a plan for administering the tests and an explanation of their most effective uses. Ex. E, CCHHS Outbreak Prevention Policy; Ex. F, Declaration of Dr. Menella. In turn, on April 11, 2020, the Sheriff created and implemented the COVID-19 Health Inquiry Referral for Medical Care, Testing or Other Medical Diagnostics Procedure to explain the process by which correctional officers refer detainees to Cermak for medical determinations about the appropriateness of testing and its actual administration. Ex. G, COVID-19 Health Inquiry Policy.

### A.  Nasopharyngeal (PCR) Testing

Standard COVID-19 testing protocol used the nasopharyngeal PCR test to swab the nasal cavity and send the sample to the lab at Stroger Hospital for testing. Ex. F, Declaration of Dr. Menella. It takes approximately 16 hours to process one sample. Ex. F, Declaration of Dr. Menella. However, given that Stroger Hospital processes samples from its patients and other CCHHS facilities, detainees' test results may not be returned for up to 48 hours, which greatly increased the chances that an unknown positive detainee, while in medical isolation with other detainees awaiting test results, could nevertheless be spreading the virus unwittingly. Ex. F, Declaration of Dr. Menella.

In addition to the slower processing time, the PCR test remains in relatively low supply. As such, the CDC and state and local health departments have recommended that only people under investigation for COVID-19 (PUI), meaning those who exhibit possible symptoms of the infection, may be tested. Dkt. 30-15, p. 22; Ex. F, Declaration of Dr. Menella.

### B.  ID Now Rapid Testing

In late March, Abbott Laboratories announced the development of the new ID Now Rapid Test for detection of the COVID-19 virus. It was widely believed that this test would greatly accelerate the processing time for test samples, allowing confirmed cases to be sent to positive medical isolation sooner. Ex. F, Declaration of Dr. Menella. The Sheriff's Office made diligent inquiries to the Illinois Department of Public Health to have the Jail designated as a test site and to be one of the first facilities in the nation offering the test through Cermak. Dkt. 29-1, p. 12.

Rapid Test is deemed superior to the traditional PCR test because it is a smaller, more portable test that can be administered and processed on site and need not be sent to a clinical laboratory for processing. Ex. F, Declaration of Dr. Menella. The test can yield positive test results in as little as 5 minutes, and negative test results in as little as 13 minutes, versus the 16 hours it takes to process a PCR test. Ex. F, Declaration of Dr. Menella. Additionally, each machine can process as many as 3 tests per hour, up to 20 tests per day. Ex. F, Declaration of Dr. Menella. While the Stroger lab can process more PCR tests per day, it takes much longer to get those results. Ex. F, Declaration of Dr. Menella.

On April 7, 2020, Cermak was fortunate to receive ID Now Rapid Test kits and two machines for use at the Jail. Ex. F, Declaration of Dr. Menella. Because Rapid Test is a novel test, it required validation to ensure that the results are reliable. Consistent with standard medical procedures, Cermak conducted validation testing over the course of several days. Ex. F, Declaration of Dr. Menella. Ultimately, Rapid Test was deemed reliably accurate for identifying positive cases, but also generated a fairly high number

of false negatives. Ex. F, Declaration of Dr. Menella. This means that detainees whose Rapid Test results are negative will remain in testing isolation and will receive the PCR test to confirm the results. Ex. F, Declaration of Dr. Menella. Rapid Test is also a novel and notably more complex test, requiring significant training and technical skill. Ex. F, Declaration of Dr. Menella

