**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| ANTHONY MAYS, *et al.*, | ) | |
| | ) | |
| Plaintiffs-Petitioners, | ) | |
| | ) | Case No. 20-cv-2134 |
| v. | ) | |
| | ) | The Hon. Matthew F. Kennelly |
| THOMAS J. DART, Sheriff of Cook County, | ) | Emergency Judge |
| | ) | |
| | ) | The Hon. Robert Gettleman |
| Defendant-Respondent. | ) | Presiding Judge |

**PLAINTIFFS' RENEWED MOTION FOR A PRELIMINARY INJUNCTION AND
FOR LIMITED, EXPEDITED DISCOVERY**

A third person has died in the jail after the entry of this Court's temporary restraining order. The Cook County Jail is currently the site of the largest single-site outbreak of COVID-19 in the country. The virus is spreading rapidly in the jail since the issuance of this Court's order,[1] and that is not surprising: People are sleeping within three feet of each other, eating and using showers in close proximity to each other, and touching the same surfaces. For counsel and the Court, casually speaking to a neighbor at arm's length or touching the pump at the gas station with an un-gloved hand are terrifying prospects; in the Cook County Jail, people are confined in near-constant contact with each other in dormitory settings, forced to forgo the social distancing that overwhelming scientific and medical consensus has led government officials to mandate—by emergency decrees

---

[1] As of April 9, 448 detainees and Sheriff's staff had tested positive for COVID-19. Two detainees have died since that date. As of April 13, 541 detainees and Sheriff's staff had tested positive for COVID-19. Injustice Watch, Cook County Jail Coronavirus Tracker, https://datastudio.google.com/u/0/reporting/1AI4THiXJ_6Nt-9NXwE0MfO_DUaa1Koxi/page/hcyJB?s=oQGghs5nYPk (last visited Apr. 14, 2020).

enforceable through criminal penalties—that the rest of us practice. These human beings are at grave risk.

In its April 9 temporary order, this Court concluded that full social distancing of detainees was not required because CDC guidance governing correctional facilities recognizes that "space limitations may require a departure from better social-distancing practices" and because the CDC acknowledged that correctional facilities must operate within their physical limitations for the purposes of that Agency's emergency guidance to them. "Order" (Doc. 48) at 24-25. Instead of ordering full social distancing—which may be impossible without reducing the population of the jail—this Court took the initial step of first requiring safer practices within the jail and, specifically, social distancing at intake. (*Id.*) Since the Court's order, it has become clear—as the evidence Plaintiffs proffer with this motion shows—that social distancing of detainees is the *only* way to prevent an intolerable risk to Plaintiffs' health and lives. One of two additional things is therefore true: either it is possible for the Sheriff to implement medically required social distancing at current population levels, and he must be ordered to do so; or it is not possible for the Sheriff to implement medically required social distancing at current population levels, and the jail's population must be decreased.

In light of this reality and the continued spread of the virus since the Complaint, Plaintiffs renew their ongoing request for a preliminary injunction and seek the following specific relief: (1) medical triage of vulnerable detainees and the implementation of social distancing, including but not limited to through transfer of detainees out of the Jail site at 2600 S. California; and (2) an emergency petition for habeas corpus on behalf of named Plaintiff Kenneth Foster and the class that he represents; and (3) narrow, targeted, and expedited discovery, *see* Ex. A and Part II(B), *infra*, which is necessary to determine whether the Sheriff is capable of complying with an

injunction requiring medical triage and social distancing and whether the Sheriff has complied with the Court's TRO.

Importantly, if this Court concludes that medically necessary social distancing is impossible given the current population in the jail, Plaintiffs request that this Court convene an emergency three-judge district Court as required by 18 U.S.C. § 3626(a)(3)(A) so that Plaintiffs may proceed before to a tribunal with the statutory authority to grant the relief that the U.S. Constitution demands that they receive. Time is of the essence and the moment is unprecedented. Whether the medically required measures are taken in the next several days will determine whether thousands of additional people contract COVID-19.

## I. The Existing TRO is an Essential First Step but One That Will Not Fully Protect Against the Constitutional Violations in the Jail.

In its April 9 order, the Court required that several steps be taken to improve conditions in the Jail. Specifically, the Court required the Office of the Sheriff (a) to establish and implement a policy requiring prompt coronavirus testing of symptomatic detainees and, to the extent feasible and at medically appropriate times, detainees who have been exposed to confirmed positive coronavirus cases and to symptomatic detainees (Order at 34); (b) to enforce social distancing during the new detainee intake process, including suspending the use of bullpens to hold new detainees awaiting intake (Order at 35); (c) to provide soap and or hand sanitizer to all detainees in quantities sufficient to permit them to frequently clean their hands; to provide adequate sanitation supplies to enable staff and detainees to regularly sanitize surfaces and objects on which the virus could be present; and to create and implement a policy of frequent sanitation of objects and surfaces and of monitoring to ensure the sanitation takes place; and (d) to provide facemasks to all detainees who have been exposed to a case of coronavirus or to a symptomatic detainee—*i.e.,* all detainees in quarantine.

