IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| ANTHONY MAYS, et al., | ) | Case No. 20-CV-2134 |
| Plaintiffs, | ) | |
| | ) | Hon. Matthew F. Kennelly, |
| v. | ) | in his capacity as Emergency |
| | ) | Judge |
| THOMAS J. DART, Sheriff of Cook County, | ) | |
| Defendant. | ) | Hon. Robert W. Gettleman, |
| | ) | District Court Judge |
| | ) | |
| | ) | Hon. M. David Weisman, |
| | ) | Magistrate Judge |

**DEFENDANT'S PARTIAL BRIEF IN OPPOSITION TO PLAINTIFFS' RENEWED
MOTION FOR PRELIMINARY INJUNCTION AND EXPEDITED DISCOVERY**

NOW COMES the Defendant, THOMAS J. DART, in his Official Capacity as Sheriff of Cook County, and for his Partial Brief in Opposition to Plaintiff's Renewed Motion for Preliminary Injunction and Expedited Discovery [Dkt. 55], states as follows[1]:

## INTRODUCTION

In response to every filing by Sheriff Dart, Plaintiffs assert a different heretofore unmentioned alleged constitutional violation. Each of these complaints amounts to nothing more than a disagreement about the policies the Sheriff has chosen to implement based on their demand for unrealistic and unattainable outcomes that the world's renowned medical experts and epidemiologists have yet to achieve. Without voicing any objection to the latest testing, intake, and sanitation policies implemented at the Jail [Dkt. 55, p.4], Plaintiffs now turn their sights on social distancing, demanding that the Sheriff comply with standards that far exceed his constitutional obligations, but with which he nevertheless complies.

The Sheriff's frustration cannot be overstated: Plaintiffs persist in pursuing this unnecessary litigation that consumes valuable resources and pulls the Jail and Office staff off of the front lines of managing the coronavirus pandemic to wage a dispute that long ago could have been avoided with a cooperative and good faith effort to address their concerns with the Office before filing this lawsuit. The suggestion that the Sheriff is purposefully, or even inadvertently, withholding any effort to protect detainees and

---

[1] Sheriff Dart does not waive and reserves the right to make any further legal arguments in response to Plaintiff's Motion should it survive beyond the Court's ruling on his objections on the following threshold dispositive issues.

his own Jail staff is belied by the extraordinary efforts taken over the past two months to identify and contain the spread of infection, as well as the quantifiable success those efforts have had. The prevention policies in place at the Jail have been thorough with data showing that COVID-19 cases at the Jail are under control and are being effectively managed. With this partial Brief in Opposition to Plaintiffs' Motion for Preliminary Injunction, exposing the structural and substantive legal failures of Plaintiffs' claims, the Sheriff hopes at last to put an end to this litigation.

## I.     UPDATED REPORT ON PROGRESS AT THE JAIL

In supplement to the report provided to the Court at the April 15 hearing, the Sheriff provides this update on progress at the Jail. With regard to the effectiveness of the numerous measures taken to reduce the spread of COVID-19 at the jail, the present data is encouraging. Most significantly, the jail population has been substantially reduced over the last month. See Exh. A, Daily CCDOC Population Report. Since March 8, the jail population has dropped 24%, from 5,710 detainees to 4,233 detainees on April 17. This corresponds with the data on daily bookings and release (See Exh. B, Daily Bookings). For example, on March 8, there were 200 bookings with 117 detainees not released on the day of booking (either through bond or EM). Bookings have declined rapidly, and on April 16, there were 52 bookings with only 13 detainees not released on the day of booking.

Meanwhile, the positive COVID detainees in isolation have generally been trending downward See Exh. C, CCDOC Testing Results. After the COVID-19 outbreak at the jail in late March, a highpoint was reached on April 10, with 289 positive COVID

detainees in isolation. Since then, there has been a relatively consistent decline with 180 positive COVID detainees in isolation on April 17. In comparison, the number of convalescent detainees in recovery has been increasing. On April 5, there were no convalescent detainees in recovery. On April 17, the number of convalescent detainees in the process of medical recovery has reached 170. *Id*.

These successes, in addition to the many others reported by the Sheriff, demonstrate why Plaintiffs have not and cannot succeed on their ever-evolving claims against the Sheriff. This is particularly true with respect to Plaintiffs' latest claim that the alleged failure to implement strict social distancing within a correctional facility—beyond the standards set forth by the CDC Guidance on Management of Coronavirus Disease 2019 in Correctional and Detention Facilities—is objectively unreasonable. As will be shown below, not only are Plaintiffs unable establish a likelihood of success on the merits of their claims, but as a preliminary matter, they cannot overcome the significant structural legal hurdles necessary to obtain their desired relief seeking the immediate release or transfer of hundreds of detainees. In other words, Plaintiffs' claims fail before they have begun. Therefore, the motion for preliminary injunction must be denied outright, obviating the need for a hearing or any request for expedited discovery.

