**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| ANTHONY MAYS, *et al.*, | ) | |
| | ) | |
| Plaintiffs-Petitioners, | ) | |
| | ) | Case No. 20-cv-2134 |
| v. | ) | |
| | ) | The Hon. Matthew F. Kennelly |
| THOMAS J. DART, Sheriff of Cook County, | ) | Emergency Judge |
| | ) | |
| | ) | The Hon. Robert Gettleman |
| Defendant-Respondent. | ) | Presiding Judge |

**REPLY IN SUPPORT OF PLAINTIFFS' RENEWED MOTION FOR A
PRELIMINARY INJUNCTION AND FOR LIMITED, EXPEDITED DISCOVERY**

**INTRODUCTION**

The Sheriff's response has clarified the path forward in this litigation. The Sheriff has conceded that medically required social distancing is not possible with the current jail population given the basic security requirements of running a jail. Doc. No. 62 at 19 ("[T]he Sheriff cannot implement 'full' social distancing throughout the Jail at this time."). The Sheriff having conceded the point, this court should so find.

The Sheriff's concession leads necessarily to the conclusion that, without a reduction of the Jail's population, the lives and safety of the persons confined there cannot be reasonably protected. As a society, we have sacrificed our economy and upended every aspect of our collective and individual lives because of the consensus that social distancing is critical to the protection of health and life. That consensus applies no less to the presumptively innocent individuals who are facing confinement as they await their trials, even if they cannot afford to pay the cash bonds required for their release. Indeed, that is the judgment of every medical expert in this case. *See* Declaration of Dr. Homer Venters, former Chief Medical Officer of the NYC Jail Correctional Health Services (Ex. A hereto) ¶ 19; Declaration of Gregg Gonsalves, Yale Medical School

Epidemiologist (Ex. G to Plaintiffs' Renewed Motion for Preliminary Injunction (Doc. No. 55-7)) ¶ 29; Declaration of Dr. Amir Mohareb (Ex. B hereto) at 5-6; Declaration of Laura Rasmussen-Torvik (Ex. C hereto), ¶ 8. The Sheriff has proffered no contrary medical opinion. Thus, this court should also find that "social distancing" as defined by the Centers for Disease Control and Prevention (CDC), Illinois and federal emergency orders for the protection of the general public, and by Plaintiffs' medical experts is necessary to reasonably protect individuals confined in the Jail.[1]

From these two findings, it follows that the court must address how to reduce the population of the Jail's physical plant. Without such a reduction, the Jail is concededly incapable of protecting the due process rights of those confined there.

As we explain below, there are three practical steps that should be taken simultaneously. *First,* the court should convene a three-judge panel to consider whether and to what extent to enter a prisoner release order. *See* 18 U.S.C. § 3626(a)(3)(A). In light of the extreme urgency, Plaintiffs ask this court to request that this tribunal be convened immediately. *Second,* independently from the three-judge panel procedure, the court should order the Sheriff to transfer detainees to some other safe location of his choosing where they will remain in his custody. *Third,* the court should immediately determine the eligibility of the subclass A Plaintiffs to emergency habeas relief. In

---

[1]      The key feature of social distancing is that individuals be able to keep at least 6 feet (or 2 meters) apart from other individuals. This is the position of the CDC (https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/social-distancing.html); the Illinois Department of Public Health (http://dph.illinois.gov/sites/default/files/COVID-19_SocialDistancing.pdf); the American Medical Association (https://www.ama-assn.org/delivering-care/public-health/covid-19-how-persuade-patients-practice-social-distancing); the American Red Cross (https://www.redcross.org/about-us/news-and-events/news/2020/coronavirus-what-social-distancing-means.html); Johns Hopkins Medicine (https://www.hopkinsmedicine.org/health/conditions-and-diseases/coronavirus/coronavirus-social-distancing-and-self-quarantine); and the American Psychological Association (https://www.hopkinsmedicine.org/health/conditions-and-diseases/coronavirus/coronavirus-social-distancing-and-self-quarantine), among others; *see also infra* Section I.

light of the Sheriff's acknowledgement that he has *not done any medical triage* of the most vulnerable (and in fact does not know who the medically vulnerable are)—even after the recent death of a third class member—there is a clear and present danger to the lives of the most medically vulnerable inside the Jail.

Finally, even as the release of some detainees is being addressed, the court must evaluate the conditions within the Jail for those who will remain behind bars. There is evidence of frequent breakdowns in the Sheriff's sanitation regimens; there is great uncertainty about the extent of spread of the virus within the Jail and a serious question as to the adequacy of the Jail's testing regimen; there has been rapid reallocation of housing within the Jail, potentially exposing detainees to unacceptable living environments, among other things. In the final section, Plaintiffs explain that—even though there is no factual dispute as to the necessity for reduction of the Jail's population—targeted, expedited discovery, the conversion of the TRO into a Preliminary Injunction (or the extension of the TRO with good cause), and potentially an evidentiary hearing are necessary to ensure adequate conditions for those who will remain.

## THE FACTS BEHIND THE JAIL WALLS

### The Evidence on the Imperative of Social Distancing Is Undisputed

The Sheriff does not dispute that maintaining social distance is an imperative for protection against becoming infected with the novel coronavirus. It is a medical necessity—even for those confined in a jail. All of the evidence in this record supports that proposition. Plaintiffs have discussed in their previous filings the voluminous evidence in the public record on the imperative of social distancing. The CDC describes social distancing as "a cornerstone of reducing

transmission of respiratory diseases such as COVID-19[,]"[2] as "[t]he best way to prevent illness[,]"[3] and as "extra important" for vulnerable individuals.[4] Governor Pritzker has described social distancing as a "paramount strategy for minimizing the spread of COVID-19 in our communities[.]"[5] The City of Chicago advises that "[w]ithout social distancing to slow the spread of COVID-19, the number of cases can increase so quickly that hospitals will not have nearly enough beds and equipment to care for all patients."[6]

Medical and epidemiological experts agree. Dr. Homer Venters, an epidemiologist and correctional medical expert who formerly oversaw the delivery of medical care in New York City jails, has submitted a declaration opining that social distancing is among the most evidence-based and critical interventions to slow the spread of COVID-19. Ex. A ¶ 9. Because individuals can transmit the disease before becoming symptomatic, *id.*, social distancing is "imperative to decrease rampant spread . . . and protect people's health." *Id.* ¶ 18.

Dr. Amir Mohareb, an infectious disease physician at Massachusetts General Hospital who is a member of that hospital's Biothreats Response Team and an instructor at Harvard Medical School, has explained in his declaration that social distancing is the "primary means" of protecting public health. Ex. B at 5-6. Dr. Mohareb further explains that proper hygiene and the provision of surgical masks *cannot* serve as an adequate substitute for social distancing, given the inability of

---

[2]        "Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities," CDC, *available at* https://www.cdc.gov/coronavirus/2019-ncov/downloads/guidance-correctional-detention.pdf.

[3]        "How to Protect Yourself & Others," CDC, *available at* https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/prevention.html.

[4]        "What You Can Do," CDC, *available at* https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/what-you-can-do.html.

[5]        Executive Order 2020-18, Apr. 1, 2020, *available at* https://www2.illinois.gov/Documents/ExecOrders/2020/ExecutiveOrder-2020-18.pdf.

[6]        City of Chicago, Frequently Asked Questions (Apr. 17, 2020), *available at* https://www.chicago.gov/city/en/sites/covid-19/home/frequently-asked-questions-.html?#faq-protect.

surgical masks to protect individuals from airborne transmission of COVID-19 and the inability of proper hygiene to protect against both droplet and airborne transmission of the virus. *Id.* at 3, 5-6. The medical evidence instead establishes that "social distancing [is] a necessary intervention to prevent the spread of infection and downstream complications of COVID-19." *Id.* at 6.

Dr. Gregg Gonsalves, an epidemiologist and professor at the Yale Schools of Medicine and Public Health, concluded that "ensuring that all detainees in Cook County Jail can socially distance from one another is the *only* way to prevent further, essentially uncontrolled, spread of the virus." Doc. No. 55-7 ¶ 29. Dr. Gonsalves has further explained that the Jail's ability to effect social distancing will have a direct impact on the utilization of county hospital beds (beds that are required for all County residents), as well as mitigating the harm to Jail staff and the public from an uncontrolled outbreak. *Id.* ¶¶ 29-31.

