# EXHIBIT A

## DECLARATION OF DR. HOMER VENTERS

I, Dr. Homer Venters, hereby declare the following under penalty of perjury pursuant to 28 U.S.C. § 1746:

1.      I am a physician, internist and epidemiologist with over a decade of experience in providing, improving and leading health services for incarcerated people. My clinical training includes residency training in internal medicine at the Albert Einstein/Montefiore Medical Center (2007) and a fellowship in public health research at the New York University School of Medicine (2009). My experience in correctional health includes two years visiting detention centers and conducting analyses of physical and mental health policies and procedures for persons detained in federal facilities. This work included and resulted in collaboration with federal detention administrators on numerous individual cases of medical release, formulation of health-related policies, and testimony before U.S. Congress regarding mortality inside detention facilities.

2.      After my fellowship training, I became the Deputy Medical Director of the New York City Jail Correctional Health Service. This position included both direct care to persons held in NYC's 12 jails, as well as oversight of medical policies for their care. This role included oversight of chronic care, sick call, specialty referral and emergency care.

3.      I subsequently was promoted to the positions of Medical Director, Assistant Commissioner, and Chief Medical Officer of NYC Jail Correctional Health Services.  We operated one of the largest correctional health care systems in the nation, with over 43,000 annual admissions in jails across the city. In the latter two roles, I was responsible for all aspects of health services including physical and mental health, addiction, quality improvement, re-entry, morbidity and mortality reviews, as well as all training and oversight of physicians, nursing and

pharmacy staff. In these roles, I was also responsible for evaluating and making recommendations on the health implications of numerous security policies and practices.

4. During this time, I managed multiple communicable disease outbreaks in our facilities, including H1N1 in 2009, which impacted almost one third of housing areas inside the adolescent jail, multiple seasonal influenza outbreaks, a recurrent legionella infection and several other smaller outbreaks. To manage all of these outbreaks, I worked closely with management at the facilities, including security and health staff, developed policies and procedures to manage the outbreaks, and oversaw training and implementation of those policies and procedures. Central aspects of my roles in these outbreak responses included the identification and protection of high-risk patient cohorts, development of infection control plans that integrated all levels of staff and detained people in mitigating the impact of the outbreak. I also led inspections of housing areas with teams of health, security, engineering and hygiene experts and developed and conducted orientations and trainings for correctional staff, health professionals and detained people. I also developed data dashboards that were updated on a daily basis and shared with local and state public health partners to integrate jail outbreak management with community efforts.

5. In March 2017, I left Correctional Health Services of NYC to become the Director of Programs for Physicians for Human Rights. In this role, I oversaw all programs of Physicians for Human Rights, including training of physicians, judges and law enforcement staff on forensic evaluation and documentation, analysis of mass graves and mass atrocities, documentation of torture and sexual violence, and analysis of attacks against healthcare workers.

6. In December 2018, I became the Senior Health and Justice Fellow for Community Oriented Correctional Health Services (COCHS), a nonprofit organization that promotes evidence-based improvements to correctional practices across the U.S. In January 2020, I

became the president of COCHS. I also work as a medical expert in cases involving correctional

health and I wrote a book on the health risks of jail (*Life and Death in Rikers Island*) which was

published in early 2019 by Johns Hopkins University Press. A copy of my curriculum vitae is

attached to this report, which includes my publications, a list of cases in which I have been

involved and a statement of my compensation.

7.    Since January 2020, I have been engaged in numerous activities in response to

COVID-19 infection in detention settings. I have published two articles on COVID-19 behind

bars[1] and participated in over 70 interviews on the need for systematic and evidence-based

practices in jails, prisons and other detention settings to both prevent deaths among incarcerated

people, and flatten the overall outbreak curve in in the community from COVID-19.[2] I am also

scheduled to conduct a court-ordered inspection of the Metropolitan Detention Center in

Brooklyn NY, which is in the throws of a COVID-19 outbreak and provide my findings to the

court. I was invited by the National Association of Counties and Fair and Just Prosecution, a

national convening of elected prosecutors, The Stanford Law School and the University of

Southern California School of Medicine to provide guidance on COVID-19 response in detention

settings, and I have provided similar guidance on multiple other webinars and presentations.

---

[1] Dr. Homer Venters, "4 ways to protect our jails and prisons from coronavirus," The Hill (Feb. 29, 2020), https://thehill.com/opinion/criminal-justice/485236-4-ways-to-protect-our-jails-and-prisons-from-coronavirus; Dr. Homer Venters, "Coronavirus behind bars: 4 priorities to save the lives of prisoners," The Hill (Mar. 23, 2020), https://thehill.com/opinion/criminal-justice/488802-coronavirus-behind-bars-4-priorities-to-save-the-lives-of-prisoners.
[2] For example: Jean Casella& Katie Rose Quandt, "US jails will become death traps in the coronavirus pandemic," The Guardian (Mar. 30, 2020), https://www.theguardian.com/commentisfree/2020/mar/30/jails-coronavirus-us-rikers-island; Erin Doherty & Kelly Cannon, "'We need help': Inmates describe prison system unprepared for coronavirus," ABC News (Apr. 5, 2020), https://abcnews.go.com/Politics/inmates-describe-prison-system-unprepared-coronavirus/story?id=69980790.

8.      I have been retained by counsel for the plaintiffs in this case to provide opinions about the actions that should be taken at the Cook County Jail in light of the current COVID-19 outbreak. As part of my work in this case, I have been provided the following documents:

- Amended Sanitation Policy
- Referral for Medical Care Policy
- Outbreak Prevention Policy
- CCSO Operational Briefing 4/4/20
- Sanitation Plans
- Intake Photos
- Declarations of Concetta Menella (2), Rebecca Levin, Henriette Gratteau, Michael Miller, Ronald Lankah, Patricia Horne, Elizabeth Scannell, Sonjourner Colbert, Matthew Burke, Jane Gubser, Brad Curry (2), and Peter Orris
- Plaintiff's Complaint and Exhibits
- Sheriff's 4/6/20 Response to the Plaintiff's Emergency Motion and Exhibits
- Sheriff's 4/13/20 Status Report and Exhibits
- Plaintiff's Motion for Preliminary Injunction and Exhibits
- 4/15/20 Hearing Transcript

All of the opinions set forth in this declaration are offered to a reasonable degree to medical certainty based on my training, experience, and review of the relevant literature, and national and international data and guidance.

9.      Coronavirus disease of 2019 (COVID-19) is a viral pandemic.[3]  This is a novel virus for which there is no established curative medical treatment and no vaccine. COVID-19 is different than all previous infectious disease outbreaks faced in our lifetime because of the speed and extent of spread throughout the globe, and how quickly it has overwhelmed healthcare systems. Infection control and social distancing represent the most evidence-based and critical interventions being utilized to slow the spread of COVID-19. Unlike many other viral outbreaks, it now appears that significant transmission of COVID-19 occurs before infected people become

---

[3] In the name COVID-19, 'CO' stands for 'corona,' 'VI' for 'virus,' and 'D' for disease.

symptomatic, which underscores the need for heavy focus on social distancing as a means to prevent transmission.

