IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| ANTHONY MAYS, Individually and on behalf of a class of similarly situated persons; and JUDIA JACKSON, as next friend of KENNETH FOSTER, Individually and on behalf of a class of similarly situated persons<br><br>            Plaintiffs-Petitioners,<br><br>v<br><br>THOMAS DART, Sheriff of Cook County,<br><br>            Defendant-Respondent | Case No. 20-cv-2134 |

## DECLARATION OF REBECCA LEVIN

I, Rebecca Levin, pursuant to 28 U.S.C. § 1746, declare as follows:

1. I have been employed by the Cook County Sheriff's Office ("CCSO") since January 2020 as a Senior Advisor. I have a Master's Degree in Public Health, with a concentration in Health Policy and Administration from the University of Illinois at Chicago and also completed doctoral coursework at Tulane University School of Public Health and Tropical Medicine's Executive Doctor of Science Program in the Department of Health Systems Management. Additionally, prior to joining the CCSO, I worked in the field of public health for twenty years, first with the American Academy of Pediatrics and then Ann & Robert H. Lurie's Children's Hospital of Chicago.

2. I previously executed a sworn Declaration concerning the CCSO's response to the Novel Coronavirus ("COVID-19") pandemic, filed on April 7, 2020 under Dkt. #30-7. Each and all paragraphs under said declaration are incorporated and re-stated herein.

3. The facts set forth in this declaration are drawn from information I have received in my position with the CCSO. It does not contain all of the facts that I know about the matters discussed below.

4. As a Senior Advisor with a public health background, I have been involved in the proactive measures taken by CCSO to combat the COVID-19 pandemic. Principally, since March 12, 2020, I have been in near constant communication with public health officials, elected officials, and other healthcare stakeholders to obtain the most current guidance on measures to prevent and mitigate COVID-19 exposure and infection (which has evolved over time), disseminated this guidance to staff responsible for implementing policies and procedures,

and worked directly with such staff to implement such policies and procedures. Indeed, this has essentially become my full-time job over the last several weeks.

5. Key collaborations to ensure the CCSO is following the most up to date guidance from the Centers for Disease Control and Prevention (CDC), particularly concerning correctional settings, has involved working with the Chicago Department of Public Health (CDPH), Cook County Health and Hospital Systems, in particular, Cermak Health, and numerous elected county, city, state and federal officials.

**Collaboration with the Centers for Disease Control and Prevention and Chicago Department of Public Health**

6. Representatives of CDPH, Stephanie Black, MD, MSc, Medical Director Communicable Disease Program and Isaac Ghinai, MBBS MSc, CDC Epidemic Intelligence Service Officer detailed to CDPH, toured the CCDOC during the month of March 2020 to observe the jail from a public health and infection control perspective.

7. Following the walk through, a team from CCDOC leadership, the CCSO Executive Office, and Cermak collaborated to identify individuals, departments or agencies with primary responsibility for amending their procedures based on feedback from CDPH and monitor the status of their implementation. These efforts focus on placement/housing of detainees, including measures to increase social distancing, such as increasing distance between occupied bunks.

8. The CDPH is aware of the CCSOs practices and procedures as it pertains to housing detainees in isolation and quarantine. These practices and procedures align closely with the housing "algorithm" provided as part of the CDPH recommendations.

9. Because Drs. Black and Ghinai from CDPH have a variety of responsibilities related to COVID-19, CDPH requested additional epidemiological support from the CDC to provide guidance on controlling the spread of COVID-19 in Cook County Jail. On behalf of the CCSO, I expressed strong support for this additional expert consultation. Paige Armstrong, MD, MHS, Epidemiology Team Lead and Lieutenant Commander in the US Public Health Service, and Alison Binder, Epidemiologist, were deployed by the CDC to Chicago on April 15 and 16 respectively.

**April 17, 2020 On-Site Visit**

10. On Friday, April 17, 2020 representatives of the CDC and CDPH conducted a site visit at the Cook County Jail. The visit lasted approximately three and a half hours and provided the representatives with information about different settings: intake; dorms and celled tiers; quarantine and isolation tiers; and cohort isolation and convalescent barracks.

11. The CCSO invited the CDC and CDPH to the Jail to conduct the site visit based on the CCSO's interest in ensuring it is following the recommended public health guidelines and continuing to evolve its policies as COVID-19 research evolves.

