**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **ANTHONY MAYS, individually and on behalf of a class of similarly situated persons; and JUDIA JACKSON, as next friend of KENNETH FOSTER, individually and on behalf of a class of similarly situated persons,** | ) ) ) ) ) ) ) | |
| **Plaintiffs-Petitioners,** | ) ) | |
| **vs.** | ) ) | **Case No. 20 C 2134** |
| **THOMAS DART,** | ) ) | |
| **Defendant-Respondent.** | ) ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

MATTHEW F. KENNELLY, District Judge:[1]

      Anthony Mays and Kenneth Foster, both of whom are detained at Cook County

Jail while awaiting trial on criminal charges, have sued Cook County Sheriff Thomas

Dart, who operates the Jail, on behalf of a class of similarly situated persons. Mays and

Foster allege the Sheriff has violated the constitutional rights of persons detained at the

jail by failing to provide them with reasonably safe living conditions in the face of the

current coronavirus pandemic. They assert claims under 42 U.S.C. § 1983 and for writs

of habeas corpus under 28 U.S.C. § 2241.

      On April 9, 2020, the Court granted the plaintiffs' motion for a temporary

---

[1] Judge Kennelly is addressing this matter as emergency judge pursuant to paragraph 5 of Second Amended General Order 20-0012.

restraining order in part. The Court directed the Sheriff to: (1) establish and implement, within two days' time, a policy requiring prompt coronavirus testing of detained persons with symptoms consistent with coronavirus disease; (2) within two days' time, eliminate the use of "bullpens" to hold groups of new detainees during the intake process; (3) begin to provide inmates and staff, within one day, soap and/or hand sanitizer sufficient to enable them to frequently clean their hands, and sanitation supplies sufficient to enable them to regularly sanitize surfaces in areas used in common; (4) establish and carry out, within two days' time, a policy requiring sanitation of all such surfaces between each use; and (5) within three days' time, distribute facemasks to all detained persons quarantined due to their exposure to a person exhibiting symptoms consistent with coronavirus disease. The Court overruled the plaintiffs' request for additional temporary relief, including a mandate for implementation of "social distancing" throughout the Jail and to provide facemasks to every detained person. The Court also concluded that the plaintiffs seeking habeas corpus relief had failed to exhaust available state court remedies.

The plaintiffs have now moved for entry of a preliminary injunction and other relief. They again seek writs of habeas corpus, based on newly discovered facts that they contend provide a basis to excuse their failure to exhaust state court remedies. They also seek conversion of the temporary restraining order to a preliminary injunction, and they again request an order requiring implementation of social distancing throughout the Jail, as well as transfer of detained persons from the Jail to other locations within the Sheriff's control, including electronic home monitoring. The plaintiffs also request the convening of a three-judge court under the Prison Litigation Reform Act

2

to consider entering a "prisoner release order" within the meaning of that statute.

For the reasons stated below, the Court converts the terms of the temporary restraining order to a preliminary injunction and enters further preliminary injunctive relief regarding social distancing but denies the plaintiffs' other requests for relief.

## Factual Background

The following discussion of relevant facts concerning coronavirus, the Cook County Jail facilities, and the parties' claims and defenses is taken from undisputed facts, the affidavits and documentary evidence submitted by the parties, and the testimony and exhibits offered at the evidentiary hearing held on April 23, 2020.

### A.     The coronavirus pandemic

The rapid global spread of the novel coronavirus has led to a pandemic of extraordinary scale.  The Court's decision on the plaintiffs' motion for a temporary restraining order includes a discussion of the gravity of the public health threat associated with this virus.  *Mays v. Dart*, No. 20 C 2134, 2020 WL 1812381, at *2 (N.D. Ill. Apr. 9, 2020).

Symptoms of the disease caused by the novel coronavirus—what has come to be known as COVID-19, which the Court will refer to as coronavirus disease—include fever, cough, and shortness of breath, and the health effects can be very severe, including serious damage to the lungs and other internal organs, and death.  People who are sixty-five years of age or older and those with certain pre-existing health conditions, including chronic lung disease, moderate to severe asthma, serious heart conditions, diabetes, chronic kidney disease, liver disease, a body mass index of forty or higher, and other conditions have a heightened vulnerability to severe illness if they

3

contract the coronavirus.

The rapid transmission of coronavirus has been attributed to several characteristics. Respiratory droplets containing the virus emitted by an infected person, though coughing or sneezing for example, can travel several feet and may persist in the air for several hours. In addition, because the virus can persist on some surfaces for up to three days, transmission can occur even without physical proximity to an infected person. Moreover, those who contract the virus may be asymptomatic for days or even for the entire duration of the infection but can still transmit the virus to others, making it more challenging to readily identify infected individuals and respond with necessary precautions.

There is currently no known effective treatment for coronavirus disease and no vaccine to prevent people from contracting it. Medical professionals and public health experts agree—and the evidence in this case demonstrates beyond peradventure—that the only way to curb the spread of the virus is through a multi-faceted strategy that includes testing to identify those who have been infected; isolation of those who test positive or develop symptoms consistent with the disease; quarantining those who may have come into contact with the virus; frequent sanitation of surfaces; frequent handwashing; and use of personal protective equipment (PPE) such as facemasks. And a key tactic recommended by public health experts to curb the spread of coronavirus disease has been to keep people apart from each other—what has come to be known as "social distancing." The Centers for Disease Control's Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and

Detention Facilities ("CDC Guidelines"),[2] defines social distancing as "the practice of increasing the space between individuals and decreasing the frequency of contact to reduce the risk of spreading a disease (ideally to maintain at least 6 feet between all individuals, even those who are asymptomatic)."  *Id.* at 4.

Social distancing has effectively been mandated by most state governments as a critical strategy in combatting the pandemic.  Here in Illinois, the state has been under a statewide stay-at-home order first imposed by Governor J.B. Pritzker effective March 20, 2020, the goal of which is to limit person-to-person contacts to curb transmission of the virus.  Activities not deemed "essential" have been shut down.  People have been strongly urged, and in many situations directed (by governments, employers, commercial establishments, and so on) to maintain space between themselves and others.  In addition, the wearing of PPE, primarily facemasks, has been strongly advised and now required in some situations, particularly when people may come into contact with others.

The effect of the stay-at-home orders imposed in Illinois and most other states, along with advice by national officials to limit contacts and group activities, has been dramatic: schools have been closed; commercial establishments and workplaces have ceased operations, resulting in massive job losses; public events have largely been cancelled; and access to public spaces has been limited or barred entirely.  Entire sectors of the national economy have slowed to a snail's pace.  Society has paid a very high price to curb the spread of this highly contagious virus.

---

[2] The Guidelines were issued on March 23, 2020 and are available at https://www.cdc.gov/coronavirus/2019-ncov/downloads/guidance-correctional-detention.pdf.

**B.      Operation of the Cook County Jail**

The Sheriff runs the Cook County Jail.  As the Court stated in its written decision on the plaintiffs' motion for a temporary restraining order (TRO), the Jail is "a very large physical facility—actually a campus of separate physical facilities—whose population, if one considers including both detainees and staff, is the size of a small (but not all that small) town."  *Mays*, 2020 WL 1812381, at *1.  Managing the Jail is extraordinarily challenging because of the size of its population and physical facilities, the diverse needs of the detainees, the Sheriff's public safety obligations, and his obligations to the criminal justice system.  The Sheriff's public safety obligations require him to consider the appropriate custodial conditions for each detained person.  As the Court has noted, the Jail's population "runs the gamut from persons with lengthy criminal records who are accused of committing violent crimes to non-violent offenders in custody for the first time who, perhaps, remain in custody only because they and their families were unable to post bond money."  *Id.*  And the Sheriff's obligations to the people in his custody, most of whom are detained awaiting trial on crimes for which they are therefore entitled to a presumption of innocence, require him to provide care sufficient to account for each individual's physical and mental health conditions.  This is no small task, particularly given that populations in custody are statistically more likely to have adverse health conditions, both physical and mental.

Adding an infectious disease outbreak to these conditions further complicates the difficult challenge of managing the Jail.  The very nature of the Jail's setup and day-to-day operations facilitates rapid transmission of communicable diseases like the one caused by the coronavirus.  First, the Jail's physical facilities are designed to

accommodate large populations, all densely housed, and many in congregate settings. In particular, the Jail has many so-called "dormitory" units, which in normal times may house as many as hundreds of detained persons in a single room with closely-spaced bunk beds.

Second, the Jail is a closed environment with many spaces used in common. Persons detained there—even those housed in single-occupancy cells—do not have individual bathing facilities; toilets are typically used in common; they eat in groups under normal circumstances; and they come into contact with each other and with correctional officers in other common areas. And even when confined, detainees are in close proximity, in adjoining cells and in tiers that use a common ventilation system.

Third, the routine operations of the Jail require high levels of movement of people. Detained persons must be escorted from their cells to common areas like shower and bathroom facilities. In normal times they are escorted to court hearings and recreational areas (all or nearly all of which have come to a stop). Finally, large numbers of staff personnel, as well as vendors, move in and out of the Jail and its various areas on a daily basis. In doing so, these individuals have contact with other members of the community at large, who themselves may have contracted coronavirus. Thus staff members and contractors potentially can carry the virus both into and out of the Jail.

Limiting exposure to the coronavirus in the Jail is therefore a significant challenge. Infection rate data reflects that it has been challenging to effectively curb transmission of the highly infectious coronavirus in the setting of the Jail. As of April 6, 2020, the infection rate within the Jail was an order of magnitude higher than the rate of

infection in Cook County.  *Mays*, 2020 WL 1812381, at *8.  And on April 8, 2019, the New York Times reported that, at that time, the Jail was the largest-known source of coronavirus infections in the United States.  See Timothy Williams and Danielle Ivory, *Chicago's Jail Is Top U.S. Hot Spot as Virus Spreads Behind Bars* (April 8, 2020), N.Y. Times, https://www.nytimes.com/2020/04/08/us/coronavirus-cook-county-jail-chicago.html (last updated April 23, 2020).

### Procedural History

**A.    Plaintiffs' suit and motion for a temporary restraining order**

The plaintiffs, Anthony Mays and Kenneth Foster, are detained at the Cook County Jail and have been housed on tiers in which at least one person had been infected with the coronavirus.  On April 3, 2020, they sued the Sheriff on behalf of themselves and others similarly situated, with allegations stemming from the risks the coronavirus poses to their health.  The plaintiffs seek to represent a class and two putative subclasses.  The class consists of "all people who are currently or who will in the future be housed in the Cook County Jail for the duration of the COVID-19 pandemic."  Compl. (dkt. no. 1) ¶ 60.  "Subclass A consists of all people who, because of age or previous medical conditions, are at particularly grave risk of harm from COVID-19."  *Id.* ¶ 61.  "Subclass B consists of all people who are currently housed on a tier where someone already tested positive for the coronavirus."  *Id.* ¶ 62.  Mays and Foster both have medical conditions that heighten their risk of serious health consequences from an infection by the coronavirus.

In their complaint, the plaintiffs alleged that because the Sheriff was not implementing measures to control the spread of the coronavirus at the Jail, especially

those recommended in the CDC Guidelines, the conditions in the Jail facilitated rapid transmission, putting the health of detained persons at great risk.  In support of this contention, the plaintiffs attached several affidavits to their complaint from individuals who had spoken to persons detained at the jail.  These affidavits reported the following conditions at the Jail in late March and early April:

- detained persons were not receiving soap, hand sanitizer, or facemasks;

- facemasks that they made for themselves out of cloth were being confiscated;

- detainees were being housed in bunks or beds that were between two and four feet apart from each other;

- many detained persons were living in dormitory-style housing, where dozens of individuals shared a single room;

- detained persons were being held at intake in so-called bullpens, where numerous detainees were held together for extended periods in a crowded cell; and

- the Jail's staff was not regularly sanitizing common surfaces or providing detainees with cleaning supplies to do this themselves.

The day they filed suit, the plaintiffs moved for the issuance of writs of habeas corpus for the members of subclass A and for a TRO or preliminary injunction on behalf of the class as a whole, requiring the Sheriff to take action to control the rapid spread of the coronavirus at the Jail.  The plaintiffs also moved to certify their proposed class and subclasses.

After an extended hearing on the motion for a temporary restraining order, the Court issued a written decision on April 9, 2020 denying the request for writs of habeas

corpus and partially, but not entirely, granting the motion for a TRO.  *Mays*, 2020 WL 1812381, at *6, 14–16.  In ruling on this motion, the Court considered the affidavits from medical experts, individuals who had spoken to detainees, and those from Jail officials and employees.  The Sheriff had raised a hearsay objection to the Court's consideration of the affidavits from individuals who had spoken to detainees, but hearsay may be considered in ruling on a motion for a TRO or for a preliminary injunction.  *See SEC v. Cherif*, 933 F.2d 403, 412 n.8 (7th Cir. 1991).[3]  The TRO directed the Sheriff to take the following actions: (1) establish and implement a policy requiring prompt testing of symptomatic detainees, and—if medically appropriate and feasible based on the availability of testing materials—detainees who may have been exposed to the virus; (2) implement social distancing during intake and suspend the use of bullpens to hold detained persons awaiting intake; (3) provide all detained persons with adequate soap or sanitizer for hand hygiene; (4) provide staff personnel and detained persons with adequate cleaning supplies to regularly sanitize surfaces and objects, including in high-traffic areas such as shower facilities; (5) establish a policy requiring frequent sanitation of these areas; and (6) provide facemasks to all detained persons in quarantine.  *Mays*, 2020 WL 1812381, at *14–15.

The Court denied several of the plaintiffs' requests for relief.  They sought an order mandating social distancing throughout the facility, not just at intake, arguing that

---

[3] "Given its temporary nature, 'a preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits.'"  *FTC v. Lifewatch Inc.*, 176 F. Supp. 3d 757, 761 (N.D. Ill. 2016) (quoting *Univ. of Tex. v. Camenisch,* 451 U.S. 390, 395 (1981)).  The same, of course, is true of a TRO.

this was one of the critical outbreak control measures outlined in the CDC Guidelines. *Id.* at \*10. The Court declined to mandate social distancing beyond intake, reasoning that there are space constraints at the Jail and the Guidelines expressly recognized that social distancing may not be feasible in a correctional facility. *Id.* The Court also declined the plaintiffs' request for direct screening of medically vulnerable detainees before they show symptoms of infection, also because the CDC Guidelines did not mandate this. *Id.* In addition, the Court denied the plaintiffs' request to require the Sheriff issue facemasks to every detained person, as the CDC Guidelines recommended this only for those who had come into contact with a symptomatic individual. *Id.* at \*12, 15. Finally, the Court declined the plaintiffs' request to transfer the members of subclass B to a safe facility or other forms of custody, because the plaintiffs had failed to show that the other protective measures that the Court had ordered would be inadequate to protect detained persons from the health risks associated with the coronavirus outbreak. *Id.* at \*15. The Court also declined subclass A's request for emergency writs of habeas corpus, concluding that they had failed to exhaust available state court remedies. *Id.* at \*6.

**B.    The Sheriff's response and current conditions at the Jail**

      **1.    April 13 status report**

On April 13, pursuant to the Court's direction, the Sheriff filed a status report regarding compliance with the TRO. First, with respect to the directive to test symptomatic detainees, the Sheriff reported that Cermak Health Services, an arm of Cook County that provides healthcare to persons detained at the Jail, maintains the

supplies for medical testing and actually administers such tests.[4]  According to the Sheriff, Cermak had determined that it would not be medically appropriate to test all detained persons in quarantine.  The Sheriff therefore instructed his personnel to isolate and refer symptomatic detainees to Cermak for further evaluation and testing.

As to the order to maintain social distancing during the Jail's intake process, the Sheriff implemented a modified procedure that maintains six feet of distance between all detained persons awaiting intake and provides them with facemasks.  Use of the bullpens was discontinued.

Regarding the order to distribute facemasks, the Sheriff stated that he had acquired and on hand sufficient surgical masks to distribute to all quarantined detainees and employees and that he was continuing his efforts to obtain additional masks. Additionally, the Sheriff was in the process of procuring cloth masks that would be available to any detained person who requested one.

The Sheriff further reported that on April 9, he delivered approximately 28 gallons of hand sanitizer and 980 bars of soap for distribution in the Jail.  He also ordered distribution of soap and sanitizer twice per week going forward.  The Sheriff noted concern that some detained persons may use the soap or hand sanitizer as a weapon and that some might try to consume hand sanitizer.  These considerations required the Sheriff to determine on a detainee-by-detainee basis whether to distribute hand sanitizer or soap.

