IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| ANTHONY MAYS, et al., | ) | Case No. 20-CV-2134 |
| Plaintiffs, | ) ) | Hon. Matthew F. Kennelly, |
| v. | ) ) | in his capacity as Emergency Judge |
| THOMAS J. DART, Sheriff of Cook County, | ) ) | |
| Defendant. | ) ) | Hon. Robert W. Gettleman, District Court Judge |
| | ) ) | |
| | ) | Hon. M. David Weisman, Magistrate Judge |

**DEFENDANT'S POST-PRELIMINARY INJUNCTION REPORT**

NOW COMES the Defendant, THOMAS J. DART, in his Official Capacity as Sheriff of Cook County, and for his Report to the Court following the April 27, 2020 ruling, states as follows:

## INTRODUCTION

Following the Court's April 27, 2020, ruling on Plaintiffs' Motion for Preliminary Injunction, the Court directed Sheriff Dart to file a report regarding his implementation of the Court's directives as outlined in the Order. Dkt. 73, pp. 84-87. The April 27 Order converted the terms of the prior temporary restraining order to a preliminary injunction, and added an additional directive to implement "full" social distancing in the Jail, subject to the six exceptions enumerated in the Order. This Report will demonstrate the measures the Sheriff's Office has taken following the April 27 ruling and provide an update on the policies and procedures described in the Post-Ruling Report filed on April 13, 2020, and presented at the evidentiary hearing on April 23, 2020. Dkt. 29-1, Dkt. 41, Dkt. 51, Dkt. 62.

## I.     COVID TESTING

In its April 27 Order, the Court directed the Sheriff to maintain and carry out a policy requiring prompt coronavirus testing of: (1) detainees who exhibit symptoms consistent with coronavirus disease; and (2) at medically appropriate times, detainees who have been exposed to others who have exhibited those symptoms or have tested positive for coronavirus. Dkt. 73, p. 85. This directive is similar to the one issued by the Court in its April 9 Order on the temporary restraining order, but the Court has now also ordered that "the appropriateness of testing…[must be] made pursuant to medical

and public health considerations and not the availability of testing materials," additionally ordering the Sheriff to "acquire and maintain sufficient testing materials" to fulfill this purpose. Dkt. 73, p. 85.

As explained in the Sheriff's prior filings, Cermak Health Systems administers all nasopharyngeal (PCR) and ID Now rapid tests according to its policies and medical protocols. Dkt. 51, p. 10. Cermak amended its Outbreak Prevention and Control Policy B-01.6 to incorporate protocols for the specific handling and testing of suspected COVID-19 cases. Dkt. 51, p. 10; Dkt. 52-2. According to Dr. Concetta Mennella, Appendix B to the Outbreak Prevention Policy provides Cermak's testing protocol to be used during the COVID-19 pandemic. Dkt. 51, p. 11; Dkt. 52-2. Appendix B has been amended to reflect that the appropriateness of medical testing is not dependent on the availability of testing supplies. Ex. A, Cermak B-01.6, Appendix B, Amended.

Consistent with the Court's directives, Cermak continues to test symptomatic detainees anywhere they may be within the Jail or at intake. Ex. B, Mennella Dec., ¶7. Importantly, between March 18 and April 30, 2020, Cermak has administered more than 1,300 tests, over 1,100 of which were administered to unique individuals.[1] Ex. B, Mennella Dec., ¶5.

