## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| ANTHONY MAYS, *et al.*, ) | |
| ) | |
| Plaintiffs-Petitioners, ) | |
| ) | Case No. 20-cv-2134 |
| v. ) | |
| ) | The Hon. Matthew F. Kennelly |
| THOMAS J. DART, Sheriff of Cook ) | Emergency Judge |
| County, ) | |
| ) | The Hon. Robert Gettleman |
| Defendant-Respondent. ) | Presiding Judge |

### PLAINTIFFS' RESPONSE TO THE SHERIFF'S MAY 1 STATUS REPORT AND REQUEST FOR TARGETED EXPEDITED DISCOVERY

The Sheriff's May 1 Compliance Report (the "Report") (Doc. No. 84) describes ongoing efforts to comply with the social distancing and other mandates of the Court's Preliminary Injunction ("Order") (Doc. No. 74) in the context of a still densely populated Jail where compliance is challenging, if not impossible. The Sheriff candidly admits that, should the Jail's daily admissions increase (as is to be expected in the warmer months) and should the need for social distancing continue though the late spring and early summer, compliance with the Order's social distancing requirements will become impossible. Even at the Jail's current population level, the Sheriff acknowledges that the social distancing required by the Order impairs his ability to address security emergencies. *See* Report at 17-18, 20. Specifically, the Sheriff's report indicates that, at the Jail's current population level, there is no longer sufficient space to separate violent detainees from the general population, or to protect vulnerable detainees from the risk of assault.

Plaintiffs recognize that the Sheriff's staff is working to achieve compliance with the requirements of the Order. Nonetheless, the Report makes plain that the Sheriff's Office has not achieved compliance, particularly with respect to coronavirus testing and social distancing. The

Report leaves many questions unanswered and underscores that certain vulnerable groups of detainees remain at high risk of contracting the coronavirus and of dying from that virus. In fact, at least one more detainee has passed away from the virus since the Sheriff filed the Report.[1]

So that they may fulfill their ongoing responsibilities to the plaintiff class, counsel seek limited emergency discovery to clarify the extent of the Sheriff's compliance with the Court's extended preliminary injunction relief, and the degree to which detainees in the Jail are being protected from coronavirus.[2] That requested discovery is attached as Exhibit A and discussed in Section II. Good cause for Plaintiff to issue expedited discovery is demonstrated by the narrowness of the requests and the urgency of the compliance issues with respect to the preliminary injunction.

Finally, given the compliance issues at stake, the security concerns detailed in the Report, and the outstanding risks to the detainees who are not socially distanced in the Jail, Plaintiffs ask that the Court consider setting in motion the process for convening a three-judge panel.

## I. The Sheriff's Report Raises Significant Concerns about Failure to Comply with the Order and Inability to Protect Detainees.

### A. The Sheriff is Failing to Comply with the Order's Requirement to Conduct Coronavirus Testing.

The Court's Order was very clear in requiring that detainees who fall into two categories be tested for the coronavirus: (1) those "who exhibit symptoms consistent with coronavirus

---

[1] A seventh detainee has just died in the Jail. William Sobczyk was scheduled to have a bond reduction hearing this week, seeking release on account of his "advanced cancer that had spread throughout his liver, lung, bones and brain." Jake Griffin, "Arlington Heights Man Awaiting Trial Dies from Covid-19 Infection," The Daily Herald (May 5, 2020), https://www.dailyherald.com/news/20200505/arlington-heights-man-awaiting-trial-dies-from-covid-19-infection. Mr. Sobczyk passed away prior to the hearing. The Sheriff's Office has not publicly reported this death, raising questions about whether other detainees in custody have also died from the virus.

[2] Plaintiffs intend to file a corresponding request for discovery before Judge Gettleman, in order to obtain information about other compliance issues not raised in this pleading, including as to the Sheriff's distribution of soap, PPE, and implementation of social distancing at intake.

disease" and (2) those who "have been exposed to others who have exhibited those symptoms or have tested positive for coronavirus." *See* Order at 1. The Court was equally clear that sufficient testing materials must be made accessible so that "availability of testing materials" does not drive who is tested, how frequently, or when. *Id.* The Court left to medical judgment the *timing* of tests for asymptomatic persons who may have been exposed to the coronavirus (category 2). But the Order does not permit medical professionals under the Sheriff's control (or anyone else) to veto testing for such persons altogether. Indeed, it would be difficult to imagine a medical judgment not to test persons potentially exposed to the virus, since the universal advice of public health experts is to test as broadly as possible, particularly in congregate settings and among high-risk groups, and given that asymptomatic carriers contribute to the spread of the disease.[3]

