IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| ANTHONY MAYS, et al., | ) | Case No. 20-CV-2134 |
| Plaintiffs, | ) | |
| | ) | Hon. Robert W. Gettleman, |
| v. | ) | District Court Judge |
| | ) | |
| THOMAS J. DART, Sheriff of Cook County, | ) | Hon. M. David Weisman, |
| | ) | Magistrate Judge |
| Defendant. | ) | |
| | ) | |
| | ) | |

**DEFENDANT'S RESPONSE TO PLAINTIFFS' MAY 6, 2020 FILING AND MOTION
TO STRIKE PLAINTIFFS' REQUEST FOR EXPEDITED DISCOVERY**

NOW COMES the Defendant, THOMAS J. DART, in his Official Capacity as Sheriff of Cook County, and for his Response to Plaintiffs' May 6, 2020 Filing and Motion to Strike Plaintiffs' Request for Expedited Discovery, at the Court's request (Dkt. 86), states as follows:

## INTRODUCTION

The unprecedented coronavirus pandemic has changed our way of life generally. Against this backdrop, the Sheriff's Office must continue to operate one of the largest single-site jail complexes in the nation, whose primary obligation is to protect the safety and security of detainees, staff, and the community at large. For the past six weeks, this litigation has drained the energy and expertise of the Sheriff's Office's front line staff. It is all the more critical now, where the Sheriff's Office has few resources left to lose.

Plaintiffs' May 6, 2020, "response" is improper, and not only because it was unsolicited and filed without leave. Substantively, it is at least a motion to reconsider or to modify the terms of the April 27, 2020 Injunction Order. At most, it is a cryptic attempt to seek an order of contempt against the Sheriff for purported noncompliance with the injunction. In either event, the "response" is an end run around the procedural requirement that if Plaintiffs seek affirmative relief, they must file an affirmative motion to do so—and bear the significant burdens that go along with those extraordinary remedies. Specifically, if Plaintiffs are suggesting that the Sheriff is noncompliant with the Order as it is written, despite his attestation of compliance and all credible evidence to the contrary, then Plaintiffs must prove contempt by clear and convincing evidence.

What Plaintiffs cannot do, however, is make an unsubstantiated assertion of noncompliance as a method of obtaining expedited discovery in an attempt to explore and perhaps prove noncompliance. Plaintiffs' request for "expedited discovery" itself is improper and must be stricken. Plaintiffs suggest that they are entitled to this discovery to allow them to "monitor" the Sheriff's compliance with the Order. However, this request was previously made and rejected by the Court. Additionally, the discovery requests are irrelevant to the *actual* terms of the injunction, and instead pertain to the terms that Plaintiffs *wish* the Court had included in its Order.

Finally, after recent legal developments and reflection upon the impact a preliminary injunction will have on the Sheriff's ability to execute his primary obligation to safely and effectively operate the Jail, he is simultaneously seeking appeal of the preliminary injunction order and seeking a request to stay enforcement of all proceedings, including a stay of enforcement of the injunction, pending appeal.

## I.    THE HISTORY OF THE SHERIFF'S PREPARATION FOR CORONAVIRUS AND ONGOING RESPONSE TO IT

Months before the coronavirus reached Chicago, the Sheriff's Office began mobilizing all operational and administrative teams to begin preparing the Jail to cope with a possible coronavirus outbreak at the Jail. He was keenly aware of the challenges of operating a jail while also managing a public health emergency. He retained expert consultants to design protocols and policies to help alleviate the spread of the virus throughout the Jail. He worked extensively with Cermak Health Services, the entity that provides all in-house medical care to detainees, in establishing a pandemic plan for if and

when the virus impacted the Jail. He lobbied federal, state, and local elected officials to get access to prophylactic supplies and facilitate testing at the Jail. He began coordinating with stakeholders in the criminal justice system to identify detainees who would be suitable for release from the Jail, all before the first confirmed case of COVID-19 infection was detected at the Jail. And he and his staff have continued to this day to vigilantly implement every possible safeguard in the Jail to protect detainees and Sheriff's Office employees from contracting or spreading the disease within the Jail.

As early as January 24, Roland Lankah, the in-house Environmental Health Specialist and epidemiologist in the Cook County Sheriff's Office, began coordinating with the Cook County Health Infection Control Department to develop a plan for the Jail in the event of an outbreak. Even at that early stage, Lankah activated the emergency protocols for sanitation and increased cleaning and sanitization throughout the Jail. Over the next few weeks, the Enhanced Sanitation and Preventative Daily Cleaning and Disinfection procedure had been implemented throughout the Jail. The policy provided instructions for increased sanitization of shared workspaces, the housing units, and the kitchen. It also provided specific instructions for sanitizing the quarantine and isolation tiers and dorms, including food trays and carts, and laundry. Dkt. 30-9, p. 3-4.

