IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| ANTHONY MAYS, et al., | ) | Case No. 20-CV-2134 |
| | ) | |
| Plaintiffs, | ) | Hon. Matthew F. Kennelly, |
| | ) | in his capacity as Emergency Judge |
| v. | ) | |
| | ) | |
| THOMAS J. DART, Sheriff of Cook County, | ) | Hon. Robert W. Gettleman, |
| | ) | District Court Judge |
| Defendant. | ) | |
| | ) | Hon. M. David Weisman, |
| | ) | Magistrate Judge |
| | ) | |

**DEFENDANT'S PRELIMINARY INJUNCTION HEARING EXHIBIT LIST**

| EXHIBIT NUMBER | DESCRIPTION |
|---|---|
| 1 | Curriculum Vitae of Dr. Homer Venters Mays v. Dart (20-cv-2134- Dkt 64-2) |
| 2 | Declaration of Dr. Homer Venters in Mays v. Dart (20-cv-2134- Dkt 64-2) |
| 3 | Declaration of Dr. Homer Venters- Chunn et al v. Edge (20-cv-01590- Dkt 26-4) |
| 4 | Declaration of Henriette Gratteau in Mays v. Dart (20-cv-2134- Dkt 30-2) |
| 5 | Declaration of Concetta Mennella in Mays v. Dart (20-cv-2134- Dkt 30-6) filed on 4/6/20 |
| 6 | Supplemental Declaration of Concetta Mennella in Mays v. Dart (20-cv-2134- Dkt 52-2) filed on 4/13/20 |
| 7 | Declaration of Michael Miller in Mays v. Dart (20-cv-2134- Dkt 30-8) filed on 4/6/20 |
| 8 | Supplemental Declaration of Michael Miller in Mays v. Dart (20-cv-2134- Dkt 62-5) filed on 4/17/20 |
| 9 | Declaration of Roland Lankah, REHS/RS, MPH, PhD (abd) in Mays v. Dart (20-cv-2134- Dkt 30-9) |
| 10 | Declaration of Brad Curry in Mays v. Dart (20-cv-2134- Dkt 31-3) filed on 4/6/20 |
| 11 | Declaration of Brad Curry in Mays v. Dart (20-cv-2134- Dkt 52-1) filed on 4/13/20 |
| 12 | Declaration of Rebecca Levin in Mays v. Dart (20-cv-2134- Dkt 70) |
| 13 | CDC Policies for Jails Mays v. Dart (20-cv-2134- Dkt 30-15) |
| 14 | Cook County Sheriff's Office Operations Briefing updated April 4, 2020 re Coronavirus Operation Plan |
| 15 | Sheriff of Cook County Inter-Departmental Memorandum dated March 29, 2020 from Brad Curry, Chief of Staff to All CCDOC Staff re Social Distancing Guidelines for Detainees in Living Unit Dayrooms |

| EXHIBIT NUMBER | DESCRIPTION |
|---|---|
| 16 | Memorandum from CCDOC to All CCDOC Detainees dated April 21, 2020 re COVID-19 Update |
| 17 | Quarantine Tiers Occupancy |
| 18 | Declaration of Jane Gubser in Mays v. Dart (20-cv-2134 – Dkt. 30-9) |
| 19 | Amended Sanitation Guidelines Specific to COVID-19 Procedure in Mays v. Dart (20-cv-2134 – Dkt. 51-4) |

# Dr. Homer D. Venters

10 ½ Jefferson St., Port Washington, NY, 11050
hventers@gmail.com, Phone: 646-734-5994

**HEALTH ADMINISTRATOR           PHYSICIAN           EPIDEMIOLOGIST**

## *Professional Profile*

- International leader in provision and improvement of health services to patients with criminal justice involvement.
- Innovator in linking care of the incarcerated to Medicaid, health homes, DSRIPs.
- Successful implementer of nations' first electronic health record, performance dashboards and health information exchange among pre-trial patients.
- Award winning epidemiologist focused on the intersection of health, criminal justice and human rights in the United States and developing nations.
- Human rights leader with experience using forensic science, epidemiology and public health methods to prevent and document human rights abuses.

## *Professional Experience*

**President**, Community Oriented Correctional Health Services (COCHS), 1/1/2020-present.
- Lead COCHS efforts to provide technical assistance, policy guidance and research regarding correctional health and justice reform.
- Oversee operations and programmatic development of COCHS
- Serve as primary liaison between COCHS board, funders, staff and partners.

**Senior Health and Justice Fellow**, Community Oriented Correctional Health Services (COCHS), 12/1/18-12/31/2018
- Lead COCHS efforts to expand Medicaid waivers for funding of care for detained persons relating to Substance Use and Hepatitis C.
- Develop and implement COCHS strategy for promoting non-profit models of diversion and correctional health care.

**Medical/Forensic Expert**, 3/2016-present
- Provide expert input, review and testimony regarding health care, quality improvement, electronic health records and data analysis in detention settings.

**Director of Programs,** Physicians for Human Rights, 3/16-11/18.
- Lead medical forensic documentation efforts of mass crimes against Rohingya and Yazidi people.
- Initiate vicarious trauma program.
- Expand forensic documentation of mass killings and war crimes.
- Develop and support sexual violence capacity development with physicians, nurses and judges.
- Expand documentation of attacks against health staff and facilities in Syria and Yemen.

**Chief Medical Officer/Assistant Vice President**, Correctional Health Services, NYC Health and Hospitals Corporation 8/15-3/17.

o Transitioned entire clinical service (1,400 staff) from a for-profit staffing company model to a new division within NYC H + H.

o Developed new models of mental health and substance abuse care that significantly lowered morbidity and other adverse events.

o Connected patients to local health systems, DSRIP and health homes using approximately $5 million in external funding (grants available on request).

o Reduced overall mortality in the nation's second largest jail system.

o Increased operating budget from $140 million to $160 million.

o Implemented nation's first patient experience, provider engagement and racial disparities programs for correctional health.

**Assistant Commissioner,** Correctional Health Services, New York Department of Health and Mental Hygiene, 6/11-8/15.

o Implemented nation's first electronic medical record and health information exchange for 1,400 staff and 75,000 patients in a jail.

o Developed bilateral agreements and programs with local health homes to identify incarcerated patients and coordinate care.

o Increased operating budget of health service from $115 million to $140 million.

o Established surveillance systems for injuries, sexual assault and mental health that drove new program development and received American Public Health Association Paper of the Year 2014.

o Personally care for and reported on over 100 patients injured during violent encounters with jail security staff.

**Medical Director,** Correctional Health Services, New York Department of Health and Mental Hygiene, 1/10-6/11.

o Directed all aspects of medical care for 75,000 patients annually in 12 jails, including specialty, dental, primary care and emergency response.

o Direct all aspects of response to infectious outbreaks of H1N1, Legionella, Clostridium Difficile.

o Developed new protocols to identify and report on injuries and sexual assault among patients.

**Deputy Medical Director,** Correctional Health Services, New York Department of Health and Mental Hygiene, 11/08-12/09.

o Developed training program with Montefiore Social internal medicine residency program.

o Directed and delivered health services in 2 jails.

**Clinical Attending Physician,** Bellevue/NYU Clinic for Survivors of Torture, 10/07-12/11.

**Clinical Attending Physician,** Montefiore Medical Center Bronx NY, Adult Medicine, 1/08-11/09.

## Education and Training
**Fellow, Public Health Research,** New York University 2007-2009. MS 6/2009
Projects: Health care for detained immigrants, Health Status of African immigrants in NYC.
**Resident, Social Internal Medicine**, Montefiore Medical Center/Albert Einstein University7/2004- 5/2007.
**M.D.,** University of Illinois, Urbana, 12/2003.
**M.S.** Biology, University of Illinois, Urbana, 6/03.
**B.A.** International Relations, Tufts University, Medford, MA, 1989**.**

## Academic Appointments, Licensure
Clinical Associate Professor, New York University College of Global Public Health, 5/18-present.

Clinical Instructor, New York University Langone School of Medicine, 2007-2018.

M.D.   New York (2007-present).

## Media
TV
i24 Crossroads re Suicide in U.S. Jails 8/13/19.

i24 Crossroads re re *Life and Death in Rikers Island* 6/13/19.

Amanpour & Company, NPR/PBS re *Life and Death in Rikers Island* 4/15/19.

CNN, Christiane Amanpour re Forensic documentation of mass crimes against Rohingya. 7/11/18.

i24 Crossroads with David Shuster re health crisis among refugees in Syria. 7/6/18.

Canadian Broadcasting Corporation TV with Sylvie Fournier (in French) re crowd control weapons. 5/10/18

i24 Crossroads with David Shuster re Cholera outbreak in Yemen.  2/15/18.

China TV re WHO guidelines on HIV medication access 9/22/17.

Radio/Podcast
Morning Edition, NPR re Health Risks of Criminal Justice System. 8/9/19.

Fresh Air with Terry Gross, NPR re *Life and Death in Rikers Island*, 3/6/19.

Morning Edition, NPR re *Life and Death in Rikers Island*, 2/22/19.

LeShow with Harry Sherer re forensic documentation of mass crimes in Myanmar, Syria,

Iraq. 4/17/18.

Print articles and public testimony
Oped: Four ways to protect our jails and prisons from coronavirus. The Hill 2/29/20.

Oped: It's Time to Eliminate the Drunk Tank. The Hill 1/28/20.

Oped: With Kathy Morse. A Visit with my Incarcerated Mother. The Hill 9/24/19.

Oped: With Five Omar Muallim-Ak. The Truth about Suicide Behind Bars is Knowable. The Hill 8/13/19.

Oped: With Katherine McKenzie. Policymakers, provide adequate health care in prisons and detention centers. CNN Opinion, 7/18/19.

Oped: Getting serious about preventable deaths and injuries behind bars. *The Hill*, 7/5/19.

Testimony: Access to Medication Assisted Treatment in Prisons and Jails,  New York State Assembly Committee on Alcoholism and Drug Abuse, Assembly Committee on Health, and Assembly Committee on Correction**.** NY, NY, 11/14/18.

Oped: Attacks in Syria and Yemen are turning disease into a weapon of war, *STAT News*, 7/7/17.

Testimony: Connecticut Advisory Committee to the U.S. Commission on Civil Rights: Regarding the use of solitary confinement for prisoners. Hartford CT, 2/3/17.

Testimony: Venters HD, New York Advisory Committee to the U.S. Commission on Civil Rights: Regarding the use of solitary confinement for juveniles in New York. July 10, 2014. NY NY.

Testimony: New York State Assembly Committee on Correction with the Committee on Mental Health: Regarding Mental Illness in Correctional Settings. November 13, 2014. Albany NY.
Testimony: New York State Assembly Committee on Correction with the Committee on Mental Health: Regarding Mental Illness in Correctional Settings. November 13, 2014. Albany NY.

Oped: Venters HD and Keller AS, The Health of Immigrant Detainees. Boston Globe, April 11, 2009.

Testimony: U.S. House of Representatives, House Judiciary Committee's Subcommittee on Immigration, Citizenship, Refugees, Border Security, and International Law: Hearing on Problems with Immigration Detainee Medical Care, June 4, 2008.

## *Peer Reviewed Publications*

Parmar PK, Leigh J, **Venters H**, Nelson T. Violence and mortality in the Northern Rakhine State of Myanmar, 2017: results of a quantitative survey of surviving community leaders in Bangladesh. Lancet Planet Health. 2019 Mar;3(3):e144-e153.

**Venters H.** Notions from Kavanaugh hearings contradict medical facts. *Lancet.* 10/5/18.

Taylor GP, Castro I, Rebergen C, Rycroft M, Nuwayhid I, Rubenstein L, Tarakji A, Modirzadeh N, **Venters H**, Jabbour S. Protecting health care in armed conflict: action towards accountability. *Lancet.* 4/14/18.

Katyal M, Leibowitz R, **Venters H**. IGRA-Based Screening for Latent Tuberculosis Infection in Persons Newly Incarcerated in New York City Jails. *J Correct Health Care.* 2018 4/18.

Harocopos A, Allen B, Glowa-Kollisch S, **Venters H**, Paone D, Macdonald R. The Rikers Island Hot Spotters: Exploring the Needs of the Most Frequently Incarcerated. *J Health Care Poor Underserved.* 4/28/17.

MacDonald R, Akiyama MJ, Kopolow A, Rosner Z, McGahee W, Joseph R, Jaffer M, **Venters H**. Feasibility of Treating Hepatitis C in a Transient Jail Population. *Open Forum Infect Dis.* 7/7/18.

Siegler A, Kaba F, MacDonald R, **Venters H**. Head Trauma in Jail and Implications for Chronic Traumatic Encephalopathy. *J Health Care Poor and Underserved.* In Press (May 2017).

Ford E, Kim S, **Venters H**. Sexual abuse and injury during incarceration reveal the need for re-entry trauma screening. *Lancet.* 4/8/18.

Alex B, Weiss DB, Kaba F, Rosner Z, Lee D, Lim S, **Venters H,** MacDonald R. Death After Jail Release. *J Correct Health Care.* 1/17.

Akiyama MJ, Kaba F, Rosner Z, Alper H, Kopolow A, Litwin AH, **Venters H**, MacDonald R. Correlates of Hepatitis C Virus Infection in the Targeted Testing Program of the New York City Jail System. *Public Health Rep.* 1/17.

Kalra R, Kollisch SG, MacDonald R, Dickey N, Rosner Z, **Venters H**. Staff Satisfaction, Ethical Concerns, and Burnout in the New York City Jail Health System. *J Correct Health Care.* 2016 Oct;22(4):383-392.

**Venters H.** A Three-Dimensional Action Plan to Raise the Quality of Care of US Correctional Health and Promote Alternatives to Incarceration. *Am J Public Health.* April 2016.104.

Glowa-Kollisch S, Kaba F, Waters A, Leung YJ, Ford E, **Venters H**. From Punishment to Treatment: The "Clinical Alternative to Punitive Segregation" (CAPS) Program in New York City Jails. *Int J Env Res Public Health.* 2016. 13(2),182.

Jaffer M, Ayad J, Tungol JG, MacDonald R, Dickey N, Venters H. Improving Transgender Healthcare in the New York City Correctional System. *LGBT Health.* 2016 1/8/16.

Granski M, Keller A, Venters H. Death Rates among Detained Immigrants in the United States. *Int J Env Res Public Health.* 2015. 11/10/15.

Michelle Martelle, Benjamin Farber, Richard Stazesky, Nathaniel Dickey, Amanda Parsons, **Homer Venters**. Meaningful Use of an Electronic Health Record in the NYC Jail System. *Am J Public Health*. 2015. 8/12/15.

Fatos Kaba, Angela Solimo, Jasmine Graves, Sarah Glowa-Kollisch, Allison Vise, Ross MacDonald, Anthony Waters, Zachary Rosner, Nathaniel Dickey, Sonia Angell, **Homer Venters**. Disparities in Mental Health Referral and Diagnosis in the NYC Jail Mental Health Service. *Am J Public Health.* 2015. 8/12/15.

Ross MacDonald, Fatos Kaba, Zachary Rosner, Alison Vise, Michelle Skerker, David Weiss, Michelle Brittner, Nathaniel Dickey, **Homer Venters**. The Rikers Island Hot Spotters. *Am J Public Health*. 2015. 9/17/15.

Selling Molly Skerker, Nathaniel Dickey, Dana Schonberg, Ross MacDonald, **Homer Venters**. Improving Antenatal Care for Incarcerated Women: fulfilling the promise of the Sustainable Development Goals. *Bulletin of the World Health Organization.*2015*.*

Jasmine Graves, Jessica Steele, Fatos Kaba, Cassandra Ramdath, Zachary Rosner, Ross MacDonald, Nathanial Dickey, **Homer Venters**. Traumatic Brain Injury and Structural Violence among Adolescent males in the NYC Jail System *J Health Care Poor Underserved.* 2015;26(2):345-57.

Glowa-Kollisch S, Graves J, Dickey N, MacDonald R, Rosner Z, Waters A, **Venters H**. Data-Driven Human Rights: Using Dual Loyalty Trainings to Promote the Care of Vulnerable Patients in Jail. *Health and Human Rights*. Online ahead of print, 3/12/15.

Teixeira PA[1], Jordan AO, Zaller N, Shah D, **Venters H**. Health Outcomes for HIV-Infected Persons Released From the New York City Jail System With a Transitional Care-Coordination Plan. 2014. *Am J Public Health*. 2014 Dec 18.

Selling D, Lee D, Solimo A, **Venters H.** A Road Not Taken: Substance Abuse Programming in the New York City Jail System. *J Correct Health Care.* 2014 Nov 17.

Glowa-Kollisch S, Lim S, Summers C, Cohen L, Selling D, **Venters H**. Beyond the Bridge: Evaluating a Novel Mental Health Program in the New York City Jail System. *Am J Public Health*. 2014 Sep 11.

Glowa-Kollisch S, Andrade K, Stazesky R, Teixeira P, Kaba F, MacDonald R, Rosner Z, Selling D, Parsons A, **Venters H**. Data-Driven Human Rights: Using the Electronic Health Record to Promote Human Rights in Jail. *Health and Human Rights*. 2014. Vol 16 (1): 157-165.

MacDonald R, Rosner Z, **Venters H**. Case series of exercise-induced rhabdomyolysis in the New York City Jail System. *Am J Emerg Med*. 2014. Vol 32(5): 446-7.

Bechelli M, Caudy M, Gardner T, Huber A, Mancuso D, Samuels P, Shah T, **Venters H.** Case Studies from Three States: Breaking Down Silos Between Health Care and Criminal Justice. *Health Affairs*. 2014. Vol. 3. 33(3):474-81.

Selling D, Solimo A, Lee D, Horne K, Panove E, **Venters H**. Surveillance of suicidal and non-suicidal self-injury in the new York city jail system. *J Correct Health Care*. 2014. Apr:20(2).

Kaba F, Diamond P, Haque A, MacDonald R, **Venters H**. Traumatic Brain Injury Among Newly Admitted Adolescents in the New York City Jail System. *J Adolesc Health*. 2014. Vol 54(5): 615-7.

Monga P, Keller A, **Venters H**. Prevention and Punishment: Barriers to accessing health services for undocumented immigrants in the United States. *LAWS*. 2014. 3(1).

Kaba F, Lewsi A, Glowa-Kollisch S, Hadler J, Lee D, Alper H, Selling D, MacDonald R, Solimo A, Parsons A, **Venters H**. Solitary Confinement and Risk of Self-Harm Among Jail Inmates. *Amer J Public Health*. 2014. Vol 104(3):442-7.

MacDonald R, Parsons A, **Venters H.** The Triple Aims of Correctional Health:  Patient safety, Population Health and Human Rights. *Journal of Health Care for the Poor and Underserved*. 2013. 24(3).

Parvez FM, Katyal M, Alper H, Leibowitz R, **Venters H.** Female sex workers incarcerated in New York City jails: prevalence of sexually transmitted infections and associated risk behaviors. *Sexually Transmitted Infections*. 89:280-284. 2013.

Brittain J, Axelrod G, **Venters H.** Deaths in New York City Jails: 2001 – 2009. *Am J Public Health*. 2013 103:4.

Jordan AO, Cohen LR, Harriman G, Teixeira PA, Cruzado-Quinones J, **Venters H.** Transitional Care Coordination in New York City Jails: Facilitating Linkages to Care for People with HIV Returning Home from Rikers Island. *AIDS Behav. Nov.* 2012.

Jaffer M, Kimura C, **Venters H.** Improving medical care for patients with HIV in New York City jails. *J Correct Health Care*. 2012 Jul;18(3):246-50.

Ludwig A, Parsons, A, Cohen, L, **Venters H.** Injury Surveillance in the NYC Jail System, *Am J Public Health* 2012 Jun;102(6).

**Venters H**, Keller, AS. *Psychiatric Services*. (2012) Diversion of Mentally Ill Patients from Court-ordered care to Immigration Detention. Epub. 4/2012.

**Venters H**, Gany, F. *Journal of Immigrant and Minority Health* (2011) Mental Health Concerns Among African Immigrants. 13(4): 795-7.

**Venters H,** Foote M, Keller AS. *Journal of Immigrant and Minority Health.* (2010) Medical Advocacy on Behalf of Detained Immigrants. 13(3): 625-8.

**Venters H,** McNeely J, Keller AS. *Health and Human Rights.* (2010) HIV Screening and Care for Immigration Detainees. 11(2) 91-102.

**Venters H,** Keller AS. *Journal of Health Care for the Poor and Underserved*. (2009) The Immigration Detention Health Plan: An Acute Care Model for a Chronic Care Population. 20:951-957.

**Venters H**, Gany, F. *Journal of Immigrant and Minority Health* (2009) African Immigrant Health. 4/4/09.

**Venters H**, Dasch-Goldberg D, Rasmussen A, Keller AS, *Human Rights Quarterly* (2009) Into the Abyss: Mortality and Morbidity among Detained Immigrant. 31 (2) 474-491.

**Venters H**, *The Lancet* (2008) Who is Jack Bauer? 372 (9653).

**Venters H**, Lainer-Vos J, Razvi A, Crawford J, Shaf'on Venable P, Drucker EM, *Am J Public Health* (2008) Bringing Health Care Advocacy to a Public Defender's Office. 98 (11).

**Venters H**, Razvi AM, Tobia MS, Drucker E. *Harm Reduct J.* (2006) The case of Scott Ortiz: a clash between criminal justice and public health. Harm Reduct J. 3:21

Cloez-Tayarani I, Petit-Bertron AF, **Venters HD**, Cavaillon JM (2003) *Internat. Immunol.* Differential effect of serotonin on cytokine production in lipopolysaccharide-stimulated human peripheral blood mononuclear cells.15,1-8.

Strle K, Zhou JH, Broussard SR, **Venters HD**, Johnson RW, Freund GG, Dantzer R, Kelley KW, (2002) *J. Neuroimmunol.* IL-10 promotes survival of microglia without activating Akt. 122, 9-19.

**Venters HD,** Broussard SR, Zhou JH, Bluthe RM, Freund GG, Johnson RW, Dantzer R, Kelley KW, (2001) *J. Neuroimmunol.* Tumor necrosis factor(alpha) and insulin-like growth factor-I in the brain: is the whole greater than the sum of its parts? 119, 151-65.

**Venters HD,** Dantzer R, Kelley KW, (2000) *Ann. N. Y. Acad. Sci.* Tumor necrosis factor-alpha induces neuronal death by silencing survival signals generated by the type I insulin-like growth factor receptor. 917, 210-20.

**Venters HD,** Dantzer R, Kelley KW, (2000) *Trends. Neurosci.* A new concept in neurodegeneration: TNFalpha is a silencer of survival signals. 23, 175-80.

**Venters HD,** Tang Q, Liu Q, VanHoy RW, Dantzer R, Kelley KW, (1999) *Proc. Natl. Acad. Sci. USA.* A new mechanism of neurodegeneration: A proinflammatory cytokine inhibits receptor signaling by a survival peptide, 96, 9879-9884.

**Venters HD,** Ala TA, Frey WH 2nd , (1998) Inhibition of antagonist binding to human brain muscarinic receptor by vanadium compounds. *Recept. Signal. Transduct.* 7, 137-142.

**Venters HD,** Tang Q, Liu Q, VanHoy RW, Dantzer R, Kelley KW, (1999) *Proc. Natl. Acad. Sci. USA.* A new mechanism of neurodegeneration: A proinflammatory cytokine inhibits receptor signaling by a survival peptide, 96, 9879-9884.

**Venters HD,** Ala TA, Frey WH 2nd , (1998) Inhibition of antagonist binding to human brain muscarinic receptor by vanadium compounds. *Recept. Signal. Transduct.* 7, 137-142**.**

**Venters HD,** Bonilla LE, Jensen T, Garner HP, Bordayo EZ, Najarian MM, Ala TA, Mason RP, Frey WH 2nd, (1997) Heme from Alzheimer's brain inhibits muscarinic receptor binding via thiyl radical generation. *Brain. Res.* 764, 93-100.

Kjome JR, Swenson KA, Johnson MN, Bordayo EZ, Anderson LE, Klevan LC, Fraticelli AI, Aldrich SL, Fawcett JR, **Venters HD**, Ala TA, Frey WH 2nd (1997) Inhibition of antagonist and agonist binding to the human brain muscarinic receptor by arachidonic acid. *J. Mol. Neurosci.* 10, 209-217.

## *Honors and Presentations (past 10 years)*

**Keynote Address**, Academic Correctional Health Conference, April 2020, Chapel Hill, North Carolina.

**TedMed Presentation**, Correctional Health, Boston MA, March 2020.

**Finalist, Prose Award for Literature**, Social Sciences category for *Life and Death in Rikers Island*, February, 2020.

**Keynote Address,** John Howard Association Annual Benefit, November 2019, Chicago IL.

**Keynote Address,** Kentucky Data Forum, Foundation for a Healthy Kentucky, November 2019, Cincinnati Ohio.

**Oral Presentation,** Dual loyalty and other human rights concerns for physicians in jails an prisons. Association of Correctional Physicians, Annual meeting. 10/16, Las Vegas.

**Oral Presentation,** Clinical Alternatives to Punitive Segregation: Reducing self-harm for incarcerated patients with mental illness. American Public Health Association Annual Meeting, November 2015, Chicago IL.

**Oral Presentation,** Analysis of Deaths in ICE Custody over 10 Years . American Public Health Association Annual Meeting, November 2015, Chicago IL.

**Oral Presentation,** Medication Assisted Therapies for Opioid Dependence in the New York City Jail System. American Public Health Association Annual Meeting, November 2015, Chicago IL.

**Oral Presentation,** Pathologizing Normal Human Behavior: Violence and Solitary Confinement in an Urban Jail. American Public Health Association Annual Meeting, November 2014, New Orleans, LA.

**Training,** International Committee of the Red Cross and Red Crescent, Medical Director meeting 10/15, Presentation on Human Rights and dual loyalty in correctional health.

**Paper of the Year,** American Public Health Association. 2014. (Kaba F, Lewis A, Glowa-Kollisch S, Hadler J, Lee D, Alper H, Selling D, MacDonald R, Solimo A, Parsons A, Venters H. Solitary Confinement and Risk of Self-Harm Among Jail Inmates. *Amer J Public Health*. 2014. Vol 104(3):442-7.)

**Oral Presentation,** Pathologizing Normal Human Behavior: Violence and Solitary Confinement in an Urban Jail. *American Public Health Association* Annual Meeting, New Orleans LA, 2014.

**Oral Presentation,** Human rights at Rikers: Dual loyalty among jail health staff. American Public Health Association Annual Meeting, New Orleans LA, 2014.

**Poster Presentation**, Mental Health Training for Immigration Judges. American Public Health

Association Annual Meeting, New Orleans LA, 2014.

**Distinguished Service Award;** Managerial Excellence. Division of Health Care Access and Improvement, NYC DOHMH. 2013.

**Oral Presentation,** Solitary confinement in the ICE detention system. American Public Health Association Annual Meeting, Boston MA, 2013.

**Oral Presentation**, Self-harm and solitary confinement in the NYC jail system. American Public Health Association Annual Meeting, Boston MA, 2013.

**Oral Presentation**, Implementing a human rights practice of medicine inside New York City jails. American Public Health Association Annual Meeting, Boston MA, 2013.

**Poster Presentation,** Human Rights on Rikers: integrating a human rights-based framework for healthcare into NYC's jail system. *American Public Health Association* Annual Meeting, Boston MA, 2013.

**Poster Presentation**, Improving correctional health care: health information exchange and the affordable care act. *American Public Health Association* Annual Meeting, Boston MA, 2013.

**Oral Presentation**, Management of Infectious Disease Outbreaks in a Large Jail System. American Public Health Association Annual Meeting, Washington DC, 2011.

**Oral Presentation,** Diversion of Patients from Court Ordered Mental Health Treatment to Immigration Detention. *American Public Health Association* Annual Meeting, Washington DC, 2011.

**Oral Presentation**, Initiation of Antiretroviral Therapy for Newly Diagnosed HIV Patients in the NYC Jail System. *American Public Health Association* Annual Meeting, Washington DC, 2011.

**Oral Presentation,** Medical Case Management in Jail Mental Health Units. *American Public Health Association* Annual Meeting, Washington DC, 2011.

**Oral Presentation**, Injury Surveillance in New York City Jails. *American Public Health Association* Annual Meeting, Washington DC, 2011.

**Oral Presentation,** Ensuring Adequate Medical Care for Detained Immigrants. Venters H, Keller A, American Public Health Association Annual Meeting, Denver, CO, 2010.

**Oral Presentation,** HIV Testing in NYC Correctional Facilities. Venters H and Jaffer M, *American Public Health Association,* Annual Meeting, Denver, CO, 2010.

**Oral Presentation,** Medical Concerns for Detained Immigrants. Venters H, Keller A, *American Public Health Association* Annual Meeting, Philadelphia, PA, November 2009.

**Oral Presentation,** Growth of Immigration Detention Around the Globe. Venters H, Keller A, *American Public Health Association* Annual Meeting, Philadelphia, PA, November 2009.

**Oral Presentation,** Role of Hospital Ethics Boards in the Care of Immigration Detainees. Venters H, Keller A, *American Public Health Association* Annual Meeting, Philadelphia, PA,

November 2009.

**Oral Presentation,** Health Law and Immigration Detainees. Venters H, Keller A, *American Public Health Association* Annual Meeting, Philadelphia, PA, November 2009.

**Bro Bono Advocacy Award,** Advocacy on behalf of detained immigrants. Legal Aid Society of New York, October 2009.

**Oral Presentation,** Deaths of immigrants detained by Immigration and Customs Enforcement. Venters H, Rasmussen A, Keller A, *American Public Health Association* Annual Meeting, San Diego CA, October 2008.

**Poster Presentation,** Death of a detained immigrant with AIDS after withholding of prophylactic Dapsone. Venters H, Rasmussen A, Keller A, *Society of General Internal Medicine* Annual Meeting, Pittsburgh PA, April 2008.

**Poster Presentation,** Tuberculosis screening among immigrants in New York City reveals higher rates of positive tuberculosis tests and less health insurance among African immigrants. *Society of General Internal Medicine* Annual Meeting, Pittsburgh PA, April 2008.

**Daniel Leicht Award for Achievement in Social Medicine,** Montefiore Medical Center, Department of Family and Social Medicine, 2007.

**Poster Presentation**, Case Findings of Recent Arestees. Venters H, Deluca J, Drucker E. *Society of General Internal Medicine* Annual Meeting, Toronto Canada, April 2007.

**Poster Presentation,** Bringing Primary Care to Legal Aid in the Bronx. Venters H, Deluca J, Drucker E. *Society of General Internal Medicine* Annual Meeting, Los Angeles CA, April 2006.

**Poster Presentation**, A Missed Opportunity, Diagnosing Multiple Myeloma in the Elderly Hospital Patient. Venters H, Green E., *Society of General Internal Medicine* Annual Meeting, New Orleans LA, April 2005.

## *Grants: Program*

San Diego County: Review of jail best practices (COCHS), 1/2020, $90,000.

Ryan White Part A - Prison Release Services (PRS). From HHS/HRSA to Correctional Health Services (NYC DOHMH), 3/1/16-2/28/17 (Renewed since 2007). Annual budget $ 2.7 million.

Ryan White Part A - Early Intervention Services- Priority Population Testing. From HHS/HRSA to Correctional Health Services (NYC DOHMH), 3/1/16-2/28/18 (Renewed since 2013). Annual budget $250,000.

Comprehensive HIV Prevention. From HHS to Correctional Health Services (NYC DOHMH), 1/1/16-12/31/16. Annual budget $500,000.

HIV/AIDS Initiative for Minority Men. From HHS Office of Minority Health to Correctional Health Services (NYC DOHMH), 9/30/14-8/31/17. Annual budget $375,000.

SPNS Workforce Initiative, From HRSA SPNS to Correctional Health Services (NYC DOHMH), 8/1/14-7/31/18. Annual budget $280,000.

SPNS Culturally Appropriate Interventions. From HRSA SPNS to Correctional Health Services (NYC DOHMH), 9/1/13-8/31/18. Annual budget $290,000.

Residential substance abuse treatment. From New York State Division of Criminal Justice Services to Correctional Health Services (NYC DOHMH), 1/1/11-12/31/17. Annual budget $175,000.

Community Action for Pre-Natal Care (CAPC). From NY State Department of Health AIDS Institute to Correctional Health Services (NYC DOHMH), 1/1/05-12/31/10. Annual budget $290,000.

Point of Service Testing. From MAC/AIDS, Elton John and Robin Hood Foundations to Correctional Health Services (NYC DOHMH), 11/1/09-10/31/12. Annual budget $100,000.

Mental Health Collaboration Grant. From USDOJ to Correctional Health Services (NYC DOHMH), 1/1/11-9/30/13. Annual budget $250,000.

## Teaching

**Instructor,** Health in Prisons Course, Bloomberg School of Public Health, Johns Hopkins University, June 2015, June 2014, April 2019.

**Instructor**, Albert Einstein College of Medicine/Montefiore Social Medicine Program Yearly lectures on Data-driven human rights, 2007-present.

## Other Health & Human Rights Activities

**DIGNITY Danish Institute Against Torture**, Symposium with Egyptian correctional health staff regarding dual loyalty and data-driven human rights. Cairo Egypt, September 20-23, 2014.

**Doctors of the World,** Physician evaluating survivors of torture, writing affidavits for asylum hearings, with testimony as needed, 7/05-11/18.

**United States Peace Corps**, Guinea Worm Educator, Togo West Africa, June 1990- December 1991.

-*Primary Project;* Draconculiasis Eradication. Activities included assessing levels of infection in 8 rural villages and giving prevention presentations to mothers in Ewe and French

-*Secondary Project;* Malaria Prevention.

## Books

**Venters H.** *Life and Death in Rikers Island*. Johns Hopkins University Press. 2/19.

## Chapters in Books

**Venters H.** Mythbusting Solitary Confinement in Jail. In Solitary Confinement Effects, Practices, and Pathways toward Reform. Oxford University Press, 2020.

MacDonald R. and **Venters H.** Correctional Health and Decarceration. In Decarceration. Ernest Drucker, New Press, 2017.

## *Membership in Professional Organizations*
**American Public Health Association**

## *Foreign Language Proficiency*
| | |
|---|---|
| **French** | Proficient |
| **Ewe** | Conversant |

## *Prior Testimony and Deposition*

Benjamin v. Horn, 75 Civ. 3073 (HB) (S.D.N.Y.) as expert for defendants, 2015

Rodgers v. Martin 2:16-cv-00216 (U.S.D.C. N.D.Tx) as expert for plaintiffs, 10/19/17

Fikes v. Abernathy, 2017 7:16-cv-00843-LSC (U.S.D.C. N.D.AL) as expert for plaintiffs 10/30/17.

Fernandez v. City of New York, 17-CV-02431 (GHW)(SN) (S.D.NY) as defendant in role as City Employee 4/10/18.

Charleston v. Corizon Health INC, 17-3039 (U.S.D.C. E.D. PA) as expert for plaintiffs 4/20/18.

Gambler v. Santa Fe County, 1:17-cv-00617 (WJ/KK) as expert for plaintiffs 7/23/18.

Hammonds v. Dekalb County AL, CASE NO.: 4:16-cv-01558-KOB as expert for plaintiffs 11/30/2018.

Mathiason v. Rio Arriba County NM, No. D-117-CV-2007-00054, as expert for plaintiff 2/7/19.

Hutchinson v. Bates et. al. AL, No. 2:17-CV-00185-WKW- GMB, as expert for plaintiff 3/27/19.

Lewis v. East Baton Rouge Parish Prison LA, No. 3:16-CV-352-JWD-RLB, as expert for plaintiff 6/24/19.

Belcher v. Lopinto, No No. 2:2018cv07368 - Document 36 (E.D. La. 2019) as expert for plaintiffs 12/5/2019.


## Fee Schedule

Case review, reports, testimony $500/hour.
Site visits and other travel, $2,500 per day (not including travel costs).

## DECLARATION OF DR. HOMER VENTERS

I, Dr. Homer Venters, hereby declare the following under penalty of perjury pursuant to 28 U.S.C. § 1746:

1.  I am a physician, internist and epidemiologist with over a decade of experience in providing, improving and leading health services for incarcerated people. My clinical training includes residency training in internal medicine at the Albert Einstein/Montefiore Medical Center (2007) and a fellowship in public health research at the New York University School of Medicine (2009). My experience in correctional health includes two years visiting detention centers and conducting analyses of physical and mental health policies and procedures for persons detained in federal facilities. This work included and resulted in collaboration with federal detention administrators on numerous individual cases of medical release, formulation of health-related policies, and testimony before U.S. Congress regarding mortality inside detention facilities.

2.  After my fellowship training, I became the Deputy Medical Director of the New York City Jail Correctional Health Service. This position included both direct care to persons held in NYC's 12 jails, as well as oversight of medical policies for their care. This role included oversight of chronic care, sick call, specialty referral and emergency care.

3.  I subsequently was promoted to the positions of Medical Director, Assistant Commissioner, and Chief Medical Officer of NYC Jail Correctional Health Services.  We operated one of the largest correctional health care systems in the nation, with over 43,000 annual admissions in jails across the city. In the latter two roles, I was responsible for all aspects of health services including physical and mental health, addiction, quality improvement, re-entry, morbidity and mortality reviews, as well as all training and oversight of physicians, nursing and

pharmacy staff. In these roles, I was also responsible for evaluating and making recommendations on the health implications of numerous security policies and practices.

4.      During this time, I managed multiple communicable disease outbreaks in our facilities, including H1N1 in 2009, which impacted almost one third of housing areas inside the adolescent jail, multiple seasonal influenza outbreaks, a recurrent legionella infection and several other smaller outbreaks. To manage all of these outbreaks, I worked closely with management at the facilities, including security and health staff, developed policies and procedures to manage the outbreaks, and oversaw training and implementation of those policies and procedures. Central aspects of my roles in these outbreak responses included the identification and protection of high-risk patient cohorts, development of infection control plans that integrated all levels of staff and detained people in mitigating the impact of the outbreak. I also led inspections of housing areas with teams of health, security, engineering and hygiene experts and developed and conducted orientations and trainings for correctional staff, health professionals and detained people. I also developed data dashboards that were updated on a daily basis and shared with local and state public health partners to integrate jail outbreak management with community efforts.

5.      In March 2017, I left Correctional Health Services of NYC to become the Director of Programs for Physicians for Human Rights. In this role, I oversaw all programs of Physicians for Human Rights, including training of physicians, judges and law enforcement staff on forensic evaluation and documentation, analysis of mass graves and mass atrocities, documentation of torture and sexual violence, and analysis of attacks against healthcare workers.

6.      In December 2018, I became the Senior Health and Justice Fellow for Community Oriented Correctional Health Services (COCHS), a nonprofit organization that promotes evidence-based improvements to correctional practices across the U.S. In January 2020, I

became the president of COCHS. I also work as a medical expert in cases involving correctional

health and I wrote a book on the health risks of jail (*Life and Death in Rikers Island*) which was

published in early 2019 by Johns Hopkins University Press. A copy of my curriculum vitae is

attached to this report, which includes my publications, a list of cases in which I have been

involved and a statement of my compensation.

7.　　Since January 2020, I have been engaged in numerous activities in response to

COVID-19 infection in detention settings. I have published two articles on COVID-19 behind

bars[1] and participated in over 70 interviews on the need for systematic and evidence-based

practices in jails, prisons and other detention settings to both prevent deaths among incarcerated

people, and flatten the overall outbreak curve in in the community from COVID-19.[2] I am also

scheduled to conduct a court-ordered inspection of the Metropolitan Detention Center in

Brooklyn NY, which is in the throws of a COVID-19 outbreak and provide my findings to the

court. I was invited by the National Association of Counties and Fair and Just Prosecution, a

national convening of elected prosecutors, The Stanford Law School and the University of

Southern California School of Medicine to provide guidance on COVID-19 response in detention

settings, and I have provided similar guidance on multiple other webinars and presentations.

---

[1] Dr. Homer Venters, "4 ways to protect our jails and prisons from coronavirus," The Hill (Feb. 29, 2020), https://thehill.com/opinion/criminal-justice/485236-4-ways-to-protect-our-jails-and-prisons-from-coronavirus; Dr. Homer Venters, "Coronavirus behind bars: 4 priorities to save the lives of prisoners," The Hill (Mar. 23, 2020), https://thehill.com/opinion/criminal-justice/488802-coronavirus-behind-bars-4-priorities-to-save-the-lives-of-prisoners.
[2] For example: Jean Casella& Katie Rose Quandt, "US jails will become death traps in the coronavirus pandemic," The Guardian (Mar. 30, 2020), https://www.theguardian.com/commentisfree/2020/mar/30/jails-coronavirus-us-rikers-island; Erin Doherty & Kelly Cannon, "'We need help': Inmates describe prison system unprepared for coronavirus," ABC News (Apr. 5, 2020), https://abcnews.go.com/Politics/inmates-describe-prison-system-unprepared-coronavirus/story?id=69980790.

8.    I have been retained by counsel for the plaintiffs in this case to provide opinions about the actions that should be taken at the Cook County Jail in light of the current COVID-19 outbreak. As part of my work in this case, I have been provided the following documents:

- Amended Sanitation Policy
- Referral for Medical Care Policy
- Outbreak Prevention Policy
- CCSO Operational Briefing 4/4/20
- Sanitation Plans
- Intake Photos
- Declarations of Concetta Menella (2), Rebecca Levin, Henriette Gratteau, Michael Miller, Ronald Lankah, Patricia Horne, Elizabeth Scannell, Sonjourner Colbert, Matthew Burke, Jane Gubser, Brad Curry (2), and Peter Orris
- Plaintiff's Complaint and Exhibits
- Sheriff's 4/6/20 Response to the Plaintiff's Emergency Motion and Exhibits
- Sheriff's 4/13/20 Status Report and Exhibits
- Plaintiff's Motion for Preliminary Injunction and Exhibits
- 4/15/20 Hearing Transcript

All of the opinions set forth in this declaration are offered to a reasonable degree to medical certainty based on my training, experience, and review of the relevant literature, and national and international data and guidance.

9.    Coronavirus disease of 2019 (COVID-19) is a viral pandemic.[3]  This is a novel virus for which there is no established curative medical treatment and no vaccine. COVID-19 is different than all previous infectious disease outbreaks faced in our lifetime because of the speed and extent of spread throughout the globe, and how quickly it has overwhelmed healthcare systems. Infection control and social distancing represent the most evidence-based and critical interventions being utilized to slow the spread of COVID-19. Unlike many other viral outbreaks, it now appears that significant transmission of COVID-19 occurs before infected people become

---

[3] In the name COVID-19, 'CO' stands for 'corona,' 'VI' for 'virus,' and 'D' for disease.

symptomatic, which underscores the need for heavy focus on social distancing as a means to prevent transmission.

10.    The Centers for Disease Control and Prevention (CDC) has identified many particularly vulnerable populations who are at increased risk of having severe outcomes from COVID-19.[4] These include:

- People with chronic lung disease or moderate to severe asthma
- People who have serious heart conditions
- People who are immunocompromised[5]
- People with severe obesity (body mass index [BMI] of 40 or higher)
- People with diabetes
- People with chronic kidney disease undergoing dialysis
- People with liver disease
- People who are smokers
- People who are pregnant or post-partum

11.    In addition, data shows that African-Americans are experiencing disproportionate rates of death from COVID-19.[6]

12.    For vulnerable individuals, social distancing and infection control play an even more central role in protecting against severe negative outcomes, there is no treatment or cure that has been identified to lessen their greater risk of harm after contracting the virus.[7]

13.    Fatality is clearly the worst outcome of COVID-19 infection, but many who contract the illness and "recover" are irreparably damaged. This cannot be understated. The

---

[4] "At Risk for Severe Illness," CDC, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-risk.html.
[5] Including but not limited to cancer treatment, smoking, bone marrow or organ transplantation, immune deficiencies, HIV/AIDS, and prolonged use of corticosteroids and other immune-weakening medications.
[6] Reis Thebault, Andrew Ba Tran, & Vanessa Williams, "The coronavirus is infecting and killing black Americans at an alarmingly high rate," The Washington Post (Apr. 7, 2020), https://www.washingtonpost.com/nation/2020/04/07/coronavirus-is-infecting-killing-black-americans-an-alarmingly-high-rate-post-analysis-shows/?arc404=true.
[7] "What You Can Do," CDC, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/what-you-can-do.html ("**Stay home and avoid close contact**"); "How to Protect Yourself and Others," CDC, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/prevention.html ("**The best way to prevent illness is to avoid being exposed to this virus.**").

respiratory damage associated with severe COVID-19 infection causes long term decreases in lung function, and it is likely that among the 10-20% of people who require hospitalization, most will experience long-term effects on their lungs, heart, kidneys, eyes, central nervous system and other major organs.[8]

14. COVID-19 infection rates have grown exponentially in the U.S. The CDC now reports COVID-19 cases and deaths in all 50 states.[9] When COVID-19 impacts a community, it will also impact the community's detention facilities. Federal and local correctional facilities will not be able to stop the entry of COVID-19 into their facilities: the reality is that the infection is inside many facilities already. It is inevitable and is not preventable. Numerous county jails, like Cook County Jail, have already reported hundreds of COVID-19 infections among staff and inmates. On March 31, 2020, the medical leadership in the NYC jail system announced that they would be unable to stop COVID from entering their facility and called for release as the primary response to this crisis.[10] Since that time, over 800 staff and inmates have tested positive in the NYC jail system.

15. Once a virus enters a facility, detention settings promote the spread of the virus to the wider community. The constant flow of staff in and out of detention facilities only increases the spread of the virus beyond the walls of the facility itself.

---

[8] Melissa Healy, "Coronavirus infection may cause lasting damage throughout the body, doctors fear," L.A. Times (Apr. 10, 2020), https://www.latimes.com/science/story/2020-04-10/coronavirus-infection-can-do-lasting-damage-to-the-heart-liver; Judith Graham, "What Does Recovery From COVID-19 Look Like? It Depends. A Pulmonologist Explains." Kaiser Health News (Apr. 9, 2020), https://khn.org/news/what-does-recovery-from-covid-19-look-like-it-depends-a-pulmonologist-explains/; Alexander Freund, "COVID-19: Recovered patients have partially reduced lung function," DW (Mar. 20, 2020), https://www.dw.com/en/covid-19-recovered-patients-have-partially-reduced-lung-function/a-52859671.

[9] Coronavirus Disease 2019 (COVID-19) Cases in US, CDC (last visited April 10, 2020), https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html.

[10] Meagan Flynn, "Top doctor at Rikers' Island calls the hail a public health disaster unfolding before our eyes," The Washington Post (Mar. 31, 2020), https://www.washingtonpost.com/nation/2020/03/31/rikers-island-coronavirus-spread/.

16.     Prisoners in general have poorer health and more underlying medical conditions than those in the community.[11] Over half of prisoners have serious physical or behavioral health problems, and incarcerated people have statistically higher rates of smoking, cardiovascular disease, infectious diseases and cancer. Additionally, the leading cause of death in U.S. jails is suicide, which reflects a toxic overlap between untreated mental health and substance use problems.[12]

17.     The CDC and other organizations have issued recommendations on how to prevent or decrease the spread of COVID-19. It is important for jails to comply with the CDC guidance on management of COVID-19 in detention facilities. But it is also important to understand that compliance with these recommendations alone is not enough to create a setting that sufficiently protects the health and safety of individuals detained and working at the jail. The CDC, a federal agency, could not impose mandatory requirements on state or local officials, even when evidence-based medicine would support such requirements. The CDC guidelines are more appropriately considered a "harm reduction" approach, which is a common practice in public health, where organizations offer recommendations on how to reduce a risk of harm even when the subject is not following the appropriate practices.

18.     The unanimous consensus from the CDC, and medical and public health experts, is that social distancing and infection control are imperative to decrease rampant spread of COVID-19 and protect people's health. The fact that the CDC adds the phrase "if possible" or "if

---

[11] Laura M. Maruschak & Marcus Berzofsky, "Medical Problems of State and Federal Prisoners and Jail Inmates, 2011-12," BJS (Feb. 5, 2015), https://www.bjs.gov/index.cfm?ty=pbdetai l&iid=5219.
[12] Laura Maruschak, "Medical Problems of Prisoners, BJS (Apr. 19, 2020), https://www.bjs.gov/content/pub/html/mpp/mpp.cfm; Ann Caron, "Mortality in Local Jails, 2000-2016 – Statistical Tables," BJS (Feb. 12, 2020), https://www.bjs.gov/index.cfm?ty=pbdetail&iid=6767; National Commission on Correctional Health Care, "Suicide Prevention Resource Guide," https://www.ncchc.org/filebin/Publications/Suicide_Prevention_Resource_Guide_2.pdf

space allows" in its guidance specifically directed at detention centers it does not control, does not alter the clear medical consensus on social distancing.[13]

19.     In my opinion, based on my correctional and epidemiological training as well as a review of the literature surrounding COVID-19, mandating that staff and detainees be kept six feet apart from each other at all times, absent life-threatening emergencies such as use of force and fire evacuation, in addition to robust sanitation, testing, and infection control, is essential to preventing a widespread outbreak of this disease in a custodial setting.

20.     I have been inside numerous state and federal detention facilities, including the Cook County Jail. In a detention facility, social distancing can be challenging and requires close attention to all aspects of operations among both staff and detained people.[14] The typical design and operation of correctional settings, including densely packed areas for housing, health services, food services, recreation, bathroom and shower facilities for detained people, as well as the entry points, locker rooms, meal areas, and control rooms for staff, all contribute to the spread of infectious disease. Detention facilities are typically operated in a way that forces close contact between people and relies on massive amounts of movement every day from one part of the facility to another, e.g., for programming, access to cafeterias, commissary, medical, just to name a few. This movement is required of detained people as well as staff. This normal level of movement requires that correctional settings design and implement detailed plans and policies to both reduce the amount of movement, and immediately change housing operations to permit

---

[13] "Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities," CDC, https://www.cdc.gov/coronavirus/2019-ncov/downloads/guidance-correctional-detention.pdf ("Although social distancing is challenging to practice in correctional and detention environments, it is a **cornerstone** of reducing transmission of respiratory diseases such as COVID-19.").
[14] State of Illinois, Executive Order 2020-13 (Mar. 26, 2020),
https://www2.illinois.gov/Documents/ExecOrders/2020/ExecutiveOrder-2020-13.pdf.

detainees to socially distance from one another in order to control the spread of a highly communicable disease, such as COVID-19.

21.    The sally-port is one of the most ubiquitous aspects of detention, and is a place that requires special attention. The sally-port, or control port, is a series of two locked gates that bring every staff member and detained person past a windowed control room as they stop in a room between locked gates. The normal functioning of detention centers demands that during shift change for staff, or as the security count approaches for detained people, large numbers of people press into sally-ports as they move into or out of other areas of the facility. This process creates close contact, and the sally port windows that are used to hand out radios, keys and other equipment to staff ensure efficient passage of communicable disease from the control rooms into the sally port areas on a regular basis. But like other aspects of detention settings, passage of staff and detained people through sally-ports can be monitored and regulated in a way that promotes six feet of separation between people. Other areas similarly require special attention, including analysis of existing workflows and honest assessment of the operational and staffing implications, including housing areas, meal spaces, medication administration, sick call, bathroom and day room access, etc.

22.    Solitary confinement is not medical isolation.[15] Simply locking detained people into cells will worsen, not improve, efforts to curb infection rates. When people are locked into cells alone, for most of the day, they quickly experience psychological distress that manifests in self-harm and suicidality, which requires rapid response and intensive care outside the facility for mental and physical health emergencies. In addition, units that are comprised of locked cells may require additional staff to escort people to and from their cells for showers, telephone calls, and

---

[15] David Cloud, Dallas Augustine & Brie Williams, "The Ethical Use of Medical Isolation," Amend (Apr. 9, 2020), https://amend.us/wp-content/uploads/2020/04/Medical-Isolation-vs-Solitary_Amend.pdf.

other encounters, and medical, pharmacy and nursing staff must move on and off these units

daily to assess the welfare and health needs of these people, creating the same spread of the virus

from the community into the facilities as if detained people were not locked down. In addition,

locking two people into a cell increases the risk of transmission of COVID-19 from one of them

to the other. This risk is especially harmful in facilities, like the Cook County Jail, that have

failed to create special protections for people with known risk factors for serious illness and

death from COVID-19 infection, and hold these high-risk patients in locked cells with other

lower-risk patients.

23.     The documents I have reviewed in this case fail to establish a comprehensive

approach to social distancing at the Cook County Jail and must be quickly integrated into a

single COVID-19 emergency response plan that not only mandates in a detailed fashion, but also

supports and monitors implementation of, social distancing. The deficiencies I have noted

include:

      a.     Lack of clarity for how detainees will be maintained with 6 feet of separation in day rooms, hallways, sally-ports, medication lines, bathrooms and showers, medical clinics, transport, and recreation spaces.

      b.     Lack of detail on how staff will engage in social distancing as they enter the facilities and are screened, pass through sally-ports, hallways, to and from their security posts, clinic assignments, administrative office, and during meals and breaks.

      c.     Lack of assessment of staffing requirements to implement social distancing among staff and detained people.

24.     Mandating social distancing for detainees is critical to protect against

uncontrolled spread of COVID-19. However, there are other actions that should be taken. In

addition to social distancing, Cook County Jail must engage in adequate infection control. My

experience managing smaller outbreaks is that an additional challenge in correctional settings is

to apply hospital-level infection control measures on security staff. Ongoing, effective training is crucial to implement as many measures as possible. In a hospital or nursing home, staff may move up and down a single hallway over their shift, and they may interact with one patient at a time. In detention settings, officers move great distances, are asked to shout or yell commands to large numbers of people, routinely apply handcuffs and operate heavy doors/gates, operate large correctional keys and are trained in the use of force. These basic duties cause the personal protective equipment they are given to quickly break and become useless, and even when in good working order, may impede their ability talk and be understood, as in the case of masks. As a result, implementation of infection control measures requires a significant amount of training and supervision. It cannot be implemented through email or signage alone, but requires active role modeling, supervision and support of staff. One of the most ubiquitous examples of this challenge is the now common observation that many correctional staff who have been issued N95 masks in the past two weeks at the Cook County Jail are currently not wearing them, or may be wearing them around their necks or on their heads.

25.     Another critical task for any detention setting responding to a COVID-19 outbreak is to identify all of the people held in their custody who are particularly vulnerable. This task is critical for several reasons, and the daily updating of the list and locations of high-risk patients is critical to basic outbreak management. Creating a real-time list of high-risk patients allows for:

- Identification of high-risk patients who are eligible for release from detention

- Implementing of active surveillance, special housing arrangements, and other protective measures for high-risk patients who are not ill

- Implementing enhanced surveillance and protective measures for high-risk patients who are in a quarantine setting, or who develop symptoms of COVID-19

- Development and implementation of re-entry plans of care and support with community partners for high-risk patients

26. Hand-washing and good hygiene practices are also important. Access to hand washing is limited in detention settings as compared to the community. Many common areas lack operable sinks with access to soap and paper hand towels. In addition, many of the sinks utilized in correctional settings do not operate with a faucet that can be turned and left on, but rather rely on pushing a button which provides a limited amount of water over a limited amount of time. These metered faucets are designed to save water by limiting the amount of time water flows, but make adequate hand washing with soap for at least 20 seconds very difficult, if not impossible.

27. Infection control policies and procedures in detention settings are often at odds with basic CDC guidance. The CDC guidelines for infection control regarding COVID-19 make clear the need to aggressively prepare for, and intervene in, the spread of this virus throughout correctional settings. One of the most serious deficiencies in correctional practices involves the failure to appropriately train and equip correctional staff and inmate workers in the disinfection of the physical plant, and enable all people inside the facility to engage on social distancing and hand washing. When security staff and detainees are given masks without any guidance about their use, or when they should be replaced, or what scenarios in their environment represent higher risk of COVID-19 infection, the net effect is to decrease attention to infection control. Similarly, when inconsistent strengths of cleaning solution, or inadequate access to clean paper towels or other products used to wipe down surfaces are utilized, the net effect is also to decrease the level of infection control and increase the risk of rapid COVID-19 spread throughout the facility. When no special effort is made to use more highly trained or equipped cleaning

personnel with protective equipment to clean and handle the effects of staff or detainees who exhibit signs and symptoms of COVID-19, an especially egregious breach in infection control has occurred. Because security staff and inmates far outnumber health staff in correctional settings, they must be trained, equipped and engaged as the first responders for infection control. Failure to take this approach significantly increases the risk of rapid COVID-19 spread throughout the facility and increases the risk of preventable illness and death. The Cook County Jail's failure to have implemented adequate infection control policies before COVID-19 appeared within the facility is likely part of the reason why the outbreak quickly became so large. But as described above, even the perfect implementation of an adequate infection control policy would be insufficient to protect against uncontrolled spread of COVID-19 in the absence of social distancing at the jail.



28.     Security staff represent the front-line infection control force inside correctional settings, and evidence-based infection control plans cannot be implemented without active training of staff that is also ongoing. This training should include formal training on the protective equipment, environmental cleaning and health service activities that security staff will participate in or support. These trainings should span every tour and day of service so that every staff member is trained, and should be conducted in both dedicated 15-30 minute sessions and also in more brief venues, such as roll call.

29.     My review of the Cook County Jail's policies and other materials additionally leads me to have the following other specific concerns and recommendations about the health status of staff and detained people inside Cook County Jail regarding COVID-19 response:

a. **Lack of a Covid-19 plan.** It appears that CSCSO does not yet have a single COVID-19 response plan, and is instead relying on an amalgam of pre-existing policies, individual protocols and other directives to manage their response to COVID-19. I have reviewed an outbreak management policy from 2017 that covers numerous types of infectious disease concerns, and has a half page amendment relating to COVID-19 testing on the last of 15 pages. I have also reviewed a separate sanitation policy that appears specific to COVID-19 and a 21-page operational briefing from April 4, 2020 that appears to include several pages of general occupational guidance relating to COVID-19 that is not jail-specific and targeted towards "maintaining a healthy business.  This lack of a single COVID-19 emergency response plan is a glaring deficiency, and at odds with good correctional practice. Large systems such as CCSO employ and care for several thousands of individuals and it is not possible to respond to a large-scale emergency without a single, coordinated plan. This is even more pressing for the COVID-19 response, because the public health directives for management change every week, sometimes

14

daily, and thus, CCSO must have one unified plan that can be updated and reliably utilized by all security, health and administrative staff, and which partners in public health organizations can review and support. If it has not already occurred, CCSO must combine all of the existing protocols and procedures into one COVID-19 emergency response plan, as is mandated in other detention settings.[16]

        b. **Lack of identification or tracking of high-risk patients.** The correctional health staff, and their electronic medical records, are very sophisticated, and the identity and location of people with CDC identified risk factors for serious illness and death from COVID-19 infection is known to the health service. In an outbreak that targets a subset of the incarcerated population, it is critical to create special protections for these individuals, which may include consideration for release, as well as active surveillance with twice daily symptom and temperature checks during incarceration, and additional support during re-entry. This requires that CCSO create a management plan that identifies these high-risk patients for specialized management and protection, which does not exist according to the statements by General Counsel for the Sheriff.

        c. **Lack of infection control practices consistent with CDC guidelines**. The sanitation and other policies I have reviewed fail to address or ensure basic infection control measures that are critical to the CDC guidelines on COVID-19 response in detention settings. Specifically:

- The sanitation policy fails to identify any special measures taken to clean or disinfect the living spaces and personal effect of people who become symptomatic for COVID-19 and are taken to medical isolation. This is an extremely high-risk scenario that has played out numerous times already in the Cook County Jail, and I fear that lack of attention to this high-risk setting has contributed to the substantial outbreak already present. The CDC gives clear guidance on this matter, including letting confined spaces sit for one day before entering/cleaning, and use of PPE for anyone engaged in cleaning.

---

[16] ICE ERO 4/10/20 mandates that all facilities housing ICE detainees must have such a plan.

- The sanitation policy leaves all communication regarding infection control to the housing area officer, but my experience during outbreaks is that detained people have numerous questions about infection control and sanitation that housing area officers are not trained to respond to. There must be regular engagement between infection control nursing or medical staff, and both staff and detained people in each housing area for implementation of effective infection control during an outbreak.

  d. **Lack of re-entry planning for detained people leaving Cook County Jail**. Part of an integrated plan for COVID-19 response in detention settings is the need to plan for safe re-entry for people leaving jail. This critical requirement is outlined in CDC recommendations and must be developed as a section in a unified COVID-19 emergency plan. The CDC makes clear recommendations on this process:[17]

- If an individual does not clear the screening process, follow the protocol for a suspected COVID-19 case – including putting a face mask on the individual, immediately placing them under medical isolation, and evaluating them for possible COVID-19 testing.

- If the individual is released before the recommended medical isolation period is complete, discuss release of the individual with state, local, tribal, and/or territorial health departments to ensure safe medical transport and continued shelter and medical care, as part of release planning. Make direct linkages to community resources to ensure proper medical isolation and access to medical care.

- Before releasing an incarcerated/detained individual with COVID-19 symptoms to a community-based facility, such as a homeless shelter, contact the facility's staff to ensure adequate time for them to prepare to continue medical isolation, or contact local public health to explore alternate housing options.

30.     These steps are important to improve conditions at the Cook County Jail that help to prevent detainees and staff from contracting COVID-19. The failures outlined above have contributed to the rapid spread of COVID-19 in Cook County Jail, and to the health consequences suffered by detained people and staff alike. As noted above, however, they alone

---

[17] "Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities," CDC, https://www.cdc.gov/coronavirus/2019-ncov/downloads/guidance-correctional-detention.pdf.

are insufficient to meaningfully reduce the rate of spread if social distancing at the jail is not immediately implemented. I believe that it is possible to make a significant difference in the number and severity of COVID-19 cases that ensue going forward, but significant work is required by the Cook County Sheriff's Office to enact social distancing and basic infection control measures for people held in detention and staff who work in this setting.

Signature: Homer Venters

Date: 4/19/2020

Location: Port Washington, NY

# Exhibit C

I, Homer Venters, hereby declare the following:

**Background**

1. I am a physician, internist and epidemiologist with over a decade of experience in providing, improving and leading health services for incarcerated people. My clinical training includes residency training in internal medicine at Albert Einstein/Montefiore Medical Center (2007) and a fellowship in public health research at the New York University School of Medicine (2009). My experience in correctional health includes two years visiting immigration detention centers and conducting analyses of physical and mental health policies and procedures for persons detained by the U.S. Department of Homeland Security. This work included and resulted in collaboration with ICE on numerous individual cases of medical release, formulation of health-related policies as well as testimony before U.S. Congress regarding mortality inside ICE detention facilities.

2. After my fellowship training, I became the Deputy Medical Director of the NYC Jail Correctional Health Service. This position included both direct care to persons held in NYC's 12 jails, as well as oversight of medical policies for their care. This role included oversight of chronic care, sick call, specialty referral and emergency care. I subsequently was promoted to the positions of Medical Director, Assistant Commissioner, and Chief Medical Officer. In the latter two roles, I was responsible for all aspects of health services including physical and mental health, addiction, quality improvement, re-entry and morbidity and mortality reviews as well as all training and oversight of physicians, nursing and pharmacy staff. In these roles I was also responsible for evaluating and making recommendations on the health implications of numerous security policies and practices including use of force and restraints. During this time I managed multiple communicable disease outbreaks including H1N1 in 2009, which impacts almost 1/3 of housing areas inside the adolescent jail, multiple seasonal influenza outbreaks, a recurrent legionella infection and several other smaller outbreaks.

3. In March 2017, I left Correctional Health Services of NYC to become the Director of Programs for Physicians for Human Rights. In this role, I oversaw all programs of Physicians for Human Rights, including training of physicians, judges and law enforcement staff on forensic evaluation and documentation, analysis of mass graves and mass atrocities, documentation of torture and sexual violence, and analysis of attacks against healthcare workers.

4. In December 2018 I became the Senior Health and Justice Fellow for Community Oriented Correctional Health Services (COCHS), a nonprofit organization that promotes evidence-based improvements to correctional practices across the U.S. In January 2020, I became the president of COCHS. I also work as a medical expert in cases involving correctional health and I have a book on the health risks of jail (*Life and Death in Rikers Island*) which was published in early 2019 by Johns Hopkins University Press.

**COVID-19 in Brooklyn Federal Prison**

5. It is my understanding that one inmate and one or more staff members tested positive for COVID-19 during the week of March 20, 2020. Based on this, and my understanding of COVID-19 pathology and spread in correctional institutions, I would expect that many more staff and inmates are currently symptomatic and would have positive tests at this point. By comparison, after the initial index cases among one correctional officer and one inmate occurred in the NYC jail system, the number of combined cases jumped to 38 and 454 in the two subsequent weeks.



6. If a similar rise in the number of cases has not been observed in the Brooklyn Federal Detention Center, I would be concerned that the facility is not following accepted infection control and surveillance measures to address COVID-19 among staff and inmates. The following measures should be part of the facility plan in place;

   a. All known contacts with the initial case who are asymptomatic should be quarantined either at home for staff, or in a designated housing area for inmates.

   b. Anyone who is symptomatic, whether or not they are a known contact of a confirmed case, should be tested.

   c. People held in the quarantine housing area should have their signs and symptoms checked daily, including temperature.

   d. People identified as high risk should be considered for immediate release based on their risk of serious illness and death from COVID-19 infection.

   e. People identified as high risk who remain incarcerated should be subject to the same active surveillance (daily sign and symptom checks) as the quarantine group.

Signed

Homer Venters MD, MS

4/2/20

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

ANTHONY MAYS, Individually and on )
behalf of a class of similarly situated persons; )
and JUDIA JACKSON, as next friend of )
KENNETH FOSTER, Individually and on )
behalf of a class of similarly situated persons )
                                                )    Case No. 20-cv-2134
                        Plaintiffs-Petitioners, )
                                                )
v                                               )
                                                )
                                                )
THOMAS DART, Sheriff of Cook County,            )
                                                )
                        Defendant-Respondent    )

## DECLARATION OF HENRIETTE GRATTEAU

I, Henriette Gratteau, pursuant to 28 U.S.C. § 1746, declare as follows:

1. I have been employed by the Cook County Sheriff's Office ("CCSO") since August 2015 as the Director of the Sheriff's Justice Institute ("SJI").

2. Before joining the CCSO, I served as the executive director of the John Howard Association of Illinois, which was a nonprofit corrections watchdog group. I also served as a commissioner of Gov. Pat Quinn's Illinois Reform Commission in the wake of the indictment of former Gov. Rod Blagojevich and as the CCSO representative on the Illinois Sentencing Policy Advisory Council. I also served as vice president of public affairs for The Ounce of Prevention Fund, a non-profit devoted to early childhood education.

3. The facts set forth in this declaration are drawn from information I have received in my position with the CCSO. It does not contain all of the facts that I know about the matters discussed below.

### The Sheriff's Justice Institute

4. The Sheriff's Justice Institute is dedicated to supporting individuals who interface with the criminal justice system.

5. During my time at the CCSO, the SJI has been responsible for performing qualitative and quantitative data analyses and reports that inform CCSO policy initiatives to enhance the delivery of justice in the criminal justice system and protect public safety.

6. The SJI is charged broadly with infusing social justice into all aspects of the work of the CCSO, from the Department of Corrections to Court Services and Police. The SJI mines data on the incarcerated population at both the Cook County Jail and those in community corrections and conducts interviews to assist in population management. This information is

used to inform the public and system stakeholders of the consequences of current public policies.

7. The SJI performs individual advocacy on behalf of incarcerated individuals that helps to surface system issues such as fairness within the bond system, the criminalization of the mentally ill and homeless, the impact of criminal histories upon those released, and how recent trends in incarceration impact public safety.

8. The SJI also collaborates with the Cook County Health and Hospitals System to address costly and sometimes unnecessary incarcerations of those with complex medical and mental health needs.

9. As a primary source of information for advocacy and community groups, the SJI provides information and data central to the mission of the CCSO, conducts informational tours of the CCDOC, and provides speakers and panelists at criminal justice events. The SJI also represents the CCSO on a variety of committees and work groups aimed at enhancing the delivery of criminal justice in Cook County.

## The Sheriff's Justice Institute Response to COVID-19

10. Since the beginning of March 2020, the CCSO has been working closely with other Cook County partners to prevent the spread of the Novel Coronavirus (COVID-19). The CCSO was and remains in communication with Cook County Department of Emergency Management and Regional Security, Cook County Health and Hospital System, and the Cook County Department of Public Health. These agencies have been communicating regularly with the Illinois Department of Public Health and the Centers for Disease Control and Prevention.

11. On March 9, 2020, Governor Pritzker declared Illinois a disaster area because of the dangers of COVID-19. As of March 9, 2020, there were 5710 detainees in physical custody at the Cook County Jail.

12. On March 17, 2020 the Cook County Board of Commissioners declared a State of Emergency related to the Novel Coronavirus ("COVID-19") pandemic, activating the emergency procurement powers of the Cook County Department of Emergency Management and Regional Security ("DEMRS").

13. That same week, the CCSO, including the SJI, began discussing efforts to reduce the detainee population, as a part of the comprehensive response to COVID-19.

14. In particular, the SJI has worked with stakeholders and partners to reduce the in-custody population. The SJI has also worked with the Office of the President, the City of Chicago, and state officials to explain our release mechanisms and quell fears that infected detainees would be released to the community without shelter or medical attention.

15. As a general matter, the CCSO does not have unilateral power or authority to release detainees in CCSO custody. By law, the Sheriff's Office cannot decide who is released from Cook County Jail. Cook County Circuit Court Judges under the auspices of the Office of the Chief Judge ("OCJ"), not the Sheriff, release detainees, in conjunction with the Cook County State's Attorney Office ("CCSAO") and the Cook County Public Defender ("PD").

16. In order to address the COVID-19 pandemic, the CCSO partnered with criminal justice stakeholders to facilitate releases of identified detainee populations, as determined by the authorizing agencies. Specifically, the CCSO has worked since as early as March 18, 2020 with the OCJ, CCSAO, and PD to identify ways to reduce the number of non-violent, low level offenders in custody – especially those at increased risk of contracting COVID-19 due to age or medical condition.

17. During that process, the SJI worked with the stakeholder agencies to identify individuals in the potential populations for consideration of release. The CCSO has been able to provide stakeholder agencies with rosters listing detainees in the targeted groups.

18. The CCSO continues to work with the CCSAO, PD, OCJ, the Clerk of the Circuit Court and the Cook County President's Office to expedite case and bond review hearings in order to secure the release of these populations as quickly as possible. Since at least March 16, 2020, the SJI has been providing daily data to the PD and CCSAO so that they can expedite bond review.

19. For example, when the Public Defender wanted to identify "medically vulnerable" detainees, I would work with them to tell them how we might define that based on information available to the CCSO, given the fact that the CCSO does not have access to HIPAA protected information. I would then work with our research staff and IT to pull rosters that included all detainees with a medical alert noted, provide them to the requesting parties, and explain any data and fields that they might not understand.

20. In addition, the Cook County Department of Corrections (CCDOC) staff has worked to contact outside jurisdictions concerning detainees who are held on warrants for non-violent offenses. The SJI calls those jurisdictions when the charges are low-level (failures to appear, thefts, etc.) and asks the jurisdictions to consider quashing or recalling the warrant or geographically limiting so that the detainee can be released from custody. This process continues.

21. In addition to working with government stakeholders, on March 29, 2020, the CCSO entered an agreement with The Bail Project to provide data regarding detainees in custody with bonds of $5000 or less. Once provided with contact information, The Bail Project independently began their intake process by contacting families of detainees who might be eligible for their program. Previously, this process began with TBP visiting people in the jail, but those visits have been halted due to the pandemic. This has resulted in more than a hundred detainees bonded out so far.

22. The SJI has also helped coordinate meetings with the Clerk of the Cook County Circuit Court's office and The Bail Project to facilitate and understand our operations regarding the release of detainees during the pandemic.

23. The SJI also attempts to identify vulnerable persons and bring them to the attention of the stakeholders—given their interest and going beyond the requests for rosters. We do this in collaboration with Cermak Health Services, the daily provided of medical care to detainees in the custody of the Cook County Jail. The SJU also conducts daily population reviews of who is in the hospital, who is in custody and is pregnant, etc.

24. The SJI has also coordinated with requests from the judiciary to honor mitts and orders that reduce bonds on warrants from outside jurisdictions so that individuals can be released.

25. By March 18, 2020, there were approximately 5,600 detainees held in CCDOC physical custody.

26. On March 23, 2020, the CCSO confirmed the first cases of COVID-19 among detainees.

27. By March 27, the reduction of CCDOC's detainee population was progressing steadily. The number of detainees in custody decreased by 424 that week, as nonviolent detainees were released as ordered by the Circuit Court.

28. By March 29, the CCDOC population had reached a record low of 4,802 detainees.

29. As of 11:00 a.m. Saturday, April 4, 2020, the CCDOC population was at 4,535.

30. The CCSO Electronic Monitoring Program has also seen a consistent increase in the number of participants ordered to it by the Circuit Court. The EM population now stands at close to 2,600 participants.

31. With partner agencies and stakeholders described above, the CCSO has worked with diligence and urgency to facilitate the release of vulnerable detainees whose medical conditions or age render them vulnerable during the COVID-19 pandemic, as well to facilitate release on bond for low-level offenders.


I declare under penalty of perjury that the foregoing is true and correct.


Executed on April 6, 2020

_Henriette Gratteau_
Henriette Gratteau

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

ANTHONY MAYS, Individually and on )
behalf of a class of similarly situated persons; )
and JUDIA JACKSON, as next friend of )
KENNETH FOSTER, Individually and on )
behalf of a class of similarly situated persons )
                     )       Case No. 20-cv-2134
           Plaintiffs-Petitioners, )
                     )
v                          )
                     )
THOMAS DART, Sheriff of Cook County, )
                     )
           Defendant-Respondent )

## DECLARATION OF CONCETTA MENNELLA

I, Concetta Mennella, pursuant to 28 U.S.C. § 1746, declare as follows:

1. That I am a Medical Doctor ("M.D.") licensed to practice medicine in the State of Illinois. I am currently employed by Cook County Health and assigned to Correctional Health Services which includes detainees held at the Cook County Jail ("Cermak") and have been so employed intermittently since 1991. As such, I have twenty-nine years of experience working in correctional health.

2. I am the Chair of Correctional Health at CCH and have been so employed since May 2014. Prior to my current assignment, I was the Interim Medical Director from July 2012 through May 2014. Preceding being the Interim Medical Director, I was the Associate Medical Director from May 2009 through July 2012.

3. Cermak provides health care to all of the detainees at the Cook County Jail ("CCJ"). Cermak is part of Cook County Health ("CCH") an affiliate of Cook County, which is an entity separate from the Cook County Sheriff's Office ("CCSO").

4. The facts set forth in this declaration are drawn from information I have received in my position with CCH and through working closely with CDPH, the and CCDOC and CCSO during the COVID-19 pandemic. It does not contain all of the facts that I know about the matters discussed below.

5. In my role as Chair of the Department of Correctional Health for Cook County Health, I provide clinical leadership for Cermak physician services. In my regular duties, and particularly now, in light for the COVID-19 pandemic, I am in constant communication and collaboration with command staff in CCDOC and CCSO.

6. Since January 24, 2020, well before any confirmed cases in CCJ, Cermak worked to create and implement a strategy aimed at adapting standard jail processes to conform with CDC and CDPH recommendations as they

1

have evolved. I have worked closely with the CCH Department of Infection Control, CCDOC , CCSO and the Chicago Department of Public Health (CDPH) to implement such plans in accordance with guidance issued by the Centers for Disease Control (CDC), particularly as related to congregate housing settings and modeling the community shelter in place initiatives.

### Detainees entering in the CCDOC

7. Beginning in January, Cermak layered enhanced processes onto their existing Infection Control and Prevention IILI/AGE (Influenza Like Illness and Acute Gastroenteritis) which included a screening process utilizing CDC and CCH based guidelines. The initially called "Novel Coronavirus Screening Tool" was performed on all new incoming detainees and anyone presenting for clinical care in the Urgent Care. All staff were advised to be on the alert for symptoms and the process was reinforced in communications. As per our already existing ILI protocol and consistent with the Novel Coronavirus screening tool, all detainees are immediately masked if they are symptomatic anywhere on the compound and brought to the Urgent Care for further evaluation or seen by a healthcare provider in the health dispensaries located in the housing units.

### Treatment of Known or Suspected Cases of COVID-19

8. Cermak utilized innovative IT strategies to enhance screening and treatment such as electronic notification of early warning elevated temperatures, COVID-19 specific care sets; early application of testing when it became available to the public/CCH.

9. Isolation housing within CCJ includes anyone presenting with symptoms and under evaluation as well as those diagnosed with COVID 19. Persons Under Investigation ("PUI") cases are patients identified as having symptoms or abnormal vitals which warranted further investigation and management who are then removed from congregate housing to isolation housing. These patients are awaiting confirmation of a COVID-19 test result. The second type of Isolation is for patients who have a confirmed COVID-19 infection. This type of housing is, in most cases, cohort housing. Cohort housing allows for the Sheriff to house together positive patients but keep them separate from the general population. This also alerts the Sheriff's staff to take the necessary safety precautions, which includes wearing Personal Protective Equipment ("PPE").

10. If clinically indicated some COVID-19 confirmed positive patients, who require an inpatient or emergent level of care, including PUI patients awaiting test results are treated at John H. Stroger, Jr. Hospital or another outside hospital until stable for return to the CCJ.

11. A quarantine is a restriction on the movement of people which is intended to prevent the spread of disease. It is used in preventing the movement of those who may have been exposed to a communicable disease, but do not have a confirmed medical diagnosis. Quarantine housing units do not allow new admissions in. Further,

3195\305529506.v1

no transfers are allowed out. Additionally, all movement off a quarantine unit is prohibited except for urgent medical and mental health concerns.

12. Quarantine units are established as soon as a confirmed COVID-19 positive case is identified. Cermak Infection Control staff work closely with Sheriff staff to notify them of potentially exposed persons in order to establish quarantine units. This also alerts the Sheriff's staff to take the necessary safety precautions, which includes wearing Personal Protective Equipment ("PPE").

**Continued Treatment of the General CDOC Population**

13. Similar to the community standard, we are utilizing a shelter-in-place model. As at all CCH facilities, non-essential health services are being modified in response to this global pandemic. The patient's medical information is available in an electronic medical record which allows providers to perform chart reviews and order well-being checks which include going to their living unit for patients as needed. Nurses round on tiers and pass medications. Consistent with the best practices in place throughout CCH, face to face contact for non-emergent visits has been decreased in order to reduce the spread of the disease. This includes the HSRF process within the jail which is by definition non-urgent. Staff that had been working in areas where HSRFs or other services that have been operationally changed have been deployed to assist in the surveillance of patients in quarantine or isolation.

14. Cermak has worked with the Sheriff and the vendor to provide a mechanism to allow detainees to use the inmate phones on their tiers to conduct telehealth visits with Cermak medical staff which will be starting imminently. This will cut down on the need for transport and is similar to the expansion of telehealth throughout CCH ambulatory clinics to cut down on the need for patients to leave their residence to receive medical care.

**Cermak Staffing, Medical Equipment and PPE**

15. Cermak staffing has been responsive to the changes in process and the additional need for treating in place and enhanced surveillance of identified patients. CCH (including Cermak) has mobilized its staff to address the COVID-19 pandemic. As discussed earlier, Cermak Nursing staff are rounding on the tiers, conducting medication pass, checking temperatures, monitoring symptoms and addressing emergent health needs. Medical and Mental Health staff are monitoring the situation by conducting chart reviews and conducting well-being checks when indicated. Mental Health historically has had a process that allows an officer to present a patient to the MHS for assessment and this process has remained in place. In addition, the Cermak on-site Urgent Care Department remains operational 24/7. Access to Urgent Care does not require a clinical referral and historically more than 60% of patients brought to the Urgent Care were brought by CCDOC staff. This speaks volumes to the 24/7 access to care that is available to patients within the jail. Unlike most jails,

Cermak has onsite daily presence of Mental Health and Medical Providers in addition to Nurses and ancillary staff. It is disingenuous to imply that nurse sick call is our only method of accessing care. Prior to the pandemic, patients received regularly scheduled as well as specialty face to face appointments based on best practice recommendations, medical needs and plan of care. This care is modified to minimize face to face by implementing a robust review of records by a consistent and present medical staff which includes specialty care that has been pivotal in addressing patient needs for those with chronic conditions and avoiding disruption in their management. Finally, CCH has already provided staffing resources from its entire system to aid Cermak.

16. PPE is used by the staff pursuant to IDPH and CDPH recommendations with the approval of CCH for what level of PPE is appropriate for the service provided at CCJ.

I, Concetta Mennella, pursuant to 28 U.S.C. § 1746, declare under penalty of perjury of the laws of the United States of America that the foregoing is true and correct.

Dated this 6ᵗʰ day of April 2020.

_____
Concetta Mennella, M.D.

4

3195\305529506.v1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

ANTHONY MAYS, Individually and on )
behalf of a class of similarly situated persons; )
and JUDIA JACKSON, as next friend of )
KENNETH FOSTER, Individually and on )
behalf of a class of similarly situated persons )
                                      )      Case No. 20-cv-2134
          Plaintiffs-Petitioners, )
                                     )

v                                          )

THOMAS DART, Sheriff of Cook County, )
                                        )
          Defendant-Respondent. )

## SUPPLEMENTAL DECLARATION OF CONCETTA MENNELLA

I, Concetta Mennella, pursuant to 28 U.S.C. § 1746, declare as follows:

1. That I am a Medical Doctor ("M.D.") licensed to practice medicine in the State of Illinois. I am currently employed by Cook County Health and assigned to Correctional Health Services which includes detainees held at the Cook County Jail ("Cermak") and have been so employed intermittently since 1991. As such, I have twenty-nine years of experience working in correctional health.

2. I am the Chair of Correctional Health at CCH and have been so employed since May 2014. Prior to my current assignment, I was the Interim Medical Director from July 2012 through May 2014. Preceding being the Interim Medical Director, I was the Associate Medical Director from May 2009 through July 2012.

3. This declaration supplements the previous declaration that I completed in the above-captioned case. The facts set forth in this declaration are drawn from information I have received in my position with CCH and through working closely with CDPH, the and CCDOC and CCSO during the COVID-19 pandemic. It does not contain all of the facts that I know about the matters discussed below.

4. In my role as Chair of the Department of Correctional Health for Cook County Health, I

provide clinical leadership for Cermak physician services. I also provide clinical leadership to physicians providing care related to the novel COVID-19 virus within our patient population. In my regular duties, and particularly now, in light for the COVID-19 pandemic, I am in constant communication with command staff in CCDOC and CCSO.

5. Cermak utilize nasopharyngeal swab ("NP") testing to determine whether detainees housed within the Cook County Jail were positive for the COVID-19 virus. This testing began on March 18, 2020. Between March 18, 2020, and today, Cermak medical staff has obtained approximately 450 swabs utilizing the NP testing. The current turnaround between submitting a NP test and obtaining the result from the lab at the John H. Stroger, Jr. Hospital ("Stroger") is at minimum sixteen hours.

6. During the week of April 6, 2020, CCH received the equipment and supplies relating to ID NOW Rapid Testing ("ID NOW Testing"). CCH commenced training Cermak staff during the week of April 6 and thereafter was required to validate the testing process. As of the date of this declaration, ID NOW training of Cermak staff continues.

7. ID NOW testing involves a deep nasal swab, as opposed to the nasopharyngeal test. The ID NOW platform amplifies the viral nucleic acid (RNA) on the swab to generate a result (positive, negative, or indeterminate).

8. The ID NOW testing platform is a small, portable unit that allows for testing outside of traditional clinical setting such as hospitals, urgent care clinics, and medical providers' offices. Once the test has been processed, a positive test result will be indicated in as little as five minutes, a negative result in as little as thirteen minutes. From preliminary results received by CCH, the ID NOW test has a minimal risk of false positive results.

9. As I understand from facts received from CCH, the ID NOW test has some disadvantages in its application at the Jail. First, per the manufacturer's notice, the test is not FDA cleared or approved, "authorized" by the FDA for emergency use. The ID NOW tests see a significant rate of false negative test results, so that a negative test result does not rule out infection with COVID-19. The ID NOW also does not detect other viral pathogens that could cause influenza-like illness and may not recognize a mutated or variant strain of

COVID-19. The test is complex and requires significant training and technical skill. The ID NOW test relies more than the NP test upon sample collection storage, and transport meeting strict requirements, and the specimen ideally should either be processed within two hours or refrigerated and tested within twenty-four hours.

10. With current equipment, Cermak can process a maximum of three ID NOW tests per hour per machine, of which we have two. The number of ID NOW tests that we can administer per day is significantly less than the number of NP tests can be processed daily at the Stroger lab.

11. Currently, due to the high incidence of false negative results, PUI patients who test negative on an ID NOW test will still need to be isolated from the presumed non-exposed population. These patients also may require retesting with ID NOW or NP at a future time to confirm the results.

12. In the specific context of the Jail, at this time ID NOW testing is best suited for priority use for PUIs. In any clinical location (intake, urgent care, isolation, quarantine), the detainees being tested are those presenting clinically as a PUI (Person Under Investigation, meaning they are exhibiting signs or symptoms of possible COVID-19). There is no added advantage to rapid results in regards to isolation housing. All PUIs are placed in isolation housing regardless of which type of test is used, including those who might test negative with the ID NOW rapid test.

13. If we were to apply ID NOW testing on asymptomatic patients at Intake, detainees will have not yet entered the jail at-large and therefore have not put staff or other patients at risk of exposure (and vice-versa). If a positive test were to be detected at intake, that patient can more rapidly be placed in isolation housing than if a nasopharyngeal swab is sent to the Stroger lab for PCR testing. Patients who would test negative are already being placed in "separate housing" and are not integrated into the jail population at-large. This further reduces the risk of a false-negative test putting a potentially infectious patient in the general population

14. In Quarantine settings, asymptomatic patients are already presumed to have been potentially exposed to a PUI or a confirmed COVID-19 case. They are already sequestered from the jail at-large population. They are already being monitored clinically. There are approximately 1500 quarantined patients at present; therefore the capacity of the ID NOW platform would be ill-suited for this population. A more rapid detection of a positive COVID-19 patient would not otherwise meaningfully reduce the risk to the remaining quarantined patients as they by definition have already potentially been exposed, nor would it alter our current management of this population.

Dated this 13th day of April 2020.

Concetta Mennella, M.D.

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| ANTHONY MAYS, Individually and on behalf of a class of similarly situated persons; and JUDIA JACKSON, as next friend of KENNETH FOSTER, Individually and on behalf of a class of similarly situated persons | ) ) ) ) ) | |
| | ) | Case No. 20-cv-2134 |
| Plaintiffs-Petitioners, | ) ) | |
| v | ) ) | |
| THOMAS DART, Sheriff of Cook County, | ) ) | |
| Defendant-Respondent | ) | |

## <u>DECLARATION OF MICHAEL MILLER</u>

I, Michael Miller, pursuant to 28 U.S.C. § 1746, declare as follows:

1. That I am currently employed by the Cook County Sheriff's Office ("CCSO") as the First Assistant Executive Director for the Cook County Department of Corrections ("CCDOC"). I have been employed in this role since 2012.

2. Prior to my appointment as First Assistant Executive Director ("AED"), I worked in CCDOC in various capacities dating back to approximately 1990. Over thirty years of service at the CCSO, I have served as a Correctional Officer, Correctional Sergeant, Correctional Lieutenant, Captain, Chief, Superintendent, and Assistant Executive Director.

3. As the First AED, I am responsible for overseeing all CCDOC operations. CCDOC is the largest single-site pretrial correctional facility in the country and employs over 3,000 sworn and civilian staff.

4. I am familiar with the CCSO's efforts to combat and prevent the spread of the Novel Coronavirus ("COVID-19"), which has impacted the international community since the first case was identified in December 2019.

5. The facts set forth in this declaration are drawn from information I have received in my work with the CCSO in response to the COVID-19 pandemic. It does not contain all of the facts that I know about the matters discussed below.

## <u>Background</u>

6. As early as January 2020 the CCSO began planning to activate emergency operational and staffing protocols, in the event that the public health crisis and a state of emergency would inevitably impact standard operating procedures.

7. As early as January 24, 2020 the CCDOC began screening incoming detainees for flu-like symptoms.

8. On or before March 12, 2020 the CCSO began sending daily notices to all staff, in addition to directions from supervisors on every shift, regarding Center for Disease Control ("CDC") guidelines on preventing the spread of the virus and handwashing.

## COVID-19 State of Emergency

9. On March 9, 2020, Governor Pritzker declared Illinois a disaster area because of the dangers of COVID-19. As of March 9, 2020, there were 5710 detainees in physical custody at the Cook County Jail. There were approximately 422 confirmed COVID-19 cases in Illinois at that time.

10. On or about March 12, 2020 the CCSO implemented the following preventative measures:

   a. The CCSO Critical Incident Command Center ("CICC") was activated to monitor all COVID-19 factors that could affect aspects of the CCSO.
   b. All visitors, vendors, volunteers, attorneys, and contractors were screened for symptoms of COVID-19, including taking temperatures. Anyone exhibiting symptoms was denied entry and encouraged to seek medical attention.
   c. CCDOC began creating receiving units for detainees to be held for their first week in custody to monitor for symptoms of COVID-19. Those who showed no symptoms after seven days would be moved to general population units. These receiving units have been active for at least fourteen (14) days as of this declaration.
   d. Visits with detainees were limited to one person, once a week, for 15 minutes. CCDOC expanded access to phone calls and video visitation across the compound.
   e. CCDOC increased cleaning and sanitation efforts throughout the facility.
   f. Cermak Health Services began actively educating detainees about COVID-19 so they can report symptoms they may experience or observe. Detainees were also educated on how to stop the spread of infection through frequent handwashing and other good hygiene practices.

11. On or about March 13, 2020, all tours of CCDOC and large gatherings within the facility were suspended. Outside food for detainees was banned.

12. On or about March 15, 2020, all in-person detainee visits were suspended. Attorneys and clergy members were directed to schedule in-person visits sparingly, and any essential visitors would be subject to screening for symptoms. Currently, confidential attorney visits may still occur 7 days per week during the day and will be accommodated behind visitor glass.

13. On or about March 16, 2020 CCDOC began preparing the empty Mental Health Transition Center barracks for additional isolation housing for detainees.

14. On March 17, 2020 the Cook County Board of Commissioners declared a State of Emergency related to the COVID-19 pandemic.

2. On March 20, 2020 the Governor of Illinois issued an executive order for citizens to shelter-in-place. CCSO instituted the following precautionary measures to address COVID-19:

    a. Continued efforts to obtain and distribute Personal Protective Equipment ("PPE").

    b. Established additional areas at the jail to be used for separation and quarantine, including opening previously closed buildings and requesting tents for outdoor areas.

    c. Began screening all new detainees and persons arrested by the Sheriff's Office with the Cook County Health COVID-19 questionnaire, including temperature checks.

    d. Continued use of receiving tiers where new detainees coming into the CCDOC are housed together for seven days of observation. If detainees do not show symptoms of the virus after seven days, they are reviewed by Cermak Health Services for clearance to be moved to general population. This waiting period has expanded to 14 days as of April 6, 2020.

    e. Created contingency plans in the event of staff shortages.

    f. Increased availability of cleaning supplies across all departments.

    g. Continued working with other stakeholders to reduce transportation of detainees to court.

    h. Began airing messages for detainees on televisions across the compound regarding the symptoms of COVID-19 and proper hand washing techniques.

    i. Began airing messages for detainees on televisions regarding court closures and contacting attorneys to address any concerns.

    j. Began posting messages to families on our website regarding canceling of visits and information regarding the bond process.

3. The CCSO disseminates information and directives for detainees and staff on a daily basis regarding screening, social distancing, obtaining supplies, and who to contact with any concerns. As of April 2, 2020 the CCSO began issuing daily information regarding tiers designated as isolation or quarantine tiers.

4. CCDOC is in constant, daily communication with Cermak Health Services regarding medical treatment for detainees and implementation of CDC guidelines, and use of video-conferencing for medical appointments unrelated to COVID-19.

5. CCDOC is in constant, daily communications with our various collective bargaining units and their union representatives to ensure that staff are safe and their concerns are heard.

15. CCSO has worked with other criminal justice stakeholders including the Cook County Office of the Chief Judge, Cook County Public Defender, and Cook County State's Attorney to assist them in identifying cases where detainees can be released from CCDOC, as well as procedural matters than can be held via video-conferencing to reduce movement and increase social distancing.

16. The CCDOC detains criminal defendants who are remanded to the custody of DOC by the Circuit Court. As such, the DOC cannot control the number of detainees housed in the Jail.

17. Supporting exhibits attached to this declaration reflect the current breakdown of every tier or dorm in the Jail. The spreadsheet shows the tier/ dorm, its maximum occupancy, current occupancy and the percentage the tier or dorm is filled.

18. CCDOC has implemented major changes to the manner in which detainees are housed due to prevent the spread of COVID-19. These major changes include:

   a. On March 15, all arrestees brought to Criminal Court for a bond hearing were screened for symptoms of the virus including a temperature check. Symptomatic arrestees were refused admittance to lockup and/or CCDOC until evaluated by medical personnel in the custody of the arresting agency.

   b. On March 20, all criminal defendants remanded to the custody of the Sheriff for detention in the Jail were "separated" from the remainder of the jail population is separate tiers or dorms with all other remanded defendants from that day of the week. Each day, the new detainees were assigned into a different tier or dorm separate from the remainder of the Jail. Those detainees remain separated for at least 7 days for symptom observation. This waiting period has been extended to 14 days as of April 6, 2020. Supporting exhibits attached hereto reflect, as of April 6, 2020 at 2:00pm, the number of detainees currently housed in a separate tier for the first 14 days of their detention in DOC. Those detainees are assigned in the dorm units in Division 2, Dorm 3 and single cells in Division 5, first floor. Currently, none of those tiers exceed 50% occupancy or, to put it another way, detainees fill less than half of the beds.

   c. Prior to the COVID outbreak, DOC operations made every effort to safely consolidate and minimize the number of tiers and, if possible, entire Divisions in operation to maintain efficiencies while ensuring safety and security. The Sheriff ordered that effort be made to single cell all detainees, if safe and secure, when he declared the impending pandemic an emergency. In cooperation with Cermak, Cook County Facilities Management and the Unions representing the sworn officers, previously closed Tiers and Divisions have been re-opened to maximize the ability of detainees to distance themselves from one another. Currently, the following previously closed or repurposed areas have been re-opened to house detainees:

       i.  Division 5, first floor, to separate new detainees;

      ii.  Division 4, 9 tiers to help single cell detainees from Division 11; and

     iii.  The Mental Health Transition Center, repurposed to hold a maximum of 500 isolated COVID-19 symptomatic or positive detainees (if necessary and separate from each other).

  d.  Providing a single cell to every detainee, or if in a dorm setting not exceeding 50% occupancy, is an on-going process, subject to our ability to open previous closed areas safely and securely. As of April 6, 2020, 111 (or 60%) of those 186 tiers/areas where at least one detainee is housed are at 50% occupancy or lower (i.e. the tier capacity is 48 and there are 24 housed on it). 26 (or 14%) of those 186 tiers/areas are at 90% occupancy or higher.

19. To reduce the potential spread of the virus, we implemented a process to quarantine and isolate tiers, designate them as such and install certain rules as it relates to each.

  a.  Quarantine tiers are tiers where a detainee resided at the time of the onset of their symptoms. The symptomatic detainee is treated and removed from the tier and taken to an Isolation Tier at the direction of medical staff. The remainder of the tier is identified as under Quarantine. Once identified, the following occurs:

       i.  Pursuant to sanitation related processes, the tier and personal area of the symptomatic detainee is cleaned.

      ii.  The tier is locked down in the sense that no new detainees will be housed there and no current detainee will be moved unless subject to release by a court or becomes symptomatic themselves. The only exception is efforts to single cell quarantined individuals from on quarantine tier to another.

     iii.  A security alert by DOC staff is entered into CCOMS (the jail management system) for every detainee housed on that tier that they are under a quarantine. The alert will last for 14 days from issuance and is renewed if any new symptomatic detainees are discovered.

     iv.  The tier is marked with a large, neon sign with a "Q" at the entrance requiring all staff entering to be properly attired in PPE appropriate for a quarantine tier.

      v.  Supporting exhibits attached hereto reflect the tiers currently identified as quarantined in the Jail. All these rules apply at these locations.

  b.  Isolation tiers are tiers designated to house symptomatic and positive tested detainees to receive immediate care and be isolated from the rest of the Jail population. Every detainee in an isolation tier has exhibited clear symptoms or has a positive test for COVID-19. However, symptomatic detainees are held in different tiers than known positive COVID detainees. Once identified, the following occurs:

      i.   The tier is locked down in the sense that no new detainees will be housed there unless they are recovering from COVID-19. No current, non-symptomatic detainee will be moved there. All positive COVID detainees will remain in isolation until medical staff clear them for a return to the Jail.

      ii.   A medical alert by Cermak staff is entered into CCOMS (the jail management system) for every detainee housed on that tier that they under isolation. The alert will last for 14 days from issuance and be renewed as necessary.

      iii.   The tier is marked with a large, neon sign with an "I" at the entrance requiring all staff entering to be properly attired in PPE appropriate for an isolation tier.

      iv.   Isolation tiers are not single cells as social distancing no longer is recommended.

   c.   Supporting exhibits attached hereto reflect the tiers currently identified as isolation tiers in the Jail. All these rules apply at these locations.

   d.   Attached hereto is a report created on April 6, 2020 by the CCSO Office of Research, based on data available through the jail management system CCOMS, which shows the number of unique detainees that have been given an isolation alert since February 29, 2020. To be clear, isolation is a medical alert that is not unique to COVID-19 and is used by DOC and Cermak for other medical and correctional reasons. Therefore, not all alerts noted on the attached chart are necessarily attributable to COVID-19.

20. Staff has been screened for symptoms and temperature checks at the beginning of every shift upon entry to the Jail. The "Cook County Department of Corrections Interim Policy and Procedure For Employee Health Screens And Temperature Checks" issued March 28, 2020 is attached hereto as a supporting exhibit. 100 new thermometers are arriving today, April 6, for use in screening employees upon entering the Jail.

21. CCDOC has worked with Harry Grenawitzke since early March, an expert in correctional sanitation conditions who previously served as a monitor within CCDOC with the Department of Justice, to implement best practices to keep the compound as clean and disinfected as possible.

22. CCDOC has worked with Dr. Peter Orris and the University of Illinois Chicago School of Public Health Occupational Health Services Institute. Dr. Orris is an expert in the field of occupational health and has provided daily consultation with CCSO on proper implementation of CDC guidelines and measures to disrupt the spread of COVID-19.

23. All PPE and cleaning products are delivered to the CICC from the Sheriff's Central Warehouse and distributed to the Jail Divisions. The CICC tracks and responds to all requests for PPE, cleaning supplies, and other COVID-19 related materials in order to allocate inventory accordingly. Distribution of supplies from the CICC and compliance

with CDC guidelines regarding use of PPE and cleaning supplies is further monitored by sanitation officers and superintendents in each Division of the jail.

24. I have supervised constant action by the CCSO to distribute PPE, hygiene, and sanitation supplies across Sheriff's Office operations, including—and most critically—the CCDOC. The CICC triages all supply and equipment needs submitted by Division, and ensures that all Divisions and tiers are adequately supplied each and every day.

25. The CCSO employs an Environmental Health Specialist and an Environmental Services Coordinator. The Environmental Health Specialist is responsible for overseeing compliance with all existing sanitation policies and procedures, including applicable local, state, and federal regulations. The Environmental Health Specialist coordinates with Divisional Sanitation Officers who are appointed for each CCDOC Division. Those sanitation officers conduct compliance checks, and report results on a daily basis to the Division Superintendent. Superintendents are under my chain of command.

26. As early as January 24, 2020 the CCDOC Environmental Specialist began to activate emergency protocol in response to the COVID-19 crisis, including but not limited to increasing the frequency of cleanings, regular sanitation of intake and identified areas where infected individuals have been present, and acquisition of additional chemicals to ensure prompt and frequent cleaning.

27. In preparation of the COVID-19 crisis and up through the date of this declaration and as a preventative measure, the CCDOC enforced a Preventative Daily Cleaning and Disinfection procedure which increased sanitation procedures across the entire CCDOC. These procedures gave detailed instruction about how to clean and disinfect surfaces in both non-quarantine/non-isolation locations and quarantine/isolation areas. Procedures also extend to the collection of food trays and carts, laundry and central kitchen procedures. In addition, directives were also provided to the organization about Vehicle Cleaning/Disinfection Procedures

28. Throughout the COVID-19 crisis and up through the date of this declaration, I have overseen continued use of enhanced sanitation measures, including interface between the CICC and divisional sanitation officers in order to continue to re-stock necessary supplies and hygiene products for detainees.

29. CCSO is engaged in regular communication with local, state, and federal agencies in order to acquire critical sanitation supplies and PPE, as well as to obtain rapid testing and establish CCDOC as a testing site, including but not limited to: Cook County Emergency Management and Regional Security, Cook County Department of Public Health, Cermak Health Services, City of Chicago Department of Public Health, Illinois Department of Public Health, Illinois Emergency Management Agency, Illinois Office of the Governor, Federal Emergency Management Agency, U.S. Senator Dick Durbin, and U.S. Department of Health and Human Services.

30. As a result of our efforts, Cermak has received approval to commence Abbott rapid testing as of April 7, 2020 for detainees.

31. As a result of our efforts, Roseland Hospital and the CCSO will be establishing Roseland Hospital as an official COVID-19 testing site, available to all staff, as early as April 6, 2020.

32. The CCSO has worked around the clock to maximize the safety and security of CCDOC detainees, its staff, and the public in the midst of an unprecedented, global pandemic.

I, Michael Miller, pursuant to 28 U.S.C. § 1746, declare under penalty of perjury of the laws of the United States of America that the foregoing is true and correct.

Dated this 6th day of April 2020.

First Asst. Executive Director

Michael S. Miller



# COOK COUNTY DEPARTMENT OF CORRECTIONS INTERIM POLICY AND PROCEDURE FOR EMPLOYEE HEALTH SCREENS AND TEMPERATURE CHECKS

**EFFECTIVE DATE:  March 28, 2020**

In accordance with the Centers for Disease Control and Prevention (CDC) and the Chicago Department of Public Health (CDPH) recommendations, and to ensure the health and safety of emergency responders, CCSO staff and volunteers, County employees and contractors, and CCDOC detainees, the following procedures described below will be implemented immediately.  These procedures will help stop the spread of COVID-19 by providing early identification of employees who may be in the early stages of COVID-19 and just beginning to show symptoms.

1.  Employees will assemble prior to their assigned shift in areas designated by Divisional supervisors in preparation for the screening.
2.  Employees will assemble in a way that allows for social distancing (standing at least 6 feet apart).
3.  Supervisors will conduct a brief, one-by-one screen of every employee consisting of the following:
    a.  Ask each employee if they currently have a cough or shortness of breath.
    b.  Take the employee's temperature using the infrared forehead thermometer.
4.  If the employee answers yes or is observed to have a cough or shortness of breath, they should be sent home.
5.  If the employee has a fever over 99.3, but not a cough or shortness of breath, they should be isolated for 2 minutes and then have their temperature checked again.  If the reading is still above 99.3, the employee should be sent home.  If the reading is 99.3 or below, conduct a third check 2 minutes later and base the decision to allow the employee to work on that reading; 99.3 or less can work, 99.4 or more should go home.
6.  Any officer that is instructed to leave must contact the Command Center at 773-674-0169 immediately.
7.  The Command Center will notify HR, who will contact the employee to discuss their situation as soon as practicable, explain how they will be compensated for the day, and provide further instructions regarding return to work.
8.  Prior to returning to work, employees may be instructed to receive medical clearance from their own health care provider and complete the CCSO's COVID-19 Return to Work Screening Questionnaire.  Questions about this process should be directed to CCSO.HR@cookcountyil.gov.

Important Guidelines for Supervisors Conducting Temperature Checks:

1.  Make sure the thermometer is calibrated properly.
2.  Make sure all PPE is used properly.
    a.  Face masks should be affixed properly.
    b.  Eye protection should be worn.
    c.  Gloves should be worn.
    d.  Gowns should be worn.
3.  When using the infrared thermometer, the PPE described above does not need to be replaced in between conducting individual temperature checks.
4.  If an employee seems ill, determine whether seeking further medical help is appropriate and isolate the individual from others immediately.
5.  If there are equipment questions, problems, concerns, or shortages, notify the Command Center immediately at 773-674-0169.

Michael Miller
1st Assistant Executive Director
Cook County Department of Corrections



The Cook County Sheriff's
# Office of Research

This memo presents trends in assigned isolation alerts from February 29, 2020 to present for unique bookings.

*Figure 1* shows the number of isolation alerts by starting date where only the first alert per booking is included.

Figure 1: Number of Isolation Alerts by Date Started



1



The Cook County Sheriff's
**Office of Research**

*Table 1* shows the number of isolation alerts begun each day where only the first alert per booking is included.

Table 1: Number of Isolation Alerts by Date Started

| Date of Isolation Alert Start | Number Alerts Started |
|---|---|
| 29-Feb | 1 |
| 1-Mar | 6 |
| 2-Mar | 5 |
| 3-Mar | 4 |
| 4-Mar | 7 |
| 5-Mar | 4 |
| 6-Mar | 2 |
| 7-Mar | 4 |
| 8-Mar | 2 |
| 9-Mar | 2 |
| 10-Mar | 1 |
| 11-Mar | 3 |
| 12-Mar | 1 |
| 14-Mar | 4 |
| 15-Mar | 7 |
| 16-Mar | 2 |
| 17-Mar | 6 |
| 18-Mar | 4 |
| 19-Mar | 1 |
| 20-Mar | 6 |
| 21-Mar | 8 |
| 22-Mar | 6 |
| 23-Mar | 9 |
| 24-Mar | 17 |
| 25-Mar | 22 |
| 26-Mar | 18 |
| 27-Mar | 30 |
| 28-Mar | 52 |
| 29-Mar | 9 |
| 30-Mar | 19 |
| 31-Mar | 23 |
| 1-Apr | 21 |
| 2-Apr | 20 |
| 3-Apr | 11 |
| 4-Apr | 11 |
| 5-Apr | 4 |
| 6-Apr | 11 |
| TOTAL | 363 |

2

| D | | | | r | | 4 6 20 | r | d | r | r | r | r | d | d D |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 10 | D | 10 | D | 10 1 | 48 | 46 | 96 | | | | | | | |
| 10 | D | 10 | D | 10 1 | 48 | 44 | 92 | | | | | | | |
| 10 | D | 10 | D | 10 1 | 48 | 24 | 50 | | | | | | | |
| 10 | D | 10 | D | 10 1D | 48 | 38 | 79 | | | | | | | |
| 10 | D | 10 | D | 10 2 | 48 | 24 | 50 | | | | | | | |
| 10 | D | 10 | D | 10 2 | 48 | 24 | 50 | | | | | | | |
| 10 | D | 10 | D | 10 2 | 48 | 24 | 50 | | | | | | | |
| 10 | D | 10 | D | 10 2D | 48 | 24 | 50 | | | | | | | |
| 10 | D | 10 | D | 10 3 | 48 | 24 | 50 | | | | | | | |
| 10 | D | 10 | D | 10 3 | 48 | 24 | 50 | | | | | | | |
| 10 | D | 10 | D | 10 3 | 48 | 17 | 35 | | r | 3 31 2020 18 10 | | 4 18 2020 | | |
| 10 | D | 10 | D | 10 3D | 48 | 24 | 50 | | | | | | | |
| 10 | D | 10 | D | 10 4 | 48 | 23 | 48 | | | | | | | |
| 10 | D | 10 | D | 10 4 | 48 | 24 | 50 | | | | | | | |
| 10 | D | 10 | D | 10 4 | 48 | 24 | 50 | | | | | | | |
| 10 | D | 10 | D | 10 4D | 48 | 24 | 50 | | | | | | | |
| 11 | D | 11 | D | 11 | 48 | 24 | 50 | | | | | | | |
| 11 | D | 11 | D | 11 | 48 | 23 | 48 | | | | | | | |
| 11 | D | 11 | D | 11 | 48 | 24 | 50 | | | | | | | |
| 11 | D | 11 | D | 11 D | 48 | 24 | 50 | | | | | | | |
| 11 | D | 11 | D | 11 | 48 | 23 | 48 | | | | | | | |
| 11 | D | 11 | D | 11 | 48 | 37 | 77 | | r | 3 31 2020 15 30 | | 4 18 2020 | | |
| 11 | D | 11 | D | 11 | 48 | 24 | 50 | | | | | | | |
| 11 | D | 11 | D | 11 | 48 | 24 | 50 | | | | | | | |
| 11 | D | 11 | D | 11 | 48 | 19 | 40 | | | | | | | |
| 11 | D | 11 | D | 11 | 48 | 24 | 50 | | | | | | | |
| 11 | D | 11 | D | 11 | 48 | 24 | 50 | | | | | | | |
| 11 | D | 11 | D | 11 D | 48 | 23 | 48 | | | | | | | |
| 11 | D | 11 | D | 11 | 48 | 30 | 63 | | r | 3 26 2020 12 07 | | 4 13 2020 | | |
| 11 | D | 11 | D | 11 | 48 | 25 | 52 | | | | | | | |
| 11 | D | 11 | D | 11 | 48 | 38 | 79 | | | | | | | |
| 11 | D | 11 | D | 11 | 48 | 24 | 50 | | | | | | | |
| 11 | D | 11 | D | 11 | 48 | 46 | 96 | | | | | | | |
| 11 | D | 11 | D | 11 | 48 | 46 | 96 | | r | 3 31 2020 17 48 | | 4 15 2020 | | |
| 11 | D | 11 | D | 11 | 48 | 46 | 96 | | | | | | | |
| 11 | D | 11 | D | 11 D | 48 | 40 | 83 | | r | 3 26 2020 12 42 | | 4 18 2020 | | |
| 11 | D | 11 | D | 11 | 48 | 41 | 85 | | r | 3 26 2020 12 13 | | 4 16 2020 | | |
| 11 | D | 11 | D | 11 | 48 | 48 | 100 | | | | | | | |
| 11 | D | 11 | D | 11 | 48 | 47 | 98 | | | | | | | |
| 11 | D | 11 | D | 11 | 48 | 36 | 75 | | r | 3 31 2020 7 21 | | 4 18 2020 | | |
| 11 | D | 11 | D | 11 D | 48 | 41 | 85 | | r | 3 31 2020 18 07 | | 4 18 2020 | | |

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 11 | | D | 11 | | D | 11 D | 48 | 24 | 50 | | | |
| 11 | | D | 11 | | D | 11 D | 48 | 44 | 92 | | | |
| 11 | | D | 11 | | D | 11 DD | 48 | 43 | 90 | r | 3 29 2020 9 02 | 4 15 2020 |
| 11 | | D | 11 | | D | 11 D | 48 | 22 | 46 | | | |
| 11 | | D | 11 | | D | 11 D | 48 | 39 | 81 | | | |
| 11 | | D | 11 | | D | 11 D | 48 | 41 | 85 | | | |
| 11 | | D | 11 | | D | 11 D | 48 | 38 | 79 | | | |
| 2 | D | 2 D r | 1 | D | 2 D1 | 48 | 16 | 33 | | | |
| 2 | D | 2 D r | 1 | D | 2 D1 | 48 | 8 | 17 | | | |
| 2 | D | 2 D r | 1 | D | 2 D1 | 48 | 22 | 46 | | | |
| 2 | D | 2 D r | 1 | D | 2 D1 D | 48 | 42 | 88 | | | |
| 2 | D | 2 D r | 1 | D | 2 D1 | 48 | 0 | d | | | |
| 2 | D | 2 D r | 1 | D | 2 D1 | 48 | 0 | d | | | |
| 2 | D | 2 D r | 1 | D | 2 D1 | 48 | 0 | d | | | |
| 2 | D | 2 D r | 1 | D | 2 D1 | 48 | 0 | d | | | |
| 2 | D | 2 D r | 2 | D | 2 D2 M | 48 | 17 | 35 | | | |
| 2 | D | 2 D r | 2 | D | 2 D2 | 48 | 26 | 54 | | | |
| 2 | D | 2 D r | 2 | D | 2 D2 | 48 | 24 | 50 | | | |
| 2 | D | 2 D r | 2 | D | 2 D2 | 48 | 18 | 41 | | | |
| 2 | D | 2 D r | 2 | D | 2 D2 R | 48 | 20 | 42 | r | 4 3 2020 6 51 | 4 18 2020 |
| 2 | D | 2 D r | 2 | D | 2 D2 | 44 | 19 | 43 | | | |
| 2 | D | 2 D r | 2 | D | 2 D2 | 48 | 19 | 40 | r | 4 5 2020 2 00 | 4 18 2020 |
| 2 | D | 2 D r | 2 | D | 2 D2 | 44 | 18 | 41 | | | |
| 2 | D | 2 D r | 2 | D | 2 D2 | 48 | 23 | 48 | | | |
| 2 | D | 2 D r | 2 | D | 2 D2 | 44 | 21 | 48 | | | |
| 2 | D | 2 D r | 3 | D | 2 D3 | 44 | 0 | d | | | |
| 2 | D | 2 D r | 3 | D | 2 D3 | 48 | 19 | 40 | r | 3 25 2020 23 29 | 4 16 2020 |
| 2 | D | 2 D r | 3 | D | 2 D3 | 48 | 0 | d | | | |
| 2 | D | 2 D r | 3 | D | 2 D3 DD | 48 | 22 | 46 | | | |
| 2 | D | 2 D r | 3 | D | 2 D3 | 48 | 15 | 31 | | | |
| 2 | D | 2 D r | 3 | D | 2 D3 | 48 | 13 | 27 | | | |
| 2 | D | 2 D r | 3 | D | 2 D3 | 48 | 16 | 33 | | | |
| 2 | D | 2 D r | 3 | D | 2 D3 | 48 | 0 | d | | | |
| 2 | D | 2 D r | 3 | D | 2 D3 | 48 | 23 | 48 | | | |
| 2 | D | 2 D r | 4 | D | 2 D4 | 54 | 18 | 33 | r | 3 25 2020 10 29 | 4 17 2020 |
| 2 | D | 2 D r | 4 | D | 2 D4 | 54 | 17 | 31 | r | 3 25 2020 10 29 | 4 17 2020 |
| 2 | D | 2 D r | 4 | D | 2 D4 M | 50 | 19 | 38 | r | 3 25 2020 10 29 | 4 17 2020 |
| 2 | D | 2 D r | 4 | D | 2 D4 M | 50 | 14 | 28 | r | 3 25 2020 10 29 | 4 17 2020 |
| 2 | D | 2 D r | 4 | D | 2 D4 | 63 | 15 | 24 | r | 3 25 2020 10 29 | 4 17 2020 |
| 2 | D | 2 D r | 4 | D | 2 D4 | 63 | 11 | 17 | r | 3 25 2020 10 29 | 4 17 2020 |
| 2 | D | 2 D r | 4 | D | 2 D4 | 48 | 13 | 27 | r | 3 25 2020 10 29 | 4 17 2020 |
| 2 | D | 2 D r | 4 | D | 2 D4 | 48 | 1 | 2 | r | 3 25 2020 10 29 | 4 17 2020 |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 2 | D | 2 D r 4 | D 2 D4 | 40 | 25 | 63 | r | 3 25 2020 10 29 | 4 17 2020 |
| 2 | D | 2 D r 4 | D 2 D4 | 40 | 26 | 65 | r | 3 25 2020 10 29 | 4 17 2020 |
| 2 | D | 2 D r 4 | D 2 D4 | 50 | 0 | d | | | |
| 2 | D | 2 D r 4 | D 2 D4 | 50 | 0 | d | | | |
| 2 | D | 2 D r 4 | D 2 D4 R | 37 | 0 | d | | | |
| 2 | D | 2 D r 4 | D 2 D4 R | 37 | 0 | d | | | |
| 4 | D | 4 | D 4 1 | 48 | 0 | d | | | |
| 4 | D | 4 | D 4 2 | 48 | 19 | 40 | | | |
| 4 | D | 4 | D 4 1 | 48 | 20 | 42 | | | |
| 4 | D | 4 | D 4 2 | 48 | 0 | d | | | |
| 4 | D | 4 | D 4 1 | 40 | 18 | 45 | | | |
| 4 | D | 4 | D 4 2 | 40 | 0 | d | | | |
| 4 | D | 4 | D 4 2 | 40 | 0 | d | | | |
| 4 | D | 4 | D 4 M1 | 40 | 17 | 43 | | | |
| 4 | D | 4 | D 4 M2 | 40 | 0 | d | | | |
| 4 | D | 4 | D 4 1 | 40 | 19 | 48 | | | |
| 4 | D | 4 | D 4 2 | 40 | 0 | d | | | |
| 4 | D | 4 | D 4 1 | 48 | 15 | 31 | | | |
| 4 | D | 4 | D 4 2 | 48 | 0 | d | | | |
| 4 | D | 4 | D 4 1 | 48 | 0 | d | | | |
| 4 | D | 4 | D 4 2 | 48 | 0 | d | | | |
| 5 | D | 5 | D 5 1 | 44 | 19 | 43 | | | |
| 5 | D | 5 | D 5 1 | 40 | 14 | 35 | | | |
| 5 | D | 5 | D 5 1 | 40 | 12 | 30 | r | 4 2 2020 12 00 | 4 15 2020 |
| 5 | D | 5 | D 5 1D | 40 | 0 | d | | | |
| 5 | D | 5 | D 5 1 | 40 | 0 | d | | | |
| 5 | D | 5 | D 5 1 | 44 | 16 | 36 | r | 4 6 2020 12 00 | 4 18 2020 |
| 5 | D | 5 | D 5 1 | 44 | 0 | d | | | |
| 5 | D | 5 | D 5 1 | 40 | 17 | 43 | | | |
| 5 | D | 5 | D 5 1 | 40 | 9 | 23 | r | 3 31 2020 7 34 | 4 12 2020 |
| 5 | D | 5 | D 5 1 | 40 | 15 | 38 | | | |
| 5 | D | 5 | D 5 1 | 40 | 0 | d | | | |
| 5 | D | 5 | D 5 1M | 44 | 18 | 41 | | | |
| 5 | D | 5 | D 5 2 | 44 | 5 | 11 | | | |
| 5 | D | 5 | D 5 2 | 40 | 5 | 13 | | | |
| 5 | D | 5 | D 5 2 | 40 | 0 | d | | | |
| 5 | D | 5 | D 5 2D | 40 | 20 | 50 | r | 4 4 2020 13 31 | 4 17 2020 |
| 5 | D | 5 | D 5 2 | 40 | 17 | 43 | r | 4 3 2020 20 30 | 4 15 2020 |
| 5 | D | 5 | D 5 2 | 44 | 15 | 34 | | | |
| 5 | D | 5 | D 5 2 | 44 | 3 | 7 | | | |
| 5 | D | 5 | D 5 2 | 40 | 0 | d | | | |

**MILLER GROUP EXH 1**
**PAGE 006**

| | | | | Code | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| 5 | D | 5 | | D 5 2 | 40 | 0 | d | | | |
| 5 | D | 5 | | D 5 2 | 40 | 0 | d | | | |
| 5 | D | 5 | | D 5 2 | 40 | 20 | 50 | | | |
| 5 | D | 5 | | D 5 2M | 44 | 21 | 48 | | | |
| 6 | D | 6 | | D 6 1 | 40 | 20 | 50 | r | 3 27 2020 12 59 | 4 10 2020 |
| 6 | D | 6 | | D 6 1 | 44 | 22 | 50 | r | 3 25 2020 20 30 | 4 10 2020 |
| 6 | D | 6 | | D 6 1 | 44 | 21 | 48 | r | 3 25 2020 20 30 | 4 14 2020 |
| 6 | D | 6 | | D 6 1D | 40 | 29 | 73 | r | 3 30 2020 13 00 | 4 13 2020 |
| 6 | D | 6 | | D 6 1 | 40 | 20 | 50 | r | 3 31 2020 12 59 | 4 14 2020 |
| 6 | D | 6 | | D 6 1 | 40 | 20 | 50 | r | 3 31 2020 14 01 | 4 14 2020 |
| 6 | D | 6 | | D 6 1 | 40 | 30 | 75 | r | 3 26 2020 23 59 | 4 9 2020 |
| 6 | D | 6 | | D 6 1 | 44 | 36 | 82 | r | 3 30 2020 13 00 | 4 7 2020 |
| 6 | D | 6 | | D 6 1 | 44 | 34 | 77 | r | 3 31 2020 14 01 | 4 17 2020 |
| 6 | D | 6 | | D 6 1 | 40 | 20 | 50 | r | 3 31 2020 13 30 | 4 14 2020 |
| 6 | D | 6 | | D 6 1 | 40 | 20 | 50 | r | 3 27 2020 12 59 | 4 9 2020 |
| 6 | D | 6 | | D 6 1R | 40 | 21 | 53 | r | 3 31 2020 9 03 | 4 15 2020 |
| 6 | D | 6 | | D 6 2 | 40 | 24 | 60 | r | 3 31 2020 14 01 | 4 12 2020 |
| 6 | D | 6 | | D 6 2 | 44 | 24 | 55 | r | 3 25 2020 16 23 | 4 14 2020 |
| 6 | D | 6 | | D 6 2 | 44 | 22 | 50 | r | 3 31 2020 13 30 | 4 17 2020 |
| 6 | D | 6 | | D 6 2D | 40 | 19 | 48 | r | 3 31 2020 8 55 | 4 17 2020 |
| 6 | D | 6 | | D 6 2 | 40 | 30 | 75 | r | 3 31 2020 14 01 | 4 14 2020 |
| 6 | D | 6 | | D 6 2 | 40 | 20 | 50 | r | 3 25 2020 21 00 | 4 13 2020 |
| 6 | D | 6 | | D 6 2 | 40 | 24 | 60 | r | 3 27 2020 12 59 | 4 17 2020 |
| 6 | D | 6 | | D 6 2 | 44 | 31 | 70 | r | 3 31 2020 12 29 | 4 16 2020 |
| 6 | D | 6 | | D 6 2 | 44 | 20 | 45 | r | 3 25 2020 21 00 | 4 13 2020 |
| 6 | D | 6 | | D 6 2 | 40 | 33 | 83 | r | 3 31 2020 12 59 | 4 11 2020 |
| 6 | D | 6 | | D 6 2 | 40 | 26 | 65 | r | 3 27 2020 14 00 | 4 15 2020 |
| 6 | D | 6 | | D 6 2R | 40 | 20 | 50 | r | 3 25 2020 9 30 | 4 11 2020 |
| 8 | D | 8 | r | D 8 2 | | 14 | | | | |
| 8 | D | 8 | r | D 8 2 | 24 | 10 | 42 | | | |
| 8 | D | 8 | r | D 8 2 | 26 | 25 | 96 | | | |
| 8 | D | 8 | r | D 8 2 | 20 | 12 | 60 | | | |
| 8 | D | 8 | r | D 8 3 | 12 | 7 | 58 | | 3 26 2020 3 01 | 4 16 2020 |
| 8 | D | 8 | r | D 8 3 | 20 | 12 | 60 | | | |
| 8 | D | 8 | r | D 8 3 | 14 | 9 | 64 | | 3 28 2020 3 00 | 4 20 2020 |
| 8 | D | 8 | r | D 8 3 | 20 | 10 | 50 | | | |
| 8 R | D | 08 R | | D 08 2 | 20 | 7 | 35 | r | 3 27 2020 12 30 | 4 10 2020 |
| 8 R | D | 08 R | | D 08 2 | 39 | 24 | 62 | | | |
| 8 R | D | 08 R | | D 08 2 | 20 | 4 | 20 | | 3 25 2020 19 59 | 4 18 2020 |
| 8 R | D | 08 R | | D 08 2 | 39 | 34 | 87 | | | |
| 8 R | D | 08 R | | D 08 2 | 39 | 39 | 100 | | 3 27 2020 7 59 | 4 19 2020 |
| 8 R | D | 08 R | | D 08 3 | 20 | 6 | 30 | | 3 26 2020 18 29 | 4 20 2020 |

| 8 R | D | 08 R | D | 08 3 | 39 | 27 | 69 | | | | |
| 8 R | D | 08 R | D | 08 3 | 39 | 39 | 100 | | | 3 25 2020 15 41 | 4 20 2020 |
| 8 R | D | 08 R | D | 08 3D | 39 | 37 | 95 | | | 3 25 2020 21 00 | 4 19 2020 |
| 8 R | D | 08 R | D | 08 3 | 20 | 6 | 30 | | | 3 25 2020 23 59 | 4 20 2020 |
| 8 R | D | 08 R | D | 08 3 | 39 | 33 | 85 | | r | 3 31 2020 17 59 | 4 16 2020 |
| 8 R | D | 08 R | D | 08 3 | 39 | 33 | 85 | | r | 3 31 2020 12 59 | 4 20 2020 |
| 8 R | D | 08 R | D | 08 4 | 20 | 13 | 65 | | | | |
| 8 R | D | 08 R | D | 08 4 | 39 | 20 | 51 | | r | 4 2 2020 20 00 | 4 14 2020 |
| 8 R | D | 08 R | D | 08 4 | 39 | 30 | 77 | | | | |
| 8 R | D | 08 R | D | 08 4D | 39 | 22 | 56 | | r | 4 4 2020 13 00 | 4 17 2020 |
| 8 R | D | 08 R | D | 08 4 | 20 | 8 | 40 | | | 3 26 2020 11 30 | 4 18 2020 |
| 8 R | D | 08 R | D | 08 4 | 39 | 33 | 85 | | | | |
| 8 R | D | 08 R | D | 08 4 | 39 | 37 | 95 | | | | |
| 8 R | D | 08 R | D | 08 4 | 39 | 23 | 59 | | r | 3 31 2020 12 27 | 4 13 2020 |
| 8 R | D | 08 R | D | 08 5 | 20 | 6 | 30 | | | | |
| 8 R | D | 08 R | D | 08 5 | 39 | 27 | 69 | | | | |
| 8 R | D | 08 R | D | 08 5 | 39 | 15 | 38 | | r | 4 4 2020 13 00 | 4 17 2020 |
| 8 R | D | 08 R | D | 08 5D | 39 | 14 | 36 | | | | |
| 8 R | D | 08 R | D | 08 5 | 20 | 5 | 25 | | | 3 30 2020 20 30 | 4 17 2020 |
| 8 R | D | 08 R | D | 08 5 | 39 | 28 | 72 | | | | |
| 8 R | D | 08 R | D | 08 5 | 39 | 0 | | d | | | |
| 8 R | D | 08 R | D | 08 5 | 39 | 23 | 59 | | r | 4 3 2020 20 30 | 4 16 2020 |
| 9 | D | 9 | D | 9 1 | 44 | 43 | 98 | | | | |
| 9 | D | 9 | D | 9 1 | 44 | 42 | 95 | | | | |
| 9 | D | 9 | D | 9 1 | 44 | 43 | 98 | | | | |
| 9 | D | 9 | D | 9 1D | 44 | 40 | 91 | | | | |
| 9 | D | 9 | D | 9 1 | 44 | 18 | 41 | | | | |
| 9 | D | 9 | D | 9 1 | 44 | 20 | 45 | | | | |
| 9 | D | 9 | D | 9 1 | 44 | 20 | 45 | | | | |
| 9 | D | 9 | D | 9 1 | 44 | 18 | 41 | | | | |
| 9 | D | 9 | D | 9 2 | 44 | 44 | 100 | | | | |
| 9 | D | 9 | D | 9 2 | 44 | 43 | 98 | | | | |
| 9 | D | 9 | D | 9 2 | 44 | 43 | 98 | | | | |
| 9 | D | 9 | D | 9 2D | 44 | 18 | 41 | | | | |
| 9 | D | 9 | D | 9 2 | 44 | 37 | 84 | | | | |
| 9 | D | 9 | D | 9 2 | 44 | 22 | 50 | | | | |
| 9 | D | 9 | D | 9 2 | 44 | 22 | 50 | | | | |
| 9 | D | 9 | D | 9 2 | 44 | 15 | 34 | | r | 4 3 2020 11 29 | 4 20 2020 |
| 9 | D | 9 | D | 9 3 | 44 | 42 | 95 | | | | |
| 9 | D | 9 | D | 9 3 | 44 | 43 | 98 | | | | |
| 9 | D | 9 | D | 9 3 | 44 | 42 | 95 | | | | |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 9 | D | 9 | D | 9 3D | 44 | 42 | 95 | r | 3 29 2020 8 45 | 4 7 2020 |
| 9 | D | 9 | D | 9 3 | 44 | 18 | 41 | | | |
| 9 | D | 9 | D | 9 3 | 44 | 21 | 48 | | | |
| 9 | D | 9 | D | 9 3 | 44 | 22 | 50 | | | |
| 9 | D | 9 | D | 9 3 | 44 | 30 | 68 | r | 3 26 2020 23 59 | 4 18 2020 |
| 9 | D | 9 | D | 9 | 10 | 1 | 10 | | | |
| | | | | | 500 | 76 | 15 | | 3 30 2020 20 30 | 4 19 2020 |
| | | | | | | 24 | | | | |
| d | d | d | | | | 8 | | | | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

ANTHONY MAYS, Individually and on behalf of )
a class of similarly situated persons; and JUDIA )
JACKSON, as next friend of KENNETH )
FOSTER, Individually and on behalf of a class of )
similarly situated persons )
)                                            Case No. 20-cv-2134
                       Plaintiffs-Petitioners, )
)
v                                            )
)
THOMAS DART, Sheriff of Cook County, )
)
                       Defendant-Respondent )

## SUPPLEMENTAL DECLARATION OF MICHAEL MILLER

I, Michael Miller, pursuant to 28 U.S.C. § 1746, declare as follows:

1. That I am currently employed by the Cook County Sheriff's Office ("CCSO") as the First Assistant Executive Director for the Cook County Department of Corrections ("CCDOC"). I have been employed in this role since 2019 and have worked in CCDOC for over thirty years.

2. I previously executed a sworn Declaration concerning the CCSO's response to the Novel Coronavirus ("COVID-19") pandemic, filed on April 7, 2020 under Dkt. #31-8. Each and all paragraphs under said declaration are incorporated and re-stated herein

3. I am familiar with the Court's order entered April 9, 2020 requiring the CCSO to report to the Court certain steps taken to combat the spread of COVID-19 in the Cook County Department of Corrections ("CCDOC").

## Background

4. CCDOC is an incredibly complex operation. On a regular day, rotating shifts of correctional officers and supervisory staff across multiple divisions transfer hundreds of detainees to court hearings, medical appointments, court-mandated and supplemental programming, and more. Detainees are provided three meals per day, essential supplies including bedding, uniforms, toothbrushes, and soap. Commissary deliveries are completed and logged. Inmate grievances and medical requests are collected and processed.

5. CCDOC is required to weigh numerous factors while operating the jail. For example, when classifying a detainee and making a housing determination, multiple factors are considered including but not limited to: criminal charge(s), criminal history and incarceration history, the safety of staff and detainees, security requirements for each detainee, correctional disciplinary history, and mental health needs.

6. As of April 17, 2020 the CCDOC detainee population is 4,233. 98 detainees were released from custody on April 16, 2020. There were 13 newly rearrested people remanded from bond court who were not released on bond or released on electronic monitoring.

7. As of April 17, 2020 at 10:00a.m., there are 180 detainees in CCDOC custody who have tested positive for COVID-19 and are assigned to Isolation tiers. 170 detainees have been moved to Convalescent Tiers, as they are recovering from COVID-19.

8. The CCSO has activated emergency staffing provisions of its Collective Bargaining Agreements in order to assign court services deputies to CCDOC operations. Approximately 123 deputies have been assigned to CCDOC as of April 17, 2020.

## Social Distancing

9. The CCSO has implemented social distancing policies across the CCDOC compound in a variety of ways. We opened previously closed divisions in order to spread housing assignments across more available space, including: Division 4, Division 5, Bootcamp barracks/Mental Health Transition Center, and Division 2 Dorm 1, Dorm 3, and Dorm 4.

10. As explained in my April 7, 2020 declaration, to reduce the potential spread of the virus, we implemented a process to quarantine and isolate tiers, designate them as such and install certain rules as it relates to each.

    a. **Quarantine Tiers** are tiers where new detainees are assigned after intake and housed for the first fourteen days of their stay. In addition, any tier where a detainee develops symptoms of COVID-19 is immediately designated as a Quarantine Tier. The symptomatic detainee is treated and removed from the tier and taken to an Isolation Tier at the direction of medical staff. The remainder of the tier is identified as under Quarantine.

    b. **Isolation Tiers** are tiers designated to house symptomatic detainees and detainees who have tested positive for COVID-19, to receive immediate care and be isolated from the rest of the jail population. Every detainee in an isolation tier has exhibited clear symptoms or has a positive test for COVID-19. However, symptomatic detainees are held in different tiers than known positive COVID detainees.

    c. **Convalescent Tiers** are tiers designated to house detainees recovering from COVID-19, who were moved to Isolation Tiers for treatment after testing positive, but have now tested negative and are in recovery.

11. CCDOC has transitioned 175 tiers across CCDOC to single cell housing. Only 11 tiers currently do not have single cell housing, due to unique mental health needs of those detainees assigned. Cermak Health Services ("Cermak") traditionally makes housing recommendations regarding such mental health needs, where, for example, an individual must be housed in a dorm setting in light of a psychiatric condition. Approximately 2,521 detainees are housed in single cells as of the date of this declaration.

12. As of April 17, 2020, for dormitory housing, we have spread detainees throughout to allow all dorms to be at 50%, aside from RTU and restricted housing. Approximately 684 detainees are currently housed in four dormitories—Division 2 Dorm 1, Dorm 2, Dorm 3, and Dorm 4—so there are approximately 170-200 detainees per dorm that each normally house 900.

13. Since March 20, 2020, the number of detainees who are housed in single cells has increased by 545%. Since March 20, 2020, the number of detainees who are housed in double cells has decreased by 93%. Miller Declaration Exhibit 1.

14. Miller Declaration Exhibit 2 attached shows the number of detainees in each open tier and division housing the general population, and the percentage those tiers were toward capacity on March 15, 2020 compared to April 17, 2020.

15. Miller Declaration Exhibit 3 attached shows the number of detainees in each open tier and division in Cermak Health Services and RTU, and the percentage those tiers were toward capacity on March 15, 2020 and April 17, 2020.

16. On March 15, 2020 there were 144 living units occupied, 27 dorms, and 117 celled tiers. As of April 17, 2929, there are 192 living units occupied, 49 dorms, and 143 celled tiers. This is a 33% overall increase in the occupied living units. As of April 17, 2020, 94% of celled tiers are single celled.

17. Cermak Health Services, RTU, and Division 2 Dorm 1 Tier DIV2-D1-D contain specialized populations that cannot be housed in other areas of the Jail.

18. CCSO has been providing detainees with education on social distancing since late February 2020, through signage and verbal direction. CCSO has emphasized that detainees should maintain 6-feet of distance from each other. During hours out of their cells or bunk beds in dormitories, the detainees may move about as they wish and may maintain separation between themselves.

19. CCDOC is rotating hours detainees may be in common areas, such that only half of all detainees assigned to a tier are released into the dayroom(s) at one time. Provide the opportunity

20. However, these procedures are subject to change in the event of a safety or security incident, such as fights involving multiple detainees. Detainees involved in such incidents may be sent to special management tiers.

21. CCSO administers the electronic monitoring program for detainees who receive electronic monitoring as a condition of bail. The CCSO can sustain the monitoring of approximately XX individuals through the electronic monitoring program. If the CCSO were required to increase the population in this program it would result in a potential risk to public safety.

**Personal Protective Equipment**

22. The CCSO has continued to work diligently to obtain and distribute personal protective equipment ("PPE") across CCDOC. Deliveries of PPE and distribution to staff—and, where appropriate, detainees—are captured and preserved on stationary cameras.

23. As of April 11, 2020, all detainees assigned to Quarantine Tiers are issued a new mask each day.

24. General population detainees have neither known exposures to people with COVID-19 nor symptoms of COVID-19. Therefore, the CDC does not recommend that they use surgical masks. The CCDOC will also provide the general population of detainees with masks for their comfort and for security purposes to avoid any conflicts related to the provision of masks to other detainees on the Quarantine Tiers, as supplies permit.

25. As of the date of this Declaration, CCDOC has inventoried XXX surgical masks and XXX cloth masks. To illustrate, between April 11 and April 13 the Critical Incident Command Center distributed 13,920 surgical masks across the jail compound. In complying with recent changes to CDC guidance, as affirmed by this court's order, we are utilizing 4,700 surgical masks for detainees per day. We expect to exhaust this supply, at its current rate, on June 7, 2020.

I, Michael Miller, pursuant to 28 U.S.C. § 1746, declare under penalty of perjury of the laws of the United States of America that the foregoing is true and correct.

Dated this 17th day of April 2020.

# Miller Declaration Exhibit 1



|  | 3/20/20 at 4am | 4/17/20 at 4pm | % Change |
|---|---|---|---|
| Single Celled | 391 | 2,521 | 545% |
| Double Celled | 3,906 | 260 | -93% |
| Housed in Dorm | 1,257 | 1,231 | -2% |
| Housed in Boot Camp | 0 | 172 | n/a |
| Hospitalized | 11 | 27 | 145% |
| Confined Total | 5,565 | 4,211 | -24% |

# Miller Declaration Exhibit 2

| Division | Facility | Tier | Capacity | Occupancy as of 3/15/2020 | Occupancy as of 4/17/2020 | Percent Occupied as of 3/15/2020 | Percent Occupied as of 7/17/2020 | Tier Type | First Quarantine | Projected End Date |
|---|---|---|---|---|---|---|---|---|---|---|
| 10 | Division 10 | DIV10-1A | 48 | 48 | 24 | 100% | 50% | | | |
| 10 | Division 10 | DIV10-1B | 48 | 46 | 24 | 96% | 50% | | | |
| 10 | Division 10 | DIV10-2A | 48 | 44 | 24 | 92% | 50% | | | |
| 10 | Division 10 | DIV10-2B | 48 | 0 | 24 | closed | 50% | | | |
| 10 | Division 10 | DIV10-2C | 48 | 46 | 24 | 96% | 50% | | | |
| 10 | Division 10 | DIV10-2D | 48 | 48 | 24 | 100% | 50% | | | |
| 10 | Division 10 | DIV10-3A | 48 | 47 | 24 | 98% | 50% | | | |
| 10 | Division 10 | DIV10-3B | 48 | 45 | 24 | 94% | 50% | | | |
| 10 | Division 10 | DIV10-3D | 48 | 43 | 23 | 90% | 48% | | | |
| 10 | Division 10 | DIV10-4A | 48 | 46 | 24 | 96% | 50% | | | |
| 10 | Division 10 | DIV10-4B | 48 | 47 | 24 | 98% | 50% | | | |
| 10 | Division 10 | DIV10-4C | 48 | 48 | 24 | 100% | 50% | | | |
| 10 | Division 10 | DIV10-4D | 48 | 48 | 23 | 100% | 48% | | | |
| 11 | Division 11 | DIV11-AA | 48 | 42 | 22 | 88% | 46% | | | |
| 11 | Division 11 | DIV11-AB | 48 | 48 | 24 | 100% | 50% | | | |
| 11 | Division 11 | DIV11-AC | 48 | 46 | 20 | 96% | 42% | | | |
| 11 | Division 11 | DIV11-AD | 48 | 48 | 23 | 100% | 48% | | | |
| 11 | Division 11 | DIV11-AF | 48 | 45 | 21 | 94% | 44% | | | |
| 11 | Division 11 | DIV11-BB | 48 | 39 | 20 | 81% | 42% | | | |
| 11 | Division 11 | DIV11-BC | 48 | 44 | 20 | 92% | 42% | | | |
| 11 | Division 11 | DIV11-BD | 48 | 42 | 21 | 88% | 44% | | | |
| 11 | Division 11 | DIV11-BF | 48 | 48 | 23 | 100% | 48% | | | |
| 11 | Division 11 | DIV11-BG | 48 | 45 | 23 | 94% | 48% | | | |
| 11 | Division 11 | DIV11-BJ | 48 | 47 | 23 | 98% | 48% | | | |
| 11 | Division 11 | DIV11-CC | 48 | 47 | 24 | 98% | 50% | | | |
| 11 | Division 11 | DIV11-CH | 48 | 48 | 22 | 100% | 46% | | | |
| 2 | Division 2 Dorm 1 | DIV2-D1-A | 48 | 38 | 13 | 79% | 27% | | | |
| 2 | Division 2 Dorm 1 | DIV2-D1-B | 48 | 0 | 8 | closed | 17% | | | |
| 2 | Division 2 Dorm 1 | DIV2-D1-C | 48 | 0 | 18 | closed | 38% | | | |
| 2 | Division 2 Dorm 1 | DIV2-D1-D | 48 | 0 | 39 | closed | 81% | | | |
| 2 | Division 2 Dorm 1 | DIV2-D1-E | 48 | 0 | 22 | closed | 46% | | | |
| 2 | Division 2 Dorm 1 | DIV2-D1-F | 48 | 0 | 24 | closed | 50% | | | |
| 2 | Division 2 Dorm 1 | DIV2-D1-G | 48 | 0 | 19 | closed | 40% | | | |
| 2 | Division 2 Dorm 1 | DIV2-D1-H | 48 | 0 | 24 | closed | 50% | | | |
| 2 | Division 2 Dorm 2 | DIV2-D2-M | 48 | 0 | 15 | closed | 31% | | | |
| 2 | Division 2 Dorm 2 | DIV2-D2-O | 48 | 41 | 15 | 85% | 31% | | | |
| 2 | Division 2 Dorm 2 | DIV2-D2-P | 44 | 44 | 17 | 100% | 39% | | | |
| 2 | Division 2 Dorm 2 | DIV2-D2-S | 44 | 0 | 15 | closed | 34% | | | |
| 2 | Division 2 Dorm 2 | DIV2-D2-T | 48 | 0 | 18 | closed | 38% | | | |
| 2 | Division 2 Dorm 2 | DIV2-D2-V | 48 | 1 | 13 | 2% | 27% | | | |
| 2 | Division 2 Dorm 3 | DIV2-D3-AA | 44 | 18 | 20 | 41% | 45% | | | |
| 2 | Division 2 Dorm 3 | DIV2-D3-BB | 48 | 0 | 22 | closed | 46% | | | |
| 2 | Division 2 Dorm 3 | DIV2-D3-CC | 48 | 0 | 0 | closed | closed | | | |
| 2 | Division 2 Dorm 3 | DIV2-D3-EE | 48 | 0 | 21 | closed | 44% | | | |
| 2 | Division 2 Dorm 3 | DIV2-D3-FF | 48 | 0 | 19 | closed | 40% | | | |
| 2 | Division 2 Dorm 3 | DIV2-D3-GG | 48 | 0 | 22 | closed | 46% | | | |
| 2 | Division 2 Dorm 3 | DIV2-D3-HH | 48 | 0 | 10 | closed | 21% | | | |
| 2 | Division 2 Dorm 4 | DIV2-D4-LL | 54 | 52 | 21 | 96% | 39% | | | |

| Division | Facility | Tier | Capacity | Occupancy as of 3/15/2020 | Occupancy as of 4/17/2020 | Percent Occupied as of 3/15/2020 | Percent Occupied as of 7/17/2020 | Tier Type | First Quarantine | Projected End Date |
|---|---|---|---|---|---|---|---|---|---|---|
| 2 | Division 2 Dorm 4 | DIV2-D4-LU | 54 | 43 | 1 | 80% | 2% | | | |
| 2 | Division 2 Dorm 4 | DIV2-D4-ML | 50 | 49 | 15 | 98% | 30% | | | |
| 2 | Division 2 Dorm 4 | DIV2-D4-MU | 50 | 44 | 11 | 88% | 22% | | | |
| 2 | Division 2 Dorm 4 | DIV2-D4-NL | 63 | 54 | 10 | 86% | 16% | | | |
| 2 | Division 2 Dorm 4 | DIV2-D4-NU | 63 | 51 | 9 | 81% | 14% | | | |
| 2 | Division 2 Dorm 4 | DIV2-D4-OL | 48 | 34 | 24 | 71% | 50% | | | |
| 2 | Division 2 Dorm 4 | DIV2-D4-OU | 48 | 0 | 0 | closed | closed | | | |
| 2 | Division 2 Dorm 4 | DIV2-D4-PL | 40 | 20 | 19 | 50% | 48% | | | |
| 2 | Division 2 Dorm 4 | DIV2-D4-PU | 40 | 19 | 18 | 48% | 45% | | | |
| 2 | Division 2 Dorm 4 | DIV2-D4-QL | 50 | 0 | 24 | closed | 48% | | | |
| 2 | Division 2 Dorm 4 | DIV2-D4-QU | 50 | 0 | 0 | closed | closed | | | |
| 2 | Division 2 Dorm 4 | DIV2-D4-RL | 37 | 0 | 26 | closed | 70% | | | |
| 2 | Division 2 Dorm 4 | DIV2-D4-RU | 37 | 0 | 0 | closed | closed | | | |
| 4 | Division 4 | DIV4-I1 | 48 | 0 | 24 | closed | 50% | | | |
| 4 | Division 4 | DIV4-J1 | 48 | 0 | 21 | closed | 44% | | | |
| 4 | Division 4 | DIV4-K1 | 40 | 0 | 16 | closed | 40% | | | |
| 4 | Division 4 | DIV4-L1 | 40 | 0 | 0 | closed | closed | | | |
| 4 | Division 4 | DIV4-L2 | 40 | 0 | 18 | closed | 45% | | | |
| 4 | Division 4 | DIV4-M1 | 40 | 0 | 0 | closed | closed | | | |
| 4 | Division 4 | DIV4-N2 | 40 | 0 | 14 | closed | 35% | | | |
| 4 | Division 4 | DIV4-P1 | 48 | 0 | 18 | closed | 38% | | | |
| 4 | Division 4 | DIV4-P2 | 48 | 0 | 24 | closed | 50% | | | |
| 4 | Division 4 | DIV4-Q1 | 48 | 0 | 20 | closed | 42% | | | |
| 4 | Division 4 | DIV4-Q2 | 48 | 0 | 22 | closed | 46% | | | |
| 5 | Division 5 | DIV5-1A | 44 | 0 | 21 | closed | 48% | | | |
| 5 | Division 5 | DIV5-1B | 40 | 0 | 19 | closed | 48% | | | |
| 5 | Division 5 | DIV5-1E | 40 | 0 | 0 | closed | closed | | | |
| 5 | Division 5 | DIV5-1G | 44 | 0 | 0 | closed | closed | | | |
| 5 | Division 5 | DIV5-1H | 40 | 0 | 16 | closed | 40% | | | |
| 5 | Division 5 | DIV5-1J | 40 | 0 | 11 | closed | 28% | | | |
| 5 | Division 5 | DIV5-1K | 40 | 0 | 18 | closed | 45% | | | |
| 5 | Division 5 | DIV5-1L | 40 | 0 | 19 | closed | 48% | | | |
| 5 | Division 5 | DIV5-2A | 44 | 0 | 5 | closed | 11% | | | |
| 5 | Division 5 | DIV5-2B | 40 | 25 | 0 | 63% | closed | | | |
| 5 | Division 5 | DIV5-2C | 40 | 0 | 0 | closed | closed | | | |
| 5 | Division 5 | DIV5-2F | 44 | 26 | 15 | 59% | 34% | | | |
| 5 | Division 5 | DIV5-2G | 44 | 7 | 0 | 16% | closed | | | |
| 5 | Division 5 | DIV5-2H | 40 | 0 | 0 | closed | closed | | | |
| 5 | Division 5 | DIV5-2J | 40 | 0 | 0 | closed | closed | | | |
| 5 | Division 5 | DIV5-2K | 40 | 0 | 0 | closed | closed | | | |
| 5 | Division 5 | DIV5-2M | 44 | 43 | 14 | 98% | 32% | | | |
| 6 | Division 6 | DIV6-1A | 40 | 38 | 18 | 95% | 45% | | | |
| 6 | Division 6 | DIV6-1B | 44 | 43 | 22 | 98% | 50% | | | |
| 6 | Division 6 | DIV6-1C | 44 | 44 | 22 | 100% | 50% | | | |
| 6 | Division 6 | DIV6-1D | 40 | 40 | 20 | 100% | 50% | | | |
| 6 | Division 6 | DIV6-1H | 40 | 35 | 20 | 88% | 50% | | | |
| 6 | Division 6 | DIV6-1J | 40 | 0 | 19 | closed | 48% | | | |
| 6 | Division 6 | DIV6-1L | 44 | 44 | 22 | 100% | 50% | | | |

| Division | Facility | Tier | Capacity | Occupancy as of 3/15/2020 | Occupancy as of 4/17/2020 | Percent Occupied as of 3/15/2020 | Percent Occupied as of 7/17/2020 | Tier Type | First Quarantine | Projected End Date |
|---|---|---|---|---|---|---|---|---|---|---|
| 6 | Division 6 | DIV6-1N | 44 | 44 | 22 | 100% | 50% | | | |
| 6 | Division 6 | DIV6-1P | 40 | 38 | 20 | 95% | 50% | | | |
| 6 | Division 6 | DIV6-1Q | 40 | 39 | 19 | 98% | 48% | | | |
| 6 | Division 6 | DIV6-1R | 40 | 37 | 20 | 93% | 50% | | | |
| 6 | Division 6 | DIV6-2B | 44 | 44 | 21 | 100% | 48% | | | |
| 6 | Division 6 | DIV6-2C | 44 | 44 | 22 | 100% | 50% | | | |
| 6 | Division 6 | DIV6-2D | 40 | 40 | 19 | 100% | 48% | | | |
| 6 | Division 6 | DIV6-2H | 40 | 40 | 20 | 100% | 50% | | | |
| 6 | Division 6 | DIV6-2J | 40 | 40 | 21 | 100% | 53% | | | |
| 6 | Division 6 | DIV6-2K | 40 | 40 | 20 | 100% | 50% | | | |
| 6 | Division 6 | DIV6-2L | 44 | 43 | 22 | 98% | 50% | | | |
| 6 | Division 6 | DIV6-2N | 44 | 43 | 22 | 98% | 50% | | | |
| 6 | Division 6 | DIV6-2P | 40 | 40 | 20 | 100% | 50% | | | |
| 6 | Division 6 | DIV6-2Q | 40 | 40 | 24 | 100% | 60% | | | |
| 6 | Division 6 | DIV6-2R | 40 | 38 | 25 | 95% | 63% | | | |
| 9 | Division 9 | DIV9-1A | 44 | 44 | 19 | 100% | 43% | | | |
| 9 | Division 9 | DIV9-1B | 44 | 44 | 22 | 100% | 50% | | | |
| 9 | Division 9 | DIV9-1D | 44 | 39 | 18 | 89% | 41% | | | |
| 9 | Division 9 | DIV9-1E | 44 | 35 | 19 | 80% | 43% | | | |
| 9 | Division 9 | DIV9-1F | 44 | 15 | 21 | 34% | 48% | | | |
| 9 | Division 9 | DIV9-1G | 44 | 34 | 22 | 77% | 50% | | | |
| 9 | Division 9 | DIV9-2A | 44 | 44 | 22 | 100% | 50% | | | |
| 9 | Division 9 | DIV9-2B | 44 | 43 | 19 | 98% | 43% | | | |
| 9 | Division 9 | DIV9-2D | 44 | 44 | 22 | 100% | 50% | | | |
| 9 | Division 9 | DIV9-2E | 44 | 37 | 37 | 84% | 84% | | | |
| 9 | Division 9 | DIV9-2F | 44 | 32 | 20 | 73% | 45% | | | |
| 9 | Division 9 | DIV9-2G | 44 | 0 | 22 | closed | 50% | | | |
| 9 | Division 9 | DIV9-3A | 44 | 42 | 22 | 95% | 50% | | | |
| 9 | Division 9 | DIV9-3B | 44 | 43 | 22 | 98% | 50% | | | |
| 9 | Division 9 | DIV9-3C | 44 | 43 | 22 | 98% | 50% | | | |
| 9 | Division 9 | DIV9-3E | 44 | 21 | 22 | 48% | 50% | | | |
| 9 | Division 9 | DIV9-3G | 44 | 43 | 22 | 98% | 50% | | | |
| 9 | Division 9 | DIV9-3H | 44 | 43 | 21 | 98% | 48% | | | |
| 9 | Division 9 | DIV9-LI | 10 | 1 | 1 | 10% | 10% | | | |
| 10 | Division 10 | DIV10-1C | 48 | 47 | 24 | 98% | 50% | Quarantine | 4/9/2020 16:26 | 5/1/2020 |
| 10 | Division 10 | DIV10-1D | 48 | 45 | 22 | 94% | 46% | Quarantine | 4/16/2020 19:59 | 4/30/2020 |
| 10 | Division 10 | DIV10-3C | 48 | 47 | 20 | 98% | 42% | Quarantine | 3/31/2020 18:10 | 4/30/2020 |
| 11 | Division 11 | DIV11-AG | 48 | 47 | 24 | 98% | 50% | Quarantine | 3/31/2020 15:30 | 4/29/2020 |
| 11 | Division 11 | DIV11-AH | 48 | 47 | 24 | 98% | 50% | Quarantine | 4/12/2020 11:29 | 5/1/2020 |
| 11 | Division 11 | DIV11-AJ | 48 | 47 | 23 | 98% | 48% | Quarantine | 4/9/2020 6:55 | 5/1/2020 |
| 11 | Division 11 | DIV11-BA | 48 | 48 | 24 | 100% | 50% | Quarantine | 4/15/2020 11:59 | 5/1/2020 |
| 11 | Division 11 | DIV11-BH | 48 | 46 | 24 | 96% | 50% | Quarantine | 4/13/2020 7:59 | 4/30/2020 |
| 11 | Division 11 | DIV11-CA | 48 | 48 | 24 | 100% | 50% | Quarantine | 4/10/2020 21:59 | 4/30/2020 |
| 11 | Division 11 | DIV11-CB | 48 | 48 | 24 | 100% | 50% | Quarantine | 3/31/2020 17:48 | 4/27/2020 |
| 11 | Division 11 | DIV11-CD | 48 | 47 | 24 | 98% | 50% | Quarantine | 3/26/2020 12:42 | 4/24/2020 |
| 11 | Division 11 | DIV11-CF | 48 | 48 | 24 | 100% | 50% | Quarantine | 3/26/2020 12:13 | 4/30/2020 |
| 11 | Division 11 | DIV11-CG | 48 | 48 | 24 | 100% | 50% | Quarantine | 4/9/2020 7:26 | 4/30/2020 |
| 11 | Division 11 | DIV11-CJ | 48 | 48 | 30 | 100% | 63% | Quarantine | 3/31/2020 7:21 | 4/29/2020 |

| Division | Facility | Tier | Capacity | Occupancy as of 3/15/2020 | Occupancy as of 4/17/2020 | Percent Occupied as of 3/15/2020 | Percent Occupied as of 7/17/2020 | Tier Type | First Quarantine | Projected End Date |
|---|---|---|---|---|---|---|---|---|---|---|
| 11 | Division 11 | DIV11-DA | 48 | 47 | 24 | 98% | 50% | Quarantine | 3/31/2020 18:07 | 4/27/2020 |
| 11 | Division 11 | DIV11-DB | 48 | 47 | 24 | 98% | 50% | Quarantine | 4/7/2020 14:57 | 5/1/2020 |
| 11 | Division 11 | DIV11-DC | 48 | 47 | 24 | 98% | 50% | Quarantine | 4/9/2020 9:30 | 5/1/2020 |
| 11 | Division 11 | DIV11-DD | 48 | 47 | 23 | 98% | 48% | Quarantine | 3/29/2020 9:02 | 5/1/2020 |
| 11 | Division 11 | DIV11-DF | 48 | 45 | 24 | 94% | 50% | Quarantine | 4/10/2020 0:59 | 4/27/2020 |
| 11 | Division 11 | DIV11-DG | 48 | 46 | 24 | 96% | 50% | Quarantine | 4/9/2020 9:30 | 4/30/2020 |
| 11 | Division 11 | DIV11-DH | 48 | 47 | 24 | 98% | 50% | Quarantine | 4/13/2020 6:43 | 4/27/2020 |
| 11 | Division 11 | DIV11-DJ | 48 | 46 | 24 | 96% | 50% | Quarantine | 4/13/2020 6:36 | 4/29/2020 |
| 2 | Division 2 Dorm 2 | DIV2-D2-N | 48 | 0 | 23 | closed | 48% | Quarantine | 4/4/2020 21:29 | 4/30/2020 |
| 2 | Division 2 Dorm 2 | DIV2-D2-R | 48 | 0 | 24 | closed | 50% | Quarantine | 4/3/2020 6:51 | 4/30/2020 |
| 2 | Division 2 Dorm 2 | DIV2-D2-U | 44 | 0 | 19 | closed | 43% | Quarantine | 4/8/2020 10:30 | 4/30/2020 |
| 2 | Division 2 Dorm 2 | DIV2-D2-W | 44 | 0 | 25 | closed | 57% | Quarantine | 4/15/2020 17:53 | 5/1/2020 |
| 2 | Division 2 Dorm 3 | DIV2-D3-DD | 48 | 0 | 22 | closed | 46% | Quarantine | 4/15/2020 19:29 | 4/30/2020 |
| 2 | Division 2 Dorm 3 | DIV2-D3-JJ | 48 | 0 | 19 | closed | 40% | Quarantine | 4/4/2020 17:59 | 4/25/2020 |
| 4 | Division 4 | DIV4-I2 | 48 | 0 | 16 | closed | 33% | Quarantine | 4/16/2020 15:59 | 4/30/2020 |
| 4 | Division 4 | DIV4-J2 | 48 | 0 | 9 | closed | 19% | Quarantine | 4/15/2020 12:29 | 5/1/2020 |
| 4 | Division 4 | DIV4-K2 | 40 | 0 | 15 | closed | 38% | Quarantine | 4/9/2020 20:59 | 4/23/2020 |
| 4 | Division 4 | DIV4-M2 | 40 | 0 | 14 | closed | 35% | Quarantine | 4/15/2020 17:11 | 4/29/2020 |
| 4 | Division 4 | DIV4-N1 | 40 | 0 | 16 | closed | 40% | Quarantine | 4/9/2020 11:59 | 4/23/2020 |
| 5 | Division 5 | DIV5-1C | 40 | 3 | 18 | 8% | 45% | Quarantine | 4/2/2020 12:00 | 4/30/2020 |
| 5 | Division 5 | DIV5-1D | 40 | 0 | 17 | closed | 43% | Quarantine | 4/15/2020 19:59 | 4/30/2020 |
| 5 | Division 5 | DIV5-1F | 44 | 0 | 17 | closed | 39% | Quarantine | 4/6/2020 12:00 | 4/30/2020 |
| 5 | Division 5 | DIV5-1M | 44 | 0 | 20 | closed | 45% | Quarantine | 4/6/2020 1:00 | 4/30/2020 |
| 5 | Division 5 | DIV5-2D | 40 | 25 | 9 | 63% | 23% | Quarantine | 4/4/2020 13:31 | 4/28/2020 |
| 5 | Division 5 | DIV5-2E | 40 | 19 | 14 | 48% | 35% | Quarantine | 4/3/2020 20:30 | 4/25/2020 |
| 5 | Division 5 | DIV5-2L | 40 | 36 | 16 | 90% | 40% | Quarantine | 4/9/2020 8:03 | 4/26/2020 |
| 6 | Division 6 | DIV6-1K | 40 | 34 | 20 | 85% | 50% | Quarantine | 3/26/2020 23:59 | 4/30/2020 |
| 6 | Division 6 | DIV6-2A | 40 | 40 | 20 | 100% | 50% | Quarantine | 3/31/2020 14:01 | 4/30/2020 |
| 9 | Division 9 | DIV9-1C | 44 | 41 | 23 | 93% | 52% | Quarantine | 4/9/2020 7:17 | 4/26/2020 |
| 9 | Division 9 | DIV9-1H | 44 | 38 | 20 | 86% | 45% | Quarantine | 4/15/2020 7:15 | 4/29/2020 |
| 9 | Division 9 | DIV9-2C | 44 | 44 | 24 | 100% | 55% | Quarantine | 4/9/2020 16:23 | 4/23/2020 |
| 9 | Division 9 | DIV9-2H | 44 | 37 | 12 | 84% | 27% | Quarantine | 4/3/2020 11:29 | 4/21/2020 |
| 9 | Division 9 | DIV9-3D | 44 | 41 | 29 | 93% | 66% | Quarantine | 3/29/2020 8:45 | 4/30/2020 |
| 9 | Division 9 | DIV9-3F | 44 | 0 | 22 | closed | 50% | Quarantine | 4/15/2020 22:30 | 4/30/2020 |
| Hospital | Hospital | Hospital | n/a | 13 | 27 | n/a | n/a | | | |
| Outside Counties | Outside Counties | Outside Counties | n/a | 8 | 8 | n/a | n/a | | | |

# Miller Declaration Exhibit 3

| Division | Facility | Tier | Capacity | Occupancy as if 3/15/2020 | Occupancy as of 4/17/2020 | Percent Occupied as of 3/15/2020 | Percent Occupied as of 4/17/2020 | Tier Type | First Quarantine | Projected End Date |
|---|---|---|---|---|---|---|---|---|---|---|
| 8 | Division 8 Cermak | DIV8-2E | n/a | 14 | 13 | n/a | n/a | | | |
| 8 | Division 8 Cermak | DIV8-2N | 24 | 27 | 4 | 113% | 17% | | | |
| 8 | Division 8 Cermak | DIV8-2S | 26 | 29 | 23 | 112% | 88% | | | |
| 8 | Division 8 Cermak | DIV8-2W | 20 | 12 | 11 | 60% | 55% | | | |
| 8 | Division 8 Cermak | DIV8-3E | 12 | 6 | 3 | 50% | 25% | Isolation | | 4/24/2020 |
| 8 | Division 8 Cermak | DIV8-3N | 20 | 14 | 14 | 70% | 70% | | | |
| 8 | Division 8 Cermak | DIV8-3S | 14 | 12 | 4 | 86% | 29% | Isolation | 3/28/2020 3:00 | 4/30/2020 |
| 8 | Division 8 Cermak | DIV8-3W | 20 | 14 | 11 | 70% | 55% | Isolation | 3/30/2020 19:00 | 4/30/2020 |
| 8 RTU | Division 08 RTU | DIV08-2A | 20 | 10 | 8 | 50% | 40% | | | |
| 8 RTU | Division 08 RTU | DIV08-2B | 39 | 21 | 12 | 54% | 31% | Quarantine | 4/16/2020 19:00 | 4/30/2020 |
| 8 RTU | Division 08 RTU | DIV08-2E | 20 | 18 | 10 | 90% | 50% | Isolation | 3/25/2020 19:59 | 5/1/2020 |
| 8 RTU | Division 08 RTU | DIV08-2F | 39 | 32 | 38 | 82% | 97% | | | |
| 8 RTU | Division 08 RTU | DIV08-2G | 39 | 28 | 39 | 72% | 100% | | | |
| 8 RTU | Division 08 RTU | DIV08-3A | 20 | 18 | 7 | 90% | 35% | Isolation | 3/26/2020 18:29 | 4/30/2020 |
| 8 RTU | Division 08 RTU | DIV08-3B | 39 | 39 | 22 | 100% | 56% | Quarantine | 4/7/2020 12:30 | 4/23/2020 |
| 8 RTU | Division 08 RTU | DIV08-3C | 39 | 38 | 38 | 97% | 97% | Isolation | 3/25/2020 15:41 | 4/30/2020 |
| 8 RTU | Division 08 RTU | DIV08-3D | 39 | 39 | 39 | 100% | 100% | Isolation | 3/25/2020 21:00 | 4/30/2020 |
| 8 RTU | Division 08 RTU | DIV08-3E | 20 | 16 | 6 | 80% | 30% | Isolation | 3/25/2020 23:59 | 5/1/2020 |
| 8 RTU | Division 08 RTU | DIV08-3F | 39 | 39 | 28 | 100% | 72% | Quarantine | 3/31/2020 17:59 | 4/25/2020 |
| 8 RTU | Division 08 RTU | DIV08-3G | 39 | 38 | 24 | 97% | 62% | Quarantine | 3/31/2020 12:59 | 4/30/2020 |
| 8 RTU | Division 08 RTU | DIV08-3H | 39 | 39 | 35 | 100% | 90% | Quarantine | 3/31/2020 9:41 | 5/1/2020 |
| 8 RTU | Division 08 RTU | DIV08-4A | 20 | 16 | 14 | 80% | 70% | | | |
| 8 RTU | Division 08 RTU | DIV08-4B | 39 | 11 | 20 | 28% | 51% | Quarantine | 4/2/2020 20:00 | 4/29/2020 |
| 8 RTU | Division 08 RTU | DIV08-4C | 39 | 39 | 37 | 100% | 95% | | | |
| 8 RTU | Division 08 RTU | DIV08-4D | 39 | 38 | 20 | 97% | 51% | | | |
| 8 RTU | Division 08 RTU | DIV08-4E | 20 | 12 | 5 | 60% | 25% | Isolation | 3/26/2020 11:30 | 4/30/2020 |
| 8 RTU | Division 08 RTU | DIV08-4F | 39 | 38 | 31 | 97% | 79% | Quarantine | 4/1/2020 20:01 | 5/1/2020 |
| 8 RTU | Division 08 RTU | DIV08-4G | 39 | 38 | 27 | 97% | 69% | Quarantine | 4/8/2020 11:29 | 4/30/2020 |
| 8 RTU | Division 08 RTU | DIV08-4H | 39 | 39 | 28 | 100% | 72% | Quarantine | 3/31/2020 12:27 | 5/1/2020 |
| 8 RTU | Division 08 RTU | DIV08-5A | 20 | 12 | 7 | 60% | 35% | | | |
| 8 RTU | Division 08 RTU | DIV08-5B | 39 | 36 | 25 | 92% | 64% | | | |
| 8 RTU | Division 08 RTU | DIV08-5C | 39 | 10 | 17 | 26% | 44% | Isolation | 4/4/2020 13:00 | 4/30/2020 |
| 8 RTU | Division 08 RTU | DIV08-5D | 39 | 28 | 11 | 72% | 28% | | | |
| 8 RTU | Division 08 RTU | DIV08-5E | 20 | 9 | 2 | 45% | 10% | Isolation | 3/30/2020 20:30 | 4/30/2020 |
| 8 RTU | Division 08 RTU | DIV08-5F | 39 | 38 | 22 | 97% | 56% | Quarantine | 4/9/2020 0:59 | 4/30/2020 |
| 8 RTU | Division 08 RTU | DIV08-5G | 39 | 23 | 9 | 59% | 23% | | | |
| 8 RTU | Division 08 RTU | DIV08-5H | 39 | 36 | 29 | 92% | 74% | Quarantine | 4/3/2020 20:30 | 4/27/2020 |
| Boot Camp | Boot Camp | Boot Camp | 500 | 0 | 172 | closed | 34% | Isolation | 3/30/2020 20:30 | 5/1/2020 |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

ANTHONY MAYS, Individually and on )
behalf of a class of similarly situated persons; )
and JUDIA JACKSON, as next friend of )
KENNETH FOSTER, Individually and on )
behalf of a class of similarly situated persons )
                                         )           Case No. 20-cv-2134
              Plaintiffs-Petitioners, )
                                          )
v.                                                )
                                          )
THOMAS DART, Sheriff of Cook County, )
                                          )
             Defendant-Respondent )

## DECLARATION OF ROLAND LANKAH, REHS/RS, MPH, PhD (abd)

I, Roland Lankah pursuant to 28 U.S.C. § 1746, declare as follows:

1. I have been employed by the Cook County Sheriff's Office ("CCSO") in the Department of Support Services since March, 2016 through the present, as an Environmental Health Specialist. I have Bachelor of Arts in Biological Science from Southern Illinois University-Carbondale and a Master's degree in Public Health from Walden University. I am a Registered Environmental Health Specialist through the National Environmental Health Association and am currently completing a dissertation for a Doctor of Philosophy Degree with emphasis in epidemiology at the Walden University. Prior to being employed at the CCSO, I held the position of an Environmental Health Sanitarian at the DuPage County Health Department in Wheaton, Illinois from approximately November, 2010 through March, 2016. While in this capacity, I performed routine compliance inspections of facilities, was responsible for the creation and maintenance of quality control procedures to ensure compliance with applicable laboratory regulation authorities including the Illinois Environmental Protection Agency, the Illinois Department of Public Health ("IDPH") and the U.S. Environmental Protection Agency. I also managed biohazard waste storage for the agency. I am currently a member of the National Environment Health Association and the Illinois Environmental Health Association.

2. The facts set forth in this declaration are drawn from information I have received in my position with the CCSO. It does not contain all of the facts that I know about the matters discussed below.

3. In my capacity as an Environmental Health Specialist for the CCSO, I oversee and coordinate the Cook County Department of Corrections ("CCDOC") Environmental Health and Safety Programs, which range from compliance with applicable Federal and State of Illinois regulations for jails, including sanitation, pest control, recreation, ventilation, water, wastewater, plumbing, solid/liquid waste, biomedical and hazardous waste and facility maintenance. In addition, I participate in

routine inspections an assessments for general environmental health and safety hazards. I evaluate, modify as necessary and oversee policies and procedures related to environmental health and safety. I also conduct epidemiological investigations in conjunction with Cermak Health and Hospital Systems ("Cermak") representatives and provide recommendations to the Executive Director and Department Superintendents about steps to minimize the spreads of infectious diseases.

4. The CCDOC has sanitation policies and procedures that require action by members of the Department. As a manager in the Sanitation Department, part of my duties includes overseeing the enforcement of these policies across each Division of the CCDOC. Each Division is required to adhere to department-specific sanitation plans which include but are not limited to housing, divisional food distributions, laundry, cleaning and disinfection of common areas in the division and inmate living units. Policies mandate the maintenance of records.

5. Each Division is assigned adequate cleaning supplies and has assigned Divisional Sanitation Officers ("Sanitation Officers") on every shift. The Sanitation Officers are trained in sanitation procedures including but not limited to the preparation of chemical materials, safety, food safety, and sanitation, and they oversee detainee work crews in their assigned Divisions. Sanitation Officers direct the detainee work crews and at no time, are the detainees involved in the mixing of chemicals as this could present a safety hazard due to the concentrate nature of the chemical, along with security concerns. They are also responsible for completing sanitation logs.

6. The Central Chemical Office is located in Division V and it houses larger quantities of chemicals and other materials for the entire CCDOC. Sanitation Officers are required to make notification when their Division is in need of chemical supplies. They will receive additional sanitation materials on an ongoing basis from the CCSO Warehouse upon submission of requests.

7. In my capacity as an Environmental Health Specialist for the CCSO, I have been involved in the proactive measures taken by the CCSO to combat the COVID-19 pandemic and continue to lend my assistance with ongoing efforts to date.

8. On or around January 24, 2020, the Cook County Health Infection Control Department was providing Cermak with clinical guidance that was being related to me, in the unlikely event that the CCDOC was to have a suspected COVID-19 patient enter the compound. Accordingly, I began conducting research and prepared correspondence to CCDOC Department Heads about the expected urgency that we will need to take in the event of a positive COVID-19 case, where confirmed by Cermak. Notably, on or around January 24, 2020, I notified the CCDOC Superintendents that the CCDOC Sanitation Department would need an urgent response to proceed with disinfection in the affected area, should a patient with Coronavirus enter the facility, noting that specific areas such as intake, receiving and urgent care facilities in Cermak would likely be the first points of contact to enter the compound. At that time, I also reminded them that bleach is available in the Central Chemical Office in Division V and that they should ascertain that their divisions had the proper PPE and chemicals available.

9. On or around January 24, 2020 and following correspondence from Cermak about preventative steps regarding COVID-19, I began researching preventative measures about COVID-19, alcohol-based solutions and formulas that could be utilized at the CCDOC and communicated these recommendations with Department Heads. I also shared this research with Dr. Zawitz of Cermak. Around that time, I also contacted the CCSO Business Agent and submitted a request about current inventory and to request additional chemical supplies. Efforts continued to be made by my Department to acquire more chemicals for cleaning throughout the month of February. (On

February 21, 2020, the sanitation department received the chemicals that had been requested earlier in the month.)

10. In addition, the Sanitation Department began introducing mechanisms for enhanced sanitation which were shared with each of the Superintendents to ensure that each Division of the CCDOC began taking steps to prepare for the possible introduction of COVID-19 into the facility from a potential carrier. On March 23, 2020, I participated in a web seminar hosted by the American Correctional Association ("ACA") about COVID-19 Corrections Update. This information was shared with members of the CCDOC, along with other recommendations following the January 24, 2020 notification.

11. On March 4, 2020, all Superintendents and some members from Cermak were reminded that they should be following the Enhanced Sanitation Protocol and that the provision of the 55 gallon drums of bleach and Sanifect had been dispatched to all divisions for their utilization. In addition, directives were provided for Divisional Sanitation Officers to contact the Sanitation Department if their Division had not yet received the drums of liquid bleach and Sanifect.

12. As a preventative measure, the CCDOC enforced a Preventative Daily Cleaning and Disinfection procedure (*hereinafter* "the Enhanced Sanitation Process") which increased sanitation procedures across the entire CCDOC. Notable procedures include but are not limited to:

   a. **Cleaning and Disinfecting Shared Items and Workspaces**: any shared workspace and related frequently touched surface were required to be cleaned and disinfected every four (4) hours and at the end of each shift. This includes tabletops, doorknobs, bathroom fixtures, toilets, phones, keyboards, chairs, elevator buttons, keys etc. The directive also mandated the use of cleaning agents with a cannister sprayer or spray bottle with bleach solutions to be sprayed on all restraints and handcuffs between uses. All CCDOC chemicals, cleaning agents and disinfectant were ordered to be acquired from the Central Chemical Office in Division V.

   b. **Cleaning and Disinfecting non-quarantine and non-isolation tiers and dorms**: Tier officers are mandated to require tier workers to clean areas with (1) a cleaning agent (e.g. Sanifect); followed by (2) the disinfection of the area with a bleach solution administered through a spray bottle. The bleach must then be left to air dry (do not wipe dry). Divisional Sanitation Officers must ensure that each tier and dorm have the required sanitation supply in the Tier Sanitation Kit. Bleach disinfectant should be replenished after every eight (8) hours. All cleaning activities (by the Sanitation officers, inmates and tier workers) should be documented in the Divisional Sanitation logbook, and Tier logbook. Stainless steel tables and chairs in day rooms must be cleaned and disinfected before and after each meal. All touch surfaces including the frequently touched areas (mentioned in the section above) must be cleaned, followed by disinfection once per shift. Inmates must be required by the Tier Officer to clean and disinfect their cells at a minimum, daily. If an inmate is unable to complete the task, the Tier Officers and his/her crew are responsible for ensuring that the cell is cleaned and disinfected once per day.

   c. **Cleaning and Disinfecting Quarantine and Isolation Tiers and Dorms:** Any areas with a confirmed case requires the usage of appropriate Personal Protective Equipment (PPE), including surgical masks, gowns and gloves, for cleaning and disinfecting any cell, dayroom and any area with a conformed case. Divisional Sanitation Officers and his/her crew are responsible for carrying out the cleaning and disinfection in isolation and quarantine tiers. Cleaning involves (1) with a cleaning agent such as Sanifest; and (2) followed by disinfecting the area with the bleach solution using the canister sprayer or spray bottle and allow the area to air dry (do not wipe dry). Stainless steel tables and chairs

in day rooms need to be cleaned and disinfected before and after each meal. Clean and disinfect all touch surfaces including, but not limited to, doorknobs, light switches, bathroom fixtures, toilets, sinks, rails, floors, desks, and chairs (*see* list above) every 4 hours and at the end of each shift. Place all used disposable gloves, facemasks, and other contaminated items in a clear, non-perforated bag before disposing of them in the Divisional dumpsters. After you remove your gloves, wash your hands with soap and water, or you may clean your hands with an alcohol-based hand sanitizer immediately after handling these items. Handwashing with soap and water is preferred if hands are visibly dirty. For training on proper PPE removal, the name and contact information of myself and another member of my Department are listed on the notice.

d. **Collecting and Returning Food Trays and Carts from Intake, Quarantine, and Isolation Tiers or Dorms:** Appropriate Personal Protective Equipment (PPE), including surgical masks, gowns, and gloves, is required for food services (both food distribution and clean-up) on quarantine and isolation tiers and dorms. The Divisional Food Officers and his/her crew are responsible for food distribution and clean up in isolation and quarantine tiers. When cleaning up, (1) empty leftover food off the trays in lined garbage can and spray the trays in the tiers or dorms with a bleach solution (do not wipe dry); (2) Collect all tray waste from the tier or dorms and dispose of the bags in the dumpster immediately; (3) Spray interior and exterior of insolated carts with a bleach solution (do not wipe dry); (4) all tasks should be completed prior to returning carts and trays to the Central kitchen; (5) Food Officers and Food workers must wash hands with soap and water for at least 20 seconds, before putting on gloves for meal service and clean-up, and between tasks.

e. **Laundry (collecting and handling potentially contaminated clothing items) from Quarantine and Isolation Tiers:** Appropriate Personal Protective Equipment (PPE), including surgical masks, gowns, and gloves, is required for the collection and handling of contaminated clothing items in cell, dayroom, laundry, and areas with a confirmed case. The Division V Laundry Officer and his/her crew are responsible for collecting and laundering potentially contaminated clothing items from isolation and quarantine tiers. All potentially contaminated items, including bed linens, towels uniforms, and personal clothing, needs to be collected in clear, non-perforated bags. Each bag must be labeled, such as "maybe contaminated," and transported immediately to Central Laundry. In the Laundry room, wear disposable gloves, surgical masks, and gowns while handling potentially contaminated items and keep items away from your body, and separately from cleaned clothes. In general, using the laundry detergent provided according to washing machine instructions and dry thoroughly using the hottest dryer temperatures recommended (170 degrees F. or above). Stainless steel tables and other hard surface equipment used for this process in laundry rooms must be cleaned and disinfected between batches and at the end of the shift. Place all used disposable gloves, facemasks, and other contaminated items in a clear, non-perforated bag and dispose of the bags in the Divisional dumpsters. Wash your hands with soap and water, or you may clean your hands with an alcohol-based hand sanitizer immediately after handling these items. Handwashing with soap and water for at least 20 seconds is preferred if hands are visibly dirty.

f. **CBM (*Regarding the Central Kitchen; CBM is the current vendor*):** Please follow the above protocol for daily cleaning and disinfection; however, any laundry should be handled and washed in Central Kitchen. Follow the above protocol for handing contaminated clothing items. Temperature gauge for dish machine in Central Kitchen should be routinely monitored every thirty (30) minutes to ensure rinse temperature is at 180 degrees F or above and documented. In the event that the rinse temperature on the dish machine falls below 180 degrees F, the following steps are required: Immediately turn off the dish machine and call Ex. 5988 to report the problem; remove all trays and utensils, including trays and utensils, washed immediately before temperature fell below 180 degrees F; Rewash all

trays and utensils in the second dish machine, ensuring that the rinse temperature on the second dish machine is at 180 degrees F or above; If the temperatures on both machines cannot reach 180 degrees F, trays, and utensils must be washed utilizing the machines; however, use the three-compartment sinks to rinse and sanitize; follow the manufacture recommendations for the sanitizer "test kit" and check the sanitizer concentration every 15 minutes to ensure it meets the required concentration level; Allow the trays and utensils to air dry (do not wipe); if both machines are non-functional, Styrofoam trays must be used for food distributions. Implement a screening protocol, including temperature checks with a cut off at 100.4 degrees F for CBM staff and DOC inmate workers in the kitchen. As part of the Preventative Daily Cleaning and Disinfectant Guideline, CBM employees should be disinfecting their personal or commonly shared workspace and related areas touch surfaces with disinfectant at least every four hours or between tasks, and at the end of each shift.

13. The Enhanced Sanitation Process evolved from existing CCDOC Sanitation policies and procedures and ongoing recommendations to Superintendents from the Sanitation Department on or around January 24, 2020 and over the following months through April 01, 2020. In addition, recommendations included information obtained through research, reliance on the Centers for Disease Control and Prevention ("CDC") disinfecting guidelines and the IDPH Interim Guidance for Congregate Living Facilities to reduce the transmission of SARS-CoV-2 (3/31/2020). The directives provided in Paragraph twelve (12) were issued in consultation with CCSO Senior Advisor, Rebecca Levin and the former Department of Justice court appointed monitor for Sanitation, Harry Grenawitzke.

14. The CCDOC provided each Divisional Superintendent, and Sanitation Officers with step-by-step recommendations and documentation about the Safety Data Sheet ("SDS") which contained information about safe product usage and the specific procedures regarding the recommended dilution process. The bleach dilution calculator spreadsheet was created by the Public Health Department of Seattle and King County for easy and accurate bleach dilution process and I utilized this to provide a proper dilution ratio to Central Chemical and Divisional Sanitation Officers based on public health recommendations. In addition, on February 24, 2020, each Divisional Superintendent received a notification to have each Divisional Sanitation Officer collect one (1) 55 gallon drum of Sanifect and one (1) 55 gallon drum of bleach solution for their respective Divisions. Divisional Sanitation Officers were invited to contact me to discuss an overview of the mixing procedure.

15. The CCDOC also issued preventative measures to all CCDOC Superintendents about Vehicle Cleaning/Disinfection Procedures on or around April 01, 2020, which articulated recommendations that were evolving from the prior weeks. Specifically, each Division/Unit was required to maintain and adhere to strict vehicle interior "touch surfaces" cleaning/disinfecting procedures as described below. Touch surfaces include, but are not limited to, the steering wheel, dashboard, door handles, internal side windows, seats (sides, back, and front), seat belts (both sides), seat belt harness, and floor. The procedure shall be completed prior to utilizing vehicles for the transport of inmates off the compound, and for Electronic Monitoring (EM): (1) Prior to the transporting of inmate(s), the Transportation Officer shall ensure that "touch surfaces" in the transporting vehicle are in a condition which is cleanable and durable. (2) The Transportation Officer shall inspect the seats and interior of the vehicle for damage, excessive wear, rips, and tears that could effectively render it un-cleanable. Any severely damaged surfaces shall be removed from service and repaired or replaced such that they are easily cleanable. (3) The Transporting Officer shall be responsible for ensuring that the interior touch surfaces are adequately cleaned and disinfected using *only* the authorized pre-measured diluted chemicals as provided in the Transport Vehicle Sanitation Kit*. (4) The Transportation Officer shall follow the procedure that is included in the Transport Vehicle

Sanitation Kit and as indicated below: (a) PPE including (gloves and masks), should be utilized when *necessary*; (b) First, use the Approved CCDOC *Cleaner* (Sanifect plus) in its diluted ratio as provided to clean all touch surfaces and wipe them dry. (c) Second, use the Approved CCDOC *Disinfectant* (bleach) in its diluted ratio as provided to disinfect all touch surfaces and allow to air dry. *NOTE: Each Transport Vehicle Sanitation Kit consists of one 24 oz spray bottle of cleaner (Sanifect plus solution), one 24 oz spray bottle of disinfectant (bleach solution), and 4 cloth rags. Chemicals and rags can be replenished at the Div. 5 Central Chemical. PPE must be acquired from the Divisional/Unit Superintendents.

16. The directives provided in Paragraph fifteen (15) were issued in consultation with CCSO Senior Advisor, Rebecca Levin and the former Department of Justice court appointed monitor for Sanitation, Harry Grenawitzke.

17. The CCDOC also issued guidance to all Superintendents specific to the prevention of Chemical Toxicity on April 06, 2020. This guidance was intended to provide awareness to CCDOC employees to continue to maintain a safe and healthful workplace, by following the Enhanced Sanitation Process. The directive was shared with all Superintendents to be distributed to ensure that employees cooperate with the recommended sanitation guidelines and adhere to the Preventative Daily Cleaning and Disinfecting Protocol to ensure that the CCDOC sanitation standards were being implemented. Notably, the directive was clear that Department Sanitation protocols were required irrespective of whether staff brought their own personal cleaning products for their personal use. The guidance also reiterated that employees are permitted to bring in hand sanitizer and Clorox disinfecting wipes, but at all times, the protocol for cleaning and disinfecting the CCDOC must continue as directed. Reminders included the availability of cleaning agents and disinfectants which could be obtained through the Central Chemical Office in Division 5 and requested through the Divisional Sanitation Officers

18. The Directive listed in Paragraph seventeen (17) was issued after consultation with CCSO Senior Advisor, Rebecca Levin and the former Department of Justice Monitor for Sanitation, Harry Grenawitzke.

19. Divisional Sanitation Officers are required to ensure that the listed living units and all touch surfaces in cells and common areas of the living unit where detainees exhibiting symptoms are housed or were housed receive enhanced cleaning and disinfection with Sanifest solution and bleach solution until the dates indicated.

20. Notably, pre-mixed bleach solution (5000 ppm) must be collected from Central Chemical in Division 5. If Division does not already have Sanifest solution, they have been directed to acquire this chemical from Central Chemical in Division 5. Gowns, gloves and rags are available in Support Services. Guidelines provide to pre-wash or clean surfaces with Sanifest solution using a rag, then apply/spray the sanitizing solution of bleach on rag or use the canister. The solution must be allowed to contact the surface for at least 5 minutes for optimum effectiveness. Afterward, rinse and-or allow the area to air dry. The CCDOC will continue the Enhanced Sanitation Process until the date indicated by Cermak and Cook County Infection Control Department.

21. Detainees are not prohibited from cleaning their cells. (The Enhanced Sanitation Process also provides for scenarios where a detainee is not able to clean his/her cell.) Living Unit Sanitation Kits are provided to each living unit and the divisions are supplied with various spray bottles, mop heads, brooms, dust pans, squeegees, rags, toilet brushes, deck brushes, scrubbers etc.

22. In accordance with existing policies, the Environmental Services Coordinator and I would conduct regular walk throughs at specific Divisions each month, to review compliance with sanitation procedures, divisional practices and divisional logs. During walk-throughs, we would speak with the Divisional Sanitation Officers and their detainee work crews to provide any recommendations and/or insight about sanitation procedures. During the middle of March, these walk throughs were limited due to organizational limits on movement across the Divisions. However, the Sanitation Office continues to assist each Department and ensures that supplies are made available to the Divisions and Central Snatiation Office.

23. All non-quarantine and non-isolation tiers continue to be subject to the cleaning requirements set forth in the sanitation policies and procedures. However, the Enhanced Sanitation Plan expands to the entire compound and increases the frequency and nature of cleaning. Power washing was being conducted in three CCDOC divisions (due to their concrete-structure in applicable common showers/ceilings) up to mid-March where applicable, but the Sanitation Department recommended that power washing halt during March, due to precautions to limit any risk of aerosol spread. Despite the lack of power washing, all Divisions are mandated to ensure sanitation procedures are followed and applicable logs completed, as set forth in the Enhanced Sanitation Process and existing policies and procedures.

24. Collaboration on sanitary procedures also occurred on an ongoing basis with Cermak Dr. Chad Zawitz. I received daily updates from Dr. Zawitz about the COVID-19 pandemic and matters that would affect the CCDOC. On March 18, 2020, the CCDOC was notified by Dr. Zawitz that multiple cases of Influenza Like Illness ("ILI") and Acute Gastroenteritis ("AGE") were identified and isolated from across the compound. Enhanced sanitation and Limited Movement Status were advised by Cermak for affected housing units. That day, Dr. Zawitz also reached out and we exchanged correspondence about disinfection pertaining to handcuffs and restraints. The CCDOC provided a reminder to all Superintendents to continue to use daily disinfection of handcuffs/restraints between uses, using spray bottles or cannisters with Clorox disinfectant. It was and is not uncommon for Dr. Zawitz to contact me about sanitation procedures.

25. I provided feedback about the script and best practices for a video that the CCDOC, to my understanding, would stream on the tiers. In consultation with Ms. Levin and the former sanitation DOJ monitor, recommendations were provided about sanitation and it is my belief that the recommendations will be incorporated into the video.

26. Efforts were made by my Department on an ongoing basis, as early as February, 2020, to obtain additional cleaning supplies as a preventative measure to ensure a safe and secure environment for the staff and detainees at the CCDOC.

27. On or around March 16, 2020, CBM and I communicated about the employee cafeteria and as a result, the vendor provided the CCDOC with an order ahead/to go menu for all employees to minimize aggregations and maintain social distancing in the Division V cafeteria. This process is currently in effect. Specifically, meal orders would be promptly prepared for pick up. In an effort to avoid agglomeration, the vendor would inform the customer of the approximate time when the order would be ready for pick up. This was part of the CCDOC's larger efforts to ensure that the vendor provided continuity of service in a manner that would limit the spread of the virus.

28. The Sanitation Department continues to evaluate existing policies and procedures so as to ensure that the CCDOC's policies evolve as research on COVID-19 and guidelines evolve.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on April 06, 2020

Roland  Lankah, REHS/RS, MPH, PhD (abd)
Registered Environmental Health Specialist
Cook County Sheriff's Office

**ROLAND'S DECLARATION – SUPPORTING DOCUMENTATION**

**APPENDIX**

1. Resume of Roland Lankah, REHS/RS, MPH, PHD (abd).
2. CCDOC Sanitation Policies (Group Exhibit).
3. Sanitation Supply Information 2019.
4. 1.24.20 Email – Cermak – Coronavirus.
5. 1.24.20 Email – Bleach – Business Agent.
6. 1.28.20 Research NCBI Article – COVID-19.
7. 1.28.20 Research email between CCDOC and Cermak.
8. 1.29.20 Research between sanitation officer and Executive Director.
9. IDPH COVID-19 Congregate Settings.
10. 3.4.20 Cermak-CCDOC Correspondence RE: ILI/AGE and Department Email.
11. 3.6.20 Liquid Bleach Instruction to Superintendents.
12. 3.16.20 CBM Order to Go Dinning Area Email.
13. 3.17.20 CBM Order Ahead/To Go Menu.
14. 3.23.20 Preventive Daily Cleaning and Disinfection.
15. 3.24.20 Talking Points for CCDOC Video.
16. Preventive Daily Cleaning and Disinfection.
17. 4.1.20 Internal CCDOC Correspondence regarding the ACA COVID-19 Training and Recommendations.
18. 4.1.2020 Memo Preventive Daily Cleaning and Disinfection.
19. 4.1.2020 Memo Vehicle Cleaning and Disinfection.
20. 4.6.20 Email and Memorandum: Preventing Chemical Toxicity.
21. Mitigation Plan - Preparedness Enhanced Sanitation AGE 9-3-19 Document.
22. Bleach Dilution Calculator Excel File.
23. 3.23.20 ACA Online Webinar.
24. CDC Guidelines – Disinfecting and Cleaning.
25. Examples of Division Walk Through Logs (3.4.20 Division V Walk Through).
26. Sanitation Logbook Example (3.24.20).

Application of:  Roland Lankah, Lankah.roland@gmail.com

29W406 Thornwood ln
Warrenville IL, 60555

6303011650

**ROLAND EXH 1**

## Qualification Highlights

- Oversee Department Environmental Health and safety program
- Provide educational training for local government employees
- Knowledge of carrying out compliance inspections to determine deficiencies, reporting, and implementing corrective actions
- Working skill in operating applicable computer hardware, software, including SPSS, Microsoft Word, Excel, PowerPoint, etc.
- Development implementation of policies and procedures related to environmental health and safety

## MANAGEMENT POSITIONS

**Chief Environmental Health and Safety Specialist**        **March 2016 - Present**
**Cook County Sheriff's Department, Chicago, IL**

- Oversee/coordinate the Cook County Department of Corrections (CCDOC) Environmental Health and safety program and ensure the Department remains in compliance with regulatory authorities. Manage and coordinate the activities of all environmental services personnel and related contracts
- Planning, and executing institutional Environmental and safety Health Programs, assure conformance with applicable Federal and State of Illinois regulations for Jails, including sanitation, pest control, recreation, ventilation, water, wastewater, plumbing, solid/liquid waste, biomedical and hazardous waste, and facility maintenance, asbestos and lead abetment;
- Participate in routine inspections and assessment activities for general environmental health and Safety Hazard
- Reviews plans, blueprints, and specifications for construction of new facilities or renovation of existing structures to assure conformance with applicable corrections standards, laws, and regulations
- Participate in budgetary activities, including approval and dissemination of monetary compensations for contracts, and budget for environmental health and safety activities
- Play a leadership role in setting human resources levels and supplies for the environmental health department.
- General assessment of all radioactive equipment, including inspection, coordination of disposal and ensuring the department comply with the Illinois Emergency Management Agency.
- Develop and implement policies and procedures related to environmental health and safety program
- Evaluate, modify as necessary, and oversee all policies and procedures related to environmental health and safety.
- In conjunction with Cermak medical staff, conduct epidemiological investigations and provide recommendations to Executive Director about infectious diseases.
- Participation in contract development and solicitation process of demolitions and reconstruction projects

ROLAND EXH 1

- Oversee interagency agreements, and the Department of Justice consent decree order as it relates to environmental health and safety compliance.
- Provide advice and recommendations to the Department of Justice Monitor and the Cook County Department of Corrections Executive Director.

- Manage the operation of Environmental Health & Safety risk assessments and the development of risk mitigation plans, and facility maintenance, building inspections, renovations, and new facilities construction
- Serve as the primary liaison for the Department of Corrections and external agencies, including Department of justice, Illinois Department of Corrections, Illinois Department of Public Health, Occupational Safety and Health (OSHA), and The Cook County Department of Health
- Researcher/consultant/expert witness for the Cook County Sheriff Office and its attorneys relative to environmental health, safety, and infectious disease legal issues.
- Collaborate with executive leadership to ensure that the Department of Environmental Health and Safety policies and procedures are implemented accordingly.

  - Develop and facilitate training to employees on the following:

    1) Safety practices
    2) Sanitation
    3) Environmental compliance inspections
    4) Safe chemical storage and use.
    5) Fire safety
- Investigate and resolve complaints of violations of regulations and jail policies as they pertain to environmental health and safety
- Performs technical public health work, including education and enforcement of public health laws and regulations relating to environmental health and safety; institutional housing, and property maintenance.
- Participate in routine inspections and assessment activities for general environmental health and Safety Hazard.
- Prepare division related projects and other public health-related educational initiatives.

**Environmental Health Sanitarian          November 2010 - March 2016**
**Dupage County Health Department,  Wheaton, IL**

- Perform routine compliance inspections of facilities including but not limited to the following: retail, mobile, and non-profit food establishments, vendors; public and private schools; public, private and institutional child-care facilities
- Responsible for collecting, testing, and analyzing water systems; such as private sewage disposal systems private well, public swimming pools, and other environmental samples to determine chemical and bacteriological components
- Develops and maintains quality control procedures in compliance with applicable laboratory regulatory authorities such as the Illinois Environmental protection Agency, Illinois Department of Public Health and the US Environmental Protection Agency.
- Manages biohazard waste storage for the agency

3

**PROFESSSIONAL AFFILIATIONS/HONORS/AWARDS:**
- Member of the National Environment Health Association
- Member of Illinois Environmental Health Association

**EDUCATION AND SPECIALIZED TRAINING**
- Bachelor of Arts, Biological Science
- Master of Public Health
- Ph.D.(dissertation)
- Registered Environmental Health Specialist

4

**ROLAND EXH 1**

# Communicable Diseases

## 149.1   PURPOSE AND SCOPE
This policy provides general guidelines for Cook County Sheriff's Office members to assist in minimizing the risk of contracting and/or spreading communicable diseases.

### 149.1.1   DEFINITIONS
Definitions related to this policy include:

**Communicable disease** - A human disease caused by microorganisms that are present in and transmissible through human blood, bodily fluid, tissue, or by breathing or coughing. These diseases commonly include, but are not limited to, hepatitis B virus (HBV), HIV and tuberculosis.

**Exposure** - When an eye, mouth, mucous membrane or non-intact skin comes into contact with blood or other potentially infectious materials, or when these substances are injected or infused under the skin; when an individual is exposed to a person who has a disease that can be passed through the air by talking, sneezing or coughing (e.g., tuberculosis), or the individual is in an area that was occupied by such a person. Exposure only includes those instances that occur due to a member's position at the Sheriff's Office. (See the exposure control plan for further details to assist in identifying whether an exposure has occurred.)

## 149.2   POLICY
The Cook County Sheriff's Office is committed to providing a safe work environment for its members. Members should be aware that they are ultimately responsible for their own health and safety.

## 149.3   EXPOSURE CONTROL OFFICER
Each respective department head will assign a person as the Exposure Control Officer (ECO), who may belong to another department of the Sheriff's Office. The ECO shall develop an exposure control plan that includes:

(a)   Exposure prevention and decontamination procedures.

(b)   Procedures for when and how to obtain medical attention in the event of an exposure or suspected exposure.

(c)   The provision that department members will have no-cost access to the appropriate personal protective equipment (PPE) (e.g., gloves, face masks, eye protection, pocket masks) for each member's position and risk of exposure.

(d)   Evaluation of persons in custody for any exposure risk and measures to separate them.

(e)   Compliance with all relevant laws or regulations related to communicable diseases, including:

1.   Reporting known and suspected cases of reportable communicable diseases to the local health authority (77 Ill. Adm. Code 690.200).

Copyright Lexipol, LLC 2020/03/16, All Rights Reserved.
Published with permission by Cook County Department of
Corrections

**ROLAND GROUP EXH 2**

# Cook County Department of Corrections

Custody Manual

*Communicable Diseases*

---

2. Acting as, or appointing a person as the designated officer to receive reports from the local health authority. The designated officer will be trained to carry out the duties described in 77 Ill. Adm. Code 690.200 regarding the procedures for follow-up after occupational exposures to specific diseases.

3. The mandates of the Illinois Occupational Safety and Health Act (820 ILCS 219/1 et seq.).

4. Responding to requests and notifications regarding exposures covered under the Ryan White law (42 USC § 300ff-133; 42 USC § 300ff-136).

5. Responding to exposure notifications from hospitals to which members have transported a patient (210 ILCS 85/6.08).

6. Exposure control mandates in 29 CFR 1910.1030 (820 ILCS 219/25; 56 Ill. Adm. Code 350.700).

The ECO should also act as the liaison with the Illinois Department of Labor (IDOL) and may request voluntary compliance inspections. The ECO should periodically review and update the exposure control plan and review implementation of the plan.

## 149.4  EXPOSURE PREVENTION AND MITIGATION

### 149.4.1  GENERAL PRECAUTIONS

All members are expected to use good judgment and follow training and procedures related to mitigating the risks associated with communicable disease. This includes, but is not limited to (29 CFR 1910.1030; 820 ILCS 219/25):

(a) Stocking disposable gloves, antiseptic hand cleanser, CPR masks or other specialized equipment in the work area of Sheriff's Office vehicles, as applicable.

(b) Wearing Sheriff's Office-approved disposable gloves when contact with blood, other potentially infectious materials, mucous membranes and non-intact skin can be reasonably anticipated.

(c) Washing hands immediately or as soon as feasible after removal of gloves or other PPE.

(d) Treating all human blood and bodily fluids/tissue as if it is known to be infectious for a communicable disease.

(e) Using an appropriate barrier device when providing CPR.

(f) Using a face mask or shield if it is reasonable to anticipate an exposure to an airborne transmissible disease.

(g) Decontaminating non-disposable equipment (e.g., flashlight, control devices, clothing and portable radio) as soon as possible if the equipment is a potential source of exposure.

1. Clothing that has been contaminated by blood or other potentially infectious materials shall be removed immediately or as soon as feasible and stored/decontaminated appropriately.

---

Copyright Lexipol, LLC 2020/03/16, All Rights Reserved.
Published with permission by Cook County Department of
Corrections

**ROLAND GROUP EXH 2**

# Cook County Department of Corrections
Custody Manual

*Communicable Diseases*

(h) Handling all sharps and items that cut or puncture (e.g., needles, broken glass, razors, knives) cautiously and using puncture-resistant containers for their storage and/or transportation.

(i) Avoiding eating, drinking, smoking, applying cosmetics or lip balm, or handling contact lenses where there is a reasonable likelihood of exposure.

(j) Disposing of biohazardous waste appropriately or labeling biohazardous material properly when it is stored.

## 149.4.2  IMMUNIZATIONS
Members who could be exposed to HBV due to their positions may receive the HBV vaccine and any routine booster at no cost (29 CFR 1910.1030; 820 ILCS 219/25).

## 149.5  POST-EXPOSURE

### 149.5.1  INITIAL POST-EXPOSURE STEPS
Members who experience an exposure or suspected exposure shall:

(a) Begin decontamination procedures immediately (e.g., wash hands and any other skin with soap and water, flush mucous membranes with water).

(b) Obtain medical attention as appropriate.

(c) Notify a supervisor as soon as practical.

### 149.5.2  REPORTING REQUIREMENTS
The supervisor on-duty shall investigate every exposure or suspected exposure that occurs as soon as possible following the incident. The supervisor shall ensure the following information is documented (29 CFR 1910.1030; 820 ILCS 219/25):

(a) Name and Social Security number of the member exposed

(b) Date and time of incident

(c) Location of incident

(d) Potentially infectious materials involved and the source of exposure (e.g., identification of the person who may have been the source)

(e) Work being done during exposure

(f) How the incident occurred or was caused

(g) PPE in use at the time of the incident

(h) Actions taken post-event (e.g., clean-up, notifications)

The supervisor shall advise the member that disclosing the identity and/or infectious status of a source to the public or to anyone who is not involved in the follow-up process is prohibited. The supervisor should complete the incident documentation in conjunction with other reporting requirements that may apply (see the Duty Injury Policy and any other related policies/procedures for further guidelines).

Copyright Lexipol, LLC 2020/03/16, All Rights Reserved.
Published with permission by Cook County Department of
Corrections

**ROLAND GROUP EXH 2**

# Cook County Department of Corrections
Custody Manual

*Communicable Diseases*

### 149.5.3 MEDICAL CONSULTATION, EVALUATION AND TREATMENT

Members shall have the opportunity to have a confidential medical evaluation immediately after an exposure and follow-up evaluations as necessary.

The ECO should request a written opinion/evaluation from the treating medical professional that contains only the following information (29 CFR 1910.1030; 820 ILCS 219/25):

(a) Whether the member has been informed of the results of the evaluation.

(b) Whether the member has been notified of any medical conditions resulting from exposure to blood or other potentially infectious materials which require further evaluation or treatment.

No other information should be requested or accepted by the ECO.

### 149.5.4 COUNSELING

The Sheriff's Office shall provide the member, and his/her family if necessary, the opportunity for counseling and consultation regarding the exposure (29 CFR 1910.1030; 820 ILCS 219/25).

### 149.5.5 SOURCE TESTING

Testing a person for communicable diseases when that person was the source of an exposure should be done when it is desired by the exposed member or when it is otherwise appropriate. Source testing is the responsibility of the ECO. If the ECO is unavailable to seek timely testing of the source, it is the responsibility of the exposed member's supervisor to ensure testing is sought.

Source testing may be achieved by:

(a) Obtaining consent from the individual.

(b) Contacting the Department of Public Health or local health authority and providing information regarding the circumstances of the exposure to determine if the appropriate authority will request consent from the person to submit to testing (77 Ill. Adm. Code 690.1380).

(c) In cases of possible exposure to infectious diseases, including HIV,, by having a health care provider or health facility test the source of the exposure pursuant to 410 ILCS 305/7 and/or 410 ILCS 312/10.

Since there is the potential for overlap between the different manners in which source testing may occur, the ECO is responsible for coordinating the testing to prevent unnecessary or duplicate testing.

The ECO should seek the consent of the individual for testing and consult the Sheriff's Office General Counsel to discuss other options when no statute exists for compelling the source of an exposure to undergo testing if he/she refuses.

## 149.6 CONFIDENTIALITY OF REPORTS

Medical information shall remain in confidential files and shall not be disclosed to anyone without the member's written consent (except as required by law) (29 CFR 1910.1030; 820 ILCS 219/25).

Copyright Lexipol, LLC 2020/03/16, All Rights Reserved.
Published with permission by Cook County Department of
Corrections

**ROLAND GROUP EXH 2**

# Cook County Department of Corrections
Custody Manual

## Communicable Diseases

Test results from persons who may have been the source of an exposure are to be kept confidential as well.

### 149.7   TRAINING

All members shall participate in training regarding communicable diseases commensurate with the requirements of their position. The training (29 CFR 1910.1030; 820 ILCS 219/25):

(a)     Shall be provided at the time of initial assignment to tasks where an occupational exposure may take place and at least annually after the initial training.

(b)     Shall be provided whenever the member is assigned new tasks or procedures affecting his/ her potential exposure to communicable disease.

(c)     Should provide guidance on what constitutes an exposure, what steps can be taken to avoid an exposure and what steps should be taken if a suspected exposure occurs.

Copyright Lexipol, LLC 2020/03/16, All Rights Reserved.
Published with permission by Cook County Department of
Corrections

**ROLAND GROUP EXH 2**

# Cook County Department of Corrections
Custody Manual

# Emergency Staffing

## 602.1   PURPOSE AND SCOPE

The Cook County Department of Corrections must operate at all times as a safe and secure environment, regardless of staffing levels. Consequently, contingency plans must be made in advance for any staffing emergency or planned job action, regardless of the length of the staffing deficit.

The purpose of this policy is to establish roles and responsibilities for creating and implementing emergency staffing plans, providing appropriate emergency staffing training to supervisory and management personnel, and identifying an update schedule and distribution list for the plan, as identified by the Executive Director or the authorized designee.

## 602.2   POLICY

It is the policy of this department to be prepared to operate a safe and secure facility in the event of a staffing emergency. Staffing emergencies that could negatively affect the good order of the Department may include, but are not limited to, an outbreak of infectious disease, a natural disaster, call-ins by members or other disruption. The Executive Director or the authorized designee shall be responsible for ensuring that an appropriate emergency staffing plan exists.

### 602.2.1   EMERGENCY STAFFING

In the event the Superintendent or the authorized designee becomes aware that a staffing emergency exists or may occur, members who are present may be ordered to remain at their posts. The Superintendent or the authorized designee will notify the respective Assistant Executive Director. Plans should include measures to achieve minimum staffing for the Department within four hours of a staffing emergency and may include the following operational adjustments:

- The Department may go to a lockdown. The following activities may be limited or temporarily suspended only if necessary: recreation, visiting including attorney visits, sanitation rounds and court transportation. The following cannot be suspended: meals and medical services. Other activities will be assessed by the respective Assistant Executive Director on a case-by-case basis.

- Supervisory and management personnel may have time-off canceled or rescheduled for the duration of the staffing emergency.

- Members from other areas of the department who have custody experience may be used to fill vacancies in the Department.

- Assistance from allied agencies may be requested to help management and supervisors in safely staffing the Department.

- Contracting with surrounding facilities may be necessary if adequate staffing cannot be obtained to safely operate the Department.

- In the event of a health-related staffing emergency, the department Environmental Health Specialist and health care professionals shall be notified in accordance with the Communicable Diseases Policy.

Copyright Lexipol, LLC 2020/03/16, All Rights Reserved.
Published with permission by Cook County Department of Corrections

**ROLAND GROUP EXH 2**

# Cook County Department of Corrections
Custody Manual

---

*Emergency Staffing*

---

### 602.2.2   TRAINING
The Superintendent or the authorized designee should be responsible for:

(a)   Establishing a distribution list for the contingency plan.

(b)   Establishing a periodic review and update of the plan.

(c)   Ensuring that all supervisors and managers are periodically trained on the plan.

(d)   Ensuring that all supervisors and managers are provided a copy of the plan and/or a means to access it in the event of an emergency.

(e)   Documenting all training.

(f)   Maintaining training records for each supervisor and manager and ensuring that those personnel periodically receive appropriate update training on the plan.

---

Copyright Lexipol, LLC 2020/03/16, All Rights Reserved.
Published with permission by Cook County Department of Corrections

**ROLAND GROUP EXH 2**

| Policy<br>**1100** | **Cook County Department of Corrections**<br>Custody Manual |
|---|---|

# Food Services

## 1100.1  PURPOSE AND SCOPE

The Cook County Department of Corrections recognizes the importance of providing nutritious food to inmates to promote good health, to reduce tension in the Department and ultimately support the safety and security of the Department. This policy provides guidelines on the preparation of food services items and dietary considerations for inmates housed in the Department.

For this policy only, kitchen staff refers to contractual members.

## 1100.2  POLICY

It is the policy of this department that food services shall provide inmates with a nutritionally balanced diet in accordance with federal, state and local laws, and with regulations for daily nutritional requirements.

The food services operation shall be sanitary and shall meet the acceptable standards of food procurement, planning, preparation, service, storage and sanitation in compliance with Food and Drug Administration (FDA) and United States Department of Agriculture (USDA) and the Illinois Jail Standards requirements and standards set forth in..

## 1100.3  FOOD SERVICES DIRECTOR

The contracted food services director shall be responsible for oversight of the day-to-day management and operation of the food services area, including:

- Developing, implementing and managing a budget for food services.

- Ensuring contracted members are assigned and scheduled to efficiently and safely carry out all functions of food services operations.

- Establishing, developing and coordinating appropriate training for members and inmate workers.

- Developing a menu plan that meets all nutrition and portion requirements and can be produced within the available budget.

- Other duties and activities as determined by the Superintendent.

### 1100.3.1  FOOD SERVICE CERTIFICATION

At least one full-time cook or the food service provider shall have a food services sanitation manager certification from the Illinois Department of Public Health (20 Ill. Adm. Code 701.110(a)).

### 1100.3.2  KITCHEN STAFF TRAINING AND SUPERVISION

All kitchen staff shall be familiar with security aspects of the jail and be effective in training and supervising inmate workers in food services (20 Ill. Adm. Code 701.110(c)).

Copyright Lexipol, LLC 2020/03/16, All Rights Reserved.
Published with permission by Cook County Department of
Corrections

**ROLAND GROUP EXH 2**

# Cook County Department of Corrections
## Custody Manual

*Food Services*

---

## 1100.4 MENU PLANNING

Menus shall provide a variety of foods and should consider appearance, dietary allowances, flavor, nutrition, and quality. Menus shall be approved by a registered dietitian or nutritionist before being served.

Any changes to the meal schedule, menu or practices should be carefully evaluated by the contracted food services director in consultation with the Superintendent, dietitian, Sanitarian and other professionals, and shall be recorded. All substitutions will be of equal or better nutritional value. If any meal served varies from the planned menu, the change shall be noted in writing on the menu and/or production sheet.

Menus as planned, including changes, shall be evaluated by a registered dietitian at least annually. Department menus shall be evaluated as needed by the food services supervisory staff to ensure adherence to established daily servings.

Copies of menus, foods purchased, annual reviews and quarterly evaluations should be maintained by the contracted food services director in accordance with established records retention schedules.

## 1100.5 FOOD SAFETY

Temperatures in all food storage areas should be checked and recorded at the beginning of each shift. Holding temperatures for cold and hot foods shall be checked and recorded every two hours. Hot food shall be reheated to 165 degrees Fahrenheit if it falls below 135 degrees at any time.

All reach-in or walk-in refrigerators and cold storage must maintain food temperature at 41 degrees Fahrenheit or below. All freezers, other than during the defrosting cycle, must maintain a temperature of 0 degrees or lower.

One sample for each meal served shall be dated and maintained under refrigeration for testing in the event of a food-borne illness outbreak. Sample meals shall be discarded at the end of three days if no food-borne illness is reported.

Food production shall be stopped immediately if there is any sewage backup in the preparation area or if there is no warm water available for washing hands. Food production shall not resume until these conditions have been corrected.

## 1100.6 THERAPEUTIC DIETS

The contracted food services director shall be responsible for ensuring that all inmates who have been prescribed therapeutic diets by a physcian are provided with compliant meals. A diet manual, which includes samples of medical diets, shall be maintained in the food services areas.

More complete information may be found in the Prescribed Therapeutic Diets Policy.

Women who are known to be pregnant or lactating shall be provided a balanced, nutritious diet approved by a physician.

---

Copyright Lexipol, LLC 2020/03/16, All Rights Reserved.
Published with permission by Cook County Department of Corrections

**ROLAND GROUP EXH 2**

# Cook County Department of Corrections
Custody Manual

*Food Services*

---

## 1100.7 RELIGIOUS DIETS

The contracted food service director, to the extent reasonably practicable, will provide special diets for inmates in compliance with the parameters of the Religious Programs Policy and the Religious Land Use and Institutionalized Persons Act (RLUIPA).

When religious diets are provided, they shall conform to the nutritional and caloric requirements for non-religious diets.

### 1100.7.1 INMATE ABSTENTION

Inmates may abstain from any foods that would violate their required religious beliefs. Alternatives available to inmates are (20 Ill. Adm. Code 701.110(a)):

(a) Menu items may be substituted when an inmate's religious beliefs prohibit the eating of particular foods.

(b) The inmate may submit a written request with the assistance of a correctional rehabilitation worker for an alternative diet.

(c) The Religious Services Coordinator may confer with religious leaders or faith representatives in determining whether to grant any such requests (see the Religious Programs Policy).

## 1100.8 FOOD SERVICES REQUIREMENTS

All reasonable efforts shall be made to protect inmates from food-borne illness. Food services staff shall adhere to sanitation and food storage practices and there shall be proper medical screening and clearance of all food handlers in accordance with the Food Services Workers' Health, Safety and Supervision Policy.

Food production and services will be under member supervision. Food production, storage and food handling practices will follow the appropriate federal, state or local sanitation laws.

### 1100.8.1 OPERATION CONFORMANCE

Facility food services shall conform to the requirements of the Food Service Sanitation Code, 77 Ill. Adm. Code 750 (20 Ill. Adm. Code 701.110(c)).

## 1100.9 MEAL SERVICE PROCEDURE

Meals shall be served at least three times during each 24-hour period. At least one meal must include hot food. Any deviation from this requirement shall be subject to the review and approval of a registered dietitian to ensure that inmates receive meals that meet nutritional and caloric guidelines.

Inmates must be provided a minimum of 30 minutes dining time for each meal. There must be no more than 14 hours between a substantial evening meal and breakfast. A substantial evening meal is classified as a serving of three or more menu items at one time to include a high quality protein, such as meat, fish, eggs or cheese. The meal shall represent no less than 20 percent of the day's total nutrition requirements.

---

Copyright Lexipol, LLC 2020/03/16, All Rights Reserved.
Published with permission by Cook County Department of
Corrections

**ROLAND GROUP EXH 2**

# Cook County Department of Corrections
Custody Manual

*Food Services*

---

Inmates who miss, or may miss, a regularly scheduled meal must be provided with a beverage and a sandwich or substitute meal.

Meals shall be served under the direct supervision of sworn members after a count is taken by the sworn member verifying the correct number of inmates and the correct amount of food was delivered.

Sworn members should identify inmates who have prescribed therapeutic or authorized religious diets so those inmates receive their meals accordingly.
It shall be the responsibility of the sworn members to maintain order and enforce rules prohibiting excessive noise and intimidation of other inmates to relinquish food during mealtime.

In the interest of security, sanitation and vermin control, inmates shall not retain food in their cell beyond 30 minutes of receiving food. Food trays shall be collected and removed from the living unit within 30 minutes of distribution.

## 1100.10  MEAL ORDER FORM
The Meal Order Form shall be completed for each shift to properly order the correct number and type of meals for each division.

## 1100.11  EMERGENCY MEAL SERVICE PLAN
The contracted food services director shall establish and maintain an emergency meal service plan for the Department.

Such a plan should ensure that there is at least a seven-day supply of food maintained in storage for inmates. In the event of an emergency that precludes the preparation of at least one hot meal per day, the Superintendent may declare an "Emergency Suspension of Standards" for the period of time the emergency exists.

During an emergency suspension, the food services manager shall assign a registered dietitian to ensure that minimum nutritional and caloric requirements are met.

In the event that the inmate food supply drops below that which is needed to provide meals for two days, the contracted food services director shall purchase food to maintain at least a four-day supply during the emergency.

Depending on the severity and length of the emergency, the Executive Director should consider requesting assistance through mutual aid or the National Guard.

---

Copyright Lexipol, LLC 2020/03/16, All Rights Reserved.
Published with permission by Cook County Department of
Corrections

**ROLAND GROUP EXH 2**

| Policy **1105** | Cook County Department of Corrections |
|---|---|
| | Custody Manual |

# Food Services Facilities Inspection

## 1105.1 PURPOSE AND SCOPE

The purpose of this policy is to establish guidelines for inspecting food services areas and facilities to ensure a safe and sanitary environment for members, inmates and meet the regulatory food safety standards.

## 1105.2 POLICY

It is the policy of the Cook County Department of Corrections to ensure food safety and that the food services area be maintained in a safe, sanitary condition by conducting regularly scheduled inspections, both by members and by a regulatory authority (e.g., Cook County Health Department, Illinois Department of Corrections) as required by law.

## 1105.3 CLEANING AND INSPECTIONS BY STAFF

The contracted food services director shall ensure that all equipment, appliances and utensils in the food preparation areas are inspected weekly. Adequate hot and cold water should be available in the kitchen. The water temperature of all fixtures should be checked to ensure compliance with the required temperature range. Deficiencies noted by inspections shall be promptly addressed by the Department of Facilities Management (DFM).

A cleaning schedule for each food services area shall be developed and posted for easy reference by members, and shall include areas such as floors, walls, windows and vent hoods. Equipment, such as chairs, prep tables, steam tables, steam kettles and floor drains, should be grouped by frequency of cleaning as follows:

- After each use
- Each shift
- Daily
- Weekly
- Monthly
- Semi-annually
- Annually

The contracted food services director shall conduct daily system checks of the food temperature and sanitary conditions and maintain the documents in accordance with established records retention schedules. At the direction of the respective Superintendent or the authorized designee, the food services director shall take prompt action to correct any identified deficiencies.

### 1105.3.1 SAFETY INSPECTION CHECKLIST

The following items should be part of the weekly inspection by the Environmental Health Specialist and DFM:

Copyright Lexipol, LLC 2020/03/16, All Rights Reserved.
Published with permission by Cook County Department of Corrections

**ROLAND GROUP EXH 2**

# Cook County Department of Corrections
Custody Manual

## Food Services Facilities Inspection

- Lighting is adequate and functioning properly.

- Ample working space is available.

- Equipment is securely anchored.

- There are suitable storage facilities, minimizing the risk of falling objects.

- Floors are clean, dry, even and uncluttered.

- Machines have proper enclosures and guards.

- A clear fire safety passageway is established and maintained.

- Fire extinguishers and sprinkler systems are available, not expired and are tested regularly.

- The food preparation area has good ventilation.

- Furniture and fixtures are free from sharp corners, exposed metal and splintered wood.

- All electrical equipment is in compliance with codes and regulations.

- All workers wear safe clothing, hair coverings, gloves and protective devices while working.

- All workers are in good health, with no symptoms of illness or injury that would pose a risk to food safety.

- All cold/hot holding equipment are clean and in good operating condition.

- Mixers and attachments are clean and in good operating condition.

- Dishwashing machines are clean and in good operating condition, and proper chemicals are in use.

- Water temperatures for hand sinks, ware washing sinks and dishwashing machines meet minimum acceptable temperatures.

- All hand-washing stations have free access, soap, hot and cold running water under pressure and a method to dry hands.

- Toilet facilities are in good repair and have a sufficient supply of toilet paper.

- All temperature charts and testing documents are current, accurate and periodically reviewed and verified by the contracted food services director.

- Only authorized personnel are allowed in the kitchen area.

- Foods are labeled and stored properly using the first-in, first-out system.

- The refrigerators and freezers are in good operating condition and maintain proper temperature.

- There is no evidence of cross-connection or cross-contamination of the potable water system.

Copyright Lexipol, LLC 2020/03/16, All Rights Reserved.
Published with permission by Cook County Department of Corrections

**ROLAND GROUP EXH 2**

# Cook County Department of Corrections
Custody Manual

*Food Services Facilities Inspection*

## 1105.4  REGULATORY INSPECTIONS

The food services director is responsible for ensuring that the food services operation works in accordance with all state and local laws and regulations.

An independent, outside source shall conduct periodic inspections of the food services facilities and equipment, to ensure that established state and local health and safety codes have been met.

Documentation of the inspections, findings, deficiencies, recommended corrective actions and verification that the corrective standards were implemented will be maintained by the Department in accordance with established records retention schedules.

Any deficiencies noted by a regulatory authority shall be documented and corrective actions shall be taken by the Department.

Copyright Lexipol, LLC 2020/03/16, All Rights Reserved.
Published with permission by Cook County Department of
Corrections

**ROLAND GROUP EXH 2**

Cook County Department of Corrections
Custody Manual

# Food Services Training

### 1101.1  PURPOSE AND SCOPE
The purpose of this policy is to establish guidelines in food services areas by developing and implementing a comprehensive training program for members and inmate workers.

### 1101.2  POLICY
The Cook County Department of Corrections ensures a safe and sanitary environment is maintained for the storage and preparation of meals through the appropriate training of food services members and inmate workers.

### 1101.3  TRAINING
The contracted food services director, under the direction of the Superintendent, is responsible for ensuring that a training curriculum is developed and implemented in the use of equipment and safety procedures for all food services members.

The training shall include, at minimum:

    (a)   Work safety practices and use of safety equipment.

    (b)   Sanitation in the Department's food services areas.

    (c)   Reducing risks associated with operating machinery.

    (d)   Proper use of chemicals in food services areas.

    (e)   Employing safe practices.

    (f)   Department emergency procedures.

    (g)   Inmate supervision.

    (h)   Orientation for inmates regarding personal hygiene and food service area rules and regulation.

    (i)   Food safety procedures.

A job description listing the duties and proper time schedule should be developed for each job function in the Department's kitchen. The contracted food services director, at the direction of the Superintendent or the authorized designee, should establish an employee/kitchen worker orientation, and all contracted members shall be trained on how to assemble, operate, clean and sanitize kitchen equipment.

Information about the operation, cleaning and care of equipment, including manufacturer's literature, that is suitable for use as reference material shall be kept in the food services operation area. The reference material should be used in developing training for members on the use of the equipment and the maintenance and cleaning procedures.

Copyright Lexipol, LLC 2020/03/16, All Rights Reserved.
Published with permission by Cook County Department of Corrections

**ROLAND GROUP EXH 2**

# Cook County Department of Corrections
Custody Manual

*Food Services Training*

---

Safety and sanitation shall be the primary consideration in equipment purchase and replacement. Placement and installation of equipment must be carefully planned to facilitate cleaning, sanitizing, service and repairs. The equipment must also meet any applicable government codes.

## 1101.4  BRIEFING TRAINING

The contracted food services director should consider daily briefing training as a method of staff development. Records of all training, including training for contract workers, should be maintained in the worker's training files in accordance with the contracted service provider's established records retention schedules.

Contracted service providers should be required to provide documentation and certification of their employees. Only trained members are authorized to use food services equipment.

---

Copyright Lexipol, LLC 2020/03/16, All Rights Reserved.
Published with permission by Cook County Department of Corrections

**ROLAND GROUP EXH 2**

**Cook County Department of Corrections**
Custody Manual

# Food Services Workers' Health, Safety and Supervision

### 1103.1  PURPOSE AND SCOPE

The purpose of this policy is to establish basic personal health, hygiene, sanitation and safety requirements to be followed by all food services workers and to ensure the proper supervision of food services members and inmate workers.

### 1103.2  POLICY

The Cook County Department of Corrections will ensure that meals are safe and prepared and served in accordance with applicable health and safety laws. All inmate food services workers will be properly supervised by sworn members to ensure safety and security at all times.

### 1103.3  FOOD SERVICES MANAGER RESPONSIBILITIES

The contracted food services director is responsible for developing and implementing procedures to ensure that all meals are prepared, delivered and served only under direct supervision by members.

Work assignments shall be developed to ensure that sufficient food services members are available to supervise inmate food services workers. The contracted food services director should coordinate with the sworn supervisor to ensure that sufficient sworn members are available to supervise inmate meal service.

The food preparation area must remain clean and sanitary at all times. The contracted food services director or the authorized designee shall post daily, weekly and monthly cleaning schedules for the equipment and food preparation area.

### 1103.4  MEDICAL SCREENING

The contracted food services director shall work cooperatively with the appropriate physician to develop procedures to minimize the potential for spreading contagious disease and food-borne illness. In an effort to prevent the spread of illness, the following shall be strictly observed (20 Ill. Adm. Code 01.110(c)):

    (a)    Food services workers shall have education and ongoing monitoring in accordance with the standards set forth in the applicable government health and safety codes.

    (b)    A supervisor shall inspect and monitor all persons working in any food services area at the beginning of each shift for health and cleanliness, and shall remove anyone exhibiting any signs of food-transmissible disease from any food services area.

    (c)    Any person working in any food services area who is diagnosed by a health care professional with a contagious illness should be excluded from the food services areas until medically cleared to return to work.

Copyright Lexipol, LLC 2020/03/16, All Rights Reserved.
Published with permission by Cook County Department of Corrections

**ROLAND GROUP EXH 2**

Case 1:20-cv-02343 Document #: 130-19 Filed: 04/06/21 Page 110 of 497 PageID #:5340

(d) Inmate food services workers shall be required to bathe and dress in department-issued, clean work clothing prior to each shift.

(e) Food handlers shall wash their hands with soap and warm water immediately prior to performing food service activities and after using toilet facilities.

(f) Aprons shall be discarded before entering the toilet facility.

(g) Food services workers shall wear disposable plastic gloves and a protective hair covering, such as a hat or hairnet, when handling or serving food. Gloves shall be changed after each task is completed.

(h) The contracted food service vendor must submit evidence of compliance with state and local food safety regulations.

(i) Smoking at any time is prohibited in any food services area.

(j) Documentation of compliance with all of the above and with any other risk-minimizing efforts implemented to reduce food transmissible disease shall be maintained in accordance with established records retention schedules.

(k) All food services workers shall report to a supervisor any information about their health and activities in accordance with health and safety codes as they relate to diseases that are transmittable through food (e.g., open sores, runny nose, sore throat, cough, vomiting, diarrhea, fever, recent exposure to contagious diseases such as Hepatitis A or tuberculosis).

Any food services worker is prohibited from handling food or working in any food services area if he/she reports symptoms such as vomiting, diarrhea, jaundice, sore throat with fever or has a lesion containing pus, such as a boil or infected wound that is open or draining. Food service workers shall only return to work in food service areas when cleared by a health care professional.

## 1103.5  TRAINING REQUIREMENTS FOR FOOD SERVICES WORKERS

The contracted food services director is responsible for developing and implementing a training program for inmate food services that includes food safety, proper food-handling techniques and personal hygiene. Each inmate food services worker shall satisfactorily complete the initial training prior to being assigned to deliver food. Food services workers should receive periodic supplemental training as determined by the contracted food services director.

The training curriculum for inmate food services workers should include, at minimum, the following topics:

- Proper hand-washing techniques and personal hygiene as it applies to food services work

- Proper application and rotation of gloves when handling food

- Proper use of protective hair coverings, such as hats or hairnets

- Wearing clean aprons and discarding aprons prior to entering toilet facilities

- Covering coughs and sneezes to reduce the risk of food-borne illness transmission

Copyright Lexipol, LLC 2020/03/16, All Rights Reserved.
Published with permission by Cook County Department of
Corrections

Food Services Workers' Health, Safety and
Supervision - 2

**ROLAND GROUP EXH 2**

*Food Services Workers' Health, Safety and Supervision*

- Reporting illness, cuts or sores to the sworn member in charge

## 1103.6  SUPERVISION OF INMATE WORKERS

Only personnel authorized to work in the food preparation area will be allowed inside. Inmate food handlers working in the kitchen must be under the supervision of a sworn member. The Executive Director will designate at least one qualified member, who will be responsible for the oversight of daily activities and ensuring food safety. The designated member must be certified by passing the American National Standards Institute food safety manager certification examination.

Sufficient sworn members shall be assigned to supervise and closely monitor inmate food services workers. Members shall ensure that inmate food services workers do not misuse or misappropriate tools or utensils, and that all workers adhere to the following:

- Correct ingredients are used in the proper proportions.

- Food is maintained at proper temperatures.

- Food is washed and handled properly.

- Food is served using the right utensils and in the proper portion sizes.

- Utensils such as sharps, cutting boards, pots, pans, trays and food carts used in the preparation, serving or consumption of food are properly washed and sanitized after use. Disposable utensils and dishes will not be reused.

- All utensils are securely stored under sanitary conditions when finished.

Refer to the Tool and Culinary Equipment Control Policy for additional guidelines.

## 1103.7  SUPERVISION OF THE FOOD SUPPLY

The risk of conflict and protest is reduced when the inmate population has confidence in the safety and quality of their food. Sworn members should supervise the transport and delivery of food to the respective serving areas. Sworn members should ensure the food is protected during transportation, delivered to the right location efficiently and under the right temperatures.

Food services workers should report any suspected breach in the safety or security of the food supply. Members should be alert to inmate behavior when serving food, and cognizant of any comments concerning perceived contamination or portioning issues. Members should report any suspicion of inmate unrest to a supervisor.

Any change to the published menu or the standard portioning should be documented and reported to the Superintendent as soon as practicable.

Copyright Lexipol, LLC 2020/03/16, All Rights Reserved.
Published with permission by Cook County Department of
Corrections

Food Services Workers' Health, Safety and
Supervision - 3

**ROLAND GROUP EXH 2**

# Food Storage

### 1106.1  PURPOSE AND SCOPE
The purpose of this policy is to establish food storage methods that are designed to meet manufacturer's recommendations, health and safety codes, state laws and local ordinances, and to safely preserve food, extend storage life and reduce food waste.

### 1106.2  POLICY
Food and food supplies will be stored in sanitary and temperature-controlled areas in compliance with state and local health codes and standards.

### 1106.3  PROCEDURES
The contracted food services director shall be responsible for establishing procedures to ensure the safe preservation and storage of food in the most cost-effective manner, beginning with the receipt of the raw materials through the delivery of prepared meals.

When receiving food deliveries, food services members shall inspect the order for quality and freshness and shall ensure that the order is correct by checking the order received against the order form. All delivery vehicles shall be inspected by food services members to make certain that the vehicles are clean, free from pest infestations and are maintained at the appropriate temperature for the type of food being carried.

If food quality and freshness do not meet commonly accepted standards or if it is determined that proper storage temperatures have not been maintained, the member checking the order in will refuse the item and note the refusal on the invoice.

Any food destined for return to the vendor should be stored separately from any food destined for consumption. The contracted food services director will contact the vendor and arrange for replacement of the unacceptable food items.

Storage temperatures in all food storage areas should be checked and logged on a daily basis. Records of the temperature readings should be maintained in accordance with established records retention schedules.

An evaluation system should be established for food stored in any area with temperature readings outside the normal range and should include contingency plans for menu changes, food storage relocation or food destruction, as indicated. All actions taken to ensure the safety of the food served should be documented and retained in accordance with established records retention schedules.

### 1106.3.1  FOOD AND DRINK TRANSPORT AND PROTECTION
Heated or insulated carts capable of transporting containers of food, beverages and eating utensils shall be utilized when the serving or dining area (e.g., cell, dayroom) is a significant distance from the kitchen and appropriate food holding temperatures would not otherwise be maintained.

Copyright Lexipol, LLC 2020/03/16, All Rights Reserved.
Published with permission by Cook County Department of Corrections

**ROLAND GROUP EXH 2**

*Food Storage*

---

Food and drink, while being stored, prepared, displayed, served or transported, shall be protected from contamination by insects or foreign substances (20 Ill. Adm. Code 701.110(c)).

## 1106.4  DRY FOOD STORAGE

Canned items and dry food that does not need refrigeration should be stored in a clean, dry and well-ventilated storage area protected from insects and rodents, where temperatures are maintained between 45 and 80 degrees Fahrenheit. Temperatures shall be monitored and recorded once each day on a checklist. Containers used to store dry bulk food items shall be lined with or have the interior coated with an acceptable impermeable material or plastic (20 Ill. Adm. Code 701.110(c)).

All dry items shall be stored at least 6 inches off the floor and at least 6 inches away from any wall. Only full unopened cans and containers shall be stored in the storerooms. Open containers and packages shall be appropriately stored in the working or holding areas.

All storage areas will be kept locked when they are not in actual use. New food shipments shall be placed behind existing like items and rotated using a first-in first-out rotation method.

Personal clothing and personal items shall not be stored in food storage areas.

### 1106.4.1  MAINTENANCE OF DRY FOOD STORAGE AREAS

Inmate workers or members should clean the storage areas at least once each day by sweeping and mopping all floors and wiping down shelves and walls. Any damaged items should be inspected for spoilage and repackaged or discarded as appropriate. Food services members should inspect the storage areas to ensure they are clean and orderly. Members will document the inspection and record the daily temperature on the storage area checklist.

## 1106.5  REFRIGERATED AND FROZEN STORAGE

Unless health codes dictate otherwise refrigerators must be kept between 32 and 41 degrees Fahrenheit. Deep chill refrigerators will be set between 28 and 32 degrees for cook-chill products, dairy and meat items, to extend shelf life. Freezers shall be maintained at 0 degrees or below. All refrigerators and freezers shall be equipped with one accurate thermometer. Foods susceptible to spoil shall be in a freezer or refrigerator (20 Ill. Adm. Code 701.110(c)).

All freezer and refrigerator storage areas should have at least two thermometers to monitor temperatures. One thermometer should have a display visible to the outside. The second thermometer shall be placed in the warmest place inside the storage area. Daily temperature readings shall be recorded on the storage area checklist. Any variance outside of acceptable temperature range shall be immediately addressed.

All food must be covered and dated when stored. Cooked or ready-to-eat items shall not be stored beneath raw meats. Cleaned vegetables shall be stored separately from unwashed vegetables. Storage practices shall use a first-in first-out rotation method.

---

Copyright Lexipol, LLC 2020/03/16, All Rights Reserved.
Published with permission by Cook County Department of
Corrections

**ROLAND GROUP EXH 2**

*Food Storage*

---

### 1106.5.1   MAINTENANCE OF REFRIGERATED AND FREEZER AREAS
Refrigeration storage units should be cleaned daily, including mopping floors and wiping down walls. A more thorough cleaning should occur weekly to include dismantling and cleaning shelves. Food services members should inspect the contents of freezers and storage units daily to ensure all items are properly sealed and labeled.

### 1106.5.2   STORAGE OF CLEANING SUPPLIES AND MATERIALS
The storage of soaps, detergents, waxes, cleaning compounds, insect spray and any other toxic or poisonous materials are kept in a separate, locked storage area to prevent cross contamination with food and other kitchen supplies.

### 1106.6   WASTE MANAGEMENT
The contracted food services director shall develop and maintain a waste management plan that ensures the garbage is removed daily. This plan also should include methods to minimize the waste of edible food and to dispose of non-edible or waste food material without utilizing a landfill.

Copyright Lexipol, LLC 2020/03/16, All Rights Reserved.
Published with permission by Cook County Department of
Corrections

**ROLAND GROUP EXH 2**

# Housekeeping and Maintenance

## 1002.1  PURPOSE AND SCOPE
The purpose of this policy is to establish guidelines to ensure that the Cook County Department of Corrections is kept clean and in good repair in accordance with accepted federal, state and county standards.

## 1002.2  POLICY
The Executive Director or the authorized designee shall establish a plan for housekeeping and maintenance of the Department. The plan should include, but is not limited to:

- Schedules that determine the frequency of cleaning activities on a daily, weekly or monthly timetable, by area of the Department. A plan for each division will be implemented by the respective Superintendent or the authorized designee.

- Supervision of the members and inmates to ensure proper implementation of the procedures and to ensure that no inmate supervises or assigns work to another inmate.

- Development and implementation of an overall sanitation plan (e.g., cleaning, maintenance, inspection, member training, inmate supervision).

- Development of inspection forms.

- All inmate responsibilities, which should be included in the inmate handbook.

- A process to ensure that deficiencies identified during inspections are satisfactorily corrected and documented.

- Detailed processes for the procurement, storage and inventory of cleaning supplies and equipment.

- A process for the preventive maintenance of equipment and systems throughout the Department.

- Member supervision of the provision and use of cleaning tools and supplies.

To the extent possible, cleaning and janitorial supplies shall be non-toxic to humans. Any poisonous, caustic or otherwise harmful substances used for cleaning shall be clearly labeled and kept in a locked storage area.

## 1002.3  SANITATION SCHEDULE
A daily, weekly and monthly cleaning schedule will be established by the respective Superintendent or the authorized designee. The members should implement a site specific plan for cleaning and maintenance of each division/unit (e.g., housing, food preparation, laundry, loading dock/trash storage, barber shop, common areas).

Refer to the Sanitation Inspections Policy for additional guidance.

Copyright Lexipol, LLC 2020/03/16, All Rights Reserved.
Published with permission by Cook County Department of Corrections

**ROLAND GROUP EXH 2**

# Cook County Department of Corrections
Custody Manual

*Housekeeping and Maintenance*

---

1002.3.1   SANITATION REQUIREMENTS
The following sanitation requirements shall be adhered to (20 Ill. Adm. Code 701.120)):

(a)   General requirements:

    1.   Non-carpeted living unit floors shall be swept and mopped with an all-purpose cleaner at least once daily. Germicidal cleaning agents shall be used  in toilet, shower and food service areas.

    2.   Windows shall be cleaned when practicable and not obscured by objects or fabric.

    3.   Openings to the outside of the facility shall be effectively protected against the entrance of rodents and insects with tight-fitting, self-closing doors. When appropriate, closed windows or screening may be utilized for protection against flying insects. Screening material shall not be less than 16 mesh to the inch.

    4.   Forced air or another form of artificial ventilation in the living area shall provide at least 10 cubic feet of fresh or purified air per minute per person.

    5.   Walls shall be kept clear of etched or inscribed graffiti or writing.

    6.   Walkways and corridors shall be free of litter or trash.

    7.   Mops and other cleaning tools and implements shall be thoroughly cleaned, dried and inspected after each use and securely stored in a well-ventilated place under sworn member control.

    8.   All inmate cleaning details shall be under the supervision of a sworn member.

(b)   Department equipment:

    1.   Toilets, washbasins, shower stalls and sinks shall be thoroughly cleaned and sanitized each day with detergent and a germicidal agent.

    2.   Trash and garbage shall be removed at least daily during each shift and disposed of in a sanitary manner. Extra plastic trash bags will not be provided to inmates.

(c)   Department drinking equipment:

    1.   Drinking water shall be provided in cells, dormitories and recreation or dayroom areas and may be from a sink tap.

(d)   Department supplies:

    1.   An adequate supply of clean clothing, bedding, towels, soap and cleaning supplies shall be maintained.

    2.   Sheets shall be changed and washed at least once a week.

    3.   Vinyl covered mattresses must be washed with hot water and disinfectant monthly or before reissue.

    4.   Blankets shall be laundered, or otherwise sterilized, monthly or before reissue.

    5.   Cotton or fiber filled mattresses or pads shall be aired and spray sanitized monthly or before reissue.

    6.   A clean towel shall be issued to each inmate at least twice weekly.

---

Copyright Lexipol, LLC 2020/03/16, All Rights Reserved.
Published with permission by Cook County Department of Corrections

**ROLAND GROUP EXH 2**

*Housekeeping and Maintenance*

---

       7.    Shaving and barber tools shall be thoroughly cleaned, disinfected using bleach or a germicidal agent, and secured.

(e)   Food service areas:

       1.    The floors of all rooms in which food or drink is stored, prepared or served, or in which utensils are washed, shall be kept clean.

       2.    All counters, shelves, tables, equipment and utensils with which food or drink come in contact shall be maintained in good repair and free of corrosion, cracks and chipped or pitted surfaces.

       3.    Utensils shall be stored in a clean, dry place protected (covered or inverted) from flies, dust, overhead leakage and condensation.

       4.    There shall be adequate plumbing facilities, in good working order, which meet applicable state plumbing codes or public health standards.

       5.    The ovens shall be cleaned regularly. Hoods, vents and filters shall be cleaned regularly.

       6.    All windows, walls and woodwork shall be kept clean.

## 1002.4  TRAINING

All members and inmate workers assigned cleaning duties shall receive instruction consistent with their tasks, including proper cleaning techniques, the safe use of cleaning chemicals and areas of responsibility.

## 1002.5  INSPECTION CHECKLIST

The Executive Director or the authorized designee should develop an inspection checklist that includes the cleaning and maintenance items that will be checked by supervisors on a daily, weekly and monthly basis throughout the facility.

The inspection checklist will closely correspond to the established cleaning and maintenance schedule.

Inspection checklists shall be forwarded to the Superintendent or the authorized designee for annual review, filing and retention as required by the established records retention schedule.

---

Copyright Lexipol, LLC 2020/03/16, All Rights Reserved.
Published with permission by Cook County Department of
Corrections

**ROLAND GROUP EXH 2**

# Cook County Department of Corrections
Custody Manual

# Inmate Hygiene

## 1005.1  PURPOSE AND SCOPE

This policy outlines the procedures that will be taken to ensure the personal hygiene of every inmate in the Cook County Department of Corrections. The Cook County Department of Corrections recognizes the importance of each inmate maintaining acceptable personal hygiene practices by providing adequate bathing facilities, hair care services, the issuance and exchange of clothing, bedding, linens, towels and other necessary personal hygiene items.

### 1005.1.1  ISSUANCE/EFFECTIVE DATE

This policy was re-issued on December 29, 2017 and shall become effective on January 1, 2018 at 0001 hours.

## 1005.2  POLICY

It is the policy of the Department to maintain a high standard of hygiene in compliance with the requirements established by all state laws, ordinances and regulations. Compliance with laws and regulations relating to good inmate hygiene practice is closely linked with good sanitation practices. Therefore, the need to maintain a high level of hygiene is not only for the protection of all inmates, but for the safety of the members and visitors. The Superintendent or the authorized designee shall ensure the basic necessities related to personal care are provided to each inmate after he/she has arrived to his/her assigned housing. Appropriate additional personal care items may be available for purchase from the inmate commissary.

## 1005.3  STORAGE SPACE

There should be adequate and appropriate storage space for inmates' bedding, linen or clothing. The inventory of clothing, bedding, linen and towels should exceed the maximum inmate population so that a reserve is always available.

The Department should have clothing, bedding, personal hygiene items, cleaning supplies and any other items required for the daily operation of the Department, including the exchange or disposal of soiled or depleted items. The assigned members shall ensure that the storage areas are properly maintained and stocked. The Executive Director or the authorized designee should be notified if additional storage space is needed.

### 1005.3.1  BEDDING ISSUE

Upon entering a living area of the Department, every inmate who is expected to remain in the facility for over eight hours shall be issued bedding and linens including, but not limited to (20 Ill. Adm. Code 701.40(o); 20 Ill. Adm. Code 720.60(e)):

    (a)   Sufficient freshly laundered blankets to provide comfort under existing temperature conditions. Blankets shall be exchanged and laundered in accordance with facility operational laundry rules.

    (b)   One clean, firm, fire-retardant mattress.

Copyright Lexipol, LLC 2020/03/16, All Rights Reserved.
Published with permission by Cook County Department of
Corrections

**ROLAND GROUP EXH 2**

    1.    Mattresses will be serviceable, fire-retardant and enclosed in an easily cleanable, non-absorbable material and conform to the size of the bunk (16 CFR 1633). Mattresses will be cleaned and disinfected when an inmate is released, transferred or if deemed necessary.

(c)    Two sheets.

(d)    One clean wash cloth and bath size cloth towel.

Linen exchange shall occur as least once weekly. Towels exchanges shall occur at least twice weekly. Exchanges shall be documented in the daily activity log (20 Ill. Adm. Code 701.100(a); 20 Ill. Adm. Code 720.60(f)). The Watch Commander shall review the daily activity log at least once per shift.

The Superintendent or the authorized designee shall conduct both scheduled and unannounced inspections of the Department to ensure that bedding issuance policies and procedures are carried out in accordance with the applicable laws and regulations.

## 1005.3.2  CLOTHING ISSUE

An inmate shall be issued a set of clothing appropriate to the climate. (20 Ill. Adm. Code 701.40(o)).

Clothing shall be exchanged twice each week, at a minimum. All exchanges shall be documented on the daily activity log. The Watch Commander or unit supervisor shall review the daily activity log at least once per shift.

Additional clothing may be issued as necessary for changing weather conditions or as seasonally appropriate. An inmate's personal undergarments may be substituted for the institutional undergarments, provided there is a legitimate medical necessity for the items and they are approved by the medical staff.

Each inmate assigned to a special work area, such as food service, medical, garden, sanitation, mechanical and other specified work, shall be clothed in accordance with the requirements of the job, including any appropriate protective clothing and equipment and shall be exchanged as frequently as the work assignment requires.

The Executive Director or the authorized designee shall conduct both scheduled and unannounced inspections of the facility to ensure that clothing issuance policies and procedures are carried out in accordance with the applicable laws and regulations.

The Executive Director or the authorized designee shall ensure that the Department maintains a sufficient inventory of extra clothing to ensure each inmate shall have neat and clean clothing appropriate to the season.

## 1005.4  LAUNDRY SERVICES

Laundry services shall be managed so that daily clothing, linen and bedding needs are met.

Copyright Lexipol, LLC 2020/03/16, All Rights Reserved.
Published with permission by Cook County Department of Corrections

**ROLAND GROUP EXH 2**

*Inmate Hygiene*

### 1005.4.1  CLEANING OF INMATE PERSONAL CLOTHING

Inmates who wear their personal undergarments shall have their clothing cleaned by the Department in conformity with laundering for jail-issued clothing (20 Ill. Adm. Code 701.100(a)).

### 1005.4.2  CLEANING OF BODILY FLUIDS AND WASTE

Mattresses or linens that have been soiled with bodily fluids or waste shall be handled using standard universal precautions to reduce exposure to bloodborne pathogens and shall be appropriately laundered, sanitized or discarded (20 Ill. Adm. Code 720.60(e)).

## 1005.5  INMATE ACCOUNTABILITY

To ensure inmate accountability, inmates are required to exchange item for item when clean clothing, bedding and linen exchange occurs.

Prior to being placed in a housing unit, inmates shall be provided with an inmate handbook listing this requirement (20 Ill. Adm. Code 701.40(o)).

## 1005.6  PERSONAL HYGIENE OF INMATES

Personal hygiene items, bedding, clothing, hair care services and facilities for showers will be provided in accordance with applicable laws and regulations. This is to maintain a standard of hygiene among inmates in compliance with the requirements established by state laws as part of a healthy living environment.

Inmates shall be issued hygiene items as needed (20 Ill. Adm. Code 720.60(d)).

Each inmate held more than 24 hours shall be issued, at a minimum, the following items:

- • One bar of bath soap or equivalent
- • Toothpaste
- • Toothbrush
- • Shaving equipment, upon request
- • Toilet paper
- • Materials as appropriate to the special hygiene needs of women

Personal hygiene items should be appropriate for the inmate's gender.

Inmates shall not be required to share personal care items or disposable razors. Used razors are to be disposed into approved sharps containers. Other barbering equipment capable of breaking the skin must be disinfected between individual uses, as prescribed by the state governing body overseeing such practices.

Inmates, except those who may not shave for reasons of identification in court, shall be allowed to shave daily. The Executive Director or the authorized designee may suspend this requirement for any inmate who is considered a danger to him/herself or others (20 Ill. Adm. Code 701.100(b)).

Copyright Lexipol, LLC 2020/03/16, All Rights Reserved.
Published with permission by Cook County Department of Corrections

**ROLAND GROUP EXH 2**

# Cook County Department of Corrections
Custody Manual

*Inmate Hygiene*

Refer to Distribution of Inmate Hygiene Supplies and Inmate Razor Distribution Procedures for further guidance.

## 1005.6.1  DISPOSABLE DRINKING CUPS
Inmates will be issued disposable drinking cups if the washbasins they are using are not drinking fountain equipped or functional (20 Ill. Adm. Code 720.60(d)).

## 1005.7  BARBER AND COSMETOLOGY SERVICES
The Executive Director or the authorized designee shall be responsible for developing and maintaining a schedule for hair care services provided to the inmate population and will have written policies and procedures for accessing these services (see the Grooming Policy). The Executive Director or the authorized designee shall ensure that the rules are included in the inmate handbook (20 Ill. Adm. Code 701.100(b)).

## 1005.7.1  SCHEDULE FOR HAIR CARE SERVICES
Inmates shall have the ability to receive hair care services once per month. Records of hair care services shall be documented in the appropriate log.

Prior to being placed in a housing unit, inmates will be given an inmate handbook, which details how to request hair care services.

## 1005.7.2  HAIR CARE SPACE
Due to sanitation concerns, the hair care services should be located in a room that is designated for that purpose. The floors, walls, cabinets, countertops and ceilings should be smooth, non-absorbent and easily cleanable. The room should be supplied with a hand-washing sink with hot and cold water under pressure. The minimum hot water temperature must comply with local building and health department standards.

Each barbering room should have all the equipment necessary for maintaining sanitary procedures for hair care, including approved, covered metal containers for waste, disinfectants, laundered towels and a means of separating sanitized equipment from soiled equipment.

After each haircut, all tools that came into contact with the inmate shall be thoroughly cleaned and sanitized according to established guidelines and regulations.

Regulations with detailed hair care cleaning and sanitation requirements shall be posted in a conspicuous place for use by all hair care personnel and inmates. Single-use items, such as cotton pads and neck strips, shall be properly disposed of immediately after a single use.

Barbers or beauticians shall not provide hair care service to any inmate when the skin of the face, neck or scalp is inflamed, or when there is scaling, pus or other evidence of skin eruptions, unless it is performed in accordance with the specific written authorization of a health care professional. If prior authorization does not exist, the sworn member present should notify the on-duty supervisor. The notified supervisor will ensure the inmate is referred to a health care professional. Any person infested with head lice shall not be given hair care service until cleared by the medical staff.

Copyright Lexipol, LLC 2020/03/16, All Rights Reserved.
Published with permission by Cook County Department of
Corrections

**ROLAND GROUP EXH 2**

# Cook County Department of Corrections
Custody Manual

The hair care services area shall be maintained and kept clean according to the requirements of the state or local board of barbering and cosmetology and the health department standards.

## 1005.8   AVAILABILITY OF PLUMBING FIXTURES
Inmates confined to cells or sleeping areas shall have access to toilets and washbasins with hot and cold running water that is temperature controlled. Access shall be available at all hours of the day and night without member assistance.

The minimum number of plumbing fixtures provided for inmates in housing units is:

- One sink/washbasin for every eight inmates.
- One toilet to every eight male inmates.
- One shower for every eight inmates.

## 1005.9   INMATE SHOWERS
Inmates shall be allowed to shower upon assignment to a housing unit a minimum of three times a week (20 Ill. Adm. Code 701.100(b)), and daily if practicable. Showering facilities for inmates housed at this department shall be clean and properly maintained. Water temperature shall be periodically measured to ensure a range of 100 to 120 degrees for the safety of inmates and staff, and shall be recorded and maintained.

Inmates shall be permitted to shower, perform bodily functions and change clothing without non-medical staff of the opposite gender viewing their breasts, buttocks or genitalia, except in exigent circumstances or when such viewing is incidental to routine cell checks. Members of the opposite gender shall announce their presence when entering an inmate housing unit (28 CFR 115.15).

Transgender and intersex inmates shall be given the opportunity to shower separately from other inmates (28 CFR 115.42).

## 1005.10   DELOUSING MATERIALS
Delousing materials and procedures shall be approved through consultation with the Responsible Physician or qualified health care professionals.

Copyright Lexipol, LLC 2020/03/16, All Rights Reserved.
Published with permission by Cook County Department of
Corrections

**ROLAND GROUP EXH 2**

# Cook County Department of Corrections
Custody Manual

# Inmate Reception and Intake

## 702.1 PURPOSE AND SCOPE
The Cook County Department of Corrections has a legal and methodical process for the reception of arrestees into the Department. This policy establishes guidelines for security needs, the classification process, identification of medical/mental health issues and the seizure and storage of personal property.

### 702.1.1 ISSUANCE/EFFECTIVE DATE
This policy was re-issued on Oct. 1, 2018 and shall become effective upon issuance (operational updates).

## 702.2 POLICY
This department shall use the following standardized policies when receiving arrestees to be booked into the department. This is to ensure security within the Department and that arrestees are properly booked and afforded their applicable rights.

### 702.2.1 TREATMENT OF ARRESTEES
All arrestees from the time they are received at the Department until their release, shall be treated humanely and provided food, shelter and medical treatment. They shall have the right to remain silent in regards to incriminating statements on their arrest charges and no unlawful means of any kind shall be used to obtain a statement of admission or confession (20 Ill. Adm. Code 720.20(a)).

### 702.2.2 LIMITATIONS ON TIME OF CONFINEMENT
An arrestee brought in by another agency with a known history or who is showing signs of a mental disorder or medical issue that requires treatment prior to accepting custody of him/her shall be medically cleared by that agency prior to being accepted by the Department.

## 702.3 PRE-BOOKING SCREENING
All arrestees shall be screened by a health care professional prior to booking to ensure the arrestee is medically acceptable for admission and that all arrest or commitment paperwork is present to qualify the arrestee for booking (20 Ill. Adm. Code 701.40(c); 20 Ill. Adm. Code 701.40(d)). Required paperwork may include, but is not limited, to the following:

    (a)   Arrest reports

    (b)   Warrants or court orders

    (c)   Information regarding suicidal statements or actions

    (d)   Body Attachment Sheet, if necessary

Any discrepancies or missing paperwork should be resolved before accepting the arrestee for booking from the arresting or transporting sworn member.

Prior to accepting custody of an arrestee who claims to have been arrested due to a mistake of the arrestee's true identity or an arrestee who claims that identity theft led to the issuance of a

Copyright Lexipol, LLC 2020/03/16, All Rights Reserved.
Published with permission by Cook County Department of Corrections

**ROLAND GROUP EXH 2**

# Cook County Department of Corrections
Custody Manual

*Inmate Reception and Intake*

warrant in the arrestee's name, sworn members shall make reasonable efforts to investigate the arrestee's claim of identity fraud or mistake. Sworn members shall notify a supervisor when an arrestee makes a claim of mistaken identity or identity fraud.

An inmate's identity shall be verified using the photographs from the required paperwork.

## 702.3.1 ADDITIONAL REQUIRED PAPERWORK FROM SUBURBAN ARRESTING AGENCIES
When accepting an arrestee from a suburban agency of Cook County the following is required, but not limited to:

- Arrest card and holding document if applicable
- Complete CQH (BOI response, LEADS records check, NCIC records check, III (Interstate Identification Index))
- CQR1
- Photograph
- Fingerprint response
- Medical clearance (if necessary)
- Complaint
  ◦ Form 101 if felony

## 702.3.2 ADDITIONAL REQUIRED PAPERWORK FROM CHICAGO POLICE DEPARTMENT
When accepting an arrestee from Chicago Police Department (CPD) the following is required, but not limited to:

- CPD criminal history report (i.e., rap sheet)
- CPD arrest report
- Photograph
- Medical clearance (if necessary)
- Court transmittal
- Complaint
  ◦ Form 101 if felony

## 702.3.3 MEDICAL ACCEPTANCE
No arrestee who is seriously injured, seriously ill or unconscious shall be admitted to the Department until examined by a qualified physician (20 Ill. Adm. Code 701.40(e); 20 Ill. Adm. Code 720.25(g)).

## 702.3.4 MEDICAL SCREENING BY RECEIVING SWORN MEMBER

Copyright Lexipol, LLC 2020/03/16, All Rights Reserved.
Published with permission by Cook County Department of Corrections

**ROLAND GROUP EXH 2**

# Cook County Department of Corrections
Custody Manual

*Inmate Reception and Intake*

The receiving sworn member shall observe the arrestee for any obvious injuries or illnesses requiring immediate emergency medical care. The sworn member shall question the arrestee to determine whether the arrestee has any medical conditions or concerns that would prevent them from attending Bond Court. If a medical condition exists or is suspected to exist, the receiving sworn member should turn the arrestee back over to the arresting officer for medical evaluation unless medical clearance is provided.

If the arrestee has been remanded into custody from Bond Court and the receiving sworn member determines the arrestee has, or may have, any medical/mental health condition or illness, the sworn member will immediately refer the arrestee to a qualified health care professional for further medical screening (20 Ill. Adm. Code 701.40(i); 20 Ill. Adm. Code 701.90(c)). If the arrestee is suspected of having any type of communicable disease, the arrestee shall be isolated and referred promptly to the appropriate physician (20 Ill. Adm. Code 701.90(c))

### 702.3.5 IMMEDIATE TREATMENT FOR LICE OR BODY PESTS
If lice or body pests are detected at screening or any other time the inmate is housed in the facility, the Responsible Physician shall ensure the inmate receives immediate treatment (20 Ill. Adm. Code 701.40(l)).

Refer to the Elimination of Ectoparasites Procedure for additional guidelines.

### 702.3.6 IMMIGRATION DETAINERS
No individual should be held based solely on a federal immigration detainer under 8 CFR 287.7 or any other hold request unless the person has been charged with a federal crime or the detainer is accompanied by a judicial warrant, or federal agencies have a criminal warrant.

Refer to the Immigration Violations Policy for additional guidance.

## 702.4 SEARCHES BEFORE ADMISSION
All arrestees and their property shall be searched for contraband by the booking sworn member before being accepted for booking. All contraband items will be handled according to department policy. Items of possible evidentiary value will be processed according to the department's rules for handling evidence. Approved personal property and clothing will be accepted. Items not approved will be returned to the arresting or transporting agency prior to the arrestee being accepted for booking.

Any request from the arresting agency for a confiscated item of evidence should be directed through the appropriate communication chains.

Strip searches shall be conducted in accordance with the Inmate Searches Policy.

Copyright Lexipol, LLC 2020/03/16, All Rights Reserved.
Published with permission by Cook County Department of
Corrections

**ROLAND GROUP EXH 2**

# Cook County Department of Corrections
### Custody Manual

*Inmate Reception and Intake*

## 702.5  ADMISSION PROCESS

A unique identification number shall be obtained specifically for the current admission. A booking number is a permanent number issued that identifies an arrestees' booking history in the Department. Each arrestee shall be photographed and fingerprinted and records shall be maintained in accordance with the Criminal Identification Act (20 ILCS 2630/5) and the Juvenile Court Act of 1987 (705 ILCS 405/1-1) (20 Ill. Adm. Code 701.40(d))

Religious garments that substantially cover the individual's head and face shall be removed and placed with the inmate's personal property. This shall be done in the presence of a member of the same sex, if necessary.

The admission process shall include an attempt to gather a comprehensive record of each arrestee, including the following (20 Ill. Adm. Code 701.40(k); 20 Ill. Adm. Code 720.120(a)):

- Identifying information, including name and any known aliases or monikers
- Current or last known address and telephone number
- Date and time of admission
- Name, rank, agency and signature of the arresting officer and transporting deputy, if different
- Health insurance information
- Legal authority for confinement, including specific charges, arrest warrant information and court of jurisdiction
- Gender
- Age
- Date of birth
- Race
- Height and weight
- Occupation and current or most recent employment
- Preferred emergency contact including name, address, telephone number and relationship to the inmate
- Social Security number
- Additional information concerning special custody requirements or special needs
- Local, state and federal criminal history records
- Photographs, fingerprints and notation of any marks or physical characteristics unique to the inmate, such as scars, birthmarks, deformities or tattoos
- Medical, dental and mental health screening records, including suicide risk which will be forwarded to Cermak

Copyright Lexipol, LLC 2020/03/16, All Rights Reserved.
Published with permission by Cook County Department of Corrections

**ROLAND GROUP EXH 2**

- Inventory of all personal property including clothing, medication, jewelry and money (20 Ill. Adm. Code 701.40(g))
  - º Items of rare or unusual value should be brought to the attention of a supervisor
  - º The inmate's signature should be obtained on the booking record and on any forms used to record money and property
- A record of personal telephone calls made at the time of booking or the time the opportunity was provided to place calls if the calls were not made (20 Ill. Adm. Code 701.40(h))
- Marital status
- Education level obtained
- Religion or religious preference
- Name and telephone number of attorney

## 702.5.1  LEGAL BASIS FOR DETENTION

Arrestees admitted to the facility shall be notified of the official charge for their detention or legal basis of confinement in a language they understand.

## 702.6  TRANSITION FROM RECEPTION TO GENERAL POPULATION

The Classification Unit staff is responsible to ensure only arrestees who qualify are placed into general population cells or housing.

### 702.6.1  MONITORING FOR SIGNS OF INTOXICATION AND WITHDRAWAL

Staff shall respond promptly to medical symptoms presented by inmates to lessen the risk of a life-threatening medical emergency and to promote the safety and security of all persons in the facility.

Custody staff should remain alert to signs of drug and alcohol overdose and withdrawal, which include, but are not limited to, sweating, nausea, abdominal cramps, anxiety, agitation, tremors, hallucinations, rapid breathing and generalized aches and pains. Any staff member who suspects that an inmate may be suffering from overdose or experiencing withdrawal symptoms shall promptly notify the supervisor, who shall ensure that the appropriate medical staff is notified.

### 702.6.2  INMATE SEPARATION

Inmates should be kept separate from the general population during the admission process. Newly admitted inmates should be separated according to the facility's classification plan.

## 702.7  INMATE PROPERTY CONTROL

All property received from inmates at the time of booking shall be inventoried in the presence of the inmate. A receipt should be signed by the inmate and the booking sworn member and referenced to the booking number before the admission is completed. A copy of the property receipt will be retained and placed with the property. A second copy will be presented to the inmate at the time of booking (20 Ill. Adm. Code 701.40(g); 20 Ill. Adm. Code 720.25(h)).

Copyright Lexipol, LLC 2020/03/16, All Rights Reserved.
Published with permission by Cook County Department of
Corrections

**ROLAND GROUP EXH 2**

# Cook County Department of Corrections
Custody Manual

*Inmate Reception and Intake*

Personal property and clothing shall be stored in containers designed for this purpose. After discharge from the Department, clothing may be picked up by an authorized family member and/or other person within 45 days.

Refer to the applicable policy and procedure.

### 702.7.1  VERIFICATION OF INMATE'S MONEY

All monies belonging to the inmate and retained by the booking Trust Unit sworn member shall be verified in front of the inmate. When possible, the inmate should initial the dollar amount on the booking sheet. All money should be entered into a money kiosk. The receipt generated by the kiosk should be signed by the inmate and a trust officer. The original copy should be forwarded to the Trust Unit.

Negotiable checks or other instruments and foreign currency should be kept with the inmate's property. Any check from another law enforcement agency should be forwarded to the Trust Unit to be deposited in the inmate's trust account. Other small property should also be sealed in an envelope (20 Ill. Adm. Code 701.40(g)).

If a money kiosk is not available, the appropriate procedure should be followed.

Jewelry (with the exception of a wedding band) should be inventoried by the arresting agency and will not be accepted by the Department. If jewelry is located, it shall be inventoried by the receiving member. If the jewelry cannot be removed, the inmate will be taken to a qualified health care professional who will assess the jewelry for removal.

### 702.7.2  PROPERTY STORAGE

All inmate property should be stored in a secure storage area. Only authorized sworn members may access the storage area and only for the purpose of depositing or retrieving property, or to conduct duly authorized work, including maintenance and other duties as directed by the Superintendent (20 Ill. Adm. Code 701.40(g)).

### 702.8  INMATE TELEPHONE CALLS

Every inmate, whether adult or juvenile, detained in this facility shall be entitled to a reasonable number of completed telephone calls, both local and long distance, to an attorney of choice, a family member or friend immediately upon being admitted and generally within one hour (20 Ill. Adm. Code 701.40(h); 20 Ill. Adm. Code 720.20(b)). The calls may be of a duration that reasonably allows the inmate to make necessary arrangements for matters that he/she may be unable to complete as a result of being arrested. The calls shall not exceed a total of 15 minutes. The calls are not intended to be lengthy conversations and the sworn members may use their judgment in determining the reasonable duration of the calls. If it is determined that the person is a custodial parent with responsibility for a minor child, the person shall be entitled to make such additional telephone calls as reasonably necessary for the purpose of arranging care for the minor child.

Copyright Lexipol, LLC 2020/03/16, All Rights Reserved.
Published with permission by Cook County Department of Corrections

**ROLAND GROUP EXH 2**

# Cook County Department of Corrections
Custody Manual

*Inmate Reception and Intake*

There is no obligation for the sworn members to make a telephone call on an inmate's behalf, for example in the case of a person who is so intoxicated that he/she cannot make a call. The sworn members are not required to wake an intoxicated person so that the person may complete a call. An intoxicated person should be provided the opportunity to make the telephone calls once the person awakes.

## 702.8.1   TELEPHONE CALL PROCEDURES
Local and long distance calls will be paid by the inmate, using calling cards or by calling collect (20 Ill. Adm. Code 701.40(h)).

Calls between the inmate and his/her attorney, that have been appropriately requested and approved, shall be deemed confidential and shall not be monitored, eavesdropped upon or recorded.

## 702.8.2   ONGOING TELEPHONE ACCESS
Ongoing telephone access for inmates who are housed at this facility will be in accordance with the Inmate Telephone Access Policy.

## 702.9   SHOWERING AND CLOTHING EXCHANGE
Showering should occur when an inmate is transferred to his/her designated housing (20 Ill. Adm. Code 701.40(m)). (Also see the Inmate Hygiene Policy).

Copyright Lexipol, LLC 2020/03/16, All Rights Reserved.
Published with permission by Cook County Department of
Corrections

**ROLAND GROUP EXH 2**

# Cook County Department of Corrections
### Custody Manual

# Medical Aid and Response

## 146.1  PURPOSE AND SCOPE
This policy recognizes that members often encounter persons who appear to be in need of medical aid or mental health assistance and establishes a law enforcement response to such situations.

### 146.1.1  ISSUANCE/EFFECTIVE DATE
This policy was re-issued on Dec. 2, 2019 and shall become effective upon issuance (operational updates).

## 146.2  POLICY
It is the policy of the Cook County Sheriff's Office that all sworn members be trained to provide emergency medical aid and to facilitate an emergency medical response.

## 146.3  FIRST RESPONDING MEMBER RESPONSIBILITIES
Whenever practicable and safe to do so, members should take appropriate steps to provide initial medical aid (e.g., first aid, CPR and use of an automated external defibrillator (AED)) in accordance with their training and current certification levels. This should be done for those in need of immediate care and only when the member can safely do so.

Prior to initiating medical aid, the member should contact the Communications Center or 9-1-1 and request response by Emergency Medical Services (EMS) as the member deems appropriate.

Members should follow universal precautions when providing medical aid, such as wearing gloves and avoiding contact with bodily fluids, consistent with the Communicable Diseases Policy. Members should use a barrier or bag device to perform rescue breathing if available.

When requesting EMS, the member should provide the Communications Center or 9-1-1 with information for relay to EMS personnel in order to enable an appropriate response, including:

    (a)    The location where EMS is needed.

    (b)    The nature of the incident.

    (c)    Any known scene hazards.

    (d)    Information on the person in need of EMS, such as:

        1.    Signs and symptoms as observed by the member.

        2.    Changes in apparent condition.

        3.    Number of patients, sex and age, if known.

        4.    Whether the person is conscious, breathing and alert, or is believed to have consumed drugs or alcohol.

        5.    Whether the person is showing signs or symptoms of excited delirium or other agitated chaotic behavior.

Copyright Lexipol, LLC 2020/03/16, All Rights Reserved.
Published with permission by Cook County Department of Corrections

**ROLAND GROUP EXH 2**

# Cook County Department of Corrections
Custody Manual

*Medical Aid and Response*

Members should stabilize the scene whenever practicable while awaiting the arrival of EMS. Members should turn care of the person over to EMS upon arrival and assist as directed. Members should not direct EMS personnel whether to transport the person for treatment.

## 146.4   TRANSPORTING ILL AND INJURED PERSONS

Except in extraordinary cases where alternatives are not reasonably available, members should not transport persons who are unconscious, who have serious injuries or who may be seriously ill. EMS personnel should be called to handle patient transportation.

Sworn members should search any person who is in custody before turning that person over to EMS for transport.

A sworn member should accompany any person in custody during transport in an ambulance, when it reasonably appears necessary to provide security, when it is necessary for investigative purposes or when so directed by a supervisor.

Members should not lead an emergency escort for medical transport or civilian vehicles. Members may follow an ambulance.

## 146.5   PERSONS REFUSING EMS CARE

If a sworn member believes that a person requires EMS care and the person refuses, they should encourage the person to receive medical treatment. If the person still refuses, the sworn member shall request that EMS respond and evaluate the person. The sworn member may also consider contacting a family member to help persuade the person to agree to treatment or who may be able to authorize treatment for the person.

If EMS determines that a person in the custody of the Sheriff's Office (i.e., an arrestee, detainee, or inmate) still requires further medical attention after the person has refused medical care, the sworn member will require the person to be transported to the nearest medical facility. In such cases, the sworn member should notify a supervisor prior to the transport.

If a person who is not in custody refuses EMS care or refuses to be transported to a medical facility, a member shall not force that person to receive care or be transported, unless the circumstances require a civil commitment assessment. However, members may assist EMS personnel when EMS personnel determine the person lacks mental capacity to understand the consequences of refusing medical care or to make an informed decision and the lack of immediate medical attention may result in serious bodily injury or the death of the person.

In cases where mental illness may be a factor (e.g., suicidal, danger to self or others), the sworn member should consider proceeding with a civil commitment in accordance with the Civil Commitments Policy, if applicable.

Members shall not sign refusal-for-treatment forms or forms accepting financial responsibility for treatment. If applicable, a copy of a refusal-for-treatment form signed by the person refusing EMS care should accompany the appropriate report (e.g., Offense/Incident Report).

Copyright Lexipol, LLC 2020/03/16, All Rights Reserved.
Published with permission by Cook County Department of Corrections

**ROLAND GROUP EXH 2**

# Cook County Department of Corrections
Custody Manual

*Medical Aid and Response*

## 146.6   SICK OR INJURED ARRESTEE

If an arrestee appears ill or injured, or claims illness or injury, they should be medically cleared prior to booking. If the sworn member has reason to believe the arrestee is feigning injury or illness, the member shall contact the appropriate medical service (e.g., EMS, Cermak) and an immediate on-duty supervisor, who will determine whether medical clearance will be obtained prior to booking. Refer to the Persons Refusing Medical Care section of this policy.

If the jail or detention facility refuses to accept custody of an arrestee based on medical screening, the sworn member should note the name of the facility person refusing to accept custody and the reason for refusal, and should notify an on-duty supervisor to determine the appropriate action.

Arrestees who appear to have a serious medical issue should be transported by ambulance. Sworn members shall not transport an arrestee to a hospital without a supervisor's approval.

Nothing in this section should delay a sworn member from requesting EMS when an arrestee reasonably appears to be exhibiting symptoms that appear to be life threatening, including breathing problems or an altered level of consciousness, or is claiming an illness or injury that reasonably warrants an EMS response in accordance with the sworn member's training.

## 146.7   MEDICAL ATTENTION RELATED TO USE OF FORCE

Specific guidelines for medical attention for injuries sustained from a use of force may be found in the Use of Force, Handcuffing and Restraints, Control Devices and Techniques, and Conducted Energy Device policies.

## 146.8   AUTOMATED EXTERNAL DEFIBRILLATOR (AED) USE

A member should use an AED only after he/she has successfully completed a course of instruction in accordance with the standards of a nationally recognized organization or rules existing under the AED Act, 410 ILCS 4/20.

### 146.8.1   AED USER RESPONSIBILITY

Any AED that is not functioning properly will be taken out of service and given to the immediate on-duty supervisor who will ensure it is transferred to the Training Academy, which is responsible for appropriate maintenance.

Following use of an AED, the device shall be cleaned and/or decontaminated as required. The electrodes and/or pads will be replaced as recommended by the AED manufacturer. If a Sheriff's Office-owned AED is transported off-site (e.g., with EMS, to Cermak) for any reason (e.g., download of log files, servicing), the AED shall be returned to the respective facility/unit as soon as practicable.

Any member using an AED shall notify the Communications Center or 9-1-1 as soon as possible and request response by EMS (410 ILCS 4/20). As soon as practicable, an on-duty supervisor should be notified to respond to the scene. Following the response by Sheriff's Office members, a notification of the Sheriff's Office-owned AED deployment shall also be made to the respective

Copyright Lexipol, LLC 2020/03/16, All Rights Reserved.
Published with permission by Cook County Department of
Corrections

**ROLAND GROUP EXH 2**

*Medical Aid and Response*

department coordinator and the Sheriff's Office Building Management and Construction Unit via email at ccso.aed-deployment@cookcountyil.gov.

**Internal AED usage logs** - Members will permit the Sheriff's Office-owned AED device to be brought to the care facility if EMS personnel request it (e.g., to download the device's internal log files at a hospital), in which case, an on-duty supervisor will ensure the AED is recovered once EMS personnel are done with it. A download shall occur for any instance where a Sheriff's Office-owned AED is deployed and pads are affixed to the individual.

If EMS or a hospital does not arrange for the download of the Sheriff's Office-owned AED's internal log files, the Building Management and Construction Unit should coordinate with the respective facility/unit and the respective department coordinator to ensure that the AED is transported to Cermak to initiate the download of the internal log files. Following the download, a copy of the internal log files shall be:

(a) Provided to the treating facility (e.g., by faxing or delivering a report printout as soon as practicable); and

(b) Maintained by the respective department.

**External AED usage logs** - If the AED is owned by another entity, the on-duty supervisor should ensure the log files are retrieved.

146.8.2 AED REPORTING
Any member using an AED will complete an incident report detailing its use.

146.8.3 AED TRAINING AND MAINTENANCE
The respective department's designated unit/member shall ensure that the Department is equipped with at least one operational and functional AED and that all AEDs are appropriately maintained and tested (55 ILCS 5/3-6040; 65 ILCS 5/11-1-13; 410 ILCS 4/20). Where practicable, the respective department should use a three-minute response time as a guideline for placement of AEDs in its facilities.

The designated members from each department will maintain a list of current locations of all the AEDs for which that department is responsible. For each of those AEDs, inspection log forms will be used to record periodic inspections and inventory information (including make, model, serial number, location, supplies, and applicable expiration dates). Records of all maintenance and testing should be maintained in accordance with the established records retention schedule.

For each AED the respective department is responsible for, the designated unit/member should ensure:

(a) The device is opened and checked once a month as instructed on the AED Monthly Inspection Log.

(b) A full inspection is completed once every 12 months as instructed on the AED Annual Inspection Log.

Copyright Lexipol, LLC 2020/03/16, All Rights Reserved.
Published with permission by Cook County Department of Corrections

**ROLAND GROUP EXH 2**

# Cook County Department of Corrections
Custody Manual

*Medical Aid and Response*

---

    (c)    The manufacturer-recommended number of extra supplies (e.g., batteries, electrode/defibrillator pads) are maintained and recorded as part of regular inspections, and that more supplies are ordered when expired, faulty or used items are replaced from existing stock.

    (d)    Each permanent AED location is clearly marked with a designated cabinet, sign or both.

    (e)    If applicable, AED software has been installed on a designated computer in the facility to retrieve AED logs.

The Executive Director of the Training Academy or the authorized designee shall ensure that an adequate number of members receive training in the use of an AED (55 ILCS 5/3-6040; 65 ILCS 5/11-1-13; 410 ILCS 4/20).

## 146.9   ADMINISTRATION OF OPIOID OVERDOSE MEDICATION
Members may administer opioid overdose medication (20 ILCS 301/5-23) and should be consistent with any applicable training and certification (e.g., CPR). See the Opioid Overdose Medication Procedure for further details.

### 146.9.1   OPIOID OVERDOSE MEDICATION USER RESPONSIBILITIES
Members who are qualified to administer opioid overdose medication, such as naloxone, should handle, store and administer the medication consistent with their training. Members should check the medication and associated administration equipment at the beginning of their shift to ensure they are serviceable and not expired. Any expired medication or unserviceable administration equipment should be removed from service and given to the department's designee.

Any member who administers an opioid overdose medication should contact the Communications Center as soon as possible and request response by EMS.

### 146.9.2   OPIOID OVERDOSE MEDICATION REPORTING
Any member administering opioid overdose medication should detail its use in an appropriate report (e.g., Offense/Incident Report, Incident Report).

All reports should be forwarded to and retained by the Training Academy.

### 146.9.3   OPIOID OVERDOSE MEDICATION TRAINING
The Executive Director of the Training Academy or the authorized designee should ensure training is provided to members authorized to administer opioid overdose medication that includes information and training on drug overdose prevention and recognition, the administration of an overdose medication and care for the person after administration of the medication as provided in 20 ILCS 301/5-23. The training should also include the proper storage, care and transportation of the medication.

---

Copyright Lexipol, LLC 2020/03/16, All Rights Reserved.
Published with permission by Cook County Department of
Corrections

**ROLAND GROUP EXH 2**

# Cook County Department of Corrections
Custody Manual

*Medical Aid and Response*

---

### 146.10  FIRST AID TRAINING

Subject to available resources, the Executive Director of the Training Academy or the authorized designee should ensure sworn members receive periodic first aid training appropriate for their position.

---

Copyright Lexipol, LLC 2020/03/16, All Rights Reserved.
Published with permission by Cook County Department of
Corrections

**ROLAND GROUP EXH 2**

# Sanitation Inspections

## 1000.1 PURPOSE AND SCOPE

The purpose of this policy is for the Cook County Department of Corrections to promote and instruct the members on environmental safety and sanitation requirements established by applicable laws, ordinances and regulations. This policy establishes a plan for housekeeping tasks and inspections required to identify and correct unsanitary or unsafe conditions or work practices in the Department.

### 1000.1.1 ISSUANCE/EFFECTIVE DATE

This policy was re-issued on Mar. 1, 2019 and shall become effective on Mar. 31, 2019 at 0001 hours (operational updates).

## 1000.2 POLICY

It is the policy to maintain a safe and sanitary department. To accomplish this goal each division/unit will maintain a written plan that contains schedules and procedures for conducting daily, and monthly sanitation inspections. The Executive Director or the authorized designee will ensure that the plan addresses, at minimum, the following:

(a) Division sanitation plan (e.g., daily, weekly, monthly cleaning, maintenance).

(b) Documentation to identify problems and to ensure cleanliness of each division/unit.

(c) Procedures, schedules and responsibilities for coordinating annual regulatory inspections by the Illinois Department of Corrections, including how deficiencies are to be addressed and corrected in a timely manner.

(d) A list of approved equipment, cleaning chemicals and related materials, operational instructions, and safe handling procedures.

(e) Record-keeping of inspections, reports and actions taken to correct deficiencies.

(f) Training requirements for members and inmate workers on accident prevention and avoidance of hazards with regard to department maintenance.

Consideration should be given to general job descriptions and/or limitations relating to members or inmates assigned to carrying out the plan. Specialized tasks, such as changing air filters and cleaning ducts are more appropriately handled by the Department of Facilities Management or may be contracted by a private firm.

Inmates engaged in sanitation duties shall do so only under the direct supervision of sworn members.

Prior to the end of the shift, the Watch Commander or the authorized designee shall inspect areas based on inmate grievances and the areas on the shift's daily sanitation duties schedule to confirm the scheduled duties were completed

The Environmental Health Specialist or the authorized designee should conduct random inspections of all divisions and units to confirm compliance with the division sanitation plan.

Copyright Lexipol, LLC 2020/03/16, All Rights Reserved.
Published with permission by Cook County Department of Corrections

**ROLAND GROUP EXH 2**

# Cook County Department of Corrections
Custody Manual

*Sanitation Inspections*

---

If the Environmental Health Specialist or the authorized designee detects any deficiencies that require attention he/she shall contact the Sheriff's Work Order Department via email to workorderstaff@cookcounty.onmicrosoft.com as soon as practicable.

## 1000.3  WORK ORDERS

All reports of unsafe conditions as well as repairs needed to the facility and equipment shall be documented in a work order. The respective Superintendent will designate a member to receive these work orders and take appropriate action to ensure the repairs or action is taken. All work and action taken will also be documented.

Refer to the Work Order Request Procedure for further guidance

## 1000.4  SAFETY DATA SHEETS (SDS)

Materials and substances used in the operation and maintenance of the Department may qualify as hazardous material. Hazardous material is required to have a Safety Data Sheet (SDS) that is provided by the manufacturer or distributor of the material. The SDS provides vital information on individual hazardous material and substances, including instructions on safe handling, storage, and disposal, prohibited interactions and other details relative to the specific material.

Each Superintendent is responsible for maintaining a SDS in the sanitation office for all chemicals being used. Each area of the Department in which any hazardous chemicals is stored or used shall maintain a SDS file in an identified location and a log for identification of new or revised SDS materials. (29 CFR 1910.1200(e)(1)).

### 1000.4.1  SDS USE, SAFETY AND TRAINING

Members and inmates shall have ready and continuous access to the latest SDS from the manufacturer for the cleaning chemicals they are using while working. In addition, the following shall be completed (29 CFR 1910.1200(e)(1)(ii)):

(a)  Members and inmates using the SDS shall review the information as necessary to be aware of any updates and to remain familiar with the safe use and handling of the hazardous chemicals they are using.

### 1000.4.2  SDS DOCUMENTATION MAINTENANCE

Changes in SDS information occur often and without general notice. Any person accepting a delivery, addition, or replacement of hazardous chemicals  shall review the accompanying SDS. If additions or changes have occurred, the revised SDS shall be incorporated into the file and a notation shall be made in the SDS revision log.

The division sanitation officer shall review SDS information in their work areas semi-annually or when necessary to determine if the information is up-to-date. Upon review, a copy of the SDS file shall be forwarded to the Environmental Health Specialist or the authorized designee.

---

Copyright Lexipol, LLC 2020/03/16, All Rights Reserved.
Published with permission by Cook County Department of
Corrections

**ROLAND GROUP EXH 2**

# Cook County Department of Corrections
Custody Manual

*Sanitation Inspections*

---

1000.4.3   SDS RECORDS MASTER INDEX

The Environmental Health Specialist or the authorized designee will compile a master index of all cleaning chemicals in the Department, including locations, along with a master file of SDS information. He/she will maintain this information electronically. Documentation of the semi-annual reviews will be maintained in the SDS master file. The master index should also include a comprehensive, up-to-date list of emergency phone numbers (e.g., fire department, poison control center) (29 CFR 1910.1200(g)(8)).

---

Copyright Lexipol, LLC 2020/03/16, All Rights Reserved.
Published with permission by Cook County Department of
Corrections

**ROLAND GROUP EXH 2**

| Policy | Cook County Department of Corrections |
|---|---|
| **1006** | Custody Manual |

# Workplace Safety Workgroup

## 1006.1  PURPOSE AND SCOPE

The purpose of this policy is to bring employees and Executive Staff together in a non-adversarial, cooperative effort to reduce the incidence of injury and illness for members of the Cook County Department of Corrections, in accordance with the requirements of the Illinois Occupational Safety and Health Act (820 ILCS 219/1 et seq.). The Workplace Safety Workgroup assists the Department by making recommendations for improvement and is overseen by the Sheriff's Office Risk Manager.

Although this policy provides the essential guidelines for a workgroup plan that reduces injury and illness, it may be supplemented by department procedures outside of the Policy Manual.

### 1006.1.1  ISSUANCE/EFFECTIVE DATE

This policy was issued on Aug. 1, 2019 and shall become effective upon issuance.

### 1006.1.2  DEFINITION

**Workplace Safety Workgroup -** The Workplace Safety Workgroup should consist of Sheriff's Office members drawn from the following:

    (a)    Cook County Sheriff's Office of Risk Management

    (b)    Cook County Correctional Officers' union

    (c)    Cook County Correctional Sergeants' union

    (d)    Cook County Correctional Lieutenants' union

    (e)    Cook County non-sworn members' union

    (f)    Cook County Sheriff's Office Executive Staff

    (g)    Cook County Sheriff's Office Building Management and Construction Unit

    (h)    Cook County Sheriff's Office Department of Quality Improvement

## 1006.2  WORKPLACE SAFETY WORKGROUP

### 1006.2.1  COMPOSITION

The Safety Workgroup shall be composed of an equal number of Executive Staff and employee representatives. The Workgroup shall elect a chairperson and secretary. Executive Staff and employee representatives should alternate in the positions. Workgroup Members names shall be posted on bulletin boards throughout the Department.

The Chairperson is responsible for ensuring that each item on the agenda receives attention, for keeping the meeting on task, and for closing the meeting on a constructive note.

The Secretary is responsible for recording and distributing meeting minutes.

Copyright Lexipol, LLC 2020/03/16, All Rights Reserved.
Published with permission by Cook County Department of Corrections

**ROLAND GROUP EXH 2**

*Workplace Safety Workgroup*

---

1006.2.2  LENGTH OF SERVICE ON WORKPLACE SAFETY WORKGROUP
Employee representatives shall serve on the Workgroup for two-year terms and may be removed and replaced with the approval of the Workgroup. Assigned Executive Staff designees shall represent management until replaced. Length of membership should be alternated or staggered so that at least one experienced member is always serving on the Workgroup.

1006.2.3  UNION MEMBER CRITERIA
The respective unions should each nominate a member(s) of their respective union for consideration to be on the Workgroup. The nominated member(s) shall not be approved for inclusion in the Workgroup if the member(s) has received four or more suspension days in the previous 12 months or has a pending merit board case. No members on a leave of absence shall serve on the Workgroup. All members shall be approved by the Sheriff's Office Chief of Staff prior to admission into the Workgroup.

**1006.3  WORKPLACE SAFETY WORKGROUP'S RESPONSIBILITIES**
The Workplace Safety Workgroup's responsibilities shall include:

(a)  Developing a written agenda for conducting safety meetings

(b)  Holding meetings every two months at the Executive Director's Office. Special meetings may be scheduled to deal with issues that are of an emergency nature.

  1.  Minutes of special meetings will be posted and distributed as soon as practicable.

(c)  Recognizing members who perform safe work practices.

1006.3.1  SAFETY RELATED INCIDENTS
The Safety Workgroup shall review reported safety related incidents,including injury accidents, illnesses, and death, and making recommendations for the prevention of future incidents. The information obtained shall be reviewed at the next Safety Workgroup meeting and recorded in the minutes for review and possible action by the employer.

A reasonable time limit shall be established for the Department to respond in writing to all Safety Workgroup recommendations.

1006.3.2  SAFETY AND HEALTH INFORMATION
The Safety Workgroup shall:

(a)  Establish a communication system facilitating the continuous flow of safety and health information between managers and members. This system shall include:

  1.  A complaint process that is separate from the employee grievance process.

  2.  Safety inspections of workplace hazards.

  3.  Recommendations for improvement.

(b)  Post or distribute safety information, including the notice required by the Illinois Occupation Safety and Health Act (820 ILCS 219/1 et seq.; 56 Ill. Adm. Code 350.30)

---

Copyright Lexipol, LLC 2020/03/16, All Rights Reserved.
Published with permission by Cook County Department of Corrections

**ROLAND GROUP EXH 2**

# Cook County Department of Corrections
Custody Manual

### 1006.3.3   SAFETY MANDATES REVIEW
The Safety Workgroup shall:

Establish a system for reviewing whether safety mandates are met that relate to:

Occupational safety and health standards adopted under 820 ILCS 219/25 and 56 Ill. Code 350.700, including:

      (a)   Communicable diseases (29 CFR 1910.1030).

      (b)   Respiratory protection (29 CFR 1910.134).

      (c)   Emergency action plan (29 CFR 1910.38).

## 1006.4   HAZARDS
All members should report and/or take reasonable steps to correct unsafe or unhealthy work conditions, practices or procedures in a timely manner. Members should make their reports to his/her immediate supervisor.

Supervisors should notify the Risk Manager and make reasonable efforts to correct unsafe or unhealthy work conditions in a timely manner, based on the severity of the hazard. These hazards should be corrected when observed or discovered, when it is reasonable to do so. When a hazard exists that cannot be immediately abated without endangering members or property, supervisors should protect or remove all exposed members from the area or item, except those necessary to correct the existing condition.

Members who are involved in correcting the hazardous condition shall be provided with the necessary protection.

All significant actions taken and dates they are completed shall be documented and forwarded to the Executive Director via the chain of command.

The Executive Director or the authorized designee shall take appropriate action to ensure the Safety Workgroup addresses potential hazards upon such notification.

## 1006.5   SAFETY INSPECTIONS
Safety inspections are crucial to a safe work environment. These inspections identify and evaluate workplace hazards and permit mitigation of those hazards. The respective forms should be used for documentation and to ensure a thorough assessment of the work environment.

### 1006.5.1   INSPECTIONS BY ILLINOIS DEPARTMENT OF LABOR (IDOL)
The Risk Manager should accompany an Illinois Department of Labor inspection officer during any physical inspection of the Department as provided by Illinois law (820 ILCS 219/75; 56 Ill. Adm. Code 350.90).

## 1006.6   RECORDS
Records relating to injury and illness prevention shall be maintained in accordance with the applicable records retention schedule.

**ROLAND GROUP EXH 2**

**Procedure**

**135**

# Exposure Control Plan Procedure

## 135.1  PURPOSE AND SCOPE

The purpose of the exposure control plan (ECP) is to eliminate or minimize occupational exposure to bloodborne pathogens in accordance with OSHA standard 29 CFR 1910.1030, "Occupational Exposure to Bloodborne Pathogens."

### 135.1.1  ISSUANCE/EFFECTIVE DATE

This procedure was issued on December 31, 2019 and shall become effective upon issuance (OSHA mandates).

### 135.1.2  DEFINITIONS

Definitions related to this procedure include:

**Blood** - Human blood, human blood components and products made from human blood.

**Blood/Potentially Infectious Material Spill Kit** - Specially designed equipment and personal protective equipment consisting minimally of a red biohazard waste bag, solidifying powder and a pair of Sheriff's Office-issued protective gloves used to clean up blood and/or potentially infectious material spills.

**Contaminated Laundry** - Laundry that has been soiled with blood or other potentially infectious materials or may contain sharps.

**Decontamination** - The use of physical or chemical means to remove, inactivate or destroy bloodborne pathogens on a surface or item to the point where they are no longer capable of transmitting infectious particles and the surface or item is rendered safe for handling, use or disposal.

**Engineering Controls** - Controls (e.g., sharps disposal containers, self-sheathing needles, safer medical devices, such as sharps with engineered sharps injury protections and needleless systems) that isolate or remove the bloodborne pathogens hazard from the workplace.

**Licensed Healthcare Professional** - A person whose legally permitted scope of practice allows them to independently perform the activities required by paragraph (f) Hepatitis B Vaccination and Post-exposure Evaluation and Follow-up.

**HBV** - Hepatitis B Virus.

**HCV** - Hepatitis C Virus.

**HIV** - Human Immunodeficiency Virus.

**Occupational Exposure** - Reasonably anticipated skin, eye, mucous membrane or parenteral contact with blood or other potentially infectious materials that may result from the performance of an employee's duties.

Copyright Lexipol, LLC 2020/03/16, All Rights Reserved.
Published with permission by Cook County Department of Corrections

**ROLAND GROUP EXH 2**

*Exposure Control Plan Procedure*

---

**Regulated Waste** - Liquid or semi-liquid blood or other potentially infectious materials; contaminated items that would release blood or other potentially infectious materials in a liquid or semi-liquid state if compressed; items that are caked with dried blood or other potentially infectious materials and are capable of releasing these materials during handling; contaminated sharps; and pathological and microbiological wastes containing blood or other potentially infectious materials.

**Source Individual** - Any individual, living or dead, whose blood or other potentially infectious materials may be a source of occupational exposure to the member.

For further guidance, refer to Universal Precautions of Bloodborne Pathogens Procedure and Tool and Equipment Control Policy.

## 135.2 POLICY

The Cook County Sheriff's Office is committed to providing a safe and healthful work environment for our entire staff. The ECP is a key document to assist the Sheriff's Office in implementing and ensuring compliance with the OSHA standard, thereby protecting our members.

## 135.3 EXPOSURE CONTROL PLAN COMPONENTS

This ECP includes:

    (a)    Determinations of member exposure

    (b)    The implementation of various methods of exposure control, including:

        1.    Universal precautions

        2.    Engineering and work practice controls

        3.    Personal protective equipment

        4.    Housekeeping

    (c)    Hepatitis B vaccinations

    (d)    Post-exposure evaluations and follow-up

    (e)    Communication of hazards to members and training

    (f)    Recordkeeping

    (g)    Procedures for evaluating circumstances surrounding an exposure incident

## 135.4 PROGRAM ADMINISTRATION

### 135.4.1 SHERIFF'S OFFICE DEPARTMENT OF RISK MANAGEMENT RESPONSIBILITIES

The Sheriff's Office Department of Risk Management is responsible for the implementation of the ECP. The Sheriff's Office Department of Risk Management will maintain, review and update the ECP at least annually, and whenever necessary to include new or modified tasks and procedures.

Copyright Lexipol, LLC 2020/03/16, All Rights Reserved.
Published with permission by Cook County Department of
Corrections

**ROLAND GROUP EXH 2**

*Exposure Control Plan Procedure*

---

### 135.4.2  MEMBER RESPONSIBILITIES

Those members who are determined to have had an occupational exposure to blood or other potentially infectious materials (OPIM) (e.g., semen, any bodily fluid that is contaminated with blood, all bodily fluid in situations where it is difficult or impossible to differentiate between bodily fluids) must comply with the procedures and work practices outlined in this ECP.

### 135.4.3  SHERIFF'S OFFICE DEPARTMENT OF SUPPLY CHAIN MANAGEMENT RESPONSIBILITIES

The Office of Supply Chain Management will maintain and provide all necessary personal protective equipment (PPE), sharps containers, labels, and red bags as required by the standard. The Office of Supply Chain Management will ensure that adequate supplies of the aforementioned equipment are available in the appropriate sizes. For additional supplies, the Office of Supply Chain Management should be contacted at sheriff.supply@cookcountyil.gov.

### 135.4.4  SUPERVISOR RESPONSIBILITIES

Supervisors should ensure that all initial decontamination and medical actions required are performed, and that the proper documents are provided, completed and submitted to the Office of Risk Management (ccso.riskmanagement@cookcountyil.gov) as soon as practicable but no later than 24 hours following the incident, absent exigent circumstances.

### 135.4.5  TRAINING ACADEMY RESPONSIBILITIES

The Training Academy will be responsible for training and documentation of training.

### 135.5  MEMBER EXPOSURE DETERMINATION

All members of the Sheriff's Office may be subject to occupational exposure.

### 135.6  METHODS OF IMPLEMENTATION AND CONTROL

### 135.6.1  UNIVERSAL PRECAUTIONS

All members will utilize universal precautions when handling blood or other potentially infectious materials.

In addition to the normal policy and procedure distribution, the latest copy of the ECP will be reviewed during annual refresher training and available through the Learning Management System as appropriate.

The Sheriff's Office Director of Risk Management is responsible for reviewing and updating the ECP annually or more frequently if necessary to reflect any new or modified tasks and procedures that affect occupational exposure and to reflect new or revised member positions with occupational exposure.

### 135.6.2  ENGINEERING CONTROLS AND WORK PRACTICES

Engineering controls and work practices are those that will be used to prevent or minimize exposure to chemical hazards, toxic substances, bloodborne pathogens and communicable diseases.

---

Copyright Lexipol, LLC 2020/03/16, All Rights Reserved.
Published with permission by Cook County Department of
Corrections

**ROLAND GROUP EXH 2**

# Cook County Department of Corrections
Cook County DOC Procedures Manual

## Exposure Control Plan Procedure

Some specific engineering controls and work practice controls used are listed below:

(a) Sharps disposal containers are inspected and maintained or replaced by the contracted agency, whenever necessary to prevent overfilling.

(b) This facility identifies the need for changes in engineering control and work practices through a review of OSHA records, injuries on-duty reports, and communications with the Workplace Safety Workgroup.

(c) We evaluate new procedures or new products regularly by reviewing recommendations made by the Workplace Safety Workgroup, a review of current industry standards and relevant literature.

(d) Both front line members and supervisors are involved in this process.

(e) Minimize contact with hazardous chemicals.

(f) General dilution ventilation.

### 135.6.3 PERSONAL PROTECTIVE EQUIPMENT (PPE)

PPE is provided to designated members at no cost to them. Training is provided by the Training Academy in the use of the appropriate PPE for the tasks or procedures members will perform.

The types of PPE available to members may be as follows but not limited to:

(a) Masks;

(b) Gloves;

(c) Glasses (with solid side shields or chin-length shields);

(d) Disposable aprons/suits; or

(e) Other protective clothing.

PPE is located in areas designated by the respective department head or the authorized designee. All members using PPE should observe the following precautions:

(a) Wash hands immediately or as soon as feasible after removal of gloves or other PPE.

(b) Remove PPE after it becomes contaminated, and before leaving the work area.

(c) Dispose of used PPE in a biohazard bag.

(d) Wear appropriate gloves when it can be reasonably anticipated that there may be hand contact with blood or OPIM, and when handling or touching contaminated items or surfaces; replace gloves if torn, punctured, contaminated or if their ability to function as a barrier is compromised.

    1. Utility gloves may be decontaminated for reuse if their integrity is not compromised; discard utility gloves if they show signs of cracking, peeling, tearing, puncturing or deterioration.

(e) Never wash or decontaminate disposable gloves for reuse.

(f) Wear appropriate face and eye protection when splashes, sprays, spatters or droplets of blood, or OPIM pose a hazard to the eye, nose or mouth.

Copyright Lexipol, LLC 2020/03/16, All Rights Reserved.
Published with permission by Cook County Department of Corrections

**ROLAND GROUP EXH 2**

Case: 1:20-cv-02343 Document #: 430-19 Filed: 04/06/20 Page 146 of 497 PageID #:5576

*Exposure Control Plan Procedure*

---

    (g)    Remove immediately or as soon as practicable any garment contaminated by blood or OPIM, in such a way as to avoid contact with the outer surface.

## 135.6.4  HOUSEKEEPING

Regulated waste is placed in containers that are closable, constructed to contain all contents and prevent leakage, appropriately labeled or color-coded (see Labels) and closed prior to removal to prevent spillage or protrusion of contents during handling.

Sharps disposal containers will be handled by the assigned contracted vendor.

For procedures for handling other regulated waste, refer to current individual department processes.

Contaminated sharps should be discarded immediately or as soon as possible in containers that are closable, puncture-resistant, leak proof on sides and bottoms, and labeled or color-coded appropriately. Sharps disposal containers are available through the Office of Supply Chain Management and are available to members at appropriate locations.

Bins and pails (e.g., wash or emesis basins) are cleaned and decontaminated as soon as practicable after visible contamination by a qualified member or authorized vendor.

Broken glassware which may be contaminated is picked up using mechanical means, such as a brush and dustpan.

## 135.6.5  INTERNAL LAUNDRY

Members shall wear PPE prior to handling contaminated laundry.

    (a)    Contaminated laundry shall be handled as little as possible with a minimum of agitation. Laundry shall not be sorted or rinsed in location of use.

    (b)    All laundry shall be placed in the container/bag where it was used.

    (c)    Wet contaminated laundry that may soak through or cause leakage from a bag or container shall be placed and transported in bags or containers that prevent soak-through and/or leakage of fluids to the exterior.

    (d)    Laundry shall be cleaned in this facility's laundries or, as directed, transported for outsourced cleaning.

## 135.6.6  LABELS

The responsible member will ensure warning labels are affixed (e.g., biohazard label) or red bags are used as required if regulated waste or contaminated equipment/laundry is brought into the facility. Members are to notify a supervisor if they discover regulated waste containers, refrigerators containing blood or OPIM, contaminated equipment or other suspected contaminated material without proper labels.

Evidence and specimens shall be labeled/handled in accordance with the applicable policy (e.g., Property and Evidence Policy, Communicable Diseases Policy).

---

Copyright Lexipol, LLC 2020/03/16, All Rights Reserved.
Published with permission by Cook County Department of
Corrections

**ROLAND GROUP EXH 2**

*Exposure Control Plan Procedure*

---

### 135.7 HEPATITIS B VACCINATION

The Training Academy will provide training to members on hepatitis B vaccinations, addressing the safety, benefits, efficacy, methods of administration and availability. The hepatitis B vaccination series is available at no cost after training and within 10 days of initial assignment to members identified in the exposure determination section of this plan.

Vaccination is encouraged unless:

    (a)    Documentation exists that the member has previously received the series,

    (b)    Antibody testing reveals that the member is immune, or

    (c)    Medical evaluation shows that vaccination is contraindicated.

Vaccination will be provided at no cost by member's employer sponsored health care plan. If the member is covered by an HMO, then the vaccine must be provided by the member's primary care physician. If the member is covered by an PPO, the vaccine has to be provided by a covered in-network provider. Documentation indicating the vaccination was performed must be provided following each administration of the vaccination series.

Members who previously received Hepatitis B vaccinations must provide to the Sheriff's Office Human Resources (HR) prior to the first day of employment, or within 10 working days of initial assignment to potential exposure, documentation indicating that the series was previously received. If documentation is unavailable or the vaccine is unnecessary, the member must provide a written opinion from a medical provider regarding whether the member requires the hepatitis vaccine and, if so, whether the vaccine was administered.

However, if a member chooses to decline vaccination, the member must sign a declination form. Members who decline may request and obtain the vaccination at a later date at no cost. Documentation of refusal of the vaccination is kept in HR.

### 135.8 POST-EXPOSURE EVALUATION AND FOLLOW-UP

Should an exposure incident occur, the on-duty supervisor should be contacted as soon as practicable (e.g., by the exposed member, by another member if the exposed member is unable to report)

An immediately available confidential medical evaluation and follow-up will be conducted by an appropriate medical provider. Following the initial first aid (clean the wound, flush eyes or other mucous membrane), the following activities will be performed by the supervisor who was notified:

    (a)    Document the routes of exposure and how the exposure occurred, which may include, but are not limited to:

        1.    Routes of exposure

            (a)    Bodily fluid

            (b)    Non-infectious bodily fluids

        2.    Exposure type:

---

Copyright Lexipol, LLC 2020/03/16, All Rights Reserved.
Published with permission by Cook County Department of
Corrections

**ROLAND GROUP EXH 2**

# Cook County Department of Corrections
Cook County DOC Procedures Manual

*Exposure Control Plan Procedure*

<div style="margin-left:2em">

(a) Percutaneous (injuries that occur when the skin is penetrated by a contaminated sharp object) document the specific type of sharp, including the brand and gauge in the case of needles. Indicate whether the injury is:

    1. Less Severe

    2. More Severe

(b) Mucous membrane exposure (inside the eyes, nose, or mouth) or exposure to non-intact skin

(c) Human bite

</div>

(b) Identify and document the source individual (unless the employer can establish that identification is infeasible or prohibited by state or local law).

(c) Obtain consent and make arrangements to have the source individual tested as soon as possible to determine HIV, HCV, and HBV infectivity; document that the source individual's test results were conveyed to the member's health care provider.

    1. If the source individual is already known to be HIV, HCV and/or HBV positive, new testing need not be performed.

(d) Assure that the exposed member is provided with the source individual's test results and with information about applicable disclosure laws and regulations concerning the identity and infectious status of the source individual (e.g., laws protecting confidentiality).

(e) After obtaining consent, collect the exposed member's blood as soon as practicable after exposure incident, and have the blood tested at an authorized location determined by the Sheriff's Office Director of Risk Management or the authorized designee for HBV and HIV serological status as soon as practicable.

(f) If the member does not give consent for HIV serological testing during collection of blood for baseline testing, the Sheriff's Office Director of Risk Management should request that the authorized location preserve the baseline blood sample for at least 90 days; if the exposed member elects to have the baseline sample tested during this waiting period, perform testing as soon as feasible.

## 135.8.1  ADMINISTRATION OF POST-EXPOSURE EVALUATION AND FOLLOW-UP

HR will ensure that health care professional(s) responsible for Sheriff's Office members hepatitis B vaccinations, post-exposure evaluations and follow-up are given a copy of OSHA's bloodborne pathogens standard.

HR will ensure that the healthcare professional evaluating a member after an exposure incident receives the following:

(a) A description of the member's job duties relevant to the exposure incident;

(b) Route(s) of exposure;

(c) Circumstances of exposure;

(d) If possible, results of the source individual's blood test; and

Copyright Lexipol, LLC 2020/03/16, All Rights Reserved.
Published with permission by Cook County Department of Corrections

**ROLAND GROUP EXH 2**

(e)     Relevant member medical records, including vaccination status.

HR will provide the member with a copy of the evaluating health care professional's written opinion within 15 days after completion of the evaluation.

## 135.9   PROCEDURES FOR EVALUATING THE CIRCUMSTANCES SURROUNDING AN EXPOSURE INCIDENT

The respective department's exposure control officer will review the circumstances of all exposure incidents to determine:

(a)     Engineering controls in use at the time.

(b)     Work practices followed.

(c)     A description of any tool or device that caused or was part of the exposure (including type and brand).

(d)     Protective equipment or clothing that was used at the time of the exposure incident (e.g., gloves, eye shields).

(e)     Location of the incident (e.g., lock-up, inmate cell, tier).

(f)     Member's training.

## 135.10   MEMBER TRAINING

All members who have occupational exposure to bloodborne pathogens will receive periodic training conducted by the Sheriff's Office Training Academy.

All members who have occupational exposure to bloodborne pathogens will receive training on the epidemiology, symptoms and transmission of bloodborne pathogen diseases. In addition, the training program covers, at a minimum, the following elements:

(a)     A copy and explanation of the OSHA standard.

(b)     An explanation of the ECP and how to obtain a copy.

(c)     An explanation of methods to recognize tasks and other activities that may involve exposure to blood and OPIM, including what constitutes an exposure incident.

(d)     An explanation of the use and limitations of engineering controls, work practices and PPE.

(e)     An explanation of the types, uses, location, removal, handling, decontamination and disposal of PPE.

(f)     An explanation of the basis for PPE selection.

(g)     Information on the hepatitis B vaccine, including information on its efficacy, safety, method of administration, the benefits of being vaccinated and that the vaccine will be offered free of charge.

(h)     Information on the appropriate actions to take and persons to contact in an emergency involving blood or OPIM.

Copyright Lexipol, LLC 2020/03/16, All Rights Reserved.
Published with permission by Cook County Department of
Corrections

**ROLAND GROUP EXH 2**

## Exposure Control Plan Procedure

(i) An explanation of the procedure to follow if an exposure incident occurs, including the method of reporting the incident and the medical follow-up that will be made available.

(j) Information on the post-exposure evaluation and follow-up that the employer is required to provide for the member following an exposure incident.

(k) An explanation of the signs and labels and/or color coding required by the standard and used at this facility.

(l) An opportunity for interactive questions and answers with the person conducting the training session.

Training materials for the Sheriff's Office are available at:

- Department of Corrections records - Moraine Valley Community College

- Court Services Department records - South Suburban College

- Sheriff's Police Department - Triton College (digitized)

- Archived records are at Skokie Courthouse

## 135.11 RECORDKEEPING
HR shall ensure that appropriate member health and OSHA records are maintained. All records will be kept in compliance with the current records retention schedule.

### 135.11.1 TRAINING RECORDS
Training records will be completed for each member upon completion of training. The training records include:

(a) The dates of the training sessions.

(b) The contents or a summary of the training sessions.

(c) The names and qualifications of persons conducting the training.

(d) The names and job titles of all persons attending the training sessions.

Member training records will be provided upon request to the member or the member's authorized representative within 15 working days. Such requests should be sent to HR. Refer to the Personnel Records policy.

### 135.11.2 MEDICAL RECORDS
Medical records will be maintained for each member with occupational exposure in accordance with 29 CFR 1910.1020, "Access to Employee Exposure and Medical Records." HR is responsible for maintenance of the required medical records. These confidential records are maintained for at least the duration of employment. Member medical records are provided upon request of the member or to anyone having written consent of the member within 15 working days. Such requests should be sent to HR. Refer to the Personnel Records policy.

Copyright Lexipol, LLC 2020/03/16, All Rights Reserved.
Published with permission by Cook County Department of
Corrections

**ROLAND GROUP EXH 2**

# Cook County Department of Corrections
Cook County DOC Procedures Manual

## *Exposure Control Plan Procedure*

### 135.11.3  OSHA RECORDKEEPING

An exposure incident will be evaluated to determine if the case meets OSHA's recordkeeping requirements (29 CFR 1904). This determination and the recording activities are done by the Sheriff's Office Department of Risk Management.

### 135.11.4  SHARPS INJURY TRACKING

In addition to the 1904 recordkeeping requirements, all percutaneous injuries from contaminated sharps will be tracked by the Sheriff's Office Department of Risk Management.

All incidences must include at least:

    (a)    The date of the injury.

    (b)    The type and brand of the device involved.

    (c)    The department or work area where the incident occurred.

    (d)    An explanation of how the incident occurred.

This log will be reviewed at least annually as part of the annual evaluation of the program and maintained for at least five years following the end of the calendar year that they cover. If a copy is requested, personal identifiers shall be removed from the report.

Copyright Lexipol, LLC 2020/03/16, All Rights Reserved.
Published with permission by Cook County Department of
Corrections

**ROLAND GROUP EXH 2**

# Laundry Exchange and Inventory

## 903.1  PURPOSE AND SCOPE

This procedure establishes guidelines for maintaining inventory as well as exchanging and laundering inmate uniforms, personal items and linens. This procedure does not apply to an inmate's personal clothes.

## 903.2  POLICY

The policy of the Cook County Department of Corrections is to provide all inmates with clean clothing and linens at regularly scheduled intervals.

The Department prohibits inmates from washing and drying clothing or linen within living units.

### 903.2.1  DEFINITIONS

Definitions related to this procedure include:

**Central Laundry Unit officer** - A sworn member responsible for exchanging soiled laundry throughout the Department and supervising inmate workers who launder clothing and linen.

**Inmate personal items** - All clothing and linen items (e.g., undergarments, thermals, towels) that an inmate has purchased through commissary. .

**Issued clothing items** - All clothing items (e.g., uniforms, night gowns, jackets, provided by the Department of Corrections .

**Issued linen items** – All linen items (e.g., sheets, blankets, towels) provided by the Department of Corrections.

## 903.3  PROCEDURES

### 903.3.1  ISSUED CLOTHING ITEMS AND LINENS

    (a)    All inmates are required to exchange soiled clothing items and linens for laundering.

    (b)    Living unit officers who observe clothing items and linens being dried (e.g., on a clothesline) by inmates should confiscate the items or clotheslines used.

        1.    An Inmate Disciplinary Report shall be initiated if an inmate does not comply or any department-issued items have been damaged or destroyed in the process.

    (c)    Each Superintendent or the authorized designee is responsible for ensuring extra issued clothing items and linens are not stored in his/her division. Extra items shall be returned to the Central Laundry Unit.

        1.    Only RTC and Cermak Health Services are allowed extra clothing and linen due to the transient populations.

    (d)    Central Laundry Unit officers should conduct clothing and linen exchanges in accordance with the following schedule as posted in each living unit:

        1.    Issued clothing exchange twice weekly.

Copyright Lexipol, LLC 2020/03/16, All Rights Reserved.
Published with permission by Cook County Department of Corrections

**ROLAND GROUP EXH 2**

*Laundry Exchange and Inventory*

2. Sheet exchange once weekly.

3. Blanket exchange once monthly.

4. Inmate personal laundry twice weekly.

## 903.3.2 CENTRAL LAUNDRY UNIT

The Central Laundry Unit officer assigned to the laundry exchange shall be responsible for the supervision of inmate workers. At no time are inmate workers allowed to have physical contact or communication with inmates on living units during the exchange procedure. Upon reporting for duty, he/she shall:

(a) Retrieve inmate workers from the respective division.

(b) Conduct a pat-down search and body scan of each inmate worker before exiting and upon returning to his/her respective division.

(c) Escort inmate workers to the laundry area and search the worker with a magnetometer or handheld wand upon arrival. Distribute personal protective equipment (PPE) (e.g., gloves, aprons). Members and inmate workers shall wear PPE when handling soiled laundry.

(d) Prepare clean laundry for distribution and proceed to the area of the scheduled exchange.

(e) Upon entering any division for an exchange, an inmate worker shall be subject to a pat-down search, a body scan (if available) or both.

(f) Exchange issued clothing and linens on a one-for-one basis. Inmate privacy when changing should be allowed when practicable. The living unit officer shall provide back-up during the exchange.

(g) Record the number of items exchanged in the Daily Exchange Log.

(h) Return the soiled laundry to the Central Laundry Unit.

(i) Weigh the gurneys containing the soiled laundry. Record the weight in the Issued Laundry Weight Log.

(j) Sort laundry according to type (e.g., shirts, pants, sheets, blankets) and document it in the Daily Exchange Log. Send any damaged items to the seamstress to determine if repairs are needed.

(k) Ensure inmates do not handle laundry chemicals except when changing barrels or accepting deliveries.

(l) Ensure that inmate workers adhere to all safety guidelines and rules and regulations as described in the Inmate Handbook.

(m) Conduct a pat-down search of each inmate prior to returning to the respective division/unit.

Copyright Lexipol, LLC 2020/03/16, All Rights Reserved.
Published with permission by Cook County Department of
Corrections

**ROLAND GROUP EXH 2**

*Laundry Exchange and Inventory*

### 903.3.3  EXCHANGE EXCEPTIONS

The Central Laundry Unit officer shall conduct the clothing and linen exchange by directly issuing clean laundry to inmates in male divisions only, with the following exceptions:

(a)  Cermak - Central Laundry Unit officers shall conduct clothing exchanges in Cermak Health Services of Cook County. Cermak custodians shall exchange linens and store them in the area designated for soiled laundry, keeping infectious items separate. The Central Laundry Unit officer shall collect the soiled linen from the designated area and exchange one-for-one with clean linen.

1.  Infectious clothing and/or linen shall be placed into a biohazard bag and sealed.

2.  Any infectious or contaminated clothing and/or linen collected shall be laundered according to this procedure. Items should not be destroyed or discarded.

(b)  Female divisions - The respective Watch Commander shall assign a sworn member to conduct the clothing and linen exchange in a female division. In the event of equipment failure. The Central Laundry Unit shall assist with the laundering of soiled laundry.

### 903.3.4  SEAMSTRESS RESPONSIBILITIES

Damaged items shall be taken to the seamstress who shall:

(a)  Repair the item if possible;

(b)  Remove the item from inventory if it is no longer serviceable; and

(c)  Email a weekly report of the number of items received, the number of items repaired and the number of items discarded to the Superintendent of Support Services or the authorized designee.

### 903.3.5  RECEIVING, TRUST AND CLASSIFICATION (RTC)

An RTC officer shall exchange soiled clothing one or more times daily in RTC as follows:

(a)  Conduct a count of soiled items;

(b)  Complete the Laundry Uniform/Linen Inventory Report; and

(c)  Replenish the supply with clean inmate clothing and linen for bedrolls.

### 903.3.6  DISCHARGE AND SHIPMENT PROCEDURE

(a)  An assigned sworn member from each division shall collect the soiled linen of a discharged or shipped inmate.

(b)  The assigned sworn member shall ensure that inmate discharges and shipments are in possession of all issued items, including clothing and linen. The assigned sworn member shall collect the issued linens before inmates are escorted to RTC for release. The Watch Commander shall be notified of any discrepancies.

(c)  The assigned sworn member shall store linens collected from inmate discharges and shipments in a gurney designated for soiled laundry.

(d)  Each division shall take the soiled linen to the Central Laundry Unit daily or more frequently if needed.

Copyright Lexipol, LLC 2020/03/16, All Rights Reserved.
Published with permission by Cook County Department of
Corrections

**ROLAND GROUP EXH 2**

Case 1: 2020-cv-02343 Document #: 430-19 Filed: 04/06/20 Page 155 of 497 PageID #:5585

(e) The sworn member assigned to deliver soiled laundry shall conduct a count of the items taken to the Central Laundry Unit, weigh them and complete the Laundry Uniform/Linen Inventory Report.

(f) A Central Laundry Unit officer shall verify the count of soiled items upon the arrival of the sworn member from each division.

(g) If there is a discrepancy in the laundry count, the Support Services Watch Commander shall advise the respective Superintendent or the authorized designee and the Superintendent of Support Services.

903.3.7 INMATE PERSONAL LAUNDRY
An assigned sworn member in each division/unit shall:

(a) Distribute serial-numbered laundry loops to inmates for personal items.

(b) Directly observe inmates placing items onto the loops and provide instructions if needed.

    1. Damaged loops are replaced by the Central Laundry Unit on a one-to-one basis.

(c) Collect inmate personal laundry and complete the Inmate Personal Laundry Log, which is retained on the respective living unit.

(d) Place the soiled laundry in the gurney and take it to the appropriate location for washing:

    1. Male inmate divisions shall deliver soiled personal laundry to the Laundry Unit and pick it up once complete; and

    2. Female inmate divisions shall deliver soiled personal laundry to the designated location.

(e) Weigh the gurneys containing the soiled laundry and record the weight in the Personal Laundry Weight Log.

(f) Upon completion, distribute clean personal items to inmates according to the entries made in the Inmate Personal Laundry Log.

**903.4 INVENTORY ISSUANCE DOCUMENTATION**
The Central Laundry Unit sworn supervisor shall be responsible for the general operation and inventory of all Central Laundry Unit locations, except for the female divsion, which is the responsibility of that division's Superintendent or the authorized designee. The Central Laundry Unit supervisor shall:

(a) Conduct a weekly inventory to determine present needs for clothing items and linens, and an estimated inmate population;

(b) Maintain a weekly spreadsheet that tracks inventory of inmate clothing and linens and inventory transactions by weight;

(c) Ensure that the Central Laundry Unit maintains an adequate inventory of supplies (i.e., clothing, linen and chemicals);

Copyright Lexipol, LLC 2020/03/16, All Rights Reserved.
Published with permission by Cook County Department of
Corrections

**ROLAND GROUP EXH 2**

Cook County Department of Corrections
Cook County DOC Procedures Manual

*Laundry Exchange and Inventory*

(d)     Report the volume of items washed weekly to the Superintendent of Support Services or the authorized designee using the Laundry Weekly Inventory Report; and

(e)     Provide the Assistant Executive Director (AED) of Support Services a weekly report of any division not participating in the inmate personal laundry procedure. The AED of Support Services shall review weekly reports and notify the respective Superintendent of any division that is not in compliance or fails to meet requirements of inmate personal laundry.

## 903.5   LAUNDRY EQUIPMENT

(a)     The Central Laundry Unit supervisor or the authorized designee shall inspect the laundry equipment prior to use for malfunction or damage.

(b)     In the event of a malfunction of the laundry equipment, the supervisor shall:

   1.     Notify the Support Services Superintendent or the authorized designee.

   2.     Notify the Business Manager, via email, when maintenance or repair services are necessary.

(c)     In event of a malfunction of the laundry equipment in female divisions, the immediate on-duty supervisor shall:

   1.     Make arrangements with the closest male division/unit to wash inmate personal laundry.

   2.     Assign a sworn member to:

      (a)     Escort inmate workers to the alternate location and launder inmate personal laundry.

      (b)     Return to the division/unit, upon completion, and return the personal laundry to the respective inmate.

## 903.6   LAUNDRY SANITATION

(a)     Central Laundry Unit sworn members shall:

   (a)     Ensure that clean clothes and linens never come into contact with soiled laundry by using separate gurneys for each;

   (b)     Ensure that clean clothes and linens are kept in a designated area isolated from the soiled laundry;

   (c)     Clean, sanitize and disinfect all surfaces that come in contact with soiled laundry, including laundry gurneys, with disinfecting wipes or rags with a disinfecting chemical between each use.

(b)     When infectious items are collected, Central Laundry Unit sworn members shall:

   (a)     Instruct inmate workers to wear PPE prior to handling any laundry suspected of being infectious;

   (b)     Ensure affected clothing items and linens do not come into contact with non-affected clothing and linen;

Copyright Lexipol, LLC 2020/03/16, All Rights Reserved.
Published with permission by Cook County Department of
Corrections

**ROLAND GROUP EXH 2**

# Cook County Department of Corrections
Cook County DOC Procedures Manual

*Laundry Exchange and Inventory*

    (c)    Empty the biohazard bag containing affected items directly into the washing machine;

    (d)    Place the biohazard bag and any used PPE into another biohazard bag for disposal;

    (e)    Wash the affected items using the hot water setting;

    (f)    Sanitize exposed body parts following the handling of infectious items; and

    (g)    Dry the items on the high heat setting.

## 903.7  TRAINING

    (a)    The Central Laundry Unit Watch Commander or the authorized designee shall train sworn members assigned to the Central Laundry Unit on procedures and sanitation during orientation. Sworn member training shall be documented and filed in the Superintendent of Support Services's office.

    (b)    The Central Laundry Unit officers shall train inmate workers regarding procedures and sanitation practices. This shall consist of classroom and hands-on instruction of the responsibilities, acceptable laundry sanitation practices, the use of laundry equipment and PPE. Central Laundry Unit inmate worker training shall be documented and filed in the Superintendent of Support Services's office.

Copyright Lexipol, LLC 2020/03/16, All Rights Reserved.
Published with permission by Cook County Department of
Corrections

**ROLAND GROUP EXH 2**

**Procedure**

**1303**

# Universal Precautions of Bloodborne Pathogens

## 1303.1 PURPOSE AND SCOPE

This procedure provides guidelines for Cook County Department of Corrections members to minimize the potential exposure of members, visitors or inmates to blood, bodily fluids or potentially infectious materials, and the steps to follow when an exposure event occurs.

## 1303.2 POLICY

The Cook County Department of Corrections shall instruct all members on proper precautions and procedures to follow in the event that members, visitors or inmates are or may become exposed to blood, bodily fluids or potentially infectious materials.

Refer to the Communicable Diseases Policy for additional guidance.

### 1303.2.1 DEFINITIONS

Definitions related to this procedure include:

(a) **Bloodborne pathogens** - Pathogenic micro-organisms that are present in human blood and can cause illness/disease in humans. These pathogens include, but are not limited to, Hepatitis B virus (HBV), Hepatitis C virus (HCV), Human Immunodeficiency Virus (HIV) and Syphilis.

(b) **Blood/Potentially Infectious Material Spill Kit** - Specially designed equipment and personal protective equipment consisting minimally of a red biohazard waste bag, solidifying powder and a pair of Sheriff's Office-issued protective gloves used to clean up blood and/or potentially infectious material spills.

(c) **Bodily fluids** - Liquids originating from inside the body of a living person, including fluids that are excreted or secreted from the body (e.g., spit, vomit, urine, blood, feces).

(d) **Contaminated** - The visible presence of, or the reasonably anticipated presence of, blood or other potentially infectious materials on an item or surface.

(e) **Exposure incident** - A specific eye, mouth, mucous membrane, non-intact skin, or parenteral contact with blood or other potentially infectious materials.

(f) **Parenteral** - The piercing of mucous membranes or skin barriers through such events as human bites, cuts, abrasions and needle punctures.

(g) **Personal protective equipment (PPE)** - Specialized clothing or equipment worn or used by members for protection against exposure to blood or potentially infectious materials. General work clothes not intended to function as protection against such a hazard are not considered to be personal protective equipment.

(h) **Potentially infectious materials** - Any unfixed tissue or organ, other than intact skin, from a human being (living or dead) and the following bodily fluids: semen, vaginal secretions, cerebrospinal fluid, synovial fluid, pleural fluid, pericardial fluid, peritoneal fluid, amniotic fluid, saliva in dental procedures, any bodily fluid that is visibly contaminated with blood, and all body fluid in situations where it is difficult or impossible to differentiate between body fluids.

Copyright Lexipol, LLC 2020/03/16, All Rights Reserved.
Published with permission by Cook County Department of Corrections

**ROLAND GROUP EXH 2**

Cook County Department of Corrections

Cook County DOC Procedures Manual

Universal Precautions of Bloodborne Pathogens

---

(i) **Source individual** - Any person (living or dead) whose blood or other potentially infectious materials may be a source of exposure to others.

## 1303.3 PROCEDURES

### 1303.3.1 EXPOSURE DETERMINATION

All Department of Corrections members are at risk to occupational exposure to blood or potentially infectious materials, and shall apply universal precautions while on duty when there is a risk for exposure.

If a member may be exposed to blood, bodily fluids or other potentially infectious materials during the course of his/her shift, the member is responsible for reasonably determining the appropriate level of PPE necessary and shall utilize it.

Under circumstances in which differentiation between body fluid types is considered difficult or impossible, all body fluids shall be considered potentially infectious and treated as potentially infectious material.

### 1303.3.2 METHODS OF CONTROLS

(a) Engineering control measures should include:

1. Puncture resistant containers for the disposal of sharps located as close as practical to the use area (e.g., Cermak, Urgent Care, dispensary). These containers shall be serviced and maintained in accordance with the applicable policies.

(b) Personal Protective Equipment (PPE):

1. PPE shall be available for use when members have deemed it necessary. PPE includes, but is not limited to:

    (a) Masks, glasses (with solid side shields or chin-length shields).

    (b) Disposable aprons/suits, or other protective clothing.

2. Blood/Potentially Infectious Material Spill Kits shall be located in the security office and sanitation office in each division/unit for use in the event a blood or potentially infectious material spill occurs.

    (a) The security officer shall check the kits for adequacy at least once per shift.

    (b) The sanitation officer shall replenish the kits in the security office as needed.

    (c) All supplies that have reached their expiration date shall be disposed of immediately and appropriately.

    (d) Supplies that have not reached or are without expiration dates but have had their original packaging damaged or compromised, shall be sent to the Director of Support Services.

---

Copyright Lexipol, LLC 2020/03/16, All Rights Reserved.
Published with permission by Cook County Department of Corrections

**ROLAND GROUP EXH 2**

# Cook County Department of Corrections
Cook County DOC Procedures Manual

## Universal Precautions of Bloodborne Pathogens

### 1303.3.3  BLOOD OR POTENTIALLY INFECTIOUS MATERIAL SPILL CLEAN UP

The member who discovers a blood or potentially infectious material spill shall secure the area to prevent another member, inmate or visitor from being exposed, and shall promptly notify the immediate on-duty supervisor.

The notified supervisor shall determine if the scene is a crime scene. If the scene is determined to be a crime scene, it should be handled according to the applicable policies and procedures. If the scene is determined not to be a crime scene, the respective trained sanitation officer should be contacted for cleanup.

The requested sanitation officer or other appropriately trained members responding to the scene shall use the appropriate equipment to clean the area consistent with applicable training.

Copyright Lexipol, LLC 2020/03/16, All Rights Reserved.
Published with permission by Cook County Department of
Corrections

**ROLAND GROUP EXH 2**

# Supply Information



LIVING UNIT SANITATION ITEMS

**Items included in Living Unit Sanitation Kits for Daily Use:**

1) Spray Bottle w/Cleaner (22E06A)
2) Spray Bottle w/Disinfectant (22E06A)
3) Trigger Sprayer for Spray Bottles (22E06D)
4) Mop Head (22E02D)
5) Mop Handle (22E02C)
6) Mop Bucket w/wringer (22E02B)
7) Push Broom and Handle (22E01A/22E01E)
8) Corn Broom (22E1)
9) Dust Pan (22000)
10) Floor Squeegee and Handle (22E05B/22E02A1)
11) Deck Brush and Handle (Need code)(22E02A1)
12) 4 Rags (22E04F)

Mops and rags are to be submitted to the laundry unit twice per week

**Items included for G.I. Day or Daily Use if approved by Division's Superintendent:**

1) Red Handle Scrub Brush (No Code; get from Support Services)
2) Doodle Bug (see below for codes)
3) Toilet Brush (22E08)

**Divisions order the following Items from the Sheriff Warehouse:**

- Mop heads (22E02D)
- Mop handles (22E02C)
- Mop bucket and wringer (22E02B)
- Push broom (22E01A)
- Corn broom (22E1)
- Dust pan (22000)
- Squeegee 8" (22E05B)
- Floor Squeegee 18" (22E05B)
- Doodlebug kit (1 holder, 2 pads) (22E04D1)
- Doodlebug pad holder (22E04C)
- Doodlebug pad (22E04D)
- Toilet brush (22E08)
- Barrel pump (22E07)
- Nitrile gloves (M-21G1. L-21G1A. XL-21G1B)

**These items use the same handle (22E02A1):**

Push Broom

Floor Squeegee

Deck Brush

Doodlebug Scrubber (flat rectangle shape)

**Divisions obtain the following items from Central Chemical:**

- Bleach (22C07)
- Glass cleaner (22C10)
- Sanifest (No Code)
- Tempest (No Code)

**Divisions obtain the following items from CCDOC Support Services Office:**

- Spray bottles
- Deck brush
- Rags
- Red handle scrub brush (No Code – Supplied by Support Services)
- Disposable face masks
- Stainless Steel Cleaner
- Graffiti Remover/Degreaser

**From:** Roland Lankah (Sheriff)
**Sent:** Sunday, April 05, 2020 7:24 AM
**To:** Elisabeth Glick (Sheriff)
**Cc:** Jasmin JarlegoPenaranda (Sheriff)
**Subject:** Fw: Coronavirus

*Roland Lankah, REHS/RS, MPH, PhD (abd)*
*Registered Environmental Health Specialist*
*Cook County Sheriff's Office/DOC*
**Office: (773) 674-5988**
**Cell: 312-590-3419**

---

**From:** Amanda Gallegos (Sheriff) <Amanda.Gallegos@cookcountyil.gov>
**Sent:** Monday, January 27, 2020 4:50 PM
**To:** Roland Lankah (Sheriff) <Roland.Lankah@cookcountyil.gov>
**Subject:** RE: Coronavirus

Thanks Roland

Amanda Gallegos, M.A., L.C.P.C.
Executive Director
Department of Corrections
Cook County Sheriff's Office
O: 773.674.5948
C: 312.502.8139

E-MAIL CONFIDENTIALITY NOTICE: This electronic mail message, including any attachments, is for the intended recipient(s) only.  This e-mail and any attachments might contain information that is confidential, legally privileged, contains law enforcement database information, or otherwise protected or exempt from disclosure under applicable law. If you are not a named recipient, or if you are named but believe that you received this e-mail in error, please notify the sender immediately by telephone or return e-mail and promptly delete this e-mail and any attachments and copies thereof from your system. If you are not the intended recipient or are otherwise not authorized to further disclose this message and its contents, please be aware that any copying, distribution, dissemination, disclosure or other use of this e-mail and any attachments is unauthorized and prohibited. Your receipt of this message is not intended to waive any applicable privilege or claim of confidentiality, and any prohibited or unauthorized disclosure is not binding on the sender or the Cook County Sheriff's Office. Thank you for your cooperation.

---

**From:** Roland Lankah (Sheriff) <Roland.Lankah@cookcountyil.gov>
**Sent:** Friday, January 24, 2020 1:58 PM
**To:** Amanda Gallegos (Sheriff) <Amanda.Gallegos@cookcountyil.gov>
**Cc:** Bradley Curry (Sheriff) <Bradley.Curry@cookcountyil.gov>; David Chiko (Sheriff) <David.Chiko@cookcountyil.gov>; Yolanda Debro (Sheriff) <Yolanda.Debro@cookcountyil.gov>; Larry Gavin (Sheriff) <Larry.Gavin@cookcountyil.gov>; Richard Brogan (Sheriff) <Richard.Brogan@cookcountyil.gov>; Jasmin JarlegoPenaranda (Sheriff) <Jasmin.JarlegoPenaranda@cookcountyil.gov>; Karen Jones-Hayes (Sheriff) <Karen.Jones-Hayes@cookcountyil.gov>;

1

**ROLAND EXH 4**

Don Beachem (Sheriff) <Don.Beachem@cookcountyil.gov>; Michael Miller (Sheriff)
<Michael.Miller1@cookcountyil.gov>; Hugh Walsh (Sheriff) <Hugh.Walsh@cookcountyil.gov>; Martha Yoksoulian
(Sheriff) <Martha.Yoksoulian@cookcountyil.gov>; Salomon Martinez (Sheriff) <Salomon.Martinez@cookcountyil.gov>;
Jennifer Black (Sheriff) <Jennifer.Black@cookcountyil.gov>; Erica Queen (Sheriff) <Erica.Queen@cookcountyil.gov>
**Subject:** Coronavirus

Good afternoon Director,

FYI the CCH Infection Control department has been providing Cermak clinical guidance in the unlikely event
the jail was to have a suspected Coronavirus patient enter the compound.  The most likely points of entry for a
detainee would be Intake/RCDC or Urgent Care in Cermak.

 In the event Cermak notified me of a suspect case,  I would request an urgent response to proceed with
disinfection in that area.  If you have any questions now, please feel free to email me.  If I have further
updates, I'll be reaching out.


**Important:**

Supts-,
Please ascertain that your Divisions have the proper PPE, including gowns, face-shields, and gloves.  If you
currently do not have these equipment available, please contact me.  Bleach is available in Central Chemical in
Division 5.

Thanks,

*Roland  Lankah, REHS/RS, MPH, PhD* (abd)
*Registered Environmental Health Specialist*
*Cook County Sheriff's Office/DOC*
**Office: (773) 674-5988**
**Cell: 312-590-3419**

**ROLAND EXH 4**

**From:** Roland Lankah (Sheriff)
**Sent:** Sunday, April 05, 2020 7:26 AM
**To:** Elisabeth Glick (Sheriff)
**Cc:** Jasmin JarlegoPenaranda (Sheriff)
**Subject:** Fw: Bleach

This email was sent to the business to provide information about inventory and to request for chemical supplies.

*Roland Lankah, REHS/RS, MPH, PhD* (abd)
*Registered Environmental Health Specialist*
*Cook County Sheriff's Office/DOC*
**Office: (773) 674-5988**
**Cell: 312-590-3419**

---

**From:** Roland Lankah (Sheriff) <Roland.Lankah@cookcountyil.gov>
**Sent:** Friday, January 24, 2020 11:23 AM
**To:** Joan Kunz (Sheriff) <Joan.Kunz@cookcountyil.gov>
**Cc:** Betty Georgakopoulos (Sheriff) <Betty.Georgakopoulos@cookcountyil.gov>; Salvatore Comparetto (Sheriff) <Salvatore.Comparetto@cookcountyil.gov>
**Subject:** Bleach

93 cases of bleach (3 bottles per case), each bottle is 121 ounces.

*Roland Lankah, REHS/RS, MPH, PhD* (abd)
*Registered Environmental Health Specialist*
*Cook County Sheriff's Office/DOC*
**Office: (773) 674-5988**
**Cell: 312-590-3419**

---

**From:** Salvatore Comparetto (Sheriff) <Salvatore.Comparetto@cookcountyil.gov>
**Sent:** Friday, January 24, 2020 11:21 AM
**To:** Roland Lankah (Sheriff) <Roland.Lankah@cookcountyil.gov>
**Subject:** Bleach

93 cases of bleach (3 bottles per case), each bottle is 121 ounces

**ROLAND EXH 5**



Viruses. 2012 Nov; 4(11): 3044–3068.

Published online 2012 Nov 12. doi: 10.3390/v4113044

PMCID: PMC3509683

PMID: 23202515

# Human Coronaviruses: Insights into Environmental Resistance and Its Influence on the Development of New Antiseptic Strategies

Chloé Geller, Mihayl Varbanov, and Raphaël E. Duval[*]

UMR 7565, SRSMC, Université de Lorraine – CNRS, Faculty of Pharmacy, 5 rue Albert Lebrun, BP 80403, 54001 Nancy Cedex, FRANCE; Email: chloe.geller@univ-lorraine.fr (C.G.); mihayl.varbanov@univ-lorraine.fr (M.V.)

[*] Author to whom correspondence should be addressed; Email: raphael.duval@univ-lorraine.fr; Tel.: +33-3-83-68-23-36; Fax: +33-3-83-68-23-01.

Received 2012 Oct 5; Revised 2012 Oct 31; Accepted 2012 Nov 2.

Copyright © 2012 by the authors; licensee MDPI, Basel, Switzerland.

This article is an open-access article distributed under the terms and conditions of the Creative Commons Attribution license (http://creativecommons.org/licenses/by/3.0/).

## Abstract

The *Coronaviridae* family, an enveloped RNA virus family, and, more particularly, human coronaviruses (HCoV), were historically known to be responsible for a large portion of common colds and other upper respiratory tract infections. HCoV are now known to be involved in more serious respiratory diseases, i.e. bronchitis, bronchiolitis or pneumonia, especially in young children and neonates, elderly people and immunosuppressed patients. They have also been involved in nosocomial viral infections. In 2002–2003, the outbreak of severe acute respiratory syndrome (SARS), due to a newly discovered coronavirus, the SARS-associated coronavirus (SARS-CoV); led to a new awareness of the medical importance of the *Coronaviridae* family. This pathogen, responsible for an emerging disease in humans, with high risk of fatal outcome; underline the pressing need for new approaches to the management of the infection, and primarily to its prevention. Another interesting feature of coronaviruses is their potential environmental resistance, despite the accepted fragility of enveloped viruses. Indeed, several studies have described the ability of HCoVs (i.e. HCoV 229E, HCoV OC43 (also known as betacoronavirus 1), NL63, HKU1 or SARS-CoV) to survive in different environmental conditions (e.g. temperature and humidity), on different supports found in hospital settings such as aluminum, sterile sponges or latex surgical gloves or in biological fluids. Finally, taking into account the persisting lack of specific antiviral treatments (there is, in fact, no specific treatment available to fight coronaviruses infections), the *Coronaviridae* specificities (i.e. pathogenicity, potential environmental resistance) make them a challenging model for the development of efficient means of prevention, as an adapted antisepsis-disinfection, to prevent the environmental spread of such infective agents. This review will summarize current knowledge on the capacity of human coronaviruses to survive in the environment and the efficacy of well-known antiseptic-disinfectants against them, with particular focus on the development of new methodologies to evaluate the activity of new antiseptic-disinfectants on viruses.

**Keywords:** human coronaviruses, environmental survival, antiseptics-disinfectants

ROLAND EXH 6

## 1. Introduction

The worldwide epidemic of SARS (Severe Acute Respiratory Syndrome) in 2002–2003, due to a newly discovered coronavirus, the SARS-CoV (SARS-associated coronavirus), reinforced the interest into the *Coronaviridae* family. Human coronaviruses 229E and OC43 (HCoV 229E and OC43) were previously already known to be responsible for mild and upper respiratory tract diseases. Since then, two further members of this family have been identified (HCoV HUK1 and NL63) and HCoVs have been involved in more serious respiratory tract infections. Moreover, these viruses show an environmental resistance that increases their probability of transfer between contaminated hosts *via* surfaces, hands, *etc*. This resistance leads to the urgent need for development of efficient and targeted modes of prevention. As no treatment or vaccines are available to cure HCoVs infections, it is fundamental to dispose of adapted antiseptics-disinfectants, whose efficiency should be rigorously evaluated.

## 2. Epidemiology and Impact of Coronaviruses in Human Health

### 2.1. Human Coronaviruses Except SARS-CoV

2.1.1. Respiratory Diseases The HCoV 229E and the HCoV OC43, now called betacoronavirus 1 [1], were the first human coronaviruses to be identified. Since the late sixties, they were recognized as being responsible for upper and mild respiratory tract infections such as the common cold [2,3,4,5,6].

Following the identification of new members of coronaviruses that infect humans, the NL63 in 2004 [7,8,9] and the HKU1 in 2005 [10] and, of course, the SARS-CoV in 2003 [11,12,13,14], new studies have been conducted on the clinical features of HCoVs infections. Indeed, before 2003, very few studies and routine monitoring dealt with the role of coronaviruses in humans. Thus, epidemiological data were rare and it is likely that, as a result, the precise role that HCoVs played in respiratory tract infections was greatly underestimated.

It is important to note that these viruses have been identified worldwide [15,16,17,18,19,20,21,22]. Human coronavirus infections occur mainly in winter, with a short incubation time [19,23,24]. They are recovered in 3 to 11% of patients sampled with a respiratory tract infection, depending on the studied population and the HCoV strain [19,21,23,24,25]. Coronaviruses occupy the fourth or fifth place, behind influenzaviruses, respiratory syncytial virus, adenoviruses and rhinoviruses and their proportion is generally equivalent to the ones of metapneumovirus and parainfluenzaviruses [23,24].

They have since been implicated in more serious diseases of the lower respiratory tract as bronchitis, bronchiolitis or pneumonia [10,26,27,28,29,30,31] or croup in the case of the HCoV NL63 [18,30]. These infections concern predominantly weak patients such as newborns or infants [23,24,26,30,32,33], elderly people [34,35] or immunosuppressed patients [23,36,37]. They have also been implicated in nosocomial infections notably in neonatal care unit [32,33].

2.1.2. Involvement of Coronaviruses in Other Human Diseases HCoVs are suspected to cause digestive dysfunctions. First, they have been associated with necrotizing enterocolitis in newborns [38], and diarrhea or other gastrointestinal symptoms have been shown to accompany coronavirus infections [17,24,27,30,39]. Then, other findings such as the detection of viral particles and coronavirus RNA in stool samples [39,40], or the presence of HCoV OC43 antibodies in children with gastroenteritis, support this idea. However, despite these arguments, their implication in human intestinal infections is still controversial but should be considered to evaluate the potential routes of HCoVs spread.

Another debate is the potential involvement of HCoVs in central nervous system diseases such as multiple sclerosis. This is supported by a body of evidence, e.g. neurological symptoms in some HCoV OC43 infected patients [29], experimental infection of neural cells with HCoV 229E and OC43 [41,42,43], detection of HCoV 229E and OC43 RNAs and antigens in brain of multiple sclerosis

**ROLAND EXH 6**

patients [44,45,46], or, more recently, neuroinvasive properties of HCoV OC43 after intranasal inoculation in mice [47]. However, the precise and real implication of HCoVs in neural diseases has not yet been clearly demonstrated.

Furthermore, some studies reported also some heart troubles associated with HCoVs infections [29,48].

## 2.2. A Highly Pathogenic Coronavirus: the SARS-Associated Coronavirus

The epidemic outbreak due to the SARS-CoV was the first worldwide epidemic of the 21st century. It began in Guangdong province of China in November 2002 and spread all over the world within just a few months. This new coronavirus was quickly identified thanks to a concerted international effort [12,13,14,49,50].

From November 2002 to July 2003, SARS-CoV affected more than 8000 people in all five continents and caused about 800 deaths [51]. One of the striking features of this epidemic was its nosocomial propagation and the heavy burden of the health care workers [49,52,53,54]. Moreover, the mortality rate was higher than 50% in aged (>60-year-old) populations [55,56,57].

SARS-CoV infection in humans typically causes an influenza-like syndrome such as malaise, rigors, tiredness and high fevers. In one-third of the infected patients, the clinical symptoms regress and patients recover, with, for some of them, persistent pulmonary lesions. In the remaining two-thirds of the infected patients, the disease progresses to an atypical pneumonia. Respiratory insufficiency leading to respiratory failure is the most common cause of death among those infected with SARS-CoV [52,54,58,59]. Many of these patients also develop watery diarrhea with active virus shedding (until several weeks), which might increase the transmissibility of the virus and add another evidence of gastrointestinal tropism of HCoVs [57]. Moreover, the SARS-CoV receptor, the angiotensin-converting enzyme 2 ACE-2, is present in lungs but also in the gastrointestinal tract [60,61].

SARS-CoV seemed predominantly transmitted by respiratory droplets over a relatively close distance [62]. However, direct and indirect contact with respiratory secretions, feces or animal vectors could also lead to transmission, at least under some circumstances [59,63].

## 2.3. Evolutionary Ability of Coronaviruses

Besides these pathogenic properties, coronaviruses represent another risk for human population through their interspecies jumping capacity. This is suspected for the HCoV OC43 that may have evolved from the bovine coronavirus, which is responsible for gastrointestinal infections in cattle [64]. Similarly, the SARS-CoV is a zoonotic virus that crossed the species barrier. Phylogenetic analysis of SARS-CoV isolates from animals and humans strongly suggest that the virus originated from animals, most likely bats [65,66,67,68], was amplified in palm civets, and transmitted to human population *via* live animal markets [69].

This potency of coronaviruses may be responsible for new disastrous outbreaks and therefore should be kept in mind.

## 2.4. Vaccines and Therapy

No treatment or vaccine is available to fight HCoVs infections. In the case of SARS-CoV, various approaches were used during the epidemic, but none was really successful and targeted. Treatment was essentially empiric and symptomatic and depended upon the severity of the illness.

ROLAND EXH 6

Since then, studies have been conducted to identify potent anti-SARS-CoV treatment. Standard molecules used in viral infections such as ribavirine, interferon or hydrocortisone, were used, leading to diverging, and not so conclusive, results as they were tested *in vivo* or *in vitro* [57,70,71,72,73]. Development of strategies with monoclonal antibodies, siRNAs or molecules such as glycyrrhizin or nelfinavir, have been conducted *in vitro* but still need to be improved [71,74,75,76].

The emergence of the SARS-CoV has also led to the development of new vaccine strategies, including expression of SARS-CoV spike protein in other viruses [77,78,79,80,81,82,83,84,85], inactivated SARS-CoV particles [82,86,87,88,89,90,91] or DNA vaccines [92,93,94,95]. However, an early concern for application of a SARS-CoV vaccine was the experience with animal coronavirus vaccines, which induced enhanced disease and immunopathology in animals when challenged with infectious virus [96]. Indeed, a similar immunopathologic reaction has been described in mice vaccinated with a SARS-CoV vaccine and subsequently challenged with SARS-CoV [97,98,99,100,101]. Thus, safety concerns related to effectiveness and safety for vaccinated persons, especially if exposed to other coronaviruses, should be carefully examined.

## 3. HCoVs: Enveloped, but not that Fragile

In this section, we highlight the potency of coronaviruses to survive in different conditions, despite their enveloped nature. This knowledge is essential for a better understanding of the possibility of virus transfer and cross-contamination, and for formulating appropriate infection-control measures. Indeed, despite the fact that transmission was believed to be mainly achieved by direct physical contact with infected patient or by respiratory droplets, several well-described clusters of infection were difficult to explain by these routes. Examples include transmission to 22 persons on an aircraft [102], to 13 guests sharing the same floor of a hotel, and more than 300 persons in an apartment complex [103]. These observations led to some speculations about a possible transmission by other means including surfaces, hands, *etc.*, and to the study of SARS-CoV (and other HCoVs) survival in different conditions.

Despite the fact that this review is devoted to human coronaviruses, some data concerning the murine hepatitis virus (MHV) and the transmissible gastroenteritis virus (TGEV), now called alphacoronavirus 1 [1], are recorded here because they have been used as SARS-CoV surrogates.

### 3.1. Survival Under Different Conditions of Humidity and Temperature

Some decades ago, a study compared the survival rates of the HCoV 229E to the ones of a non-enveloped virus, the type 1-poliovirus, under different conditions of temperature and humidity. Results are reported in Table 1.

ROLAND EXH 6

Table 1

Survival rates of the HCoV 229E and the poliovirus, type 1, under different conditions of temperature and humidity [104].

| Relative humidity | HCoV 229E | | | | | | Type 1-Poliovirus, Sabin strain | | | |
| | 20 °C | | | | 6 °C | | 20 °C | | 6 °C | |
| | 15 min | 24 h | 72 h | 6 days | 15 min | 24 h | 15 min | 24 h | 15 min | 24 h |
|---|---|---|---|---|---|---|---|---|---|---|
| 30% | *87%* | *65%* | *>50%* | n.d. | 91% | 65% | *0%* | *0%* | n.d. | n.d. |
| 50% | *90.9%* | *75%* | *>50%* | *20%* | 96.5% | 80% | *0%* | *0%* | n.d. | n.d. |
| 80% | 55% | 3% | 0% | n.d. | *104.8%* | *86%* | 90% | 30% | n.d. | n.d. |

(n.d.: not done)

Thus, at 20 °C, aerosolized HCoV 229E was found to better survive at 50% relative humidity than at 30%. Indeed, nearly 20% of the original infectious virus was still detectable after six days. High relative humidity seemed less favorable to the virus, unless the temperature came down to 6 °C. At this temperature, the survival of the HCoV 229E was significantly enhanced whatever the rate of relative humidity. This enhanced survival rate at high relative humidity and low temperature may explain the winter propagation of coronaviruses. Moreover, the HCoV 229E survival was significantly higher at 30% and 50% of relative humidity than those of the poliovirus in the same experimental conditions, which could be a striking result according to its non-enveloped nature [104].

Sensitivity of SARS-CoV to temperature has also been assayed. The exposure of the virus to a temperature of 56 °C over 30 min reduced virus titer under an undetectable level, except if SARS-CoV is associated with proteins, such as 20% fetal calf serum (FCS), which bring a protection for the virus. In this case, the temperature needs to reach 60 °C over 30 min to bring virus titer below the detection limit. This emphasizes the importance of organic material in which viruses could be embedded in the real conditions and could protect the virus, mostly from disinfection procedures. When the virus was placed at 4 °C, there was no loss of infectivity [105]. Another study confirms the viral stability at 4 °C, and also at 20 °C and 37 °C for at least 2 hrs, but SARS-CoV lost its infectivity after 90, 60 and 30 min exposure at 56 °C, 67 °C and 75 °C, respectively [106].

## 3.2. Suspension vs. Desiccation

Coronaviruses also well survive in suspension. At 37 °C, HCoV 229E and OC43 displayed survival rates of 80% and 100%, respectively, in phosphate buffered saline (PBS) over three days and of 30% and 55%, respectively, over six days. These survival rates came down to 50% for HCoV 229E and 30% for HCoV OC43 after three days in culture medium and after ten days, they were of 0% and 10% for each virus, respectively. The same study also showed that desiccation has a more severe effect on coronaviruses. Indeed, in standard environmental conditions (21 °C and 50% to 70% of relative humidity), HCoV 229E infectivity came down to 30% after three hrs of desiccation on various surfaces

ROLAND EXH 6

that can be found in hospital settings, such as aluminum, sterile sponges or surgical latex gloves. HCoV OC43 was more sensitive to desiccation, since its infectivity was below the detectable threshold after three hrs of drying [107].

Rabenau et al. made a comparative study on the stability of different viruses, i.e. SARS-CoV, HCoV 229E, type 1-herpes simplex virus (HSV-1) and the type 3-adenovirus, in suspension and after drying. In medium culture, with and without 10% FCS, the HCoV 229E progressively lost its infectivity over nine days, which is consistent with the previous study. The infectious titers of the three other viruses, including the SARS-CoV, were stable over nine days, with and without proteins. After drying on a plastic surface, the HCoV 229E and the HSV-1 lost their infectivity in 72 hrs, in the presence or absence of FCS. In contrast, the SARS-CoV retained its infectivity for as long as six days, with a further protecting effect of proteins. It took nine days in a dried state, for SARS-CoV to completely lose its infectivity. The adenovirus was the most stable virus assayed as it conserved its infectivity throughout the nine days of the experiment [105].

Some other studies confirm these results. SARS-CoV has been shown to survive after drying on different kinds of materials or diluted in water, revealing a decreased infectivity only after 72 to 96 hrs, depending on the conditions. However, its infectivity is reduced more rapidly if it is deposited on porous surfaces such as cotton or paper [106,108].

Thus, RNA of SARS-CoV was found on different environment samples, such as chair, elevator, computer mouse, etc., and this may have contributed to contamination of health-care workers who had not been in direct contact with SARS-patients [109,110].

A more recent study implicated water and sewage in the transmission of SARS-CoV, taking the MHV and the TGEV as surrogates for their experiments. At 25 °C, the time required for 99% reduction in water was 22 days for TGEV and 17 days for MHV, and, in sewage, it took nine days for TGEV and seven days for MHV. After four weeks in almost the same conditions but at 4 °C, there was less than <1 $log_{10}$ infectivity decrease for both viruses. The authors concluded that in case of SARS-CoV re-emergence water contaminated with fecal waste should be considered as a potential vehicle of transmission [111].

These studies firmly illustrated the potency of coronaviruses and especially the SARS-CoV, to be transmitted via other routes than respiratory droplets and the likely risk of contamination via surfaces and fomites. It should also be noticed that the residual infectivity of those enveloped viruses in different conditions can almost reach the one of non-enveloped viruses. This reappraises the environmental stability of these two types of viruses.

### 3.3. Influence of pH Conditions on Coronaviruses Survival

The sensitivity of coronaviruses to pH variations has been established for a number of them. They are more stable at slightly acidic pH (6 – 6.5) than at alkaline pH (8). This has been shown for the HCoV 229E [112], the MHV [113,114], the TGEV [115] and the canine coronavirus [116].

### 3.4. Survival in Biological Fluids

As it has been noted earlier, HCoVs are excreted in respiratory secretions but also in other biological fluids such as feces. Knowing and understanding viral survival is then essential to estimate the risk of potential transmission through this route.

Studies have been conducted on SARS-CoV, which was shown to survive at least 96 hrs in sputum, serum and feces. Its infectivity level is nevertheless lower when it is suspended in urines [106]. It is noteworthy that SARS-CoV survival depends on the kind of feces whose pH may vary. Some studies

ROLAND EXH 6

have shown certain surprising results in regard of the previously quoted studies. Indeed, SARS-CoV did not survive beyond 24 hrs in normal feces of an adult or beyond three hrs in newborns' feces, which is slightly acidic. In contrast, it could survive longer, up to four days, in diarrheic feces whose pH could reach pH 9. The same study revealed a SARS-CoV survival until four to five days in respiratory specimen [108,117].

According to these data, transfer of viruses and cross-contamination should be carefully considered. Indeed, under certain circumstances, for instance in health-care settings, contamination of inanimate materials or other people by infectious respiratory secretions or other body fluids (saliva, urine or feces) seems to play a role in SARS-CoV transmission, and it is likely the same for the other HCoVs. Thus, it is essential to dispose of adapted, targeted and efficient ways of disinfection whose efficiency has to be correctly evaluated.

## 4. Antisepsis-Disinfection: An Efficient Weapon, with Room for Improvement

### 4.1. How Prevention Measures Halted the Propagation of SARS-CoV

The absence of treatment, the high mortality rate and the transmission patterns of SARS-CoV involved the setting of powerful and coordinated means of prevention to stop the worldwide spread of this virus. Indeed, the SARS-CoV epidemic has been brought under control thanks to basic public health measures, including rapid case detection and isolation, contact tracing, quarantine and good precautionary control measures (hand washing, use of personal protective equipment) [54,59]. Additionally, the WHO expressed recommendations for travelers coming from areas affected by the SARS with screening of potential cases and in-flight care of suspected cases followed by aircraft disinfection [121].

Thus, besides these standard measures, our knowledge on HCoVs sensitivity to antiseptics-disinfectants should improve, in order to use these fundamental prevention tools in a targeted and coherent manner.

### 4.2 What is Antisepsis-Disinfection and how do we Evaluate its Efficiency?

Facing the lack in a specific antiviral treatment, it is necessary to develop new means of prevention and to ensure that the existing ones are efficient according to the field situation. Proper evaluation of the efficiency of antiseptics-disinfectants on viruses is thus crucial.

Essentially, antiseptic-disinfectant antiviral activity is evaluated by combining viruses and the product to be tested for an appropriately defined and precise contact time, according to the expected use of the product (surface or hands disinfection, for instance). Product activity and its eventual cytotoxicity are then neutralized and the loss of viral infectivity due to the product activity is estimated. Neutralization of the antiseptic-disinfectant activity plays a key role in the test procedure; it ensures a precise contact time, the elimination of the residual activity and cytotoxicity of the tested product, and the successful recovery of viruses that are not killed by the product. These tests require appropriate controls, especially to check the absence of interference on viral infectivity, due to the test itself. It is also important to test the efficiency of neutralization, removal of cytotoxicity under reproducible and well-defined test conditions (e.g., contact time and environmental temperature). A germicide can be considered to have an efficient antiseptic-disinfectant antiviral activity if it induces, in a well-defined contact time, a reduction in viral titers higher than 3 or 4 $\log_{10}$, depending on American and European regulatory agencies, respectively [122,123].

### 4.3. Critical Parameters in Antiviral Antiseptic-Disinfectant Efficiency Evaluation

Some parameters have to be checked particularly carefully to ensure the validity of the results.

ROLAND EXH 6

Case 1:20-cv-02343-RDB Document 1-30-19 Filed: 04/06/20 Page 172 of 497 Page ID #:5802

### 4.3.1. Neutralization Step and Contact Time
The neutralization step plays a key role in this methodology. Several different methods exist to achieve neutralization. The first one is the neutralization by dilution. Theoretically, it allows an instantaneous arrest of the activity of the tested product and the elimination of its cytotoxicity. However, it requires viruses with very high titers in order to observe a reduction in viral titers afterwards. In that case, it is frequently observed that the cytotoxicity is not eliminated thoroughly, making impossible the titration of the virus. Two other techniques are available to counter these drawbacks. Chemical neutralization associates dilution and chemical inactivation of the tested product and its cytotoxicity. However, few neutralizers are available, especially when taking into account the huge number of antiseptics-disinfectants. The gel filtration method allows the retention of antiseptic-disinfectant molecules (and so, their antiviral activity and their cytotoxicity), and the release of viral particles, which could then be tittered. Yet, this method may lengthen the contact time and lead to an overestimation of the product's activity. Indeed, a precise contact time is fundamental to respect future use conditions and to reflect the real activity of the product in the field.

### 4.3.2. Mimics of Field Conditions
Different factors should be considered in order to represent the future use conditions of the product as closely as possible. Different types of tests exist with different levels of evidence: (i) suspension tests, which are useful to screen molecules efficiency and cytotoxicity, (ii) carrier tests, which allow monitoring of the efficiency of the product after viruses have dried on different kinds of surfaces and (iii) in-field tests, for instance, in hospital settings. These are rarely performed because of cost and standardization problems.

In all these tests, organic material (FCS, feces, albumin, *etc.*) could, even should, be added. Indeed, viruses are normally founded embedded in such material protecting them from the action of antiseptics-disinfectants Moreover, a significant part of antiseptics-disinfectants, such as chlorine derived compounds, are inactivated by organic materials. Finally, viruses are known to aggregate themselves and this might be enhanced by the presence of organic material, making them even more resistant to the action of antiseptics-disinfectants.

### 4.4. International Standardization Context

One of the challenges of antiviral antiseptics-disinfectants testing is the standardization to obtain valuable and comparable results. This is illustrated in the next section, where, even if the results concerning the activity of antiseptics-disinfectants on HCoVs are generally consistent with each other, they are still difficult to compare. It is then extremely important to set standards to test these antiseptic activities.

To date, only one European Standard (NF EN 14476+A1) on virucidal antiseptic-disinfectant activity testing in human medicine has been published [122]. This protocol, from January 2007, specifies the test method and the minimum requirements to establish virucidal activity according to the potential use of the products tested, e.g. disinfection of surfaces and instruments, hygienic hand wash or thermochemical disinfection. Virus strains, temperatures, contact times and interfering substances are specified for each potential use. According to this standard, a product is considered to have an antiseptic-disinfectant antiviral activity if it induces a loss of infectivity of at least 4 $\log_{10}$ in viral titers during an accurate contact time.

In the United States, the principal standard is relatively close to the European one but it specifies an efficacy criterion of 3 $\log_{10}$. Several standards have been then published to cover the different field situations such as two standards concerning the evaluation of hygienic hand wash, a standard concerning the evaluation of efficacy of virucidal agents intended for inanimate environmental surfaces and, finally, a specific standard concerning the neutralization step [123,124,125,126,127].

**ROLAND EXH 6**

#### 4.5. Sensitivity of HCoVs to Antiseptics-Disinfectants

##### 4.5.1. Sensitivity of "Classic" HCoVs (other than SARS-CoV) to Antiseptics-Disinfectants
A study, by Sattar *et al.*, evaluated the efficiency of 15 antiseptics-disinfectants of various chemical families on four different viruses: two non-enveloped viruses (type b-coxsackievirus and type 5-adenovirus) and two enveloped viruses (HCoV 229E and type 3-parainfluenzavirus). With this aim in view, viral inocula were suspended in feces or mucin to mimic organic matter and left to dry on stainless-steel disks. The contact time was 1 min and the efficacy criterion was a reduction in viral titers of 3 $\log_{10}$. Results are gathered in Table 2.

ROLAND EXH 6

### Table 2

Comparison of non-enveloped and enveloped viruses (HCoV 229E, type 3-parainfluenzavirus, type b-coxsackievirus and type 5-adenovirus) sensitivity to different antiseptics-disinfectants formulations, thanks to carrier tests [128].

*The efficiency is validated if the reduction in viral titers after a contact-time of 1 min is ≥ 3 log_{10}.*

ROLAND EXH 6

Open in a separate window

This study highlighted the fact that enveloped viruses are more sensitive than non-enveloped viruses to the action of antiseptics-disinfectants, despite sensitivity discrepancies within each group. However, enveloped viruses are not that fragile and they are not inactivated by a number of antiseptics-disinfectants such as quaternary ammoniums compounds or phenolic compounds. The association chlorhexidine and cetrimide, widely used in human medicine, did not seem to be effective on HCoV 229E, except if ethanol is added [128].

A more recent study investigated the action of antiseptics-disinfectants on HCoVs 229E and OC43 with suspension tests and contact times of 5 min. The neutralization step was achieved by dilution in medium culture. The povidone-iodine (0.75% free iodine) caused a 50% reduction in infectivity of both of the viruses, which is not enough to claim a virucidal activity. Moreover, to obtain a 50% reduction in HCoV 229E titers, tenfold increase in concentration of povidone-iodine was required. Some other products (70% ethanol, soap or 5% bleach) were assayed but without success because they interfered with the biological viral titration assay [107].

This also highlights the importance of the neutralization step and the necessity of developing means to eliminate the toxicity of the tested products.

This result was also confirmed on the SARS-CoV by Kariwa *et al.* who tested different formulations of povidone-iodine with suspensions tests and contact times of 1 and 2 min. The neutralization step was achieved chemically by the addition of sodium thiosulfate. All formulations reduced the viral infectivity under the detectable level after 2 min of contact-time. The same result was obtained with 70% ethanol in 1 min [129].

Two other studies conducted in our laboratory concerned the HCoV 229E and its sensitivity to two widely used antiseptics, chlorhexidine and hexamidine, but also to new molecules belonging to the calixarene family [q30,131]. In these studies, antiseptic antiviral activities were assayed thanks to suspension tests and the efficacy criterion was a reduction of 4 $\log_{10}$, as recommended by the European Standard [122]. A novel methodology of gel filtration for the neutralization step was developed in these studies, using homemade and reproducible Sephadex™ columns.

Chlorhexidine was shown to have a time and concentration-dependent anti-HCoV 229E activity allowing a 3 $\log_{10}$ reduction, but only after a 60 min contact time (Figure 1a). It was then not sufficient to claim an antiseptic anti-HCoV 229E activity. Hexamidine did not show any activity against HCoV 229E [130,131]. These results highlighted the necessity of (i) evaluating the activity of commonly used antiseptics-disinfectants against different viruses, to be sure of their efficiency and to develop a targeted antisepsis, and (ii) developing new active noncytotoxic molecules.

The second study concerned the antiseptic anti-HCoV 229E activity of two calixarenic compounds, i.e. the tetra-para-sulfonato-calix[4]arene (C[4]S) and the 1,3-bis(bithiazolyl)-tetra-para-sulfonato-calix[4]arene (C[4]S-BTZ) [130,131]. These molecules were attractive targets at first because they did not show any cytotoxicity. Then, the C[4]S-BTZ showed an equivalent, and even better, activity than that of chlorhexidine. Indeed, its activity reached almost 3 $\log_{10}$ reduction in viral titers from 5 min of contact time (Figure 1b). Some further studies are needed, but calixarenes appear as interesting candidates to be new antiseptics-disinfectants.

ROLAND EXH 6

Figure 1

*The bold line in both graphs represents the European threshold of 4 $log_{10}$ reduction to qualify as an antiviral antiseptic activity.*



Open in a separate window

Evaluation of antiseptic HCoV 229E activity of **(a)** chlorhexidine (CHX) and **(b)** the 1,3-bis(bithiazolyl)-tetra-para-sulfonato-calix[4]arene (C[4]S-BTZ) [130,131].

4.5.2. SARS-CoV Sensitivity to Antiseptics-Disinfectants Rabenau *et al.* achieved a study using suspension tests with different organic loads (albumin, FCS or sheep erythrocytes) and following the recommendations of the European Standard [122]. Most of the tested alcoholic-based solutions (isopropanol or ethanol) has been shown to allow a reduction > 4 $log_{10}$ in viral titers over 30 sec, whatever the added organic load. They also investigated the activity of three surface and instrument disinfectants (one based on benzalkonium chloride and laurylamine; one based on benzalkonium chloride, glutaraldehyde and didecyldimonium chloride; and one based on magnesium monoperphthalate). Contact times were then, still in accordance to the European Standard, 30 and 60 min. SARS-CoV was inactivated by all the disinfectants to below the limit of detection (the smaller reduction factor was 3.25 $log_{10}$), regardless of the type of organic load [132]. The same team pursued its investigation evaluating the SARS-CoV virucidal activity of different disinfectants based on alcohols (propanol, ethanol used for hands disinfection), aldehydes (formaldehyde, glutardialdehyde), glucoprotamin and wine vinegar. The methodology was the same that previously described, except for the organic load, which was FCS. In case of cytotoxic effect after the dilution-neutralization step, the virus-disinfectant mixture was membrane filtered. This allowed the concentration of the viral particles, which could then be tittered, while retaining the disinfectant. The results are recorded in Table 3. The variation in reduction factors was due to the filtration used as neutralization step when disinfectant toxicity was too strong [105].

ROLAND EXH 6

### Table 3

Virucidal activity on SARS-CoV of different hand-rub formulations and surfaces disinfectants thanks to suspension tests [105].

| Tested formulations | Contact times | Minimal reduction factor (log10) |
|---|---|---|
| 100% 2-propanol | 30 s | ≥ 3.31 |
| 70% 2-propanol | 30 s | ≥ 3.31 |
| 78% ethanol | 30 s | ≥ 5.01 |
| 45% 2-propanol, 30% 1-propanol | 30 s | ≥ 2.78 |
| Wine vinegar | 60 s | ≥ 3.0 |
| 0.7% formaldehyde | 2 min | ≥ 3.01 |
| 1.0% formaldehyde | 2 min | ≥ 3.01 |
| 0.5% glutardialdehyde | 2 min | ≥ 4.01 |
| 26% glucoprotamin | 2 min | ≥ 1.68 |

Recently, a study used MHV and TGEV as SARS-CoV surrogates. Thanks to carrier tests on stainless steel surfaces and a chemical neutralization step, the anti-SARS-CoV efficacy of six different formulations was evaluated. The efficacy criterion was a reduction of 3 $\log_{10}$ in viral titers after 1 min contact time. Results are reported in Table 4.

### Table 4

Virucidal activity on MHV and TGEV, used as SARS-CoV surrogates, of different hand-rub formulations and surface disinfectants using carrier test methodology [133] *(MHV: Murine hepatitis virus, TGEV: Transmissible gastro-enteritis virus)*.

| Concentration of active ingredients of the tested commercial formulations | MHV | TGEV |
|---|---|---|
| Bleach (6% sodium hypochlorite – use dilution: 1:100, ≈ 600 mg/mL) | No | No |
| 9.09% o-phenylphenol, 7.66% p-tertiary amylphenol | No | No |
| 0.55% ortho-phthalaldehyde | No | No |
| 70% ethanol | **Yes** | **Yes** |
| 62% ethanol | No | **Yes** |
| 71% ethanol | No | **Yes** |

ROLAND EXH 6

This study revealed first that there were some behavioral differences between the two viruses chosen as surrogates. This raises the question of the pertinence of surrogates use. However, SARS-CoV is a virus which requires a level 3 containment laboratory. Therefore, virus surrogates allow laboratories, which do not dispose of this type of equipment, to conduct studies and produce precious data without working on a virus, which had already caused a worldwide epidemic.

Another important point revealed by this study is the inefficiency of bleach, a widely used disinfectant, when applied at the 1:100 (0.06%) use-dilution prescribed by the manufacturer. Sattar *et al.*, whose results are recorded in Table 2, have found higher reductions of HCoV 229E viral titers with concentrations of hypochlorite greater than the one tested here. These results are then consistent with a concentration-dependent effect [133].

Another recent study used MHV as the SARS-CoV surrogate, and carrier tests on Petri dishes. Antiseptic antiviral activity of common household disinfectants or antiseptics, containing either 0.05% of triclosan, 0.12% of chloroxylenol, 0.21% of sodium hypochlorite, 0.23% of pine oil, or 0.10% of a quaternary compound with 79.0% of ethanol, were investigated. All of them provided at least a 3 $\log_{10}$ reduction in viral titers within a 30 sec contact time, which is consistent with the previous results [134].

Despite the fact that these studies bring vital information, they also highlight the necessity of standardization of the antiseptics-disinfectants activity evaluation. We should also develop in-field tests in order to have a better appreciation of the true action of antiseptics-disinfectants.

## 5. Conclusions

The four HCoVs 229E, OC43, NL63 and HKU1 cause mild respiratory illnesses compared to SARS-CoV, but these infectious agents are involved in 10 to 20% of hospitalizations of young children and immunocompromised adults with respiratory tract illness and they are also involved in nosocomial infections. Moreover, although the SARS-epidemic has been contained, the possibility of re-emergence of SARS-CoV or emergence of another zoonotic strain remains.

Besides the absence of specific treatment and vaccine, HCoVs are now known to show a significant environmental resistance. Their survival in different biological fluids such as respiratory secretions or feces has been proved. Furthermore, some parameters seem of benefit for HCoVs such as the stabilizing effect of low temperature and high relative humidity or the protective action of organic materials. This protective effect should be carefully considered when developing antiseptic-disinfection strategies. Indeed, this often involves a higher quantity and/or concentration of the antiseptic-disinfectant product and so, a higher toxicity. Thus, an efficient disinfection process should include a precleaning step to get rid of these organic materials. The old well-known principle of antisepsis-disinfection that only clean things can be efficiently disinfected is still valuable.

Finally, in regard to the different studies on HCoVs's sensitivity to antiseptics-disinfectants, only few formulations are efficient within an adapted contact time and without a too-strong toxicity. For instance, considering their lack of efficiency against HCoVs, and also their toxicity, products only based on quaternary ammoniums or phenolic compounds should be avoided. Some largely used antiseptics-disinfectants such as ethanol or bleach show a significant activity on the HCoVs. However, some critical parameters should be considered, especially in the case of chlorine-derived compounds, such as the presence of organic materials that could prevent their antiseptic activity, or their dose-dependent effect on the HCoVs. The povidone-iodine or the chlorhexidine, when associated to ethanol and/or cetrimide, could be recommended when there is a risk of HCoVs contamination, contrary to another widely used antiseptic, the hexamidine.

**ROLAND EXH 6**

It is now essential to pursue investigations on (i) HCoVs's environmental stability and the role of inanimate material in their spread, (ii) their sensitivity to antiseptics-disinfectants formulations in standardized and targeted conditions, and (iii) the development of new efficient and nontoxic antiseptic-disinfectant molecules such as the calixarenic compounds.

## Acknowledgments

Financial support was provided by the French Ministry for Education and Research and the French National Scientific Research Center.

## Conflict of Interest

The authors declare no conflict of interest.

## References

1. ICTV (International Committee on Taxonomy on Viruses) Virus Taxonomy: 2011 Release (current) [(Accessed on 24 September 2012)]. Available online: http://ictvonline.org/virusTaxonomy.asp?version=2011.

2. Almeida J.D., Tyrrell D.A. The morphology of three previously uncharacterized human respiratory viruses that grow in organ culture. J. Gen. Virol. 1967;1:175–178. doi: 10.1099/0022-1317-1-2-175. [PubMed] [CrossRef] [Google Scholar]

3. Bradburne A.F., Bynoe M.L., Tyrrell D.A. Effects of a "new" human respiratory virus in volunteers. Br. Med. J. 1967;3:767–769. doi: 10.1136/bmj.3.5568.767. [PMC free article] [PubMed] [CrossRef] [Google Scholar]

4. Hamre D., Procknow J.J. A new virus isolated from the human respiratory tract. Proc. Soc. Exp. Biol. Med. 1966;121:190–193. [PubMed] [Google Scholar]

5. McIntosh K., Dees J.H., Becker W.B., Kapikian A.Z., Chanock R.M. Recovery in tracheal organ cultures of novel viruses from patients with respiratory disease. Proc. Natl. Acad. Sci. USA. 1967;57:933–940. doi: 10.1073/pnas.57.4.933. [PMC free article] [PubMed] [CrossRef] [Google Scholar]

6. Larson H.E., Reed S.E., Tyrrell D.A. Isolation of rhinoviruses and coronaviruses from 38 colds in adults. J. Med. Virol. 1980;5:221–229. doi: 10.1002/jmv.1890050306. [PubMed] [CrossRef] [Google Scholar]

7. Esper F., Weibel C., Ferguson D., Landry M.L., Kahn J.S. Evidence of a novel human coronavirus that is associated with respiratory tract disease in infants and young children. J. Infect. Dis. 2005;191:492–498. doi: 10.1086/428138. [PubMed] [CrossRef] [Google Scholar]

8. Fouchier R.A., Hartwig N.G., Bestebroer T.M., Niemeyer B., de Jong J.C., Simon J.H., Osterhaus A.D. A previously undescribed coronavirus associated with respiratory disease in humans. Proc. Natl. Acad. Sci. USA. 2004;101:6212–6216. [PMC free article] [PubMed] [Google Scholar]

9. Van der Hoek L., Pyrc K., Jebbink M.F., Vermeulen-Oost W., Berkhout R.J., Wolthers K.C., Wertheim-van Dillen P.M., Kaandorp J., Spaargaren J., Berkhout B. Identification of a new human coronavirus. Nat. Med. 2004;10:368–373. [PMC free article] [PubMed] [Google Scholar]

**ROLAND EXH 6**

10. Woo P.C., Lau S.K., Chu C.M., Chan K.H., Tsoi H.W., Huang Y., Wong B.H., Poon R.W., Cai J.J., Luk W.K., et al. Characterization and complete genome sequence of a novel coronavirus, coronavirus HKU1, from patients with pneumonia. J. Virol. 2005;79:884–895. [PMC free article] [PubMed] [Google Scholar]

11. Drosten C., Gunther S., Preiser W., van der Werf S., Brodt H.R., Becker S., Rabenau H., Panning M., Kolesnikova L., Fouchier R.A., et al. Identification of a novel coronavirus in patients with severe acute respiratory syndrome. N. Engl. J. Med. 2003;348:1967–1976. doi: 10.1056/NEJMoa030747. [PubMed] [CrossRef] [Google Scholar]

12. Ksiazek T.G., Erdman D., Goldsmith C.S., Zaki S.R., Peret T., Emery S., Tong S., Urbani C., Comer J.A., Lim W., et al. A novel coronavirus associated with severe acute respiratory syndrome. N. Engl. J. Med. 2003;348:1953–1966. doi: 10.1056/NEJMoa030781. [PubMed] [CrossRef] [Google Scholar]

13. Peiris J.S., Lai S.T., Poon L.L., Guan Y., Yam L.Y., Lim W., Nicholls J., Yee W.K., Yan W.W., Cheung M.T., et al. Coronavirus as a possible cause of severe acute respiratory syndrome. Lancet. 2003;361:1319–1325. [PMC free article] [PubMed] [Google Scholar]

14. WHO multicentre collaborative network for Severe Acute Respiratory Syndrome diagnosis. A multicentre collaboration to investigate the cause of severe acute respiratory syndrome. Lancet. 2003;361:1730–1733. doi: 10.1016/S0140-6736(03)13376-4. [PMC free article] [PubMed] [CrossRef] [Google Scholar]

15. Arden K.E., Nissen M.D., Sloots T.P., Mackay I.M. New human coronavirus, HCoV-NL63, associated with severe lower respiratory tract disease in Australia. J. Med. Virol. 2005;75:455–462. doi: 10.1002/jmv.20288. [PubMed] [CrossRef] [Google Scholar]

16. Bastien N., Anderson K., Hart L., Van Caeseele P., Brandt K., Milley D., Hatchette T., Weiss E.C., Li Y. Human coronavirus NL63 infection in Canada. J. Infect. Dis. 2005;191:503–506. doi: 10.1086/426869. [PubMed] [CrossRef] [Google Scholar]

17. Vabret A., Mourez T., Dina J., van der Hoek L., Gouarin S., Petitjean J., Brouard J., Freymuth F. Human coronavirus NL63, France. Emerg. Infect. Dis. 2005;11:1225–1229. doi: 10.3201/eid1108.050110. [PMC free article] [PubMed] [CrossRef] [Google Scholar]

18. Van der Hoek L., Sure K., Ihorst G., Stang A., Pyrc K., Jebbink M.F., Petersen G., Forster J., Berkhout B., Uberla K. Croup is associated with the novel coronavirus NL63. PLoS Med. 2005;2:e240. doi: 10.1371/journal.pmed.0020240. [PMC free article] [PubMed] [CrossRef] [Google Scholar]

19. Gerna G., Percivalle E., Sarasini A., Campanini G., Piralla A., Rovida F., Genini E., Marchi A., Baldanti F. Human respiratory coronavirus HKU1 versus other coronavirus infections in Italian hospitalised patients. J. Clin. Virol. 2007;38:244–250. doi: 10.1016/j.jcv.2006.12.008. [PMC free article] [PubMed] [CrossRef] [Google Scholar]

20. Sloots T.P., McErlean P., Speicher D.J., Arden K.E., Nissen M.D., Mackay I.M. Evidence of human coronavirus HKU1 and human bocavirus in Australian children. J. Clin. Virol. 2006;35:99–102. doi: 10.1016/j.jcv.2005.09.008. [PMC free article] [PubMed] [CrossRef] [Google Scholar]

21. Chiu S.S., Chan K.H., Chu K.W., Kwan S.W., Guan Y., Poon L.L., Peiris J.S. Human coronavirus NL63 infection and other coronavirus infections in children hospitalized with acute respiratory disease in Hong Kong, China. Clin. Infect. Dis. 2005;40:1721–1729. doi: 10.1086/430301. [PMC free article] [PubMed] [CrossRef] [Google Scholar]

**ROLAND EXH 6**

22. Kon M., Watanabe K., Tazawa T., Tamura T., Tsukagoshi H., Noda M., Kimura H., Mizuta K. Detection of human coronavirus NL63 and OC43 in children with acute respiratory infections in Niigata, Japan, between 2010 and 2011. Jpn. J. Infect. Dis. 2012;65:270–272. doi: 10.7883/yoken.65.270. [PubMed] [CrossRef] [Google Scholar]

23. Gerna G., Campanini G., Rovida F., Percivalle E., Sarasini A., Marchi A., Baldanti F. Genetic variability of human coronavirus OC43-, 229E-, and NL63-like strains and their association with lower respiratory tract infections of hospitalized infants and immunocompromised patients. J. Med. Virol. 2006;78:938–949. doi: 10.1002/jmv.20645. [PubMed] [CrossRef] [Google Scholar]

24. Esposito S., Bosis S., Niesters H.G., Tremolati E., Begliatti E., Rognoni A., Tagliabue C., Principi N., Osterhaus A.D. Impact of human coronavirus infections in otherwise healthy children who attended an emergency department. J. Med. Virol. 2006;78:1609–1615. doi: 10.1002/jmv.20745. [PubMed] [CrossRef] [Google Scholar]

25. Vabret A., Dina J., Gouarin S., Petitjean J., Tripey V., Brouard J., Freymuth F. Human (non-severe acute respiratory syndrome) coronavirus infections in hospitalised children in France. J. Paediatr. Child. Health. 2008;44:176–181. doi: 10.1111/j.1440-1754.2007.01246.x. [PubMed] [CrossRef] [Google Scholar]

26. Talbot H.K., Shepherd B.E., Crowe J.E., Jr., Griffin M.R., Edwards K.M., Podsiad A.B., Tollefson S.J., Wright P.F., Williams J.V. The pediatric burden of human coronaviruses evaluated for twenty years. Pediatr. Infect. Dis. J. 2009;28:682–687. doi: 10.1097/INF.0b013e31819d0d27. [PMC free article] [PubMed] [CrossRef] [Google Scholar]

27. Vabret A., Mourez T., Gouarin S., Petitjean J., Freymuth F. An outbreak of coronavirus OC43 respiratory infection in Normandy, France. Clin. Infect. Dis. 2003;36:985–989. doi: 10.1086/374222. [PMC free article] [PubMed] [CrossRef] [Google Scholar]

28. Van Elden L.J., van Loon A.M., van Alphen F., Hendriksen K.A., Hoepelman A.I., van Kraaij M.G., Oosterheert J.J., Schipper P., Schuurman R., Nijhuis M. Frequent detection of human coronaviruses in clinical specimens from patients with respiratory tract infection by use of a novel real-time reverse-transcriptase polymerase chain reaction. J. Infect. Dis. 2004;189:652–657. doi: 10.1086/381207. [PMC free article] [PubMed] [CrossRef] [Google Scholar]

29. Riski H., Hovi T. Coronavirus infections of man associated with diseases other than the common cold. J. Med. Virol. 1980;6:259–265. doi: 10.1002/jmv.1890060309. [PubMed] [CrossRef] [Google Scholar]

30. Talbot H.K., Crowe J.E., Jr., Edwards K.M., Griffin M.R., Zhu Y., Weinberg G.A., Szilagyi P.G., Hall C.B., Podsiad A.B., Iwane M., et al. Coronavirus infection and hospitalizations for acute respiratory illness in young children. J. Med. Virol. 2009;81:853–856. doi: 10.1002/jmv.21443. [PMC free article] [PubMed] [CrossRef] [Google Scholar]

31. Woo P.C., Lau S.K., Tsoi H.W., Huang Y., Poon R.W., Chu C.M., Lee R.A., Luk W.K., Wong G.K., Wong B.H., et al. Clinical and molecular epidemiological features of coronavirus HKU1-associated community-acquired pneumonia. J. Infect. Dis. 2005;192:1898–1907. doi: 10.1086/497151. [PMC free article] [PubMed] [CrossRef] [Google Scholar]

32. Gagneur A., Sizun J., Vallet S., Legr M.C., Picard B., Talbot P.J. Coronavirus-related nosocomial viral respiratory infections in a neonatal and paediatric intensive care unit: a prospective study. J. Hosp. Infect. 2002;51:59–64. doi: 10.1053/jhin.2002.1179. [PubMed] [CrossRef] [Google Scholar]

**ROLAND EXH 6**

33. Sizun J., Soupre D., Legrand M.C., Giroux J.D., Rubio S., Cauvin J.M., Chastel C., Alix D., de Parscau L. Neonatal nosocomial respiratory infection with coronavirus: a prospective study in a neonatal intensive care unit. Acta Paediatr. 1995;84:617–620. doi: 10.1111/j.1651-2227.1995.tb13710.x. [PubMed] [CrossRef] [Google Scholar]

34. Falsey A.R., Walsh E.E., Hayden F.G. Rhinovirus and coronavirus infection-associated hospitalizations among older adults. J. Infect. Dis. 2002;185:1338–1341. doi: 10.1086/339881. [PMC free article] [PubMed] [CrossRef] [Google Scholar]

35. Nicholson K.G., Kent J., Hammersley V., Cancio E. Acute viral infections of upper respiratory tract in elderly people living in the community: comparative, prospective, population based study of disease burden. BMJ. 1997;315:1060–1064. doi: 10.1136/bmj.315.7115.1060. [PMC free article] [PubMed] [CrossRef] [Google Scholar]

36. Pene F., Merlat A., Vabret A., Rozenberg F., Buzyn A., Dreyfus F., Cariou A., Freymuth F., Lebon P. Coronavirus 229E-related pneumonia in immunocompromised patients. Clin. Infect. Dis. 2003;37:929–932. doi: 10.1086/377612. [PMC free article] [PubMed] [CrossRef] [Google Scholar]

37. Folz R.J., Elkordy M.A. Coronavirus pneumonia following autologous bone marrow transplantation for breast cancer. Chest. 1999;115:901–905. doi: 10.1378/chest.115.3.901. [PMC free article] [PubMed] [CrossRef] [Google Scholar]

38. Chany C., Moscovici O., Lebon P., Rousset S. Association of coronavirus infection with neonatal necrotizing enterocolitis. Pediatrics. 1982;69:209–214. [PubMed] [Google Scholar]

39. Vabret A., Dina J., Gouarin S., Petitjean J., Corbet S., Freymuth F. Detection of the new human coronavirus HKU1: a report of 6 cases. Clin. Infect. Dis. 2006;42:634–639. doi: 10.1086/500136. [PMC free article] [PubMed] [CrossRef] [Google Scholar]

40. Zhang X.M., Herbst W., Kousoulas K.G., Storz J. Biological and genetic characterization of a hemagglutinating coronavirus isolated from a diarrhoeic child. J. Med. Virol. 1994;44:152–161. doi: 10.1002/jmv.1890440207. [PubMed] [CrossRef] [Google Scholar]

41. Arbour N., Cote G., Lachance C., Tardieu M., Cashman N.R., Talbot P.J. Acute and persistent infection of human neural cell lines by human coronavirus OC43. J. Virol. 1999;73:3338–3350. [PMC free article] [PubMed] [Google Scholar]

42. Arbour N., Ekande S., Cote G., Lachance C., Chagnon F., Tardieu M., Cashman N.R., Talbot P.J. Persistent infection of human oligodendrocytic and neuroglial cell lines by human coronavirus 229E. J. Virol. 1999;73:3326–3337. [PMC free article] [PubMed] [Google Scholar]

43. Bonavia A., Arbour N., Yong V.W., Talbot P.J. Infection of primary cultures of human neural cells by human coronaviruses 229E and OC43. J. Virol. 1997;71:800–806. [PMC free article] [PubMed] [Google Scholar]

44. Arbour N., Day R., Newcombe J., Talbot P.J. Neuroinvasion by human respiratory coronaviruses. J. Virol. 2000;74:8913–8921. doi: 10.1128/JVI.74.19.8913-8921.2000. [PMC free article] [PubMed] [CrossRef] [Google Scholar]

45. Murray R.S., Brown B., Brian D., Cabirac G.F. Detection of coronavirus RNA and antigen in multiple sclerosis brain. Ann. Neurol. 1992;31:525–533. doi: 10.1002/ana.410310511. [PubMed] [CrossRef] [Google Scholar]

46. Stewart J.N., Mounir S., Talbot P.J. Human coronavirus gene expression in the brains of multiple sclerosis patients. Virology. 1992;191:502–505. doi: 10.1016/0042-6822(92)90220-J. [PubMed] [CrossRef] [Google Scholar]

**ROLAND EXH 6**

47. St-Jean J.R., Jacomy H., Desforges M., Vabret A., Freymuth F., Talbot P.J. Human respiratory coronavirus OC43: genetic stability and neuroinvasion. J. Virol. 2004;78:8824–8834. doi: 10.1128/JVI.78.16.8824-8834.2004. [PMC free article] [PubMed] [CrossRef] [Google Scholar]

48. Riski H., Hovi T., Frick M.H. Carditis associated with coronavirus infection. Lancet. 1980;2:100 –101. [PubMed] [Google Scholar]

49. Hsu L.Y., Lee C.C., Green J.A., Ang B., Paton N.I., Lee L., Villacian J.S., Lim P.L., Earnest A., Leo Y.S. Severe acute respiratory syndrome (SARS) in Singapore: clinical features of index patient and initial contacts. Emerg. Infect. Dis. 2003;9:713–717. doi: 10.3201/eid0906.030264. [PMC free article] [PubMed] [CrossRef] [Google Scholar]

50. Poutanen S.M., Low D.E., Henry B., Finkelstein S., Rose D., Green K., Tellier R., Draker R., Adachi D., Ayers M., et al. Identification of severe acute respiratory syndrome in Canada. N. Engl. J. Med. 2003;348:1995–2005. doi: 10.1056/NEJMoa030634. [PubMed] [CrossRef] [Google Scholar]

51. WHO (World Health Organization) Summary of probable SARS cases with onset of illness from 1 November 2002 to 31 July. [(Accessed on 21 February 2010)]. Available online: http://www.who.int/csr/sars/country/table2004_04_21/en/index.html.

52. Lee N., Hui D., Wu A., Chan P., Cameron P., Joynt G.M., Ahuja A., Yung M.Y., Leung C.B., To K.F., et al. A major outbreak of severe acute respiratory syndrome in Hong Kong. N. Engl. J. Med. 2003;348:1986–1994. doi: 10.1056/NEJMoa030685. [PubMed] [CrossRef] [Google Scholar]

53. Varia M., Wilson S., Sarwal S., McGeer A., Gournis E., Galanis E., Henry B. Investigation of a nosocomial outbreak of severe acute respiratory syndrome (SARS) in Toronto, Canada. CMAJ. 2003;169:285–292. [PMC free article] [PubMed] [Google Scholar]

54. Zhao Z., Zhang F., Xu M., Huang K., Zhong W., Cai W., Yin Z., Huang S., Deng Z., Wei M., et al. Description and clinical treatment of an early outbreak of severe acute respiratory syndrome (SARS) in Guangzhou, PR China. J. Med. Microbiol. 2003;52:715–720. doi: 10.1099/jmm.0.05320-0. [PubMed] [CrossRef] [Google Scholar]

55. Booth C.M., Matukas L.M., Tomlinson G.A., Rachlis A.R., Rose D.B., Dwosh H.A., Walmsley S.L., Mazzulli T., Avendano M., Derkach P., et al. Clinical features and short-term outcomes of 144 patients with SARS in the greater Toronto area. JAMA. 2003;289:2801–2809. doi: 10.1001/jama.289.21.JOC30885. [PubMed] [CrossRef] [Google Scholar]

56. Donnelly C.A., Ghani A.C., Leung G.M., Hedley A.J., Fraser C., Riley S., Abu-Raddad L.J., Ho L.M., Thach T.Q., Chau P., et al. Epidemiological determinants of spread of causal agent of severe acute respiratory syndrome in Hong Kong. Lancet. 2003;361:1761–1766. [PMC free article] [PubMed] [Google Scholar]

57. Peiris J.S., Chu C.M., Cheng V.C., Chan K.S., Hung I.F., Poon L.L., Law K.I., Tang B.S., Hon T.Y., Chan C.S., et al. Clinical progression and viral load in a community outbreak of coronavirus-associated SARS pneumonia: a prospective study. Lancet. 2003;361:1767–1772. [PMC free article] [PubMed] [Google Scholar]

58. Peiris J.S., Yuen K.Y., Osterhaus A.D., Stohr K. The severe acute respiratory syndrome. N. Engl. J. Med. 2003;349:2431–2441. doi: 10.1056/NEJMra032498. [PubMed] [CrossRef] [Google Scholar]

59. WHO (World Health Organization) Consensus document on the epidemiology of severe acute respiratory syndrome (SARS) [(Accessed on 25-09-12)]. Available online: http://www.who.int/csr/sars/en/WHOconsensus.pdf.

**ROLAND EXH 6**

60. Hamming I., Timens W., Bulthuis M.L., Lely A.T., Navis G.J., van Goor H. Tissue distribution of ACE2 protein, the functional receptor for SARS coronavirus. A first step in understanding SARS pathogenesis. J. Pathol. 2004;203:631–637. doi: 10.1002/path.1570. [PubMed] [CrossRef] [Google Scholar]

61. Li W., Moore M.J., Vasilieva N., Sui J., Wong S.K., Berne M.A., Somasundaran M., Sullivan J.L., Luzuriaga K., Greenough T.C., et al. Angiotensin-converting enzyme 2 is a functional receptor for the SARS coronavirus. Nature. 2003;426:450–454. doi: 10.1038/nature02145. [PMC free article] [PubMed] [CrossRef] [Google Scholar]

62. Dwosh H.A., Hong H.H., Austgarden D., Herman S., Schabas R. Identification and containment of an outbreak of SARS in a community hospital. CMAJ. 2003;168:1415–1420. [PMC free article] [PubMed] [Google Scholar]

63. Ng S.K. Possible role of an animal vector in the SARS outbreak at Amoy Gardens. Lancet. 2003;362:570–572. doi: 10.1016/S0140-6736(03)14121-9. [PubMed] [CrossRef] [Google Scholar]

64. Vijgen L., Keyaerts E., Moes E., Thoelen I., Wollants E., Lemey P., Vandamme A.M., Van Ranst M. Complete genomic sequence of human coronavirus OC43: molecular clock analysis suggests a relatively recent zoonotic coronavirus transmission event. J. Virol. 2005;79:1595–1604. [PMC free article] [PubMed] [Google Scholar]

65. Lau S.K., Woo P.C., Li K.S., Huang Y., Tsoi H.W., Wong B.H., Wong S.S., Leung S.Y., Chan K.H., Yuen K.Y. Severe acute respiratory syndrome coronavirus-like virus in Chinese horseshoe bats. Proc. Natl. Acad. Sci. USA. 2005;102:14040–14045. [PMC free article] [PubMed] [Google Scholar]

66. Li W., Shi Z., Yu M., Ren W., Smith C., Epstein J.H., Wang H., Crameri G., Hu Z., Zhang H., et al. Bats are natural reservoirs of SARS-like coronaviruses. Science. 2005;310:676–679. doi: 10.1126/science.1118391. [PubMed] [CrossRef] [Google Scholar]

67. Poon L.L., Chu D.K., Chan K.H., Wong O.K., Ellis T.M., Leung Y.H., Lau S.K., Woo P.C., Suen K.Y., Yuen K.Y., et al. Identification of a novel coronavirus in bats. J. Virol. 2005;79:2001–2009. [PMC free article] [PubMed] [Google Scholar]

68. Woo P.C., Lau S.K., Li K.S., Poon R.W., Wong B.H., Tsoi H.W., Yip B.C., Huang Y., Chan K.H., Yuen K.Y. Molecular diversity of coronaviruses in bats. Virology. 2006;351:180–187. doi: 10.1016/j.virol.2006.02.041. [PMC free article] [PubMed] [CrossRef] [Google Scholar]

69. Kan B., Wang M., Jing H., Xu H., Jiang X., Yan M., Liang W., Zheng H., Wan K., Liu Q., et al. Molecular evolution analysis and geographic investigation of severe acute respiratory syndrome coronavirus-like virus in palm civets at an animal market and on farms. J. Virol. 2005;79:11892–11900. doi: 10.1128/JVI.79.18.11892-11900.2005. [PMC free article] [PubMed] [CrossRef] [Google Scholar]

70. Cinatl J., Jr., Michaelis M., Morgenstern B., Doerr H.W. High-dose hydrocortisone reduces expression of the pro-inflammatory chemokines CXCL8 and CXCL10 in SARS coronavirus-infected intestinal cells. Int. J. Mol. Med. 2005;15:323–327. [PubMed] [Google Scholar]

71. Cinatl J., Morgenstern B., Bauer G., Chandra P., Rabenau H., Doerr H.W. Glycyrrhizin, an active component of liquorice roots, and replication of SARS-associated coronavirus. Lancet. 2003;361:2045 –2046. doi: 10.1016/S0140-6736(03)13615-X. [PMC free article] [PubMed] [CrossRef] [Google Scholar]

ROLAND EXH 6

72. Morgenstern B., Michaelis M., Baer P.C., Doerr H.W., Cinatl J., Jr. Ribavirin and interferon-beta synergistically inhibit SARS-associated coronavirus replication in animal and human cell lines. Biochem. Biophys. Res. Commun. 2005;326:905–908. doi: 10.1016/j.bbrc.2004.11.128. [PMC free article] [PubMed] [CrossRef] [Google Scholar]

73. Mazzulli T., Farcas G.A., Poutanen S.M., Willey B.M., Low D.E., Butany J., Asa S.L., Kain K.C. Severe acute respiratory syndrome-associated coronavirus in lung tissue. Emerg. Infect. Dis. 2004;10:20–24. doi: 10.3201/eid1001.030404. [PMC free article] [PubMed] [CrossRef] [Google Scholar]

74. Yamamoto N., Yang R., Yoshinaka Y., Amari S., Nakano T., Cinatl J., Rabenau H., Doerr H.W., Hunsmann G., Otaka A., et al. HIV protease inhibitor nelfinavir inhibits replication of SARS-associated coronavirus. Biochem. Biophys. Res. Commun. 2004;318:719–725. doi: 10.1016/j.bbrc.2004.04.083. [PMC free article] [PubMed] [CrossRef] [Google Scholar]

75. Cinatl J., Jr., Michaelis M., Hoever G., Preiser W., Doerr H.W. Development of antiviral therapy for severe acute respiratory syndrome. Antiviral Res. 2005;66:81–97. doi: 10.1016/j.antiviral.2005.03.002. [PubMed] [CrossRef] [Google Scholar]

76. Haagmans B.L., Osterhaus A.D. Coronaviruses and their therapy. Antiviral Res. 2006;71:397–403. doi: 10.1016/j.antiviral.2006.05.019. [PMC free article] [PubMed] [CrossRef] [Google Scholar]

77. Bisht H., Roberts A., Vogel L., Bukreyev A., Collins P.L., Murphy B.R., Subbarao K., Moss B. Severe acute respiratory syndrome coronavirus spike protein expressed by attenuated vaccinia virus protectively immunizes mice. Proc. Natl. Acad. Sci. USA. 2004;101:6641–6646. [PMC free article] [PubMed] [Google Scholar]

78. Kapadia S.U., Rose J.K., Lamirande E., Vogel L., Subbarao K., Roberts A. Long-term protection from SARS coronavirus infection conferred by a single immunization with an attenuated VSV-based vaccine. Virology. 2005;340:174–182. doi: 10.1016/j.virol.2005.06.016. [PMC free article] [PubMed] [CrossRef] [Google Scholar]

79. Chen Z., Zhang L., Qin C., Ba L., Yi C.E., Zhang F., Wei Q., He T., Yu W., Yu J., et al. Recombinant modified vaccinia virus Ankara expressing the spike glycoprotein of severe acute respiratory syndrome coronavirus induces protective neutralizing antibodies primarily targeting the receptor binding region. J. Virol. 2005;79:2678–2688. [PMC free article] [PubMed] [Google Scholar]

80. Bukreyev A., Lamirande E.W., Buchholz U.J., Vogel L.N., Elkins W.R., St Claire M., Murphy B.R., Subbarao K., Collins P.L. Mucosal immunisation of African green monkeys (Cercopithecus aethiops) with an attenuated parainfluenza virus expressing the SARS coronavirus spike protein for the prevention of SARS. Lancet. 2004;363:2122–2127. [PMC free article] [PubMed] [Google Scholar]

81. Ishii K., Hasegawa H., Nagata N., Mizutani T., Morikawa S., Suzuki T., Taguchi F., Tashiro M., Takemori T., Miyamura T., et al. Induction of protective immunity against severe acute respiratory syndrome coronavirus (SARS-CoV) infection using highly attenuated recombinant vaccinia virus DIs. Virology. 2006;351:368–380. doi: 10.1016/j.virol.2006.03.020. [PMC free article] [PubMed] [CrossRef] [Google Scholar]

82. See R.H., Zakhartchouk A.N., Petric M., Lawrence D.J., Mok C.P., Hogan R.J., Rowe T., Zitzow L.A., Karunakaran K.P., Hitt M.M., et al. Comparative evaluation of two severe acute respiratory syndrome (SARS) vaccine candidates in mice challenged with SARS coronavirus. J. Gen. Virol. 2006;87:641–650. doi: 10.1099/vir.0.81579-0. [PubMed] [CrossRef] [Google Scholar]

**ROLAND EXH 6**

83. Czub M., Weingartl H., Czub S., He R., Cao J. Evaluation of modified vaccinia virus Ankara based recombinant SARS vaccine in ferrets. Vaccine. 2005;23:2273–2279. doi: 10.1016/j.vaccine.2005.01.033. [PMC free article] [PubMed] [CrossRef] [Google Scholar]

84. He Y., Li J., Heck S., Lustigman S., Jiang S. Antigenic and immunogenic characterization of recombinant baculovirus-expressed severe acute respiratory syndrome coronavirus spike protein: implication for vaccine design. J. Virol. 2006;80:5757–5767. doi: 10.1128/JVI.00083-06. [PMC free article] [PubMed] [CrossRef] [Google Scholar]

85. Zhou Z., Post P., Chubet R., Holtz K., McPherson C., Petric M., Cox M. A recombinant baculovirus-expressed S glycoprotein vaccine elicits high titers of SARS-associated coronavirus (SARS-CoV) neutralizing antibodies in mice. Vaccine. 2006;24:3624–3631. doi: 10.1016/j.vaccine.2006.01.059. [PMC free article] [PubMed] [CrossRef] [Google Scholar]

86. He Y., Zhou Y., Siddiqui P., Jiang S. Inactivated SARS-CoV vaccine elicits high titers of spike protein-specific antibodies that block receptor binding and virus entry. Biochem. Biophys. Res. Commun. 2004;325:445–452. doi: 10.1016/j.bbrc.2004.10.052. [PMC free article] [PubMed] [CrossRef] [Google Scholar]

87. Spruth M., Kistner O., Savidis-Dacho H., Hitter E., Crowe B., Gerencer M., Bruhl P., Grillberger L., Reiter M., Tauer C., et al. A double-inactivated whole virus candidate SARS coronavirus vaccine stimulates neutralising and protective antibody responses. Vaccine. 2006;24:652–661. [PMC free article] [PubMed] [Google Scholar]

88. Tang L., Zhu Q., Qin E., Yu M., Ding Z., Shi H., Cheng X., Wang C., Chang G., Fang F., et al. Inactivated SARS-CoV vaccine prepared from whole virus induces a high level of neutralizing antibodies in BALB/c mice. DNA Cell Biol. 2004;23:391–394. doi: 10.1089/104454904323145272. [PubMed] [CrossRef] [Google Scholar]

89. Xiong S., Wang Y.F., Zhang M.Y., Liu X.J., Zhang C.H., Liu S.S., Qian C.W., Li J.X., Lu J.H., Wan Z.Y., et al. Immunogenicity of SARS inactivated vaccine in BALB/c mice. Immunol. Lett. 2004;95:139–143. doi: 10.1016/j.imlet.2004.06.014. [PMC free article] [PubMed] [CrossRef] [Google Scholar]

90. Takasuka N., Fujii H., Takahashi Y., Kasai M., Morikawa S., Itamura S., Ishii K., Sakaguchi M., Ohnishi K., Ohshima M., et al. A subcutaneously injected UV-inactivated SARS coronavirus vaccine elicits systemic humoral immunity in mice. Int. Immunology. 2004;16:1423–1430. doi: 10.1093/intimm/dxh143. [PMC free article] [PubMed] [CrossRef] [Google Scholar]

91. Stadler K., Roberts A., Becker S., Vogel L., Eickmann M., Kolesnikova L., Klenk H.D., Murphy B., Rappuoli R., Abrignani S., et al. SARS vaccine protective in mice. Emerg. Infect. Dis. 2005;11:1312–1314. [PMC free article] [PubMed] [Google Scholar]

92. Woo P.C., Lau S.K., Tsoi H.W., Chen Z.W., Wong B.H., Zhang L., Chan J.K., Wong L.P., He W., Ma C., et al. SARS coronavirus spike polypeptide DNA vaccine priming with recombinant spike polypeptide from Escherichia coli as booster induces high titer of neutralizing antibody against SARS coronavirus. Vaccine. 2005;23:4959–4968. doi: 10.1016/j.vaccine.2005.05.023. [PMC free article] [PubMed] [CrossRef] [Google Scholar]

93. Yang Z.Y., Kong W.P., Huang Y., Roberts A., Murphy B.R., Subbarao K., Nabel G.J. A DNA vaccine induces SARS coronavirus neutralization and protective immunity in mice. Nature. 2004;428:561–564. [PMC free article] [PubMed] [Google Scholar]

**ROLAND EXH 6**

94. Zhao P., Ke J.S., Qin Z.L., Ren H., Zhao L.J., Yu J.G., Gao J., Zhu S.Y., Qi Z.T. DNA vaccine of SARS-Cov S gene induces antibody response in mice. Acta Biochim. Biophys. Sin. 2004;36:37–41. doi: 10.1093/abbs/36.1.37. [PMC free article] [PubMed] [CrossRef] [Google Scholar]

95. Wang Z., Yuan Z., Matsumoto M., Hengge U.R., Chang Y.F. Immune responses with DNA vaccines encoded different gene fragments of severe acute respiratory syndrome coronavirus in BALB/c mice. Biochem. Biophys. Res. Commun. 2005;327:130–135. doi: 10.1016/j.bbrc.2004.11.147. [PMC free article] [PubMed] [CrossRef] [Google Scholar]

96. Perlman S., Dandekar A.A. Immunopathogenesis of coronavirus infections: implications for SARS. Nat. Rev. Immunol. 2005;5:917–927. doi: 10.1038/nri1732. [PMC free article] [PubMed] [CrossRef] [Google Scholar]

97. Bolles M., Deming D., Long K., Agnihothram S., Whitmore A., Ferris M., Funkhouser W., Gralinski L., Totura A., Heise M., et al. A double-inactivated severe acute respiratory syndrome coronavirus vaccine provides incomplete protection in mice and induces increased eosinophilic proinflammatory pulmonary response upon challenge. J. Virol. 2011;85:12201–12215. doi: 10.1128/JVI.06048-11. [PMC free article] [PubMed] [CrossRef] [Google Scholar]

98. Deming D., Sheahan T., Heise M., Yount B., Davis N., Sims A., Suthar M., Harkema J., Whitmore A., Pickles R., et al. Vaccine efficacy in senescent mice challenged with recombinant SARS-CoV bearing epidemic and zoonotic spike variants. PLoS Med. 2006;3:e525. doi: 10.1371/journal.pmed.0030525. [PMC free article] [PubMed] [CrossRef] [Google Scholar]

99. Lokugamage K.G., Yoshikawa-Iwata N., Ito N., Watts D.M., Wyde P.R., Wang N., Newman P., Kent Tseng C.T., Peters C.J., Makino S. Chimeric coronavirus-like particles carrying severe acute respiratory syndrome coronavirus (SCoV) S protein protect mice against challenge with SCoV. Vaccine. 2008;26:797–808. [PMC free article] [PubMed] [Google Scholar]

100. Yasui F., Kai C., Kitabatake M., Inoue S., Yoneda M., Yokochi S., Kase R., Sekiguchi S., Morita K., Hishima T., et al. Prior immunization with severe acute respiratory syndrome (SARS)-associated coronavirus (SARS-CoV) nucleocapsid protein causes severe pneumonia in mice infected with SARS-CoV. J. Immunol. 2008;181:6337–6348. [PubMed] [Google Scholar]

101. Tseng C.T., Sbrana E., Iwata-Yoshikawa N., Newman P.C., Garron T., Atmar R.L., Peters C.J., Couch R.B. Immunization with SARS coronavirus vaccines leads to pulmonary immunopathology on challenge with the SARS virus. PLoS ONE. 2012;7:e35421. [PMC free article] [PubMed] [Google Scholar]

102. Olsen S.J., Chang H.L., Cheung T.Y., Tang A.F., Fisk T.L., Ooi S.P., Kuo H.W., Jiang D.D., Chen K.T., Lando J., et al. Transmission of the severe acute respiratory syndrome on aircraft. N. Engl. J. Med. 2003;349:2416–2422. doi: 10.1056/NEJMoa031349. [PubMed] [CrossRef] [Google Scholar]

103. Lee S.H. The SARS epidemic in Hong Kong. J. Epidemiol. Community Health. 2003;57:652–654. doi: 10.1136/jech.57.9.652. [PMC free article] [PubMed] [CrossRef] [Google Scholar]

104. Ijaz M.K., Brunner A.H., Sattar S.A., Nair R.C., Johnson-Lussenburg C.M. Survival characteristics of airborne human coronavirus 229E. J. Gen. Virol. 1985;66 ( Pt 12) [PubMed] [Google Scholar]

105. Rabenau H.F., Cinatl J., Morgenstern B., Bauer G., Preiser W., Doerr H.W. Stability and inactivation of SARS coronavirus. Med. Microbiol. Immunol. 2005;194:1–6. doi: 10.1007/s00430-004-0219-0. [PMC free article] [PubMed] [CrossRef] [Google Scholar]

ROLAND EXH 6

106. Duan S.M., Zhao X.S., Wen R.F., Huang J.J., Pi G.H., Zhang S.X., Han J., Bi S.L., Ruan L., Dong X.P. Stability of SARS coronavirus in human specimens and environment and its sensitivity to heating and UV irradiation. Biomed. Environ. Sci. 2003;16:246–255. [PubMed] [Google Scholar]

107. Sizun J., Yu M.W., Talbot P.J. Survival of human coronaviruses 229E and OC43 in suspension and after drying on surfaces: a possible source of hospital-acquired infections. J. Hosp. Infect. 2000;46:55–60. doi: 10.1053/jhin.2000.0795. [PubMed] [CrossRef] [Google Scholar]

108. Lai M.Y., Cheng P.K., Lim W.W. Survival of severe acute respiratory syndrome coronavirus. Clin. Infect. Dis. 2005;41:e67–71. doi: 10.1086/433186. [PMC free article] [PubMed] [CrossRef] [Google Scholar]

109. Chen Y.C., Huang L.M., Chan C.C., Su C.P., Chang S.C., Chang Y.Y., Chen M.L., Hung C.C., Chen W.J., Lin F.Y., et al. SARS in hospital emergency room. Emerg. Infect. Dis. 2004;10:782–788. [PMC free article] [PubMed] [Google Scholar]

110. Dowell S.F., Simmerman J.M., Erdman D.D., Wu J.S., Chaovavanich A., Javadi M., Yang J.Y., Anderson L.J., Tong S., Ho M.S. Severe acute respiratory syndrome coronavirus on hospital surfaces. Clin. Infect. Dis. 2004;39:652–657. doi: 10.1086/422652. [PMC free article] [PubMed] [CrossRef] [Google Scholar]

111. Casanova L., Rutala W.A., Weber D.J., Sobsey M.D. Survival of surrogate coronaviruses in water. Water Res. 2009;43:1893–1898. doi: 10.1016/j.watres.2009.02.002. [PMC free article] [PubMed] [CrossRef] [Google Scholar]

112. Lamarre A., Talbot P.J. Effect of pH and temperature on the infectivity of human coronavirus 229E. Can. J. Microbiol. 1989;35:972–974. [PubMed] [Google Scholar]

113. Sturman L.S., Ricard C.S., Holmes K.V. Conformational change of the coronavirus peplomer glycoprotein at pH 8.0 and 37 degrees C correlates with virus aggregation and virus-induced cell fusion. J. Virol. 1990;64:3042–3050. [PMC free article] [PubMed] [Google Scholar]

114. Daniel C., Talbot P.J. Physico-chemical properties of murine hepatitis virus, strain A 59. Brief report. Arch. Virol. 1987;96:241–248. doi: 10.1007/BF01320963. [PMC free article] [PubMed] [CrossRef] [Google Scholar]

115. Pocock D.H., Garwes D.J. The influence of pH on the growth and stability of transmissible gastroenteritis virus in vitro. Arch. Virol. 1975;49:239–247. doi: 10.1007/BF01317542. [PMC free article] [PubMed] [CrossRef] [Google Scholar]

116. Pratelli A. Canine coronavirus inactivation with physical and chemical agents. Vet. J. 2008;177:71–79. doi: 10.1016/j.tvjl.2007.03.019. [PMC free article] [PubMed] [CrossRef] [Google Scholar]

117. WHO (World Health Organization) First data on stability and resistance of SARS coronavirus compiled by members of WHO laboratory network. [(Accessed on 16 February 2010)]. Available online: http://www.who.int/csr/sars/survival_2003_05_04/en/index.html.

118. Lipsitch M., Cohen T., Cooper B., Robins J.M., Ma S., James L., Gopalakrishna G., Chew S.K., Tan C.C., Samore M.H., et al. Transmission dynamics and control of severe acute respiratory syndrome. Science. 2003;300:1966–1970. [PMC free article] [PubMed] [Google Scholar]

119. Riley S., Fraser C., Donnelly C.A., Ghani A.C., Abu-Raddad L.J., Hedley A.J., Leung G.M., Ho L.M., Lam T.H., Thach T.Q., et al. Transmission dynamics of the etiological agent of SARS in Hong Kong: impact of public health interventions. Science. 2003;300:1961–1966. [PubMed] [Google Scholar]

**ROLAND EXH 6**

120. Seto W.H., Tsang D., Yung R.W., Ching T.Y., Ng T.K., Ho M., Ho L.M., Peiris J.S. Effectiveness of precautions against droplets and contact in prevention of nosocomial transmission of severe acute respiratory syndrome (SARS) Lancet. 2003;361:1519–1520. [PMC free article] [PubMed] [Google Scholar]

121. WHO (World Health Organization) Global surveillance for Severe Acute Respiratory Syndrome (SARS) Wkly. Epidemiol. Rec. 2003;78:100–109. [PubMed] [Google Scholar]

122. AFNOR. Chemical disinfectants and- Virucidal quantitative suspension test for chemical disinfectants and antiseptics used in human medicine - Test method and requirements (phase 2, step 1). NF EN 14476+A1. 2007.

123. ASTM. Standard Test Method for Efficacy of Virucidal Agents Intended for Inanimate Environmental Surfaces. E1053-97 (last reapproval in 2002) 1997.

124. ASTM. Standard Test Method for Efficacy of Antimicrobial Agents Against Viruses in Suspension. E1052-96 (last reapproval in 2002) 1996.

125. ASTM. Standard Test Method for Neutralization of Virucidal Agents in Virucidal Efficacy Evaluations. E1482-04. 2004.

126. ASTM (American Society for Testing and Materials) Standard Test Method for Determining the Virus-Eliminating Effectiveness of Liquid Hygienic Handwash and Handrub Agents Using the Fingerpads of Adult Volunteers. E1838-02. 2002.

127. ASTM (American Society for Testing and Materials) Standard Test Method for Evaluation of Hygienic Handwash and Handrub Formulations for Virus-Eliminating Activity Using the Entire Hand. E2011-09. 2009.

128. Sattar S.A., Springthorpe V.S., Karim Y., Loro P. Chemical disinfection of non-porous inanimate surfaces experimentally contaminated with four human pathogenic viruses. Epidemiol. Infect. 1989;102:493–505. doi: 10.1017/S0950268800030211. [PMC free article] [PubMed] [CrossRef] [Google Scholar]

129. Kariwa H., Fujii N., Takashima I. Inactivation of SARS coronavirus by means of povidone-iodine, physical conditions and chemical reagents. Dermatology. 2006;212 Suppl 1:119–123. [PubMed] [Google Scholar]

130. Geller C., Fontanay S., Finance C., Duval R.E. A new Sephadex-based method for removing microbicidal and cytotoxic residues when testing antiseptics against viruses: Experiments with a human coronavirus as a model. J. Virol. Methods. 2009;159:217–226. doi: 10.1016/j.jviromet.2009.03.023. [PMC free article] [PubMed] [CrossRef] [Google Scholar]

131. Geller C., Fontanay S., Mourer M., Dibama H.M., Regnouf-de-Vains J.B., Finance C., Duval R.E. Antiseptic properties of two calix[4]arenes derivatives on the human coronavirus 229E. Antiviral Res. 2010;88:343–346. doi: 10.1016/j.antiviral.2010.09.009. [PMC free article] [PubMed] [CrossRef] [Google Scholar]

132. Rabenau H.F., Kampf G., Cinatl J., Doerr H.W. Efficacy of various disinfectants against SARS coronavirus. J. Hosp. Infect. 2005;61:107–111. doi: 10.1016/j.jhin.2004.12.023. [PubMed] [CrossRef] [Google Scholar]

133. Hulkower R.L., Casanova L.M., Rutala W.A., Weber D.J., Sobsey M.D. Inactivation of surrogate coronaviruses on hard surfaces by health care germicides. Am. J. Infect. Control. 2011;39:401–407. doi: 10.1016/j.ajic.2010.08.011. [PubMed] [CrossRef] [Google Scholar]

**ROLAND EXH 6**

134. Dellanno C., Vega Q., Boesenberg D. The antiviral action of common household disinfectants and antiseptics against murine hepatitis virus, a potential surrogate for SARS coronavirus. Am. J. Infect. Control. 2009;37:649–652. doi: 10.1016/j.ajic.2009.03.012. [PubMed] [CrossRef] [Google Scholar]

---

Articles from Viruses are provided here courtesy of **Multidisciplinary Digital Publishing Institute (MDPI)**

**ROLAND EXH 6**

| | |
|---|---|
| **From:** | Roland Lankah (Sheriff) |
| **Sent:** | Sunday, April 05, 2020 7:32 AM |
| **To:** | Elisabeth Glick (Sheriff) |
| **Cc:** | Jasmin JarlegoPenaranda (Sheriff) |
| **Subject:** | Fw: Coronavirus info |

More research regarding chemicals.

*Roland Lankah, REHS/RS, MPH, PhD* (abd)
*Registered Environmental Health Specialist*
*Cook County Sheriff's Office/DOC*
**Office: (773) 674-5988**
**Cell: 312-590-3419**

---

**From:** Zawitz, Chad <czawitz@cookcountyhhs.org>
**Sent:** Tuesday, January 28, 2020 4:10 PM
**To:** Roland Lankah (Sheriff) <Roland.Lankah@cookcountyil.gov>
**Subject:** Re: Coronavirus info

10-4

On Jan 28, 2020, at 4:00 PM, Roland Lankah (Sheriff) <Roland.Lankah@cookcountyil.gov> wrote:

This other study indicated that they are sensitive to variation in pH level (increased toxicity) and contact time. Pre-cleaning before disinfecting is essential because it remove organic maters increasing the chemical contact with the virus. So I am working on the pH calculations to make the necessary adjustment in the chemical concentration based on this study. Hopefully it is a working recipe, and hopefully we don't experience anything here.
Keep me updated, and I will do the same.

https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3509683/



Human Coronaviruses: Insights into Environmental Resistance and Its Influence on the Development of New Antiseptic Strategies

The Coronaviridae family, an enveloped RNA virus family, and, more particularly, human coronaviruses (HCoV),

1

**ROLAND EXH 7**

were historically known to be responsible for a large portion of common colds and other upper respiratory tract infections. HCoV are now known to be involved in more serious respiratory diseases, i.e. bronchitis, bronchiolitis or pneumonia, especially in young children and neonates ...

www.ncbi.nlm.nih.gov

*Roland  Lankah, REHS/RS, MPH, PhD (abd)*
*Registered Environmental Health Specialist*
*Cook County Sheriff's Office/DOC*
**Office: (773) 674-5988**
**Cell: 312-590-3419**

**From:** Roland Lankah (Sheriff) <Roland.Lankah@cookcountyil.gov>
**Sent:** Tuesday, January 28, 2020 3:05 PM
**To:** Chad Zawitz (CCHHS) <CZawitz@cookcountyil.gov>
**Subject:** Re: Coronavirus info

Thank Dr. Z,
I saw that too and I was surprise that the Clorox-based products were ineffective as these have been useful  against several SARS type infections. However, while I was also researching Rhinovirus infections, a study suggested that Lysol was more likely to be effective against Rhinovirus as compared to bleach.  Contact time is also shorter as compared to bleach.  The study is really old, but may still be relevant.

link below:
https://www.ncbi.nlm.nih.gov/pmc/articles/PMC182122/



Chemical disinfection to interrupt transfer of rhinovirus type 14 from environmental surfaces to hands.

Rhinoviruses can survive on environmental surfaces for several hours under ambient conditions. Hands can readily become contaminated after contact with such surfaces, and self-inoculation may lead to infection. Whereas hand washing is crucial in preventing ...

www.ncbi.nlm.nih.gov

2

**ROLAND EXH 7**

*Roland Lankah, REHS/RS, MPH, PhD* (abd)
*Registered Environmental Health Specialist*
*Cook County Sheriff's Office/DOC*
**Office: (773) 674-5988**
**Cell: 312-590-3419**

---

**From:** Zawitz, Chad <czawitz@cookcountyhhs.org>
**Sent:** Tuesday, January 28, 2020 9:32 AM
**To:** Roland Lankah (Sheriff) <Roland.Lankah@cookcountyil.gov>
**Subject:** Coronavirus info

Hi.

While doing some reading for clinical purposes, I came across this in the medical literature, which may or may not be what you have found on your end regarding coronaviruses in a general sense:

"Preventive measures are the same as for rhinovirus infections, which consist of handwashing and the careful disposal of materials infected with nasal secretions. Several antiseptic/disinfectant solutions used commonly in hospitals and households, including chloroxylenol, benzalkonium chloride, and cetrimide/chlorhexidine, have been shown to be ineffective against coronaviruses [106]."

3

**ROLAND EXH 7**

| From: | Roland Lankah (Sheriff) |
|---|---|
| Sent: | Sunday, April 05, 2020 7:22 AM |
| To: | Elisabeth Glick (Sheriff) |
| Cc: | Jasmin JarlegoPenaranda (Sheriff) |
| Subject: | Fw: Coronavirus |

Part of research in preparation for COVID19.


*Roland Lankah, REHS/RS, MPH, PhD (abd)*
*Registered Environmental Health Specialist*
*Cook County Sheriff's Office/DOC*
**Office: (773) 674-5988**
*Cell: 312-590-3419*

---

**From:** Roland Lankah (Sheriff) <Roland.Lankah@cookcountyil.gov>
**Sent:** Wednesday, January 29, 2020 3:19 PM
**To:** Amanda Gallegos (Sheriff) <Amanda.Gallegos@cookcountyil.gov>
**Cc:** Michael Miller (Sheriff) <Michael.Miller1@cookcountyil.gov>
**Subject:** Coronavirus



Good afternoon Director,

Just wanted to bring this to your attention.

"Preventive measures are the same as for rhinovirus infections, which consist of handwashing and the careful disposal of materials infected with nasal secretions. Several antiseptic/disinfectant solutions used commonly in hospitals and households, including chloroxylenol, benzalkonium chloride, and cetrimide/chlorhexidine, have been shown to be ineffective against coronaviruses."

I was reading through some articles and I came across the following. I thought they were interesting and I wanted to share. You may probably already know these. It also showed that alcohol based products could be effective as compared to the bleach based products. In the chart below, pay particular attention to the ethanol-based product.

In this study, Geller, Varbanov, and Duval (2012) indicated that one of the striking features of this epidemic was its nosocomial propagation.
Many of the patients also develop watery diarrhea with active virus shedding (until several weeks), which might increase the transmissibility of the virus.
SARS-CoV seemed predominantly transmitted by respiratory droplets over a relatively close distance. However, direct and indirect contact with respiratory secretions, feces or animal vectors could also lead to transmission, at least under some circumstances

1

**ROLAND EXH 8**

Most of the tested alcoholic-based solutions (isopropanol or ethanol) has been shown to allow a reduction > 4 $log_{10}$ in viral titers over 30 sec, whatever the added organic load

Enveloped viruses are not that fragile and they are not inactivated by a number of antiseptics-disinfectants such as quaternary ammoniums compounds or phenolic compounds. The association chlorhexidine and cetrimide, widely used in human medicine, did not seem to be effective on HCoV 229E, except if ethanol is added.

Virucidal activity on SARS-CoV of different hand-rub formulations and surfaces disinfectants thanks to suspension tests.

| Tested formulations | Contact times | Minimal reduction factor (log10) |
|---|---|---|
| 100% 2-propanol | 30 s | $\geq 3.31$ |
| 70% 2-propanol | 30 s | $\geq 3.31$ |
| 78% ethanol | 30 s | $\geq 5.01$ |
| 45% 2-propanol, 30% 1-propanol | 30 s | $\geq 2.78$ |
| Wine vinegar | 60 s | $\geq 3.0$ |
| 0.7% formaldehyde | 2 min | $\geq 3.01$ |
| 1.0% formaldehyde | 2 min | $\geq 3.01$ |
| 0.5% glutardialdehyde | 2 min | $\geq 4.01$ |
| 26% glucoprotamin | 2 min | $\geq 1.68$ |

Virucidal activity on MHV and TGEV, used as SARS-CoV surrogates, of different hand-rub formulations and surface disinfectants using carrier test methodology  *(MHV: Murine hepatitis virus*, *TGEV: Transmissible gastro-enteritis virus).*

| Concentration of active ingredients of the tested commercial formulations | MHV | TGEV |
|---|---|---|
| Bleach (6% sodium hypochlorite – use dilution: 1:100, ≈ 600 mg/mL) | No | No |
| 9.09% o-phenylphenol, 7.66% p-tertiary amylphenol | No | No |
| 0.55% ortho-phthalaldehyde | No | No |
| 70% ethanol | **Yes** | **Yes** |
| 62% ethanol | No | **Yes** |
| 71% ethanol | No | **Yes** |

*Roland   Lankah, REHS/RS, MPH, PhD* (abd)
*Registered Environmental Health Specialist*
*Cook County Sheriff's Office/DOC*
**Office: (773) 674-5988**
**Cell: 312-590-3419**

2

ROLAND EXH 8



**Guidance for Congregate Living Facilities**

| JB Pritzker, Governor | Ngozi O. Ezike, MD, Director |

**Interim Recommendations to Reduce Transmission of SARS-CoV-2 in Congregate Living Facilities: Universal Masking and Enhanced Environmental Disinfection**

I.  **Background**

SARS-CoV-2 is clearly highly transmissible in congregate living facilities such as prisons and jails. In addition to droplet transmission, contact transmission (e.g. fomites) may play an important role in SARS-CoV-2 spread. Evidence suggests that SARS-CoV-2 may remain viable for hours to days on surfaces.

II.  **Purpose**

This guidance provides universal masking and environmental disinfection recommendations for congregate living facilities.

III.  **Recommendation for Universal Masking Policy in Residential Congregate Living Facilities**

Until further notice, IDPH recommends that congregate living facilities serving vulnerable populations[1] implement a universal-masking policy requiring all staff to wear a mask when working. This includes staff responsible for direct interaction or care involving residents as well as staff who do not normally interact directly with patients and residents, such as administrative, dietary, environmental services, and facility maintenance staff. Universal masking will reduce the risk of transmission from staff who may be carrying SARS-CoV2 but are asymptomatic. In addition, face masks are widely used as an important part of droplet precautions when caring for patients with respiratory infections

CDC has issued guidance regarding optimizing the supply of facemasks, including extended use and reuse strategies: https://www.cdc.gov/coronavirus/2019-ncov/hcp/ppe-strategy/face-masks.html.

Hand hygiene should be performed before putting on a mask, and after touching, adjusting, or removing a mask. Facemasks should be removed and discarded if soiled, damaged, or hard to breathe through. Facemasks with elastic ear hooks may be more suitable for re-use.

In the context of severe personal protective equipment (PPE) shortages, and only if surgical masks or respirators are not available, home-made cloth masks have been proposed as a last-resort

---

[1] Congregate setting that serves vulnerable populations: a skilled nursing facility, an assisted living facility, a group home, a homeless shelter, or a correctional setting.

Version 1.0 (03.31.2020)                                                                                               1

solution by the CDC until availability of standard PPE is restored. Homemade masks are not considered PPE: health care staff should continue to wear N-95 respirators as appropriate, based on the type of patient care involved (aerosolizing procedures), per CDC guidance.

Additional information and resources about alternative facemasks and universal masking are available from the Minnesota Department of Public Health and University of Nebraska (See attached; links to this guidance are below, as updates to these documents may occur.)

Guidance from the Minnesota Department of Health on alternative facemasks:
http://www.health.state.mn.us/diseases/coronavirus/hcp/masksalt.pdf

The University of Nebraska Policy on Universal Masking:
http://www.nebraskamed.com/sites/default/files/documents/covid-19/surgical-mask-policy-and-faq-nebraska-med.pdf.

IV. **Recommendation for Enhanced Environmental Disinfection**

Until further notice, in order to assist with efforts to interrupt transmission of SARS-CoV-2 via contaminated surfaces in residential congregate living facilities, IDPH recommends frequent environmental disinfection of surfaces frequently touched by occupants – at least three times per day or once per shift. When feasible, **IDPH recommends use of a spray (no-wipe) product to facilitate application.**

Common touchpoints include: door knobs and door handles, door push bars, light switches and cover plates, telephones, reception desks and reception area furniture, elevator call buttons and cover plates, refrigerator door handles, TV remote controls, microwave buttons, breakroom tables and countertops, filing cabinet handles, stair and ramp hand railings, vending machine buttons, paper towel dispensers, soap dispensers, toilet seat and urinal flush handles, restroom door partition door handles, workstation and office desktops, drawer pulls, keyboards and mice, and office equipment. Health care facilities will require cleaning of additional surfaces, including but not limited to wheelchair handles, IV poles, bed rails, nightstands, and nurse call buttons.

IDPH recommends selecting a disinfectant from U.S. EPA's list of disinfectants for use against SARS-CoV-2, known as the N-List, available from the EPA website at https://www.epa.gov/pesticide-registration/list-n-disinfectants-use-against-sars-cov-2. Follow manufacturers' instructions for application and proper ventilation when using disinfectants. Dilutions should be performed according to written guidance from the manufacturer.

Ease of use, contact times, and safety (staff/patient/resident) concerns must be taken into account when selecting and using a disinfection agent. N-List products that can be sprayed, with a short contact time, (e.g. between 30 seconds and one minute as indicated on the label) and do not require wiping have potential advantages. Application of disinfectant may be facilitated by use of an industrial-style sprayer with the nozzle of the spray wand held close – 6 to 8 inches – to the

**ROLAND EXH 9**

surface to which disinfectant is being applied. Some products (e.g. sodium hypochlorite or household bleach, and peracetic acid) pose increased inhalational risks, but a diluted solution of household bleach may be useful in some settings. [2] Depending on the disinfectant, it may be appropriate for residents to leave the room for a brief period where disinfectants are being used. Pre-cleaning may be required if surfaces are visibly dirty.

Consult the manufacturer's instructions for cleaning and disinfection products used. Products should be used per manufacturer labelling, and the Safety Data Sheet for any product being used should be reviewed and readily available to employees. Wear disposable gloves when cleaning and disinfecting surfaces. Gloves should be discarded after each cleaning. If reusable gloves are used, those gloves should be dedicated for cleaning and disinfection of surfaces for COVID-19 and should not be used for other purposes. Clean hands immediately after gloves are removed.

IDPH does not recommend applying disinfection products using methods other than those described on the product labeling.

V. **Resources**
CDC Strategies for Optimizing the Supply of N95 Respirators: Crisis/Alternate Strategies
CDC Cleaning and Disinfection for Community Facilities
USEPA List N: Disinfectants for Use Against SARS-CoV-2

---

[2] Diluted household bleach solutions (e.g.1000 parts per million (ppm) sodium hypochlorite) may be used if appropriate for the surface. Check to ensure the bleach product is not past its expiration date. Never mix household bleach with ammonia or any other cleanser. Do not premix the water and bleach solution, as it loses potency over time. Additional guidance regarding dilution and storage of bleach is available at: https://www.canr.msu.edu/news/covid-19-disinfecting-with-bleach. A bleach dilution calculator is available at https://www.publichealthontario.ca/en/health-topics/environmental-occupational-health/water-quality/chlorine-dilution-calculator

3



# DEPARTMENT OF HEALTH

# Interim Guidance on Alternative Facemasks

## CURRENT AS OF MARCH 27, 2020

Alternative facemasks can be homemade facemasks, or manufactured facemasks that are not regulated by the U.S. Food and Drug Administration (FDA). There are many versions of non-FDA regulated facemasks, and facilities should evaluate each product before use.

Every effort should be made to obtain FDA regulated facemasks and to comply with CDC's <u>Strategies for Optimizing the Supply of PPE and Equipment (www.cdc.gov/coronavirus/2019-ncov/hcp/ppe-strategy/index.html)</u> for the purpose of protecting the health care worker from exposure to infectious particles. Alternative facemasks can serve as source control for an individual who may be infected (transmission may occur prior to the development of overt symptoms) as an approach to limit transmission of the virus. MDH recommends the use of source control at this time for all health care workers.

## When is it appropriate to wear an alternative facemask:

1. FDA regulated PPE supply has been exhausted and all efforts to extend PPE use has been exhausted.
2. A worker in a health care facility does not have direct patient care responsibility (e.g. dietary staff, environmental services staff, administrative staff)
3. Use by patients who do not have respiratory symptoms.
4. Use by visitors or contract staff who are providing services to a healthcare facility.
5. Asymptomatic staff who have not had exposures to known or suspect COVID-19 cases.

## Design principles:

1. Build a mask that tightly encloses the area around the nose and mouth, from the bridge of the  nose down to the chin, and extending onto the cheek beyond the corners of the mouth, so no gaps occur when talking or moving.
2. Use mask material that is tightly woven but breathable. Possibly double-layer the fabric.
   - Masks must be made from washable material such as fabric. Choose a fabric that can handle high temperatures and bleach without shrinking or otherwise deforming.
3. The mask should be tolerant of expected amounts of moisture from breathing.
4. Other Considerations
   - Suggested materials- outer layer tea cloth, inner layer of a microfleece to wick away moisture, and an inner tea cloth layer. Use an accordion fold to mimic a hospital mask as much as possible and use a fat woven shoelace type material to bind the sides (such as quilt binding). For straps, use elastic straps that loop behind the ears.

## Use of alternate facemasks:

1. Alternative facemasks should be donned and doffed per usual CDC protocol.

2. Alternative facemasks should be changed when saturated from condensation build up from breathing, or after a gross contamination event.

3. Dirty and clean facemasks must be housed in separate, clearly labeled containers to prevent cross contamination.

# Washing masks:

Wash dirty masks between each use. Wash in hot water with regular detergent. Dry completely on hot setting.

# Design examples:

There is no standard design for a homemade facemask therefore, consider innovation using the design principle above. Below are example designs for consideration:

## Videos:

- Face Mask Kit (https://vimeo.com/399324367/13cd93f150), Providence St. Joseph Health
- How to sew a simple Fabric Face Mask (https://www.youtube.com/watch?v=sOJ_sm137fQ), YouTube

## Written instructions:

- How to make a facemask (www.allinahealth.org/-/media/allina-health/files/mask-sewing-how-to.pdf), Allina Health
- Face Mask Directions (https://www.leadingagewa.org/wp-content/uploads/sites/296/2020/02/Instructions.pdf), Joan Glass
- Facemask: A picture tutorial (https://buttoncounter.com/2018/01/14/facemask-a-picture-tutorial/)
- Taiwanese Doctor Teaches How to DIY Cloth Face Mask (https://mustsharenews.com/cloth-face-mask/)
- Can DIY Masks Protect Us from Coronavirus? (https://smartairfilters.com/en/blog/diy-homemade-mask-protect-virus-coronavirus/)
- DIY Homemade Masks vs. What's the Best Material? (https://smartairfilters.com/en/blog/best-materials-make-diy-face-mask-virus/)
- DIY Cloth Face Mask (www.instructables.com/id/DIY-Cloth-Face-Mask/)

## Articles:

- Dato, VM, Hostler, D, and Hahn, ME. Simple Respiratory Mask, *Emerg Infect Dis*. 2006;12(6):1033–1034. https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3373043/
- Rengasamy S, Eimer B, and Shaffer R. Simple respiratory protection-evaluation of the filtration performance of cloth masks and common fabric materials against 20-1000 nm size particles, *Ann Occup Hyg*. 2010;54(7):789-98. https://academic.oup.com/annweh/article/54/7/789/202744
- Davies, Anna & Thompson, Katy-Anne & Giri, Karthika & Kafatos, George & Walker, James & Bennett, Allan. (2013). Testing the Efficacy of Homemade Masks: Would They Protect in an Influenza Pandemic? *Disaster medicine and public health preparedness*. 7. 413-418. 10.1017/dmp.2013.43. https://www.researchgate.net/publication/258525804_Testing_the_Efficacy_of_Homemade_Masks_Would_They_Protect_in_an_Influenza_Pandemic

2

**ROLAND EXH 9**

- Letter: CDC Emerging Infectious Diseases Simple Respiratory Mask.
  https://wwwnc.cdc.gov/eid/article/12/6/05-1468_article

- *JAMA*: Conserving Supply of Personal Protective Equipment—A Call for Ideas.
  https://jamanetwork.com/journals/jama/fullarticle/2763590?guestAccessKey=a9713d59-cf2a-4658-9630-13e58b1b5954&utm_source=silverchair&utm_medium=email&utm_campaign=article_alert-jama&utm_content=olf&utm_term=032020.

## Other Resources:

- N95 Filtering Facemask Respirator Ultraviolet Germicidal Irradiation (UVGI) Process for Decontamination and Reuse (https://www.nebraskamed.com/sites/default/files/documents/covid-19/n-95-decon-process.pdf).

Minnesota Department of Health
PO Box 64975
St. Paul, MN 55164-0975
651-201-5414
www.health.state.mn.us

03/27/20

To obtain this information in a different format, call: 651-201-5414.

3

**ROLAND EXH 9**



# Universal Mask Policy and FAQs

Effective Saturday, March 28th, all employees working in inpatient units, ambulatory clinic spaces, and procedural areas will be expected to wear procedural/surgical face masks, at all times, while in their respective clinical care settings.  The exception to this would include those health care professional wearing N95 respirators while providing care for presumed COVID-19 (rule out) or known COVID-19 positive patients. We recognize this is a departure from standard infection prevention; however, we find ourselves in extraordinary times and given current circumstances, we believe this deviation from standard policy is warranted. This practice will be continually monitored and re-evaluated for extension with a tentative end date of April 17, 2020.

Additionally, we will require all employees to self-monitor for symptoms concerning COVID-19 infection at the beginning of every shift. If you feel you are displaying symptoms related to the virus, we ask that you notify your manager and contact Employee Health at 888-OUCH.

COVID-19 symptoms are defined below and may be mild. They include new onset of any <u>one</u> of the following:
1. Fever (≥100.0 F)
2. Cough
3. Shortness of Breath

**Process to Obtain and Discard Procedure/Surgical Mask**

A procedural face mask will be issued **at the start of each shift,** for those individuals working in one of the clinical care settings outlined above.  Masks will be available at each entrance to the hospital, and will be used throughout the shift.  In the event that the mask becomes visibly soiled, saturated or damaged, a new mask must be obtained. Stock will be securely stored in each clinical setting.  Should you need a replacement mask, you must request one from supervisory personnel in the clinical area you are working. For personnel who do not enter via a main hospital entrance, an initial mask may be obtained upon first presence on a clinical area from nursing personnel.
We ask all personnel to make every effort to help preserve the supply of PPE and reduce the need for replacement masks whenever possible. Infection Prevention guidelines should be followed on the use and re-use of procedure/surgical masks. More information can be found at the end of this document.

1



**At the end of shift,** personnel will be asked to doff their face mask as they exit the building. Receptacles will be placed at each exit so that masks may be collected for potential decontamination and reuse should this become necessary. Please do not place visibly soiled, saturated, or torn procedure/surgical masks in these receptacles. Damaged procedure/surgical masks should be discarded in the trash.

**Infection Prevention Guidance on Procedure/Surgical Mask Use and Re-Use**

To Doff facemask with intent to reuse
1. **Perform hand hygiene**
2. Remove mask
   - Remove <u>procedure mask</u> by holding the ear loops. The front is contaminated, so remove slowly and carefully.
   - Remove <u>surgical mask</u> by untying lower ties FIRST. Untie upper ties last. The front is contaminated, so remove slowly and carefully. Ensure ties do not fall into clean interior side of mask.
3. After removing facemask, visually inspect for contamination, distortion in shape/form. If soiled, torn, or saturated the mask should be discarded.
4. If the facemask is NOT visibly soiled, torn, or saturated, carefully store **on a paper towel exterior side down.**
5. **Perform hand hygiene.**

To Re-Don Mask
1. **Perform hand hygiene**
2. Grasp mask
   - Pinch procedure mask at the ear loops or
   - Grasp upper ties on surgical mask
3. Place over face
   - <u>For procedure mask</u>: Secure ear loops behind the ears. Secure mask.
   - <u>For surgical mask</u>: Secure upper ties first, behind head. End by securing lower ties behind head.
4. **Perform hand hygiene**

A disposable facemask can be worn throughout your shift if not visibly soiled, torn or saturated, and NOT touched while delivering patient care.

**Conservation of PPE**

Nebraska Medicine is well-positioned and has an adequate, but not inexhaustible, stock of masks for staff utilization. In an effort to maintain the supply, conservation of



masks is essential.   We have no way to predict how long this pandemic will affect us. In an effort to ensure masks continue to be available to healthcare workers, we must make all efforts to conserve our supply. In the event the supply of procedure/surgical masks prohibits this strategy, distribution of masks will be prioritized based on the highest risk clinical activities. Supply chain is working diligently to secure additional stocks of procedural masks.

Used procedural masks that are not visibly soiled, saturated, or torn will be collected as a potential safeguard for the future. Soiled, saturated, or torn masks should be disposed of as routine trash.
We are evaluating a plan to potentially reprocess procedural masks that will ensure safety, sanitation and sterilization. Reprocessed procedure/surgical masks will not be put into circulation until we have evaluated that plan. However, if it is needed, reprocessing will help ensure we maintain a healthy stock of PPE.

**Rationale to Universal Mask Policy**

Our knowledge regarding COVID-19 is rapidly expanding.  This allows us the opportunity to update PPE policies to incorporate the best evidence about issues like mask and respirator reuse and viral transmission. Due to continually evolving evidence, we expect these policies will be further refined and revised
Given what we have learned about COVID-19, this universal mask approach will serve to:
1. Protect our patients and other staff members should the healthcare worker have presymptomatic or asymptomatic COVID-19 infection or develop symptoms at work (a mask achieves source control and decreases the risk of spreading infection)
2. Protect our healthcare workers should they come in close contact with an individual with either presymptomatic or mild  COVID-19 infection or who has symptoms that have not yet been recognized

To be successful, this new approach will require support from all of us across the enterprise and require the following:
- Strict adherence to extended use/reuse of masks
- Meticulous adherence to hand hygiene
- Proper mask use and hygiene including wearing the mask as directed to cover the mouth and nose
- Strict avoidance of manipulation/touching the mask to reduce the risk of contamination and self-inoculation

**SERIOUS MEDICINE.** EXTRAORDINARY CARE.®



**Frequently Asked Questions**

**Why are we recommending a procedure/surgical mask and not an N95 respirator?**
Similar to influenza and other respiratory viruses, COVID-19 appears to be transmitted primarily through large respiratory droplets. Procedure masks help to provide protection against respiratory droplet spread. In addition, although not thought to be a major route of transmission, there are some data to indicate COVID-19 viral shedding in the presymptomatic stage. Wearing procedure masks in a more generalized manner may help to prevent spread from persons with presymptomatic shedding or persons with very mild disease. Finally, wearing a procedure mask very effectively contains respiratory secretions and may prevent an infected provider from spreading the virus to patients or coworkers. In contrast, N95 respirators provide a higher level of filtration and are important in clinical situations where infectious droplets could become aerosolized. This primarily occurs in specific clinical situations such as when a patient is intubated or undergoes bronchoscopy. N95 respirators are difficult to wear for long periods of time and are impractical for generalized use. Also, the supply of N95 respirators is smaller and our supply would not support universal use. We must reserve N95 use for patients with known or suspected COVID-19 and high risk situations.

**Does the universal mask policy apply to every member of the workforce working anywhere in the Nebraska Medicine Enterprise?**
The universal mask policy applies to employees working in areas where **clinical care** is provided.

Personnel working in nonclinical offices or in nonclinical settings where persons are reliably separated by more than 6 feet, should not wear masks in order to conserve stock for patient -care. However, when walking through common clinical areas where care is delivered, the mask policy applies. Stop at an entry point prior to entering the clinical area to obtain a masks for use. Personnel that work in nonclinical buildings (ECCP, Kiewit Tower) are excluded from this process. These employees should practice principles of social distancing, respiratory etiquette and frequent hand hygiene. If these workers visit areas where clinical care is provided, the mask policy applies as above.

**I am involved with research and operate out of the research towers, does the universal mask policy apply to me?**
No, not unless you visit any spaces where clinical care is provided. We would encourage you to avoid these locations.

**SERIOUS MEDICINE.** EXTRAORDINARY CARE.®



**Should visitors be wearing face masks?**
Visitors will be limited on campus except for certain circumstances. (See visitor policy for detail). Visitors will not be instructed to wear face masks. If a visitor develops symptoms while on the premises, that person should be provided a face mask and asked to leave.

**Should all patients be wearing face masks?**
No. Patients with symptoms concerning for COVID-19, or other respiratory illness, will be provided a face mask and isolated per our existing policies. Once roomed, it is recommended that symptomatic patients  continue to wear their face mask to mitigate exposure risk.  This is an evolving situation and will be reevaluated as needed.

**In procedural areas, can a single procedural mask be worn continuously, including across different cases?**
Yes, a single mask can be worn across different cases and between cares of different patients. Masks must be changed if they become wet or contaminated during a case. The routine use of face shields will decrease the likelihood of this occurring and is encouraged.

**I work in a clinical setting. How can I eat when I am supposed to wear a procedural mask?**
Eating is not permitted in clinical areas. If you are working in a clinical setting, follow the removal and reuse instructions as is outlined in the Extended Use and Limited Reuse of Disposable Facemasks, Respirators and Protective Eyewear document.

**I work in a clinical setting. How can I drink when I am supposed to wear a procedural mask?**
Drinking is permitted in designated locations in clinical areas. If you need to drink, ensure you are 6 feet away from others, perform hand hygiene, remove the mask, drink, and then replace your procedure/surgical mask. Please follow the guidelines on appropriate doffing found at the end of this document.

**Are staff allowed to take off their masks to eat while on hospital or clinic premises?**
Staff can take off their masks to eat and drink when they are on premises in a location where they can maintain a distance of 6 feet. It is preferable to minimize going outside to prevent the need to discard masks and to help the hospital preserve mask supplies. Please follow guidelines on appropriate doffing found at the end of this document.

**If I need to leave the facility and come back later in my shift, what should I do?**



Every effort should be made to preserve supplies of face masks. You may remove your mask and store it for short periods of time as noted at the end of this document and then reuse the mask.

**Can I use my procedure/surgical mask between patients, including those with confirmed COVID-19, suspect COVID-19, other respiratory viruses or patients in whom none of these apply?**

Yes. Your procedure/surgical mask should be used according to the Extended Use and Reuse guidelines, which ensures careful and deliberate handling of the mask to prevent both self-contamination and cross contamination. Under conditions of extended use or reuse, a face shield is preferentially worn over the procedure/surgical mask as the form of eye protection. However, direct care of patients with known or suspected COVID-19 requires use of N95 respirators or PAPRs.

**Should employees be wearing the mask at home and should their families wear masks?**

Employees should discard their masks when leaving the hospital. They should not wear them home.  There is generally no reason for employees and their families to wear masks at home. Social distancing and taking precautions like washing your hands, using hand sanitizer, and cleaning surfaces frequently should be appropriate for home.

**Can staff gather in break rooms and other places to eat and relax, and if so should they leave their procedure/surgical masks on?**

Staff should adhere to the same principles of social distancing when together in break rooms, conference rooms or other spaces. They should allow 6 feet distance from others and should take the appropriate precautions involving hand hygiene and not touching their faces. Masks can be taken off in such areas for eating and drinking. To limit the number of people in a break room, staff should considering staggering their break times.



**Visual Guidance**

The following images are intended to provide clarification to avoid potential errors in the proper use and re-use of face masks.



*Figure 1 – This image demonstrates approved wear of face mask. Facemask is shown secured over nose and mouth.*



*Figure 2 – This image shows the correct way to store mask when not in use. Notice the exterior of the mask is facing DOWN.*





*Figure 3 - This image shows the correct way to store a surgical mask when not in use. Notice the exterior of the mask is facing DOWN and ties are placed carefully away from the inside of the mask*



*Figure 4 – This image demonstrates inappropriate wear of the procedure mask. Procedure mask should not be pulled under mouth*

**SERIOUS MEDICINE.** EXTRAORDINARY CARE.®





*Figure 5 – This image demonstrates inappropriate wear of the procedure mask. Procedure mask should not be pulled under chin*



*Figure 6 - This image demonstrates inappropriate use of procedure mask. Procedure mask should not be kept on the elbow when not in use*



*Figure 7 - This image demonstrates inappropriate wear of the surgical mask. Surgical mask should not hang from lower ties*

**SERIOUS MEDICINE. EXTRAORDINARY CARE.®**





*Figure 8 – This image demonstrates the wrong way to place mask when not in use. Notice the exterior of the mask if facing up. This is not correct*



*Figure 9 – This image demonstrates the wrong way to store surgical mask when not in use. Notice the exterior of the mask if facing up and ties are touching the interior of the mask. This is not correct*

**SERIOUS MEDICINE.** EXTRAORDINARY CARE.®

| | |
|---|---|
| **From:** | Roland Lankah (Sheriff) |
| **Sent:** | Sunday, April 05, 2020 8:01 AM |
| **To:** | Elisabeth Glick (Sheriff) |
| **Cc:** | Jasmin JarlegoPenaranda (Sheriff) |
| **Subject:** | Fw: ILI/AGE 3/4/20 |

*Roland Lankah, REHS/RS, MPH, PhD (abd)*
*Registered Environmental Health Specialist*
*Cook County Sheriff's Office/DOC*
**Office: (773) 674-5988**
**Cell: 312-590-3419**

---

**From:** Jane Gubser (Sheriff) <Jane.Gubser@cookcountyil.gov>
**Sent:** Wednesday, March 4, 2020 2:27 PM
**To:** Roland Lankah (Sheriff) <Roland.Lankah@cookcountyil.gov>
**Subject:** RE: ILI/AGE 3/4/20

Thank you

---

**From:** Roland Lankah (Sheriff) <Roland.Lankah@cookcountyil.gov>
**Sent:** Wednesday, March 4, 2020 2:10 PM
**To:** Chad Zawitz (CCHHS) <CZawitz@cookcountyil.gov>; Joseph Hilburger (Sheriff) <Joseph.Hilburger@cookcountyil.gov>
**Cc:** Chad Zawitz (CCHHS) <CZawitz@cookcountyil.gov>; Connie Mennella (CCHHS) <CMennella@cookcountyil.gov>; Andrew De Funiak (CCHHS) <ADeFuniak@cookcountyil.gov>; Michael Miller (Sheriff) <Michael.Miller1@cookcountyil.gov>; DOC Classification <doc.classification@cookcountyil.gov>; Esequiel Iracheta (Sheriff) <Esequiel.Iracheta@cookcountyil.gov>; Karen Jones-Hayes (Sheriff) <Karen.Jones-Hayes@cookcountyil.gov>; Richard Brogan (Sheriff) <Richard.Brogan@cookcountyil.gov>; Amanda Gallegos (Sheriff) <Amanda.Gallegos@cookcountyil.gov>; Salomon Martinez (Sheriff) <Salomon.Martinez@cookcountyil.gov>; Tarry Williams (Sheriff) <Tarry.Williams@cookcountyil.gov>; Jane Gubser (Sheriff) <Jane.Gubser@cookcountyil.gov>; Bradley Curry (Sheriff) <Bradley.Curry@cookcountyil.gov>; Larry Gavin (Sheriff) <Larry.Gavin@cookcountyil.gov>; Don Beachem (Sheriff) <Don.Beachem@cookcountyil.gov>; Martha Yoksoulian (Sheriff) <Martha.Yoksoulian@cookcountyil.gov>; Jason Cianciarulo (Sheriff) <Jason.Cianciarulo@cookcountyil.gov>; Hugh Walsh (Sheriff) <Hugh.Walsh@cookcountyil.gov>; Joseph Giunta (Sheriff) <Joseph.Giunta@cookcountyil.gov>; Erica Queen (Sheriff) <Erica.Queen@cookcountyil.gov>; Bridgette Jones (CCHHS) <BridgetteJones@cookcountyil.gov>; Agnes Jones-Perry (CCHHS) <apjones@cookcountyil.gov>; Cermak Nursing Leadership <CHSNursingLeadership@cookcountyhhs.org>; Tina Richardson (CCHHS) <TRichardson2@cookcountyil.gov>; Jasmin JarlegoPenaranda (Sheriff) <Jasmin.JarlegoPenaranda@cookcountyil.gov>; Deborah Boecker (Sheriff) <Deborah.Boecker@cookcountyil.gov>; Marlena Jentz (Sheriff) <Marlena.Jentz@cookcountyil.gov>; Sabrina RiveroCanchola (Sheriff) <Sabrina.RiveroCanchola@cookcountyil.gov>
**Subject:** Re: ILI/AGE 3/4/20

Good afternoon Supt,
Please continue the enhanced sanitation procedure as stipulated in our enhanced sanitation protocol. 55 gallons drums of liquid bleach have been dispatched to your divisions for utilization in the enhanced sanitation

**ROLAND EXH 10**

process.  Please send your Divisional Sanitation Officer to see me if your Division has not received the chemical.

Thank you so much for your cooperation.  Should you have any questions or concerns, please reach out to me.

*Roland  Lankah, REHS/RS, MPH, PhD (abd)*
*Registered Environmental Health Specialist*
*Cook County Sheriff's Office/DOC*
**Office: (773) 674-5988**
**Cell: 312-590-3419**

---

**From:** Zawitz, Chad <czawitz@cookcountyhhs.org>
**Sent:** Wednesday, March 4, 2020 7:07 AM
**To:** Joseph Hilburger (Sheriff) <Joseph.Hilburger@cookcountyil.gov>
**Cc:** Chad Zawitz (CCHHS) <CZawitz@cookcountyil.gov>; Connie Mennella (CCHHS) <CMennella@cookcountyil.gov>; Andrew De Funiak (CCHHS) <ADeFuniak@cookcountyil.gov>; Roland Lankah (Sheriff) <Roland.Lankah@cookcountyil.gov>; Michael Miller (Sheriff) <Michael.Miller1@cookcountyil.gov>; DOC Classification <doc.classification@cookcountyil.gov>; Esequiel Iracheta (Sheriff) <Esequiel.Iracheta@cookcountyil.gov>; Karen Jones-Hayes (Sheriff) <Karen.Jones-Hayes@cookcountyil.gov>; Richard Brogan (Sheriff) <Richard.Brogan@cookcountyil.gov>; Amanda Gallegos (Sheriff) <Amanda.Gallegos@cookcountyil.gov>; Salomon Martinez (Sheriff) <Salomon.Martinez@cookcountyil.gov>; Tarry Williams (Sheriff) <Tarry.Williams@cookcountyil.gov>; Jane Gubser (Sheriff) <Jane.Gubser@cookcountyil.gov>; Bradley Curry (Sheriff) <Bradley.Curry@cookcountyil.gov>; Larry Gavin (Sheriff) <Larry.Gavin@cookcountyil.gov>; Don Beachem (Sheriff) <Don.Beachem@cookcountyil.gov>; Martha Yoksoulian (Sheriff) <Martha.Yoksoulian@cookcountyil.gov>; Jason Cianciarulo (Sheriff) <Jason.Cianciarulo@cookcountyil.gov>; Hugh Walsh (Sheriff) <Hugh.Walsh@cookcountyil.gov>; Joseph Giunta (Sheriff) <Joseph.Giunta@cookcountyil.gov>; Erica Queen (Sheriff) <Erica.Queen@cookcountyil.gov>; Bridgette Jones (CCHHS) <BridgetteJones@cookcountyil.gov>; Agnes Jones-Perry (CCHHS) <apjones@cookcountyil.gov>; Cermak Nursing Leadership <CHSNursingLeadership@cookcountyhhs.org>; Tina Richardson (CCHHS) <TRichardson2@cookcountyil.gov>; Jasmin JarlegoPenaranda (Sheriff) <Jasmin.JarlegoPenaranda@cookcountyil.gov>; Deborah Boecker (Sheriff) <Deborah.Boecker@cookcountyil.gov>; Marlena Jentz (Sheriff) <Marlena.Jentz@cookcountyil.gov>; Sabrina RiveroCanchola (Sheriff) <Sabrina.RiveroCanchola@cookcountyil.gov>
**Subject:** ILI/AGE 3/4/20

All,

Multiple cases of Influenza Like Illness (ILI) and Acute Gastroenteritis (AGE) have been identified and isolated from across the compound.  Enhanced sanitation and Limited Movement Status*(see definition below) has been advised.  We will continue daily reports listing originating units and surveillance activity, numbers of cases, and which (if any) units we will recommend are placed on "limited movement" status.

We will utilize **Cermak 3 South** to house our Isolation patients.   We have limited available beds for isolation patients on 3South.

**Division 6-1J overflow unit is OPEN for ILI until further notice.**

**\*Limited Movement= no new admissions in and no transfers off this unit**.  Movements to court, medical appointments, visitation etc <u>are all permitted as long as the detainee is screened AGE symptoms prior to the movement</u>.  Symptomatic patients should be brought directly to Urgent Care.

**ROLAND EXH 10**

### 3/4/20  ILI/AGE Status Report:

**Isolation Housing census**:  8 (eight) patients isolated on 3 SOUTH; 3 (three) isolated on 6-1J

**Originating Housing Units of Isolated Cases** have been identified from: (**\** = NEW past 24  hours; housing units will be under surveillance)

10-2A
10-4B
RTU-3C \*\*\*AGE\*\*\*
6-2K \*\*\*AGE\*\*\*
\*\*2D2-P house
\*\*RTU-3A
\*\*RTU-3D
\*\*Cermak 3N   \*\*\*AGE\*\*\*


### Limited Movement  Housing Units

NONE

### Nursing Surveillance Housing Units

~~RTU-4H~~
~~until at least 3/3~~
~~10-4D~~
~~until at least 3/3~~
~~10-4B~~
~~until at least 3/3~~
~~11-3DJ~~
~~until at least 3/3~~
10-2A
until at least 3/4
10-4B
until at least 3/4
RTU-3C
until at least 3/4
6-2K
until at least 3/4
RTU-3A
until at least 3/5
RTU-3D
until at least 3/5
Cermak 3N
until at least 3/5
\*\*AGE\*\*


**Staff working with detainees on these units should utilize appropriate hand hygiene (soap and water) before and after detainee contact.  Please ensure detainees have access to soap and water in the affected areas.**

ROLAND EXH 10

**Enhanced sanitation is advised for affected housing units.**

Please let me know if there are any questions.

-Chad



Be counted in the 2020 census. Visit www.cookcountyil.gov/census for more information.

4

**ROLAND EXH 10**

| | |
|---|---|
| **From:** | Roland Lankah (Sheriff) |
| **Sent:** | Sunday, April 05, 2020 7:56 AM |
| **To:** | Elisabeth Glick (Sheriff) |
| **Cc:** | Jasmin JarlegoPenaranda (Sheriff) |
| **Subject:** | Fw: Liquid bleach |
| **Attachments:** | Ecolab Sodium Hypochlorite.pdf; Bleach-Dilution.pdf |

Instructions to all Supts regarding chemical usage for preemptive cleaning.

*Roland  Lankah, REHS/RS, MPH, PhD* (abd)
*Registered Environmental Health Specialist*
*Cook County Sheriff's Office/DOC*
**Office: (773) 674-5988**
**Cell: 312-590-3419**

---

**From:** Roland Lankah (Sheriff)
**Sent:** Friday, March 6, 2020 11:34 AM
**To:** Martha Yoksoulian (Sheriff) <Martha.Yoksoulian@cookcountyil.gov>; Salomon Martinez (Sheriff) <Salomon.Martinez@cookcountyil.gov>; Erica Queen (Sheriff) <Erica.Queen@cookcountyil.gov>; Esequiel Iracheta (Sheriff) <Esequiel.Iracheta@cookcountyil.gov>; Karen Jones-Hayes (Sheriff) <Karen.Jones-Hayes@cookcountyil.gov>; Hugh Walsh (Sheriff) <Hugh.Walsh@cookcountyil.gov>; Larry Gavin (Sheriff) <Larry.Gavin@cookcountyil.gov>; Richard Brogan (Sheriff) <Richard.Brogan@cookcountyil.gov>; David Chiko (Sheriff) <David.Chiko@cookcountyil.gov>; Kedgrick Pullums (Sheriff) <Kedgrick.Pullums@cookcountyil.gov>; Alice Palomo (Sheriff) <Alice.Palomo@cookcountyil.gov>; Ronald Clark (Sheriff) <Ronald.Clark@cookcountyil.gov>; John Carbone (Sheriff) <John.Carbone@cookcountyil.gov>; Anthony Villarreal (Sheriff) <Anthony.Villarreal@cookcountyil.gov>; Damita Delitz (Sheriff) <Damita.Delitz@cookcountyil.gov>; Anthony Hamiti (Sheriff) <Anthony.Hamiti@cookcountyil.gov>; Jasmin JarlegoPenaranda (Sheriff) <Jasmin.JarlegoPenaranda@cookcountyil.gov>
**Subject:** Liquid bleach

Good morning All,

Please see attached documents for both SDS and dilution procedure.

Two gallons of the pure chemical should be mixed in a 55 gallons drum with 32 gallons of water. Use the pump provided to your Divisions.  You may also use 8 ounces or a cup of pure chemical to a 1 gallon of water.

- The diluted chemical should be provided to individual tier in a portion of 4 gallons when needed, during heavy cleaning and disinfection or enhanced sanitation.

- The chemical must be used within 4 hours upon dilution.

- The chemical should only be used for disinfecting purposes, and no other chemical should be mixed with this chemical

- Please apply precautionary measures, including the use of proper PPE (gloves, masks, & gowns) when mixing the chemical

**ROLAND EXH 11**

Should you have any questions/concerns, please reach out to me.


Thanks,


*Roland  Lankah, REHS/RS, MPH, PhD* (abd)
*Registered Environmental Health Specialist*
*Cook County Sheriff's Office/DOC*
**Office: (773) 674-5988**
**Cell: 312-590-3419**

2

**ROLAND EXH 11**

# ECOLAB®

## SAFETY DATA SHEET

### ECO-STAR DESTAINER

---

**SECTION 1. PRODUCT AND COMPANY IDENTIFICATION**

| | | |
|---|---|---|
| Product name | : | ECO-STAR DESTAINER |
| Other means of identification | : | not applicable |
| Recommended use | : | Bleach |
| Restrictions on use | : | Reserved for industrial and professional use. |
| Product dilution information | : | 0.0 % - 0.14 % |
| Company | : | Ecolab Inc.<br>370 N. Wabasha Street<br>St. Paul, Minnesota USA 55102<br>1-800-352-5326 |
| Emergency telephone | : | 1-800-328-0026 (US/Canada), 1-651-222-5352 (outside US) |
| Issuing date | : | 03/24/2014 |

---

**SECTION 2. HAZARDS IDENTIFICATION**

### GHS Classification

**Product AS SOLD**

| | | |
|---|---|---|
| Skin corrosion | : | Category 1A |
| Serious eye damage | : | Category 1 |

**Product AT USE DILUTION**
Not a hazardous substance or mixture.

### GHS Label element

**Product AS SOLD**

Hazard pictograms : 

| | | |
|---|---|---|
| Signal Word | : | Danger |
| Hazard Statements | : | Causes severe skin burns and eye damage. |
| Precautionary Statements | : | **Prevention:**<br>Wash skin thoroughly after handling. Wear protective gloves/ protective clothing/ eye protection/ face protection. Mixing this product with acid or ammonia releases chlorine gas.<br>**Response:**<br>IF SWALLOWED: rinse mouth. Do NOT induce vomiting. IF ON SKIN (or hair): Remove/ Take off immediately all contaminated clothing. Rinse skin with water/ shower. IF INHALED: Remove victim to fresh air and keep at rest in a position comfortable for breathing. IF IN EYES: Rinse cautiously with water for several minutes. Remove contact lenses, if present and easy to do. Continue rinsing. Immediately call a POISON CENTER or doctor/ physician. Wash contaminated clothing before reuse.<br>**Storage:** |

ROLAND EXH 11

## ECO-STAR DESTAINER

Store locked up.
**Disposal:**
Dispose of contents/ container to an approved waste disposal plant.

**Product AT USE DILUTION**
Precautionary Statements

**Prevention:**
Wash hands thoroughly after handling.
**Response:**
Get medical advice/ attention if you feel unwell.
**Storage:**
Store in accordance with local regulations.

Other hazards               :   None known.

## SECTION 3. COMPOSITION/INFORMATION ON INGREDIENTS

**Product AS SOLD**
Pure substance/mixture      :   Mixture

| Chemical Name | CAS-No. | Concentration (%) |
|---|---|---|
| sodium hypochlorite | 7681-52-9 | 10 - 30 |

**Product AT USE DILUTION**

No hazardous ingredients

## SECTION 4. FIRST AID MEASURES

**Product AS SOLD**

| In case of eye contact | : | Rinse immediately with plenty of water, also under the eyelids, for at least 15 minutes. Remove contact lenses, if present and easy to do. Continue rinsing. Get medical attention immediately. |
|---|---|---|
| In case of skin contact | : | Wash off immediately with plenty of water for at least 15 minutes. Use a mild soap if available. Wash clothing before reuse. Thoroughly clean shoes before reuse. Get medical attention immediately. |
| If swallowed | : | Rinse mouth with water. Do NOT induce vomiting. Never give anything by mouth to an unconscious person. Get medical attention immediately. |
| If inhaled | : | Remove to fresh air. Treat symptomatically. Get medical attention if symptoms occur. |
| Protection of first-aiders | : | If potential for exposure exists refer to Section 8 for specific personal protective equipment. |
| Notes to physician | : | Treat symptomatically. |

**Product AT USE DILUTION**

| In case of eye contact | : | Rinse with plenty of water. |
|---|---|---|
| In case of skin contact | : | Rinse with plenty of water. |
| If swallowed | : | Rinse mouth. Get medical attention if symptoms occur. |
| If inhaled | : | Get medical attention if symptoms occur. |

SAFETY DATA SHEET

## ECO-STAR DESTAINER

See toxicological information (Section 11)

### SECTION 5. FIRE-FIGHTING MEASURES

**Product AS SOLD**

| | | |
|---|---|---|
| Suitable extinguishing media | : | Use extinguishing measures that are appropriate to local circumstances and the surrounding environment. |
| Unsuitable extinguishing media | : | None known. |
| Specific hazards during fire fighting | : | Not flammable or combustible. |
| Hazardous combustion products | : | Carbon oxides |
| Special protective equipment for fire-fighters | : | Use personal protective equipment. |
| Specific extinguishing methods | : | Collect contaminated fire extinguishing water separately. This must not be discharged into drains. Fire residues and contaminated fire extinguishing water must be disposed of in accordance with local regulations. In the event of fire and/or explosion do not breathe fumes. |

### SECTION 6. ACCIDENTAL RELEASE MEASURES

**Product AS SOLD**

| | | |
|---|---|---|
| Personal precautions, protective equipment and emergency procedures | : | Ensure adequate ventilation. Keep people away from and upwind of spill/leak. Avoid inhalation, ingestion and contact with skin and eyes. When workers are facing concentrations above the exposure limit they must use appropriate certified respirators. Ensure clean-up is conducted by trained personnel only. Refer to protective measures listed in sections 7 and 8. |
| Environmental precautions | : | Do not allow contact with soil, surface or ground water. |
| Methods and materials for containment and cleaning up | : | Stop leak if safe to do so. Contain spillage, and then collect with non-combustible absorbent material, (e.g. sand, earth, diatomaceous earth, vermiculite) and place in container for disposal according to local / national regulations (see section 13). Flush away traces with water. For large spills, dike spilled material or otherwise contain material to ensure runoff does not reach a waterway. |

**Product AT USE DILUTION**

| | | |
|---|---|---|
| Personal precautions, protective equipment and emergency procedures | : | Ensure clean-up is conducted by trained personnel only. Refer to protective measures listed in sections 7 and 8. |
| Environmental precautions | : | Do not allow contact with soil, surface or ground water. |
| Methods and materials for containment and cleaning up | : | Stop leak if safe to do so. Contain spillage, and then collect with non-combustible absorbent material, (e.g. sand, earth, diatomaceous earth, vermiculite) and place in container for disposal according to local / national regulations (see section 13). Flush away traces with water. For large spills, dike spilled material or otherwise contain material to ensure runoff does not reach a waterway. |

### SECTION 7. HANDLING AND STORAGE

ROLAND EXH 11

900043-65                                3 / 11

## ECO-STAR DESTAINER

**Product AS SOLD**

Advice on safe handling : Do not ingest. Do not breathe dust/ fume/ gas/ mist/ vapors/ spray. Do not get in eyes, on skin, or on clothing. Wash hands thoroughly after handling. Use only with adequate ventilation. Mixing this product with acid or ammonia releases chlorine gas.

Conditions for safe storage : Keep in a cool, well-ventilated place. Do not store near acids. Keep away from reducing agents. Keep away from combustible material. Keep out of reach of children. Keep container tightly closed. Store in suitable labeled containers.

Storage temperature : -15 °C to 40 °C

**Product AT USE DILUTION**

Advice on safe handling : Wash hands thoroughly after handling. Use only with adequate ventilation.

Conditions for safe storage : Keep out of reach of children. Keep container tightly closed. Store in suitable labeled containers.

## SECTION 8. EXPOSURE CONTROLS/PERSONAL PROTECTION

**Product AS SOLD**
**Ingredients with workplace control parameters**

| Ingredients | CAS-No. | Form of exposure | Permissible concentration | Basis |
|---|---|---|---|---|
| sodium hypochlorite | 7681-52-9 | STEL | 2 mg/m3 | WEEL |
| chlorine | 7782-50-5 | TWA | 0.5 ppm | ACGIH |
| | | STEL | 1 ppm | ACGIH |
| | | Ceiling | 0.5 ppm 1.45 mg/m3 | NIOSH REL |
| | | C | 1 ppm 3 mg/m3 | OSHA Z1 |
| sodium hypochlorite | 7681-52-9 | STEL | 2 mg/m3 | WEEL |

Engineering measures : Effective exhaust ventilation system. Maintain air concentrations below occupational exposure standards.

**Personal protective equipment**

Eye protection : Safety goggles
Face-shield

Hand protection : Wear the following personal protective equipment:
Standard glove type.
Gloves should be discarded and replaced if there is any indication of degradation or chemical breakthrough.

Skin protection : Personal protective equipment comprising: suitable protective gloves, safety goggles and protective clothing

Respiratory protection : When workers are facing concentrations above the exposure limit they must use appropriate certified respirators.

Hygiene measures : Handle in accordance with good industrial hygiene and safety

ROLAND EXH 11

SAFETY DATA SHEET

## ECO-STAR DESTAINER

practice. Remove and wash contaminated clothing before re-use. Wash face, hands and any exposed skin thoroughly after handling. Provide suitable facilities for quick drenching or flushing of the eyes and body in case of contact or splash hazard.

| Product AT USE DILUTION | |
|---|---|
| Engineering measures | : Good general ventilation should be sufficient to control worker exposure to airborne contaminants. |

**Personal protective equipment**

| | |
|---|---|
| Eye protection | : No special protective equipment required. |
| Hand protection | : No special protective equipment required. |
| Skin protection | : No special protective equipment required. |
| Respiratory protection | : No personal respiratory protective equipment normally required. |

## SECTION 9. PHYSICAL AND CHEMICAL PROPERTIES

| | | Product AS SOLD | Product AT USE DILUTION |
|---|---|---|---|
| Appearance | : | liquid | liquid |
| Color | : | light yellow | colorless |
| Odor | : | Chlorine | slight |
| pH | : | 12.5, 100 % | 7.5 - 9.0 |
| Flash point | : | not applicable | |
| Odor Threshold | : | no data available | |
| Melting point/freezing point | : | no data available | |
| Initial boiling point and boiling range | : | no data available | |
| Evaporation rate | : | no data available | |
| Flammability (solid, gas) | : | no data available | |
| Upper explosion limit | : | no data available | |
| Lower explosion limit | : | no data available | |
| Vapor pressure | : | no data available | |
| Relative vapor density | : | no data available | |
| Relative density | : | 1.154 | |
| Water solubility | : | no data available | |
| Solubility in other solvents | : | no data available | |
| Partition coefficient: n-octanol/water | : | no data available | |
| Autoignition temperature | : | no data available | |
| Thermal decomposition | : | no data available | |
| Viscosity, kinematic | : | no data available | |
| Explosive properties | : | no data available | |
| Oxidizing properties | : | no data available | |

**ROLAND EXH 11**

| ECO-STAR DESTAINER |
| --- |

| Molecular weight | : | no data available |
| --- | --- | --- |
| VOC | : | no data available |

| SECTION 10. STABILITY AND REACTIVITY |
| --- |

**Product AS SOLD**

| Chemical stability | : | Stable under normal conditions. |
| --- | --- | --- |
| Possibility of hazardous reactions | : | Mixing this product with acid or ammonia releases chlorine gas. |
| Conditions to avoid | : | None known. |
| Incompatible materials | : | Acids<br>Metals |
| Hazardous decomposition products | : | Carbon oxides |

| SECTION 11. TOXICOLOGICAL INFORMATION |
| --- |

| Information on likely routes of exposure | : | Inhalation, Eye contact, Skin contact |
| --- | --- | --- |

**Potential Health Effects**

**Product AS SOLD**

| Eyes | : | Causes serious eye damage. |
| --- | --- | --- |
| Skin | : | Causes severe skin burns. |
| Ingestion | : | Causes digestive tract burns. |
| Inhalation | : | May cause nose, throat, and lung irritation. |
| Chronic Exposure | : | Health injuries are not known or expected under normal use. |

**Product AT USE DILUTION**

| Eyes | : | Health injuries are not known or expected under normal use. |
| --- | --- | --- |
| Skin | : | Health injuries are not known or expected under normal use. |
| Ingestion | : | Health injuries are not known or expected under normal use. |
| Inhalation | : | Health injuries are not known or expected under normal use. |
| Chronic Exposure | : | Health injuries are not known or expected under normal use. |

**Experience with human exposure**

**Product AS SOLD**

| Eye contact | : | Redness, Pain, Corrosion |
| --- | --- | --- |
| Skin contact | : | Redness, Pain, Corrosion |
| Ingestion | : | Corrosion, Abdominal pain |
| Inhalation | : | Respiratory irritation, Cough |

ROLAND EXH 11

SAFETY DATA SHEET

**ECO-STAR DESTAINER**

| **Product AT USE DILUTION** | |
|---|---|
| Eye contact | No symptoms known or expected. |
| Skin contact | No symptoms known or expected. |
| Ingestion | No symptoms known or expected. |
| Inhalation | No symptoms known or expected. |

**Toxicity**

**Product AS SOLD**

| | | |
|---|---|---|
| Acute oral toxicity | : | no data available |
| Acute inhalation toxicity | : | no data available |
| Acute dermal toxicity | : | no data available |
| Skin corrosion/irritation | : | no data available |
| Serious eye damage/eye irritation | : | no data available |
| Respiratory or skin sensitization | : | no data available |
| Carcinogenicity | : | no data available |
| Reproductive effects | : | no data available |
| Germ cell mutagenicity | : | no data available |
| Teratogenicity | : | no data available |
| STOT-single exposure | : | no data available |
| STOT-repeated exposure | : | no data available |
| Aspiration toxicity | : | no data available |

**Ingredients**

| Acute oral toxicity | : | sodium hypochlorite LD50 rat  5,230 mg/kg |
|---|---|---|

**Ingredients**

| Acute inhalation toxicity | : | sodium hypochlorite 1 h LC50 rat: > 10,500 mg/l |
|---|---|---|

**Ingredients**

| Acute dermal toxicity | : | sodium hypochlorite LD50 rabbit: > 10,000 mg/kg |
|---|---|---|

**SECTION 12. ECOLOGICAL INFORMATION**

**Product AS SOLD**
**Ecotoxicity**

| Environmental Effects | : | Toxic to aquatic life. |
|---|---|---|

**Product**

| Toxicity to fish | : | 96 h LC50 Oncorhynchus mykiss (rainbow trout) : 2.1 mg/l |
|---|---|---|

**ROLAND EXH 11**

## ECO-STAR DESTAINER

|  | | 96 h LC50 Inland Silverside : 7.6 mg/l |
| --- | --- | --- |
| Toxicity to daphnia and other aquatic invertebrates | : | 48 h LC50 Americamysis bahia : 18.1 mg/l |
|  | | 48 h LC50 Daphnia dubia : 0.57 mg/l |
| Toxicity to algae | : | no data available |

**Persistence and degradability**

The methods for determining the biological degradability are not applicable to inorganic substances.

**Bioaccumulative potential**

no data available

**Mobility in soil**

no data available

**Other adverse effects**

no data available

## SECTION 13. DISPOSAL CONSIDERATIONS

**Product AS SOLD**

| Disposal methods | : | The product should not be allowed to enter drains, water courses or the soil. Where possible recycling is preferred to disposal or incineration. If recycling is not practicable, dispose of in compliance with local regulations. Dispose of wastes in an approved waste disposal facility. |
| --- | --- | --- |
| Disposal considerations | : | Dispose of as unused product. Empty containers should be taken to an approved waste handling site for recycling or disposal. Do not re-use empty containers. |
| RCRA - Resource Conservation and Recovery Authorization Act Hazardous waste | : | D002 (Corrosive) |

**Product AT USE DILUTION**

| Disposal methods | : | The product should not be allowed to enter drains, water courses or the soil. Where possible recycling is preferred to disposal or incineration. If recycling is not practicable, dispose of in compliance with local regulations. Dispose of wastes in an approved waste disposal facility. |
| --- | --- | --- |
| Disposal considerations | : | Dispose of as unused product. Empty containers should be taken to an approved waste handling site for recycling or disposal. Do not re-use empty containers. |

## SECTION 14. TRANSPORT INFORMATION

**Product AS SOLD**

The shipper/consignor/sender is responsible to ensure that the packaging, labeling, and markings are in compliance with the selected mode of transport.

**Land transport (DOT)**

| UN number | : | 1791 |
| --- | --- | --- |

**ROLAND EXH 11**

**SAFETY DATA SHEET**

| ECO-STAR DESTAINER |
|---|

Description of the goods   :  Hypochlorite solutions
Class                      :  8
Packing group        :  III
Environmentally hazardous  :  no

**Sea transport (IMDG/IMO)**
UN number            :  1791
Description of the goods   :  HYPOCHLORITE SOLUTION
Class                      :  8
Packing group        :  III
Marine pollutant       :  yes

**Product AT USE DILUTION**
Not intended for transport.

| SECTION 15. REGULATORY INFORMATION |
|---|

**Product AS SOLD**

**EPCRA - Emergency Planning and Community Right-to-Know**

**CERCLA Reportable Quantity**
This material does not contain any components with a CERCLA RQ.

**SARA 304 Extremely Hazardous Substances Reportable Quantity**
This material does not contain any components with a section 304 EHS RQ.

**SARA 311/312 Hazards**     :  Acute Health Hazard

**SARA 302**                      :  SARA 302: No chemicals in this material are subject to the reporting requirements of SARA Title III, Section 302.

**SARA 313**                      :  SARA 313: This material does not contain any chemical components with known CAS numbers that exceed the threshold (De Minimis) reporting levels established by SARA Title III, Section 313.

**California Prop 65**
This product does not contain any chemicals known to the State of California to cause cancer, birth, or any other reproductive defects.

**The ingredients of this product are reported in the following inventories:**

**1907/2006 (EU)** :
not determined

**Switzerland. New notified substances and declared preparations** :
The mixture contains substances listed on the Swiss Inventory On the inventory, or in compliance with the inventory

**United States TSCA Inventory** :
On TSCA Inventory

**Canadian Domestic Substances List (DSL)** :
All components of this product are on the Canadian DSL.

**Australia Inventory of Chemical Substances (AICS)** :
On the inventory, or in compliance with the inventory

ROLAND EXH 11

# SAFETY DATA SHEET

## ECO-STAR DESTAINER

**New Zealand. Inventory of Chemical Substances** :
On the inventory, or in compliance with the inventory

**Japan. ENCS - Existing and New Chemical Substances Inventory** :
not determined

**Japan. ISHL - Inventory of Chemical Substances (METI)** :
On the inventory, or in compliance with the inventory

**Korea. Korean Existing Chemicals Inventory (KECI)** :
On the inventory, or in compliance with the inventory

**Philippines Inventory of Chemicals and Chemical Substances (PICCS)** :
On the inventory, or in compliance with the inventory

**China. Inventory of Existing Chemical Substances in China (IECSC)** :
On the inventory, or in compliance with the inventory

## SECTION 16. OTHER INFORMATION

**Product AS SOLD**
**NFPA:**



**HMIS III:**

| HEALTH | 3 |
|---|---|
| FLAMMABILITY | 0 |
| PHYSICAL HAZARD | 0 |

0 = not significant, 1 =Slight,
2 = Moderate, 3 = High
4 = Extreme, * = Chronic



**Product AT USE DILUTION**
**NFPA:**

**HMIS III:**

| HEALTH | 0 |
|---|---|
| FLAMMABILITY | 0 |
| PHYSICAL HAZARD | 0 |

0 = not significant, 1 =Slight,
2 = Moderate, 3 = High
4 = Extreme, * = Chronic

| Issuing date | : | 03/24/2014 |
|---|---|---|
| Version | : | 1.0 |
| Prepared by | : | Regulatory Affairs |

REVISED INFORMATION: Significant changes to regulatory or health information for this revision is
indicated by a bar in the left-hand margin of the SDS.

# SAFETY DATA SHEET

## ECO-STAR DESTAINER

The information provided in this Material Safety Data Sheet is correct to the best of our knowledge, information and belief at the date of its publication. The information given is designed only as a guidance for safe handling, use, processing, storage, transportation, disposal and release and is not to be considered a warranty or quality specification. The information relates only to the specific material designated and may not be valid for such material used in combination with any other materials or in any process, unless specified in the text.

**ROLAND EXH 11**

## BLEACH DILUTION CALCULATOR

**1. Enter the approximate parts per million (PPM) that you need*:**    | 5000 | PPM

*The following are recommended ranges based on the task:

| Recommended PPM | Disinfecting task |
|---|---|
| 600-700 | Food/water bowls, toys |
| 1500-1700 | Routine disinfection of surfaces |
| 6000-8000 | Disinfecting to kill ringworm |

**2. Enter the concentration of the bleach you are using**:**    | 10 | %

**Find this in the list of active ingredients, listed as sodium hypochlorite at x%.

**3. Enter the number of ounces in the container you are using^:**    | 640 | ounces

^Common container sizes are a 24 ounce spray bottle, 1 quart container, 1 gallon container, and 5 gallon container.

*Conversion to ounces:*

| | |
|---|---|
| 1 quart = 32 ounces | |
| 1 gallon = 128 ounces | |
| 5 gallon = 640 ounces | |

**Add the following amount of bleach to your container:**

| | | | | |
|---|---|---|---|---|
| Ounces: | 32.0 | ≈ | 32 | OR |
| Tablespoons: | 64.0 | ≈ | 64 | OR |
| Cups: | 4.0 | ≈ | 4 | |

Note: convert the decimal amount to the nearest fraction or whole number, or use the estimated fraction to the nearest quarter after the approximately equal (≈) sign.

**You have made a dilution of:**    **1: 20**

*Other useful conversions:*

| |
|---|
| 1 Tablespoon = 0.5 ounces |
| 1 cup = 8 ounces = 16 Tablespoons |
| 1 quart = 4 cups |

*Created by the Public Health - Seattle & King County Pet Business Program. For more information, call 206.263.9566.*

**ROLAND EXH 11**

**From:** Roland Lankah (Sheriff)
**Sent:** Monday, April 06, 2020 11:12 AM
**To:** Elisabeth Glick (Sheriff)
**Subject:** Fw: CBM ODR Dinning Area

Use this for the CBM dinner area closure.

*Roland  Lankah, REHS/RS, MPH, PhD* (abd)
*Registered Environmental Health Specialist*
*Cook County Sheriff's Office/DOC*
**Office: (773) 674-5988**
*Cell: 312-590-3419*

---

**From:** Roland Lankah (Sheriff) <Roland.Lankah@cookcountyil.gov>
**Sent:** Monday, April 6, 2020 11:09 AM
**To:** Elisabeth Glick (Sheriff) <Elisabeth.Glick@cookcountyil.gov>
**Subject:** Fw: CBM ODR Dinning Area


*Roland  Lankah, REHS/RS, MPH, PhD* (abd)
*Registered Environmental Health Specialist*
*Cook County Sheriff's Office/DOC*
**Office: (773) 674-5988**
*Cell: 312-590-3419*

---

**From:** Roland Lankah (Sheriff) <Roland.Lankah@cookcountyil.gov>
**Sent:** Monday, March 16, 2020 9:49 AM
**To:** Yolanda Debro (Sheriff) <Yolanda.Debro@cookcountyil.gov>
**Cc:** Jasmin JarlegoPenaranda (Sheriff) <Jasmin.JarlegoPenaranda@cookcountyil.gov>
**Subject:** Re: ODR Dinning Area

I would suggest that they close the dinner area and keep the restaurant running for take out food.  You may ask Director and see what he wants.

Thanks,


*Roland  Lankah, REHS/RS, MPH, PhD* (abd)
*Registered Environmental Health Specialist*
*Cook County Sheriff's Office/DOC*
**Office: (773) 674-5988**
*Cell: 312-590-3419*

---

1

**ROLAND EXH 12**

**From:** maria.medina@cbmpremier.com <maria.medina@cbmpremier.com>
**Sent:** Monday, March 16, 2020 9:34 AM
**To:** Yolanda Debro (Sheriff) <Yolanda.Debro@cookcountyil.gov>
**Cc:** mark.wagner@cbmpremier.com <mark.wagner@cbmpremier.com>; Jasmin JarlegoPenaranda (Sheriff)
<Jasmin.JarlegoPenaranda@cookcountyil.gov>; Roland Lankah (Sheriff) <Roland.Lankah@cookcountyil.gov>
**Subject:** ODR Dinning Area

Good morning Superintendent.

I understand that the state of Illinois have implement the shutdown of restaurant's dinning Service areas. How would
you like for us to proceed with the odr dinning service?

Maria Medina
CBM Premier Management
Office773-674-2614
Cell 773-822-4811
Fax 773-674-4160
Maria.medina@cbmpremier.com

**ROLAND EXH 12**



**WE'VE BEEN BUSY...**

**Come Back to Café PREMIER and see for yourself!**

☆ Fresh New Breakfast and Lunch Specials Daily
☆ Speed of Service
☆ Favorites from the Grill
☆ Catering on-Site or Delivery
☆ Hot and Cold Grab & Go
☆ Convenience Store Style Retail Variety

**CALL AHEAD!!**
**4-5147 or (773)847-7770**
**Open 24 hours 7 days a week**
**CCDOC Division 5 Second Floor**

- Breakfast Grab & Go
  - Muffin, Bagel, Breakfast Sandwiches
  - Quiche
  - Belgium Waffles
  - Pancakes
  - Muffins and Pastries
  - *Daily Specials*

- Lunch Break Grab & Go
  - Burgers, Chicken Sandwiches, Grilled Cheese
  - Tex-Mex
  - Fried Chicken
  - *Daily Specials*

- Catering
  - Call us to set up your event today!

<div style="background:#cfe0f0;">Call Ahead Ext. 5147 or (773)847-7770</div>

---





## Breakfast *Served 05:00 am – 10:00 am*

☆ Breakfast Sandwich w/ Bread or Muffin w/ Egg, Cheese, and choice of Sausage or Bacon
$3.50



☆ Three Egg Omelet with any 3 fillings:
$3.95

   ☆ Bacon – Sausage – Ham – Cheese – Bell Pepper – Onion – Tomatoes
   ☆ Additional Ingredients Add   $0.50

☆ Pancakes (2)   $2.50
   ☆ Additional Pancakes   $1.00



*Add Tater Tots and a Drink $2.00*

Sides:
☆ Grits  $2.25
☆ Side Bacon $2.95 or Sausage $1.95
☆ Tater Tots $1.95

**Present this Coupon for
$1 Off Any Value or
Combo Meal**

  

<div style="background:#cfe0f0;">Call Ahead Ext. 5147 or (773)847-7770</div>

**ROLAND EXH 13**

---



## Lunch *Served 10:00 am to 5:00 am*

☆ Cheeseburger   $5.75
☆ Double Burger   $7.75
☆ Chicken Sandwich   $5.75
☆ Veggie Burger   $5.75
☆ Turkey Burger   $5.75
☆ Grilled Cheese   $3.50
☆ BLT   $3.50
☆ Pizza Puffs   $3.95
☆ Polish Sausage   $3.95
☆ Chicken Strips   $5.95
☆ Salads to Order   $0.39 oz.

*Add French Fries and a Drink $3.00*

- Side French Fries  $2.25
- Loaded Fries $3.50



### Fresh Express – Grab & Go!

☆ Variety Entrée Salads
☆ Dinner Salads
☆ Complete Boxed Lunch Kits
   ☆ Wraps and Sandwiches with Chips and Cookie
☆ Fruit Cups
☆ Parfait
☆ Desserts
   ☆ Cakes
   ☆ Pies
   ☆ Pudding
   ☆ Fruit Gelatin

<div style="background:#cfe0f0;">Call Ahead Ext. 5147 or (773)847-7770</div>

**Café PREMIER**

*Ask About Our Daily <u>Breakfast</u> Specials!*



## Monday

## Tuesday





## Wednesday

## Thursday





## Friday

## Saturday



## Sunday

*Ever changing variety…*

Call Ahead Ext. 5147 or (773)847-7770

---

**Café PREMIER**



## Meetings & Special Events

### Pastry Basket
Assorted Cinnamon Rolls, Danish, Scones, and Sweets Delights

$1.75 person

### Cookie Basket
Chocolate Chip, White Chocolate with Macadamia Nuts, Snickerdoodle, Sugar, and Oatmeal Raisin

$1.75 person

### Snack Basket
Trail Mix, Granola Bars, Pretzels, Raisins

$1.75 person

### Fruit Basket
A variety of whole seasonal fruit

$1.75 person

### Hot Beverage Service
Coffee, Variety Tea, & Cocoa with Condiments

1.75 person

**Have something else in mind? Just ask us and we'll prepare a custom menu to fit your needs.**
**(773)847-7770 or Ext. 4-5147**



Call Ahead Ext. 5147 or (773)847-7770

**ROLAND EXH 13**

---

*Ever changing variety…*

*Ask About Our Daily Lunch Specials*



## Monday



## Tuesday



## Wednesday



## Thursday

## Friday



## Saturday

## Sunday

**Café PREMIER**



| | |
|---|---|
| **From:** | Roland Lankah (Sheriff) |
| **Sent:** | Sunday, April 05, 2020 8:42 AM |
| **To:** | Elisabeth Glick (Sheriff) |
| **Subject:** | Fw: Preventive Daily Cleaning and Disinfection |
| **Attachments:** | Preventive Daily Cleaning and Disinfection.pdf |

Here you go.

*Roland Lankah, REHS/RS, MPH, PhD* (abd)
*Registered Environmental Health Specialist*
*Cook County Sheriff's Office/DOC*
**Office: (773) 674-5988**
**Cell: 312-590-3419**

---

**From:** Roland Lankah (Sheriff)
**Sent:** Monday, March 23, 2020 3:38 PM
**To:** Erica Queen (Sheriff) <Erica.Queen@cookcountyil.gov>; Martha Yoksoulian (Sheriff)
<Martha.Yoksoulian@cookcountyil.gov>; Don Beachem (Sheriff) <Don.Beachem@cookcountyil.gov>; Salomon Martinez
(Sheriff) <Salomon.Martinez@cookcountyil.gov>; Hugh Walsh (Sheriff) <Hugh.Walsh@cookcountyil.gov>; Yolanda Debro
(Sheriff) <Yolanda.Debro@cookcountyil.gov>; Karen Jones-Hayes (Sheriff) <Karen.Jones-Hayes@cookcountyil.gov>
**Cc:** Jasmin JarlegoPenaranda (Sheriff) <Jasmin.JarlegoPenaranda@cookcountyil.gov>; mark.wagner@cbmpremier.com
<mark.wagner@cbmpremier.com>; Jane Gubser (Sheriff) <Jane.Gubser@cookcountyil.gov>; Michael Miller (Sheriff)
<Michael.Miller1@cookcountyil.gov>; Richard Brogan (Sheriff) <Richard.Brogan@cookcountyil.gov>; Larry Gavin
(Sheriff) <Larry.Gavin@cookcountyil.gov>; Rebecca Levin (Sheriff) <Rebecca.Levin@cookcountyil.gov>; Esequiel Iracheta
(Sheriff) <Esequiel.Iracheta@cookcountyil.gov>; David Chiko (Sheriff) <David.Chiko@cookcountyil.gov>
**Subject:** Preventive Daily Cleaning and Disinfection

Good Afternoon Supts, and Mark,
Please see the attached Daily Cleaning and Disinfection protocol to be shared with your staff.

Should you have any questions/concerns, please feel free to contact me.

Thanks,

*Roland Lankah, REHS/RS, MPH, PhD* (abd)
*Registered Environmental Health Specialist*
*Cook County Sheriff's Office/DOC*
**Office: (773) 674-5988**
**Cell: 312-590-3419**

**ROLAND EXH 14**

# Preventive Daily Cleaning and Disinfection

**I. Daily Cleaning and Disinfection**

- Stainless steel tables in day rooms should be cleaned and disinfected after every meal
- Frequently touched surfaces, including, tabletops, doorknobs, bathroom fixtures, toilets, phones, keyboards, chairs, light switches, desks top, elevator buttons, keys, etc. should be disinfected every shift or between every 4 hours
- Bleach disinfectant should be replenished after every 8 hours
- Sanitation Officers and Food handlers should wash hands with soap and water between tasks and between changing gloves.
- All DOC chemicals, including cleaning agents, and disinfectant should be acquired from Central Chemical in Division 5
- Spray restraint/handcuff using canister sprayer or spray bottle with a bleach solution between uses.

**II. Intake (Division 6 Annex)**

- Food trays and food carts returning from Intakes should be sprayed with bleach disinfectant. Allow the food trays and carts to air dry prior to returning to Central Kitchen

**III. Cleaning and Disinfecting Areas of Confirmed Case**

- Adequate Personal Protective Equipment (PPE), including masks, gowns, and gloves, is required to clean and disinfect cell, dayroom, or areas of a confirmed case.
- All potentially exposed items, including bed sheets, uniforms, and personals, should be collected in a cleared, non-perforated bags. Contact to notify Central Laundry regarding the status of the content in the bag. Label the bag, such as "maybe contaminated," and send the bag with content to Central Laundry.
- Clean area (1) with a cleaning agent such as Sanifect, and (2) disinfect area with bleach solution using the Canister sprayer or spray bottle and allow the area to air dry (do not wipe)
- Place all used disposable gloves, facemasks, and other contaminated items in a clear, non-perforated bag before disposing of them in the Divisional dumpsters. Wash your hands with soap and water, or you may clean your hands with an alcohol-based hand sanitizer immediately after handling these items. Handwashing with soap and water should be used preferentially if hands are visibly dirty.
- For training on proper PPE removal, please contact Roland Lankah at ext. 5988, and Jasmin JarlegoPenaranda at ext. 2638.

**IV. Laundry (handling potentially contaminated clothing items)**

- Wear disposable gloves, masks, and gowns while handling soiled items and keep soiled items away from your body, and separately from cleaned clothes.
- In general, using a typical laundry detergent according to washing machine instructions and dry thoroughly using the hottest temperatures recommended (170 degrees F or above).
- Stainless steel tables and other hard surface equipment used for this process in laundry rooms should be cleaned and disinfected between uses
- Place all used disposable gloves, facemasks, and other contaminated items in a clear, non-perforated bag before disposing of them in the Divisional dumpsters. Wash your hands with soap and water, or you may clean your hands with an alcohol-based hand sanitizer immediately

ROLAND EXH 14

# Preventive Daily Cleaning and Disinfection

after handling these items. Handwashing with soap and water should be used preferentially if hands are visibly dirty.

**V.     CBM**

- Please follow the above protocol for daily cleaning and disinfection; however, any laundry should be handled and wash in Central Kitchen
- Temperature gauge for dish machine in Central Kitchen should be routinely checked to ensure rinse temperature is at 180 degrees or above and documented.
- Implement a screening protocol, including temperature checks with a cut off at 100.4$^{o}$ F for all CBM staff and DOC inmate workers in kitchen.

ROLAND EXH 14

| | |
|---|---|
| **From:** | Roland Lankah (Sheriff) |
| **Sent:** | Sunday, April 05, 2020 8:18 AM |
| **To:** | Elisabeth Glick (Sheriff) |
| **Cc:** | Jasmin JarlegoPenaranda (Sheriff) |
| **Subject:** | Fw: confirming speaking points for video |

*Roland  Lankah, REHS/RS, MPH, PhD (abd)*
*Registered Environmental Health Specialist*
*Cook County Sheriff's Office/DOC*
**Office: (773) 674-5988**
**Cell: 312-590-3419**

---

**From:** Penny Mateck-Greene (Sheriff) <Penny.Mateck-Greene@cookcountyil.gov>
**Sent:** Tuesday, March 24, 2020 2:27 PM
**To:** Roland Lankah (Sheriff) <Roland.Lankah@cookcountyil.gov>
**Subject:** Re: confirming speaking points for video

Ok, I can include him when I send it out as long as his email is in our system

Sent from my iPhone

On Mar 24, 2020, at 11:57 AM, Roland Lankah (Sheriff) <Roland.Lankah@cookcountyil.gov> wrote:

> Penny,
> Just a quick correction on # 1
>
> 1) Divisional Sanitation Officers are responsible for cleaning and disinfecting the high-touch areas throughout the Divisions, and DOC Sanitation Officers are responsible for lobbies and exterior areas.
>
> Thanks,
>
> *Roland  Lankah, REHS/RS, MPH, PhD (abd)*
> *Registered Environmental Health Specialist*
> *Cook County Sheriff's Office/DOC*
> **Office: (773) 674-5988**
> **Cell: 312-590-3419**

---

**From:** Roland Lankah (Sheriff) <Roland.Lankah@cookcountyil.gov>
**Sent:** Tuesday, March 24, 2020 10:33 AM
**To:** Penny Mateck-Greene (Sheriff) <Penny.Mateck-Greene@cookcountyil.gov>; Lawrence Wayne

1

**ROLAND EXH 15**

(Sheriff) <Lawrence.Wayne@cookcountyil.gov>
**Cc:** Jane Gubser (Sheriff) <Jane.Gubser@cookcountyil.gov>
**Subject:** Re: confirming speaking points for video

Please re-write # 1, 2, and 5 as

1) DOC Sanitation Officers are responsible for cleaning the high-touch areas throughout the CCDOC.

2) Towels, and spray bottles with cleaning agent (Sanifect Plus), and bleach solution are available in all Divisions for cleaning  and disinfecting by employees. Should no spray  bottles and towels be available in your Divisions, equipment can be retrieved from Support Services in Division 5 by calling x5988 or x2638.  All chemicals, including the cleaning agent and bleach solution can be retrieved from Central Chemical in Division 5.

5) All frequently touched surfaces  should be cleaned with a cleaning agent, and  sprayed with the bleach solution and left to air dry, with the exception of the Sherriff's electronic equipment such as computer keyboards, and telephones. Employees should spray the cleaning agent and bleach solution on towels for the cleaning and disinfection of the electronic equipment.

Hope this can help,

*Roland  Lankah, REHS/RS, MPH, PhD (abd)*
*Registered Environmental Health Specialist*
*Cook County Sheriff's Office/DOC*
**Office: (773) 674-5988**
**Cell: 312-590-3419**

---

**From:** Penny Mateck-Greene (Sheriff) <Penny.Mateck-Greene@cookcountyil.gov>
**Sent:** Monday, March 23, 2020 5:06 PM
**To:** Roland Lankah (Sheriff) <Roland.Lankah@cookcountyil.gov>; Lawrence Wayne (Sheriff) <Lawrence.Wayne@cookcountyil.gov>
**Cc:** Jane Gubser (Sheriff) <Jane.Gubser@cookcountyil.gov>
**Subject:** confirming speaking points for video

Roland,

Thank you so much for your time today.

I just wanted to make sure I had all the points we discussed today correct before we include them with the video:

1) DOC sanitation officers are responsible for cleaning the high touch areas throughout the CCDOC.

2) Spray bottles with the bleach / water solution, as recommended by the CDC, and towels are available in all areas of the Jail for disinfecting by employees. Should no spray solution and towels be available in your area, equipment can be retrieved from Support Services in Division 5 by calling x5988 or x2638.

2

**ROLAND EXH 15**

3) As part of the DOC's Preventative Daily Cleaning & Disinfection Guideline, DOC employees should be disinfecting their personal or commonly shared work spaces and related frequently touched surfaces every shift or between every 4 hours.

4) Frequently touched surfaces include tables, desks, hard backed chairs, doorknobs, light switches, elevator buttons, remote controls, keys, handles and computer keyboards.

5) All surfaces should be sprayed with the bleach solution and left to air dry, with the exception of computer keyboards. Employees should spray the disinfectant solution onto a towel and wipe the keyboard with the towel. The keyboard should then also be left to air dry.

Please let me know of any corrections / changes to the above points.

Thank you,

Penny

*Penny Mateck*
Community Policing Specialist
Community Relations Unit
Leg 5 Leader, Law Enforcement Torch Run, Special Olympics
Cook County (IL) Sheriff's Police Department
1401 South Maybrook Drive
Maywood, IL 60153
office 708.865.4917
www.cookcountysheriff.org

**ROLAND EXH 15**



# COOK COUNTY DEPARTMENT OF CORRECTIONS
## MEMORANDUM

| TO: All Unit Superintendents | DATE: 4/01/2020 |
|---|---|
| FROM: Roland Lankah, Environmental Health Specialist. | |
| SUBJECT: Preventive Daily Cleaning and Disinfection | |

**Cleaning and Disinfection Shared Items and Workspace**

- Clean and disinfect personal or commonly shared workspace and related frequently touched surfaces with cleaning agent followed by disinfectant every four hours and at the end of each shift
- Frequently touched surfaces include, but not limited, tabletops, doorknobs, bathroom fixtures, toilets, phones, keyboards, chairs, light switches, desks top, elevator buttons, keys, etc
- All DOC chemicals, including cleaning agents, and disinfectant must be acquired from Central Chemical in Division 5
- Spray restraint/handcuff using canister sprayer or spray bottle with a bleach solution between uses.

**Cleaning and Disinfecting non-Quarantine and non-Isolation Tiers and Dorms**

- Tier Officers must require Tier workers to clean area (1) with a cleaning agent such as Sanifect, and followed by 2) disinfecting the area with bleach solution using the spray bottle and allow the area to air dry (do not wipe dry.)
  - Stainless steel tables and chairs in day rooms must be cleaned and disinfected before and after each meal.
  - All touch surfaces including, but not limited to, doorknobs, light switches, bathroom fixtures, toilets, and sinks desks and chairs, stair rail  (See list above) must be cleaned, followed by disinfection once per shift.
  - Inmates must be required by the Tier Officers to clean and disinfect their cells at minimum, daily. If an inmate is unable to complete this task, the Tier Officer must report the issues to the Divisional Sanitation Officer. The Divisional Sanitation Officers and his/her crew are responsible for ensuring that the cell is cleaned and disinfected once per day
- Divisional Sanitation Officers must  ensure that each tier and dorm have the required sanitation supply in the Tier Sanitation Kit
  - Bleach disinfectant should be replenished after every 8 hours
- All cleaning activities-both by the Sanitation Officers, inmates, and Tier workers should be documented in the Tier log book.

**Cleaning and Disinfecting Quarantine, and Isolation Tiers and Dorms**

- Appropriate Personal Protective Equipment (PPE), including surgical masks, gowns, and gloves, is required to clean and disinfect cell, dayroom, and any areas with a confirmed case.
- Divisional Sanitation Officers and his/her crew are responsible for carrying out the cleaning and disinfection in Isolation and Quarantine tiers.
  - Clean area (1) with a cleaning agent such as Sanifect, and followed by 2) disinfecting the area with bleach solution using the Canister sprayer or spray bottle and allow the area to air dry (do not wipe dry.)

# SIGNATURE:

- o Stainless steel tables and chairs in day rooms need to be cleaned and disinfected before and after each meal.
- o Clean and disinfect all touch surfaces including, but not limited to, doorknobs, light switches, bathroom fixtures, toilets, sinks, rails, floors, desks, and chairs (See list above) every 4 hours and at the end of each shift.
- Place all used disposable gloves, facemasks, and other contaminated items in a clear, non-perforated bag before disposing of them in the Divisional dumpsters. After you remove your gloves, wash your hands with soap and water, or you may clean your hands with an alcohol-based hand sanitizer immediately after handling these items. Handwashing with soap and water is preferred if hands are visibly dirty.
- For training on proper PPE removal, please contact Roland Lankah at ext. 5988, and Jasmin JarlegoPenaranda at ext. 2638.

**Collecting and Returning Food Trays and Carts from Intake, Quarantine, and Isolation Tiers or Dorms**

- Appropriate Personal Protective Equipment (PPE), including surgical masks, gowns, and gloves, is required for food services (both food distribution and clean-up) on quarantine and isolation tiers and dorms.
- The Divisional Food Officers and his/her crew are responsible for food distribution and clean up in Isolation and Quarantine tiers. When cleaning up,
- o Empty leftover food off the trays in lined garbage can and spray the trays in the tiers or dorms with a bleach solution. (Do not wipe dry.)
- o Collect all tray waste from the tier or dorms and dispose of the bags in the dumpster immediately.
- o Spray interior and exterior of insolated carts with a bleach solution. (Do not wipe dry.)
- o All tasks should be completed prior to returning carts and trays to the Central kitchen.
- o Food Officers and Food workers must wash hands with soap and water for at least 20 seconds, before putting on gloves for meal service and clean-up, and between tasks.

**Laundry (collecting and handling potentially contaminated clothing items) from Quarantine and Isolation Tiers**

- Appropriate Personal Protective Equipment (PPE), including surgical masks, gowns, and gloves, is required for the collection and handling of contaminated clothing items in cell, dayroom, laundry, and areas with a confirmed case.
- Division 5 Laundry Officer and his/her crew are responsible for collecting and laundering potentially contaminated clothing items from Isolation and Quarantine tiers.
- o All potentially contaminated items, including bed linens, towels uniforms, and personal clothing, needs to be collected in clear, non-perforated bags.
- o Each bag must be labeled, such as "maybe contaminated," and transported immediately to Central Laundry.
- o In the Laundry room, wear disposable gloves, surgical masks, and gowns while handling potentially contaminated items and keep items away from your body, and separately from cleaned clothes.
- o In general, using the laundry detergent provided according to washing machine instructions and dry thoroughly using the hottest dryer temperatures recommended (170 degrees F. or above).
- o Stainless steel tables and other hard surface equipment used for this process in laundry rooms must be cleaned and disinfected between batches and at the end of the shift.
- o Place all used disposable gloves, facemasks, and other contaminated items in a clear, non-perforated bag and dispose of the bags in the Divisional dumpsters. Wash your hands with soap and water, or you may clean your hands with an alcohol-based hand sanitizer immediately after handling these items. Handwashing with soap and water for at least 20 seconds is preferred if hands are visibly dirty.

## SIGNATURE:

**CBM**

- Please follow the above protocol for daily cleaning and disinfection; however, any laundry should be handled and washed in Central Kitchen. Follow the above protocol for handing contaminated clothing items.
- Temperature gauge for dish machine in Central Kitchen should be routinely monitored every thirty (30) minutes to ensure rinse temperature is at 180 degrees F or above and documented.
- In the event that the rinse temperature on the dish machine falls below 180 degrees F, the following steps are required;
  - Immediately turn off the dish machine and call Ex. 5988 to report the problem.
  - Remove all trays and utensils, including trays and utensils, washed immediately before temperature fell below 180 degrees F.
  - Rewash all trays and utensils in the second dish machine, ensuring that the rinse temperature on the second dish machine is at 180 degrees F or above.
  - If the temperatures on both machines can not reach 180 degrees F, trays, and utensils must be washed utilizing the machines; however, use the three-compartment sinks to rinse and sanitize.
  - Follow the manufacture recommendations for the sanitizer "test kit" and check the sanitizer concentration every 15 minutes to ensure it meets the required concentration level.
  - Allow the trays and utensils to air dry (Do not wipe)
  - If both machines are non-functional, styrofoam trays must be used for food distributions.

- Implement a screening protocol, including temperature checks with a cut off at 100.4 degrees F for CBM staff and DOC inmate workers in the kitchen.
- As part of the Preventative Daily Cleaning and Disinfectant Guideline, CBM employees should be disinfecting their personal or commonly shared workspace and related AREAS touch surfaces with disinfectant AT LEAST every four hours OR BETWEEN TASKS, and at the end of each shift.

**SIGNATURE:**

| | |
|---|---|
| **From:** | Roland Lankah (Sheriff) |
| **Sent:** | Sunday, April 05, 2020 8:15 AM |
| **To:** | Elisabeth Glick (Sheriff) |
| **Cc:** | Jasmin JarlegoPenaranda (Sheriff) |
| **Subject:** | Fw: ACA training |

*Roland  Lankah, REHS/RS, MPH, PhD* (abd)
*Registered Environmental Health Specialist*
*Cook County Sheriff's Office/DOC*
**Office: (773) 674-5988**
**Cell: 312-590-3419**

---

**From:** Roland Lankah (Sheriff) <Roland.Lankah@cookcountyil.gov>
**Sent:** Monday, March 23, 2020 4:24 PM
**To:** Matthew Burke (Sheriff) <Matthew.Burke@cookcountyil.gov>
**Cc:** Jane Gubser (Sheriff) <Jane.Gubser@cookcountyil.gov>; Michael Miller (Sheriff)
<Michael.Miller1@cookcountyil.gov>; Jasmin JarlegoPenaranda (Sheriff) <Jasmin.JarlegoPenaranda@cookcountyil.gov>;
Rebecca Levin (Sheriff) <Rebecca.Levin@cookcountyil.gov>; David Chiko (Sheriff) <David.Chiko@cookcountyil.gov>
**Subject:** Re: ACA training

Sure-I have copied them on here.

Roland  Lankah, REHS/RS, MPH, PhD (abd)
Registered Environmental Health Specialist
Cook County Sheriff's Office/DOC
Office: (773) 674-5988
Cell: 312-590-3419

---

**From:** Matthew Burke (Sheriff) <Matthew.Burke@cookcountyil.gov>
**Sent:** Monday, March 23, 2020 4:17:50 PM
**To:** Roland Lankah (Sheriff) <Roland.Lankah@cookcountyil.gov>
**Cc:** Jane Gubser (Sheriff) <Jane.Gubser@cookcountyil.gov>; Michael Miller (Sheriff)
<Michael.Miller1@cookcountyil.gov>; Jasmin JarlegoPenaranda (Sheriff) <Jasmin.JarlegoPenaranda@cookcountyil.gov>
**Subject:** RE: ACA training

Thank you very much.
Will you please share with Dave Chiko and Becky Levin?
Stay safe.

Matt Burke
**Cook County Sheriff's Office | Department of Human Resources**
**3026 S. California Ave., Building 2 | Chicago, IL 60608**
**Office | TEL: 773-674-7921**
**Email|** Matthew.Burke@cookcountyil.gov

1

**ROLAND EXH 17**

The contents of this e-mail message and any attachments are intended solely for the addressee(s) named in this message. This communication is intended to be and to remain confidential and may be subject to applicable attorney/client and/or work product privileges. If you are not the intended recipient of this message, or if this message has been addressed to you in error, please immediately alert the sender by reply e-mail and then delete this message and its attachments. Do not deliver, distribute or copy this message and/or any attachments and if you are not the intended recipient, do not disclose the contents or take any action in reliance upon the information contained in this communication or any attachments.

**From:** Roland Lankah (Sheriff) <Roland.Lankah@cookcountyil.gov>
**Sent:** Monday, March 23, 2020 3:46 PM
**To:** Matthew Burke (Sheriff) <Matthew.Burke@cookcountyil.gov>
**Cc:** Jane Gubser (Sheriff) <Jane.Gubser@cookcountyil.gov>; Michael Miller (Sheriff) <Michael.Miller1@cookcountyil.gov>; Jasmin JarlegoPenaranda (Sheriff) <Jasmin.JarlegoPenaranda@cookcountyil.gov>
**Subject:** ACA training

Good evening Matt,

After the training with the American Correctional Association (ACA), some essential information which could be useful for DOC include:

INMATES:

- Protocol for elderly inmates with underlying medical conditions, including temperature checks, survey questionnaires  to determine symptoms such diarrhea and Nausea in addition to the the upper respiratory symptoms.
- Town Hall meetings or videos training for the inmate population to provide CoVID-19 health literacy, including preventive measures (handwashing, and reporting symptoms)
- Prepared for isolations, such as primary isolation and secondary isolation in the event of a large outbreak.
- Restrict non-essentials transfers between Divisions, other than for urgent needs.
- Identify whether inmates have had  flu shots in the past to eliminate misdiagnosis (could be useful for Cermak)
- Enhanced screening at Intakes (I would assume this is probably being carried out)
- Eliminate power wash in all Divisions to prevent transmission through aerosol.


OFFICERS AND CIVILIAN STAFF

- All employees and staff members should be screened using a temperature check with a cut off at 100.4 ºF prior to commencing daily tasks.
- Preventive plans in the events of employee shortage, cross-training
- Status of Vaccination of staff
- CoVID-19 awareness and open communication


Thanks,

*Roland  Lankah, REHS/ RS, MPH, PhD (abd)*
*Registered Environmental Health Specialist*
*Cook County Sheriff's Office/ DOC*
**Office: (773) 674-5988**

2

**ROLAND EXH 17**

*Cell: 312-590-3419*

**ROLAND EXH 17**



# COOK COUNTY DEPARTMENT OF CORRECTIONS
# MEMORANDUM

| TO: All Unit Superintendents | DATE: 4/01/2020 |
|---|---|
| FROM: Roland Lankah, Environmental Health Specialist. | |
| SUBJECT: Preventive Daily Cleaning and Disinfection | |

**Cleaning and Disinfection Shared Items and Workspace**

- Clean and disinfect personal or commonly shared workspace and related frequently touched surfaces with cleaning agent followed by disinfectant every four hours and at the end of each shift
- Frequently touched surfaces include, but not limited, tabletops, doorknobs, bathroom fixtures, toilets, phones, keyboards, chairs, light switches, desks top, elevator buttons, keys, etc
- All DOC chemicals, including cleaning agents, and disinfectant must be acquired from Central Chemical in Division 5
- Spray restraint/handcuff using canister sprayer or spray bottle with a bleach solution between uses.

**Cleaning and Disinfecting non-Quarantine and non-Isolation Tiers and Dorms**

- Tier Officers must require Tier workers to clean area (1) with a cleaning agent such as Sanifect, and followed by 2) disinfecting the area with bleach solution using the spray bottle and allow the area to air dry (do not wipe dry.)
    - Stainless steel tables and chairs in day rooms must be cleaned and disinfected before and after each meal.
    - All touch surfaces including, but not limited to, doorknobs, light switches, bathroom fixtures, toilets, and sinks desks and chairs, stair rail (See list above) must be cleaned, followed by disinfection once per shift.
    - Inmates must be required by the Tier Officers to clean and disinfect their cells at minimum, daily. If an inmate is unable to complete this task, the Tier Officer must report the issues to the Divisional Sanitation Officer. The Divisional Sanitation Officers and his/her crew are responsible for ensuring that the cell is cleaned and disinfected once per day
- Divisional Sanitation Officers must ensure that each tier and dorm have the required sanitation supply in the Tier Sanitation Kit
    - Bleach disinfectant should be replenished after every 8 hours
- All cleaning activities-both by the Sanitation Officers, inmates, and Tier workers should be documented in the Tier log book.

**Cleaning and Disinfecting Quarantine, and Isolation Tiers and Dorms**

- Appropriate Personal Protective Equipment (PPE), including surgical masks, gowns, and gloves, is required to clean and disinfect cell, dayroom, and any areas with a confirmed case.
- Divisional Sanitation Officers and his/her crew are responsible for carrying out the cleaning and disinfection in Isolation and Quarantine tiers.
    - Clean area (1) with a cleaning agent such as Sanifect, and followed by 2) disinfecting the area with bleach solution using the Canister sprayer or spray bottle and allow the area to air dry (do not wipe dry.)

# SIGNATURE:

- o Stainless steel tables and chairs in day rooms need to be cleaned and disinfected before and after each meal.
  - o Clean and disinfect all touch surfaces including, but not limited to, doorknobs, light switches, bathroom fixtures, toilets, sinks, rails, floors, desks, and chairs (See list above) every 4 hours and at the end of each shift.
- Place all used disposable gloves, facemasks, and other contaminated items in a clear, non-perforated bag before disposing of them in the Divisional dumpsters. After you remove your gloves, wash your hands with soap and water, or you may clean your hands with an alcohol-based hand sanitizer immediately after handling these items. Handwashing with soap and water is preferred if hands are visibly dirty.
- For training on proper PPE removal, please contact Roland Lankah at ext. 5988, and Jasmin JarlegoPenaranda at ext. 2638.

**Collecting and Returning Food Trays and Carts from Intake, Quarantine, and Isolation Tiers or Dorms**

- Appropriate Personal Protective Equipment (PPE), including surgical masks, gowns, and gloves, is required for food services (both food distribution and clean-up) on quarantine and isolation tiers and dorms.
- The Divisional Food Officers and his/her crew are responsible for food distribution and clean up in Isolation and Quarantine tiers. When cleaning up,
  - o Empty leftover food off the trays in lined garbage can and spray the trays in the tiers or dorms with a bleach solution. (Do not wipe dry.)
  - o Collect all tray waste from the tier or dorms and dispose of the bags in the dumpster immediately.
  - o Spray interior and exterior of insolated carts with a bleach solution. (Do not wipe dry.)
  - o All tasks should be completed prior to returning carts and trays to the Central kitchen.
  - o Food Officers and Food workers must wash hands with soap and water for at least 20 seconds, before putting on gloves for meal service and clean-up, and between tasks.

**Laundry (collecting and handling potentially contaminated clothing items) from Quarantine and Isolation Tiers**

- Appropriate Personal Protective Equipment (PPE), including surgical masks, gowns, and gloves, is required for the collection and handling of contaminated clothing items in cell, dayroom, laundry, and areas with a confirmed case.
- Division 5 Laundry Officer and his/her crew are responsible for collecting and laundering potentially contaminated clothing items from Isolation and Quarantine tiers.
  - o All potentially contaminated items, including bed linens, towels uniforms, and personal clothing, needs to be collected in clear, non-perforated bags.
  - o Each bag must be labeled, such as "maybe contaminated," and transported immediately to Central Laundry.
  - o In the Laundry room, wear disposable gloves, surgical masks, and gowns while handling potentially contaminated items and keep items away from your body, and separately from cleaned clothes.
  - o In general, using the laundry detergent provided according to washing machine instructions and dry thoroughly using the hottest dryer temperatures recommended (170 degrees F. or above).
  - o Stainless steel tables and other hard surface equipment used for this process in laundry rooms must be cleaned and disinfected between batches and at the end of the shift.
  - o Place all used disposable gloves, facemasks, and other contaminated items in a clear, non-perforated bag and dispose of the bags in the Divisional dumpsters. Wash your hands with soap and water, or you may clean your hands with an alcohol-based hand sanitizer immediately after handling these items. Handwashing with soap and water for at least 20 seconds is preferred if hands are visibly dirty.

# SIGNATURE:

**ROLAND EXH 18**

**CBM**

- Please follow the above protocol for daily cleaning and disinfection; however, any laundry should be handled and washed in Central Kitchen. Follow the above protocol for handing contaminated clothing items.
- Temperature gauge for dish machine in Central Kitchen should be routinely monitored every thirty (30) minutes to ensure rinse temperature is at 180 degrees F or above and documented.
- In the event that the rinse temperature on the dish machine falls below 180 degrees F, the following steps are required;
  - Immediately turn off the dish machine and call Ex. 5988 to report the problem.
  - Remove all trays and utensils, including trays and utensils, washed immediately before temperature fell below 180 degrees F.
  - Rewash all trays and utensils in the second dish machine, ensuring that the rinse temperature on the second dish machine is at 180 degrees F or above.
  - If the temperatures on both machines can not reach 180 degrees F, trays, and utensils must be washed utilizing the machines; however, use the three-compartment sinks to rinse and sanitize.
  - Follow the manufacture recommendations for the sanitizer "test kit" and check the sanitizer concentration every 15 minutes to ensure it meets the required concentration level.
  - Allow the trays and utensils to air dry (Do not wipe)
  - If both machines are non-functional, styrofoam trays must be used for food distributions.

- Implement a screening protocol, including temperature checks with a cut off at 100.4 degrees F for CBM staff and DOC inmate workers in the kitchen.
- As part of the Preventative Daily Cleaning and Disinfectant Guideline, CBM employees should be disinfecting their personal or commonly shared workspace and related AREAS touch surfaces with disinfectant AT LEAST every four hours OR BETWEEN TASKS, and at the end of each shift.

**SIGNATURE:**



## COOK COUNTY DEPARTMENT OF CORRECTIONS
## MEMORANDUM

| TO: All Unit Superintendents | DATE: 4/01/2020 |
|---|---|
| FROM: Roland Lankah, Environmental Health Specialist. | |
| SUBJECT: Vehicle Cleaning/Disinfection Procedure | |

Please be advised that each Division/Unit shall maintain and adhere to the strict vehicle interior "touch surfaces" cleaning/disinfection procedure described below. Touch surfaces include, but not limited to, the steering wheel, dashboard, door handles, internal side windows, seats (sides, back, and front), seat belts (both sides), seat belt harness, and floor. The procedure shall be completed prior to utilizing vehicles for the transport of inmates off the compound, and for Electronic Monitoring (EM):

1. Prior to the transporting of inmate(s), the Transportation Officer shall ensure that "touch surfaces" in the transporting vehicle are in a condition which is cleanable and durable.

2. The Transportation Officer shall inspect the seats and interior of the vehicle for damage, excessive wear, rips, and tears that could effectively render it un-cleanable. Any severely damaged surfaces shall be removed from service and repaired or replaced such that they are easily cleanable.

3. The Transporting Officer shall be responsible for ensuring that the interior touch surfaces are adequately cleaned and disinfected using *only* the authorized pre-measured diluted chemicals as provided in the Transport Vehicle Sanitation Kit*.

4. The Transportation Officer shall follow the procedure that is included in the Transport Vehicle Sanitation Kit and as indicated below:

   a. Personal Protective Equipment (PPE), including (gloves and masks), should be utilized when *necessary*.
   b. First, use the Approved CCDOC *Cleaner* (Sanifect plus) in its diluted ratio as provided to clean all touch surfaces and wipe them dry.
   c. Second, use the Approved CCDOC *Disinfectant* (bleach) in its diluted ratio as provided to disinfect all touch surfaces and allow to air dry.

*NOTE: Each Transport Vehicle Sanitation Kit consists of one 24 oz spray bottle of cleaner- (Sanifect plus solution), one 24 oz spray bottle of disinfectant (bleach solution), and 4 cloth rags. Chemicals and rags can be replenished at the Div 5 Central Chemical. PPE must be acquired from the Divisional/Unit Superintendents

**SIGNATURE:**

ROLAND EXH 19

| | |
|---|---|
| **From:** | Roland Lankah (Sheriff) |
| **Sent:** | Monday, April 06, 2020 11:36 AM |
| **To:** | Elisabeth Glick (Sheriff) |
| **Subject:** | Fw: Preventing Chemical Toxicity |
| **Attachments:** | preventing chemical toxicity.pdf |

*Roland Lankah, REHS/RS, MPH, PhD* (abd)
*Registered Environmental Health Specialist*
*Cook County Sheriff's Office/DOC*
**Office: (773) 674-5988**
**Cell: 312-590-3419**

---

**From:** Roland Lankah (Sheriff)
**Sent:** Monday, April 6, 2020 11:26 AM
**To:** Martha Yoksoulian (Sheriff) <Martha.Yoksoulian@cookcountyil.gov>; Karen Jones-Hayes (Sheriff) <Karen.Jones-Hayes@cookcountyil.gov>; Erica Queen (Sheriff) <Erica.Queen@cookcountyil.gov>; Salomon Martinez (Sheriff) <Salomon.Martinez@cookcountyil.gov>; Don Beachem (Sheriff) <Don.Beachem@cookcountyil.gov>; Hugh Walsh (Sheriff) <Hugh.Walsh@cookcountyil.gov>; Jason Cianciarulo (Sheriff) <Jason.Cianciarulo@cookcountyil.gov>; Esequiel Iracheta (Sheriff) <Esequiel.Iracheta@cookcountyil.gov>; Yolanda Debro (Sheriff) <Yolanda.Debro@cookcountyil.gov>
**Cc:** David Chiko (Sheriff) <David.Chiko@cookcountyil.gov>; Richard Brogan (Sheriff) <Richard.Brogan@cookcountyil.gov>; Larry Gavin (Sheriff) <Larry.Gavin@cookcountyil.gov>; Rebecca Levin (Sheriff) <Rebecca.Levin@cookcountyil.gov>; Michael Miller (Sheriff) <Michael.Miller1@cookcountyil.gov>; Jane Gubser (Sheriff) <Jane.Gubser@cookcountyil.gov>; Jasmin JarlegoPenaranda (Sheriff) <Jasmin.JarlegoPenaranda@cookcountyil.gov>; mark.wagner@cbmpremier.com <mark.wagner@cbmpremier.com>
**Subject:** Preventing Chemical Toxicity

Good morning Supt,
Please see that attached document for you and your staff.
Please let me know if you have any questions/concerns.

Thanks,

*Roland Lankah, REHS/RS, MPH, PhD* (abd)
*Registered Environmental Health Specialist*
*Cook County Sheriff's Office/DOC*
**Office: (773) 674-5988**
**Cell: 312-590-3419**

1

**ROLAND EXH 20**



**COOK COUNTY DEPARTMENT OF CORRECTIONS
MEMORANDUM**

| TO: All Unit Superintendents | DATE: 4/06/2020 |
|---|---|
| FROM: Roland Lankah, Environmental Health Specialist. | |
| SUBJECT: Preventing Chemical Toxicity | |

This guidance is intended to provide awareness to CCDOC employees to maintain a safe and healthful workplace. As we continue to apply preventive measures for COVID19, it is crucial to remember that improperly using chemicals may unintentionally release toxic materials that may be harmful to you and your fellow employees. For example, a toxic substance may be corrosive and flammable, or mixing certain chemical products such as chlorine bleach and ammonia cleaners can be explosive, resulting in injury or death. While everyone can be susceptible, pregnant women, employees, and inmates with immune-compromised conditions may also be at an increased risk of toxicity.

CCDOC is requesting all employees' cooperation and to refrain from the use of outside chemicals for cleaning and disinfecting workspace. It is our collective responsibility to adhere to the strict Preventive Dialy Cleaning and Disinfection Protocol. Material Safety Data Sheets are provided for all CCDOC approved chemicals used throughout the compound, and designated employees have been appropriately trained to properly mix or dilute all chemicals at the exact ratio specified by the manufacturer.
Employees must follow the procedure included in the protocol for cleaning and disinfecting. Again only CDOC chemicals, including cleaning agents and disinfectants, can be used and must be acquired from Central Chemical Office in Division 5. The cleaning agent and disinfectant can be requested through the Divisional Sanitation Officers.

**The following items are allowed to be brought in from outside; however, they must be for personal use only and no sharing.**
- Hand sanitizer
- Clorox disinfecting wipes

**SIGNATURE:**

Good morning Supt,

Please follow a similar enhanced sanitation procedure for AGE as we have established for ILI. It is essential to be aware that this illness spread rapidly. Common symptoms include diarrhea, vomit, etc. As a result, contaminated hands and surfaces are major sources of transmission. For this reason, it would be appropriate to ensure that all affected areas are (1) cleaned, and (2) disinfected. All workers must wear the proper PPE (gowns and gloves), and should thoroughly wash their hands with soap and water upon completing the cleaning tasks. Concentration for bleach solution will be increased to properly disinfect the affected areas.

Please refer to the message below and advice the Divisional Sanitation Officers to see that the listed living unit(s) receives enhanced cleaning and disinfection with Sinifect solution and bleach solution respectively of all touch surfaces in cell(s) and common areas of the living unit where these inmates are housed until the date indicated.

It's always advisable to get ahead of these types of illnesses before they spread.

--Please follow the procedure below:

**Divisional Enhanced-Sanitation Process:**

❖ Pre-mixed bleach solution (>5000ppm) must be collected from Central Chemical in Division 5.

❖ If Division does not already have Sanifect solution, please acquire this chemical from Central Chemical in Division 5
❖ Gowns and rags are available in Support Services
❖ Pre-wash or clean surface with Sanifect solution using rags, then apply the bleach solution with rags, or use the canister to spray the bleach solution.
❖ Allow the solution to contact surface for at least 5 minutes for optimum effectiveness. Afterward, rinse and-or allow the area to air dry
❖ Continue the enhanced Sanitation process until the date indicated by Cermak Health and Hospital Services infection Control Department.
❖ All potentially contaminated clothing must be collected in a non-perforated bag, labeled and sent to Central Laundry to be laundered.
❖ Please indicate AGE or ILI on the bag.

**Laundry Process**

❖ Keep contaminated and uncontaminated clothes separate.
❖ Handle contaminated linens and laundry as little as possible utilizing the appropriate PPE (gloves, and gowns).
❖ Wash contaminated items separately in a pre-wash cycle. Then, use a regular wash cycle—using detergent—and dry separately from uncontaminated clothing at high temperature (170 degrees Fahrenheit or above).
❖ Make sure that all soiled linens, clothes are kept away from cleaned items

❖ Make sure that workers are thoroughly washing their hands with soap and water upon completion of laundry tasks or when changing tasks.

ROLAND EXH 21

## BLEACH DILUTION CALCULATOR

**1. Enter the approximate parts per million (PPM) that you need*:**  | 5000 | PPM

*The following are recommended ranges based on the task:

| Recommended PPM | Disinfecting task |
|---|---|
| 600-700 | Food/water bowls, toys |
| 1500-1700 | Routine disinfection of surfaces |
| 6000-8000 | Disinfecting to kill ringworm |

**2. Enter the concentration of the bleach you are using**:**  | 4.2 | %

**Find this in the list of active ingredients, listed as sodium hypochlorite at x%.

**3. Enter the number of ounces in the container you are using^:**  | 512 | ounces

^Common container sizes are a 24 ounce spray bottle, 1 quart container, 1 gallon container, and 5 gallon container.

Conversion to ounces:

| | |
|---|---|
| 1 quart = 32 ounces | |
| 1 gallon = 128 ounces | |
| 5 gallon = 640 ounces | |

**Add the following amount of bleach to your container:**

| | Ounces: | 61.0 | ≈ | 61 | OR |
|---|---|---|---|---|---|
| | Tablespoons: | 121.9 | ≈ | 122 | OR |
| | Cups: | 7.6 | ≈ | 7 2/4 | |

Note: convert the decimal amount to the nearest fraction or whole number, or use the estimated fraction to the nearest quarter after the approximately equal (≈) sign.

**You have made a dilution of:** 1: 8

Other useful conversions:

| |
|---|
| 1 Tablespoon = 0.5 ounces |
| 1 cup = 8 ounces = 16 Tablespoons |
| 1 quart = 4 cups |

*Created by the Public Health - Seattle & King County Pet Business Program. For more information, call 206.263.9566.*

**ROLAND EXH 22**

## Registration approved for Web seminar: Coronavirus COVID-19 Corrections Update

| | |
|---|---|
| Organizer | ACA Online Meetings <acaevents@aca.org> |
| Time | Monday, March 23, 2020 1:00 PM-3:00 PM |
| Location | https://acaevents.webex.com/acaevents/onstage/g.php?MTID=e07a8a49064948c3ee1ecbfbfc1419a7a |

**ROLAND EXH 23**

Case 1:20-cv-02134 Document #: 140-1 Filed: 04/06/20 Page 258 of 497 PageID #:6458



**Centers for Disease Control and Prevention**
CDC 24/7: Saving Lives, Protecting People™

## Coronavirus Disease 2019 (COVID-19)

# Cleaning And Disinfecting Your Home
Everyday Steps and Extra Steps When Someone Is Sick
Printer-friendly version 🔴 [3 pages]

## How to clean and disinfect



**Wear disposable gloves** to clean and disinfect.

### Clean

- **Clean surfaces using soap and water.** Practice routine cleaning of frequently touched surfaces.

**High touch surfaces include:**
Tables, doorknobs, light switches, countertops, handles, desks, phones, keyboards, toilets, faucets, sinks, etc.



### Disinfect

- Clean the area or item with soap and water or another detergent if it is dirty. Then, use a household disinfectant.

- **Recommend use of EPA-registered household disinfectant** ☐ .
  **Follow the instructions on the label** to ensure safe and effective use of the product. Many products recommend:
  ◦ Keeping surface wet for a period of time (see product label)
  ◦ Precautions such as wearing gloves and making sure you have good ventilation during use of the product.

- **Diluted household bleach solutions may also be used** if appropriate for the surface. Check to ensure the product is not past its expiration date. Unexpired household bleach will be effective against coronaviruses when properly diluted.
  **Follow manufacturer's instructions** for application and proper ventilation. Never mix household bleach with ammonia or any other cleanser.
  **Leave solution** on the surface for **at least 1 minute**
  **To make a bleach solution**, mix:
  ◦ 5 tablespoons (1/3rd cup) bleach per gallon of water
    OR

**ROLAND EXH 24**

◦ 4 teaspoons bleach per quart of water

- **Alcohol solutions with at least 70% alcohol.**

> **More details:** Complete Disinfection Guidance



## Soft surfaces

For soft surfaces such as **carpeted floor, rugs, and drapes**

- **Clean the surface using soap and water** or with cleaners appropriate for use on these surfaces.
- **Launder items** (if possible) according to the manufacturer's instructions.Use the warmest appropriate water setting and dry items completely.

OR

- **Disinfect with an EPA-registered household disinfectant.** These disinfectants ⬚ meet EPA's criteria for use against COVID-19.



## Electronics

For electronics, such as **tablets, touch screens, keyboards, and remote controls.**

- Consider putting a **wipeable cover** on electronics
- Follow **manufacturer's instruction** for cleaning and disinfecting
  ◦ If no guidance, use alcohol-based wipes or sprays containing at least 70% alcohol. Dry surface thoroughly.



## Laundry

For clothing, towels, linens and other items

- Launder items according to the manufacturer's instructions. Use the **warmest appropriate water setting** and dry items completely.
- **Wear disposable gloves** when handling dirty laundry from a person who is sick**.**
- Dirty laundry from a person who is sick **can be washed with other people's items**.
- **Do not shake** dirty laundry.
- Clean and **disinfect clothes hampers** according to guidance above for surfaces.
- Remove gloves, and **wash hands right away**.

## Clean hands often

- **Wash your hands often** with soap and water for 20 seconds.
  ◦ Always wash immediately after removing gloves and after contact with a person who is sick.

**ROLAND EXH 24**



- **Hand sanitizer:** If soap and water are not readily available and hands are not visibly dirty, use a hand sanitizer that contains at least 60% alcohol. However, if hands are visibly dirty, always wash hands with soap and water.
- **Additional key times to clean hands** include:
  - After blowing one's nose, coughing, or sneezing
  - After using the restroom
  - Before eating or preparing food
  - After contact with animals or pets
  - Before and after providing routine care for another person who needs assistance (e.g. a child)
- **Avoid touching** your eyes, nose, and mouth with unwashed hands.

# When Someone is Sick



## Bedroom and Bathroom

Keep **separate bedroom and bathroom for a person who is sick** (if possible)

- The person who is sick should stay separated from other people in the home (as much as possible).
- **If you have a separate bedroom and bathroom:** Only clean the area around the person who is sick when needed, such as when the area is soiled. This will help limit your contact with the person who is sick.
  - Caregivers can **provide personal cleaning supplies** to the person who is sick (if appropriate). Supplies include tissues, paper towels, cleaners, and EPA-registered disinfectants ⧉ . If they feel up to it, the person who is sick can clean their own space.
- **If shared bathroom:** The person who is sick should clean and disinfect after each use. If this is not possible, the caregiver should wait as long as possible before cleaning and disinfecting.
- See precautions for household members and caregivers for more information.

## Food



- **Stay separated:** The person who is sick should eat (or be fed) in their room if possible.
- **Wash dishes and utensils using gloves and hot water:** Handle any used dishes, cups/glasses, or silverware with gloves. Wash them with soap and hot water or in a dishwasher.
- Clean hands after taking off gloves or handling used items.

## Trash

**ROLAND EXH 24**



- **Dedicated, lined trash can:** If possible, dedicate a lined trash can for the person who is sick. Use gloves when removing garbage bags, and handling and disposing of trash. Wash hands afterwards.

**More details:** Complete Disinfection Guidance

## More Information

| | |
|---|---|
| Symptoms | Get your home ready |
| What to do if you are sick | Schools, workplaces, and community locations |
| Frequently asked questions | Healthcare professionals |
| COVID-19 and Animals | |

Page last reviewed: April 2, 2020

Content source: National Center for Immunization and Respiratory Diseases (NCIRD), Division of Viral Diseases

**ROLAND EXH 24**

| SANITATION WALK THRU | | Inspection Start Date: | 3/4/2020 | | Accompanied By: | Ofc. Garibay |
| **Division 8 Annex** | | Inspection End Date: | 3/4/2020 | | | |
| | | Inspected By: | Jasmin Jarlego Penaranda | | | |

| **GENERAL COMPLIANCE RELATED ISSUES** | *Showers with deficiencies were much improved.* |
| **SANITATION ROOM OBSERVATION** | *Supplies are adequate to perform daily cleaning tasts* |

| | | **DEFICIENCIES** | **CORRECTIVE ACTIONS** | **DFM/WORK ORDERS** (BRM- bathroom /SHR-shower) **or** *PEST CONTROL | *SUPPLIES NEEDED* |
|---|---|---|---|---|---|
| **F I R S T  F L O O R** | A | *Vacant Tier* | | | |
| | B | *Vacant Tier* | | | |
| | C | *Vacant Tier* | | | |
| | D | *Vacant Tier* | | | |
| | E | *Vacant Tier* | | | |
| | F | *Vacant Tier* | | | |
| | G | *Vacant Tier* | | | |
| | H | *Vacant Tier* | | | |
| | J | *Vacant Tier* | | | |
| | K | *Vacant Tier* | | | |
| | L | *Vacant Tier* | | | |
| | M | *Vacant Tier* | | | |
| **S** | A | *Vacant Tier* | | | |
| | B | Shower walls need to be scrubbed throughly | Tier did not meet compliant during follow up visit - **TIER OFFICER/S PLEASE FOLLOW UP** | **DFM**: shower constant running water (work order placed) | |

| | | | | | |
|---|---|---|---|---|---|
| S E C O N D<br><br>F L O O R | C | *Vacant Tier* | | | |
| | D | Cleaned and maintained - keep up the good work! | | | |
| | E | Cleaned and maintained - keep up the good work! | | | |
| | F | Cleaned and maintained - keep up the good work! | | **DFM:** leaking toilet | deck brush, broom |
| | G | *Vacant Tier* | | | |
| | H | *Vacant Tier* | | | |
| | J | *Vacant Tier* | | | |
| | K | *Vacant Tier* | | | |
| | L | Cleaned and maintained - keep up the good work! | | **DFM:** leaking toilet | |
| | M | Shower walls need to be scrubbed throughly | Tier Officer, please follow up on Bathroom/Showers clean up | | |

## GENERAL NOTES:

| | |
|---|---|
| **FOCUS** | Tiers are cleaned and had much improved since the last visit. Thank you Ofc. Garibay for your hard work. |
| **Sanitation Room** | Supplies were replenished by Support Services |
| **Documentation Compliant** | Will follow up. |
| **Bloodborne Pathogen** | Provided 1 set of Bloodborne pathogen kit |
| **Next Visit Goal** | Tiers are continuing to utilize sheets as privacy curtain. |
| **Work Order/Pest Ctrl** | DFM: 3 work order- second request. Informed Facilities to shut off all shower heads near the shower entrance where predominantly floods when used. |
| **Appreciation** | Thank you Ofc. Garibay for assisting me during the walk thru. |

## SHERIFF WAREHOUSE

*Supply should be ordered by the Divisional Sanitiation Officer vie email to the Sheriff supply officer based on the current Divisional Supply Inventory, the Sanitation Supply Information document, and the Inspection Report.*

## SUPPORT SERVICES (Division 5)

*Supply should be ordered by the Divisional Sanitation Officer based on the current Divisional Supply Inventory, the Sanitation Supply Information document, and the Inspection Report.*

**ROLAND EXH 25**



# DEPARTMENT OF CORRECTIONS
## DIVISION/UNIT SANITATION LOGBOOK

| DATE | SHIFT | COMPLETE | TASK COMPLETED / ADDITIONAL INFORMATION | OFFICER (Signature/Star) |
|---|---|---|---|---|
| 23/mar20 | 7-3 | ☑ | **Living Units** – Restock cleaning supplies as needed | |
| 23/mar20 | 7-3 | ☑ | **Living Units** – Living unit to be cleaned by the detainee worker | |
| 23/mar20 | 7-3 | ☑ | **Corridors** – Sweep and mop floors | |
| 23/mar20 | 7-3 | ☑ | **Corridors** – Clean window ledges | |
| 23/mar20 | 7-3 | ☑ | **Corridors** – Clean and replenish paper products to officer's washrooms | |
| 23/mar20 | 7-3 | ☑ | **Corridors** – Clean elevators, doors and tracks | |
| 23/mar20 | 7-3 | ☑ | **Corridors** – Remove all trash | |
| 23/mar20 | 7-3 | ☑ | **Basement** – Sweep and mop entire floor | |
| 23/mar20 | 7-3 | ☐ | **Basement** – Clean breakroom | |
| 23/mar20 | 7-3 | ☑ | **Basement** – Clean male and female locker / restrooms area | |
| 23/mar20 | 7-3 | ☑ | **Basement** – Clean the Sanitation/Chemical room | |

**NOTES:**

WATCH COMMANDER (Print Name): CT. Rodriguez

WATCH COMMANDER (Signature): CT. R #762

| STAR NUMBER: | 752 |
|---|---|
| DATE: | 23 mar 20 |
| TIME: | 1400 |

(FCN-20)(MAR 19)

**ROLAND EXH 26**

# DEPARTMENT OF CORRECTIONS
## DIVISION/UNIT SANITATION LOGBOOK

| DATE | SHIFT | COMPLETE | TASK COMPLETED / ADDITIONAL INFORMATION | OFFICER (Signature/Star) |
|------|-------|----------|------------------------------------------|--------------------------|
| 23 mar 20 | 7-3 | ☑ | **Basement** – Clean Intake | |
| 22 mar 20 | 7-3 | ☑ | **Basement** – Remove all trash | |
| 23 mar 20 | 7-3 | ☑ | **Basement** – Clean Bullpens | |
| 23 mar 20 | 7-3 | ☑ | **Basement** – Clean Security | |
| 23 mar 20 | 7-3 | ☑ | **Basement** – Sweep and mop Chapel | |
| | 7-3 | ☐ | **Basement** – Sweep and mop Law Library (Monday thru Friday) | |
| 23 mar 20 | 7-3 | ☑ | **Basement** – Remove all trash from the Shift Commander's Office and Security | |
| 23 mar 20 | 7-3 | ☑ | **First Floor** – Clean attorney visiting area | |
| 23 mar 20 | 7-3 | ☐ | **First Floor** – Sweep and mop corridor floor | |
| 23 mar 20 | 7-3 | ☑ | **First Floor** – Remove all trash | |
| 23 mar 20 | 7-3 | ☑ | **Second Floor** – Clean attorney visiting area | |
| 23 mar 20 | 7-3 | ☑ | **Second Floor** –Sweep and mop corridor floor | |

**NOTES:**

WATCH COMMANDER (Signature): LT. _R. #732_

WATCH COMMANDER (Print Name): LT. RODRIGUEZ

DATE: 23 MAR 20    TIME: 1400

STAR NUMBER: 732

(FCN-20)(MAR 19)

ROLAND EXH 26



# DEPARTMENT OF CORRECTIONS
## DIVISION/UNIT SANITATION LOGBOOK

| DATE | SHIFT | COMPLETE | TASK COMPLETED / ADDITIONAL INFORMATION | OFFICER (Signature/Star) |
|---|---|---|---|---|
| 22 mar 20 | 7-3 | ☑ | Second Floor – Remove all trash | |
| | 7-3 | ☐ | Third Floor – Remove all trash | |
| | 7-3 | ☐ | Third Floor – Clean attorney visiting area | |
| 23 mar 20 | 7-3 | ☑ | Third Floor – Sweep and mop corridor floor | |
| 23 mar 20 | 7-3 | ☑ | Third Floor – Remove all trash | |
| 23 mar 20 | 7-3 | ☑ | Remove all trash from Division Nine out to the dumpster to keep the dumpster area clean | |
| 23 mar 20 | 7-3 | ☑ | Enhanced cleaning | |
| 23 mar 20 | 7-3 | ☑ | Soap passed out to each tin | |
| 23 mar 20 | 7-3 | ☑ | classrooms cleaned sanitized w/s tein | |
| | 7-3 | ☑ | | |
| | 7-3 | ☐ | | |
| | 7-3 | ☐ | | |
| | 7-3 | ☐ | | |
| | 7-3 | ☐ | | |

**NOTES:** Door handles throughout building sprayed with sanitizer, staff restrooms sprayed with sanitizer (bathroom and towel), all elevator panels sprayed daily, sanitize all phones sanitized all pc, sanitized, booth, rover, room sanitize

| WATCH COMMANDER (Signature): LT. Rodriguez | DATE: | |
|---|---|---|
| WATCH COMMANDER (Print Name): LT. Rodriguez | TIME: | STAR NUMBER: |
| | 23 Mar 20 1400 | 752 |

(FCN-20)(MAR 19)

ROLAND EXH 26

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| ANTHONY MAYS, Individually and on behalf of a class of similarly situated persons; and JUDIA JACKSON, as next friend of KENNETH FOSTER, Individually and on behalf of a class of similarly situated persons<br><br>Plaintiffs-Petitioners,<br><br>v<br><br>THOMAS DART, Sheriff of Cook County,<br><br>Defendant-Respondent | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)    Case No. 20-cv-2134 |

## DECLARATION OF BRAD CURRY

I, Brad Curry, pursuant to 28 U.S.C. § 1746, declare as follows:

1. I have been employed by the Cook County Sherriff's Office (CCSO) since January 2015. I am currently the Chief of Staff, a position I have held since January 2019. My earlier titles were First Assistant Executive Director, followed by Bureau Chief of Corrections, Courts, Investigations, and Intelligence, and most recently Chief Operating Officer. During my time at the CCSO, I have been responsible for overseeing the Cook County Department of Corrections (the CCDOC or jail) and the Cook County Courts System (the courts). Before joining the CCSO, I spent 26 years working in corrections at the Illinois Department of Corrections.

2. As Chief of Staff, I oversee all CCSO operations. I oversee all CCSO efforts to address, combat and limit the spread of Novel Coronavirus ("COVID-19") within our Departments, the Jail and in the County generally.

3. I am familiar with the CCSO's efforts to combat and prevent the spread of COVID-19, which has impacted the international community since the first case was identified in December 2019.

4. The facts set forth in this declaration are drawn from information I have received in my work with the CCSO in response to the COVID-19 pandemic. It does not contain all of the facts that I know about the matters discussed below.

## Background

5. The Cook County Sheriff's Office is the main law enforcement agency serving Cook County. It contains several departments, including the Cook County Sherriff's Police, the

1

Court Services Division, and the Cook County Department of Corrections and has over 6,900 members. Among other things, the CCSO oversees individuals in Cook County being held on criminal charges pending resolution of their criminal cases, following which they, if convicted, are sent to the Illinois Department of Corrections to serve their sentences.

6. Cook County detainees are held in custody at the Cook County Department of Corrections (referred to herein as "CCDOC" or the "Jail") pursuant to Court Order, which currently houses approximately 4,500 detainees. The Jail consists of a single site compound over 96 acres, comprised of 11 Divisions and numerous administrative buildings. Healthcare and emergency medical response is managed within the Jail by Cermak Health Services (Cermak), a division of Cook County Health, which is a separate and distinct entity from the CCSO and does not report to the CCSO.

7. Prior to the viral pandemic, detainees were regularly transported from the Jail to those courthouses for court appearances. On an average day, approximately 700 to 900 detainees are transported to and from court, with the majority of them to the Leighton Criminal Courthouse. Detainees had scheduled visitation with family. Programming in various forms occurred throughout the facility requiring collected detainees and staff. Eligible detainees went to high school or worked on their GED. Correctional officers and deputy sheriffs are responsible for overseeing the detainees in either the jail itself or the lock ups in the courthouses.

8. Beginning in early 2020, the CCSO began implementing procedures to prepare for the influenza season. Cermak began routinely testing new detainees for flu-like symptoms in January.

9. On or around January 2020, the CCSO began planning to activate emergency operational and staffing protocols, in anticipation of the public health crisis inevitably impacting standard operating procedures.

10. In February and March, the DOC began making specific modifications to existing procedures to directly address the threat of COVID-19. The CCSO assessed the looming threat of the spread of the virus into Cook County and began planning accordingly.

11. In response, the CCSO developed a plan to respond to the crisis and establish procedures to be implemented if and as the virus entered the Jail. The plan, which by its nature changes, is attached hereto as a supporting exhibit in its current form as of April 6, 2020. The procedures, directives and orders incorporated into the operations plan have generally been put into effect throughout the Jail and other departments.

12. The CCSO did not complete any of this alone. We have partnered with Cermak Health Services, Chicago Department of Public Health, Illinois Department of Public Health, the criminal justice stakeholders of Cook County, Unions and Cook County Department of Public Health.

**COVID-19 State of Emergency**

2

13. On March 9, 2020, Governor Pritzker declared Illinois a disaster area because of the dangers of COVID-19. As of March 9, 2020, there were 5710 detainees in physical custody at the Cook County Jail. There were approximately 422 confirmed COVID-19 cases in Illinois at that time.

14. On or about March 12, 2020 the CCSO implemented the following preventative measures:

   a. The CCSO Critical Incident Command Center ("CICC") was activated to monitor all COVID-19 factors that could affect aspects of the CCSO.
   b. All visitors, vendors, volunteers, attorneys, and contractors were screened for symptoms of COVID-19, including taking temperatures. Anyone exhibiting symptoms was denied entry and encouraged to seek medical attention.
   c. CCDOC began creating receiving units for detainees to be held for their first week in custody to monitor for symptoms of COVID-19. Those who showed no symptoms after seven days would be moved to general population units. These receiving units have been active for at least fourteen (14) days as of this declaration.
   d. Visits with detainees were limited to one person, once a week, for 15 minutes. CCDOC expanded access to phone calls and video visitation across the compound.
   e. CCDOC increased cleaning and sanitation efforts throughout the facility.
   f. Cermak Health Services began actively educating detainees about COVID-19 so they can report symptoms they may experience or observe. Detainees were also educated on how to stop the spread of infection through frequent handwashing and other good hygiene practices.

15. On or about March 13, 2020, all tours of CCDOC and large gatherings within the facility were suspended. Outside food for detainees was banned.

16. On or about March 15, 2020, all in-person detainee visits were suspended. Attorneys and clergy members were directed to schedule in-person visits sparingly, and any essential visitors would be subject to screening for symptoms. Currently, confidential attorney visits may still occur 7 days per week during the day and will be accommodated behind visitor glass.

17. On or about March 16, 2020 CCDOC began preparing the empty Mental Health Transition Center barracks for additional isolation housing for detainees.

18. On March 17, 2020 the Cook County Board of Commissioners declared a State of Emergency related to the COVID-19 pandemic.

19. On March 20, 2020 the Governor of Illinois issued an executive order for citizens to shelter-in-place. CCSO instituted the following precautionary measures to address COVID-19:

   a. Continued efforts to obtain and distribute Personal Protective Equipment ("PPE").
   b. Established additional areas at the jail to be used for separation and quarantine, including opening previously closed buildings and requesting tents for outdoor areas.

      c. Began screening all new detainees and persons arrested by the Sheriff's Office with the Cook County Health COVID-19 questionnaire, including temperature checks.

      d. Continued use of receiving tiers where new detainees coming into the CCDOC are housed together for seven days of observation. If detainees do not show symptoms of the virus after seven days, they are reviewed by Cermak Health Services for clearance to be moved to general population. This waiting period has expanded to 14 days as of April 6, 2020.

      e. Created contingency plans in the event of staff shortages.

      f. Increased availability of cleaning supplies across all departments.

      g. Continued working with other stakeholders to reduce transportation of detainees to court.

      h. Began airing messages for detainees on televisions across the compound regarding the symptoms of COVID-19 and proper hand washing techniques.

      i. Began airing messages for detainees on televisions regarding court closures and contacting attorneys to address any concerns.

      j. Began posting messages to families on our website regarding canceling of visits and information regarding the bond process.

20. The CCSO disseminates information and directives for detainees and staff on a daily basis regarding screening, social distancing, obtaining supplies, and who to contact with any concerns. As of April 2, 2020 the CCSO began issuing daily information regarding tiers designated as isolation or quarantine tiers.

21. CCDOC is in constant, daily communication with Cermak Health Services regarding medical treatment for detainees and implementation of CDC guidelines, and use of video-conferencing for medical appointments unrelated to COVID-19.

22. CCDOC is in constant, daily communications with our various collective bargaining units and their union representatives to ensure that staff are safe and their concerns are heard.

23. Since March 10, 2020, I have authorized a daily message to all staff regarding a wide variety of pandemic related issues. Those messages included helpful data, information on keeping safe, PPE guidance, procedural changes and reporting pathways. Attached hereto as supporting exhibits are true and accurate copy of each of those messages and its attachments.

24. I am critically aware of the fear and apprehension inherent in this pandemic amongst our staff, management and the detainees. Through a combination of clear processes, procedures, instruction, daily encouragement, communication and easy reporting structures, we sought to alleviate fear and apprehension in all people involved in the Jail.

25. On March 12, we activated the Critical Incident Command Center on the Jail Compound. The CICC serves as the epicenter of information for all CCSO operations and departments. The CICC works in conjunction with all departments in identifying and addressing issues related to COVID-19. The command structure and duties are articulated in the operations plan attached hereto as a supporting exhibit.

26. All Personal Protective Equipment and cleaning products are delivered to the CCDOC from the Sheriff's Central Warehouse, and thereafter distributed to the Jail Divisions. The CICC tracks and responds to all requests for PPE, cleaning supplies, and other COVID-19 related materials in order to allocate inventory accordingly. Distribution of supplies and compliance with CDC guidelines regarding use of PPE and cleaning supplies is further monitored by sanitation officers and superintendents in each Division of the jail.

27. I have supervised constant action by the CCSO to distribute PPE, hygiene, and sanitation supplies across Sheriff's Office operations, including—and most critically—the CCDOC. The CICC triages all supply and equipment needs submitted by Divisions and ensures that all Divisions and tiers are adequately supplied each and every day.

28. The CCSO employs an Environmental Health Specialist and an Environmental Services Coordinator. The Environmental Health Specialist is responsible for overseeing compliance with all existing sanitation policies and procedures, including applicable local, state, and federal regulations. The Environmental Health Specialist coordinates with Divisional Sanitation Officers who are appointed for each CCDOC Division. Those sanitation officers conduct compliance checks, and report results daily to the Division Superintendent.

29. In preparation of the COVID-19 crisis and up through the date of this declaration and as a preventative measure, the CCDOC enforced a Preventative Daily Cleaning and Disinfection procedure which increased sanitation procedures across the entire CCDOC. These procedures gave detailed instruction about how to clean and disinfect surfaces in both non-quarantine/non-isolation locations and quarantine/isolation areas. Procedures also extend to the collection of food trays and carts, laundry and central kitchen procedures. In addition, directives were also provided to the organization about Vehicle Cleaning/Disinfection Procedures. I have overseen continued use of enhanced sanitation measures, including interface between the CICC and divisional sanitation officers in order to continue to re-stock necessary supplies and hygiene products for detainees.

30. I have authorized communications with local Cook County agencies regarding supply and testing demands, including but not limited to the following:

    a. Regular, if not daily, phone and written correspondence with DEMRS, Cook County Health and Hospital System through Cermak Health Services ("CCHHS"), and Chicago Department of Public Health ("CDPH") regarding the CCSO's immediate and urgent need for cleaning supplies and PPE, including: N95 Respirator Masks, 3Ply Face Mask, Isolation Gowns, Nitrile Disposable Gloves, Goggles, Gallons of Hand Sanitizer, and Infrared Thermometers.

    b. Regular, if not daily, phone and written correspondence with DEMRS, CCHHS, and CDPH regarding the CCSO's urgent request for implementation of COVID-19 rapid testing at CCDOC.

    c. Regular correspondence with DEMRS, CCHHS, and CDPH regarding access to Abbott Laboratories' Abbott ID NOW COVID-19 test, approved by the U.S. Food and Drug Administration on an expedited timeline on or around March 30, 2020.

    d. Regular correspondence with DEMRS, CCHHS, and CDPH regarding the CCSO's urgent request for IDPH to establish CCDOC as a formal testing site for COVID-19.

31. I have authorized communications with State of Illinois agencies regarding supply and testing demands, including but not limited to the following:

    a. Daily requests to IDPH, Illinois Emergency Management Agency ("IEMA"), and the Office of the Illinois Governor, through written correspondence, electronic follow-up, and via telephone regarding the CCSO's immediate and urgent need for cleaning supplies and PPE, including: N95 Respirator Masks, 3Ply Face Mask, Isolation Gowns, Nitrile Disposable Gloves, Goggles, Gallons of Hand Sanitizer, and Infrared Thermometers.

    b. Regular correspondence with IDPH, IEMA, and the Office of the Illinois Governor regarding the CCSO's urgent request for implementation of COVID-19 rapid testing at CCDOC.

    c. Regular correspondence with IDPH, IEMA, and the Office of the Illinois Governor regarding access to Abbott Laboratories' Abbott ID NOW COVID-19 test, approved by the U.S. Food and Drug Administration on an expedited timeline on or around March 30, 2020.

    d. Regular correspondence with IDPH, IEMA, and the Office of the Illinois Governor regarding the CCSO's urgent request for IDPH to establish CCDOC as a formal testing site for COVID-19.

32. I have authorized communications with federal agencies regarding supply and testing demands, including but not limited to the following:

    a. Regular requests to Federal Emergency Management Agency ("FEMA"), U.S. Department of Health and Human Services ("HHS"), and U.S. Senator Dick Durbin, through written correspondence, electronic follow-up, and via telephone regarding the CCSO's immediate and urgent need for cleaning supplies and PPE, including: N95 Respirator Masks, 3Ply Face Mask, Isolation Gowns, Nitrile Disposable Gloves, Goggles, Gallons of Hand Sanitizer, and Infrared Thermometers.

    b. Regular correspondence with FEMA, HHS, and Senator Durbin regarding the CCSO's urgent request for implementation of COVID-19 rapid testing at CCDOC.

    c. Regular correspondence with FEMA, HHS, and Senator Durbin regarding access to Abbott Laboratories' Abbott ID NOW COVID-19 test, approved by the U.S.

Food and Drug Administration on an expedited timeline on or around March 30, 2020.

    d. Regular correspondence with FEMA, HHS, and Senator Durbin regarding the CCSO's urgent request for IDPH to establish CCDOC as a formal testing site for COVID-19.

33. As a result of our efforts, Cermak has received approval to commence Abbott rapid testing as of April 7, 2020 for detainees.

34. As a result of our efforts, Roseland Hospital and the CCSO will be establishing Roseland Hospital as an official COVID-19 testing site, available to all staff, as early as April 6, 2020. 50 employees were tested today.

35. In addition to supply and testing demands, I authorized and supervised CCSO's regular communications to other local, state and federal stakeholders regarding procedural changes to assist CCDOC in preventing the spread of COVID-19, including:

    a. Notification to the Clerk of the Circuit Court and Chief Judge regarding suspension of eviction and foreclosure enforcement activities.

    b. Working with the Illinois Department of Corrections ("IDOC") to identify IDOC inmates who have a Cook County hold, meaning that after satisfying their IDOC sentence they would traditionally be returned to Cook County to serve a County sentence in CCDOC. This identification would assist the CCSO in working with criminal justice stakeholders to potentially release the hold, in order to prevent transmission of COVID-19 as new detainees enter custody.

    c. Working with the Cook County President's Office and the Office of the Chief Judge ("OCJ") to consolidate court operations and limit movement to and from court hearings.

    d. Working with local criminal justice stakeholders including the OCJ, Cook County State's Attorney, and Cook County Public Defender to triage criminal cases and determine whether detainees being held in CCDOC pre-trial could be released.

    e. Communicating with Cook County Commissioners, members of the media, and members of the public regarding CCSO's response to COVID-19, in order to be as forthcoming and transparent as possible regarding the CCSO's attempts to maintain the safety and security of detainees and staff.

36. The CCSO has worked around the clock to maximize the safety and security of CCDOC detainees, its staff, and the public in the midst of an unprecedented, global pandemic.

I, Brad Curry, pursuant to 28 U.S.C. § 1746, declare under penalty of perjury of the laws of the United States of America that the foregoing is true and correct.

Dated this 6th day of April 2020.

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

ANTHONY MAYS, Individually and on )
behalf of a class of similarly situated persons; )
and JUDIA JACKSON, as next friend of )
KENNETH FOSTER, Individually and on )
behalf of a class of similarly situated persons )
)                                                   Case No. 20-cv-2134
Plaintiffs-Petitioners, )
)
v )
)
THOMAS DART, Sheriff of Cook County, )
)
Defendant-Respondent )

## DECLARATION OF BRAD CURRY

I, Brad Curry, pursuant to 28 U.S.C. § 1746, declare as follows:

1. I am currently employed by the Cook County Sheriff's Office (CCSO) in the position of Chief of Staff.

2. I previously executed a sworn Declaration concerning the CCSO's response to the Novel Coronavirus ("COVID-19") pandemic, filed on April 7, 2020 under Dkt. #31-3. Each and all paragraphs under said declaration are incorporated and re-stated herein.

3. I am familiar with Court's order entered April 9, 2020 requiring the CCSO to report to the Court certain steps taken to combat the spread of COVID-19 in the Cook County Department of Corrections ("CCDOC").

## COVID-19 Testing

4. As of April 10, Cermak Health Services ("Cermak") had implemented rapid testing for Cook County Department of Corrections ("CCDOC") detainees through Abbott Laboratories and the Illinois Department of Public Health.

5. Cermak is the primary custodian of records related to testing.

6. In addition to the current CCSO Health Inquiry Policy, the CCSO issued the "COVID-19 Health Inquiry Referral for Medical Care, Testing, and other Medical Diagnostics Procedure," which was enacted on April 11, 2020 and is attached hereto as a supporting exhibit.

## Quarantine & Social Distancing

1

7. The CCSO has implemented social distancing policies across the CCDOC compound, with the most recent requirements in effect on April 10, 2020.

8. The Reception Classification and Diagnostic Center ("RCDC") holds all arrestees who await their bond hearings in a separate, distinct location (hereafter "Arrestees"). Detainees who have already been remanded to CCDOC custody and are awaiting intake procedures are held by RCDC in a separate, distinct location (hereafter "Detainees Awaiting Intake"). Once intake is complete, Custodial Detainees are assigned to tiers based on a screening protocol (hereafter "Custodial Detainees").

9. Arrestees are brought to RCDC in groups of no more than three individuals, once per day. Between March 1 and April 12, the number of Arrestees moving through CCDOC has steadily decreased. The highest volume being 227 Arrestees on March 9, compared to the lowest volume of 43 Arrestees on April 6.

10. Previously, Arrestees were housed in holding cells, or "bullpens," to await bond hearings. Currently, Arrestees are seated in chairs spaced at least six feet apart in hallways in the basement and on the first floor of RCDC. The attached document entitled "New RCDC Male Holding Outline Video Court Process," is a true and accurate representation of the Arrestee waiting area.

11. Upon arrival to RCDC, each Arrestee is given a surgical mask and CCSO staff provides them with a dollop of hand sanitizer.

12. CCDOC staff assigned to RCDC administer verbal COVID-19 screening for each Arrestee and take each Arrestee's temperature. If the Arrestee's temperature is over 99.3 degrees, or if the Arrestee reports suspected COVID-19 symptoms, CCDOC returns the Arrestee to the arresting agency to transfer the Arrestee to an outlying hospital for treatment and isolation. If neither of those factors are present, the Arrestee is returned to his seat to await his bond hearing.

13. CCSO has placed signage across RCDC with information concerning COVID-19 symptoms, and is in the process of installing TV monitors in receiving areas to display the same. Such signage has been in place since at least April 9, 2020, with examples attached hereto as supporting exhibits.

14. After his bond hearing, the Arrestee is either released, or is transferred to the intake area of RCDC for further processing. Once all Arrestees are moved out of the Arrestee holding area, CCSO staff sanitizes the area.

15. Detainees Awaiting Intake each have masks, have had their hands sanitized, and have received verbal screening and temperature checks from the arrestee stage. Between March 1 and April 12, the number of detainees booked into the CCDOC has steadily decreased. The highest volume being 117 Detainees Awaiting Intake on March 8, compared to the lowest volume of 9 Detainees Awaiting Intake on April 6.

16. Detainees Awaiting Intake are moved through different areas of RCDC for processing, including but not limited to: physical search, contraband search through CCDOC metal detectors, booking and ID assignment, and a standard medical evaluation by Cermak to determine any medical needs.

17. Detainees Awaiting Intake at each stage are either seated, or directed to stand, at least six feet apart. Six foot spacing is marked on the floor with blue tape for guidance.

18. CCSO has placed signage across RCDC intake areas with information concerning COVID-19 symptoms.

19. After intake is complete, the now Custodial Detainees are taken to their assigned housing tiers. All new Custodial Detainees are assigned to Quarantine Tiers for the first fourteen (14) days of their stay. After the Quarantine period as expired, each Custodial Detainees is transferred to general population.

20. The modified Arrestee and intake procedures described above can be maintained while the number of arrestees and detainees remains below a level of approximately 45 Arrestees. However, if these populations rise beyond that threshold number at one time, CCSO may no longer be able to maintain these modified procedures. We are continuing to explore contingency plans and adapted procedures to accommodate such a change, including utilizing empty tiers for holding Arrestees as they await their bond hearings.

## **Sanitation**

21. All Custodial Detainees are provided soap. Each detainee is provided soap by correctional officers assigned to the tiers. Each tier has received hand sanitizer, which detainees and employees may access. Soap, hand sanitizer, and cleaning supplies are replenished throughout each shift as needed. Records reflecting deliveries of supplied to each tier are maintained by the Divisions.

22. The Incident Command Center ("ICC") tracks daily supply requests and deliveries, and has prepared a distribution plan with a timeline regarding soap and cleaning supplies, including—for illustration—the following:

    a. Delivery and distribution of thousands of units of soap and/or hand sanitizer to divisions on April 10, 2020
    b. Delivery and distribution of sanitation/cleaning supplies on April 10, 2020
    c. Soap and sanitation supplies will be delivered at least twice per week

23. The CCSO is also in the process of procuring additional cleaning services from different vendors through the Cook County Department of Emergency Management, in order to supplement current practices.

24. Deliveries of soap and cleaning supplies, and distribution to detainees, are captured and preserved on stationary cameras.

25. An amended Sanitation Procedure, titled "Amended Sanitation Guidelines Specific to COVID-19" was enacted on April 11, 2020 and is attached hereto as a supporting exhibit. Enhanced sanitation logs were implemented in conjunction with this procedure.

**Personal Protective Equipment**

26. The CCSO has continued to work diligently to obtain and distribute personal protective equipment ("PPE") across CCDOC.

27. On April 11, 2020 the CCSO sent additional requests to IEMA and FEMA in accordance with this Court's order, in order to prioritize deliveries of all PPE, but particularly delivery of masks and gowns.

28. Deliveries of PPE and distribution to staff—and, where appropriate, detainees—are captured and preserved on stationary cameras.

29. As of April 11, 2020, all Custodial Detainees assigned to Quarantine Tiers are issued a new surgical mask each day. Assuming that IEMA and/or FEMA deliver the requested amount, the Sheriff's Office inventory or masks is expected to last until approximately June of 2020. The CCSO will continue to exhaust every venue for obtaining PPE.

30. Based on present usage and the new requirement to provide surgical masks to the Custodial Detainees assigned to the Quarantine Tiers, we anticipate that we will exhaust our current supply in 6 to 7 days if we do not receive a shipment.

31. The CCSO is working to supply the general population of detainees with non-PPE cloth masks, for their comfort and for security purposes to avoid any conflicts related to the provision of masks to other detainees on the Quarantine Tiers. The CCSO has ordered 50,000 non-PPE cloth masks as of April 12, 2020.

**Implementation**

32. The COVID-19 Health Inquiry Referral for Medical Care, Testing, and other Medical Diagnostics Procedure was enacted on April 11, 2020.

33. The Amended Sanitation Policy was enacted on April 11, 2020.

34. The CCSO is finalizing its COVID-19 Social Distancing Policy, to reflect the procedures defined in this Declaration.

35. All CCSO staff, including all CCDOC correctional officers, were notified of the implementation of the new policies and procedures through office-wide electronic correspondence and by way of directives given at roll call.

36. CCSO Video Monitoring Unit and PPE and Maintenance Team are reviewing fixed surveillance video and documentation on a daily basis to confirm compliance with these policies and procedures.

37. All CCDOC staff assigned to Arrestee and Detainees Awaiting Intake areas of RCDC received a roll call memo specifically informing them of the new procedures defined under the Health Inquiry Policy.

38. Copies of the signage posted in RCDC Arrestee and Detainee Awaiting Intake areas are attached hereto as supporting exhibits, which reflect information regarding COVID-19 symptoms, prevention behaviors, and instructions to report symptoms. These postings are also displayed throughout the CCDOC compound and on tiers.

39. There were 5,087 bookings from March 1, 2020 to April 12, 2020 and the average number of daily bookings was 118. The current custodial population as of the date of this Declaration is 4,367.

40. Approximately 1,500 detainees are currently assigned to Quarantine tiers as, although they are asymptomatic, they were exposed to someone with suspected COVID-19 symptoms. This number is down from 1,719.

41. CCSO staff, including CCDOC supervisory and CCSO executive staff, are conducting regular walkthroughs of the divisions and are auditing daily sanitation logs in order to ensure compliance.

I, Brad Curry, pursuant to 28 U.S.C. § 1746, declare under penalty of perjury of the laws of the United States of America that the foregoing is true and correct.

Dated this 13th day of April 2020.

_____

5

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| ANTHONY MAYS, Individually and on behalf of a class of similarly situated persons; and JUDIA JACKSON, as next friend of KENNETH FOSTER, Individually and on behalf of a class of similarly situated persons | ) ) ) ) ) | |
| | ) | Case No. 20-cv-2134 |
| Plaintiffs-Petitioners, | ) ) | |
| v | ) ) | |
| THOMAS DART, Sheriff of Cook County, | ) ) | |
| Defendant-Respondent | ) | |

## **DECLARATION OF REBECCA LEVIN**

I, Rebecca Levin, pursuant to 28 U.S.C. § 1746, declare as follows:

1. I have been employed by the Cook County Sheriff's Office ("CCSO") since January 2020 as a Senior Advisor. I have a Master's Degree in Public Health, with a concentration in Health Policy and Administration from the University of Illinois at Chicago and also completed doctoral coursework at Tulane University School of Public Health and Tropical Medicine's Executive Doctor of Science Program in the Department of Health Systems Management. Additionally, prior to joining the CCSO, I worked in the field of public health for twenty years, first with the American Academy of Pediatrics and then Ann & Robert H. Lurie's Children's Hospital of Chicago.

2. I previously executed a sworn Declaration concerning the CCSO's response to the Novel Coronavirus ("COVID-19") pandemic, filed on April 7, 2020 under Dkt. #30-7. Each and all paragraphs under said declaration are incorporated and re-stated herein.

3. The facts set forth in this declaration are drawn from information I have received in my position with the CCSO. It does not contain all of the facts that I know about the matters discussed below.

4. As a Senior Advisor with a public health background, I have been involved in the proactive measures taken by CCSO to combat the COVID-19 pandemic. Principally, since March 12, 2020, I have been in near constant communication with public health officials, elected officials, and other healthcare stakeholders to obtain the most current guidance on measures to prevent and mitigate COVID-19 exposure and infection (which has evolved over time), disseminated this guidance to staff responsible for implementing policies and procedures,

and worked directly with such staff to implement such policies and procedures. Indeed, this has essentially become my full-time job over the last several weeks.

5. Key collaborations to ensure the CCSO is following the most up to date guidance from the Centers for Disease Control and Prevention (CDC), particularly concerning correctional settings, has involved working with the Chicago Department of Public Health (CDPH), Cook County Health and Hospital Systems, in particular, Cermak Health, and numerous elected county, city, state and federal officials.

**Collaboration with the Centers for Disease Control and Prevention and Chicago Department of Public Health**

6. Representatives of CDPH, Stephanie Black, MD, MSc, Medical Director Communicable Disease Program and Isaac Ghinai, MBBS MSc, CDC Epidemic Intelligence Service Officer detailed to CDPH, toured the CCDOC during the month of March 2020 to observe the jail from a public health and infection control perspective.

7. Following the walk through, a team from CCDOC leadership, the CCSO Executive Office, and Cermak collaborated to identify individuals, departments or agencies with primary responsibility for amending their procedures based on feedback from CDPH and monitor the status of their implementation. These efforts focus on placement/housing of detainees, including measures to increase social distancing, such as increasing distance between occupied bunks.

8. The CDPH is aware of the CCSOs practices and procedures as it pertains to housing detainees in isolation and quarantine. These practices and procedures align closely with the housing "algorithm" provided as part of the CDPH recommendations.

9. Because Drs. Black and Ghinai from CDPH have a variety of responsibilities related to COVID-19, CDPH requested additional epidemiological support from the CDC to provide guidance on controlling the spread of COVID-19 in Cook County Jail. On behalf of the CCSO, I expressed strong support for this additional expert consultation. Paige Armstrong, MD, MHS, Epidemiology Team Lead and Lieutenant Commander in the US Public Health Service, and Alison Binder, Epidemiologist, were deployed by the CDC to Chicago on April 15 and 16 respectively.

**April 17, 2020 On-Site Visit**

10. On Friday, April 17, 2020 representatives of the CDC and CDPH conducted a site visit at the Cook County Jail. The visit lasted approximately three and a half hours and provided the representatives with information about different settings: intake; dorms and celled tiers; quarantine and isolation tiers; and cohort isolation and convalescent barracks.

11. The CCSO invited the CDC and CDPH to the Jail to conduct the site visit based on the CCSO's interest in ensuring it is following the recommended public health guidelines and continuing to evolve its policies as COVID-19 research evolves.

12. The following individuals attended the site visit: from the CDC Paige Armstrong, MD, MHS, Epidemiology Team Lead and Alison Binder, Epidemiologist; from CDPH Stephanie Black, MD, MSc, Medical Director Communicable Disease Program and Isaac Ghinai, MBBS MSc, CDC Epidemic Intelligence Service Officer detailed to CDPH; from Cermak Health Services Dr. Connie Mennella, Linda Follenweider, Chad Zawitz, and Bridgette Jones; and from CCSO Mike Miller, Jane Gubser and myself.

13. CDC and CDPH representatives noted that gaining some familiarity with the physical layout of the Jail will be helpful in assuring CCSO practices met CDC standards and to provide additional recommendations for continuing to slow the spread of COVID-19.

14. The CDC and CDPH representatives commented frequently on the cleanliness of the facility and the noticeable smell of bleach throughout. Representatives observed cleaning by both detainees and staff during the site visit.

15. The CDPH representatives noted increased social distancing, particularly with the reduced density of bunk assignments in the dorms. This change was implemented following the CDPH recommendation following the March 2020 site visit.

16. Although the site visit showed that face masks were being made available to detainees, not all detainees chose to wear them. Commander Armstrong had previously been deployed to respond to COVID-19 on a cruise ship and noted that encouraging people to consistently follow public health guidance was a challenge in other environments as well.

17. The CDC and CDPH representatives expressed their appreciation for the thoughtful efforts of the CCDOC in the context of a large and complex facility. Commander Armstrong stated "you guys are doing an amazing job."

18. The CDC and CDPH will use the information observed during the site visit to develop recommendations for a plan to continue to address the evolving COVID-19 pandemic based on the complex needs of the Jail. These recommendations will take into account the CDC Guidelines for Correctional Facilities as well as the specific characteristics of the Jail space, detainees, and staff. The CDC will also use this information to improve the guidance they provide to correctional facilities around the nation.

19. The CCSO expects to receive these recommendations within the next several weeks. As with the recommendations received from CDPH, the CCSO will review these recommendations for purposes of implementation.

20. The CCSO will continue to work with the CDC and CDPH to receive such information as COVID-19 and its handling continue to be researched, understood and managed.

21. I will continue to take this into account for purposes of my recommendations to office on our implementation and procedures.

I, Rebecca Levin, pursuant to 28 U.S.C. § 1746, declare under penalty of perjury of the laws of the United States of America that the foregoing is true and correct.

Dated this __21__ day of April 2020.

_____
Rebecca Levin, MPH



# DEPARTMENT OF PUBLIC HEALTH
## CITY OF CHICAGO

To:    **Connie Mennella, MD**
       *Chair, Department of Correctional Health/Cermak Health Services*
       **Bradley Curry**
       *Chief of Staff, Cook County Sheriff's Office*

From: **Stephanie R. Black, MD, MSc**
       *Communicable Disease Program, Chicago Department of Public Health*
       **Isaac Ghinai, MBBS, MSc**
       *CDC Epidemic Intelligence Service Officer, Chicago Department of Public Health*

Date:  **March 27, 2020**
Re:    **Recommendations for control and mitigation of coronavirus disease at the Cook County Jail**

CDPH was notified the first suspected case of coronavirus disease (COVID-19) in Cook County Jail on March 20, 2020. As of March 27, 2020, 38 confirmed COVID-19 cases have been confirmed among inmates at Cook County Jail from multiple accommodation units (principally RTU, Division 6 and Dorm 4). Several staff members have also reportedly been diagnosed with COVID-19. In addition, approximately 135 inmates and have tests pending for COVID-19, and more inmates are experiencing symptoms and testing positive each day.

The CDPH investigation team reviewed epidemiological data with Dr Chad Zawitz, Director of Infectious Diseases at Cermak Health Services and conducted a field visit to the jail on March 26th 2020, from 12pm to 4pm, and met with Dr Connie Mennella, Chairperson of the Department of Correctional Health at Cermak Health Services; Dr Sharon Welbel, Director of Infection Control and Hospital Epidemiology at Cook County Health; Bridgette Jones, nurse epidemiologist for Cermak Health Services and Jasmin Jarlega Penaranda, Environmental Services Coordinator at Cook County Jail and others.

Wherever possible, these recommendations follow CDC guidance and account for local conditions. For CDC's Interim Guidance on Management of COVID-19 in Correctional and Detention Facilities, see: https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html

Broadly, we recommend grouping inmates into four groups:
Group 1       Confirmed cases: isolate together in the Bootcamp barracks
Group 2       Symptomatic, clinically higher-risk persons under investigation (PUI): who should be
              isolated in cells, individually or in very small groups

Group 3    Symptomatic, clinically lower-risk PUIs: consider isolating together in Bootcamp barracks, with social distancing and consider universal use of face masks

Group 4    Asymptomatic contacts: quarantine in small units if possible, quarantined together if needed.

Recommendations are divided into 4 sections: Epidemiology, Placement/Housing, Infection Control, and Release. Most of our recommendations (Sections 1-3) apply to the partnership between Cook County Department of Corrections and Cermak Health Services in running Cook County Jail, and all will play a role in controlling the spread or limiting the impact of COVID-19. Some of the most impactful recommendations, those in Section 4 pertaining to the release of inmates for urgent public health reasons, apply to the broader criminal justice system.

| | Task | Person/ Team Responsible |
|---|---|---|
| **1. Epidemiologic Investigation** | **1.1** <br> Provide a list of all accommodation units, by division and by housing situation (e.g. dorm of 200 people, individual cells of 2 people), for the jail under normal operating conditions | |
| | **1.2** <br> Provide a line list of known COVID positive employees to CDPH each day including date of symptom onset and units worked in last 14 days | |
| | **1.3** <br> Provide a line list of known COVID positive inmates to CDPH including date of symptom onset, accommodation units and work assignments for last 14 days.  This may be done at some time after the peak of cases and/or CDPH staff may deploy to collect this information. | |
| | **1.4** <br> Cases in inmates should be reported by infection preventionist through the Illinois National Electronic Surveillance System | |
| | **1.5** <br> Per CDC recommendations, the value of interviewing individual healthcare workers (HCW) who may have seen a COVID case is limited in the context of community transmission (https://www.cdc.gov/coronavirus/2019-ncov/hcp/guidance-risk-assesment-hcp.html). The focus should instead be on ensuring HCW are asymptomatic, e.g. by ensuring pre-shift symptom screening. | |
| | **1.6** <br> Assess risk of COVID-19 in inmates. We suggest the following categories (see attached algorithm). <br> Group 1: Confirmed cases <br> Group 2: Symptomatic, clinically higher-risk persons under investigation (PUIs) <br> Group 3: Symptomatic, clinically lower-risk PUIs <br> Group 4: Asymptomatic contacts (not reflected on algorithm) | |

| | | |
|---|---|---|
| | See attached algorithm. | |
| **2. Placement/ housing** | **2.1**<br>House confirmed cases (Group 1) together in a unit in the Bootcamp barracks and isolated. Lift them from isolation 7 days since their first symptom or 3 days following resolution of fever (off antipyretics) and improvement in respiratory symptoms, whichever is later<br>https://www.cdc.gov/coronavirus/2019-ncov/hcp/disposition-in-home-patients.html | |
| | **2.2**<br>CDC recommends isolating persons under investigation (PUIs) separately, in single cells, where possible. Cook Co Jail has been attempting to do this, but space is extremely limited with the increasing number of PUIs. Where necessary, CDC recommends cohorting isolated individuals in a large, well-ventilated cell with solid walls and a solid door that closes fully. Therefore, consider housing clinically lower-risk probable cases (Group 3) together in the Bootcamp barracks and isolate as ("the PUI unit"). Consider face masks for this group. Reassign bunks to allow 6 feet or more in all directions. Ensure bunks are cleaned thoroughly if assigned to a new occupant. Arrange bunks so that individuals sleep head-to-foot to increase distance between them.<br><br>Given the high rate of COVID positivity in PUIs tested so far from units with known exposure, consider not testing this group to avoid exposures to healthcare staff and preserve PPE.<br>If testing, and an individual tests positive, transfer to Group 1.<br>If testing, and an individual tests negative, isolate them for the remainder of their isolation period away from all COVID positives and PUIs.<br>Lift them from isolation 7 days since their first symptom or 3 days following resolution of fever (off antipyretics) and improvement in respiratory symptoms, whichever is later | |
| | **2.3**<br>Test clinically higher-risk PUIs for COVID-19 (Group 2) and house separately in cells (e.g. in Division 6) until results are available. While tests are pending, these individuals should wear a face mask if they leave their isolation room or another person enters.<br>If an individual tests positive, transfer to Group 1.<br>If they test negative, continue to isolate in an individual cell or cells of two, until 7 days following their symptom onset or 3 days fever free with resolving respiratory symptoms | |
| | **2.4**<br>Immediately isolate and test any inmates with new symptoms but no known exposure (e.g. in Division 6). IDPH has agreed to accept and prioritize these specimens, with a projected turnaround time of 48 hrs. or less. Rapid testing is needed to identify newly affected units | |
| | **2.5**<br>Quarantine all asymptomatic inmates from units with confirmed or probable COVID cases or PUIs (Group 4; not on algorithm as not symptomatic). These individuals should not participate in work in the jail. While CDC recommends close contacts of COVID-19 cases should be isolated individually and their least-preferred option is to house quarantined individuals in their regularly assigned housing unit, recognizing the large numbers of close contacts of cases at this time, this may be the only realistic option. Fortunately, the largest affected dorm (Dorm 4) is not at full occupancy. Employing social distancing in these settings and removing individuals at high risk of severe disease would be beneficial | |
| | **2.6**<br>Where possible, staff the Bootcamp barracks with COVID-recovered staff and or inmates | |

| | | |
|---|---|---|
| **3. Infection Control** | **3.1**<br>All jail staff should have their temperature checked and be screened for symptoms (e.g. cough, shortness of breath) prior to starting their shift | |
| | **3.2**<br>Inmates, especially those on quarantine units, should be screened for a fever, cough or shortness of breath each shift | |
| | **3.3**<br>Any potentially aerosol generating procedures (e.g. CPAP) should be avoided in open units | |
| | **3.4**<br>Outside of performing aerosol generating procedures (e.g. nebulizer treatment, intubation; most likely to be conducted in Cermak Health Center), N95s masks are not recommended and should be preserved for healthcare personnel conducting aerosol generating procedures | |
| | **3.5**<br>Staff having direct physical contact with confirmed or probable COVID-19 patients or PUIs should wear eye protection (goggles or face shield), a surgical mask, latex gloves, and a disposable medical gown | |
| | **3.6**<br>Staff entering the COVID unit but not having physical contact with patients (e.g. sitting at observation desk) should wear a surgical mask and gloves | |
| | **3.7**<br>Staff entering the PUI unit but not having physical contact with patients (e.g. sitting at observation desk) should wear a surgical mask and gloves | |
| | **3.8**<br>Staff entering quarantined units, including physical contact with any asymptomatic inmate, should wear a surgical mask and gloves (if inmate is identified as symptomatic, full PPE should be used as above, as they become a PUI) | |
| | **3.9**<br>All staff on any unit, but especially those requiring a surgical mask (i.e. any unit on isolation or quarantine), should have easy access to alcohol-based hand rub immediately outside of the unit so it can be used immediately after removing their gloves and surgical mask (e.g. on RTU, the alcohol-based hand rub outside the unit was only available in the dispensary behind a locked door) | |
| | **3.10**<br>Staff should be trained repeatedly on the correct use of PPE (we saw numerous examples of staff touching the outside of their masks and not washing their hands, even though training had occurred. In this instance, masks will act as a mechanism of transmission, rather than a barrier to transmission) | |
| | **3.11**<br>Staff should be cohorted to work in specific epidemiological contexts, e.g. rotating staff between isolation units, quarantine units and unaffected units should be avoided | |
| | **3.12**<br>Inmates from different units should not mingle in central workspace (e.g. laundry) | |
| | **3.13**<br>Quarantine all new intakes for 14 days before they enter the facility's general population away from all COVID isolation and quarantine units | |

| | | |
|---|---|---|
| **4. Release** | 4.1<br>Every inmate sharing a unit with a COVID case can be epidemiologically considered a close contact of a case, equivalent to a household contact. High attack rates in household contacts have been documented (>10%). Decompressing the jail would allow large accommodation units to be split into smaller units, and therefore reduce the number of close contacts of each future case. | |
| | 4.2<br>We recommend considering mass release of inmates to decompress the jail for urgent public health reasons (see 2.2 and 2.5 for illustrations of the need to decompress the jail) | |
| | 4.3<br>First, prioritize the unexposed for immediate release on public health grounds | |
| | 4.4<br>Second, consider the release of high risk inmates (e.g. aged over 65, underlying comorbidities) as long as appropriate follow-up and isolation (i.e. stable housing and telephone contact) can be arranged https://www.cdc.gov/coronavirus/2019-ncov/specific-groups/people-at-higher-risk.html | |
| | 4.5<br>Given the necessity of ensuring controlled release, no inmate should be released without an exit interview (including temperature check) and stable housing being arranged by the criminal justice system. CDPH should be notified during business hours of the release of any COVID positive inmate or PUI with unstable housing | |

# Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities

This interim guidance is based on what is currently known about the transmission and severity of coronavirus disease 2019 (COVID-19) as of **March 23, 2020**.

The US Centers for Disease Control and Prevention (CDC) will update this guidance as needed and as additional information becomes available. Please check the following CDC website periodically for updated interim guidance: https://www.cdc.gov/coronavirus/2019-ncov/index.html.

This document provides interim guidance specific for correctional facilities and detention centers during the outbreak of COVID-19, to ensure continuation of essential public services and protection of the health and safety of incarcerated and detained persons, staff, and visitors. Recommendations may need to be revised as more information becomes available.

## In this guidance

- Who is the intended audience for this guidance?
- Why is this guidance being issued?
- What topics does this guidance include?
- Definitions of Commonly Used Terms
- Facilities with Limited Onsite Healthcare Services
- COVID-19 Guidance for Correctional Facilities
- Operational Preparedness
- Prevention
- Management
- Infection Control
- Clinical Care of COVID-19 Cases
- Recommended PPE and PPE Training for Staff and Incarcerated/Detained Persons
- Verbal Screening and Temperature Check Protocols for Incarcerated/Detained Persons, Staff, and Visitors

## Who is the intended audience for this guidance?



This document is intended to provide guiding principles for healthcare and non-healthcare administrators of correctional and detention facilities (including but not limited to federal and state prisons, local jails, and detention centers), law enforcement agencies that have custodial authority for detained populations (i.e., US Immigration and Customs Enforcement and US Marshals Service), and their respective health departments, to assist in preparing for potential introduction, spread, and mitigation of COVID-19 in their facilities. In general, the document uses terminology referring to correctional environments but can also be applied to civil and pre-trial detention settings.

This guidance will not necessarily address every possible custodial setting and may not use legal terminology specific to individual agencies' authorities or processes. **The guidance may need to be adapted based on individual facilities' physical space, staffing, population, operations, and other resources and conditions.** Facilities should contact CDC or their state, local, territorial, and/or tribal public health department if they need assistance in applying these principles or addressing topics that are not specifically covered in this guidance.



**cdc.gov/coronavirus**

CS 316182-A 03/27/2020

# Why is this guidance being issued?

Correctional and detention facilities can include custody, housing, education, recreation, healthcare, food service, and workplace components in a single physical setting. The integration of these components presents unique challenges for control of COVID-19 transmission among incarcerated/detained persons, staff, and visitors. Consistent application of specific preparation, prevention, and management measures can help reduce the risk of transmission and severe disease from COVID-19.

- Incarcerated/detained persons live, work, eat, study, and recreate within congregate environments, heightening the potential for COVID-19 to spread once introduced.

- In most cases, incarcerated/detained persons are not permitted to leave the facility.

- There are many opportunities for COVID-19 to be introduced into a correctional or detention facility, including daily staff ingress and egress; transfer of incarcerated/detained persons between facilities and systems, to court appearances, and to outside medical visits; and visits from family, legal representatives, and other community members. Some settings, particularly jails and detention centers, have high turnover, admitting new entrants daily who may have been exposed to COVID-19 in the surrounding community or other regions.

- Persons incarcerated/detained in a particular facility often come from a variety of locations, increasing the potential to introduce COVID-19 from different geographic areas.

- Options for medical isolation of COVID-19 cases are limited and vary depending on the type and size of facility, as well as the current level of available capacity, which is partly based on medical isolation needs for other conditions.

- Adequate levels of custody and healthcare staffing must be maintained to ensure safe operation of the facility, and options to practice social distancing through work alternatives such as working from home or reduced/alternate schedules are limited for many staff roles.

- Correctional and detention facilities can be complex, multi-employer settings that include government and private employers. Each is organizationally distinct and responsible for its own operational, personnel, and occupational health protocols and may be prohibited from issuing guidance or providing services to other employers or their staff within the same setting. Similarly, correctional and detention facilities may house individuals from multiple law enforcement agencies or jurisdictions subject to different policies and procedures.

- Incarcerated/detained persons and staff may have medical conditions that increase their risk of severe disease from COVID-19.

- Because limited outside information is available to many incarcerated/detained persons, unease and misinformation regarding the potential for COVID-19 spread may be high, potentially creating security and morale challenges.

- The ability of incarcerated/detained persons to exercise disease prevention measures (e.g., frequent handwashing) may be limited and is determined by the supplies provided in the facility and by security considerations. Many facilities restrict access to soap and paper towels and prohibit alcohol-based hand sanitizer and many disinfectants.

- Incarcerated persons may hesitate to report symptoms of COVID-19 or seek medical care due to co-pay requirements and fear of isolation.

CDC has issued separate COVID-19 guidance addressing healthcare infection control and clinical care of COVID-19 cases as well as close contacts of cases in community-based settings. Where relevant, community-focused guidance documents are referenced in this document and should be monitored regularly for updates, but they may require adaptation for correctional and detention settings.

This guidance document provides additional recommended best practices specifically for correctional and detention facilities. **At this time, different facility types (e.g., prison vs. jail) and sizes are not differentiated. Administrators and agencies should adapt these guiding principles to the specific needs of their facility.**

## What topics does this guidance include?

The guidance below includes detailed recommendations on the following topics related to COVID-19 in correctional and detention settings:

√   Operational and communications preparations for COVID-19

√   Enhanced cleaning/disinfecting and hygiene practices

√   Social distancing strategies to increase space between individuals in the facility

√   How to limit transmission from visitors

√   Infection control, including recommended personal protective equipment (PPE) and potential alternatives during PPE shortages

√   Verbal screening and temperature check protocols for incoming incarcerated/detained individuals, staff, and visitors

√   Medical isolation of confirmed and suspected cases and quarantine of contacts, including considerations for cohorting when individual spaces are limited

√   Healthcare evaluation for suspected cases, including testing for COVID-19

√   Clinical care for confirmed and suspected cases

√   Considerations for persons at higher risk of severe disease from COVID-19

## Definitions of Commonly Used Terms

**Close contact of a COVID-19 case—**In the context of COVID-19, an individual is considered a close contact if they a) have been within approximately 6 feet of a COVID-19 case for a prolonged period of time or b) have had direct contact with infectious secretions from a COVID-19 case (e.g., have been coughed on). Close contact can occur while caring for, living with, visiting, or sharing a common space with a COVID-19 case. Data to inform the definition of close contact are limited. Considerations when assessing close contact include the duration of exposure (e.g., longer exposure time likely increases exposure risk) and the clinical symptoms of the person with COVID-19 (e.g., coughing likely increases exposure risk, as does exposure to a severely ill patient).

**Cohorting—**Cohorting refers to the practice of isolating multiple laboratory-confirmed COVID-19 cases together as a group, or quarantining close contacts of a particular case together as a group. Ideally, cases should be isolated individually, and close contacts should be quarantined individually. However, some correctional facilities and detention centers do not have enough individual cells to do so and must consider cohorting as an alternative. See Quarantine and Medical Isolation sections below for specific details about ways to implement cohorting to minimize the risk of disease spread and adverse health outcomes.

**Community transmission of COVID-19—**Community transmission of COVID-19 occurs when individuals acquire the disease through contact with someone in their local community, rather than through travel to an affected location. Once community transmission is identified in a particular area, correctional facilities and detention centers are more likely to start seeing cases inside their walls. Facilities should consult with local public health departments if assistance is needed in determining how to define "local community" in the context of COVID-19 spread. However, because all states have reported cases, all facilities should be vigilant for introduction into their populations.

**Confirmed vs. Suspected COVID-19 case—**A confirmed case has received a positive result from a COVID-19 laboratory test, with or without symptoms. A suspected case shows symptoms of COVID-19 but either has not been tested or is awaiting test results. If test results are positive, a suspected case becomes a confirmed case.

**Incarcerated/detained persons—**For the purpose of this document, "incarcerated/detained persons" refers to persons held in a prison, jail, detention center, or other custodial setting where these guidelines are generally applicable. The term includes those who have been sentenced (i.e., in prisons) as well as those held for pre-trial (i.e., jails) or civil purposes (i.e, detention centers). Although this guidance does not specifically reference individuals in every type of custodial setting (e.g., juvenile facilities, community confinement facilities), facility administrators can adapt this guidance to apply to their specific circumstances as needed.

**Medical Isolation—**Medical isolation refers to confining a confirmed or suspected COVID-19 case (ideally to a single cell with solid walls and a solid door that closes), to prevent contact with others and to reduce the risk of transmission. Medical isolation ends when the individual meets pre-established clinical and/or testing criteria for release from isolation, in consultation with clinical providers and public health officials (detailed in guidance below). In this context, isolation does NOT refer to punitive isolation for behavioral infractions within the custodial setting. Staff are encouraged to use the term "medical isolation" to avoid confusion.

**Quarantine—**Quarantine refers to the practice of confining individuals who have had close contact with a COVID-19 case to determine whether they develop symptoms of the disease. Quarantine for COVID-19 should last for a period of 14 days. Ideally, each quarantined individual would be quarantined in a single cell with solid walls and a solid door that closes. If symptoms develop during the 14-day period, the individual should be placed under medical isolation and evaluated for COVID-19. If symptoms do not develop, movement restrictions can be lifted, and the individual can return to their previous residency status within the facility.

**Social Distancing—**Social distancing is the practice of increasing the space between individuals and decreasing the frequency of contact to reduce the risk of spreading a disease (ideally to maintain at least 6 feet between all individuals, even those who are asymptomatic). Social distancing strategies can be applied on an individual level (e.g., avoiding physical contact), a group level (e.g., canceling group activities where individuals will be in close contact), and an operational level (e.g., rearranging chairs in the dining hall to increase distance between them). Although social distancing is challenging to practice in correctional and detention environments, it is a cornerstone of reducing transmission of respiratory diseases such as COVID-19. Additional information about social distancing, including information on its use to reduce the spread of other viral illnesses, is available in this CDC publication.

**Staff—**In this document, "staff" refers to all public sector employees as well as those working for a private contractor within a correctional facility (e.g., private healthcare or food service). Except where noted, "staff" does not distinguish between healthcare, custody, and other types of staff including private facility operators.

**Symptoms—**Symptoms of COVID-19 include fever, cough, and shortness of breath. Like other respiratory infections, COVID-19 can vary in severity from mild to severe. When severe, pneumonia, respiratory failure, and death are possible. COVID-19 is a novel disease, therefore the full range of signs and symptoms, the clinical course of the disease, and the individuals and populations most at risk for disease and complications are not yet fully understood. Monitor the CDC website for updates on these topics.

## Facilities with Limited Onsite Healthcare Services

Although many large facilities such as prisons and some jails usually employ onsite healthcare staff and have the capacity to evaluate incarcerated/detained persons for potential illness within a dedicated healthcare space, many smaller facilities do not. Some of these facilities have access to on-call healthcare staff or providers who visit the facility every few days. Others have neither onsite healthcare capacity nor onsite medical isolation/quarantine space and must transfer ill patients to other correctional or detention facilities or local hospitals for evaluation and care.

The majority of the guidance below is designed to be applied to any correctional or detention facility, either as written or with modifications based on a facility's individual structure and resources. However, topics related to healthcare evaluation and clinical care of confirmed and suspected COVID-19 cases and their close contacts may not apply directly to facilities with limited or no onsite healthcare services. It will be especially important for these types of facilities to coordinate closely with their state, local, tribal, and/or territorial health department when they encounter confirmed or suspected cases among incarcerated/detained persons or staff, in order to ensure effective medical isolation and quarantine, necessary medical evaluation and care, and medical transfer if needed. The guidance makes note of strategies tailored to facilities without onsite healthcare where possible.

Note that all staff in any sized facility, regardless of the presence of onsite healthcare services, should observe guidance on recommended PPE in order to ensure their own safety when interacting with confirmed and suspected COVID-19 cases. Facilities should make contingency plans for the likely event of PPE shortages during the COVID-19 pandemic.

# COVID-19 Guidance for Correctional Facilities

Guidance for correctional and detention facilities is organized into 3 sections: Operational Preparedness, Prevention, and Management of COVID-19. Recommendations across these sections can be applied simultaneously based on the progress of the outbreak in a particular facility and the surrounding community.

- **Operational Preparedness**. This guidance is intended to help facilities prepare for potential COVID-19 transmission in the facility. Strategies focus on operational and communications planning and personnel practices.

- **Prevention.** This guidance is intended to help facilities prevent spread of COVID-19 from outside the facility to inside. Strategies focus on reinforcing hygiene practices, intensifying cleaning and disinfection of the facility, screening (new intakes, visitors, and staff), continued communication with incarcerated/detained persons and staff, and social distancing measures (increasing distance between individuals).

- **Management.** This guidance is intended to help facilities clinically manage confirmed and suspected COVID-19 cases inside the facility and prevent further transmission. Strategies include medical isolation and care of incarcerated/detained persons with symptoms (including considerations for cohorting), quarantine of cases' close contacts, restricting movement in and out of the facility, infection control practices for individuals interacting with cases and quarantined contacts or contaminated items, intensified social distancing, and cleaning and disinfecting areas visited by cases.

# Operational Preparedness

Administrators can plan and prepare for COVID-19 by ensuring that all persons in the facility know the symptoms of COVID-19 and how to respond if they develop symptoms. Other essential actions include developing contingency plans for reduced workforces due to absences, coordinating with public health and correctional partners, and communicating clearly with staff and incarcerated/detained persons about these preparations and how they may temporarily alter daily life.

## Communication & Coordination

√ **Develop information-sharing systems with partners.**

- o Identify points of contact in relevant state, local, tribal, and/or territorial public health departments before cases develop. Actively engage with the health department to understand in advance which entity has jurisdiction to implement public health control measures for COVID-19 in a particular correctional or detention facility.

- o Create and test communications plans to disseminate critical information to incarcerated/detained persons, staff, contractors, vendors, and visitors as the pandemic progresses.

- o Communicate with other correctional facilities in the same geographic area to share information including disease surveillance and absenteeism patterns among staff.
- o Where possible, put plans in place with other jurisdictions to prevent confirmed and suspected COVID-19 cases and their close contacts from being transferred between jurisdictions and facilities unless necessary for medical evaluation, medical isolation/quarantine, clinical care, extenuating security concerns, or to prevent overcrowding.
- o Stay informed about updates to CDC guidance via the CDC COVID-19 website as more information becomes known.

√ **Review existing pandemic flu, all-hazards, and disaster plans, and revise for COVID-19.**

- o Ensure that physical locations (dedicated housing areas and bathrooms) have been identified to isolate confirmed COVID-19 cases and individuals displaying COVID-19 symptoms, and to quarantine known close contacts of cases. (Medical isolation and quarantine locations should be separate). The plan should include contingencies for multiple locations if numerous cases and/or contacts are identified and require medical isolation or quarantine simultaneously. See Medical Isolation and Quarantine sections below for details regarding individual medical isolation and quarantine locations (preferred) vs. cohorting.
- o Facilities without onsite healthcare capacity should make a plan for how they will ensure that suspected COVID-19 cases will be isolated, evaluated, tested (if indicated), and provided necessary medical care.
- o Make a list of possible social distancing strategies that could be implemented as needed at different stages of transmission intensity.
- o Designate officials who will be authorized to make decisions about escalating or de-escalating response efforts as the epidemiologic context changes.

√ **Coordinate with local law enforcement and court officials.**

- o Identify lawful alternatives to in-person court appearances, such as virtual court, as a social distancing measure to reduce the risk of COVID-19 transmission.
- o Explore strategies to prevent over-crowding of correctional and detention facilities during a community outbreak.

√ **Post signage throughout the facility communicating the following:**

- o **For all:** symptoms of COVID-19 and hand hygiene instructions
- o **For incarcerated/detained persons:** report symptoms to staff
- o **For staff:** stay at home when sick; if symptoms develop while on duty, leave the facility as soon as possible and follow CDC-recommended steps for persons who are ill with COVID-19 symptoms including self-isolating at home, contacting their healthcare provider as soon as possible to determine whether they need to be evaluated and tested, and contacting their supervisor.
- o Ensure that signage is understandable for non-English speaking persons and those with low literacy, and make necessary accommodations for those with cognitive or intellectual disabilities and those who are deaf, blind, or low-vision.

## Personnel Practices

√ **Review the sick leave policies of each employer that operates in the facility.**

- o Review policies to ensure that they actively encourage staff to stay home when sick.
- o If these policies do not encourage staff to stay home when sick, discuss with the contract company.
- o Determine which officials will have the authority to send symptomatic staff home.

√ **Identify staff whose duties would allow them to work from home. Where possible, allowing staff to work from home can be an effective social distancing strategy to reduce the risk of COVID-19 transmission.**

   o Discuss work from home options with these staff and determine whether they have the supplies and technological equipment required to do so.

   o Put systems in place to implement work from home programs (e.g., time tracking, etc.).

√ **Plan for staff absences.** Staff should stay home when they are sick, or they may need to stay home to care for a sick household member or care for children in the event of school and childcare dismissals.

   o Allow staff to work from home when possible, within the scope of their duties.

   o Identify critical job functions and plan for alternative coverage by cross-training staff where possible.

   o Determine minimum levels of staff in all categories required for the facility to function safely. If possible, develop a plan to secure additional staff if absenteeism due to COVID-19 threatens to bring staffing to minimum levels.

   o Consider increasing keep on person (KOP) medication orders to cover 30 days in case of healthcare staff shortages.

√ **Consider offering revised duties to staff who are at** higher risk of severe illness with COVID-19**.** Persons at higher risk may include older adults and persons of any age with serious underlying medical conditions including lung disease, heart disease, and diabetes. See CDC's website for a complete list, and check regularly for updates as more data become available to inform this issue.

   o Facility administrators should consult with their occupational health providers to determine whether it would be allowable to reassign duties for specific staff members to reduce their likelihood of exposure to COVID-19.

√ **Offer the seasonal influenza vaccine to all incarcerated/detained persons (existing population and new intakes) and staff throughout the influenza season.** Symptoms of COVID-19 are similar to those of influenza. Preventing influenza cases in a facility can speed the detection of COVID-19 cases and reduce pressure on healthcare resources.

√ **Reference the Occupational Safety and Health Administration website for recommendations regarding worker health.**

√ **Review** CDC's guidance for businesses and employers to identify any additional strategies the facility can use within its role as an employer.

## Operations & Supplies

√ **Ensure that sufficient stocks of hygiene supplies, cleaning supplies, PPE, and medical supplies (consistent with the healthcare capabilities of the facility) are on hand and available, and have a plan in place to restock as needed if COVID-19 transmission occurs within the facility.**

   o Standard medical supplies for daily clinic needs

   o Tissues

   o Liquid soap when possible. If bar soap must be used, ensure that it does not irritate the skin and thereby discourage frequent hand washing.

   o Hand drying supplies

   o Alcohol-based hand sanitizer containing at least 60% alcohol (where permissible based on security restrictions)

   o Cleaning supplies, including EPA-registered disinfectants effective against the virus that causes COVID-19

- o Recommended PPE (facemasks, N95 respirators, eye protection, disposable medical gloves, and disposable gowns/one-piece coveralls). See PPE section and Table 1 for more detailed information, including recommendations for extending the life of all PPE categories in the event of shortages, and when face masks are acceptable alternatives to N95s.
- o Sterile viral transport media and sterile swabs to collect nasopharyngeal specimens if COVID-19 testing is indicated

√ **Make contingency plans for the probable event of PPE shortages during the COVID-19 pandemic, particularly for non-healthcare workers.**

- o See CDC guidance optimizing PPE supplies.

√ **Consider relaxing restrictions on allowing alcohol-based hand sanitizer in the secure setting where security concerns allow.** If soap and water are not available, CDC recommends cleaning hands with an alcohol-based hand sanitizer that contains at least 60% alcohol. Consider allowing staff to carry individual-sized bottles for their personal hand hygiene while on duty.

√ **Provide a no-cost supply of soap to incarcerated/detained persons, sufficient to allow frequent hand washing.** (See Hygiene section below for additional detail regarding recommended frequency and protocol for hand washing.)

- o Provide liquid soap where possible. If bar soap must be used, ensure that it does not irritate the skin and thereby discourage frequent hand washing.

√ I**f not already in place, employers operating within the facility should establish a respiratory protection program as appropriate, to ensure that staff and incarcerated/detained persons are fit tested for any respiratory protection they will need within the scope of their responsibilities.**

√ **Ensure that staff and incarcerated/detained persons are trained to correctly don, doff, and dispose of PPE that they will need to use within the scope of their responsibilities.** See Table 1 for recommended PPE for incarcerated/detained persons and staff with varying levels of contact with COVID-19 cases or their close contacts.

## Prevention

Cases of COVID-19 have been documented in all 50 US states. Correctional and detention facilities can prevent introduction of COVID-19 from the community and reduce transmission if it is already inside by reinforcing good hygiene practices among incarcerated/detained persons, staff, and visitors (including increasing access to soap and paper towels), intensifying cleaning/disinfection practices, and implementing social distancing strategies.

Because many individuals infected with COVID-19 do not display symptoms, the virus could be present in facilities before cases are identified. Both good hygiene practices and social distancing are critical in preventing further transmission.

### Operations

√ **Stay in communication with partners about your facility's current situation.**

- o State, local, territorial, and/or tribal health departments
- o Other correctional facilities

√ **Communicate with the public about any changes to facility operations, including visitation programs.**

√ **Restrict transfers of incarcerated/detained persons to and from other jurisdictions and facilities unless necessary for medical evaluation, medical isolation/quarantine, clinical care, extenuating security concerns, or to prevent overcrowding.**

    o  Strongly consider postponing non-urgent outside medical visits.

    o  If a transfer is absolutely necessary, perform verbal screening and a temperature check as outlined in the Screening section below, before the individual leaves the facility. If an individual does not clear the screening process, delay the transfer and follow the protocol for a suspected COVID-19 case— including putting a face mask on the individual, immediately placing them under medical isolation, and evaluating them for possible COVID-19 testing. If the transfer must still occur, ensure that the receiving facility has capacity to properly isolate the individual upon arrival. Ensure that staff transporting the individual wear recommended PPE (see Table 1) and that the transport vehicle is cleaned thoroughly after transport.

√ **Implement lawful alternatives to in-person court appearances where permissible.**

√ **Where relevant, consider suspending co-pays for incarcerated/detained persons seeking medical evaluation for respiratory symptoms.**

√ **Limit the number of operational entrances and exits to the facility.**

## Cleaning and Disinfecting Practices

√ **Even if COVID-19 cases have not yet been identified inside the facility or in the surrounding community, begin implementing intensified cleaning and disinfecting procedures according to the recommendations below. These measures may prevent spread of COVID-19 if introduced.**

√ **Adhere to** CDC recommendations for cleaning and disinfection during the COVID-19 response. Monitor these recommendations for updates.

    o  Several times per day, clean and disinfect surfaces and objects that are frequently touched, especially in common areas. Such surfaces may include objects/surfaces not ordinarily cleaned daily (e.g., doorknobs, light switches, sink handles, countertops, toilets, toilet handles, recreation equipment, kiosks, and telephones).

    o  Staff should clean shared equipment several times per day and on a conclusion of use basis (e.g., radios, service weapons, keys, handcuffs).

    o  Use household cleaners and EPA-registered disinfectants effective against the virus that causes COVID-19 as appropriate for the surface, following label instructions. This may require lifting restrictions on undiluted disinfectants.

    o  Labels contain instructions for safe and effective use of the cleaning product, including precautions that should be taken when applying the product, such as wearing gloves and making sure there is good ventilation during use.

√ **Consider increasing the number of staff and/or incarcerated/detained persons trained and responsible for cleaning common areas to ensure continual cleaning of these areas throughout the day.**

√ **Ensure adequate supplies to support intensified cleaning and disinfection practices, and have a plan in place to restock rapidly if needed.**

## Hygiene

√ **Reinforce healthy hygiene practices, and provide and continually restock hygiene supplies throughout the facility, including in bathrooms, food preparation and dining areas, intake areas, visitor entries and exits, visitation rooms and waiting rooms, common areas, medical, and staff-restricted areas (e.g., break rooms).**

√ **Encourage all persons in the facility to take the following actions to protect themselves and others from COVID-19. Post signage throughout the facility, and communicate this information verbally on a regular basis.** Sample signage and other communications materials **are available on the CDC website.** Ensure that materials can be understood by non-English speakers and those with low literacy, and make necessary accommodations for those with cognitive or intellectual disabilities and those who are deaf, blind, or low-vision.

  o **Practice good cough etiquette:** Cover your mouth and nose with your elbow (or ideally with a tissue) rather than with your hand when you cough or sneeze, and throw all tissues in the trash immediately after use.

  o **Practice good hand hygiene:** Regularly wash your hands with soap and water for at least 20 seconds, especially after coughing, sneezing, or blowing your nose; after using the bathroom; before eating or preparing food; before taking medication; and after touching garbage.

  o **Avoid touching your eyes, nose, or mouth without cleaning your hands first.**

  o **Avoid sharing eating utensils, dishes, and cups.**

  o **Avoid non-essential physical contact.**

√ **Provide incarcerated/detained persons and staff no-cost access to:**

  o **Soap**—Provide liquid soap where possible. If bar soap must be used, ensure that it does not irritate the skin, as this would discourage frequent hand washing.

  o **Running water, and hand drying machines or disposable paper towels for hand washing**

  o **Tissues** and no-touch trash receptacles for disposal

√ **Provide alcohol-based hand sanitizer with at least 60% alcohol where permissible based on security restrictions.** Consider allowing staff to carry individual-sized bottles to maintain hand hygiene.

√ **Communicate that sharing drugs and drug preparation equipment can spread COVID-19 due to potential contamination of shared items and close contact between individuals.**

## Prevention Practices for Incarcerated/Detained Persons

√ **Perform pre-intake screening and temperature checks for all new entrants. Screening should take place in the sallyport, before beginning the intake process,** in order to identify and immediately place individuals with symptoms under medical isolation. See Screening section below for the wording of screening questions and a recommended procedure to safely perform a temperature check. Staff performing temperature checks should wear recommended PPE (see PPE section below).

  o **If an individual has symptoms of COVID-19** (fever, cough, shortness of breath):

    ▪ Require the individual to wear a face mask.

    ▪ Ensure that staff who have direct contact with the symptomatic individual wear recommended PPE.

    ▪ Place the individual under medical isolation (ideally in a room near the screening location, rather than transporting the ill individual through the facility), and refer to healthcare staff for further evaluation. (See Infection Control and Clinical Care sections below.)

    ▪ Facilities without onsite healthcare staff should contact their state, local, tribal, and/or territorial health department to coordinate effective medical isolation and necessary medical care.

- o **If an individual is a** close contact **of a known COVID-19 case (but has no COVID-19 symptoms):**
    - Quarantine the individual and monitor for symptoms two times per day for 14 days. (See Quarantine section below.)
    - Facilities without onsite healthcare staff should contact their state, local, tribal, and/or territorial health department to coordinate effective quarantine and necessary medical care.

√ **Implement** social distancing **strategies to increase the physical space between incarcerated/detained persons (ideally 6 feet between all individuals, regardless of the presence of symptoms).** Strategies will need to be tailored to the individual space in the facility and the needs of the population and staff. Not all strategies will be feasible in all facilities. Example strategies with varying levels of intensity include:

- o **Common areas:**
    - Enforce increased space between individuals in holding cells, as well as in lines and waiting areas such as intake (e.g., remove every other chair in a waiting area)
- o **Recreation:**
    - Choose recreation spaces where individuals can spread out
    - Stagger time in recreation spaces
    - Restrict recreation space usage to a single housing unit per space (where feasible)
- o **Meals:**
    - Stagger meals
    - Rearrange seating in the dining hall so that there is more space between individuals (e.g., remove every other chair and use only one side of the table)
    - Provide meals inside housing units or cells
- o **Group activities:**
    - Limit the size of group activities
    - Increase space between individuals during group activities
    - Suspend group programs where participants are likely to be in closer contact than they are in their housing environment
    - Consider alternatives to existing group activities, in outdoor areas or other areas where individuals can spread out
- o **Housing:**
    - If space allows, reassign bunks to provide more space between individuals, ideally 6 feet or more in all directions. (Ensure that bunks are cleaned thoroughly if assigned to a new occupant.)
    - Arrange bunks so that individuals sleep head to foot to increase the distance between them
    - Rearrange scheduled movements to minimize mixing of individuals from different housing areas
- o **Medical:**
    - If possible, designate a room near each housing unit to evaluate individuals with COVID-19 symptoms, rather than having them walk through the facility to be evaluated in the medical unit. If this is not feasible, consider staggering sick call.
    - Designate a room near the intake area to evaluate new entrants who are flagged by the intake screening process for COVID-19 symptoms or case contact, before they move to other parts of the facility.

√ **Communicate clearly and frequently with incarcerated/detained persons about changes to their daily routine and how they can contribute to risk reduction.**

√ **Note that if group activities are discontinued, it will be important to identify alternative forms of activity to support the mental health of incarcerated/detained persons.**

√ **Consider suspending work release programs and other programs that involve movement of incarcerated/detained individuals in and out of the facility.**

√ **Provide** up-to-date information about COVID-19 **to incarcerated/detained persons on a regular basis, including:**

  o Symptoms of COVID-19 and its health risks

  o Reminders to report COVID-19 symptoms to staff at the first sign of illness

√ **Consider having healthcare staff perform rounds on a regular basis to answer questions about COVID-19.**

## Prevention Practices for Staff

√ **Remind staff to stay at home if they are sick.** Ensure that staff are aware that they will not be able to enter the facility if they have symptoms of COVID-19, and that they will be expected to leave the facility as soon as possible if they develop symptoms while on duty.

√ **Perform verbal screening (for COVID-19 symptoms and close contact with cases) and temperature checks for all staff daily on entry.** See Screening section below for wording of screening questions and a recommended procedure to safely perform temperature checks.

  o In very small facilities with only a few staff, consider self-monitoring or virtual monitoring (e.g., reporting to a central authority via phone).

  o Send staff home who do not clear the screening process, and advise them to follow CDC-recommended steps for persons who are ill with COVID-19 symptoms.

√ **Provide staff with up-to-date information about COVID-19 and about facility policies on a regular basis, including:**

  o Symptoms of COVID-19 and its health risks

  o Employers' sick leave policy

  o **If staff develop a fever, cough, or shortness of breath while at work:** immediately put on a face mask, inform supervisor, leave the facility, and follow CDC-recommended steps for persons who are ill with COVID-19 symptoms.

  o **If staff test positive for COVID-19:** inform workplace and personal contacts immediately, and do not return to work until a decision to discontinue home medical isolation precautions is made. Monitor CDC guidance on discontinuing home isolation regularly as circumstances evolve rapidly.

  o **If a staff member is identified as a close contact of a COVID-19 case (either within the facility or in the community):** self-quarantine at home for 14 days and return to work if symptoms do not develop. If symptoms do develop, follow CDC-recommended steps for persons who are ill with COVID-19 symptoms.

√ **If a staff member has a confirmed COVID-19 infection, the relevant employers should inform other staff about their possible exposure to COVID-19 in the workplace, but should maintain confidentiality as required by the Americans with Disabilities Act.**

  o Employees who are close contacts of the case should then self-monitor for symptoms (i.e., fever, cough, or shortness of breath).

√ **When feasible and consistent with security priorities, encourage staff to maintain a distance of 6 feet or more from an individual with respiratory symptoms while interviewing, escorting, or interacting in other ways.**

√ **Ask staff to keep interactions with individuals with respiratory symptoms as brief as possible.**

## Prevention Practices for Visitors

√ **If possible, communicate with potential visitors to discourage contact visits in the interest of their own health and the health of their family members and friends inside the facility.**

√ **Perform verbal screening (for COVID-19 symptoms and close contact with cases) and temperature checks for all visitors and volunteers on entry.** See Screening section below for wording of screening questions and a recommended procedure to safely perform temperature checks.

    o Staff performing temperature checks should wear recommended PPE.

    o Exclude visitors and volunteers who do not clear the screening process or who decline screening.

√ **Provide alcohol-based hand sanitizer with at least 60% alcohol in visitor entrances, exits, and waiting areas.**

√ **Provide visitors and volunteers with information to prepare them for screening.**

    o Instruct visitors to postpone their visit if they have symptoms of respiratory illness.

    o If possible, inform potential visitors and volunteers before they travel to the facility that they should expect to be screened for COVID-19 (including a temperature check), and will be unable to enter the facility if they do not clear the screening process or if they decline screening.

    o Display signage outside visiting areas explaining the COVID-19 screening and temperature check process. Ensure that materials are understandable for non-English speakers and those with low literacy.

√ **Promote non-contact visits:**

    o Encourage incarcerated/detained persons to limit contact visits in the interest of their own health and the health of their visitors.

    o Consider reducing or temporarily eliminating the cost of phone calls for incarcerated/detained persons.

    o Consider increasing incarcerated/detained persons' telephone privileges to promote mental health and reduce exposure from direct contact with community visitors.

√ **Consider suspending or modifying visitation programs, if legally permissible. For example, provide access to virtual visitation options where available.**

    o If moving to virtual visitation, clean electronic surfaces regularly. (See Cleaning guidance below for instructions on cleaning electronic surfaces.)

    o Inform potential visitors of changes to, or suspension of, visitation programs.

    o Clearly communicate any visitation program changes to incarcerated/detained persons, along with the reasons for them (including protecting their health and their family and community members' health).

    o If suspending contact visits, provide alternate means (e.g., phone or video visitation) for incarcerated/detained individuals to engage with legal representatives, clergy, and other individuals with whom they have legal right to consult.

NOTE: Suspending visitation would be done in the interest of incarcerated/detained persons' physical health and the health of the general public. However, visitation is important to maintain mental health.

If visitation is suspended, facilities should explore alternative ways for incarcerated/detained persons to communicate with their families, friends, and other visitors in a way that is not financially burdensome for them. See above suggestions for promoting non-contact visits.

√ **Restrict non-essential vendors, volunteers, and tours from entering the facility.**

## Management

If there has been a suspected COVID-19 case inside the facility (among incarcerated/detained persons, staff, or visitors who have recently been inside), begin implementing Management strategies while test results are pending. Essential Management strategies include placing cases and individuals with symptoms under medical isolation, quarantining their close contacts, and facilitating necessary medical care, while observing relevant infection control and environmental disinfection protocols and wearing recommended PPE.

## Operations

√ **Implement alternate work arrangements deemed feasible in the** Operational Preparedness **section.**

√ **Suspend all transfers of incarcerated/detained persons to and from other jurisdictions and facilities (including work release where relevant), unless necessary for medical evaluation, medical isolation/quarantine, care, extenuating security concerns, or to prevent overcrowding.**

o If a transfer is absolutely necessary, perform verbal screening and a temperature check as outlined in the Screening section below, before the individual leaves the facility. If an individual does not clear the screening process, delay the transfer and follow the protocol for a suspected COVID-19 case— including putting a face mask on the individual, immediately placing them under medical isolation, and evaluating them for possible COVID-19 testing. If the transfer must still occur, ensure that the receiving facility has capacity to appropriately isolate the individual upon arrival. Ensure that staff transporting the individual wear recommended PPE (see Table 1) and that the transport vehicle is cleaned thoroughly after transport.

√ **If possible, consider quarantining all new intakes for 14 days before they enter the facility's general population (SEPARATELY from other individuals who are quarantined due to contact with a COVID-19 case).** Subsequently in this document, this practice is referred to as **routine intake quarantine**.

√ **When possible, arrange lawful alternatives to in-person court appearances.**

√ **Incorporate screening for COVID-19 symptoms and a temperature check into release planning.**

o Screen all releasing individuals for COVID-19 symptoms and perform a temperature check. (See Screening section below.)

▪ If an individual does not clear the screening process, follow the protocol for a suspected COVID-19 case—including putting a face mask on the individual, immediately placing them under medical isolation, and evaluating them for possible COVID-19 testing.

▪ If the individual is released before the recommended medical isolation period is complete, discuss release of the individual with state, local, tribal, and/or territorial health departments to ensure safe medical transport and continued shelter and medical care, as part of release planning. Make direct linkages to community resources to ensure proper medical isolation and access to medical care.

▪ Before releasing an incarcerated/detained individual with COVID-19 symptoms to a community-based facility, such as a homeless shelter, contact the facility's staff to ensure adequate time for them to prepare to continue medical isolation, or contact local public health to explore alternate housing options.

√ **Coordinate with state, local, tribal, and/or territorial health departments.**

   o When a COVID-19 case is suspected, work with public health to determine action. See Medical Isolation section below.

   o When a COVID-19 case is suspected or confirmed, work with public health to identify close contacts who should be placed under quarantine. See Quarantine section below.

   o Facilities with limited onsite medical isolation, quarantine, and/or healthcare services should coordinate closely with state, local, tribal, and/or territorial health departments when they encounter a confirmed or suspected case, in order to ensure effective medical isolation or quarantine, necessary medical evaluation and care, and medical transfer if needed. See Facilities with Limited Onsite Healthcare Services section.

## Hygiene

√ **Continue to ensure that hand hygiene supplies are well-stocked in all areas of the facility.** (See above.)

√ **Continue to emphasize practicing good hand hygiene and cough etiquette.** (See above.)

## Cleaning and Disinfecting Practices

√ **Continue adhering to recommended cleaning and disinfection procedures for the facility at large.** (See above.)

√ **Reference specific cleaning and disinfection procedures for areas where a COVID-19 case has spent time (below).**

## Medical Isolation of Confirmed or Suspected COVID-19 Cases

**NOTE: Some recommendations below apply primarily to facilities with onsite healthcare capacity. Facilities with Limited Onsite Healthcare Services, or without sufficient space to implement effective medical isolation, should coordinate with local public health officials to ensure that COVID-19 cases will be appropriately isolated, evaluated, tested (if indicated), and given care.**

√ **As soon as an individual develops symptoms of COVID-19, they should wear a face mask (if it does not restrict breathing) and should be immediately placed under medical isolation in a separate environment from other individuals.**

√ **Keep the individual's movement outside the medical isolation space to an absolute minimum.**

   o Provide medical care to cases inside the medical isolation space. See Infection Control and Clinical Care sections for additional details.

   o Serve meals to cases inside the medical isolation space.

   o Exclude the individual from all group activities.

   o Assign the isolated individual a dedicated bathroom when possible.

√ **Ensure that the individual is wearing a face mask at all times when outside of the medical isolation space, and whenever another individual enters.** Provide clean masks as needed. Masks should be changed at least daily, and when visibly soiled or wet.

√ **Facilities should make every possible effort to place suspected and confirmed COVID-19 cases under medical isolation individually. Each isolated individual should be assigned their own housing space and bathroom where possible.** Cohorting should only be practiced if there are no other available options.

- o If cohorting is necessary:
  - **Only individuals who are laboratory confirmed COVID-19 cases should be placed under medical isolation as a cohort. Do not cohort confirmed cases with suspected cases or case contacts.**
  - Unless no other options exist, do not house COVID-19 cases with individuals who have an undiagnosed respiratory infection.
  - Ensure that cohorted cases wear face masks at all times.

√ **In order of preference, individuals under medical isolation should be housed:**

- o Separately, in single cells with solid walls (i.e., not bars) and solid doors that close fully
- o Separately, in single cells with solid walls but without solid doors
- o As a cohort, in a large, well-ventilated cell with solid walls and a solid door that closes fully. Employ social distancing strategies related to housing in the Prevention section above.
- o As a cohort, in a large, well-ventilated cell with solid walls but without a solid door. Employ social distancing strategies related to housing in the Prevention section above.
- o As a cohort, in single cells without solid walls or solid doors (i.e., cells enclosed entirely with bars), preferably with an empty cell between occupied cells. (Although individuals are in single cells in this scenario, the airflow between cells essentially makes it a cohort arrangement in the context of COVID-19.)
- o As a cohort, in multi-person cells without solid walls or solid doors (i.e., cells enclosed entirely with bars), preferably with an empty cell between occupied cells. Employ social distancing strategies related to housing in the Prevention section above.
- o Safely transfer individual(s) to another facility with available medical isolation capacity in one of the above arrangements
  (NOTE—Transfer should be avoided due to the potential to introduce infection to another facility; proceed only if no other options are available.)

If the ideal choice does not exist in a facility, use the next best alternative.

√ **If the number of confirmed cases exceeds the number of individual medical isolation spaces available in the facility, be especially mindful of cases who are at higher risk of severe illness from COVID-19**. Ideally, they should not be cohorted with other infected individuals. If cohorting is unavoidable, make all possible accommodations to prevent transmission of other infectious diseases to the higher-risk individual. (For example, allocate more space for a higher-risk individual within a shared medical isolation space.)

- o Persons at higher risk may include older adults and persons of any age with serious underlying medical conditions such as lung disease, heart disease, and diabetes. See CDC's website for a complete list, and check regularly for updates as more data become available to inform this issue.
- o Note that incarcerated/detained populations have higher prevalence of infectious and chronic diseases and are in poorer health than the general population, even at younger ages.

√ **Custody staff should be designated to monitor these individuals exclusively where possible.** These staff should wear recommended PPE as appropriate for their level of contact with the individual under medical isolation (see PPE section below) and should limit their own movement between different parts of the facility to the extent possible.

√ **Minimize transfer of COVID-19 cases between spaces within the healthcare unit.**

√ **Provide individuals under medical isolation with tissues and, if permissible, a lined no-touch trash receptacle.** Instruct them to:

- o **Cover** their mouth and nose with a tissue when they cough or sneeze
- o **Dispose** of used tissues immediately in the lined trash receptacle
- o **Wash hands** immediately with soap and water for at least 20 seconds. If soap and water are not available, clean hands with an alcohol-based hand sanitizer that contains at least 60% alcohol (where security concerns permit). Ensure that hand washing supplies are continually restocked.

√ **Maintain medical isolation until all the following criteria have been met. Monitor the CDC website for updates to these criteria.**

**For individuals who will be tested to determine if they are still contagious:**

- ▪ The individual has been free from fever for at least 72 hours without the use of fever-reducing medications **AND**
- ▪ The individual's other symptoms have improved (e.g., cough, shortness of breath) **AND**
- ▪ The individual has tested negative in at least two consecutive respiratory specimens collected at least 24 hours apart

**For individuals who will NOT be tested to determine if they are still contagious:**

- ▪ The individual has been free from fever for at least 72 hours without the use of fever-reducing medications **AND**
- ▪ The individual's other symptoms have improved (e.g., cough, shortness of breath) **AND**
- ▪ At least 7 days have passed since the first symptoms appeared

**For individuals who had a confirmed positive COVID-19 test but never showed symptoms:**

- o At least 7 days have passed since the date of the individual's first positive COVID-19 test **AND**
- o The individual has had no subsequent illness

√ **Restrict cases from leaving the facility while under medical isolation precautions, unless released from custody or if a transfer is necessary for medical care, infection control, lack of medical isolation space, or extenuating security concerns.**

- o If an incarcerated/detained individual who is a COVID-19 case is released from custody during their medical isolation period, contact public health to arrange for safe transport and continuation of necessary medical care and medical isolation as part of release planning.

## Cleaning Spaces where COVID-19 Cases Spent Time

**Thoroughly clean and disinfect all areas where the confirmed or suspected COVID-19 case spent time. Note—these protocols apply to suspected cases as well as confirmed cases, to ensure adequate disinfection in the event that the suspected case does, in fact, have COVID-19. Refer to the Definitions section for the distinction between confirmed and suspected cases.**

- o Close off areas used by the infected individual. If possible, open outside doors and windows to increase air circulation in the area. Wait as long as practical, up to 24 hours under the poorest air exchange conditions (consult CDC Guidelines for Environmental Infection Control in Health-Care Facilities for wait time based on different ventilation conditions), before beginning to clean and disinfect, to minimize potential for exposure to respiratory droplets.
- o Clean and disinfect all areas (e.g., cells, bathrooms, and common areas) used by the infected individual, focusing especially on frequently touched surfaces (see list above in Prevention section).

√ **Hard (non-porous) surface cleaning and disinfection**

   o If surfaces are dirty, they should be cleaned using a detergent or soap and water prior to disinfection.

   o For disinfection, most common EPA-registered household disinfectants should be effective. Choose cleaning products based on security requirements within the facility.

      ▪ Consult a list of products that are EPA-approved for use against the virus that causes COVID-19. Follow the manufacturer's instructions for all cleaning and disinfection products (e.g., concentration, application method and contact time, etc.).

      ▪ Diluted household bleach solutions can be used if appropriate for the surface. Follow the manufacturer's instructions for application and proper ventilation, and check to ensure the product is not past its expiration date. Never mix household bleach with ammonia or any other cleanser. Unexpired household bleach will be effective against coronaviruses when properly diluted. Prepare a bleach solution by mixing:

        - 5 tablespoons (1/3rd cup) bleach per gallon of water or

        - 4 teaspoons bleach per quart of water

√ **Soft (porous) surface cleaning and disinfection**

   o For soft (porous) surfaces such as carpeted floors and rugs, remove visible contamination if present and clean with appropriate cleaners indicated for use on these surfaces. After cleaning:

      ▪ If the items can be laundered, launder items in accordance with the manufacturer's instructions using the warmest appropriate water setting for the items and then dry items completely.

      ▪ Otherwise, use products that are EPA-approved for use against the virus that causes COVID-19 and are suitable for porous surfaces.

√ **Electronics cleaning and disinfection**

   o For electronics such as tablets, touch screens, keyboards, and remote controls, remove visible contamination if present.

      ▪ Follow the manufacturer's instructions for all cleaning and disinfection products.

      ▪ Consider use of wipeable covers for electronics.

      ▪ If no manufacturer guidance is available, consider the use of alcohol-based wipes or spray containing at least 70% alcohol to disinfect touch screens. Dry surfaces thoroughly to avoid pooling of liquids.

Additional information on cleaning and disinfection of communal facilities such can be found on CDC's website.

√ **Ensure that staff and incarcerated/detained persons performing cleaning wear recommended PPE.** (See PPE section below.)

√ **Food service items.** Cases under medical isolation should throw disposable food service items in the trash in their medical isolation room. Non-disposable food service items should be handled with gloves and washed with hot water or in a dishwasher. Individuals handling used food service items should clean their hands after removing gloves.

√ Laundry from a COVID-19 cases **can be washed with other individuals' laundry.**

   o Individuals handling laundry from COVID-19 cases should wear disposable gloves, discard after each use, and clean their hands after.

   o Do not shake dirty laundry. This will minimize the possibility of dispersing virus through the air.

   o Launder items as appropriate in accordance with the manufacturer's instructions. If possible, launder items using the warmest appropriate water setting for the items and dry items completely.

o Clean and disinfect clothes hampers according to guidance above for surfaces. If permissible, consider using a bag liner that is either disposable or can be laundered.

√ **Consult** cleaning recommendations above **to ensure that transport vehicles are thoroughly cleaned after carrying a confirmed or suspected COVID-19 case.**

## Quarantining Close Contacts of COVID-19 Cases

**NOTE: Some recommendations below apply primarily to facilities with onsite healthcare capacity. Facilities without onsite healthcare capacity, or without sufficient space to implement effective quarantine, should coordinate with local public health officials to ensure that close contacts of COVID-19 cases will be effectively quarantined and medically monitored.**

√ **Incarcerated/detained persons who are close contacts of a** confirmed or suspected COVID-19 case **(whether the case is another incarcerated/detained person, staff member, or visitor) should be placed under quarantine for 14 days (see CDC guidelines).**

o If an individual is quarantined due to contact with a suspected case who is subsequently tested for COVID-19 and receives a negative result, the quarantined individual should be released from quarantine restrictions.

√ **In the context of COVID-19, an individual (incarcerated/detained person or staff) is considered a close contact if they:**

o Have been within approximately 6 feet of a COVID-19 case for a prolonged period of time OR

o Have had direct contact with infectious secretions of a COVID-19 case (e.g., have been coughed on)

Close contact can occur while caring for, living with, visiting, or sharing a common space with a COVID-19 case. Data to inform the definition of close contact are limited. Considerations when assessing close contact include the duration of exposure (e.g., longer exposure time likely increases exposure risk) and the clinical symptoms of the person with COVID-19 (e.g., coughing likely increases exposure risk, as does exposure to a severely ill patient).

√ **Keep a quarantined individual's movement outside the quarantine space to an absolute minimum.**

o Provide medical evaluation and care inside or near the quarantine space when possible.

o Serve meals inside the quarantine space.

o Exclude the quarantined individual from all group activities.

o Assign the quarantined individual a dedicated bathroom when possible.

√ **Facilities should make every possible effort to quarantine close contacts of COVID-19 cases individually.** Cohorting multiple quarantined close contacts of a COVID-19 case could transmit COVID-19 from those who are infected to those who are uninfected. Cohorting should only be practiced if there are no other available options.

o If cohorting of close contacts under quarantine is absolutely necessary, symptoms of all individuals should be monitored closely, and individuals with symptoms of COVID-19 should be placed under medical isolation immediately.

o If an entire housing unit is under quarantine due to contact with a case from the same housing unit, the entire housing unit may need to be treated as a cohort and quarantine in place.

o Some facilities may choose to quarantine all new intakes for 14 days before moving them to the facility's general population as a general rule (not because they were exposed to a COVID-19 case). Under this scenario, avoid mixing individuals quarantined due to exposure to a COVID-19 case with individuals undergoing routine intake quarantine.

o If at all possible, do not add more individuals to an existing quarantine cohort after the 14-day quarantine clock has started.

√ **If the number of quarantined individuals exceeds the number of individual quarantine spaces available in the facility, be especially mindful of those who are at higher risk of severe illness from COVID-19.** Ideally, they should not be cohorted with other quarantined individuals. If cohorting is unavoidable, make all possible accommodations to reduce exposure risk for the higher-risk individuals. (For example, intensify social distancing strategies for higher-risk individuals.)

√ **In order of preference, multiple quarantined individuals should be housed:**

   o Separately, in single cells with solid walls (i.e., not bars) and solid doors that close fully

   o Separately, in single cells with solid walls but without solid doors

   o As a cohort, in a large, well-ventilated cell with solid walls, a solid door that closes fully, and at least 6 feet of personal space assigned to each individual in all directions

   o As a cohort, in a large, well-ventilated cell with solid walls and at least 6 feet of personal space assigned to each individual in all directions, but without a solid door

   o As a cohort, in single cells without solid walls or solid doors (i.e., cells enclosed entirely with bars), preferably with an empty cell between occupied cells creating at least 6 feet of space between individuals. (Although individuals are in single cells in this scenario, the airflow between cells essentially makes it a cohort arrangement in the context of COVID-19.)

   o As a cohort, in multi-person cells without solid walls or solid doors (i.e., cells enclosed entirely with bars), preferably with an empty cell between occupied cells. Employ social distancing strategies related to housing in the Prevention section to maintain at least 6 feet of space between individuals housed in the same cell.

   o As a cohort, in individuals' regularly assigned housing unit but with no movement outside the unit (if an entire housing unit has been exposed). Employ social distancing strategies related to housing in the Prevention section above to maintain at least 6 feet of space between individuals.

   o Safely transfer to another facility with capacity to quarantine in one of the above arrangements

(NOTE—Transfer should be avoided due to the potential to introduce infection to another facility; proceed only if no other options are available.)

√ **Quarantined individuals should wear face masks if feasible based on local supply, as source control, under the following circumstances** (see PPE section and Table 1):

   o If cohorted, quarantined individuals should wear face masks at all times (to prevent transmission from infected to uninfected individuals).

   o If quarantined separately, individuals should wear face masks whenever a non-quarantined individual enters the quarantine space.

   o All quarantined individuals should wear a face mask if they must leave the quarantine space for any reason.

   o Asymptomatic individuals under routine intake quarantine (with no known exposure to a COVID-19 case) do not need to wear face masks.

√ **Staff who have close contact with quarantined individuals should wear recommended PPE if feasible based on local supply, feasibility, and safety within the scope of their duties** (see PPE section and Table 1).

   o Staff supervising asymptomatic incarcerated/detained persons under routine intake quarantine (with no known exposure to a COVID-19 case) do not need to wear PPE.

√ **Quarantined individuals should be monitored for COVID-19 symptoms twice per day, including temperature checks.**

   o If an individual develops symptoms, they should be moved to medical isolation immediately and further evaluated. (See Medical Isolation section above.)

   o See Screening section for a procedure to perform temperature checks safely on asymptomatic close contacts of COVID-19 cases.

√ **If an individual who is part of a quarantined cohort becomes symptomatic:**

   o **If the individual is tested for COVID-19 and tests positive:** the 14-day quarantine clock for the remainder of the cohort must be reset to 0.

   o **If the individual is tested for COVID-19 and tests negative:** the 14-day quarantine clock for this individual and the remainder of the cohort does not need to be reset. This individual can return from medical isolation to the quarantined cohort for the remainder of the quarantine period.

   o **If the individual is not tested for COVID-19:** the 14-day quarantine clock for the remainder of the cohort must be reset to 0.

√ **Restrict quarantined individuals from leaving the facility (including transfers to other facilities) during the 14-day quarantine period, unless released from custody or a transfer is necessary for medical care, infection control, lack of quarantine space, or extenuating security concerns.**

√ **Quarantined individuals can be released from quarantine restrictions if they have not developed symptoms during the 14-day quarantine period.**

√ **Meals should be provided to quarantined individuals in their quarantine spaces.** Individuals under quarantine should throw disposable food service items in the trash. Non-disposable food service items should be handled with gloves and washed with hot water or in a dishwasher. Individuals handling used food service items should clean their hands after removing gloves.

√ **Laundry from quarantined individuals can be washed with other individuals' laundry.**

   o Individuals handling laundry from quarantined persons should wear disposable gloves, discard after each use, and clean their hands after.

   o Do not shake dirty laundry. This will minimize the possibility of dispersing virus through the air.

   o Launder items as appropriate in accordance with the manufacturer's instructions. If possible, launder items using the warmest appropriate water setting for the items and dry items completely.

   o Clean and disinfect clothes hampers according to guidance above for surfaces. If permissible, consider using a bag liner that is either disposable or can be laundered.

## Management of Incarcerated/Detained Persons with COVID-19 Symptoms

**NOTE: Some recommendations below apply primarily to facilities with onsite healthcare capacity. Facilities without onsite healthcare capacity or without sufficient space for medical isolation should coordinate with local public health officials to ensure that suspected COVID-19 cases will be effectively isolated, evaluated, tested (if indicated), and given care.**

√ **If possible, designate a room near each housing unit for healthcare staff to evaluate individuals with COVID-19 symptoms, rather than having them walk through the facility to be evaluated in the medical unit.**

√ **Incarcerated/detained individuals with COVID-19 symptoms should wear a face mask and should be placed under medical isolation immediately. Discontinue the use of a face mask if it inhibits breathing. See Medical Isolation section above.**

√ **Medical staff should evaluate symptomatic individuals to determine whether COVID-19 testing is indicated.** Refer to CDC guidelines for information on evaluation and testing. See Infection Control and Clinical Care sections below as well.

√ **If testing is indicated (or if medical staff need clarification on when testing is indicated), contact the state, local, tribal, and/or territorial health department. Work with public health or private labs as available to access testing supplies or services.**

   o If the COVID-19 test is positive, continue medical isolation. (See Medical Isolation section above.)

   o If the COVID-19 test is negative, return the individual to their prior housing assignment unless they require further medical assessment or care.

## Management Strategies for Incarcerated/Detained Persons without COVID-19 Symptoms

√ **Provide clear information to incarcerated/detained persons about the presence of COVID-19 cases within the facility, and the need to increase social distancing and maintain hygiene precautions.**

   o Consider having healthcare staff perform regular rounds to answer questions about COVID-19.

   o Ensure that information is provided in a manner that can be understood by non-English speaking individuals and those with low literacy, and make necessary accommodations for those with cognitive or intellectual disabilities and those who are deaf, blind, or low-vision.

√ **Implement daily temperature checks in housing units where COVID-19 cases have been identified, especially if there is concern that incarcerated/detained individuals are not notifying staff of symptoms.** See Screening section for a procedure to safely perform a temperature check.

√ **Consider additional options to intensify social distancing within the facility.**

## Management Strategies for Staff

√ **Provide clear information to staff about the presence of COVID-19 cases within the facility, and the need to enforce social distancing and encourage hygiene precautions.**

   o Consider having healthcare staff perform regular rounds to answer questions about COVID-19 from staff.

√ **Staff identified as close contacts of a COVID-19 case should self-quarantine at home for 14 days and may return to work if symptoms do not develop.**

   o See above for definition of a close contact.

   o Refer to CDC guidelines for further recommendations regarding home quarantine for staff.

# Infection Control

Infection control guidance below is applicable to all types of correctional facilities. Individual facilities should assess their unique needs based on the types of exposure staff and incarcerated/detained persons may have with confirmed or suspected COVID-19 cases.

√ **All individuals who have the potential for direct or indirect exposure to COVID-19 cases or infectious materials (including body substances; contaminated medical supplies, devices, and equipment; contaminated environmental surfaces; or contaminated air) should follow infection control practices outlined in the CDC Interim Infection Prevention and Control Recommendations for Patients with Suspected or Confirmed Coronavirus Disease 2019 (COVID-19) in Healthcare Settings. Monitor these guidelines regularly for updates.**

- o Implement the above guidance as fully as possible within the correctional/detention context. Some of the specific language may not apply directly to healthcare settings within correctional facilities and detention centers, or to facilities without onsite healthcare capacity, and may need to be adapted to reflect facility operations and custody needs.

- o Note that these recommendations apply to staff as well as to incarcerated/detained individuals who may come in contact with contaminated materials during the course of their work placement in the facility (e.g., cleaning).

√ **Staff should exercise caution when in contact with individuals showing symptoms of a respiratory infection.** Contact should be minimized to the extent possible until the infected individual is wearing a face mask. If COVID-19 is suspected, staff should wear recommended PPE (see PPE section).

√ **Refer to PPE section to determine recommended PPE for individuals persons in contact with confirmed COVID-19 cases, contacts, and potentially contaminated items.**

## Clinical Care of COVID-19 Cases

√ **Facilities should ensure that incarcerated/detained individuals receive medical evaluation and treatment at the first signs of COVID-19 symptoms.**

- o If a facility is not able to provide such evaluation and treatment, a plan should be in place to safely transfer the individual to another facility or local hospital.

- o The initial medical evaluation should determine whether a symptomatic individual is at higher risk for severe illness from COVID-19. Persons at higher risk may include older adults and persons of any age with serious underlying medical conditions such as lung disease, heart disease, and diabetes. See CDC's website for a complete list, and check regularly for updates as more data become available to inform this issue.

√ **Staff evaluating and providing care for confirmed or suspected COVID-19 cases should follow the CDC Interim Clinical Guidance for Management of Patients with Confirmed Coronavirus Disease (COVID-19) and monitor the guidance website regularly for updates to these recommendations.**

√ **Healthcare staff should evaluate persons with respiratory symptoms or contact with a COVID-19 case in a separate room, with the door closed if possible, while wearing recommended PPE and ensuring that the suspected case is wearing a face mask.**

- o If possible, designate a room near each housing unit to evaluate individuals with COVID-19 symptoms, rather than having them walk through the facility to be evaluated in the medical unit.

√ **Clinicians are strongly encouraged to test for other causes of respiratory illness (e.g., influenza).**

√ **The facility should have a plan in place to safely transfer persons with severe illness from COVID-19 to a local hospital if they require care beyond what the facility is able to provide.**

√ **When evaluating and treating persons with symptoms of COVID-19 who do not speak English, using a language line or provide a trained interpreter when possible.**

## Recommended PPE and PPE Training for Staff and Incarcerated/Detained Persons

√ **Ensure that all staff (healthcare and non-healthcare) and incarcerated/detained persons who will have contact with infectious materials in their work placements have been trained to correctly don, doff, and dispose of PPE relevant to the level of contact they will have with confirmed and suspected COVID-19 cases.**

- o Ensure that staff and incarcerated/detained persons who require respiratory protection (e.g., N95s) for their work responsibilities have been medically cleared, trained, and fit-tested in the context of an employer's respiratory protection program.
- o For PPE training materials and posters, please visit the CDC website on Protecting Healthcare Personnel.

√ **Ensure that all staff are trained to perform hand hygiene after removing PPE.**

√ **If administrators anticipate that incarcerated/detained persons will request unnecessary PPE, consider providing training on the different types of PPE that are needed for differing degrees of contact with COVID-19 cases and contacts, and the reasons for those differences (**see Table 1). **Monitor linked CDC guidelines in Table 1 for updates to recommended PPE.**

√ **Keep recommended PPE near the spaces in the facility where it could be needed, to facilitate quick access in an emergency.**

√ **Recommended PPE for incarcerated/detained individuals and staff in a correctional facility** will vary based on the type of contact they have with COVID-19 cases and their contacts (see Table 1). Each type of recommended PPE is defined below. **As above, note that PPE shortages are anticipated in every category during the COVID-19 response.**

- o **N95 respirator**

See below for guidance on when face masks are acceptable alternatives for N95s. N95 respirators should be prioritized when staff anticipate contact with infectious aerosols from a COVID-19 case.

- o **Face mask**
- o **Eye protection—**goggles or disposable face shield that fully covers the front and sides of the face
- o **A single pair of disposable patient examination gloves**

Gloves should be changed if they become torn or heavily contaminated.

- o **Disposable medical isolation gown or single-use/disposable coveralls, when feasible**
  - ▪ If custody staff are unable to wear a disposable gown or coveralls because it limits access to their duty belt and gear, ensure that duty belt and gear are disinfected after close contact with the individual. Clean and disinfect duty belt and gear prior to reuse using a household cleaning spray or wipe, according to the product label.
  - ▪ If there are shortages of gowns, they should be prioritized for aerosol-generating procedures, care activities where splashes and sprays are anticipated, and high-contact patient care activities that provide opportunities for transfer of pathogens to the hands and clothing of staff.

√ **Note that shortages of all PPE categories are anticipated during the COVID-19 response, particularly for non-healthcare workers. Guidance for optimizing the supply of each category can be found on CDC's website:**

- o **Guidance in the event of a shortage of N95 respirators**
  - ▪ Based on local and regional situational analysis of PPE supplies, **face masks are an acceptable alternative when the supply chain of respirators cannot meet the demand.** During this time, available respirators should be prioritized for staff engaging in activities that would expose them to respiratory aerosols, which pose the highest exposure risk.
- o **Guidance in the event of a shortage of face masks**
- o **Guidance in the event of a shortage of eye protection**
- o **Guidance in the event of a shortage of gowns/coveralls**

**Table 1. Recommended Personal Protective Equipment (PPE) for Incarcerated/Detained Persons and Staff in a Correctional Facility during the COVID-19 Response**

| Classification of Individual Wearing PPE | N95 respirator | Face mask | Eye Protection | Gloves | Gown/ Coveralls |
|---|---|---|---|---|---|
| **Incarcerated/Detained Persons** | | | | | |
| Asymptomatic incarcerated/detained persons (under quarantine as close contacts of a COVID-19 case*) | Apply face masks for source control as feasible based on local supply, especially if housed as a cohort | | | | |
| Incarcerated/detained persons who are confirmed or suspected COVID-19 cases, or showing symptoms of COVID-19 | – | ✓ | – | – | – |
| Incarcerated/detained persons in a work placement handling laundry or used food service items from a COVID-19 case or case contact | – | – | – | ✓ | ✓ |
| Incarcerated/detained persons in a work placement cleaning areas where a COVID-19 case has spent time | Additional PPE may be needed based on the product label. See CDC guidelines for more details. | | | ✓ | ✓ |
| **Staff** | | | | | |
| Staff having direct contact with asymptomatic incarcerated/detained persons under quarantine as close contacts of a COVID-19 case* (but not performing temperature checks or providing medical care) | – | Face mask, eye protection, and gloves as local supply and scope of duties allow. | | | – |
| Staff performing temperature checks on any group of people (staff, visitors, or incarcerated/detained persons), or providing medical care to asymptomatic quarantined persons | – | ✓ | ✓ | ✓ | ✓ |
| Staff having direct contact with (including transport) or offering medical care to confirmed or suspected COVID-19 cases (see CDC infection control guidelines) | ✓** | | ✓ | ✓ | ✓ |
| Staff present during a procedure on a confirmed or suspected COVID-19 case that may generate respiratory aerosols (see CDC infection control guidelines) | ✓ | – | ✓ | ✓ | ✓ |
| Staff handling laundry or used food service items from a COVID-19 case or case contact | – | – | – | ✓ | ✓ |
| Staff cleaning an area where a COVID-19 case has spent time | Additional PPE may be needed based on the product label. See CDC guidelines for more details. | | | ✓ | ✓ |

\*   If a facility chooses to routinely quarantine all new intakes (without symptoms or known exposure to a COVID-19 case) before integrating into the facility's general population, face masks are not necessary.

\*\* A NIOSH-approved N95 is preferred. However, based on local and regional situational analysis of PPE supplies, face masks are an acceptable alternative when the supply chain of respirators cannot meet the demand. During this time, available respirators should be prioritized for procedures that are likely to generate respiratory aerosols, which would pose the highest exposure risk to staff.

# Verbal Screening and Temperature Check Protocols for Incarcerated/Detained Persons, Staff, and Visitors

The guidance above recommends verbal screening and temperature checks for incarcerated/detained persons, staff, volunteers, and visitors who enter correctional and detention facilities, as well as incarcerated/detained persons who are transferred to another facility or released from custody. Below, verbal screening questions for COVID-19 symptoms and contact with known cases, and a safe temperature check procedure are detailed.

√ **Verbal screening for symptoms of COVID-19 and contact with COVID-19 cases should include the following questions:**

- o *Today or in the past 24 hours, have you had any of the following symptoms?*
  - ▪ *Fever, felt feverish, or had chills?*
  - ▪ *Cough?*
  - ▪ *Difficulty breathing?*
- o *In the past 14 days, have you had contact with a person known to be infected with the novel coronavirus (COVID-19)?*

√ **The following is a protocol to safely check an individual's temperature:**

- o Perform hand hygiene
- o Put on a face mask, eye protection (goggles or disposable face shield that fully covers the front and sides of the face), gown/coveralls, and a single pair of disposable gloves
- o Check individual's temperature
- o **If performing a temperature check on multiple individuals, ensure that a clean pair of gloves is used for each individual and that the thermometer has been thoroughly cleaned in between each check.** If disposable or non-contact thermometers are used and the screener did not have physical contact with an individual, gloves do not need to be changed before the next check. If non-contact thermometers are used, they should be cleaned routinely as recommended by CDC for infection control.
- o Remove and discard PPE
- o Perform hand hygiene

# Cook County Sheriff's Office
# Operations Briefing

| Incident Name: | | Date Updated: | Time Prepared: |
|---|---|---|---|
| **Coronavirus Operation Plan** | | **April   4, 2020** | **1800 hours** |
| Operational Period: | | | |
| **March 12, 2020 – TBD** | | | |

## SITUATIONAL ANALYSIS

**EVENT OVERVIEW:**   Coronavirus: The virus that causes COVID-19 appears to be spreading easily and quickly in Hubei province and other parts of China. In the United States, spread of the virus from person-to-person has begun to affect communities in California, New York, Oregon, Massachusetts, and Washington. Illinois now has significant levels of COVID-19, with over 10,000 residents testing positive; Cook County is experiencing transmission in the community, with over 7,000 confirmed cases.

**SYMPTOMS:**   For confirmed COVID-19 cases, reported incidences have ranged from mild symptoms to severe illness and death. Symptoms can include respiratory symptoms, fever, cough, shortness of breath, and breathing difficulties. These symptoms may appear 2-14 days after exposure. In more severe cases, infection can cause pneumonia, severe acute respiratory syndrome, kidney failure, and even death.

**SPREAD:**   The Coronavirus 2019 (COVID-19) is thought to spread mainly from person-to-person through respiratory droplets that are produced when an infected person coughs or sneezes. These droplets can land in the mouths and noses of people who are within close contact (within about 6 feet). Individuals are believed to be the most contagious when they are most symptomatic, however, spread can occur before an individual begins to show symptoms. Additionally, it is possible for a person to get COVID-19 by touching a surface or object that has the virus on it, and then touching their own mouth, nose, or eyes. The virus that causes COVID-19 seems to be spreading easily throughout communities in certain geographic areas. Community spread often results in individuals becoming infected with the virus without knowing how or where they became infected.

**U.S SITUATION:**   Imported cases of COVID-19 in travelers has been detected in the United States, initially through close contacts of returned travelers from Wuhan, China. However, imported cases have expanded to include travelers from other Asian and European countries. During the week of February 23, the CDC reported community spread of COVID-19 in California (in two places), Oregon, New York, and Washington. Community spread in Washington resulted in the first COVID-19 related death in the United States, as well as the first reported case of COVID-19 in a health care worker, and the first potential outbreak in a long-term care facility. On March 13th, President Donald Trump declared a national state of emergency due to increasing spread of COVID-19 throughout the United States. During the week of March 15th, it was reported that all 50 states had incidents of COVID-19.

**CONFIDENTIAL- ATTORNEYS EYES ONLY**

**KNOWN THREATS:**    A husband and wife in Illinois were treated for COVID-19 and were discharged on February 7th. A second couple in Arlington Heights is transitioning to discharge. The couple's son lives with them and has tested negative for COVID-19 but will continue to be monitored and housed separately from his parents. The couple will be quarantined for an additional two weeks. The couple identified 100 contacts who are now being tested for status and further advisement. A fifth person in Illinois was diagnosed with the Coronavirus on March 5, 2020 after returning from studying abroad in Italy and is currently at Rush University Medical Center. Updated threats will be communicated after being received from the Illinois State Police Statewide Terrorist Intelligence Center (STIC) and the Department of Homeland Security. The 6th confirmed case of COVID-19 in Illinois is a CPS special education assistant at Vaughn Occupational High School who recently travelled on the Grand Princess cruise ship. Classes at the high school have been cancelled for the week to allow for sanitation and preventative measures. The 7th confirmed case in Illinois is a man in his 60s who has been hospitalized in serious condition, his diagnosis does not appear to be linked to recent travel. Loyola Academy in Wilmette is closed March 9, 2020 after school officials received information that a student and their family had contacted with an individual who tested positive for COVID-19. The student and their family are currently in a 14-day quarantine and are not exhibiting symptoms for the virus, but school officials decided to close for the day to allow for enhanced sanitation to prevent spread of the virus. We will no longer be listing them independently at this point. As of April 5, 2020, 58,983 individuals have been tested and there are currently 11,256 active COVID-19 cases in Illinois and 274 deaths. Situational updates will be communicated in the morning and evening on current diagnoses and numbers of suspected/confirmed COVID-19 cases once received from the Illinois State Police Statewide Terrorist Intelligence Center (STIC) and Cook County Department of Emergency Management and Regional Security (DEMRS).

**PREVENTION:**    There is currently no vaccine to prevent COVID-19. The best way to prevent illness is to avoid being exposed to the virus. All members are expected to follow training and procedures related to mitigating the risks associated with communicable diseases. The CDC recommends everyday preventative actions to help prevent the spread of respiratory diseases. Preventative measures that staff should engage in include:

- Avoid close contact with people who are sick
- Avoid touching your eyes, nose, and mouth
- Stay home when sick
- Covering cough or sneeze with a tissue, then throwing the tissue in the trash
- Washing hands often with soap and water for at least 20 seconds, especially after going to the bathroom, before eating, and after blowing your nose, coughing, or sneezing.
  - Always wash hands with soap and water if hands are visibly dirty
  - If soap and water are not readily available, use an alcohol-based hand sanitizer with at least 60% alcohol.
- Cleaning and disinfecting frequently touched objects and surfaces using a regular household cleaning spray or wipe
  - This includes decontaminating non-disposable equipment (flashlights, control devices, clothing, and portable radios) as soon as possible if it a potential source of exposure
  - Facemasks should be used by people who display symptoms of COVID-19 to help prevent the spread of the disease to others. The use of facemasks is also

**CONFIDENTIAL- ATTORNEYS EYES ONLY**

        crucial for health workers and others who are caring for someone in close
        settings (at home or in a health care facility)
- Treating all human blood and bodily fluids/tissue as if it is known to be infectious for a communicable disease
- All vehicles used to transport individuals in custody should be wiped down and disinfected before and after transport.
- Staff should begin to have conference calls if possible, instead of in person meetings.
- Tours of Sheriff's Office facilities should be suspended until further notice.
- Volunteers should be reduced and utilized for only essential services. Updated below.
- Mass gatherings should be suspended until further notice.
- No external food for programs will be allowed into the CCDOC.
- Notice to all external law enforcement agencies advising to screen individuals that are arrested and taken into custody.
- For additional information visit the CDC website at:
  https://www.cdc.gov/coronavirus/2019-ncov/about/prevention.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fabout%2Fprevention-treatment.html
- Following CDC's recommendations for using a facemask
  - On 4/3/2020, The CDC issued a recommendation that all individuals wear facemasks in public to protect themselves from developing and spreading respiratory diseases, including COVID-19

## OPERATION BRIEFING

**INCIDENT COMMANDER:**      David Chiko (3605)
                           Assistant Executive Director
                           (312) 859-5425
                           David.chiko@cookcountyil.gov

**FIELD COMMANDER DOC:**      Richard Brogan
                           Assistant Executive Director
                           (312) 497-0882
                           Michael.brady@cookcountyil.gov

**FIELD COMMANDER COURTS:**  Michael Brady (3604)
                           Deputy Director
                           (312) 805-1152
                           Michael.brady@cookcountyil.gov

**FIELD COMMANDER EM:**       Michael Lucente
                           Police Officer
                           (312) 502-0556
                           Michael.lucente@cookcountyil.gov

**FIELD COMMANDER POLICE:**   Tim O'Donnell
                           Commander
                           (312) 459-4776
                           Timmothy.Odonnell@cookcountyil.gov

**LOGISTICS COMMAND:**       Stephen Bouffard
                           Director
                           (312) 859-1626
                           Stephen.bouffard@cookcountyil.gov

**CONFIDENTIAL- ATTORNEYS EYES ONLY**

| | |
|---|---|
| **LOGISTICS SUPPLY COMMAND:** | Brittney Blair<br>Deputy Director<br>(312) 590-0849<br>Brittney.blair@cookcountyil.gov |
| **COMMAND POST:** | Critical Incident Command Center<br>Building 5<br>(773) 674-0169 |
| **COMMAND POST STAFFING:** | CCDOC Officer Robert Moore<br>CCDOC Officer Renee Vandenberg<br>ERT Officer Eriaka Phillips<br>ERT Officer Martha Hernandez |
| **MEDICAL EMERGENCIES (PLAN/CENTERS):** | Cook County Health and Hospitals System |
| **RADIO ZONE:** | CCSO- Statewide 1<br>CCDEMRS- |
| **UNIFORM:** | All personnel assigned to this detail will wear Class B uniforms, Green ERT uniforms and those in civilian dress will have CCSO ID on display. All Sheriff's personnel who engage in an emergency during this assignment will have Sheriff identifiers visible and clearly displayed. Uniform may be modified at anytime during this operation. |
| **PRE – OPS MEETING:** | March 12, 0900 |
| **POST- OPS MEETING:** | To be Determined |
| **CCSO UNITS INVOLVED IN OPERATIONS:** | Cook County Sheriff's Office |
| **COOK COUNTY PARTNERS:** | Health and Hospitals System<br>Cook County Department of Public Health<br>Medical Examiner<br>Department of Emergency Management and Regional Security (DEMRS) |
| **STATE PARTNERS:** | Illinois Department of Public Health (IDPH)<br>Illinois Emergency Management Agency (IEMA)<br>Illinois State Police (ISP)<br>Illinois Department of Corrections (IDOC) |
| **FEDERAL PARTNERS:** | Salvation Army<br>American Red Cross |
| **LOCAL PARTNERS:** | Office of Emergency Management and Communications (OEMC)<br>Chicago Police Department, Crime Prevention and Information Center (CPIC)<br>Chicago Department of Public Health (CDPH) |

CONFIDENTIAL- ATTORNEYS EYES ONLY

**ACTIVITY:** Any staff member involved in any incident during this event shall notify Field Command for reporting purposes and complete a report. Field Command will also notify the Incident Command (ext. 4-0169) during the operation and provide any situational updates. CICC will provide a Situational Report every hour during the duration of the operation to the Incident Commander. If the State of Illinois activates the Illinois Emergency Management Agency (IEMA) State Emergency Operation Center (SEOC), CCSO will have a direct link into the operation center.

**OVERALL COMMAND:** Bradley Curry
Chief of Staff
(312) 590-2608
Bradley.curry@cookcountyil.gov

**OPERATIONS COMMAND** Tarry Williams
1st Deputy Chief of Staff
(312) 802-1547
Tarry.williams@cookcountyil.gov

**PUBLIC SAFETY
COMMAND:** Leo Schmitz
Chief of Public Safety
(312) 318-1473
Leo.schmitz@cookcountyil.gov

**COMMUNITY CORRECTIONS,
COURTS COMMAND:** Adriana Morales
Chief of Intergovernmental & Community Affairs
(312) 914-2969
Adriana.morales@cookcountyil.gov

**SOCIAL MEDIA:** The Strategic Operations Center will be monitoring social media to provide real time logistical challenges and threats that may be faced during this operation. Social media will be monitored for the duration of this operation. If necessary, HSI and STIC will review social media and provide additional information. Any information gathered will be immediately reported to the Incident Commander. The command center will also monitor the Centers for Disease Control (CDC), Illinois Department of Public Health (IDPH), Cook County Department of Public Health (CCDPH), and the World Health Organization (WHO) websites for updated information.

**DAILY HISTORIAN:** A daily historian will be assigned to the command center to monitor the Centers for Disease Control (CDC), Illinois Department of Public Health (IDPH), Cook County Department of Public Health (CCDPH), and the World Health Organization (WHO) websites for updated information on the Coronavirus. The daily historian shall also read all articles, periodicals, news reports, law enforcement bulletins, and public safety announcements in order to update the command staff team.

**OPERATION PLAN:** Cook County Department of Emergency Management and Regional Security (DEMRS) has activated the Emergency Operations Center (EOC). The Illinois Department of Public Health and Centers for Disease Control are testing and strategizing with hospital management to ensure staff and patients are treated according to protocol. EOC has reported the Cook County threat for COVID-19 to be Level 2 – Partial, which indicates the involvement of several agencies to address

**CONFIDENTIAL- ATTORNEYS EYES ONLY**

a moderate incident/threat. CCSO will collaborate with DEMRS to prepare a step by step guide to ensure the privacy rights of the patients are respected and any personal information is not disclosed. In an effort to not duplicate work, we need to work efficiently and effectively.

**FISCAL IMPACT:** Since the State of Illinois has declared a Disaster Proclamation by Governor Pritzker, funding to fight Coronavirus may be available to federal, state, and local governments. The budget office will be responsible for tracking overtime, spending, supplies utilized, and other operational expenses. A tracking form will be issued to all offices in the Sheriff's Office in order to track expenses.

**COMMUNICATION:** Communication to staff, the public, and the detainee population is very critical. Misinformation can cause overreaction and under reporting. The executive staff and communications team will be responsible for developing messages to staff, visitors, and the public on current and correct information that should be relayed. Information should be shared as often as possible. The Chief of Staff will send daily messages to staff of updates and pertinent information. There will be daily communication with CCDOC staff. In addition, a roll call memo will read at five (5) consecutive roll calls, reminding staff that if they are transporting a detainee to urgent care who is suspected to have flu-like symptoms, personal protective equipment (PPE) is located in intake and urgent care and is available to them. PPE includes a single pair of disposable examination gloves, disposable isolation gown or single use/disposable coveralls, any NIOSH-approved particulate respirator (i.e., N-95 or higher-level respirator), surgical mask, and eye protection (i.e., goggles or disposable face shield that fully covers the front and sides of the face).

**SUPPLY CHAIN:** The Logistics coordinator of supply chain management shall ensure that there is enough cleaning supplies and personal protective equipment on hand at all times. Staff requesting supplies must follow the Centralized Inventory Protocol to ensure appropriate distribution.

**LABOR:** Labor representatives should meet with union leaders to discuss the handling of the Coronavirus during the course of this operation. Communication to union officials will ensure a clear understanding of expectations and responsibilities. On 3/14/20 the Sheriff's Office invoked the Emergency Provisions of the collective bargaining agreements pursuant to the Employer Rights clauses because of the Coronavirus (COVID-19) outbreak. Each CBA clause allows for the Sheriff's Office in sum, "*to take any and all actions as may be necessary to carry out the duties and responsibilities of the employer in situations of civil emergency as may be declared by the employer. … [The Sheriff's Office] may be required to assign employees as the Employer deems necessary to carry out its duties and responsibilities.*"

**CCDOC OPERATION PLAN:** Detainees exhibiting symptoms will be housed in Cermak 3 South, Stroger Hospital, or other local hospitals depending on availability and circumstances. Additionally, the CCDOC may develop additional isolation areas depending on the extent of the outbreak. Cermak has 14 available negative pressure isolation cells. DOC executive leadership, as well as classification, legal, and sanitarians will receive daily correspondence from Cermak if there were to be a COVID-19 outbreak. If an outbreak were to occur, isolation, enhanced sanitation, additional screening (at all entry points-prior to entry), and limited movement will be implemented. Reports listing originating units, surveillance activity, and number of cases, and any units recommended to be placed on limited movement status will be provided by CCHHS. If a unit is recommended to be placed on limited movement, then there will be no new admissions or transfers on or off this unit. Movement to court, medical appointments, visitation (while allowed) will be permitted as long as the detainee is screened for flu-like symptoms prior to the movement. Symptomatic

CONFIDENTIAL- ATTORNEYS EYES ONLY

patients will be brought directly to urgent care by divisional security staff. All affected areas will be cleaned and disinfected. All workers must wear proper Personal Protective Equipment (PPE), and should thoroughly wash their hands with soap and water upon completion of the cleaning tasks. Please see the below link for additional CDC guidance:

https://www.cdc.gov/coronavirus/2019-ncov/hcp/ppe-strategy/index.html

Concentration for bleach solution will be increased in order to properly disinfect the affected areas. The Divisional Sanitation Officers will ensure that the listed living units and all touch surfaces in cells and common areas of the living unit where those inmates were housed receive enhanced cleaning and disinfection with Sanifest/Enviro-Care solution and bleach solution until the dates indicated. In the event that there is a shortage of Divisional Sanitation Officers, an emergency response team will be thoroughly trained and deployed to provide enhanced sanitation. For additional information dealing with Coronavirus COVID-19 please see the below link:

https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html.

The Department of Corrections will develop a receiving area where new detainees brought into the jail will be housed for 7-14 days, based on capacity to monitor for symptoms of COVID-19. Minimum and Medium inmates will be housed in the same Division while maximum inmates will be housed in a separate Division. After 7-14 days if no one on that living unit is symptomatic, that living unit will be moved to general population. The area that the population vacates will be cleaned and sanitized before allowing another population to move onto that living unit.

On March 11, 2020 DOC began screening all visitors, vendors, attorneys, and the public before allowing entry into DOC.

On March 12, 2020 DOC began implementing a policy where the screening tool had to be filled out for everyone that was screened. The DOC began restricted visitation to only one 15-minute visit per detainee, with one visitor, per week.

On March 13, 2020, as part of the screening process, the DOC began taking temperatures of all incoming detainees.

On March 14, 2020 detainees and the public were advised that on March 15, 2020 the DOC will suspend all in person detainee visitation until further notice.

On March 16, 2020 we began screening all detainees with the algorithm upon discharge from DOC. Temperatures will not be taken at this time due to a shortage of thermometers.

On March 16, 2020 we began holding inmates for 4 days prior to shipping them to IDOC.

On March 16, 2020 we began holding detainees court ordered to a paid placement, A Safe Haven or Henry's Sober Living, for 7 days. They will also be screened before discharge to ensure they are not symptomatic.

On March 17, 2020 we began taking temperatures at discharge.

On March 18, 2020 we began preparing MHTC Barracks 2 with 21 beds for isolation housing.

On March 19, 2020 we began utilizing the screening algorithm at roll call. Additionally, staff

CONFIDENTIAL- ATTORNEYS EYES ONLY

were asked to take their temperatures twice before reporting to duty every day.

On March 24, 2020 we continued preparing the isolation housing at Division 16/Isolation Compound and added approximately 300 beds.

On March 24, 2020 deputy sheriffs began conducting public well-being checks on an as needed basis

**SPECIAL INFORMATION:**

Cermak began screening detainees on January 24, for flu like symptoms in both Intake and the Urgent Care. Jail visitations will continue. Any detainee who screens (+) will be reported to CCH Infection Control/Disease. Care coordination and transfer to an Emergency Room or Hospital will be determined by CCH and local health departments' recommendation. Sanitarians have been advised and are aware of the disinfection process needed in the event a detainee screens (+). We are in regular contact with the Illinois Department of Public Health, the Cook County Department of Public Health and the Chicago Department of Public Health. On March 12, 2020 we began screening all arrestees, visitors, volunteers, vendors, public defenders, State's Attorneys, non-employees, etc., upon entry to the Cook County Department of Corrections using the Cook County Health screening tool. This screening will take place before individuals are allowed into the confined area of the jail. If people answer in the affirmative to questions that would make them suspect to contracting the Coronavirus, they will be denied entry into the Department of Corrections.

The DOC will not allow any food to be brought in for detainee graduations or special events.

All large gatherings should be canceled until further notice.

On March 12, 2020 the CCSO Training Academy was advised that effective March 16, 2020 all staff in-service training will be suspended until further notice.

On March 12, 2020 begin providing daily messages to staff.

On March 12, 2020 sent request to CCDEMRS requesting assistance with sourcing tents.

On March 13, 2020 sent letter from Sheriff Dart to Cook County stakeholders regarding court consolidation.

On Sunday March 15, 2020 the AFSCME and Teamsters compound bids were to take effect. This would have caused many staff to be moved from one Division to another. The moves on this bid was stopped in order to ensure staff continued to work in the same work location during this pandemic.

On March 16, 2020 signage was posted at internal and external CCSO staff entry points and at all time clocks altering staff to the symptoms of the Coronavirus. Staff are also being directed to contact HR regarding medical and leave policies. To streamline communication regarding staff, HR is collaborating with the command center.

On March 17, 2020 the CCSO Training Academy was advised that effective March 18, 2020 the cadet training academy will be suspended until further notice. The cadets will be redeployed.

On March 17, 2020 CCSO participated in a discussion with ISP to address the Governor's executive orders.

March 18, 2020 Cermak provided a letter that they sent to their leadership advising that we needed to have the ability to test for the virus.

On March 18, 2020 Harry Grenawitzke begins providing consultation to CCDOC.

**CONFIDENTIAL- ATTORNEYS EYES ONLY**

On March 19, 2020 all community RENEW activities were suspended until further notice.

On March 19, 2020 a Crisis Team was established. The Crisis Team is a group of employees with experienced backgrounds in many areas to include mental health treatment, security, substance abuse, crisis intervention, hostage negotiators, peer support, etc. This team will respond to address an employee need in the event of a mental health/stressful episode.

On March 20, 2020 we secured 3 tents from the Department of Emergency Management and Regional Security (DEMRS). This can house up to 148 people. DEMRS also provided us with an additional 1,000 masks and 2,000 pairs of gloves.

On March 20, 2020 we sent an additional request to ILEAS for PPE and supplies.

On March 20, 2020 we began screening and taking the temperatures of all volunteers, vendors, contractors, and individuals from Department of Facilities Management prior to entrance.

Beginning on March 20, 2020 the Cook County Sheriff's Police will not be towing vehicles unless they are impeding public safety.

On March 20, 2020 we sent letter to Chicago Community Bond Fund explaining efforts to curb COVID-19.

As of March 21, 2020, DOC Correctional Officers can only work overtime in the division they are assigned.

Starting on March 23, 2020 there will be a quick lane for bonding out so that individuals entering to be bonded out can stand in a separate lane and staff will not need to come into direct contact with them.

On March 23, 2020 Dr. Orris begins providing consultation to CCDOC.

On March 26, 2020 we added additional beds to Division 16/Isolation Compound so that it could hold over 500 isolation beds.

On March 27, 2020 we sent letter to FEMA, U.S. HHS, Senator Durbin, Bureau of Prisons asking for additional PPE.

On March 27, 2020 we sent letter to IDPH, IEMA, CCHHS, Governor Pritzker asking for additional PPE.

On March 28, 2020 we began taking the temperatures of all employees at the start of their workday.

On March 30, 2020 follow up emails sent to FEMA, IDPH, Governor, Senator Durbin, BOP, HHS, IEMA, CCDEMRS regarding PPE, supplies, and rapid testing.

On March 30, 2020 we began moving 80 detainees to Division 16/Isolation Compound.

On March 31, 2020 follow up emails sent to FEMA, IDPH, Governor, Senator Durbin, BOP, HHS, IEMA, CCDEMRS regarding PPE, supplies, and rapid testing.

On April 1, 2020 a PPE Accountability Team began operating on every shift, providing guidance to staff regarding PPE use and ensuring the availability of PPE in every division.

On April 1, 2020 we sent letter to Abbott Labs requesting access to FDA-approved rapid testing.

On April 1, 2020 had phone calls with HHS and FEMA regarding supplies and testing.

On April 1, 2020 we sent letter to IDOC from Brady Curry concerning County holds.

CONFIDENTIAL- ATTORNEYS EYES ONLY

On April 2, 2020 we began requiring all staff entering the DOC to wear surgical masks.

On April 2, 2020 we sent letter to IDPH renewing request for rapid testing to be established as a testing site.

On April 3, 2020 Abbott Labs test approved for use by CCHHS for detainees.

**ENHANCED-SANITATION PROCESS:**

Pre-mixed bleach solution (>5000ppm) must be collected from Central Chemical in Division 5.

If Division does not already have Sanifest solution, please acquire this chemical from Central Chemical in Division 5.

Gowns and rags are available in Support Services.

Follow Sanitarian Protocol for cleaning areas suspected of a COVID-19 contamination issued April 1, 2020.

Pre-wash or clean surface with Sanifest solution using rag, then apply/spray the sanitizing solution of bleach or rag or use the canister. Allow solution to contact surface for at least 5 minutes for optimum effectiveness. Afterward, rinse and-or allow area to air dry.

Continue the enhanced Sanitation process until the date indicated by Cermak Health and Hospital Services infection Control Department.

All potentially contaminated clothing must be collected in a biohazard waste bag, labeled, and sent to Central Laundry to be laundered.

**DETAINEE LAUNDRY PROCESS:**

Keep contaminated and uncontaminated clothes separate.

Handle contaminated linens and laundry as little as possible, utilizing the appropriate PPE. Make certain that workers are thoroughly washing their hands with soap and water.

Wash contaminated items separately in a pre-wash cycle. Then, use a regular wash cycle—using detergent—and dry separately from uncontaminated clothing at high temperature (greater than 170 degrees Fahrenheit).

Ensure that all soiled linens and clothes are kept away from cleaned items. Please indicate COVID-19 on the bag.

**OUTBREAK:**

In the event of a catastrophic outbreak of coronavirus, or any other rapidly spreading infectious disease, the CCDOC will continue to use 3 South (14 total beds) in Cermak as the first location for treatment. If additional bed space is required, the DOC could potentially open the following tiers:

If isolation overflow space becomes necessary, Cermak and CCDOC collaboratively agree to utilize Cermak, RTU, and Division 16 – Isolation Compound. The areas listed above do not have any facilities related issues preventing them from being safely utilized in the event of an outbreak.

Outlying counties for new intake detainees in the event of a partial evacuation or quarantine overflow will be Jefferson County, Mercer County, Kendall County, Rock Island County and IDOC.

**CONFIDENTIAL- ATTORNEYS EYES ONLY**

**\*Current practice is that individuals with COVID-19 symptoms must be in negative pressure environment and cannot be housed in normal airflow environment. This is subject to change based on availability and recommendations from the Illinois Department of Public Health. Positive detainees can be housed together.**

**DOC MITIGATING STRATEGIES:**

Patients presenting with fever or respiratory symptoms should perform hand hygiene, wear surgical/face masks, and /or be placed in a contained unit with the door closed and a special precautions sign posted.

- All personnel entering the containment areas will wear appropriate personal protective equipment, such as gowns, gloves, eye protection and masks.
- Use of social distancing and isolation will be initiated in coordination with local health recommendations.
- Limit points of entry to facility.
- Limit visitors to those essential for facility support.
- Screen all persons entering the facility for fever and respiratory symptoms.
- Implement system for detecting and reporting signs and symptoms of staff reporting for duty.
- Symptomatic employees will be screened regarding fit for duty.
- Entry logs will be at all facility entrances to document all who enter the containment unit.
- Personnel assigned to combined patient care units should not float to other areas.
- If transportation of symptomatic person is necessary, have individual wear surgical/face mask to contain respiratory secretions.
- Cancel all events at the facility where many people come together.
  - All non-essential events have been suspended.
- Detainees should have limited movement and should remain in the same Division and same Tier as much as possible.

**POLICE, COURTS, FIELD UNITS, AND COMMUNITY CORRECTIONS:**

Court lock ups should begin screening all new detainees using the approved Cook County Health algorithm. Anyone who self admits to exposure of the Coronavirus should be immediately isolated by giving them a mask to wear, placing them in a single cell, and kept separate from all other detainees. Staff should immediately follow the directions below this section.

For field units and other departments that must come into regular contact with the public, this operation plan will outline preventative actions and procedures to promote staff safety.

- If possible, maintain a distance of at least 6 feet
- Practice proper hand hygiene
  - Wash hands with soap and water for at least 20 seconds. If soap and water are not readily available and illicit drugs are NOT suspected to be present, use an alcohol-based hand sanitizer with at least 60% alcohol
  - Do not touch your face with unwashed hands
- Have a trained Emergency Medical Service/Emergency Medical Technician (EMS/EMT) assess and transport anyone suspected of having COVID-19 to a healthcare facility
- Ensure only trained personnel wearing appropriate PPE have contact with individuals who have COVID-19 symptoms or who may have COVID-19

Law enforcement who must make contact with individuals confirmed or suspected to have COVID-19 should follow CDC's Interim Guidance for EMS. Different styles of PPE may be necessary to perform operational duties. These alternative styles (i.e. coveralls) must provide

**CONFIDENTIAL- ATTORNEYS EYES ONLY**

protection that is at least as great as that provided by the minimum amount of PPE recommended.

The minimum recommended PPE for coming into contact with someone who is confirmed or suspected to have COVID-19 is:

- A single pair of disposable examination gloves,
- Disposable isolation gown or single use/disposable coveralls*,
- <u>Any</u> NIOSH-approved particulate respirator (i.e., N-95 or higher-level respirator), and
- Eye protection (i.e., goggles or face shield that fully covers the front and sides of the face)

*If unable to wear a disposable gown or coveralls because it limits access to duty belt and gear, ensure duty belt and gear are disinfected after contact with individual.

If close contact occurs during apprehension:

- Clean and disinfect duty belt and gear prior to reuse using a household cleaning spray or wipe, according to the product label
- Follow standard operating procedures for the containment and disposal of used PPE
- Follow standard operating procedures for containing and laundering clothes. Launder at the warmest temperature the clothing will tolerate. Avoid shaking the clothes.

**For law enforcement personnel performing <u>daily routine activities</u>, the immediate health risk is considered low. However, law enforcement leadership and personnel should follow <u>https://www.cdc.gov/coronavirus/2019-ncov/community/guidance-law-enforcement.html</u>.**

In the event that an EM participant is self-quarantined in the host site for 14 days, EM staff shall suspend all nonessential movement. An information letter shall be sent to all EM participants advising them of the steps they should take to protect themselves and others.

Sheriff's Work Alternative Program (SWAP) participants shall be screened for the Coronavirus before being allowed to work for the day. This shall be done using the Cook County Health Algorithm and by taking temperatures.

On March 14, 2020 SWAP was advised to cancel SWAP until further notice beginning on March 15, 2020.

On March 14, 2020 evictions were cancelled based on direction from the Chief Judge of Cook County. Civil Process will only serve emergency orders (stalking orders, orders of protection, etc.)

On March 16, 2020 RENEW was advised that effective March 17, 2020 RENEW will assign no more than nine (9) total participants demolition projects. Effective March 19, 2020 RENEW will not be allowed to work in the community but will be allowed to work on the DOC compound.

**SUPPORT STAFF:**     Support staff are identified as Administrative Assistants, Project Managers, and other individuals who work in Human Resources, Legal, Information and Technology, Payroll, and Budget. Support staff will be identified to work based on the staffing plan (page 14).

**HUMAN RESOURCES:**     All employees reporting close contact with someone who has the Coronavirus (COVID-19) and employees that are positive or exhibiting symptoms of COVID-19 must report that information to the command center. The command center will notify HR. HR will then notify staff of the appropriate steps to take before returning to work. All new employees, vendors, contractors, maintenance staff, etc. should also be screened prior to allowing to begin employment. Drug

testing will cease on all employees, except for reasonable suspicion.

**EXPOSURE TO A COMMUNICABLE DISEASE:**

In the event that a staff member approaches a supervisor and reports a possible exposure, the supervisor should immediately isolate the individual from other employees, give the person a mask to wear, get as much information as possible about the exposure, and then notify the command center for further direction.

Sheriff's Office members who must make contact with individuals confirmed or suspected to have COVID-19 should follow CDC's Interim Guidance for EMS. Different styles of PPE may be necessary to perform operational duties. These alternative styles (i.e. coveralls) must provide protection that is at least as great as that provided by the minimum amount of PPE recommended.

The minimum recommended PPE for coming into contact with someone who is confirmed or suspected to have COVID-19 is:

- A single pair of disposable examination gloves,
- Disposable isolation gown or single-use/disposable coveralls*,
- Any NIOSH-approved particulate respirator (i.e., N-95 or higher-level respirator); Facemasks are an acceptable alternative until the supply chain is restored, and
- Eye protection (i.e., goggles or disposable face shield that fully covers the front and sides of the face)

*If unable to wear a disposable gown or coveralls because it limits access to duty belt and gear, ensure duty belt and gear are disinfected after contact with individual.

**If close contact occurred during apprehension**

- Clean and disinfect duty belt and gear prior to reuse using a household cleaning spray or wipe, according to the product label.
- Follow standard operating procedures for the containment and disposal of used PPE.
- Follow standard operating procedures for containing and laundering clothes. Avoid shaking the clothes.

As of March 12, 2020, we have identified the following vulnerabilities: Staff, Detainees, Volunteers, Public and Alternative Work locations, that are continuously being addressed.

CONFIDENTIAL- ATTORNEYS EYES ONLY

| Staffing Plan | | | | | |
|---|---|---|---|---|---|
| **STAFF SHORTAGE** | 25% staff call off | 50% staff call off | 75% staff call off | **100% all Staff** | |
| **ESSENTIAL DEPARTMENTS** | **Open the Command Center** | | | | |
| **DOC** | 77.5 - normal operations | 155 - 12-hour shifts, limited movement, close programming | 232 - assign exempt, lockdown, specialty units, other sworn staff from other units | All staff - assign other sworn staff from other units, lockdown, no visits, civilian staff assigned to assist in non-security roles, ILEAS Activation | |
| **POLICE** | 28-normal operations | 56- 12-hour shift | 84- specialized units, consolidate beats in unincorporated areas, staff only two areas, patrol and CSI | All staff - ILEAS Activation, Suburban support, ISP support, CPD support, | |
| **COURTS** -Court schedules -Civil Process -Evictions | 168 Court CPU- 12-hour shifts | 336 Courts/42 CPU- Suspend evictions, non-essential CP | 504 Courts/63 CPU- Suspend programs, assign exempt staff, specialty units | All staff - Suspend court, evictions, exempt staff, ILEAS activation | |
| **ELECTRONIC MONITORING** | 22- Police, Protocol to make phone checks, Civil Process, Evictions | 44- Emergency Response Team, Protocol to make phone checks, Police | 66- Lockdown, Protocol and EM to do phone checks only, Police, Civil Process, Evictions | All Staff - Outside LE ILEAS activation, other sworn staff | |
| **SUPPORT** | **Civilian Staff** | **Exempt Staff** | **Volunteers** | **National Guard** | **Outside Law Enf.** |
| **IT** | 1 staff on virtual help support, 1 staff on site, based on need | | | | |
| **PAYROLL** | Work remotely | | | | |

CONFIDENTIAL- ATTORNEYS EYES ONLY

| Available Bed Space for Intakes<br>PARTIAL EVACUATE/OVERFLOW BASED ON QUARATINE | | | |
|---|---|---|---|
| **Location** | **Available Beds** | **Location** | **Available Beds** |
| Rock Island | 67 beds | IDOC | TBD – 2000+ |
| CCDOC | 1250 beds | | |
| Mercer County | 48 beds | | |
| Kendall County | 12 beds | | |
| Jefferson County | 75 beds | | |
| Livingston County | 28 beds | | |

CONFIDENTIAL- ATTORNEYS EYES ONLY

**Interim Guidance for Businesses and Employers to Plan and Respond to Coronavirus Disease 2019 (COVID-19)**

Plan, Prepare and Respond to Coronavirus Disease 2019

Related Pages

**Older adults and people who have severe underlying chronic medical conditions** like heart or lung disease or diabetes seem to be at higher risk for developing more serious complications from COVID-19 illness.
Find more information here.

Summary of Changes to the Guidance:

Below are changes as of March 21, 2020

- Updated cleaning and disinfection guidance
- Updated best practices for conducting social distancing
- Updated strategies and recommendations that can be implemented now to respond to COVID-19

**Purpose**

This interim guidance is based on what is currently known about the coronavirus disease 2019 (COVID-19). COVID-19 is a respiratory illness that can spread from person to person. The outbreak first started in China, but the virus continues to spread internationally and in the United States. The Centers for Disease Control and Prevention (CDC) will update this interim guidance as additional information becomes available.

The following interim guidance may help prevent workplace exposures to COVID-19, in non-healthcare settings. (CDC has provided separate guidance for healthcare settings.) This guidance also provides planning considerations for community spread of COVID-19.

To prevent stigma and discrimination in the workplace, use only the guidance described below to determine risk of COVID-19 infection. Do not make determinations of risk based on race or country of origin and be sure to maintain confidentiality of people with confirmed coronavirus infection. There is much more to learn about the transmissibility, severity, and other features of COVID-19 and investigations are ongoing. Updates are available on CDC's web page.

**Preparing Workplaces
for a COVID-19
Outbreak**

Businesses and employers can prevent and slow the spread of COVID-19. Employers should plan to respond in a flexible way to varying levels of disease transmission in the community and be prepared to refine their business response plans as needed. According to the Occupational Safety and Health Administration (OSHA), most American workers will likely experience low (caution) or medium exposure risk levels at their job or place of employment (see OSHA guidance for employerspdf iconexternal icon for more information about job risk classifications).

Businesses are strongly encouraged to coordinate with stateexternal icon and localexternal icon health officials so timely and accurate information can guide appropriate responses. Local conditions will influence the decisions that public health officials make regarding community-level strategies. CDC has guidance for mitigation strategiespdf icon according to the level of community transmission or impact of COVID-19.

All employers need to consider how best to decrease the spread of COVID-19 and lower the impact in their workplace. This may include activities in one or more of the following areas:

**CONFIDENTIAL- ATTORNEYS EYES ONLY**

1. reduce transmission among employees,
2. maintain healthy business operations, and
3. maintain a healthy work environment.

**Reduce Transmission Among Employees**

**Actively encourage sick employees to stay home:**

- Employees who have symptoms (i.e., fever, cough, or shortness of breath) should notify their supervisor and stay home.
- Sick employees should follow CDC-recommended steps. Employees should not return to work until the criteria to discontinue home isolation are met, in consultation with healthcare providers and state and local health departments.Employees who are well but who have a sick family member at home with COVID-19 should notify their supervisor and follow CDC recommended precautions.

**Identify where and how workers might be exposed to COVID-19 at work:**

- See OSHA COVID-19external icon webpage for more information on how to protect workers from potential exposures and guidance for employerspdf iconexternal icon, including steps to take for jobs according to exposure risk.
- Be aware that some employees may be at higher risk for serious illness, such as older adults and those with chronic medical conditions. Consider minimizing face-to-face contact between these employees or assign work tasks that allow them to maintain a distance of six feet from other workers, customers and visitors, or to telework if possible.

**Separate sick employees:**

- Employees who appear to have symptoms (i.e., fever, cough, or shortness of breath) upon arrival at work or who become sick during the day should immediately be separated from other employees, customers, and visitors and sent home.
- If an employee is confirmed to have COVID-19 infection, employers should inform fellow employees of their possible exposure to COVID-19 in the workplace but maintain confidentiality as required by the Americans with Disabilities Act (ADA). The fellow employees should then self-monitor for symptoms (i.e., fever, cough, or shortness of breath).

**Educate employees about how they can reduce the spread of COVID-19:**

- Employees can take steps to protect themselves at work and at home. Older people and people with serious chronic medical conditions are at higher risk for complications.
- Follow the policies and procedures of your employer related to illness, cleaning and disinfecting, and work meetings and travel.
- Stay home if you are sick, except to get medical care. Learn what to do if you are sick.
- Inform your supervisor if you have a sick family member at home with COVID-19. Learn what to do if someone in your house is sick.
- Wash your hands often with soap and water for at least 20 seconds. Use hand sanitizer with at least 60% alcohol if soap and water are not available.
- Avoid touching your eyes, nose, and mouth with unwashed hands.
- Cover your mouth and nose with a tissue when you cough or sneeze or use the inside of your elbow. Throw used tissues in the trash and immediately wash hands with soap and water for at least 20 seconds. If soap and water are not available, use hand sanitizer containing at least 60% alcohol. Learn more about coughing and sneezing etiquette on the CDC website.
- Clean AND disinfect frequently touched objects and surfaces such as workstations, keyboards, telephones, handrails, and doorknobs. Dirty surfaces can be cleaned with soap and water prior to disinfection. To disinfect, use products that meet EPA's criteria for use against SARS-CoV-2external icon, the cause of COVID-19, and are appropriate for the surface.

CONFIDENTIAL- ATTORNEYS EYES ONLY

- Avoid using other employees' phones, desks, offices, or other work tools and equipment, when possible. If necessary, clean and disinfect them before and after use.
- Practice social distancing by avoiding large gatherings and maintaining distance (approximately 6 feet or 2 meters) from others when possible.

**Maintain Healthy Business Operations**

**Identify a workplace coordinator** who will be responsible for COVID-19 issues and their impact at the workplace.

**Implement flexible sick leave and supportive policies and practices.**

- Ensure that sick leave policies are flexible and consistent with public health guidance and that employees are aware of and understand these policies.
- Maintain flexible policies that permit employees to stay home to care for a sick family member or take care of children due to school and childcare closures. Additional flexibilities might include giving advances on future sick leave and allowing employees to donate sick leave to each other.
- Employers that do not currently offer sick leave to some or all of their employees may want to draft non-punitive "emergency sick leave" policies.
- Employers should not require a positive COVID-19 test result or a healthcare provider's note for employees who are sick to validate their illness, qualify for sick leave, or to return to work. Healthcare provider offices and medical facilities may be extremely busy and not able to provide such documentation in a timely manner.
- Review human resources policies to make sure that policies and practices are consistent with public health recommendations and are consistent with existing state and federal workplace laws (for more information on employer responsibilities, visit the Department of Labor's external icon and the Equal Employment Opportunity Commission's external icon websites).
- Connect employees to employee assistance program (EAP) resources (if available) and community resources as needed. Employees may need additional social, behavioral, and other services, for example, to cope with the death of a loved one.

**Assess your essential functions** and the reliance that others and the community have on your services or products.

- Be prepared to change your business practices if needed to maintain critical operations (e.g., identify alternative suppliers, prioritize existing customers, or temporarily suspend some of your operations if needed).
- Identify alternate supply chains for critical goods and services. Some good and services may be in higher demand or unavailable.
- Talk with companies that provide your business with contract or temporary employees about the importance of sick employees staying home and encourage them to develop non-punitive leave policies.
- Talk with business partners about your response plans. Share best practices with other businesses in your communities (especially those in your supply chain), chambers of commerce, and associations to improve community response efforts.

**Determine how you will operate if absenteeism spikes** from increases in sick employees, those who stay home to care for sick family members, and those who must stay home to watch their children if dismissed from childcare programs and K-12 schools.

- Plan to monitor and respond to absenteeism at the workplace.
- Implement plans to continue your essential business functions in case you experience higher than usual absenteeism.
- Prepare to institute flexible workplace and leave policies.

CONFIDENTIAL- ATTORNEYS EYES ONLY

- Cross-train employees to perform essential functions so the workplace can operate even if key employees are absent.

**Consider establishing policies and practices for social distancing.** Social distancing should be implemented if recommended by state and local health authorities. Social distancing means avoiding large gatherings and maintaining distance (approximately 6 feet or 2 meters) from others when possible (e.g., breakrooms and cafeterias). Strategies that business could use include:

- Implementing flexible worksites (e.g., telework)
- Implementing flexible work hours (e.g., staggered shifts)
- Increasing physical space between employees at the worksite
- Increasing physical space between employees and customers (e.g., drive through, partitions)
- Implementing flexible meeting and travel options (e.g., postpone non-essential meetings or events)
- Downsizing operations
- Delivering services remotely (e.g. phone, video, or web)
- Delivering products through curbside pick-up or delivery

**Employers with more than one business location** are encouraged to provide local managers with the authority to take appropriate actions outlined in their COVID-19 response plan based on local conditions.

**Maintain a healthy work environment**

**Consider improving the engineering controls using the building ventilation system.** This may include some or all of the following activities:

- Increase ventilation rates.
- Increase the percentage of outdoor air that circulates into the system.

**Support respiratory etiquette and hand hygiene for employees, customers, and worksite visitors:**

- Provide tissues and no-touch disposal receptacles.
- Provide soap and water in the workplace. If soap and water are not readily available, use alcohol-based hand sanitizer that is at least 60% alcohol. If hands are visibly dirty, soap and water should be chosen over hand sanitizer. Ensure that adequate supplies are maintained.
- Place hand sanitizers in multiple locations to encourage hand hygiene.
- Place posters that encourage hand hygiene to help stop the spread at the entrance to your workplace and in other workplace areas where they are likely to be seen.
- Discourage handshaking – encourage the use of other noncontact methods of greeting.
- Direct employees to visit the coughing and sneezing etiquette and clean hands webpage for more information.

**Perform routine environmental cleaning and disinfection:**

- Routinely clean and disinfect all frequently touched surfaces in the workplace, such as workstations, keyboards, telephones, handrails, and doorknobs.
  - If surfaces are dirty, they should be cleaned using a detergent or soap and water prior to disinfection.
  - For disinfection, most common EPA-registered household disinfectants should be effective. A list of products that are EPA-approved for use against the virus that causes COVID-19 is available herepdf iconexternal icon. Follow the manufacturer's instructions for all cleaning and disinfection products (e.g., concentration, application method and contact time, etc.).

CONFIDENTIAL- ATTORNEYS EYES ONLY

- Discourage workers from using other workers' phones, desks, offices, or other work tools and equipment, when possible. If necessary, clean and disinfect them before and after use.
- Provide disposable wipes so that commonly used surfaces (for example, doorknobs, keyboards, remote controls, desks, other work tools and equipment) can be wiped down by employees before each use. To disinfect, use products that meet EPA's criteria for use against SARS-Cov-2external icon, the cause of COVID-19, and are appropriate for the surface.

**Perform enhanced cleaning and disinfection after persons suspected/confirmed to have COVID-19 have been in the facility:**

- If a sick employee is suspected or confirmed to have COVID-19, follow the CDC cleaning and disinfection recommendations.

**Advise employees before traveling to take additional preparations:**

- Check the CDC's Traveler's Health Notices for the latest guidance and recommendations for each country to which you will travel. Specific travel information for travelers going to and returning from countries with travel advisories, and information for aircrew, can be found on the CDC website.
- Advise employees to check themselves for symptoms of COVID-19 (i.e., fever, cough, or shortness of breath) before starting travel and notify their supervisor and stay home if they are sick.
- Ensure employees who become sick while traveling or on temporary assignment understand that they should notify their supervisor and promptly call a healthcare provider for advice if needed.
- If outside the United States, sick employees should follow company policy for obtaining medical care or contact a healthcare provider or overseas medical assistance company to assist them with finding an appropriate healthcare provider in that country. A U.S. consular officer can help locate healthcare services. However, U.S. embassies, consulates, and military facilities do not have the legal authority, capability, and resources to evacuate or give medicines, vaccines, or medical care to private U.S. citizens overseas.

**Take care when attending meetings and gatherings:**

- Carefully consider whether travel is necessary.
- Consider using videoconferencing or teleconferencing when possible for work-related meetings and gatherings.
- Consider canceling, adjusting, or postponing large work-related meetings or gatherings that can only occur in-person.
- When videoconferencing or teleconferencing is not possible, hold meetings in open, well-ventilated spaces.

**Resources for more information:**

**CDC Guidance**

- COVID-19 Website
- What You Need to Know About COVID-19pdf icon
- What to Do If You Are Sick With COVID-19pdf icon
- Interim US Guidance for Risk Assessment and Public Health Management of Persons with Potential Coronavirus Disease 2019 (COVID-19) Exposure in Travel-associated or Community Settings
- Health Alert Network
- Travelers' Health Website
- National Institute for Occupational Safety and Health'spdf icon
- Small Business International Travel Resource Travel Plannerpdf icon

CONFIDENTIAL- ATTORNEYS EYES ONLY

- Coronavirus Disease 2019 Recommendations for Ships
- Coronavirus Disease 2019 Recommendations for Airlines and Airline crew
- Persons at Higher Risk of Severe Illness
- Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities
- **What Law Enforcement Personnel Need to Know about Coronavirus Disease 2019 (COVID-19)**

**Other Federal Agencies and Partners**

- OSHA COVID-19 Websiteexternal icon
- OSHA Guidance for Preparing Workplaces for COVID-19pdf iconexternal icon

CONFIDENTIAL- ATTORNEYS EYES ONLY



# Thomas J. Dart
## SHERIFF OF COOK COUNTY
### INTER-DEPARTMENTAL MEMORANDUM

**To:** All CCODC Staff
**From:** Brad Curry, Chief of Staff
**Subject:** Social Distancing Guidelines for Detainees in Living Unit Dayrooms
**Date:** March 29, 2020
_____

It is critical that all CCDOC detainees follow the social distancing guidelines set forth by the CDC and we need your help to ensure the guidelines are followed.

**Social Distancing** is defined as the practice of increasing the space between individuals and decreasing the frequency of contact to reduce the risk of spreading a disease (ideally to maintain at least six feet between all individuals, even those who are asymptomatic). Although social distancing is challenging to practice in correctional environments, it is key to reduce transmission of COVID-19.

Social distancing in the context of living unit dayroom activities means following the below to limit exposure or transmission of COVID-19:

1. Maintain at least six feet distance from other personnel and detainees as much as possible. Ensure detainees are spread out in the dayroom to meet the six feet guidelines.
2. Avoid physical cross-contact with other detainees in the divisions and other living units as much as possible.
3. If an incident occurs where you need to self-sanitize and wash your hands, notify your supervisor immediately to ensure coverage.
4. Encourage all detainees to wash their hands and sanitize living unit areas frequently.
5. Avoid large group gatherings within the living unit dayrooms.
6. Increase space between detainees in lines and waiting/holding areas.

Although our role as law enforcement inherently limits our ability to isolate from the detainees, all staff should be practicing social distancing while on and off duty to the greatest extent possible and encourage the detainee population to practice social distancing as well.

Thank you for your cooperation.

**TO BE READ AT FIVE (5) CONSECUTIVE ROLL CALLS**

## ATTENTION ALL CCDOC DETAINEES

# COVID-19 UPDATE – 4/21/2020

The World Health Organization has advised that we should be adjusting our usual behaviors for the foreseeable future to curb the spread of the novel coronavirus. We know these reminders are tedious, but please continue to review and take the following actions to protect yourself and others from CoVID-19:

- Practice good cough etiquette: Cover your mouth and nose with your elbow (or ideally with a tissue) rather than with your hand when you cough or sneeze, and throw all tissues in the trash immediately after use.

- Practice good hand hygiene: Regularly wash your hands with soap and water for at least 20 seconds, especially after coughing, sneezing, or blowing your nose; after using the bathroom; before eating or preparing food; before taking medication; and after touching garbage.

- Avoid touching your eyes, nose, or mouth without cleaning your hands first.

- Avoid sharing eating utensils, dishes, and cups.

- Avoid non-essential physical contact and spread out as often as you can.

Through these daily briefings, we are doing our best to provide you with the latest knowledge from experts in order to combat any unease and misinformation regarding the potential for COVID-19 spread. We know these times are tough on morale. Please continue to look out for yourselves and each other.

### HOUSING AND SOCIAL DISTANCING

Coronavirus spreads most quickly in crowded and closed environments. As we take steps such as reopening buildings to make social distancing easier, it is crucial that you are doing your part by following all guidelines to the extent that you can.

Many advocates across the county have called for jails and prisons to build outside of their existing facilities to brace for the effects of the pandemic. Cook County has been leading the way in this respect, as CCDOC prepared the decommissioned boot camp dorms for medical housing and isolating sick individuals away from the rest of the compound even before the jail's first case of COVID-19. We have dedicated physical locations to isolate confirmed COVID-19 cases and individuals displaying COVID-19 symptoms, and to quarantine known close contacts of cases. Medical and sanitation supplies are being surged into these areas as well.

### PETITIONS FOR RELEASE

Only a state court has the authority to release a pretrial detainee – *The Sheriff does not have the authority to release anyone without a court order.* The Sheriff's Office is helping the state courts process case and bond review hearings. If you believe you may be a candidate for review/release, ESPECIALLY if your age or medical conditions put you at higher risk of serious illness, discuss this with your attorney. Everyone that has been court-ordered for release is being safely and swiftly discharged from the DOC. Jail officials are <u>absolutely not</u> preventing the release of individuals who have tested positive for CoVID-19. Additionally, Sheriff's office staff are making phone calls to the homes that detainees are being released to in an effort to ensure that all are returning to a healthy environment. This also ensures that other residents at the home are informed of the proper protocols if the discharged individual was exposed, symptomatic, or confirmed to have the virus.

DOC Executive Office

| Division | Facility | Tier | Capacity | Occupancy | Percent Oc | Holding Ty | Tier Type | First Quarantine | Projected End Date |
|---|---|---|---|---|---|---|---|---|---|
| 10 | Division 10 | DIV10-1A | 48 | 23 | 48% | | Single Cell | | |
| 10 | Division 10 | DIV10-1B | 48 | 24 | 50% | | Single Cell | | |
| 10 | Division 10 | DIV10-1C | 48 | 24 | 50% | | Single Cell | Quarantine | 4/9/2020 16:26 | 5/1/2020 |
| 10 | Division 10 | DIV10-1D | 48 | 24 | 50% | | Single Cell | Quarantine | 4/16/2020 19:59 | 5/2/2020 |
| 10 | Division 10 | DIV10-2A | 48 | 24 | 50% | | Single Cell | | |
| 10 | Division 10 | DIV10-2B | 48 | 24 | 50% | | Single Cell | | |
| 10 | Division 10 | DIV10-2C | 48 | 24 | 50% | | Single Cell | Quarantine | 4/17/2020 12:59 | 5/1/2020 |
| 10 | Division 10 | DIV10-2D | 48 | 24 | 50% | | Single Cell | | |
| 10 | Division 10 | DIV10-3A | 48 | 24 | 50% | | Single Cell | | |
| 10 | Division 10 | DIV10-3B | 48 | 23 | 48% | | Single Cell | | |
| 10 | Division 10 | DIV10-3C | 48 | 24 | 50% | | Single Cell | | |
| 10 | Division 10 | DIV10-3D | 48 | 24 | 50% | | Single Cell | | |
| 10 | Division 10 | DIV10-4A | 48 | 24 | 50% | | Single Cell | | |
| 10 | Division 10 | DIV10-4B | 48 | 24 | 50% | | Single Cell | | |
| 10 | Division 10 | DIV10-4C | 48 | 24 | 50% | | Single Cell | | |
| 10 | Division 10 | DIV10-4D | 48 | 24 | 50% | | Single Cell | | |
| 11 | Division 11 | DIV11-AA | 48 | 19 | 40% | | Single Cell | | |
| 11 | Division 11 | DIV11-AB | 48 | 22 | 46% | | Single Cell | | |
| 11 | Division 11 | DIV11-AC | 48 | 19 | 40% | | Single Cell | | |
| 11 | Division 11 | DIV11-AD | 48 | 20 | 42% | | Single Cell | | |
| 11 | Division 11 | DIV11-AF | 48 | 21 | 44% | | Single Cell | | |
| 11 | Division 11 | DIV11-AG | 48 | 24 | 50% | | Single Cell | Quarantine | 3/31/2020 15:30 | 4/29/2020 |
| 11 | Division 11 | DIV11-AH | 48 | 22 | 46% | | Single Cell | Quarantine | 4/12/2020 11:29 | 5/1/2020 |
| 11 | Division 11 | DIV11-AJ | 48 | 22 | 46% | | Single Cell | Quarantine | 4/9/2020 6:55 | 5/1/2020 |
| 11 | Division 11 | DIV11-BA | 48 | 20 | 42% | | Single Cell | Quarantine | 4/15/2020 11:59 | 5/5/2020 |
| 11 | Division 11 | DIV11-BB | 48 | 19 | 40% | | Single Cell | | |
| 11 | Division 11 | DIV11-BC | 48 | 17 | 35% | | Single Cell | | |
| 11 | Division 11 | DIV11-BD | 48 | 18 | 38% | | Single Cell | | |
| 11 | Division 11 | DIV11-BF | 48 | 18 | 38% | | Single Cell | Quarantine | 3/26/2020 12:07 | 5/1/2020 |
| 11 | Division 11 | DIV11-BG | 48 | 24 | 50% | | Single Cell | | |
| 11 | Division 11 | DIV11-BH | 48 | 24 | 50% | | Single Cell | Quarantine | 4/13/2020 7:59 | 5/5/2020 |
| 11 | Division 11 | DIV11-BJ | 48 | 22 | 46% | | Single Cell | | |
| 11 | Division 11 | DIV11-CA | 48 | 24 | 50% | | Single Cell | Quarantine | 4/10/2020 21:59 | 4/30/2020 |
| 11 | Division 11 | DIV11-CB | 48 | 24 | 50% | | Single Cell | Quarantine | 3/31/2020 17:48 | 4/27/2020 |
| 11 | Division 11 | DIV11-CC | 48 | 24 | 50% | | Single Cell | | |
| 11 | Division 11 | DIV11-CD | 48 | 24 | 50% | | Single Cell | Quarantine | 3/26/2020 12:42 | 5/5/2020 |
| 11 | Division 11 | DIV11-CF | 48 | 24 | 50% | | Single Cell | Quarantine | 3/26/2020 12:13 | 4/30/2020 |
| 11 | Division 11 | DIV11-CG | 48 | 24 | 50% | | Single Cell | Quarantine | 4/9/2020 7:26 | 5/5/2020 |
| 11 | Division 11 | DIV11-CH | 48 | 24 | 50% | | Single Cell | | |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 11 | Division 11 | DIV11-CJ | 48 | 24 | 50% | Single Cell | Quarantine | 3/31/2020 7:21 | 4/29/2020 |
| 11 | Division 11 | DIV11-DA | 48 | 21 | 44% | Single Cell | Quarantine | 3/31/2020 18:07 | 5/4/2020 |
| 11 | Division 11 | DIV11-DB | 48 | 24 | 50% | Single Cell | | | |
| 11 | Division 11 | DIV11-DC | 48 | 24 | 50% | Single Cell | | | |
| 11 | Division 11 | DIV11-DD | 48 | 21 | 44% | Single Cell | Quarantine | 3/29/2020 9:02 | 5/5/2020 |
| 11 | Division 11 | DIV11-DF | 48 | 24 | 50% | Single Cell | Quarantine | 4/10/2020 0:59 | 5/5/2020 |
| 11 | Division 11 | DIV11-DG | 48 | 23 | 48% | Single Cell | Quarantine | 4/9/2020 9:30 | 5/6/2020 |
| 11 | Division 11 | DIV11-DH | 48 | 24 | 50% | Single Cell | Quarantine | 4/13/2020 6:43 | 5/6/2020 |
| 11 | Division 11 | DIV11-DJ | 48 | 23 | 48% | Single Cell | Quarantine | 4/13/2020 6:36 | 4/29/2020 |
| 2 | Division 2 [ | DIV2-D1-A | 48 | 13 | 27% | Dorm | | | |
| 2 | Division 2 [ | DIV2-D1-B | 48 | 7 | 15% | Dorm | | | |
| 2 | Division 2 [ | DIV2-D1-C | 48 | 18 | 38% | Dorm | | | |
| 2 | Division 2 [ | DIV2-D1-D | 48 | 39 | 81% | Dorm | | | |
| 2 | Division 2 [ | DIV2-D1-E | 48 | 19 | 40% | Dorm | | | |
| 2 | Division 2 [ | DIV2-D1-F | 48 | 22 | 46% | Dorm | | | |
| 2 | Division 2 [ | DIV2-D1-G | 48 | 18 | 38% | Dorm | | | |
| 2 | Division 2 [ | DIV2-D1-H | 48 | 0 | closed | | | | |
| 2 | Division 2 [ | DIV2-D2-M | 48 | 10 | 21% | Dorm | Quarantine | 4/13/2020 12:30 | 5/2/2020 |
| 2 | Division 2 [ | DIV2-D2-N | 48 | 21 | 44% | Dorm | Quarantine | 4/4/2020 21:29 | 5/3/2020 |
| 2 | Division 2 [ | DIV2-D2-O | 48 | 23 | 48% | Dorm | | | |
| 2 | Division 2 [ | DIV2-D2-P | 44 | 17 | 39% | Dorm | | | |
| 2 | Division 2 [ | DIV2-D2-R | 48 | 26 | 54% | Dorm | Quarantine | 4/3/2020 6:51 | 5/6/2020 |
| 2 | Division 2 [ | DIV2-D2-S | 44 | 14 | 32% | Dorm | | | |
| 2 | Division 2 [ | DIV2-D2-T | 48 | 18 | 38% | Dorm | | | |
| 2 | Division 2 [ | DIV2-D2-U | 44 | 19 | 43% | Dorm | | | |
| 2 | Division 2 [ | DIV2-D2-V | 48 | 19 | 40% | Dorm | | | |
| 2 | Division 2 [ | DIV2-D2-W | 44 | 19 | 43% | Dorm | Quarantine | 4/15/2020 17:53 | 5/1/2020 |
| 2 | Division 2 [ | DIV2-D3-A | 44 | 14 | 32% | Dorm | | | |
| 2 | Division 2 [ | DIV2-D3-B | 48 | 24 | 50% | Dorm | | | |
| 2 | Division 2 [ | DIV2-D3-C | 48 | 0 | closed | | | | |
| 2 | Division 2 [ | DIV2-D3-D | 48 | 14 | 29% | Dorm | Quarantine | 4/15/2020 19:29 | 5/6/2020 |
| 2 | Division 2 [ | DIV2-D3-E | 48 | 15 | 31% | Dorm | | | |
| 2 | Division 2 [ | DIV2-D3-F | 48 | 18 | 38% | Dorm | | | |
| 2 | Division 2 [ | DIV2-D3-G | 48 | 22 | 46% | Dorm | Quarantine | 4/5/2020 9:30 | 5/6/2020 |
| 2 | Division 2 [ | DIV2-D3-H | 48 | 23 | 48% | Dorm | | | |
| 2 | Division 2 [ | DIV2-D3-J | 48 | 19 | 40% | Dorm | Quarantine | 4/4/2020 17:59 | 5/6/2020 |
| 2 | Division 2 [ | DIV2-D4-LI | 54 | 20 | 37% | Dorm | | | |
| 2 | Division 2 [ | DIV2-D4-LI | 54 | 1 | 2% | Dorm | | | |
| 2 | Division 2 [ | DIV2-D4-M | 50 | 13 | 26% | Dorm | | | |
| 2 | Division 2 [ | DIV2-D4-M | 50 | 7 | 14% | Dorm | | | |

| 2 | Division 2 | DIV2-D4-N | 63 | 9 | 14% | Dorm | | |
| 2 | Division 2 | DIV2-D4-N | 63 | 7 | 11% | Dorm | | |
| 2 | Division 2 | DIV2-D4-O | 48 | 22 | 46% | Dorm | | |
| 2 | Division 2 | DIV2-D4-O | 48 | 0 | closed | | | |
| 2 | Division 2 | DIV2-D4-P | 40 | 15 | 38% | Dorm | | |
| 2 | Division 2 | DIV2-D4-P | 40 | 17 | 43% | Dorm | | |
| 2 | Division 2 | DIV2-D4-Q | 50 | 23 | 46% | Dorm | | |
| 2 | Division 2 | DIV2-D4-Q | 50 | 0 | closed | | | |
| 2 | Division 2 | DIV2-D4-R | 37 | 22 | 59% | Dorm | | |
| 2 | Division 2 | DIV2-D4-R | 37 | 0 | closed | | | |
| 4 | Division 4 | DIV4-I1 | 48 | 20 | 42% | Single Cell | | |
| 4 | Division 4 | DIV4-I2 | 48 | 16 | 33% | Single Cell Quarantine | 4/16/2020 15:59 | 4/30/2020 |
| 4 | Division 4 | DIV4-J1 | 48 | 21 | 44% | Single Cell | | |
| 4 | Division 4 | DIV4-J2 | 48 | 8 | 17% | Single Cell Quarantine | 4/15/2020 12:29 | 5/2/2020 |
| 4 | Division 4 | DIV4-K1 | 40 | 15 | 38% | Single Cell | | |
| 4 | Division 4 | DIV4-K2 | 40 | 14 | 35% | Single Cell | | |
| 4 | Division 4 | DIV4-L1 | 40 | 0 | closed | | | |
| 4 | Division 4 | DIV4-L2 | 40 | 19 | 48% | Single Cell | | |
| 4 | Division 4 | DIV4-M1 | 40 | 0 | closed | | | |
| 4 | Division 4 | DIV4-M2 | 40 | 13 | 33% | Single Cell Quarantine | 4/15/2020 17:11 | 5/3/2020 |
| 4 | Division 4 | DIV4-N1 | 40 | 16 | 40% | Single Cell | | |
| 4 | Division 4 | DIV4-N2 | 40 | 20 | 50% | Single Cell | | |
| 4 | Division 4 | DIV4-P1 | 48 | 22 | 46% | Single Cell | | |
| 4 | Division 4 | DIV4-P2 | 48 | 23 | 48% | Single Cell Quarantine | 4/16/2020 12:29 | 5/6/2020 |
| 4 | Division 4 | DIV4-Q1 | 48 | 18 | 38% | Single Cell Quarantine | 4/16/2020 12:29 | 5/5/2020 |
| 4 | Division 4 | DIV4-Q2 | 48 | 22 | 46% | Single Cell | | |
| 5 | Division 5 | DIV5-1A | 44 | 22 | 50% | Single Cell | | |
| 5 | Division 5 | DIV5-1B | 40 | 20 | 50% | Single Cell | | |
| 5 | Division 5 | DIV5-1C | 40 | 17 | 43% | Single Cell | | |
| 5 | Division 5 | DIV5-1D | 40 | 16 | 40% | Single Cell Quarantine | 4/15/2020 19:59 | 5/6/2020 |
| 5 | Division 5 | DIV5-1E | 40 | 15 | 38% | Single Cell | | |
| 5 | Division 5 | DIV5-1F | 44 | 22 | 50% | Single Cell | | |
| 5 | Division 5 | DIV5-1G | 44 | 0 | closed | | | |
| 5 | Division 5 | DIV5-1H | 40 | 18 | 45% | Single Cell Quarantine | 4/16/2020 15:59 | 5/6/2020 |
| 5 | Division 5 | DIV5-1J | 40 | 11 | 28% | Single Cell | | |
| 5 | Division 5 | DIV5-1K | 40 | 16 | 40% | Single Cell | | |
| 5 | Division 5 | DIV5-1L | 40 | 19 | 48% | Single Cell Quarantine | 4/16/2020 16:29 | 5/6/2020 |
| 5 | Division 5 | DIV5-1M | 44 | 22 | 50% | Single Cell | | |
| 5 | Division 5 | DIV5-2A | 44 | 5 | 11% | Single Cell | | |
| 5 | Division 5 | DIV5-2B | 40 | 0 | closed | | | |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 5 | Division 5 | DIV5-2C | 40 | 0 | closed | | | |
| 5 | Division 5 | DIV5-2D | 40 | 7 | 18% | Single Cell Quarantine | 4/4/2020 13:31 | 5/5/2020 |
| 5 | Division 5 | DIV5-2E | 40 | 9 | 23% | Single Cell Quarantine | 4/3/2020 20:30 | 5/6/2020 |
| 5 | Division 5 | DIV5-2F | 44 | 15 | 34% | Single Cell | | |
| 5 | Division 5 | DIV5-2G | 44 | 0 | closed | | | |
| 5 | Division 5 | DIV5-2H | 40 | 0 | closed | | | |
| 5 | Division 5 | DIV5-2J | 40 | 0 | closed | | | |
| 5 | Division 5 | DIV5-2K | 40 | 0 | closed | | | |
| 5 | Division 5 | DIV5-2L | 40 | 10 | 25% | Single Cell Quarantine | 4/9/2020 8:03 | 5/6/2020 |
| 5 | Division 5 | DIV5-2M | 44 | 12 | 27% | Single Cell | | |
| 6 | Division 6 | DIV6-1A | 40 | 20 | 50% | Single Cell Quarantine | 3/27/2020 12:59 | 5/4/2020 |
| 6 | Division 6 | DIV6-1B | 44 | 22 | 50% | Single Cell | | |
| 6 | Division 6 | DIV6-1C | 44 | 22 | 50% | Single Cell | | |
| 6 | Division 6 | DIV6-1D | 40 | 20 | 50% | Single Cell | | |
| 6 | Division 6 | DIV6-1H | 40 | 20 | 50% | Single Cell | | |
| 6 | Division 6 | DIV6-1J | 40 | 20 | 50% | Single Cell | | |
| 6 | Division 6 | DIV6-1K | 40 | 20 | 50% | Single Cell Quarantine | 3/26/2020 23:59 | 5/2/2020 |
| 6 | Division 6 | DIV6-1L | 44 | 22 | 50% | Single Cell | | |
| 6 | Division 6 | DIV6-1N | 44 | 22 | 50% | Single Cell | | |
| 6 | Division 6 | DIV6-1P | 40 | 19 | 48% | Single Cell | | |
| 6 | Division 6 | DIV6-1Q | 40 | 19 | 48% | Single Cell | | |
| 6 | Division 6 | DIV6-1R | 40 | 20 | 50% | Single Cell | | |
| 6 | Division 6 | DIV6-2A | 40 | 17 | 43% | Single Cell Quarantine | 3/31/2020 14:01 | 5/3/2020 |
| 6 | Division 6 | DIV6-2B | 44 | 22 | 50% | Single Cell | | |
| 6 | Division 6 | DIV6-2C | 44 | 21 | 48% | Single Cell | | |
| 6 | Division 6 | DIV6-2D | 40 | 20 | 50% | Single Cell | | |
| 6 | Division 6 | DIV6-2H | 40 | 20 | 50% | Single Cell | | |
| 6 | Division 6 | DIV6-2J | 40 | 20 | 50% | Single Cell | | |
| 6 | Division 6 | DIV6-2K | 40 | 19 | 48% | Single Cell | | |
| 6 | Division 6 | DIV6-2L | 44 | 22 | 50% | Single Cell | | |
| 6 | Division 6 | DIV6-2N | 44 | 21 | 48% | Single Cell | | |
| 6 | Division 6 | DIV6-2P | 40 | 19 | 48% | Single Cell | | |
| 6 | Division 6 | DIV6-2Q | 40 | 20 | 50% | Single Cell | | |
| 6 | Division 6 | DIV6-2R | 40 | 20 | 50% | Single Cell | | |
| 8 | Division 8 ( | DIV8-2E | n/a | 14 | n/a | Double Cel | | |
| 8 | Division 8 ( | DIV8-2N | 24 | 14 | 58% | Double Cel | | |
| 8 | Division 8 ( | DIV8-2S | 26 | 22 | 85% | Single Cell | | |
| 8 | Division 8 ( | DIV8-2W | 20 | 15 | 75% | Single Cell | | |
| 8 | Division 8 ( | DIV8-3E | 12 | 4 | 33% | Single Cell Isolation | 4/21/2020 17:59 | 5/5/2020 |
| 8 | Division 8 ( | DIV8-3N | 20 | 15 | 75% | Double Cel | | |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 8 | Division 8 ( | DIV8-3S | 14 | 8 | 57% | Single Cell Isolation | 3/28/2020 3:00 | 5/6/2020 |
| 8 | Division 8 ( | DIV8-3W | 20 | 11 | 55% | Double Cell Isolation | 3/30/2020 19:00 | 5/6/2020 |
| 8 RTU | Division 08 | DIV08-2A | 20 | 9 | 45% | Single Cell | | |
| 8 RTU | Division 08 | DIV08-2B | 39 | 8 | 21% | Dorm | Quarantine | 4/16/2020 19:00 | 5/6/2020 |
| 8 RTU | Division 08 | DIV08-2E | 20 | 11 | 55% | Single Cell Isolation | 3/25/2020 19:59 | 5/5/2020 |
| 8 RTU | Division 08 | DIV08-2F | 39 | 37 | 95% | Dorm | | |
| 8 RTU | Division 08 | DIV08-2G | 39 | 39 | 100% | Dorm | | |
| 8 RTU | Division 08 | DIV08-3A | 20 | 8 | 40% | Single Cell Isolation | 3/26/2020 18:29 | 5/6/2020 |
| 8 RTU | Division 08 | DIV08-3B | 39 | 23 | 59% | Dorm | Quarantine | 4/7/2020 12:30 | 5/4/2020 |
| 8 RTU | Division 08 | DIV08-3C | 39 | 38 | 97% | Dorm | Isolation | 3/25/2020 15:41 | 5/6/2020 |
| 8 RTU | Division 08 | DIV08-3D | 39 | 32 | 82% | Dorm | Isolation | 3/25/2020 21:00 | 5/6/2020 |
| 8 RTU | Division 08 | DIV08-3E | 20 | 9 | 45% | Single Cell Isolation | 3/25/2020 23:59 | 5/6/2020 |
| 8 RTU | Division 08 | DIV08-3F | 39 | 29 | 74% | Dorm | Quarantine | 3/31/2020 17:59 | 5/5/2020 |
| 8 RTU | Division 08 | DIV08-3G | 39 | 38 | 97% | Dorm | Isolation | 3/31/2020 12:59 | 5/6/2020 |
| 8 RTU | Division 08 | DIV08-3H | 39 | 39 | 100% | Dorm | Isolation | 3/31/2020 9:41 | 5/6/2020 |
| 8 RTU | Division 08 | DIV08-4A | 20 | 14 | 70% | Double Cell | | |
| 8 RTU | Division 08 | DIV08-4B | 39 | 15 | 38% | Dorm | Quarantine | 4/2/2020 20:00 | 5/5/2020 |
| 8 RTU | Division 08 | DIV08-4C | 39 | 38 | 97% | Dorm | | |
| 8 RTU | Division 08 | DIV08-4D | 39 | 32 | 82% | Dorm | | |
| 8 RTU | Division 08 | DIV08-4E | 20 | 8 | 40% | Single Cell Isolation | 3/26/2020 11:30 | 5/5/2020 |
| 8 RTU | Division 08 | DIV08-4F | 39 | 37 | 95% | Dorm | | |
| 8 RTU | Division 08 | DIV08-4G | 39 | 25 | 64% | Dorm | Isolation | 4/8/2020 11:29 | 5/6/2020 |
| 8 RTU | Division 08 | DIV08-4H | 39 | 28 | 72% | Dorm | Quarantine | 3/31/2020 12:27 | 5/5/2020 |
| 8 RTU | Division 08 | DIV08-5A | 20 | 9 | 45% | Single Cell | | |
| 8 RTU | Division 08 | DIV08-5B | 39 | 25 | 64% | Dorm | | |
| 8 RTU | Division 08 | DIV08-5C | 39 | 20 | 51% | Dorm | Isolation | 4/4/2020 13:00 | 5/6/2020 |
| 8 RTU | Division 08 | DIV08-5D | 39 | 10 | 26% | Dorm | Quarantine | 4/5/2020 9:30 | 5/3/2020 |
| 8 RTU | Division 08 | DIV08-5E | 20 | 13 | 65% | Double Cell Isolation | 3/30/2020 20:30 | 5/6/2020 |
| 8 RTU | Division 08 | DIV08-5F | 39 | 18 | 46% | Dorm | Quarantine | 4/9/2020 0:59 | 5/2/2020 |
| 8 RTU | Division 08 | DIV08-5G | 39 | 13 | 33% | Dorm | | |
| 8 RTU | Division 08 | DIV08-5H | 39 | 25 | 64% | Dorm | Quarantine | 4/3/2020 20:30 | 5/6/2020 |
| 9 | Division 9 | DIV9-1A | 44 | 20 | 45% | Single Cell | | |
| 9 | Division 9 | DIV9-1B | 44 | 21 | 48% | Single Cell | | |
| 9 | Division 9 | DIV9-1C | 44 | 22 | 50% | Single Cell Quarantine | 4/9/2020 7:17 | 4/26/2020 |
| 9 | Division 9 | DIV9-1D | 44 | 18 | 41% | Single Cell | | |
| 9 | Division 9 | DIV9-1E | 44 | 22 | 50% | Single Cell | | |
| 9 | Division 9 | DIV9-1F | 44 | 18 | 41% | Single Cell | | |
| 9 | Division 9 | DIV9-1G | 44 | 22 | 50% | Single Cell | | |
| 9 | Division 9 | DIV9-1H | 44 | 22 | 50% | Single Cell Quarantine | 4/15/2020 7:15 | 5/1/2020 |
| 9 | Division 9 | DIV9-2A | 44 | 22 | 50% | Single Cell | | |

| 9 | Division 9 | DIV9-2B | 44 | 19 | 43% | Single Cell | | |
| 9 | Division 9 | DIV9-2C | 44 | 21 | 48% | Single Cell Quarantine | 4/9/2020 16:23 | 5/5/2020 |
| 9 | Division 9 | DIV9-2D | 44 | 22 | 50% | Single Cell | | |
| 9 | Division 9 | DIV9-2E | 44 | 27 | 61% | Single Cell Quarantine | 4/18/2020 19:08 | 5/2/2020 |
| 9 | Division 9 | DIV9-2F | 44 | 20 | 45% | Single Cell | | |
| 9 | Division 9 | DIV9-2G | 44 | 22 | 50% | Single Cell | | |
| 9 | Division 9 | DIV9-2H | 44 | 21 | 48% | Single Cell | | |
| 9 | Division 9 | DIV9-3A | 44 | 21 | 48% | Single Cell | | |
| 9 | Division 9 | DIV9-3B | 44 | 22 | 50% | Single Cell | | |
| 9 | Division 9 | DIV9-3C | 44 | 22 | 50% | Single Cell | | |
| 9 | Division 9 | DIV9-3D | 44 | 22 | 50% | Single Cell | | |
| 9 | Division 9 | DIV9-3E | 44 | 21 | 48% | Single Cell | | |
| 9 | Division 9 | DIV9-3F | 44 | 19 | 43% | Single Cell Quarantine | 4/15/2020 22:30 | 5/4/2020 |
| 9 | Division 9 | DIV9-3G | 44 | 22 | 50% | Single Cell | | |
| 9 | Division 9 | DIV9-3H | 44 | 21 | 48% | Single Cell | | |
| 9 | Division 9 | DIV9-LI | 10 | 1 | 10% | Single Cell | | |
| Boot Camp | Boot Camp | Boot Camp | 500 | 171 | 34% | Boot Camp Isolation | 3/30/2020 20:30 | 5/5/2020 |
| Hospital | Hospital | Hospital | n/a | 24 | n/a | Hospital | | |
| Outside Co | Outside Co | Outside Co | n/a | 7 | n/a | Hospital | | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| ANTHONY MAYS, Individually and on behalf of a class of similarly situated persons; and JUDIA JACKSON, as next friend of KENNETH FOSTER, Individually and on behalf of a class of similarly situated persons | ) ) ) ) ) | |
| | ) | Case No. 20-cv-2134 |
| Plaintiffs-Petitioners, | ) | |
| | ) | |
| v | ) | |
| | ) | |
| THOMAS DART, Sheriff of Cook County, | ) | |
| | ) | |
| Defendant-Respondent | ) | |

### DECLARATION OF JANE GUBSER

I, **JANE GUBSER**, pursuant to 28 U.S.C. § 1746, declare as follows:

1. I am currently the 1st Assistant Executive Director of Programs for the Cook County Sheriff's Office ("CCSO"), Cook County Dept Of Corrections ("CCDOC"). I have worked for the CCDOC since Aug 2016.

2. I received a doctorate in Clinical Psychology from The Chicago School of Professional Psychology in 2016.

3. Before joining the CCSO in my current capacity, I worked as an executive assistant for the CCSO for three years, between 2008 and 2011.

4. While working towards my Master of Arts and my Doctorate in Clinical Psychology between 2011 and 2016, I worked as a Clinical Intern Lawrence Hall Youth Services, Advanced Therapy Extern for A Safe Haven Foundation**,** Therapy Extern, Cook County Sheriff's Women's Justice Program, a TASC Diagnostic Intern in the Cook County Mental Health Court.

5. The facts set forth in this declaration are drawn from information I have received in my position with the CCSO. It does not contain all of the facts that I know about the matters discussed below.

6. In my role as 1st Assistant Executive Director of Programs, I act as a leader and supervisor of CCDOC programs and services offered to detainees. I oversee the Inmate Programs Department and the Inmate Services Department. Develop programs for detainees such a Mental Health, Religion, Education, Substance Abuse, Vocational, etc. I lead the CCDOC Quality Improvement ("QI") team meetings. I also represent our office on panels and

committees related to mental health programs and initiatives. I also develop and oversee re-entry programs and programs for individuals on electronic monitoring

7. My office is also in daily communication with Cermak Health Services, a division of the Cook County Health and Hospital System. Cermak Health Services is the daily provider of healthcare to the detainees at the CCDOC. I work closely to collaborate with Cermak Health Services surrounding issues related to access to care and conditions of confinement. I work with Cermak Health Services on the maintenance and expansion of medication assisted treatment programs. As a part CCSO's COVID-19 prevention and response efforts, my office continues to communicate and with Cermak employees and decision makers daily to address issues related to prevention, detection, treatment, and information.

8. The CCSO has been working closely with local and Cook County partners to prevent the spread of the Novel Coronavirus (COVID-19). The CCSO was and remains in communication with Cook County Department of Emergency Management and Regional Security, Cook County Health and Hospital System, and the Cook County Department of Public Health. These agencies have been communicating regularly with the Chicago Department of Public Health, the Illinois Department of Public Health and the Centers for Disease Control and Prevention.

9. I have been involved in the proactive measures taken by the CCSO to combat the COVID-19 pandemic and continue to lend my assistance with ongoing efforts to date. My involvement has included, but is not limited to, the following: I am in daily communication with CCSO and CCDOC Department Heads on initiatives to combat COVID-19. I also collaborate with Cermak Health Services to develop appropriate modifications to service delivery to inmates. I am also involved in the issuance of memoranda to staff regarding new directives for staff in response to COVID-19. I have also worked on the development of processes for screening new arrestees, visitors, staff and volunteers, worked with CBM food vendor to promote best practices, and worked to develop messaging to detainees about COVID-19 education and attendant modifications to processes.

10. On March 9, 2020, Governor Pritzker declared Illinois a disaster area because of the dangers of COVID-19.

11. During this time, the CCSO has worked diligently to provide instruction to detainees regarding the importance of regularly sanitizing all surfaces and objects on which the virus could be present.

12. The week the Governor Pritzker issued the disaster declaration, the CCSO was disseminating information concerning changes in policies intended to help prevent the spread of the virus. On March 12, 2020, the CCDOC issued a press release informing the public of a number of measures had been implemented at the CCDOC to help protect the detainee population and the public.

13. First, as of that week, all non-staff members, including visitors, vendors, volunteers, attorneys, and contractors, were screened for symptoms of COVID-19. Screening was conducted using the screening questions suggested by CDC guidance. Under the new policies for COVID-19, anyone exhibiting symptoms was denied entry and encouraged to seek medical attention. Later, the screening was expanded to include taking temperatures of any visitors.

14. Second, as of that week, the CCDOC continued screening all new detainees and persons arrested by the Sheriff's Office with the Cook County Health COVID-19 questionnaire, including temperature checks. Receiving tiers were created for new detainees to be housed for at least the first seven days of observation. After being cleared by Cermak Health Services, detainees showing no symptoms of the virus may be moved to general population. Since that time, the CCDOC has also implemented procedures to ensure that detainees are also screened for any symptoms of infection at the time of discharge

15. Third, CCDOC staff continued to work closely with our state and local partners, asking all law enforcement agencies to screen individuals for symptoms before transferring them to the custody of the CCSO.

16. Fourth, as of March 12, 2020, CCSO worked with Cermak Health Services on educating detainees about COVID-19 so detainees would be able to report symptoms they may experience or observe. Detainees were also educated on how to stop the spread of infection through frequent handwashing and other good hygiene practices.

17. Fifth, as of March 12, 2020, visits with detainees were limited to one person once a week for 15 minutes until further notice. However, beginning on March 15, 2020, all visits to detainees were suspended until further notice. While there were no known cases of COVID-19 in the DOC at that time, the decision to suspend visits was made based on the recommendations of the World Health Organization, the Centers for Disease Control, the Department of Justice, and other state and local health officials. The CCDOC established a policy of providing detainees with 30 minutes of weekly free phone calls due to the suspension of social visits. The free 30 minutes is provided in *addition* to being able to make calls pursuant to existing CCDOC policies. By March 17, phone usage lists were provided to all divisions to ensure that detainees would have a chance to use the phones.

18. While visits have been cancelled until further notice, the new policy would allow attorneys and clergy members to visit detainees, though they are first screened by staff for symptoms of COVID-19.

19. All tours of the Cook County Jail were also cancelled as of March 11, 2020.

20. The CCSO also posted messages to families on the website regarding canceling of visits. **https://www.cookcountysheriff.org/ccdoc-visitors/**

21. On March 14, 2020, detainees were notified of the March 13, 2020, Judicial Order of the Circuit Court of Cook County postponing certain court proceedings on March 14, 2020. A notice was prepared and sent by email to all CCDOC division Superintendents, for posting on every occupied tier. At that time, a notice was also posted concerning the change in visitation policies for the CCDOC.

22. As of March 13, 2020, off-tier programs were limited to 10 persons at a time, in accordance with CDC guidance on social gatherings. During that week, various events constituting close-contact programming for detainees were cancelled as a method of COVID-19 prevention and precaution. This included religious group meeting, recreational classes and activities, AA meetings, a detainee basketball tournament, a March 25 family chess event, and GED/high school/university classes. CCDOC programs staff visited tiers in person to inform detainees of changes and cancellations in programs and activities.

23. Working in coordination with Cermak Health Services, the CCSO also worked on establishing use of videoconferencing for detainee medical appointments when possible. In coordination with Cermak Health Services, each detainee's temperature is to be checked twice a day.

24. On March 16, 2020, CCDOC began airing messages for detainees on tier televisions regarding COVID-19 prevention, precautions, and procedures. These messages, aired on televisions in the various divisions, provided both updates and instructions. The messaging provided information regarding court closures and contacting attorneys to address any concerns.

25. These messages were and are aired daily, in presentation format, on the detainee television system, mixed in with other scheduled programming. The presentations aired for a total of an hour, three separate times a day between 8 am and 4 pm, and on a constant loop between approximately 11 pm and 8 am.

26. The information contained in these video presentations includes:

   a. Detailed instructions on handwashing with liquid or bar soap for 20 seconds or more.

   b. Details on the importance of social distancing, no-touch greetings, and avoiding touching one's face.

   c. Detailed messaging on the importance of covering the mouth and face when coughing or sneezing.

   d. Instructions on when and how to seek medical care upon appearance of specified symptoms.

   e. Instructions on using cleaning supplies to clean living areas and high touch surfaces.

   f. Notices to detainees on suspended visits effective March 15, with the exception of attorneys and clergy, after screening

   g. Notice of postponed court proceedings in the Circuit Court of Cook County, including categories of exceptions, such as bail review.

   h. Information on how detainees who test positive for COVID-19 were being isolated.

27. The video presentations also explained in detail various steps that the CCDOC had been taking in recent weeks to address the potential spread of COVID-19.

28. In particular, since mid-March 2020, the detainee video presentation has informed detainees that the following steps were being taken:

   a. Screenings and temperature checks are being performed on all new arrestees before intake. Anyone with symptoms is immediately placed under medical isolation.

   b. All new detainees brought into the jail are housed on a transition tier for at least 7 days to monitor for symptoms of Coronavirus. After 7 days if no one on that living unit is symptomatic, that living unit may be moved to general population. The area that the population vacates is thoroughly cleaned and sanitized before another population moves onto that living unit.

Declaration of Jane Gubser

4

    c. All vehicles used to transport individuals in custody are wiped down and disinfected before and after transport.

    d. DOC is making every effort to put increased space between individuals in lines and waiting areas.

29. As of April 2, 2020, the video presentation also includes additional, expanded messaging on social distancing, including the following: "Social Distancing is defined as the practice of increasing the space between individuals and decreasing the frequency of contact to reduce the risk of spreading a disease (ideally to maintain at least six feet between all individuals, even those who are not showing symptoms). Although social distancing is challenging to practice in correctional environments, it is key to reduce transmission of COVID-19."

30. On each tier of the CCDOC, notices to detainees concerning matters related to COVID-19 have been posted for all detainees to see. These notices of posted on all tiers, whether quarantine, isolation, or general population. In addition to posting the notice concerning the visits and the changes in the Circuit Court schedules on March 14, 2020, information on COVID-19-related changes and policies was posted on tiers on March 25, March 31, April 2, and April 3, 2020.

31. Beginning on March 15, 2020, other Inmate Services responses to the threat of COVID-19 have included increased dayroom time, care packages for detainees, additional packaged meals, and increased free phone time.

32. Although Correctional Rehabilitation Workers ("CRWs") began to telecommute four days a week beginning March 23, 2020, a CRW is still available twice a week to pick up and process inmate requests. While telecommuting, the CRWs are still working to review, review, and respond to detainee requests and grievances. As a COVID-19 related precaution, face-to-face meetings are not taking place, but the work to address and respond to inmate requests continues. Detainees have been instructed that they may pose concerns or questions to tier officers or CRWs. Law library requests are also being addressed remotely by Inmate Services staff.

33. CCSO has also reassigned staff to assist with discharge of detainees during this time. In addition to medical screening at the time of discharge, a team of staff members have been reassigned to assist those being discharged by making calls to ensure that each person being discharged has a place to go where no one is sick or showing symptoms of infection with COVID-19 virus.

34. Other steps have been taken to protect detainees from being inadvertently exposed to sick staff members. In addition to cancellation of close-contact programming, and limited face-to-face contact with programming staff, since March 13, 2020, there has been signage on the tiers informing staff not to enter a tier if they have any reason to believe that they might be ill. Non-union CCDOC staff have been encouraged to telecommute since March 20, 2020. On March 23, 2020, all non-union employees with laptops were asked to plan on working from home. Some union personnel were classified as "essential," but able to perform many of their job duties from home as of March 23, 2020. Those employees were contacted by their managers to arrange a rotating shift for essential duties to be performed

to-face contact with programming staff, since March 13, 2020, there has been signage on the tiers informing staff not to enter a tier if they have any reason to believe that they might be ill. Non-union CCDOC staff have been encouraged to telecommute since March 20, 2020. On March 23, 2020, all non-union employees with laptops were asked to plan on working from home. Some union personnel were classified as "essential," but able to perform many of their job duties from home as of March 23, 2020. Those employees were contacted by their managers to arrange a rotating shift for essential duties to be performed on site. Eligible union employees began to work a rotating shift, as scheduled, the week of March 23, 2020.

36. Our Department has provided updates to the divisional superintendents concerning the changes in Inmates Services procedure in response to COVID-19, so that the Divisions can disseminate the relevant information to the detainees.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on April 6, 2020

_____
Jane Gubser

# Amended Sanitation Guidelines Specific to COVID-19 Procedure

## I.1 PURPOSE AND SCOPE

This procedure provides amended guidelines for a safe and sanitary environment as well as reporting and correcting any sanitation deficiencies within the Cook County Department of Corrections due to COVID-19 and is intended to clarify and emphasize the current procedures for sanitation.

Refer to the Sanitation, Fire, Health and Life Safety Plans and Reporting Procedure and all related sanitation policies for further guidelines.

### I.1.1 ISSUANCE/EFFECTIVE DATE

This procedure was issued on April 11, 2020 and shall become effective upon issuance.

## I.2 AMENDED SANITATION GUIDELINES FOR LIVING UNITS

### I.2.1 CLEANING SUPPLIES

a) All detainees shall have access to sanitation supplies to use to sanitize frequently touched surfaces (e.g., tables, doorknobs, light switches, countertops, handles, desks, phones, toilets, faucets, sinks).

b) All divisions shall have Sanifect solution (i.e., pre-mixed bleach solution less than 5000ppm) on hand at all times. In the event additional solution is needed, the Central Chemicals located in Division 5 shall be notified.

c) The living unit officer shall provide the chemicals to the living unit detainee worker under their supervision.

d) The living unit officer shall provide rags to the living unit detainee worker under their supervision.

e) In the event that the living unit detainee worker exhausts the supply of rags, cleaning fluid and/or disinfectant before completing the work assignment, the replacement of supplies shall be requested from the designated Sanitation/Safety Officer.

f) Each living tier shall also have a sanitation kit for use by the detainees to clean their cells/living area. The living unit sanitation kit shall be collected each day between 2300 hours and 0700 hours, inventoried, restocked and redistributed by the Sanitation/Safety Officer.

g) All damaged equipment shall be documented, replaced and salvaged. All soiled mop heads and rags shall be collected and sent for laundering.

1

### I.2.2 COMMON AREAS

The following guidelines shall apply:

a)      The living unit officer should oversee the living unit inmate worker who shall be responsible for cleaning of the walls, floors, windows, restroom facilities (e.g., showers, toilets, sinks) and frequently touched surfaces in common areas of the living units (e.g., tables, doorknobs, light switches, countertops, handles, desks, phones, toilets, faucets, sinks).

b)      Cleaning of frequently touched surfaces shall be completed each time after those surfaces are used, such as tables following a meal or phones between calls. Detainees shall be allowed to clean such surfaces with the Sanifect solution at any time during day room hours.

c)      All surfaces (e.g., walls, floors, windows, showers, toilets, sinks, phones, tables) throughout the Department of Corrections campus (e.g., living units, divisions, common areas, security posts) shall be pre-washed and cleaned with the Sanifect solution and rewashed and sanitized between all uses.

     1.      This may be done using the solution on rags or with a spray canister.

     2.      Allow the solution to contact the surface for at least five minutes for optimum effectiveness.

     3.      After the solution has remained on the surface for at least five minutes, rinse and allow the area to air dry.

### I.2.3 CELLS/LIVING AREAS

Detainees are responsible for maintaining clean and sanitary cells, utilizing a living unit sanitation kit, unless physically incapable of doing so.

Detainees should watch the daily COVID-19 video to learn how to properly clean their living area. Detainees shall be allowed to ask sanitation officers questions regarding proper cleaning techniques.

Detainees should routinely clean frequently touched areas within their living area.

### I.2.4 LAUNDRY

Soiled laundry shall always be kept away from clean laundry. If potentially contaminated laundry is collected, the following guidelines shall apply:

a)      Contaminated laundry shall be collected in a non-perforated bag that shall be labeled and sent to Central Laundry to be laundered.

     1.      Contaminated laundry should be kept separate from uncontaminated laundry.

     2.      Each bag should be labeled "AGE" (acute gastroenteritis) or "ILI" (influenza-like illness).

b)      Members shall use PPE to handle any contaminated laundry.

c)      Contaminated laundry should be pre-washed, washed and dried separately.

      1.      The regular wash cycle shall include detergent.

      2.      The dry cycle shall be done at a high temperature (i.e., 170 degrees Fahrenheit or above).

## I.3    MONITORING AND SUPERVISION

a)      The living unit officer on each shift shall ensure that all frequently touched surfaces, referenced in this procedure, are routinely cleaned and/or disinfected.

b)      The living unit officer on each shift shall ensure the living unit detainee worker completes the tasks listed on the Living Unit Sanitation Log/Safety Inspection form.

c)      The living unit officer shall complete the appropriate section of the Living Unit Sanitation Log/Safety Inspection form prior to the end of their shift and ensure that each item on the form is completed and signed.

d)      The immediate on-duty supervisor shall review the log for completion and inspect the areas specified to confirm the scheduled duties were completed prior to the end of the shift.

e)      The immediate on-duty supervisor shall document work order numbers when applicable and sign the Living Unit Sanitation Log/Safety Inspection form in the appropriate area.



## COOK COUNTY DEPARTMENT OF CORRECTIONS
### Living Unit Sanitation Log/Safety Inspection

| | DIVISION/LIVING UNIT | DATE |
|---|---|---|

**The living unit officer shall inspect the sanitation kit and equipment at the beginning of shift and complete the appropriate section prior to the end of the shift. The living unit officer shall ensure all duties and responsibilities listed below have been completed by the inmate worker. This form starts on the 11-7 shift and turned in by the 3-11 shift at the end of his/her tour of duty.**

| DUTIES AND RESPONSIBILITIES OF INMATE WORKER | 11-7/6-6 RTU YES / NO | 7-3 YES / NO | 3-11/6-6 RTU YES / NO | Reason not completed |
|---|---|---|---|---|
| Sweep and mop entire living unit at least twice daily (e.g. dayroom, utility closet, washroom, shower, upper and lower levels if applicable) | | | | |
| Clean and disinfect dayroom tables, benches, chairs, sinks, urinals, toilets, and hand rails, lower walls, water fountain | | | | |
| Remove any visible graffiti on dayroom walls and columns (if applicable) | | | | |
| Collect, count and remove all food trays and milk cartons from the dayroom area and place in designated area. | | | | |
| Collect and remove all garbage from the dayroom area, cells and in officer's work area and place in hallway. | | | | |
| Sanitize, rinse and replace liner in dayroom garbage can | | | | |
| Sanitize and scrub shower walls utilizing the sanitation kit, mop floors, and clear drains of any debris | | | | |
| Frequently Touched Areas (e.g., phones, door knobs) | | | | |
| Other | | | | |

| LIVING UNIT INSPECTION (To be conducted by the Living Unit Officer) | COMMENTS | | |
|---|---|---|---|
| Inspect cell/living unit for; graffiti, wall damage, clutter/garbage, milk cartons, meal trays, clotheslines, excess uniform/blankets, door/lock obstructions and operational, light/outlet fixtures, plumbing operable, fire extinguishers, exit signs, windows. | 11-7/6-6 RTU | 7-3 | 3-11/6-6 RTU |

| List deficiencies or damages and report any deficiencies or damages requiring immediate attention to an immediate supervisor | | | |
|---|---|---|---|
| SHIFT | DEFICIENCY OR DAMAGE | NAME OF IMMEDIATE SUPERVISOR NOTIFIED | WORK ORDER SUBMITTED (TO BE COMPLETED BY A SUPERVISOR) |
| | | | |
| | | | |
| | | | |
| | | | |

| INMATE WORKER INFORMATION | | | |
|---|---|---|---|
| INMATE WORKER (Print) | IDENTIFICATION NUMBER | NAME OF ALTERNATE WORKER (PRINT) | IDENTIFICATION NUMBER |
| NAME OF ALTERNATE WORKER (PRINT) | IDENTIFICATION NUMBER | NAME OF ALTERNATE WORKER (PRINT) | IDENTIFICATION NUMBER |

| 11-7/6-6 RTU SHIFT REQUIRED SIGNATURES | | |
|---|---|---|
| LIVING UNIT OFFICER/STAR (Print) | SIGNATURE | DATE |
| IMMEDIATE SUPERVISOR/STAR (Print) | SIGNATURE | DATE |

| 7-3 SHIFT REQUIRED SIGNATURES | | |
|---|---|---|
| LIVING UNIT OFFICER/STAR (Print) | SIGNATURE | DATE |
| IMMEDIATE SUPERVISOR/STAR (Print) | SIGNATURE | DATE |

| 3-11 /6-6 RTU SHIFT REQUIRED SIGNATURES | | |
|---|---|---|
| LIVING UNIT OFFICER/STAR (Print) | SIGNATURE | DATE |
| IMMEDIATE SUPERVISOR/STAR (Print) | SIGNATURE | DATE |

(FCN -34)(APR 20)

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| ANTHONY MAYS, Individually and on behalf of a class of similarly situated persons; and JUDIA JACKSON, as next friend of KENNETH FOSTER, Individually and on behalf of a class of similarly situated persons, | ) ) ) ) ) ) | |
| Plaintiffs-Petitioners, | ) ) | |
| v. | ) ) | Case No. 1:20-cv-2134 |
| THOMAS J. DART, Sheriff of Cook County, | ) ) ) | The Hon. Matthew F. Kennelly Emergency Judge |
| Defendant-Respondent. | ) ) ) | The Hon. Robert Gettleman Presiding Judge |

## **PLAINTIFFS' EXHIBITS**

| Exhibit | Description |
|---|---|
| A | April 6, 2020 Declaration of Michael Miller and Exhibits |
| B | April 17, 2020 Declaration of Michael Miller and Exhibits |
| C | April 21, 2020 Declaration of Rebecca Levin with Exhibits |
| D | Photos of Cook County Jail Division 2 as presented in Plaintiffs' Class Action Complaint |
| E | Photo of Cook County Jail Residential Treatment Unit ("RTU") as presented in Plaintiffs' Class Action Complaint |
| F | April 22, 2020 COVID-19 Cases at CCDOC as provided by Cook County Sheriff's Office |
| G | Declarations of Cook County Jail Detainees Bryant Blake, Kevin Watson, Charles Bocock, Javier Montanez, Jeffrey Ferguson, Dominick Wing, Lamonte Powell, Dante McGee, Eric Blake, Deon Baker, Michael Jorgensen, Isaac Correcillias-Correa, and Joshua Barbee |
| H | April 19, 2020 Declaration of Dr. Homer Venters and Venters *Curriculum Vitae* |
| I | Defendant's Response to Plaintiff's Renewed Motion for Preliminary Injunction and Expedited Discovery |
| J | "Prevent the Spread of COVID-19 If You Are Sick" Guidelines from Centers for Disease Control and Protection |
| K | "Communication on Patient's Health Needs" Policy No. A-08 from Cook County Health and Hospitals System |
| L | Photos of Cook County Jail Intake Social Distancing |

# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

ANTHONY MAYS, Individually and on )
behalf of a class of similarly situated persons; )
and JUDIA JACKSON, as next friend of )
KENNETH FOSTER, Individually and on )
behalf of a class of similarly situated persons )
  )     Case No. 20-cv-2134
              Plaintiffs-Petitioners, )
  )
v )
  )
THOMAS DART, Sheriff of Cook County, )
  )
             Defendant-Respondent )

## <u>DECLARATION OF MICHAEL MILLER</u>

I, Michael Miller, pursuant to 28 U.S.C. § 1746, declare as follows:

1. That I am currently employed by the Cook County Sheriff's Office ("CCSO") as the First Assistant Executive Director for the Cook County Department of Corrections ("CCDOC"). I have been employed in this role since 2012.

2. Prior to my appointment as First Assistant Executive Director ("AED"), I worked in CCDOC in various capacities dating back to approximately 1990. Over thirty years of service at the CCSO, I have served as a Correctional Officer, Correctional Sergeant, Correctional Lieutenant, Captain, Chief, Superintendent, and Assistant Executive Director.

3. As the First AED, I am responsible for overseeing all CCDOC operations. CCDOC is the largest single-site pretrial correctional facility in the country and employs over 3,000 sworn and civilian staff.

4. I am familiar with the CCSO's efforts to combat and prevent the spread of the Novel Coronavirus ("COVID-19"), which has impacted the international community since the first case was identified in December 2019.

5. The facts set forth in this declaration are drawn from information I have received in my work with the CCSO in response to the COVID-19 pandemic. It does not contain all of the facts that I know about the matters discussed below.

## <u>Background</u>

6. As early as January 2020 the CCSO began planning to activate emergency operational and staffing protocols, in the event that the public health crisis and a state of emergency would inevitably impact standard operating procedures.

7. As early as January 24, 2020 the CCDOC began screening incoming detainees for flu-like symptoms.

8. On or before March 12, 2020 the CCSO began sending daily notices to all staff, in addition to directions from supervisors on every shift, regarding Center for Disease Control ("CDC") guidelines on preventing the spread of the virus and handwashing.

## COVID-19 State of Emergency

9. On March 9, 2020, Governor Pritzker declared Illinois a disaster area because of the dangers of COVID-19. As of March 9, 2020, there were 5710 detainees in physical custody at the Cook County Jail. There were approximately 422 confirmed COVID-19 cases in Illinois at that time.

10. On or about March 12, 2020 the CCSO implemented the following preventative measures:

   a. The CCSO Critical Incident Command Center ("CICC") was activated to monitor all COVID-19 factors that could affect aspects of the CCSO.
   b. All visitors, vendors, volunteers, attorneys, and contractors were screened for symptoms of COVID-19, including taking temperatures. Anyone exhibiting symptoms was denied entry and encouraged to seek medical attention.
   c. CCDOC began creating receiving units for detainees to be held for their first week in custody to monitor for symptoms of COVID-19. Those who showed no symptoms after seven days would be moved to general population units. These receiving units have been active for at least fourteen (14) days as of this declaration.
   d. Visits with detainees were limited to one person, once a week, for 15 minutes. CCDOC expanded access to phone calls and video visitation across the compound.
   e. CCDOC increased cleaning and sanitation efforts throughout the facility.
   f. Cermak Health Services began actively educating detainees about COVID-19 so they can report symptoms they may experience or observe. Detainees were also educated on how to stop the spread of infection through frequent handwashing and other good hygiene practices.

11. On or about March 13, 2020, all tours of CCDOC and large gatherings within the facility were suspended. Outside food for detainees was banned.

12. On or about March 15, 2020, all in-person detainee visits were suspended. Attorneys and clergy members were directed to schedule in-person visits sparingly, and any essential visitors would be subject to screening for symptoms. Currently, confidential attorney visits may still occur 7 days per week during the day and will be accommodated behind visitor glass.

13. On or about March 16, 2020 CCDOC began preparing the empty Mental Health Transition Center barracks for additional isolation housing for detainees.

14. On March 17, 2020 the Cook County Board of Commissioners declared a State of Emergency related to the COVID-19 pandemic.

2. On March 20, 2020 the Governor of Illinois issued an executive order for citizens to shelter-in-place. CCSO instituted the following precautionary measures to address COVID-19:

    a. Continued efforts to obtain and distribute Personal Protective Equipment ("PPE").

    b. Established additional areas at the jail to be used for separation and quarantine, including opening previously closed buildings and requesting tents for outdoor areas.

    c. Began screening all new detainees and persons arrested by the Sheriff's Office with the Cook County Health COVID-19 questionnaire, including temperature checks.

    d. Continued use of receiving tiers where new detainees coming into the CCDOC are housed together for seven days of observation. If detainees do not show symptoms of the virus after seven days, they are reviewed by Cermak Health Services for clearance to be moved to general population. This waiting period has expanded to 14 days as of April 6, 2020.

    e. Created contingency plans in the event of staff shortages.

    f. Increased availability of cleaning supplies across all departments.

    g. Continued working with other stakeholders to reduce transportation of detainees to court.

    h. Began airing messages for detainees on televisions across the compound regarding the symptoms of COVID-19 and proper hand washing techniques.

    i. Began airing messages for detainees on televisions regarding court closures and contacting attorneys to address any concerns.

    j. Began posting messages to families on our website regarding canceling of visits and information regarding the bond process.

3. The CCSO disseminates information and directives for detainees and staff on a daily basis regarding screening, social distancing, obtaining supplies, and who to contact with any concerns. As of April 2, 2020 the CCSO began issuing daily information regarding tiers designated as isolation or quarantine tiers.

4. CCDOC is in constant, daily communication with Cermak Health Services regarding medical treatment for detainees and implementation of CDC guidelines, and use of video-conferencing for medical appointments unrelated to COVID-19.

5. CCDOC is in constant, daily communications with our various collective bargaining units and their union representatives to ensure that staff are safe and their concerns are heard.

15. CCSO has worked with other criminal justice stakeholders including the Cook County Office of the Chief Judge, Cook County Public Defender, and Cook County State's Attorney to assist them in identifying cases where detainees can be released from CCDOC, as well as procedural matters than can be held via video-conferencing to reduce movement and increase social distancing.

16. The CCDOC detains criminal defendants who are remanded to the custody of DOC by the Circuit Court. As such, the DOC cannot control the number of detainees housed in the Jail.

17. Supporting exhibits attached to this declaration reflect the current breakdown of every tier or dorm in the Jail. The spreadsheet shows the tier/ dorm, its maximum occupancy, current occupancy and the percentage the tier or dorm is filled.

18. CCDOC has implemented major changes to the manner in which detainees are housed due to prevent the spread of COVID-19. These major changes include:

   a. On March 15, all arrestees brought to Criminal Court for a bond hearing were screened for symptoms of the virus including a temperature check. Symptomatic arrestees were refused admittance to lockup and/or CCDOC until evaluated by medical personnel in the custody of the arresting agency.

   b. On March 20, all criminal defendants remanded to the custody of the Sheriff for detention in the Jail were "separated" from the remainder of the jail population is separate tiers or dorms with all other remanded defendants from that day of the week. Each day, the new detainees were assigned into a different tier or dorm separate from the remainder of the Jail. Those detainees remain separated for at least 7 days for symptom observation.   This waiting period has been extended to 14 days as of April 6, 2020.  Supporting exhibits attached hereto reflect, as of April 6, 2020 at 2:00pm, the number of detainees currently housed in a separate tier for the first 14 days of their detention in DOC. Those detainees are assigned in the dorm units in Division 2, Dorm 3 and single cells in Division 5, first floor. Currently, none of those tiers exceed 50% occupancy or, to put it another way, detainees fill less than half of the beds.

   c. Prior to the COVID outbreak, DOC operations made every effort to safely consolidate and minimize the number of tiers and, if possible, entire Divisions in operation to maintain efficiencies while ensuring safety and security. The Sheriff ordered that effort be made to single cell all detainees, if safe and secure, when he declared the impending pandemic an emergency. In cooperation with Cermak, Cook County Facilities Management and the Unions representing the sworn officers, previously closed Tiers and Divisions have been re-opened to maximize the ability of detainees to distance themselves from one another. Currently, the following previously closed or repurposed areas have been re-opened to house detainees:

      i.   Division 5, first floor, to separate new detainees;

      ii.   Division 4, 9 tiers to help single cell detainees from Division 11; and

      iii.   The Mental Health Transition Center, repurposed to hold a maximum of 500 isolated COVID-19 symptomatic or positive detainees (if necessary and separate from each other).

d.   Providing a single cell to every detainee, or if in a dorm setting not exceeding 50% occupancy, is an on-going process, subject to our ability to open previous closed areas safely and securely. As of April 6, 2020, 111 (or 60%) of those 186 tiers/areas where at least one detainee is housed are at 50% occupancy or lower (i.e. the tier capacity is 48 and there are 24 housed on it). 26 (or 14%) of those 186 tiers/areas are at 90% occupancy or higher.

19. To reduce the potential spread of the virus, we implemented a process to quarantine and isolate tiers, designate them as such and install certain rules as it relates to each.

a.   Quarantine tiers are tiers where a detainee resided at the time of the onset of their symptoms. The symptomatic detainee is treated and removed from the tier and taken to an Isolation Tier at the direction of medical staff. The remainder of the tier is identified as under Quarantine. Once identified, the following occurs:

      i.   Pursuant to sanitation related processes, the tier and personal area of the symptomatic detainee is cleaned.

      ii.   The tier is locked down in the sense that no new detainees will be housed there and no current detainee will be moved unless subject to release by a court or becomes symptomatic themselves. The only exception is efforts to single cell quarantined individuals from on quarantine tier to another.

      iii.   A security alert by DOC staff is entered into CCOMS (the jail management system) for every detainee housed on that tier that they are under a quarantine. The alert will last for 14 days from issuance and is renewed if any new symptomatic detainees are discovered.

      iv.   The tier is marked with a large, neon sign with a "Q" at the entrance requiring all staff entering to be properly attired in PPE appropriate for a quarantine tier.

      v.   Supporting exhibits attached hereto reflect the tiers currently identified as quarantined in the Jail. All these rules apply at these locations.

b.   Isolation tiers are tiers designated to house symptomatic and positive tested detainees to receive immediate care and be isolated from the rest of the Jail population. Every detainee in an isolation tier has exhibited clear symptoms or has a positive test for COVID-19. However, symptomatic detainees are held in different tiers than known positive COVID detainees. Once identified, the following occurs:

      i.   The tier is locked down in the sense that no new detainees will be housed there unless they are recovering from COVID-19. No current, non-symptomatic detainee will be moved there. All positive COVID detainees will remain in isolation until medical staff clear them for a return to the Jail.

      ii.  A medical alert by Cermak staff is entered into CCOMS (the jail management system) for every detainee housed on that tier that they under isolation. The alert will last for 14 days from issuance and be renewed as necessary.

      iii. The tier is marked with a large, neon sign with an "I" at the entrance requiring all staff entering to be properly attired in PPE appropriate for an isolation tier.

      iv. Isolation tiers are not single cells as social distancing no longer is recommended.

c.  Supporting exhibits attached hereto reflect the tiers currently identified as isolation tiers in the Jail. All these rules apply at these locations.

d.  Attached hereto is a report created on April 6, 2020 by the CCSO Office of Research, based on data available through the jail management system CCOMS, which shows the number of unique detainees that have been given an isolation alert since February 29, 2020. To be clear, isolation is a medical alert that is not unique to COVID-19 and is used by DOC and Cermak for other medical and correctional reasons. Therefore, not all alerts noted on the attached chart are necessarily attributable to COVID-19.

20. Staff has been screened for symptoms and temperature checks at the beginning of every shift upon entry to the Jail. The "Cook County Department of Corrections Interim Policy and Procedure For Employee Health Screens And Temperature Checks" issued March 28, 2020 is attached hereto as a supporting exhibit. 100 new thermometers are arriving today, April 6, for use in screening employees upon entering the Jail.

21. CCDOC has worked with Harry Grenawitzke since early March, an expert in correctional sanitation conditions who previously served as a monitor within CCDOC with the Department of Justice, to implement best practices to keep the compound as clean and disinfected as possible.

22. CCDOC has worked with Dr. Peter Orris and the University of Illinois Chicago School of Public Health Occupational Health Services Institute. Dr. Orris is an expert in the field of occupational health and has provided daily consultation with CCSO on proper implementation of CDC guidelines and measures to disrupt the spread of COVID-19.

23. All PPE and cleaning products are delivered to the CICC from the Sheriff's Central Warehouse and distributed to the Jail Divisions. The CICC tracks and responds to all requests for PPE, cleaning supplies, and other COVID-19 related materials in order to allocate inventory accordingly. Distribution of supplies from the CICC and compliance

with CDC guidelines regarding use of PPE and cleaning supplies is further monitored by sanitation officers and superintendents in each Division of the jail.

24. I have supervised constant action by the CCSO to distribute PPE, hygiene, and sanitation supplies across Sheriff's Office operations, including—and most critically—the CCDOC. The CICC triages all supply and equipment needs submitted by Division, and ensures that all Divisions and tiers are adequately supplied each and every day.

25. The CCSO employs an Environmental Health Specialist and an Environmental Services Coordinator. The Environmental Health Specialist is responsible for overseeing compliance with all existing sanitation policies and procedures, including applicable local, state, and federal regulations. The Environmental Health Specialist coordinates with Divisional Sanitation Officers who are appointed for each CCDOC Division. Those sanitation officers conduct compliance checks, and report results on a daily basis to the Division Superintendent. Superintendents are under my chain of command.

26. As early as January 24, 2020 the CCDOC Environmental Specialist began to activate emergency protocol in response to the COVID-19 crisis, including but not limited to increasing the frequency of cleanings, regular sanitation of intake and identified areas where infected individuals have been present, and acquisition of additional chemicals to ensure prompt and frequent cleaning.

27. In preparation of the COVID-19 crisis and up through the date of this declaration and as a preventative measure, the CCDOC enforced a Preventative Daily Cleaning and Disinfection procedure which increased sanitation procedures across the entire CCDOC. These procedures gave detailed instruction about how to clean and disinfect surfaces in both non-quarantine/non-isolation locations and quarantine/isolation areas. Procedures also extend to the collection of food trays and carts, laundry and central kitchen procedures. In addition, directives were also provided to the organization about Vehicle Cleaning/Disinfection Procedures

28. Throughout the COVID-19 crisis and up through the date of this declaration, I have overseen continued use of enhanced sanitation measures, including interface between the CICC and divisional sanitation officers in order to continue to re-stock necessary supplies and hygiene products for detainees.

29. CCSO is engaged in regular communication with local, state, and federal agencies in order to acquire critical sanitation supplies and PPE, as well as to obtain rapid testing and establish CCDOC as a testing site, including but not limited to: Cook County Emergency Management and Regional Security, Cook County Department of Public Health, Cermak Health Services, City of Chicago Department of Public Health, Illinois Department of Public Health, Illinois Emergency Management Agency, Illinois Office of the Governor, Federal Emergency Management Agency, U.S. Senator Dick Durbin, and U.S. Department of Health and Human Services.

30. As a result of our efforts, Cermak has received approval to commence Abbott rapid testing as of April 7, 2020 for detainees.

31. As a result of our efforts, Roseland Hospital and the CCSO will be establishing Roseland Hospital as an official COVID-19 testing site, available to all staff, as early as April 6, 2020.

32. The CCSO has worked around the clock to maximize the safety and security of CCDOC detainees, its staff, and the public in the midst of an unprecedented, global pandemic.

I, Michael Miller, pursuant to 28 U.S.C. § 1746, declare under penalty of perjury of the laws of the United States of America that the foregoing is true and correct.

Dated this 6th day of April 2020.

FIRST ASST. EXECUTIVE DIRECTOR

Michael S. Miller



**COOK COUNTY DEPARTMENT OF CORRECTIONS INTERIM POLICY AND PROCEDURE FOR EMPLOYEE HEALTH SCREENS AND TEMPERATURE CHECKS**

**EFFECTIVE DATE:  March 28, 2020**

In accordance with the Centers for Disease Control and Prevention (CDC) and the Chicago Department of Public Health (CDPH) recommendations, and to ensure the health and safety of emergency responders, CCSO staff and volunteers, County employees and contractors, and CCDOC detainees, the following procedures described below will be implemented immediately.  These procedures will help stop the spread of COVID-19 by providing early identification of employees who may be in the early stages of COVID-19 and just beginning to show symptoms.

1. Employees will assemble prior to their assigned shift in areas designated by Divisional supervisors in preparation for the screening.
2. Employees will assemble in a way that allows for social distancing (standing at least 6 feet apart).
3. Supervisors will conduct a brief, one-by-one screen of every employee consisting of the following:
    a. Ask each employee if they currently have a cough or shortness of breath.
    b. Take the employee's temperature using the infrared forehead thermometer.
4. If the employee answers yes or is observed to have a cough or shortness of breath, they should be sent home.
5. If the employee has a fever over 99.3, but not a cough or shortness of breath, they should be isolated for 2 minutes and then have their temperature checked again.  If the reading is still above 99.3, the employee should be sent home.  If the reading is 99.3 or below, conduct a third check 2 minutes later and base the decision to allow the employee to work on that reading; 99.3 or less can work, 99.4 or more should go home.
6. Any officer that is instructed to leave must contact the Command Center at 773-674-0169 immediately.
7. The Command Center will notify HR, who will contact the employee to discuss their situation as soon as practicable, explain how they will be compensated for the day, and provide further instructions regarding return to work.
8. Prior to returning to work, employees may be instructed to receive medical clearance from their own health care provider and complete the CCSO's COVID-19 Return to Work Screening Questionnaire.  Questions about this process should be directed to CCSO.HR@cookcountyil.gov.

Important Guidelines for Supervisors Conducting Temperature Checks:

1. Make sure the thermometer is calibrated properly.
2. Make sure all PPE is used properly.
    a. Face masks should be affixed properly.
    b. Eye protection should be worn.
    c. Gloves should be worn.
    d. Gowns should be worn.
3. When using the infrared thermometer, the PPE described above does not need to be replaced in between conducting individual temperature checks.
4. If an employee seems ill, determine whether seeking further medical help is appropriate and isolate the individual from others immediately.
5. If there are equipment questions, problems, concerns, or shortages, notify the Command Center immediately at 773-674-0169.

Michael Miller
1st Assistant Executive Director
Cook County Department of Corrections



The Cook County Sheriff's
**Office of Research**

Isolation Alerts by Date
To: CCSO Executive Staff
Date: April 6, 2020
THIS IS A PRELIMINARY ANALYSIS

This memo presents trends in assigned isolation alerts from February 29, 2020 to present for unique bookings.

*Figure 1* shows the number of isolation alerts by starting date where only the first alert per booking is included.

Figure 1: Number of Isolation Alerts by Date Started



**MILLER GROUP EXH 1**
**PAGE 002**



The Cook County Sheriff's
**Office of Research**

*Table 1* shows the number of isolation alerts begun each day where only the first alert per booking is included.

Table 1: Number of Isolation Alerts by Date Started

| Date of Isolation Alert Start | Number Alerts Started |
|---|---|
| 29-Feb | 1 |
| 1-Mar | 6 |
| 2-Mar | 5 |
| 3-Mar | 4 |
| 4-Mar | 7 |
| 5-Mar | 4 |
| 6-Mar | 2 |
| 7-Mar | 4 |
| 8-Mar | 2 |
| 9-Mar | 2 |
| 10-Mar | 1 |
| 11-Mar | 3 |
| 12-Mar | 1 |
| 14-Mar | 4 |
| 15-Mar | 7 |
| 16-Mar | 2 |
| 17-Mar | 6 |
| 18-Mar | 4 |
| 19-Mar | 1 |
| 20-Mar | 6 |
| 21-Mar | 8 |
| 22-Mar | 6 |
| 23-Mar | 9 |
| 24-Mar | 17 |
| 25-Mar | 22 |
| 26-Mar | 18 |
| 27-Mar | 30 |
| 28-Mar | 52 |
| 29-Mar | 9 |
| 30-Mar | 19 |
| 31-Mar | 23 |
| 1-Apr | 21 |
| 2-Apr | 20 |
| 3-Apr | 11 |
| 4-Apr | 11 |
| 5-Apr | 4 |
| 6-Apr | 11 |
| TOTAL | 363 |

2

| D | | | | r | | 4 6 20 | r | | d | r | r | r | r | r | d | d D |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 10 | D | 10 | D | 10 1 | 48 | 46 | 96 | | | | | | | | | |
| 10 | D | 10 | D | 10 1 | 48 | 44 | 92 | | | | | | | | | |
| 10 | D | 10 | D | 10 1 | 48 | 24 | 50 | | | | | | | | | |
| 10 | D | 10 | D | 10 1D | 48 | 38 | 79 | | | | | | | | | |
| 10 | D | 10 | D | 10 2 | 48 | 24 | 50 | | | | | | | | | |
| 10 | D | 10 | D | 10 2 | 48 | 24 | 50 | | | | | | | | | |
| 10 | D | 10 | D | 10 2 | 48 | 24 | 50 | | | | | | | | | |
| 10 | D | 10 | D | 10 2D | 48 | 24 | 50 | | | | | | | | | |
| 10 | D | 10 | D | 10 3 | 48 | 24 | 50 | | | | | | | | | |
| 10 | D | 10 | D | 10 3 | 48 | 24 | 50 | | | | | | | | | |
| 10 | D | 10 | D | 10 3 | 48 | 17 | 35 | | | r | | 3 31 2020 18 10 | | 4 18 2020 | | |
| 10 | D | 10 | D | 10 3D | 48 | 24 | 50 | | | | | | | | | |
| 10 | D | 10 | D | 10 4 | 48 | 23 | 48 | | | | | | | | | |
| 10 | D | 10 | D | 10 4 | 48 | 24 | 50 | | | | | | | | | |
| 10 | D | 10 | D | 10 4 | 48 | 24 | 50 | | | | | | | | | |
| 10 | D | 10 | D | 10 4D | 48 | 24 | 50 | | | | | | | | | |
| 11 | D | 11 | D | 11 | 48 | 24 | 50 | | | | | | | | | |
| 11 | D | 11 | D | 11 | 48 | 23 | 48 | | | | | | | | | |
| 11 | D | 11 | D | 11 | 48 | 24 | 50 | | | | | | | | | |
| 11 | D | 11 | D | 11 D | 48 | 24 | 50 | | | | | | | | | |
| 11 | D | 11 | D | 11 | 48 | 23 | 48 | | | | | | | | | |
| 11 | D | 11 | D | 11 | 48 | 37 | 77 | | | r | | 3 31 2020 15 30 | | 4 18 2020 | | |
| 11 | D | 11 | D | 11 | 48 | 24 | 50 | | | | | | | | | |
| 11 | D | 11 | D | 11 | 48 | 24 | 50 | | | | | | | | | |
| 11 | D | 11 | D | 11 | 48 | 19 | 40 | | | | | | | | | |
| 11 | D | 11 | D | 11 | 48 | 24 | 50 | | | | | | | | | |
| 11 | D | 11 | D | 11 | 48 | 24 | 50 | | | | | | | | | |
| 11 | D | 11 | D | 11 D | 48 | 23 | 48 | | | | | | | | | |
| 11 | D | 11 | D | 11 | 48 | 30 | 63 | | | r | | 3 26 2020 12 07 | | 4 13 2020 | | |
| 11 | D | 11 | D | 11 | 48 | 25 | 52 | | | | | | | | | |
| 11 | D | 11 | D | 11 | 48 | 38 | 79 | | | | | | | | | |
| 11 | D | 11 | D | 11 | 48 | 24 | 50 | | | | | | | | | |
| 11 | D | 11 | D | 11 | 48 | 46 | 96 | | | | | | | | | |
| 11 | D | 11 | D | 11 | 48 | 46 | 96 | | | r | | 3 31 2020 17 48 | | 4 15 2020 | | |
| 11 | D | 11 | D | 11 | 48 | 46 | 96 | | | | | | | | | |
| 11 | D | 11 | D | 11 D | 48 | 40 | 83 | | | r | | 3 26 2020 12 42 | | 4 18 2020 | | |
| 11 | D | 11 | D | 11 | 48 | 41 | 85 | | | r | | 3 26 2020 12 13 | | 4 16 2020 | | |
| 11 | D | 11 | D | 11 | 48 | 48 | 100 | | | | | | | | | |
| 11 | D | 11 | D | 11 | 48 | 47 | 98 | | | | | | | | | |
| 11 | D | 11 | D | 11 | 48 | 36 | 75 | | | r | | 3 31 2020 7 21 | | 4 18 2020 | | |
| 11 | D | 11 | D | 11 D | 48 | 41 | 85 | | | r | | 3 31 2020 18 07 | | 4 18 2020 | | |

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| 11 | | D | 11 | D | 11 D | 48 | 24 | 50 | | |
| 11 | | D | 11 | D | 11 D | 48 | 44 | 92 | | |
| 11 | | D | 11 | D | 11 DD | 48 | 43 | 90 | r | 3 29 2020 9 02 | 4 15 2020 |
| 11 | | D | 11 | D | 11 D | 48 | 22 | 46 | | |
| 11 | | D | 11 | D | 11 D | 48 | 39 | 81 | | |
| 11 | | D | 11 | D | 11 D | 48 | 41 | 85 | | |
| 11 | | D | 11 | D | 11 D | 48 | 38 | 79 | | |
| 2 | D | 2 D r | 1 | D | 2 D1 | 48 | 16 | 33 | | |
| 2 | D | 2 D r | 1 | D | 2 D1 | 48 | 8 | 17 | | |
| 2 | D | 2 D r | 1 | D | 2 D1 | 48 | 22 | 46 | | |
| 2 | D | 2 D r | 1 | D | 2 D1 D | 48 | 42 | 88 | | |
| 2 | D | 2 D r | 1 | D | 2 D1 | 48 | 0 | d | | |
| 2 | D | 2 D r | 1 | D | 2 D1 | 48 | 0 | d | | |
| 2 | D | 2 D r | 1 | D | 2 D1 | 48 | 0 | d | | |
| 2 | D | 2 D r | 1 | D | 2 D1 | 48 | 0 | d | | |
| 2 | D | 2 D r | 2 | D | 2 D2 M | 48 | 17 | 35 | | |
| 2 | D | 2 D r | 2 | D | 2 D2 | 48 | 26 | 54 | | |
| 2 | D | 2 D r | 2 | D | 2 D2 | 48 | 24 | 50 | | |
| 2 | D | 2 D r | 2 | D | 2 D2 | 44 | 18 | 41 | | |
| 2 | D | 2 D r | 2 | D | 2 D2 R | 48 | 20 | 42 | r | 4 3 2020 6 51 | 4 18 2020 |
| 2 | D | 2 D r | 2 | D | 2 D2 | 44 | 19 | 43 | | |
| 2 | D | 2 D r | 2 | D | 2 D2 | 48 | 19 | 40 | r | 4 5 2020 2 00 | 4 18 2020 |
| 2 | D | 2 D r | 2 | D | 2 D2 | 44 | 18 | 41 | | |
| 2 | D | 2 D r | 2 | D | 2 D2 | 48 | 23 | 48 | | |
| 2 | D | 2 D r | 2 | D | 2 D2 | 44 | 21 | 48 | | |
| 2 | D | 2 D r | 3 | D | 2 D3 | 44 | 0 | d | | |
| 2 | D | 2 D r | 3 | D | 2 D3 | 48 | 19 | 40 | r | 3 25 2020 23 29 | 4 16 2020 |
| 2 | D | 2 D r | 3 | D | 2 D3 | 48 | 0 | d | | |
| 2 | D | 2 D r | 3 | D | 2 D3 DD | 48 | 22 | 46 | | |
| 2 | D | 2 D r | 3 | D | 2 D3 | 48 | 15 | 31 | | |
| 2 | D | 2 D r | 3 | D | 2 D3 | 48 | 13 | 27 | | |
| 2 | D | 2 D r | 3 | D | 2 D3 | 48 | 16 | 33 | | |
| 2 | D | 2 D r | 3 | D | 2 D3 | 48 | 0 | d | | |
| 2 | D | 2 D r | 3 | D | 2 D3 | 48 | 23 | 48 | | |
| 2 | D | 2 D r | 4 | D | 2 D4 | 54 | 18 | 33 | r | 3 25 2020 10 29 | 4 17 2020 |
| 2 | D | 2 D r | 4 | D | 2 D4 | 54 | 17 | 31 | r | 3 25 2020 10 29 | 4 17 2020 |
| 2 | D | 2 D r | 4 | D | 2 D4 M | 50 | 19 | 38 | r | 3 25 2020 10 29 | 4 17 2020 |
| 2 | D | 2 D r | 4 | D | 2 D4 M | 50 | 14 | 28 | r | 3 25 2020 10 29 | 4 17 2020 |
| 2 | D | 2 D r | 4 | D | 2 D4 | 63 | 15 | 24 | r | 3 25 2020 10 29 | 4 17 2020 |
| 2 | D | 2 D r | 4 | D | 2 D4 | 63 | 11 | 17 | r | 3 25 2020 10 29 | 4 17 2020 |
| 2 | D | 2 D r | 4 | D | 2 D4 | 48 | 13 | 27 | r | 3 25 2020 10 29 | 4 17 2020 |
| 2 | D | 2 D r | 4 | D | 2 D4 | 48 | 1 | 2 | r | 3 25 2020 10 29 | 4 17 2020 |

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 2 | D | 2 D r | 4 | D | 2 D4 | 40 | 25 | 63 | r | 3 25 2020 10 29 | 4 17 2020 |
| 2 | D | 2 D r | 4 | D | 2 D4 | 40 | 26 | 65 | r | 3 25 2020 10 29 | 4 17 2020 |
| 2 | D | 2 D r | 4 | D | 2 D4 | 50 | 0 | d | | | |
| 2 | D | 2 D r | 4 | D | 2 D4 | 50 | 0 | d | | | |
| 2 | D | 2 D r | 4 | D | 2 D4 R | 37 | 0 | d | | | |
| 2 | D | 2 D r | 4 | D | 2 D4 R | 37 | 0 | d | | | |
| 4 | | D | 4 | | D 4 1 | 48 | 0 | d | | | |
| 4 | | D | 4 | | D 4 2 | 48 | 19 | 40 | | | |
| 4 | | D | 4 | | D 4 1 | 48 | 20 | 42 | | | |
| 4 | | D | 4 | | D 4 2 | 48 | 0 | d | | | |
| 4 | | D | 4 | | D 4 1 | 40 | 18 | 45 | | | |
| 4 | | D | 4 | | D 4 2 | 40 | 0 | d | | | |
| 4 | | D | 4 | | D 4 2 | 40 | 0 | d | | | |
| 4 | | D | 4 | | D 4 M1 | 40 | 17 | 43 | | | |
| 4 | | D | 4 | | D 4 M2 | 40 | 0 | d | | | |
| 4 | | D | 4 | | D 4 1 | 40 | 19 | 48 | | | |
| 4 | | D | 4 | | D 4 2 | 40 | 0 | d | | | |
| 4 | | D | 4 | | D 4 1 | 48 | 15 | 31 | | | |
| 4 | | D | 4 | | D 4 2 | 48 | 0 | d | | | |
| 4 | | D | 4 | | D 4 1 | 48 | 0 | d | | | |
| 4 | | D | 4 | | D 4 2 | 48 | 0 | d | | | |
| 5 | | D | 5 | | D 5 1 | 44 | 19 | 43 | | | |
| 5 | | D | 5 | | D 5 1 | 40 | 14 | 35 | | | |
| 5 | | D | 5 | | D 5 1 | 40 | 12 | 30 | r | 4 2 2020 12 00 | 4 15 2020 |
| 5 | | D | 5 | | D 5 1D | 40 | 0 | d | | | |
| 5 | | D | 5 | | D 5 1 | 40 | 0 | d | | | |
| 5 | | D | 5 | | D 5 1 | 44 | 16 | 36 | r | 4 6 2020 12 00 | 4 18 2020 |
| 5 | | D | 5 | | D 5 1 | 44 | 0 | d | | | |
| 5 | | D | 5 | | D 5 1 | 40 | 17 | 43 | | | |
| 5 | | D | 5 | | D 5 1 | 40 | 9 | 23 | r | 3 31 2020 7 34 | 4 12 2020 |
| 5 | | D | 5 | | D 5 1 | 40 | 15 | 38 | | | |
| 5 | | D | 5 | | D 5 1 | 40 | 0 | d | | | |
| 5 | | D | 5 | | D 5 1M | 44 | 18 | 41 | | | |
| 5 | | D | 5 | | D 5 2 | 44 | 5 | 11 | | | |
| 5 | | D | 5 | | D 5 2 | 40 | 5 | 13 | | | |
| 5 | | D | 5 | | D 5 2 | 40 | 0 | d | | | |
| 5 | | D | 5 | | D 5 2D | 40 | 20 | 50 | r | 4 4 2020 13 31 | 4 17 2020 |
| 5 | | D | 5 | | D 5 2 | 40 | 17 | 43 | r | 4 3 2020 20 30 | 4 15 2020 |
| 5 | | D | 5 | | D 5 2 | 44 | 15 | 34 | | | |
| 5 | | D | 5 | | D 5 2 | 44 | 3 | 7 | | | |
| 5 | | D | 5 | | D 5 2 | 40 | 0 | d | | | |

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 5 | D | 5 | | D | 5 2 | 40 | 0 | | | | d |
| 5 | D | 5 | | D | 5 2 | 40 | 0 | | | | d |
| 5 | D | 5 | | D | 5 2 | 40 | 20 | 50 | | | |
| 5 | D | 5 | | D | 5 2M | 44 | 21 | 48 | | | |
| 6 | D | 6 | | D | 6 1 | 40 | 20 | 50 | r | 3 27 2020 12 59 | 4 10 2020 |
| 6 | D | 6 | | D | 6 1 | 44 | 22 | 50 | r | 3 25 2020 20 30 | 4 10 2020 |
| 6 | D | 6 | | D | 6 1 | 44 | 21 | 48 | r | 3 25 2020 20 30 | 4 14 2020 |
| 6 | D | 6 | | D | 6 1D | 40 | 29 | 73 | r | 3 30 2020 13 00 | 4 13 2020 |
| 6 | D | 6 | | D | 6 1 | 40 | 20 | 50 | r | 3 31 2020 12 59 | 4 14 2020 |
| 6 | D | 6 | | D | 6 1 | 40 | 20 | 50 | r | 3 31 2020 14 01 | 4 14 2020 |
| 6 | D | 6 | | D | 6 1 | 40 | 30 | 75 | r | 3 26 2020 23 59 | 4 9 2020 |
| 6 | D | 6 | | D | 6 1 | 44 | 36 | 82 | r | 3 30 2020 13 00 | 4 7 2020 |
| 6 | D | 6 | | D | 6 1 | 44 | 34 | 77 | r | 3 31 2020 14 01 | 4 17 2020 |
| 6 | D | 6 | | D | 6 1 | 40 | 20 | 50 | r | 3 31 2020 13 30 | 4 14 2020 |
| 6 | D | 6 | | D | 6 1 | 40 | 20 | 50 | r | 3 27 2020 12 59 | 4 9 2020 |
| 6 | D | 6 | | D | 6 1R | 40 | 21 | 53 | r | 3 31 2020 9 03 | 4 15 2020 |
| 6 | D | 6 | | D | 6 2 | 40 | 24 | 60 | r | 3 31 2020 14 01 | 4 12 2020 |
| 6 | D | 6 | | D | 6 2 | 44 | 24 | 55 | r | 3 25 2020 16 23 | 4 14 2020 |
| 6 | D | 6 | | D | 6 2 | 44 | 22 | 50 | r | 3 31 2020 13 30 | 4 17 2020 |
| 6 | D | 6 | | D | 6 2D | 40 | 19 | 48 | r | 3 31 2020 8 55 | 4 17 2020 |
| 6 | D | 6 | | D | 6 2 | 40 | 30 | 75 | r | 3 31 2020 14 01 | 4 14 2020 |
| 6 | D | 6 | | D | 6 2 | 40 | 20 | 50 | r | 3 25 2020 21 00 | 4 13 2020 |
| 6 | D | 6 | | D | 6 2 | 40 | 24 | 60 | r | 3 27 2020 12 59 | 4 17 2020 |
| 6 | D | 6 | | D | 6 2 | 44 | 31 | 70 | r | 3 31 2020 12 29 | 4 16 2020 |
| 6 | D | 6 | | D | 6 2 | 44 | 20 | 45 | r | 3 25 2020 21 00 | 4 13 2020 |
| 6 | D | 6 | | D | 6 2 | 40 | 33 | 83 | r | 3 31 2020 12 59 | 4 11 2020 |
| 6 | D | 6 | | D | 6 2 | 40 | 26 | 65 | r | 3 27 2020 14 00 | 4 15 2020 |
| 6 | D | 6 | | D | 6 2R | 40 | 20 | 50 | r | 3 25 2020 9 30 | 4 11 2020 |
| 8 | D | 8 | r | D | 8 2 | | 14 | | | | |
| 8 | D | 8 | r | D | 8 2 | 24 | 10 | 42 | | | |
| 8 | D | 8 | r | D | 8 2 | 26 | 25 | 96 | | | |
| 8 | D | 8 | r | D | 8 2 | 20 | 12 | 60 | | | |
| 8 | D | 8 | r | D | 8 3 | 12 | 7 | 58 | | 3 26 2020 3 01 | 4 16 2020 |
| 8 | D | 8 | r | D | 8 3 | 20 | 12 | 60 | | | |
| 8 | D | 8 | r | D | 8 3 | 14 | 9 | 64 | | 3 28 2020 3 00 | 4 20 2020 |
| 8 | D | 8 | r | D | 8 3 | 20 | 10 | 50 | | | |
| 8 R | D | 08 R | | D | 08 2 | 20 | 7 | 35 | r | 3 27 2020 12 30 | 4 10 2020 |
| 8 R | D | 08 R | | D | 08 2 | 39 | 24 | 62 | | | |
| 8 R | D | 08 R | | D | 08 2 | 20 | 4 | 20 | | 3 25 2020 19 59 | 4 18 2020 |
| 8 R | D | 08 R | | D | 08 2 | 39 | 34 | 87 | | | |
| 8 R | D | 08 R | | D | 08 2 | 39 | 39 | 100 | | 3 27 2020 7 59 | 4 19 2020 |
| 8 R | D | 08 R | | D | 08 3 | 20 | 6 | 30 | | 3 26 2020 18 29 | 4 20 2020 |

| 8 R | D | 08 R | D | 08 3 | 39 | 27 | 69 | | | |
| 8 R | D | 08 R | D | 08 3 | 39 | 39 | 100 | | 3 25 2020 15 41 | 4 20 2020 |
| 8 R | D | 08 R | D | 08 3D | 39 | 37 | 95 | | 3 25 2020 21 00 | 4 19 2020 |
| 8 R | D | 08 R | D | 08 3 | 20 | 6 | 30 | | 3 25 2020 23 59 | 4 20 2020 |
| 8 R | D | 08 R | D | 08 3 | 39 | 33 | 85 | r | 3 31 2020 17 59 | 4 16 2020 |
| 8 R | D | 08 R | D | 08 3 | 39 | 33 | 85 | r | 3 31 2020 12 59 | 4 20 2020 |
| 8 R | D | 08 R | D | 08 4 | 20 | 13 | 65 | | | |
| 8 R | D | 08 R | D | 08 4 | 39 | 20 | 51 | r | 4 2 2020 20 00 | 4 14 2020 |
| 8 R | D | 08 R | D | 08 4 | 39 | 30 | 77 | | | |
| 8 R | D | 08 R | D | 08 4D | 39 | 22 | 56 | r | 4 4 2020 13 00 | 4 17 2020 |
| 8 R | D | 08 R | D | 08 4 | 20 | 8 | 40 | | 3 26 2020 11 30 | 4 18 2020 |
| 8 R | D | 08 R | D | 08 4 | 39 | 33 | 85 | | | |
| 8 R | D | 08 R | D | 08 4 | 39 | 37 | 95 | | | |
| 8 R | D | 08 R | D | 08 4 | 39 | 23 | 59 | r | 3 31 2020 12 27 | 4 13 2020 |
| 8 R | D | 08 R | D | 08 5 | 20 | 6 | 30 | | | |
| 8 R | D | 08 R | D | 08 5 | 39 | 27 | 69 | | | |
| 8 R | D | 08 R | D | 08 5 | 39 | 15 | 38 | r | 4 4 2020 13 00 | 4 17 2020 |
| 8 R | D | 08 R | D | 08 5D | 39 | 14 | 36 | | | |
| 8 R | D | 08 R | D | 08 5 | 20 | 5 | 25 | | 3 30 2020 20 30 | 4 17 2020 |
| 8 R | D | 08 R | D | 08 5 | 39 | 28 | 72 | | | |
| 8 R | D | 08 R | D | 08 5 | 39 | 0 | d | | | |
| 8 R | D | 08 R | D | 08 5 | 39 | 23 | 59 | r | 4 3 2020 20 30 | 4 16 2020 |
| 9 | D | 9 | D | 9 1 | 44 | 43 | 98 | | | |
| 9 | D | 9 | D | 9 1 | 44 | 42 | 95 | | | |
| 9 | D | 9 | D | 9 1 | 44 | 43 | 98 | | | |
| 9 | D | 9 | D | 9 1D | 44 | 40 | 91 | | | |
| 9 | D | 9 | D | 9 1 | 44 | 18 | 41 | | | |
| 9 | D | 9 | D | 9 1 | 44 | 20 | 45 | | | |
| 9 | D | 9 | D | 9 1 | 44 | 20 | 45 | | | |
| 9 | D | 9 | D | 9 1 | 44 | 18 | 41 | | | |
| 9 | D | 9 | D | 9 2 | 44 | 44 | 100 | | | |
| 9 | D | 9 | D | 9 2 | 44 | 43 | 98 | | | |
| 9 | D | 9 | D | 9 2 | 44 | 43 | 98 | | | |
| 9 | D | 9 | D | 9 2D | 44 | 18 | 41 | | | |
| 9 | D | 9 | D | 9 2 | 44 | 37 | 84 | | | |
| 9 | D | 9 | D | 9 2 | 44 | 22 | 50 | | | |
| 9 | D | 9 | D | 9 2 | 44 | 22 | 50 | | | |
| 9 | D | 9 | D | 9 2 | 44 | 15 | 34 | r | 4 3 2020 11 29 | 4 20 2020 |
| 9 | D | 9 | D | 9 3 | 44 | 42 | 95 | | | |
| 9 | D | 9 | D | 9 3 | 44 | 43 | 98 | | | |
| 9 | D | 9 | D | 9 3 | 44 | 42 | 95 | | | |

**MILLER GROUP EXH 1**
**PAGE 008**

| 9 | D | 9 | D | 9 3D | 44 | 42 | 95 | r | 3 29 2020 8 45 | 4 7 2020 |
| 9 | D | 9 | D | 9 3 | 44 | 18 | 41 | | | |
| 9 | D | 9 | D | 9 3 | 44 | 21 | 48 | | | |
| 9 | D | 9 | D | 9 3 | 44 | 22 | 50 | | | |
| 9 | D | 9 | D | 9 3 | 44 | 30 | 68 | r | 3 26 2020 23 59 | 4 18 2020 |
| 9 | D | 9 | D | 9 | 10 | 1 | 10 | | | |
| | | | | | 500 | 76 | 15 | | 3 30 2020 20 30 | 4 19 2020 |
| | | | | | | 24 | | | | |
| d | | d | | d | | 8 | | | | |

# EXHIBIT B

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| ANTHONY MAYS, Individually and on behalf of a class of similarly situated persons; and JUDIA JACKSON, as next friend of KENNETH FOSTER, Individually and on behalf of a class of similarly situated persons | ) ) ) ) ) | |
| | ) | Case No. 20-cv-2134 |
| Plaintiffs-Petitioners, | ) ) | |
| v | ) ) | |
| THOMAS DART, Sheriff of Cook County, | ) ) | |
| Defendant-Respondent | ) | |

## **SUPPLEMENTAL DECLARATION OF MICHAEL MILLER**

I, Michael Miller, pursuant to 28 U.S.C. § 1746, declare as follows:

1. That I am currently employed by the Cook County Sheriff's Office ("CCSO") as the First Assistant Executive Director for the Cook County Department of Corrections ("CCDOC"). I have been employed in this role since 2019 and have worked in CCDOC for over thirty years.

2. I previously executed a sworn Declaration concerning the CCSO's response to the Novel Coronavirus ("COVID-19") pandemic, filed on April 7, 2020 under Dkt. #31-8. Each and all paragraphs under said declaration are incorporated and re-stated herein

3. I am familiar with the Court's order entered April 9, 2020 requiring the CCSO to report to the Court certain steps taken to combat the spread of COVID-19 in the Cook County Department of Corrections ("CCDOC").

## **Background**

4. CCDOC is an incredibly complex operation. On a regular day, rotating shifts of correctional officers and supervisory staff across multiple divisions transfer hundreds of detainees to court hearings, medical appointments, court-mandated and supplemental programming, and more. Detainees are provided three meals per day, essential supplies including bedding, uniforms, toothbrushes, and soap. Commissary deliveries are completed and logged. Inmate grievances and medical requests are collected and processed.

5. CCDOC is required to weigh numerous factors while operating the jail. For example, when classifying a detainee and making a housing determination, multiple factors are considered including but not limited to: criminal charge(s), criminal history and incarceration history, the safety of staff and detainees, security requirements for each detainee, correctional disciplinary history, and mental health needs.

6. As of April 17, 2020 the CCDOC detainee population is 4,233. 98 detainees were released from custody on April 16, 2020. There were 13 newly rearrested people remanded from bond court who were not released on bond or released on electronic monitoring.

7. As of April 17, 2020 at 10:00a.m., there are 180 detainees in CCDOC custody who have tested positive for COVID-19 and are assigned to Isolation tiers. 170 detainees have been moved to Convalescent Tiers, as they are recovering from COVID-19.

8. The CCSO has activated emergency staffing provisions of its Collective Bargaining Agreements in order to assign court services deputies to CCDOC operations. Approximately 123 deputies have been assigned to CCDOC as of April 17, 2020.

**Social Distancing**

9. The CCSO has implemented social distancing policies across the CCDOC compound in a variety of ways. We opened previously closed divisions in order to spread housing assignments across more available space, including: Division 4, Division 5, Bootcamp barracks/Mental Health Transition Center, and Division 2 Dorm 1, Dorm 3, and Dorm 4.

10. As explained in my April 7, 2020 declaration, to reduce the potential spread of the virus, we implemented a process to quarantine and isolate tiers, designate them as such and install certain rules as it relates to each.

    a. **Quarantine Tiers** are tiers where new detainees are assigned after intake and housed for the first fourteen days of their stay. In addition, any tier where a detainee develops symptoms of COVID-19 is immediately designated as a Quarantine Tier. The symptomatic detainee is treated and removed from the tier and taken to an Isolation Tier at the direction of medical staff. The remainder of the tier is identified as under Quarantine.

    b. **Isolation Tiers** are tiers designated to house symptomatic detainees and detainees who have tested positive for COVID-19, to receive immediate care and be isolated from the rest of the jail population. Every detainee in an isolation tier has exhibited clear symptoms or has a positive test for COVID-19. However, symptomatic detainees are held in different tiers than known positive COVID detainees.

    c. **Convalescent Tiers** are tiers designated to house detainees recovering from COVID-19, who were moved to Isolation Tiers for treatment after testing positive, but have now tested negative and are in recovery.

11. CCDOC has transitioned 175 tiers across CCDOC to single cell housing. Only 11 tiers currently do not have single cell housing, due to unique mental health needs of those detainees assigned. Cermak Health Services ("Cermak") traditionally makes housing recommendations regarding such mental health needs, where, for example, an individual must be housed in a dorm setting in light of a psychiatric condition. Approximately 2,521 detainees are housed in single cells as of the date of this declaration.

12. As of April 17, 2020, for dormitory housing, we have spread detainees throughout to allow all dorms to be at 50%, aside from RTU and restricted housing. Approximately 684 detainees are currently housed in four dormitories—Division 2 Dorm 1, Dorm 2, Dorm 3, and Dorm 4—so there are approximately 170-200 detainees per dorm that each normally house 900.

13. Since March 20, 2020, the number of detainees who are housed in single cells has increased by 545%. Since March 20, 2020, the number of detainees who are housed in double cells has decreased by 93%. Miller Declaration Exhibit 1.

14. Miller Declaration Exhibit 2 attached shows the number of detainees in each open tier and division housing the general population, and the percentage those tiers were toward capacity on March 15, 2020 compared to April 17, 2020.

15. Miller Declaration Exhibit 3 attached shows the number of detainees in each open tier and division in Cermak Health Services and RTU, and the percentage those tiers were toward capacity on March 15, 2020 and April 17, 2020.

16. On March 15, 2020 there were 144 living units occupied, 27 dorms, and 117 celled tiers. As of April 17, 2929, there are 192 living units occupied, 49 dorms, and 143 celled tiers. This is a 33% overall increase in the occupied living units. As of April 17, 2020, 94% of celled tiers are single celled.

17. Cermak Health Services, RTU, and Division 2 Dorm 1 Tier DIV2-D1-D contain specialized populations that cannot be housed in other areas of the Jail.

18. CCSO has been providing detainees with education on social distancing since late February 2020, through signage and verbal direction. CCSO has emphasized that detainees should maintain 6-feet of distance from each other. During hours out of their cells or bunk beds in dormitories, the detainees may move about as they wish and may maintain separation between themselves.

19. CCDOC is rotating hours detainees may be in common areas, such that only half of all detainees assigned to a tier are released into the dayroom(s) at one time. Provide the opportunity

20. However, these procedures are subject to change in the event of a safety or security incident, such as fights involving multiple detainees. Detainees involved in such incidents may be sent to special management tiers.

21. CCSO administers the electronic monitoring program for detainees who receive electronic monitoring as a condition of bail. The CCSO can sustain the monitoring of approximately XX individuals through the electronic monitoring program. If the CCSO were required to increase the population in this program it would result in a potential risk to public safety.

**Personal Protective Equipment**

22. The CCSO has continued to work diligently to obtain and distribute personal protective equipment ("PPE") across CCDOC. Deliveries of PPE and distribution to staff—and, where appropriate, detainees—are captured and preserved on stationary cameras.

23. As of April 11, 2020, all detainees assigned to Quarantine Tiers are issued a new mask each day.

24. General population detainees have neither known exposures to people with COVID-19 nor symptoms of COVID-19. Therefore, the CDC does not recommend that they use surgical masks. The CCDOC will also provide the general population of detainees with masks for their comfort and for security purposes to avoid any conflicts related to the provision of masks to other detainees on the Quarantine Tiers, as supplies permit.

25. As of the date of this Declaration, CCDOC has inventoried XXX surgical masks and XXX cloth masks. To illustrate, between April 11 and April 13 the Critical Incident Command Center distributed 13,920 surgical masks across the jail compound. In complying with recent changes to CDC guidance, as affirmed by this court's order, we are utilizing 4,700 surgical masks for detainees per day. We expect to exhaust this supply, at its current rate, on June 7, 2020.

I, Michael Miller, pursuant to 28 U.S.C. § 1746, declare under penalty of perjury of the laws of the United States of America that the foregoing is true and correct.

Dated this 17th day of April 2020.

# Miller Declaration Exhibit 1



|  | 3/20/20 at 4am | 4/17/20 at 4pm | % Change |
|---|---|---|---|
| Single Celled | 391 | 2,521 | 545% |
| Double Celled | 3,906 | 260 | -93% |
| Housed in Dorm | 1,257 | 1,231 | -2% |
| Housed in Boot Camp | 0 | 172 | n/a |
| Hospitalized | 11 | 27 | 145% |
| Confined Total | 5,565 | 4,211 | -24% |

# Miller Declaration Exhibit 2

| Division | Facility | Tier | Capacity | Occupancy as of 3/15/2020 | Occupancy as of 4/17/2020 | Percent Occupied as of 3/15/2020 | Percent Occupied as of 7/17/2020 | Tier Type | First Quarantine | Projected End Date |
|---|---|---|---|---|---|---|---|---|---|---|
| 10 | Division 10 | DIV10-1A | 48 | 48 | 24 | 100% | 50% | | | |
| 10 | Division 10 | DIV10-1B | 48 | 46 | 24 | 96% | 50% | | | |
| 10 | Division 10 | DIV10-2A | 48 | 44 | 24 | 92% | 50% | | | |
| 10 | Division 10 | DIV10-2B | 48 | 0 | 24 | closed | 50% | | | |
| 10 | Division 10 | DIV10-2C | 48 | 46 | 24 | 96% | 50% | | | |
| 10 | Division 10 | DIV10-2D | 48 | 48 | 24 | 100% | 50% | | | |
| 10 | Division 10 | DIV10-3A | 48 | 47 | 24 | 98% | 50% | | | |
| 10 | Division 10 | DIV10-3B | 48 | 45 | 24 | 94% | 50% | | | |
| 10 | Division 10 | DIV10-3D | 48 | 43 | 23 | 90% | 48% | | | |
| 10 | Division 10 | DIV10-4A | 48 | 46 | 24 | 96% | 50% | | | |
| 10 | Division 10 | DIV10-4B | 48 | 47 | 24 | 98% | 50% | | | |
| 10 | Division 10 | DIV10-4C | 48 | 48 | 24 | 100% | 50% | | | |
| 10 | Division 10 | DIV10-4D | 48 | 48 | 23 | 100% | 48% | | | |
| 11 | Division 11 | DIV11-AA | 48 | 42 | 22 | 88% | 46% | | | |
| 11 | Division 11 | DIV11-AB | 48 | 48 | 24 | 100% | 50% | | | |
| 11 | Division 11 | DIV11-AC | 48 | 46 | 20 | 96% | 42% | | | |
| 11 | Division 11 | DIV11-AD | 48 | 48 | 23 | 100% | 48% | | | |
| 11 | Division 11 | DIV11-AF | 48 | 45 | 21 | 94% | 44% | | | |
| 11 | Division 11 | DIV11-BB | 48 | 39 | 20 | 81% | 42% | | | |
| 11 | Division 11 | DIV11-BC | 48 | 44 | 20 | 92% | 42% | | | |
| 11 | Division 11 | DIV11-BD | 48 | 42 | 21 | 88% | 44% | | | |
| 11 | Division 11 | DIV11-BF | 48 | 48 | 23 | 100% | 48% | | | |
| 11 | Division 11 | DIV11-BG | 48 | 45 | 23 | 94% | 48% | | | |
| 11 | Division 11 | DIV11-BJ | 48 | 47 | 23 | 98% | 48% | | | |
| 11 | Division 11 | DIV11-CC | 48 | 47 | 24 | 98% | 50% | | | |
| 11 | Division 11 | DIV11-CH | 48 | 48 | 22 | 100% | 46% | | | |
| 2 | Division 2 Dorm 1 | DIV2-D1-A | 48 | 38 | 13 | 79% | 27% | | | |
| 2 | Division 2 Dorm 1 | DIV2-D1-B | 48 | 0 | 8 | closed | 17% | | | |
| 2 | Division 2 Dorm 1 | DIV2-D1-C | 48 | 0 | 18 | closed | 38% | | | |
| 2 | Division 2 Dorm 1 | DIV2-D1-D | 48 | 0 | 39 | closed | 81% | | | |
| 2 | Division 2 Dorm 1 | DIV2-D1-E | 48 | 0 | 22 | closed | 46% | | | |
| 2 | Division 2 Dorm 1 | DIV2-D1-F | 48 | 0 | 24 | closed | 50% | | | |
| 2 | Division 2 Dorm 1 | DIV2-D1-G | 48 | 0 | 19 | closed | 40% | | | |
| 2 | Division 2 Dorm 1 | DIV2-D1-H | 48 | 0 | 24 | closed | 50% | | | |
| 2 | Division 2 Dorm 2 | DIV2-D2-M | 48 | 0 | 15 | closed | 31% | | | |
| 2 | Division 2 Dorm 2 | DIV2-D2-O | 48 | 41 | 15 | 85% | 31% | | | |
| 2 | Division 2 Dorm 2 | DIV2-D2-P | 44 | 44 | 17 | 100% | 39% | | | |
| 2 | Division 2 Dorm 2 | DIV2-D2-S | 44 | 0 | 15 | closed | 34% | | | |
| 2 | Division 2 Dorm 2 | DIV2-D2-T | 48 | 0 | 18 | closed | 38% | | | |
| 2 | Division 2 Dorm 2 | DIV2-D2-V | 48 | 1 | 13 | 2% | 27% | | | |
| 2 | Division 2 Dorm 3 | DIV2-D3-AA | 44 | 18 | 20 | 41% | 45% | | | |
| 2 | Division 2 Dorm 3 | DIV2-D3-BB | 48 | 0 | 22 | closed | 46% | | | |
| 2 | Division 2 Dorm 3 | DIV2-D3-CC | 48 | 0 | 0 | closed | closed | | | |
| 2 | Division 2 Dorm 3 | DIV2-D3-EE | 48 | 0 | 21 | closed | 44% | | | |
| 2 | Division 2 Dorm 3 | DIV2-D3-FF | 48 | 0 | 19 | closed | 40% | | | |
| 2 | Division 2 Dorm 3 | DIV2-D3-GG | 48 | 0 | 22 | closed | 46% | | | |
| 2 | Division 2 Dorm 3 | DIV2-D3-HH | 48 | 0 | 10 | closed | 21% | | | |
| 2 | Division 2 Dorm 4 | DIV2-D4-LL | 54 | 52 | 21 | 96% | 39% | | | |

| Division | Facility | Tier | Capacity | Occupancy as of 3/15/2020 | Occupancy as of 4/17/2020 | Percent Occupied as of 3/15/2020 | Percent Occupied as of 7/17/2020 | Tier Type | First Quarantine | Projected End Date |
|---|---|---|---|---|---|---|---|---|---|---|
| 2 | Division 2 Dorm 4 | DIV2-D4-LU | 54 | 43 | 1 | 80% | 2% | | | |
| 2 | Division 2 Dorm 4 | DIV2-D4-ML | 50 | 49 | 15 | 98% | 30% | | | |
| 2 | Division 2 Dorm 4 | DIV2-D4-MU | 50 | 44 | 11 | 88% | 22% | | | |
| 2 | Division 2 Dorm 4 | DIV2-D4-NL | 63 | 54 | 10 | 86% | 16% | | | |
| 2 | Division 2 Dorm 4 | DIV2-D4-NU | 63 | 51 | 9 | 81% | 14% | | | |
| 2 | Division 2 Dorm 4 | DIV2-D4-OL | 48 | 34 | 24 | 71% | 50% | | | |
| 2 | Division 2 Dorm 4 | DIV2-D4-OU | 48 | 0 | 0 | closed | closed | | | |
| 2 | Division 2 Dorm 4 | DIV2-D4-PL | 40 | 20 | 19 | 50% | 48% | | | |
| 2 | Division 2 Dorm 4 | DIV2-D4-PU | 40 | 19 | 18 | 48% | 45% | | | |
| 2 | Division 2 Dorm 4 | DIV2-D4-QL | 50 | 0 | 24 | closed | 48% | | | |
| 2 | Division 2 Dorm 4 | DIV2-D4-QU | 50 | 0 | 0 | closed | closed | | | |
| 2 | Division 2 Dorm 4 | DIV2-D4-RL | 37 | 0 | 26 | closed | 70% | | | |
| 2 | Division 2 Dorm 4 | DIV2-D4-RU | 37 | 0 | 0 | closed | closed | | | |
| 4 | Division 4 | DIV4-I1 | 48 | 0 | 24 | closed | 50% | | | |
| 4 | Division 4 | DIV4-J1 | 48 | 0 | 21 | closed | 44% | | | |
| 4 | Division 4 | DIV4-K1 | 40 | 0 | 16 | closed | 40% | | | |
| 4 | Division 4 | DIV4-L1 | 40 | 0 | 0 | closed | closed | | | |
| 4 | Division 4 | DIV4-L2 | 40 | 0 | 18 | closed | 45% | | | |
| 4 | Division 4 | DIV4-M1 | 40 | 0 | 0 | closed | closed | | | |
| 4 | Division 4 | DIV4-N2 | 40 | 0 | 14 | closed | 35% | | | |
| 4 | Division 4 | DIV4-P1 | 48 | 0 | 18 | closed | 38% | | | |
| 4 | Division 4 | DIV4-P2 | 48 | 0 | 24 | closed | 50% | | | |
| 4 | Division 4 | DIV4-Q1 | 48 | 0 | 20 | closed | 42% | | | |
| 4 | Division 4 | DIV4-Q2 | 48 | 0 | 22 | closed | 46% | | | |
| 5 | Division 5 | DIV5-1A | 44 | 0 | 21 | closed | 48% | | | |
| 5 | Division 5 | DIV5-1B | 40 | 0 | 19 | closed | 48% | | | |
| 5 | Division 5 | DIV5-1E | 40 | 0 | 0 | closed | closed | | | |
| 5 | Division 5 | DIV5-1G | 44 | 0 | 0 | closed | closed | | | |
| 5 | Division 5 | DIV5-1H | 40 | 0 | 16 | closed | 40% | | | |
| 5 | Division 5 | DIV5-1J | 40 | 0 | 11 | closed | 28% | | | |
| 5 | Division 5 | DIV5-1K | 40 | 0 | 18 | closed | 45% | | | |
| 5 | Division 5 | DIV5-1L | 40 | 0 | 19 | closed | 48% | | | |
| 5 | Division 5 | DIV5-2A | 44 | 0 | 5 | closed | 11% | | | |
| 5 | Division 5 | DIV5-2B | 40 | 25 | 0 | 63% | closed | | | |
| 5 | Division 5 | DIV5-2C | 40 | 0 | 0 | closed | closed | | | |
| 5 | Division 5 | DIV5-2F | 44 | 26 | 15 | 59% | 34% | | | |
| 5 | Division 5 | DIV5-2G | 44 | 7 | 0 | 16% | closed | | | |
| 5 | Division 5 | DIV5-2H | 40 | 0 | 0 | closed | closed | | | |
| 5 | Division 5 | DIV5-2J | 40 | 0 | 0 | closed | closed | | | |
| 5 | Division 5 | DIV5-2K | 40 | 0 | 0 | closed | closed | | | |
| 5 | Division 5 | DIV5-2M | 44 | 43 | 14 | 98% | 32% | | | |
| 6 | Division 6 | DIV6-1A | 40 | 38 | 18 | 95% | 45% | | | |
| 6 | Division 6 | DIV6-1B | 44 | 43 | 22 | 98% | 50% | | | |
| 6 | Division 6 | DIV6-1C | 44 | 44 | 22 | 100% | 50% | | | |
| 6 | Division 6 | DIV6-1D | 40 | 40 | 20 | 100% | 50% | | | |
| 6 | Division 6 | DIV6-1H | 40 | 35 | 20 | 88% | 50% | | | |
| 6 | Division 6 | DIV6-1J | 40 | 0 | 19 | closed | 48% | | | |
| 6 | Division 6 | DIV6-1L | 44 | 44 | 22 | 100% | 50% | | | |

| Division | Facility | Tier | Capacity | Occupancy as of 3/15/2020 | Occupancy as of 4/17/2020 | Percent Occupied as of 3/15/2020 | Percent Occupied as of 7/17/2020 | Tier Type | First Quarantine | Projected End Date |
|---|---|---|---|---|---|---|---|---|---|---|
| 6 | Division 6 | DIV6-1N | 44 | 44 | 22 | 100% | 50% | | | |
| 6 | Division 6 | DIV6-1P | 40 | 38 | 20 | 95% | 50% | | | |
| 6 | Division 6 | DIV6-1Q | 40 | 39 | 19 | 98% | 48% | | | |
| 6 | Division 6 | DIV6-1R | 40 | 37 | 20 | 93% | 50% | | | |
| 6 | Division 6 | DIV6-2B | 44 | 44 | 21 | 100% | 48% | | | |
| 6 | Division 6 | DIV6-2C | 44 | 44 | 22 | 100% | 50% | | | |
| 6 | Division 6 | DIV6-2D | 40 | 40 | 19 | 100% | 48% | | | |
| 6 | Division 6 | DIV6-2H | 40 | 40 | 20 | 100% | 50% | | | |
| 6 | Division 6 | DIV6-2J | 40 | 40 | 21 | 100% | 53% | | | |
| 6 | Division 6 | DIV6-2K | 40 | 40 | 20 | 100% | 50% | | | |
| 6 | Division 6 | DIV6-2L | 44 | 43 | 22 | 98% | 50% | | | |
| 6 | Division 6 | DIV6-2N | 44 | 43 | 22 | 98% | 50% | | | |
| 6 | Division 6 | DIV6-2P | 40 | 40 | 20 | 100% | 50% | | | |
| 6 | Division 6 | DIV6-2Q | 40 | 40 | 24 | 100% | 60% | | | |
| 6 | Division 6 | DIV6-2R | 40 | 38 | 25 | 95% | 63% | | | |
| 9 | Division 9 | DIV9-1A | 44 | 44 | 19 | 100% | 43% | | | |
| 9 | Division 9 | DIV9-1B | 44 | 44 | 22 | 100% | 50% | | | |
| 9 | Division 9 | DIV9-1D | 44 | 39 | 18 | 89% | 41% | | | |
| 9 | Division 9 | DIV9-1E | 44 | 35 | 19 | 80% | 43% | | | |
| 9 | Division 9 | DIV9-1F | 44 | 15 | 21 | 34% | 48% | | | |
| 9 | Division 9 | DIV9-1G | 44 | 34 | 22 | 77% | 50% | | | |
| 9 | Division 9 | DIV9-2A | 44 | 44 | 22 | 100% | 50% | | | |
| 9 | Division 9 | DIV9-2B | 44 | 43 | 19 | 98% | 43% | | | |
| 9 | Division 9 | DIV9-2D | 44 | 44 | 22 | 100% | 50% | | | |
| 9 | Division 9 | DIV9-2E | 44 | 37 | 37 | 84% | 84% | | | |
| 9 | Division 9 | DIV9-2F | 44 | 32 | 20 | 73% | 45% | | | |
| 9 | Division 9 | DIV9-2G | 44 | 0 | 22 | closed | 50% | | | |
| 9 | Division 9 | DIV9-3A | 44 | 42 | 22 | 95% | 50% | | | |
| 9 | Division 9 | DIV9-3B | 44 | 43 | 22 | 98% | 50% | | | |
| 9 | Division 9 | DIV9-3C | 44 | 43 | 22 | 98% | 50% | | | |
| 9 | Division 9 | DIV9-3E | 44 | 21 | 22 | 48% | 50% | | | |
| 9 | Division 9 | DIV9-3G | 44 | 43 | 22 | 98% | 50% | | | |
| 9 | Division 9 | DIV9-3H | 44 | 43 | 21 | 98% | 48% | | | |
| 9 | Division 9 | DIV9-LI | 10 | 1 | 1 | 10% | 10% | | | |
| 10 | Division 10 | DIV10-1C | 48 | 47 | 24 | 98% | 50% | Quarantine | 4/9/2020 16:26 | 5/1/2020 |
| 10 | Division 10 | DIV10-1D | 48 | 45 | 22 | 94% | 46% | Quarantine | 4/16/2020 19:59 | 4/30/2020 |
| 10 | Division 10 | DIV10-3C | 48 | 47 | 20 | 98% | 42% | Quarantine | 3/31/2020 18:10 | 4/30/2020 |
| 11 | Division 11 | DIV11-AG | 48 | 47 | 24 | 98% | 50% | Quarantine | 3/31/2020 15:30 | 4/29/2020 |
| 11 | Division 11 | DIV11-AH | 48 | 47 | 24 | 98% | 50% | Quarantine | 4/12/2020 11:29 | 5/1/2020 |
| 11 | Division 11 | DIV11-AJ | 48 | 47 | 23 | 98% | 48% | Quarantine | 4/9/2020 6:55 | 5/1/2020 |
| 11 | Division 11 | DIV11-BA | 48 | 48 | 24 | 100% | 50% | Quarantine | 4/15/2020 11:59 | 5/1/2020 |
| 11 | Division 11 | DIV11-BH | 48 | 46 | 24 | 96% | 50% | Quarantine | 4/13/2020 7:59 | 4/30/2020 |
| 11 | Division 11 | DIV11-CA | 48 | 48 | 24 | 100% | 50% | Quarantine | 4/10/2020 21:59 | 4/30/2020 |
| 11 | Division 11 | DIV11-CB | 48 | 48 | 24 | 100% | 50% | Quarantine | 3/31/2020 17:48 | 4/27/2020 |
| 11 | Division 11 | DIV11-CD | 48 | 47 | 24 | 98% | 50% | Quarantine | 3/26/2020 12:42 | 4/24/2020 |
| 11 | Division 11 | DIV11-CF | 48 | 48 | 24 | 100% | 50% | Quarantine | 3/26/2020 12:13 | 4/30/2020 |
| 11 | Division 11 | DIV11-CG | 48 | 48 | 24 | 100% | 50% | Quarantine | 4/9/2020 7:26 | 4/30/2020 |
| 11 | Division 11 | DIV11-CJ | 48 | 48 | 30 | 100% | 63% | Quarantine | 3/31/2020 7:21 | 4/29/2020 |

| Division | Facility | Tier | Capacity | Occupancy as of 3/15/2020 | Occupancy as of 4/17/2020 | Percent Occupied as of 3/15/2020 | Percent Occupied as of 7/17/2020 | Tier Type | First Quarantine | Projected End Date |
|---|---|---|---|---|---|---|---|---|---|---|
| 11 | Division 11 | DIV11-DA | 48 | 47 | 24 | 98% | 50% | Quarantine | 3/31/2020 18:07 | 4/27/2020 |
| 11 | Division 11 | DIV11-DB | 48 | 47 | 24 | 98% | 50% | Quarantine | 4/7/2020 14:57 | 5/1/2020 |
| 11 | Division 11 | DIV11-DC | 48 | 47 | 24 | 98% | 50% | Quarantine | 4/9/2020 9:30 | 5/1/2020 |
| 11 | Division 11 | DIV11-DD | 48 | 47 | 23 | 98% | 48% | Quarantine | 3/29/2020 9:02 | 5/1/2020 |
| 11 | Division 11 | DIV11-DF | 48 | 45 | 24 | 94% | 50% | Quarantine | 4/10/2020 0:59 | 4/27/2020 |
| 11 | Division 11 | DIV11-DG | 48 | 46 | 24 | 96% | 50% | Quarantine | 4/9/2020 9:30 | 4/30/2020 |
| 11 | Division 11 | DIV11-DH | 48 | 47 | 24 | 98% | 50% | Quarantine | 4/13/2020 6:43 | 4/27/2020 |
| 11 | Division 11 | DIV11-DJ | 48 | 46 | 24 | 96% | 50% | Quarantine | 4/13/2020 6:36 | 4/29/2020 |
| 2 | Division 2 Dorm 2 | DIV2-D2-N | 48 | 0 | 23 | closed | 48% | Quarantine | 4/4/2020 21:29 | 4/30/2020 |
| 2 | Division 2 Dorm 2 | DIV2-D2-R | 48 | 0 | 24 | closed | 50% | Quarantine | 4/3/2020 6:51 | 4/30/2020 |
| 2 | Division 2 Dorm 2 | DIV2-D2-U | 44 | 0 | 19 | closed | 43% | Quarantine | 4/8/2020 10:30 | 4/30/2020 |
| 2 | Division 2 Dorm 2 | DIV2-D2-W | 44 | 0 | 25 | closed | 57% | Quarantine | 4/15/2020 17:53 | 5/1/2020 |
| 2 | Division 2 Dorm 3 | DIV2-D3-DD | 48 | 0 | 22 | closed | 46% | Quarantine | 4/15/2020 19:29 | 4/30/2020 |
| 2 | Division 2 Dorm 3 | DIV2-D3-JJ | 48 | 0 | 19 | closed | 40% | Quarantine | 4/4/2020 17:59 | 4/25/2020 |
| 4 | Division 4 | DIV4-I2 | 48 | 0 | 16 | closed | 33% | Quarantine | 4/16/2020 15:59 | 4/30/2020 |
| 4 | Division 4 | DIV4-J2 | 48 | 0 | 9 | closed | 19% | Quarantine | 4/15/2020 12:29 | 5/1/2020 |
| 4 | Division 4 | DIV4-K2 | 40 | 0 | 15 | closed | 38% | Quarantine | 4/9/2020 20:59 | 4/23/2020 |
| 4 | Division 4 | DIV4-M2 | 40 | 0 | 14 | closed | 35% | Quarantine | 4/15/2020 17:11 | 4/29/2020 |
| 4 | Division 4 | DIV4-N1 | 40 | 0 | 16 | closed | 40% | Quarantine | 4/9/2020 11:59 | 4/23/2020 |
| 5 | Division 5 | DIV5-1C | 40 | 3 | 18 | 8% | 45% | Quarantine | 4/2/2020 12:00 | 4/30/2020 |
| 5 | Division 5 | DIV5-1D | 40 | 0 | 17 | closed | 43% | Quarantine | 4/15/2020 19:59 | 4/30/2020 |
| 5 | Division 5 | DIV5-1F | 44 | 0 | 17 | closed | 39% | Quarantine | 4/6/2020 12:00 | 4/30/2020 |
| 5 | Division 5 | DIV5-1M | 44 | 0 | 20 | closed | 45% | Quarantine | 4/6/2020 1:00 | 4/30/2020 |
| 5 | Division 5 | DIV5-2D | 40 | 25 | 9 | 63% | 23% | Quarantine | 4/4/2020 13:31 | 4/28/2020 |
| 5 | Division 5 | DIV5-2E | 40 | 19 | 14 | 48% | 35% | Quarantine | 4/3/2020 20:30 | 4/25/2020 |
| 5 | Division 5 | DIV5-2L | 40 | 36 | 16 | 90% | 40% | Quarantine | 4/9/2020 8:03 | 4/26/2020 |
| 6 | Division 6 | DIV6-1K | 40 | 34 | 20 | 85% | 50% | Quarantine | 3/26/2020 23:59 | 4/30/2020 |
| 6 | Division 6 | DIV6-2A | 40 | 40 | 20 | 100% | 50% | Quarantine | 3/31/2020 14:01 | 4/30/2020 |
| 9 | Division 9 | DIV9-1C | 44 | 41 | 23 | 93% | 52% | Quarantine | 4/9/2020 7:17 | 4/26/2020 |
| 9 | Division 9 | DIV9-1H | 44 | 38 | 20 | 86% | 45% | Quarantine | 4/15/2020 7:15 | 4/29/2020 |
| 9 | Division 9 | DIV9-2C | 44 | 44 | 24 | 100% | 55% | Quarantine | 4/9/2020 16:23 | 4/23/2020 |
| 9 | Division 9 | DIV9-2H | 44 | 37 | 12 | 84% | 27% | Quarantine | 4/3/2020 11:29 | 4/21/2020 |
| 9 | Division 9 | DIV9-3D | 44 | 41 | 29 | 93% | 66% | Quarantine | 3/29/2020 8:45 | 4/30/2020 |
| 9 | Division 9 | DIV9-3F | 44 | 0 | 22 | closed | 50% | Quarantine | 4/15/2020 22:30 | 4/30/2020 |
| Hospital | Hospital | Hospital | n/a | 13 | 27 | n/a | n/a | | | |
| Outside Counties | Outside Counties | Outside Counties | n/a | 8 | 8 | n/a | n/a | | | |

# Miller Declaration Exhibit 3

| Division | Facility | Tier | Capacity | Occupancy as if 3/15/2020 | Occupancy as of 4/17/2020 | Percent Occupied as of 3/15/2020 | Percent Occupied as of 4/17/2020 | Tier Type | First Quarantine | Projected End Date |
|---|---|---|---|---|---|---|---|---|---|---|
| 8 | Division 8 Cermak | DIV8-2E | n/a | 14 | 13 | n/a | n/a | | | |
| 8 | Division 8 Cermak | DIV8-2N | 24 | 27 | 4 | 113% | 17% | | | |
| 8 | Division 8 Cermak | DIV8-2S | 26 | 29 | 23 | 112% | 88% | | | |
| 8 | Division 8 Cermak | DIV8-2W | 20 | 12 | 11 | 60% | 55% | | | |
| 8 | Division 8 Cermak | DIV8-3E | 12 | 6 | 3 | 50% | 25% | Isolation | | 4/24/2020 |
| 8 | Division 8 Cermak | DIV8-3N | 20 | 14 | 14 | 70% | 70% | | | |
| 8 | Division 8 Cermak | DIV8-3S | 14 | 12 | 4 | 86% | 29% | Isolation | 3/28/2020 3:00 | 4/30/2020 |
| 8 | Division 8 Cermak | DIV8-3W | 20 | 14 | 11 | 70% | 55% | Isolation | 3/30/2020 19:00 | 4/30/2020 |
| 8 RTU | Division 08 RTU | DIV08-2A | 20 | 10 | 8 | 50% | 40% | | | |
| 8 RTU | Division 08 RTU | DIV08-2B | 39 | 21 | 12 | 54% | 31% | Quarantine | 4/16/2020 19:00 | 4/30/2020 |
| 8 RTU | Division 08 RTU | DIV08-2E | 20 | 18 | 10 | 90% | 50% | Isolation | 3/25/2020 19:59 | 5/1/2020 |
| 8 RTU | Division 08 RTU | DIV08-2F | 39 | 32 | 38 | 82% | 97% | | | |
| 8 RTU | Division 08 RTU | DIV08-2G | 39 | 28 | 39 | 72% | 100% | | | |
| 8 RTU | Division 08 RTU | DIV08-3A | 20 | 18 | 7 | 90% | 35% | Isolation | 3/26/2020 18:29 | 4/30/2020 |
| 8 RTU | Division 08 RTU | DIV08-3B | 39 | 39 | 22 | 100% | 56% | Quarantine | 4/7/2020 12:30 | 4/23/2020 |
| 8 RTU | Division 08 RTU | DIV08-3C | 39 | 38 | 38 | 97% | 97% | Isolation | 3/25/2020 15:41 | 4/30/2020 |
| 8 RTU | Division 08 RTU | DIV08-3D | 39 | 39 | 39 | 100% | 100% | Isolation | 3/25/2020 21:00 | 4/30/2020 |
| 8 RTU | Division 08 RTU | DIV08-3E | 20 | 16 | 6 | 80% | 30% | Isolation | 3/25/2020 23:59 | 5/1/2020 |
| 8 RTU | Division 08 RTU | DIV08-3F | 39 | 39 | 28 | 100% | 72% | Quarantine | 3/31/2020 17:59 | 4/25/2020 |
| 8 RTU | Division 08 RTU | DIV08-3G | 39 | 38 | 24 | 97% | 62% | Quarantine | 3/31/2020 12:59 | 4/30/2020 |
| 8 RTU | Division 08 RTU | DIV08-3H | 39 | 39 | 35 | 100% | 90% | Quarantine | 3/31/2020 9:41 | 5/1/2020 |
| 8 RTU | Division 08 RTU | DIV08-4A | 20 | 16 | 14 | 80% | 70% | | | |
| 8 RTU | Division 08 RTU | DIV08-4B | 39 | 11 | 20 | 28% | 51% | Quarantine | 4/2/2020 20:00 | 4/29/2020 |
| 8 RTU | Division 08 RTU | DIV08-4C | 39 | 39 | 37 | 100% | 95% | | | |
| 8 RTU | Division 08 RTU | DIV08-4D | 39 | 38 | 20 | 97% | 51% | | | |
| 8 RTU | Division 08 RTU | DIV08-4E | 20 | 12 | 5 | 60% | 25% | Isolation | 3/26/2020 11:30 | 4/30/2020 |
| 8 RTU | Division 08 RTU | DIV08-4F | 39 | 38 | 31 | 97% | 79% | Quarantine | 4/1/2020 20:01 | 5/1/2020 |
| 8 RTU | Division 08 RTU | DIV08-4G | 39 | 38 | 27 | 97% | 69% | Quarantine | 4/8/2020 11:29 | 4/30/2020 |
| 8 RTU | Division 08 RTU | DIV08-4H | 39 | 39 | 28 | 100% | 72% | Quarantine | 3/31/2020 12:27 | 5/1/2020 |
| 8 RTU | Division 08 RTU | DIV08-5A | 20 | 12 | 7 | 60% | 35% | | | |
| 8 RTU | Division 08 RTU | DIV08-5B | 39 | 36 | 25 | 92% | 64% | | | |
| 8 RTU | Division 08 RTU | DIV08-5C | 39 | 10 | 17 | 26% | 44% | Isolation | 4/4/2020 13:00 | 4/30/2020 |
| 8 RTU | Division 08 RTU | DIV08-5D | 39 | 28 | 11 | 72% | 28% | | | |
| 8 RTU | Division 08 RTU | DIV08-5E | 20 | 9 | 2 | 45% | 10% | Isolation | 3/30/2020 20:30 | 4/30/2020 |
| 8 RTU | Division 08 RTU | DIV08-5F | 39 | 38 | 22 | 97% | 56% | Quarantine | 4/9/2020 0:59 | 4/30/2020 |
| 8 RTU | Division 08 RTU | DIV08-5G | 39 | 23 | 9 | 59% | 23% | | | |
| 8 RTU | Division 08 RTU | DIV08-5H | 39 | 36 | 29 | 92% | 74% | Quarantine | 4/3/2020 20:30 | 4/27/2020 |
| Boot Camp | Boot Camp | Boot Camp | 500 | 0 | 172 | closed | 34% | Isolation | 3/30/2020 20:30 | 5/1/2020 |

# EXHIBIT C

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

ANTHONY MAYS, Individually and on )
behalf of a class of similarly situated persons; )
and JUDIA JACKSON, as next friend of )
KENNETH FOSTER, Individually and on )
behalf of a class of similarly situated persons )
    )
                         Plaintiffs-Petitioners, )
    )
v )
    )
THOMAS DART, Sheriff of Cook County, )
    )
                        Defendant-Respondent )

                         Case No. 20-cv-2134

## DECLARATION OF REBECCA LEVIN

I, Rebecca Levin, pursuant to 28 U.S.C. § 1746, declare as follows:

1.  I have been employed by the Cook County Sheriff's Office ("CCSO") since January 2020 as a Senior Advisor. I have a Master's Degree in Public Health, with a concentration in Health Policy and Administration from the University of Illinois at Chicago and also completed doctoral coursework at Tulane University School of Public Health and Tropical Medicine's Executive Doctor of Science Program in the Department of Health Systems Management. Additionally, prior to joining the CCSO, I worked in the field of public health for twenty years, first with the American Academy of Pediatrics and then Ann & Robert H. Lurie's Children's Hospital of Chicago.

2.  I previously executed a sworn Declaration concerning the CCSO's response to the Novel Coronavirus ("COVID-19") pandemic, filed on April 7, 2020 under Dkt. #30-7. Each and all paragraphs under said declaration are incorporated and re-stated herein.

3.  The facts set forth in this declaration are drawn from information I have received in my position with the CCSO. It does not contain all of the facts that I know about the matters discussed below.

4.  As a Senior Advisor with a public health background, I have been involved in the proactive measures taken by CCSO to combat the COVID-19 pandemic. Principally, since March 12, 2020, I have been in near constant communication with public health officials, elected officials, and other healthcare stakeholders to obtain the most current guidance on measures to prevent and mitigate COVID-19 exposure and infection (which has evolved over time), disseminated this guidance to staff responsible for implementing policies and procedures,

and worked directly with such staff to implement such policies and procedures. Indeed, this has essentially become my full-time job over the last several weeks.

5. Key collaborations to ensure the CCSO is following the most up to date guidance from the Centers for Disease Control and Prevention (CDC), particularly concerning correctional settings, has involved working with the Chicago Department of Public Health (CDPH), Cook County Health and Hospital Systems, in particular, Cermak Health, and numerous elected county, city, state and federal officials.

### Collaboration with the Centers for Disease Control and Prevention and Chicago Department of Public Health

6. Representatives of CDPH, Stephanie Black, MD, MSc, Medical Director Communicable Disease Program and Isaac Ghinai, MBBS MSc, CDC Epidemic Intelligence Service Officer detailed to CDPH, toured the CCDOC during the month of March 2020 to observe the jail from a public health and infection control perspective.

7. Following the walk through, a team from CCDOC leadership, the CCSO Executive Office, and Cermak collaborated to identify individuals, departments or agencies with primary responsibility for amending their procedures based on feedback from CDPH and monitor the status of their implementation. These efforts focus on placement/housing of detainees, including measures to increase social distancing, such as increasing distance between occupied bunks.

8. The CDPH is aware of the CCSOs practices and procedures as it pertains to housing detainees in isolation and quarantine. These practices and procedures align closely with the housing "algorithm" provided as part of the CDPH recommendations.

9. Because Drs. Black and Ghinai from CDPH have a variety of responsibilities related to COVID-19, CDPH requested additional epidemiological support from the CDC to provide guidance on controlling the spread of COVID-19 in Cook County Jail. On behalf of the CCSO, I expressed strong support for this additional expert consultation. Paige Armstrong, MD, MHS, Epidemiology Team Lead and Lieutenant Commander in the US Public Health Service, and Alison Binder, Epidemiologist, were deployed by the CDC to Chicago on April 15 and 16 respectively.

### April 17, 2020 On-Site Visit

10. On Friday, April 17, 2020 representatives of the CDC and CDPH conducted a site visit at the Cook County Jail. The visit lasted approximately three and a half hours and provided the representatives with information about different settings: intake; dorms and celled tiers; quarantine and isolation tiers; and cohort isolation and convalescent barracks.

11. The CCSO invited the CDC and CDPH to the Jail to conduct the site visit based on the CCSO's interest in ensuring it is following the recommended public health guidelines and continuing to evolve its policies as COVID-19 research evolves.

12. The following individuals attended the site visit: from the CDC Paige Armstrong, MD, MHS, Epidemiology Team Lead and Alison Binder, Epidemiologist; from CDPH Stephanie Black, MD, MSc, Medical Director Communicable Disease Program and Isaac Ghinai, MBBS MSc, CDC Epidemic Intelligence Service Officer detailed to CDPH; from Cermak Health Services Dr. Connie Mennella, Linda Follenweider, Chad Zawitz, and Bridgette Jones; and from CCSO Mike Miller, Jane Gubser and myself.

13. CDC and CDPH representatives noted that gaining some familiarity with the physical layout of the Jail will be helpful in assuring CCSO practices met CDC standards and to provide additional recommendations for continuing to slow the spread of COVID-19.

14. The CDC and CDPH representatives commented frequently on the cleanliness of the facility and the noticeable smell of bleach throughout. Representatives observed cleaning by both detainees and staff during the site visit.

15. The CDPH representatives noted increased social distancing, particularly with the reduced density of bunk assignments in the dorms. This change was implemented following the CDPH recommendation following the March 2020 site visit.

16. Although the site visit showed that face masks were being made available to detainees, not all detainees chose to wear them. Commander Armstrong had previously been deployed to respond to COVID-19 on a cruise ship and noted that encouraging people to consistently follow public health guidance was a challenge in other environments as well.

17. The CDC and CDPH representatives expressed their appreciation for the thoughtful efforts of the CCDOC in the context of a large and complex facility. Commander Armstrong stated "you guys are doing an amazing job."

18. The CDC and CDPH will use the information observed during the site visit to develop recommendations for a plan to continue to address the evolving COVID-19 pandemic based on the complex needs of the Jail. These recommendations will take into account the CDC Guidelines for Correctional Facilities as well as the specific characteristics of the Jail space, detainees, and staff. The CDC will also use this information to improve the guidance they provide to correctional facilities around the nation.

19. The CCSO expects to receive these recommendations within the next several weeks. As with the recommendations received from CDPH, the CCSO will review these recommendations for purposes of implementation.

20. The CCSO will continue to work with the CDC and CDPH to receive such information as COVID-19 and its handling continue to be researched, understood and managed.

21. I will continue to take this into account for purposes of my recommendations to office on our implementation and procedures.

I, Rebecca Levin, pursuant to 28 U.S.C. § 1746, declare under penalty of perjury of the laws of the United States of America that the foregoing is true and correct.

Dated this __21__ day of April 2020.

_____
Rebecca Levin, MPH



# DEPARTMENT OF PUBLIC HEALTH

## CITY OF CHICAGO

**To:**   **Connie Mennella, MD**
*Chair, Department of Correctional Health/Cermak Health Services*
**Bradley Curry**
*Chief of Staff, Cook County Sheriff's Office*

**From: Stephanie R. Black, MD, MSc**
*Communicable Disease Program, Chicago Department of Public Health*
**Isaac Ghinai, MBBS, MSc**
*CDC Epidemic Intelligence Service Officer, Chicago Department of Public Health*

**Date: March 27, 2020**
**Re:    Recommendations for control and mitigation of coronavirus disease at the Cook County Jail**

CDPH was notified the first suspected case of coronavirus disease (COVID-19) in Cook County Jail on March 20, 2020. As of March 27, 2020, 38 confirmed COVID-19 cases have been confirmed among inmates at Cook County Jail from multiple accommodation units (principally RTU, Division 6 and Dorm 4). Several staff members have also reportedly been diagnosed with COVID-19. In addition, approximately 135 inmates and have tests pending for COVID-19, and more inmates are experiencing symptoms and testing positive each day.

The CDPH investigation team reviewed epidemiological data with Dr Chad Zawitz, Director of Infectious Diseases at Cermak Health Services and conducted a field visit to the jail on March 26th 2020, from 12pm to 4pm, and met with Dr Connie Mennella, Chairperson of the Department of Correctional Health at Cermak Health Services; Dr Sharon Welbel, Director of Infection Control and Hospital Epidemiology at Cook County Health; Bridgette Jones, nurse epidemiologist for Cermak Health Services and Jasmin Jarlega Penaranda, Environmental Services Coordinator at Cook County Jail and others.

Wherever possible, these recommendations follow CDC guidance and account for local conditions. For CDC's Interim Guidance on Management of COVID-19 in Correctional and Detention Facilities, see: https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html

Broadly, we recommend grouping inmates into four groups:
Group 1       Confirmed cases: isolate together in the Bootcamp barracks
Group 2       Symptomatic, clinically higher-risk persons under investigation (PUI): who should be
              isolated in cells, individually or in very small groups

Group 3      Symptomatic, clinically lower-risk PUIs: consider isolating together in Bootcamp barracks, with social distancing and consider universal use of face masks

Group 4      Asymptomatic contacts: quarantine in small units if possible, quarantined together if needed.

Recommendations are divided into 4 sections: Epidemiology, Placement/Housing, Infection Control, and Release. Most of our recommendations (Sections 1-3) apply to the partnership between Cook County Department of Corrections and Cermak Health Services in running Cook County Jail, and all will play a role in controlling the spread or limiting the impact of COVID-19. Some of the most impactful recommendations, those in Section 4 pertaining to the release of inmates for urgent public health reasons, apply to the broader criminal justice system.

| | Task | Person/ Team Responsible |
|---|---|---|
| **1. Epidemiologic Investigation** | 1.1<br>Provide a list of all accommodation units, by division and by housing situation (e.g. dorm of 200 people, individual cells of 2 people), for the jail under normal operating conditions | |
| | 1.2<br>Provide a line list of known COVID positive employees to CDPH each day including date of symptom onset and units worked in last 14 days | |
| | 1.3<br>Provide a line list of known COVID positive inmates to CDPH including date of symptom onset, accommodation units and work assignments for last 14 days.  This may be done at some time after the peak of cases and/or CDPH staff may deploy to collect this information. | |
| | 1.4<br>Cases in inmates should be reported by infection preventionist through the Illinois National Electronic Surveillance System | |
| | 1.5<br>Per CDC recommendations, the value of interviewing individual healthcare workers (HCW) who may have seen a COVID case is limited in the context of community transmission (https://www.cdc.gov/coronavirus/2019-ncov/hcp/guidance-risk-assesment-hcp.html). The focus should instead be on ensuring HCW are asymptomatic, e.g. by ensuring pre-shift symptom screening. | |
| | 1.6<br>Assess risk of COVID-19 in inmates. We suggest the following categories (see attached algorithm).<br>Group 1: Confirmed cases<br>Group 2: Symptomatic, clinically higher-risk persons under investigation (PUIs)<br>Group 3: Symptomatic, clinically lower-risk PUIs<br>Group 4: Asymptomatic contacts (not reflected on algorithm) | |

| | | |
|---|---|---|
| | See attached algorithm. | |
| **2. Placement/ housing** | **2.1**<br>House confirmed cases (Group 1) together in a unit in the Bootcamp barracks and isolated. Lift them from isolation 7 days since their first symptom or 3 days following resolution of fever (off antipyretics) and improvement in respiratory symptoms, whichever is later<br>https://www.cdc.gov/coronavirus/2019-ncov/hcp/disposition-in-home-patients.html | |
| | **2.2**<br>CDC recommends isolating persons under investigation (PUIs) separately, in single cells, where possible. Cook Co Jail has been attempting to do this, but space is extremely limited with the increasing number of PUIs. Where necessary, CDC recommends cohorting isolated individuals in a large, well-ventilated cell with solid walls and a solid door that closes fully. Therefore, consider housing clinically lower-risk probable cases (Group 3) together in the Bootcamp barracks and isolate as ("the PUI unit"). Consider face masks for this group. Reassign bunks to allow 6 feet or more in all directions. Ensure bunks are cleaned thoroughly if assigned to a new occupant. Arrange bunks so that individuals sleep head-to-foot to increase distance between them.<br><br>Given the high rate of COVID positivity in PUIs tested so far from units with known exposure, consider not testing this group to avoid exposures to healthcare staff and preserve PPE.<br>If testing, and an individual tests positive, transfer to Group 1.<br>If testing, and an individual tests negative, isolate them for the remainder of their isolation period away from all COVID positives and PUIs.<br>Lift them from isolation 7 days since their first symptom or 3 days following resolution of fever (off antipyretics) and improvement in respiratory symptoms, whichever is later | |
| | **2.3**<br>Test clinically higher-risk PUIs for COVID-19 (Group 2) and house separately in cells (e.g. in Division 6) until results are available. While tests are pending, these individuals should wear a face mask if they leave their isolation room or another person enters.<br>If an individual tests positive, transfer to Group 1.<br>If they test negative, continue to isolate in an individual cell or cells of two, until 7 days following their symptom onset or 3 days fever free with resolving respiratory symptoms | |
| | **2.4**<br>Immediately isolate and test any inmates with new symptoms but no known exposure (e.g. in Division 6). IDPH has agreed to accept and prioritize these specimens, with a projected turnaround time of 48 hrs. or less. Rapid testing is needed to identify newly affected units | |
| | **2.5**<br>Quarantine all asymptomatic inmates from units with confirmed or probable COVID cases or PUIs (Group 4; not on algorithm as not symptomatic). These individuals should not participate in work in the jail. While CDC recommends close contacts of COVID-19 cases should be isolated individually and their least-preferred option is to house quarantined individuals in their regularly assigned housing unit, recognizing the large numbers of close contacts of cases at this time, this may be the only realistic option. Fortunately, the largest affected dorm (Dorm 4) is not at full occupancy. Employing social distancing in these settings and removing individuals at high risk of severe disease would be beneficial | |
| | **2.6**<br>Where possible, staff the Bootcamp barracks with COVID-recovered staff and or inmates | |

| | | |
|---|---|---|
| **3. Infection Control** | **3.1**<br>All jail staff should have their temperature checked and be screened for symptoms (e.g. cough, shortness of breath) prior to starting their shift | |
| | **3.2**<br>Inmates, especially those on quarantine units, should be screened for a fever, cough or shortness of breath each shift | |
| | **3.3**<br>Any potentially aerosol generating procedures (e.g. CPAP) should be avoided in open units | |
| | **3.4**<br>Outside of performing aerosol generating procedures (e.g. nebulizer treatment, intubation; most likely to be conducted in Cermak Health Center), N95s masks are not recommended and should be preserved for healthcare personnel conducting aerosol generating procedures | |
| | **3.5**<br>Staff having direct physical contact with confirmed or probable COVID-19 patients or PUIs should wear eye protection (goggles or face shield), a surgical mask, latex gloves, and a disposable medical gown | |
| | **3.6**<br>Staff entering the COVID unit but not having physical contact with patients (e.g. sitting at observation desk) should wear a surgical mask and gloves | |
| | **3.7**<br>Staff entering the PUI unit but not having physical contact with patients (e.g. sitting at observation desk) should wear a surgical mask and gloves | |
| | **3.8**<br>Staff entering quarantined units, including physical contact with any asymptomatic inmate, should wear a surgical mask and gloves (if inmate is identified as symptomatic, full PPE should be used as above, as they become a PUI) | |
| | **3.9**<br>All staff on any unit, but especially those requiring a surgical mask (i.e. any unit on isolation or quarantine), should have easy access to alcohol-based hand rub immediately outside of the unit so it can be used immediately after removing their gloves and surgical mask (e.g. on RTU, the alcohol-based hand rub outside the unit was only available in the dispensary behind a locked door) | |
| | **3.10**<br>Staff should be trained repeatedly on the correct use of PPE (we saw numerous examples of staff touching the outside of their masks and not washing their hands, even though training had occurred. In this instance, masks will act as a mechanism of transmission, rather than a barrier to transmission) | |
| | **3.11**<br>Staff should be cohorted to work in specific epidemiological contexts, e.g. rotating staff between isolation units, quarantine units and unaffected units should be avoided | |
| | **3.12**<br>Inmates from different units should not mingle in central workspace (e.g. laundry) | |
| | **3.13**<br>Quarantine all new intakes for 14 days before they enter the facility's general population away from all COVID isolation and quarantine units | |

| | | |
|---|---|---|
| **4. Release** | **4.1**<br>Every inmate sharing a unit with a COVID case can be epidemiologically considered a close contact of a case, equivalent to a household contact. High attack rates in household contacts have been documented (>10%). Decompressing the jail would allow large accommodation units to be split into smaller units, and therefore reduce the number of close contacts of each future case. | |
| | **4.2**<br>We recommend considering mass release of inmates to decompress the jail for urgent public health reasons (see 2.2 and 2.5 for illustrations of the need to decompress the jail) | |
| | **4.3**<br>First, prioritize the unexposed for immediate release on public health grounds | |
| | **4.4**<br>Second, consider the release of high risk inmates (e.g. aged over 65, underlying comorbidities) as long as appropriate follow-up and isolation (i.e. stable housing and telephone contact) can be arranged https://www.cdc.gov/coronavirus/2019-ncov/specific-groups/people-at-higher-risk.html | |
| | **4.5**<br>Given the necessity of ensuring controlled release, no inmate should be released without an exit interview (including temperature check) and stable housing being arranged by the criminal justice system. CDPH should be notified during business hours of the release of any COVID positive inmate or PUI with unstable housing | |

# EXHIBIT D

**Pulled from Plaintiffs' Class Action
Complaint (ECF No. 1 at 13-14)**

The photographs below depict one of several tiers in Division 2 of the jail, which houses a large portion of the jail's detainees.







# EXHIBIT E

**Pulled from Plaintiffs' Class Action Complaint (ECF No. 1 at 14)**



The Jail's Residential Treatment Unit ("RTU"), where medically vulnerable detainees are housed.

# EXHIBIT F

(https://www.cookcountysheriff.org) (https://www.cookcountysheriff.org)

 English

# COVID-19 Cases at CCDOC

Home (https://www.cookcountysheriff.org) > COVID-19 Cases at CCDOC

Sheriff's officers and county medical professionals are aggressively working round-the-clock to combat the global coronavirus pandemic. Even before the virus started rapidly spreading in the Chicago area, the office instituted early screening and testing of detainees and moved to increase the availability of PPE and sanitation supplies throughout the jail. Detainees who have symptoms of COVID-19 are isolated and tested by Cermak Health Services staff and receive thorough medical attention and cellmates are quarantined and monitored.

The Sheriff's Office also created an off-site, 500-bed isolation and care facility for detainees, took up an unprecedented effort to move detainees from double cells to single cells to increase social distancing, partnered with The New Roseland Community Hospital to provide on-site testing for frontline staff, and is consulting with noted sanitation and infectious disease experts.

For more information regarding our ongoing efforts to respond to COVID-19 at the DOC, please visit our website: https://www.cookcountysheriff.org/category/press-release/ (https://www.cookcountysheriff.org/category/press-release/)

As of 5 p.m. on 04/21/2020:

- 235 detainees in custody at Cook County Jail are currently positive for COVID-19.
  - This includes 19 who are being treated at local hospitals.
- 192 detainees in custody are no longer positive and are being monitored at a recovery facility at the jail.
- 145 detainees have tested negative for COVID-19.
- 6 detainees who tested positive for COVID-19 have died while receiving treatment at local hospitals.
  - Juan Salgado Mendoza, 53, was pronounced dead on April 20 at Stroger Hospital.
  - Rene Olivo, 42, was pronounced dead on the night of April 19 at Saint Anthony Hospital.

Additionally, 180 correctional officers are positive for COVID-19, as are 30 other Cook County Sheriff's employees.

There are 120 employees who previously tested positive who are now recovered and have returned to work.

We are saddened to report that one of our correctional officers has passed away as result of complications due to COVID-19.



# Search

Search for: [                    ] [ Search ]

# Recent Press Releases



Sheriff Dart, New Roseland Community Hospital Opens COVID-19 Test Site for Sheriff's Office Employees (https://www.cookcountysheriff.org/sheriff-dart-new-roseland-community-hospital-opens-covid-19-test-site-for-sheriffs-office-employees/)
Cook County Sheriff Thomas J. Dart announced that a mobile COVID-19 testing site opened today at [Read More]



Update on COVID-19 Cases at Cook County Jail (https://www.cookcountysheriff.org/update-on-covid-19-cases-at-cook-county-jail-4/)
As part of its ongoing effort to inform the public of the measures being taken to combat the spread [Read More]



Update on COVID-19 Cases at Cook County Jail (https://www.cookcountysheriff.org/update-on-covid-19-cases-at-cook-county-jail-2/)
As part of its ongoing effort to inform the public of the measures being taken to combat the spread [Read More]

Update on COVID-19 Cases at Cook County Jail (https://www.cookcountysheriff.org/update-on-covid-19-cases-at-cook-county-jail-3/)
As part of its ongoing effort to inform the public of the measures being taken to combat the spread [Read More]



 Update on COVID-19 Cases at Cook County Jail (https://www.cookcountysheriff.org/update-on-covid-19-cases-at-cook-county-jail/)
As part of its ongoing effort to inform the public of measures being taken to combat the spread of [Read More]

Copyright 2018 © Cook County Sheriff's Office.
All Rights Reserved.

**CONNECT WITH US**

 (https://www.facebook.com/pages/Cook-County-Sheriffs-Office-Official/234150779931765?ref=br_rs)

(https://twitter.com/ccsopio) (https://vimeo.com/cookcounty)
 (https://www.instagram.com/cookcountysheriff/)

# EXHIBIT G

**Affidavit of Elizabeth Corrado For Bryant Blake**

My name is Elizabeth Corrado. I am a Volunteer Investigator at the Chicago Community Bond Fund, assisting Plaintiffs' counsel in *Mays v. Dart*. On April 14, I spoke to Bryant Blake, a detainee in the Cook County Jail, who provided me the following information.

1. Mr. Blake is 51 years old. He is residing in Division 11 (**Div11-BF-310-1**) of the Cook County Jail. He is incarcerated on $100,000 bond that he cannot afford to pay. He has been in the Jail since February 29, 2020.

2. Mr. Blake was residing in quarantine until April 12. His previous roommate contracted COVID-19, at which point he was moved from a double cell to a single cell. Mr. Blake asked to be tested after his cellmate tested positive, but he did not receive a test.

3. Mr. Blake has a spinal and neck injury. He is supposed to receive bilateral facial injections because of the injury but he has not been receiving them.

4. Social distancing is not possible in the Jail. The detainees in Mr. Blake's tier share showers, toilets and sinks. They share 12 tables in the dayroom, and phones, which are under 2 feet apart.

5. Mr. Blake has access to soap but not hand sanitizer. He does not have access to cleaning supplies for his cell and it does not get cleaned regularly.

6. Mr. Blake received a mask for the first time on April 12.

7. Mr. Blake has written multiple grievances since the pandemic started, including one asking for a COVID-19 test after his cellmate tested positive. He has not seen a counselor to submit the grievances.

I am providing this hearsay declaration because of restrictions on visitors and contact with detainees in the Cook County Jail. I declare under penalty of perjury that the foregoing is true and correct.

April 14, 2020         /s/ Elizabeth Corrado
Chicago, Illinois         Elizabeth Corrado

## Affidavit of Elizabeth Corrado For Kevin Watson

My name is Elizabeth Corrado. I am a Volunteer Investigator at the Chicago Community Bond Fund, assisting Plaintiffs' counsel in *Mays v. Dart*. On April 14, I spoke to Kevin Watson, a detainee in the Cook County Jail, who provided me the following information.

1. Mr. Watson is 35 years old. He is residing in Division 11 (**Div11-AH-401-1**) of the Cook County Jail. He is incarcerated on a no bond order. He was booked in the Jail on August 24, 2019.

2. Mr. Watson is HIV-positive and he has a hernia.

3. Mr. Watson's deck went on quarantine on April 14. The deck across from his is also on quarantine (after three people tested positive). Four people from the deck across from Mr. Watson's were moved to his deck on April 13. One of those people had a fever, and he was then moved to Division 4. Mr. Watson's deck first had their temperatures taken on April 14. A nurse told him that if it was 102 degrees or over, it was a symptom of COVID.

4. Because they are on quarantine, people on Mr. Watson's deck are only allowed out of their cells for 2.5 hours total in a day, 6 people at a time.

5. Everyone on the deck shares showers, sinks and toilets.

6. Mr. Watson has filed two grievances related to COVID but has not received a response.

I am providing this hearsay declaration because of restrictions on visitors and contact with detainees in the Cook County Jail. I declare under penalty of perjury that the foregoing is true and correct.

April 14, 2020                           /s/ Elizabeth Corrado
Chicago, Illinois                        Elizabeth Corrado

**Affidavit of Elizabeth Corrado on Behalf of Charles Bocock**

My name is Elizabeth Corrado. I am a volunteer investigator helping Plaintiffs' counsel in *Mays v. Dart*. On April 16, 2020, I spoke to Charles Bocock, who is a detainee in the Cook County Jail.

1. Charles Bocock was transferred to Division 4 on April 15.

2. His unit experienced flooding and has been closed for a while. A lot of the toilets and sinks don't work.

3. There is no heat on the Division 4 tier.

4. Detainees were told not to drink the water coming from the taps. A cooler was brought in and placed in the day room, but detainees are only allowed in the day room for a few hours each day.

5. The plumbing is broken in most of the cells so it's impossible to wash hands.

6. He has not seen cleaning supplies. Whereas in Division 6 (his origin division) the COs had spray bottles to disinfect things, none of the guards here do.

7. Some guards placed duct tape and sprayed paint on the floor and said it had something to do with social distancing, but didn't explained how it works, and haven't enforced it.

8. Detainees have no cleaning cloths in Division 4, so they have ripped apart towels of detainees who have been discharged.

9. A person in Division 6 who was in the kitchen tested positive for COVID-19 and went to Stroger.


I am providing this hearsay declaration because of restrictions on visitors and contact with detainees in the Cook County Jail. I declare under penalty of perjury that the foregoing is true and correct.

April 19, 2020                          /s/ Elizabeth Corrado
Chicago, Illinois                       Elizabeth Corrado

### Affidavit of Jason Hammond For Javier Montanez

My name is Jason Hammond. I am a Volunteer Investigator at the Chicago Community Bond Fund, assisting Plaintiffs' counsel in *Mays v. Dart*. On April 16, I spoke to Javier Montanez, a detainee in the Cook County Jail, who provided me the following information.

1. Mr. Montanez is 52 years old. He is residing in Division 6 (**DIV6-1L-21-2**) of the Cook County Jail. He is incarcerated on a no bond order. He has been in the Jail since March 29, 2019.

2. Mr. Montanez has Hepatitis C and high blood pressure. He is supposed to be receiving blood draws every three weeks because of his Hepatitis. Mr. Montanez has not been receiving the draws, and he was told that medical was shut down.

3. The entire division is on lockdown/quarantine. Mr. Montanez is let out of his cell 6 hours per day, and locked in for 18 hours per day. 12 people ae allowed in the dayroom at a time.

4. Everyone shares the dayroom bathroom, as well as general showers and toilets. People share dayroom tables, three phones and a single microwave.

5. Mr. Montanez receives soap but not hand sanitizer. Cells are never cleaned and the common areas only get cleaned with watered down bleach.

6. About a week ago, detainees started receiving one mask per day.

7. Nobody in Mr. Montanez's tier has been tested for COVID-19.

8. Mr. Montanez submitted a grievance about COVID two weeks ago (April 2) but has not received a response. He also wrote to a person at Cermak about his complaint but did not receive a response.

I am providing this hearsay declaration because of restrictions on visitors and contact with detainees in the Cook County Jail. I declare under penalty of perjury that the foregoing is true and correct.

April 14, 2020                           /s/ Jason Hammond
Chicago, Illinois                        Jason Hammond

### Affidavit of Jason Hammond For Jeffrey Ferguson

My name is Jason Hammond. I am a Volunteer Investigator at the Chicago Community Bond Fund, assisting Plaintiffs' counsel in *Mays v. Dart*. On April 16, I spoke to Jeffrey Ferguson, a detainee in the Cook County Jail, who provided me the following information.

1. Mr. Ferguson is 42 years old. He is residing in Division 2 (**DIV2-D2-N-23**) of the Cook County Jail. He is incarcerated on a no bond order. He was booked in the Jail on January 22, 2018.

2. Mr. Ferguson has chronic mental health issues, including mania and psychosis, as well as high blood pressure.

3. Mr. Ferguson is living in an open dormitory, which is on quarantine. It is a working deck, and kitchen workers reside there.

4. Everyone on the deck shares a toilet, shower and sinks. The beds are 2-3 feet from one another. The detainees all share telephones, which are two feet apart, as well as tables for eating and one microwave that is shared with another unit as well.

5. Mr. Ferguson receives soap but rarely hand sanitizer. The bathrooms are very dirty as no one monitors that they get cleaned.

6. On April 12, all detainees in his unit started receiving a mask per day.

7. Some people on the deck have had serious COVID symptoms, and they were removed. On April 7, one person was brought in to the deck right after being booked, even though the deck was on quarantine.

8. Mr. Ferguson has had symptoms of COVID for about a week. He has asked twice to be tested but has still not received a test. Jail staff just started checking temperatures on April 13.

9. On April 12, Mr. Ferguson put duct tape down in the dayroom to remind detainees to social distance. But guards are making jokes about breaking compliance, and showing disregard for detainees' health and inability to social distance.

10. On April 2, Mr. Ferguson tried to submit a health grievance. But there is no system for submitting grievances. The Jail is not giving out forms or receipts or signatures or any records that the Jail is receiving or processing grievances.

I am providing this hearsay declaration because of restrictions on visitors and contact with detainees in the Cook County Jail. I declare under penalty of perjury that the foregoing is true and correct.

April 16, 2020                          /s/ Jason Hammond
Chicago, Illinois                       Jason Hammond

**Affidavit of Jason Hammond on Behalf of Jalessa Boner for Dominick Wing**

My name is Jason Hammond. I am a Volunteer Investigator at the Chicago Community Bond Fund, assisting Plaintiffs' counsel in *Mays v. Dart*. On April 14, I spoke to Jalessa Boner about Dominick Wing, a detainee in the Cook County Jail, who provided me the following information.

1. Mr. Wing is 27 years old. He is residing in Division 9 (**DIV9-2B-2302-1**) of the Cook County Jail. He is incarcerated on a no bond order. He has been in the Jail since September 6, 2019.

2. Mr. Wing has asthma. He is currently out of medicine. Nurses have been ignoring his requests for asthma medicine for months.

3. Mr. Wing is residing in a two person cell in Division 9, with another person, who is sleeping four feet away from him. His tier is not on lockdown. 48 other people are on the tier.

4. Social distancing is not possible in the tier. People share the dayroom toilets, Mr. Wing shares a cell, and everyone shares the phones, which are two feet apart.

5. Mr. Wing does not have access to soap or hand sanitizer. Mr. Wing requested soap through Commissary but it was never delivered. He has no access to cleaning supplies.

6. Mr. Wing has not received a mask.

7. Mr. Wing filed a grievance asking for a COVID-19 test. He has not received a response.

I am providing this hearsay declaration because of restrictions on visitors and contact with detainees in the Cook County Jail. I declare under penalty of perjury that the foregoing is true and correct.

April 14, 2020                              /s/ Jason Hammond
Chicago, Illinois                          Jason Hammond

**Affidavit of Jason Hammond on Behalf of Lamonte Powell**

My name is Jason Hammond. I am a volunteer investigator at the Chicago Community Bond Fund, helping Plaintiffs' counsel in *Mays v. Dart*. On April 18, 2020, I spoke to Lamonte Powell, who is a detainee in the Cook County Jail.

1. Lamonte Powell is housed in Division 11 on a $10,000 bond.

2. He is in a single cell. There are 12 people allowed out on his dayroom at a time.

3. Soap is available in the commissary but he has not received free soap.

4. Detainees are provided with hand sanitizer once a day, in the morning.

5. There is no cleaning of the cells, which is very worrisome; he does not know whether someone previously occupying had symptoms.

6. The common areas are cleaned every other day by 6 or 7 inmates from Division 11. They do a thorough job but the bleach is watered down.

7. He often sees guards with their masks off.

I am providing this hearsay declaration because of restrictions on visitors and contact with detainees in the Cook County Jail. I declare under penalty of perjury that the foregoing is true and correct.

April 18, 2020                          /s/ Jason Hammond
Chicago, Illinois                       Jason Hammond

**Affidavit of Kara Crutcher For Dante McGee**

My name is Kara Crutcher. I am a Volunteer Investigator at the Chicago Community Bond Fund, assisting Plaintiffs' counsel in *Mays v. Dart*. On April 14, I spoke to Dante McGee, a detainee in the Cook County Jail, who provided me the following information.

1. Mr. McGee is 58 years old. At the time of the conversation, Dante McGee was residing in Division 4 of the Cook County Jail. According to the Sheriff's website, he is now in the Hospital wing of the Jail. He is incarcerated on a $30,000 bond he cannot afford to pay. He has been in the Jail since October 16, 2019.

2. While in Division 4, Mr. McGee lived with 24 other people. 12 people were left out of their cells at a time. They shared showers and sinks. They shared phones.

3. Mr. McGee receives small bars of soap. He does not have access to hand sanitizer or clean towels and wipes for cleaning. Mr. McGee's cell in Division 4 was not cleaned.

4. Mr. McGee lived in Division 8 before Division 4. While there, he shared a cell with someone who tested positive.

5. Mr. McGee filed two grievances about the danger of COVID-19 in the Jail but never heard back.

I am providing this hearsay declaration because of restrictions on visitors and contact with detainees in the Cook County Jail. I declare under penalty of perjury that the foregoing is true and correct.

April 14, 2020                    /s/ Kara Crutcher
Chicago, Illinois                 Kara Crutcher

**Affidavit of Kara Crutcher For Eric Blake**

My name is Kara Crutcher. I am a Volunteer Investigator at the Chicago Community Bond Fund, assisting Plaintiffs' counsel in *Mays v. Dart*. On April 14, I spoke to Bryant Blake, a detainee in the Cook County Jail, who provided me the following information.

1. Mr. Blake is 25 years old. He is residing in Division 10 (**DIV10-2A-2120-2)** of the Cook County Jail. He is incarcerated on a no bond order. He has been in the Jail since April 20, 2018.

2. Mr. Blake was residing in a double cell until April 12, when he was moved into a single cell. He is not in quarantine.

3. Social distancing is not practical. Half of the tier (24 people) come out of their cell, for 2.5 hours at a time.  The people on his tier share sinks, showers, and toilets. They also share 12 tables in the common area and four phones.

4. People in the division have symptoms of dry throat, inability to breathe and fevers, but they were tested after telling staff they were sick.

5. One person was removed from the tier because he was sick. No one who was exposed to that man was tested for COVID-19.

6. Mr. Blake receives a hotel bar of soap, once a week. No one comes to clean his cell. Mr. Blake uses soap he bought in Commissary to clean his cell.

7. Detainees are receiving masks but not on a regular basis.

8. Mr. Blake put in one grievance for medical treatment because nurses have not been coming around for medical treatment.  Mr. Blake gave the grievance to CO Sanders and has not heard anything.

9. Usually detainees give grievances to the social workers. But no social workers are allowed in the tier, so the grievances are disappearing.


I am providing this hearsay declaration because of restrictions on visitors and contact with detainees in the Cook County Jail. I declare under penalty of perjury that the foregoing is true and correct.

April 14, 2020                            /s/ Kara Crutcher
Chicago, Illinois                        Kara Crutcher

**Affidavit of Laura Stempel on Behalf of Deon Baker**

My name is Laura Stempel. I am a volunteer investigator at the Chicago Community Bond Fund, helping Plaintiffs' counsel in *Mays v. Dart*.  On April 18, 2020, I spoke to Deon Baker, who is a detainee in the Cook County Jail.

1.  Deon Baker has asthma.  He was housed in Division 11 but was recently moved to Division 4.

2.  It appears that his unit has not been used for several years.  Everything is filthy.  The detainees were not given anything to clean their unit.

3.  The sinks in the unit are rusted out and the water is the color of rust.  The jail has provided a water cooler but it's only accessible when staff make it available.

4.  The unit has no heat and during this cold spell it has been extremely cold inside

I am providing this hearsay declaration because of restrictions on visitors and contact with detainees in the Cook County Jail. I declare under penalty of perjury that the foregoing is true and correct.

April 18, 2020                    /s/ Laura Stempel
Chicago, Illinois                 Laura Stempel

**Affidavit of Laura Stempel on Behalf of Michael Jorgensen**

My name is Laura Stempel. I am a Volunteer Investigator at the Chicago Community Bond Fund, assisting Plaintiffs' counsel in *Mays v. Dart*. On April 14, I spoke to Michael Jorgensen, a detainee in the Cook County Jail, who provided me the following information.

1. Mr. Jorgensen is 31 years old. He is residing in Division 10 (**DIV10-2A-2106-2**) of the Cook County Jail. He is incarcerated on a no bond order. He has been in the Jail since February 16, 2018.

2. Mr. Jorgensen is residing in quarantine.

3. Mr. Jorgensen has had COVID-19 symptoms (cough, difficulty breathing) for some days. He did not receive care until he began vomiting blood. At that point he was put in isolation for five days and given antibiotics. He was unable to get tested.

4. Mr. Jorgensen filed a grievance asking for a COVID-19 test. He has not received a response.

I am providing this hearsay declaration because of restrictions on visitors and contact with detainees in the Cook County Jail. I declare under penalty of perjury that the foregoing is true and correct.

April 14, 2020                    /s/ Laura Stempel
Chicago, Illinois                 Laura Stempel

**Affidavit of Sam Goldberg on Behalf of Isaac Correcillias-Correa**

My name is Sam Goldberg. I am a volunteer investigator at the Chicago Community Bond Fund, helping Plaintiffs' counsel in *Mays v. Dart*.  On April 17, 2020, I spoke to Isaac Correcillias-Correa, who is a detainee in the Cook County Jail.

1. Isaac Correcillias-Correa is housed in Division 2, in a dorm setting.

2. There are about 150 people in the dorm.  On April 16, they moved another 50 or so people to the dorm.

3. His bunk is close to others.

4. When eating the detainees use a common area.  They have to sit picnic-bench style; social distancing is impossible in this setting.

5. Two bars of soap are given out each week but they are not enough to last a week.  They would last two days if you were washing your hands after contact with other people.

6. The area is cleaned once per day by inmates.

7. Lots of people on the deck don't feel well, but they aren't tested.  Some are removed, but the Jail does not disinfect the area near them.  New people are moved in and they are given the removed detainee's sheets.

8. There is no cleaning of the detainee phones between calls.

9. More than half the guards use masks, but many don't use them.


I am providing this hearsay declaration because of restrictions on visitors and contact with detainees in the Cook County Jail. I declare under penalty of perjury that the foregoing is true and correct.

April 18, 2020                             /s/ Sam Goldberg
Chicago, Illinois                        Sam Goldberg

**Affidavit of Sam Goldberg on Behalf of Joshua Barbee**

My name is Sam Goldberg. I am a volunteer investigator at the Chicago Community Bond Fund, helping Plaintiffs' counsel in *Mays v. Dart*. On April 17, 2020, I spoke to Joshua Barbee, who is a detainee in the Cook County Jail.

1. Joshua Barbee is housed in Division 6, in a tier setting.

2. Mr. Barbee was single-celled until the morning of April 17, when another detainee was placed in his cell.

3. Detainees are given two bars of soap per week, size of a hotel soap bar. It is not enough to last the week. You can ask a guard for more soap, but only some guards will give it to you.

4. There is no cleaning of the phones between uses.

5. There is one bottle of disinfectant on the tier, it's not enough to disinfect surfaces because it's for everything.

6. Guards wear masks for the most part, but some don't.

I am providing this hearsay declaration because of restrictions on visitors and contact with detainees in the Cook County Jail. I declare under penalty of perjury that the foregoing is true and correct.

April 19, 2020                                    /s/ Sam Goldberg
Chicago, Illinois                               Sam Goldberg

# EXHIBIT H

## DECLARATION OF DR. HOMER VENTERS

I, Dr. Homer Venters, hereby declare the following under penalty of perjury pursuant to 28 U.S.C. § 1746:

1.     I am a physician, internist and epidemiologist with over a decade of experience in providing, improving and leading health services for incarcerated people. My clinical training includes residency training in internal medicine at the Albert Einstein/Montefiore Medical Center (2007) and a fellowship in public health research at the New York University School of Medicine (2009). My experience in correctional health includes two years visiting detention centers and conducting analyses of physical and mental health policies and procedures for persons detained in federal facilities. This work included and resulted in collaboration with federal detention administrators on numerous individual cases of medical release, formulation of health-related policies, and testimony before U.S. Congress regarding mortality inside detention facilities.

2.     After my fellowship training, I became the Deputy Medical Director of the New York City Jail Correctional Health Service. This position included both direct care to persons held in NYC's 12 jails, as well as oversight of medical policies for their care. This role included oversight of chronic care, sick call, specialty referral and emergency care.

3.     I subsequently was promoted to the positions of Medical Director, Assistant Commissioner, and Chief Medical Officer of NYC Jail Correctional Health Services.  We operated one of the largest correctional health care systems in the nation, with over 43,000 annual admissions in jails across the city. In the latter two roles, I was responsible for all aspects of health services including physical and mental health, addiction, quality improvement, re-entry, morbidity and mortality reviews, as well as all training and oversight of physicians, nursing and

pharmacy staff. In these roles, I was also responsible for evaluating and making recommendations on the health implications of numerous security policies and practices.

4.     During this time, I managed multiple communicable disease outbreaks in our facilities, including H1N1 in 2009, which impacted almost one third of housing areas inside the adolescent jail, multiple seasonal influenza outbreaks, a recurrent legionella infection and several other smaller outbreaks. To manage all of these outbreaks, I worked closely with management at the facilities, including security and health staff, developed policies and procedures to manage the outbreaks, and oversaw training and implementation of those policies and procedures. Central aspects of my roles in these outbreak responses included the identification and protection of high-risk patient cohorts, development of infection control plans that integrated all levels of staff and detained people in mitigating the impact of the outbreak. I also led inspections of housing areas with teams of health, security, engineering and hygiene experts and developed and conducted orientations and trainings for correctional staff, health professionals and detained people. I also developed data dashboards that were updated on a daily basis and shared with local and state public health partners to integrate jail outbreak management with community efforts.

5.     In March 2017, I left Correctional Health Services of NYC to become the Director of Programs for Physicians for Human Rights. In this role, I oversaw all programs of Physicians for Human Rights, including training of physicians, judges and law enforcement staff on forensic evaluation and documentation, analysis of mass graves and mass atrocities, documentation of torture and sexual violence, and analysis of attacks against healthcare workers.

6.     In December 2018, I became the Senior Health and Justice Fellow for Community Oriented Correctional Health Services (COCHS), a nonprofit organization that promotes evidence-based improvements to correctional practices across the U.S. In January 2020, I

became the president of COCHS. I also work as a medical expert in cases involving correctional health and I wrote a book on the health risks of jail (*Life and Death in Rikers Island*) which was published in early 2019 by Johns Hopkins University Press. A copy of my curriculum vitae is attached to this report, which includes my publications, a list of cases in which I have been involved and a statement of my compensation.

7.       Since January 2020, I have been engaged in numerous activities in response to COVID-19 infection in detention settings. I have published two articles on COVID-19 behind bars[1] and participated in over 70 interviews on the need for systematic and evidence-based practices in jails, prisons and other detention settings to both prevent deaths among incarcerated people, and flatten the overall outbreak curve in in the community from COVID-19.[2] I am also scheduled to conduct a court-ordered inspection of the Metropolitan Detention Center in Brooklyn NY, which is in the throws of a COVID-19 outbreak and provide my findings to the court. I was invited by the National Association of Counties and Fair and Just Prosecution, a national convening of elected prosecutors, The Stanford Law School and the University of Southern California School of Medicine to provide guidance on COVID-19 response in detention settings, and I have provided similar guidance on multiple other webinars and presentations.

---

[1] Dr. Homer Venters, "4 ways to protect our jails and prisons from coronavirus," The Hill (Feb. 29, 2020), https://thehill.com/opinion/criminal-justice/485236-4-ways-to-protect-our-jails-and-prisons-from-coronavirus; Dr. Homer Venters, "Coronavirus behind bars: 4 priorities to save the lives of prisoners," The Hill (Mar. 23, 2020), https://thehill.com/opinion/criminal-justice/488802-coronavirus-behind-bars-4-priorities-to-save-the-lives-of-prisoners.
[2] For example: Jean Casella& Katie Rose Quandt, "US jails will become death traps in the coronavirus pandemic," The Guardian (Mar. 30, 2020), https://www.theguardian.com/commentisfree/2020/mar/30/jails-coronavirus-us-rikers-island; Erin Doherty & Kelly Cannon, "'We need help': Inmates describe prison system unprepared for coronavirus," ABC News (Apr. 5, 2020), https://abcnews.go.com/Politics/inmates-describe-prison-system-unprepared-coronavirus/story?id=69980790.

8.      I have been retained by counsel for the plaintiffs in this case to provide opinions about the actions that should be taken at the Cook County Jail in light of the current COVID-19 outbreak. As part of my work in this case, I have been provided the following documents:

- Amended Sanitation Policy
- Referral for Medical Care Policy
- Outbreak Prevention Policy
- CCSO Operational Briefing 4/4/20
- Sanitation Plans
- Intake Photos
- Declarations of Concetta Menella (2), Rebecca Levin, Henriette Gratteau, Michael Miller, Ronald Lankah, Patricia Horne, Elizabeth Scannell, Sonjourner Colbert, Matthew Burke, Jane Gubser, Brad Curry (2), and Peter Orris
- Plaintiff's Complaint and Exhibits
- Sheriff's 4/6/20 Response to the Plaintiff's Emergency Motion and Exhibits
- Sheriff's 4/13/20 Status Report and Exhibits
- Plaintiff's Motion for Preliminary Injunction and Exhibits
- 4/15/20 Hearing Transcript

All of the opinions set forth in this declaration are offered to a reasonable degree to medical certainty based on my training, experience, and review of the relevant literature, and national and international data and guidance.

9.      Coronavirus disease of 2019 (COVID-19) is a viral pandemic.[3]  This is a novel virus for which there is no established curative medical treatment and no vaccine. COVID-19 is different than all previous infectious disease outbreaks faced in our lifetime because of the speed and extent of spread throughout the globe, and how quickly it has overwhelmed healthcare systems. Infection control and social distancing represent the most evidence-based and critical interventions being utilized to slow the spread of COVID-19. Unlike many other viral outbreaks, it now appears that significant transmission of COVID-19 occurs before infected people become

---

[3] In the name COVID-19, 'CO' stands for 'corona,' 'VI' for 'virus,' and 'D' for disease.

symptomatic, which underscores the need for heavy focus on social distancing as a means to prevent transmission.

10. The Centers for Disease Control and Prevention (CDC) has identified many particularly vulnerable populations who are at increased risk of having severe outcomes from COVID-19.[4] These include:

- People with chronic lung disease or moderate to severe asthma
- People who have serious heart conditions
- People who are immunocompromised[5]
- People with severe obesity (body mass index [BMI] of 40 or higher)
- People with diabetes
- People with chronic kidney disease undergoing dialysis
- People with liver disease
- People who are smokers
- People who are pregnant or post-partum

11. In addition, data shows that African-Americans are experiencing disproportionate rates of death from COVID-19.[6]

12. For vulnerable individuals, social distancing and infection control play an even more central role in protecting against severe negative outcomes, there is no treatment or cure that has been identified to lessen their greater risk of harm after contracting the virus.[7]

13. Fatality is clearly the worst outcome of COVID-19 infection, but many who contract the illness and "recover" are irreparably damaged. This cannot be understated. The

---

[4] "At Risk for Severe Illness," CDC, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-risk.html.
[5] Including but not limited to cancer treatment, smoking, bone marrow or organ transplantation, immune deficiencies, HIV/AIDS, and prolonged use of corticosteroids and other immune-weakening medications.
[6] Reis Thebault, Andrew Ba Tran, & Vanessa Williams, "The coronavirus is infecting and killing black Americans at an alarmingly high rate," The Washington Post (Apr. 7, 2020), https://www.washingtonpost.com/nation/2020/04/07/coronavirus-is-infecting-killing-black-americans-an-alarmingly-high-rate-post-analysis-shows/?arc404=true.
[7] "What You Can Do," CDC, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/what-you-can-do.html ("**Stay home and avoid close contact**"); "How to Protect Yourself and Others," CDC, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/prevention.html ("**The best way to prevent illness is to avoid being exposed to this virus.**").

respiratory damage associated with severe COVID-19 infection causes long term decreases in lung function, and it is likely that among the 10-20% of people who require hospitalization, most will experience long-term effects on their lungs, heart, kidneys, eyes, central nervous system and other major organs.[8]

14.    COVID-19 infection rates have grown exponentially in the U.S. The CDC now reports COVID-19 cases and deaths in all 50 states.[9] When COVID-19 impacts a community, it will also impact the community's detention facilities. Federal and local correctional facilities will not be able to stop the entry of COVID-19 into their facilities: the reality is that the infection is inside many facilities already. It is inevitable and is not preventable. Numerous county jails, like Cook County Jail, have already reported hundreds of COVID-19 infections among staff and inmates. On March 31, 2020, the medical leadership in the NYC jail system announced that they would be unable to stop COVID from entering their facility and called for release as the primary response to this crisis.[10] Since that time, over 800 staff and inmates have tested positive in the NYC jail system.

15.    Once a virus enters a facility, detention settings promote the spread of the virus to the wider community. The constant flow of staff in and out of detention facilities only increases the spread of the virus beyond the walls of the facility itself.

---

[8] Melissa Healy, "Coronavirus infection may cause lasting damage throughout the body, doctors fear," L.A. Times (Apr. 10, 2020), https://www.latimes.com/science/story/2020-04-10/coronavirus-infection-can-do-lasting-damage-to-the-heart-liver; Judith Graham, "What Does Recovery From COVID-19 Look Like? It Depends. A Pulmonologist Explains." Kaiser Health News (Apr. 9, 2020), https://khn.org/news/what-does-recovery-from-covid-19-look-like-it-depends-a-pulmonologist-explains/; Alexander Freund, "COVID-19: Recovered patients have partially reduced lung function," DW (Mar. 20, 2020), https://www.dw.com/en/covid-19-recovered-patients-have-partially-reduced-lung-function/a-52859671.
[9] Coronavirus Disease 2019 (COVID-19) Cases in US, CDC (last visited April 10, 2020), https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html.
[10] Meagan Flynn, "Top doctor at Rikers' Island calls the hail a public health disaster unfolding before our eyes," The Washington Post (Mar. 31, 2020), https://www.washingtonpost.com/nation/2020/03/31/rikers-island-coronavirus-spread/.

16. Prisoners in general have poorer health and more underlying medical conditions than those in the community.[11] Over half of prisoners have serious physical or behavioral health problems, and incarcerated people have statistically higher rates of smoking, cardiovascular disease, infectious diseases and cancer. Additionally, the leading cause of death in U.S. jails is suicide, which reflects a toxic overlap between untreated mental health and substance use problems.[12]

17. The CDC and other organizations have issued recommendations on how to prevent or decrease the spread of COVID-19. It is important for jails to comply with the CDC guidance on management of COVID-19 in detention facilities. But it is also important to understand that compliance with these recommendations alone is not enough to create a setting that sufficiently protects the health and safety of individuals detained and working at the jail. The CDC, a federal agency, could not impose mandatory requirements on state or local officials, even when evidence-based medicine would support such requirements. The CDC guidelines are more appropriately considered a "harm reduction" approach, which is a common practice in public health, where organizations offer recommendations on how to reduce a risk of harm even when the subject is not following the appropriate practices.

18. The unanimous consensus from the CDC, and medical and public health experts, is that social distancing and infection control are imperative to decrease rampant spread of COVID-19 and protect people's health. The fact that the CDC adds the phrase "if possible" or "if

---

[11] Laura M. Maruschak & Marcus Berzofsky, "Medical Problems of State and Federal Prisoners and Jail Inmates, 2011-12," BJS (Feb. 5, 2015), https://www.bjs.gov/index.cfm?ty=pbdetai l&iid=5219.
[12] Laura Maruschak, "Medical Problems of Prisoners, BJS (Apr. 19, 2020), https://www.bjs.gov/content/pub/html/mpp/mpp.cfm; Ann Caron, "Mortality in Local Jails, 2000-2016 – Statistical Tables," BJS (Feb. 12, 2020), https://www.bjs.gov/index.cfm?ty=pbdetail&iid=6767; National Commission on Correctional Health Care, "Suicide Prevention Resource Guide," https://www.ncchc.org/filebin/Publications/Suicide_Prevention_Resource_Guide_2.pdf

space allows" in its guidance specifically directed at detention centers it does not control, does not alter the clear medical consensus on social distancing.[13]

19.    In my opinion, based on my correctional and epidemiological training as well as a review of the literature surrounding COVID-19, mandating that staff and detainees be kept six feet apart from each other at all times, absent life-threatening emergencies such as use of force and fire evacuation, in addition to robust sanitation,  testing, and infection control, is essential to preventing a widespread outbreak of this disease in a custodial setting.

20.    I have been inside numerous state and federal detention facilities, including the Cook County Jail. In a detention facility, social distancing can be challenging and requires close attention to all aspects of operations among both staff and detained people.[14] The typical design and operation of correctional settings, including densely packed areas for housing, health services, food services, recreation, bathroom and shower facilities for detained people, as well as the entry points, locker rooms, meal areas, and control rooms for staff, all contribute to the spread of infectious disease. Detention facilities are typically operated in a way that forces close contact between people and relies on massive amounts of movement every day from one part of the facility to another, e.g., for programming, access to cafeterias, commissary, medical, just to name a few. This movement is required of detained people as well as staff. This normal level of movement requires that correctional settings design and implement detailed plans and policies to both reduce the amount of movement, and immediately change housing operations to permit

---

[13] "Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities," CDC, https://www.cdc.gov/coronavirus/2019-ncov/downloads/guidance-correctional-detention.pdf ("Although social distancing is challenging to practice in correctional and detention environments, it is a **cornerstone** of reducing transmission of respiratory diseases such as COVID-19.").
[14] State of Illinois, Executive Order 2020-13 (Mar. 26, 2020), https://www2.illinois.gov/Documents/ExecOrders/2020/ExecutiveOrder-2020-13.pdf.

detainees to socially distance from one another in order to control the spread of a highly communicable disease, such as COVID-19.

21.     The sally-port is one of the most ubiquitous aspects of detention, and is a place that requires special attention. The sally-port, or control port, is a series of two locked gates that bring every staff member and detained person past a windowed control room as they stop in a room between locked gates. The normal functioning of detention centers demands that during shift change for staff, or as the security count approaches for detained people, large numbers of people press into sally-ports as they move into or out of other areas of the facility. This process creates close contact, and the sally port windows that are used to hand out radios, keys and other equipment to staff ensure efficient passage of communicable disease from the control rooms into the sally port areas on a regular basis. But like other aspects of detention settings, passage of staff and detained people through sally-ports can be monitored and regulated in a way that promotes six feet of separation between people. Other areas similarly require special attention, including analysis of existing workflows and honest assessment of the operational and staffing implications, including housing areas, meal spaces, medication administration, sick call, bathroom and day room access, etc.

22.     Solitary confinement is not medical isolation.[15] Simply locking detained people into cells will worsen, not improve, efforts to curb infection rates. When people are locked into cells alone, for most of the day, they quickly experience psychological distress that manifests in self-harm and suicidality, which requires rapid response and intensive care outside the facility for mental and physical health emergencies. In addition, units that are comprised of locked cells may require additional staff to escort people to and from their cells for showers, telephone calls, and

---

[15] David Cloud, Dallas Augustine & Brie Williams, "The Ethical Use of Medical Isolation," Amend (Apr. 9, 2020), https://amend.us/wp-content/uploads/2020/04/Medical-Isolation-vs-Solitary_Amend.pdf.

other encounters, and medical, pharmacy and nursing staff must move on and off these units

daily to assess the welfare and health needs of these people, creating the same spread of the virus

from the community into the facilities as if detained people were not locked down. In addition,

locking two people into a cell increases the risk of transmission of COVID-19 from one of them

to the other. This risk is especially harmful in facilities, like the Cook County Jail, that have

failed to create special protections for people with known risk factors for serious illness and

death from COVID-19 infection, and hold these high-risk patients in locked cells with other

lower-risk patients.

23.     The documents I have reviewed in this case fail to establish a comprehensive

approach to social distancing at the Cook County Jail and must be quickly integrated into a

single COVID-19 emergency response plan that not only mandates in a detailed fashion, but also

supports and monitors implementation of, social distancing. The deficiencies I have noted

include:

a.     Lack of clarity for how detainees will be maintained with 6 feet of separation
       in day rooms, hallways, sally-ports, medication lines, bathrooms and showers,
       medical clinics, transport, and recreation spaces.

b.     Lack of detail on how staff will engage in social distancing as they enter the
       facilities and are screened, pass through sally-ports, hallways, to and from
       their security posts, clinic assignments, administrative office, and during
       meals and breaks.

c.     Lack of assessment of staffing requirements to implement social distancing
       among staff and detained people.

24.     Mandating social distancing for detainees is critical to protect against

uncontrolled spread of COVID-19. However, there are other actions that should be taken. In

addition to social distancing, Cook County Jail must engage in adequate infection control. My

experience managing smaller outbreaks is that an additional challenge in correctional settings is

to apply hospital-level infection control measures on security staff. Ongoing, effective training is crucial to implement as many measures as possible. In a hospital or nursing home, staff may move up and down a single hallway over their shift, and they may interact with one patient at a time. In detention settings, officers move great distances, are asked to shout or yell commands to large numbers of people, routinely apply handcuffs and operate heavy doors/gates, operate large correctional keys and are trained in the use of force. These basic duties cause the personal protective equipment they are given to quickly break and become useless, and even when in good working order, may impede their ability talk and be understood, as in the case of masks. As a result, implementation of infection control measures requires a significant amount of training and supervision. It cannot be implemented through email or signage alone, but requires active role modeling, supervision and support of staff. One of the most ubiquitous examples of this challenge is the now common observation that many correctional staff who have been issued N95 masks in the past two weeks at the Cook County Jail are currently not wearing them, or may be wearing them around their necks or on their heads.

25.     Another critical task for any detention setting responding to a COVID-19 outbreak is to identify all of the people held in their custody who are particularly vulnerable. This task is critical for several reasons, and the daily updating of the list and locations of high-risk patients is critical to basic outbreak management. Creating a real-time list of high-risk patients allows for:

- Identification of high-risk patients who are eligible for release from detention

- Implementing of active surveillance, special housing arrangements, and other protective measures for high-risk patients who are not ill

- Implementing enhanced surveillance and protective measures for high-risk patients who are in a quarantine setting, or who develop symptoms of COVID-19

11

- Development and implementation of re-entry plans of care and support with community partners for high-risk patients

26.     Hand-washing and good hygiene practices are also important. Access to hand washing is limited in detention settings as compared to the community. Many common areas lack operable sinks with access to soap and paper hand towels. In addition, many of the sinks utilized in correctional settings do not operate with a faucet that can be turned and left on, but rather rely on pushing a button which provides a limited amount of water over a limited amount of time. These metered faucets are designed to save water by limiting the amount of time water flows, but make adequate hand washing with soap for at least 20 seconds very difficult, if not impossible.

27.     Infection control policies and procedures in detention settings are often at odds with basic CDC guidance. The CDC guidelines for infection control regarding COVID-19 make clear the need to aggressively prepare for, and intervene in, the spread of this virus throughout correctional settings. One of the most serious deficiencies in correctional practices involves the failure to appropriately train and equip correctional staff and inmate workers in the disinfection of the physical plant, and enable all people inside the facility to engage on social distancing and hand washing. When security staff and detainees are given masks without any guidance about their use, or when they should be replaced, or what scenarios in their environment represent higher risk of COVID-19 infection, the net effect is to decrease attention to infection control. Similarly, when inconsistent strengths of cleaning solution, or inadequate access to clean paper towels or other products used to wipe down surfaces are utilized, the net effect is also to decrease the level of infection control and increase the risk of rapid COVID-19 spread throughout the facility. When no special effort is made to use more highly trained or equipped cleaning

personnel with protective equipment to clean and handle the effects of staff or detainees who exhibit signs and symptoms of COVID-19, an especially egregious breach in infection control has occurred. Because security staff and inmates far outnumber health staff in correctional settings, they must be trained, equipped and engaged as the first responders for infection control. Failure to take this approach significantly increases the risk of rapid COVID-19 spread throughout the facility and increases the risk of preventable illness and death. The Cook County Jail's failure to have implemented adequate infection control policies before COVID-19 appeared within the facility is likely part of the reason why the outbreak quickly became so large. But as described above, even the perfect implementation of an adequate infection control policy would be insufficient to protect against uncontrolled spread of COVID-19 in the absence of social distancing at the jail.



28.     Security staff represent the front-line infection control force inside correctional settings, and evidence-based infection control plans cannot be implemented without active training of staff that is also ongoing. This training should include formal training on the protective equipment, environmental cleaning and health service activities that security staff will participate in or support. These trainings should span every tour and day of service so that every staff member is trained, and should be conducted in both dedicated 15-30 minute sessions and also in more brief venues, such as roll call.

29.     My review of the Cook County Jail's policies and other materials additionally leads me to have the following other specific concerns and recommendations about the health status of staff and detained people inside Cook County Jail regarding COVID-19 response:

a.  **Lack of a Covid-19 plan.** It appears that CSCSO does not yet have a single COVID-19 response plan, and is instead relying on an amalgam of pre-existing policies, individual protocols and other directives to manage their response to COVID-19. I have reviewed an outbreak management policy from 2017 that covers numerous types of infectious disease concerns, and has a half page amendment relating to COVID-19 testing on the last of 15 pages. I have also reviewed a separate sanitation policy that appears specific to COVID-19 and a 21-page operational briefing from April 4, 2020 that appears to include several pages of general occupational guidance relating to COVID-19 that is not jail-specific and targeted towards "maintaining a healthy business.  This lack of a single COVID-19 emergency response plan is a glaring deficiency, and at odds with good correctional practice. Large systems such as CCSO employ and care for several thousands of individuals and it is not possible to respond to a large-scale emergency without a single, coordinated plan. This is even more pressing for the COVID-19 response, because the public health directives for management change every week, sometimes

daily, and thus, CCSO must have one unified plan that can be updated and reliably utilized by all security, health and administrative staff, and which partners in public health organizations can review and support. If it has not already occurred, CCSO must combine all of the existing protocols and procedures into one COVID-19 emergency response plan, as is mandated in other detention settings.[16]

    b. **Lack of identification or tracking of high-risk patients.** The correctional health staff, and their electronic medical records, are very sophisticated, and the identity and location of people with CDC identified risk factors for serious illness and death from COVID-19 infection is known to the health service. In an outbreak that targets a subset of the incarcerated population, it is critical to create special protections for these individuals, which may include consideration for release, as well as active surveillance with twice daily symptom and temperature checks during incarceration, and additional support during re-entry. This requires that CCSO create a management plan that identifies these high-risk patients for specialized management and protection, which does not exist according to the statements by General Counsel for the Sheriff.

    c. **Lack of infection control practices consistent with CDC guidelines**. The sanitation and other policies I have reviewed fail to address or ensure basic infection control measures that are critical to the CDC guidelines on COVID-19 response in detention settings. Specifically:

- The sanitation policy fails to identify any special measures taken to clean or disinfect the living spaces and personal effect of people who become symptomatic for COVID-19 and are taken to medical isolation. This is an extremely high-risk scenario that has played out numerous times already in the Cook County Jail, and I fear that lack of attention to this high-risk setting has contributed to the substantial outbreak already present. The CDC gives clear guidance on this matter, including letting confined spaces sit for one day before entering/cleaning, and use of PPE for anyone engaged in cleaning.

---

[16] ICE ERO 4/10/20 mandates that all facilities housing ICE detainees must have such a plan.

- The sanitation policy leaves all communication regarding infection control to the housing area officer, but my experience during outbreaks is that detained people have numerous questions about infection control and sanitation that housing area officers are not trained to respond to. There must be regular engagement between infection control nursing or medical staff, and both staff and detained people in each housing area for implementation of effective infection control during an outbreak.

    d. **Lack of re-entry planning for detained people leaving Cook County Jail**. Part of an integrated plan for COVID-19 response in detention settings is the need to plan for safe re-entry for people leaving jail. This critical requirement is outlined in CDC recommendations and must be developed as a section in a unified COVID-19 emergency plan. The CDC makes clear recommendations on this process:[17]

- If an individual does not clear the screening process, follow the protocol for a suspected COVID-19 case – including putting a face mask on the individual, immediately placing them under medical isolation, and evaluating them for possible COVID-19 testing.

- If the individual is released before the recommended medical isolation period is complete, discuss release of the individual with state, local, tribal, and/or territorial health departments to ensure safe medical transport and continued shelter and medical care, as part of release planning. Make direct linkages to community resources to ensure proper medical isolation and access to medical care.

- Before releasing an incarcerated/detained individual with COVID-19 symptoms to a community-based facility, such as a homeless shelter, contact the facility's staff to ensure adequate time for them to prepare to continue medical isolation, or contact local public health to explore alternate housing options.

    30.    These steps are important to improve conditions at the Cook County Jail that help to prevent detainees and staff from contracting COVID-19. The failures outlined above have contributed to the rapid spread of COVID-19 in Cook County Jail, and to the health consequences suffered by detained people and staff alike. As noted above, however, they alone

---

[17] "Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities," CDC, https://www.cdc.gov/coronavirus/2019-ncov/downloads/guidance-correctional-detention.pdf.

are insufficient to meaningfully reduce the rate of spread if social distancing at the jail is not immediately implemented. I believe that it is possible to make a significant difference in the number and severity of COVID-19 cases that ensue going forward, but significant work is required by the Cook County Sheriff's Office to enact social distancing and basic infection control measures for people held in detention and staff who work in this setting.

Signature: Homer Venters



Date: 4/19/2020

Location: Port Washington, NY

# Dr. Homer D. Venters

10 ½ Jefferson St., Port Washington, NY, 11050
hventers@gmail.com, Phone: 646-734-5994

HEALTH ADMINISTRATOR          PHYSICIAN          EPIDEMIOLOGIST

## Professional Profile

- International leader in provision and improvement of health services to patients with criminal justice involvement.
- Innovator in linking care of the incarcerated to Medicaid, health homes, DSRIPs.
- Successful implementer of nations' first electronic health record, performance dashboards and health information exchange among pre-trial patients.
- Award winning epidemiologist focused on the intersection of health, criminal justice and human rights in the United States and developing nations.
- Human rights leader with experience using forensic science, epidemiology and public health methods to prevent and document human rights abuses.

## Professional Experience

**President**, Community Oriented Correctional Health Services (COCHS), 1/1/2020-present.
- o Lead COCHS efforts to provide technical assistance, policy guidance and research regarding correctional health and justice reform.
- o Oversee operations and programmatic development of COCHS
- o Serve as primary liaison between COCHS board, funders, staff and partners.

**Senior Health and Justice Fellow**, Community Oriented Correctional Health Services (COCHS), 12/1/18-12/31/2018
- o Lead COCHS efforts to expand Medicaid waivers for funding of care for detained persons relating to Substance Use and Hepatitis C.
- o Develop and implement COCHS strategy for promoting non-profit models of diversion and correctional health care.

**Medical/Forensic Expert**, 3/2016-present
- o Provide expert input, review and testimony regarding health care, quality improvement, electronic health records and data analysis in detention settings.

**Director of Programs,** Physicians for Human Rights, 3/16-11/18.
- o Lead medical forensic documentation efforts of mass crimes against Rohingya and Yazidi people.
- o Initiate vicarious trauma program.
- o Expand forensic documentation of mass killings and war crimes.
- o Develop and support sexual violence capacity development with physicians, nurses and judges.
- o Expand documentation of attacks against health staff and facilities in Syria and Yemen.

**Chief Medical Officer/Assistant Vice President**, Correctional Health Services, NYC Health and Hospitals Corporation 8/15-3/17.

o  Transitioned entire clinical service (1,400 staff) from a for-profit staffing company model to a new division within NYC H + H.
o  Developed new models of mental health and substance abuse care that significantly lowered morbidity and other adverse events.
o  Connected patients to local health systems, DSRIP and health homes using approximately $5 million in external funding (grants available on request).
o  Reduced overall mortality in the nation's second largest jail system.
o  Increased operating budget from $140 million to $160 million.
o  Implemented nation's first patient experience, provider engagement and racial disparities programs for correctional health.

**Assistant Commissioner,** Correctional Health Services, New York Department of Health and Mental Hygiene, 6/11-8/15.

o  Implemented nation's first electronic medical record and health information exchange for 1,400 staff and 75,000 patients in a jail.
o  Developed bilateral agreements and programs with local health homes to identify incarcerated patients and coordinate care.
o  Increased operating budget of health service from $115 million to $140 million.
o  Established surveillance systems for injuries, sexual assault and mental health that drove new program development and received American Public Health Association Paper of the Year 2014.
o  Personally care for and reported on over 100 patients injured during violent encounters with jail security staff.

**Medical Director,** Correctional Health Services, New York Department of Health and Mental Hygiene, 1/10-6/11.

o  Directed all aspects of medical care for 75,000 patients annually in 12 jails, including specialty, dental, primary care and emergency response.
o  Direct all aspects of response to infectious outbreaks of H1N1, Legionella, Clostridium Difficile.
o  Developed new protocols to identify and report on injuries and sexual assault among patients.

**Deputy Medical Director,** Correctional Health Services, New York Department of Health and Mental Hygiene, 11/08-12/09.

o  Developed training program with Montefiore Social internal medicine residency program.
o  Directed and delivered health services in 2 jails.

**Clinical Attending Physician,** Bellevue/NYU Clinic for Survivors of Torture, 10/07-12/11.

**Clinical Attending Physician,** Montefiore Medical Center Bronx NY, Adult Medicine, 1/08-11/09.

## Education and Training
**Fellow, Public Health Research,** New York University 2007-2009. MS 6/2009
Projects: Health care for detained immigrants, Health Status of African immigrants in NYC.
**Resident, Social Internal Medicine**, Montefiore Medical Center/Albert    Einstein University7/2004- 5/2007.
**M.D.,** University of Illinois, Urbana, 12/2003.
**M.S.** Biology, University of Illinois, Urbana, 6/03.
**B.A.** International Relations, Tufts University, Medford, MA, 1989**.**

## Academic Appointments, Licensure
Clinical Associate Professor, New York University College of Global Public Health, 5/18-present.

Clinical Instructor, New York University Langone School of Medicine, 2007-2018.

M.D.  New York (2007-present).

## Media
TV
i24 Crossroads re Suicide in U.S. Jails 8/13/19.

i24 Crossroads re re *Life and Death in Rikers Island* 6/13/19.

Amanpour & Company, NPR/PBS re *Life and Death in Rikers Island* 4/15/19.

CNN, Christiane Amanpour re Forensic documentation of mass crimes against Rohingya. 7/11/18.

i24 Crossroads with David Shuster re health crisis among refugees in Syria. 7/6/18.

Canadian Broadcasting Corporation TV with Sylvie Fournier (in French) re crowd control weapons. 5/10/18

i24 Crossroads with David Shuster re Cholera outbreak in Yemen.  2/15/18.

China TV re WHO guidelines on HIV medication access 9/22/17.

Radio/Podcast
Morning Edition, NPR re Health Risks of Criminal Justice System. 8/9/19.

Fresh Air with Terry Gross, NPR re *Life and Death in Rikers Island*, 3/6/19.

Morning Edition, NPR re *Life and Death in Rikers Island*, 2/22/19.

LeShow with Harry Sherer re forensic documentation of mass crimes in Myanmar, Syria,

Iraq. 4/17/18.

Print articles and public testimony
Oped: Four ways to protect our jails and prisons from coronavirus. The Hill 2/29/20.

Oped: It's Time to Eliminate the Drunk Tank. The Hill 1/28/20.

Oped: With Kathy Morse. A Visit with my Incarcerated Mother. The Hill 9/24/19.

Oped: With Five Omar Muallim-Ak. The Truth about Suicide Behind Bars is Knowable. The Hill 8/13/19.

Oped: With Katherine McKenzie. Policymakers, provide adequate health care in prisons and detention centers. CNN Opinion, 7/18/19.

Oped: Getting serious about preventable deaths and injuries behind bars. *The Hill*, 7/5/19.

Testimony: Access to Medication Assisted Treatment in Prisons and Jails,  New York State Assembly Committee on Alcoholism and Drug Abuse, Assembly Committee on Health, and Assembly Committee on Correction**.** NY, NY, 11/14/18.

Oped: Attacks in Syria and Yemen are turning disease into a weapon of war, *STAT News*, 7/7/17.

Testimony: Connecticut Advisory Committee to the U.S. Commission on Civil Rights: Regarding the use of solitary confinement for prisoners. Hartford CT, 2/3/17.

Testimony: Venters HD, New York Advisory Committee to the U.S. Commission on Civil Rights: Regarding the use of solitary confinement for juveniles in New York. July 10, 2014. NY NY.

Testimony: New York State Assembly Committee on Correction with the Committee on Mental Health: Regarding Mental Illness in Correctional Settings. November 13, 2014. Albany NY.
Testimony: New York State Assembly Committee on Correction with the Committee on Mental Health: Regarding Mental Illness in Correctional Settings. November 13, 2014. Albany NY.

Oped: Venters HD and Keller AS, The Health of Immigrant Detainees. Boston Globe, April 11, 2009.

Testimony: U.S. House of Representatives, House Judiciary Committee's Subcommittee on Immigration, Citizenship, Refugees, Border Security, and International Law: Hearing on Problems with Immigration Detainee Medical Care, June 4, 2008.

## Peer Reviewed Publications

Parmar PK, Leigh J, **Venters H**, Nelson T. Violence and mortality in the Northern Rakhine State of Myanmar, 2017: results of a quantitative survey of surviving community leaders in Bangladesh. Lancet Planet Health. 2019 Mar;3(3):e144-e153.

**Venters H.** Notions from Kavanaugh hearings contradict medical facts. *Lancet.* 10/5/18.

Taylor GP, Castro I, Rebergen C, Rycroft M, Nuwayhid I, Rubenstein L, Tarakji A, Modirzadeh N, **Venters H**, Jabbour S. Protecting health care in armed conflict: action towards accountability. *Lancet.* 4/14/18.

Katyal M, Leibowitz R, **Venters H**. IGRA-Based Screening for Latent Tuberculosis Infection in Persons Newly Incarcerated in New York City Jails. *J Correct Health Care.* 2018 4/18.

Harocopos A, Allen B, Glowa-Kollisch S, **Venters H**, Paone D, Macdonald R. The Rikers Island Hot Spotters: Exploring the Needs of the Most Frequently Incarcerated. *J Health Care Poor Underserved.* 4/28/17.

MacDonald R, Akiyama MJ, Kopolow A, Rosner Z, McGahee W, Joseph R, Jaffer M, **Venters H**. Feasibility of Treating Hepatitis C in a Transient Jail Population. *Open Forum Infect Dis.* 7/7/18.

Siegler A, Kaba F, MacDonald R, **Venters H**. Head Trauma in Jail and Implications for Chronic Traumatic Encephalopathy. *J Health Care Poor and Underserved.* In Press (May 2017).

Ford E, Kim S, **Venters H**. Sexual abuse and injury during incarceration reveal the need for re-entry trauma screening. *Lancet.* 4/8/18.

Alex B, Weiss DB, Kaba F, Rosner Z, Lee D, Lim S, **Venters H,** MacDonald R. Death After Jail Release. *J Correct Health Care.* 1/17.

Akiyama MJ, Kaba F, Rosner Z, Alper H, Kopolow A, Litwin AH, **Venters H**, MacDonald R. Correlates of Hepatitis C Virus Infection in the Targeted Testing Program of the New York City Jail System. *Public Health Rep.* 1/17.

Kalra R, Kollisch SG, MacDonald R, Dickey N, Rosner Z, **Venters H**. Staff Satisfaction, Ethical Concerns, and Burnout in the New York City Jail Health System. *J Correct Health Care.* 2016 Oct;22(4):383-392.

**Venters H.** A Three-Dimensional Action Plan to Raise the Quality of Care of US Correctional Health and Promote Alternatives to Incarceration. *Am J Public Health.* April 2016.104.

Glowa-Kollisch S, Kaba F, Waters A, Leung YJ, Ford E, **Venters H**. From Punishment to Treatment: The "Clinical Alternative to Punitive Segregation" (CAPS) Program in New York City Jails. *Int J Env Res Public Health.* 2016. 13(2),182.

Jaffer M, Ayad J, Tungol JG, MacDonald R, Dickey N, Venters H. Improving Transgender Healthcare in the New York City Correctional System. *LGBT Health.* 2016 1/8/16.

Granski M, Keller A, Venters H. Death Rates among Detained Immigrants in the United States. *Int J Env Res Public Health.* 2015. 11/10/15.

Michelle Martelle, Benjamin Farber, Richard Stazesky, Nathaniel Dickey, Amanda Parsons, **Homer Venters**. Meaningful Use of an Electronic Health Record in the NYC Jail System. *Am J Public Health*. 2015. 8/12/15.

Fatos Kaba, Angela Solimo, Jasmine Graves, Sarah Glowa-Kollisch, Allison Vise, Ross MacDonald, Anthony Waters, Zachary Rosner, Nathaniel Dickey, Sonia Angell, **Homer Venters**. Disparities in Mental Health Referral and Diagnosis in the NYC Jail Mental Health Service. *Am J Public Health.* 2015. 8/12/15.

Ross MacDonald, Fatos Kaba, Zachary Rosner, Alison Vise, Michelle Skerker, David Weiss, Michelle Brittner, Nathaniel Dickey, **Homer Venters**. The Rikers Island Hot Spotters. *Am J Public Health*. 2015. 9/17/15.

Selling Molly Skerker, Nathaniel Dickey, Dana Schonberg, Ross MacDonald, **Homer Venters**. Improving Antenatal Care for Incarcerated Women: fulfilling the promise of the Sustainable Development Goals. *Bulletin of the World Health Organization*.2015.

Jasmine Graves, Jessica Steele, Fatos Kaba, Cassandra Ramdath, Zachary Rosner, Ross MacDonald, Nathanial Dickey, **Homer Venters**. Traumatic Brain Injury and Structural Violence among Adolescent males in the NYC Jail System *J Health Care Poor Underserved.* 2015;26(2):345-57.

Glowa-Kollisch S, Graves J, Dickey N, MacDonald R, Rosner Z, Waters A, **Venters H**. Data-Driven Human Rights: Using Dual Loyalty Trainings to Promote the Care of Vulnerable Patients in Jail. *Health and Human Rights*. Online ahead of print, 3/12/15.

Teixeira PA[1], Jordan AO, Zaller N, Shah D, **Venters H**. Health Outcomes for HIV-Infected Persons Released From the New York City Jail System With a Transitional Care-Coordination Plan. 2014. *Am J Public Health*. 2014 Dec 18.

Selling D, Lee D, Solimo A, **Venters H.** A Road Not Taken: Substance Abuse Programming in the New York City Jail System. *J Correct Health Care.* 2014 Nov 17.

Glowa-Kollisch S, Lim S, Summers C, Cohen L, Selling D, **Venters H**. Beyond the Bridge: Evaluating a Novel Mental Health Program in the New York City Jail System. *Am J Public Health*. 2014 Sep 11.

Glowa-Kollisch S, Andrade K, Stazesky R, Teixeira P, Kaba F, MacDonald R, Rosner Z, Selling D, Parsons A, **Venters H**. Data-Driven Human Rights: Using the Electronic Health Record to Promote Human Rights in Jail. *Health and Human Rights*. 2014. Vol 16 (1): 157-165.

MacDonald R, Rosner Z, **Venters H**. Case series of exercise-induced rhabdomyolysis in the New York City Jail System. *Am J Emerg Med*. 2014. Vol 32(5): 446-7.

Bechelli M, Caudy M, Gardner T, Huber A, Mancuso D, Samuels P, Shah T, **Venters H.** Case Studies from Three States: Breaking Down Silos Between Health Care and Criminal Justice. *Health Affairs*. 2014. Vol. 3. 33(3):474-81.

Selling D, Solimo A, Lee D, Horne K, Panove E, **Venters H**. Surveillance of suicidal and non-suicidal self-injury in the new York city jail system. *J Correct Health Care*. 2014. Apr:20(2).

Kaba F, Diamond P, Haque A, MacDonald R, **Venters H**. Traumatic Brain Injury Among Newly Admitted Adolescents in the New York City Jail System. *J Adolesc Health*. 2014. Vol 54(5): 615-7.

Monga P, Keller A, **Venters H**. Prevention and Punishment: Barriers to accessing health services for undocumented immigrants in the United States. *LAWS*. 2014. 3(1).

Kaba F, Lewsi A, Glowa-Kollisch S, Hadler J, Lee D, Alper H, Selling D, MacDonald R, Solimo A, Parsons A, **Venters H**. Solitary Confinement and Risk of Self-Harm Among Jail Inmates. *Amer J Public Health*. 2014. Vol 104(3):442-7.

MacDonald R, Parsons A, **Venters H.** The Triple Aims of Correctional Health:  Patient safety, Population Health and Human Rights. *Journal of Health Care for the Poor and Underserved*. 2013. 24(3).

Parvez FM, Katyal M, Alper H, Leibowitz R, **Venters H.** Female sex workers incarcerated in New York City jails: prevalence of sexually transmitted infections and associated risk behaviors. *Sexually Transmitted Infections*. 89:280-284. 2013.

Brittain J, Axelrod G, **Venters H.** Deaths in New York City Jails: 2001 – 2009. *Am J Public Health*. 2013 103:4.

Jordan AO, Cohen LR, Harriman G, Teixeira PA, Cruzado-Quinones J, **Venters H.** Transitional Care Coordination in New York City Jails: Facilitating Linkages to Care for People with HIV Returning Home from Rikers Island. *AIDS Behav. Nov.* 2012.

Jaffer M, Kimura C, **Venters H.** Improving medical care for patients with HIV in New York City jails. *J Correct Health Care*. 2012 Jul;18(3):246-50.

Ludwig A, Parsons, A, Cohen, L, **Venters H.** Injury Surveillance in the NYC Jail System, *Am J Public Health* 2012 Jun;102(6).

**Venters H**, Keller, AS. *Psychiatric Services*. (2012) Diversion of Mentally Ill Patients from Court-ordered care to Immigration Detention. Epub. 4/2012.

**Venters H**, Gany, F. *Journal of Immigrant and Minority Health* (2011) Mental Health Concerns Among African Immigrants. 13(4): 795-7.

**Venters H,** Foote M, Keller AS. *Journal of Immigrant and Minority Health.* (2010) Medical Advocacy on Behalf of Detained Immigrants. 13(3): 625-8.

**Venters H,** McNeely J, Keller AS. *Health and Human Rights.* (2010) HIV Screening and Care for Immigration Detainees. 11(2) 91-102.

**Venters H,** Keller AS. *Journal of Health Care for the Poor and Underserved*. (2009) The Immigration Detention Health Plan: An Acute Care Model for a Chronic Care Population. 20:951-957.

**Venters H**, Gany, F. *Journal of Immigrant and Minority Health* (2009) African Immigrant Health. 4/4/09.

**Venters H**, Dasch-Goldberg D, Rasmussen A, Keller AS, *Human Rights Quarterly* (2009) Into the Abyss: Mortality and Morbidity among Detained Immigrant. 31 (2) 474-491.

**Venters H**, *The Lancet* (2008) Who is Jack Bauer? 372 (9653).

**Venters H**, Lainer-Vos J, Razvi A, Crawford J, Shaf'on Venable P, Drucker EM, *Am J Public Health* (2008) Bringing Health Care Advocacy to a Public Defender's Office. 98 (11).

**Venters H**, Razvi AM, Tobia MS, Drucker E. *Harm Reduct J*. (2006) The case of Scott Ortiz: a clash between criminal justice and public health. Harm Reduct J. 3:21

Cloez-Tayarani I, Petit-Bertron AF, **Venters HD**, Cavaillon JM (2003) *Internat. Immunol.* Differential effect of serotonin on cytokine production in lipopolysaccharide-stimulated human peripheral blood mononuclear cells.15,1-8.

Strle K, Zhou JH, Broussard SR, **Venters HD**, Johnson RW, Freund GG, Dantzer R, Kelley KW, (2002) *J. Neuroimmunol.* IL-10 promotes survival of microglia without activating Akt. 122, 9-19.

**Venters HD,** Broussard SR, Zhou JH, Bluthe RM, Freund GG, Johnson RW, Dantzer R, Kelley KW, (2001) *J. Neuroimmunol.* Tumor necrosis factor(alpha) and insulin-like growth factor-I in the brain: is the whole greater than the sum of its parts? 119, 151-65.

**Venters HD,** Dantzer R, Kelley KW, (2000) *Ann. N. Y. Acad. Sci.* Tumor necrosis factor-alpha induces neuronal death by silencing survival signals generated by the type I insulin-like growth factor receptor. 917, 210-20.

**Venters HD,** Dantzer R, Kelley KW, (2000) *Trends. Neurosci.* A new concept in neurodegeneration: TNFalpha is a silencer of survival signals. 23, 175-80.

**Venters HD,** Tang Q, Liu Q, VanHoy RW, Dantzer R, Kelley KW, (1999) *Proc. Natl. Acad. Sci. USA.* A new mechanism of neurodegeneration: A proinflammatory cytokine inhibits receptor signaling by a survival peptide, 96, 9879-9884.

**Venters HD,** Ala TA, Frey WH 2nd, (1998) Inhibition of antagonist binding to human brain muscarinic receptor by vanadium compounds. *Recept. Signal. Transduct.* 7, 137-142.

**Venters HD,** Tang Q, Liu Q, VanHoy RW, Dantzer R, Kelley KW, (1999) *Proc. Natl. Acad. Sci. USA.* A new mechanism of neurodegeneration: A proinflammatory cytokine inhibits receptor signaling by a survival peptide, 96, 9879-9884.

**Venters HD,** Ala TA, Frey WH 2nd, (1998) Inhibition of antagonist binding to human brain muscarinic receptor by vanadium compounds. *Recept. Signal. Transduct.* 7, 137-142**.**

**Venters HD,** Bonilla LE, Jensen T, Garner HP, Bordayo EZ, Najarian MM, Ala TA, Mason RP, Frey WH 2nd, (1997) Heme from Alzheimer's brain inhibits muscarinic receptor binding via thiyl radical generation. *Brain. Res.* 764, 93-100.

Kjome JR, Swenson KA, Johnson MN, Bordayo EZ, Anderson LE, Klevan LC, Fraticelli AI, Aldrich SL, Fawcett JR, **Venters HD**, Ala TA, Frey WH 2nd (1997) Inhibition of antagonist and agonist binding to the human brain muscarinic receptor by arachidonic acid. *J. Mol. Neurosci.* 10, 209-217.

## Honors and Presentations (past 10 years)

**Keynote Address**, Academic Correctional Health Conference, April 2020, Chapel Hill, North Carolina.

**TedMed Presentation**, Correctional Health, Boston MA, March 2020.

**Finalist, Prose Award for Literature**, Social Sciences category for *Life and Death in Rikers Island*, February, 2020.

**Keynote Address,** John Howard Association Annual Benefit, November 2019, Chicago IL.

**Keynote Address,** Kentucky Data Forum, Foundation for a Healthy Kentucky, November 2019, Cincinnati Ohio.

**Oral Presentation,** Dual loyalty and other human rights concerns for physicians in jails an prisons. Association of Correctional Physicians, Annual meeting. 10/16, Las Vegas.

**Oral Presentation,** Clinical Alternatives to Punitive Segregation: Reducing self-harm for incarcerated patients with mental illness. American Public Health Association Annual Meeting, November 2015, Chicago IL.

**Oral Presentation,** Analysis of Deaths in ICE Custody over 10 Years . American Public Health Association Annual Meeting, November 2015, Chicago IL.

**Oral Presentation,** Medication Assisted Therapies for Opioid Dependence in the New York City Jail System. American Public Health Association Annual Meeting, November 2015, Chicago IL.

**Oral Presentation,** Pathologizing Normal Human Behavior: Violence and Solitary Confinement in an Urban Jail. American Public Health Association Annual Meeting, November 2014, New Orleans, LA.

**Training,** International Committee of the Red Cross and Red Crescent, Medical Director meeting 10/15, Presentation on Human Rights and dual loyalty in correctional health.

**Paper of the Year,** American Public Health Association. 2014. (Kaba F, Lewis A, Glowa-Kollisch S, Hadler J, Lee D, Alper H, Selling D, MacDonald R, Solimo A, Parsons A, Venters H. Solitary Confinement and Risk of Self-Harm Among Jail Inmates. *Amer J Public Health*. 2014. Vol 104(3):442-7.)

**Oral Presentation,** Pathologizing Normal Human Behavior: Violence and Solitary Confinement in an Urban Jail. *American Public Health Association* Annual Meeting, New Orleans LA, 2014.

**Oral Presentation,** Human rights at Rikers: Dual loyalty among jail health staff. American Public Health Association Annual Meeting, New Orleans LA, 2014.

**Poster Presentation**, Mental Health Training for Immigration Judges. American Public Health

Association Annual Meeting, New Orleans LA, 2014.

**Distinguished Service Award;** Managerial Excellence. Division of Health Care Access and Improvement, NYC DOHMH. 2013.

**Oral Presentation,** Solitary confinement in the ICE detention system. American Public Health Association Annual Meeting, Boston MA, 2013.

**Oral Presentation**, Self-harm and solitary confinement in the NYC jail system. American Public Health Association Annual Meeting, Boston MA, 2013.

**Oral Presentation**, Implementing a human rights practice of medicine inside New York City jails. American Public Health Association Annual Meeting, Boston MA, 2013.

**Poster Presentation,** Human Rights on Rikers: integrating a human rights-based framework for healthcare into NYC's jail system. *American Public Health Association* Annual Meeting, Boston MA, 2013.

**Poster Presentation**, Improving correctional health care: health information exchange and the affordable care act. *American Public Health Association* Annual Meeting, Boston MA, 2013.

**Oral Presentation**, Management of Infectious Disease Outbreaks in a Large Jail System. American Public Health Association Annual Meeting, Washington DC, 2011.

**Oral Presentation,** Diversion of Patients from Court Ordered Mental Health Treatment to Immigration Detention. *American Public Health Association* Annual Meeting, Washington DC, 2011.

**Oral Presentation**, Initiation of Antiretroviral Therapy for Newly Diagnosed HIV Patients in the NYC Jail System. *American Public Health Association* Annual Meeting, Washington DC, 2011.

**Oral Presentation,** Medical Case Management in Jail Mental Health Units. *American Public Health Association* Annual Meeting, Washington DC, 2011.

**Oral Presentation**, Injury Surveillance in New York City Jails. *American Public Health Association* Annual Meeting, Washington DC, 2011.

**Oral Presentation,** Ensuring Adequate Medical Care for Detained Immigrants. Venters H, Keller A, American Public Health Association Annual Meeting, Denver, CO, 2010.

**Oral Presentation,** HIV Testing in NYC Correctional Facilities. Venters H and Jaffer M, *American Public Health Association,* Annual Meeting, Denver, CO, 2010.

**Oral Presentation,** Medical Concerns for Detained Immigrants. Venters H, Keller A, *American Public Health Association* Annual Meeting, Philadelphia, PA, November 2009.

**Oral Presentation,** Growth of Immigration Detention Around the Globe. Venters H, Keller A, *American Public Health Association* Annual Meeting, Philadelphia, PA, November 2009.

**Oral Presentation,** Role of Hospital Ethics Boards in the Care of Immigration Detainees. Venters H, Keller A, *American Public Health Association* Annual Meeting, Philadelphia, PA,

November 2009.

**Oral Presentation,** Health Law and Immigration Detainees. Venters H, Keller A, *American Public Health Association* Annual Meeting, Philadelphia, PA, November 2009.

**Bro Bono Advocacy Award,** Advocacy on behalf of detained immigrants. Legal Aid Society of New York, October 2009.

**Oral Presentation,** Deaths of immigrants detained by Immigration and Customs Enforcement. Venters H, Rasmussen A, Keller A, *American Public Health Association* Annual Meeting, San Diego CA, October 2008.

**Poster Presentation,** Death of a detained immigrant with AIDS after withholding of prophylactic Dapsone. Venters H, Rasmussen A, Keller A, *Society of General Internal Medicine* Annual Meeting, Pittsburgh PA, April 2008.

**Poster Presentation,** Tuberculosis screening among immigrants in New York City reveals higher rates of positive tuberculosis tests and less health insurance among African immigrants. *Society of General Internal Medicine* Annual Meeting, Pittsburgh PA, April 2008.

**Daniel Leicht Award for Achievement in Social Medicine,** Montefiore Medical Center, Department of Family and Social Medicine, 2007.

**Poster Presentation**, Case Findings of Recent Arestees. Venters H, Deluca J, Drucker E. *Society of General Internal Medicine* Annual Meeting, Toronto Canada, April 2007.

**Poster Presentation,** Bringing Primary Care to Legal Aid in the Bronx. Venters H, Deluca J, Drucker E. *Society of General Internal Medicine* Annual Meeting, Los Angeles CA, April 2006.

**Poster Presentation**, A Missed Opportunity, Diagnosing Multiple Myeloma in the Elderly Hospital Patient. Venters H, Green E., *Society of General Internal Medicine* Annual Meeting, New Orleans LA, April 2005.

## *Grants: Program*

San Diego County: Review of jail best practices (COCHS), 1/2020, $90,000.

Ryan White Part A - Prison Release Services (PRS). From HHS/HRSA to Correctional Health Services (NYC DOHMH), 3/1/16-2/28/17 (Renewed since 2007). Annual budget $ 2.7 million.

Ryan White Part A - Early Intervention Services- Priority Population Testing. From HHS/HRSA to Correctional Health Services (NYC DOHMH), 3/1/16-2/28/18 (Renewed since 2013). Annual budget $250,000.

Comprehensive HIV Prevention. From HHS to Correctional Health Services (NYC DOHMH), 1/1/16-12/31/16. Annual budget $500,000.

HIV/AIDS Initiative for Minority Men. From HHS Office of Minority Health to Correctional Health Services (NYC DOHMH), 9/30/14-8/31/17. Annual budget $375,000.

SPNS Workforce Initiative, From HRSA SPNS to Correctional Health Services (NYC DOHMH), 8/1/14-7/31/18. Annual budget $280,000.

SPNS Culturally Appropriate Interventions. From HRSA SPNS to Correctional Health Services (NYC DOHMH), 9/1/13-8/31/18. Annual budget $290,000.

Residential substance abuse treatment. From New York State Division of Criminal Justice Services to Correctional Health Services (NYC DOHMH), 1/1/11-12/31/17. Annual budget $175,000.

Community Action for Pre-Natal Care (CAPC). From NY State Department of Health AIDS Institute to Correctional Health Services (NYC DOHMH), 1/1/05-12/31/10. Annual budget $290,000.

Point of Service Testing. From MAC/AIDS, Elton John and Robin Hood Foundations to Correctional Health Services (NYC DOHMH), 11/1/09-10/31/12. Annual budget $100,000.

Mental Health Collaboration Grant. From USDOJ to Correctional Health Services (NYC DOHMH), 1/1/11-9/30/13. Annual budget $250,000.

## Teaching

**Instructor,** Health in Prisons Course, Bloomberg School of Public Health, Johns Hopkins University, June 2015, June 2014, April 2019.

**Instructor**, Albert Einstein College of Medicine/Montefiore Social Medicine Program Yearly lectures on Data-driven human rights, 2007-present.

## Other Health & Human Rights Activities

**DIGNITY Danish Institute Against Torture**, Symposium with Egyptian correctional health staff regarding dual loyalty and data-driven human rights. Cairo Egypt, September 20-23, 2014.

**Doctors of the World,** Physician evaluating survivors of torture, writing affidavits for asylum hearings, with testimony as needed, 7/05-11/18.

**United States Peace Corps**, Guinea Worm Educator, Togo West Africa, June 1990- December 1991.

> -*Primary Project;* Draconculiasis Eradication. Activities included assessing levels of infection in 8 rural villages and giving prevention presentations to mothers in Ewe and French
> -*Secondary Project;* Malaria Prevention.

## Books

**Venters H.** *Life and Death in Rikers Island*. Johns Hopkins University Press. 2/19.

## Chapters in Books

**Venters H.** Mythbusting Solitary Confinement in Jail. In Solitary Confinement Effects, Practices, and Pathways toward Reform. Oxford University Press, 2020.

MacDonald R. and **Venters H.** Correctional Health and Decarceration. In Decarceration. Ernest Drucker, New Press, 2017.

## *Membership in Professional Organizations*
**American Public Health Association**

## *Foreign Language Proficiency*
**French**        Proficient
**Ewe**           Conversant

## *Prior Testimony and Deposition*

Benjamin v. Horn, 75 Civ. 3073 (HB) (S.D.N.Y.) as expert for defendants, 2015

Rodgers v. Martin 2:16-cv-00216 (U.S.D.C. N.D.Tx) as expert for plaintiffs, 10/19/17

Fikes v. Abernathy, 2017 7:16-cv-00843-LSC (U.S.D.C. N.D.AL) as expert for plaintiffs 10/30/17.

Fernandez v. City of New York, 17-CV-02431 (GHW)(SN) (S.D.NY) as defendant in role as City Employee 4/10/18.

Charleston v. Corizon Health INC, 17-3039 (U.S.D.C. E.D. PA) as expert for plaintiffs 4/20/18.

Gambler v. Santa Fe County, 1:17-cv-00617 (WJ/KK) as expert for plaintiffs 7/23/18.

Hammonds v. Dekalb County AL, CASE NO.: 4:16-cv-01558-KOB as expert for plaintiffs 11/30/2018.

Mathiason v. Rio Arriba County NM, No. D-117-CV-2007-00054, as expert for plaintiff 2/7/19.

Hutchinson v. Bates et. al. AL, No. 2:17-CV-00185-WKW- GMB, as expert for plaintiff 3/27/19.

Lewis v. East Baton Rouge Parish Prison LA, No. 3:16-CV-352-JWD-RLB, as expert for plaintiff 6/24/19.

Belcher v. Lopinto, No No. 2:2018cv07368 - Document 36 (E.D. La. 2019) as expert for plaintiffs 12/5/2019.


## Fee Schedule

Case review, reports, testimony $500/hour.
Site visits and other travel, $2,500 per day (not including travel costs).

# EXHIBIT I

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

ANTHONY MAYS, et al.,

   Plaintiffs,

v.

THOMAS J. DART, Sheriff of Cook County,

   Defendant.

)
)
)
)
)
)
)
)
)
)
)
)

Case No. 20-CV-2134

Hon. Matthew F. Kennelly,
in his capacity as Emergency
Judge

Hon. Robert W. Gettleman,
District Court Judge

Hon. M. David Weisman,
Magistrate Judge

## DEFENDANT'S PARTIAL BRIEF IN OPPOSITION TO PLAINTIFFS' RENEWED MOTION FOR PRELIMINARY INJUNCTION AND EXPEDITED DISCOVERY

NOW COMES the Defendant, THOMAS J. DART, in his Official Capacity as Sheriff of Cook County, and for his Partial Brief in Opposition to Plaintiff's Renewed Motion for Preliminary Injunction and Expedited Discovery [Dkt. 55], states as follows[1]:

## INTRODUCTION

In response to every filing by Sheriff Dart, Plaintiffs assert a different heretofore unmentioned alleged constitutional violation. Each of these complaints amounts to nothing more than a disagreement about the policies the Sheriff has chosen to implement based on their demand for unrealistic and unattainable outcomes that the world's renowned medical experts and epidemiologists have yet to achieve. Without voicing any objection to the latest testing, intake, and sanitation policies implemented at the Jail [Dkt. 55, p.4], Plaintiffs now turn their sights on social distancing, demanding that the Sheriff comply with standards that far exceed his constitutional obligations, but with which he nevertheless complies.

The Sheriff's frustration cannot be overstated: Plaintiffs persist in pursuing this unnecessary litigation that consumes valuable resources and pulls the Jail and Office staff off of the front lines of managing the coronavirus pandemic to wage a dispute that long ago could have been avoided with a cooperative and good faith effort to address their concerns with the Office before filing this lawsuit. The suggestion that the Sheriff is purposefully, or even inadvertently, withholding any effort to protect detainees and

---

[1] Sheriff Dart does not waive and reserves the right to make any further legal arguments in response to Plaintiff's Motion should it survive beyond the Court's ruling on his objections on the following threshold dispositive issues.

his own Jail staff is belied by the extraordinary efforts taken over the past two months to identify and contain the spread of infection, as well as the quantifiable success those efforts have had. The prevention policies in place at the Jail have been thorough with data showing that COVID-19 cases at the Jail are under control and are being effectively managed. With this partial Brief in Opposition to Plaintiffs' Motion for Preliminary Injunction, exposing the structural and substantive legal failures of Plaintiffs' claims, the Sheriff hopes at last to put an end to this litigation.

## I.    UPDATED REPORT ON PROGRESS AT THE JAIL

In supplement to the report provided to the Court at the April 15 hearing, the Sheriff provides this update on progress at the Jail. With regard to the effectiveness of the numerous measures taken to reduce the spread of COVID-19 at the jail, the present data is encouraging. Most significantly, the jail population has been substantially reduced over the last month. See Exh. A, Daily CCDOC Population Report. Since March 8, the jail population has dropped 24%, from 5,710 detainees to 4,233 detainees on April 17. This corresponds with the data on daily bookings and release (See Exh. B, Daily Bookings). For example, on March 8, there were 200 bookings with 117 detainees not released on the day of booking (either through bond or EM). Bookings have declined rapidly, and on April 16, there were 52 bookings with only 13 detainees not released on the day of booking.

Meanwhile, the positive COVID detainees in isolation have generally been trending downward See Exh. C, CCDOC Testing Results. After the COVID-19 outbreak at the jail in late March, a highpoint was reached on April 10, with 289 positive COVID

detainees in isolation. Since then, there has been a relatively consistent decline with 180 positive COVID detainees in isolation on April 17. In comparison, the number of convalescent detainees in recovery has been increasing. On April 5, there were no convalescent detainees in recovery. On April 17, the number of convalescent detainees in the process of medical recovery has reached 170. *Id*.

These successes, in addition to the many others reported by the Sheriff, demonstrate why Plaintiffs have not and cannot succeed on their ever-evolving claims against the Sheriff. This is particularly true with respect to Plaintiffs' latest claim that the alleged failure to implement strict social distancing within a correctional facility — beyond the standards set forth by the CDC Guidance on Management of Coronavirus Disease 2019 in Correctional and Detention Facilities — is objectively unreasonable. As will be shown below, not only are Plaintiffs unable establish a likelihood of success on the merits of their claims, but as a preliminary matter, they cannot overcome the significant structural legal hurdles necessary to obtain their desired relief seeking the immediate release or transfer of hundreds of detainees. In other words, Plaintiffs' claims fail before they have begun. Therefore, the motion for preliminary injunction must be denied outright, obviating the need for a hearing or any request for expedited discovery.

## II.     PLAINTIFFS CANNOT SUCCEED ON THE  MERITS OF THEIR CLAIMS

The standard for a preliminary injunction is identical the standard for a temporary restraining order, which is well known at this point in the litigation. Dkt. 47, p. 10. Plaintiffs must establish that they will suffer irreparable harm without the

requested relief; they have no adequate remedy at law; and they are likely to succeed on the merits of their claim. If Plaintiffs can meet this threshold, then the Court must determine whether the harm to the public in categorically releasing hundreds of detainees outweighs the risk of harm to the Plaintiffs. These standards are exceedingly stringent here, where Plaintiffs seek a mandatory injunction requiring affirmative action by the Sheriff. Dkt. 47, p. 10.

Plaintiffs' motion must be denied not only because they cannot establish success on the merits of their claims, but as a preliminary matter, they cannot overcome the significant procedural and substantive legal hurdles that would allow this Court to grant their requested relief. First, Plaintiff Foster still has not exhausted all available remedies that would entitle him to release pursuant to a writ of habeas corpus. Even as to his preliminary effort to alter the conditions of bond, principles of comity and abstention counsel against this Court revisiting the state court judge's finding that Foster's risk to society upon release outweighs any possibility of harm that could befall him in the Jail. Second, Plaintiffs are not entitled to release or transfer under section 1983 because their claims are procedurally barred by the Prisoner Litigation Reform Act (PLRA). Finally, Plaintiffs' quest to obtain release on a class-wide scale is "untenable" and "unworkable" under either theory of relief because of the inherently individualized considerations involved in evaluating detainee release. Notwithstanding these procedural failures, on the merits, Plaintiffs cannot succeed on their due process claim because as this Court previously found, the Sheriff was entitled to rely on the CDC Guidance for correctional facilities with respect to social distancing in the living

quarters and common areas at the Jail, which complies with these standards. In practice, over the past month, the Sheriff has made significant structural efforts to increase social distancing in the living quarters at the Jail. At this point, the majority the tiers now house single-celled detainees and a majority of the dorms are now at 50% occupancy or less. Accordingly, the Sheriff's efforts to increase opportunities for social distancing at the Jail have been objectively reasonable.

### A. Plaintiffs Cannot Succeed on the Merits Because They Cannot Overcome the Procedural Hurdles to Obtain the Requested Forms of Relief.

As a preliminary matter, Plaintiffs' cannot succeed on the merits of their claims because they are procedurally barred. As to Plaintiffs' claim for habeas relief, Mr. Foster still has not exhausted his administrative remedies sufficient to invoke habeas relief. Moreover, while he did make a preliminary effort to seek a bond reduction in state court, he never sought appeal or rehearing on that finding. Moreover, Plaintiffs' claim for release under section 1983 is barred by the Prisoner Litigation Reform Act (PLRA) because they have failed to satisfy the requisite conditions for pursuing relief under 18 USC §3626.

### 1. Plaintiffs are not entitled to habeas relief because they still have not exhausted their administrative remedies.

Plaintiffs contend that Kenneth Foster "and the subclass he provisionally represents" is entitled to emergency release pursuant to a writ of habeas corpus based on his medical status, which he claims puts him at a higher risk of contracting COVID-19. Dkt. 55, p. 14. The Court previously denied this request at the TRO stage because

Plaintiffs made no showing—and in fact, were unaware one way or another—that Foster, Mays, or any other detainees had availed themselves of existing (and still-available) state court remedies to seek release through emergency bond proceedings. Dkt. 47, p. 12-13. The Court rejected the notion that pursuing such remedies was futile.

First, it is important to note that the Court has not "provisionally" certified a subclass of detainees who "in addition to having health vulnerabilities that elevate their risk of serious COVID-19, also … sought release from the Jail" (Dkt. 55, p. 13) under the bond modification process relative to the instant motion for preliminary injunction, nor could it for reasons explained more fully in section II.C.3., *infra*. Also, the Plaintiff's motion for class certification was not before the Court at the time the TRO motion was heard, and its provisional certification of all pretrial detainees relative to the conditions of confinement under Rule 23(b)(2) was entered *sua sponte* pursuant to its equitable power in that proceeding. That provisional class certification applies only to the relief granted in the TRO, and does not extend to the present motion, particularly where the Sheriff has not yet had an opportunity to respond to Plaintiffs' motion for class certification. Dkt. 6.

Plaintiffs now contend that Mr. Foster *did* in fact seek release by way of the expedited bond hearing process implemented by Judge Martin, but that his request was denied. The briefing in Mr. Foster's case shows that he presented Judge Joyce with the same arguments he makes here: namely, that he should be released on bond because his medical condition makes him susceptible to coronavirus infection. Dkt. 55-6. However, in light of the violent crimes with which Mr. Foster has been charged—namely, robbery,

6

domestic battery, and false imprisonment—Judge Joyce evidently determined that Mr. Foster's risk to society outweighed the potential risk of infection. Additionally, Judge Joyce was statutorily prohibited from releasing Mr. Foster to electronic monitoring in light of his domestic battery charge. Nevertheless, Mr. Foster has made no attempt to appeal or seek reconsideration of that ruling. However, he is not excused from pursuing this remedy: the Court previously rejected the notion that pursuing an appeal or rehearing so "unduly time consuming" as to make the process futile. Dkt. 47, p. 13. Accordingly, Mr. Foster still has not exhausted his administrative remedies, and therefore, cannot obtain release by way of a writ of habeas corpus. Nor do the principles of comity permit the Court to interfere with the paramount interest of the state courts to adjudicate criminal matters by revisiting Judge Joyce's determination that Mr. Foster is too dangerous to be released.

2. **Plaintiffs are not entitled to release under section 1983 because their claims are barred under the PLRA.**

Plaintiffs' Preliminary Injunction Motion seeks two orders from this Court that arise out of their § 1983 claim[2]: (1) order the Sheriff to implement social distancing; and (2) order a three judge panel to be empaneled to enter a release order; (3) or order a "transfer" of detainees. Dkt. #55, pgs. 17-19 ("Mot."). Plaintiff's cannot meet their burden for relief under the PLRA.

i. **The PLRA prohibits this Court from empaneling a three-judge court at this stage in this litigation.**

---

[2] The PLRA applies to all Section 1983 claims brought by prisoners. *Walker v. O'Brien*, 216 F.3d 626, 639 (7th Cir. 2000). The PLRA has a broad definition of "prisoner" that includes pretrial detainees. 18 U.S. Code § 3626(g)(3).

Plaintiffs next argue this Court should immediately empanel a three judge panel through 18 U.S.C. 3626(a)(3) to consider a prisoner release order if the Court determines social distancing is impossible. Dkt. 55, p. 17.

The PLRA prohibits this Court from entering empaneling a three judge panel at this point. A three judge panel is required under PLRA for a prisoner release order. 18 U.S.C. 3626(a)(3)(B). There are two requirements that must be met before a court may enter a prisoner release order: "(i) a court has previously entered an order for less intrusive relief that has failed to remedy the deprivation of the Federal right sought to be remedied through the prisoner release order; and (ii) the defendant has had a reasonable amount of time to comply with the previous court orders." 18 U.S.C. 3626(a)(3)(A). Neither requirement has been met here.

First, this Court's TRO Order denied Plaintiffs' request for a TRO on social distancing in the jail. The Court found "[s]pace constraints at the Jail do not allow for the more preferable degree of social distancing that exists in the community at large." Dkt. #47, pg. 25. The Court concluded that "plaintiffs have filed to show a reasonable likelihood of success on their contention that the Sheriff is acting in an objectively unreasonable manner by failing to mandate full social distancing. This is particularly so because the Sheriff's submission reflects an ongoing effort to modify custodial arrangements at the Jail in a way that will permit greater separation of detainees." *Id.*

As a result, this Court has not previously entered an order for less intrusive relief on social distancing. And, of course, it is impossible to find the Sheriff "has had a

reasonable amount of time to comply" with an order that has never been entered. Thus, it is premature to consider relief under 18 U.S.C. 3626(a)(3)(A).

### ii. This Court should not order a "transfer" of detainees.

Plaintiffs motion also asks this court to "transfer" detainees. Though the motion does not specify the relief Plaintiffs seek, it references Plaintiffs previous filing in response to this Court's April, 3, 2020 Order. In support, Plaintiffs argued the Sheriff has the authority under the Illinois County Jail Act to transfer detainees. Dkt. #26-1, pg. 25. Plaintiffs cited to Section 125/14 of the County Jail Act, which states:

> At any time, in the opinion of the Warden, the lives or health of the prisoners are endangered or the security of the penal institution is threatened, to such a degree as to render their removal necessary, the Warden may cause an individual prisoner or a group of prisoners to be removed to some suitable place within the county, or to the jail of some convenient county, where they may be confined until they can be safely returned to the place whence they were removed. 730 ILCS 125/14.

Contrary to Plaintiffs' claims, all the County Jail Act envisions is that the Warden can remove prisoners to another "suitable place within the county." *Id*. But Cook County only has the one jail facility. To find another "suitable place" to transfer detainees to, and then prepare that place and properly staff it to ensure public safety, would be, under the current circumstances, widely impractical if not impossible. It certainly would not be "the least intrusive means necessary to correct [any] harm." 18 U.S.C. 3626(a)(2). Plaintiffs have therefore not established a transfer under the County Jail Act is appropriate under the PLRA.

Though Plaintiffs' briefing refers to "transfer," their focus has been on a "transfer" to electronic home monitoring. Plaintiffs claim the County Jail Act provides the Sheriff the authority to "transfer" detainees to electronic monitoring. Dkt. #26-1, pg. 25. But nowhere in the County Jail Act is electronic home monitoring, or any equivalent phrase or concept, referenced. Electronic monitoring is instead governed by the Conditions of Bail Bond section of the Illinois Code of Civil Procedure, which states the court may impose electronic monitoring as a condition of bond. 725 ILCS 5/110-10(b)(14-14.3) Thus, under Illinois law, a judicial order is necessary for a detainee to be released on electronic monitoring. The Sheriff therefore lacks the authority to unilaterally release detainees on home monitoring.

Plaintiffs also argue this Court, rather than a three-judge court, may order transfer to electronic monitoring under the PLRA. This too is incorrect. Plaintiffs attempt to support their argument by citing to *Plata v. Brown*, No. C01-1351 TEH, 2013 WL 3200587, at *8 (N.D. Cal. June 24, 2013). Dkt. #55, pg. 16. But the court in *Plata* was considering transferring inmates from one prison facility to another. *Id*. pg. 42, fn. 11. Here, Plaintiffs are seeking detainees be released under electronic home monitoring.

Electronic home monitoring is not another "facility." The PLRA defines a "prisoner release order" as one that "includes any order, including a temporary restraining order or preliminary injunctive relief, that has the purpose or effect of reducing or limiting the prison population, or that directs the release from or

nonadmission of prisoners to a prison[.]"[3] 18 U.S.C. § 3626(g)(4). Any order from this Court to "transfer," to use Plaintiffs' term, would have the effect and purpose of reducing the Jail population to achieve social distancing, and the would direct the release of detains from the jail. Such an order would therefore have to be issued by a three judge court. 18 U.S.C. § 3626(a)(3). In fact, the three judge court is what this District used to order the Sheriff to release detainees on electronic home monitoring through § 3626(a)(3) in *United States v. Cook County*, 761 F. Supp. 2d 794, 800 (N.D. Ill. 2011).

Finally, any "transfer" order would still have to comply with the PLRA's requirement that "[t]he court shall give substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the preliminary relief[.]" 18. U.S.C. § 3626(a)(2). The number of detainees currently on electronic monitoring is 2,904. (Ex. A) This is an increase of nearly 450 detainees on electronic monitoring since March 17, 2020. Ex. D, Scannel Dec. As a result, an order that transfers detainees would have the risk of overloading the Sheriff's electronic monitoring system, which would create a grave risk to public safety.

### iii. A preliminary injunction ordering the Sheriff to implement social distancing would be improper under the PLRA.

Plaintiffs request this Court enter a preliminary injunction ordering the Sheriff "to take all possible steps to implement medically required social distancing because it

---

[3] "Prison" and "Prisoners" are broadly defined to include jails and detainees. 18 U.S. Code § 3626(g)(3),(5).

is the only way to prevent a severe risk of harm." Mot. pg. 8. The PLRA states that an preliminary injunctive relief "must be narrowly drawn, extend no further than necessary to correct the harm the court finds requires preliminary relief, and be the least intrusive means necessary to correct that harm." 18 U.S.C. 3626(a)(2). In addition, the Court "shall give substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the preliminary relief and shall respect the principles of comity set out in paragraph (1)(B) in tailoring any preliminary relief." *Id*.

The order Plaintiffs seek would have a significantly adverse impact on the operation of the Jail. Regardless that the CCSO has already taken "all possible steps" to implement social distancing, there are instances where social distancing must yield to security concerns (for example, housing certain classifications of detainees, medical concerns, or breaking up fights). An order mandating social distancing would impede the Sheriff's ability to address security and medical issues that may arise.

Furthermore, Plaintiffs have not offered this Court any guidance on how this Court could draft a narrowly tailored order that would direct the CCSO to do anything more than he is currently doing. As the Jail population has decreased, the CCSO has used that flexibility to provide detainees more space to achieve social distancing. More importantly, since this Court's TRO Order denied social distancing relief in the Jail, the CCSO has obtained enough masks to provide every detainees with a new PPE surgical mask everyday until June 7, 2020. Ex. E, Miller Dec. The CCSO is therefore providing detainees in the Jail with better protection from coronavirus than most essential

workers are receiving. While complete social distancing is the ideal, the ability to provide each detainee with a surgical mask lessens the risk to detainees in situations where complete social distancing is not possible.

### 3. Plaintiffs requested relief is inherently individualized and cannot be granted on a class-wide basis.

Plaintiffs also cannot succeed in obtaining the ultimate relief they seek because the decision to release or transfer a detainee from the Jail is an inherently individualized process that is not amenable to class-wide resolution. The requirements for class certification seeking injunctive relief under Federal Rule 23 are: (1) numerosity; (2) commonality; (3) typicality; and (4) adequacy of representation. Fed. R. Civ. P. 23(a)(2). The failure to satisfy any one of these elements precludes class certification. *Arreola v. Godinez*, 546 F.3d 788, 794 (7th Cir. 2008). In this case, the inherently individualized process of assessing a detainees risk to the public when seeking release or transfer from custody precludes a finding of commonality or typicality, and class certification must be denied under either theory of relief. *Id.*

Generally speaking, to satisfy the commonality element, the plaintiff must show there are questions of law or fact common to the class. However, this means more than that they all suffered a violation of the same provision of law. Rather, the plaintiff must demonstrate that the class members *have suffered the same injury*. *Wal-Mart v. Dukes*, 564 U.S. 338, 360 (2011). The crux of commonality is "not the raising of common questions," but rather, "the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation." *Id.* (internal quotations omitted).

13

In the specific context of a Rule 23(b)(2) class seeking injunctive relief, the analysis centers on whether "the party opposing the class [allegedly] has acted or refused to act on grounds that apply generally to the class so that *final* injunctive relief or corresponding declaratory relief is appropriate respecting the class *as a whole*." Fed. R. Civ. P. 23(b)(2); *Jamie S. v. Milwaukee Public Schools*, 668 F.3d 481, 498-99 (7th Cir. 2012) (emphasis added). However, "claims for *individualized* relief … do not satisfy Rule 23(b)(2)." Id. at 499, quoting *Wal-Mart*, 564 U.S. at 360. In other words, a single injunction must provide complete relief to each member of the class. *Wal-Mart*, 564 U.S. at 360. A class cannot be certified under Rule 23(b)(2) "when each individual class member would be entitled to a *different* injunction…against the defendant." *Id*. (emphasis in original). It is not sufficient for a plaintiff to "superficially" style his case as a claim for class-wide injunctive relief if "as a substantive matter the relief sought would merely initiate a process through which highly individualized determinations of liability and remedy are made; this kind of relief would be class-wide in name only and it would certainly not be final." *Jamie S.*, 668 F.3d at 499.

Here, even if Plaintiffs' section 1983 claims were not barred by the PLRA, they still could not obtain the relief they seek because categorical release or transfer from the Jail is unattainable on a class-wide basis. It is imperative that a detainee's suitability for for and conditions of release be based on an individualized consideration of the safety of the detainee, his family, and the public at large. *Money v. Pritzker*, 2020 U.S. Dist. LEXIS 63599, *49. In this context, certainly the detainees' health status is an important consideration for release—not only the underlying condition for which he seeks release,

but also any signs of coronavirus infection, for his safety and his family's safety. Most importantly, the public's interest must be considered in light of the potential release of detainees who have been accused of serious violent crimes. *Id.*

Plaintiffs fully acknowledge "that the court will need to individually assess the conditions under which each individual class member should be released, consistent with public safety concerns separate from the spread of coronavirus." Dkt. 55, p. 16. It is precisely this need for individualized assessments that make this case inappropriate for class treatment. *Id.* Indeed, the differences among putative class members are so vastly and fundamentally different that class treatment is deemed "untenable" and "completely unworkable." *Money*, 2020 U.S. Dist. LEXIS 63599, *6, 49. Accordingly, without the ability for Plaintiffs to obtain relief on a class-wide basis, this case reverts to two individual section 1983 lawsuits, which defeats their class claims and precludes Plaintiffs from obtaining the expedited discovery they seek.

While it is unclear whether class-wide relief is available for habeas claims at all, it certainly would not be available here, because of the need for individualized assessments of whether any of the plaintiffs are entitled to release. *Bijeol v. Benson*, 513 F.3d 965, 968 (7th Cir. 1975); *Money*, 2020 U.S. Dist. LEXIS 63599, *72 n.15.

**B. Plaintiffs Cannot Succeed on the Merits Because the Sheriff's Actions are Objectively Reasonable.**

Not only are Plaintiffs unable to succeed on the merits of their claims because of the procedural deficiencies of their case, they also cannot succeed on the merits of their

claims. The Sheriff's reliance upon and compliance with the CDC Guidance regarding social distancing is objectively reasonable and does not result in a due process violation.

### 1. The Sheriff contends that it is objectively reasonable to comply with the CDC Guidance adapted for correctional facilities.

As explained more fully in the Sheriff's Supplemental Brief in Opposition to the TRO, Plaintiffs must establish a likelihood of success that the Sheriff was objectively unreasonable in implementing the CDC Guidance adapted specifically for correctional facilities with respect to social distancing. Dkt. 41, p. 1-2. It must be remembered that barely two weeks ago, in the remarkably short history of this case, Plaintiffs very first request for relief sought a TRO forcing the Sheriff to implement *these very guidelines* that they now say are utterly deficient. And this case has been a game of constitutional whack-a-mole ever since. With every documented policy, practice, and act of creative problem solving the Sheriff has implemented in the Jail during these unprecedented times, Plaintiffs abandon their last complaint and find a new one to explore.

In this specific context, Plaintiffs now claim that the Sheriff is constitutionally obligated to exceed the CDC Guidance for correctional facilities as it relates to social distancing. The Court previously rejected this contention and declined to order the Sheriff to implement full social distancing, remarking that while Plaintiffs complained that the sleeping and common areas of the Jail "run afoul of CDC guidance," "the CDC's guidance is not as definitive as plaintiffs suggest." Dkt. 47, p. 23. In fact, the CDC Guidance for correctional facilities specifically "acknowledges that space limitations may require a departure from better social-distancing practices… [T]he CDC's guidance

16

expressly recognizes that complete social distancing may not be possible in the sleeping areas of a jail [and s]pace constrains at the Jail do not allow for the more preferable degree of social distancing that exists in the community at large." Dkt. 47, p. 24-25.

Nevertheless, Plaintiffs have proffered the declaration of an infectious disease expert who may be very accomplished in his own right, but has no experience with correctional facilities, and a promise that a former jail medical director may offer his opinion at some point in the future supporting full social distancing. On the basis of these two submissions, and in the face of the Court's prior recognition that the Sheriff rightly relied on and complied with jail-specific guidelines promulgated by the leading authoritative agency on infectious disease, Plaintiffs again contend that merely complying with the CDC Guidance is not objectively reasonable.

To the contrary, the Seventh Circuit has recognized that courts do not "impose upon prisons in the name of the Constitution a duty to take remedial measures against [allegedly harmful conditions] that the agencies responsible for the control of these hazards do not think require remedial measures." *Carroll v. DeTella*, 255 F.3d 470, 472-73 (7th Cir. 2001) (analyzing claims against a prison for alleged water contamination). If the relevant government agencies believe that certain standards are acceptable, "prison officials cannot be faulted for not thinking it necessary for them to do anything either. *They can defer to the superior expertise of those authorities*." *Id*. at 473. Although *Carroll* was analyzed under the eighth amendment, the Court's analysis speaks directly to the reasonableness of a jailer's ability to rely on the "superior expertise" of the leading authorities who promulgate policies and standards relative to the apparent risk.

The constitution also does not require a "maximally safe environment… completely free from pollution or safety hazards." *Id*. at 472. Where a prison official knew of a substantial risk of harm to inmate health or safety, and "responded reasonably to the risk, even if the harm ultimately was not averted," their conduct is not unconstitutional. *Peate v. McCann*, 294 F.3d 879, 882 (7th Cir. 2002). This is not to say that the Sheriff does not appreciate the seriousness of controlling the spread of COVID-19 in the Jail or that he is not taking action to control it. He certainly does, and that is evident from the extraordinary efforts he has undertaken to contain it, discussed more fully below. Accordingly, the Sheriff's reliance on the CDC Guidance and compliance with it with respect to social distancing is objectively reasonable.

> **2.** **While the Sheriff has voluntarily made efforts that allow detainees to practice "full" social distancing in a majority of the general population living quarters, he cannot implement "full" social distancing throughout the Jail outside of the CDC guidelines that apply to jails.**

As explained above, to fulfill his constitutional obligations, the Sheriff may rely on the CDC Guidance for management of correctional facilities to set compliance standards at the Jail, and he acted objectively reasonably in doing so. Nevertheless, in light of Plaintiffs' new contention that full social distancing at the Jail is "impossible without reducing the population of the jail" in an effort to obtain categorical detainee release, (Dkt. 55, p. 2), the Court asked the Sheriff to provide his "position on whether it is possible to … rearrange people within the Jail to accomplish social distancing" of six feet between individuals as defined by the CDC "without the safety valve" that allows an exception where social distancing "might not be feasible given the nature of the

facility." Ex. A, Transcript 4/15/20, 39:20-40:19. Indeed, the Sheriff can and has been proactive in his efforts to implement social distancing in the majority of the Jail's living quarters and common areas. However, due to several factors, including security and medical classification restrictions and the size of the population, among other things, the Sheriff cannot implement "full" social distancing throughout the Jail at this time. Given the ever-changing nature of the population and detainees' needs and characteristics, it is not "impossible," but would likely require a reduction in population in the short term.

It is important to note at the outset that any suggestion that the Sheriff is relying on the modifications in the CDC Guidance to avoid making even minimal efforts to accommodate social distancing throughout the Jail is belied by the powerful data showing the results of the Sheriff's ongoing efforts to contain the spread of the coronavirus for the protection of the detainees and the staff. As the Court has recognized, the Jail system is a large and very complex compound, the operation of which is very challenging even in normal times. Dkt. 47, p. 2.

Despite this, the Sheriff has undertaken many structural efforts to allow detainees to practice social distancing, particularly in living quarters and common areas. For example, as noted elsewhere in the Sheriff's briefing, he has worked cooperatively with the State's Attorney and the Public Defender to identify detainees who would be suitable for release and who would appear before a bond court judge to seek modifications of conditions of bond. To date, over 1,200 detainees have been released since March, and the Sheriff continues to work with Public Defender

Campanelli to evaluate the detainee population and identify other detainees who may be eligible for release under the bond court procedure. See Ex. F, Campanelli letter. As mentioned above, the Jail population remains at a record low of 4,211, while there are a record high number of detainees on the electronic monitoring program, approaching 3,000.

The Sheriff also has "rearranged people" and reconfigured spaces to allow for social distancing in the housing units, made possible by the fact that the Jail population has dropped by 24% over the past month. One month ago, there were 391 detainees in single-celled housing. Today, there are 2,521, marking a 545% increase. One month ago, there were 3,906 detainees in double-celled housing; today, there are 260, a decrease of 93%. Single-cell housing is now available on 175 tiers, with only 11 tiers that remain double celled, due to the unique mental health needs of those detainees. CHART; Exh. __, Miller Dec., at 11, 13.

The Sheriff also opened several divisions of the Jail that previously were closed in order to spread out detainee housing: Division IV, Division V, Bootcamp barracks/Mental Health Transition Center, and Division II, Dorms 1, 3, and 4. Ex. __, Miller Dec., at 9. This is no small undertaking, and all was done in extremely short order to accommodate new housing units. Opening these tiers requires that the space be thoroughly cleaned; that utilities be connected; that a system for food and medical delivery be established; and that the Division be properly staffed.

By opening these Divisions, the Sheriff is now able to spread out detainees assigned to dormitory housing. Each of the four dorms can accommodate 900 detainees.

Currently, there are 684 detainees housed across the four dorms, permitting 170-200 detainees per dorm. Ex., __, Miller Dec. at 12. Occupancy in these dorms is at 50% of capacity, allowing for one-man bunks. Where the bunks are movable, they are spaced 6' apart. For those bunks that are bolted to the floor, every other bunk is unoccupied.

In addition to the structural changes implemented, it is important to also note that the Sheriff provides all detainees in the Jail with masks, including those in the general population. Ex. __, Miller Dec., at 23--25. The use of masks to stringently control transmission of the virus cannot be discounted. None of Plaintiffs' experts, through declaration or Plaintiffs' characterization of their purported testimony, account for the role masks play in preventing the spread of the virus. At this time, with the new supply of PPE, the Sheriff can provide a new mask to every detainee every day, and plans to incorporate those needs into his ongoing PPE estimates. If supplies run short, however, the Sheriff may provide cloth masks to detainees in the general population, which are CDC-approved for the general public.

As mentioned above, the population at the Jail changes daily, in number and character, and with that comes the ever-present need for the Sheriff's Officers to have the flexibility to adapt to the needs of the population as a whole at any given time. This leads to unpredictable situations that may require housing adjustments on an ongoing basis to operate the Jail safely and efficiently, which is the Sheriff's first priority at all times.

For example, despite all efforts of the officers and staff, fights break out in the Jail, and sometimes in large numbers. These are not common occurrences, but they

happen, and the Sheriff must have the flexibility to prioritize Jail safety over voluntary "full" social distancing. Currently, if a small infraction occurs, discipline housing can accommodate single-cell housing; however, if a large-scale fight occurs, that could require alternative housing arrangements to house the detainees involved.

Additionally, there is a population of approximately 1,700 mentally ill detainees who may not be assigned to a single cell for medical reasons, and who have been designated as such by Cermak Health Services. They are largely housed in the dorms, they must be given priority in certain dorms, in the event that security and other population adjustments are necessary.

Additionally, there are currently 170 detainees on the convalescent tier who have medically recovered from COVID-19. Ex. __, Miller Dec., at 7. As these detainees eventually make their way back to the general population, the CDC permits them to be housed in cohorts, and need not practice social distancing as they have developed immunity to the virus. As the recovery population continues to grow, these additional considerations factor into future housing decisions and may eventually change the need for social distancing. The Sheriff also rotates the hours detainees may be in dayrooms and common areas. Ex. __, Miller Dec., at 19

As with any condition at the Jail, the Sheriff is responsible for providing the opportunity for detainees to exercise their free will and practice social distancing or wear masks. Many do. However, correctional officers do not "enforce" social distancing or use of PPE with threat of discipline, which could raise a host of constitutional concerns. Ex. __, Miller Dec., at 18.

### 3. The Sheriff is Under No Constitutional Obligation to Identify and Medically Triage "Medically Vulnerable" Detainees.

The Sheriff is under no constitutional obligation to affirmatively identify and "triage" certain detainees based on their health conditions. Plaintiffs have not proffered any expert opinions or any other authority suggesting that the Sheriff has such a duty. Dkt. 55, 55-7. In fact, the Sheriff *cannot* identify detainees by their health conditions. While Plaintiffs are correct that the Department of Corrections may place a health alert in certain detainees files based on information received from Cermak Health Systems, Plaintiffs misunderstand the scope of these alerts. (4/15/20 Transcript, p. 15) As Mr. Scouffas explained at the hearing on April 15, these alerts do not contain information on the detainee's specific health condition. (4/15/20 Transcript, p. 34) Instead, these alerts simply contain information that is required to make operational decisions, such as whether an asthmatic detainee was permitted to have an inhaler, which otherwise would be confiscated as contraband. *Id.* The Sheriff's office is not a "covered entity" under HIPAA, and as such, are not entitled to and may not receive detainees' personal health information.

There is a process in place at the Jail that would allow any detainee to request assistance or accommodations for their health conditions, but the Sheriff's Office has not affirmative obligation to identify them or provide any segregated housing for them. Sheriff's Officers also will refer any detainee who complains of a medical issue to Cermak Health Services for evaluation. Dkt. 30-6. Cermak Health Services continues to perform reviews of any detainee with a medical issue and order well-being checks

which include going to detainees living units as needed for treatment. *Id.* Cermak Health Service, the proper entity to monitor detainees with any medical issues, continues to provide full care for all detainees at the Jail. *Id.* Thus, with no constitutional obligation to affirmatively identify and "triage" medically vulnerable detainees, the Sheriff certainly cannot have acted objectively unreasonably by not doing so.

### IV. The Balancing of Harms Weighs in Favor of Not Imposing a Mandatory Injunction on the Sheriff to Categorically Release or Transfer Detainees Out of the Jail.

As more fully set forth in the Sheriff's previous filings, all of which are incorporated here by reference, even if Plaintiffs could establish all of the threshold elements for preliminary injunction, they cannot establish that the balance of harms weighs in their favor. See Dkt. 29-1, p. 17. Overwhelmingly this is because ordering the categorical release of the Subclass A detainees—with no assessment of their risk to society upon release—would be harmful to the public interest. The decision to release a person from jail must be made on a case by case basis, after examining all of the relevant risk factors. As in any case, that decision must evaluate the seriousness of the crime charged, the recidivist nature of the detainee, and the risk that he is a danger to himself or others, among other things. Here, there also would need to be an evaluation of whether the detainee actually suffered from the claimed medical condition that allegedly makes him vulnerable to COVID-19 infection.

The Sheriff has worked cooperatively with the State's Attorney and the Public Defender to identify detainees who are suitable for release based on their criminal background, medical history, and a host of other factors. For those who remain in the

Jail who have not be identified for release, and particularly those who have petitioned unsuccessfully for bond modifications, the assessment of risk to the public evidently outweighed any perceived risk to their health, and the are not eligible for release, through the bond process, habeas, or an order of release.

## V.    PLAINTIFFS' REQUEST FOR EXPEDITED DISCOVERY MUST BE DENIED

For the reasons stated above and also in Plaintiffs' motion for expedited discovery itself, plaintiffs cannot, in the balance, establish good cause for discovery. There are dispositive barriers to each of the requests made by plaintiffs in their renewed filing (medical triage and implementation of social distancing beyond that required by the CDC), as well as to each of the remedies sought in their brief (transfer out of the jail or three judge habeas corpus panel). (Renewed brief, p. 2). These requests and remedies either are legally barred or moot or both. As a result, plaintiffs have no likelihood of success on these claims and no degree of discovery will change that result. Here, Plaintiffs seek discovery on whether social distancing is "possible," (p. 10) but that question has been answered to the fullest extent possible at this time. In the meantime, the defendants should be permitted to re-direct their full attention to managing the pandemic and to maintaining the objectively reasonable policies that have been put in place according to the CDC Guidance that also are consistent with this Court's prior order. Accordingly, this Court should find that Plaintiffs have not established good cause for discovery of any kind, particularly on an expedited basis, and deny their request for preliminary injunction.

# CONCLUSION

For the foregoing reasons, Sheriff Dart respectfully requests that the Court deny Plaintiffs' request for a preliminary injunction outright and deny their request for expedited discovery.

By: */s/ Gretchen Harris Sperry*
One of the attorneys for Defendant
Thomas J. Dart, Sheriff of Cook
County

Robert T. Shannon
James M. Lydon
Gretchen Harris Sperry
Adam R. Vaught
Lari Dierks
HINSHAW & CULBERTSON LLP
151 N. Franklin Street, Suite 2500
Chicago, Illinois 60601
Tel. 312-704-3000

CERTIFICATE OF SERVICE

The undersigned certifies that on April 17, 2020, I electronically filed the forgoing **DEFENDANT'S PARTIAL BRIEF IN OPPOSITION TO PLAINTIFFS' RENEWED MOTION FOR PRELIMINARY INJUNCTION AND FOR LIMITED, EXPEDITED DISCOVERY** with the Clerk of the U.S. District Court, using the Court's CM/ECF system, which will accomplish service electronically on all counsel of record.


*/s/ Gretchen Harris Sperry*

# EXHIBIT J

# Prevent the spread of COVID-19 if you are sick

Accessible version: https://www.cdc.gov/coronavirus/2019-ncov/if-you-are-sick/steps-when-sick.html

**If you are sick with COVID-19 or think you might have COVID-19, follow the steps below to help protect other people in your home and community.**

## Stay home except to get medical care.



- **Stay home.** Most people with COVID-19 have mild illness and are able to recover at home without medical care. Do not leave your home, except to get medical care. Do not visit public areas.

- **Take care of yourself.** Get rest and stay hydrated.

- **Get medical care when needed.** Call your doctor before you go to their office for care. But, if you have trouble breathing or other concerning symptoms, call 911 for immediate help.

- **Avoid public transportation,** ride-sharing, or taxis.

## Separate yourself from other people and pets in your home.



- **As much as possible, stay in a specific room** and away from other people and pets in your home. Also, you should use a separate bathroom, if available. If you need to be around other people or animals in or outside of the home, wear a cloth face covering.

    - See COVID-19 and Animals if you have questions about pets: https://www.cdc.gov/coronavirus/2019-ncov/faq.html#COVID19animals

## Monitor your symptoms.

- **Common symptoms of COVID-19 include fever and cough.** Trouble breathing is a more serious symptom that means you should get medical attention.

- **Follow care instructions from your healthcare provider and local health department.** Your local health authorities will give instructions on checking your symptoms and reporting information.

If you develop **emergency warning signs** for COVID-19 get **medical attention immediately.**

Emergency warning signs include*:

- Trouble breathing
- Persistent pain or pressure in the chest
- New confusion or not able to be woken
- Bluish lips or face

*This list is not all inclusive. Please consult your medical provider for any other symptoms that are severe or concerning to you.

**Call 911 if you have a medical emergency.** If you have a medical emergency and need to call 911, notify the operator that you have or think you might have, COVID-19. If possible, put on a facemask before medical help arrives.

## Call ahead before visiting your doctor.



- **Call ahead.** Many medical visits for routine care are being postponed or done by phone or telemedicine.

- **If you have a medical appointment that cannot be postponed, call your doctor's office.** This will help the office protect themselves and other patients.

## If you are sick, wear a cloth covering over your nose and mouth.



- **You should wear a cloth face covering over your nose and mouth** if you must be around other people or animals, including pets (even at home).

- You don't need to wear the cloth face covering if you are alone. If you can't put on a cloth face covering (because of trouble breathing for example), cover your coughs and sneezes in some other way. Try to stay at least 6 feet away from other people. This will help protect the people around you.

**Note:** During the COVID-19 pandemic, medical grade facemasks are reserved for healthcare workers and some first responders. You may need to make a cloth face covering using a scarf or bandana.



### Cover your coughs and sneezes.



- **Cover your mouth and nose** with a tissue when you cough or sneeze.

- **Throw used tissues** in a lined trash can.

- **Immediately wash your hands** with soap and water for at least 20 seconds. If soap and water are not available, clean your hands with an alcohol-based hand sanitizer that contains at least 60% alcohol.

### Clean your hands often.



- **Wash your hands often** with soap and water for at least 20 seconds. This is especially important after blowing your nose, coughing, or sneezing; going to the bathroom; and before eating or preparing food.

- **Use hand sanitizer** if soap and water are not available. Use an alcohol-based hand sanitizer with at least 60% alcohol, covering all surfaces of your hands and rubbing them together until they feel dry.

- **Soap and water are the best option**, especially if your hands are visibly dirty.

- **Avoid touching** your eyes, nose, and mouth with unwashed hands.

### Avoid sharing personal household items.



- **Do not share** dishes, drinking glasses, cups, eating utensils, towels, or bedding with other people in your home.

- **Wash these items thoroughly after using them** with soap and water or put them in the dishwasher.

### Clean all "high-touch" surfaces everyday.

- **Clean and disinfect** high-touch surfaces in your "sick room" and bathroom. Let someone else clean and disinfect surfaces in common areas, but not your bedroom and bathroom.

- **If a caregiver or other person needs to clean and disinfect** a sick person's bedroom or bathroom, they should do so on an as-needed basis. The caregiver/other person should wear a mask and wait as long as possible after the sick person has used the bathroom.

High-touch surfaces include phones, remote controls, counters, tabletops, doorknobs, bathroom fixtures, toilets, keyboards, tablets, and bedside tables.

- **Clean and disinfect areas that may have blood, stool, or body fluids on them.**

- **Use household cleaners and disinfectants.** Clean the area or item with soap and water or another detergent if it is dirty. Then use a household disinfectant.

  - Be sure to follow the instructions on the label to ensure safe and effective use of the product. Many products recommend keeping the surface wet for several minutes to ensure germs are killed. Many also recommend precautions such as wearing gloves and making sure you have good ventilation during use of the product.

  - Most EPA-registered household disinfectants should be effective.

### How to discontinue home isolation



- People **with COVID-19 who have stayed home (home isolated)** can stop home isolation under the following conditions:

  - *If you will not have a test* to determine if you are still contagious, you can leave home after these three things have happened:
    - You have had no fever for at least 72 hours (that is three full days of no fever without the use of medicine that reduces fevers)

      AND

    - other symptoms have improved (for example, when your cough or shortness of breath has improved)

      AND

    - at least 7 days have passed since your symptoms first appeared.

  - *If you will be tested* to determine if you are still contagious, you can leave home after these three things have happened:
    - You no longer have a fever (without the use of medicine that reduces fevers)

      AND

    - other symptoms have improved (for example, when your cough or shortness of breath has improved)

      AND

    - you received two negative tests in a row, 24 hours apart. Your doctor will follow CDC guidelines.

**In all cases, follow the guidance of your healthcare provider and local health department.** The decision to stop home isolation should be made in consultation with your healthcare provider and state and local health departments. Local decisions depend on local circumstances.

# EXHIBIT K

| COOK COUNTY HEALTH & HOSPITALS SYSTEM CCHHS | Category: **Cermak Health Services** | |
|---|---|---|
| Subject: **Governance and Administration** | Page 1 of 3 | Policy #: A-08 |
| Title: **COMMUNICATION ON PATIENT'S HEALTH NEEDS** | Approval Date: 04/11/2017 | Posting Date: 04/11/2017 |

## PURPOSE

The purpose of this policy is to establish methods for the communication of inmates' significant health needs from health staff to correctional staff.

## AFFECTED AREAS

This policy affects all areas of Cermak Health Services.

## POLICY

Health staff will communicate with correctional staff requiring inmates' significant health needs, within limits allowed by federal and state laws and regulations regarding protected health information. The purposes of sharing this information are to recommend accommodation for inmates with disabilities and to provide anticipatory guidance for officers, relative to classification decisions in order to preserve the health and safety of inmates, other inmates, or staff.

Correctional staff are advised of inmates' special health needs that may affect housing, work, and program assignments; disciplinary measures; and admissions to and transfers from institutions. Such communication is documented. Health and custody staff communicated about inmates with special needs conditions that may include, but are not limited to, the following:

1. chronically ill
2. on dialysis
3. adolescents in adult facilities
4. have communicable disease
5. physically disabled
6. pregnant
7. frail or elderly
8. terminally ill
9. mentally ill or suicidal
10. developmentally disabled
11. suspected victim of physical or sexual abuse

Regarding protected health information, see Cermak Policies A-09 and H-02. Regarding health alerts for aids to impairment, also see Cermak Policy G-01, G-02, G-02.10, and G-10. Regarding medical diets see Cermak Policy F-02.

Exhibit 8 Page 1

| Title:<br>COMMUNICATION ON PATIENT'S HEALTH NEEDS | Page<br>2 of 3 | Policy #<br>A-08 |
|---|---|---|

## PROCEDURE

### A. To establish a health alert

*Cermak's Chair of Correctional Health (Chair)* will:

1. Determine the need for additions or change in the existing menu of health alerts;
2. Communicate these changes to information technology staff for Cermak Health Services and to a designated liaison for the Cook County Department of Corrections (CCDOC) so that they can be incorporated into Cerner and CCDOC'S electronic information systems, respectively;
3. Provide an updated version of the "Quick Guide to Health Alerts for Correctional Officers" (See Appendix A) to the following:
   a. The Executive Directors of CCDOC and the Sheriff's Training Academy;
   b. Cermak's director of quality improvement.
4. Notify health staff regarding the change.

### B. To enter a health alert

*Qualified medical and mental health professionals and staff*, upon identification of a health condition or health need, will:

1. Decide whether an alert is necessary based on the clinical encounter (see Appendix B):
2. Enter an "Alert CCDOC" order into Cerner when necessary. The alert will be electronically transmitted via interface to the CCDOC jail management system.

*Correctional officers* will see alerts in red on the CCDOC CCOMS jail management system.

See **APPENDIX A** – A Quick Guide to Health Alerts for Correctional Officers
See **APPENDIX B** – Bed Control Key
See **APPENDIX C** – CCDOC New Inmate ID Notification

## CROSS REFERENCES

| NCCHC Standards addressed by this policy | A-08 |
|---|---|
| Pertinent ACA Standards | 4-ALDF-4C-40 |
| Cermak policy number in last revision | n/a |
| Revision dates of all previous versions | 1/2016, 11/2014, 5/2012 |
| Date of last review, if later than last revision | n/a |
| Other related Cermak policies | A-09, G-01, G-02, G-02.10, G-10, H-02 |
| Pertinent system-wide CCHHS policies | n/a |
| Pertinent custody directives | n/a |

Exhibit 8 Page 2

| Title: | Page | Policy # |
|---|---|---|
| COMMUNICATION ON PATIENT'S HEALTH NEEDS | 3 of 3 | A-08 |

## POLICY UPDATE SCHEDULE

To be reviewed no later than 1 year after posting date.

**POLICY LEAD**　　　　　Chair of Correctional Health

**REVIEWER(S)**

　　　　　　　　　　　　Director of Nursing

**APPROVAL PARTY (IES)**

Chief Operating Officer

Chair of Correctional Health

Director of Nursing

Division Chief of Correctional Psychiatry

## REVIEW HISTORY

| | | | | | |
|---|---|---|---|---|---|
| Written: | August 01, 2010 | | | | |
| Revised: | May 25, 2012 | | | | |
| Revised: November 25, 2014 | | Approved: | 11/24/2014 | Posted: | 11/28/2014 |
| Revised: | January 22, 2016 | Approved: | 01/25/2016 | Posted: | 01/30/2016 |
| Revised: | January 1, 2017 | Approved: | 04/11/2017 | Posted: | 04/11/2017 |

Exhibit 8 Page 3

**A-08    COMMUNICATION ON PATIENT'S HEALTH NEEDS**          4/8/2017

**APPENDIX A**

### A Quick Guide to Health Alerts for Correctional Officers

Cermak Health Services communicates health needs of jail patients to the Department of Corrections through a system of health alerts, which are posted in the CCDOC CCOMS information system. This listing, a companion document to Cermak Policy A-08, specifies the action to be taken by correctional staff for each alert.

**Accommodation Plan – Cuff in Front** - Medical staff recommend handcuffing in front of the body due to orthopedic or other medical issues of shoulder, arm, wrist, or hand. This alert has been ordered and vetted by Cermak specialists.

**Accommodation Plan – Medical Equipment** - The patient has some medical equipment not otherwise specified.

**Accommodation Plan – Protective Eyewear -** The patient has been advised to utilize goggles due to being blind in one eye or other medical issues.

**Accommodation Plan – Shoe Insert** - The patient has been advised to use an orthotic, AFO, or other shoe insert due to orthopedic or other medical issues of the leg, ankle or foot.

**Authorized Involuntary Medication** - Involuntary psychotropic medications (non-emergency basis) authorized by a court order.

**Bladder Catheter –** The patient cannot pass urine in the normal manner and must use a tube to empty the bladder. The patient should be allowed to keep and use supplies provided by the health service.

**Blind** –Medical staff will recommend specific accommodations on a case-by-case basis. Some legally blind patients have a limited degree of vision, while others are totally blind. Patients with this alert should also be handled as Lower Bunk.

**Blood Thinner/Bleeding Disorder** – The patient takes a strong medication or has a health condition that prevents blood from clotting normally. Trauma may cause serious internal bleeding without visible signs. If trauma occurs, take the patient for medical attention promptly. Patients with this alert should also be handled as Lower Bunk.

**Brace/Collar –** The patient has a brace to stabilize the ankle or knee, or the upper extremity, back or neck. Patients with this alert should also be handled as Lower Bunk**.**

**Cane/Cane LDO (Long Distance Only)** – Allow the patient to use a cane. (Medical staff will specify a review date and may also set limits on use, such as "when out of the housing division" or LOO (long distance only)). Patients with this alert should also be handled as Lower Bunk.

**Cast/Splint** – The patient is wearing a cast or splint made of plaster or fiberglass. Patients with any of these alerts should be handled as Lower Bunk. Patients should be given plastic barrier for hygiene purposes (showering).

**Clear Before Release** – It is medically unsafe for the patient to leave the jail without seeing a physician or qualified mental health professional first. If a judge releases the patient, take him or her to Cermak's Urgent Care for instructions. Patients with this alert should also be handled as Medical or Mental Health Housing. All P4/M4 are considered Clear Before Release unless otherwise indicated.

Exhibit 8 Page 4

**Cognitive Impairment** – The patient has a mental disability which may result in inability to understand procedures or communicate effectively. Confer with Cermak staff as needed.

**Crutches/Crutches LDO (Long Distance Only)** – Allow the patient to use crutches. Patients with this alert should be handled as Lower Bunk.

**Deaf/Hearing Impaired** – Medical staff will recommend a preferred method of communication, such as sign language or TDD terminal, on a case-by-case basis. Contact Program Services to make specific arrangements. Housing assignment per Interagency Accommodation Committee.

**Detox** – The patient is at risk for withdrawal from alcohol, opiates, benzodiazepines, or substances. Patients with this alert are to be house in Detox medical housing, RTU, SCU, or Prenatal tier. See Bed Control key. These patients may be at risk for overdose during their incarceration.

**Diabetes** – The patient needs to eat meals on a regular schedule to avoid low blood sugar caused by diabetic medication. Low blood sugar (hypoglycemia) can cause shakiness, dizziness, confusion, bizarre behavior and, in severe cases, unconsciousness. Allow the patient to retain snack items in the cell to take if symptoms of low blood sugar develop. If the patient has no food or symptoms do not resolve with food, then take the patient for medical attention promptly.

The diabetic patient also needs to receive medications regularly to avoid high blood sugar. High blood sugar (hyperglycemia) can cause excessive urination, rapid weight loss and, in severe cases, unconsciousness. If the patient has these symptoms, or cannot take food or medication due to nausea and vomiting, then take him or her for medical attention promptly.

**Discharge Medications** – Arrangements have been made for prescription to be available after release from custody. Follow CCDOC protocol at time of release.

**Epi Pen** – The patient has been advised to use an epinephrine injector pen in case of allergic emergency. If symptoms such as shortness of breath, dizziness, hives, or facial swelling develop, then take the patient immediately to the divisional dispensary or to the Urgent Care or activate EMS or 911.

**External Fixator** – The patient has a broken bone, which is being held together by bolts and rods that pierce the skin. Use special caution to avoid re-injury.

**Hemodialysis/No Court M-W-F -** – The patient has kidney failure and needs to be hooked up to a kidney machine three times a week. Schedule court dates for Tuesdays or Thursdays because dialysis treatments take place on Mondays, Wednesdays, and Fridays. If a court date conflicts with a hemodialysis date, contact medical staff to make special arrangements.

**History of Serious Suicide Attempt** – In the past, while in the Sheriff's custody, the patient has made a suicide attempt that either was considered potentially life-threatening or required medical treatment for serious harm. Be aware of the possibility of future serious attempts.

**Hoards Medication** – In the past, the patient has possessed and/or intentionally ingested excessive amounts of medication. Follow CCDOC protocol.

**Immobilizer** – Allow the patient to use the indicated medical device. Patients with this alert should be handled as Lower Bunk.

**Inhaler -** The patient has been prescribed an inhaler for respiratory issues which should be maintained as keep on person. The patient has been instructed to notify Cermak when a new inhaler is needed and to turn in the empty inhaler. The patient may have more than one inhaler in his/her possession. Inhalers should not be confiscated.

**Isolation** – The patient may have an infectious disease that may be contagious. House the patient as designated by medical staff. The patient should not be moved to court or visits. If movement is a medical

Exhibit 8 Page 5

necessity, then check with health staff regarding appropriate precautions during movement, such as masking the patient. Patients with this alert should also be handled as Clear Before Release.

**Jaw Wired** – The patient has a broken jaw, which has been wired shut in order to heal. He or she should receive a liquid diet. Vomiting can be fatal because the vomit has no escape route and go down into the lungs. If patient is on distress, medical staff have wire cutters immediately available in case of medical emergency.

**Lower Bunk** – The patient has a medical condition that increases the risk of injury due to a fall from an upper bunk. Assign patient to a lower bunk.

**Linkage Alert – Mental Health** - Alerts assigned by Medical Social Worker to denote that community care linkage exists for patients on mental health caseload.

**Linkage Alert – Substance Use** - Alerts assigned by Medical Social Worker to denote that community care linkage exists for patients on substance use disorder caseload.

**Medical Housing** – See M4, M3, M2 - Refer to Bed Control Key

> **M4- Medical Special Care Unit (MSCU)** – Patients is recommended for monitoring and care in an environment with direct access to a nurse. Cermak Medical Special Care Unit- See Bed Control key.

> **M3 – Medical Intermediate** - Patients is recommended for housing with 24/7 nursing and access to special accommodations but does not need M4 Special Care Unit level of care (Residential Treatment Unit- RTU- see Bed Control key.

> **M2 - DXD Medical**– Patients need dose by dose medication for a medical condition and does not have an M3 requirement. See Bed Control key.

**Naloxone Trained** - The patient has received education from Pharmacy regarding use of naloxone to manage opioid overdose release, and will be provided a discharge kit upon release.

**Opioid Treatment Program (OTP)** – The patient is on methadone. Bring him or her to the Pharmacy or designated area each day for administration of his or her daily dose.

**Ostomy** -- The patient cannot pass feces or urine in the normal manner and has an artificial opening for emptying his or her bowels or bladder. The patient should be allowed to keep and use supplies provided by the health service.

**Oxygen** – The patient has been advised to use oxygen continuously. When off the tier, should travel with an oxygen tank. Patients with this alert should also be handled as M4 (MSCU). Court Transporters should coordinate with healthcare to ensure adequate oxygen supply.

**Paraplegia/Tetraplegia** - The patient has significant paralysis or weakness of one to four limbs. Individuals with this alert should be handled as Lower Bunk, Wheel Chair and/or Walker.

**Pregnant/Perinatal Housing** – The patient either is pregnant or has recently been pregnant. House the patient in the RTU or Cermak Special Care Unit and proceed in accordance If the patient has vaginal bleeding or feels that she is going into labor, take her for medical attention promptly. Allow the patient to keep snack items in the cell if she wishes because the nausea of pregnancy may prevent her from taking adequate nutrition at mealtimes. Patients with this alert should be handled as Lower Bunk and Perinatal Housing.

**Prosthetic Limb** – Allow the patient to use the indicated medical device to replace the amputated limb. Patients with this alert should also be handled as Lower Bunk. Notify Cermak if the device is malfunctioning.

Exhibit 8 Page 6

**Psychiatric / Mental Health Housing –** See P4, P3, P2 - Refer to Bed Control Key

**P4 - Psychiatric Special Care Unit (PSCU) –** Severe functional impairment with regression, disorganization, and chaotic functioning, such as failure perform ADLs; and/or Behavior related to major mental illness that results in imminent risk of harm to self or others.

**P3 - Mental Health Intermediate –** Moderate or serious symptoms; and/or some impairment in reality testing or communication; and/or moderate to serious impairment in social and overall functioning.

**P2 - Mental Health Outpatient –** Minor or intermittent functional impairment; patient functions safely and independently in the designated correctional setting(s).

**Seizure Disorder** – The patient with a seizure disorder may experience convulsions or smaller seizures without convulsions. During and after a seizure, the patient may be confused and disoriented for a period of minutes. Immediately after the seizure, the patient may not respond appropriately to questions and commands. If the patient has a seizure, bring him or her for medical attention. If the seizure does not stop, call 911. (See Emergency Code Sheet). Patients with this alert should also be handled as Lower Bunk.

**Sleep Apnea/CPAP** - The patient has a diagnosed obstructive airway disorder with sleep disruption, snoring, and occasional notable pauses with breathing. This individual should be housed in a unit that allows the use of a CPAP machine while sleeping and should be handled as Lower Bunk.

**Transgender/Gender Non-Conforming –** Proceed in accordance with Interagency Directive 64.5.43.1, "Management of Transgender Inmates." Please call the patient by their preferred name / pronoun.

**Walker/LDO (Long Distance Only) –** Allow the patient to use a walker. Medical staff will specify a review date and may also set limits on use, such as "when out of the housing division." Patients with this alert should also be handled as Lower Bunk.

**Wheelchair/LDO (Long Distance Only)** – Allow the patient to use a wheelchair. Patients with this alert should also be handled as Lower Bunk .

Exhibit 8 Page 7

# EXHIBIT L

# DIVISION 5 RCDC INTAKE PROCESS

**STEP 1:** RCDC INTAKE PROCEDURE (RECEIVING EAST/DOCK)
SOCIAL DISTANCING 6 FEET AND FACE MASKS



**STEP 2:** RCDC GENERAL AREA/SCANNING
SOCIAL DISTANCING 6 FEET AND FACE MASKS



**STEP 3:** RCDC SEARCH AND NUMBERING
SOCIAL DISTANCING 6 FEET AND FACE MASKS



**STEP 4:** RCDC SEARCH AND NUMBERING
SOCIAL DISTANCING 6 FEET COMPLIANCE DIRECTIVES, FACE MASKS



**STEP 5:** RCDC SEARCH AND NUMBERING
SOCIAL DISTANCING 6 FEET AND FACE MASKS



**STEP 6:** RCDC INTAKE/VIDEO BOND COURT
SOCIAL DISTANCING 6 FEET AND FACE MASKS



# DIVISION 5 RCDC INTAKE PROCESS

**STEP 7:** RCDC INTAKE/VIDEO BOND COURT
SOCIAL DISTANCING 6 FEET, FACE MASKS AND SANITIZING



**STEP 8:** RCDC RAPID BOOKING PROCESS
SOCIAL DISTANCING 6 FEET AND FACE MASKS



**STEP 9:** RCDC RAPID BOOKING PROCESS
SOCIAL DISTANCING 6 FEET AND FACE MASKS



**STEP 10:** RCDC INTAKE/VIDEO BOND COURT
SOCIAL DISTANCING 6 FEET AND FACE MASKS



**STEP 11:** RCDC INTAKE/VIDEO BOND COURT
SOCIAL DISTANCING 6 FEET, FACE MASKS AND HAND SANITIZING