### C. Cermak's Testing Protocols for ID Now Rapid Testing

Pursuant to the Court's inquiry, the Sheriff obtained information relative to Cermak's policies on the administrative of the Rapid Tests. Dkt. 47, p. 30. Cermak amended its Outbreak Prevention and Control Policy B-01.6, which currently addresses general Influenza-like Illness (ILI) generally, to incorporate protocols for the specific handling and testing of suspected COVID-19 cases. Ex. F, Declaration of Dr. Menella; Ex. E, Outbreak Prevention Policy, p. 7. Appendix A of the Outbreak Prevention Policy describes the detailed process for identifying symptoms of a general ILI and responding to a person exhibiting those symptoms. Ex. F, Declaration of Dr. Menella; Ex. E, Outbreak Prevention Policy, App. A, p. 2-3. While describing the isolation protocols for a general ILI outbreak, this document also generally reflects the system of medical isolation, testing isolation, and quarantine implemented at the Jail specifically in response to the COVID-19 pandemic, as more fully described in the Sheriff's response brief. Dkt. 29-1. Those detainees who are confirmed positive for COVID-19 are placed in *medical isolation*. Those PUI (likely symptomatic) detainees who have been tested, but are their awaiting results, are placed in a different isolation area, *testing isolation*. Those detainees who are not symptomatic, but who have been exposed to a symptomatic or

positive detainee, are placed in *quarantine* to monitor the possible development of symptoms. As explained more fully in Section IV., *infra*, all of these detainees will be wearing surgical masks.

According to Dr. Menella, Cermak also recently created Appendix B to the Outbreak Prevention Policy to specifically identify a testing protocol to be used during the COVID-19 pandemic. Ex. F, Declaration of Dr. Menella. According to Cermak's policy, it will administer COVID-19 testing first to all PUI (likely symptomatic) detainees, which satisfies the Court's concern regarding testing of this specific population. Ex. F, Declaration of Dr. Menella; Ex. E, Outbreak Prevention Policy, App. B; Dkt. 47, p. 34. The test is well suited to this population for two reasons: 1) it is a small population and is suited to the limited capacity of this testing platform; and 2) it yields results faster than the PCR test and allows them to be moved to the medical isolation unit, if they were not already housed there. Ex. F, Declaration of Dr. Menella. Cermak began administering the Rapid Test to all PUI on April 10, 2020. Ex. F, Declaration of Dr. Menella.

Those detainees testing positive will immediately be moved from testing isolation to medical isolation. Ex. F, Declaration of Dr. Menella; Ex. E, Outbreak Prevention Policy, App. B. As noted above, the Rapid Test has a high false-negative rate. Therefore, Cermak has determined that any detainees who test negative after the Rapid Test will be retested using the PCR method, as clinically indicated. Ex. F, Declaration of Dr. Menella; Ex. E, Outbreak Prevention Policy, App. B. While this may result in additional testing for a subgroup of detainees, this protocol remains more

11

beneficial overall because the Rapid Test will quickly and reliably identify positive detainees and move them out of testing isolation unit before they may expose others in that unit who may, in fact, be negative. Ex. F, Declaration of Dr. Menella; Ex. E, Outbreak Prevention Policy, App. B.

Cermak also has determined that "surveillance testing" of quarantined detainees who have been exposed to PUI, but who are themselves asymptomatic, will only be conducted as directed by the public health authorities at medically appropriate times and to the extent feasible based on the acquisition of sufficient testing materials. Ex. F, Declaration of Dr. Menella; Ex. E, Outbreak Prevention Policy, App. B. At this time, Cermak has determined that Rapid Test is best suited for priority use in urgent care for PUI, but not for quarantined detainees. Ex. F, Declaration of Dr. Manella.

Cermak explained that consistent with the priorities established by IDPH and CDPH, it is not medically appropriate to use Rapid Test with quarantined detainees. Ex. F, Declaration of Dr. Menella. Following their exposure, these detainees already have been removed from the general population and are being monitored for the development of symptoms. Ex. F, Declaration of Dr. Menella. It has determined that a "more rapid detection of a positive COVID-19 patient would not otherwise meaningfully reduce the risk to the remaining quarantined patients… nor would it alter our current management of this population." Ex. F, Declaration of Dr. Menella. Therefore, Cermak concluded that at this time, there is insufficient medical evidence to suggest any additional benefit to testing the 1,500 detainees currently in quarantine, although this rationale may change as "given the rapidly evolving science and situation

updates during this public health crisis." Ex. F, Declaration of Dr. Menella.