Unfortunately, the evidence available since the TRO establishes that these essential steps have not worked and cannot work to abate the spread of the disease. Two facts are of utmost importance to this point: First, COVID-19 presents a threat of serious illness, organ failure, and death, particularly to individuals with pre-existing medical vulnerabilities.[2] Second, the overwhelming scientific and medical consensus, as will be more fully described by Plaintiffs' experts, is that it is not possible to reduce the serious risk of COVID-19 infection without social distancing. The legal significance of these two facts, under binding precedent discussed below, is that requiring confinement under conditions that expose individuals to this serious risk is not constitutionally permissible. Only two options remain, then. Either Defendant is ordered to accomplish the social distancing that overwhelming evidence demands and that all of us are required to practice in our own lives, or Defendant is ordered to reduce the population of the jail until such distancing is possible.

## II.    Social Distancing Is Necessary to Prevent an Unreasonable Risk to the Class.

The only way to prevent a severe risk to Plaintiffs is to immediately implement medically required social distancing. Dr. Gregg Gonsalves, an epidemiologist at the Yale School of Medicine and School of Public Health, submits an expert declaration attached to this Motion. In it, he explains the risks that COVID-19 poses to the health of people in the jail. COVID-19, he testifies, can lead to "bilateral interstitial pneumonia, which causes partial or total collapse of the lung

---

[2]    *See* Melissa Healy, Coronavirus infection may cause lasting damage throughout the body, doctors fear, Los Angeles Times (Apr. 10, 2020) https://www.latimes.com/science/story/2020-04-10/coronavirus-infection-can-do-lasting-damage-to-the-heart-liver ("[E]ven after patients who become severely ill have recovered and cleared the virus, physicians have begun seeing evidence of the infection's lingering effects," and describing many biological functions that had "failed to return to normal," including impaired liver function, and noting concern from cardiologists that "there will be long-term sequelae" form the disease); Tianbing Wang et al., Comorbidities and multi-organ injuries in the treatment of COVID-19, The Lancet, https://www.thelancet.com/journals/lancet/article/PIIS0140-6736(20)30558-4/fulltext (Mar. 21, 2020) (reporting clinical indications that COVID-19 is not only capable of causing pneumonia; it may also cause damage to other organs such as the heart, the liver, and the kidneys).

alveoli, making it difficult or impossible for patients to breathe. . . . COVID-19 can progress from a fever to life-threatening pneumonia with what are known as 'ground-glass opacities.'" Ex. G ¶ 2. In his expert opinion, the only way to prevent an "essentially uncontrolled" spread of this deadly virus is to require complete "social distancing" of inmates—that is, to keep them six feet apart from one another. *Compare id.* ¶ 16 ("Social distancing means, in essence, isolating oneself from other people . . . and generally staying at least 6-12 feet from other people."), *with id.* ¶ ("In my opinion, from an epidemiological perspective, ensuring that all detainees in Cook County Jail can socially distance from one another is the only way to prevent further, essentially uncontrolled, spread of the virus.").[3]

As discussed more fully below, the Constitution forbids jailing people in conditions that pose an "unreasonable" risk to their health where "the risk . . . is not one that today's society chooses to tolerate." *Helling v. McKinney*, 509 U.S. 25, 36 (1993). The mere fact that the CDC acknowledged in its guidance to jails that full social distancing may not be immediately feasible at current population levels does not affect the applicable constitutional principle. *Cf.* Edward J. Hanlon, "Proof of Unconstitutional Prison Conditions," 24 AMJUR POF 3d 467 § 7 ("Most courts have held that it is improper to attempt to assess whether a given occupancy level violates a pretrial detainee's Fourteenth Amendment rights or a prisoner's Eighth Amendment rights by reference to standards set by a professional organization or by expert testimony based on such standards.") (citing cases); *Moralis v. Fageole*, No. 06 C 2034, 2007 WL 2893652, at (CD. Ill.

---

[3]      Plaintiffs' counsel has also worked with Professor Gonsalves to create a model that provides projections of the impact of COVID-19 within correctional facilities like the Cook County Jail based on the Jail's ability to implement social distancing. See Ex. D (Grady Declaration) (providing information about the creation of the Model); See also Ex. J (COVID-19 Incarceration Model) (being provided to the Court in its native Excel format via e-mail to the Court and counsel).