## II. PLAINTIFFS CANNOT SUCCEED ON THE MERITS OF THEIR CLAIMS

The standard for a preliminary injunction is identical the standard for a temporary restraining order, which is well known at this point in the litigation. Dkt. 47, p. 10. Plaintiffs must establish that they will suffer irreparable harm without the

requested relief; they have no adequate remedy at law; and they are likely to succeed on the merits of their claim. If Plaintiffs can meet this threshold, then the Court must determine whether the harm to the public in categorically releasing hundreds of detainees outweighs the risk of harm to the Plaintiffs. These standards are exceedingly stringent here, where Plaintiffs seek a mandatory injunction requiring affirmative action by the Sheriff. Dkt. 47, p. 10.

Plaintiffs' motion must be denied not only because they cannot establish success on the merits of their claims, but as a preliminary matter, they cannot overcome the significant procedural and substantive legal hurdles that would allow this Court to grant their requested relief. First, Plaintiff Foster still has not exhausted all available remedies that would entitle him to release pursuant to a writ of habeas corpus. Even as to his preliminary effort to alter the conditions of bond, principles of comity and abstention counsel against this Court revisiting the state court judge's finding that Foster's risk to society upon release outweighs any possibility of harm that could befall him in the Jail. Second, Plaintiffs are not entitled to release or transfer under section 1983 because their claims are procedurally barred by the Prisoner Litigation Reform Act (PLRA). Finally, Plaintiffs' quest to obtain release on a class-wide scale is "untenable" and "unworkable" under either theory of relief because of the inherently individualized considerations involved in evaluating detainee release. Notwithstanding these procedural failures, on the merits, Plaintiffs cannot succeed on their due process claim because as this Court previously found, the Sheriff was entitled to rely on the CDC Guidance for correctional facilities with respect to social distancing in the living

quarters and common areas at the Jail, which complies with these standards. In practice, over the past month, the Sheriff has made significant structural efforts to increase social distancing in the living quarters at the Jail. At this point, the majority the tiers now house single-celled detainees and a majority of the dorms are now at 50% occupancy or less. Accordingly, the Sheriff's efforts to increase opportunities for social distancing at the Jail have been objectively reasonable.

**A.    Plaintiffs Cannot Succeed on the Merits Because They Cannot Overcome the Procedural Hurdles to Obtain the Requested Forms of Relief.**

As a preliminary matter, Plaintiffs' cannot succeed on the merits of their claims because they are procedurally barred. As to Plaintiffs' claim for habeas relief, Mr. Foster still has not exhausted his administrative remedies sufficient to invoke habeas relief. Moreover, while he did make a preliminary effort to seek a bond reduction in state court, he never sought appeal or rehearing on that finding. Moreover, Plaintiffs' claim for release under section 1983 is barred by the Prisoner Litigation Reform Act (PLRA) because they have failed to satisfy the requisite conditions for pursuing relief under 18 USC §3626.

**1.    Plaintiffs are not entitled to habeas relief because they still have not exhausted their administrative remedies.**

Plaintiffs contend that Kenneth Foster "and the subclass he provisionally represents" is entitled to emergency release pursuant to a writ of habeas corpus based on his medical status, which he claims puts him at a higher risk of contracting COVID-19. Dkt. 55, p. 14. The Court previously denied this request at the TRO stage because

Plaintiffs made no showing—and in fact, were unaware one way or another—that Foster, Mays, or any other detainees had availed themselves of existing (and still-available) state court remedies to seek release through emergency bond proceedings. Dkt. 47, p. 12-13. The Court rejected the notion that pursuing such remedies was futile.

First, it is important to note that the Court has not "provisionally" certified a subclass of detainees who "in addition to having health vulnerabilities that elevate their risk of serious COVID-19, also ... sought release from the Jail" (Dkt. 55, p. 13) under the bond modification process relative to the instant motion for preliminary injunction, nor could it for reasons explained more fully in section II.C.3., *infra*. Also, the Plaintiff's motion for class certification was not before the Court at the time the TRO motion was heard, and its provisional certification of all pretrial detainees relative to the conditions of confinement under Rule 23(b)(2) was entered *sua sponte* pursuant to its equitable power in that proceeding. That provisional class certification applies only to the relief granted in the TRO, and does not extend to the present motion, particularly where the Sheriff has not yet had an opportunity to respond to Plaintiffs' motion for class certification. Dkt. 6.