Dr. Laura Rasmussin-Torvik, Ph.D., Chief of Epidemiology in the Department of Preventive Medicine at Northwestern University and a member of the Northwestern faculty, concurs. Ex. C at ¶ 8 ("Given recent evidence of spread of COVID-19 from people without any symptoms (https://www.cdc.gov/mmwr/volumes/69/wr/mm6914e1.htm) it is critical that all Illinoisans continue to practice social distancing, remaining 6 feet apart, practicing appropriate hand hygiene, and utilizing cloth masks whenever possible in order to control the spread of this disease.").

Even the Sheriff agrees that social distancing is necessary. In a recent supplemental declaration, Michael Miller states that the Sheriff has "emphasized that detainees should maintain 6-feet of distance from each other." Doc. No. 62-5 (Miller. Supp. Decl.) ¶ 18; *see also* Doc. No. 62 at 13 ("complete social distancing is the ideal"). Despite these admissions, the Sheriff continues

to house Plaintiffs in a way that makes social distancing among detainees impossible because there are too many people in his custody to do otherwise.

### The Sheriff Has Conceded That Social Distancing Is Impossible at Current Population Levels

The Sheriff concedes that he "cannot implement 'full' social distancing throughout the Jail at this time." Doc. No. 62 at 19. This is not for lack of trying. The Sheriff appears to have taken dramatic steps to try to expand the Jail's capacity, including by opening tiers that have been closed for some time. For example, since March 15 the Sheriff has opened Division 4, which had been closed entirely, as well as numerous tiers in Division 2. *See* Doc. No. 62-5 (Miller Supp. Decl.) at 11-14. Indeed, multiple detainees have reported that in the last few days they have been moved to mothballed units that appear not to have been used in year, many of which are filthy, lack heat, and lack running or potable water. *E.g.,* Ex. D (Detainee Decls.) at 4, 11, 13.

These efforts are insufficient. *First,* the Sheriff's submission concedes that detainees are still being confined in double cells. Doc. No. 62 at 20. Social distancing in a double celled environment is categorically impossible.

*Second,* the Court will recall expressing concern that given the tight bunk-bed arrangement in Division 2, even placing units in that Division at 50% capacity was unlikely to effectuate social distancing. *See* Apr. 7, 2020 Tr. at 24:9-20. Yet the Sheriff's latest submission shows that of Division 2's 40 dorm units, 20 are at above 40% capacity, ranging up to 70% and above. Doc. No. 62-5 at 9-12. A similar pattern appears in Division 8, a photograph of which is also included in Plaintiffs' complaint. *See* Doc. No. 1 at ¶ 33 (bottom photograph). Of the 30 RTU tiers in Division 8, 21 are above 40% capacity, and 12 are at or near 70% capacity. Doc. No. 62-5 at 14. These tiers house hundreds of people who are unable to take the most basic protective measures against COVID-19. These detainees will be forced to sleep and live well within six feet of each other. Not

surprisingly, many of these tiers are quarantined, indicating that some of the detainees housed there tested positive for COVID-19.

*Third*, the jail's dorms and tiers are enclosed spaces in which dozens of detainees are confined together. Thus even if detainees manage at times to achieve six feet of separation, that will not be sufficient to address the health risk in such environments. As Dr. Amir Mohareb explains, such settings are ideal environment for long-distance, airborne transmission of COVID-19:

> virus particles in small respiratory droplets (<5micrometres) that are emitted by an infected person can remain suspended in the air and remain infective over several hours and over long distances. Pathogens that travel via airborne transmission can infect persons even if they are wearing surgical or procedural masks. Healthcare workers protect themselves against airborne transmission by wearing specialized masks (N95 masks or Powered Air-Purifying Respirators) and by isolating infected persons in closed rooms with negative-pressure ventilation. Buildings or facilities with other forms of ventilation may spread aerosolized pathogens between rooms.

Ex. B (Mohareb Decl.) at 3.

Notably, this form of transmission is distinct from the large respiratory (>5micrometres) transmission for which the six-foot rule is designed. *Id.* The jail's detainee housing, needless to say, is not a negative pressure environment, nor is it well ventilated. Hundreds of detainees, in other words, still sit all day in close proximity to numerous other detainees, in poorly ventilated rooms that will allow any one of them to pass on a virus that can survive in the air for at least three hours. *Id.* In such environments, as Dr. Mohareb notes, the cloth masks that detainees have been provided (*see* Doc. No. 62-5 (Miller Supp. Decl.) ¶ 23) are not adequate protection against airborne transmission. *Id.* at 5-6. Indeed as the CDC cautions, effective social distancing is required "even when you wear a face covering."[7]

---

[7] "Social Distancing, Quarantine, and Isolation," CDC, *available at* https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/social-distancing.html.

*Finally*, the jail's dorms and tiers are simply not set up to isolate large numbers of people. To the contrary, they are designed in a manner that ensures large numbers of people will touch the same things, constantly. As can be seen from the complaint photos of Tiers 2 and 8, for example, dozens of detainees share common bathrooms, showers, sinks, toilets, meal tables, microwaves, and the like. The same situation exists on other tiers, even those with individual cells. Ex. D (Detainee Decls.) at 2-3, 7-8, 10, 14. Although increased cleaning will certainly help, each of those surfaces inevitably will be touched by numerous different people throughout the day— compounding the risk of transmission.

In the present emergency, the design of the jail makes it impossible to imprison so many persons in a reasonably safe manner. As a district court recently explained, "the only way to stop [COVID-19's] spread is through preventive measures—principal among them maintaining physical distancing sufficient to hinder airborne person-to-person transmission. Creating physical distancing is uniquely difficult in a congregate environment like a prison. . . . [which is] a problem shared by *all* prisons" alike. *Coleman v. Newsom*, 2020 WL 1675775, at *5 (E.D. Cal. Apr. 4, 2020) (citations omitted, emphasis original).

## ARGUMENT

## I.     THE CONSTITUTION PROTECTS CLASS MEMBERS FROM A SERIOUS AND UNREASONABLE RISK TO THEIR HEALTH AND SAFETY.

It cannot be consistent with due process to allow the Jail's detainees to remain in an environment in which they are unnecessarily and unreasonably exposed to a potentially deadly, life-altering coronavirus. The consensus of medical and epidemiological judgment on the record of this case is that such a practice is intolerable and cannot be justified.

Due process requires that detainees in a jail be protected from conditions that "pose an unreasonable risk of serious damage to . . . future health." *Helling v. McKinney*, 509 U.S. 25, 35

(1993); *see also Powers v. Snyder*, 484 F.3d 929, 931 (7th Cir. 2007) (The Eighth Amendment protects prisoners from known exposure to serious diseases, and in such circumstances, "[t]he prison must be allowed to choose between removing the prisoner from the unhealthy environment and protecting him from its consequences . . . provided, of course, that the protection is efficacious."); *Mark v. Officers Olson, Haglin, Harsma Granton's 1st, 2nd, 3rd Shift Officers Between Dates of 7-29-02, 8-13-02*, 2003 WL 23221515, at *7-8 (W.D. Wis. Oct. 21, 2003) (plaintiff properly alleged that prison officials acted with deliberate indifference to his health when they knowingly placed another inmate who had been diagnosed with hepatitis B and hepatitis C in his cell, for "[c]ertainly, in some cases, the risk of harm in placing a healthy inmate in the same cell as one with a communicable disease would be significant enough to be considered cruel and unusual punishment.").[8] So too here: it cannot pass constitutional muster to allow detainees in the Jail to live in close proximity to others who may be infected with a deadly virus.

The Sheriff contends that he has satisfied the Fourteenth Amendment by complying with the CDC's Guidance for jails and prisons because that guidance essentially tells him to do the best he can to socially distance, understanding he has no control over jail population. But the CDC's guidelines to jails to do the best they can to protect confined prisoners as practicable based on current population and space limitations does not, by definition, purport to be a statement of what

---

[8]     Scores of cases nationwide reinforce this principle, and show that, even if held to an Eighth Amendment standard, the Sheriff would be liable for failing to provide protection from a risk of serious medical harm. *See also, e.g.*, *Washington v. Denney*, 900 F.3d 549 (8th Cir. 2018) (failure to protect an inmate from exposure to secondhand smoke constitutes deliberate indifference to his serious medical need); *Ball v. LeBlanc*, 792 F.3d 584 (5th Cir. 2015) (failure to remedy extreme temperatures and sanitation issues in prisons constitutes deliberate indifference); *Spencer v. Bouchard*, 449 F.3d 721 (6th Cir. 2006) (in § 1983 action against a county sheriff in Michigan, court found that "[t]he fact that cold, wet conditions existed would have been obvious to anyone in the vicinity . . . [a]lthough jail officials might be unaware (due to unfamiliarity) that certain conditions are dangerous, the fact that exposure to cold, wet conditions for months at a time is a substantial risk is so obvious as to merit no further discussion."); *Gray v. Hardy*, 826 F.3d 1000 (7th Cir. 2016) (failure to address birds and pests within an inmate's cell constitutes deliberate indifference); *Wallis v. Baldwin*, 70 F.3d 1074 (9th Cir. 1995) (failure to protect inmates from exposure to asbestos-containing insulation constitutes deliberate indifference).

is *medically required*, much less a repudiation of the CDC's general scientific guidance. On this question, the CDC can set neither a constitutional floor nor a constitutional ceiling for jails on what is objectively reasonable—that is for this Court to decide, in light of the particular conditions that Plaintiffs are experiencing and the particular risks that they face as a result. *See United States v. Proano*, 912 F.3d 431, 439 (7th Cir. 2019) (the Constitution, "not departmental policy, sets the constitutional floor"); *Thompson v. City of Chicago*, 472 F.3d 444, 454 (7th Cir. 2006) (administrative regulations "shed[] no light on what may or may not be considered 'objectively reasonable'").