10.    The Centers for Disease Control and Prevention (CDC) has identified many particularly vulnerable populations who are at increased risk of having severe outcomes from COVID-19.[4] These include:

- People with chronic lung disease or moderate to severe asthma
- People who have serious heart conditions
- People who are immunocompromised[5]
- People with severe obesity (body mass index [BMI] of 40 or higher)
- People with diabetes
- People with chronic kidney disease undergoing dialysis
- People with liver disease
- People who are smokers
- People who are pregnant or post-partum

11.    In addition, data shows that African-Americans are experiencing disproportionate rates of death from COVID-19.[6]

12.    For vulnerable individuals, social distancing and infection control play an even more central role in protecting against severe negative outcomes, there is no treatment or cure that has been identified to lessen their greater risk of harm after contracting the virus.[7]

13.    Fatality is clearly the worst outcome of COVID-19 infection, but many who contract the illness and "recover" are irreparably damaged. This cannot be understated. The

---

[4] "At Risk for Severe Illness," CDC, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-risk.html.
[5] Including but not limited to cancer treatment, smoking, bone marrow or organ transplantation, immune deficiencies, HIV/AIDS, and prolonged use of corticosteroids and other immune-weakening medications.
[6] Reis Thebault, Andrew Ba Tran, & Vanessa Williams, "The coronavirus is infecting and killing black Americans at an alarmingly high rate," The Washington Post (Apr. 7, 2020), https://www.washingtonpost.com/nation/2020/04/07/coronavirus-is-infecting-killing-black-americans-an-alarmingly-high-rate-post-analysis-shows/?arc404=true.
[7] "What You Can Do," CDC, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/what-you-can-do.html ("**Stay home and avoid close contact**"); "How to Protect Yourself and Others," CDC, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/prevention.html ("**The best way to prevent illness is to avoid being exposed to this virus.**").

respiratory damage associated with severe COVID-19 infection causes long term decreases in lung function, and it is likely that among the 10-20% of people who require hospitalization, most will experience long-term effects on their lungs, heart, kidneys, eyes, central nervous system and other major organs.[8]

14.     COVID-19 infection rates have grown exponentially in the U.S. The CDC now reports COVID-19 cases and deaths in all 50 states.[9] When COVID-19 impacts a community, it will also impact the community's detention facilities. Federal and local correctional facilities will not be able to stop the entry of COVID-19 into their facilities: the reality is that the infection is inside many facilities already. It is inevitable and is not preventable. Numerous county jails, like Cook County Jail, have already reported hundreds of COVID-19 infections among staff and inmates. On March 31, 2020, the medical leadership in the NYC jail system announced that they would be unable to stop COVID from entering their facility and called for release as the primary response to this crisis.[10] Since that time, over 800 staff and inmates have tested positive in the NYC jail system.

15.     Once a virus enters a facility, detention settings promote the spread of the virus to the wider community. The constant flow of staff in and out of detention facilities only increases the spread of the virus beyond the walls of the facility itself.

---

[8] Melissa Healy, "Coronavirus infection may cause lasting damage throughout the body, doctors fear," L.A. Times (Apr. 10, 2020), https://www.latimes.com/science/story/2020-04-10/coronavirus-infection-can-do-lasting-damage-to-the-heart-liver; Judith Graham, "What Does Recovery From COVID-19 Look Like? It Depends. A Pulmonologist Explains." Kaiser Health News (Apr. 9, 2020), https://khn.org/news/what-does-recovery-from-covid-19-look-like-it-depends-a-pulmonologist-explains/; Alexander Freund, "COVID-19: Recovered patients have partially reduced lung function," DW (Mar. 20, 2020), https://www.dw.com/en/covid-19-recovered-patients-have-partially-reduced-lung-function/a-52859671.
[9] Coronavirus Disease 2019 (COVID-19) Cases in US, CDC (last visited April 10, 2020), https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html.
[10] Meagan Flynn, "Top doctor at Rikers' Island calls the hail a public health disaster unfolding before our eyes," The Washington Post (Mar. 31, 2020), https://www.washingtonpost.com/nation/2020/03/31/rikers-island-coronavirus-spread/.

16.     Prisoners in general have poorer health and more underlying medical conditions than those in the community.[11] Over half of prisoners have serious physical or behavioral health problems, and incarcerated people have statistically higher rates of smoking, cardiovascular disease, infectious diseases and cancer. Additionally, the leading cause of death in U.S. jails is suicide, which reflects a toxic overlap between untreated mental health and substance use problems.[12]

17.     The CDC and other organizations have issued recommendations on how to prevent or decrease the spread of COVID-19. It is important for jails to comply with the CDC guidance on management of COVID-19 in detention facilities. But it is also important to understand that compliance with these recommendations alone is not enough to create a setting that sufficiently protects the health and safety of individuals detained and working at the jail. The CDC, a federal agency, could not impose mandatory requirements on state or local officials, even when evidence-based medicine would support such requirements. The CDC guidelines are more appropriately considered a "harm reduction" approach, which is a common practice in public health, where organizations offer recommendations on how to reduce a risk of harm even when the subject is not following the appropriate practices.

18.     The unanimous consensus from the CDC, and medical and public health experts, is that social distancing and infection control are imperative to decrease rampant spread of COVID-19 and protect people's health. The fact that the CDC adds the phrase "if possible" or "if

---

[11] Laura M. Maruschak & Marcus Berzofsky, "Medical Problems of State and Federal Prisoners and Jail Inmates, 2011-12," BJS (Feb. 5, 2015), https://www.bjs.gov/index.cfm?ty=pbdetai l&iid=5219.
[12] Laura Maruschak, "Medical Problems of Prisoners, BJS (Apr. 19, 2020), https://www.bjs.gov/content/pub/html/mpp/mpp.cfm; Ann Caron, "Mortality in Local Jails, 2000-2016 – Statistical Tables," BJS (Feb. 12, 2020), https://www.bjs.gov/index.cfm?ty=pbdetail&iid=6767; National Commission on Correctional Health Care, "Suicide Prevention Resource Guide," https://www.ncchc.org/filebin/Publications/Suicide_Prevention_Resource_Guide_2.pdf

space allows" in its guidance specifically directed at detention centers it does not control, does not alter the clear medical consensus on social distancing.[13]

19.    In my opinion, based on my correctional and epidemiological training as well as a review of the literature surrounding COVID-19, mandating that staff and detainees be kept six feet apart from each other at all times, absent life-threatening emergencies such as use of force and fire evacuation, in addition to robust sanitation,  testing, and infection control, is essential to preventing a widespread outbreak of this disease in a custodial setting.

20.    I have been inside numerous state and federal detention facilities, including the Cook County Jail. In a detention facility, social distancing can be challenging and requires close attention to all aspects of operations among both staff and detained people.[14] The typical design and operation of correctional settings, including densely packed areas for housing, health services, food services, recreation, bathroom and shower facilities for detained people, as well as the entry points, locker rooms, meal areas, and control rooms for staff, all contribute to the spread of infectious disease. Detention facilities are typically operated in a way that forces close contact between people and relies on massive amounts of movement every day from one part of the facility to another, e.g., for programming, access to cafeterias, commissary, medical, just to name a few. This movement is required of detained people as well as staff. This normal level of movement requires that correctional settings design and implement detailed plans and policies to both reduce the amount of movement, and immediately change housing operations to permit

---

[13] "Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities," CDC, https://www.cdc.gov/coronavirus/2019-ncov/downloads/guidance-correctional-detention.pdf ("Although social distancing is challenging to practice in correctional and detention environments, it is a **cornerstone** of reducing transmission of respiratory diseases such as COVID-19.").
[14] State of Illinois, Executive Order 2020-13 (Mar. 26, 2020), https://www2.illinois.gov/Documents/ExecOrders/2020/ExecutiveOrder-2020-13.pdf.

detainees to socially distance from one another in order to control the spread of a highly communicable disease, such as COVID-19.