12. The following individuals attended the site visit: from the CDC Paige Armstrong, MD, MHS, Epidemiology Team Lead and Alison Binder, Epidemiologist; from CDPH Stephanie Black, MD, MSc, Medical Director Communicable Disease Program and Isaac Ghinai, MBBS MSc, CDC Epidemic Intelligence Service Officer detailed to CDPH; from Cermak Health Services Dr. Connie Mennella, Linda Follenweider, Chad Zawitz, and Bridgette Jones; and from CCSO Mike Miller, Jane Gubser and myself.

13. CDC and CDPH representatives noted that gaining some familiarity with the physical layout of the Jail will be helpful in assuring CCSO practices met CDC standards and to provide additional recommendations for continuing to slow the spread of COVID-19.

14. The CDC and CDPH representatives commented frequently on the cleanliness of the facility and the noticeable smell of bleach throughout. Representatives observed cleaning by both detainees and staff during the site visit.

15. The CDPH representatives noted increased social distancing, particularly with the reduced density of bunk assignments in the dorms. This change was implemented following the CDPH recommendation following the March 2020 site visit.

16. Although the site visit showed that face masks were being made available to detainees, not all detainees chose to wear them. Commander Armstrong had previously been deployed to respond to COVID-19 on a cruise ship and noted that encouraging people to consistently follow public health guidance was a challenge in other environments as well.

17. The CDC and CDPH representatives expressed their appreciation for the thoughtful efforts of the CCDOC in the context of a large and complex facility. Commander Armstrong stated "you guys are doing an amazing job."

18. The CDC and CDPH will use the information observed during the site visit to develop recommendations for a plan to continue to address the evolving COVID-19 pandemic based on the complex needs of the Jail. These recommendations will take into account the CDC Guidelines for Correctional Facilities as well as the specific characteristics of the Jail space, detainees, and staff. The CDC will also use this information to improve the guidance they provide to correctional facilities around the nation.

19. The CCSO expects to receive these recommendations within the next several weeks. As with the recommendations received from CDPH, the CCSO will review these recommendations for purposes of implementation.

20. The CCSO will continue to work with the CDC and CDPH to receive such information as COVID-19 and its handling continue to be researched, understood and managed.

21. I will continue to take this into account for purposes of my recommendations to office on our implementation and procedures.

I, Rebecca Levin, pursuant to 28 U.S.C. § 1746, declare under penalty of perjury of the laws of the United States of America that the foregoing is true and correct.

Dated this  21  day of April 2020.

*Rebecca A Levin*

_____
Rebecca Levin, MPH



# DEPARTMENT OF PUBLIC HEALTH
## CITY OF CHICAGO

**To:** Connie Mennella, MD
*Chair, Department of Correctional Health/Cermak Health Services*
**Bradley Curry**
*Chief of Staff, Cook County Sheriff's Office*

**From:** Stephanie R. Black, MD, MSc
*Communicable Disease Program, Chicago Department of Public Health*
Isaac Ghinai, MBBS, MSc
*CDC Epidemic Intelligence Service Officer, Chicago Department of Public Health*

**Date:** March 27, 2020
**Re:** Recommendations for control and mitigation of coronavirus disease at the Cook County Jail

CDPH was notified the first suspected case of coronavirus disease (COVID-19) in Cook County Jail on March 20, 2020. As of March 27, 2020, 38 confirmed COVID-19 cases have been confirmed among inmates at Cook County Jail from multiple accommodation units (principally RTU, Division 6 and Dorm 4). Several staff members have also reportedly been diagnosed with COVID-19. In addition, approximately 135 inmates and have tests pending for COVID-19, and more inmates are experiencing symptoms and testing positive each day.

The CDPH investigation team reviewed epidemiological data with Dr Chad Zawitz, Director of Infectious Diseases at Cermak Health Services and conducted a field visit to the jail on March 26th 2020, from 12pm to 4pm, and met with Dr Connie Mennella, Chairperson of the Department of Correctional Health at Cermak Health Services; Dr Sharon Welbel, Director of Infection Control and Hospital Epidemiology at Cook County Health; Bridgette Jones, nurse epidemiologist for Cermak Health Services and Jasmin Jarlega Penaranda, Environmental Services Coordinator at Cook County Jail and others.