With respect to the sanitation-related directives in the TRO, the Sheriff reported

---

[4] From a chain-of-command standpoint, Cermak is under the control of Cook County, not the Sheriff.

that he had distributed cleaning supplies to staff and detained persons on April 10. He also issued a sanitation policy to ensure that frequently touched areas such as doorknobs and phones are sanitized between uses. He issued another a policy requiring each living unit officer to ensure that surfaces are routinely cleaned and sanitized during the officer's shift. Additionally, the Sheriff stated that he was planning to hire an independent contractor to professionally clean the Jail.

### 2.  April 17 updates from the Sheriff

On April 17, three days after the Sheriff submitted his status report, officials from the Chicago Department of Public Health (CDPH), including one designated as a CDC epidemic intelligence service officer, inspected the Jail. These officials had toured the Jail roughly a month prior, on March 20, and issued recommendations for controlling COVID-19 at the Jail. A report from this inspection, dated March 27, was introduced in connection with the preliminary injunction hearing held on April 23. The March 27 recommendations from the CDPH included screening and classifying inmates based on their level of risk associated with coronavirus disease and "considering mass release of inmates to decompress the jail for urgent public health reasons." Levin Dec. (dkt. no. 70) at 10.

A report from the more recent April 17 had not yet been received by the Sheriff as of the April 23 hearing. The Sheriff therefore submitted statements and testimony from two Jail officials who participated in the April site visit: Rebecca Levin, a senior public health advisor to the Sheriff, and Michael Miller, the Executive Director of the Cook County Department of Corrections. Levin stated that during the April 17 inspection, the officials commended the Jail's efforts to reduce density in housing units.

13

Miller testified that the officials visited two of the dormitory units—Dorm 4, the largest dormitory unit, and Dorm 2—and commented positively about the organization and cleanliness of these spaces.

In a declaration dated April 17, Miller also provided an update to the Sheriff's April 14 status report on efforts to control the coronavirus outbreak at the Jail.  He reported that each person detained in a quarantine tier was receiving a new surgical-type facemask each day.  Miller anticipated that at its current rate of consumption of masks, the Sheriff would exhaust his supplies on June 7, 2020.  He added that, "as supplies permit," the Sheriff planned to distribute masks to detainees who are not on quarantine tiers.  Miller Dec., Def.'s Resp. to Renewed Mot. for Prelim. Inj., Ex. E (dkt. no. 62-5) ¶ 24.

Although the TRO did not require the Sheriff to implement social distancing beyond modifying his intake procedures, Miller reported in his April 17 affidavit that the Sheriff had engaged in a significant effort to increase social distancing at the Jail. Specifically, he reported the following measures: opening previously closed divisions to better distribute detainees across available space; converting housing on 175 tiers to single-occupancy cells only; limiting dormitory units to fifty percent of capacity, with the exception of detainees in medical or "restricted housing," *id.* ¶ 12; and limiting the number of detained persons released into dayroom common areas to half the number assigned to that area.  He reported that beds in dormitory units have been spaced so that they are at least six feet apart, and if beds are bolted to the floor, then detained persons are distributed so that there is six feet of distance between occupied beds.

Attached to Miller's declaration was a spreadsheet with the occupancy rates as of

14

April 17 on each tier of the Jail, including units in Cermak and Division 8, the Residential Treatment Unit (RTU). Miller later explained that the RTU provides twenty-four-hour access to medical care and houses people who have medical needs (though the level of need was not described). This spreadsheet showed, apparently contrary to the statement in Miller's declaration, that some dormitory units were still occupied above fifty percent capacity. For example, Tier D of Dorm 1 in Division 2, which was not then under quarantine, was occupied at eighty-one percent capacity. In addition, many dormitory units in the RTU, Division 8, were occupied at nearly full capacity. For example, Tier 2F was occupied at ninety-seven percent capacity, and Tier 2G was occupied at one hundred percent capacity. (Also, Tiers 2Q and 2R in Division 6 were occupied at sixty percent and sixty-three percent capacity, respectively. They are not labeled as dormitory units in the spreadsheet, but they each have a forty-person capacity.)

The Sheriff submitted additional evidence reflecting that his ability to implement social distancing had increased by virtue of, among other things, a significant expansion of the electronic home monitoring program. He offered a chart showing a steady decline in the Jail's daily population over the previous month, including a reduction of roughly 230 detainees between April 9, when the Court issued the TRO, and April 17. Another chart showed a steady increase in the jail's electronic home monitoring population over the previous month, with an increase of approximately 300 detainees on electronic home monitoring between April 9 and April 17. The Sheriff also offered evidence, however, that utilization of this program had been extended to its outside limits, or nearly so, in light of the apparent exhaustion of program vendor's supply of

15

monitoring equipment.

### 3. Plaintiffs' reports regarding conditions at the Jail

In anticipation of the preliminary injunction hearing, the plaintiffs submitted a number of affidavits identifying problems or deficiencies in the Sheriff's compliance with the directives in the TRO. These affidavits were from individuals who had spoken to detained persons between April 14 and April 18, and they described these persons' current experiences at the Jail. According to these affidavits, symptomatic individuals are not being tested. Additionally, although facemasks are now being distributed, detainees reported, it is not happening regularly.

The detained persons discussed in the affidavits also reported inadequacies in cleaning and sanitation practices at the Jail. Several stated that detained persons lack cleaning supplies for their individual cells and that some common spaces lack cleaning supplies as well. And even where cleaning solution is available, they reported, cloths or wipes have not been provided to enable use of the solution. A number of detainees also reported that commonly used objects, such as telephones, are not being sanitized between uses. In addition, they stated, the Jail's staff has not been cleaning cells, and some common areas are cleaned only every other day, meaning they stand uncleaned despite multiple uses and repeated touching by numerous detained persons and potentially staff personnel.

The detainees also reported an inability or great difficulty in practicing social distancing. In common areas where detained persons eat, several stated, it has been impossible to practice social distancing due to the arrangement of picnic-style benches. Tape or paint markings have been placed on the floor in some dayrooms to designate

appropriate space for social distancing, but, they reported, some correctional officers have mocked the practice of social distancing, and many have failed to enforce it. By way of example, detained persons have been using, at the same time, telephones that are spaced only two feet apart.

## C.    The renewed preliminary injunction motion

In their renewed motion for a preliminary injunction, filed on April 14, 2020, the plaintiffs contend that the Sheriff's efforts in response to the TRO "have not worked and cannot work to abate the spread of the disease" caused by the coronavirus. Pls.' Renewed Mot. for Prelim. Inj. (dkt. no. 55) at 4. The plaintiffs focus primarily on two inadequacies of the Sheriff's efforts to date: failure to identify and transfer medically vulnerable detainees out of the Jail, and insufficient social distancing, which, the plaintiffs contend, "is the *only* way to prevent intolerable risk to [their] health and lives." *Id.* at 2.

The plaintiffs request the following in their renewed motion for a preliminary injunction. First, they ask for a preliminary injunction ordering the Sheriff to mandate social distancing throughout the Jail. In support of this request, the plaintiffs have submitted the declaration of Dr. Gregg Gonsalves, an epidemiologist at the Yale School of Medicine and School of Public Health, who opined that social distancing is "the only way to prevent further, essentially uncontrolled, spread of the virus" in the Jail. *Id.*, Ex. G (dkt. no. 55-7) ¶ 29. In the alternative, the plaintiffs argue that if the Court concludes that additional social distancing is not possible, an order should be entered requiring the Sheriff to transfer detained persons to another safe facility, or the Court should request convening a three-judge panel with the authority to order the release of detainees, as

17

required under the Prison Litigation Reform Act . *See* 18 U.S.C. § 3626(a)(3)(B). In addition, subclass A has renewed its request for issuance of emergency writs of habeas corpus.[5]

In response, the Sheriff argues that he has sufficiently addressed the risks to the health of persons in his custody, in accordance with constitutional requirements, through the protective measures he has already implemented; his efforts were consistent with the recommendations in the CDC Guidelines; and he has taken substantial steps to implement social distancing. The Sheriff also appears to contend that further implementation of social distancing was not realistically possible in the Jail at this time. In response to the plaintiff's contention that the Sheriff has not adequately abated the risk of infection to medically vulnerable detainees, he argues that he cannot screen such individuals, because he does not have access to detained persons' health information. Furthermore, the Sheriff has explained, he already refers all medical complaints and issues to Cermak, and nothing more on his part is required to satisfy the requirements of the Fourteenth Amendment.

In their reply brief, the plaintiffs acknowledge that the Sheriff has taken "dramatic steps" to increase social distancing in the Jail. Pls.' Reply in Supp. of Renewed Mot. for Prelim. Inj. (dkt. no. 64) at 6. They contend, however, that these efforts have been insufficient to remedy the constitutional violation. They reaffirm their request to immediately convene a three-judge court to determine whether to release detained persons. They also reaffirm their request for a preliminary injunction mandating social

---

[5] The plaintiffs also sought expedited discovery, but that largely became a moot point in light of later developments, so the Court does not discuss the request here.

distancing throughout the Jail as well as transfer of detained persons to "some other safe location," *id.* at 2, and they ask the Court to issue such an order contemporaneously with a request to convene a three-judge panel. Additionally, the plaintiffs ask the Court to convert the TRO to a preliminary injunction.

### 1. Hearing on motion for preliminary injunction

The Court held an evidentiary hearing on the preliminary injunction motion by videoconference on April 23, 2020. In light of the unusually compressed time schedule necessitated by the development of the coronavirus pandemic and increases in confirmed coronavirus infections at the Jail, the Court determined that it would consider the parties' affidavits (giving due consideration to issues regarding weight) and would permit each side to call one live witness. Executive Director Miller testified as the Sheriff's witness; he offered, among other things, updates to his April 17 affidavit regarding the Sheriff's efforts to manage the coronavirus outbreak.

With respect to screening medically vulnerable detainees, Miller testified that the Jail was doing what it could based on the limited medical information that it has available. Miller explained that Cermak conducts a medical evaluation of every detained person at intake, and based on this, it transmits information called "alerts" to the Jail to inform housing decisions based on medical needs. These alerts do not contain any diagnostic information; rather, they simply specify the accommodations necessary to address a medical need. For example, an alert from Cermak may inform the Jail that a detained person should be housed on a bottom bunk, but it will not state the medical reason for this determination. Miller testified that Cermak has not "yet" created an alert for those who have heightened risk of severe health consequences

19

from a coronavirus infection.  Without such an alert, Miller explained that the Jail is

conducting coronavirus screening based on any medical information about a detained

person that it already has, including existing alerts.

Miller also reported that the Jail had made additional efforts to implement social

distancing.  To encourage persons housed in dormitory units to stay at their beds rather

than congregating in common spaces, the Jail has been providing them with free books,

writing pads, and puzzle books.  In addition, Miller stated, detainees throughout the Jail

are now released to use shared shower facilities one at a time.  In common areas, six-

foot intervals have been demarcated with spray paint markings.  Correctional officers,

Miller said, have been trained to enforce social distancing by first communicating to

detained persons the importance of maintaining the distance, and if that fails, using

disincentives such as loss of microwave privileges.  Miller acknowledged that despite

this, detainees have not always been practicing social distancing and that they continue

to congregate in common spaces such as eating areas.

Miller reported that the Jail's staff has worked diligently to increase the Jail's

ability to reduce the density of the population in its housing units.  Over the past month,

he stated, the Jail has opened up several hundred additional housing units.  Between

April 17 and April 23, the Jail doubled the number of detainees housed in single-

occupancy cells, and this effort included moving 260 detainees out of double-occupancy

cells.  Miller stated that there are currently no detainees housed in double-occupancy

cells without a medical or security reason.  Most of those who are still in double-

occupancy cells, he said, are either housed by Cermak or are designated by Cermak as

requiring placement in a double-occupancy cell due to a health condition or possible

20

suicide risk. Miller did not explain why a health condition might require placement in a double-occupancy cell. Some of those in double-occupancy cells have been placed there, he said, due to disorderly conduct—though, again, he did not explain how double-celling serves a security purpose in such situations. Miller acknowledged on cross examination that social distancing is impossible for persons housed in double-occupancy cells.

Miller also reported that roughly 1,000 detainees are still being housed in dormitory units. He stated that approximately seventy percent of that population must remain in those units due to a medical need, though he did not explain this. As for the remainder, Miller cited one possible non-medical reason that some detainees must remain in dorm units: they are housed there in accordance with requirements of the Prison Rape Elimination Act. He explained that it would be "very challenging to try to separate those individuals and keep them protected as we need to under the PREA Act so that those individuals are not vulnerable in other areas while they're incarcerated." April 23, 2020 Tr. at 46–47. Again, however, Miller did not explain this.

Miller supplemented his testimony with an updated spreadsheet showing the occupancy of the Jail's housing units as of April 23. This spreadsheet showed that the capacity of almost every tier that was not in Cermak, the RTU, or under quarantine was fifty percent or below. However, in Division 2, Tier D1-D was at eighty-one percent capacity, and Tier D4-R was at fifty-nine percent (Tier D3-B was right at fifty percent). A number of Cermak and RTU tiers had occupancy rates as high as ninety-seven or one hundred percent.

On cross examination, the plaintiffs' counsel asked Miller about the high

occupancy levels in certain Cermak and RTU tiers reported in the April 17 and April 22 spreadsheets. Miller explained that Cermak needed to house those individuals together to be able to provide them with access to care at all hours of the day or night. Miller acknowledged that social distancing was not possible for those housed in the Cermak and RTU tiers.

Plaintiffs' counsel also asked Miller about a high occupancy rate listed in the April 17 spreadsheet for a tier (referenced above) that was not in Cermak, the RTU, or under quarantine: Tier D of Dorm 1 in Division 2, which was then at eighty-one percent capacity. The April 22 spreadsheet showed that the dorm was still at the same capacity. Miller stated: "There's another security level and/or issue with having this many people on this tier that we've had to abide by." *Id.* at 31. He did not clarify the nature of the security issue. Miller acknowledged that social distancing was not possible for detainees on that tier.

When the Court asked Miller if there was still room at the Jail to move more detainees out of dorms and into cells, Miller responded, "I do have a plan in my back pocket." *Id.* at 57. He explained that he was working on moving people out of Dorms 1, 2, and 3. He added that the Jail is considering reconfiguring housing arrangements on tiers for detainees who are women to see if there is a way to create more capacity, presumably to disperse the much larger population of detainees who are men.

As for cleaning and sanitation of common areas, Miller reported that detainees have been given the supplies they need to do sanitation; he attributed shortfalls in sanitation to their own behavior. For example, he stated, at each microwave stations and shared showers and toilets, detained persons have been provided cleaning solution

so that they can sanitize the facility prior to use.

Finally, Miller stated, to ensure implementation of its response measures, such as sanitation of common areas or use of PPE, the Sheriff has deployed "audit teams" that oversee these efforts. For example, the Jail has a PPE audit team that patrols PPE use and educates staff members and detained persons who are not using PPE properly.

Plaintiffs called as their hearing witness Dr. Homer Venters, a medical doctor with over a decade of experience in correctional health. Dr. Venters is the former Deputy Medical Director of the New York City Jail Correctional Health Service, a position in which he oversaw care of detainees and medical policies governing care in New York City's twelve jails. He had previously submitted a declaration along with plaintiffs' preliminary injunction reply brief. At the hearing, he testified that, in his view, the Jail's coronavirus response efforts have three key deficiencies: (1) lack of a cohesive coronavirus response plan; (2) failure to screen for individuals at higher risk of experiencing severe health consequences from a coronavirus infection; and (3) insufficient social distancing.

First, Dr. Venters explained that having a cohesive plan, rather than a collection of policy documents that address different aspects of emergency response, is a critical first step to addressing an outbreak of a communicable disease in a jail facility. He stated that because jails are such complex systems, employing and housing several thousand people, it is not possible to respond to a large outbreak without a single, coordinate plan that coordinates response measures implemented by security, health, and administrative staff.

23

Second, Dr. Venters testified that screening medically vulnerable individuals is critical so that they can immediately receive heightened surveillance of possible symptoms of a coronavirus infection. This heightened surveillance would entail daily checks on those individuals for symptoms such as elevated temperature, shortness of breath, and fatigue.

Third, Dr. Venters emphasized the importance of social distancing in combatting the spread of coronavirus. In his declaration, Dr. Venters stated that medical literature on the coronavirus confirms that social distancing is an essential strategy in controlling an outbreak. During the hearing, he explained that because the coronavirus spreads so easily through respiratory droplets emitted from an infected person, transmission "is greatly impeded by physical distance that we establish through social distancing." *Id.* at 67.