Dr. Mennella also provided an updated testing protocol for asymptomatic detainees (surveillance testing), within quarantine units and elsewhere in the Jail. Ex. B, Mennella Dec., ¶8. According to Dr. Mennella, this updated testing protocol is based on

---

[1] Others of these tests are given to detainees who may have received a suspected false positive result, or those who are transitioning out of medical isolation and into a convalescent unit. Ex. B, Mennella Dec., ¶9.

guidance from the Centers for Disease Control, the Chicago Department of Public Health, and Cook County Health Infection Control. Ex. B, Mennella Dec., ¶6. Dr. Mennella stated that surveillance testing is conducted within the Jail's quarantine units, which house those detainees who have possibly been exposed to COVID-positive or symptomatic detainees (persons under investigation). Ex. B, Mennella Dec., ¶8. Within that population, priority is given to those quarantined detainees who also have pre-existing conditions that may put them at greater risk of infection. Ex. B, Mennella Dec., ¶8. According to Dr. Mennella, Cermak is also testing detainees who enter the Jail upon intake; detainees who are being admitted to a Medical or Psychiatric Special Care Unit within the Jail, which includes the Residential Treatment Unit (RTU) and the onsite Cermak hospital unit, both in Division 8; and detainees who transition to another facility, upon the request of that external facility. Ex. B, Mennella Dec., ¶8.

The Sheriff has worked diligently in the past to have the Jail designated as one of the first sites in the nation to receive ID Now rapid testing capabilities. Dkt. 51, p. 7. He also facilitated the expedited delivery of rapid-testing technology to Cermak for use at the Jail. Dkt. 29-1, pp. 6, 8. However, as the Court has previously recognized, Cermak maintains the supplies for medical testing and it alone has the authority to administer them. Dkt. 73, p. 11, 12 n.4. The Sheriff does not obtain medical tests on behalf of Cermak or control Cermak's medical operations. Dkt. 47, p. 36. Additionally, any decisions about medical recommendations and medical care, including when testing is medically appropriate, are made by Cermak alone, upon which the Sheriff is entitled to rely. *McCann v. Ogle*, 9090 F.3d 881, 888 (7th Cir. 2018). While it is possible that testing

supply shortages may occur at some point in the future, as has happened in the past on a nationwide scale, to date, Cermak has not indicated to the Sheriff that it is in danger of exhausting its supply of testing materials. If Cermak seeks the Sheriff's assistance to obtain expedited delivery of testing equipment in the future, he will assist to the extent possible, as he has done in the past, by making inquiries of local authorities and emergency management agencies as a courtesy.

Finally, as described more fully in the Sheriff's Post-Ruling Status Report, the Sheriff enacted a policy, effective April 11, 2020, directing his correctional officers to refer any detainees with suspected symptoms of COVID-19 to Cermak for further evaluation and testing, if Cermak deems it medically appropriate under its testing protocols. Dkt. 51, p. 13. Given the Court's satisfaction with the Sheriff's compliance on this issue (Dkt. 73, p. 67), the Sheriff continues to successfully administer the "COVID-19 Health Inquiry Referral for Medical Care, Testing or Other Medical Diagnostics Procedure," which coordinates the actions of DOC staff and Cermak in response to situations where COVID-19 symptoms, or other flu-like symptoms, may be present. Cermak's Outbreak Prevention and Control Policy B-01.6 is specifically referenced in the Health Inquiry Referral policy. Dkt. 51-6.

The Sheriff's staff also will continue to coordinate with Cermak to issue any necessary quarantine alerts in the Jail based on Cermak's evaluations. Dkt. 51-6. If Cermak determines that a detainee must be isolated, it will notify the Watch Commander, who must then request that the Classification Unit enter a "Quarantine Alert" into the jail management system for that tier. Dkt. 51-6. Thus, while the Sheriff's

staff cannot itself make the medical determinations necessary to "require" prompt testing of any detainees (Dkt. 73, p. 85), it will promptly notify Cermak that a detainee is complaining of or displaying suspected COVID-19 symptoms and facilitate the process by which Cermak must determine whether coronavirus testing is medically appropriate. Dkt. 51-6.