The Sheriff's Report suggests that he is not complying with the Court's Order, both as to symptomatic and exposed detainees. The Sheriff's Report appears to say that 1,100 symptomatic detainees were tested for coronavirus between March 18 and April 30. *See* Report, at 2. With respect to symptomatic detainees, the Report is silent as to what symptoms trigger a test, whether and how symptoms are verified, and by whom. No medical protocols relating to testing have been described or produced. The Sheriff's testing protocols, procedures, and outcomes remain a black box. And as Plaintiffs have previously pointed out (*see* Doc. No. 64 at 34; *see also* 64-5), detainees report being denied testing even though they were symptomatic. The attached declarations confirm this is still happening. *See* Group Ex. D (Detainee Declarations). The Report avoids

---

[3]   *See Wilson v. Williams*, ___ F. Supp. 3d ___, 2020 WL 1940882, at *1 (N.D. Ohio Apr. 22, 2020) ("[F]or some time health officials have known and reported that asymptomatic persons spread the virus. A large percentage of coronavirus-infected citizens are asymptomatic. These asymptomatic persons show no, or limited, symptoms. Yet, they spread the virus. Due to this threat from infected but asymptomatic individuals, testing, tracing and treatment became the first mitigation responsibilities."); *see also* Centers on Disease Control, Evaluating and Testing Persons for Coronavirus Disease 2019 (COVID-19), available at https://www.cdc.gov/coronavirus/2019-ncov/hcp/clinical-criteria.html (last updated May 3, 2020).

saying that *all* symptomatic detainees have been or will be tested—which is what the Order unambiguously requires.

The Report offers still less clarity with respect to the testing of individuals who may have been exposed to the virus. Plaintiffs presume that these persons are being housed on quarantined tiers, pursuant to the policies that Director Miller described earlier in this litigation whereby the tiers on which a symptomatic or COVID-positive detainee has resided are placed under quarantine. *See* Miller 4/6/20 Dec. ¶ 19 (Doc. No. 30-8). The Sheriff's most recent tier occupancy chart shows that as of May 1, there were 910 quarantined detainees on 47 separate tiers. *See* Tier Occupancy Chart (Ex. K to the Report, Doc. No. 84-12). By definition, and under the Order's mandate, *all* of these detainees must (at a medically appropriate time) receive a coronavirus test.

The Report makes clear that full quarantine testing has not and will not happen. It states that "surveillance testing is conducted within the Jail's quarantine units." Report, at 3. But the Sheriff tacitly admits that not all detainees in those units receive a test. Instead, "priority is given to those quarantined detainees who also have pre-existing conditions that may put them at greater risk of infection." *Id.* The Sheriff's updated coronavirus testing policy (Ex. A to the Report, Doc. No. 84-2) and the Declaration of Dr. Concetta Mennella (Ex. B to the Report, Doc. No. 84-3) offer no explanation—medical or otherwise—for this limitation on testing. The Sheriff's materials provide no information about the extent of testing of exposed, asymptomatic individuals— including how many detainees on the quarantined tiers have pre-existing conditions and, of those, how many have been tested. The Sheriff does not explain the failure to comply with the Order in this respect. Nor does he offer any assurance that the availability of testing will be expanded to enable surveillance testing of asymptomatic, exposed individuals.

4

The requested discovery, in Section II, is designed to address these omissions and to gather concrete information about the Sheriff's compliance with the Order regarding coronavirus testing.

### B. The Sheriff's Housing Assignments Fail to Protect Vulnerable Detainees.

The Sheriff's Report notes that the Order exempted certain housing areas from the general requirement that housing within the Jail be configured so as to enable detainees to maintain six feet of separation from all other persons. Order at 2-3. The manner in which the Sheriff is using these exemptions puts detainees at unjustifiable risk of illness and imperils their safety.

Further, with this latest report the Sheriff asks for yet another exception – this time, for security. Report at 17-19. He admits he cannot both run a safe jail and protect the health of detainees by instituting social distancing. This not only underscores the on-going crisis at the Jail but begs the urgent question of whether release of some detainees is a necessary part of the remedy.