Lankah also identified the intake process and the urgent care facility within the Jail as the most likely points of entry for the virus. Dkt. 30-9, p. 2; Dkt. 30-8, p. 7. The urgent care facility in the Residential Treatment Unit (RTU) is operated by Cermak Health Services, a division of the Cook County Health and Hospital Systems (CCHHS), and the Chair of Correctional Health, Dr. Concetta Mennella. Cermak also operates a

more traditional hospital housing tier uniquely situated in Division 8 of the Jail, which provides 24/7 medical and psychiatric care for all detainees. Although Cermak is a separate and distinct entity from CCSO and does not report to CCSO, Cermak works closely with CCDOC to coordinate medical and special housing needs for detainees. Dkt. 30-6, p. 3; Dkt. 29-1, p. 11, 13.

At that time, Dr. Mennella, was also beginning to implement new medical protocols to screen detainees for flu-like symptoms at intake and at RTU with the "Novel Coronavirus Screening Tool." Any individual displaying possible signs of infection was given a surgical mask and immediately brought to the RTU for further evaluation. Soon after, she enacted enhanced screening and treatment protocols in the Jail and sought to obtain coronavirus testing materials. Dkt. 30-6; Dkt. 29-1, p. 10.

Dr. Mennella also began creating a strategy for housing infected detainees in the event of an outbreak, according to standards articulated by the Centers for Disease Control (CDC) and the Chicago Department of Public Health, which has primary jurisdiction over the Jail. Detainees who were suspected of having COVID-19 symptoms, known as persons under investigation (PUI), were tested for the infection and would be isolated awaiting the results of those tests (testing isolation). Dkt. 30-6, p. 2. If detainees tested positive, they would be housed in a separate isolation tier (medical isolation). Once a PUI or COVID-positive detainee was transferred to isolation tiers, his living areas would be disinfected and sanitized and the entire tier would be quarantined for a period of 14 days and monitored for possible manifestation of symptoms. Dkt. 30-6, p. 2-3. Dr.

Mennella coordinated with Department of Corrections staff to identify the suitable locations for the isolation tiers. Dkt. 30-6; Dkt. 62-5, p. 2.

Sheriff's Office Chief of Staff Brad Curry was also preparing emergency operational and staffing protocols in anticipation of a possible outbreak among the Jail population of 5,710 detainees at that point. Dkt. 31-3, p. 2-3. Within days of Governor Pritzker declaring Illinois a disaster area on March 9, the Sheriff's Office had created the Critical Incident Command Center (CICC), which monitored all COVID-related factors that could affect CCSO operations. One of the first orders of business was to set up a separate area for all new detainees upon intake into the Jail to remain in isolation for a period of 7 (now at least 14 days) before they were assigned to their housing tiers among the general population. The Sheriff's Office also began restricting access for all outside visitors, and required COVID screening and temperature checks for those few people who were permitted entry. Dkt. 31-3, p. 3-4.

On March 12, the Sheriff's Office enacted the first iteration of its comprehensive Coronavirus Operation Plan, which continues to be updated in real time to reflect the ever-changing recommendations of public health agencies. Dkt. 40-1, pp. 6-10. The Coronavirus Operation Plan is based largely on the "Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities" (CDC Guidance), and as it is interpreted and relayed through IDPH and CDPH to the Sheriff's Office. Importantly, the CDC recognizes that "the guidance may need to be adapted based on individual facilities' physical space, staffing, population, operations, and other

resources and conditions," but jails should work with their state and local public health departments for guidance. Dkt. 30-15

By this point, Curry had already been sending out daily messages to all staff with information about the nature of the coronavirus, the common signs and symptoms of infection, social distancing, and handwashing and hygienic products like facemasks to prevent transmission. Cermak was providing the same instruction to detainees to enable them to recognize and report symptoms, and to guard against further infection. Curry also was communicating with officers daily to inform them of newly-implemented policies, suspension of many detainees group programs, instruction on carrying them out, and reporting and monitoring protocols. Dkt. 31-3, p. 3-4; 30-14, p. 3. These instructions and explanations of preventative measures were also conveyed to the detainees and staff through video programs that played throughout the day on the televisions in each of the tiers. 30-14, p.4.

Structurally, First Assistant Executive Director Michel Miller was also beginning to prepare new divisions of the Jail to house detainees, whether as isolation tiers, or to create space to allow for more single-celled living units and reduce the occupation density in the dorms. Dkt. 62, p. 20-22; Dkt. 84, p. 18-20; 4/23/20 Hrg. Tr. 13:18-14:10. In mid-March, CCDOC began converting the Mental Health Transition Center to a 500-bed isolation unit. He worked with the Cook County Department of Emergency Management and Regional Security (DEMRS) to obtain tents that could be used for overflow housing. Dkt. 31-3, p. 3-4.

Elsewhere within the CCSO organization, before the President had even declared a national state of emergency on March 13, Senior Advisor Rebecca Levin, MPH, had been in daily contact with local and regional public health agencies, including CDPH, IDPH, and CCHHS, as well as local elected officials. She coordinated with these agencies to learn the most up-to-date information on housing and testing requirements, recommendations on the use of personal protective equipment (PPE), sanitation protocols, and best practices for minimizing the public health risk upon a detainee's release. With this information, she crafted new policies to be implemented at the Jail. Levin also created training programs related to these new policies and trained officers directly. As in the larger community, Levin worked primarily to "flatten the curve" within the Jail, which means not exceeding isolation housing or workforce capacity and slowing the overall spread of the virus throughout the Jail. 30-7, p. 1-3.