Furthermore, the testing population is very large and would consume these limited

resources that would be better used in a more targeted setting, for new intake detainees

and PUI. Ex. F, Declaration of Dr. Menella. Accordingly, Cermak has concluded that it

is not currently medically appropriate to conduct Rapid Testing on quarantined

detainees, nor is it feasible based on the limited supply of testing materials. Ex. F,

Declaration of Dr. Menella.

> **D. The Sheriff's COVID-19 Health Inquiry Referral for Medical Care, Testing or Other Medical Diagnostics Procedure**

As the Court acknowledged, the Rapid Tests are in Cermak's possession and it

alone has the authority to administer them. Dkt. 47, p. 30. The Sheriff does not control

Cermak's medical staff. Dkt. 47, p. 36. And decisions about medical recommendations

and medical care are made by Cermak alone, upon which the Sheriff is entitled to rely.

*McCann v. Ogle*, 9090 F.3d 881, 888 (7th Cir. 2018). Upon recognition of Cermak's

policies relative to the Rapid Tests, the Sheriff has promulgated a policy, effective April

11, 2020, for his correctional officers to refer any detainees with suspected symptoms of

COVID-19 to Cermak for further evaluation and testing, if Cermak deems it medically

appropriate. Ex. G.

The Sheriff's COVID-19 Health Inquiry Referral for Medical Care, Testing or

Other Medical Diagnostics Procedure, developed specifically in response to the COVID-

19 pandemic, is intended to coordinate the actions of DOC staff and Cermak in response

to situations where COVID-19 symptoms, or other flu-like symptoms, may be present.

Ex. G. The policy generally directs correctional officers to undertake a series of actions upon encountering a detainee who complains of or displays suspected COVID-19 symptoms, such as coughing, shortness of breath, and fever, or other flu-like symptoms. Ex. G.

First, upon learning of the suspected symptoms, the officer must separate the detainee from others and notify his immediate on-duty supervisor of the suspected symptoms as soon as practicable. After the detainee has been separated and the officer has ensured that they each are wearing the proper personal protective equipment (PPE), the officer must notify Cermak in person or by phone that the detainee is complaining of or appears to display suspected symptoms of COVID-19, and complete an Inter-Agency Health Inquiry Form indicating the same. Ex. G.

From that point, Cermak's policies regarding the assessment of possible COVID-19 or other flu-like symptoms take effect (Ex. F, Declaration of Dr. Menella.; Ex. E, Outbreak Prevention Policy, App. A), and any further medical evaluation about testing or medical isolation is to be determined by Cermak staff. Ex. F, Declaration of Dr. Menella; Ex. E, Outbreak Prevention Policy, App. A, B; Ex. G. Cermak staff also will screen other detainees who were in close contact with the detainee complaining of or displaying suspected symptoms of COVID-19.

The Sheriff's staff also will coordinate with Cermak to issue any necessary alerts about quarantine based on Cermak's evaluations. Ex. G. If Cermak determines that the detainee must be isolated, it will notify the Watch Commander, who then must request that the Classification Unit enter a "Quarantine Alert" into the jail management system

for that tier. Ex. G. Thus, while the Sheriff's staff cannot itself make the medical determinations necessary to "require" prompt testing of any detainees (Dkt. 47, p. 34), it will swiftly notify Cermak that a detainee is complaining of or displaying suspected COVID-19 symptoms and facilitate the process by which Cermak must determine whether coronavirus testing is medically appropriate. Ex. G.