Sept. 28, 2007) (" [D]efendants cannot simply escape their duty to provide dental care to those detained in their jail by asserting [the United States Marshall Service agreement] does not authorize the treatment."). This is true for two reasons: First, the CDC never purported to declare that social distancing is *unnecessary*; it only concluded that *at current population levels* it may not be feasible.  To this point, the CDC guidelines for correctional institutions specifically encourage correctional administrators to "work with local law enforcement and court officials" to "prevent over-crowding of correctional and detention facilities,"[4] and in other settings, the CDC recommends wholesale cancellation of schools, closures of nursing facilities, closing of business offices, and cancellation of "faith-based gatherings of any size."[5]  Indeed as one court observed,

> Though the CDC has recommended public health guidance for detention facilities . . . these measures are inadequate to sufficiently decrease the substantial likelihood that Petitioner will contract COVID-19. As prison officials are beginning to recognize around the country, even the most stringent precautionary measures— short of limiting the detained population itself—simply cannot protect detainees from the extremely high risk of contracting this unique and deadly disease.

*Malam v. Barr*, No. 20-10829, 2020 WL 1672662, at *8 (E.D. Mich. Apr. 5, 2020), as amended (Apr. 6, 2020). Second, there is no doubt that the risk of exposure to COVID-19 even in the *general public* is one to which society is unwilling to subject itself as a whole. Governors across the country, including in Illinois, have mandated social distancing and are using criminal laws to enforce that mandate.

---

[4] CDC, Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities, at 6 (Mar. 23, 2020), https://www.cdc.gov/coronavirus/2019-cov/downloads/guidance-correctional-detention.pdf.

[5] CDC, Implementation of Mitigation Strategies for Communities with Local COVID-19 Transmission, https://www.cdc.gov/coronavirus/2019-ncov/downloads/community-mitigation-strategy.pdf (last visited April 14, 2020) ("substantial" spread recommendations).

At a hearing, Plaintiffs will present testimony from Dr. Homer Venters, a correctional health expert and epidemiologist. Dr. Venters, whose CV is attached as Exhibit H, served as the Chief Medical Officer for the New York City jail system and before that, worked for several years in various other administrative positions in New York's jail system. Dr. Venters now serves as the President of Community Oriented Correctional Health Services, an organization working with correctional healthcare systems to improve patient services. Dr. Venters regularly provides expert testimony on the topic of correctional healthcare and has extensive experience creating policies and practices to respond to infectious disease outbreaks in the correctional setting.

Plaintiffs expect that Dr. Venters will testify about the pressing need for social distancing at the Cook County Jail to protect against rampant infection. Dr. Venters will also testify about the need to triage and separate medically vulnerable detainees because of the higher level of medical supervision that they required during a viral outbreak. Finally, Dr. Venters will provide testimony about the various ways in which the Sheriff's policies are inadequate to protect against the substantial risk of harm posed to detainees at the Jail by rampant spread of the virus.

Plaintiffs will also present evidence from Dr. Amir Moheb Mohareb, an infectious disease specialist. Dr. Mohareb completed his medical degree at Johns Hopkins University School of Medicine, his medical training at Yale-New Haven Hospital, and his infectious disease fellowship training in the joint program of Brigham & Women's Hospital and Massachusetts General Hospital. He is board-certified in both Internal Medicine and Infectious Diseases. A copy of his CV is attached as Exhibit I. Dr. Mohareb practices at Massachusetts General Hospital and teaches at Harvard Medical School. Among other qualifications, Dr. Mohareb is a member

of the Biothreats Response Team at Massachusetts General Hospital, a position which has required him to take a leading role in infection control during the current COVID-19 outbreak.

Plaintiffs expect that Dr. Mohareb will testify about the clinical presentation of COVID-19, the typical course of the disease in both non-vulnerable and vulnerable populations, and the method and rates of transmission of the virus. Dr. Mohareb will also offer testimony about the primary importance of social distancing in protecting against transmission of the virus, and the important, but supportive, role that hygiene and sanitization plays in protecting against transmission of the virus.

The above expert evidence regarding COVID-19 in the Jail, which Plaintiffs touch upon here and that they intend to present more fulsomely at the hearing, is confirmed by a broad and deep public health consensus. More than *six hundred* public health officials wrote to the CDC to ask that it explicitly call for significant reductions of the incarcerated population on the ground that the current risk even assuming compliance with other CDC protocols is intolerably high.[6]

### III.   If Social Distancing Is Possible at the Current Population Levels, this Court Should Order it Immediately.

The Sheriff must immediately be ordered to take all possible steps to implement medically required social distancing because it is the only way to prevent a severe risk of harm. Detainees may not constitutionally be exposed to a severe risk of contracting a communicable disease. *Gates v. Collier*, 501 F.2d 1291, 1300-1303 (5th Cir. 194) (cited with approval in *Helling*, 509 U.S. at 34); *see also Forbes v. Edgar*, 112 F.3d 262, 266 (7th Cir. 1997) (noting that "exposure of inmates to a serious, communicable disease . . . can qualify [as a] deprivation . . . [that is] sufficiently serious; ); *Jolly v. Coughlin*, 76 F.3d 468, 477 (2d Cir. 1996) ("[C]orrectional officials have an

---

[6] *See* Robert R. Redfield, MD, et al., April 9, 2020 Letter, *available at* https://www.drugpolicy.org/sites/default/files/cdc_letter_on_decarceration_v3_0.pdf (last accessed Apr. 14, 2020).

affirmative obligation to protect inmates from infectious disease."); *Lareau v. Manson*, 651 F.2d 96, 109–11 (2d Cir. 1981).