Plaintiffs now contend that Mr. Foster *did* in fact seek release by way of the expedited bond hearing process implemented by Judge Martin, but that his request was denied. The briefing in Mr. Foster's case shows that he presented Judge Joyce with the same arguments he makes here: namely, that he should be released on bond because his medical condition makes him susceptible to coronavirus infection. Dkt. 55-6. However, in light of the violent crimes with which Mr. Foster has been charged—namely, robbery,

domestic battery, and false imprisonment—Judge Joyce evidently determined that Mr. Foster's risk to society outweighed the potential risk of infection. Additionally, Judge Joyce was statutorily prohibited from releasing Mr. Foster to electronic monitoring in light of his domestic battery charge. Nevertheless, Mr. Foster has made no attempt to appeal or seek reconsideration of that ruling. However, he is not excused from pursuing this remedy: the Court previously rejected the notion that pursuing an appeal or rehearing so "unduly time consuming" as to make the process futile. Dkt. 47, p. 13. Accordingly, Mr. Foster still has not exhausted his administrative remedies, and therefore, cannot obtain release by way of a writ of habeas corpus. Nor do the principles of comity permit the Court to interfere with the paramount interest of the state courts to adjudicate criminal matters by revisiting Judge Joyce's determination that Mr. Foster is too dangerous to be released.

2. **Plaintiffs are not entitled to release under section 1983 because their claims are barred under the PLRA.**

Plaintiffs' Preliminary Injunction Motion seeks two orders from this Court that arise out of their § 1983 claim[2]: (1) order the Sheriff to implement social distancing; and (2) order a three judge panel to be empaneled to enter a release order; (3) or order a "transfer" of detainees. Dkt. #55, pgs. 17-19 ("Mot."). Plaintiff's cannot meet their burden for relief under the PLRA.

i. **The PLRA prohibits this Court from empaneling a three-judge court at this stage in this litigation.**

---

[2] The PLRA applies to all Section 1983 claims brought by prisoners. *Walker v. O'Brien*, 216 F.3d 626, 639 (7th Cir. 2000). The PLRA has a broad definition of "prisoner" that includes pretrial detainees. 18 U.S. Code § 3626(g)(3).

Plaintiffs next argue this Court should immediately empanel a three judge panel through 18 U.S.C. 3626(a)(3) to consider a prisoner release order if the Court determines social distancing is impossible. Dkt. 55, p. 17.

The PLRA prohibits this Court from entering empaneling a three judge panel at this point. A three judge panel is required under PLRA for a prisoner release order. 18 U.S.C. 3626(a)(3)(B). There are two requirements that must be met before a court may enter a prisoner release order: "(i) a court has previously entered an order for less intrusive relief that has failed to remedy the deprivation of the Federal right sought to be remedied through the prisoner release order; and (ii) the defendant has had a reasonable amount of time to comply with the previous court orders." 18 U.S.C. 3626(a)(3)(A). Neither requirement has been met here.

First, this Court's TRO Order denied Plaintiffs' request for a TRO on social distancing in the jail. The Court found "[s]pace constraints at the Jail do not allow for the more preferable degree of social distancing that exists in the community at large." Dkt. #47, pg. 25. The Court concluded that "plaintiffs have filed to show a reasonable likelihood of success on their contention that the Sheriff is acting in an objectively unreasonable manner by failing to mandate full social distancing. This is particularly so because the Sheriff's submission reflects an ongoing effort to modify custodial arrangements at the Jail in a way that will permit greater separation of detainees." *Id.*

As a result, this Court has not previously entered an order for less intrusive relief on social distancing. And, of course, it is impossible to find the Sheriff "has had a

reasonable amount of time to comply" with an order that has never been entered. Thus, it is premature to consider relief under 18 U.S.C. 3626(a)(3)(A).

### ii.    This Court should not order a "transfer" of detainees.

Plaintiffs motion also asks this court to "transfer" detainees. Though the motion does not specify the relief Plaintiffs seek, it references Plaintiffs previous filing in response to this Court's April, 3, 2020 Order. In support, Plaintiffs argued the Sheriff has the authority under the Illinois County Jail Act to transfer detainees. Dkt. #26-1, pg. 25. Plaintiffs cited to Section 125/14 of the County Jail Act, which states:

> At any time, in the opinion of the Warden, the lives or health of the prisoners are endangered or the security of the penal institution is threatened, to such a degree as to render their removal necessary, the Warden may cause an individual prisoner or a group of prisoners to be removed to some suitable place within the county, or to the jail of some convenient county, where they may be confined until they can be safely returned to the place whence they were removed. 730 ILCS 125/14.

Contrary to Plaintiffs' claims, all the County Jail Act envisions is that the Warden can remove prisoners to another "suitable place within the county." *Id*. But Cook County only has the one jail facility. To find another "suitable place" to transfer detainees to, and then prepare that place and properly staff it to ensure public safety, would be, under the current circumstances, widely impractical if not impossible. It certainly would not be "the least intrusive means necessary to correct [any] harm." 18 U.S.C. 3626(a)(2). Plaintiffs have therefore not established a transfer under the County Jail Act is appropriate under the PLRA.