In *Thompson*, the Seventh Circuit held that an administrative order regarding use of force had no relevance to the question of whether a police officer's use of force was "objectively reasonable" under the Fourth Amendment. 472 F.3d at 454-55. The court explained that because an assessment of objective reasonableness demands particular consideration of the precise circumstances of the case, administrative guidance and general orders were not "reliable gauges" of what was required by the Constitution. *Id.* at 455. In *Proano*, the Seventh Circuit explained that administrative guidance and the like are admissible in cases where intent is at issue—because a deviation from guidance and training permits an inference of culpable intent—but often *are not* relevant in cases that lack a specific-intent requirement. 912 F.3d at 439.

Administrative guidance may have some relevance in certain situations, like when the reasonableness of the particular circumstances involves consideration of issues for which expert testimony would helpful to the trier of fact to understand the evidence. *See United States v. Brown*, 871 F.3d 532, 537 (7th Cir. 2017). But even if relevant, this type of evidence must be assessed in light of the other expert testimony and evidence in the case, including all of the CDC's guidance about COVID-19, and the court must ensure that the constitutional inquiry "is governed by

constitutional principles, not [administrative] regulations." *Id.* at 537; *see also England v. Allen*, 2019 WL 2743481, at *5 (N.D. Ill. July 1, 2019) (describing the slight relevance that administrative regulations have in objective reasonableness inquiry).

The Sheriff's citation to *Carroll v. DeTella*, 255 F.3d 470 (7th Cir. 2001), supports the principle. Doc. No. 62 at 17. In *Carroll*, the Seventh Circuit determined that no reasonable jury could find that the defendant had the requisite subjective disregard for health and safety required by the Eighth Amendment, given his compliance with mandatory state standards. 255 F.3d at 473. But in *Carroll*, the EPA standard at issue reflected the agency's judgement about an acceptable safety standard for *all* people—the EPA did not single prisoners out for less protection from water contamination, or conclude that a higher risk of cancer was acceptable for prisoners than the public at large. *Id.* at 473.

The CDC Guidance at issue here does something else entirely. The Guidance encourages correctional institutions to implement social distancing, but only to the extent practicable given the facility's particular circumstances.[9] The CDC's correctional guidance effectively abandons the social distancing recommendation to the extent that a jail's population and its physical plant make social distancing impracticable. But it is not for the CDC to decide whether it is objectively reasonable to expose pretrial detainees to serious medical risks that our society has deemed intolerable for everyone else; that is a decision for this court.

The Sheriff thus wrongly implies that the CDC Guidelines for jails indicates that the CDC believes that social distancing can safely be abandoned in jails. To the contrary, public health authorities, the CDC first among them, have issued a raft of admonishments that effective social distancing is critical for stopping the spread of COVID-19.[10]

---

[9]     *See supra* n.2.
[10]    *See supra* n.1.

The CDC's Guidance for individuals[11] explains that "keeping space between you and others is one of the best tools we have to avoid being exposed to this virus and slowing its spread." CDC therefore advises individuals to:

- Stay at least 6 feet from other people, "even when you wear a face covering"
- Do not gather in groups
- Stay out of crowded places and avoid mass gatherings
- Avoid grocery shopping; use a delivery service
- Work from home
- Avoid public transportation

The CDC's guidance for public officials place this individual guidance in context, recommending that when there is community spread, officials should consider closures of schools, workplaces, and even assisted living facilities and religious congregations. Other authorities are equally emphatic. The Illinois Department of Public Health recommends that people stay at least six feet apart, avoid public transportation, work from home, use a delivery service instead of shopping, suspend schooling, and the like.[12] The American Medical Association likewise recommends that "[p]hysical distancing and staying at home are the key to slowing the spread of 2019 novel coronavirus," and likewise recommends a six-foot separation,[13] as does the American Red Cross.[14] And the court, of course, is witness to this advice playing out in the most dramatic fashion. On the advice of these same authorities, to accomplish social distancing, we have shut down our national economy, with catastrophic and cascading effects across the country. If public

---

[11]    "Social Distancing, Quarantine, and Isolation," CDC, *available at* https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/social-distancing.html.
[12]    "COVID-19 Social Distancing," Ill. Dep't of Pub. Health, *available at* http://dph.illinois.gov/sites/default/files/COVID-19_SocialDistancing.pdf.
[13]    "AMA, AHA, ANA: #StayHome to confront COVID-19," AMA, *available at* https://www.ama-assn.org/press-center/press-releases/ama-aha-ana-stayhome-confront-covid-19.
[14]    "Coronavirus – What Social Distancing Means," Am. Red Cross, *available at* https://www.redcross.org/about-us/news-and-events/news/2020/coronavirus-what-social-distancing-means.html.

health authorities believed that other measures could effectively manage the disease, they would have recommended them instead.

Fundamentally, the Sheriff may not point to the CDC Guidance as the arbiter of his compliance with the Constitution. The CDC's Guidance merely acknowledges that jails and prisons may not be able to implement proper social distancing. It urges these institutions, in effect, to do their best within the limits of the carceral environment. But that cannot be taken to say that to place the Jail's detainees at a high risk of contracting a deadly disease—a risk that our society has deemed unacceptable—comports with the Fourteenth Amendment.

## II.   THE COURT MAY MAKE THE NECESSARY FINDINGS AND BEGIN THE STEPS NECESSARY TO CONVENE A THREE JUDGE PANEL TO CONSIDER RELEASE OF DETAINEES.

Plaintiffs urge the court to request the convening of a three-judge panel to determine whether and to what extent a prisoner release order should be entered in this case. 18 U.S.C. § 3626(a)(3)(A). Plaintiffs further request that this court simultaneously enter a preliminary injunction mandating the Sheriff to permit detainees to socially distance from one another, except in an emergency situation.

### A.   This Court Should Immediately Request That A Three-Judge Panel Be Convened.

The Prison Litigation Reform Act (PLRA) prohibits a prisoner release order to be entered unless a court has "previously entered an order for less intrusive relief that has failed to remedy the deprivation of the Federal right" at issue, and the defendant has had "a reasonable amount of time to comply" with prior court orders. 18 U.S.C. § 3626(a)(3)(A). Once these conditions are satisfied, a three-judge panel should be convened, either upon request of the party seeking the order or *sua sponte* by the court, following the procedures set forth in 28 U.S.C. § 2284.

13

The conditions of Section 3626(a)(3)(A) have been satisfied. *First*, the court has already entered an injunctive order for less intrusive relief. On April 9, 2020, this court issued a temporary restraining order, directing the Sheriff to (a) establish a policy requiring prompt testing of symptomatic detainees and, to the extent feasible, those who were exposed to symptomatic or confirmed COVID-19 detainees; (b) effect social distancing for detainees during the intake process (and to suspend the use of bullpens during intake); (c) provide soap or hand sanitizer to detainees in quantities sufficient to permit frequent hand-cleaning, provide sanitation supplies sufficient to permit regular sanitization of surfaces on which the virus could be present, and establish a policy requiring sanitization of frequently touched surfaces between uses (with compliance monitoring); and (d) provide facemasks to detainees who have been exposed to a symptomatic detainee. Doc. No. 47 at 34-36.