21.     The sally-port is one of the most ubiquitous aspects of detention, and is a place that requires special attention. The sally-port, or control port, is a series of two locked gates that bring every staff member and detained person past a windowed control room as they stop in a room between locked gates. The normal functioning of detention centers demands that during shift change for staff, or as the security count approaches for detained people, large numbers of people press into sally-ports as they move into or out of other areas of the facility. This process creates close contact, and the sally port windows that are used to hand out radios, keys and other equipment to staff ensure efficient passage of communicable disease from the control rooms into the sally port areas on a regular basis. But like other aspects of detention settings, passage of staff and detained people through sally-ports can be monitored and regulated in a way that promotes six feet of separation between people. Other areas similarly require special attention, including analysis of existing workflows and honest assessment of the operational and staffing implications, including housing areas, meal spaces, medication administration, sick call, bathroom and day room access, etc.

22.     Solitary confinement is not medical isolation.[15] Simply locking detained people into cells will worsen, not improve, efforts to curb infection rates. When people are locked into cells alone, for most of the day, they quickly experience psychological distress that manifests in self-harm and suicidality, which requires rapid response and intensive care outside the facility for mental and physical health emergencies. In addition, units that are comprised of locked cells may require additional staff to escort people to and from their cells for showers, telephone calls, and

---

[15] David Cloud, Dallas Augustine & Brie Williams, "The Ethical Use of Medical Isolation," Amend (Apr. 9, 2020), https://amend.us/wp-content/uploads/2020/04/Medical-Isolation-vs-Solitary_Amend.pdf.

other encounters, and medical, pharmacy and nursing staff must move on and off these units

daily to assess the welfare and health needs of these people, creating the same spread of the virus

from the community into the facilities as if detained people were not locked down. In addition,

locking two people into a cell increases the risk of transmission of COVID-19 from one of them

to the other. This risk is especially harmful in facilities, like the Cook County Jail, that have

failed to create special protections for people with known risk factors for serious illness and

death from COVID-19 infection, and hold these high-risk patients in locked cells with other

lower-risk patients.

23.     The documents I have reviewed in this case fail to establish a comprehensive

approach to social distancing at the Cook County Jail and must be quickly integrated into a

single COVID-19 emergency response plan that not only mandates in a detailed fashion, but also

supports and monitors implementation of, social distancing. The deficiencies I have noted

include:

a.      Lack of clarity for how detainees will be maintained with 6 feet of separation
        in day rooms, hallways, sally-ports, medication lines, bathrooms and showers,
        medical clinics, transport, and recreation spaces.

b.      Lack of detail on how staff will engage in social distancing as they enter the
        facilities and are screened, pass through sally-ports, hallways, to and from
        their security posts, clinic assignments, administrative office, and during
        meals and breaks.

c.      Lack of assessment of staffing requirements to implement social distancing
        among staff and detained people.

24.     Mandating social distancing for detainees is critical to protect against

uncontrolled spread of COVID-19. However, there are other actions that should be taken. In

addition to social distancing, Cook County Jail must engage in adequate infection control. My

experience managing smaller outbreaks is that an additional challenge in correctional settings is

to apply hospital-level infection control measures on security staff. Ongoing, effective training is crucial to implement as many measures as possible. In a hospital or nursing home, staff may move up and down a single hallway over their shift, and they may interact with one patient at a time. In detention settings, officers move great distances, are asked to shout or yell commands to large numbers of people, routinely apply handcuffs and operate heavy doors/gates, operate large correctional keys and are trained in the use of force. These basic duties cause the personal protective equipment they are given to quickly break and become useless, and even when in good working order, may impede their ability talk and be understood, as in the case of masks. As a result, implementation of infection control measures requires a significant amount of training and supervision. It cannot be implemented through email or signage alone, but requires active role modeling, supervision and support of staff. One of the most ubiquitous examples of this challenge is the now common observation that many correctional staff who have been issued N95 masks in the past two weeks at the Cook County Jail are currently not wearing them, or may be wearing them around their necks or on their heads.

25. Another critical task for any detention setting responding to a COVID-19 outbreak is to identify all of the people held in their custody who are particularly vulnerable. This task is critical for several reasons, and the daily updating of the list and locations of high-risk patients is critical to basic outbreak management. Creating a real-time list of high-risk patients allows for:

- Identification of high-risk patients who are eligible for release from detention

- Implementing of active surveillance, special housing arrangements, and other protective measures for high-risk patients who are not ill

- Implementing enhanced surveillance and protective measures for high-risk patients who are in a quarantine setting, or who develop symptoms of COVID-19

- Development and implementation of re-entry plans of care and support with community partners for high-risk patients

26.     Hand-washing and good hygiene practices are also important. Access to hand washing is limited in detention settings as compared to the community. Many common areas lack operable sinks with access to soap and paper hand towels. In addition, many of the sinks utilized in correctional settings do not operate with a faucet that can be turned and left on, but rather rely on pushing a button which provides a limited amount of water over a limited amount of time. These metered faucets are designed to save water by limiting the amount of time water flows, but make adequate hand washing with soap for at least 20 seconds very difficult, if not impossible.

27.     Infection control policies and procedures in detention settings are often at odds with basic CDC guidance. The CDC guidelines for infection control regarding COVID-19 make clear the need to aggressively prepare for, and intervene in, the spread of this virus throughout correctional settings. One of the most serious deficiencies in correctional practices involves the failure to appropriately train and equip correctional staff and inmate workers in the disinfection of the physical plant, and enable all people inside the facility to engage on social distancing and hand washing. When security staff and detainees are given masks without any guidance about their use, or when they should be replaced, or what scenarios in their environment represent higher risk of COVID-19 infection, the net effect is to decrease attention to infection control. Similarly, when inconsistent strengths of cleaning solution, or inadequate access to clean paper towels or other products used to wipe down surfaces are utilized, the net effect is also to decrease the level of infection control and increase the risk of rapid COVID-19 spread throughout the facility. When no special effort is made to use more highly trained or equipped cleaning

personnel with protective equipment to clean and handle the effects of staff or detainees who exhibit signs and symptoms of COVID-19, an especially egregious breach in infection control has occurred. Because security staff and inmates far outnumber health staff in correctional settings, they must be trained, equipped and engaged as the first responders for infection control. Failure to take this approach significantly increases the risk of rapid COVID-19 spread throughout the facility and increases the risk of preventable illness and death. The Cook County Jail's failure to have implemented adequate infection control policies before COVID-19 appeared within the facility is likely part of the reason why the outbreak quickly became so large. But as described above, even the perfect implementation of an adequate infection control policy would be insufficient to protect against uncontrolled spread of COVID-19 in the absence of social distancing at the jail.



28.     Security staff represent the front-line infection control force inside correctional settings, and evidence-based infection control plans cannot be implemented without active training of staff that is also ongoing. This training should include formal training on the protective equipment, environmental cleaning and health service activities that security staff will participate in or support. These trainings should span every tour and day of service so that every staff member is trained, and should be conducted in both dedicated 15-30 minute sessions and also in more brief venues, such as roll call.