Wherever possible, these recommendations follow CDC guidance and account for local conditions. For CDC's Interim Guidance on Management of COVID-19 in Correctional and Detention Facilities, see:
https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html

Broadly, we recommend grouping inmates into four groups:
Group 1     Confirmed cases: isolate together in the Bootcamp barracks
Group 2     Symptomatic, clinically higher-risk persons under investigation (PUI): who should be isolated in cells, individually or in very small groups

Group 3    Symptomatic, clinically lower-risk PUIs: consider isolating together in Bootcamp barracks, with social distancing and consider universal use of face masks

Group 4    Asymptomatic contacts: quarantine in small units if possible, quarantined together if needed.

Recommendations are divided into 4 sections: Epidemiology, Placement/Housing, Infection Control, and Release. Most of our recommendations (Sections 1-3) apply to the partnership between Cook County Department of Corrections and Cermak Health Services in running Cook County Jail, and all will play a role in controlling the spread or limiting the impact of COVID-19. Some of the most impactful recommendations, those in Section 4 pertaining to the release of inmates for urgent public health reasons, apply to the broader criminal justice system.

| | Task | Person/Team Responsible |
|---|---|---|
| **1. Epidemiologic Investigation** | 1.1 Provide a list of all accommodation units, by division and by housing situation (e.g. dorm of 200 people, individual cells of 2 people), for the jail under normal operating conditions | |
| | 1.2 Provide a line list of known COVID positive employees to CDPH each day including date of symptom onset and units worked in last 14 days | |
| | 1.3 Provide a line list of known COVID positive inmates to CDPH including date of symptom onset, accommodation units and work assignments for last 14 days. This may be done at some time after the peak of cases and/or CDPH staff may deploy to collect this information. | |
| | 1.4 Cases in inmates should be reported by infection preventionist through the Illinois National Electronic Surveillance System | |
| | 1.5 Per CDC recommendations, the value of interviewing individual healthcare workers (HCW) who may have seen a COVID case is limited in the context of community transmission (https://www.cdc.gov/coronavirus/2019-ncov/hcp/guidance-risk-assesment-hcp.html). The focus should instead be on ensuring HCW are asymptomatic, e.g. by ensuring pre-shift symptom screening. | |
| | 1.6 Assess risk of COVID-19 in inmates. We suggest the following categories (see attached algorithm). Group 1: Confirmed cases Group 2: Symptomatic, clinically higher-risk persons under investigation (PUIs) Group 3: Symptomatic, clinically lower-risk PUIs Group 4: Asymptomatic contacts (not reflected on algorithm) | |

| | | |
|---|---|---|
| **2. Placement/ housing** | See attached algorithm. | |
| | 2.1<br>House confirmed cases (Group 1) together in a unit in the Bootcamp barracks and isolated. Lift them from isolation 7 days since their first symptom or 3 days following resolution of fever (off antipyretics) and improvement in respiratory symptoms, whichever is later<br>https://www.cdc.gov/coronavirus/2019-ncov/hcp/disposition-in-home-patients.html | |
| | 2.2<br>CDC recommends isolating persons under investigation (PUIs) separately, in single cells, where possible. Cook Co Jail has been attempting to do this, but space is extremely limited with the increasing number of PUIs. Where necessary, CDC recommends cohorting isolated individuals in a large, well-ventilated cell with solid walls and a solid door that closes fully. Therefore, consider housing clinically lower-risk probable cases (Group 3) together in the Bootcamp barracks and isolate as ("the PUI unit"). Consider face masks for this group. Reassign bunks to allow 6 feet or more in all directions. Ensure bunks are cleaned thoroughly if assigned to a new occupant. Arrange bunks so that individuals sleep head-to-foot to increase distance between them.<br><br>Given the high rate of COVID positivity in PUIs tested so far from units with known exposure, consider not testing this group to avoid exposures to healthcare staff and preserve PPE.<br>If testing, and an individual tests positive, transfer to Group 1.<br>If testing, and an individual tests negative, isolate them for the remainder of their isolation period away from all COVID positives and PUIs.<br>Lift them from isolation 7 days since their first symptom or 3 days following resolution of fever (off antipyretics) and improvement in respiratory symptoms, whichever is later | |
| | 2.3<br>Test clinically higher-risk PUIs for COVID-19 (Group 2) and house separately in cells (e.g. in Division 6) until results are available. While tests are pending, these individuals should wear a face mask if they leave their isolation room or another person enters.<br>If an individual tests positive, transfer to Group 1.<br>If they test negative, continue to isolate in an individual cell or cells of two, until 7 days following their symptom onset or 3 days fever free with resolving respiratory symptoms | |
| | 2.4<br>Immediately isolate and test any inmates with new symptoms but no known exposure (e.g. in Division 6). IDPH has agreed to accept and prioritize these specimens, with a projected turnaround time of 48 hrs. or less. Rapid testing is needed to identify newly affected units | |
| | 2.5<br>Quarantine all asymptomatic inmates from units with confirmed or probable COVID cases or PUIs (Group 4; not on algorithm as not symptomatic). These individuals should not participate in work in the jail. While CDC recommends close contacts of COVID-19 cases should be isolated individually and their least-preferred option is to house quarantined individuals in their regularly assigned housing unit, recognizing the large numbers of close contacts of cases at this time, this may be the only realistic option. Fortunately, the largest affected dorm (Dorm 4) is not at full occupancy. Employing social distancing in these settings and removing individuals at high risk of severe disease would be beneficial | |
| | 2.6<br>Where possible, staff the Bootcamp barracks with COVID-recovered staff and or inmates | |