During his testimony, Dr. Venters emphasized that practicing social distancing only in some specific areas of a congregate setting like the Jail is insufficient to curb virus transmission rates. Because people are densely packed in many contexts during routine operations of a detention facility—e.g., sleeping areas, dayrooms, shower facilities, and areas where medication is dispensed—it is critical to implement social distancing throughout the entire facility. Dr. Venters explained that a "lack of a full commitment or complete commitment to social distancing" in the Jail would promote faster transmission of the coronavirus, and more detainees and staff would become "seriously ill." *Id.* at 74. In his declaration, Dr. Venters had observed that the concern about severe health effects is heightened when considering detainees, because they are statistically more likely than the general public to have pre-existing health problems

24

such as cardiovascular disease and cancer.

Dr. Venters also discussed the importance of communication with detainees and staff as a means to ensure that they practice social distancing in an appropriate way. Specifically, he said, to ensure widespread observance of this practice, individuals must understand what social distancing means and why it is important.

On cross examination, Dr. Venters acknowledged that outbreak management in a correctional setting imposes "unique challenges," *id.* at 79, and that the CDC Guidelines are "now the most important set of principles" on response, *id.* at 81. He also acknowledged that the CDC Guidelines provide that social distancing might not always be feasible in a correctional setting.

Dr. Venters testified that although use of single-occupancy cells facilitates social distancing, doing so poses a risk of increasing detainees' psychological distress from social isolation. He also testified that the Jail's practice of housing detainees with mental health conditions in double-occupancy cells is inappropriate, because they cannot practice social distancing at all. Though these two concerns point in opposite directions, Dr. Venters reconciled them by clarifying that, in the current pandemic environment, housing detainees in single-occupancy cells is preferable to double-occupancy because social distancing is critical. To address the psychological toll of isolation in single-occupancy cells, Dr. Venters testified, the Jail should provide opportunities for detained persons to come out of their cells and benefit from engagement with others in common areas while practicing social distancing.

Dr. Venters's testimony largely buttressed the points made by several other medical doctors and epidemiologists in affidavits and declarations that the plaintiffs had

attached to their complaint and briefing of this motion. The plaintiffs' medical, public health, and correctional health experts have analogized the conditions in the Jail to those on cruise ships, which have experienced some of the largest concentrated outbreaks of the coronavirus. Specifically, these experts observe, a jail, like a cruise ship, is an environmentally enclosed, congregate-living setting with high levels of movement of people. Mohareb Dec., Pls.' Reply in Supp. of Renewed Mot. for Prelim. Inj., Ex. B (dkt. no. 64-3) at 5; Gonsalves Dec., Pls.' Renewed Mot. for Prelim. Inj., Ex. G (dkt. no. 55-7) ¶¶ 17, 27; Med. Profs.' Dec., Compl., Ex. B (dkt. no. 1-2) ¶¶ 24, 25, 26.

In particular, Dr. Amir Mohareb, a medical doctor who is a biothreat response expert and an instructor at Harvard Medical School, used the example of the Diamond Princess cruise ship to highlight the importance of social distancing. The Diamond Princess sailed from Japan to Hong Kong in January of this year. After one of its passengers tested positive for the coronavirus in the last week of January, "strict precautions of hand hygiene and cabin isolation were implemented for all crew and passengers." Mohareb Dec. (dkt. no. 64-3) at 5. Despite these efforts, 700 of the people who had been on the ship tested positive for the virus over the course of the following month. This example, Dr. Mohareb, said, reflects that in the context of a congregate living arrangement like a cruise ship, hand hygiene and cabin cell isolation are insufficient to control the transmission of the coronavirus. He stated that a jail, which is similarly a congregate environment, "constitutes an equal or greater risk setting to that of a cruise ship." *Id.*

Dr. Mohareb explained that because respiratory droplets emitted by an infected person can travel up to six feet and be inhaled by another, social distancing is "a

necessary intervention to prevent the spread of infection" from the coronavirus. *Id.* at 3, 6. He emphasized that social distancing is particularly important because an infected person may be mildly symptomatic or not symptomatic at all. Dr. Mohareb also noted that numerous authoritative bodies, including the CDC, the World Health Organization, and the Infectious Diseases Society of America, have recommended social distancing to control the transmission of coronavirus. He added that mathematical modeling supports a conclusion that social distancing is "the primary means by which individuals can be safely protected from the threat of COVID-19." *Id.* at 5.

All of the plaintiffs' expert affidavits emphasized the critical need to implement social distancing in order to meaningfully control the spread of the virus. Gonsalves Dec. ¶ 29 (social distancing is the "only way" to control outbreak); *see also* Rasmussen-Torvik Dec., Pls.' Reply in Supp. of Renewed Mot. for Prelim. Inj., Ex. C (dkt. no. 64-4) ¶ 9. They reiterated Dr. Venters's point that the very design of a correctional facilities promotes transmission of the coronavirus because it densely packs large groups of people together. Dr. Gonsalves stated that although correctional facilities are like cruise ships in that they are enclosed environments, they present an even higher risk of rapid transmission of the coronavirus because of "conditions of crowding, the proportion of vulnerable people detained, and often scant medical care resources." Gonsalves Dec. ¶ 17. In a joint declaration, five medical doctors with experience working in a correctional setting—including three doctors who had worked at the Jail—similarly observed that the "crowded congregate housing arrangements" of jails and prisons promote the transmission of respiratory illnesses like the coronavirus disease. Med. Profs.' Dec. (dkt. no. 1-2) ¶ 24

Beyond providing additional support for the points in Dr. Venters's testimony, the plaintiffs' other medical and public health experts added that the risks of severe health consequences from a coronavirus infection are not limited only to those who have preexisting medical conditions or are over the age of sixty-five. According to Dr. Gonsalves, "young and healthy individuals may be more susceptible than originally thought." Gonsalves Dec. ¶ 5. He reported that in March, the CDC reported that one-fifth of infected people between the ages of twenty to forty-four had been hospitalized. Dr. Mohareb also stated that "a fraction of patients with COVID-19 in all groups go on to develop severe respiratory disease." Mohareb Dec. at 1.

At the conclusion of the April 23 preliminary injunction hearing, the Court extended the TRO, which was set to expire that day, pending its ruling on the motion for a preliminary injunction.

## Discussion

"A preliminary injunction is an extraordinary remedy." *Whitaker ex rel. Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1044 (7th Cir. 2017). A court's determination of whether to issue a preliminary injunction or temporary restraining order involves a two-step inquiry, with a threshold phase and a balancing phase. *Id.* First, the party seeking the preliminary injunction has to make a threshold showing, which has three elements: (1) reasonable likelihood of success on the merits of the claim; (2) irreparable harm to the movant absent preliminary injunctive relief; (3) lack of adequate remedies at law. *Id.* If the movant makes the threshold showing, the court proceeds to the balancing step, in which it determines "whether the balance of harm favors the moving party or whether the harm to other parties or the public

sufficiently outweighs the movant's interests." *Id.*

Because they request relief that changes the status quo or requires the Sheriff to take affirmative action, the plaintiffs are requesting what is sometimes referred to as "mandatory" preliminary injunctive relief. *See Graham v. Med. Mut. of Ohio*, 130 F.3d 293, 295 (7th Cir. 1997); *O'Malley v. Chrysler Corp.*, 160 F.2d 35, 37 (7th Cir. 1947); *cf. Schrier v. Univ. Of Co.*, 427 F.3d 1253, 1260 (10th Cir. 2005) ("[D]etermining whether an injunction is mandatory as opposed to prohibitory can be vexing."). Mandatory preliminary injunctions typically are "cautiously viewed and sparingly issued." *Graham*, 130 F.3d at 295 (quoting *Jordan v. Wolke*, 593 F.2d 772, 774 (7th Cir. 1978)); *see also Knox v. Shearing*, 637 F. App'x 226, 228 (7th Cir. 2016). But "there may be situations justifying a mandatory temporary injunction compelling the defendant to take affirmative action" based on the circumstances, *Jordan*, 593 F.2d at 774, and "the clearest [of] equitable grounds," *W. A. Mack, Inc. v. Gen. Motors Corp.*, 260 F.2d 886, 890 (7th Cir. 1958). At least two courts have recognized the unusual nature of mandatory preliminary injunctions and yet issued them after finding violations of the rights of people in custody during the coronavirus pandemic. *See Barbecho v. Decker*, No. 20-CV-2821 (AJN), 2020 WL 1876328, at *2, 8–9 (S.D.N.Y. Apr. 15, 2020); *Jones v. Wolf*, No. 20-CV-361, 2020 WL 1643857, at *2, 14–15 (W.D.N.Y. Apr. 2, 2020).

In assessing each claim, the Court will address the first threshold requirement for a preliminary injunction: likelihood of success on the merits, which requires showing only a "better than negligible" chance of success. *Whitaker*, 858 F.3d at 1046 (quoting *Cooper v. Salazar*, 196 F.3d 809, 813 (7th Cir. 1999)). Generally speaking, "[t]his is a

29

low threshold," *id.*, but the Court gives the matter greater scrutiny here in light of the fact that plaintiffs are seeking affirmative conduct by the Sheriff.

## A.    Habeas corpus claim

Plaintiffs and subclass A have petitioned for a writ of habeas corpus under 28 U.S.C. § 2241.  The Court first addresses the issue of exhaustion of remedies and then considers subclass A's ability to satisfy the criteria for a representative action.

### 1.    Exhaustion

As the Court concluded in its TRO decision, a petition for a writ of habeas corpus under 28 U.S.C. § 2241 is the appropriate mechanism for a state pretrial detainee to challenge his or her detention.  *Jackson v. Clements*, 796 F.3d 841, 843 (7th Cir. 2015). "Because a pre-trial detainee is not yet in custody pursuant to the judgment of a State court, relief under 28 U.S.C. § 2254 is not available."  *Id.* (internal quotation marks omitted).

Section 2241 has no express exhaustion requirement, but courts apply a common-law exhaustion rule.  *Richmond v. Scibana*, 387 F.3d 602, 604 (7th Cir. 2004). A pretrial detainee must "exhaust all avenues of state relief" before seeking a writ of habeas corpus through a section 2241 action.  *See United States v. Castor*, 937 F.2d 293, 296–97 (7th Cir. 1991).  Although there are exceptions, "the hurdle is high." *Richmond*, 387 F.3d at 604.  In deciding whether an exception applies, courts "must balance the individual and institutional interests involved, taking into account 'the nature of the claim presented and the characteristics of the particular administrative procedure provided.'"  *Gonzalez v. O'Connell*, 355 F.3d 1010, 1016 (7th Cir. 2004) (quoting *McCarthy v. Madigan*, 503 U.S. 140, 146 (1992), *superseded by statute on other*

30

*grounds as recognized in Porter v. Nussle*, 534 U.S. 516 (2002)).  A court may excuse

exhaustion where:

> (1) requiring exhaustion of administrative remedies causes prejudice, due
> to unreasonable delay or an indefinite timeframe for administrative action;
> (2) the agency lacks the ability or competence to resolve the issue or grant
> the relief requested; (3) appealing through the administrative process
> would be futile because the agency is biased or has predetermined the
> issue; or (4) where substantial constitutional questions are raised.

*Id.*

It is undisputed that a state court has the authority to release a pretrial detainee.

A person who is detained in Illinois may challenge his or her detention by seeking

judicial review of his or her bond.  725 Ill. Comp. Stat. Ann. 5/110-6.   On March 23,

2020, in response to an emergency petition filed by the Cook County Public Defender,

the Presiding Judge of the Cook County Circuit Court's Criminal Division issued an

order setting out an expedited bond hearing process that applied to seven designated

classes of detained persons.  Def.'s Resp. to Mot. for TRO, Ex. E (dkt. no. 31-1) at 1–2.

The seven classes included those at an elevated risk of contracting coronavirus due to

their ages or underlying medical conditions—that is, the putative members of subclass

A.  *Id.*  The expedited hearings took place from March 24 through March 27.  *Id.* at 3–5.

Although the expedited hearings do not appear to be currently ongoing, Cook County's

courts are still available for emergency matters, and judges are hearing motions to

review or reduce bail daily at all locations where court is held.  Def.'s Supp. Resp. to

Mot. for TRO, Ex. A (dkt. no. 41-1) at 1.

In the TRO decision, the Court concluded that the plaintiffs—who both were

named as representatives of subclass A—could not show that they exhausted available

state remedies before petitioning for habeas corpus because they did not "contend that

they sought expedited bond hearings or initiated any sort of state proceedings challenging their bonds." *Mays*, 2020 WL 1812381, at *6. The Court declined to excuse exhaustion because it found that the state's existing bond reduction process is "anything but futile"; the plaintiffs did not show that the process is "unduly time-consuming in a way that undermines their claimed constitutional rights"; and they did not show that state courts cannot remedy the type of constitutional violations they raise. *Id.*

After the Court issued its decision, the plaintiffs' counsel learned that Foster had sought release in the Circuit Court of Cook County through an expedited bond hearing. (The plaintiffs do not contend that Mays separately sought release in state court prior to the filing of this lawsuit.) Foster is charged with domestic battery, robbery, and unlawful restraint. Pls.' Renewed Mot. for Prelim. Inj., Ex. F (dkt. no. 55-6) at ECF p. 3 of 17. His bail was set at $50,000, requiring him to post $5,000 to be released, which he is unable to afford. *Id.* In his motion to reduce bond, he described his serious medical conditions and explained that they place him at a heightened risk of becoming critically ill if he contracts coronavirus. *Id.* at ECF p. 4–5 of 17. He also argued that it would violate his constitutional rights to keep him in custody during the coronavirus pandemic. *Id.* at ECF p. 13 of 17. On April 2, 2020, a state trial judge heard and denied Foster's motion. *See id.* at ECF p. 16 of 17.

The plaintiffs argue that Foster has sufficiently presented his request to the state courts and should not be required to do more. They acknowledge that he has not exhausted all avenues of state relief: he could appeal the state court's denial of his motion to reduce his bond, but plaintiffs do not contend that he done so. They argue,

32

however, that the Court should excuse exhaustion based on the futility of an appeal or the Court's equitable authority to excuse exhaustion. They contend that an appeal would take weeks to pursue, making appellate remedies practically unavailable to him in light of the urgency of the coronavirus pandemic and causing an unreasonable delay that would force him to continue to suffer the alleged harm. In support of this contention, they offer an affidavit from Lester Finkle, the Chief of Staff to the Cook County Public Defender, who explains the procedure for interlocutory appeals of denials to modify bail. Pls.' Renewed Mot. for Prelim. Inj., Ex. C (dkt. no. 55-3). Under Illinois Supreme Court Rule 604(c), before a defendant can file such an appeal, he must file a verified motion in the trial court providing certain information about himself. *Id.* ¶ 2. Only after the trial court denies the verified motion can the defendant file an appeal. *Id.* The affidavit submitted by the plaintiffs reflects that this process typically takes two to four weeks. *Id.* ¶ 5. After that, if the appellate court denies the defendant's appeal, he can seek discretionary review in the Illinois Supreme Court. *Id.* ¶ 3. Based on this information, the plaintiffs argue that their state-court remedies are futile or practically unavailable and that requiring them to pursue these remedies would unfairly prejudice them.

The plaintiffs' contentions are not persuasive. Their only evidence, Finkle's affidavit, describes how long such an appeal would take under ordinary circumstances. But here we are not dealing with not ordinary circumstances. The affidavit does not adequately show how the state appellate process would be expected to work for a medically vulnerable detainee claiming that due to a global pandemic that has infiltrated the Jail, he faces immediate risk of serious health consequences unless his bail is

reduced. We know the state courts are capable of dealing with emergency requests of this type promptly and efficiently; Cook County trial court judges dealt quickly and efficiently with hundreds of such requests in late March, and they continue to do so now. There is no reason to believe that the Illinois Appellate Court would treat such an appeal as an ordinary, run-of-the-mill bail issue and would refuse to deal with it promptly. Although a court may excuse exhaustion in the unusual case where a state process would cause an unreasonable delay, *see, e.g.*, *Gonzalez*, 355 F.3d at 1016, the plaintiffs have not established that this is so in the present situation.