## II.   SOCIAL DISTANCING AT INTAKE

The Court also directed the Sheriff to "enforce social distancing during the new detainee intake process, including continued suspension of the use of bullpens and other multiple-person cells or enclosures to hold new detainees awaiting intake." Dkt. 73, p. 85. As the Court recognized in its Order, the Sheriff "implemented a modified procedure that maintains six feet of distance between all detained persons awaiting intake and provides them with facemasks. Use of the bullpens was discontinued." Dkt. 73, p. 12. Although the Court only initially required social distancing for new detainees upon intake into the Jail after being remanded to the Sheriff's custody, the Sheriff voluntarily extended this social distancing practice to arrestees upon their arrival at the DOC facility, while they are awaiting bond hearings. Dkt. 51, p. 3. The Court acknowledged that the Sheriff "has complied with the TRO by implementing social distancing at intake." Dkt. 73,  p. 79.

The Sheriff continues to implement these social distancing practices for arrestees in the Reception Classification and Diagnostic Center (RCDC) upon their arrival at DOC, and during the intake process. These arrestees and detainees also are given surgical masks to wear as they make their way through these processes. They receive

standard verbal screening questions for the presence of COVID-19 symptoms and any known contact with an infected person, and have their temperature taken to screen for signs of a fever. Dkt. 51, p. 4. If Cermak determines that an arrestee or detainee has a fever or suspected COVID-19 symptoms at any point from the time of arrival at RCDC, the individual is sent to testing isolation for further medical evaluation by Cermak. Dkt. 51, p. 4.

To further prevent the introduction of coronavirus into the Jail, all detainees are housed in a quarantine tier for 14 days before joining the general population. Furthermore, as described above, pursuant to Cermak's modified testing protocols, these detainees also will receive COVID-19 tests at intake, even if they appear asymptomatic. Ex. B, Mennella Dec., ¶8.

Consistent with the Sheriff's prior reporting, the number of arrestees arriving at the Jail remains very low. On average, between April 12 and April 30, 2020, approximately 34 arrestees were booked and released after their bond hearings. During the same period, approximately 23 detainees were processed into the Jail after being remanded to the Sheriff's custody. Ex. C, Declaration of Michael Miller.

The Sheriff previously reported that these modified social distancing practices could be maintained while the number of arrestees and detainees remained low. However, as noted, a sharp increase in the intake population will affect the Sheriff's ability to maintain these modified processes. In his declaration, Chief of Staff Brad Curry attested that the Sheriff's Office was evaluating a contingency plan to hold arrestees and detainees in an unoccupied tier where they would be single-celled as they

awaited processing. Dkt. 52-1. To date, it has not been necessary to implement this contingency plan. The unoccupied tier remains designated for intake overflow, but that may need to be reevaluated in light of the new demands for single-celled housing as a result of the new "full" social distancing requirements imposed by the Court's April 27 Order, as discussed more fully in section IV below.

### III.   SANITATION/PPE

The Court's Order also directed the Sheriff to continue his efforts to provide adequate sanitation supplies and personal protective equipment (PPE) to detainees throughout the Jail. Specifically, the Court ordered the Sheriff to: (A) provide soap and/or hand sanitizer to all detainees in quantities sufficient to permit them to frequently clean their hands; (B) provide sanitation supplies sufficient to enable all staff and detainees to regularly sanitize surfaces and objects on which the virus could be present, including frequently-touched surfaces, and to ensure that sanitization occurs regularly; and (C) provide facemasks to all detainees in quarantine tiers, replacing them when medically appropriate, and provide instruction on use of facemasks. Dkt. 73, p. 85-86.

The Court acknowledged that the Sheriff "has complied with the TRO by…developing and implementing a plan to distribute soap, sanitizer, and cleaning suppliers [sic] more frequently; and providing facemasks to detained persons housed on tiers under quarantine." Dkt. 73, p. 79. The Sheriff enacted the Amended Sanitation Guidelines Specific to COVID-19 Procedure, and as the Court noted, these "enhance[d] sanitation practices" continue to be diligently carried out. Dkt. 73, p. 56; Dkt. 51-4.