#### 1. The Sheriff Cannot Simultaneously Protect Detainees' Physical Safety and Their Health.

The Sheriff's Report indicates that the Jail may have too many detainees, or not enough space, to institute the social distancing necessary to protect detainees from infection while simultaneously protecting detainees from unacceptable risks of physical attack. The Report suggests there is insufficient room in the Jail to protect highly vulnerable detainees from the general population, and moreover, there is insufficient space to protect general population detainees from particularly violent detainees in the jail.

First, the Report indicates that there are not enough dormitory units to segregate detainees who have been identified as being at risk of sexual assault. At the preliminary injunction hearing, Director Miller explained that one of the non-isolation, non-quarantine tiers at more than 50% capacity was a tier comprised of detainees who had been identified as in need of protection in accordance with the Prison Rape Elimination Act (PREA), 34 U.S.C. § 30301, *et seq.*, and

5

applicable standards.[4] Plaintiffs presume that these detainees had been determined to be "at high risk for sexual victimization" and that each was placed in segregated housing because there was "no available alternative means of separation from likely abusers." 28 C.F.R. § 115.43(a).

With sufficient space, the detainees on the PREA tier could be placed on two separate tiers segregated from the general population. The Sheriff reports that these vulnerable detainees have instead been reassigned to "different housing units" where, though they may practice social distancing, it will be "more difficult to guarantee their protection." Report, at 14. It appears, in other words, that in response to the Order, the Sheriff has removed PREA detainees from protective custody and dispersed them throughout the Jail, at great risk to their safety.

This is unacceptable, as Dr. Venters testified in the Preliminary Injunction hearing. *See* Prelim. Injunction Hr'g Tr. ("Hr'g Tr.") (attached as Ex. B hereto) at 72-73.[5] The PREA-identified detainees are entitled to protection from sexual assault.[6] The Sheriff does not explain why the safety of this group of detainees must be sacrificed to enable them to practice social distancing. The apparent reason is that there is insufficient room in the Jail to permit the PREA tier residents to enjoy both reasonable protection from assault and the opportunity to practice social distancing.

---

[4] Mr. Miller's April 17 affidavit indicates that this tier is DIV2-D1-D, which was then at 81% capacity with 39 detainees. Miller Decl. (Doc. No. 62-5 ¶ 17)

[5] "[T]he whole notion of PREA is that we – because we know that sexual abuse is endemic in many correctional settings, that we're going to create special tools that we all sign on to [] train our staff, to find patients or detained people who might be especially vulnerable and to think about how to protect them…. I don't believe that there is any rationale or logic or certainly scientific reason that we should swap one set of risks for another, certainly when it comes to social distancing and applying that tool for people who are in a housing area for PREA-related concerns."

[6] *See Ramos v. Hamblin*, 840 F.3d 442, 444 (7th Cir. 2016) ("[A]s the name implies, [PREA]... makes the prevention of prison rape a priority concern of prison administrators."); *see also* Cook County Sheriff's Office, "Prison Rape Elimination Act Compliance," https://www.cookcountysheriff.org/cook-county-department-of-corrections/prison-rape-elimination-act/ (last visited May 4, 2020).

In any event, the Order does not entitle the Sheriff to evade his other responsibilities under federal law, particularly as they pertain to vulnerable detainees.

Second, the Report indicates that because celled detainees must be housed in single cells in order to prevent the spread of coronavirus, there are now no available vacant cells in which to isolate detainees whose violent behavior requires emergency isolation. *See* Report at 17-18. Indeed, because detainees must now be housed in single-celled units, the Sheriff reports that many detainees who "would not otherwise be assigned to a dormitory setting based on their security classifications" are nevertheless being assigned there. *Id.* at 18. That has led to an increasing number of security incidents, including in the RTU. *Id.* at 18-19.

The Sheriff's response to this state of affairs is to assert that a new "security exception" to the Order is warranted so that he can forego essential preventative medical measures in order to control security. *Id*. at 17-19. Plaintiffs strongly disagree. They seek discovery into current conditions, outlined in Section II, to assess the extent to which class members are having their health and safety put at risk. But further, the Sheriff's inability to safely secure the facilities during the on-going pandemic weighs in favor of release via a three-judge panel, *see* Section III, *infra*, not additional social distancing exceptions.