Levin also worked with Senator Richard Durbin's office, FEMA, and Governor Pritzker's office, among others, proactively seeking clearance for the Jail to receive priority access to the national strategic stockpile of PPE supplies in Illinois. Dkt. 30-7, p. 5. Assistant General Counsel Elizabeth Scannell continued to follow up with these agencies on a daily basis for the next several weeks to ultimately secure delivery of PPE, including masks, gloves, gowns, and eye protection, in a time of nationwide supply shortages. Dkt. 30-11, p. 2-4.

On March 18, CCSO retained sanitation expert, Harry Grenawitzke, as an expert consultant to review and improve the sanitation policies at the Jail. Grenawitzke had served as a court-appointed monitor at the Jail under the Department of Justice Consent

Decree several years before, and was intimately familiar with the infrastructure at the Jail. Levin worked closely with Grenawitzke to turn his recommendations into more refined sanitation policies and procedures. Grenawitzke recommended sending staff a "health tip of the day" email highlighting the latest health information, which was implemented. He also recommended creating a video demonstrating proper handwashing and sanitation techniques for staff training purposes, in which Levin starred. He reviewed the latest public health agency guidelines and counseled Levin on any effect they may have had on existing CCSO policies. Dkt. 30-7, p. 4-5; Dkt. 31-3, p. 3.

On March 18, CCSO also began working directly with various stakeholders in the criminal justice system in a shared undertaking to reduce the Jail population, which was about 5,600 detainees at that time. Dkt. 30-2, p. 4. Although the Sheriff has no authority to release any pretrial detainees, who are remanded to his custody by order of the court as a condition of bond, he conferred with the Office of the Cook County President, the Cook County Public Defender, the Cook County State's Attorney, and the Office of the Chief Judge of the Cook County Circuit Court to identify any detainees who could be safely released from custody while awaiting trial. CCSO worked through its Sheriff's Justice Institute, which is led by Henriette Gratteau, a former director of the corrections reform advocacy group, The John Howard Association. Dkt. 30-2, p. 2-3. The Sheriff also worked with these stakeholders to consolidate court proceedings and avoid as much face-to-face interaction possible. Dkt. 31-3, p. 3.

As a result of this process, on March 20, the Public Defender filed a petition with the Presiding Judge of the Criminal Court seeking mass release for a number of offenders,

including a particular subgroup detainees who may have medical conditions that put them at heightened risk of infection. Dkt. 30-3. Coincidentally, counsel for the Plaintiffs also filed an amicus brief in support of this petition. Dkt. 30-4. The court declined to order mass release due to the inherently individualized nature of that process, but on March 27, established a week-long process by which detainees could seek expedited and streamlined bond review hearings in the criminal courts, for the detainees represented by the Public Defender, as well as any others who sought review. Dkt. 31-1. Through this process, the Sheriff assisted the stakeholders in securing release or electronic monitoring status for over 1,200 detainees.

For context, the Governor imposed the statewide shelter in place on March 20. At around this time, CCDOC also began working in earnest to begin opening previously-closed divisions of the Jail and preparing them for future occupancy. In total, it opened Divisions 4 and 5, the "bootcamp" building in the Mental Health Transition Center, and Dorms 1, 3, and 4 in Division 2. This required deep cleaning the buildings, reconnecting utilities, staffing it with a team of correctional officers, arranging meal and medication deliveries, among other things, on a very expedited schedule. Dkt. 31-3, p. 3; Dkt. 62-5, p. 2. By March 26, CCDOC would add another 500 beds for isolation housing in the Bootcamp facility in Divison 16. Dkt. 40-2.

On March 23, the Sheriff retained Dr. Peter Orris as an expert consultant. Dr. Orris is the Chief of Occupational and Environmental Health at the University of Illinois Health System. He is the former Midwest Regional Director for the National Institute for Occupational Safety and Health for the CDC, and a former adviser to the World Health

Organization, federal governments, unions, and corporations. Levin worked closely with Dr. Orris to implement his recommendations. Dkt. 30-7, p. 3-4.

In light of jail staff's ingress and egress from the Jail, he consulted on processes relating to medical screenings for staff, return to work policies after missing work due to COVID-like symptoms, and monitored other developments in guidance issued by CDC and CDPH on essential workers. Dr. Orris toured the Jail with representatives from the Teamsters Local 700, which represents correctional officers, to observe best practices in place to prevent and mitigate the spread of coronavirus. CCSO began implementing more guidelines on jail staff health and restrictions on their movement to reduce the risk of transmission due to their ingress and egress to the Jail on a daily basis. Jail staff had to have their temperature taken twice before reporting for duty. They were restricted to working in the same division and not moving throughout the complex. New contingency plans were drawn up to account for any possible staff shortages. Dkt. 30-18. Indeed, CCSO eventually reassigned all current cadets from the Training Academy and more than 200 courtroom deputies to the Jail since the academy and courthouses were closed. 4/23/20 Hrg. Tr., 138:23-139:1; Dkt. 31-3.