## III.   SANITATION

In its April 9, 2020 order, the court directed "the Sheriff to begin, by April 10, 2020, providing soap and/or hand sanitizer to all detainees in quantities sufficient to permit them to frequently clean their hands. The Court also order[ed] the Sheriff to begin, by April 10, 2020, providing adequate sanitation supplies to enable all staff and detainees to regularly sanitize surfaces and objects on which the virus could be present, including in all areas occupied or frequented by more than one person (such as two-person cells, as well as bathrooms and showers). The Court further direct[ed] the Sheriff to establish, by April 11, 2020, a policy requiring sanitization of all uses of frequently touched surfaces and objects as well as monitoring and supervision to ensure that such sanitization takes place regularly." Order, p. 35.

On April 9, 2020, the Sheriff's office delivered 27.5 gallons of hand sanitizer for distribution throughout the Jail. (Ex. H, Sheriff's Office Central Warehouse Invoices) On April 9, 2020, the Sheriff's office also delivered 980 bars of soap for distribution throughout the Jail. (Ex. I, Sheriff's Office Central Warehouse Invoices) On April 10, 2020, the Sheriff's office delivered 7,100 bars of soap for distribution throughout the Jail. (Ex. I, Sheriff's Office Central Warehouse Invoices). The Sheriff's office is required to

weigh whether a detainee receives soap or hand sanitizer based on the safety concerns associated with either. For example, a detainee used two bars of soap as a sock weapon last week to attack another detainee. On the other hand, hand sanitizer can create other dangers by ingestion or use as a weapon. As typically required in administration of the Jail, the Sheriff weighs these potential issues in determining which supplies to provide throughout the Jail, and continuously evolves his policies based on the information that is available. Distribution of soap and/or hand sanitizer will occur twice a week throughout the duration of the COVID-19 pandemic. (Ex. A, Curry Declaration)

Since at least February 11, 2020, the Sheriff's office has distributed sanitation supplies including Sanifect, bleach, Clorox wipes, Envirocare, Lysol spray, and more to enable staff and detainees to sanitize areas where the virus could be present. (Ex. J, Sanitation Chemical Distribution Report) Throughout the week of April 6, 2020, and specifically on April 10, 2020, the Sheriff's office delivered bleach, Sanitek, Lysol,, Windex, and other cleaning supplies and ensured these materials were distributed throughout the Jail. *Id.* As with soap and hand sanitizer, the Sheriff is required to weigh potential dangers associated with providing detainees chemicals to determine what sanitation supplies are delivered. The Sheriff's office ensured soap and/or hand sanitizer as well as sanitation supplies were received by each tier and distributed throughout the Jail by requiring that each supervisor confirm receipt and reviewing

video footage of distribution. (Ex. J, Summary Spreadsheet of Tier Reports; Ex. K, Examples of Tier Reports; Ex. L, Examples of Distribution Video Footage)3

The Sheriff's office will continue to track distribution to ensure all detainees are receiving soap and/or hand sanitizer. (Ex. M, Soap Distribution and Timeline) The Sheriff will also continue to track distribution of sanitation supplies to ensure staff and detainees have sufficient supplies to sanitize surfaces (Ex. J, Sanitation Chemical Distribution Report) Additionally, the Sheriff is in the process of procuring an independent contractor to professionally clean the facility. (Ex. A, Curry Declaration)

On April 11, 2020, the Sheriff issued a sanitation policy to ensure frequently touched areas, as identified by the CDC, are sanitized between uses. (Ex. D, Amended Sanitation Guidelines Specific to COVID-19 Procedure) These areas include tables, doorknobs, light switches, countertops, handles, desks, phones, toilets, faucets, sinks, etc. This policy supplements the sanitation plans and sanitation policies previously issued by the Sheriff to ensure all areas of the Jail are regularly sanitized. (Ex. N, Example of Sanitation Plan; Dkt. 30-9, pp. 36-43, 57-59, 163-165, Example of Sanitation Policies) The policy also mandates that the living unit officer on each shift shall ensure that all frequently touched surfaces are routinely cleaned and/or disinfected. *Id.* This policy was transmitted to all employees on April 11, 2020. (Ex. A, Curry Declaration) In addition to consistent monitoring, the Sheriff's office will continue to ensure this policy