At this current time, it is clear that social distancing is not happening outside of intake at the Jail. Declarations on behalf of detainees that were taken on April 13 and 14, and are submitted as Group Exhibit E, make this evident. Detainees continue to reside in dorms, sleeping in close proximity to others, and in cells with two people.[7] Detainees also continue to share common areas, sinks, showers, toilets and eating areas.[8] Given the current state of affairs, the question is not

---

[7] *See e.g.*, Affidavit of Christina Lorenzo ("Lorenzo") on Behalf of Durrell Barker ("Mr. Barker is currently residing in a two-person cell with a cellmate. He was previously in a one-person cell but then he received a cellmate on April 11, 2020."); Aff. of Kara Crutcher on Behalf of Lonnie Sanders ("Until the morning of April 14, Mr. Sanders was living in a two-person cell with another person. Mr. Sanders slept on the floor of the cell. Mr. Sander's tier has 25 people on it. There were 40 people on it as of yesterday."); Aff. of Laura Stempel ("Stempel") on Behalf of Adam Sneed ("Mr. Sneed is residing in a dorm, and there are three feet between beds."); Aff. of Stempel on Behalf of Charles Wills ("Mr. Wills is living in a dorm with 40 other people. There are 3 feet between bunks in the dorm."); Aff. of Elizabeth Corrado ("Corrado") on Behalf of Daniel Arroyo ("There are 38 beds in Mr. Arroyo's tier. He estimates that 30 are being used. The beds are not far apart and social distancing is not possible."); Aff. of Jason Hammond ("Hammond") on Behalf of Keith Jones ("Mr. Jones is living in a dorm with about 27 people. . . . Social distancing is not possible in the tier. The beds are 3-5 feet apart from one another."); and Aff. of Hammond on Behalf of Torrenta Woodgett ("Social distancing is not possible in Mr. Woodgett's housing area. 12 people are allowed out in the common area for 6 hours at a time.") (attached hereto as Group Ex. E).

[8] *See e.g.*, Affidavit of Christina Lorenzo ("Lorenzo") on Behalf of Durrell Barker ("Everyone on the tier [in Division 10] shares the shower area and the phone, which are close together. They also share common areas."); Aff. of Laura Stempel ("Stempel") on Behalf of James Johnson Sr. ("[In Division 10] all detainees (40 people) share the shower area."); Aff. of Kara Crutcher on Behalf of Lonnie Sanders ("Social distancing [in Division 6] is not possible when using the phones, which are close together, or in the shared bathrooms."); Aff. of Stempel on Behalf of Adam Sneed ("Social distancing [in Division 8] is impossible as the detainees share sinks, showers and toilets."); Aff. of Stempel on Behalf of Charles Wills ("All detainees in his dorm [in Division 8] share showers and toilets. Social distancing is not possible in the dorm."); Aff. of Elizabeth Carrado ("Corrado") on Behalf of Mateusz Zabrzenski ("The tier [in Division 8] has 4 showers and 4 bathroom stalls. . . . The tier's day room is crammed. Social distancing is impossible."); Aff. Of Lorenzo on Behalf of Ricardo Hargrove ("The detainees [in Division 11] use a shared shower area. They can use the shared shower area when they are allowed out of their cells to use the phones."); Aff. of Jason Hammond ("Hammond") on Behalf of Keith Jones ("The telephones in the tier [in Division 8] are two feet apart. Everyone eats next to each other and detainees share tables in the dayroom."); and Aff. of Hammond on Behalf of Torrenta Woodgett ("Everyone [in Division 11] shares

whether social distancing is being done at a constitutionally sufficient level, but *whether* it can be done as such. As their contemporaneously filed motion for expedited discovery shows, Plaintiffs are seeking a minimally intrusive means to determine whether medically required social distancing is possible, but if it is there can be no doubt that the Sheriff must implement it immediately.

IV. **If Social Distancing is Impossible at the Current Population Levels, the Jail Population Must Be Reduced through Release or Habeas Corpus, or People Must be Transferred to Another Safe Location in the Sheriff's Custody.[9]**

If medically required social distancing is not possible, people in the jail must be transferred (which is not a prisoner release order under the PLRA), or the jail population must be reduced, by convening a three-judge district court to hear evidence and issue a prisoner-release order, or by granting habeas corpus release to sufficient numbers of the medically vulnerable so as to enable medically required social distancing.

A. **Population Density at the Jail Must be Reduced.**

To show a constitutional violation in this case, Plaintiffs must show that they are being confined in conditions that are "objectively unreasonable." (Order at 16–17.)