9

Though Plaintiffs' briefing refers to "transfer," their focus has been on a "transfer" to electronic home monitoring. Plaintiffs claim the County Jail Act provides the Sheriff the authority to "transfer" detainees to electronic monitoring. Dkt. #26-1, pg. 25. But nowhere in the County Jail Act is electronic home monitoring, or any equivalent phrase or concept, referenced. Electronic monitoring is instead governed by the Conditions of Bail Bond section of the Illinois Code of Civil Procedure, which states the court may impose electronic monitoring as a condition of bond. 725 ILCS 5/110-10(b)(14-14.3) Thus, under Illinois law, a judicial order is necessary for a detainee to be released on electronic monitoring. The Sheriff therefore lacks the authority to unilaterally release detainees on home monitoring.

Plaintiffs also argue this Court, rather than a three-judge court, may order transfer to electronic monitoring under the PLRA. This too is incorrect. Plaintiffs attempt to support their argument by citing to *Plata v. Brown*, No. C01-1351 TEH, 2013 WL 3200587, at *8 (N.D. Cal. June 24, 2013). Dkt. #55, pg. 16. But the court in *Plata* was considering transferring inmates from one prison facility to another. *Id*. pg. 42, fn. 11. Here, Plaintiffs are seeking detainees be released under electronic home monitoring.

Electronic home monitoring is not another "facility." The PLRA defines a "prisoner release order" as one that "includes any order, including a temporary restraining order or preliminary injunctive relief, that has the purpose or effect of reducing or limiting the prison population, or that directs the release from or

nonadmission of prisoners to a prison[.]"[3] 18 U.S.C. § 3626(g)(4). Any order from this Court to "transfer," to use Plaintiffs' term, would have the effect and purpose of reducing the Jail population to achieve social distancing, and the would direct the release of detains from the jail. Such an order would therefore have to be issued by a three judge court. 18 U.S.C. § 3626(a)(3). In fact, the three judge court is what this District used to order the Sheriff to release detainees on electronic home monitoring through § 3626(a)(3) in *United States v. Cook County*, 761 F. Supp. 2d 794, 800 (N.D. Ill. 2011).

Finally, any "transfer" order would still have to comply with the PLRA's requirement that "[t]he court shall give substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the preliminary relief[.]" 18. U.S.C. § 3626(a)(2). The number of detainees currently on electronic monitoring is 2,904. (Ex. A) This is an increase of nearly 450 detainees on electronic monitoring since March 17, 2020. Ex. D, Scannel Dec. As a result, an order that transfers detainees would have the risk of overloading the Sheriff's electronic monitoring system, which would create a grave risk to public safety.

   **iii. A preliminary injunction ordering the Sheriff to implement social distancing would be improper under the PLRA.**

Plaintiffs request this Court enter a preliminary injunction ordering the Sheriff "to take all possible steps to implement medically required social distancing because it

---

[3] "Prison" and "Prisoners" are broadly defined to include jails and detainees. 18 U.S. Code § 3626(g)(3),(5).

is the only way to prevent a severe risk of harm." Mot. pg. 8. The PLRA states that an preliminary injunctive relief "must be narrowly drawn, extend no further than necessary to correct the harm the court finds requires preliminary relief, and be the least intrusive means necessary to correct that harm." 18 U.S.C. 3626(a)(2). In addition, the Court "shall give substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the preliminary relief and shall respect the principles of comity set out in paragraph (1)(B) in tailoring any preliminary relief." *Id*.

The order Plaintiffs seek would have a significantly adverse impact on the operation of the Jail. Regardless that the CCSO has already taken "all possible steps" to implement social distancing, there are instances where social distancing must yield to security concerns (for example, housing certain classifications of detainees, medical concerns, or breaking up fights). An order mandating social distancing would impede the Sheriff's ability to address security and medical issues that may arise.

Furthermore, Plaintiffs have not offered this Court any guidance on how this Court could draft a narrowly tailored order that would direct the CCSO to do anything more than he is currently doing. As the Jail population has decreased, the CCSO has used that flexibility to provide detainees more space to achieve social distancing. More importantly, since this Court's TRO Order denied social distancing relief in the Jail, the CCSO has obtained enough masks to provide every detainees with a new PPE surgical mask everyday until June 7, 2020. Ex. E, Miller Dec. The CCSO is therefore providing detainees in the Jail with better protection from coronavirus than most essential

workers are receiving. While complete social distancing is the ideal, the ability to provide each detainee with a surgical mask lessens the risk to detainees in situations where complete social distancing is not possible.

### 3. Plaintiffs requested relief is inherently individualized and cannot be granted on a class-wide basis.

Plaintiffs also cannot succeed in obtaining the ultimate relief they seek because the decision to release or transfer a detainee from the Jail is an inherently individualized process that is not amenable to class-wide resolution. The requirements for class certification seeking injunctive relief under Federal Rule 23 are: (1) numerosity; (2) commonality; (3) typicality; and (4) adequacy of representation. Fed. R. Civ. P. 23(a)(2). The failure to satisfy any one of these elements precludes class certification. *Arreola v. Godinez*, 546 F.3d 788, 794 (7th Cir. 2008). In this case, the inherently individualized process of assessing a detainees risk to the public when seeking release or transfer from custody precludes a finding of commonality or typicality, and class certification must be denied under either theory of relief. *Id*.