*Second*, as described above, that Order has failed to remedy the constitutional violation at issue in this case: the objectively unreasonable conditions of confinement that Plaintiffs are forced to endure as a result of the COVID-19 outbreak at the Cook County Jail. 18 U.S.C. § 3626(a)(3)(A)(i); *Brown v. Plata*, 563 U.S. 493, 514 (2011) (Section 3626(a)(3)(A)(i) "is satisfied if the court has entered one order, and this single order has failed to remedy the constitutional violation." (internal quotation marks omitted)). The Sheriff has admitted that social distancing, which the undisputed evidence establishes is necessary to protect Plaintiffs' right to objectively reasonable conditions under the Fourteenth Amendment, is impossible without reducing the population in custody at the Jail. Doc. No. 62 at 20. *See Brown*, 563 U.S. at 515 (holding that the three-judge panel was properly convened because, even though more recent orders had been entered, the evidence did not "provide assurance that further, substantially similar efforts would yield success absent a population reduction"); *see also Roberts v. County of*

14

*Mahoning*, 495 F. Supp. 2d 694, 697 (N.D. Oh. 2006) (convening three-judge panel after finding by the court that it was "unlikely that the plan to maintain constitutional population levels at the jail [would] be effective without . . . a prisoner release mechanism.").

*Finally*, the Sheriff has had a reasonable time to comply with this court's orders under these unprecedented circumstances. As of the date of this filing, the Sheriff has had 10 days to comply with the court's TRO order. In ordinary times, the Sheriff might reasonably insist on more time for compliance with changes in jail conditions. But as courts have acknowledged, "the *status quo* of a mere few weeks ago no longer applies. Our world has been altered with lightning speed, and the results are both unprecedented and ghastly." *Thakker v. Doll*, 2020 WL 1671563, at *9 (M.D. Pa. Mar. 31, 2020). Each day the number of confirmed COVID-19 cases in the country and the state grows larger, and despite the Sheriff's unilateral and unsupported assertion that COVID-19 cases at the Jail are under control, the medical and statistical evidence—including the 78.5% positive rate of detainees at the Jail who are being tested, Ex. C (Rasmussen-Torvik Decl.)—suggests that the outbreak is far greater than the Sheriff claims, and the rate of infection remains uncontrolled. *See also* Doc. No. 55-4 (Ex. D to Pl.'s Mot. for Prelim. Inj.) at 6 (projecting that 1,240 detainees will have contracted COVID-19 in one week's time).

In these extraordinary times, with death and severe illness so imminent if social distancing does not *immediately* occur, 10 days is a "reasonable amount of time to comply" with this Court's orders for purposes of Section 3626(a)(3)(A)(ii). *Coleman*, 2020 WL 1675775, at *4 n.9 ("We recognize that what is reasonable in ordinary times may be quite different from what is reasonable in these extraordinary times."); *id.* at *9 (Mueller, C.J., concurring) (concurring that plaintiffs must seek precedent injunctive relief before a three-judge panel is convened, but emphasizing "the availability of expedited proceedings . . . to *immediately* exhaust" the precedent relief).

In sum, Plaintiffs have demonstrated that the conditions precedent to convening a three-judge panel are met. The situation is emergent, and the time for convening such a panel is now.

### B. An Injunction Should Issue Mandating Social Distancing in the Jail.

While the court is processing the request for a three-judge panel, it should simultaneously order the Sheriff to mandate all possible social distancing throughout the Jail. Social distancing is required to remedy the ongoing constitutional violation suffered by Plaintiffs. Nothing in the PLRA prohibits this court from continuing to enter remedial orders while the process for convening a three-judge panel is ongoing. To the contrary, the Supreme Court has determined that the PLRA permits such an approach because a contrary reading of the statute "would in effect require district courts to impose a moratorium on new remedial orders before issuing a population limit." *Brown*, 563 U.S. at 516. So long as the Sheriff has had a reasonable time to comply with the Court's social-distancing order by the time a three-judge panel enters a prisoner release order (which, as explained above will be inherently satisfied given what constitutes a "reasonable time" in these extraordinary circumstances and the Sheriff's concession regarding its ability to effectively socially distance at the Jail with the current population), Section 3626's requirements will be satisfied. *Id.*

An injunction mandating social distancing would meet the need-narrowness-intrusiveness criteria required by the PLRA. As discussed in Plaintiffs' April 6 brief on the applicability of the PLRA to Plaintiffs' requests for relief, Section 3626(a)(1)-(2) requires the Court to make findings that any preliminary injunction orders are "narrowly drawn, extend no further than necessary to correct the harm the court finds requires preliminary relief, and be the least intrusive means necessary to correct that harm." 18 U.S.C. § 3626(a)(2); *Fields v. Smith*, 653 F.3d 550, 558 (7th Cir. 2011). The Court must also give substantial weight to any adverse impact on public safety or

the operation of a criminal justice system. *Id.* § 3626(a)(1). The need-narrowness-intrusiveness inquiry is case-specific, and "must be undertaken in light of both the magnitude of existing constitutional violations and the available alternative remedies." *Morales Feliciano v. Rullan*, 378 F.3d 42, 54 (1st Cir. 2004).

In this case, the evidence is clear and it is one-sided: social distancing is the *only* way to meaningfully reduce rampant transmission of the virus inside the Jail. This Court's prior, less drastic, injunctive orders have not sufficed. *Plata v. Schwarzenegger*, 603 F.3d 1088, 1097-98 (9th Cir. 2010) (affirming court's injunctive order based, in part, on the failure of less intrusive injunctive orders). The Sheriff's own submission, arguing that he is objectively reasonable because he has made efforts to implement social distancing, acknowledges that social distancing is required in order to protect detainees' Fourteenth Amendment rights. Doc. No. 62 at 6; *see also Braggs v. Dunn*, 383 F. Supp. 3d 1218, 1253 (M.D. Ala. 2019) (agreements between the parties are "compelling evidence" that the injunctive relief request satisfies the need-narrowness-intrusiveness criteria). And the Sheriff has proposed no alternative relief that he contends would be less intrusive or more narrowly tailored, suggesting that there is no other relief that would suffice. *Plata v. Schwarzenegger*, 2008 WL 4847080, at *8 (N.D. Cal. Nov. 7, 2008) (noting that, despite objecting to the proposed injunctive relief, "[d]efendants have not once—even in these contempt proceedings—suggested any relief that would be less intrusive").

The Sheriff contends that the PLRA bars an order mandating social distancing because it "would impede the Sheriff's ability to address security and medical issues that may arise." Doc. No. 62 at 12. But the Sheriff offers no support for or explanation of this contention. To the contrary, the definition of social distancing proposed by Plaintiffs—an order requiring the Sheriff to permit detainees to socially distance from one another by at least six feet, except in an emergency—will

provide all of the leeway necessary for the Sheriff and his employees to break up fights or escort detainees for medical attention, as alluded to in the Sheriff's brief. *Id*.

And such an order could also permit the Sheriff to have maximum discretion in determining *how* to effect social distancing, given the physical layout of the Jail, and the number of staff and detainees. *See Pierce v. County of Orange*, 761 F. Supp. 2d 915, 947-48 (C.D. Cal. 2011) ("With regard to intrusiveness, the Court must take care not to enmesh [itself] in the minutiae of prison operations . . . and the Court satisfies the intrusiveness prohibition by ordering a defendant to draft and promulgate a plan, which leaves to the defendant discretion to determine the details of how to deliver the relief ordered." (internal quotation marks omitted)).

In sum, consistent with the PLRA, the court should (1) convene a three-judge panel immediately and (2) enter an injunctive order at this time to require the Sheriff to implement and maintain social distancing throughout the Jail. No further hearing is necessary on this question because the record is uncontested on the medical and scientific need for social distancing.

## III.     THE COURT MAY ORDER THE RELEASE OF VULNERABLE PRETRIAL DETAINEES THROUGH HABEAS CORPUS.

Plaintiffs seek writs of habeas corpus for the members of subclass A—those who are particularly vulnerable to COVID-19 because of their age or underlying medical problems. Elderly and medically vulnerable individuals are particularly in need of the court's intervention. They are at heightened risk of contracting serious COVID-19 and experiencing excruciating illness when they do. And yet, the Sheriff admits that he has yet even to identify them. In the Sheriff's view, he is "under no constitutional obligation to affirmatively identify and 'triage' certain detainees based on their health condition." Doc. No. 62 at 23. This is untrue. When state officials "strip [prisoners] of virtually every means of self-protection and foreclose[] their access to outside aid, [they] are not free to let the state of nature take its course." *Farmer v. Brennan*, 511 U.S. 825, 833 (1994).

For the Sheriff to fail even to *identify* the vulnerable in his care in this time of crisis defies accepted medical correctional standards and deviates from general practice for correctional facilities nationwide.[15] Ex. A (Venters Decl.) ¶¶ 25, 28(b).