29.     My review of the Cook County Jail's policies and other materials additionally leads me to have the following other specific concerns and recommendations about the health status of staff and detained people inside Cook County Jail regarding COVID-19 response:

a. **Lack of a Covid-19 plan.** It appears that CSCSO does not yet have a single COVID-19 response plan, and is instead relying on an amalgam of pre-existing policies, individual protocols and other directives to manage their response to COVID-19. I have reviewed an outbreak management policy from 2017 that covers numerous types of infectious disease concerns, and has a half page amendment relating to COVID-19 testing on the last of 15 pages. I have also reviewed a separate sanitation policy that appears specific to COVID-19 and a 21-page operational briefing from April 4, 2020 that appears to include several pages of general occupational guidance relating to COVID-19 that is not jail-specific and targeted towards "maintaining a healthy business.  This lack of a single COVID-19 emergency response plan is a glaring deficiency, and at odds with good correctional practice. Large systems such as CCSO employ and care for several thousands of individuals and it is not possible to respond to a large-scale emergency without a single, coordinated plan. This is even more pressing for the COVID-19 response, because the public health directives for management change every week, sometimes

14

daily, and thus, CCSO must have one unified plan that can be updated and reliably utilized by all security, health and administrative staff, and which partners in public health organizations can review and support. If it has not already occurred, CCSO must combine all of the existing protocols and procedures into one COVID-19 emergency response plan, as is mandated in other detention settings.[16]

  b. **Lack of identification or tracking of high-risk patients.** The correctional health staff, and their electronic medical records, are very sophisticated, and the identity and location of people with CDC identified risk factors for serious illness and death from COVID-19 infection is known to the health service. In an outbreak that targets a subset of the incarcerated population, it is critical to create special protections for these individuals, which may include consideration for release, as well as active surveillance with twice daily symptom and temperature checks during incarceration, and additional support during re-entry. This requires that CCSO create a management plan that identifies these high-risk patients for specialized management and protection, which does not exist according to the statements by General Counsel for the Sheriff.

  c. **Lack of infection control practices consistent with CDC guidelines**. The sanitation and other policies I have reviewed fail to address or ensure basic infection control measures that are critical to the CDC guidelines on COVID-19 response in detention settings. Specifically:

- The sanitation policy fails to identify any special measures taken to clean or disinfect the living spaces and personal effect of people who become symptomatic for COVID-19 and are taken to medical isolation. This is an extremely high-risk scenario that has played out numerous times already in the Cook County Jail, and I fear that lack of attention to this high-risk setting has contributed to the substantial outbreak already present. The CDC gives clear guidance on this matter, including letting confined spaces sit for one day before entering/cleaning, and use of PPE for anyone engaged in cleaning.

---

[16] ICE ERO 4/10/20 mandates that all facilities housing ICE detainees must have such a plan.

- The sanitation policy leaves all communication regarding infection control to the housing area officer, but my experience during outbreaks is that detained people have numerous questions about infection control and sanitation that housing area officers are not trained to respond to. There must be regular engagement between infection control nursing or medical staff, and both staff and detained people in each housing area for implementation of effective infection control during an outbreak.

    d. **Lack of re-entry planning for detained people leaving Cook County Jail**. Part of an integrated plan for COVID-19 response in detention settings is the need to plan for safe re-entry for people leaving jail. This critical requirement is outlined in CDC recommendations and must be developed as a section in a unified COVID-19 emergency plan. The CDC makes clear recommendations on this process:[17]

- If an individual does not clear the screening process, follow the protocol for a suspected COVID-19 case – including putting a face mask on the individual, immediately placing them under medical isolation, and evaluating them for possible COVID-19 testing.

- If the individual is released before the recommended medical isolation period is complete, discuss release of the individual with state, local, tribal, and/or territorial health departments to ensure safe medical transport and continued shelter and medical care, as part of release planning. Make direct linkages to community resources to ensure proper medical isolation and access to medical care.

- Before releasing an incarcerated/detained individual with COVID-19 symptoms to a community-based facility, such as a homeless shelter, contact the facility's staff to ensure adequate time for them to prepare to continue medical isolation, or contact local public health to explore alternate housing options.

    30.    These steps are important to improve conditions at the Cook County Jail that help to prevent detainees and staff from contracting COVID-19. The failures outlined above have contributed to the rapid spread of COVID-19 in Cook County Jail, and to the health consequences suffered by detained people and staff alike. As noted above, however, they alone

---

[17] "Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities," CDC, https://www.cdc.gov/coronavirus/2019-ncov/downloads/guidance-correctional-detention.pdf.

are insufficient to meaningfully reduce the rate of spread if social distancing at the jail is not immediately implemented. I believe that it is possible to make a significant difference in the number and severity of COVID-19 cases that ensue going forward, but significant work is required by the Cook County Sheriff's Office to enact social distancing and basic infection control measures for people held in detention and staff who work in this setting.

Signature: Homer Venters

Date: 4/19/2020

Location: Port Washington, NY

# Dr. Homer D. Venters

10 ½ Jefferson St., Port Washington, NY, 11050
hventers@gmail.com, Phone: 646-734-5994

### HEALTH ADMINISTRATOR     PHYSICIAN     EPIDEMIOLOGIST

## Professional Profile

- International leader in provision and improvement of health services to patients with criminal justice involvement.
- Innovator in linking care of the incarcerated to Medicaid, health homes, DSRIPs.
- Successful implementer of nations' first electronic health record, performance dashboards and health information exchange among pre-trial patients.
- Award winning epidemiologist focused on the intersection of health, criminal justice and human rights in the United States and developing nations.
- Human rights leader with experience using forensic science, epidemiology and public health methods to prevent and document human rights abuses.

## Professional Experience

**President**, Community Oriented Correctional Health Services (COCHS), 1/1/2020-present.
- Lead COCHS efforts to provide technical assistance, policy guidance and research regarding correctional health and justice reform.
- Oversee operations and programmatic development of COCHS
- Serve as primary liaison between COCHS board, funders, staff and partners.

**Senior Health and Justice Fellow**, Community Oriented Correctional Health Services (COCHS), 12/1/18-12/31/2018
- Lead COCHS efforts to expand Medicaid waivers for funding of care for detained persons relating to Substance Use and Hepatitis C.
- Develop and implement COCHS strategy for promoting non-profit models of diversion and correctional health care.

**Medical/Forensic Expert**, 3/2016-present
- Provide expert input, review and testimony regarding health care, quality improvement, electronic health records and data analysis in detention settings.

**Director of Programs,** Physicians for Human Rights, 3/16-11/18.
- Lead medical forensic documentation efforts of mass crimes against Rohingya and Yazidi people.
- Initiate vicarious trauma program.
- Expand forensic documentation of mass killings and war crimes.
- Develop and support sexual violence capacity development with physicians, nurses and judges.
- Expand documentation of attacks against health staff and facilities in Syria and Yemen.

**Chief Medical Officer/Assistant Vice President**, Correctional Health Services, NYC Health and Hospitals Corporation 8/15-3/17.
o   Transitioned entire clinical service (1,400 staff) from a for-profit staffing company model to a new division within NYC H + H.
o   Developed new models of mental health and substance abuse care that significantly lowered morbidity and other adverse events.
o   Connected patients to local health systems, DSRIP and health homes using approximately $5 million in external funding (grants available on request).
o   Reduced overall mortality in the nation's second largest jail system.
o   Increased operating budget from $140 million to $160 million.
o   Implemented nation's first patient experience, provider engagement and racial disparities programs for correctional health.

**Assistant Commissioner,** Correctional Health Services, New York Department of Health and Mental Hygiene, 6/11-8/15.
o   Implemented nation's first electronic medical record and health information exchange for 1,400 staff and 75,000 patients in a jail.
o   Developed bilateral agreements and programs with local health homes to identify incarcerated patients and coordinate care.
o   Increased operating budget of health service from $115 million to $140 million.
o   Established surveillance systems for injuries, sexual assault and mental health that drove new program development and received American Public Health Association Paper of the Year 2014.
o   Personally care for and reported on over 100 patients injured during violent encounters with jail security staff.