| | | |
|---|---|---|
| **3. Infection Control** | 3.1<br>All jail staff should have their temperature checked and be screened for symptoms (e.g. cough, shortness of breath) prior to starting their shift | |
| | 3.2<br>Inmates, especially those on quarantine units, should be screened for a fever, cough or shortness of breath each shift | |
| | 3.3<br>Any potentially aerosol generating procedures (e.g. CPAP) should be avoided in open units | |
| | 3.4<br>Outside of performing aerosol generating procedures (e.g. nebulizer treatment, intubation; most likely to be conducted in Cermak Health Center), N95s masks are not recommended and should be preserved for healthcare personnel conducting aerosol generating procedures | |
| | 3.5<br>Staff having direct physical contact with confirmed or probable COVID-19 patients or PUIs should wear eye protection (goggles or face shield), a surgical mask, latex gloves, and a disposable medical gown | |
| | 3.6<br>Staff entering the COVID unit but not having physical contact with patients (e.g. sitting at observation desk) should wear a surgical mask and gloves | |
| | 3.7<br>Staff entering the PUI unit but not having physical contact with patients (e.g. sitting at observation desk) should wear a surgical mask and gloves | |
| | 3.8<br>Staff entering quarantined units, including physical contact with any asymptomatic inmate, should wear a surgical mask and gloves (if inmate is identified as symptomatic, full PPE should be used as above, as they become a PUI) | |
| | 3.9<br>All staff on any unit, but especially those requiring a surgical mask (i.e. any unit on isolation or quarantine), should have easy access to alcohol-based hand rub immediately outside of the unit so it can be used immediately after removing their gloves and surgical mask (e.g. on RTU, the alcohol-based hand rub outside the unit was only available in the dispensary behind a locked door) | |
| | 3.10<br>Staff should be trained repeatedly on the correct use of PPE (we saw numerous examples of staff touching the outside of their masks and not washing their hands, even though training had occurred. In this instance, masks will act as a mechanism of transmission, rather than a barrier to transmission) | |
| | 3.11<br>Staff should be cohorted to work in specific epidemiological contexts, e.g. rotating staff between isolation units, quarantine units and unaffected units should be avoided | |
| | 3.12<br>Inmates from different units should not mingle in central workspace (e.g. laundry) | |
| | 3.13<br>Quarantine all new intakes for 14 days before they enter the facility's general population away from all COVID isolation and quarantine units | |

| | | |
|---|---|---|
| **4. Release** | 4.1<br>Every inmate sharing a unit with a COVID case can be epidemiologically considered a close contact of a case, equivalent to a household contact. High attack rates in household contacts have been documented (>10%). Decompressing the jail would allow large accommodation units to be split into smaller units, and therefore reduce the number of close contacts of each future case. | |
| | 4.2<br>We recommend considering mass release of inmates to decompress the jail for urgent public health reasons (see 2.2 and 2.5 for illustrations of the need to decompress the jail) | |
| | 4.3<br>First, prioritize the unexposed for immediate release on public health grounds | |
| | 4.4<br>Second, consider the release of high risk inmates (e.g. aged over 65, underlying comorbidities) as long as appropriate follow-up and isolation (i.e. stable housing and telephone contact) can be arranged https://www.cdc.gov/coronavirus/2019-ncov/specific-groups/people-at-higher-risk.html | |
| | 4.5<br>Given the necessity of ensuring controlled release, no inmate should be released without an exit interview (including temperature check) and stable housing being arranged by the criminal justice system. CDPH should be notified during business hours of the release of any COVID positive inmate or PUI with unstable housing | |