The plaintiffs also contend that the existing bond review processes provide no effective remedy for the claims that the class members advance in this case. Specifically, they contend that the Illinois statute governing bail, 725 Ill. Comp. Stat. Ann. 5/110-5, does not require state courts to consider a detained person's medical health in deciding whether to set or reduce the amount of bail and that state judges making those decisions would not be expected to consider the medical risks at the Jail. But they point to no evidence that state courts are not *permitted* to consider detained persons' medical conditions, let alone that state courts reviewing bonds are not actively considering detained persons' medical conditions in light of the coronavirus pandemic. To the contrary, the evidence in the record suggests that state courts *are* considering the medical dangers the coronavirus presents to detained persons. As the Court indicated in its TRO decision, between early March and early April 2020, the Jail's population decreased by over 1,175 detainees, *Mays*, 2020 WL 1812381, at *6; since then, the population has decreased by at least 300 more detainees, *see* Def.'s Resp. to Renewed Mot. for Prelim. Inj., Ex. A (dkt. no. 62-1) at 1. An affidavit submitted by the

plaintiffs reflects that this reduction in the Jail's population has occurred, at least in part, because state court judges have granted bond reductions. *See* Pls.' Renewed Mot. for Prelim. Inj., Ex. B (dkt. no. 55-2) ¶ 3 (state courts released 719 detainees through an expedited process for bond reconsiderations in light of the coronavirus pandemic). In short, the contention that state courts cannot or will not consider detained persons' medical conditions in bond review proceedings is unsupported. Accordingly, the Court concludes that the plaintiffs have not shown that the state courts do not provide an effective remedy for detained persons with medical conditions that place them at a high risk of severe illness or death if they contract coronavirus.

The plaintiffs also appear to argue that the state courts cannot provide an adequate remedy because, they contend, unlike the federal habeas claims in this case, state courts can consider factors other than medical need. That contention is based on an erroneous premise, which the Court will discuss momentarily, that a district court addressing a habeas corpus petition challenging jail conditions under section 2241 cannot or would not consider other factors such as whether a detainee poses a threat to public safety. The bottom line is that the plaintiffs have not shown that the bond reduction remedy offered by the state courts is any less effective than a federal remedy.

For these reasons, the Court concludes—as it did in its TRO decision—that the plaintiffs have no likelihood of success on the habeas corpus claim advanced by them on behalf the representatives of subclass A due to their failure to exhaust available state court remedies.

### 2. Representative action

Even if the plaintiffs could establish some likelihood of success on their

contention that the failure to exhaust state remedies should be excused, they would be unable to satisfy the criteria for a representative action. Although the Court need not actually certify a representative action at this point, before issuing a preliminary injunction it would need to find that the requirements for such an action conditionally would be met. *Mays*, 2020 WL 1812381, at *3 (collecting cases). Because the plaintiffs cannot satisfy those requirements, the representative class has no likelihood of success on the merits.

In the Seventh Circuit, the Federal Rule of Civil Procedure that governs class actions, Rule 23, does not apply to habeas corpus proceedings. *Bijeol v. Benson*, 513 F.2d 965, 967–68 (7th Cir. 1975); *cf. Rodriguez v. Hayes*, 591 F.3d 1105, 1117 (9th Cir. 2010). But representative actions—which are analogous to class actions—on rare occasions can be brought in habeas corpus proceedings. *Bijeol*, 513 F.2d at 967–68; *see also United States ex rel. Morgan v. Sielaff*, 546 F.2d 218, 220–21 (7th Cir. 1976); *Kazarov v. Achim*, No. 02 C 5097, 2003 WL 22956006, at *8 (N.D. Ill. Dec. 12, 2003); *United States ex rel. Green v. Peters*, 153 F.R.D. 615, 619 (N.D. Ill. 1994); *Faheem-El v. Klincar*, 600 F. Supp. 1029, 1033 (N.D. Ill. 1984). The Seventh Circuit has not "set down a strict formula which must be mechanically followed" before people in custody can bring a representative habeas corpus action. *Morgan*, 546 F.2d at 221. Instead, it has suggested that courts can look to the provisions of Rule 23 in determining whether a representative action is appropriate, though courts need not "precisely" comply with Rule 23. *Id.* n.5. The Court thus finds that Rule 23 is instructive in analyzing whether plaintiffs can bring a representative action. The parties seem to agree; they discuss the issue within the framework of Rule 23.

36

To bring a class action, and by analogy a representative action, a plaintiff must show that the proposed class meets the four requirements of Rule 23(a): "numerosity, commonality, typicality, and adequate representation." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 349 (2011). In addition, "the proposed class must satisfy at least one of the three requirements listed in Rule 23(b)." *Id.* at 345. The plaintiffs here rely on, or analogize to, Rule 23(b)(2), which applies when "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2).

The parties dispute whether subclass A satisfies each requirement of Rule 23, as applied to representative actions, apart from numerosity. The Court discusses each disputed requirement in turn.

### a. Commonality

To establish that they are likely to satisfy the commonality requirement, the plaintiffs must show that there likely "are questions of law or fact common to" the members of subclass A. Fed. R. Civ. P. 23(a)(2). "That language is easy to misread." *Wal-Mart*, 564 U.S. at 349. "Commonality requires the plaintiff[s] to demonstrate that the class members have suffered the same injury." *Id.* at 349–50 (internal quotation marks omitted). In addition, "[t]heir claims must depend upon a common contention" for which the "determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id.* at 350. Thus "what matters . . . is not the raising of common 'questions' . . . but rather, the capacity of a [representative] proceeding to generate common answers apt to drive the resolution of the litigation." *Id.*

37

at 350 (emphasis omitted). "Where the same conduct or practice by the same defendant gives rise to the same kind of claims from all class members, there is a common question." *Suchanek v. Sturm Foods, Inc.*, 764 F.3d 750, 756 (7th Cir. 2014).

Subclass A conditionally satisfies the commonality requirement because the plaintiffs likely can show that its members "suffered the same injury." *See Wal-Mart*, 564 U.S. at 349–50. Specifically, the members of subclass A can show that the Sheriff's response to the coronavirus pandemic gave rise to their habeas claim. In addition, the plaintiffs point to several questions the determination of which, they contend, will resolve issues that are central to the validity of their habeas claim. For purposes of commonality, the Court need consider only one: whether coronavirus presents so severe a risk of harm to some people in the Sheriff's custody such it is unconstitutional to confine them in in the Jail.[6] In a representative proceeding, a common answer to that question likely would drive the resolution of the litigation by resolving a core issue underlying subclass A's request for a writ of habeas corpus.

The Sheriff contends that subclass A cannot satisfy the commonality requirement because its members seek habeas corpus relief that would require individual proceedings or determinations. But issues pertaining to the individualized nature of the desired injunctive relief go to the requirements of Rule 23(b), not commonality. *See id.*

---

[6] The Court notes that the plaintiffs posed different questions in their motion for class certification than in their reply brief in support of their motion for a preliminary injunction. *Compare* Pls.' Mot. to Cert. Class (dkt. no. 6) at 7–8 *with* Pls.' Reply in Supp. of Renewed Mot. for Prelim. Inj. (dkt. no. 64) at 21–22. Which particular question the Court identifies as conditionally satisfying the commonality requirement makes no difference for the purpose of this opinion. Regardless, at least one question the plaintiffs pose in their reply brief would also satisfy the commonality requirement: whether detainees in the Jail, as a matter of due process, are entitled to practice social distancing consistent with people in the community at large.

at 360–62; *Bell v. PNC Bank, Nat. Ass'n*, 800 F.3d 360, 379–80 (7th Cir. 2015). In other words, the commonality requirement of Rule 23(a) does not demand that the relief ultimately awarded to each plaintiff be the same. *See id.*; *Suchanek*, 764 F.3d at 756 (commonality of relief is not essential); *In re IKO Roofing Shingle Prod. Liab. Litig.*, 757 F.3d 599, 602 (7th Cir. 2014) ("[The commonality requirement as discussed in] *Wal–Mart* has nothing to do with commonality of damages."). Nor is this a case in which the commonality requirement is not satisfied because individual plaintiffs experienced the harm in meaningfully different ways. *Cf. Jamie S. v. Milwaukee Pub. Sch.*, 668 F.3d 481, 497–98 (7th Cir. 2012) (class of disabled students did not meet commonality requirement where its members likely experienced alleged violations of federal and state law in different ways). The putative members of subclass A all experienced the alleged harm from the Sheriff's response to coronavirus in the same or similar ways, specifically their allegedly increased risk of exposure to the virus. In addition, all of them raise the same kind of claim, and their claims all involve a common question that would resolve a central issue of that claim.

The Court acknowledges that, in a case raising claims similar to the habeas corpus claims asserted in this one, another judge in this district recently took a different approach with regard to commonality. A putative representative class of convicted prisoners in *Money v. Pritzker*, No. 20-CV-2093, 2020 WL 1820660 (N.D. Ill. Apr. 10, 2020), also sought habeas corpus relief and medical furloughs or home detentions under section 1983 based on an allegedly inadequate response to the coronavirus pandemic by the director of the Illinois Department of Corrections. *Id.* at *1–2. For the section 1983 claim, the court found the only common question "apt to drive the

resolution of the litigation," *id.* at *15 (quoting *Wal-Mart*, 564 U.S. at 350), was "which class members should actually be given a furlough," *id.* That question did not satisfy the commonality requirement, the court found, because "individualized determinations" would be necessary to answer it. *Id.* The court also indicated that the habeas claim would not be "suitable for representative or class treatment" because "release determinations must be made on an individual basis regardless of the vehicle for considering and effectuating them." *Id.* at *21 n.15. The court did not clarify whether it based its finding that the habeas claim would be unsuitable for representative or class treatment on the commonality requirement or another Rule 23 consideration. *See id.*

This Court respects the court's decision in *Money*, which it cites as persuasive authority elsewhere in this opinion. But to the extent that the court in *Money* found that the putative classes failed to satisfy the commonality requirement because their requested relief would entail individualized determinations, this Court departs from the analysis in *Money*. As indicated, the commonality requirement does not mean that the relief ultimately awarded to each plaintiff must be the same. Thus whether the release determinations would need to be made on an individual basis does not factor into the Rule 23(a) commonality analysis.

The Court concludes, for the reasons stated above, that the putative class satisfies Rule 23(a)'s commonality requirement.

> ### b. Typicality

The Sheriff contends that the putative subclass does not meet Rule 23(a)'s typicality requirement. He does not explain why, and he is incorrect. The named plaintiffs' habeas corpus "claim is typical if it arises from the same event or practice or

course of conduct that gives rise to the claims of other [subclass] members and is based on the same legal theory." *Lacy v. Cook County*, 897 F.3d 847, 866 (7th Cir. 2018) (alteration omitted). "This requirement is meant to ensure that the named representative's claims have the same essential characteristics as the claims of the class at large." *Id.* (internal quotation marks omitted). Typicality is satisfied for subclass A because the named plaintiffs have alleged the same injurious conduct stemming from the Sheriff's response to the coronavirus pandemic as the other members of the subclass and have advanced the same legal theory as the subclass at large.

        **c.**        **Rule 23(b)(2)**

Rule 23(b)(2) is the sticking point for the habeas corpus plaintiffs' attempt to bring a representative action on behalf of subclass A. As indicated, Rule 23(b)(2) allows for class certification where "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief . . . is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). It "applies only when a single injunction or declaratory judgment would provide relief to each member of the class," not "when each individual class member would be entitled to a *different* injunction." *Wal-Mart*, 564 U.S. at 360.

The Sheriff contends that the putative subclass A does not satisfy Rule 23(b)(2) because the plaintiffs seek individualized relief. He suggests that any habeas corpus proceeding would need to account for each subclass member's individual circumstances, including, for example, the danger each detainee would pose to the public if released. The plaintiffs expressly concede that the relief would need to be at least partly individualized. They contend, however, that this could be achieved through

"brief, individual proceedings" without defeating class certification. Pls.' Reply in Supp. of Renewed Mot. for Prelim. Inj. (dkt. no. 64) at 23; *see also* Pls.' Renewed Mot. for Prelim. Inj. (dkt. no. 55) at 16.

In actions where plaintiffs seek an injunction that "would merely initiate a process through which highly individualized determinations of liability and remedy are made," Rule 23(b)(2) is not satisfied. *Jamie S.*, 668 F.3d at 499 (7th Cir. 2012) (injunction that established a system for identifying disabled children and implementing individualized education plans and remedies did not satisfy Rule 23(b)(2) because it "merely establish[ed] a system for eventually providing individualized relief"). *Compare id. and Kartman v. State Farm Mut. Auto. Ins. Co.*, 634 F.3d 883, 893 (7th Cir. 2011) (in case challenging insurer's performance of hail storm damage appraisals, injunction requiring class-wide roof reinspection did not satisfy Rule 23(b)(2) where it "would only initiate thousands of individualized proceedings to determine breach and damages") *with Chi. Teachers Union, Local No. 1 v. Bd. of Educ. of City of Chi.*, 797 F.3d 426, 441–42 (7th Cir. 2015) (proposed class was maintainable under Rule 23(b)(2) where plaintiffs asked the court for a declaration that a school board's policies violated Title VII and prospective relief including a moratorium on a challenged practice and the appointment of a monitor).

The plaintiffs concede that issuing writs of habeas corpus in this case would entail individualized proceedings but not that Rule 23(b)(2) precludes them from proceeding on a representative basis. They suggest that the type of supposedly brief, individualized proceedings they seek "have long been commonplace in class litigation." Pls.' Reply in Supp. of Renewed Mot. for Prelim. Inj. (dkt. no. 64) at 23. But the cases

they cite to support that proposition are distinguishable from this one. Both *Barnes v. District of Columbia*, 278 F.R.D. 14 (D.D.C. 2011), and *Dunn v. City of Chicago*, 231 F.R.D. 367 (N.D. Ill. 2005), *amended on reconsideration*, No. 04 C 6804, 2005 WL 3299391 (N.D. Ill. Nov. 30, 2005), involved individualized proceedings on damages under Rule 23(b)(3), not individualized proceedings for injunctive relief under Rule 23(b)(2). *See Barnes*, 278 F.R.D. at 19–23; *Dunn*, 231 F.R.D. 367, at 375–78. *Dunn* also involved class members who had variations in how they *experienced* the constitutional violations—an issue the court properly discussed as part of the commonality analysis, not the Rule 23(b)(2) analysis. *See id.* at 372.

Even if the plaintiffs did not concede it, individualized proceedings would be required for writs of habeas corpus that the plaintiffs seek because the Prisoner Litigation Reform Act (PLRA) applies to their habeas corpus claims. Under the PLRA, in tailoring any prospective or preliminary injunctive relief "in any civil action with respect to prison conditions," a court must "give substantial weight to any adverse impact on public safety," among other considerations. 18 U.S.C. § 3626(a)(1)(A), (a)(2). The PLRA defines "civil action with respect to prison conditions" as "any civil proceeding arising under Federal law with respect to the conditions of confinement or the effects of actions by government officials on the lives of persons confined in prison, but does not include habeas corpus proceedings challenging the fact or duration of confinement in prison." *Id.* § 3626(g)(2). Thus if the plaintiffs' habeas claims constitute civil actions as defined by the PLRA, the Court would need to give substantial weight to the public safety of granting writs, which would require consideration of, among other things, any danger each individual member of subclass A poses to the public.

43

As the Court indicated in its TRO decision, the question of whether detained persons can even use a section 2241 petition to challenge the conditions of their confinement has divided courts. *Mays*, 2020 WL 1812381, at *6 (comparing, e.g.*, Aamer v. Obama*, 742 F.3d 1023, 1032 (D.C. Cir. 2014) (a prisoner may challenge the conditions of his confinement in a federal habeas corpus petition) and *Thompson v. Choinski*, 525 F.3d 205, 209 (2d Cir. 2008) (same) with *Spencer v. Haynes*, 774 F.3d 467, 469–70 (8th Cir. 2014) (section 2241 petitions may not challenge conditions)). The Seventh Circuit has expressed a "long-standing view that habeas corpus is not a permissible route for challenging prison conditions," at least when a prisoner's claim does not have "even an indirect effect on the duration of punishment." *Robinson v. Sherrod*, 631 F.3d 839, 840–41 (7th Cir. 2011). But the Seventh Circuit has also noted that "the Supreme Court [has] left the door open a crack for prisoners to use habeas corpus to challenge a condition of confinement." *Id.* at 840 (quoting *Glaus v. Anderson*, 408 F.3d 382, 387 (7th Cir. 2005)) (citing *Nelson v. Campbell*, 541 U.S. 637, 644–46 (2004); *Bell v. Wolfish*, 441 U.S. 520, 526 n.6 (1979); *Preiser v. Rodriguez*, 411 U.S. 475, 499–500 (1973)).