The Sheriff's Office staff has created one integrated chart showing the date and time of distribution of soap, facemasks, and sanitation supplies, as well as the quantities distributed. Ex. D, Supply Log.[2] As previously reported, the Sheriff continues to distribute soap and/or hand sanitizer to detainees twice per week. Posted notices and video monitors on the tiers and at intake reinforce the need for sanitation and hygienic practices to prevent the spread of COVID-19 in the Jail. These notices include signs reinforcing the importance of proper hygiene, regular hand washing, and social distancing, with illustrations of each. Dkt. 51-3; Ex. G, Presentation to Detainees. These notices also include detailed information from the World Health Organization on how to properly put on and take off masks, and the importance of wearing masks. Ex. G, Presentation to Detainees.

The Sheriff's Office staff also continues to distribute sanitation supplies including Sanifect, bleach, Clorox wipes, Envirocare, Lysol spray, several times a week as needed to enable staff and detainees to sanitize areas where the virus could be present. In addition to the regular completion of supply delivery logs and sanitation inspection logs maintained by the living unit officers, members of the CCDOC Sanitation Audit Team tour all divisions of the Jail and inspect the cleanliness of each area. Ex. C, Sanitation Team Divisional Report. Members of the sanitation team comment on the officers' efforts to keep their divisions clean, noting how a division "keeps getting cleaner every time we complete these rounds," and how the officers "take great pride"

---

[2] Ex. E and Ex. F are examples of the documents that support the summary supply log.

in their divisions. Ex. H, Sanitation Team Divisional Report, p. 4. Often, sanitation team members will even note observations of good social distancing practices by detainees, social distancing enforcement efforts by officers, and proper use of facemasks. Ex. H, Sanitation Team Divisional Report, pp. 2-5.

This is consistent with reports from public health agency representatives who toured the Jail on April 17, 2020. CDC Epidemiologists Paige Armstrong and Alison Binder, CDC Epidemic Intelligence Service Officer Isaac Ghinai, and CDPH Medical Director Stephanie Black visited the Jail as part of an ongoing collaboration with the Jail. According to CCSO Senior Advisor Rebecca Levin, who also attended the tour, these officials "commented frequently on the cleanliness of the facility and the noticeable smell of bleach throughout." They also observed detainees and staff members actively cleaning. Dkt. 70, ¶14.

As to PPE, the Court ordered only that detainees on quarantine tiers and in areas where social distancing is not possible must receive surgical facemasks. However, the Sheriff has been voluntarily providing *all* detainees in the Jail with surgical facemasks on a daily basis since April 13, which are replaced as needed. Dkt. 73, p. 56. The Sheriff has been successful in obtaining a steady supply of these facemasks and has nearly 420,000 on hand currently, which will last into August at current usage rates. Ex. C, Declaration of Michael Miller.

In addition to supply delivery logs maintained by the living unit officers, members of the CCDOC Personal Protective Equipment (PPE) Accountability Team tour all divisions of the Jail and inspect each area for cleanliness and PPE usage. Ex. I,

PPE Team Report. Members of the PPE team verify the amount of supplies on hand in the divisions, document usage of PPE by detainees and staff, and remind detainees and staff to practice social distancing. Ex. I, PPE Team Report. They also record other observations, such as cleanliness of common areas, the presence of Cermak nurses taking temperature checks on the tiers, and the need for any additional supplies. Ex. I, PPE Team Report, pp. 10-15. This, too, is consistent with observations by the CDC and CDPH representatives during their April 17 tour. Dkt. 70, ¶15.