### 2. The Sheriff is Likely Housing Vulnerable Detainees on Tiers Where Social Distancing is Impossible.

The evidence in this case is undisputed that persons who are elderly or who have certain pre-existing medical conditions are at elevated risk for contracting the coronavirus. Nor is there any dispute that, because of the potentially very serious consequences if persons in this group become infected with the virus, these individuals should be afforded every possible protection. The Sheriff admits that these individuals must be prioritized for coronavirus testing. Report, at 3 ("[S]urveillance testing is conducted within the Jail's quarantine units….Within that population,

7

priority is given to those quarantined detainees who also have preexisting conditions that may put them at greater risk of infection."). But the evidence is also clear that testing alone (a largely reactive measure) is insufficient to proactively protect highly-susceptible individuals who remain in the Jail. Instead, experts agree that preventative precautions to minimize the risk of infection are paramount for vulnerable individuals, including ensuring that they are able to practice social distancing. Venters Decl. (Doc. No. 64-2) at ¶ 12 ("For vulnerable individuals, social distancing and infection control play an even more central role in protecting against severe negative outcomes, there is no treatment or cure that has been identified to lessen their greater risk of harm after contracting the virus."); *id*. at ¶ 25 ("Creating a real-time list of high-risk patients allows for….[i]mplementing of active surveillance, special housing arrangements, and other protective measures for high-risk patients who are not ill."); Mohareb Decl. (Doc. No. 64-3) at 2 ("Persons who are susceptible to COVID-19 must maintain social distancing from others."); *id*. at 5 ("There is a strong biological rationale to containing a respiratory viral illness when susceptible populations stop gathering around persons who are potentially infected.").

       The Report suggests that the Sheriff knows who the coronavirus-vulnerable detainees are—or at least who some of them are. *See* Report at 3. Nonetheless, he admits he has taken no steps to formally flag them and to provide them affirmative protections, for example (and to the extent they are symptom-free and not positive), instituting infection control measures and housing them as a cohort with full opportunity for social distancing, where even incidental contacts are less likely to result in infection. *See* Venters Direct, Hr'g Tr. at 66 ("There also seemed to be a lack of process to identify high-risk patients, patients who are at high risk of serious illness and death

based on criteria identified by the CDC. And both create surveillance and protection for those patients who are at a high risk of serious illness and death.").[7]

To the contrary, many coronavirus-vulnerable detainees are currently being housed in dormitories that are at greater than 50% capacity, where social distancing is concededly impossible. As of May 1, there are four non-isolation, non-quarantine RTU tiers that house detainees "with serious medical or mental health conditions" where the population exceeds 50% capacity (two of them are at nearly 100% capacity). *See* Report, at 15; Tier Occupancy Chart (Report, Ex. K). The Court acknowledged that in such circumstances, social distancing is "practically impossible," putting the lives of affected detainees at unacceptable risk. Preliminary Injunction Mem. Op. (Doc. No. 73) at 63; *see also id*. ("At the current stage of the pandemic, group housing and double celling subject detainees to a heightened, and potentially unreasonable and therefore constitutionally unacceptable, risk of contracting and transmitting the coronavirus. Such arrangements make it impossible or unduly difficult to maintain social distancing, a 'cornerstone' of the reduction of coronavirus transmission among detainees."). Detainee reports confirm social distancing is *actually* impossible in the RTU and other specialty housing areas, including for those with medical vulnerabilities. *See* Group Ex. D.

---

[7] In his testimony, Dr. Venters emphasized that it was the responsibility of jail staff, not just medical staff, to ensure the protection of high-risk individuals through implementation of an integrated and proactive plan. *See* Venters Cross, Hr'g Tr. at 99 ("So I didn't see anything about the identification of high-risk patients in the building…and because of that, that identification and the act of surveillance has lots of implications for security staff. It's not just health staff doing it."); *id*. at 102 ("And so if 30 or 40 or 50 percent of the people in the whole setting have risk factors, then the question is how can you get them active surveillance. And for some of them, they'll have even more additional risk factors. So it may be that there's a gradation of people who have two risk factors or who have multiple serious risk factors might go into a cohorted house, but that all takes a plan, and that plan has to be integrated with security because, as we're talking about here, it has profound implications for housing areas, for planning of security staff."); *id*. ("I haven't seen any policies or procedures about the identification or management of high-risk patients."); *id*. at 106 ("My experience is in an outbreak…that the health system, and Cermak would fall into this, does routinely and should in an outbreak be able to communicate who is high risk and work with security staff with an integrated plan to make sure they are in the right housing area that have the right level of support, surveillance and infection control.").