Dr. Orris also consulted on the need for jail staff to use PPE. His recommendations led to the creation of the PPE Accountability Task Force to monitor adequate supplies and proper use of PPE throughout the Jail. Dkt. 30-7, p. 3-4. By April 1, Levin had trained the PPE Accountability Teams and they were operating on every shift to ensure adequate supplies and provide guidance to officers. Levin also worked with Dr. Orris to develop handouts and illustrated instructions for use of PPE, which follows the CDC Guidance.

Dkt. 30-7, p. 6. By April 1, a mandatory computerized staff training module had been released on PPE regulations. Dr. Orris remarked on the significant efforts the Sheriff's Office had taken to forecast need for PPE and to secure supplies to avoid a shortage. He noted that it was "clear they [were] proactively working to develop plans and policies to protect detainees and employees working inside the [CCDOC] from the dangers of COVID-19, including seeking input, guidance, and help" from public health agencies and medical professionals. Dkt. 30-18; Dkt. 30-7, p. 5.

On March 23, the first confirmed case of COVID-19 infection was reported at the Jail. Levin worked with her contacts at CDPH to schedule a field visit at the Jail to assist in advising on the Jail's practices and particularly its compliance with the CDC Guidance. Dkt. 70, p. 5 ("Wherever possible, these recommendations [from CDPH] follow CDC guidance and account for local conditions"). On March 26, Stephanie Black from CDPH and Dr. Isaac Ghinai, a CDC Epidemiological Intelligence Service Officer detailed to CDPH, conducted a half-day tour of the Jail. They issued a report listing some of their observations and making recommendations for additional procedures that should be implemented at the Jail. Dkt. 70, pp. 2, 5-10.

Most of the recommendations were already in process at the Jail and were being monitored for progress. The letter also commented on the need to establish adequate quarantine and isolation housing, for which planning had been underway for weeks. They also suggested that CCDOC attempt to implement social distancing, or make any adjustments possible to increase distance between detainees, particularly while sleeping, but specifically noted the difficulty involved with "extremely limited" space. Dkt. 70, p.

8. They also suggested reducing the Jail population to help alleviate that issue, which was currently occurring through the criminal court's expedited bond modification proceedings, which would eventually secure the release of more than 1,200 detainees. Dkt. 70, pp. 5-10. By March 29, the population was down to 4,802. Dkt. 30-2.

At this time, Scannell continued to contact various agencies on a daily basis to secure PPE. On April 1, she also reached out to IDPH and other local authorities seeking to have the Jail approved as one of the first test sites in the nation where Abbott Laboratory's newly-developed ID Now coronavirus rapid test kits would be administered. Ultimately, Cermak was approved to administer the rapid tests, which would provide results in a matter of minutes, rather than several days, as with the traditional nasopharyngeal nasal swab tests that had been used for the past several weeks. Dkt. 52-2, p. 2. After appropriate training and approval, Cermak began administering the rapid testing kits on April 10. This would allow them to identify COVID-positive detainees and remove them to isolation tiers sooner. Dkt. 52-2, p. 2.

CCSO remained alert for the frequent adjustments to the public health agencies' updates on recommended practices and procedures, and had well-structured systems in place to implement these adjustments. For example, by April 2, CCSO implemented a revised policy requiring all staff entering the Jail to wear surgical masks, based on recently updated IDPH guidelines. Dkt. 30-7, p. 5. The Jail continued to evaluate the evolving guidance on whether masks were required for detainees in the general population, and whether they should receive surgical masks or cloth masks, as recommended for the general public. By April 6, CCSO implemented a program with

Roseland Hospital to be the official COVID-19 testing site for all Jail staff, given their movement in and out of the Jail. Dkt. 31-3, p. 5.

## II. THE HISTORY OF THIS LITIGATION RELATIVE TO THE SHERIFF'S ONGOING CONTAINMENT EFFORTS AT THE JAIL

Notwithstanding all of the above, on April 3, Plaintiffs filed their complaint and request for a temporary restraining order. They never made contact with the Sheriff's Office to find out what was being done to protect against infection in the Jail. They never contacted the Sheriff's Office to suggest they had perhaps received a report about a lapse in execution of containment efforts. Rather, they filed this lawsuit—demanding that the Sheriff implement "the CDC Guidance for managing detention and correctional facilities." Dkt. 2, p. 17-18; Dkt. 29-1, p. 7-8. To be clear, there was no allegation that they were not properly *executing* the requirements of the CDC Guidance that had been implemented. They flatly claimed that the Sheriff had done *nothing* to mitigate the spread of COVID-19 within the Jail and that "chaos is reigning." Dkt. 2, p. 9. They sought categorical release of an unspecified number of detainees in a class-wide habeas proceeding. Failing that, they sought an injunction forcing the Sheriff to "acquire rapid testing" (although it had not even received FDA approval yet); create quarantine and isolation housing; provide PPE and sanitation products to all detainees; and instruct staff on the importance of sanitizing surfaces and objects and ensure that they were being cleaned. Dkt. 2, p. 17-18. Notably, they included a perfunctory request for social distancing "to the maximum extent possible." Dkt. 2, p. 15