---

[3] Sheriff Dart has provided examples of the documentation collected to ensure distribution of soap and/or hand sanitizer, and cleaning supplies. In an effort to not overwhelm the record, these documents do not contain each and every report or the related video footage. Sheriff Dart will provide all related documentation at the court's request.

is followed by reviewing the Living Unit Sanitation/Safety Log completed by each living unit officer and monitoring video of distribution. (See, Ex. O, Example of Living Unit Sanitation/Safety Log; Ex. A, Curry Declaration)

The Sheriff will also continue to post notices and play videos throughout the Jail, including at intake, to reinforce the need for sanitation and hygienic practices to prevent the spread of COVID-19 in the Jail. These notices include signs explaining that detainees have the right to soap and reinforcing the importance of regular hand washing. (Ex. C, Soap and Handwashing Signs)

## IV. PERSONAL PROTECTIVE EQUIPMENT

In its April 9, 2020 Order, this Court ordered "the Sheriff, effective April 12, 2020, to provide facemasks to all detainees who are quarantined—i.e., those who have been exposed to a detainee who is symptomatic (even if not coronavirus-positive)." Dkt. #47, pg. 36. The Sheriff began complying with this order on April 11, 2020 by providing all quarantined detainees one surgical mask per day. (Ex. P)

As of today, the Sheriff's Office has a supply of surgical masks to provide all quarantined detainees and employees surgical masks for six to seven more days. (Declaration of Brad Curry, ¶ 31) As the Sheriff stated to the Court at the April 4, 2020 hearing, supply issues remain regarding surgical masks. Transcript 32:18-33:5. The Sheriff's Office continues to request PPE from the Federal Emergency Management Agency and the Illinois Emergency Management Agency. (Ex. Q)

Though the Sherriff's Office has not received confirmation that the new supply of surgical masks will in fact arrive this week, if they do arrive and in the numbers

discussed, the Sheriff's Office calculates it will be able to provide all quarantined detainees with a new surgical mask daily until June 2020. (Curry Declaration, ¶ 30)

In addition, though this Court's Order only requires quarantined detainees to receive masks, the Sherriff's Office is in the process of procuring cloth masks to be made available to any detainee. (Curry Declaration, ¶ 32) The cloth masks are not PPE, and detainees will be informed they are not PPE, but the CDC "advises the use of simple cloth face coverings to slow the spread of the virus and help people who may have the virus and do not know it from transmitting it to others. Cloth face coverings fashioned from household items or made at home from common materials at low cost can be used as an additional, voluntary public health measure."[4] (Curry Declaration, ¶ 32) The Sheriff's Office is therefore also making cloth masks available to non-quarantined detainees in an attempt to quell potential unrest that could arise from non-quarantined detainees having no access to masks while seeing quarantined detainees with masks. (Curry Declaration, ¶ 32).

---

[4] https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/diy-cloth-face-coverings.html (last visited 4/13/2020).

19

## CONCLUSION

Sheriff Dart respectfully submits this Post-Ruling Report for the Court's consideration and in preparation for the hearing to occur on April 14, 2020, at 8:30 a.m.

By: */s/ Gretchen Harris Sperry*
One of the attorneys for Defendant
Thomas J. Dart, Sheriff of Cook
County

Robert T. Shannon
James M. Lydon
Gretchen Harris Sperry
Adam R. Vaught
Lari Dierks
HINSHAW & CULBERTSON LLP
151 N. Franklin Street, Suite 2500
Chicago, Illinois 60601
Tel. 312-704-3000

<u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that on April 13, 2020, I electronically filed the forgoing **DEFENDANT'S POST-RULING REPORT** with the Clerk of the U.S. District Court, using the Court's CM/ECF system, which will accomplish service electronically on all counsel of record.

<u>*/s/ Gretchen Harris Sperry*</u>