It might seem obvious that if the current population of a jail unavoidably creates intolerable risk to life and health then the current population must change. But the Sheriff contends that "the Constitution simply cannot require that the only objectively reasonable response to the current pandemic is for wardens across the country to be forced to open the jail doors." (Doc. 41 at 9–10.) He cites no authority for this proposition. Because the proposition would apply regardless of the

---

showers and bathrooms. Detainees in the tier eat at shared picnic-style tables. People share the telephones, which are located about one foot from one another.") (attached hereto as Group Ex. E).

[9]     Plaintiffs incorporate all prior briefing on the Prison Litigation Reform Act, habeas corpus and transfer submitted in the above-captioned case, and which are specifically referenced throughout this motion.

risk to the detainees, taken to its inevitable conclusion it would require that people—in this case legally innocent people, charged but not convicted of crimes, and many releasable on mere payment of money—suffer excruciating and preventable illness and death. According to the Sheriff, even if Plaintiffs prove that they are at an unreasonable risk of death or serious injury in the jail, and even if they prove that the *only* way to mitigate that risk is to transfer people or reduce the number of people in the jail, they *still* cannot obtain relief. This has it backwards. If current population levels in the Jail necessarily result in unconstitutional conditions, that does not make the conditions "objectively reasonable" and therefore constitutional; it requires a change in population levels.

The Sheriff argues also that it cannot be objectively unreasonable to do the best that one can under the circumstances—that is, if he is indeed doing his best (a point that Plaintiffs dispute at least prior to this Court's intervention) to keep people safe in the jail, an injunction cannot issue. (Doc. 41 at 9-10) This is not the law. The law does not require the Sheriff to be a bad person or to be responsible for the overcrowded jail in order to be ordered to cease confining people in unlawful and dangerous conditions. In *Brown v. Plata*, the Supreme Court confirmed that where the prison population is such that reduction is the *only* way to cure a constitutional violation, an injunction may issue even if the defendant's affirmative conduct did not cause the overcrowding. 563 U.S. 493, 521, 526–29 (2011) (noting that prisoner-release order was appropriate because adequate care was "impossible" without a reduction). If it were true that doing one's best under the circumstances meant that there could be no constitutional violation—under the *Eighth* amendment, let alone the Fourteenth—then *Brown*'s conclusion that non-release measures were "impossible" would have ended that case. But the plaintiffs in *Brown* won.

11

This principle is illustrated by the leading precedent in this area. In a case seeking injunctive relief, the question is whether *at the time the relief would issue* the Plaintiffs state a Constitutional violation. *See Helling*, 509 U.S. at 36 ("[T]he subjective factor . . . should be determined in light of the prison authorities' current attitudes and conduct."). If the Sheriff were told that a bomb or a gas line were about to explode in the jail in several days, it would make no sense to say that the Constitution has not been violated because *up to that point* there was nothing the Sheriff could have done to prevent the harm; *at that point*, the moment before the explosion— the Court may order the Sheriff to get people out of the jail. The Supreme Court explained that even the more restrictive deliberate-indifference standard follows this "common sense" notion:

> If, for example, the evidence before a district court establishes that an inmate faces an objectively intolerable risk of serious injury, the defendants could not plausibly persist in claiming lack of awareness, any more than prison officials who state during the litigation that they will not take reasonable measures to abate an intolerable risk of which they are aware could claim to be subjectively blameless for purposes of the Eighth Amendment, and in deciding whether an inmate has established a continuing constitutional violation a district court may take such developments into account.

*Farmer v. Brennan*, 511 U.S. 825, 846 n.9 (1994).

*Money v. Pritzker*, Case No. 20-cv-2093, 2020 WL 1820660 (N.D. Ill. April 10, 2020), does not counsel a different result than this Supreme Court precedent. There, the Court considered a request for population reduction in the Illinois Department of Corrections owing to the risks posed by COVID-19. The Court concluded that plaintiffs had not shown "deliberate indifference" to an unconstitutional risk of serious harm because numerous measures were being implemented such that there was no factual showing of an immediate intolerable risk to the plaintiffs' health and lives. *Id.* at *17–18.[10] Most importantly, *Money* did not have the benefit of an evidentiary

---

[10] To the extent it makes a difference, in this case, the lesser standard of "objectively unreasonable" conditions applies to Plaintiffs' claims because they are pretrial detainees. It should be noted that forcing

record that establishes that the only way to mitigate medically intolerable serious risk of infection was social distancing. Such distancing should be ordered here to reduce that risk, and if the current population requires unconstitutional conditions of confinement, the population must change. *Money* does not hold otherwise. Moreover, the *Money* plaintiffs, unlike Plaintiffs here, did not request improved conditions in the facilities to prevent an outbreak; their request, unlike Plaintiffs' here, was interpreted by the court as one for immediate release and, therefore, the *Money* Court could not address the question whether continuing to jail people in conditions that threaten their lives *after* lesser steps have been implemented or are impossible violates the Constitution. *Id.* at *12–13. Moreover, *Money* considered the case at a time when an outbreak had not already threatened the lives of many people inside the facility; here, three people are already dead because of this virus. It is within *that* context and in a facility that is the largest known site of outbreak in the United States, that Plaintiffs' expert testimony and legal argument is before this Court.