Generally speaking, to satisfy the commonality element, the plaintiff must show there are questions of law or fact common to the class. However, this means more than that they all suffered a violation of the same provision of law. Rather, the plaintiff must demonstrate that the class members *have suffered the same injury*. *Wal-Mart v. Dukes*, 564 U.S. 338, 360 (2011). The crux of commonality is "not the raising of common questions," but rather, "the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation." *Id*. (internal quotations omitted).

13

In the specific context of a Rule 23(b)(2) class seeking injunctive relief, the analysis centers on whether "the party opposing the class [allegedly] has acted or refused to act on grounds that apply generally to the class so that *final* injunctive relief or corresponding declaratory relief is appropriate respecting the class *as a whole*." Fed. R. Civ. P. 23(b)(2); *Jamie S. v. Milwaukee Public Schools*, 668 F.3d 481, 498-99 (7th Cir. 2012) (emphasis added). However, "claims for *individualized* relief … do not satisfy Rule 23(b)(2)." Id. at 499, quoting *Wal-Mart*, 564 U.S. at 360. In other words, a single injunction must provide complete relief to each member of the class. *Wal-Mart*, 564 U.S. at 360. A class cannot be certified under Rule 23(b)(2) "when each individual class member would be entitled to a *different* injunction…against the defendant." *Id*. (emphasis in original). It is not sufficient for a plaintiff to "superficially" style his case as a claim for class-wide injunctive relief if "as a substantive matter the relief sought would merely initiate a process through which highly individualized determinations of liability and remedy are made; this kind of relief would be class-wide in name only and it would certainly not be final." *Jamie S.*, 668 F.3d at 499.

Here, even if Plaintiffs' section 1983 claims were not barred by the PLRA, they still could not obtain the relief they seek because categorical release or transfer from the Jail is unattainable on a class-wide basis. It is imperative that a detainee's suitability for for and conditions of release be based on an individualized consideration of the safety of the detainee, his family, and the public at large. *Money v. Pritzker*, 2020 U.S. Dist. LEXIS 63599, *49. In this context, certainly the detainees' health status is an important consideration for release—not only the underlying condition for which he seeks release,

14

but also any signs of coronavirus infection, for his safety and his family's safety. Most importantly, the public's interest must be considered in light of the potential release of detainees who have been accused of serious violent crimes. *Id.*

Plaintiffs fully acknowledge "that the court will need to individually assess the conditions under which each individual class member should be released, consistent with public safety concerns separate from the spread of coronavirus." Dkt. 55, p. 16. It is precisely this need for individualized assessments that make this case inappropriate for class treatment. *Id.* Indeed, the differences among putative class members are so vastly and fundamentally different that class treatment is deemed "untenable" and "completely unworkable." *Money*, 2020 U.S. Dist. LEXIS 63599, *6, 49. Accordingly, without the ability for Plaintiffs to obtain relief on a class-wide basis, this case reverts to two individual section 1983 lawsuits, which defeats their class claims and precludes Plaintiffs from obtaining the expedited discovery they seek.

While it is unclear whether class-wide relief is available for habeas claims at all, it certainly would not be available here, because of the need for individualized assessments of whether any of the plaintiffs are entitled to release. *Bijeol v. Benson*, 513 F.3d 965, 968 (7th Cir. 1975); *Money*, 2020 U.S. Dist. LEXIS 63599, *72 n.15.

**B.    Plaintiffs Cannot Succeed on the Merits Because the Sheriff's Actions are Objectively Reasonable.**

Not only are Plaintiffs unable to succeed on the merits of their claims because of the procedural deficiencies of their case, they also cannot succeed on the merits of their

claims. The Sheriff's reliance upon and compliance with the CDC Guidance regarding social distancing is objectively reasonable and does not result in a due process violation.

      **1.**      **The Sheriff contends that it is objectively reasonable to comply with the CDC Guidance adapted for correctional facilities.**

As explained more fully in the Sheriff's Supplemental Brief in Opposition to the TRO, Plaintiffs must establish a likelihood of success that the Sheriff was objectively unreasonable in implementing the CDC Guidance adapted specifically for correctional facilities with respect to social distancing. Dkt. 41, p. 1-2. It must be remembered that barely two weeks ago, in the remarkably short history of this case, Plaintiffs very first request for relief sought a TRO forcing the Sheriff to implement *these very guidelines* that they now say are utterly deficient. And this case has been a game of constitutional whack-a-mole ever since. With every documented policy, practice, and act of creative problem solving the Sheriff has implemented in the Jail during these unprecedented times, Plaintiffs abandon their last complaint and find a new one to explore.