Bearing in mind the constitutional protections owed prisoners in the wake of the COVID pandemic, federal courts across the country have granted emergency relief brought on behalf of vulnerable individuals in custody. *See, e.g., Thakker*, 2020 WL 1671563; *Coronel v. Decker,* ___ F.Supp.3d ___, 2020 WL 1487274 (S.D.N.Y. Mar. 27, 2020); *see also Basank, et al. v. Decker, et al.*, No. 20 C 2518, Doc. No. 11 (S.D.N.Y. Mar. 26, 2020); *Flores, et al. v. Barr, et al.*, No. 85 C 4544, Doc. No. 740 (Mar. 28, 2020) (attached as Group Ex. E). The court *in Thakker* noted that "the status quo of a mere few weeks ago no longer applies. Our world has been altered with lightning speed, and the results are both unprecedented and ghastly . . . . The choice we now make must reflect this new reality." *Thakker*, 2020 WL 1671563, at *9. It held that even though the

---

[15]     The Sheriff argues that it is impossible for his Office to identify the vulnerable under his current procedures, since the health alerts placed on detainees (presumably at intake when detainees are screened by the Jail) do not provide specific medical information but only operational information related to detainees' health conditions. This procedural failure to share vital information between the Sheriff and his contracted medical provider does not somehow prevent this court from ordering a remedy. Fundamentally, a Sheriff cannot contract away his constitutional obligations to protect the medically vulnerable, for instance, by shifting the onus of care to contracted healthcare entities. *But see* Doc. No. 62 at 24 ("Cermak Health Service, the proper entity to monitor detainees with any medical issues, continues to provide full care for all detainees at the Jail."). *See, e.g., Leach v. Shelby Cty. Sheriff*, 891 F.2d 1241, 1250 (6th Cir. 1989) ("[S]ince the Sheriff is here in his official capacity . . . the Sheriff is not excused from liability due to having contracted out the medical care."). And the fact that Cermak, and not the Sheriff, may be the relevant covered entity under HIPAA has no bearing at all on Plaintiffs' constitutional rights. In any event, a court order mandating the identification of medically vulnerable individuals in the Jail cures any potential privacy or regulatory objections. *See National Abortion Federation v. Ashcroft*, 2004 WL 292079, at *3 (N.D. Ill. Feb. 6, 2004) (citing 45 C.F .R. § 164.512(e)(1)(i)*)* ("HIPAA allows a hospital such as Northwestern to disclose patient medical records subject to a court order."); *see also United States v. James*, 2007 WL 914242, at *30 (Mar. 21, 2007) ("[T]he government raises concerns concerning disclosure of these records under the Privacy Act, 5 U.S.C. § 552a(b) . . . and HIPAA regulations. However, the Staff Attorney for the Bureau of Prisons himself concedes that 'a Court order is sufficient to overcome these obstacles,' noting that such an Order 'requires the Court to weigh the public interest in the information sought against the privacy interests affected by their release.'").

conditions in the local federal detention facilities were not insufficient because of intent or malice, "should we fail to afford relief" to medically vulnerable prisoners "we will be a party to an unconscionable and possibly barbaric result." *Id.*; *see also id.* ("Our Constitution and laws apply equally to the most vulnerable among us, particularly when matters of public health are at issue."). The district court accordingly granted a temporary restraining order requiring the immediate release of 11 prisoners in federal custody who suffered from chronic medical conditions and who faced a serious threat of injury or death if exposed to COVID-19. *Id.* at 2, 24–25.

Here, the members of subclass A should be released via writs of habeas corpus. The Sheriff does not quarrel with Plaintiffs' ability, as a general matter, to seek habeas relief in a representative action. He does not challenge the reasoning of *Bijeol v. Benson*, 513 F.3d 965, 968 (7th Cir. 1975), which authorizes such an action. *See also U.S. ex rel. Morgan v. Sielaff*, 546 F.2d 218, 221 (7th Cir. 1976); *U.S. ex rel. Green v. Peters,* 153 F.R.D. 615, 617 (N.D. Ill. 1994). Nor does the Sheriff dispute the proposition that habeas is an appropriate vehicle to litigate the question of whether a confined person must be released because the conditions of his confinement are unconstitutional. *See, e.g., Glaus v. Anderson*, 408 F.3d 382, 387 (7th Cir. 2005).

The Sheriff opposes habeas relief for two reasons. *First,* he claims that a representative habeas action in this particular case is inappropriate because of the need for individual determinations of whether the release of each class member is warranted. *Second,* he urges dismissal of the habeas claim on the theory that, even those class members who availed themselves of the Judge Martin procedure should be barred by the exhaustion doctrine. Neither argument defeats this habeas claim.

### A.    The Common Questions in this Case Should Be Decided Together.

There is a set of common questions in this case that are well suited to resolution on a class wide basis.[16] Fundamental among these questions is whether detainees in the Jail, as a matter of due process, are entitled to an opportunity to practice social distancing consistent with those in the community at large. There are a number of subsidiary questions: (1) what risks are associated with the failure to socially distance in the Jail?; (2) what has been the effect, in terms of spread of the coronavirus, of the Jail's inability to provide social distance for detainees and Jail staff?; (3) to what extent can the remedy of release reduce risk of serious illness or death for detainees, staff and the public?; (4) are there improvements to the conditions in the Jail, short of enabling social distancing, that might be sufficient to comport with due process?

---

[16]    It is unclear whether the Sheriff's contentions regarding the unsuitability of the case to class resolution are intended to apply only to Plaintiffs' habeas claim or whether those arguments are directed against the Section 1983 claims as well. If the latter, they would also fail for the reasons stated in this section and an additional reason: the "inherently individualized" process the Sheriff references will not play into this Court's factual findings or legal conclusions on the Section 1983 claims. This is a textbook prison-conditions class action in which Plaintiffs challenge the circumstances under which they are confined. Claims challenging jail-wide conditions are paradigmatic class actions. *See Postawko v. Missouri Dep't of Corr.*, 2017 WL 3185155, at *14 (W.D. Mo. July 26, 2017), aff'd, 910 F.3d 1030 (8th Cir. 2018) (citing 1 H. Newberg & A. Conte, Newberg on Class Actions § 4.34 (5th ed. 2016 update)) ("For example, if a prisoner in a prison conditions lawsuit secures a ruling that a prison policy violates the Constitution, the court-ordered injunctive relief will necessarily apply to all other prisoners."); *Id.* (citing Charles Alan Wright, et al., 7AA Fed. Prac. & Proc. Civ. § 1776 (3d ed. 2017 update)) ("[I]t should be noted that a common use of Rule 23(b)(2) is in prisoner actions brought to challenge various practices or rules in the prisons on the ground that they violate the constitution. For example, Rule 23(b)(2) class actions have been utilized to challenge prison policies or procedures alleged to . . . violate the prisoners' Eighth Amendment rights to be free from cruel and unusual punishment."); *see also Holmes v. Godinez*, 311 F.R.D. 177, 219 (N.D. Ill. 2015) (granting class certification in prison-conditions case "is consistent with numerous other courts that have found, after *Wal-Mart*, that the commonality requirement was met in cases where prisoners alleged system-wide practices and/or failures resulting in constitutional and statutory violations" and collecting cases). And if indeed this case proceeds to a three-judge court and release is determined to be necessary, a class action again is appropriate and perhaps even mandatory. A resulting order will require the Sheriff to reduce the population in his custody, and *he* can choose whom to release; the *court* will not be asked to resolve a single individualized question regarding health or safety. *See Brown*, 563 U.S. at 502 (2011).

These are complicated factual questions. The record of this case already includes voluminous evidence regarding conditions in the Jail, the nature and scope of the Jail's response to the pandemic, medical and epidemiological evaluations of the quality and effect of the Jail's response and, more broadly, the threat posed by the coronavirus and the interventions that will mitigate spread, among other things. All of this evidence is necessary to "generate common answers" to the question of whether due process permits the vulnerable members of subclass A to remain in the Jail. *Wal-Mart v. Dukes,* 564 U.S. 338, 360 (2011).

Moreover, there are critical common legal issues, such as the availability of habeas corpus as a remedy when immediate circumstances render it impossible to safely confine a person; the applicability of the exhaustion doctrine to the subclass's claims under the circumstances; and the constitutional merits of whether it is "objectively unreasonable" for a medically vulnerable person to be exposed on an ongoing basis to a serious risk of contracting a potentially deadly virus.

The Sheriff would prefer scores of individual habeas petitions in which the declarations, the medical and epidemiological expertise, and the Jail records would be separately assembled (if, indeed, each of the individual class members individually had the resources to do so) and then would be evaluated separately for each class member. The process would not just be massively wasteful and cumbersome; it would needlessly risk the safety of class members, jail staff, and the public as the virus continues to spread while different judges are forced to churn through the same complex and voluminous material. It would also require the Sheriff and his lawyers to separately brief the same dispositive legal issues before several courts, each of which may come to different legal conclusions.