**Medical Director,** Correctional Health Services, New York Department of Health and Mental Hygiene, 1/10-6/11.
o   Directed all aspects of medical care for 75,000 patients annually in 12 jails, including specialty, dental, primary care and emergency response.
o   Direct all aspects of response to infectious outbreaks of H1N1, Legionella, Clostridium Difficile.
o   Developed new protocols to identify and report on injuries and sexual assault among patients.

**Deputy Medical Director,** Correctional Health Services, New York Department of Health and Mental Hygiene, 11/08-12/09.
o   Developed training program with Montefiore Social internal medicine residency program.
o   Directed and delivered health services in 2 jails.

**Clinical Attending Physician,** Bellevue/NYU Clinic for Survivors of Torture, 10/07-12/11.

**Clinical Attending Physician,** Montefiore Medical Center Bronx NY, Adult Medicine, 1/08-11/09.

## Education and Training

**Fellow, Public Health Research,** New York University 2007-2009. MS 6/2009
Projects: Health care for detained immigrants, Health Status of African immigrants in NYC.

**Resident, Social Internal Medicine**, Montefiore Medical Center/Albert Einstein University7/2004- 5/2007.

**M.D.,** University of Illinois, Urbana, 12/2003.

**M.S.** Biology, University of Illinois, Urbana, 6/03.

**B.A.** International Relations, Tufts University, Medford, MA, 1989**.**

## Academic Appointments, Licensure

Clinical Associate Professor, New York University College of Global Public Health, 5/18-present.

Clinical Instructor, New York University Langone School of Medicine, 2007-2018.

M.D. New York (2007-present).

## Media

TV

i24 Crossroads re Suicide in U.S. Jails 8/13/19.

i24 Crossroads re re *Life and Death in Rikers Island* 6/13/19.

Amanpour & Company, NPR/PBS re *Life and Death in Rikers Island* 4/15/19.

CNN, Christiane Amanpour re Forensic documentation of mass crimes against Rohingya. 7/11/18.

i24 Crossroads with David Shuster re health crisis among refugees in Syria. 7/6/18.

Canadian Broadcasting Corporation TV with Sylvie Fournier (in French) re crowd control weapons. 5/10/18

i24 Crossroads with David Shuster re Cholera outbreak in Yemen.  2/15/18.

China TV re WHO guidelines on HIV medication access 9/22/17.

Radio/Podcast

Morning Edition, NPR re Health Risks of Criminal Justice System. 8/9/19.

Fresh Air with Terry Gross, NPR re *Life and Death in Rikers Island*, 3/6/19.

Morning Edition, NPR re *Life and Death in Rikers Island*, 2/22/19.

LeShow with Harry Sherer re forensic documentation of mass crimes in Myanmar, Syria,

Iraq. 4/17/18.

Print articles and public testimony
Oped: Four ways to protect our jails and prisons from coronavirus. The Hill 2/29/20.

Oped: It's Time to Eliminate the Drunk Tank. The Hill 1/28/20.

Oped: With Kathy Morse. A Visit with my Incarcerated Mother. The Hill 9/24/19.

Oped: With Five Omar Muallim-Ak. The Truth about Suicide Behind Bars is Knowable. The Hill 8/13/19.

Oped: With Katherine McKenzie. Policymakers, provide adequate health care in prisons and detention centers. CNN Opinion, 7/18/19.

Oped: Getting serious about preventable deaths and injuries behind bars. *The Hill*, 7/5/19.

Testimony: Access to Medication Assisted Treatment in Prisons and Jails,  New York State Assembly Committee on Alcoholism and Drug Abuse, Assembly Committee on Health, and Assembly Committee on Correction**.** NY, NY, 11/14/18.

Oped: Attacks in Syria and Yemen are turning disease into a weapon of war, *STAT News*, 7/7/17.

Testimony: Connecticut Advisory Committee to the U.S. Commission on Civil Rights: Regarding the use of solitary confinement for prisoners. Hartford CT, 2/3/17.

Testimony: Venters HD, New York Advisory Committee to the U.S. Commission on Civil Rights: Regarding the use of solitary confinement for juveniles in New York. July 10, 2014. NY NY.

Testimony: New York State Assembly Committee on Correction with the Committee on Mental Health: Regarding Mental Illness in Correctional Settings. November 13, 2014. Albany NY.
Testimony: New York State Assembly Committee on Correction with the Committee on Mental Health: Regarding Mental Illness in Correctional Settings. November 13, 2014. Albany NY.

Oped: Venters HD and Keller AS, The Health of Immigrant Detainees. Boston Globe, April 11, 2009.

Testimony: U.S. House of Representatives, House Judiciary Committee's Subcommittee on Immigration, Citizenship, Refugees, Border Security, and International Law: Hearing on Problems with Immigration Detainee Medical Care, June 4, 2008.

*Peer Reviewed Publications*

Parmar PK, Leigh J, **Venters H**, Nelson T. Violence and mortality in the Northern Rakhine State of Myanmar, 2017: results of a quantitative survey of surviving community leaders in Bangladesh. Lancet Planet Health. 2019 Mar;3(3):e144-e153.

**Venters H.** Notions from Kavanaugh hearings contradict medical facts. *Lancet.* 10/5/18.

Taylor GP, Castro I, Rebergen C, Rycroft M, Nuwayhid I, Rubenstein L, Tarakji A, Modirzadeh N, **Venters H**, Jabbour S. Protecting health care in armed conflict: action towards accountability. *Lancet.* 4/14/18.

Katyal M, Leibowitz R, **Venters H**. IGRA-Based Screening for Latent Tuberculosis Infection in Persons Newly Incarcerated in New York City Jails. *J Correct Health Care.* 2018 4/18.

Harocopos A, Allen B, Glowa-Kollisch S, **Venters H**, Paone D, Macdonald R. The Rikers Island Hot Spotters: Exploring the Needs of the Most Frequently Incarcerated.
*J Health Care Poor Underserved.* 4/28/17.

MacDonald R, Akiyama MJ, Kopolow A, Rosner Z, McGahee W, Joseph R, Jaffer M, **Venters H**. Feasibility of Treating Hepatitis C in a Transient Jail Population.
*Open Forum Infect Dis*. 7/7/18.

Siegler A, Kaba F, MacDonald R, **Venters H**. Head Trauma in Jail and Implications for Chronic Traumatic Encephalopathy. *J Health Care Poor and Underserved.* In Press (May 2017).

Ford E, Kim S, **Venters H**. Sexual abuse and injury during incarceration reveal the need for re-entry trauma screening. *Lancet.* 4/8/18.

Alex B, Weiss DB, Kaba F, Rosner Z, Lee D, Lim S, **Venters H,** MacDonald R. Death After Jail Release. *J Correct Health Care*. 1/17.

Akiyama MJ, Kaba F, Rosner Z, Alper H, Kopolow A, Litwin AH, **Venters H**, MacDonald R. Correlates of Hepatitis C Virus Infection in the Targeted Testing Program of the New York City Jail System. *Public Health Rep.* 1/17.

Kalra R, Kollisch SG, MacDonald R, Dickey N, Rosner Z, **Venters H**. Staff Satisfaction, Ethical Concerns, and Burnout in the New York City Jail Health System. *J Correct Health Care.* 2016 Oct;22(4):383-392.

**Venters H.** A Three-Dimensional Action Plan to Raise the Quality of Care of US Correctional Health and Promote Alternatives to Incarceration. *Am J Public Health*. April 2016.104.

Glowa-Kollisch S, Kaba F, Waters A, Leung YJ, Ford E, **Venters H**. From Punishment to Treatment: The "Clinical Alternative to Punitive Segregation" (CAPS) Program in New York City Jails. *Int J Env Res Public Health.* 2016. 13(2),182.