In the TRO decision, the Court said that it did not need to decide the question of whether the plaintiffs could challenge conditions of confinement in a habeas corpus proceeding definitively at the time but stated that were it "required to address this point, [the Court] would not consider it to be an absolute bar to plaintiffs' motion for a temporary restraining order." *Mays*, 2020 WL 1812381, at *6. The Court stated that "[t]he plaintiffs' claims, as they have framed them, *do* bear on the duration of their confinement (they contend, ultimately, that they cannot be held in the Jail consistent

44

with the Constitution's requirements), and they are not the sort of claims that are, or can be, appropriately addressed via a claim for damages." *Id.*

But the plaintiffs' claims also bear on the conditions of their confinement: they challenge the constitutionality of the conditions in the Jail during the coronavirus pandemic, and they contend that the conditions are so deficient that it is unconstitutional for subclass A to be confined at the Jail. The Seventh Circuit has not expressly addressed whether the PLRA applies to habeas corpus petitions that involve conditions of confinement, but it has not foreclosed the application of the PLRA to such petitions. *Cf. Walker v. O'Brien*, 216 F.3d 626, 634 (7th Cir. 2000) (stating that actions "brought under section 2241 . . . as habeas corpus petitions are not subject to the PLRA"—but not addressing such petitions that challenge the conditions of confinement); *see also Thomas v. Zatecky*, 712 F.3d 1004, 1005 (7th Cir. 2013) (*Walker* holds, among other things, "that a *collateral attack* under § 2241 or § 2254 is not a 'civil action' for the purpose" of the PLRA (emphasis added)). By specifying that a "civil action with respect to prison conditions . . . does not include habeas corpus proceedings challenging the fact or duration of confinement in prison," the language of the PLRA appears suggests that it may cover other types of habeas corpus proceedings, including, potentially, those challenging the conditions of confinement. *See Advocate Health Care Network v. Stapleton*, 137 S. Ct. 1652, 1659 (2017) (courts should interpret a statute in a way that would "give effect, if possible, to every clause and word"). And at least some courts addressing the issue have suggested that the PLRA applies to habeas corpus petitions involving the conditions of confinement. *See Jones v. Smith*, 720 F.3d 142, 145, 145 n.3 (2d Cir. 2013) (the PLRA does not apply to "habeas petition[s] seeking to overturn a

criminal conviction or sentence" but presumably would apply to conditions-of-confinement habeas claims brought under section 2241); *Blair-Bey v. Quick*, 151 F.3d 1036, 1042 (D.C. Cir.) (habeas corpus petitions challenging conditions of confinement "would have to be subject to the PLRA's . . . rules, as they are precisely the sort of actions that the PLRA sought to address"), *on reh'g*, 159 F.3d 591 (D.C. Cir. 1998).

Accordingly, the Court concludes that the PLRA applies to the plaintiffs' habeas corpus claim. The PLRA's mandate that a court "give substantial weight to any adverse impact on public safety" before issuing preliminary injunctive or prospective relief thus would apply to the habeas corpus claim. *See* 18 U.S.C. § 3626(a)(1)(A), (a)(2). To do so, the Court would need to consider the circumstances of the detained persons and any threat they pose to public safety, which plainly would vary from one person to another. This is a process that would render the claim unsuitable to certification under Rule 23(b)(2) or its analogy for representative actions.

The plaintiffs also state, in two sentences found at the very end of a small-type, twenty-four-line footnote, that a release order would not require a court to resolve individualized questions regarding safety because such an order would give the Sheriff discretion on which detained persons to release. Pls.' Reply in Supp. of Renewed Mot. for Prelim. Inj. (dkt. no. 64) at 21 n.16. The plaintiffs make this point with respect to commonality for their section 1983 claim, not on the question of whether the habeas corpus claim may be handled on a representative basis. They nowhere attempt to explain how the Court could condition the issuance of writs of habeas corpus on detainee-specific decisions made by the Sheriff. As this Court stated in its TRO decision, "[t]he issuance of [a] writ of habeas corpus through a section 2241 petition is a

46

federal remedy (in other words, it does not depend on state law)." *Mays*, 2020 WL 1812381, at *7. Nor could the issuance of a writ depend on subsequent decisions by a detained person's custodian. The habeas corpus claim proceeds *against* the custodian based on the fundamental, long-standing rule that a person in custody "may be liberated if no sufficient reason is shown to the contrary." *Rumsfeld v. Padilla*, 542 U.S. 426, 435 (2004) (quoting *Wales v. Whitney*, 114 U.S. 564, 574 (1885)). The only remedy available for a habeas corpus claim is liberation of the person in custody. *See id.* It is difficult to imagine a writ of habeas corpus that would tell a jailer to release the petitioner—unless he decides it would not be a good idea to do so. Plaintiffs offer no authority supporting the proposition that a writ of habeas corpus could appropriately be issued in this way.

In sum, though representative habeas corpus actions do not need to comply "precisely" with Rule 23, *Morgan*, 546 F.2d at 221 n.5, the plaintiffs cannot meet the requirements for representative treatment.[7]

Because the plaintiffs' habeas corpus claims founder on the exhaustion requirement, and because they have not established that the claims may be pursued on a representative basis, their representative action on behalf of subclass A has no likelihood of success on the merits. Accordingly, the plaintiffs' request for the Court to

---

[7] The Court acknowledges that this is different from the conclusion it reached in the TRO decision, in which it conditionally certified subclass A. *See Mays*, 2020 WL 1812381, at *4. But that was, of course, a provisional decision. And even for a non-conditionally certified class, a court may alter or amend an order granting class certification at any point before final judgment. Fed. R. Civ. P. 23(c)(1)(C); *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 160 (1982) (class certification order is "inherently tentative," and a district court "remains free to modify it in the light of subsequent developments in the litigation").

release medically vulnerable members of subclass A on unsecured or non-monetary bail conditions pending review of their habeas corpus claims is moot.

**B.    Section 1983 claim**

The Court next addresses the question of likelihood of success on the plaintiffs' section 1983 claim, dealing with conditional class certification first, followed by the merits.  The Court then addresses certain provisions of the PLRA as applied to the section 1983 claim.

**1.    Conditional class certification**

For their section 1983 claim, the plaintiffs seek class-wide relief in the form of a preliminary injunction.  But because the plaintiffs only recently filed the lawsuit, there has not yet been a class certification ruling.  As the Court indicated in its TRO opinion, "[t]his does not foreclose the possibility of relief for the plaintiffs at this stage, because a district court has general equity powers allowing it to grant temporary or preliminary injunctive relief to a conditional class."  *Mays*, 2020 WL 1812381, at *3 (citing *Lee v. Orr*, No. 13 C 8719, 2013 WL 6490577, at *2 (N.D. Ill. Dec. 10, 2013); *Al Otro Lado v. Wolf*, 952 F.3d 999, 1005 n.4 (9th Cir. 2020); *Gooch v. Life Inv'rs Ins. Co. of Am.*, 672 F.3d 402, 433 (6th Cir. 2012); *Howe v. Varity Corp.*, 896 F.2d 1107, 1112 (8th Cir. 1990)).  "Furthermore, Federal Rule of Civil Procedure 23(b)(2) 'does not restrict class certification to instances when final injunctive relief issues' and permits certification of a conditional class for the purpose of granting preliminary injunctive relief."  *Id.* (quoting *Meyer v. Portfolio Recovery Assocs., LLC*, 707 F.3d 1036, 1043 (9th Cir. 2012)).

As indicated, to bring a class action a plaintiff must show that the proposed class meets the four requirements of Rule 23(a):  "numerosity, commonality, typicality, and

adequate representation." *Wal-Mart*, 564 U.S. at 349. In addition, "the proposed class must satisfy at least one of the three requirements listed in Rule 23(b)." *Wal-Mart*, 564 U.S. at 345. The plaintiffs rely on Rule 23(b)(2).

As an initial matter, the Court must clarify the scope of the class or subclasses for which the plaintiffs have sought certification. They assert count 1 under section 1983 on behalf of all putative members of a class consisting of "all people who are currently or who will in the future be housed in the Cook County Jail for the duration of the COVID-19 pandemic." Compl. (dkt. no. 1) ¶ 60. In their reply brief in support of their motion for a preliminary injunction, however, the plaintiffs indicate that they also request injunctive relief for claims under section 1983 specifically for the putative members of proposed subclass B, which consists of "all people who are currently housed on a tier where someone has already tested positive for the coronavirus," *id.* ¶ 62. *See, e.g.*, Pls.' Reply in Supp. of Renewed Mot. for Prelim. Inj. (dkt. no. 64) at 29 (requesting the transfer of members of putative subclass B). Accordingly, the Court takes this as meaning that, with respect the section 1983 claim, the plaintiffs seek injunctive relief on behalf of both the overall class and subclass B.

The parties dispute whether the class and subclass B satisfy each requirement of Rule 23, except for numerosity. The Court's analysis earlier in this opinion finding that subclass A (the subclass seeking habeas relief) satisfies the typicality and commonality requirements apply to the overall class and subclass B as well. Specifically, the class and subclass B satisfy the commonality requirement because their members "have suffered the same injury" and their claims "depend upon a common contention" for which class action proceedings will "generate common answers apt to drive the

resolution of the litigation." *Wal-Mart*, 564 U.S. at 350 (emphasis omitted). As with subclass A, the claims members of the class and subclass B raise at least one common question that satisfies Rule 23(a)'s commonality requirement: whether coronavirus presents so severe a risk of harm to those in the Sheriff's custody that their conditions of confinement are unconstitutional. For the reasons previously discussed, Rule 23(a)'s commonality requirement does not involve whether each member of the class would be entitled to identical relief.

The Class and subclass B also satisfy Rule 23(a)'s typicality requirement. Each member's section 1983 claim arises from the Sheriff's response to the coronavirus pandemic—"the same event or practice or course of conduct"—and "is based on the same legal theory." *See Lacy*, 897 F.3d at 866 (alteration omitted).

The Court's analysis under Rule 23(b)(2), however, differs from its analysis regarding the habeas corpus claim. Again, Rule 23(b)(2) allows for class certification where "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief . . . is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). It "applies only when a single injunction or declaratory judgment would provide relief to each member of the class," not "when each individual class member would be entitled to a different injunction." *Wal-Mart*, 564 U.S. at 360.

A good deal of the injunctive relief that the plaintiffs seek would provide relief to the entire class via a single order. Specifically, on behalf of the overall class, the plaintiffs request a single order mandating social distancing and/or extending the TRO or converting it to a preliminary injunction, which would provide the same relief to each

class member.  Accordingly, the class satisfies the requirements of Rule 23(b) to the extent the plaintiffs request relief under section 1983 mandating social distancing and/or extending the TRO or converting it into a preliminary injunction.

The plaintiffs' requests for prisoner transfers and/or releases on behalf of subclass B, however, likely would entail individual determinations to some degree.  The parties do not dispute that the PLRA applies to the plaintiffs' section 1983 claim or that the 1983 claim involves prison conditions.  As discussed earlier with regard to the habeas corpus claim, before granting prospective or preliminary injunctive relief on the section 1983 claim, the PLRA requires the Court to "give substantial weight to any adverse impact on public safety," in addition to making other findings.  18 U.S.C. § 3626(a)(1)(A), (a)(2).  As indicated, the Sheriff contends that these individual determinations prevent certification under 23(b)(2).  As the Court has discussed, the plaintiffs contend (albeit only in a footnote) that a court would not be required to make those individual determinations because a court could grant a single injunction while delegating those questions to the Sheriff.  Pls.' Reply in Supp. of Renewed Mot. for Prelim. Inj.  (dkt. no. 64) at 21 n.16; *see also Brown*, 563 U.S. at 537–38 (three-judge court adequately considered "public safety by leaving" decision "of how best to comply with its population limit to state prison officials").  The Court recognizes that analysis of whether the Sheriff may exercise discretion in carrying out a transfer or release order may be different for the section 1983 claim.  Among other differences, a petition for habeas corpus contemplates a singular form of relief with regard to habeas—release from custody—whereas a court has a broader spectrum of possible relief under section 1983.  S*ee Rumsfeld*, 542 U.S. at 435; *Preiser*, 411 U.S. at 484–86, 489.  The range of

injunctive relief available under section 1983 may allow courts to "leave details of implementation to [a] State's discretion by leaving sensitive policy decisions to responsible and competent policy state officials." *See, e.g.*, *Brown*, 563 U.S. at 538. The Court need not decide that issue now, however, because, as it will explain later in this opinion, at this point it concludes that the predicate under the PLRA for convening a three-judge court or ordering prisoner transfers has not been established.

In sum, the Court conditionally certifies the class to the extent the plaintiffs request relief under section 1983 requiring social distancing and/or extending the TRO or converting it to a preliminary injunction. The Court declines to decide whether subclass B satisfies the requirements of Rule 23(b) because it is not necessary to do so at this time.

### 2. Likelihood of success on the merits

The injunctive relief requests remaining for determination are the class's requests to require social distancing throughout the Jail and (it appears) advance identification and further screening of detained persons with conditions that make them more vulnerable to severe health consequences from coronavirus disease, as well as their request to convert the TRO to a preliminary injunction. (The Court addresses in later sections the plaintiffs' request to require the Sheriff to transfer detainees out of the Jail and to convene a three-judge panel.)

The claims of the class arise under the Due Process Clause of the Fourteenth Amendment. "When a state actor [ ] deprives a person of his ability to care for himself by . . . detaining him . . . , it assumes an obligation to provide some minimum level of well-being and safety." *Johnson v. Rimmer*, 936 F.3d 695, 706 (7th Cir. 2019) (quoting

*Collignon v. Milwaukee County*, 163 F.3d 982, 987 (7th Cir. 1998)).  The Due Process

Clause requires a jailer to provide a pretrial detainee with food, shelter, and basic

necessities, including reasonably adequate sanitation, ventilation, bedding, hygienic

materials, and utilities, *Hardeman v. Curran*, 933 F.3d 816, 820 (7th Cir. 2019), and to

"meet[ ] the person's medical needs while he is in custody," *Johnson*, 936 F.3d at 706.

More broadly, the Due Process Clause protects pretrial detainees, who "have not been

convicted of anything," *Miranda v. County of Lake*, 900 F.3d 335, 350 (7th Cir. 2018),

from conditions that "amount[ ] to punishment."  *Kingsley v. Hendrickson*, 135 S. Ct.

2466, 247 (2015) (quoting *Graham v. Connor*, 490 U.S. 386, 395 n.10 (1989));

*Hardeman*, 933 F.3d at 823.

　　　　Here there is no question that the plaintiffs' claims involve conditions that are

sufficiently serious to invoke the Fourteenth Amendment; the Sheriff does not argue

otherwise.  A pretrial detainee may establish a Fourteenth Amendment violation based

on a condition, or combination of conditions, posing an "unreasonable risk of serious

damage to [his] future health."  *Henderson v. Sheahan*, 196 F.3d 839, 847 (7th Cir.

1999) (decided under Eighth Amendment "deliberate indifference" standard).  *See*

*Helling v. McKinney*, 509 U.S. 25, 33, 35 (1993) (Eighth Amendment case; "exposure of

inmates to a serious, communicable disease" that poses a risk of future harm is a

deprivation sufficiently serious to invoke constitutional protections).  This is precisely

where persons detained in the Jail find themselves.  The coronavirus is indisputably

present in the Jail.  And the persons detained there are housed in settings that facilitate

its transmission.  This is true throughout the Jail, given the close proximity in which even

single-celled detained persons are housed and the fact that they occupy common areas

like bathrooms, showers, and dayrooms where other inmates congregate or have been present. And it is particularly true for detained persons who are doubled celled and those who are still housed in the dormitory units, where dozens (or more) spend twenty-four hours per day, or close to it, in the same room. It is equally undisputed that persons are detained in these settings with the knowledge of the Sheriff and his personnel, who have assigned them to live in these quarters while aware of the risks of virus transmission. All of this, taken together, is sufficient for the plaintiffs to have well more than a "better than negligible chance," *see Whitaker*, 858 F.3d at 1046, of establishing the threshold requirement of their due process claim—conduct that the Sheriff knows puts detainees at a significant risk of serious harm from coronavirus. *See Kingsley*, 135 S. Ct. at 2472; *Miranda*, 900 F.3d at 353. Meeting this threshold requirement of the due process standard does not require an intent to cause harm; it requires only knowledge of "the physical consequences" of one's conduct. *Kingsley*, 135 S. Ct. at 2472.

The primary dispute before the Court, and the point on which the Sheriff focuses his defense, involves the second requirement of a due process claim. To succeed on their claim, the plaintiffs must show that the Sheriff's conduct in addressing the risks posed by exposure to coronavirus is objectively unreasonable in one or more respects. *See, e.g., McCann v. Ogle County*, 909 F.3d 881, 886 (7th Cir. 2018). At the preliminary injunction stage, however, the plaintiffs are not required to prove this definitively; they are required only to establish a reasonable likelihood that they will ultimately succeed in proving it.