## IV.   "FULL" SOCIAL DISTANCING

Finally, the Court's Order directs the Sheriff to establish a policy prohibiting group housing or double-celling of detainees, except in certain situations, effective May 1, 2020. While the Court initially declined to order "full" social distancing in housing areas throughout the Jail in its April 9 Order, recognizing the infeasibility of accomplishing that in light of space constraints, the Sheriff has nevertheless been making "significant efforts" to increase social distancing where possible at the Jail. Dkt. 73, p. 14; Dkt. 61, p. 18-19. Specifically, the Court recognized the Sheriff's voluntary efforts to open previously closed divisions of the Jail to accommodate more housing; convert 175 tiers to single-occupancy cells; limit dormitory units to fifty percent of capacity outside of the medical and mental health housing units; and regulating detainees' use of dayrooms and common areas. Dkt. 73, p. 14, 79. This housing reconfiguration was made possible in part because of a decrease in the Jail population since mid-March, due to the efforts of the State's Attorney, the Public Defender, and the criminal courts to secure the pretrial release of nearly 1,500 detainees, and reassignment

of nearly 500 detainees to the electronic home monitoring program. Dkt. 73, p. 15; Dkt. 62-4, ¶7-8; Ex. C, Declaration of Michael Miller.

Nevertheless, while the Court and Plaintiffs have recognized the "dramatic steps" taken by the Sheriff to voluntarily implement social distancing at the Jail wherever possible (Dkt. 73, p. 18), the Sheriff candidly reported that he could not accomplish "full" social distancing throughout the Jail at this time because of certain housing restrictions, like detainee medical conditions, security classifications and concerns, and quarantine or isolation status, among other things. Dkt. 61, p. 19.

The Court credited some of these functional limitations and created several exceptions to its "full" social distancing directive in this Order. The Sheriff may not double-cell detainees or assign them to group housing, except in the following situations:

1.  Persons detained in tiers or dormitories currently under quarantine following a positive test for the coronavirus within the tier or dormitory ("quarantine tiers");

2.  Detained persons who have tested positive for the coronavirus and are under medical observation ("isolation tiers");

3.  Detained persons who have tested positive for coronavirus and are recovering ("convalescent tiers");

4.  Double-celled or dormitory-housed detainees for whom there is a documented determination by a medical or mental health professional that single-celling poses a risk of suicide or self-harm;

5.  Persons detained housed in a dormitory unit that is at less than fifty percent capacity; and

6.  Detained persons committed, at the documented direction of a medical or mental health professional, to a group housing unit that is equipped for medical or mental health treatment, if but only if there is not available

space in an appropriate housing or medical unit that permits full social distancing. Dkt. 73, p. 86.

Pursuant to this directive, the Sheriff enacted "Preliminary Injunction Order: Housing of Detainees During COVID-19 Pandemic," effective May 1, 2020. The policy sets forth the Court's requirements for social distancing in housing units, subject to the enumerated exceptions. Ex. J, CCSO Housing Policy. This policy is administered in conjunction with Cermak, given that all but one of the exceptions is premised on a documented medical determination made by Cermak staff. Based on the current Tier Occupancy Chart, 184 of 206 housing units are at 50% capacity or less. The remaining units fall within one or more of the following exceptions.  Ex. K, Tier Occupancy Chart, May 1, 2020.

### 1.    Quarantine tiers

As described elsewhere in the Sheriff's briefing, when a watch commander receives verification from Cermak that a detainee will be isolated after testing positive for COVID-19 or is a PUI, then a quarantine alert is issued for that detainee's entire tier. Dkt. 30-8, ¶19(a); Dkt. 62-5; Dkt. 51-6. The tier remains on quarantine for 14 days. As the Court noted, it is not advisable to move any detainees while on quarantine. Dkt. 73, p. 64. Thus, any housing arrangements must remain as they are until the expiration of the quarantine period. The Tier Occupancy Chart, updated on May 1, 2020, shows that there are currently 47 tiers on quarantine status, 7 of which are specialty housing dorms within Division 8 RTU, and fall under exception 6 as well. It is also worth noting that 42

of these quarantine tiers are at 50% occupancy or less, and fall under exception 5. Ex. K, Tier Occupancy Chart, May 1, 2020.