9

The Sheriff has yet to explain why those with special medical and/or mental health needs (a group that by definition includes coronavirus-vulnerable detainees) should be housed in an environment where their risk of becoming infected is enhanced, not minimized. Both Dr. Mohareb and Dr. Venters opined that such groups in particular need to be protected during an outbreak, including through the implementation of full social distancing and infection control measures.[8] Instead, these detainees continue to be the ones most at risk inside the Jail. *Cf. Wilson*, 2020 WL 1940882, at *3, *10-11 (ordering release of subclass of medically vulnerable and elderly prisoners who were highly susceptible to COVID-19) ("[W]hile the deteriorating health conditions at Elkton pose a danger for each of the 2,400 men who are incarcerated at Elkton, the institution's inability to stop the spread of the virus among the inmates in its care poses an even greater risk for inmates whose medical conditions put them at higher risk of death if they contract the virus.").

3. **Dormitory Tiers (and Indeed all Tiers) At Less than 50% Capacity May Not Enable Social Distancing Necessary to Protect Against Transmission.**

The Court's Order concluded that social distancing is feasible, and that detainees suffer no constitutional violation, in dormitory settings, so long as they are at less than 50% capacity. Doc. No. 73 at 64. But the Report suggests that, as a practical matter, neither may be true.

First, there was evidence presented at the hearing that social distancing in reduced capacity dormitories is hit or miss, depending on detainees' compliance. *See* Miller Cross, Hr'g Tr. at 28.

---

[8] *See* Section I(B)(2), *supra*; *see also* Venters Cross, Hr'g Tr. at 70-72 ("So it is a complex set of housing areas and patients to think about, but it is important to recall that these [are] likely the sickest patients in the building before an outbreak starts, and so any infection control measures that are designed to save people's lives or stem the tide of an outbreak are really doubly important in these places….There are multiple reasons why we cannot ignore a high-risk group like this that we know need to be protected especially."); *id.* at 105 ("Q. Is there a way to socially distance people with mental health issues while also taking into account their possible higher suicide risk? A. Yes. I don't view that – suicide risk is an important concern in correctional settings, but to my view, the failure to implement just basic infection control and the same types of protections that are happening for everybody else in a facility will drive the suicide risk in the opposite direction.").

10

The Report is notable for its failure to specify steps that have been taken to more clearly communicate and enforce social distancing requirements within these dormitories as well as in other congregate settings. Plaintiffs have become aware of a concerning grievance filed on April 28 by one of the Sheriff's correctional officers complaining about the absence of social distancing in congregate areas of the Jail. The officer says that his allegations may be corroborated by video. *See* Michael Moore, 4/28/20 Grievance (Ex. C hereto). This report is substantiated by very recent reports of detainees, who say that even in reduced capacity dorm settings social distancing is not taking place as people still share bathrooms and eating areas and where dorm beds remain less than 6 feet apart. *See* Group Ex. D.

Thus, the reality behind the Jail walls may be far different than what is portrayed in the Report, as evidenced by the Moore grievance and the declarations on behalf of detainees. Social distancing may simply not be achievable on those tiers, even where population is below capacity.

Second, even if there was 100% compliance with the Order's mandates, expert evidence presented in the hearing showed that congregate living without full social distancing (meaning the implementation of six feet of distance in all living, sleeping, and security areas), even where tiers are at 50% capacity, will not prevent transmission of the disease. *See* Venters Direct, Hr'g Tr. at 68-70 ("[W]hen we look at a correctional facility, we really need to look at every physical space where staff and detained people are." (listing all locations in the Jail where people congregate beyond sleeping areas and thus recommending "full" social distancing at the Jail)). This has been the result at the Jail.