From a legal perspective, Plaintiffs were required to demonstrate that the actions taken by the Sheriff to mitigate the spread of coronavirus at the Jail were not objectively reasonable. Dkt. 29-1, p. 14. As outlined above, by April 3, the Sheriff had been consulting with representatives from the CDPH and CDC in the Jail, along with his own retained experts, for weeks, receiving direct and targeted guidance from these consultants on mitigation efforts. Detainees were already housed in isolation and quarantine tiers. Task forces were already monitoring and documenting implementation and compliance with sanitation and PPE policies in the Jail that were based *directly* on the CDC Guidance. CCDOC was opening previously-closed divisions of the Jail to allow for more distanced housing, where possible. Additionally, by that point, more than 1,200 detainees had been released in less than a month's time, and the number of detainees on electronic monitoring was reaching a record high. Dkt. 30-2.

Based on the Plaintiffs' allegations, it was difficult to imagine how the Sheriff's actions could not be viewed as objectively reasonable, considering he was doing precisely what Plaintiffs said he should be doing to mitigate the spread of infection, and more. The Sheriff countered Plaintiffs' claims with the realities of what had been done, as well as noting the continuing efforts to fully implement the Coronavirus Operation Plan and related procedures at the Jail. Dkt. 29-1.

While the Sheriff was making efforts to increase spacing in the housing areas, particularly by opening previously closed tiers of the Jail, the Court acknowledged that "the CDC's [G]uidance expressly recognizes that complete social distancing may not be possible in the sleeping areas of a jail." Dkt. 47, p. 25. Because "space constraints at the

Jail do not allow for the more preferable degree of social distancing that exists in the community at large," these limitations "require a departure from better social-distancing practices." Dkt. 47, p. 25.

Nevertheless, the Court on its own apparently believed that more could be done to enact social distancing during the intake process, even though the intake population had decreased significantly. It thus directed the Sheriff, of its own volition, to suspend the use of bullpens and revise the intake process to allow for social distancing. Dkt. 51, pp. 3-8. It otherwise directed the Sheriff to continue supplying sufficient amounts of soap to detainees; to continue supplying adequate sanitizing products and document proper cleaning procedures; to provide facemasks to detainees in quarantined tiers[1]; and to create a written policy to codify the practice of referring symptomatic detainees to Cermak for testing. Dkt. 47, pp. 33-35. To the extent the Court sought medical testing protocols, the Sheriff provided declarations from Dr. Mennella on behalf of Cermak as to their medical testing protocols, which are based on current CDC and CDPH guidance. Dkt. 51, p. 8-16.

The Sheriff filed his report documenting implementation of the Court's directives and compliance with the terms of the TRO. Dkt. 51. Plaintiffs took no issue with the Sheriff's practices on sanitation, PPE, and social distancing at intake. Dkt. 55, p. 3-4. Rather, in their renewed motion for preliminary injunction, Plaintiffs acknowledge that

---

[1] At the time the lawsuit was filed, the Sheriff's Office had in reserve approximately 27,000 surgical masks, which would have been exhausted by staff alone in less than a month. That number now stands at over 519,000 masks for distribution to both staff and detainees

15

the very relief they once requested is insufficient, and the standards they once sought to have implemented are inadequate, as they pursue entirely new challenges. It is what the Sheriff can only characterize as constitutional whack-a-mole. Dkt. 62, p. 17. Plaintiffs instead demanded that strict 6-foot social distancing be ordered throughout the Jail at all times, notwithstanding the fact that the Court previously rejected that demand, given the structural and/or operational limitations that prevent the Sheriff from accomplishing that in the Jail, as recognized in the CDC Guidance. Yet, Plaintiffs chose to force the issue: if it was possible to practice "full" social distancing at the Jail, the Court must order it immediately. If it was not, they argued, then the Court must categorically release detainees en masse either through a writ of habeas corpus, or a prison release order under the Prisoner Litigation Reform Act. Dkt. 55, p. 8-20.

The Sheriff again argued it is objectively reasonable under the constitution to follow the CDC Guidance on social distancing in a correctional facility, as the Court and Plaintiffs themselves, at one time, recognized. At the very least, substantially complying with the CDC Guidance, in addition to all of the other extraordinary actions taken by the Sheriff in response to the pandemic cannot be deemed objectively unreasonable.

In any event, Plaintiffs have no remedy because their claims for release are procedurally barred, as Judge Dow recently held in *Money v. Pritzker*, 2020 U.S. Dist. LEXIS 63599 (N.D. Ill.). Dkt. 61, 6-15. The Sheriff has made significant efforts to permit social distancing, but without the permitted allowances for special housing designations at RTU and Cermak, psychiatric impacts, cohort housing in isolation and convalescent tiers, restricted movement in quarantine tiers, and 50% occupancy allowances in dorms,

the Sheriff could not presently accomplish "full" social distancing in the Jail. Dkt. 61, p. 19-23. Critically, the Sheriff also expressed the need to be able to prioritize safety and security over social distancing at the Jail at those times when it is necessary to immediately control a dangerous situation, such as when separating and isolating many detainees involved in a large-scale fight or incident.