### a.  *Habeas Corpus*

Plaintiff Kenneth Foster, by his next friend, seeks emergency release from the Jail pursuant to a Section 2241 writ of habeas corpus because Mr. Foster has multiple health problems that place him at elevated risk of contracting serious COVID 19, making his continued detention in the Jail objectively unreasonable. Mr. Foster seeks this relief on behalf of himself and on behalf of those members of subclass A who, in addition to having health vulnerabilities that elevate their risk of serious COVID 19, also, like Mr. Foster, sought release from the Jail pursuant to the procedure established by Cook County Criminal Court Chief Judge Leroy K. Martin, Jr. by order dated March 23, 2020 and were denied.

---

someone to remain confined *after* a serious and intolerable risk to their life is proven would likely meet either standard. *Farmer*, 511 U.S. at 846 & n.9.

The court's April 9 order concluded that Plaintiff Foster and the subclass he provisionally represents are not entitled to habeas relief because Mr. Foster presented no evidence that he and the class had attempted to initiate the emergency procedure established by Judge Martin. *See* Order at 13. The undersigned counsel has subsequently learned that, in fact, Mr. Foster did seek release in the Circuit Court of Cook County under the Judge Martin procedure. Group Ex. F to this motion includes a motion to reduce bail, filed with the Circuit Court in Mr. Foster's case on March 30. Mr. Foster is charged with robbery, domestic battery and unlawful restraint. Bail is set at $50,000 and he remains in the Jail because he does not have $5000 to pay bond. The motion to reduce bond sets forth Mr. Foster's medical vulnerabilities (¶¶ 5-8) and explains that those vulnerabilities place him particularly at risk within the Jail in light of the pandemic (¶¶ 27-28). The motion specifically alleges that Mr. Foster's constitutional right to objectively reasonable conditions of confinement in violation of the principles enunciated in *Helling v. McKinney*, 509 U.S. 25, 33-34 (1993). *See* Ex. F at ¶¶ 29-31. The motion was heard by Judge Joyce and was denied on April 2. *See* Ex. F.

The Public Defender has informed the undersigned counsel that Mr. Foster's petition was one of 1193 cases that her office presented for review pursuant to Judge Martin's procedure and that release was granted in 719 cases—leaving over 470 cases in which the defendant sought release but was denied. *See* Declaration of Locke E. Bowman Ex. B hereto) at ¶ 3. Counsel are informed and believe that the petitioner-defendant in a significant number of those cases suffers from an underlying health condition that makes them vulnerable to the coronavirus. The Sheriff possesses information that can confirm this belief. Class wide treatment of this habeas claim is therefore appropriate.

As Plaintiffs have acknowledged elsewhere, Illinois law provides a right of appeal from a trial court's refusal to modify bond. *See* Ill. S. Ct. Rule 604(c). But that remedy would require weeks to pursue, as the declaration of the Public Defender's Chief of Staff, Lester Finkle, (attached as Ex. C) makes clear. Plaintiffs have argued elsewhere that such time frames render appellate remedies practically unavailable in the context of the present emergency. *See* Plaintiffs' Supplemental Br. in Support of TRO (Doc. No. 42) at 13-16. Those arguments are incorporated by reference here. This court should find, under the circumstances, that exhaustion must be excused, either because it would be futile or by application of the court's equitable authority to excuse exhaustion in Section 2241 cases. *See generally Gonzalez v. O'Connell,* 355 F.3d 1010, 1016 (7th Cir. 2004).

Mr. Foster is entitled to a writ of habeas corpus based on the totality of the evidence before the court as to the unacceptable risk he faces within the Jail of contracting a life-altering, potentially fatal illness. Mr. Foster suffers from a number of chronic illnesses that elevate his risk, including a history of stomach cancer (for which he was scheduled to begin chemotherapy at the time of his arrest), chronic kidney disease and high blood pressure, among others. *See* Ex. __ at ¶ 5. He has a home to which he could return, where he would live alone and would not be a threat to the personal safety of any person. *See* Bowman Dec. at ¶ 4. It is appropriate to grant habeas corpus relief to a confined person in order to remove that individual from unacceptable conditions of confinement. *Compare, e.g.*, *Robinson v. Sherrod*, 631 F.3d 839, 840–41 (7th Cir. 2011), *with Glaus v. Anderson*, 408 F.3d 382, 387 (7th Cir. 2005); *see also* TRO Order at 14–15.

The same relief is appropriate for each member of the class identified in this motion. Every member of this class faces the same unacceptable risk of serious illness or death because of their heightened vulnerability to the coronavirus and every member of the class faces that risk because

of the impossibility of social distancing within the Jail and the exorbitant risk of infection in the Jail environment. These common factual and legal issues should therefore be addressed on a class wide basis.