In this specific context, Plaintiffs now claim that the Sheriff is constitutionally obligated to exceed the CDC Guidance for correctional facilities as it relates to social distancing. The Court previously rejected this contention and declined to order the Sheriff to implement full social distancing, remarking that while Plaintiffs complained that the sleeping and common areas of the Jail "run afoul of CDC guidance," "the CDC's guidance is not as definitive as plaintiffs suggest." Dkt. 47, p. 23. In fact, the CDC Guidance for correctional facilities specifically "acknowledges that space limitations may require a departure from better social-distancing practices… [T]he CDC's guidance

expressly recognizes that complete social distancing may not be possible in the sleeping areas of a jail [and s]pace constrains at the Jail do not allow for the more preferable degree of social distancing that exists in the community at large." Dkt. 47, p. 24-25.

Nevertheless, Plaintiffs have proffered the declaration of an infectious disease expert who may be very accomplished in his own right, but has no experience with correctional facilities, and a promise that a former jail medical director may offer his opinion at some point in the future supporting full social distancing. On the basis of these two submissions, and in the face of the Court's prior recognition that the Sheriff rightly relied on and complied with jail-specific guidelines promulgated by the leading authoritative agency on infectious disease, Plaintiffs again contend that merely complying with the CDC Guidance is not objectively reasonable.

To the contrary, the Seventh Circuit has recognized that courts do not "impose upon prisons in the name of the Constitution a duty to take remedial measures against [allegedly harmful conditions] that the agencies responsible for the control of these hazards do not think require remedial measures." *Carroll v. DeTella*, 255 F.3d 470, 472-73 (7th Cir. 2001) (analyzing claims against a prison for alleged water contamination). If the relevant government agencies believe that certain standards are acceptable, "prison officials cannot be faulted for not thinking it necessary for them to do anything either. *They can defer to the superior expertise of those authorities*." *Id*. at 473. Although *Carroll* was analyzed under the eighth amendment, the Court's analysis speaks directly to the reasonableness of a jailer's ability to rely on the "superior expertise" of the leading authorities who promulgate policies and standards relative to the apparent risk.

The constitution also does not require a "maximally safe environment… completely free from pollution or safety hazards." *Id.* at 472. Where a prison official knew of a substantial risk of harm to inmate health or safety, and "responded reasonably to the risk, even if the harm ultimately was not averted," their conduct is not unconstitutional. *Peate v. McCann*, 294 F.3d 879, 882 (7th Cir. 2002). This is not to say that the Sheriff does not appreciate the seriousness of controlling the spread of COVID-19 in the Jail or that he is not taking action to control it. He certainly does, and that is evident from the extraordinary efforts he has undertaken to contain it, discussed more fully below. Accordingly, the Sheriff's reliance on the CDC Guidance and compliance with it with respect to social distancing is objectively reasonable.

2. **While the Sheriff has voluntarily made efforts that allow detainees to practice "full" social distancing in a majority of the general population living quarters, he cannot implement "full" social distancing throughout the Jail outside of the CDC guidelines that apply to jails.**

As explained above, to fulfill his constitutional obligations, the Sheriff may rely on the CDC Guidance for management of correctional facilities to set compliance standards at the Jail, and he acted objectively reasonably in doing so. Nevertheless, in light of Plaintiffs' new contention that full social distancing at the Jail is "impossible without reducing the population of the jail" in an effort to obtain categorical detainee release, (Dkt. 55, p. 2), the Court asked the Sheriff to provide his "position on whether it is possible to … rearrange people within the Jail to accomplish social distancing" of six feet between individuals as defined by the CDC "without the safety valve" that allows an exception where social distancing "might not be feasible given the nature of the

18

facility." Ex. A, Transcript 4/15/20, 39:20-40:19. Indeed, the Sheriff can and has been proactive in his efforts to implement social distancing in the majority of the Jail's living quarters and common areas. However, due to several factors, including security and medical classification restrictions and the size of the population, among other things, the Sheriff cannot implement "full" social distancing throughout the Jail at this time. Given the ever-changing nature of the population and detainees' needs and characteristics, it is not "impossible," but would likely require a reduction in population in the short term.

It is important to note at the outset that any suggestion that the Sheriff is relying on the modifications in the CDC Guidance to avoid making even minimal efforts to accommodate social distancing throughout the Jail is belied by the powerful data showing the results of the Sheriff's ongoing efforts to contain the spread of the coronavirus for the protection of the detainees and the staff. As the Court has recognized, the Jail system is a large and very complex compound, the operation of which is very challenging even in normal times. Dkt. 47, p. 2.