Clearly, the preferable approach is class-wide resolution of the factual and legal questions on which the due process rights of the members of subclass A depend. To be sure, there are

individual questions that bear on the circumstances and conditions under which the members of the class would be released: individuals with documented exposure to COVID-19 should be released with assurance that they will be medically monitored and will socially isolate; individuals whose charges and/or criminal backgrounds suggest public safety concerns should be released subject to conditions, such as electronic monitoring; individuals at particularly elevated risk of contracting serious COVID-19 should be prioritized for prompt release.

These questions can and should appropriately be resolved via brief, individual proceedings. Such an approach—class-wide determination of the broad, central legal and factual questions that drive the class's entitlement to relief followed by individual assessments of the particular remedy—have long been commonplace in class litigation. *See, e.g., Barnes v. District of Columbia*, 278 F.R.D. 14, 18 (D.D.C. 2011) (approving class action where liability and "general" damages were to be resolved on class-wide basis but individual damages may remain); *Dunn v. City of Chicago*, 231 F.R.D. 367, 370 (N.D. Ill. 2005) (same). It is therefore appropriate for Plaintiffs' habeas claim to proceed on a class wide basis.

### B. The Habeas Claim Is Not Barred by the Exhaustion Doctrine.

Plaintiff Foster availed himself of the special bond review procedure that Judge Martin established in response to the pandemic. He was denied relief. The Sheriff nonetheless insists that Foster did not sufficiently exhaust State remedies because he did not pursue "reconsideration" or appeal of the ruling denying reduction of the financial conditions of his pretrial release made in his case on April 2. The argument should be rejected.

Plaintiffs have provided uncontested facts demonstrating the futility in this emergency context of pursuing the full panoply of available appeals with respect to an unsuccessful motion for bond review. An appeal pursuant to Illinois Supreme Court Rule 604(c) takes time to prepare

and for the Appellate Court to consider; such claims will not be resolved for weeks. *See* Doc. No. 55 at 15; Doc. No. 55-3 (Decl. of Lester Finkle). With the death toll from COVID-19 climbing hourly and daily, these appellate remedies are not available in practice to the medically vulnerable whose risk is ongoing and escalating.

This court based its April 9 ruling on Plaintiff Foster having made "no effort to initiate" the special Judge Martin bail review procedure. Plaintiffs have corrected the record; Foster *did* initiate the procedure, and was denied. The Sheriff offers no argument to refute Plaintiffs' demonstration that appeals and petitions to the Illinois Appellate and Supreme Courts would entail delay that would necessarily force Foster to suffer at length the very constitutional violation he seeks to avoid. The Sheriff does not dispute the factual or legal demonstration Plaintiffs have made on this point in their earlier filings. *See* Doc. No. 62 at 6-7.

The Sheriff's argument inadvertently highlights an independent dispositive point on exhaustion: the state court "bond review" proceedings are not a forum in which to decide the federal claim brought by class members in *this* case. In addition to the practical inability to offer the kind of evidentiary record requiring release as a matter of due process in an individual state-court bond review hearing, there is a more central legal obstacle to doing so: Illinois statutory law governing bail provides consideration of 37 factors when determining conditions of pretrial release; a detainee's medical health is not one of them. 725 ILCS 5/110-5. Whatever the public health impetus behind Judge Martin convening special proceedings to reconsider financial conditions of release, those proceedings (and any appeals that flow from them) were neither required nor expected to rule on medical conditions inside the jail.

The Sheriff himself makes the crucial point. He explains that state court defendants like Foster were denied reduction in monetary bond because "the assessment of risk to the public

evidently outweighed any perceived risk to their health." Doc. 62 at 25. Thus, the Sheriff concedes, the state court applied Illinois law to reject pretrial release (or reduced monetary bond) based on factors *other than* medical need, such as predictions of a person's future dangerousness. *Id*. That is the essential legal difference between the legal questions decided in the state court bond hearing and the federal habeas proceedings here: even if a person proved in a state court bond proceeding that the jail poses unreasonable risk to their health, the state court may still weigh the Illinois state law factors and order pretrial detention in the County Jail.

But that is not the case for Foster's claims *in this court*. For the due process claims brought in this *federal* case, the remedy is categorical: if Foster proves that his ongoing detention inside the Cook County Jail is a serious and unreasonable risk to his health and life, then habeas relief will ultimately be granted. Whether the Sheriff chooses to release him from the Cook County Jail to lockdown at a local hotel, to electronic home confinement, or with other conditions that the Court deems reasonable, some form of release from his custody would be required if a medically vulnerable person prevails on his federal due process claim that pretrial detention threatens his life under current conditions in the Cook County Jail.

Thus, for the purposes of the unique, narrow due process claim raised here, even if exhaustion of the existing state court procedures were not futile because of their timing (which it is), the Sheriff agrees that the state court is actually not legally competent—much less required—to resolve that freestanding federal question in the context of following the Illinois bond statute.

### C. This Court Should Also Exercise Its Authority to Release Medically Vulnerable Subclass Members on Unsecured or Non-Monetary Bail Conditions Pending Review of Their Request for Habeas Relief Under § 2241.

Courts of equity operate with flexibility, especially in emergencies of great consequence. Plaintiffs recognize the unprecedented nature of this request for federal habeas relief for Foster

and the other medically vulnerable people confined with him. But the events unfolding around us are unprecedented. This court has the power to protect the lives and constitutional rights of the subclass. Foster sets forth below how this Court could vindicate these rights in practical terms.

*First*, in the TRO context, the Court must weigh the "public interest" in vindicating the constitutional rights at issue, *Lawson Prods., Inc. v. Avnet, Inc.*, 782 F.2d 1429, 1433 (7th Cir. 1986), and so the court could order immediate release of certain categories of subclass members temporarily, even if concluding that public safety precluded the emergency release of other subclass members.

*Second*, a federal court has the authority to grant bail to habeas petitioners who are properly before it. *See Cherek v. United States*, 767 F.2d 335, 337 (7th Cir. 1985) (holding that, even in post-conviction habeas proceedings that involve those already convicted of state offenses, "federal district judges in habeas corpus and Section 2255 proceedings have inherent power to admit applicants to bail pending the decision."); *Bolante v. Keisler*, 506 F.3d 618, 620 (7th Cir. 2007) ("Inherent judicial authority to grant bail to persons who have asked for relief in an application for habeas corpus is a natural incident of habeas corpus, the vehicle by which a person questions the government's right to detain him."); *Swanson v. United States*, 2016 WL 5422048, at *1 (C.D. Ill. Sept. 28, 2016) (granting bail pending Section 2255 proceedings).

As least in post-conviction proceedings where principles of comity and finality are at their zenith, to be released on bail pending habeas review the petitioner must demonstrate a high probability of success on the merits and "extraordinary or exceptional circumstances … which make the grant of bail necessary to make the habeas remedy effective." *Swanson*, 2016 WL 5422048, at *1; *see also Abdullah v. Obama*, 753 F.3d 193 (D.C. Cir. 2014); *Landano v. Rafferty*, 970 F.2d 1230, 1239 (3d Cir. 1992); *cf. Johnston v. Marsh*, 227 F.2d 528, 529-32 (3d Cir. 1955)

(finding that a district court had the power to grant of bail pending habeas consideration where the petitioner, "an advanced diabetic, was, under conditions of confinement, rapidly progressing toward total blindness," comparing this authority to a judge's power to issue a "stay of execution" while a petition is pending). Under this "exceptional circumstances" evaluation, courts also consider a person's characteristics. *See, e.g.*, *Swanson*, 2016 WL 5422048, at *1 (finding that petitioner was a "good candidate for bond").