Jaffer M, Ayad J, Tungol JG, MacDonald R, Dickey N, Venters H. Improving Transgender Healthcare in the New York City Correctional System. *LGBT Health.* 2016 1/8/16.

Granski M, Keller A, Venters H. Death Rates among Detained Immigrants in the United States. *Int J Env Res Public Health.* 2015. 11/10/15.

Michelle Martelle, Benjamin Farber, Richard Stazesky, Nathaniel Dickey, Amanda Parsons, **Homer Venters**. Meaningful Use of an Electronic Health Record in the NYC Jail System. *Am J Public Health*. 2015. 8/12/15.

Fatos Kaba, Angela Solimo, Jasmine Graves, Sarah Glowa-Kollisch, Allison Vise, Ross MacDonald, Anthony Waters, Zachary Rosner, Nathaniel Dickey, Sonia Angell, **Homer Venters**. Disparities in Mental Health Referral and Diagnosis in the NYC Jail Mental Health Service. *Am J Public Health.* 2015. 8/12/15.

Ross MacDonald, Fatos Kaba, Zachary Rosner, Alison Vise, Michelle Skerker, David Weiss, Michelle Brittner, Nathaniel Dickey, **Homer Venters**. The Rikers Island Hot Spotters. *Am J Public Health*. 2015. 9/17/15.

Selling Molly Skerker, Nathaniel Dickey, Dana Schonberg, Ross MacDonald, **Homer Venters**. Improving Antenatal Care for Incarcerated Women: fulfilling the promise of the Sustainable Development Goals. *Bulletin of the World Health Organization*.2015.

Jasmine Graves, Jessica Steele, Fatos Kaba, Cassandra Ramdath, Zachary Rosner, Ross MacDonald, Nathanial Dickey, **Homer Venters**. Traumatic Brain Injury and Structural Violence among Adolescent males in the NYC Jail System *J Health Care Poor Underserved.* 2015;26(2):345-57.

Glowa-Kollisch S, Graves J, Dickey N, MacDonald R, Rosner Z, Waters A, **Venters H**. Data-Driven Human Rights: Using Dual Loyalty Trainings to Promote the Care of Vulnerable Patients in Jail. *Health and Human Rights*. Online ahead of print, 3/12/15.

Teixeira PA[1], Jordan AO, Zaller N, Shah D, **Venters H**. Health Outcomes for HIV-Infected Persons Released From the New York City Jail System With a Transitional Care-Coordination Plan. 2014. *Am J Public Health*. 2014 Dec 18.

Selling D, Lee D, Solimo A, **Venters H.** A Road Not Taken: Substance Abuse Programming in the New York City Jail System. *J Correct Health Care.* 2014 Nov 17.

Glowa-Kollisch S, Lim S, Summers C, Cohen L, Selling D, **Venters H**. Beyond the Bridge: Evaluating a Novel Mental Health Program in the New York City Jail System. *Am J Public Health*. 2014 Sep 11.

Glowa-Kollisch S, Andrade K, Stazesky R, Teixeira P, Kaba F, MacDonald R, Rosner Z, Selling D, Parsons A, **Venters H**. Data-Driven Human Rights: Using the Electronic Health Record to Promote Human Rights in Jail. *Health and Human Rights*. 2014. Vol 16 (1): 157-165.

MacDonald R, Rosner Z, **Venters H**. Case series of exercise-induced rhabdomyolysis in the New York City Jail System. *Am J Emerg Med*. 2014. Vol 32(5): 446-7.

Bechelli M, Caudy M, Gardner T, Huber A, Mancuso D, Samuels P, Shah T, **Venters H.** Case Studies from Three States: Breaking Down Silos Between Health Care and Criminal Justice. *Health Affairs*. 2014. Vol. 3. 33(3):474-81.

Selling D, Solimo A, Lee D, Horne K, Panove E, **Venters H**. Surveillance of suicidal and non-suicidal self-injury in the new York city jail system. *J Correct Health Care*. 2014. Apr:20(2).

Kaba F, Diamond P, Haque A, MacDonald R, **Venters H**. Traumatic Brain Injury Among Newly Admitted Adolescents in the New York City Jail System. *J Adolesc Health*. 2014. Vol 54(5): 615-7.

Monga P, Keller A, **Venters H**. Prevention and Punishment: Barriers to accessing health services for undocumented immigrants in the United States. *LAWS*. 2014. 3(1).

Kaba F, Lewsi A, Glowa-Kollisch S, Hadler J, Lee D, Alper H, Selling D, MacDonald R, Solimo A, Parsons A, **Venters H**. Solitary Confinement and Risk of Self-Harm Among Jail Inmates. *Amer J Public Health*. 2014. Vol 104(3):442-7.

MacDonald R, Parsons A, **Venters H.** The Triple Aims of Correctional Health:  Patient safety, Population Health and Human Rights. *Journal of Health Care for the Poor and Underserved*. 2013. 24(3).

Parvez FM, Katyal M, Alper H, Leibowitz R, **Venters H.** Female sex workers incarcerated in New York City jails: prevalence of sexually transmitted infections and associated risk behaviors. *Sexually Transmitted Infections*. 89:280-284. 2013.

Brittain J, Axelrod G, **Venters H.** Deaths in New York City Jails: 2001 – 2009. *Am J Public Health*. 2013 103:4.

Jordan AO, Cohen LR, Harriman G, Teixeira PA, Cruzado-Quinones J, **Venters H.** Transitional Care Coordination in New York City Jails: Facilitating Linkages to Care for People with HIV Returning Home from Rikers Island. *AIDS Behav. Nov.* 2012.

Jaffer M, Kimura C, **Venters H.** Improving medical care for patients with HIV in New York City jails. *J Correct Health Care*. 2012 Jul;18(3):246-50.

Ludwig A, Parsons, A, Cohen, L, **Venters H.** Injury Surveillance in the NYC Jail System, *Am J Public Health* 2012 Jun;102(6).

**Venters H**, Keller, AS. *Psychiatric Services*. (2012) Diversion of Mentally Ill Patients from Court-ordered care to Immigration Detention. Epub. 4/2012.

**Venters H**, Gany, F. *Journal of Immigrant and Minority Health* (2011) Mental Health Concerns Among African Immigrants. 13(4): 795-7.

**Venters H,** Foote M, Keller AS. *Journal of Immigrant and Minority Health.* (2010) Medical Advocacy on Behalf of Detained Immigrants. 13(3): 625-8.

**Venters H,** McNeely J, Keller AS. *Health and Human Rights.* (2010) HIV Screening and Care for Immigration Detainees. 11(2) 91-102.

**Venters H,** Keller AS. *Journal of Health Care for the Poor and Underserved*. (2009) The Immigration Detention Health Plan: An Acute Care Model for a Chronic Care Population. 20:951-957.

**Venters H**, Gany, F. *Journal of Immigrant and Minority Health* (2009) African Immigrant Health. 4/4/09.

**Venters H**, Dasch-Goldberg D, Rasmussen A, Keller AS, *Human Rights Quarterly* (2009) Into the Abyss: Mortality and Morbidity among Detained Immigrant. 31 (2) 474-491.

**Venters H**, *The Lancet* (2008) Who is Jack Bauer? 372 (9653).

**Venters H**, Lainer-Vos J, Razvi A, Crawford J, Shaf´on Venable P, Drucker EM, *Am J Public Health* (2008) Bringing Health Care Advocacy to a Public Defender's Office. 98 (11).