The plaintiffs concede that the Sheriff and others have taken significant steps to

reduce the Jail's population and to decrease the number of persons housed in groups or double celled. They argue, however, that the Sheriff's actions do not go far enough and that detained persons continue to be unreasonably exposed to a risk of serious harm. The plaintiffs contend that social distancing is not being enforced even in units where detained persons are single celled, given joint usage of showers, toilet facilities, and dayrooms. And, they say, social distancing is not even a possibility for the hundreds who are double celled or remain in dormitory units. The plaintiffs also contend that despite policies promulgated by the Sheriff, proper sanitation—in particular, frequent cleaning of surfaces and facilities used in common, distribution of cleaning materials to detainees, and so on—is not actually being carried out on the ground. Finally, the plaintiffs contend—and it is undisputed—that nothing has been done by the Sheriff to enable him to identify, in advance, detained persons with medical or other conditions that make them particularly vulnerable to serious illness should they contract the coronavirus.

The Sheriff argues that he and others have taken significant steps to reduce the risk to detained persons from coronavirus. One critical aspect of this is a very significant reduction in the overall population of the Jail, accomplished by bond reductions issued by judges and by expansion, to its limits, of the Sheriff's electronic home monitoring program. In addition, in recent weeks, there have been far fewer new detainees admitted on a daily basis than has been the case historically, presumably due to fewer arrests. At the same time, the Sheriff has taken steps to increase capacity, including by reopening previously shuttered buildings and parts of buildings within the Jail complex. Together, these actions have enabled the Sheriff to take further steps to

separate persons who remain detained in the Jail. Specifically, a far greater percentage of detainees are now in cells by themselves. And far fewer are housed in the dormitory units than before, with many having been transferred to single-cell units. In addition, at the Sheriff's direction, detainees have been provided guidance regarding social distancing. The Sheriff has also instituted policies to enhance sanitation practices and to carry out these policies. He has also implemented the distribution of facemasks to certain detained persons—in particular, those who are in quarantine—consistent with the availability of supplies, and he has undertaken efforts to acquire more. (Some of this has taken place as a result of the TRO entered on April 9.)

It cannot reasonably be disputed that the Sheriff has undertaken a significant, and impressive, effort to safeguard detained persons in his custody from infection by coronavirus. And based on the record, including the testimony of Executive Director Miller at the April 23 hearing, the Court is satisfied that the Sheriff and his staff have acted in good faith, with the goal of protecting the people placed in his custody, consistent with his obligation to maintain security.

Were this an Eighth Amendment case involving convicted prisoners, the efforts the Court has just described likely would be the end of the story. To prevail in a case involving a convicted prisoner, a plaintiff is required to show that the prison official was *deliberately indifferent* to the risk of harm to the plaintiff—in other words, the official knew about but disregarded that risk. *See, e.g., Orr v. Shicker*, 953 F.3d 490, 499 (7th Cir. 2020); *Garcia v. Armor Corr. Health Serv., Inc.*, 788 F. App'x 393, 395 (7th Cir. 2019). Were the plaintiffs in this case required to make that showing, they would be unable to prevail; the Sheriff has been anything but deliberately indifferent to the risk of

56

harm to pretrial detainees from coronavirus.

But because this is a case involving persons detained prior to an adjudication of their guilt or innocence, the Sheriff's good intentions are not dispositive of the plaintiffs' claims. There is a critical difference between a claim regarding conditions of confinement brought by pretrial detainees like the plaintiffs and one brought by a convicted prisoner under the Eighth Amendment, who unlike a pretrial detainee can constitutionally be subjected to punishment. *See Hardeman*, 933 F.3d at 824 (Eighth Amendment standard is "more demanding"). The standard by which a court evaluates a claim by a pretrial detainee like the plaintiffs "is solely an objective one." *Kingsley*, 135 S. Ct. at 2473. The plaintiffs are not required to show that the Sheriff had an intent to punish or to harm them, *id.*; indeed, they need not show any sort of malicious or bad intent at all. Rather, what they are required to show—actually, on a preliminary injunction, simply establish a reasonable likelihood of showing—is that the Sheriff's conduct with respect to the particular condition has been objectively unreasonable in one or more respects. *See McCann*, 909 F.3d at 886. In applying this standard, a court "focus[es] on the totality of facts and circumstances" the defendant faced "to gauge objectively—without regard to any subjective belief held by the [defendant]—whether the response [to the conditions] was reasonable." *Id.*

The plaintiffs contend that the Sheriff's response to the coronavirus outbreak at the Jail has not been objectively reasonable or sufficiently protective of the people in his custody, at least with respect to the issues currently before the Court—social distancing, sanitation, and identification and monitoring of highly vulnerable detainees. In evaluating the plaintiffs' contentions, the Court assesses objective reasonableness

57

"from the perspective of 'a reasonable [official] on the scene,' based on what the [official] knew at the time." *Mays*, 2020 WL 1812381, at *9 (quoting *Kingsley*, 135 S. Ct. at 2473). The question, in the present context, is whether the Sheriff "acted reasonably to mitigate the risks to [the] health and safety of detainees." *Id.* (citing *Hardeman*, 933 F.3d at 825; *Darnell v. Pineiro*, 849 F.3d 17, 35 (2d Cir. 2017)). And in determining the reasonableness of the Sheriff's actions, the Court "must account for his legitimate interest in managing the Jail facilities," and it must "defer to policies and practices that 'are needed to preserve internal order and discipline and to maintain institutional security.'" *Id.* (quoting *Kingsley*, 135 S. Ct. at 2473); *see Bell*, 441 U.S. at 547.

The fact of the matter is that the Sheriff's actions have not eliminated the risk to detained persons; far from it. But this, too, is not dispositive. Although a jailer must make a reasonable effort to abate conditions that pose an excessive risk to the health or safety of the people in his custody, the fact that he fails to prevent actual harm does not mean that his response was unreasonable. *See Dale v. Poston*, 548 F.3d 563, 569 (7th Cir. 2008) (applying Eighth Amendment deliberate indifference standard). More specifically, the Constitution does not require a detention facility to provide "foolproof protection from infection" by a communicable disease. *Forbes v. Edgar*, 112 F.3d 262, 266 (7th Cir. 1997) (applying Eighth Amendment standard); *see also Smith v. Sangamon Cty. Sheriff's Dep't*, 715 F.3d 188, 191 (7th Cir. 2013) (applying Eighth Amendment standard; "Prison and jail officials are not required to guarantee [a] detainee's safety." (internal quotation marks omitted)). That said, the ongoing risk to detained persons at the Jail, confirmed by increases in the number who have tested positive for coronavirus and the death of six detained persons from coronavirus disease

as of April 23, is the backdrop against which the Court must view the Sheriff's conduct.

The Court begins with the question of social distancing. As the plaintiffs see it, a policy that fails to fully implement social distancing throughout the Jail—which indisputably has not happened—cannot possibly be considered an objectively reasonable response to the coronavirus outbreak there. At least until full social distancing is enforced, the plaintiffs contend, detained persons face an unacceptably high risk of death or serious harm to their health.

The Sheriff's position is likewise simple and straightforward. His implementation of a coronavirus response plan at the Jail complies, he says, with the CDC Guidelines, and for this reason his actions have been objectively reasonable. The Guidelines, he points out, do not require social distancing in correctional facilities where it is not feasible given physical space, population, and staffing.[8] The plaintiffs respond that the CDC Guidelines are not a surrogate for constitutional due process requirements.

To support his position that compliance with the CDC Guidelines should effectively be dispositive, the Sheriff cites *Carroll v. DeTella*, 255 F.3d 470 (7th Cir. 2001). There the Seventh Circuit held that a convicted prisoner could not show that prison officials had been deliberately indifferent to his lack of access to safe drinking water, because radium concentrations in the prison's drinking water were at a level that the U.S. Environmental Protection Agency deemed at the time to be safe. *Id.* at 472–73. The court noted that because prisoners are not entitled to better quality of air,

---

[8] Largely based on this aspect of the CDC Guidelines, the Court, in deciding the TRO motion, declined to require the Sheriff to enforce social distancing other than during the intake process, one very obvious point at which social distancing was not taking place. The TRO ruling, however, is neither final nor binding. The Court has reassessed the matter with the benefit of more thorough briefing and a more complete record.

water, or environment than the general public, prisons do not have "a duty to take remedial measures against pollution or other contamination that the agencies responsible for the control of these hazards do not think require remedial measures." *Id.*

The Sheriff's reliance on *Carroll* is unavailing. First of all, the plaintiffs do not suggest any entitlement on the part of pretrial detainees to conditions that exceed health and safety standards applicable to the general public. But that aside, the CDC Guidelines, unlike the EPA standards relied upon in *Carroll*, do not say or suggest that compliance makes detained people safe. This is particularly so in view of the fact that the Guidelines include feasibility qualifiers, particularly in relation to social distancing. *See* CDC Guidelines at 1, 3, 4, 11. Given this limitation, the Guidelines are not the same as a safety standard set by a regulatory agency.

For their part, the plaintiffs suggest that the CDC Guidelines "shed no light" on whether the Sheriff's conduct has been objectively reasonable, in conformity with constitutional requirements. Pls.' Reply in Supp. of Renewed Mot. for Prelim. Inj. (dkt. no. 64) at 10 (quoting *Thompson v. City of Chicago*, 472 F.3d 444, 454 (7th Cir. 1996)). The Court disagrees with this as well. The plaintiffs rely to a significant extent on *Thompson*. There the court, considering a claim of excessive force against a police officer—a claim also determined by a standard of objective reasonableness—stated that a policy on the use of force established by the police department was "completely immaterial [on] the question of whether a violation of the federal constitution has been established." *Id.* at 454. But later, in *United States v. Brown*, 871 F.3d 532 (7th Cir. 2017), the Seventh Circuit clarified that *Thompson* simply means that a police

60

department's own policies do not establish the standard of what is reasonable for purposes of the Constitution. *See id.* at 537 ("Despite its strong language, *Thompson* should not be understood as establishing a rule that evidence of police policy or procedure will *never* be relevant to the objective-reasonableness inquiry."). The court explained in *Brown* that, in the fact-intensive objective reasonableness analysis, evidence of national or widely used police policies could be relevant to helping a factfinder understand how a reasonable officer might have behaved under the circumstances that faced the defendant. *Id.* at 538. The court noted that the relevance of such policy evidence may turn on the "factual complexity" of the circumstances facing the defendant, and it may be less relevant in circumstances in which a factfinder can rely on common sense to determine the reasonableness of conduct. *See id.*

Here—unlike, perhaps, a relatively simple excessive force claim against an arresting officer—the circumstances facing the Sheriff in operating the Jail are quite complex. In these circumstances, guidance from an expert body like the CDC is beneficial in assessing the objective reasonableness of the Sheriff's conduct in the face of an ongoing outbreak. Indeed, in *Forbes*, the Seventh Circuit concluded that a prison's response to a case of active tuberculosis in its facility had been objectively reasonable in part because it had implemented and effected the recommendations of the CDC. *Forbes*, 112 F.3d at 267.

In sum, the CDC Guidelines are an important piece of evidence to consider in assessing the Sheriff's conduct, but they cannot be appropriately viewed as dispositive standing alone. Indeed, the CDC's recommendations on tuberculosis were not dispositive in *Forbes*; the court also considered other facts—noting, for example, that

the prison had only one case of active tuberculosis, "a far cry" from an outbreak. *Id.* As
the Court has indicated, one reason why the CDC Guidelines are not appropriately
viewed as dispositive of the plaintiffs' due process claims is the way in which they
account for feasibility. Although feasibility may be a consideration in determining
objective reasonableness, *see Gayton v. McCoy,* 593 F.3d 610, 622 (7th Cir. 2010)
(decided under deliberate indifference standard), no case of which the Court is aware
sets it as a dispositive factor. That, however, is exactly what the CDC Guidelines do, at
least if read as the Sheriff suggests: they set a feasibility or practicality limitation on
social distancing practices that they also call "a cornerstone of reducing transmission of
respiratory diseases such as COVID-19." CDC Guidelines at 4. One can certainly
understand why the CDC, a public health body, has acknowledged these sorts of limits
upon its ability to prescribe guidelines for managing jails. But from a constitutional-law
standpoint, it is difficult to believe that "do what you can, but if you can't, so be it"[9]
satisfies a jailer's constitutional obligation to take objectively reasonable steps to
mitigate known risks to the life and health of people in his custody who are detained
awaiting determination of their guilt or innocence.

Currently the Sheriff is housing hundreds of detained persons under conditions
that make social distancing completely impossible or nearly so, or at least very difficult.
Those for whom it is completely impossible are the detainees who are double celled.
Those for whom it is at least very difficult and likely impossible are detainees who are
housed in dormitory units that are not operating at a greatly reduced capacity.

---

[9] The Court does not intend by this to suggest that this is the attitude of the Sheriff, the
Executive Director, or their staff. Here the Court is characterizing a legal argument, not
any person's behavior.

Specifically, a significant number of the existing dormitory units are operating at or greater than fifty percent capacity. Based on the record before the Court, social distancing is practically impossible in such units, and this cannot be completely attributed to detainee conduct or misconduct: if people are kept in groups in relatively close quarters, it is entirely predictable that they will have difficulty maintaining separation.

At the current stage of the pandemic, group housing and double celling subject detainees to a heightened, and potentially unreasonable and therefore constitutionally unacceptable, risk of contracting and transmitting the coronavirus. Such arrangements make it impossible or unduly difficult to maintain social distancing, a "cornerstone" of the reduction of coronavirus transmission among detainees. The Court, however, must account for and give deference to the Sheriff's interest in managing the Jail facilities and to practices that are needed to preserve order and discipline and maintain security. *See Kingsley*, 135 S. Ct. at 2473; *Bell*, 441 U.S. at 547. These include documented considerations that make group or double celling appropriate or necessary. Feasibility limitations imposed by existing or otherwise available physical facilities are also taken into account, though this is not and cannot be a controlling factor. In this regard, it is worth noting that despite general statements by both sides to the contrary, it does not appear, based on the evidence, that the Sheriff has yet hit the feasibility limit on getting detainees out of group housing, even if one considers only the Jail complex itself. *See* Apr. 23, 2020 Hearing Tr. at 57:2–19 (testimony by Executive Director Miller referencing the possibility of further moves of detained persons out of dormitories).

Based on the evidence submitted, the Court finds that the plaintiffs are

reasonably likely to succeed on their contention that group housing or double celling of detained persons is objectively unreasonable given the immediate and significant risk to their life and health from transmission of coronavirus, except in the following situations:

- Persons detained in tiers or dormitories currently under quarantine following a positive test for the coronavirus within the tier or dormitory, as this makes it inadvisable to transfer them to other housing arrangements until the quarantine period has expired (what the Sheriff refers to as "quarantine tiers").

- Detained persons who have tested positive for the coronavirus and are under medical observation (what the Sheriff refers to as "isolation tiers"), a housing arrangement that the CDC Guidelines specifically authorize.

- Detained persons who have tested positive for coronavirus and are recovering (what the Sheriff refers to as "convalescent tiers"), which the CDC Guidelines likewise authorize.

- Double-celled or dormitory-housed detainees for whom there is a documented determination by a medical or mental health professional that single-celling poses a risk of suicide or self-harm.

- Persons detained housed in a dormitory unit that is at less than fifty percent capacity, which the record reflects will permit adequate social distancing.

- Detained persons committed, at the documented direction of a medical or mental health professional, to a group housing unit that is equipped for medical or mental health treatment, if but only if there is not available space in an appropriate housing or medical unit that permits full social distancing.

Detained persons housed in any of the listed "acceptable" arrangements will, however,

need facemasks that are replaced at appropriate intervals and must be provided with instruction on how to use a facemask and the reasons for its use. They also must be instructed, at regular intervals, on the importance of social distancing.

The Court has omitted from the list above two categories of detained persons referenced in Executive Director Miller's affidavits and testimony: persons put into group housing or double celled because of conduct issues (including those who Miller referred to during his testimony as "our disorderly . . . population," Apr. 23, 2020 Tr. at 52:6) or for reasons associated with the PREA. On the record as it currently stands, the plaintiffs have a reasonable likelihood of succeeding on a contention that it is objectively unreasonable to effectively preclude social distancing for such persons. With regard to PREA detainees, the proposition that they cannot be single celled is counterintuitive, to say the least.[10] And with regard to individuals with conduct issues, without more the Court cannot say that there is an objectively reasonable basis to hold them in a setting that does not permit adequate social distancing. With regard to detained persons in these categories, the Court is willing to entertain a properly-supported request by the Sheriff to include them in the category of persons who may be appropriately detained in group housing, perhaps with appropriate distancing.

Beyond what the Court has described, the plaintiffs have not established a reasonable likelihood of success on their due process claims. Specifically, the Court is not prepared to say that it is constitutionally inappropriate, in light of the coronavirus pandemic, to detain persons in the Jail in any form of group housing or to detain them in

[10] This is so whether these persons are alleged perpetrators or likely victims, which is not clear from the record.