**2.      Isolation tiers**

Cermak makes all medical determinations as to whether a detainee must be placed in medical isolation after testing positive for coronavirus. The CDC Guidelines advise that individuals who have tested positive for COVID-19 can be in "cohort" or congregate housing in medical isolation and need not practice strict social distancing since they have already contracted the virus. Dkt. 73, p. 64; Dkt. 30-8, ¶19(b); Dkt. 62-5. There are currently 16 tiers on isolation status, all but two of which are in Division 8 Cermak or RTU. They are occupied at a density above 50%, but in addition to their isolation status, they fall under exception 6 as well. One isolation area is a single-celled tier in Division 10, and the other is the Boot Camp unit. Ex. K, Tier Occupancy Chart, May 1, 2020.

**3.      Convalescent tiers**

Cermak makes all medical determinations as to whether a detainee is in recovery and may be moved to a convalescent tier. Ex. B, Mennella Dec., ¶9. The CDC Guidelines advise that convalescent tiers with recovering detainees may have cohort housing as well. Dkt. 73, p. 64. There are currently two tiers designated as convalescent, one of which is in Division 10, and one of which is in Division 8 RTU. Ex. K, Tier Occupancy Chart, May 1, 2020.

### 4. Risk of self-harm

Cermak staff advise that there may be a small number of detainees in poor mental health who may experience suicidal ideation or engage in other types of self-harm if they are assigned to a single cell and do not have sufficient socialization. Dkt. 61, p. 22. If these individuals are not already assigned to special medical housing in Cermak or RTU, see exception 6 *supra*, they may be housed in dorms or double-celled under this exception.

### 5. Dormitories with less than fifty percent occupancy

Currently, there are 59 dormitory tiers, 43 of which are occupied at 50% capacity or less. This is up from 40 dorms at the time of the evidentiary hearing. In the Order, the Court specifically noted that at the time of the hearing, Division 2, Tier D1-D was at 81% capacity. Dkt. 73, p. 21. This tier housed the population of 39 detainees who were in protective custody for reasons associated with the PREA. Pursuant to the Court's ruling, they have been reassigned to different housing units that permit them to practice "full" social distancing. Dkt. 73, p. 65. However, they also will be housed near other groups of detainees in this tier, which makes it more difficult to guarantee their protection than in Division 2. Additionally, Division 2, Tier D4-RL was at 59% occupancy at the time of the hearing (Dkt. 73, p. 21). But half of those detainees were moved to Tier D4-RU (previously closed), and now each tier has 30% and 24% occupancy, respectively. Ex. K, Tier Occupancy Chart, May 1, 2020. Furthermore, since the hearing, Executive Director Miller has executed his "back pocket" plan to reconfigure housing arrangements among the men's and women's tiers to use the space

in the celled tiers and the dorms more efficiently. Dkt. 73, p. 22; Ex. C, Declaration of Michael Miller.

Currently, sixteen dorms are over 50% capacity, but all fall within at least one of the permitted exceptions: one is a convalescent tier; five are quarantine tiers; six are isolation tiers; and four are specialty medical housing tiers in RTU. Ex. K, Tier Occupancy Chart, May 1, 2020. It bears noting that during the April 17 Jail tour, CDPH representatives commented on the notable increase in social distancing at the Jail, particularly with respect to the reduced density of bunk assignments in the dorms, since their last visit in March. Dkt. 70, ¶15; Dkt. 73, p. 13-14.

### 6. Group housing for medical or mental health treatment

During the intake process, Cermak staff members perform a standard medical evaluation of each detainee. Dkt. 51, p. 6. Based on these evaluations, Cermak staff may enter a "medical alert" into the DOC communication system alerting DOC staff generally of a medical condition that may affect operational decisions as to that detainee, such as special dietary needs, whether he is permitted to have a medical device like an inhaler that will not be confiscated as contraband, or any special housing needs. Dkt. 62, p. 24; Dkt. 73, p. 19.