Miller previously reported that decks are put on quarantine status for 14 days following the removal of a person from that deck with symptoms. Miller Decl. (Doc. No. 30-8), ¶ 19. The Sheriff's May 1 tier occupancy chart, however, shows dorm tiers that have been on quarantine

11

status for much longer than 14 days. *See* Report, Ex. K. For instance, a tier in Division 2, Dorm 2 (Div2-D2-N) has been on quarantine since April 4, and is not expected to be out of quarantine until at least May 14, despite being reported at only 33% capacity. *See id*. at 2. This is not an aberration. The tier chart suggests not only that detainees are contracting the coronavirus while on quarantine, thus extending the tier's quarantine status, but that even reduced capacity dorm living does not prevent transmission where full social distancing measures are not in effect.

This transmission risk is evident not only in dorms, but also in many of the single cell tiers throughout the Jail. Despite single-celling, dozens of tiers are on extended quarantine as new cases continue to arise. *See* Report, Ex. K at 1 (10-1C, 10-2D, 11-AG, 11-AJ, 11-BG, 11B-H, 11C-A, 11-DD, 11-DF), at 2 (Division 11-DG, 11-DH, 11-DJ), at 3 (4-I2, 4-M1, 4-P2, 5-1A, 5-1D, 5-1J, 5-1L, 5-2H, 6-1A, 6-1D, 6-1J, 6-1K), at 5 (Division 9-1F, 9-1G, 9-1H, 9-2E, 9-2F, 9-3E, 9-3F).

In sum, the transmission of the disease continues unabated even in reduced capacity dorms. That informs Plaintiffs' discovery requests in Section II, and their request for relief in Section III.

## II. The Above Compliance and Safety Concerns Demonstrate "Good Cause" For Targeted Discovery.

In order to effectively monitor the Sheriff's compliance with the coronavirus testing and social distancing requirements in the Order, Plaintiffs seek narrowly targeted documentary discovery, listed in Plaintiffs' proposed expedited document production request. *See* Ex. A.

Parties are entitled to expedited discovery upon a showing of "good cause," based on the "entirety of the record to date and the reasonableness of the request in light of all the surrounding circumstances." *Ibarra v. City of Chicago*, 816 F. Supp. 2d 541, 554 (N.D. Ill. 2011) (citing cases); *see also Hard Drive Productions, Inc. v. Doe*, 283 F.R.D. 409, 410 (N.D. Ill. 2012) ("Good cause may be found where the need for expedited discovery, in consideration of the administration of justice, outweighs the prejudice to the responding party." (citation and marks

12

omitted)). When the discovery request is made in the course of preliminary injunction proceedings, the court's analysis takes into account potential irreparable injury to the moving party. *See Landwehr v. F.D.I.C.*, 282 F.R.D. 1, 4 (D.D.C. 2010).

*First,* there is no question here that the "surrounding circumstances" are grave. Detainees are continuing to die, and the evidence amassed in the record thus far suggests that the Sheriff is not fully complying with the Court's Order, and that the existing measures in place are not sufficient to protect detainees. *Second*, Plaintiffs have designed the below discovery to be as targeted as possible. As stated above, Plaintiffs intend to seek other forms of compliance discovery with the assigned judge in this case. Here, Plaintiffs seek limited discovery only about testing and social distancing, the most central remedies of the Court's Order. *Third*, Plaintiffs have gathered as much publicly available information about the Sheriff's handling of the coronavirus pandemic as possible (for instance, by monitoring the Sheriff's coronavirus website and press releases and talking to detainees and their families), but there is no other avenue by which Plaintiffs can obtain the remaining essential discovery, below, which is solely in the Sheriff's custody and control.

In short, the expedited discovery is necessary for Plaintiffs to track the Sheriff's compliance with the Order and protect class members while the pandemic rages on in the Jail.

**Discovery About Coronavirus Testing**

Plaintiffs seek the following discovery requests regarding the Sheriff's coronavirus testing protocol and procedures, including data about how many tests are actually being administered and their results (which is not publicly-available information):

1. Documents sufficient to show daily updates on the number of people in the Jail who have been tested for coronavirus (both staff and detainees), and the number of people who have tested negative and positive for coronavirus (both staff and detainees). This request includes

13

but is not limited to documents sufficient to show the number of tests provided to individuals residing in all tiers designated as being on quarantine, *see* Ex. K (Doc. No. 84-12), between April 15 and May 6, 2020, and the results of those tests.