During a brief evidentiary hearing on the injunction, the Court once again recognized the extraordinary efforts taken by the Sheriff on social distancing, but appeared to believe that there was more the Sheriff could do. First Executive Director Michael Miller testified about the continued efforts to implement social distancing at the Jail. He testified about the dramatic increase in the number of detainees in single-celled housing (+545%) and the dramatic decrease in double-celled housing (-93%) over the past month; moving nearly all non-RTU dorms to less than 50% occupancy; and methods implemented to provide detainees with opportunities to practice social distancing in common areas.

Director Miller also testified about an April 17 field tour of the Jail by a team of epidemiologists and public health officials from the CDC and CDPH in follow up to their tour a month earlier. He participated in the Jail tour, led by Lt. Commander Paige Armstrong, CDC Epidemiological Team Lead and Officer in the U.S. Public Health Service, and her CDC colleague, Alison Binder. Dkt. 70, p.2. Director Miller testified that the group chose several areas to visit within the entire Jail complex, including the intake area, the dorms and celled tiers, quarantine tiers, isolation tiers, and convalescent tiers.

Commander Armstrong and her colleagues commended the Jail team on their efforts. They specifically noted the prevalence of social distancing and recognized the much lower occupation density in the dorms since the last visit. They also commented on the cleanliness of the tiers and the notable bleach smell in particular. They observed social distancing being practiced and facemasks being worn, while also noting the universal difficulty in getting people to fully comply with these policies even in non-carceral environments. Dkt. 70, p. 2. In conclusion, Commander Armstrong stated: "You guys are doing an amazing job." Dkt. 70, p. 2-3.

Director Miller testified that even with the Jail population at a historic low of 4,233 detainees, without the allowances for medical and security related housing decisions, it is not possible to practice social distancing. The Court then questioned Director Miller in great detail about the specific housing tiers and his justifications for making the housing assignment decisions at the Jail. 4/23/20 Hrg. Tr., 51:16-64:3.

Despite its previous recognition that it was constitutional for the Sheriff to rely on the CDC Guidance on social distancing and implement it where possible in light of structural and operational limitations, the Court reversed course in its order granting the preliminary injunction. Dkt. 73, p. 62. It recognized the Sheriff's "significant and impressive" effort to safeguard detainees from coronavirus and that the Sheriff has "acted in good faith" in doing so, but concluded that regardless of this good will, the Sheriff's implementation of social distancing is objectively unreasonable because the Sheriff "has not yet hit the feasibility limit" on social distancing, and there is more he can do. Dkt. 73, p. 63. The Court then ordered the Sheriff to implement "full" social distancing

at the Jail, without allowances for feasibility considerations, but permitted six of the feasibility exceptions that the Sheriff sought. Dkt. 73, p. 64.

In spirit of good faith, expedience, and in the short time permitted to evaluate next steps, the Sheriff accomplished full social distancing, as ordered, and remains in compliance with the Order today. The Sheriff expressly acknowledged that these arrangements may not be sustainable for the foreseeable future, given the ever changing nature of the detainee population and their specific housing needs. The Sheriff indicated that he may need to seek modification if necessary, as the Court appeared to invite. Dkt. 84, p. 20. The Sheriff filed his report on May 1, as ordered, detailing all of these considerations.

**III.  PLAINTIFFS' "RESPONSE" IS AN IMPROPER ATTEMPT TO SEEK RECONSIDERATION OR MODIFICATION OF THE TERMS OF THE INJUNCTION, OR CIVIL CONTEMPT, AND EVADE THE HEIGHTENED BURDENS THEY IMPOSE**

Notwithstanding the fact that Plaintiffs' May 6 "response" was filed without leave of court, it is an improper filing because it is in effect asking for new or revised relief that was considered and rejected by Judge Kennelly. They are seeking "expedited discovery" to investigate *whether* the Sheriff is compliant with terms that don't exist in the Court's order. If Plaintiffs are seeking entry of those additional terms, then they must seek do so in a motion to reconsider, or in a petition to modify the injunction. *Zcm Asset Holding Co. v. Allamian*, 2002 U.S. Dist. LEXIS 24471, *12-13 (N.D. Ill. 2002).

Curiously, at the same time, Plaintiffs also appear to argue that the Sheriff is *currently* noncompliant with the terms of the injunction, and seek "expedited discovery" to document that. If that is Plaintiffs' position, then the proper procedure is to file a rule to show cause and seek an order of civil contempt, which must be proved by clear and convincing evidence. *Maynard v. Nygren*, 332 F.3d 462, 469 (7th Cir. 2003). However, they cannot argue noncompliance and then use that alleged noncompliance as a basis for seeking expedited discovery to prove noncompliance, which is precisely what they are trying to do here.

In either case, Plaintiffs bear a substantial burden to convince the Court that any modification order or finding of contempt is warranted here. That relief is not likely, given that the Sheriff has reported and demonstrated full compliance with the order, apparently to the emergency judge's satisfaction, since the matter has now been returned to this Court. Nevertheless, Plaintiffs cannot evade their substantial burdens in the first instance by trying to obtain affirmative relief buried in an unsolicited "response" and demand for "expedited discovery" that is far broader and more intrusive than any previous request has been. While there is nothing properly before the Court for consideration, the Sheriff requests that in the interest of completeness, the Court strike Plaintiffs' "request" for expedited discovery.