Plaintiffs acknowledge that the court will need to individually assess the conditions under which each individual class member should be released, consistent with public safety concerns separate from the spread of the coronavirus. After adjudication of the class wide issues, such individual questions may be taken up by the parties and the court on a case-by-case basis.

### b. *Transfer*

This Court, sitting as a single judge, may order that Dart transfer prisoners to a safe facility or form of custody of his choosing. As Plaintiffs' response to the Court's April 3 Order makes clear (Doc. No. 26-1) at 17-25, an order that prisoners be transferred to receive adequate medical care or to be removed from areas where they would be exposed to deadly diseases is not a "prisoner release order" within the meaning of the PLRA and, therefore, may be issued by a single-judge court. *See Plata v. Brown*, No. C01-1351 TEH, 2013 WL 3200587, at *8 (N.D. Cal. June 24, 2013) (granting motion requiring transfer from area at high risk of coccidioidomycosis, known as "Valley Fever"); *Reaves v. Dep't of Correction*, 404 F. Supp. 3d 520, 523 (D. Mass. 2019) (three judge panel was not required for order of transfer of quadriplegic prisoner to another facility in which he would be treated by a physician with training to care for his substantial and numerous medical needs, as remedy for defendants' failure to provide adequate medical care). This is true under the Prison Litigation Reform Act (PLRA), even if the Sheriff transfers detainees to forms of custody outside of traditional prison buildings. *See Jackson v. Johnson*, 475 F.3d 261, 265-66 (5th Cir. 2007) (holding that a person subjected to confinement in a halfway house counts as a "prisoner" under the PLRA ) ("[A]lthough Jackson has been released from confinement in prison, his release

was not to the general public but was rather to a different form of confinement, albeit with certain additional liberties. It is clear that Jackson is being 'detained in any facility' since he is locked up in the halfway house 16 to 24 hours a day and since he may leave the halfway house only for very limited purposes." (citing *Witzke v. Femal*, 376 F.3d 744, 752 (7th Cir. 2004) (determining that halfway-house resident who could leave the facility only during the day and was locked inside at night was confined for PLRA purposes)). Under the PLRA, a "prison" is a "Federal, State, or local facility that incarcerates or detains." 18 U.S.C. § 3626(g)(5). As Plaintiffs' Supplemental Brief further elucidates (Doc. No. 42 at 17-19), Plaintiffs are not asking that they be sent anywhere other than a safe facility that incarcerates them—that is a place that "confin[es]" them, *see* Black's Law Dictionary, *Incarceration* (11th ed. 2019) —and, therefore, they do not seek a "prisoner release order" under the PLRA.[11]

### c. *Release*

Finally, if this Court concludes that social distancing is medically required to reasonably prevent transmission of the virus and that this social distancing is likely impossible under current conditions, Plaintiffs respectfully request that this Court immediately convene a three-judge panel pursuant to 18 U.S.C. 3626(a)(3)(A).

To convene a three-judge district court, this Court must (a) have "previously entered an order for less intrusive relief that has failed to remedy the deprivation of the Federal right sought to be remedied"; and (b) that the Court give the Defendant a "reasonable time" to comply with the prior order to determine whether compliance will cure the constitutional violation. *Id.* "[W]hat is

---

[11] The district court in *Gray v. County of Riverside*, No. 13 C 0444, Dkt. 191 (C.D. Cal. Apr. 14, 2020), recently recognized that an order directing a sheriff to transfer detainees to a safer location is *not* a "prisoner release order" and therefore not subject to the requirements of 18 U.S.C. § 3626(a)(3). *See* Ex. K (Order Granting Emergency Motion to Enforce Consent Decree) at 4-5.

reasonable in ordinary times may be quite different from what is reasonable in these extraordinary times." *Coleman v. Newsome*, No. 01-CV-01351-JST, 2020 WL 1675775, at *4 n. 9 (E.D. Cal. Apr. 4, 2020) (three-judge court).

Much of what comes next depends on the Office of the Sheriff. If the Sheriff contends that social distancing of the kind required by medical science (which the Sheriff appears to have implemented at intake, *see* Doc. 51-2) is possible *throughout* the facility with the current population at the physical 2600 S. California facility, then this Court should order that, an emergency three-judge panel need not be convened, and Plaintiffs should be given a chance to discover on an expedited basis the extent to which Defendant's contention is true.

If, however, the Sheriff contends that the Office is doing its best under difficult circumstances but that, for whatever reason, such social distancing is not immediately possible with the current jail population, no further time is reasonable to comply. By definition, further time will not yield compliance and will not lead to constitutionally tolerable conditions. At that point, release will be the only remaining option to save the lives and health of potentially thousands of people, and so Plaintiffs would request that a tribunal statutorily empowered to order release be convened as quickly as possible to hear evidence on whether the current population at the jail is indeed the source of constitutional violations, and to determine whether release is necessary. *See, e.g.*, *Coleman*, 2020 WL 1675775, at *4 n. 9. Should the tribunal be unable to be convened within the time period necessary to avert disaster under prevailing scientific reality, then that narrow procedural component of the PLRA would be unconstitutional because it would prevent the emergency vindication of essential constitutional rights, and this Court should order such emergency relief until such time as the tribunal can convene. *Cf. See, e.g.*, *Plata*, , 2013 WL

18

3200587 at *8 (rejecting interpretation of the PLRA because it "would prevent vindication of the inmates' constitutional rights and would therefore be impermissible").