Despite this, the Sheriff has undertaken many structural efforts to allow detainees to practice social distancing, particularly in living quarters and common areas. For example, as noted elsewhere in the Sheriff's briefing, he has worked cooperatively with the State's Attorney and the Public Defender to identify detainees who would be suitable for release and who would appear before a bond court judge to seek modifications of conditions of bond. To date, over 1,200 detainees have been released since March, and the Sheriff continues to work with Public Defender

Campanelli to evaluate the detainee population and identify other detainees who may be eligible for release under the bond court procedure. See Ex. F, Campanelli letter. As mentioned above, the Jail population remains at a record low of 4,211, while there are a record high number of detainees on the electronic monitoring program, approaching 3,000.

The Sheriff also has "rearranged people" and reconfigured spaces to allow for social distancing in the housing units, made possible by the fact that the Jail population has dropped by 24% over the past month. One month ago, there were 391 detainees in single-celled housing. Today, there are 2,521, marking a 545% increase. One month ago, there were 3,906 detainees in double-celled housing; today, there are 260, a decrease of 93%. Single-cell housing is now available on 175 tiers, with only 11 tiers that remain double celled, due to the unique mental health needs of those detainees. CHART; Exh. __, Miller Dec., at 11, 13.

The Sheriff also opened several divisions of the Jail that previously were closed in order to spread out detainee housing: Division IV, Division V, Bootcamp barracks/Mental Health Transition Center, and Division II, Dorms 1, 3, and 4. Ex. __, Miller Dec., at 9. This is no small undertaking, and all was done in extremely short order to accommodate new housing units. Opening these tiers requires that the space be thoroughly cleaned; that utilities be connected; that a system for food and medical delivery be established; and that the Division be properly staffed.

By opening these Divisions, the Sheriff is now able to spread out detainees assigned to dormitory housing. Each of the four dorms can accommodate 900 detainees.

Currently, there are 684 detainees housed across the four dorms, permitting 170-200 detainees per dorm. Ex., __, Miller Dec. at 12. Occupancy in these dorms is at 50% of capacity, allowing for one-man bunks. Where the bunks are movable, they are spaced 6' apart. For those bunks that are bolted to the floor, every other bunk is unoccupied.

In addition to the structural changes implemented, it is important to also note that the Sheriff provides all detainees in the Jail with masks, including those in the general population. Ex. __, Miller Dec., at 23--25. The use of masks to stringently control transmission of the virus cannot be discounted. None of Plaintiffs' experts, through declaration or Plaintiffs' characterization of their purported testimony, account for the role masks play in preventing the spread of the virus. At this time, with the new supply of PPE, the Sheriff can provide a new mask to every detainee every day, and plans to incorporate those needs into his ongoing PPE estimates. If supplies run short, however, the Sheriff may provide cloth masks to detainees in the general population, which are CDC-approved for the general public.

As mentioned above, the population at the Jail changes daily, in number and character, and with that comes the ever-present need for the Sheriff's Officers to have the flexibility to adapt to the needs of the population as a whole at any given time. This leads to unpredictable situations that may require housing adjustments on an ongoing basis to operate the Jail safely and efficiently, which is the Sheriff's first priority at all times.

For example, despite all efforts of the officers and staff, fights break out in the Jail, and sometimes in large numbers. These are not common occurrences, but they

happen, and the Sheriff must have the flexibility to prioritize Jail safety over voluntary "full" social distancing. Currently, if a small infraction occurs, discipline housing can accommodate single-cell housing; however, if a large-scale fight occurs, that could require alternative housing arrangements to house the detainees involved.

Additionally, there is a population of approximately 1,700 mentally ill detainees who may not be assigned to a single cell for medical reasons, and who have been designated as such by Cermak Health Services. They are largely housed in the dorms, they must be given priority in certain dorms, in the event that security and other population adjustments are necessary.

Additionally, there are currently 170 detainees on the convalescent tier who have medically recovered from COVID-19. Ex. __, Miller Dec., at 7. As these detainees eventually make their way back to the general population, the CDC permits them to be housed in cohorts, and need not practice social distancing as they have developed immunity to the virus. As the recovery population continues to grow, these additional considerations factor into future housing decisions and may eventually change the need for social distancing. The Sheriff also rotates the hours detainees may be in dayrooms and common areas. Ex. __, Miller Dec., at 19

As with any condition at the Jail, the Sheriff is responsible for providing the opportunity for detainees to exercise their free will and practice social distancing or wear masks. Many do. However, correctional officers do not "enforce" social distancing or use of PPE with threat of discipline, which could raise a host of constitutional concerns. Ex. __, Miller Dec., at 18.

3. **The Sheriff is Under No Constitutional Obligation to Identify and Medically Triage "Medically Vulnerable" Detainees.**

The Sheriff is under no constitutional obligation to affirmatively identify and "triage" certain detainees based on their health conditions. Plaintiffs have not proffered any expert opinions or any other authority suggesting that the Sheriff has such a duty. Dkt. 55, 55-7. In fact, the Sheriff *cannot* identify detainees by their health conditions. While Plaintiffs are correct that the Department of Corrections may place a health alert in certain detainees files based on information received from Cermak Health Systems, Plaintiffs misunderstand the scope of these alerts. (4/15/20 Transcript, p. 15) As Mr. Scouffas explained at the hearing on April 15, these alerts do not contain information on the detainee's specific health condition. (4/15/20 Transcript, p. 34) Instead, these alerts simply contain information that is required to make operational decisions, such as whether an asthmatic detainee was permitted to have an inhaler, which otherwise would be confiscated as contraband. *Id.* The Sheriff's office is not a "covered entity" under HIPAA, and as such, are not entitled to and may not receive detainees' personal health information.