Based on these considerations, a federal court for the District of Massachusetts has released (and continues to release) numerous civil immigration detainees on non-monetary bond conditions while their class action habeas petition is pending. *See Savino v. Souza*, 2020 WL 1703844, at *8-9 (Apr. 8, 2020) (explaining its decision to grant bail pending habeas). In that case, named petitioners and class members include all immigration detainees held at two facilities in Massachusetts. *Id.* at *1. The *Savino* petitioners seek habeas relief because those facilities are too cramped and unsanitary to protect them from contracting COVID-19. *Id.* at *1-3.[17] Finding "extraordinary circumstances" in "this nightmarish pandemic," the court opted to "diligently entertain[] bail applications while the petitions for habeas corpus are pending." *Id.* at *9. The district court requested and rapidly considered an initial list of 50 detainees for bail, and has since considered class members' bail applications in groups of 10. Order, *Savino v. Souza*, No. 20-10617-WGY, Doc. No. 44, at 3 (Apr. 4, 2020); *see id.*, Doc. No. 45 at 1-3 (listing class members in groups of 10 for bail consideration); *id.*, Doc. No.77 at 1-3 (Apr. 10, 2020) (same) (attached as Group Ex. F). On April 15, 2020, the Court denied the government's request to stay the releases. In its Order, the Court explained: "We are in the midst of a pandemic unprecedented in our lifetime. . . . [T]he Court will continue, on an individual basis, to work through the difficult issues of bail

---

[17]     Unlike in this case, the *Savino* class is not limited to detainees who are medically vulnerable. *Savino*, No. 20-10617-WGY, 2020 WL 1703844, at *1.

in the present crisis. . . . Moreover, compelling issues of individual, institutional, and community health preclude the luxury of a stay so counsel can 'consider their appellate options.'" Doc. No. 86 at 1-3 (Apr. 15, 2020).

Other courts have also found that the risks imposed by COVID-19 warranted release on bail while a habeas action was pending. *See Avendano Hernandez v. Decker*, 2020 WL 1547459, at *3 (S.D.N.Y. Mar. 31, 2020) (releasing § 2241 habeas petitioner challenging unconstitutional conditions of confinement—"specifically, continued risk of exposure to COVID-19"—because his continued detention would expose him to the infection he seeks habeas relief to avoid and, thus, "immediately release [wa]s necessary to 'make the habeas remedy effective'" (quoting *Mapp*, 241 F.3d at 230)); *Jiminez v. Wolf*, No. 18-10225-MLW, Doc. No. 507-1 at 3-4 (D. Mass. Mar. 26, 2020) (concluding that release of habeas petitioner on bail was "necessary to … make the habeas remedy effective" because "we're living in the midst of a coronavirus pandemic," "being in a jail enhances risk," and "[i]f the petitioner is infected and dies …. [t]he habeas remedy will be ineffective").

Here too, this court could exercise equitable flexibility. For example, the court could release on bail every medically vulnerable pretrial detainee charged with an offense that does not have as an element the use or threatened use of violence or unwanted sexual touching of another person. Similarly, the court could release every pretrial detainee who would be eligible for release if they paid $10,000 or less. Both of these filters would aid the Sheriff in achieving the social distancing required (and may avert the need for the three-judge tribunal to act), and both are very reasonable proxies for public safety under these extraordinary circumstances. The Sheriff does not even attempt to justify why Foster is so dangerous that he must be detained when any person could walk to a Cook County window, hand over $5,000, and Foster would be released immediately.

The court could also order that any and all non-financial conditions of release already ordered by a state court in any person's case remain the same. This approach would help ensure that any intrusion on state court proceedings is minimal and targeted only at terminating pretrial detention of presumptively innocent people in dangerous conditions. Indeed, this court could even convert the *secured* bail amount to an *unsecured* bond amount, meaning that the *same financial condition of release remains in each person's case*, but merely removing the obligation to pay prior to release. *See ODonnell v. Harris Cty.*, Texas, 251 F. Supp. 3d 1052, 1144 (S.D. Tex. 2017), *aff'd as modified sub nom. ODonnell v. Harris Cty.*, 892 F.3d 147 (5th Cir. 2018) ("[T]he record evidence shows that secured money bail is not more effective at increasing the likelihood of appearance or law-abiding behavior before trial than release on an unsecured or nonfinancial condition.").

These proxies and solutions are neither perfect nor common in federal court habeas cases, but these are extraordinary times and petitioners lives are at stake.

## IV. THE COURT MAY ORDER THE TRANSFER OF SOME DETAINEES TO A SAFE LOCATION WITHIN THE SHERIFF'S CUSTODY.

It would also be proper for this court, on the present record and without need for a further hearing, to enter an order directing the Sheriff to transfer detainees who have been exposed to the coronavirus (the subclass B Plaintiffs) to "a safe facility or form of custody of [the sheriff's] choosing." Doc. No. 55 at 15.

That transfer could be to any safe location in which the detainee may remain confined within the Sheriff's custody, including, for instance, to another correctional space, a hospital or medical facility, a clinic, home confinement, administrative furlough, or electronic home monitoring. Such an order would not require the *release* of any detainee and therefore would not involve the three judge panel procedure of Section 3626(a)(3)(A).

29

The Sheriff states that transfer outside the Jail would be "widely impractical if not impossible." Doc. No. 61 at 9. To the contrary, the Sheriff is empowered under the County Jail Act to transfer detainees—including to home confinement—in a health emergency. *See* Doc. No. 26-1 (Pls.' Resp. to Court's Apr. 3 Order) at 19; Doc. No. 42 (Pls.' Suppl. Br. in Support of TRO) at 17-19 (discussing County Jail Act, 730 ILCS 125/14, and how electronic monitoring constitutes confinement in accordance with the statutory mandate).

Using this authority, the Sheriff has previously opened clinical facilities in the County, in order to house detainees who the Sheriff believed were better suited to detention outside the physical Jail plant. For example, in 2015, the Sheriff began operating a mental health clinic in the south suburbs of Cook County. The clinic, run in collaboration with Adler Community Health Services, served as a transfer site for mentally ill detainees in the jail (without court order). The Sheriff has also historically run a program of administrative furlough, by which detainees remain in the Sheriff's custody but outside the walls of the Jail. *See People v. Campa*, 353 Ill.App.3d 178, 179-80 (1st Dist. 2004) (detainee was "in custody" of Sheriff for purposes of Illinois' speedy trial statute, where detainee was placed by the Sheriff on "the Cook County Department of Corrections administrative furlough, and the Department of Community Supervision and Intervention, Day Reporting Program"); *People v. Smith*, 2014 IL App (3d) 130548, ¶ 27 (noting that detainee who was admitted into Sheriff's day reporting program was subject to lesser protection than detainee released on bond on home monitoring; as Sheriff had no need to obtain a warrant prior to defendant's re-arrest, there was no way to challenge selection of defendants for entry into Sheriff's program, and defendant "must simply adhere to the sheriff's unilaterally imposed conditions of participation."). Electronic monitoring, furlough, and the use of outside facilities to house

detainees are all available transfers that the Sheriff could employ. They are neither impractical nor impossible.

Plaintiffs' transfer request also meets the requirements of the PLRA. First, and contrary to Defendant's claims, Doc. No. 61 at 9, there is a clear fit between the violations at stake (the exposure of incarcerated individuals to conditions of confinement that threaten their health and safety), and the requested remedy (an order requiring the Sheriff transfer prisoners from the physical facility where those conditions exist). *See* Doc. No. 26-1 at 24-25.

*Second*, there is no evidence that transfer would have an adverse impact on public safety. The Sheriff claims that ordering more detainees on electronic monitoring "would have the risk of overloading the Sheriff's electronic monitoring system," which would thereby endanger the public. Doc. No. 61 at 11. But since Plaintiffs have not requested that all or indeed any of the transfers be done via electronic home monitoring, the Sheriff retains leeway to address any operational concerns in the implementation of the requested court order (for instance, by initiating transfers to other facilities or using administrative furlough).

*Third*, as made clear in prior briefing, based on the statutory construction of the PLRA, the statute's legislative history, and the practical effect of the requested relief, a transfer in which detainees remain in the Sheriff's custody is not a prisoner release order under 18 U.S.C. § 3626(a)(3). *See* Doc. No. 26-1 at 20-23; Doc. No. 55 at 16-17. This is true *even where* the effect of the order is to reduce the prison population. *See Plata v. Brown*, 2013 WL 3200587, at *8 (N.D. Cal. June 24, 2013); *Doe*, No. 91-187 (Doc. No. 26-3) at 10-12; *Reaves v. Dep't of Correction*, 404 F. Supp. 3d 520, 523 (D. Mass. 2019); *see also Gray v. County of Riverside*, Doc. No. 56 at 4-5 (recently recognizing that an order directing a sheriff to transfer detainees to a safer location

is not a "prisoner release order" and therefore not subject to the requirements of 18 U.S.C. §
3626(a)(3)).