**Venters H**, Razvi AM, Tobia MS, Drucker E. *Harm Reduct J.* (2006) The case of Scott Ortiz: a clash between criminal justice and public health. Harm Reduct J. 3:21

Cloez-Tayarani I, Petit-Bertron AF, **Venters HD**, Cavaillon JM (2003) *Internat. Immunol.* Differential effect of serotonin on cytokine production in lipopolysaccharide-stimulated human peripheral blood mononuclear cells.15,1-8.

Strle K, Zhou JH, Broussard SR, **Venters HD**, Johnson RW, Freund GG, Dantzer R, Kelley KW, (2002) *J. Neuroimmunol.* IL-10 promotes survival of microglia without activating Akt. 122, 9-19.

**Venters HD,** Broussard SR, Zhou JH, Bluthe RM, Freund GG, Johnson RW, Dantzer R, Kelley KW, (2001) *J. Neuroimmunol.* Tumor necrosis factor(alpha) and insulin-like growth factor-I in the brain: is the whole greater than the sum of its parts? 119, 151-65.

**Venters HD,** Dantzer R, Kelley KW, (2000) *Ann. N. Y. Acad. Sci.* Tumor necrosis factor-alpha induces neuronal death by silencing survival signals generated by the type I insulin-like growth factor receptor. 917, 210-20.

**Venters HD,** Dantzer R, Kelley KW, (2000) *Trends. Neurosci.* A new concept in neurodegeneration: TNFalpha is a silencer of survival signals. 23, 175-80.

**Venters HD,** Tang Q, Liu Q, VanHoy RW, Dantzer R, Kelley KW, (1999) *Proc. Natl. Acad. Sci. USA.* A new mechanism of neurodegeneration: A proinflammatory cytokine inhibits receptor signaling by a survival peptide, 96, 9879-9884.

**Venters HD,** Ala TA, Frey WH 2nd , (1998) Inhibition of antagonist binding to human brain muscarinic receptor by vanadium compounds. *Recept. Signal. Transduct.* 7, 137-142.

**Venters HD,** Tang Q, Liu Q, VanHoy RW, Dantzer R, Kelley KW, (1999) *Proc. Natl. Acad. Sci. USA.* A new mechanism of neurodegeneration: A proinflammatory cytokine inhibits receptor signaling by a survival peptide, 96, 9879-9884.

**Venters HD,** Ala TA, Frey WH 2nd , (1998) Inhibition of antagonist binding to human brain muscarinic receptor by vanadium compounds. *Recept. Signal. Transduct.* 7, 137-142**.**

**Venters HD,** Bonilla LE, Jensen T, Garner HP, Bordayo EZ, Najarian MM, Ala TA, Mason RP, Frey WH 2nd, (1997) Heme from Alzheimer's brain inhibits muscarinic receptor binding via thiyl radical generation. *Brain. Res.* 764, 93-100.

Kjome JR, Swenson KA, Johnson MN, Bordayo EZ, Anderson LE, Klevan LC, Fraticelli AI, Aldrich SL, Fawcett JR, **Venters HD**, Ala TA, Frey WH 2nd (1997) Inhibition of antagonist and agonist binding to the human brain muscarinic receptor by arachidonic acid. *J. Mol. Neurosci.* 10, 209-217.

## *Honors and Presentations (past 10 years)*

**Keynote Address**, Academic Correctional Health Conference, April 2020, Chapel Hill, North Carolina.

**TedMed Presentation**, Correctional Health, Boston MA, March 2020.

**Finalist, Prose Award for Literature**, Social Sciences category for *Life and Death in Rikers Island*, February, 2020.

**Keynote Address,** John Howard Association Annual Benefit, November 2019, Chicago IL.

**Keynote Address,** Kentucky Data Forum, Foundation for a Healthy Kentucky, November 2019, Cincinnati Ohio.

**Oral Presentation,** Dual loyalty and other human rights concerns for physicians in jails an prisons. Association of Correctional Physicians, Annual meeting. 10/16, Las Vegas.

**Oral Presentation,** Clinical Alternatives to Punitive Segregation: Reducing self-harm for incarcerated patients with mental illness. American Public Health Association Annual Meeting, November 2015, Chicago IL.

**Oral Presentation,** Analysis of Deaths in ICE Custody over 10 Years . American Public Health Association Annual Meeting, November 2015, Chicago IL.

**Oral Presentation,** Medication Assisted Therapies for Opioid Dependence in the New York City Jail System. American Public Health Association Annual Meeting, November 2015, Chicago IL.

**Oral Presentation,** Pathologizing Normal Human Behavior: Violence and Solitary Confinement in an Urban Jail. American Public Health Association Annual Meeting, November 2014, New Orleans, LA.

**Training,** International Committee of the Red Cross and Red Crescent, Medical Director meeting 10/15, Presentation on Human Rights and dual loyalty in correctional health.

**Paper of the Year,** American Public Health Association. 2014. (Kaba F, Lewis A, Glowa-Kollisch S, Hadler J, Lee D, Alper H, Selling D, MacDonald R, Solimo A, Parsons A, Venters H. Solitary Confinement and Risk of Self-Harm Among Jail Inmates. *Amer J Public Health*. 2014. Vol 104(3):442-7.)

**Oral Presentation,** Pathologizing Normal Human Behavior: Violence and Solitary Confinement in an Urban Jail. *American Public Health Association* Annual Meeting, New Orleans LA, 2014.

**Oral Presentation,** Human rights at Rikers: Dual loyalty among jail health staff. American Public Health Association Annual Meeting, New Orleans LA, 2014.

**Poster Presentation**, Mental Health Training for Immigration Judges. American Public Health

Association Annual Meeting, New Orleans LA, 2014.

**Distinguished Service Award;** Managerial Excellence. Division of Health Care Access and Improvement, NYC DOHMH. 2013.

**Oral Presentation,** Solitary confinement in the ICE detention system. American Public Health Association Annual Meeting, Boston MA, 2013.

**Oral Presentation**, Self-harm and solitary confinement in the NYC jail system. American Public Health Association Annual Meeting, Boston MA, 2013.

**Oral Presentation**, Implementing a human rights practice of medicine inside New York City jails. American Public Health Association Annual Meeting, Boston MA, 2013.

**Poster Presentation,** Human Rights on Rikers: integrating a human rights-based framework for healthcare into NYC's jail system. *American Public Health Association* Annual Meeting, Boston MA, 2013.

**Poster Presentation**, Improving correctional health care: health information exchange and the affordable care act. *American Public Health Association* Annual Meeting, Boston MA, 2013.

**Oral Presentation**, Management of Infectious Disease Outbreaks in a Large Jail System. American Public Health Association Annual Meeting, Washington DC, 2011.

**Oral Presentation,** Diversion of Patients from Court Ordered Mental Health Treatment to Immigration Detention. *American Public Health Association* Annual Meeting, Washington DC, 2011.

**Oral Presentation**, Initiation of Antiretroviral Therapy for Newly Diagnosed HIV Patients in the NYC Jail System. *American Public Health Association* Annual Meeting, Washington DC, 2011.

**Oral Presentation,** Medical Case Management in Jail Mental Health Units. *American Public Health Association* Annual Meeting, Washington DC, 2011.

**Oral Presentation**, Injury Surveillance in New York City Jails. *American Public Health Association* Annual Meeting, Washington DC, 2011.

**Oral Presentation,** Ensuring Adequate Medical Care for Detained Immigrants. Venters H, Keller A, American Public Health Association Annual Meeting, Denver, CO, 2010.