65

single cells given the likelihood of multiple uses of common facilities and areas. This would be tantamount to saying that, in the present circumstances, the Constitution prohibits detaining people in jails. The plaintiffs have not established, and are not likely to be able to establish, that this is so.

Next, the Court addresses the plaintiffs' contentions regarding advance identification of detained persons who are especially vulnerable to severe illness or death if they contract the coronavirus. The Court remains unpersuaded that the plaintiffs have a reasonable likelihood of showing that this is objectively unreasonable and thus violative of those class members' constitutional rights. The plaintiffs' experts opined that screening is important so that vulnerable individuals can be monitored for symptoms. Miller explained, however, that any person with symptoms consistent with coronavirus disease is already provided immediate screening and treatment, and medical professionals treating such a person will have immediate access to his or her medical records (which include an inventory of medical conditions reported by the detained person upon intake or thereafter). Though, as the Court stated in its TRO decision, advance identification of persons with heightened vulnerability would appear to be a good practice and perhaps a best practice, the plaintiffs have not shown that failing to do so is, under the circumstances, objectively unreasonable.

Finally, the Court addresses the plaintiffs' request for extension of the TRO. The TRO required the Sheriff to establish and implement a policy regarding coronavirus testing; provide cleaning supplies to detainees and staff and soap and/or hand sanitizer to detained persons; establish and implement a policy regarding sanitization of frequently touched surfaces; and provide facemasks to all detained persons who are

66

quarantined. *Mays*, 2020 WL 1812381, at *14–15. The plaintiffs ask the Court to convert these requirements into a preliminary injunction. The Sheriff argues that the Court need not extend or convert the TRO because he has complied with it and continues to do so.

A court "retains the power to grant injunctive relief" even after the defendant ceases the allegedly unlawful conduct. *Milwaukee Police Ass'n v. Jones*, 192 F.3d 742, 748 (7th Cir. 1999); *see also United Air Lines, Inc. v. Air Line Pilots Ass'n, Int'l*, 563 F.3d 257, 275 (7th Cir. 2009). The moving party must show that such relief still is required. *Milwaukee Police Ass'n*, 192 F.3d at 748. "The necessary determination is that there exists some cognizable danger of recurrent violation, something more than the mere possibility which serves to keep the case alive." *Id.* (quoting *United States v. W. T. Grant Co.*, 345 U.S. 629, 633 (1953)); *see also United Air Lines, Inc.*, 563 F.3d at 275 ("The court may consider how easily former practices might be resumed at any time in determining the appropriateness of injunctive relief."). Where the cessation of an allegedly wrongful activity occurred "only after a lawsuit has been filed," a district court is "within its discretion" to find that the cessation was "not voluntary, and that even a voluntary cessation is not determinative." *Id.*

Although the Sheriff appears to have complied with the TRO, the Court cannot say that the constitutional violations the Court sought to address will not recur absent an extension of the TRO's requirements. The Sheriff's actions to develop policies on sanitation and coronavirus testing, distribute soap and cleaning supplies, and distribute facemasks to detained persons who are quarantined—at least those done after the April 9 TRO—cannot be said to have been undertaken entirely voluntarily. Rather, they were

done in response to the TRO, and there is at least some evidence of problems in carrying out the TRO's directives. In addition, without a court order, there is at least a possibility that these important measures could slip to the wayside, despite the Sheriff's best intentions, as he works to manage the complexities of the Jail during this public health crisis. For these reasons, the Court concludes that it is appropriate to convert the TRO to a preliminary injunction.

### 3. Transfer

The plaintiffs next request the transfer of members of subclass B out of the Jail "to another safe location in the Sheriff's custody." Pls.' Reply in Supp. of Renewed Mot. for Prelim. Inj. (dkt. no. 64) at 2. Until recently, they primarily suggested that such a location could include "home confinement or electronic home monitoring." Pls.' Resp. to April 3, 2020 Ord. (dkt. no. 26-1) at 17; *see also* Pls.' Renewed Mot. for Prelim. Inj. (dkt. no. 55) at 16–17 (requesting transfer without specifying the location to which detained people should be transferred). But in their most recent reply brief, they suggest that this also could include transfer to "another correctional space, a hospital or medical facility, a clinic, [or] administrative furlough." Pls.' Reply in Supp. of Renewed Mot. for Prelim. Inj. (dkt. no. 64) at 29. The Sheriff contends that, under the PLRA, only a three-judge court may order such transfers and that, regardless, he lacks the authority to transfer detainees to electronic home monitoring. The Court starts with the threshold issue: whether this Court may, on its own, order the transfer of detained persons as proposed by the plaintiffs.

As indicated, under the PLRA, "[i]n any civil action in Federal court with respect to prison conditions, a prisoner release order shall be entered only by a three-judge

court." 18 U.S.C. § 3626(a)(3)(B). The PLRA defines "prisoner release order" as "any order, including a temporary restraining order or preliminary injunctive relief, that has the purpose or effect of reducing or limiting the prison population, or that directs the release from or nonadmission of prisoners to a prison." 18 U.S.C. § 3626(g)(4). It defines "prison" as "any Federal, State, or local facility that incarcerates or detains juveniles or adults accused of, convicted of, sentenced for, or adjudicated delinquent for, violations of criminal law." *Id.* § 3626(g)(5). This definition plainly includes the Jail.

The plaintiffs contend that the transfer of detained persons that they seek would not be a prisoner release order because it would simply involve moving them from one place under the Sheriff's control to another place under his control. That misses the mark. Transfers to home confinement, administrative furlough, or electronic home monitoring in particular—which, at least up until they filed their reply brief, are the primary forms of transfer the plaintiffs have requested—would constitute prisoner release orders because they would have "the purpose or effect of reducing [the] population" of the Jail. *Id.* § 3626(g)(4); *Money*, 2020 WL 1820660, at *12 (transfers of prisoners to temporary medical furlough or home detention within the state's custody would constitute prisoner release orders because "the PLRA does not focus on custodial status under state law, nor does it say anything about whether the reduction of population is temporary or permanent."). Population reduction is the "whole point" of the transfers the plaintiffs seek—they propose to prevent or curb the spread of coronavirus to detained persons, and in particular those who are vulnerable, by reducing the Jail's population. *See id.* at *13.

The transfers sought by the plaintiffs would constitute prisoner release orders for

an additional reason: they would direct the release of detained persons out of the Jail. *See* 18 U.S.C. § 3626(g)(4). The plaintiffs contend that, for people confined at home at the direction of a state authority, a home may amount to a prison within the meaning of the PLRA. To be sure, the list of institutions that qualify as prisons under the PLRA is not limited to those specified in the statute. *Witzke v. Femal*, 376 F.3d 744, 753 (7th Cir. 2004) (confinement in a drug rehabilitation halfway house qualified as confinement in a correctional facility under the PLRA). But, as defined by the PLRA, a prison is a facility. *Id.* § 3626(g)(5). The common definition of a facility is "a building or establishment that [provides a service or feature of a specified kind]."[11] That does not appear to cover a person's home; a home, even one in which a person is residing subject to a court or law enforcement authority's order, is not a place that provides specified services or features.[12] It is hard to see the PLRA's definition of "prison" stretching that far. In addition, even if home confinement and/or electronic home monitoring constitutes imprisonment under state law (an issue the Court need not decide), an order mandating the transfer of prisoners out of the Jail to confinement in their homes likely would constitute a prisoner release order because it would "direct[] the release [of prisoners] from . . . a prison" to another place of confinement, 18 U.S.C. § 3626(g)(4).

The plaintiffs, however, appear to take the position even if prisoner transfers

---

[11] *Facility*, Oxford English Dictionary Online, https://www.oed.com/view/Entry/67465?redirectedFrom=facility& (last visited April 26, 2020).

[12] *Home*, Oxford English Dictionary Online, https://www.oed.com/view/Entry/87869?rskey=8yYRsS&result=1&isAdvanced=false (last visited April 26, 2020).

have the effect of reducing the prison population, a single-judge court may order them where the basis for the order is not crowding or overcrowding. They may be correct. One of the PLRA's requirements for the entry of a prisoner release order by a three-judge panel is that "crowding is the primary cause of the violation of a Federal right." 18 U.S.C. § 3626(a)(3)(E)(i). Some courts have concluded that single-judge courts can order the transfers of prisoners, at least to other facilities, where the purpose of the transfer involves the prisoners' medical needs or vulnerabilities. *See Plata v. Brown*, No. C01-1351 TEH, 2013 WL 12436093, at *9–10, 15 (N.D. Cal. June 24, 2013) (ordering the transfer to other institutions of certain medically high-risk categories of prisoners out of two prisons where they were at risk of contracting Valley Fever, a disease not spread through human-to-human contact); *Reaves v. Dep't of Correction*, 404 F. Supp. 3d 520, 523–24 (D. Mass. 2019) (denying a stay pending appeal and explaining why the PLRA permitted the court to order the transfer of a quadriplegic prisoner to a medical facility equipped to care for him in *Reaves v. Dep't of Correction*, 392 F. Supp. 3d 195 (D. Mass. 2019), *appeal docketed*, No. 19-2089 (1st Cir. Nov. 4, 2019)); *see also Money*, 2020 WL 1820660, at *12 n.11 (suggesting that a single-judge courts can order prisoner transfers for reasons other than crowding). This conclusion seems correct: because three-judge courts can order prisoner releases only where crowding is the primary cause of the violation of a federal right, 18 U.S.C. § 3626(a)(3)(E)(i), to ensure the vindication of people in custody's constitutional rights, the PLRA must be read to permit courts to order transfers where some other condition causes the violation of a constitutional right. *See Plata*, 2013 WL 12436093, at *9–10.

But a single judge's ability to order a prisoner transfer for reasons other than

crowding makes no difference in this case: the primary basis for the transfers the plaintiffs request is to reduce crowding in the Jail. *See Money*, 2020 WL 1820660, at *13 (plaintiffs' suggestion that they did not seek a remedy for overcrowding "contradict[ed] the allegations of their complaint and their entire theory of the case"). To put it in simple terms, one of plaintiffs' core contentions is that their constitutional rights are being violated because social distancing, which they contend is crucial to protect their health, has not been or cannot be accomplished at the Jail. Social distancing is essentially the converse of overcrowding. Thus it is apparent that the plaintiffs' request for prisoner transfers or releases *is* based on overcrowding.

To be more specific, one of the central allegations in the complaint is that the crowded conditions in the Jail "ensure the continued[,] rapid, uncontrolled spread of COVID-19 within the Jail and beyond—because the Jail is not and cannot be isolated from the larger community" and "because the Jail is a crowded, congregate environment." Compl. (dkt. no. 1) ¶ 2; *see also, e.g.*, *id.* at ¶¶ 20, 25–26, 30–35, 37–41, 46, 51. The plaintiffs hinge their legal arguments on the contention that "without a reduction of the Jail's population, the lives and safety of the persons confined there cannot be reasonably protected" because "social distancing is not possible with the current jail population." Pls.' Reply in Supp. of Renewed Mot. for Prelim. Inj. (dkt. no. 64) at 1; *see also, e.g.*, Pls.' Renewed Mot. for Prelim. Inj. (dkt. no. 55) at 1 ("The virus is spreading rapidly in the jail . . ., and that is not surprising: People are sleeping within three feet of each other, eating and using showers in close proximity to each other, and touching the same surfaces."). They contend that the imperative of social distancing is an undisputed "medical necessity" and that "[a]ll of the evidence in this record supports

72

that proposition." Pls.' Reply in Supp. of Renewed Mot. for Prelim. Inj. (dkt. no. 64) at 3. As indicated, they cite evidence from a range of sources—including the CDC, the governor of Illinois, the City of Chicago, and medical and epidemiological experts— reflecting that social distancing is among the most effective and important interventions to reduce the spread of coronavirus and protect public health right now. *Id.* at 3–5; *see also, e.g.*, Pls.' Renewed Mot. for Prelim. Inj. (dkt. no. 55) at 4–8. And, crucially, they contend that social distancing at the jail is impossible *because of its current population levels. Id.* at 10 ("[I]f the current population of a jail unavoidably creates intolerable risk to life and health then the current population must change."); *see also id.* at 10–13; Pls.' Reply in Supp. of Renewed Mot. for Prelim. Inj. (dkt. no. 64) at 6–8. In short, the plaintiffs are requesting transfers because social distancing is impossible; with that in mind, it is incongruous to contend that crowding is not the basis or primary basis for seeking compelled transfers. *See Money*, 2020 WL 1820660, at *13.

Citing *United States v. Cook County*, 761 F. Supp. 2d 794 (N.D. Ill. 2000), the plaintiffs contend that the PLRA applies only to prisoner release orders that are "explicitly related to population caps," not to all such orders stemming primarily from crowding. Pls.' Reply in Supp. of Renewed Mot. for Prelim. Inj. (dkt. no. 64) at 32 (citing *id.* at 796 –97). That interpretation stretches the statute's language too far. Even if "[s]ponsors of the PLRA were especially concerned with courts setting 'population caps,'" *Plata*, 2013 WL 12436093, at *10 (quoting *Gilmore v. California*, 220 F.3d 987, 998 n. 14 (9th Cir. 2000)), the PLRA's text does not limit prisoner release orders issued by three-judge courts to only orders that set population caps, *see* 18 U.S.C. § 3626(a)(3)(E). *United States v. Cook County* does not suggest otherwise. The three-

73

judge court in that case found "that overcrowding [was] a primary cause of unconstitutional conditions at the jail" because it caused, among other things, "excessive force by guards, grossly unsanitary and unhealthy conditions, and grossly inadequate medical (including mental-health) care." *Cook County*, 761 F. Supp. 2d at 797. Although these conditions might have existed even without overcrowding, overcrowding made them worse. *Id.* at 797–98. Thus the purpose of the prisoner release order in *Cook County* was not merely to set prison caps but, rather, to address constitutional violations caused primarily by overcrowding. *See id.* The same is true in this case: the severe medical risks posed by coronavirus would exist even if the Jail was not crowded, but the plaintiffs contend the crowding at the Jail significantly enhances those risks and makes the outbreak more challenging to control. The purpose of a transfer order would be to address alleged constitutional violations stemming from coronavirus due to crowding in the Jail, and that is the type of order than only a three-judge court may issue.

### 4.    Three-judge court

The plaintiffs also have asked the Court to convene a three-judge court "to consider whether and to what extent to enter a prisoner release order." Pls.' Reply in Supp. of Renewed Mot. for Prelim. Inj. (dkt. no. 64) at 2. Under the PLRA, "[i]n any civil action in Federal court with respect to prison conditions, a prisoner release order shall be entered only by a three-judge court." 18 U.S.C. § 3626(a)(3)(B). The Sheriff contends that the requirements for convening a three-judge court have not been met.

The PLRA provides that no court may enter a prisoner release order unless two requirements are met. 18 U.S.C. § 3636(a)(3)(A). First, a court must have "previously

entered an order for less intrusive relief that has failed to remedy the deprivation of the Federal right sought to be remedied through the prisoner release order." *Id.* § 3636(a)(3)(A)(i) (the "previous order requirement"). In addition, the defendant must have "had a reasonable amount of time to comply with the previous court orders." *Id.* § 3636(a)(3)(A)(ii) (the "reasonable time requirement").

Together, these requirements ensure that a three-judge court's prisoner release order is a "last resort remedy." *Brown*, 563 U.S. at 514. A party requesting a prisoner release order and the convening of a three-judge court must file "materials sufficient to demonstrate" that both requirements have been met. *Id.* § 3636(a)(3)(C). A federal judge can also request *sua sponte* the convening of a three-judge court if both requirements are met. *Id.* § 3636(a)(3)(D). The judge need not consider the likelihood of whether a three-judge court would issue a prisoner release order. *See Plata v. Schwarzenegger*, No. C01-1351-TEH, 2007 WL 2122657, at *1 (N.D. Cal. July 23, 2007).

### a. Previous order requirement

The Court starts with the previous order requirement. It previously entered an order for less intrusive relief by issuing the TRO. *Mays*, 2020 WL 1812381, at *14–16. The Sheriff contends that the TRO does not satisfy the PLRA's previous order requirement because it did not include an order requiring social distancing. In the TRO decision, the Court found that the plaintiffs had failed "to show a reasonable likelihood of success on their contention that the Sheriff is acting in an objectively unreasonable manner by failing to mandate full social distancing." *Id.* at *10. The Court declined to order relief with respect to social distancing throughout the Jail but required the Sheriff

to enforce social distancing in connection with the new detainee intake process. *Id.* at *14.