Some of the more important medical alerts pertain to housing requirements for detainees with serious medical or mental health conditions. Where Cermak staff assign a detainee an M3 alert, it indicates that the patient requires housing with a round-the-clock nurse and access to special accommodations, and the recommended housing unit is the RTU. Ex. L, Cermak Policy A-08, Communication on Patient's Health Needs, p. 6.

If a Cermak staff member assigns a detainee an M4 designation, it indicates that the detainee requires monitoring and care in an environment with direct access to a nurse, and the recommended housing unit is Cermak. Ex. L, Cermak Policy A-08, Communication on Patient's Health Needs, p. 6.

Similarly, a detainee designated as a P3 has moderate or serious symptoms; some impairment in reality testing or communication; and/or moderate to serious impairment in social and overall functioning, and is similarly suited for the RTU. A detainee with a P4 designation suffers from severe functional impairment with regression, disorganization, and chaotic functioning, and/or behavior related to major mental illness that results in imminent risk of harm to self or others and is recommended for housing in Cermak. Unit. Ex. L, Cermak Policy A-08, Communication on Patient's Health Needs, p. 7. These tend to be permanent or long-term housing placements due to the detainee's need for extensive medical or psychological care or monitoring. Because of these special medical and housing needs, these detainees cannot be housed in the general population tiers. Ex. C, Declaration of Michael Miller. Thus, Cermak and RTU are exempt from full social distancing because the detainees reside there for the purpose of obtaining medical or mental health treatment at the documented direction of a medical or mental health professional, which takes precedence over "full" social distancing.

At any given time, the residents of Division 8 may not be able to practice "full" social distancing depending on the number of other detainees also assigned to those units. Dkt. 73, p. 21-22. Currently, as a function of the number of detainees in Cermak,

half of the tiers are occupied at more than 50%, although one of those tiers is an isolation tier as well. Slightly more than half of the tiers in RTU are occupied at more than 50% also, although nearly all of them are quarantine or isolation tiers. Ex. K, Tier Occupancy Chart, May 1, 2020.

The Court also instructed that detainees housed in these "acceptable" arrangements must be provided with facemasks that are replaced at medically appropriate intervals and be instructed on how and why they are used, as well as the need for social distancing. Dkt. 73, p. As stated above, for the past three weeks, *every* detainee in the Jail has been given at least one surgical facemask each day. Additionally, notices and video monitors in the tiers display information about the need for sanitation and hygienic practices to prevent the spread of COVID-19, and reinforce the importance of proper hygiene, regular hand washing, and social distancing, with illustrations of each. Dkt. 51-3.

### 7. Safety and security exception

The Court declined to create a safety and security exception to the social distancing requirement that would allow officers to regain control in situations involving disorderly or dangerous conduct by detainees, but invited the Sheriff to submit a supplemental and properly-supported request for such an exception. Dkt. 73, p. 65. In his declaration, Executive Director Miller stated that particularly when multiple detainees become involved in fights or other incidents at the Jail, ordinarily they are separated immediately, removed from the situation, and held in special management tiers so officers can tend to any injuries and regain control of the emergent

situation. Ex. C, Declaration of Michael Miller, p. 12. The detainees also would remain in those special management tiers to await a disciplinary hearing or other consequences for their unruly or dangerous behavior. Dkt. 62-5, ¶20. Currently, because of the social distancing requirement, many of the special management tiers are being used for single-cell housing, and detainees cannot be double celled.

However, responding to security situations at any given time is a fluid situation, despite the officers' best efforts, and they must be able to use all devices available to them to maintain order and safety in the Jail. There have recently been an increasing number of incidents involving multiple detainees acting in concert in response to measures implemented by the Sheriff in response to the COVID-19 outbreak. For example, on April 29, there was a detainee uprising in RTU Tier 3G, which is currently housing many detainees who would not otherwise be assigned to a dormitory setting based on their security classifications in the Jail. Ex. C, Declaration of Michael Miller, Ex. 1. At least 13 detainees were involved in threatening bodily harm to any staff members entering the tier. Medical equipment was broken to be used as weapons and soapy water was spread all over the floor. The Emergency Response Team was required to respond and numerous detainees were handcuffed and removed from the tier.