2. Documents sufficient to show the medical protocols and procedures governing coronavirus testing in the Jail, including but not limited to how many testing kits are available as of the date of these requests, what symptoms result in a detainee being tested, when exposed individuals are tested and based on what metrics, whether asymptomatic detainees are ever tested and if so, when and based on what metrics, which pre-existing conditions entitle detainees to priority in testing (*see* Report at 3), and how the Jail determines that a detainee is "recovering," including, for instance, whether detainees are given tests to ensure their negative status.[9]

3. Documents sufficient to identify (by name and age) each individual who died as a result of coronavirus contacted while in the Sheriff's custody, whether or not the individual was formally in custody at the time of death.

**Discovery about Social Distancing and Vulnerability**

Plaintiffs seek the following discovery concerning whom the Sheriff is exempting from the Court's social distancing requirements and why, the location and designation of individuals in the Jail who are most vulnerable to coronavirus (and who are also Plaintiff class members), and video evidence of the tiers to assess how social distancing is being implemented in the Jail:

---

[9] The Sheriff's use of the term "recovering" to designate detainees who are supposedly coronavirus negative is opaque. After reviewing the Sheriff's response to coronavirus, Dr. Amir Mohareb declared that "the term 'medically recovered' is ambiguous since it can mean either (1) the alleviation of symptoms and clinical resolution of disease in an individual or (2) the inability for a person with COVID-19 to transmit the virus and infect others. The determination of when a COVID-19 patient is unable to transmit the virus and infect others is complex because of the limited data on this issue. In most settings, patients with COVID-19 are considered to be unable to transmit the infection only several days following the resolution of symptoms and with a negative nasopharyngeal SARS-CoV-2 PCR test." Mohareb Decl. (Doc. No. 64-3) at 6. There is no indication in the Sheriff's Response or supporting documentation that recovering detainees are receiving tests to verify their status.

1. Documents identifying every person currently housed in the RTU (Division 8) and within Cermak Hospital. This list should include, at least, each person's name, age, booking number, bond status/amount, housing location, and their medical designation, as used by the Sheriff in his Report (*i.e.*, M3, M4, P3, and P4, *see* Report at 15-16).

2. Documents sufficient to show biweekly updates to the Sheriff's Tier Occupancy Report (Ex. K), Doc. 84-12, including:

   a. A list of tier and occupancy information including, but not limited to, Division, Facility, Tier, Capacity, Occupancy, Percent Occupied, Tier Type, Quarantine/Isolation status, First Quarantine, and Projected Quarantine End Date;

   b. The location(s) (divisions and tiers) of people who are assigned to "PREA" housing in the Jail, as well as the capacity and occupancy information for those locations.[10]

3. For any detainee who the Sheriff claims is not subject to the Order's prohibition on group housing (e.g., dormitory housing above 50% capacity) and double celling, please provide any and all documentation that exists in support of this contention, separately for each such detainee. This request includes anyone the Sheriff contends presents "a risk of suicide or self-harm," as well as anyone housed in a unit "equipped for medical or mental health treatment" AND where there is "not available space in an appropriate housing or medical unit that permits full social distancing." Order at 3. The requested documentation includes, but may not be limited to, each applicable detainee's current location (division and tier) within the Jail, whether that tier is a special medical or mental health unit, medical and Jail records sufficient to show why the detainee presents a risk of suicide or self-harm (*i.e.,* diagnosis information or information

---

[10] Plaintiffs agree that this information should be produced and maintained as attorneys' eyes only.

contained on a detainee's health "problem list"),[11] and information sufficient to show that there is no available space in an appropriate housing or medical unit that would permit social distancing per the Court's Order.

    4.    Closed Circuit (CCTV) footage[12] of the following tiers, captured between 8 a.m. and 6 p.m. on May 1, 2020:

    a. Division 10, 1C

    b. Division 11, DF: Quarantine

    c. Division 2, D3, EE

    d. Division 4, N2

    e. Division 5, 2B

    f. Division 6, 1A: Quarantine

    g. Division 8, 2N

    h. Division 8, 2F (RTU): Quarantine

    i. Division 8, 4H (RTU)

    j. Division 8, 2S (Cermak)

    k. Division 9, 2A

Plaintiffs also seek leave to issue a third-party subpoena to Cook County Health, in order to ascertain which detainees have pre-existing or chronic conditions that render them particularly susceptible to coronavirus. Plaintiffs originally sought this information from the Sheriff, *see* Doc.