Plaintiffs' entire filing is premised on two primary misconceptions, although there are others: (1) they appear to believe that they have a right to monitor the Sheriff's compliance on behalf of the Court and demand regular reporting by the Sheriff; and (2)

they grossly misconstrue the Court's order and the Sheriff's report and draw questionable inferences that strain credibility.

Despite the Court's stated satisfaction with, and commendation of, the Sheriff's compliance with the TRO order, it nevertheless converted the TRO to a preliminary injunction and ordered the following relief on April 27: to maintain the testing protocols previously ordered, except that testing decisions may not be based on the sufficiency of testing materials; to maintain the social distancing procedures at intake that were previously ordered; to maintain the soap and/or hand sanitizer distribution that was previously ordered; to provide sanitation supplies and ensure adequate cleaning of common areas as previously ordered; to continue providing quarantined detainees with facemasks as previously ordered; and to establish a policy precluding group housing or double celling of detainees, except as permitted in six enumerated exceptions, nearly all of those exceptions sought by the Sheriff. Dkt. 73, p. 85-87.

The Court ordered the Sheriff to file a status report on May 1. It also suggested it would entertain further argument on the Sheriff's rejected request for a security exception to social distancing, the duration of the injunction, and an invitation to seek relief from the terms of the injunction in the future. Beyond that, the Court ordered no further relief. It did not order any further filings by the parties. It did not direct the Sheriff to provide Plaintiffs with any ongoing reporting of any kind. Dkt. 73, p. 85-87.

Nevertheless, Plaintiffs variously state that they are seeking to "monitor compliance" with the injunction order; "track the Sheriff's compliance with the order"; and "clarify the extent of noncompliance" by the Sheriff. Dkt. 85, pp. 2, 13, 18. It is possible

there may be a mechanism by which Plaintiffs can seek discovery, if they decide to proceed on their complaint in a nonemergency proceeding. Their demands are not of this character. Not only are they not entitled to any affirmative reporting on compliance with the injunction order by the Sheriff to them on the Court's behalf, their discovery requests are not even relevant to the actual terms of the injunction order, as discussed below.

To be clear, the Sheriff stated in no uncertain terms in his May 1 Report that he was fully compliant with the Order, and he remains so today. Dkt. 84, p. 5-8, 20. Plaintiffs' suggestion that the Sheriff has admitted otherwise is misguided and is based on rather tenuous inferences. As to medical testing, contrary to Plaintiffs' contention, the Sheriff has filed scores of documents and declarations obtained from Cermak that set forth its testing protocols, including when testing is indicated and how symptoms present. See e.g., Dkt. 84, p. 2-6; Dkt. 85, p. 3-4. This information was before the Court when it ruled, and it was satisfied that the policies were justified. There has been no further request for clarification from the Court about Cermak's testing policies, and Plaintiffs are not entitled to any more than that. If the Court has any further inquiries about testing, those should be directed to Cermak directly, as the Sheriff has no involvement in determining testing protocols or oversight of Cermak.

The Court also never ordered the Sheriff or Cermak to report on the identification of any detainees who were or were not tested. Nor is there any merit to Plaintiffs' unusual reading of the Court's order, suggesting that the Court ordered *all* quarantined, asymptomatic detainees to be tested in due course, regardless of whether it is medically

indicated or not. That is directly contrary to what the Court actually ordered, which is that any testing be based on medical appropriateness. Dkt. 73, p. 85.

Plaintiffs also make the brazen claim that the Sheriff has "removed PREA detainees from protective custody and dispersed them throughout the Jail, at great risk to their safety." Dkt. 85, p. 6. The protective custody detainees were moved from a dorm in a more secluded area of the Jail to a single-celled tier. They remain in protective custody, they remain housed together on the same tier, and they remain fully protected. The Sheriff made the point that the Court's preliminary injunction order impacted the normal practice of housing those detainees who may now encounter other detainees in the common areas of the Jail that they otherwise would not have in their prior housing unit.

As to identification and segregated housing for medically vulnerable detainees (Dkt. 85, p. 7-10), Plaintiffs argument is an open request for reconsideration of the Court's order rejecting this relief. The Court determined that this may be a "good practice," but was not a constitutionally required practice, and failing to do so is not objectively unreasonable. Dkt. 73, p. 66. Moreover, the Sheriff has described at length the nature of the medical alerts used to determine housing assignments, but otherwise, does not have the type of information Plaintiffs think he should have. Dkt. 85, p. 8. Plaintiffs also grossly misunderstand RTU and Cermak housing, particularly relative to the Court's understanding as reflected in its order. They appear to take issue with the social distancing exceptions allowed by the Court as to specialized medical housing, which may

be remedied through modification, but is not subject to exploratory discovery. If they wish to challenge these exceptions, they can seek to modify the order. Dkt. 85, p. 9-10.