**B. Limited Discovery Is Necessary and Appropriate as to the Relief Requested.**

The court should also afford Plaintiffs an opportunity to conduct limited discovery on an expedited basis in advance of a hearing on their requests. Although the commencement of formal discovery typically awaits the completion of the parties' Rule 26(f) conference, the court's ability to control the timing and sequencing of discovery has been interpreted to allow the entry of an order to expedite the discovery process—particularly where the plaintiff seeks preliminary injunctive relief. *See, e.g., Ellsworth Associates, Inc. v. United States,* 917 F. Supp. 841, 844 (D. D.C. 1996); *Revlon Consumer Products Corp. v. Jennifer Leather Broadway, Inc.,* 858 F. Supp. 1268, 1269 (S.D.N.Y. 1994); *Rehabilitation Institute of Chicago v. Hicks*, 1990 WL 16298 (N.D. Ill. Jan. 26, 1990). To obtain expedited discovery, the requesting party must establish "good cause," generally interpreted to mean that the need for discovery outweighs the prejudice to the responding party. *Share Corp. Momar, Inc.* 2010 WL 724321 (E.D. Wis. Feb. 26, 2010).

Plaintiffs seek to leave to expedite three items of discovery: (1) Plaintiffs seek entry into the Jail for their designated medical/public health expert and, in the course of that view, the opportunity to photograph and to take video of selected conditions; (2) Plaintiffs seek depositions, limited to three hours, of Dr. Connie Menella, the Chair of Correctional Health at Cook County Hospital, whose declaration the Sheriff filed in response to relief in this case and as part of the Sheriff's status on compliance with the TRO, and of Michael Miller, the Jail's First Assistant Executive Director whose declaration the Sheriff filed in opposition to relief in this case; and (3) the opportunity to propound a narrow set of document production requests seeking the identity and

location of the members of subclass A and ongoing data regarding the spread of the coronavirus in the Jail, among other things. This proposed discovery is attached as Exhibit A.

There is "good cause" for this discovery. The court has held that Plaintiffs are entitled to a TRO with respect to certain aspects of the Jail's response to the pandemic, as to which there is evidence of inadequacy. Plaintiffs have proffered new evidence further supporting their very urgent claim that the lives of members of the plaintiff classes are being unnecessarily placed at risk by further inadequacies of the Jail's coronavirus response—in particular, the failure to mandate social distancing and the failure to identify and triage medically vulnerable detainees. The limited discovery Plaintiffs seek is necessary to enable the Plaintiffs to present evidence to the court in the emergency hearing that Plaintiffs seek on their second preliminary injunction motion.

Plaintiff recognize that the Jail is in crisis; that there is a shortage of staff because of illness, including confirmed and suspected coronavirus cases among Jail staff; and that these are trying times for all of us. With this in mind, Plaintiffs have narrowly circumscribed their discovery requests so as to intrude only minimally on the Jail. Balancing the need for discovery against the prejudice caused to the Sheriff, the court should conclude that there is "good cause" to expedite discovery and to grant this motion in its entirety.

WHEREFORE, Plaintiffs request that this Court grant their renewed motion for a Preliminary Injunction and for limited, expedited discovery.

Respectfully submitted,

/s/ Alexa A. Van Brunt
Locke E. Bowman
Alexa A. Van Brunt
Roderick and Solange MacArthur Justice Center
Northwestern Pritzker School of Law
375 E. Chicago Avenue, Chicago, IL 60611
(312) 503-0884
l-bowman@law.northwestern.edu
a-vanbrunt@law.northwestern.edu

Stephen H. Weil
Sarah Grady
LOEVY & LOEVY
311 N. Aberdeen Street, #3
Chicago, IL 60607
Tel: 312-243-5900
Fax: 312-243-5902
weil@loevy.com
sarah@loevy.com

Charles Gerstein
Alec Karakatsanis
Civil Rights Corps
1601 Connecticut Ave NW, Suite 800
Washington, DC 20009
charlie@civilrightscorps.org
alec@civilrightscorps.org
202-894-6128

## CERTIFICATE OF SERVICE

I, Alexa Van Brunt, an attorney, hereby certify that on April 14, 2020 before 8:00 p.m., I caused a copy of the foregoing to be filed using the Court's CM/ECF system and served upon all counsel who have filed appearances in the above-captioned matter.

/s/ Alexa A. Van Brunt
Alexa A. Van Brunt