There is a process in place at the Jail that would allow any detainee to request assistance or accommodations for their health conditions, but the Sheriff's Office has not affirmative obligation to identify them or provide any segregated housing for them. Sheriff's Officers also will refer any detainee who complains of a medical issue to Cermak Health Services for evaluation. Dkt. 30-6. Cermak Health Services continues to perform reviews of any detainee with a medical issue and order well-being checks

which include going to detainees living units as needed for treatment. *Id.* Cermak Health Service, the proper entity to monitor detainees with any medical issues, continues to provide full care for all detainees at the Jail. *Id.* Thus, with no constitutional obligation to affirmatively identify and "triage" medically vulnerable detainees, the Sheriff certainly cannot have acted objectively unreasonably by not doing so.

## IV. The Balancing of Harms Weighs in Favor of Not Imposing a Mandatory Injunction on the Sheriff to Categorically Release or Transfer Detainees Out of the Jail.

As more fully set forth in the Sheriff's previous filings, all of which are incorporated here by reference, even if Plaintiffs could establish all of the threshold elements for preliminary injunction, they cannot establish that the balance of harms weighs in their favor. See Dkt. 29-1, p. 17. Overwhelmingly this is because ordering the categorical release of the Subclass A detainees—with no assessment of their risk to society upon release—would be harmful to the public interest. The decision to release a person from jail must be made on a case by case basis, after examining all of the relevant risk factors. As in any case, that decision must evaluate the seriousness of the crime charged, the recidivist nature of the detainee, and the risk that he is a danger to himself or others, among other things. Here, there also would need to be an evaluation of whether the detainee actually suffered from the claimed medical condition that allegedly makes him vulnerable to COVID-19 infection.

The Sheriff has worked cooperatively with the State's Attorney and the Public Defender to identify detainees who are suitable for release based on their criminal background, medical history, and a host of other factors. For those who remain in the

Jail who have not be identified for release, and particularly those who have petitioned unsuccessfully for bond modifications, the assessment of risk to the public evidently outweighed any perceived risk to their health, and the are not eligible for release, through the bond process, habeas, or an order of release.

## V.   PLAINTIFFS' REQUEST FOR EXPEDITED DISCOVERY MUST BE DENIED

For the reasons stated above and also in Plaintiffs' motion for expedited discovery itself, plaintiffs cannot, in the balance, establish good cause for discovery.  There are dispositive barriers to each of the requests made by plaintiffs in their renewed filing (medical triage and implementation of social distancing beyond that required by the CDC), as well as to each of the remedies sought in their brief (transfer out of the jail or three judge habeas corpus panel).  (Renewed brief, p. 2).  These requests and remedies either are legally barred or moot or both.  As a result, plaintiffs have no likelihood of success on these claims and no degree of discovery will change that result.  Here, Plaintiffs seek discovery on whether social distancing is "possible," (p. 10) but that question has been answered to the fullest extent possible at this time.  In the meantime, the defendants should be permitted to re-direct their full attention to managing the pandemic and to maintaining the objectively reasonable policies that have been put in place according to the CDC Guidance that also are consistent with this Court's prior order.  Accordingly, this Court should find that Plaintiffs have not established good cause for discovery of any kind, particularly on an expedited basis, and deny their request for preliminary injunction.

## CONCLUSION

For the foregoing reasons, Sheriff Dart respectfully requests that the Court deny Plaintiffs' request for a preliminary injunction outright and deny their request for expedited discovery.

By: _/s/ Gretchen Harris Sperry_
One of the attorneys for Defendant
Thomas J. Dart, Sheriff of Cook
County

Robert T. Shannon
James M. Lydon
Gretchen Harris Sperry
Adam R. Vaught
Lari Dierks
HINSHAW & CULBERTSON LLP
151 N. Franklin Street, Suite 2500
Chicago, Illinois 60601
Tel. 312-704-3000

## CERTIFICATE OF SERVICE

The undersigned certifies that on April 17, 2020, I electronically filed the forgoing **DEFENDANT'S PARTIAL BRIEF IN OPPOSITION TO PLAINTIFFS' RENEWED MOTION FOR PRELIMINARY INJUNCTION AND FOR LIMITED, EXPEDITED DISCOVERY** with the Clerk of the U.S. District Court, using the Court's CM/ECF system, which will accomplish service electronically on all counsel of record.

*/s/ Gretchen Harris Sperry*