The Sheriff's cited case of *United States v. Cook County*, 761 F. Supp. 2d 794 (N.D. Ill.
2000) does not suggest otherwise. There, a three-judge panel ordered the release of detainees from
the Jail to address the facility's "excess population" after finding that overcrowding was the
"primary cause of unconstitutional conditions at the Jail." *Id*. at 796, 797 (interpreting 18 U.S.C.
§ 3626(a)(3)(E)(i)). Population cap litigation, stemming from capacity overcrowding (as in *Cook
County*), was what motivated the drafters of the PRLA to circumscribe relief available to prisoners
in overpopulated facilities by instituting the three-judge panel requirements. *See* Doc. No. 26-1 at
20-23. The statute was not designed to limit remedies available to address violations that were not
explicitly related to population caps, like those presented here. *See id.*; *see also Plata*, 2013 WL
3200587, at *9 ("[A]dopting Defendants' interpretation of 'prisoner release order' would mean
that a court could only order that prisoners be transferred from one prison to another if
overcrowding were the primary cause of the violation of those prisoners' rights, and not if any
other reason were causing the violation. Defendants have failed to point to anything in the
legislative history that indicates an intent to limit the protection of inmates' constitutional rights
in this manner . . . .").

*Fourth* and finally, the PLRA does not limit where a prisoner may be transferred while
remaining in a warden's custody. Citing *Plata*, the Sheriff states that transfer is only permitted
under the PLRA to another *jail* facility. Doc. No. 61 at 10-11. But the statute has no such
requirement. The plaintiff in *Reaves*, for instance, won transfer to a non-correctional hospital on
the same grounds as the *Plata* plaintiffs. *Reaves* was in keeping with other judicial orders finding
that a person constitutes a "prisoner" even outside the four walls of the prison building, where she

otherwise remains in custodial confinement. *See Jackson v. Johnson*, 475 F.3d 261, 265-66 (5th Cir. 2007) (holding that a person subjected to confinement in a halfway house counts as a "prisoner" under the PLRA ) ("[A]lthough Jackson has been released from confinement in prison, his release was not to the general public but was rather to a different form of confinement, albeit with certain additional liberties. It is clear that Jackson is being 'detained in any facility' since he is locked up in the halfway house 16 to 24 hours a day and since he may leave the halfway house only for very limited purposes." (citing *Witzke v. Femal*, 376 F.3d 744, 752 (7th Cir. 2004) (determining that halfway-house resident who could leave the facility only during the day and was locked inside at night was confined for PLRA purposes)).

Plaintiffs seek a remedy for subclass B that allows the continued confinement of class members, but outside the physical plant of the Jail, which is so hazardous to their health and well-being.

## V. EVEN AS NECESSARY DETAINEE RELEASES ARE IN PROCESS, THE COURT SHOULD CONVERT THE APRIL 9 ORDER TO A PRELIMINARY INJUNCTION (OR EXTEND THE TRO), AND CONTINUE TO ENFORCE IT.

Release from the Jail of the medically vulnerable and to permit social distancing is the essential remedy to cure the violations here, as Plaintiffs have explained above. But the requirements of the court's April 9 Order must remain in force to protect the health and well-being of all those who will necessarily remain incarcerated in the Jail.

The Order has made a difference in how the Jail operates, as evidenced by the Sheriff's compliance report, particularly as to intake procedures, Doc. No. 51 at 2-7, and by the declarations on behalf of detainees from April 14 onward. It was only after the entry of the Order that detainees began receiving free soap, some cleaning supplies and facemasks in most tiers. Ex. D (Detainee Decl.).

33

There is also evidence that the Sheriff is not in full compliance with the Order. *First*, there is a reason to doubt that all symptomatic detainees are being tested for COVID-19, as the court's order required. Given the high positive rate and the Sheriff's own published numbers, the answer is almost certainly no. Ex. C (Rasmussen-Torvik Decl.) ¶ 4 ("Per the Cook County Sheriff's website on April 18, it appears that cumulatively 445 detainees have been tested for COVID-19 and 350 have tested positive—a positive test result rate of over 78%. . . . Michael Ryan, executive director of the WHO Health Emergencies Program, stated that "If 80-90% of the people test positive, you are probably missing a lot of cases[.]"). And no one who is living in quarantine is being tested, by the Sheriff's own admission. Doc. No. 51 at 12. Detainee declarations further demonstrate the Jail's failure to provide testing even to symptomatic detainees. Ex. D. In this regard, it is notable that since March 22, the Sheriff has tested a total of 445 detainees,[18] for an average of 17.8 detainees per day. By contrast, since at least April 7, the Sheriff appears to have been testing 100 Sheriff's employees per day, on a first-come, first-served basis.[19]

*Second*, while many detainees speak of receiving soap, many simultaneously profess a lack of cleaning supplies for individual cells, the use of watered down bleach for the common areas, and a lack of compliance and monitoring as to whether areas are in fact being cleaned. Ex. D.

*Third*, other components of the Sheriff's COVID response are troubling; for example, detainees report that Division 4, where many have been moved, appears not to have been lived in for years, is filthy, there are limited cleaning supplies, and it has no heat. Indeed, although water

---

[18]  *See* https://www.cookcountysheriff.org/covid-19-cases-at-ccdoc/ (last visited Apr. 19, 2020) (171 positive tests, 176 detainees in "recovery," 3 deaths, and 95 negative tests).

[19]  *See* April 6, 2020 Email from "CCSO Administration" to "Cook County Sheriff's Employees" ("The Sheriff is pleased to announce that . . . the CCDOC is now able to serve as a testing site. . . . . is available to all CCSO staff. . . . The first 100 people will be tested. Additionally, testing of 100 staff will continue each day until everyone that wants to be tested has had the opportunity."). Doc. No. 31.-3, Curry Group Ex. 1, at 150.

coolers have been provided to detainees, they are located in dayrooms, where detainees are only allowed a few hours every day.

Given these circumstances, the court should convert the April 9 Order to a preliminary injunction (or if there are factual disputes, extend the TRO for good cause before a hearing) and grant Plaintiffs the right to continue to monitor the Sheriff's compliance, with the Court's oversight, while litigation of the release and transfer issues.

To this end, Plaintiffs maintain their request for leave to issue expedited discovery, *see* Doc. No. 55-1, but with further refinements. The Sheriff's response brief has changed the state of play in some key respects. Since the Sheriff is not contesting that social distancing is impossible in the Jail, Plaintiffs no longer seek updates of the exhibits to the Michael Miller declaration, or a deposition from Michael Miller.

To address ongoing compliance with the April 9 Order, Plaintiffs seek the following:

- An inspection by a corrections expert to assess the condition of the tiers to which detainees are being moved (and which were previously closed because of poor conditions), the actual regimen of cleaning, and the provision of supplies;

- CCTV video from various tiers, which Plaintiffs understand is digitally available, to provide real time evidence of what is happening on the ground as to cleaning and tier conditions;

- A deposition of Dr. Menella, for the limited purpose of ascertaining how many total tests have been administered to detainees since the outbreak of the pandemic, the parameters that render a detainee "symptomatic" such that he is eligible for testing by Cermak, how convalescence is defined by Cermak and the Sheriff, and how many detainees are hospitalized in the Jail, as opposed to at Stroger, and the general condition of the detainees who are in each medical facility, *see* Ex. C (Rasmussen-Torvik Decl.) ¶ 8.

**CONCLUSION**

For the foregoing reasons and for the reasons stated in Plaintiffs' renewed motion for preliminary injunction, this court should enter such orders as are necessary to effectuate the relief requested in Plaintiff's renewed preliminary injunction motion and in this reply brief.

Respectfully submitted,

/s/ Sarah Grady
Sarah Grady
Attorney for Plaintiffs

Sarah Grady
Stephen H. Weil
LOEVY & LOEVY
311 North Aberdeen St., 3rd Fl.
Chicago, IL 60607
Tel: 312-243-5900
weil@loevy.com
sarah@loevy.com

Locke E. Bowman
Alexa A. Van Brunt
Roderick and Solange MacArthur Justice Center
Northwestern Pritzker School of Law
375 E. Chicago Avenue, Chicago, IL 60611
Tel: 312-503-0884
l-bowman@law.northwestern.edu
a-vanbrunt@law.northwestern.edu

Charles Gerstein
Alec Karakatsanis
Civil Rights Corps
1601 Connecticut Ave NW, Suite 800
Washington, DC 20009
charlie@civilrightscorps.org
alec@civilrightscorps.org
Tel: 202-894-6128

Steve Grimes
Thomas F. McAndrew
Winston & Strawn LLP
35 W. Wacker Drive
Chicago, IL 60601-9703
Tel: 852-2292-2138
SGrimes@winston.com
TMcAndrew@winston.com

## CERTIFICATE OF SERVICE

I, Sarah C. Grady, an attorney, hereby certify that on April 19, 2020 before 12 p.m., I

caused a copy of the foregoing to be filed using the Court's CM/ECF system and served upon all

counsel who have filed appearances in the above-captioned matter.


/s/ Sarah Grady
Sarah Grady
Attorney for Plaintiffs