**Oral Presentation,** HIV Testing in NYC Correctional Facilities. Venters H and Jaffer M, *American Public Health Association,* Annual Meeting, Denver, CO, 2010.

**Oral Presentation,** Medical Concerns for Detained Immigrants. Venters H, Keller A, *American Public Health Association* Annual Meeting, Philadelphia, PA, November 2009.

**Oral Presentation,** Growth of Immigration Detention Around the Globe. Venters H, Keller A, *American Public Health Association* Annual Meeting, Philadelphia, PA, November 2009.

**Oral Presentation,** Role of Hospital Ethics Boards in the Care of Immigration Detainees. Venters H, Keller A, *American Public Health Association* Annual Meeting, Philadelphia, PA,

November 2009.

**Oral Presentation,** Health Law and Immigration Detainees. Venters H, Keller A, *American Public Health Association* Annual Meeting, Philadelphia, PA, November 2009.

**Bro Bono Advocacy Award,** Advocacy on behalf of detained immigrants. Legal Aid Society of New York, October 2009.

**Oral Presentation,** Deaths of immigrants detained by Immigration and Customs Enforcement. Venters H, Rasmussen A, Keller A, *American Public Health Association* Annual Meeting, San Diego CA, October 2008.

**Poster Presentation,** Death of a detained immigrant with AIDS after withholding of prophylactic Dapsone. Venters H, Rasmussen A, Keller A, *Society of General Internal Medicine* Annual Meeting, Pittsburgh PA, April 2008.

**Poster Presentation,** Tuberculosis screening among immigrants in New York City reveals higher rates of positive tuberculosis tests and less health insurance among African immigrants. *Society of General Internal Medicine* Annual Meeting, Pittsburgh PA, April 2008.

**Daniel Leicht Award for Achievement in Social Medicine,** Montefiore Medical Center, Department of Family and Social Medicine, 2007.

**Poster Presentation**, Case Findings of Recent Arestees. Venters H, Deluca J, Drucker E. *Society of General Internal Medicine* Annual Meeting, Toronto Canada, April 2007.

**Poster Presentation,** Bringing Primary Care to Legal Aid in the Bronx. Venters H, Deluca J, Drucker E. *Society of General Internal Medicine* Annual Meeting, Los Angeles CA, April 2006.

**Poster Presentation**, A Missed Opportunity, Diagnosing Multiple Myeloma in the Elderly Hospital Patient. Venters H, Green E., *Society of General Internal Medicine* Annual Meeting, New Orleans LA, April 2005.

## *Grants: Program*

San Diego County: Review of jail best practices (COCHS), 1/2020, $90,000.

Ryan White Part A - Prison Release Services (PRS). From HHS/HRSA to Correctional Health Services (NYC DOHMH), 3/1/16-2/28/17 (Renewed since 2007). Annual budget $ 2.7 million.

Ryan White Part A - Early Intervention Services- Priority Population Testing. From HHS/HRSA to Correctional Health Services (NYC DOHMH), 3/1/16-2/28/18 (Renewed since 2013). Annual budget $250,000.

Comprehensive HIV Prevention. From HHS to Correctional Health Services (NYC DOHMH), 1/1/16-12/31/16. Annual budget $500,000.

HIV/AIDS Initiative for Minority Men. From HHS Office of Minority Health to Correctional Health Services (NYC DOHMH), 9/30/14-8/31/17. Annual budget $375,000.

SPNS Workforce Initiative, From HRSA SPNS to Correctional Health Services (NYC DOHMH), 8/1/14-7/31/18. Annual budget $280,000.

SPNS Culturally Appropriate Interventions. From HRSA SPNS to Correctional Health Services (NYC DOHMH), 9/1/13-8/31/18. Annual budget $290,000.

Residential substance abuse treatment. From New York State Division of Criminal Justice Services to Correctional Health Services (NYC DOHMH), 1/1/11-12/31/17. Annual budget $175,000.

Community Action for Pre-Natal Care (CAPC). From NY State Department of Health AIDS Institute to Correctional Health Services (NYC DOHMH), 1/1/05-12/31/10. Annual budget $290,000.

Point of Service Testing. From MAC/AIDS, Elton John and Robin Hood Foundations to Correctional Health Services (NYC DOHMH), 11/1/09-10/31/12. Annual budget $100,000.

Mental Health Collaboration Grant. From USDOJ to Correctional Health Services (NYC DOHMH), 1/1/11-9/30/13. Annual budget $250,000.

## Teaching

**Instructor,** Health in Prisons Course, Bloomberg School of Public Health, Johns Hopkins University, June 2015, June 2014, April 2019.

**Instructor**, Albert Einstein College of Medicine/Montefiore Social Medicine Program Yearly lectures on Data-driven human rights, 2007-present.

## Other Health & Human Rights Activities

**DIGNITY Danish Institute Against Torture**, Symposium with Egyptian correctional health staff regarding dual loyalty and data-driven human rights. Cairo Egypt, September 20-23, 2014.

**Doctors of the World,** Physician evaluating survivors of torture, writing affidavits for asylum hearings, with testimony as needed, 7/05-11/18.

**United States Peace Corps**, Guinea Worm Educator, Togo West Africa, June 1990- December 1991.

-*Primary Project;* Draconculiasis Eradication. Activities included assessing levels of infection in 8 rural villages and giving prevention presentations to mothers in Ewe and French
-*Secondary Project;* Malaria Prevention.

## Books

**Venters H.** *Life and Death in Rikers Island*. Johns Hopkins University Press. 2/19.

## Chapters in Books

**Venters H.** Mythbusting Solitary Confinement in Jail. In Solitary Confinement Effects, Practices, and Pathways toward Reform. Oxford University Press, 2020.

MacDonald R. and **Venters H.** Correctional Health and Decarceration. In Decarceration. Ernest Drucker, New Press, 2017.

## *Membership in Professional Organizations*

**American Public Health Association**

## *Foreign Language Proficiency*

**French**   Proficient
**Ewe**      Conversant

## *Prior Testimony and Deposition*

Benjamin v. Horn, 75 Civ. 3073 (HB) (S.D.N.Y.) as expert for defendants, 2015

Rodgers v. Martin 2:16-cv-00216 (U.S.D.C. N.D.Tx) as expert for plaintiffs, 10/19/17

Fikes v. Abernathy, 2017 7:16-cv-00843-LSC (U.S.D.C. N.D.AL) as expert for plaintiffs 10/30/17.

Fernandez v. City of New York, 17-CV-02431 (GHW)(SN) (S.D.NY) as defendant in role as City Employee 4/10/18.

Charleston v. Corizon Health INC, 17-3039 (U.S.D.C. E.D. PA) as expert for plaintiffs 4/20/18.

Gambler v. Santa Fe County, 1:17-cv-00617 (WJ/KK) as expert for plaintiffs 7/23/18.

Hammonds v. Dekalb County AL, CASE NO.: 4:16-cv-01558-KOB as expert for plaintiffs 11/30/2018.

Mathiason v. Rio Arriba County NM, No. D-117-CV-2007-00054, as expert for plaintiff 2/7/19.

Hutchinson v. Bates et. al. AL, No. 2:17-CV-00185-WKW- GMB, as expert for plaintiff 3/27/19.

Lewis v. East Baton Rouge Parish Prison LA, No. 3:16-CV-352-JWD-RLB, as expert for plaintiff 6/24/19.

Belcher v. Lopinto, No No. 2:2018cv07368 - Document 36 (E.D. La. 2019) as expert for plaintiffs 12/5/2019.


## Fee Schedule

Case review, reports, testimony $500/hour.
Site visits and other travel, $2,500 per day (not including travel costs).