The previous order requirement is "satisfied if the court has entered one order [that] 'failed to remedy' the constitutional violation." *Brown v. Plata*, 563 U.S. at 514. Neither the statute nor the relevant case law suggests that a court must attempt all possible steps short of release before requesting the convening of a three-judge court. *See* 18 U.S.C. § 3636; *Brown*, 563 at 514–16. And the PLRA does not require a previous order involving a particular type of remedy; instead, it simply requires a previous order that attempted but failed to remedy the constitutional deprivation itself. *See id.* In *Brown*, the Supreme Court affirmed an order of a three-judge court mandating a population limit for California's prison system as a remedy for constitutional violations in two class actions, one involving a class of prisoners with serious mental disorders and the other involving prisoners with serious medical conditions. *Id.* at 499, 502. The Court found that district courts "acted reasonably when they convened a three-judge court," despite recent, ongoing plans to address the at-issue constitutional violations, because they "had a solid basis to doubt" that the "additional efforts . . . would achieve a remedy." *Id.* at 516.

In the TRO, the Court ordered relief less intrusive than a prisoner release order. Specifically, it required the Sheriff to establish and implement policies regarding coronavirus testing and sanitation in the Jail, implement social distancing during the new detainee intake process, provide adequate soap and/or hand sanitizer and sanitation supplies, and provide facemasks to all detained persons who are quarantined. *Mays*, 2020 WL 1812381, at *14–15. Because the TRO has not remedied

the overall claimed constitutional violation—deficient conditions in the Jail during a pandemic—it satisfied the PLRA's previous order requirement.

### b. Reasonable time requirement

Additionally, before a three-judge court is convened under the PLRA, the defendant must have "had a reasonable amount of time to comply with the previous court orders," as indicated. *Id.* § 3636(a)(3)(A)(ii). This provision "requires that the defendant have been given a reasonable time to comply with *all* of the court's orders." *Brown*, 563 U.S. at 514 (emphasis added). In some situations, a court may need "to issue multiple orders directing and adjusting ongoing remedial efforts" while it "attempts to remedy an entrenched constitutional violation through reform of a complex institution." *Id.* at 516. "Each new order must be given a reasonable time to succeed, [and] reasonableness must be assessed in light of the entire history of the court's remedial efforts." *Id.* But a court may request the convening of a three-judge court even while its remedial efforts are ongoing; otherwise, a court unreasonably would have "to impose a moratorium on new remedial orders" before a three-judge court considers the issuance of a prisoner release. *Id.*

In *Brown*, the Supreme Court found that defendants in the two consolidated cases had reasonable time to comply with court orders where one court had "engaged in remedial efforts" for five years and the other court had done so for twelve years. *Id.* Remedial efforts were ongoing when the district courts requested three-judge courts, but those ongoing efforts merely attempted "to solve the crisis" through the same "basic plan[s]" as earlier efforts. *Id.* at 515. In one case, a special master the district court

77

appointed to oversee remedial matters had issued over seventy remedial orders. *Id.* The courts had no "assurance[s] that further, substantially similar efforts would yield success absent a population reduction." *Id.* Indeed, advances that had been made in one case were "'slip-sliding away' as a result of overcrowding." *Id.* (quoting court-appointed special master).

The plaintiffs contend that the Sheriff has had a reasonable time to comply with the Court's previous order. They have requested a preliminary injunction ordering social distancing, but, in light of the urgency of the situation, they also have requested the convening of a three-judge court to consider the question of prisoner release. The plaintiffs appear to contend that if an injunction directing social distancing does not remedy the alleged constitutional violations, then only the immediate release of prisoners by a three-judge court will achieve a remedy, so a three-judge court needs to be ready to issue a ruling as soon as that time comes. The Sheriff contends that he has not reasonably had time to comply with any such order because the Court has not directed him to implement social distancing throughout the Jail.

The Court recognizes that determination of what amounts to a "reasonable time" to comply with a court's previous orders may depend on the circumstances, and here the circumstances are extraordinary, involving an infectious virus that can be transmitted quickly from person to person. So here, perhaps, a "reasonable time" may amount to days or a small number of weeks, not years as may be the case in other situations. Undue delays in responding to the coronavirus pandemic may place detained persons' health and lives in imminent danger.

Unlike in *Brown*, however, the ongoing remedial efforts in this case might remedy

the ongoing constitutional violation—which, to be clear, involves the objective reasonableness of the Sheriff's response to the coronavirus outbreak, not existence of coronavirus itself—if given adequate time.  The Sheriff has offered evidence that may be understood to suggest that he is making a substantial effort to comply with the Court's order and attempt to improve the conditions of confinement at the Jail in response to the coronavirus pandemic.  As detailed earlier in this opinion, he has complied with the TRO by implementing social distancing at intake; developing and implementing a plan to distribute soap, sanitizer, and cleaning suppliers more frequently; and providing facemasks to detained persons housed on tiers under quarantine.  In addition, he has made efforts to spread out detainees within the Jail, even though the TRO did not mandate it.  As detailed earlier, he has opened up previously closed units, doubled the number of persons housed in single-occupancy cells, attempted to ensure that detained persons are assigned beds in dorm units that are spaced more than six feet apart, and adopted various practices to encourage detained persons to practice social distancing in dorms and in common areas.   As the Court has explained, it believes that the narrowly tailored relief it is ordering via this opinion appropriately addressed the claimed constitutional violations on which the plaintiffs have shown a likelihood of success.  Unlike in *Brown*, the additional relief ordered in this decision is not based on the same "basic plan" as earlier efforts but rather takes a different and focused approach.  *Brown*, 563 U.S. at 515.  In short, it will require preventative public health measures that the Court has not previously ordered and that the Sheriff has not shown he has implemented.

Further, although the PLRA's previous order requirement refers to a single order,

its reasonable time requirement uses the plural "orders." *Compare* 18 U.S.C. §
3626(a)(3)(A)(i) *with id.* § 3626(a)(3)(A)(ii); *see also Brown*, 563 U.S. at 514.  Nothing in
the statute or the relevant case law indicates that a court must convene a three-judge
panel after issuing only one order.  Rather, the case law reflects that a court can, and
perhaps in some circumstances should, make additional efforts beyond a single TRO
before convening a three-judge court to consider ordering the release of imprisoned or
detained persons.  *See id.* (releasing prisoners is a "last resort remedy").  This seems
particularly true where, as here, a Court has a basis on which to issue an additional
order that is not "substantially similar" to its previous order and thus can attempt a new
approach to remedying the constitutional violation that might "yield success."  *Cf.*
*Brown*, 563 U.S. at 515.

For these reasons, the Court is not persuaded that it has given its less-intrusive
orders "a reasonable time to succeed," *Brown*, 563 U.S. at 516; that the Sheriff has
"reasonable amount of time to comply" with those orders, 18 U.S.C. § 3636(a)(3)(A)(ii);
or that the Sheriff could have reasonable time to comply in light of the further efforts the
Court is taking in this order to remedy the claimed constitutional violations.  The Court
concludes that the PLRA's reasonable time prerequisite for the convening of a three-
judge court has not yet been satisfied.

For these reasons, the Court declines to request the convening of a three-judge
court. [13]

---

[13] As the Court has previously advised the parties, however, immediately after the
issuance of the TRO, the Court advised the chief circuit judge of the pendency of the
case and the potential need, at some point, to convene a three-judge court.

### 5.    Irreparable harm

In addition to showing a likelihood of success on the merits, the plaintiffs must show that they will likely suffer irreparable harm without a preliminary injunction. *Whitaker*, 858 F.3d at 1044.  Irreparable harm is "harm that cannot be repaired and for which money compensation is inadequate."  *Orr v. Shicker*, 953 F.3d 490, 502 (7th Cir. 2020) (internal quotation marks omitted).  The plaintiffs must show more than a "mere possibility" of harm but not that harm has already occurred or is certain to occur. *Whitaker*, 858 F.3d at 1045.  "[A] remedy for unsafe conditions need not await a tragic event."  *Helling v. McKinney*, 509 U.S. 25, 33 (1993).

The plaintiffs have satisfied this requirement.  They have shown a likelihood that, without additional measures to expand and enforce social distancing and the continuation of measures aimed at enhancing sanitation of surfaces within the Jail and otherwise curbing the spread of coronavirus among detained persons, some of the class members will contract the virus.   If they contract coronavirus, class members— particularly those over the age of sixty-five or with certain preexisting health conditions—risk severe health consequences, including death.  These grave risks to health are not an insignificant possibility for the class members, all of whom are live in the Jail's congregate environment, where the coronavirus has been spreading for weeks and where detained persons—even those who sleep their own cells—share spaces like common areas and showers.  Therefore, the plaintiffs have adequately shown a likelihood that they will suffer irreparable harm without a preliminary injunction.

### 6.    No adequate remedy at law

The plaintiffs also must show that they have no adequate remedy at law should

the preliminary injunction not issue. *Whitaker*, 858 F.3d at 1046. They are not required to show that a remedy is "wholly ineffectual" but rather "that any award would be seriously deficient as compared to the harm suffered." *Id.* Where harm cannot be practicably remedied by monetary damages, there is no adequate legal remedy. *See id.*; *Foodcomm Int'l v. Barry*, 328 F.3d 300, 304 (7th Cir. 2003); *see also W.S.R. v. Sessions*, 318 F. Supp. 3d 1116, 1126–27 (N.D. Ill. 2018) (no adequate remedy of law to address harm from prolonging child's separation from parent). The plaintiffs have clearly shown that the risk of harm to their health and possibly their lives cannot be fully remedied through damages, and therefore they have shown that they have no adequate remedy at law.

### 7. Balancing of harms

"Once a moving party has met its burden of establishing the threshold requirements for a preliminary injunction, the court must balance the harms faced by both parties and the public as a whole." *Whitaker*, 858 F.3d at 1054. The nature of the balancing analysis depends on the moving party's likelihood of success: the higher the likelihood, the more the balance tips in favor of granting injunctive relief. *Id.* Before issuing an injunction ordering a defendant to perform an affirmative act, which can impose "significant burdens on the defendant," a court must give "careful consideration [to] the intrusiveness of the ordered act, as well as the difficulties that may be encountered in supervising the enjoined party's compliance with the court's order." *Kartman*, 634 F.3d at 892 (discussing certification of a class seeking mandatory injunctive relief).

The Sheriff argues that the balance of harms weighs against issuing a

82

preliminary injunction because he is doing the best he can to contain the spread of coronavirus at the Jail, including, he contends, following the CDC Guidelines to the greatest extent possible. He argues that an order requiring him to implement more health and protective measures would be disruptive to his ongoing and persistent efforts to protect detainees from coronavirus. He also argues that the Court should defer to his expertise and judgment regarding the best policies and practices to implement at the Jail, particularly in light of the fundamental need for him to maintain internal security and order. *See Bell*, 441 U.S. at 547–48. The plaintiffs contend that the risk of severe health consequences or death to the class members is so grave that it tips the balance of harms in favor of granting a preliminary injunction. Additionally, the plaintiffs argue the public's interest in containing outbreaks of coronavirus favors granting injunctive relief.

The Court concludes that the balance favors granting preliminary injunctive relief to the plaintiffs to the limited extent contemplated by this order. First, as detailed above, the plaintiffs have presented ample evidence of conditions that pose an unreasonable risk of serious harm to the class members' health and, despite the laudable strides the Sheriff has made since the Court issued the TRO, at least some shortcomings in the Sheriff's mitigation of that risk. This evidence tips the balance in favor of injunctive relief because, as the Court has explained, the plaintiffs have far surpassed their burden of demonstrating a "better than negligible" likelihood of success on the merits. *Whitaker*, 858 F.3d at 1046 (quoting *Cooper v. Salazar*, 196 F.3d 809, 813 (7th Cir. 1999)). The interest of the public in containing the spread of coronavirus further tips the balance in favor of injunctive relief.

As it did in issuing the TRO, the Court acknowledges the deference owed to the Sheriff in the operation of the Jail and in his development of internal procedures to maintain safety, order, and security and to response to this severe crisis. The Court recognizes the immense amount of time and work that the Sheriff and his staff have spent trying to respond to this crisis. The Court further recognizes that compliance with judicial orders impose burdens on the Sheriff and his staff, in no small part by requiring them to devote some of their limited time and resources to following a court's directives.

The Court has taken these considerations into account in ordering the limited relief described in this order. It has ensured that the relief is narrowly drawn, extends no further than necessary, and is the least intrusive means necessary to address the shortcomings discussed earlier in this opinion. The Court has tailored the relief to account for deference to the Jail's ongoing planning and efforts to address the risks associated with the coronavirus outbreak. The Court also has, as indicated earlier, taken into account the enhanced requirements for issuing what it has referred to as a "mandatory injunction." And the Court has concluded that it will not encounter significant obstacles in supervising the order despite its mandatory nature. Despite these considerations, the risk to the health and safety of detainees and others is sufficient to permit and require preliminary injunctive relief.

## C. Preliminary injunctive relief

For the reasons stated above, the plaintiffs have met the criteria for a preliminary restraining order with regard to at least parts of Count 1 of their complaint. The Court orders as follows and will also include this in a separate preliminary injunction order issued under Federal Rule of Civil Procedure 65(d).

84

- The Sheriff shall maintain and carry out a policy requiring prompt coronavirus testing of: (1) detained persons who exhibit symptoms consistent with coronavirus disease, and (2) at medically appropriate times, detained persons who have been exposed to others who have exhibited those symptoms or have tested positive for coronavirus. With regard to the category (2), the Sheriff must acquire and maintain sufficient testing materials so that determination of the appropriateness of testing such persons is made pursuant to medical and public health considerations and not the availability of testing materials.

- The Sheriff shall enforce social distancing during the new detainee intake process, including continued suspension of the use of bullpens and other multiple-person cells or enclosures to hold new detainees awaiting intake.

- The Sheriff shall provide soap and/or hand sanitizer to all detainees in quantities sufficient to permit them to frequently clean their hands.

- The Sheriff shall provide sanitation supplies sufficient and adequate to enable all staff and detainees to regularly sanitize surfaces and objects on which the virus could be present, including in all areas occupied or frequented by more than one person (such as two-person cells, as well as bathrooms, showers, and other surfaces in common areas). The Sheriff shall also maintain and carry out a policy requiring sanitization between all uses of frequently touched surfaces and objects as well as monitoring and supervision to ensure that such sanitization takes place regularly.

- The Sheriff shall provide facemasks to all detained persons who are quarantined—i.e., those who have been exposed to a detained person who is

symptomatic (even if not coronavirus-positive). The facemasks must be replaced at medically appropriate intervals, and the Sheriff must provide the users with instruction on how to use a facemask and the reasons for its use.

- The Sheriff shall establish by no later than April 29, 2020 and shall put into effect by no later than May 1, 2020 a policy precluding group housing or double celling of detained persons, except in the following situations:

  o Persons detained in tiers or dormitories currently under quarantine following a positive test for the coronavirus within the tier or dormitory ("quarantine tiers");

  o Detained persons who have tested positive for the coronavirus and are under medical observation ("isolation tiers");

  o Detained persons who have tested positive for coronavirus and are recovering ("convalescent tiers");

  o Double-celled or dormitory-housed detainees for whom there is a documented determination by a medical or mental health professional that single-celling poses a risk of suicide or self-harm;

  o Persons detained housed in a dormitory unit that is at less than fifty percent capacity; and

  o Detained persons committed, at the documented direction of a medical or mental health professional, to a group housing unit that is equipped for medical or mental health treatment, if but only if there is not available space in an appropriate housing or medical unit that permits full social distancing.

- Detained persons housed in any of the listed "acceptable" arrangements must be provided with facemasks that are replaced at medically appropriate intervals. The detained persons must be provided with instruction on how to use a facemask and the reasons for its use. They also must be instructed, at regular intervals, on the importance of social distancing.

- On May 1, 2020, the Sheriff shall file a report regarding his compliance with the terms of the preliminary injunction.

Finally, the Court will entertain submissions by the parties regarding the duration of the preliminary injunction, in particular the social distancing provisions. Typically, a preliminary injunction lasts until the trial on the merits, but the order the Court is entering is predicated on an underlying condition—the ongoing pandemic—that, one can hope, will not last indefinitely. Under ordinary circumstances, there is nothing constitutionally inappropriate about housing detained persons in groups and allowing them to come into contact with each other. Currently we are not living in ordinary circumstances—hence the preliminary injunction—but once matters return to something approaching normal, it may be appropriate to loosen the requirements of the injunction. The Court (either the emergency judge or the assigned judge) will address this with the parties at a future date.

### Conclusion

The Court grants the plaintiffs' motion for preliminary injunction in part and denies it in part as set out in this Memorandum Opinion and Order [dkt. no. 55].

_____
MATTHEW F. KENNELLY
United States District Judge

Date: April 27, 2020