Incidents like this one require that all of those detainees—13 in this case—be placed in disciplinary housing for security and safety reasons on an immediate basis. Given that those special management tiers are now being occupied as single-cell housing units, that impedes the Sheriff's ability to detain the offenders and quell an emergent situation by having to defer to the social distancing policy. There are limited

18

housinoptions available due to the social distancing requirement, but time is of the essence in situations like this. If similar incidents continue to occur, and continue to escalate, safety and security will have to take precedence, and it will not always be possible to maintain full social distancing when an emergency or security related situation requires that the offender(s) be immediately removed and isolated.

## V.      THE FEASIBILITY LIMIT

While the Court acknowledges the "significant and impressive" efforts taken by the Sheriff "in good faith" to protect detainees from the spread of infection (Dkt. 73, p. 56)—including, among many other things, the extraordinary step of opening several dormant divisions of the Jail to provide additional socially-distanced housing—the Sheriff has been, and will continue to be, candid with the Court about the limitations on his ability to maintain "full" social distancing at the Jail for the foreseeable future, despite his best efforts. Dkt. 62, p. 20. The Sheriff, and Executive Director Michael Miller in particular, have been able to make further adjustments to reduce occupation density in group housing units, even in the week since the evidentiary hearing, to achieve full compliance with the Court's Order as of the time of this filing.

However, it is likely that the Sheriff will at some point approach the "feasibility limit" of housing any more detainees while maintaining "full" social distancing throughout the Jail. Dkt. 73, p. 63. As the Court is aware, while the Jail campus is one of the largest in the nation, detainee housing options are limited when the tiers can only be occupied at half capacity. And unfortunately, the detainee population in Cook County is not a static one. Historically, the Jail experiences a sharp rise in the intake population

as the weather grows warmer, and there is little reason to think that will be different this year. In fact, the first warm Spring weekend may now be upon us, and the officers are bracing for a wave of new detainees. However, the resources at the Jail are reaching their limit already under the Court's Order. A sudden spike in the Jail population in the near term would upend the delicately balanced housing arrangements currently in place, and there are few alternatives left that would allow the Jail to operate effectively and still permit "full" social distancing throughout the Jail.

It is possible that the emergency nature of this pandemic will subside before the Jail's space and resources are fully depleted. In the event it does not, the Sheriff may do as the Court suggests and seek to modify the terms of the injunction in full consideration of all relevant factors. Dkt. 73, p. 87. In that case, the Sheriff would continue to act in good faith to implement the letter and spirit of the Court's order, as he has done, and to maintain as much social distancing as operationally possible until any resolution by the Court. But with the benefit of experience on historic trends in the Jail population, before long, the Sheriff's overriding obligation to preserve order, maintain discipline, and provide security at the Jail may very well have to be balanced directly against his obligation to reasonably abate the risk of harm from coronavirus.

## CONCLUSION

Sheriff Dart respectfully submits this Post-Preliminary Injunction Report for the

Court's consideration pursuant to its April 27, 2020 Order.

By: */s/ Gretchen Harris Sperry*
One of the attorneys for Defendant
Thomas J. Dart, Sheriff of Cook
County

Robert T. Shannon
James M. Lydon
Gretchen Harris Sperry
Adam R. Vaught
Lari Dierks
HINSHAW & CULBERTSON LLP
151 N. Franklin Street, Suite 2500
Chicago, Illinois 60601
Tel. 312-704-3000

<u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that on May 1, 2020, I electronically filed the forgoing **DEFENDANT'S POST-PRELIMINARY INJUNCTION REPORT** with the Clerk of the U.S. District Court, using the Court's CM/ECF system, which will accomplish service electronically on all counsel of record.

*/s/ Gretchen Harris Sperry*