---

[11] Plaintiffs are of course amenable to the entry of a HIPAA protective order in this case, to guard against the dissemination and protect the privacy of the requested health records.

[12] In order to streamline discovery and mitigate the burden on the Sheriff, Plaintiffs seek CCTV footage, which Plaintiffs understand is digitally available, in lieu of an inspection at this point in the litigation. For the CCTV requests, Plaintiffs identified a representative set of tiers, on both quarantine and non-quarantine status.

No. 55-1, RFP. No. 1, prior to learning that the Sheriff does not maintain information about which detainees in his custody are medically vulnerable.

### III. Where Social Distancing Is Not Feasible, the Court Should Request That a Three-Judge Panel Be Convened.

The Sheriff states there is a "feasibility limit" on compliance with the social distancing requirement in the Order. Report at 19-20. The Report is crystal clear that a meaningful increase in the Jail's population will make the present arrangements—where most dormitories are below 50% capacity and almost all detainees are in single cells—an impossibility. *See id*. at 20 ("A sudden spike in the Jail population in the near term would upend the delicately balanced housing arrangements currently in place, and there are few alternatives left that would allow the Jail to operate effectively and still permit 'full' social distancing throughout the Jail."). He admits that in this scenario he is likely unable to both preserve order and protect detainees' health. *Id*. at 20 ("The Sheriff's overriding obligation to preserve order, maintain discipline, and provide security at the Jail may very well have to be balanced directly against his obligation to reasonably abate the risk of harm from coronavirus."). And in fact, the Sheriff may have already reached his feasibility limit. As Plaintiffs note above, the Sheriff's implementation of the Order appears to have sacrificed the safety of detainees because of existing space limitations. *See id*. at 17-18.

Plaintiffs have argued in several of their earlier briefs that when social distancing—which this court's Order confirms is necessary to protect detainees from a serious and unreasonable risk of harm—becomes impossible, the appropriate remedy is release of some detainees, beginning with the medically vulnerable. Whether to release detainees is a decision that must be made by a three-judge court. 18 U.S.C. § 3626(a)(3). In light of the Sheriff's expressed concerns about feasibility, the security breakdowns that have already occurred, including among the vulnerable,

17

and the Sheriff's failure to implement effective distancing thus far, Plaintiffs again ask the court to request that a three-judge panel be convened pursuant to 28 U.S.C. § 2284.

## CONCLUSION

So that Plaintiffs' counsel may fulfill their obligation to monitor compliance with the Court's critically important Order, and seek additional relief as necessary to protect the lives of the class members, there is "good cause" for Plaintiff to issue the targeted document discovery attached as Ex. A hereto. Plaintiffs further ask that the Court request that a three-judge court be convened to consider whether a prisoner release order should be entered.

Respectfully submitted,

/s/ Alexa Van Brunt
Locke E. Bowman
Alexa A. Van Brunt
Ro MacArthur Justice Center
Northwestern Pritzker School of Law
375 E. Chicago Avenue, Chicago, IL 60611
Tel: 312-503-0884
l-bowman@law.northwestern.edu
a-vanbrunt@law.northwestern.edu

Sarah C. Grady
Stephen H. Weil
LOEVY & LOEVY
311 N. Aberdeen Street, #3
Chicago, IL 60607
Tel: 312-243-5900
Fax:312-243-5902
weil@loevy.com
sarah@loevy.com

Charles Gerstein
Alec Karakatsanis
Civil Rights Corps
1601 Connecticut Ave NW, Suite 800
Washington, DC 20009
charlie@civilrightscorps.org
alec@civilrightscorps.org
Tel: 202-894-6128

Steve Grimes
Thomas F. McAndrew
Winston & Strawn LLP
35 W. Wacker Drive
Chicago, IL 60601-9703
Tel: (312) 558-8317
SGrimes@winston.com
TMcAndrew@winston.com

## **CERTIFICATE OF SERVICE**

I, Alexa Van Brunt, an attorney, hereby certify that on May 6, 2020, I caused a copy of the foregoing to be filed using the Court's CM/ECF system and served upon all counsel who have filed appearances in the above-captioned matter.

/s/ Alexa A. Van Brunt
Alexa A. Van Brunt