The same is true of Plaintiffs' apparent challenge to the Court's order regarding enforcement of housing and appropriate spacing within the celled and dormitory living units. Director Miller testified about the process for encouraging social distancing, at the division level, and through the accountability task force members and detainee education, which apparently satisfied the Court that adequate enforcement processes were in place. Plaintiffs suggest that detainees are not social distancing, which is not what the Court ordered. Besides specific demands during the intake process, the Court ordered housing of detainees be completed within specific restrictions and expirations.

While there is no proper motion pending before the Court, for the sake of completeness, Plaintiffs' discovery requests must be stricken. The discovery sought is largely irrelevant to the injunction order and overly burdensome, as is any request to update the reporting on an ongoing basis. The burden may have been relaxed while Plaintiffs sought preliminary relief, but they cannot escape their heightened burdens to persuade the Court to modify the terms of the injunction or enter an order of civil contempt if they challenge compliance.

## IV.  STATEMENT REGARDING THE SHERIFF'S PURSUIT OF APPELLATE RELIEF

In the past two weeks, three different circuit courts of appeal have determined that a district court may not micromanage the complex day-to-day operations of running a jail, particularly not under threat of contempt, even as they work to maintain operational

security in the Jail in the midst of a global pandemic. On May 5, 2020, the 11th Circuit issued an opinion *Swain v. Junior*, 2020 U.S. App. LEXIS 14301 (11th Cir., May 5, 2020), staying enforcement of a mandatory preliminary injunction, styled much as the injunction order in this case, that put the district court in the role of a "super-warden." *Swain*, 2020 U.S. App. LEXIS 14301, *14. While the posture of that case may be different, the policy behind it is sound, and is deeply embedded in United States Supreme Court precedent, particularly in examining the harm resulting from a district court's unnecessary interference with jail operations "under pain of contempt." *Id*. See also *Valentine v. Collier*, 2020 U.S. App. LEXIS 12941 (5th Cir., Apr. 22, 2020); *Roman v. Wolf*, 2020 U.S. App. LEXIS 14331 (9th Cir., May 5, 2020).

With the momentum of the appellate courts' reasoning and time to consider the effect of the mandatory injunction on daily jail operations in this case, the Sheriff is simultaneously filing his notice of appeal from the April 27 Order. It has been clear throughout this litigation that Plaintiffs' counsel lack appreciation for the complexities of jail operations in ordinary times, to say nothing of these times of uncertainty. They have persisted in this litigation with no understanding of the enormous burden it places on the Sheriff's Office staff and for minimal gain, as nearly all of the relief they have pursued has long been in place at the Jail. Rather, it has become apparent that Plaintiffs' counsel has been singularly focused on categorial release at all costs—arguably pursuing a political decarceration policy through misuse of the legal process in the middle of a pandemic—and their cries for release will only intensify and cause further distraction for the Sheriff as long as this injunction remains in place. The perverse consequence is that

their focus on release fills their clients with false hope, stoking further anxiety, frustration, and unrest in the Jail setting, which has manifested in detainee misconduct. Dkt. 84, p. 18-20. The Sheriff is a strong proponent of social justice, and has assisted the courts and other stakeholders to obtain release for eligible detainees, but pursued in the right way.

In light of the fact that the Coronavirus Operation Plan has been in place and dutifully executed since early March, Plaintiffs have not and cannot show that they will suffer irreparable harm in the absence of an injunction, as they must. *Swain*, 2020 U.S. App. LEXIS 14301, *14. In fact, Plaintiffs have never claimed there is a risk that the Sheriff will discontinue any of the practices in place at the Jail, nor have they provided evidence of that. They only seem to claim, as the emergency judge did in this case, that more can be done. However, that is not what the constitution requires, and an injunction may not be used for that purpose. The Sheriff has and will continue to administer the policies in place, particularly given that so much of it was in process long before Plaintiffs filed this lawsuit. Judge Kennelly recognized as much, and commended the Sheriff for his significant efforts. But the Jail simply cannot operate under threat of contempt and disruption when so many resources have been invested to protect detainees—as much as is structurally and operationally possible, and well beyond what is objectively reasonable.

**CONCLUSION**

Sheriff Dart respectfully submits this Response to Plaintiffs May 6, 2020 Filing for

the Court's consideration pursuant to its Order.


By: */s/ Gretchen Harris Sperry*
One of the attorneys for Defendant
Thomas J. Dart, Sheriff of Cook
County

Robert T. Shannon
James M. Lydon
Gretchen Harris Sperry
Adam R. Vaught
Lari Dierks
HINSHAW & CULBERTSON LLP
151 N. Franklin Street, Suite 2500
Chicago, Illinois 60601
Tel. 312-704-3000

<u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that on May 11, 2020, I electronically filed the forgoing **DEFENDANT'S RESPONSE TO PLAINTIFFS' MAY 6, 20202 FILING AND MOTION TO STRIKE PLAINTIFFS' REQUEST FOR EXPEDITED DISCOVERY** with the Clerk of the U.S. District Court, using the Court's CM/ECF system, which will accomplish service electronically on all counsel of record.

*/s/ Gretchen Harris Sperry*